IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD P. by and for | ) | No. 03-390 Erie |
| RACHEL P. and DENISE L. by | ) | |
| and for KRISTINA L., | ) | |
| | ) | ELECTRONICALLY FILED |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Jury Trial Demanded** |
| | ) | |
| SCHOOL DISTRICT OF THE CITY | ) | |
| OF ERIE, et al | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' PRETRIAL STATEMENT**

## I.  JURISDICTION

This Court has jurisdiction over this matter by virtue of 28 U.S.C. §1331.  Plaintiffs assert claims under Title IX of the Education Act.  Plaintiffs also ask this Court to assume supplemental jurisdiction of their state law claims under 28 U.S.C. §1367.

## II.  NARRATIVE STATEMENT

### Introduction and Factual Summary

Kristina L. and Rachel P. were Erie School District students who were sexually assaulted by other students on December 19, 2001, when the girls were in seventh grade.  The students viciously forced Kristina (age 12) and Rachel (age 13) to engage in oral sex.

The incident occurred at a laundromat near their school. The students responsible for the assault were on their way home from after-school detention.

The sexual encounter came to the attention of Linda Cappabianca, middle school assistant principal, the very next day when she heard "hall talk" regarding Kristina and one of the assailants, Charles B. Kristina confirmed to her that something sexual had happened. Cappabianca told her that the activity was something that "adults do when they are in love." Cappabianca then asked Charles about what she had heard about Charles, Kristina, and oral sex. Charles denied that anything had happened and claimed that Kristina was spreading the story because she liked him.

After talking the matter over with the school principal, Janet Woods, Cappabianca opted to do nothing, in violation of the mandatory-reporting law that required her to report sexual abuse of a minor and against school procedures that dictated that she inform the parent of sexual activity (whether voluntary or involuntary).

When the students returned from Christmas vacation, Rachel tried more than once to tell Cappabianca of the assault, but Cappabianca told Rachel she did not want to hear about it.

After Christmas vacation, Cappabianca did not follow up in any way on the disturbing story of sexual behavior among these children. Consequently, the assailants of Kristina and Rachel were not disciplined and, instead, were permitted to remain in the

school interacting with both Kristina and Rachel as if nothing had happened. When students taunted and harassed Rachel and Kristina about performing oral sex, the girls tried to report the harassment to Cappabianca, but she took no steps to protect them.

The situation became unbearable for the girls. Kristina's mother learned of the sexual activity (though not yet of its forcible nature) from her other daughter. Kristina, overhearing the conversation, became so distraught that she intentionally burned herself and locked herself in the bathroom. The police had to assist Kristina's mother in transporting Kristina to Millcreek Community Hospital, where Kristina was hospitalized for more than a week. This happened at the end of the first week of school after Christmas vacation.

Rachel likewise was subject to harassment from the students, but she also suffered two additional sexual assaults. One was an attempted assault in the school and involved Becky and a male student. The second occurred again at the laundromat, involving Charles and another boy, who forced Rachel against a wall and rubbed his penis in her face. This incident occurred immediately after PASS. As a result of the unremitting taunting and the trauma of yet another attack, Rachel had an outburst in school which forced the School District officials to finally confront the situation.

The School District's initial failure to investigate a story of sexual activity perpetrated by a boy with a long history of serious misbehavior resulted in psychiatric hospitalization for Kristina and in two subsequent sexual assaults on Rachel, as well as psychological harm caused by refusing to listen to and act on the girls' reports.

When the school finally did investigate, school administrators assumed that the girls had been willing participants and conducted their investigation in such a way as to set up the girls for removal from the school. The school never did discipline the students who had perpetrated the attacks on the girls. Administrators never attempted to identify students who had harassed the girls at school, to identify the boy who was going to participate with Becky C. in the sexual attack at school, or even to identify the boy who attacked Rachel at the laundromat.

Instead, Cappabianca, Woods, Frank Scozzi, the assistant superintendent and director of special education for the Erie School District, manipulated the IEP process to remove the girls from the school.

The School District did nothing to assure Rachel and Kristina could be provided with a safe environment, free from sexual harassment. Instead, its officials immediately removed Rachel from the school and changed the site of the girls' education, initially to their homes and then to a behavior modification program in an

alternative education school. They were assigned to classes with children who suffered intense behavioral problems, and given no therapy.

The students who assaulted Rachel and Kristina remained in Strong Vincent until removed by the police. They were never disciplined by school authorities.

### *Historical Background and Lead-Up to the Assault*

Rachel P. was born on November 6, 1988. Kristina was born on July 5, 1989. Although both girls were from the Erie area, Rachel's family had been living in Arizona and Kristina had been living in Meadville. In 2001, both girls came from other schools to attend middle school at Strong Vincent Middle School. Both girls were in special education classes, as both girls had IEPs. Rachel's IEP provided that the School District would address language and reading problems. Kristina's IEP required different services from Rachel, as Kristina had been identified as mildly mentally retarded.

At some point in the fall of 2001, Kristina began to be victimized by other students who exhibited extreme behavioral problems in the school. Kristina, who was small for her age and mildly mentally retarded, was harassed by one student in particular, Charles B. Charles was a troubled student with a long history of acting out in class, disregarding teachers' orders,

disrupting class, and engaging in aggressive sexual activity. In fact, his behavior was so extreme that the assistant principal for the middle school, Linda Cappabianca, was actively seeking to have him placed out of the school, in an alternative educational placement. Over the course of the fall of 2001, he harassed Kristina on numerous occasions with increasing intensity. On one occasion, Kristina fled from her class and hid in the bathroom because Charles was threatening her. Kristina complained about his conduct to Cappabianca, but Cappabianca wanted Kristina to learn to ignore him. Cappabianca did nothing to protect Kristina from Charles.

Another student who caused the school endless trouble and who ended up victimizing both Rachel and Kristina was Becky C., a friend of Charles. Becky repeatedly challenged authority and disrupted class. She started picking on Rachel in school. She challenged Rachel to fights on several occasions. Rachel was afraid of Becky. Charles and Becky would figure into the sexual assault of Kristina and Rachel.

### *The Planning of the Sexual Assault in PASS*

The School District enforced discipline rules by requiring children who acted out in school, such as Becky and Charles, to attend an after-school detention known as PASS. The PASS program lasted from immediately after the school day ended until 6:00 p.m.

On an occasion in December 2001, when Becky, Charles, and a student named Anthony K. were in PASS, Becky claimed that she knew a girl who would "give head," i.e. perform oral sex. Another student, Antonio G. F., who was also in PASS, overheard the conversation. The girl Becky was referring to was Rachel. Becky and Charles therefore planned the assault of Rachel while they sat in PASS, and concluded it immediately after PASS was over.

