IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Richard P., by and for **R.P.**, and Denise L., by and for **K.L.**, | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | |
| **SCHOOL DISTRICT OF THE CITY OF ERIE, PENNSYLVANIA; JANET WOODS**, Individually and in her Capacity as Principal of Strong Vincent High School; and **LINDA L. CAPPABIANCA**, Individually and in her Capacity as Assistant Principal of Strong Vincent High School, | ) ) ) ) ) ) ) ) ) | Civil Action No.  03-390 Erie |
| Defendants | ) | **JURY TRIAL DEMANDED** |

**BRIEF IN SUPPORT OF DEFENDANTS' AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants The School District of the City of Erie, Pennsylvania, Janet M. Woods, and

Linda L. Cappabianca, respectfully submit the following Brief in Support of Defendants'

Amended Motion for Partial Summary Judgment.

**Issues**

A.    Whether as a matter of law plaintiffs can satisfy their burden of proving those facts necessary to establish the liability of ESD under Title IX for the sexual assaults and the harassment that preceded those assaults.

B.    Whether as a matter of law plaintiffs can satisfy their burden of proving those facts necessary to establish the liability of Ms. Woods and Ms. Cappabianca under the Equal Protection Clause and the Equal Rights Amendment of the Pennsylvania Constitution for the sexual assaults and the harassment that preceded and succeeded those assaults.

    C.      Whether as a matter of law the Court is without subject matter jurisdiction to address any claim by plaintiffs that their placement at Sarah Reed  violated IDEA or the Rehabilitation Act.

## Facts

**Procedural History**

This action was commenced on November 24, 2003, plaintiffs R.P. and K.L., by their respective parents, Richard P. ("Richard") and Denise L. ("Denise"), filing a Complaint against defendants The School District of the City of Erie, Pennsylvania ("ESD"), Janet Woods and Linda Cappabianca.  (A1, A3, A9-A31) R.P. and K.L. asserted in their Complaint that they were victims of sexual harassment, including rape, by fellow students at Strong Vincent High School ("Strong Vincent") during the 2001-2002 school year, at a time when Strong Vincent housed a middle school (grades 7 through 9) and a high school (grades 10 through 12), and defendant Woods was the principal of Strong Vincent and defendant Cappabianca was an assistant principal, assigned to the middle school.  (A9-A31)

Plaintiffs' Complaint asserted four theories of recovery in four separate counts.  Count I alleged a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq,* ("Title IX"), while Counts II and III asserted causes of action against defendants ESD and Cappabianca pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"), for violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution.  (A26-A29)  Count IV set forth a claim against defendants Cappabianca and Woods for violation of Sections 26 (Equal Protection Clause) and 28 (Equal Rights Amendment) of the Pennsylvania Constitution.  (A29)

On November 22, 2004 defendants filed a Motion for Judgment on the Pleadings, seeking the dismissal of Counts II and III of the Complaint.  (A6, A32-A36)  The Court heard oral

argument on the motion on January 12, 2005 (A37-A60), entering an order that same day granting the motion, dismissing Counts II and III (A56-A58). On March 11, 2005, with leave from the Court, plaintiffs filed an Amended Complaint, referring to Count IV of the original Complaint as Count II of the Amended Complaint and adding a new Count III, asserting a claim for defamation under Pennsylvania law against defendant Cappabianca. (A7-A8, A61-A82)

**Amended Complaint**

Plaintiffs' Amended Complaint (A61-A82) asserts that plaintiffs were seventh-grade students in the middle school at Strong Vincent during the 2001-2002 school year, K.L. being twelve years old and R.P. becoming thirteen years old on in the fall of 2001. The Amended Complaint contends that on November 27, 2001 K.L. was raped by fellow student C.B., R.P. was raped by C.B. and another Strong Vincent student, A.K., and both plaintiffs were physically assaulted by fellow student B.C. These assaults occurred after school near a laundromat across the street from Strong Vincent.

The Amended Complaint alleges that shortly after the school year began K.L. was subjected to verbal harassment by C.B., A.K. and B.C., at first consisting of derogatory comments about her mental abilities, then escalating to comments of a sexual nature. One of these latter comments consisted of a threat by C.B. to take her into a Strong Vincent restroom and force her to perform oral sex on him.

The Amended Complaint alleges that following the rapes K.L. and R.P. were subjected to verbal sexual harassment by many students at Strong Vincent, including C.B., A.K. and B.C. R.P. was also twice threatened with sexual assault. In January 2002 K.L. intentionally injured herself and was hospitalized as a consequence.

Plaintiffs assert that K.L. reported the pre-assault verbal harassment to Ms. Cappabianca and various teachers, and Denise also spoke with Ms. Cappabianca about it, all to no avail.

3

Within days of the rapes K.L. and R.P. allegedly reported them to Ms. Cappabianca, although they did not tell their parents they had been raped.  K.L. and R.P.also informed Ms. Cappabianca of the harassment that followed the rapes and, allegedly, Ms. Woods, teachers and other administrators also became aware of the rapes and subsequent harassment, but exhibited only indifference.

After she was hospitalized in January 2002, K.L. first informed Denise of her rape and Ms. Woods informed Richard that R.P. had been raped.  At about the same time ESD contacted the police, who thereafter investigated and prosecuted the assailants, and K.L. and R.P. were transferred from Strong Vincent to Sarah Reed Children's Center.