### The Sexual Assault

When the students were discharged from PASS that evening, Becky, Charles, Anthony, and Antonio F. crossed the street to go to the laundromat which sat on a corner across from the school, known to the students as "smokers' corner." "Smokers' corner" was patrolled by the school police before and after school, as it was an area where students congregated. They did not, however, patrol the area after PASS to monitor students as they were discharged from PASS.

The group of students led by Becky C. encountered Rachel near the laundromat. Becky C. coerced Rachel into performing oral sex with Anthony and Charles hitting her with a belt. Rachel was forced to perform oral sex several times, at one point being hit with a belt to force her to perform.

Kristina had been scheduled to be in PASS that afternoon but skipped it when she saw that Charles was in the PASS room, being

afraid of him. She returned to the school area at around 6:00 to wait for her mother to pick her up. However, she encountered Charles and Becky near the laundromat, and they forced her to perform oral sex on Charles.

### The Assault's Aftermath and Report of the Assault to Cappabianca and Woods

Neither Kristina nor Rachel was able to tell their parents of the assault. However, Kristina told Cappabianca about the assault the very next day. According to Cappabianca, she heard "hall talk" on December 20, 2001, concerning a sexual encounter between Kristina and Charles. She had a conversation about this with the principal, Janet Woods, who instructed Cappabianca to investigate. Cappabianca approached Kristina to find out whether it was true that Kristina and Charles had had a sexual encounter, and Kristina confirmed that it was true. She then asked Charles about it. He testified in his deposition that Cappabianca came up to him and asked him: "What's this I hear about oral sex?"[1] Bibbs and Cappabianca testified that Bibbs denied any encounter. Cappabianca

---

[1] Naturally enough, Cappabianca equivocated about precisely what the hall talk suggested had occurred between Kristina and Bibbs. Obviously, for it to get her attention, it would have to comprise more than just infatuation. One can infer this by Cappabianca's acknowledgment of the nature of her comment to Kristina, that the conduct she admitted to was the type that adults engaged in "when they were in love."

stated that Bibbs claimed that Kristina was "just talking," because she liked him.

Cappabianca admitted that when she approached Kristina and asked her "if it's true," she got a different story. Cappabianca stated that Kristina admitted to the sexual encounter. Kristina affirms that she did tell Cappabianca of the incident. Both Kristina and Cappabianca testified that Cappabianca then told Kristina, "[T]hat's what adults do when they are in love." In other words, Cappabianca apparently assumed that the 12-year-old Kristina was engaging in voluntary oral sex. Rachel also told Cappabianca about the incident.

Kristina was 12 and Rachel was 13 at the time of the assault. Under Pennsylvania's mandatory-reporting laws, Cappabianca had an obligation to report the incident to child welfare authorities. Cappabianca did not follow this procedure. In fact, she did not even call Kristina's mother about what she had learned. Cappabianca did not conduct any further investigation and took no steps to discipline the children involved in the assault.

Kristina was mildly mentally retarded. She had difficulty expressing herself and Cappabianca knew that Kristina was in the school's special education program. Up until this point, Kristina and Cappabianca had had a friendly relationship, and Kristina had felt comfortable in approaching Cappabianca about matters such as these.

Rachel also has difficulty with self-expression and was a quiet girl. When she tried to tell Cappabianca about the assault, after the students returned from the winter break, Cappabianca deliberately cut her off and would not listen. In fact, Cappabianca called Rachel's father to come to the school for a conference, and in front of Rachel said that Rachel had a dirty mouth and should be punished by her parents.

By approaching Cappabianca, Kristina and Rachel put their trust in someone they thought would help remedy the injury inflicted upon them by the sexual assault. Instead, Cappabianca inflicted even more--and perhaps greater--harm on them, apparently choosing not to believe that the girls had been victims of a violent sexual assault.

Cappabianca's refusal to help Kristina and Rachel had a profound impact on the girls. Both girls were profoundly injured and disappointed because the adult authorities, as represented by Cappabianca, ignored their victimization and were indifferent to the sexual assaults and the aftermath. Equally significant is the fact that the school officials' failure to take any steps to discipline Charles, or to investigate what had happened--which would have alerted them to the role of Becky, Anthony, and Antonio--opened the floodgates so that other students felt free to tease, taunt, and sexually harass Kristina and Rachel. The school's failure to address the situation when it was first reported

exacerbated the situation. The girls were unable to defend themselves against the harassment and further assaults.

**The Further Injuries of Kristina and Rachel Stemming from the Assault and the School District's Failure to Properly Respond to the Assault**

### Kristina's self-injury and psychiatric hospitalization

After the winter break, Kristina and Rachel continued to experience the trauma of the assault. Other students began harassing them at school and taunting them. The girls were the subject of school gossip and the butt of cruel jokes. This in-school harassment resulted in direct injury to the girls.

The harassment of Kristina led to self-injury and a psychiatric hospitalization. On Friday at the end of the first week of school after vacation, January 4, 2002, Kristina's mother heard from her other daughter, who is retarded and learning disabled, that Strong Vincent students were urging her to engage in oral sex "like her sister." Kristina, who was standing in the family kitchen at the time, became so distraught when she overheard the conversation that she intentionally burned herself on a hot frying pan, then locked herself in the bathroom. The police assisted her mother with transporting her to Millcreek Community Hospital that evening, where she was hospitalized in the psychiatric wing for more than a week. That first weekend, Kristina finally told her mother, Denise Long, about the sexual assault.

Denise Long reported to Ms. Cappabianca on the morning of January 7, 2002, that her daughter had been assaulted and asked Cappabianca what the School District was going to do. Cappabianca falsely assured Ms. Long that the School District was investigating the claim. However, Cappabianca had done and would continue to do nothing. Cappabianca did not make the mandated report of sexual abuse and conducted no investigation until further events forced her hand.

**The additional sexual assaults directed at Rachel**

Cappabianca's failure to report or investigate the sexual assaults led to Rachel becoming vulnerable to further sexual assault and injury on January 7, 2002. At the beginning of the second full week of school after the winter vacation, Becky accosted Rachel at a water fountain between classes and tried to coerce Rachel to perform oral sex on a boy who was with Becky. Becky started shoving Rachel down a stairwell, accompanied by the boy in anticipation of oral sex. An unknown faculty member happened upon the scene and broke up the situation. Rachel was sent to Cappabianca, and Rachel, not Becky, was disciplined by Cappabianca. Cappabianca assigned Rachel to PASS for not being in class, and Becky and the boy were not disciplined!

That evening, Rachel was again sexually assaulted at the laundromat, this time by Charles and another boy, a high school

student unknown to Rachel.[2] In this encounter, Rachel was pushed into a corner and the young man accompanying Charles pulled his penis out of his pants and rubbed it in Rachel's face. The sexual encounter was broken up when an adult intervened and Charles and the other young man fled.