**K.L.'s Testimony**

The first day of school during the 2001-2002 ESD school year was August 27, 2001. (A201-A202, A685-A95)  K.L. entered Strong Vincent for the seventh grade in early September 2001, the delay being attributable to the late arrival of some documents. (A200-A201) At about the time when she was "just getting used to school" three other students began bothering her:  B.C., C.B. and A.F.; at no time did A.K. bother her.  (A200-A201, A203-A204) B.C. was a girl who was in eighth grade at Strong Vincent, while C.B. was an eighth-grade boy at Strong Vincent; K.L. did not know what grade A.F. was in, but he also attended Strong Vincent.  (A200-A201, A203)

Following a school day before Thanksgiving 2001, after 6:30 p.m. and after dark, C.B. sexually assaulted K.L. once, behind a house near a laundromat located "across the street" from Strong Vincent.  (A206-A207, A212-A216, A36-A37)  C.B. was the only person who sexually assaulted her that evening and he did so once that evening.  (A206)  K.L. attended school that day and was scheduled to attend PASS until 6:30 p.m., but she skipped PASS to avoid C.B, who

was also scheduled to attend PASS, and she visited a friend at the friend's residence, walking back to Strong Vincent at about 6:30 p.m., where Denise was to pick her up to give her a ride home.  (A207-A212, A215-A216)  The friend resided several blocks from Strong Vincent and the laundromat.  (A211-A12)

K.L. walked to the laundromat and, at 6:30 p.m., she left the laundromat, intending to walk back to Strong Vincent to wait for Denise.  As she left the laundromat she observed other students walking toward her, having just been discharged from PASS; two of those students were B.C. and C.B.  She re-entered the laundromat, entered the laundromat restroom and locked the door, her intent being to wait in there until the other students passed by the laundromat; she was afraid of B.C. and C.B.  (A214-A216, A232-A233)

As K.L. left the restroom B.C. "charged in [the laundromat] from the back door" and struck K.L. above one of her ears with a visor.  K.L. then struck B.C. on a shoulder with her fist, B.C. responding by pulling K.L. outside through the rear laundromat door.  C.B. was standing behind the laundromat in a group of three or four people; he grabbed K.L., pulled her behind a nearby house, struck her with his knee and fist, and sexually assaulted her.  (A208-A209, A214, A232-A237)

B.C. was in one of K.L.'s classes.  (A219)  Prior to the sexual assault B.C. called K.L. names in that class and in the hallway as K.L. went to her next class.  She did not call K.L. names every day, "[j]ust sometimes when she had moods."  The names she called K.L. included "bitch," "whore" and "slut."  At no time prior to the evening of the sexual assault did B.C. physically touch K.L.  (A204, A208-A209, A216, A218, A220-A221)

C.B. and K.L. were in the same Science class, taught by Ms. Scully; K.L. could not recall whether that class was held each day.  C.B. sat in a seat immediately behind K.L. and, on "most" days, poked her with a pencil and tapped her back with his hand.  (A206-A208, A216-A221)

This was the only physical contact C.B. had with K.L. before the evening of the sexual assault. (A218)

At some time before the sexual assault, while the two of them were in a hallway at school between classes, with other students around, C.B. threatened to take K.L. into a school restroom and force her to perform oral sex on him. (A245-A246, pp.15-17) At no other time prior to the sexual assault did C.B. bother K.L. verbally. (A216)

A.F. and K.L. were in two classes together, one of which was taught by Ms. Scully. Prior to the sexual assault A.F. bothered her by "following her" and making comments such as, "You're going to get something," which frightened K.L.. (A218-A219)

Prior to the sexual assault K.L. repeatedly informed Ms. Scully about C.B. bothering her and she repeatedly asked Ms. Scully to change her seat. Ms. Scully's only response was to tell C.B. to stop what he was doing; at no time did she move K.L.'s seat. (A217, A220) Following C.B.'s threat to sexually assault her in a school restroom, K.L. informed the teacher of her next class of that threat; K.L. could not identify the teacher, indicating that the teacher's only response was to tell her to take her seat. (A246, p.17) K.L. made no complaints to any teacher about B.C., C.B. and A.F. bothering her besides these complaints. (A220)

Prior to the sexual assault K.L. complained to Ms. Cappabianca "many times" about C.B: she told her that C.B. would not "leave [her] alone, and [she] kept . . . asking the teacher to move [her] seat and she didn't do anything about it. [She] was tired of [C.B.] poking [her] and stuff." Ms. Cappabianca's response was to say that "she would take care of it." At no time before the sexual assault did K.L. complain to Ms. Cappabianca about B.C. or A.F., or about C.B.'s threat to force her to perform oral sex on him. (A220-A222; A246, p.17)

K.L. did not inform Denise of the sexual assault by C.B.; Denise did not learn of the assault until K.G., who was K.L.'s sister, told Denise that students at Strong Vincent were talking

about K.L. performing oral sex.  Denise then questioned K.L., who at first repeatedly denied that any sexual activity occurred, then intentionally burned herself, as a result of which she was taken to Millcreek Community Hospital for treatment.  That evening K.L. informed Denise for the first time that she had been sexually assaulted.  (A237-A238; A243-A244, pp.7-11; A247, pp.21-22)  While she was in the hospital she also, for the first time, informed Denise of the pre-assault threat by C.B. to force her to perform oral sex on him in the Strong Vincent restroom.  (A246, p.18)

Following the sexual assault B.C., C.B. and many other students, male and female, repeatedly called her names such as "nasty bitch" and "whore," and male students told K.G., ". . . [Y]our sister can come over here any day and do that to me."  This name-calling persisted until K.L. entered the hospital.  (A239; A243-A245, pp.6-7, 11-12, 14)