### *The School District Finally Responds to the Sexual Assault*

The harassment of Rachel by the other students continued to swell. Finally, on January 9, Rachel had an outburst in response to sexual taunting by other students and was sent to the office by her teacher, Ms. Scully, to be handled by Cappabianca. At this time, Cappabianca finally started to appreciate the gravity of the situation. She could no longer ignore the fact that Rachel and Kristina had been serious in their attempts to inform her that something awful had occurred. Cappabianca still did not get the story straight, however. Her attitude continued to be one which blamed Kristina and Rachel for the assault.

After meeting with Rachel and hearing the full story, Cappabianca and Woods decided to investigate whether Rachel was engaging in deviant sexual behavior. Incredibly, Cappabianca did

---

[2] While the School District told the police that this individual's identity was not known, the principal, Janet Woods, surmised his identity. This individual was never punished, and his identity was not pursued. None of the students who participated in the sexual assaults or the sexual taunting of Rachel and Kristina were ever disciplined by the school district.

not immediately call Rachel's parents, or report the sexual assault to the child welfare hotline, or contact the police. In fact, later the same afternoon, Rachel was sent to PASS again, serving a sentence imposed upon her for not being in class while Becky was trying to coerce her into engaging in oral sex during school hours.

Cappabianca and Woods claim that they spent all of that day and the following two days investigating the incident, talking to students, parents, and other School District officials. Except for one student's statement (by Antonio) and a short narrative written by Cappabianca, there is not a shred of paper to evidence their investigation.[3] The only contemporaneous record which survives –– a typed statement prepared by Cappabianca sometime after January –– survived because it was sent to the police.[4]

Rachel's parents did not learn about the assault until the second day of the school's investigation. Her father encountered Cappabianca while waiting to pick up Rachel after PASS on Thursday, January 10. Cappabianca told him that there had been an incident

---

[3]To the extent there ever were documents pertaining to the purported investigation they were destroyed by Cappabianca and Woods.

[4]All other records of the two-day investigation, to the extent they ever existed, were allegedly destroyed by Cappabianca. According to Cappabianca, she destroyed the records because she claims the School District promulgated a new records retention policy, requiring the destruction of discipline records at the end of each school year. Of course, there was no such change in the policy, and her personal notes of the investigation were never covered by any such policy.

14

and asked him to come to school for a meeting the next morning. At that meeting he learned for the first time about the assault, after numerous other students and parents had already been interviewed by Cappabianca and Woods.

On Friday, January 11, the school finally notified city police of the crime that had taken place.

### *Discrimination and Deception of the School District*

It cannot now be said what Cappabianca and Woods gained by allegedly conducting their own investigation over the course of two days. As noted, there are no documents which even evidence the fact that they conducted such an investigation, other than one statement from the student Antonio. What they did not do, however, can be easily itemized.

School officials did not follow mandatory reporting requirements, nor did they follow their internal policy of notifying parents whenever there were allegations or reports of student sexual activity.

School officials did not discipline any of the students who participated in the sexual assault or sexual harassment of Rachel and Kristina, nor did they even both to identify all the participants.

School officials belatedly argued that they could not discipline students for off-campus activities. This is patently

false, though, because the school's discipline policy clearly stated that it governs conduct of students on the way to and from school. Furthermore, much of the conduct perpetrated against the girls, particularly Rachel, took place in the school building. School officials failed to identify the male student who participated in the attempted assault on Rachel at school, and they failed to identify students who were harassing Rachel and Kristina at school. And unbelievably, when they learned of the second assault on Rachel at the laundromat, they failed to involve the police in tracking down the young man who thrust his penis in her face, or to discipline him. No discipline was imposed on any student.

Cappabianca and Woods did not immediately inform the police of their investigation into the sexual assault because they were so sure that they were dealing with "voluntary" sexual misbehavior on the part of these two 12- and 13-year-old girls. Although the School District had City of Erie police officers assigned to the school to help keep order, these officers were not informed of the allegations, and never participated in any aspect of the investigation. In fact, they did not learn of the seriousness of the situation until Cappabianca and Woods had completed much of their investigation.

Cappabianca made her perspective abundantly clear on the second day of the investigation, when she met with a friend of

16

Rachel's and the friend's mother. Ms. Cappabianca called the mother, Robin Johnson, to come to a meeting at school about her daughter. Cappabianca told Ms. Johnson, in front of her daughter, that Rachel was "giving head" to boys or performing "blow jobs" in school. She told Ms. Johnson that Rachel's conduct was occurring at various places around the school as well at "Smoker's Corner" or the laundromat, and that Ms. Johnson should keep her daughter away from Rachel's bad influence.

Cappabianca and Woods were not honest when they met with the police on the morning of January 11 when the police began the official investigation. They told the police that they became aware of the assault on January 9, 2002, when Rachel had her outburst. However, Cappabianca admitted that she knew about the attempted sexual assault of Rachel in the school earlier in the week when a teacher reported that Becky Campbell attempted to coerce Rachel into engaging in oral sex in the school and shoved her down a stairwell. Moreover, neither Cappabianca nor Woods advised the police that they had learned on December 20, from Kristina, that a sexual assault had occurred, or that Rachel had attempted to report the assault. They also neglected to put the police in touch with Denise Long. As noted, they never called the child welfare hotline. More significantly, they did not tell the police anything about Kristina's predicament, including that she was hospitalized in an attempt to injure herself.

17

Hence, during the course of the investigation and its aftermath, Rachel and Kristina were stereotyped by Cappabianca and Woods. Even though they were the victims of a sexual assault, Cappabianca's initial response to Kristina reflects a callous indifference to the fact that a 12-year-old girl was the victim of a sexual assault. Her response to Kristina's initial report of the assault, which she received before Christmas, was that that was "what adults did when they were in love." No report of the assault was made because Cappabianca assumed the 12-year-old Kristina was engaging in consensual sex. She formed the same stereotyped view of Rachel.

In the report to the police which has survived, Cappabianca described the sexual encounter as one involving "deviant" conduct on the part of the girls. By her actions toward Rachel, Cappabianca made clear that she had stereotyped Rachel as a promiscuous girl who needed to be punished rather than a victim who needed to be helped.

### The Police Investigation and Juvenile Court Proceeding

The police treated the assault of Kristina and Rachel as a criminal matter. Eventually they would institute juvenile delinquency proceedings against Charles, Anthony, and Becky. They would arrest Becky Campbell in the school where she had been allowed to remain after instigating the assaults. All three were

adjudicated delinquent for their conduct and were eventually incarcerated.