K.L. told Ms. Scully about the name-calling "[a] few times," and she also told another teacher, Ms. Manus, about it.  Ms. Scully invited K.L. to see Ms. Cappabianca, while Ms. Manus told K.L. she would talk with the offenders after class.  K.L. saw Ms. Cappabianca once or twice about this name-calling; Ms. Cappabianca requested the names of the offenders so she could talk with them, but K.L. did not know their names.  (A244-A245, pp.12-14)  K.L. also asked Ms. Cappabianca to change her classes, but she did not know whether Ms. Cappabianca did so.  At some point, either before or after the assault, Ms. Cappabianca told K.L. "to just suck it up and don't let them bother [you] because [you] won't be able to concentrate . . . if you don't."  (A247, pp.21-22)

At some point K.L. informed Ms. Cappabianca of the sexual assault and Ms. Cappabianca told her "that's what people do when they are in love."  (A247, pp.21, 23)

Following the assault K.L. felt that Ms. Cappabianca was not doing enough about the name-calling.  When asked whether she informed Ms. Woods about the name-calling, K.L. said she did not recall who Ms. Woods was.  (A245, p.15)

**R.P.'s Testimony**

At no time before the November 27, 2001 sexual assaults was R.P. bothered in any way by C.B. or A.F..  (A270, p.17; A284, pp.72-73; A243, p.106)  However, she had difficulties with B.C. on two occasions.  In October 2001, while R.P. and B.C. were in a class together B.C., for no reason, told R.P. she wanted to fight with her; at some time thereafter B.C. approached R.P. in gym class and told her to meet her after school so they could fight.  At no time prior to the November 27, 2001 sexual assault did R.P. complain to any teacher or administrator that B.C. was bothering her.  (A271, pp.19-20; A278, pp.46-48; A292, pp.104-106)

On November 27, 2001 after PASS, which began at 3:30 p.m. and ended at 6:30 p.m., during the hours of darkness, across the street from Strong Vincent, R.P. was sexually assaulted; R.P. did not attend PASS that day.  (A281, p.60; A283-A285, pp.69-74)  On November 29 or 30, 2001 R.P. went to Ms. Cappabianca's office and attempted to inform Ms. Cappabianca of the assault and subsequent verbal harassment by male students relating to her performing oral sex; while she was able to tell Ms. Cappabianca that "these boys won't stop bothering me," Ms. Cappabianca would not permit her to say more and, consequently, R.P. left her office without informing her of the assault or of any specifics concerning the subsequent verbal harassment.  (A285-A286, pp.75-78)

At some time after the November 27 sexual assault B.C. tried to bully R.P. into performing oral sex on a male student in a stairwell in Strong Vincent.  R.P. informed a substitute teacher of this event, who responded merely by saying that a similar thing had

happened to a friend of hers.  R.P. did not inform Ms. Cappabianca of this incident.

(A278-A281, pp.47-61)  In early December 2001 a male Strong Vincent student whose name

was not known to R.P. sexually assaulted R.P. after PASS in the laundromat across the street

from Strong Vincent.  (A281-A284, pp.61-72)

      Following R.P.'s first attempt to inform Ms. Cappabianca of the sexual assault and

subsequent harassment, on ten or fifteen occasions R.P. went to Ms. Cappabianca's office and

tried to tell her she had been sexually assaulted but, on each occasion, Ms. Cappabianca

instructed her to stop talking, preventing her from telling her of the assault and of the fact that

since the assault male students were requesting oral sex from her.  On one of these occasions

Ms. Cappabianca telephoned Richard in R.P.'s presence and told Richard, "Your daughter is

being a filthy little girl," then handed the telephone to R.P..  On another occasion

Ms. Cappabianca told R.P., "I know what happened."  (A286, pp.78-79; A290-A292, pp.97-102)

On yet another occasion Ms. Cappabianca told R.P., "You need to suck it up and ignore it."

(A283, p.69)

      At some point in time R.P. informed a guidance counselor whom she could not identify

that "boys [were] bothering [her] after PASS."  At no time other than this conversation, her

conversations with Ms. Cappabianca and her conversation with the student teacher concerning

the stairwell incident, did R.P. speak with other teachers or administrators about the

November 27 sexual assault, the two subsequent assaults and the verbal harassment.

(A289-A290, pp.91-96)

      At some time after the 2001-2002 Christmas holiday Ms. Cappabianca summoned R.P.

from PASS to a meeting with Ms. Cappabianca and Ms. Woods in Ms. Woods's office where, for

the first time, Ms. Cappabianca asked R.P. to explain the facts relating to the assault, which R.P.

thereupon did.  R.P. attended a meeting the next day with Richard, Ms. Woods and Mr. Ruhl, at

which meeting Ms. Woods told Richard that R.P. "was giving head". Later that week R.P. was

interviewed by the police. At no time before the meeting with Ms. Woods and Mr. Ruhl did R.P.

tell her parents about the sexual assaults. (A286-A290, pp.80-81, 84-87, 89-90)

**Denise's Testimony**

K.L. burned herself at about 7:00 or 7:30 p.m. on Friday, January 4, 2002, and she was

admitted to the emergency room at Millcreek Community Hospital that evening, she was

admitted as an inpatient in the early morning of January 5, 2002, and she remained at Millcreek

Community Hospital as an inpatient until her discharge on January 11, 2002. (A170-A171,

pp.17-22)