### *The Cover-up and Removal of the Girls from Their School*

Neither Woods nor Cappabianca had observed Pennsylvania's mandatory reporting laws. Naturally, as the gravity of the situation began to settle in, Woods and Cappabianca decided to continue to cover up and contacted Frank Scozzi, assistant superintendent and director of special education for the school district, bringing him into the situation. The result of the contact was the decision that Rachel and Kristina would be removed from Strong Vincent.[5] He fully supported the idea of removing the girls and brought his considerable clout to achieve this goal quickly. He directed his staff to clear the way to immediately transfer Kristina and Rachel to Sarah A. Reed Children's Center, an alternative educational placement. Their parents were told that Rachel and Kristina would be placed in an alternative education program for their safety.

The decision to move Kristina and Rachel was carried out in an extraordinary fashion. They were both in learning support classes

---

[5]When Woods was asked why it was necessary for the girls to be removed from the School District, she said she was concerned about their psychological state and that they were removed for their protection.

but had significantly different educational needs. There was no evaluation or assessment of their educational needs or any considered judgment about whether their educational placement needed changed. There was no effort to see what sorts of extra school counseling or other assistance might be available.

After school district officials made their decision to change the girls' educational placement, they proceeded to further their cover-up by manipulating the IEP process to justify and smooth the way for the girls' removal from the school. IEP forms were completed, but the actual process was a ruse. The goal of getting the girls out of Strong Vincent was paramount, and overtook the normal considerations involved in changing an educational placement. Immediately after the police were contacted on January 11, the girls' IEPs were changed to five days of home schooling. There was no IEP team meeting, no assessment or evaluation, and no statement on the IEPs about the purpose of the change. Then, in the absence of an invitation to an IEP meeting, the IEPs were revised again.[6] Identical IEPs were written for each of the girls, in spite of the fact that they had different educational needs. The new

---

[6]In the case of Rachel P., the School District did not deal with Rachel's father in changing Rachel's placement, even though he had ALWAYS been the parent who dealt with Rachel's schooling because her mother was extremely ill and highly medicated. Instead of making an appointment with the father, the IEP revision document for Rachel was delivered to Rachel's mother at Rachel's home. The home school visitor, Audrey Peccoraro, noted that Rachel P.'s mother was under the influence of medication and had forgotten about the meeting.

IEPs, which were identical, stated that the girls would have to be moved to the "alternative" educational placement.

The only alternative education program which was available was a "behavior modification" program offered by Sarah A. Reed Children's Center ("Sarah Reed"). Sarah Reed provides both day and residential treatment for children with severe behavioral problems, through a variety of different programs. The behavioral problems either involve profound depression or severe acting out in the school. The students in their classes were generally students who had been sent there because they had significant social and emotional problems which prevented them from succeeding at school. Rachel and Kristina found themselves in a placement with students with significant behavioral problems, and could only conclude that they were being punished because they had been placed in an "alternative school", in a behavior modification program.

The School District claims that Sarah Reed was chosen as their educational setting because it offered therapy; however, the therapy consisted of no more than 15-20 minutes a week, based upon the caseload of the therapist. There was no therapy to help Kristina or Rachel deal with the trauma of the sexual assault, the harassment of other students, or their abrupt removal from the regular school system. While Kristina was compliant with the Sarah Reed program, Rachel bridled at her placement at the school. She did not have the perception of having done anything wrong, and she

21

couldn't understand why she was being punished.

While the IEPs referred the girls to Sarah Reed for behavior modification, neither girl had exhibited the type of behavior problems in the learning environment which typically resulted in a referral for a Sarah Reed educational placement. Sarah Reed's intake personnel acknowledged that the referral of Kristina and Rachel did not follow the normal protocol. The referral was based on the fact that the girls had suffered a sexual assault and were being harassed in school. When Sarah Reed accepted the girls, it received no information about the girls' educational performance or needs.

The referral was made by a phone call. Sarah Reed's typical intake review was ignored because intake personnel had no information other than what was provided in the phone call. Intake personnel did not have hospital or school records, and no history of Kristina and Rachel's past behavior or experience; they only had the verbal referral. The Erie School District officials claimed that in making the verbal referral, they were relying on the expertise of Sarah Reed to determine whether the placement would be appropriate. However, at Sarah Reed, neither of the girls saw a therapist for over a month. All children entering Sarah Reed enter at the same level, a level consisting of intense supervision by a school teacher. For all intents and purposes, the girls received no therapy at Sarah Reed.

The education at Sarah Reed focused on creating appropriate behavior. It turned out that there was no therapy for the trauma that the girls had suffered. Thus, the master plan set up for Kristina upon her arrival at Sarah Reed called for her to behave in class and to respond to the first prompt insofar as performing her school work was concerned. Rachel's plan was slightly different, not because of anything requested by the school district, but because her parents had set up an appointment for her to receive outpatient therapy before the sexual assault occurred.

The condition of Rachel and Kristina spiraled downward after they were transferred to Sarah Reed. Both eventually engaged in delinquent behavior and were placed within the juvenile system. Neither girl had previously presented the types of emotional problems which surfaced after the School District's discrimination against them. In other words, a causal relationship exists between the spiraling downhill of Rachel and Kristina and the school's mistreatment of the girls' situation.

The School District's motive in banishing Kristina and Rachel from the regular school is challenged by this case. Hence, the School District's response to the sexual assault of Rachel and Kristina was not to assure that Rachel and Kristina could attend school in an atmosphere free of sexual assault. Rather, its response was to immediately get the victims out of the school,

deprive them of a regular public education, and relegate them to an "alternative school."

### III.  <u>DAMAGES</u>

Each of the Plaintiffs suffered severe emotional distress, post traumatic stress syndrome, anxiety, humiliation, and other personal injury.  Rachel has a claim for loss of reputation as a consequence of Cappabianca's defamation, as well as claims for emotional distress, anxiety, and humiliation stemming from that tort.  Rachel suffered a physical assault after Cappabianca knew of the original assault of Kristina and Rachel.  Had Cappabianca acted on that knowledge, Rachel would not have been victimized a second time.  Kristina's injuries, including the attempt to injure herself, all stem from the School District failure to provide Rachel and Kristina with an atmosphere free from discrimination and harassment.  The fact that the girls were removed from their regular educational placement and placed in a behavior modification program at Sarah Reed also caused injuries in that the educational placement was not appropriate for them.