K.L. told Denise before Thanksgiving 2001 about B.C. bothering her and C.B. "poking

her and stuff." Denise spoke with Ms. Cappabianca several times per week between the third

week of October and Thanksgiving 2001 about this. Ms. Cappabianca suggested with respect to

B.C.'s conduct that "sometimes you have to overlook things because kids are going to be kids";

Ms. Cappabianca told Denise that C.B. was punished for "poking" K.L. Denise requested that

K.L. be moved out of C.B.'s class, but Ms. Cappabianca refused, stating, ". . . [T]he schedule is

set." (A173-A175, pp.30-38)

Following Thanksgiving vacation K.L. "became more depressed" and had emotional

outbursts at home. Denise visited Ms. Cappabianca two to three times per week after

Thanksgiving vacation, complaining about B.C. picking on K.L.; Ms. Cappabianca told Denise

"sometimes kids are going to be kids [and] you can't discipline them for everything because

some of it is normal." Denise insisted to Ms. Cappabianca that B.C.'s conduct went beyond

"normal." (A175, pp.38-39)

All of Denise's contact with Strong Vincent relative to B.C.'s harassment of K.L. before

K.L. was hospitalized was with Ms. Cappabianca. She tried to see Ms. Woods in person once in

November 2001 and a second time in December 2001, but on both occasions she was told that

Ms. Woods was not available to see her.  At no time did she contact any ESD representative

outside of Strong Vincent concerning this matter.  (A175-A176, pp.39-42)

K.L.'s last day at Strong Vincent was January 4, 2002, the day on which she was admitted

to Millcreek Community Hospital.  (A174, p.34)  On January 15, 2002 she was placed in her

home for educational purposes and, on January 17, 2002, her Individualized Educational

Program ("IEP") was changed, changing her educational placement from Strong Vincent to

Sarah Reed Children's Center ("Sarah Reed").  Denise consented to the change in placement on

the recommendation of Mr. Ruhl.  (A182-A183, pp.65-71; A587-A598)

**Richard's Testimony**

On November 30, 2001 Ms. Cappabianca telephoned Richard and asked him to come to

Strong Vincent to get R.P., because she "was being dirty and filthy.  She was being a filthy little

girl and she needed to be disciplined . . . ."  Richard and his wife, Shelley, who was also R.P.'s

mother, immediately went to Strong Vincent and met with R.P. and Ms. Cappabianca.  Ms.

Cappabianca told Richard and Shelley in vulgar language that R.P. was talking about oral sex

and about other students verbally harassing her; that she was a "filthy little girl" who "needs to

suck it up [and] ignore it;" and that Richard and Shelley should take her home and discipline her.

(A306-A309, pp. 14-21, 26-27; A312-A313, pp.40-42; A831-A839)

Richard accepted Ms. Cappabianca's comments at face value and scolded R.P. in Ms.

Cappabianca's presence at Strong Vincent.  Richard and Shelley then took R.P. home, where

Richard questioned R.P. about the situation; she told him that "everybody just won't leave her

alone" and that she was being accused of "doing bad things," although she did not specify what

those things were.  Richard did not know how to communicate with R.P. about the situation, so he just "[gave her] a little love." (A307-A309, pp. 19-25)

On January 9, 2002 Richard was at Strong Vincent picking up R.P. from PASS when Ms. Woods and Ms. Cappabianca asked him to meet them at Strong Vincent the next morning and he agreed to do so.  Before that time he was unaware of what had happened, except that he knew from being asked hypothetical questions by R.P. that she was still undergoing some harassment at school.  (A306, pp. 13-14; A309, p.25; A314, pp. 45-47)

On the morning of January 10, 2002 Richard and R.P. met with Ms. Woods, Chris Ruhl and a woman not known to Richard.  Ms. Woods opened the meeting by informing Richard in vulgar language that R.P. had been engaging in oral sex; R.P. then explained that she had been sexually assaulted.  Ms. Woods told Richard that R.P. would be transferred to Sarah Reed for her safety.  (A314-A318, pp. 48-62; A831-A839)

Richard did not object to Ms. Woods about R.P. going to Sarah Reed, although when an ESD home school teacher came to the house, and at the time of the intake interview at Sarah Reed, he questioned the placement.  At no time did he execute a written consent to the Sarah Reed placement but, knowing he had a right to object to it, he did not object.  (A316-A318, pp. 56-62)

**Linda Cappabianca's Testimony**

"PASS" is an acronym for Program, for After School Suspension.  It is one of six steps in the disciplinary process of ESD relating to students, and involves a student remaining after school from 3:30 p.m. to 6:30 p.m. under the supervision of an administrator with exclusion from school-sponsored activities and requiring the completion of work assignments while in PASS. (A103, pp. 29-31; A710-A714)

On and after January 9, 2002 through January 11, 2002 Ms. Woods and Ms. Cappabianca interviewed students and had discussions with their parents concerning the sexual assaults on K.L. and R.P. (A109-A110, pp. 54-60; A117, p. 85) All of the students, including R.P., very clearly stated that the sexual assaults occurred not on November 27, 2001, but on December 19, 2001. (A101, p. 24) Ms. Cappabianca did not meet with Richard and R.P. together on January 10, but Ms. Woods and Chris Ruhl did, in the "SAP room." (A117, pp. 85-86) Chris Ruhl was an ESD mental health counselor who was a part of the "SAP program"; "SAP" is an acronym for the Student Assistance Program of ESD, which provides assistance to at-risk-students. (A100-A101, pp. 18-21; A713)