## IV.  **LIST OF EXHIBITS**

1.  Discharge Instruction Sheet of Kristina L. admitted 1/23/02 and discharged 6/7/02 (200290-200291)

2.  Sarah A. Reed Children's Center Narrative Addendum of Kristina L. dated 1/22/02 (200309)

3.  Sarah A. Reed Children's Center Partial Hospitalization Program of Kristina L. dated 9/5/95 200310-200312)

4.  Sarah A. Reed Children's Center Partial Hospitalization Program Proposed Service Plan of Kristina L. starting 1-23-02 and ending 1-22-03 (200332)

5.  Sarah A. Reed Children's Center Master Treatment Plan of Kristina L. dated 1/28/02 (200333-200334)

6.  Sarah A. Reed Children's Center Treatment Plan Review of Kristina L. dated 4/5/02 (200337)

7.  Sarah A. Reed Children's Center Treatment Plan Review of Kristina L. dated 2/28/02 (200338)

8.  Sarah A. Reed Children's Center Adolescent Partial Hospitalization Program Weekly Point Card and Clinical Case Progress Notes of Kristina L.  from 1/23/02 to5/3/02

9.  Sarah A. Reed Children's Center Partial Hospitalization Program Initial Psychiatric Evaluation of Kristina L. dated 02-01-02 (200394-200396)

10.  The School District of Erie Student Assignment Information of Kristina L. dated February 5, 2002 (200409)

11.  IEP Revision Review of Kristina L. dated 1-27-02 (200410)

12.  Notice of Recommended Educational Placement of Kristina L. dated 1/17/02 (200411-200412)

13.  Comprehensive Evaluation Report (CER) of Kristina L. dated 5-1-00 (200413-200416)

14.  Permission to Reevaluate Kristina L. dated 4-10-2000 (200417)

15.  Letter to Parent/Guardian of Kristina L. from John Timon dated 7-12-2000 (200418)

25

16.   The School District of the City of Erie, PA Notice of Recommended Educational Placement of Kristina L. dated 11/12/01 (200419-200420)

17.   The School District of the City of Erie, PA Individualized Education Program (IEP) Format of Kristina L. dated 11/12/01 (200421-200433)

18.   The School District of the City of Erie, PA Invitation to Participate in the IEP Team Meeting to Denise L. dated 10/30/01 with log of contacts (200434-200436)

19.   Comprehensive Evaluation Report (CER) of Kristina L. dated 5-1-00 (200437-200439)

20.   Special Education Tract of Kristina L. dated 7-5-89 (200440)

21.   Handwritten Letter from Denise L. dated 1/17/02 (200441)

22.   The School District of the City of Erie, PA request to Sarah Reed to send info on Kristina L. to Child Study Department dated 1-17-02 (200442)

23.   The School District of the City of Erie, PA request to Child Study Department to send info on Kristina L. to Sarah Reed dated 1-17-02 (200443)

24.   Contact info on Kristina L. (200444)

25.   The School District of the City of Erie, PA Pupil Progress Report of Kristina L. dated 10/31/01 (200445-200447)

26.   Comprehensive Evaluation Report (CER) of Kristina L. dated 5-15-95 (200448-200452)

27.   Sarah A. Reed Children's Center Educational Psychiatric Progress Report of Kristina L. dated 5/7/02 (200455-200456)

28.   Sarah A. Reed Children's Center Narrative Addendum of Rachel P. dated 1/23/02 (200031)

29.   Erie County Mental Health Service Unit Mental health Assessment Form of Rachel P. dated 5-8-01 (200032, 200038)

30.   Sarah A. Reed Children's Center Master Treatment Plan of Rachel P. dated 01/29/02 (2001999)

31.   Sarah A. Reed Children's Center Treatment Plan Review of Rachel P. dated 05/06/02 (200200)

32.   Sarah A. Reed Children's Center Treatment Plan Review of Rachel P. dated 04/08/02 (200201)

33.   Sarah A. Reed Children's Center Treatment Plan Review of Rachel P. dated 03/01/02 (200202)

34.   Sarah A. Reed Children's Center Adolescent Partial Hospitalization Program Weekly Point Card and Clinical Case Progress Notes of Rachel P. from 1/21/02 to 7/12/02 (200208-200236)

35.  Sarah A. Reed Children's Center Outpatient Services Initial Psychiatric Evaluation of Rachel P. dated 12-20-01 (200272)

36.  Sarah A. Reed Children's Center Program Handbook - School Day Services

37.   The School District of the City of Erie, PA Notice of Recommended Assignment of Kristina L. dated 8-29-2001 (3344-3347)

38. The School District of the City of Erie, PA Individualized Education Program (IEP) of Kristina L. dated 8-29-2001 (3348-3350)

39.   The School District of the City of Erie, PA Notice of Recommended Educational Placement of Kristina L. dated 11/21/01 (3362-3363)

40.   The School District of the City of Erie, PA Individualized Education Program (IEP) Format of Kristina L. dated 11/14/01 (830-842)

41. The School District of the City of Erie, PA Individualized Education Program (IEP) of Rachel P. dated 7-23-01 (405-416)

42.  Calendar August - June 2001 (281-291)

43.  Report Card of Rachel P. 2001-2 school year (14-15)

44.  Pupil Progress Report of Rachel P. (16)

45.  Pupil Progress Report of Rachel P. dated 1/16/02 (17)

46. Attendance Sheet of Rachel P. (18-21)

47.  Strong Vincent High School Attendance Accounting Sheet for Rachel P. with attachments (22-26)

48.  The School District of the City of Erie, PA Student Assignment Information of Rachel P. dated August 5, 2002 (1444)

49.  Fax cover sheet with letter To Whom It May Concern from Patt Lee RE: Receipt of Transfer and Request for Copy of immunization Grade Transcripts and Special Education Records (1460-1461)

50.  Individualized Education Program (IEP) Format of Rachel P. dated 2-10-03 (1465-1474)

51.  Cornell Abraxas Youth Center Learning Center Release To Whom it May Concern from Annette Stultz RE: Rachel P. dated Oct 14 2003 (1384)

52.  City of Erie Police Department - Police Report dated 6/11/2004 (1-16)

53.  IEP Revision/Review of Kristina L. dated 6/7/02 (3406)

54.  Memo to Vicki Scully from James Piekanski dated 7/5/89 RE: Processing/Tracking IEPS (846)

55.  Notes from police investigation dated 1-12-02 (127)

56.  Notes of police investigation dated 1-31-02 (128-129)

57.  Notes of police investigation dated 2-1-02 (130)

58.  Statement dated January 10, 2001 of Cappabianca (133-134)

59.  Statement of Antonio dated 1-11-02 written by Cappabianca (17-18)

60.  Pupil Progress Report of Kristina L. dated 1/16/02 (248)

61.  Information sheet on Kristina L. (247-254)

62.  The School District of the City of Erie, PA Middle and High School Discipline Policy 2001-2002 (94-163)

63. SAP Daily Report Form dated 1-8-02 to 1-16-02 Specialist Chris Ruhl (2244-2256)

64. Student Assistance Program High/Middle School Student Referral Form of Rachel P. dated 1-8-02 with attached report card (2302-2304)