**Janet Woods's Testimony**

Ms. Woods and Ms. Cappabianca conducted their investigation of the sexual assaults on K.L. and R.P. and contacted the police on January 10, 2002, when they concluded that there was a credible case for police investigation; the police were at Strong Vincent on January 11 to commence their investigation. At that time the police were provided with a summary of the investigation conducted by Ms. Woods and Ms. Cappabianca and, thereafter, B.C., C.B. and A.K. were arrested. (A371-A373, pp. 42, 49-51; A377, pp.66-67; A384, pp. 95-96; A392-A393, pp. 129-130)

During the course of the investigation Ms. Woods contacted administrators at the central office of ESD regarding the disciplining of the alleged assailants and assistance to K.L. and R.P.. Those administrators determined that since the sexual assaults occurred off ESD property and after hours, criminal prosecutions, not ESD discipline, were the only possible remedies with respect to the assailants. They also determined that the placement of K.L. and R.P. at Sarah Reed was in their best interest. (A370-A371, pp. 40-44; A379-A380, pp. 77-80; A382, p. 87)

**Charlise Moore's Testimony**

      Frank Scozzie, the ESD Director of Special Education, initiated the process of placing

K.L. and R.P. at Sarah Reed; Ms. Moore, who is a Supervisor of Special Education, implemented

that decision.  (A250, p.4; A260, pp. 43-44)  The placement decision with respect to each student

was made by an IEP team, Sarah Reed and the parents.  An alternative placement such as this

with respect to special education students such as K.L. and R.P. must be made by an IEP team;

Sarah Reed must determine whether it can provide appropriate services; and the parents'consent

to the placement is necessary.  (A252-A253, pp. 10, 14; A255, p. 24; A579-A598)  The

placements at Sarah Reed were made to provide Kristina and Rachel therapeutic support at a

more intense level than ESD could provide for the emotional consequences of the sexual

assaults.  (A255-A257, pp. 25-31)

**Matthew Bogardus's Testimony**

      Mr. Bogardus is the intake supervisor of the Sarah Reed outpatient program, the position

he also held in January 2002 when K.L. and R.P. were placed in that program.  (A85, p. 8)  K.L.

and R.P. were referred to Sarah Reed in January 2002 and Sarah Reed accepted the referral,

placing them in its "partial hospitalization" and "alternative education" programs, providing

mental health and education services to them.  (A88-A89, pp. 19, 24-25)  Sarah Reed would not

have accepted the placements had the parents of the two girls not consented to those placements.

(A94, p. 42)

## Standard of Review

Defendants categorically deny plaintiffs' allegations in this case but, of course, are not permitted to dispute plaintiffs' version of the relevant events at this time, in this summary judgment proceeding. Instead, to the extent that the facts asserted by plaintiffs R.P. and K.L. are supported by admissible evidence, they must be accepted as true. Moreover, all reasonable inferences from those facts must be drawn in favor of R.P. and K.L. **Gleason v. Norwest Mortgage, Inc.,** 243 F.3d 130, 138(3d Cir. 2001)

Summary judgment may be entered for a party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Fed.R.Civ.P. 56(c).** If, after adequate time for discovery, plaintiffs have failed to make a showing sufficient to establish the existence of an element essential to their case, on which they have the burden of proof at trial, defendants are entitled to judgment as a matter of law under Rule 56. **Celotex Corp. v. Catrett**, 477 U.S. 317, 106 S.Ct. 2548, 2552 (1986). Summary judgment should be entered if there is insufficient evidence for a reasonable jury to return a verdict for plaintiffs. **GFL Advantage Fund, Ltd. v. Colkitt,** 272 F.3d 189, 199 (3d Cir. 2001).

This brief is filed in support of a motion for "partial summary judgment," a common expression, but one which is to some extent a misnomer. As to defendants ESD and Cappabianca, defendants' motion seeks a pretrial adjudication pursuant to Fed.R.Civ.P. 56(d) that certain issues are no longer in dispute and will not be litigated at trial. **Shtab v. Greate Bay Hotel and Casino**, 173 F.Supp.2d 255, 257, n.1 (D. N.J. 2001); **10B Charles Allan Wright et al., Fed.Prac.&Proc.Civ.3d § 2736**. Defendants' motion as regards defendant Woods seeks summary judgment pursuant to Fed.R.Civ.P. 56(c).

**Argument**

A.    **As a matter of law plaintiffs cannot satisfy their burden
of proving those facts necessary to establish the liability of ESD
under Title IX for the sexual assaults and the harassment
that preceded those assaults.**

Title IX provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." **21 U.S.C. §1681.**  Private parties may sue to enforce its provisions, **Cannon v. University of Chicago**, 441 U.S. 677, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560 (1979), their implied cause of action including the right to claim money damages.  **Franklin v. Gwinnett County Public Schools**, 503 U.S. 60, 112 S.Ct. 1028, 1037, 117 L.Ed.2d 208 (1992).  However, such an action may be brought only against recipients of federal funds.  **Davis v. Monroe County Board of Education**, 526 U.S. 629, 119 S.Ct. 1661, 1670, 143 L.Ed.2d 839 (1999).  Moreover, Title IX will support a cause of action for damages for sexual harassment by an employee of the funding recipient, **Franklin**, 119 S.Ct. at 1037, **Gebser v. Lago Vista Independent School District**, 524 U.S. 274, 118 S.Ct. 1989, 1995, 141 L.Ed.2d 277 (1998); and under certain circumstances, it will also support a claim for damages for sexual harassment by student peers of the plaintiff.  **Davis**, 119 S.Ct. at 1666.