65.   Student Assistance Program Teacher Checklist of Rachel P. dated 12/4/01responding teacher Scully (2305-2306)

66.   Student Assistance Program Teacher Checklist of Rachel P. dated 12/4/01responding teacher Manus (2307-2308)

67.   Student Assistance Program Teacher Checklist of Rachel P. dated 12/4/01responding teacher Gray (2309-2310)

68.   Student Assistance Program Teacher Checklist of Rachel P. dated 12/4/01responding teacher Vallimont (2311-2312)

69.   Student Assistance Program Teacher Checklist of Rachel P. dated 12/4/01responding teacher Acke (2313-2314)

70.   Student Assistance Program Teacher Checklist of Rachel P. dated 12/4/01responding teacher Bufalino (2315-2316)

71.   Student Assistance Program Teacher Checklist of Rachel P. dated 12/4/01responding teacher Dean (2317)

72.   Student Assistance Program (SAP) Administrator's Checklist of Rachel P. dated ?/4/01 administrator's name Linda Cappabianca (2318-2319)

73.   The School District of the City of Erie Student Assistance Program Services Permission Form of Rachel P. dated 11-12-01 (2320)

74.   Student Assistance Program High/Middle School Student Referral Form of Rachel P. dated 11/15/01 (2321-2322)

75.   Handwritten Note - Dr. Joy 12-20-01 (2323)

76.   Strong Vincent High School Attendance Accounting Sheet of Rachel P.

77.   IEP Revision/Review of Rachel P. dated 1-18-02 (419)

78.   Notice of Recommended Educational Placement of Rachel P. dated 1-18-02 (420-421)

79.   Memo to James Piekanski from Audrey Pecoraro dated January 17, 2002 RE: Request for speech services for Rachel P. (422)

80.   Handwritten letter from Shelly P. dated 1-18-02 (422)

81.   Department of Pupil Learner Services Child Study Office Request For Home School Visitor Service of Rachel P. (443)

82.  Memo to Frank Scozzie, Charlise Moore, Marlene Chrisman from Audrey Pecoraro dated January 17, 2002 RE: Placement of Rachel P. at Sarah Reed Children's Center (445)

83.  Special Education Tract Placement of Rachel P. - Sarah Reed (454)

84.  Notice of Recommended Educational Placement of Kristina L. dated 1/15/02 (3400-3401)

85.  IEP Revision/Review of Kristina L. dated 1-17-02 (739)

86.  Department of Pupil Learner Services Child Study Office Request For Home School Visitor Service of Kristina L. (743)

87.  Handwritten letter from Denise L. dated 1/17/02 (744)

88.  Notice of Recommended Educational Placement of Kristina L. dated 1-17-02 (819-820)

89.  Special Education Tract Placement of Kristina L. - Sarah Reed (821)

90.  Memo to Frank Scozzie, Charlise Moore, Marlene Chrisman from Audrey Pecoraro dated January 17, 2002 RE: Placement of Kristina L. at Sarah Reed Children's Center (742)

91.  Discipline Note for Rachel P. dated 1/11/02

92.  Discipline Note for Kristina L. dated 1/11/02

93.  Memo Handwritten Notes Info on Rachel P. and Kristina L. (741)

94.  Handwritten letter from Denise L. dated 11/17/02 (823)

95. Memo to Jo Barker from Marlene Chrisman dated 1/15/02 RE: B-Mod Referrals (847)

96.  Memo to Jo Barker from Marlene Chrisman dated 1/15/02 RE: B-Mod Referrals (446)

97.  IEP Revision/Review of Rachel P. dated 1-18-02 (419)

98. Notice of Recommended Educational Placement of Rachel P. dated 1-18-02 (420-421)

99.  Sarah A. Reed Children's Center Narrative Addendum of Rachel P. dated 2/23/04

100.  Sarah A. Reed Children's Center Partial Hospitalization Services Narrative Addendum of Rachel P. dated 11/11/02

101.  Sarah A. Reed Children's Center Clinical Case Progress Notes dated 2/23-3/12

102.  Sarah A. Reed Children's Center Clinical Collateral Contact Notes of Rachel P.

103.  Sarah A. Reed Children's Center Partial Hospitalization Services Narrative Addendum of Rachel P. dated 7/09/03

104.  Sarah A. Reed Children's Center Clinical Collateral Contact Notes of Rachel P.

105.  Sarah A. Reed Children's Center Clinical Case Progress Notes of Rachel P. dated 7/14/03 - 8/24/03

106.  Sarah A. Reed Children's Center Collateral Contact Summary of Rachel P.

107.  Sarah A. Reed Children's Center Psychiatric Evaluation and Nursing Assessment of Rachel P. dated 8/6/03

108.  Sarah A. Reed Children's Center Partial Hospitalization Program Initial Psychiatric Evaluation of Rachel P. dated 7-16-03

109.  Interagency Treatment Team Summary of Rachel P. dated 10/08/02

110.  Family Services of Northwestern Pennsylvania Family Based Mental Health Initial/Closing Summary of Rachel P. dated 10/8/02

111.  Client Contact Summary of Rachel P.

112.  Sarah A. Reed Children's Center Attendance Record of Rachel P.

113.  Sarah A. Reed Children's Center Service Plan of Rachel P. dated 1/7/02

114.  Sarah A. Reed Children's Center Psychiatric Evaluation of Rachel P. dated 11/10/02

115.  Sarah A. Reed Children's Center Outpatient Service Initial Psychiatric Evaluation of Rachel P. dated 12-20-01

116.  Sarah A. Reed Children's Center Psychiatric Evaluation of Rachel P. dated 12/20/01

117.  Sarah A. Reed Children's Center Psychiatric Evaluation of Rachel P. dated 11/16/88

118.  Sarah A. Reed Children's Center Psychiatric Evaluation of Rachel P. dated 9/27/01

119.  Sarah A. Reed Children's Center Psycho tropic Medication Record of Rachel p. dated 12/20/01

120.  Sarah A. Reed Children's Center Outpatient Services Discontinuation Sheet of Rachel P. dated 10-19-01

121.  Sarah A. Reed Children's Center letter to Parent from Rhonda Wilcox of Rachel P. dated 11/21/2001

122.  Sarah A. Reed Children's Center letter to Parent from Jennifer Held of Rachel P. dated 10/01/2001

123.  Sarah A. Reed Children's Center letter to Parent from Out Patient Staff of Rachel P.  dated 08/14/2001

124.  Sarah A. Reed Children's Center letter to Parent from Out Patient Staff of Rachel P. dated 07/26/2001
125. Sarah A. Reed Children's Center letter to Parent from Jennifer Held of Rachel P. dated 07/09/2001

126.  Sarah A. Reed Children's Center letter to Parent from Out Patient Staff of Rachel P. dated 06/18/2001

127.  Sarah A. Reed Children's Center Partial Hospitalization Program Initial Psychiatric Evaluation of Rachel P. dated 02-01-02