Recipients of federal funds are liable in damages for the sexual harassment of one student by another only where (1) they were deliberately indifferent to sexual harassment of which they had actual knowledge, (2) the harassment was so severe, pervasive and objectively offensive that it deprived the victim of access to the educational opportunities or benefits provided by the school of the funding recipient and (3) the deliberate indifference caused the victim to undergo harassment or it made the victim more vulnerable to harassment.  **Davis**, 119 S.Ct. at 1671-1677.

16

ESD, as the funding recipient in this case, must have exercised substantial control over the harassers and the context in which the known harassment occurred.  **Id.**, 119 S.Ct. at 1672.  Deliberate indifference requires that its response or lack of a response is clearly unreasonable in light of the known circumstances.  **Id.**, 119 S.Ct. at 1674.

Of course, Title IX applies only to sexual harassment.  **Davis**, 119 S.Ct. at 1675.  Not only does plaintiffs' Amended Complaint contain no allegations of harassment against R.P. occurring before the sexual assaults upon K.L. and R.P., but R.P.'s testimony describes only two acts occurring before the time of the assaults that could be construed as harassment, *i.e.* the two threats by B.C. to "fight" her, neither of which was sexual in nature.  Moreover, no Strong Vincent teacher or administrator was aware of those threats and, even taken together, they were not so severe, pervasive or objectively offensive that R.P. was denied access to an education.  Therefore, to the extent that R.P. may be claiming damages as a result of sexual harassment before the sexual assaults, there is no evidence supporting such a claim.

Similarly, the touching of K.L. by C.B. in Ms. Scully's class, and A.F. "following her" and commenting, "You're going to get something," were not of a sexual nature.  Only B.C.'s occasional name-calling and C.B.'s one-time threat to force her to perform oral sex could be characterized as sexual.

However, mere name-calling among children, even though sexual in nature, is not sufficient to impose Title IX liability on ESD.  **Davis**, 119 S.Ct. at 1675.  *See also*, **Hawkins v. Sarasota County School Board**, 322 F.3d 1279 (11th Cir. 2003) and **Burwell v. Peken Community High School District 303**, 213 F.Supp.2d 917 (C.D. Ill. 2002).  Moreover, C.B.'s single threat of sexual violence, while clearly objectively offensive, was incapable of having the systemic effect of denying K.L. equal access to the educational facilies of Strong Vincent.  **Davis**, 119 S.Ct. at 1676.  Indeed, there is no evidence that it had such an effect.

The sexual assaults obviously were acts that were "severe" and "objectively offensive." Considered alone they may have even had the "pervasive" effect on the educational experiences of K.L. and R.P. that is required for Title IX liability.  However, they were not caused by any deliberate indifference of ESD teachers or administrators to any severe, pervasive and objectively offensive sexual harassment of K.L. and R.P.  They occurred off school property after school hours with no prior notice to school officials and in the absence of any circumstances that could be portrayed as the kind of enabling conduct envisioned by **Davis**.

Therefore, any claim of sexual harassment by R.P. relating to the time period before the sexual assaults fails as a matter of law because the harassment she sustained was not sexual, no teacher or administrator was aware of it and it was not of sufficient severity.  Some of the conduct of which K.L. complains was not sexual and none of it was sufficiently severe to impose liability.  As a matter of law ESD is not liable for any harassment before the sexual assaults or for the sexual assaults themselves, the latter because they were not the result of any deliberate indifference to severe, pervasive and objectively offensive sexual harassment.

> **B.**     **As a matter of law plaintiffs cannot satisfy their burden of proving those facts necessary to establish the liability of Ms. Woods and Ms. Cappabianca under the Equal Protection Clause and the Equal Rights Amendment of the Pennsylvania Constitution for the sexual assaults and the harassment that preceded and succeeded those assaults.**

The Pennsylvania Supreme Court has not ruled on the issue of whether there is a private right of action for damages under the Pennsylvania Constitution, but a number of federal district courts have held that no such right exists, one of which relates to the Pennsylvania Equal Rights Amendment, Section 28 of the Pennsylvania Constitution.  **Ryan v. General Machine Products**, 277 F.Supp.2d 585, 595 (E.D. Pa. 2003).  However, another district court has held that the Pennsylvania Equal Rights Amendment does support a private action for damages,

18

**Kemether v. Pennsylvania Interscholastic Athletic Association, Inc.**, 15 F.Supp.2d 740, 755 (E.D. Pa. 1998), relying on **Pfeiffer v. Marion Center Area School District**, 917 F.2d 779, 789 (3d Cir. 1990).  There are no court decisions specifically addressing whether a cause of action for damages will lie for a breach of the Equal Protection Clause, Section 26 of the Pennsylvania Constitution.

The Pennsylvania Equal Protection Clause is analyzed by the Pennsylvania state courts under the same standards used by the federal courts when reviewing equal protection claims under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  **Love v. Borough of Stroudsburg**, 528 Pa. 320, 597 A.2d 1137, 1139 (1991).  The same is true of claims of violations of the Pennsylvania Equal Rights Amendment, although arguably the Pennsylvania Equal Rights Amendment demands more stringent scrutiny of sex-based classifications than does the federal Equal Protection Clause.  **Williams v. School District of Bethlehem**, 998 F.2d 168, 179 (3d Cir. 1993).  Given the similarity between the Pennsylvania Equal Protection Clause and the Pennsylvania Equal Rights Amendment, it would seem that if the Equal Rights Amendment will support a claim for damages, so will the Equal Protection Clause.  Moreover, the analytical interrelationship of federal and state principles of equal protection suggests that since the United States Constitution has been held to support private actions for damages against federal agents for violations of the United States Constitution, the Pennsylvania Constitution would have the same effect regarding violations of the Pennsylvania Constitution, even though there is no state legislation expressly providing for a cause of action for violation of the Pennsylvania Constitution.  **Brown v. Philip Morris, Inc.**, 250 F.3d 789, 800 (3d Cir. 2001).