128.  Sarah A. Reed Children's Center Psychiatric Evaluation of Rachel P. dated 02/01/02

129.  Sarah A. Reed Children's Center Partial Hospitalization Program Proposed Service Plan of Kristina L. dated 01-23-02 - -1-22-03

130.  Sarah A. Reed Children's Center Treatment Plan Review of Kristina L. dated 5/03/02

131.  Sarah A. Reed Children's Center Psychiatric Evaluation of Kristina L. dated 05/08/02

132.  Sarah A. Reed Children's Center Psychiatric Evaluation of Kristina L. dated 04/10/02

133.  Sarah A. Reed Children's Center Psychiatric Evaluation of Kristina L. dated 03/13/02

134.  Sarah A. Reed Children's Center Psychiatric Evaluation of Kristina L. dated 02/20/02

135.  Sarah A. Reed Children's Center Partial Hospitalization Program Initial Psychiatric Evaluation of Kristina L. dated 02-01-02

136.  Sarah A. Reed Children's Center Partial Hospitalization Program Narrative Addendum of Kristina L. dated 6/8/04

137.  Sarah A. Reed Children's Center Narrative Addendum of Kristina L. dated 1/22/02

138.  Sarah A. Reed Children's Center Partial Hospitalization Program Intake Narrative of Kristina L. dated 9/5/95

139.  Sarah A. Reed Children's Early Intervention Center Intake Narrative of Kristina L. dated 5/22/95

140.  Sarah A. Reed Children's Center Progress Notes of Kristina L. dated 12/16/04

141.  Sarah A. Reed Children's Center Partial Hospitalization Program Initial Psychiatric Evaluation of Kristina L. dated 6/17/04

142.  Comprehensive Evaluation Report of Rachel P. dated 12/15/94

143.  Request and Record of Psychological Consultation of Rachel P. dated 11/1995

144.  Vineland Adaptive Behavior Scales Questionnaire of Rachel P. dated 11/14/95

145.  Comprehensive Evaluation Report of Rachel P. dated 12/18/95

146.  Letter to the Polancys from Bob Peterson the School Psychologist dated 1/10/96

147.  Comprehensive Evaluation Report of Rachel P. dated 5/1/96

148.  Comprehensive Evaluation Report of Rachel P. dated 3/2/98

149.  MESA Public Schools Addendum to a Psycho-Educational Evaluation of Rachel P. dated 4/14/99

150.  MESA Public Schools Individualized Education Elementary Written Notice of Rachel P. dated 12/13/00

151.  MESA Public Schools Psycho-Educational Evaluation Team Report of Rachel P. dated 3/6/01

152.  Millcreek Community Hospital Psychiatric Evaluation of Rachel P. dated 3/26/02

153.  Millcreek Community Hospital Discharge Summary of Rachel P. dated 4/2/02

154.  Educational Psychiatric Progress Report of Rachel P. dated 5/7/02

155.  Millcreek Community Hospital Psychiatric Evaluation of Rachel P. dated 6/16/02

156.  Millcreek Community Hospital Discharge Summary of Rachel P. dated 6/25/02

157.  Evaluation Report of Rachel P. dated 10/28/02

158.  Attendance Record Community Integration 2003 of Rachel P.

159.  Updated Progress Note of Rachel P. dated 5/13/03

160.  Community Integration, Inc. Initial Psychiatric Evaluation of Rachel P. dated 8/8/03

161.  Community Integration, Inc. Initial Treatment Agreement of Rachel P. dated 8/2003

162.  Community Integration, Inc. Medication Management Progress Note of Rachel P. dated 9/19/03

163.  Letter to Mr. Olds from Rebecca Torrey of Crime Victim Center dated 12/10/03

164.  Manifestation Determination Worksheet of Rachel P. dated 1/13/05

165.  Notice of Recommended Educational Placement of Rachel P. dated 1/27/05

166.  Hermitage House Youth Shelter School Progress Report of Rachel P. dated 9/02

167.  Community Integration patient care notes 1997-99 of Kristina L.

168.  Community Integration patient care notes 1999-2003 of Kristina L.

169.  Community Integration Attendance Record starting 2/13/97 of Kristina L.

170.  Community Integration Physician and Medication Order Sheet starting 9/25/97 of Kristina L.

171.  Comprehensive Evaluation Report of Kristina L. dated 6/1/96

172.  Initial Psychiatric Evaluation of Kristina L. dated 9/25/97 by Dennis Borczon MD

173.  Comprehensive Evaluation Report of Kristina L. dated 5/1/98

174.  Community Integration Outpatient Therapy Report of Kristina L. dated 3/29/99

175.  Comprehensive Evaluation Report of Kristina L. dated 5/1/00

176.  Kaufman Test of Educational Achievement Comprehensive Form of Kristina L. dated 6/6/00

177.  Psychiatric Evaluation of Kristina L. dated 7/20/00 by Dennis Borczon MD

178.  Psychiatric Evaluation of Kristina L. dated  8/10/00 by Dennis Borczon MD

179.  Millcreek Community Hospital Admission Summary dated 1/15/02, and Psychiatric Evaluation dated 1/5/02, Charles Joy MD of Kristina L.