A denial of equal protection involves purposeful discrimination, that is, treatment different than that accorded other individuals similarly situated.  Sexual discrimination involves

disparate treatment based on gender.  **Andrews v. City of Philadelphia**, 895 F.2d 1469, 1478 (3d Cir. 1990).  However, while Title IX imposes an affirmative duty on recipients of federal funds to protect students from the actions of non-state actor, such as other students, neither the United States Constitution nor the Pennsylvania Constitution creates such a duty in the absence of a special relationship, which is not the case with public school students and the school districts in which they attend school.  **D.R. v. Middle Bucks Area Vocational Technical School**, 972 F.2d 1364 (3d Cir. 1992).  *Compare* **Stoneking v. Bradford Area School District**, 882 F.2d 720 (3d Cir. 1989).  Instead, equal protection liability as applied to student-on-student sexual harassment requires different treatment of disciplinary issues based on gender.  **Nabozny v. Podlesny**, 92 F.3d 446, 454 (7th Cir. 1996); **Soper v. Hoben**, 195 F.3d 845, 852 (6th Cir. 1999); **Flores v. Morgan Hill Unified School District**, 324 F.3d 1130, 1135 (9th Cir. 2003).

Two decisions have been located that analyze equal protection liability for peer harassment in a way that is identical to the Title IX analysis adopted by the United States Supreme Court in **Davis v. Monroe County Board of Education**:  **Gant v. Wallingford Board of Education**, 195 F.3d 134, 140 (2d Cir. 1999), and **Murrell v. School District No. 1, Denver, Colorado**, 186 F.3d 1238, 1249-1250 (10th Cir. 1999).  However, it is respectfully submitted that the better rule is that disparate treatment is required.  While **Middle Bucks** and **Stoneking** were Due Process Clause cases and while the former relied on **DeShaney v. Winnebago County Department of Social Services**, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), also a Due Process Clause case, the point remains that the Constitution does not impose an affirmative duty of protection on the state, while Title IX does.

There is no evidence in this case that K.L. and R.P. were treated differently in relation to the harassment they underwent on the basis of their gender.  Accordingly, judgment should be entered in favor of Ms. Woods and it should be determined that Ms. Cappabianca is not liable to

plaintiffs on Count II of the Amended Complaint.  In any case, liability for violation of the Equal

Protection Clause and the Equal Rights Amendment depends on the personal involvement of Ms.

Woods and Ms. Cappabianca in the discriminatory conduct.  **Andrews v. City of Philadelphia**

at 1478.  There is no evidence that Ms. Woods was aware of plaintiffs' complaints until January

9, 2002, the day on which the interviews of the students by Ms. Woods and Ms. Cappabianca

began.  Therefore, for this reason alone, judgment should be entered for Ms. Woods.

> C.    **As a matter of law the Court is without subject matter
> jurisdiction to address any claim by plaintiffs that their
> placement at Sarah Reed violated IDEA or the Rehabilitation
> Act.**

The Individuals with Disabilities Education Act, **20 U.S.C. §1401,** *et seq.* ("IDEA"),

makes federal funds available to state special education programs on the condition that states

implement policies assuring a "free appropriate public education" ("FAPE") for all of their

disabled children, which must be tailored to the unique needs of each disabled student through

the formulation of an individualized education program ("IEP").  **Ridgewood Board of**

**Education v. N.E.**, 172 F.3d 238, 247 (3d Cir. 1999).  Section 504 of the Rehabilitation Act of

1973, **29 U.S.C. §794** ("Rehabilitation Act"), provides, *inter alia*, that "[n]o otherwise qualified

individual with a disability . . . shall, solely by reason of her or his disability, be excluded from

the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance."  Regulations promulgated under the

Rehabilitation Act also impose requirements on the states with respect to the implementation of

the policies of the Rehabilitation Act.  **34 CFR §104.31,** *et seq.*  IDEA and the Rehabilitation

Act, while phrased differently, guarantee the same FAPE for disabled persons.  **W.B. v. Matula**,

67 F.3d 484, 492-3 (3d Cir. 1995).

Plaintiffs' Amended Complaint contains no reference to IDEA or the Rehabilitation Act and does not expressly state a claim for their placement at Sarah Reed in January 2002, although paragraphs 25 and 37 (A70-A71, A75) seem to vaguely complain of that placement. Moreover, plaintiffs' counsel's interrogation of witnesses at discovery depositions suggested that plaintiffs are claiming that their placement at Sarah Reed was wrongful. Accordingly, defendants address herein the propriety of such a claim.