180.  Millcreek Community Hospital Discharge Summary of Kristina L. dated 1/11/02, Dennis Borczon MD

181.  Patient Discharge Instruction Sheet of Kristina L. dated 1/11/02, Millcreek Behavioral Care

182.  Millcreek Community Hospital Medical Records of Kristina L.

183.  ACL Quest Diagnostics report of Kristina L. dated 2/4/02

184.  Educational Psychiatric Progress Report, Sarah Reed Children's Center of Kristina L. dated 5/7/02

185.  Evaluation Report of Kristina L. dated  5/7/02

186.  Millcreek Community Hospital Psychiatric Evaluation of Kristina L. dated 8/5/02, Charles Joy, MD

187.  Millcreek Community Hospital Discharge Summary of Kristina L.dated 8/13/02, Charles Joy MD

188.  Patient Discharge Instruction Sheet of Kristina L. dated 8-13-02, Millcreek Behavioral Care

189.  Interdisciplinary Treatment Plan of Kristina L. dated 8/6/02, Millcreek Behavioral Care

190.  Interdisciplinary Treatment Plan of Kristina L. dated 8/10/02, Millcreek Behavioral Care

191.  Patient Discharge Instruction Sheet, Page 2, of Kristina L. dated 8-13-02, Millcreek Behavioral Care

192.  Evaluation Report of Kristina L. dated 10/31/02

193.  Erie Psychological Consortium, Psychiatric Evaluation of Kristina L. dated 12/16/02

194.  Case Review Initial Consultation of Kristina L. dated 7/29/03

195.  Perseus House Preliminary Treatment Plan of Kristina L. dated 8/3/03

196.  Perseus House Type-53 Initial Psychiatric Evaluation of Kristina L. dated August 5, 2003, Dennis Borczon, MD

197.  Monthly Residential Treatment Facility (RTF) Progress Summary of Kristina L. dated 7/29/03-8/25/03

198.  Perseus House, Inc. Individualized Treatment Plan Problem List of Kristina L. dated 9/5/03

199. Perseus House Updated Progress Note of Kristina L. dated 9/16/03

200. Monthly Residential Treatment Facility Progress Summary of Kristina L. dated 8/25/03-9/26/03

201. Perseus House Treatment Plan Progress Review/Revision of Kristina L. dated 10/05/03

202. Perseus House Quarterly Summary Report of Kristina L. Reporting Period 7/29/03-10/23/03

203. Monthly Residential Treatment Facility Progress Summary of Kristina L. dated 9/27/03-10/30/03

204. Evaluation Report of Kristina L. dated 10/31/03

205. Letter to Attorney Olds from Lynn B. McGrath Lake Erie Women's Center dated December 4, 2003

206. Crime Victim Center of Erie County counseling summary of Carol Finotti and Rebecca Torrey of Kristina L. dated December 10, 2003

207. School District of Erie authorization form for disclosure of protected health information of Kristina L.

208. Evaluation Report of Kristina L. dated 11/19/04

209. Erie County Crippled Children & Learning Disability Center Early Intervention Team Screening of Kristina L. dated 4/18/90

210. Erie County Crippled Children & Learning Disability Center Occupational Therapy/Physical Therapy Initial Evaluation of Kristina L. dated 5/18/90

211. Achievement Center Physical Therapy Re-evaluation of Kristina L. dated 6/14/91

212. Erie School District Early Intervention MDT Report of Kristina L. dated 8/27/92

213. Erie School District Two Year Re-evaluation Report of Kristina L. dated 4/16/93

214. Erie School District Comprehensive Evaluation Report of Kristina L. dated 10/6/93

215.  Erie School District Comprehensive Evaluation Report dated 4/25/94

216.  Notice of Recommended Assignment and IEP of Kristina L. dated 5/30/95

217.  Erie School District Comprehensive Evaluation Report of Kristina L. dated 5/15/95

218.  Erie School District Comprehensive Evaluation Report of Kristina L. dated 6/1/96

219.  Notice of Recommended Assignment of Kristina L. dated 11/14/96

220.  Notice of Recommended Assignment of Kristina L. dated 11/14/97

221.  Erie School District IEP of Kristina L. dated 11/14/00

222.  Crawford School District IEP of Kristina L. dated 3/20/01

223.  Erie School District Evaluation Report - IEP Revision - Notice of Recommended Educational Placement of Kristina L. dated 5/7/02

224.  Erie School District Evaluation Report Notice of Recommended Educational Placement of Kristina L. dated 6/7/02

225.  Erie School District DRAFT Evaluation Report of Kristina L. dated 11/3/04

Plaintiffs reserve the right to add any Exhibit which has been produced or identified in discovery.


## V.  LIST OF WITNESSES

Kristina L.
P.O. Box 152024
San Diego, CA 92195

Denise L.
P.O. Box 152024
San Diego, CA 92195

Rachel P.
179 East Main Street
Northeast, PA 16428

Richard P.
179 East Main Street
Northeast, PA 16428

Shelly P.
179 East Main Street
Northeast, PA 16428

Frank Scozzie
Erie School District

Janet M. Woods
11380 Fry
Edinboro

Linda Cappabianca
820 Lincoln Avenue
Erie, PA 16505

Matthew Bogardus
1020 East 10th Street
Erie, PA 16503

Robert Ray Iddings
Sarah Reed Children's Center
1020 East 10th Street
Erie, PA 16503

Vikki Scully
c/o Erie School District

Constance Levon Manus
603 Pasadena Drive
Erie, PA

Walter Love
2325 Wagner Avenue
Erie, PA 16510

Ronald Slupski
4241 Dunn Valley Road
McKean, PA 16426

Robin A. Johnson
5 Bothel Street
Northeast, PA 16428

Pamela A. Barber
City of Erie, Bureau of Police
626 State Street
Erie, PA 16501

Audrey Pecoraro
148 West 21st Street
Erie, PA 16502

Mary Ann Tempestini
148 West 21st Street
Erie, PA 16502

Christian Andrew Ruhl
809 Tacoma Avenue
Buffalo, NY 14216

Stanley D. Green, Jr.
City of Erie, Bureau of Police
626 State Street
Erie, PA 1601

Charles E. Bibbs, Jr.
Glen Mills Schools
Glen Mills, PA

Antonio Flemings
539 East 22nd Street
Erie, PA 16503

Charlise Moore
148 West 21st Street
Erie, PA 16502

Becky Marie Campbell
1063 West 11th Street
Erie, PA

Anthony Kincaid

Charles Joy, MD
Millcreek Community Hospital
5515 Peach Street
Millcreek, PA 16509

Dennis Borczon MD
Millcreek Community Hospital
5515 Peach Street
Millcreek, PA 16509

Kelly A. Haugh
Sarah Reed Children's Center
1020 East 10th Street
Erie, PA 16503

Jill Huston
Sarah Reed Children's Center
1020 East 10th Street
Erie, PA 16503

Jennifer L. Vaglia
Sarah Reed Children's Center
1020 East 10th Street
Erie, PA 16503

Christina L. Graves
Sarah Reed Children's Center
1020 East 10th Street
Erie, PA 16503

Denise Shreve        (Rachel P.)
Case Counselor
Crime Victim Center
of Erie County, Inc.
125 West 16th Street
Erie, PA 16501-2103

Carol Finotti        (Kristina L.)
Case Counselor
Crime Victim Center
of Erie County, Inc.
125 West 16th Street
Erie, PA 16501-2103

Rebecca A. Torrey
Direct Services Supervisor
Crime Victim Center
of Erie County, Inc.
125 West 16th Street
Erie, PA 16501-2103

Damages:
Plaintiffs will present testimony of Stephen Schachner Ph.D.  His
expert reports will be produced as a supplement to this report.



                              Respectfully submitted,


                              s/ Edward A. Olds
                              Edward A. Olds, Esquire
                              Pa. I.D. No. 23601
                              Carolyn Spicer Russ
                              Pa. I.D. No. 36232
                              Richard S. Matesic
                              Pa. I.D. No. 72211

                              1007 Mount Royal Boulevard
                              Pittsburgh, PA 15223
                              (412) 492-8975
                              (412) 492-8971 (facsimile)
                              edolds@earthlink.net


                              *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2005, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

James T. Marnen, Esquire
KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.
120 West Tenth Street
Erie, PA 16501-1461

S/ Edward A. Olds
Edward A. Olds, Esquire

43