The Pennsylvania statutory vehicle for the implementation of IDEA's policies is found in the Public School Code of 1949, **24 P.S. §13-1371,** *et seq.* Regulations of the Pennsylvania Department of Education appear at **22 Pa. Code §14.101,** *et seq.* regarding special education programs. Regulations of the United States Department of Education on special education, promulgated under IDEA, appear at **34 CFR §300.1,** *et seq.* And United States Department of Education regulations promulgated under the Rehabilitation Act with respect to preschool, elementary and secondary school students appear at **34 CFR §104.31,** *et seq.* The Pennsylvania regulations that address school districts' responsibilities under the Rehabilitation Act appear at **22 Pa. Code §15.1,** *et seq.*

While the Rehabilitation Act regulations contain only general statements relating to the evaluation of disabled children and due process procedures that provide protection of their rights, the regulations promulgated under IDEA set forth with great specificity evaluation and due process procedures concerning children with disabilities who, by reason thereof, need special education and related services. **34 CFR §§300.500-300.517**, **300.530-300.536**. The Rehabilitation Act regulations do require recipients of federal financial assistance to "adopt grievance procedures that incorporate appropriate due process standards and provide for the prompt and equitable resolution of complaints alleging any action prohibited by" the Rehabilitation Act regulations. **34 CFR §104.7(b)**. The Pennsylvania regulations that have been

adopted to satisfy the due process requirements of IDEA appear at **22 Pa. Code §§14.161-14.162**, while those that relate to due process under the Rehabilitation Act appear at **22 Pa. Code §15.8**.

Section 1983 allows an award of money damages for violation of IDEA and the Rehabilitation Act, and the latter independently permits an award of damages for violation of its terms. **Matula at 493-4.** However, before a civil action is filed under Section 1983 or the Rehabilitation Act regarding the rights of students with disabilities "seeking relief that is also available under" IDEA, the administrative procedures specified by IDEA must be exhausted. **20 U.S.C. §1415(l)**; **Matula at 495**; **Jeremy H. v. Mt. Lebanon School District**, 95 F.3d 272, 281 (3d Cir. 1996); **Charlie F. v. Board of Education of Skokie School District 68**, 98 F.3d 989, 991 (7th Cir. 1996).

The courts lack subject matter jurisdiction over an action where the plaintiff has not exhausted the administrative remedies relating to that action, unless exhaustion would be futile or inadequate. **Honig v. Doe**, 484 U.S. 305, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988). Exhaustion of the administrative process under IDEA "allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children." **Hoeft v. Tucson Unified School District**, 967 F.2d 1298, 1303 (9th Cir. 1992). While **20 U.S.C. §1415(l)** by its express terms does not require exhaustion of administrative remedies where the civil action filed does not seek "relief . . . also available" under IDEA, and while money damages are not available in the IDEA administrative process, that is not to say that the student and her parents may simply ignore that process, opting out of it merely by choosing to file a lawsuit for damages. **Charlie F. at 993**. Where available

administrative procedures are capable of providing relief, even if it is not the relief plaintiffs would prefer, exhaustion of the administrative process is necessary, to permit the education professionals with the requisite expertise to address the case and to provide a record for the Court in the event of an appeal. **Lindsley v. Girard School District**, 213 F.Supp.2d 523, 537-8 (W.D.Pa. 2002).

Here placement was proposed at Sarah Reed and, at no time, did plaintiffs or their parents object to that placement. In fact, plaintiffs' parents consented to the placement. They filed this lawsuit 22 months later and, even then, did not clearly complain of the placement. Had K.L. and R.P. been placed at Sarah Reed over their parents' objections the administrative process was capable of reversing that decision. But they could not have been placed at Sarah Reed without their parents' consent as Sarah Reed would not have accepted the placements without that consent. Under these circumstances this Court lacks subject matter jurisdiction to address any claim by plaintiffs that their placement at Sarah Reed violated IDEA or the Rehabilitation Act.

## Conclusion

It is respectfully submitted that the Court should determine that plaintiffs' claims (1) under Title IX against ESD for damages for the sexual assaults and the harassment that preceded those assaults, (2) under the Equal Protection Clause and the Equal Rights Amendment of the Pennsylvania Constitution against Ms. Woods and Ms. Cappabianca for damages for the sexual assaults and the harassment that preceded and succeeded those assaults and (3) under IDEA and the Rehabilitation Act for damages for the placement of plaintiffs at Sarah Reed may not proceed to trial and that summary judgment should be entered for Ms. Woods and against plaintiffs. This action should proceed to trial regarding the alleged liability of ESD under Title IX for the

harassment that succeeded the sexual assaults and the alleged liability of Ms. Cappabianca on

R.P.'s claim for defamation under Pennsylvania law.

Respectfully submitted,


/s/  James T. Marnen
James T. Marnen
PA I.D. No. 15858
KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.
120 West 10th Street
Erie, PA  16501
General Tel:   814-459-2800
Direct Dial Tel:  814-459-9886, ext. 203
Fax:    814-453-4530
E-mail:jmarnen@kmgslaw.com

Attorney for Defendants,
The School District of the City of Erie,
Pennsylvania, Janet M. Woods and Linda L.
Cappabianca

# 625322

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Richard P., by and for **RACHEL P.**, and<br>Denise L., by and for **KRISTINA L.**,<br><br>    Plaintiffs<br><br> v.<br><br>**SCHOOL DISTRICT OF THE CITY**<br>**OF ERIE, PENNSYLVANIA; JANET**<br>**WOODS**, Individually and in her Capacity<br>as Principal of Strong Vincent High<br>School; and **LINDA L. CAPPABIANCA**,<br>Individually and in her Capacity as<br>Assistant Principal of Strong Vincent High<br>School,<br><br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.  03-390 Erie<br><br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 19th day of August, 2005, a copy of the

within document was served on all counsel of record and unrepresented parties in accordance

with the applicable rules of court.


        /s/  James T. Marnen
        James T. Marnen

#628093