## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD P., by and for R█████P., and )
DENISE L., by and for K█████L., )
                    )
      Plaintiffs )
                    )
      v. )    Civil Action No. 03 – 390 Erie
                    )
SCHOOL DISTRICT OF THE CITY OF )
ERIE, PENNSYLVANIA; JANET WOODS, )
Individually and in her Capacity as Principal )
of Strong Vincent High School; and LINDA )
L. CAPPABIANCA, Individually and in her )
Capacity as Assistant Principal of Strong )
Vincent High School, )
                    )
      Defendants )

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 22ⁿᵈ day of November, 2004, a copy of the

within document was served on all counsel of record and unrepresented parties in accordance

with the applicable rules of court.

_____
James T. Marnen

# 582390

A000000036

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD P., by and for R███ P., and )
DENISE L., by and for K███ L.,       )
                                      )
            Plaintiffs                )
                                      )
        v.                            )    Civil Action No. 03 – 390 Erie
                                      )
SCHOOL DISTRICT OF THE CITY OF        )
ERIE, PENNSYLVANIA; JANET             )
WOODS, Individually and in her Capacity )
as Principal of Strong Vincent High   )
School; and LINDA L. CAPPABIANCA,     )
Individually and in her Capacity as   )
Assistant Principal of Strong Vincent High )
School,                               )
                                      )
            Defendants                )

## ORDER

AND NOW, this ____ day of _____, 2004, defendants' Motion for Judgment

on the Pleadings is hereby GRANTED.  Counts II and III of plaintiffs' Complaint are hereby

DISMISSED.

_____
Sean J. McLaughlin
United States District Judge

1             IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3   RICHARD P., by and for      :  No. 03-390 Erie
    R█████ P., and DENISE L., by :
4   and for K████████ L.,        :
                 Plaintiffs      :
5                                :      RECEIVED JAN 2 1 2005
            v.                   :
6                                :
    SCHOOL DISTRICT OF THE CITY  :
7   OF ERIE, et al.,             :
                 Defendants      :
8

9

10          Hearing in the above-captioned matter held

11      on Wednesday, January 12, 2005, commencing at

12      1:35 p.m., before the Honorable Sean J.

13      McLaughlin, Courtroom C, United States

14      Courthouse, 617 State Street, Erie, Pennsylvania

15      16501.

16

17

18  For the Plaintiffs:
        Edward A. Olds, Esquire
19      1007 Mount Royal Boulevard
        Pittsburgh, PA 15223
20
    For the Defendants:
21      James T. Marnen, Esquire
        Knox McLaughlin Gornall & Sennett, PC
22      120 West 10th Street
        Erie, PA 16501
23

24
            Reported by Janis L. Ferguson, RPR
25          Ferguson & Holdnack Reporting, Inc.

1

1                                    I N D E X

2

3       TRANSCRIPT OF THE PROCEEDINGS   . . . . . . . . . . .   3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Maybe the best way to do this is for

2    me to start out by saying this:  That I have two motions

3    before me.  One is the Plaintiff's motion to reconsider or a

4    sua sponte dismissed claim.  That's how it's styled.  Then I

5    have a motion for judgment on the pleadings filed by the

6    Defendant.

7          Let me say for the record, I went back and

8    looked at the record or my Order which has spawned the

9    Plaintiff's motion to reconsider, which, of course, was

10   entered in connection with a discovery dispute.  When I read

11   that, when I read my Order, I never entered judgment on any

12   of those claims, but I did express an opinion as to their

13   nonviability.

14         So with that having been said, it seems to me

15   the way to kill two birds with one stone is to turn to Mr.

16   Marnen's motion for judgment on the pleadings, because I'll

17   take up the same issue on the merits, which is the viability

18   of the substantive due process claim and the viability of

19   the equal protection claim.

20         MR. MARNEN:  Yes, Your Honor.  Thank you, sir.

21         There are, Your Honor, four counts in the

22   Complaint.  We're not concerned with the first or the last

23   count.  The first count is Title IX against the School

24   District, and the last one is the Pennsylvania Constitution

25   against the two individuals.

1          The ones that we are concerned with are the

2    second and third.  The second one is equal protection under

3    1983 against one of the individuals, Mrs. Cappabianca, and

4    against the School District, and the other is due process

5    against Cappabianca and the School District.  Woods is only

6    a Defendant on the fourth count.  Miss Cappabianca was the

7    assistant principal at Strong Vincent High School when these

8    events took place.

9          As a preliminary comment, I don't think that

10   the due process issue is -- I suspect we're in agreement

11   with respect to the due process issue, but there has been no

12   allegation of special relationship or state-created danger,

13   and, therefore, there is no cause of action alleged for

14   violation of due process against either Miss Cappabianca or

15   the School District, although I -- just for the sake of

16   completeness, I think Stoneking and D.R. versus Middle Bucks

17   clearly indicate those are nonviable causes of action in the

18   circumstances alleged here.

19          We have here, instead, a set of facts that

20   are classic Title IX facts.  We have student-on-student

21   harassment.  We do not have state action to that extent.  I

22   mean, we have an alleged awareness of that

23   student-on-student harassment and disregard of it by

24   Miss Cappabianca and by the School District.

25          The School District clearly cannot have

4

1    asserted against it the equal protection claim.  It's

2    obvious that, I think, under the case law, that the only

3    cause of action against the District is Title IX, because

4    the equal protection claim is subsumed under that.  I think

5    the hot issue here with respect to equal protection is

6    whether that claim may be asserted against Miss Cappabianca

7    because a Title IX claim cannot be asserted against her.

8              I would respectfully submit that the argument

9    made by the Plaintiffs that cases like Andrews versus City

10   of Philadelphia, which is a Title VII case, cannot just be

11   taken from Title VII and be slapped onto the situation we

12   have here, which is discrimination, alleged discrimination

13   in the education forum.

14             In Andrews versus Philadelphia and cases of

15   that nature, we have a duty established by Title VII.  We do

16   not have here a duty alleged.  Again, I think the special

17   relationship and the state-created danger requirements also

18   apply in the area of equal protection.  There is no state

19   activity here or state actor here.  We have here nonstate

20   actors; students harassing students.  And Congress, I would

21   respectfully submit, has promulgated Title IX as the

22   statutory way to deal with that.

23             So there is an overlap between whether equal

24   protection in 1983 affords a remedy and Title IX and whether

25   that subsumes all remedies in this area.

1              THE COURT:  Let me ask you this:  If the

2     Plaintiffs had alleged in the Complaint that male students

3     had been the object of similar sexual abuse or harassment,

4     but their complaints were dealt with promptly and

5     efficiently, would you still be making this equal protection

6     argument?

7              MR. MARNEN:  That is certainly closer to equal

8     protection.  Let me dodge that for one second -- I'll get

9     back to it -- and address one area of their -- of their

10    contention that I think is valid.  That a valid equal

11    protection claim has been alleged with respect to the

12    allegation that these two girls were punished by

13    Miss Cappabianca for what happened here, and should not have

14    been, but that was arbitrarily -- I think that's the kind of

15    affirmative action by a state actor you need in this area,

16    as opposed to not doing anything in the face of someone else

17    doing something; in the face of students harassing each

18    other.

19             THE COURT:  You mean punished for making the

20    complaints?

21             MR. MARNEN:  Being punished for making the

22    complaints, being punished -- I think the allegation is for

23    engaging in the conduct, being punished for acting badly,

24    alleging they did it and not the alleged harassers.  So I

25    think that kind of activity is a valid equal protection

1    claim.  I don't think, however, that neglecting the

2    situation is.

3            THE COURT:  Well, I have to admit to a little bit

4    of confusion.  Are you saying -- are you then conceding for

5    purposes of your motion that a portion of the equal

6    protection claim, at least certain portions of the factual

7    predicate for the claim, i.e., the punishment and that type

8    of thing, state a viable claim, or are you still saying it's

9    subsumed by Title IX?  It's not clear to me.

10           MR. MARNEN:  I'm saying that -- I guess I didn't

11   get to the Title IX there.  I was saying that it was not --

12   when you look at equal protection alone and forget about

13   Title IX for the moment, that alone, punishing someone for

14   arbitrary reasons, for discriminatory reasons would be a

15   valid equal protection claim.  However, I still contend that

16   Title IX subsumes the entire area.

17               We have made two arguments in our brief and

18   are making two arguments here why the equal protection claim

19   is not a viable claim.  One is the subsuming argument.  The

20   other one, we simply don't have a duty, except in the area

21   of punishment.  And in the area of punishment, again, Title

22   IX has taken over the area.  I think it's Congress' intent

23   here that sexual discrimination in the education place is

24   dealt with entirely by Title IX.  And the case law is clear,

25   of course, that there was no cause of action against anyone

1    but the recipient of grants under Title IX.

2        THE COURT:  You argue that there's no comparators;

3    there's no similarly situated people that have been pled in

4    this Complaint that allegedly fared better under the same

5    circumstances than the girls.  Does that argument have any

6    sway insofar as the punishment allegations are concerned?

7        MR. MARNEN:  I think it does.  The brief doesn't

8    talk about this.  I am now amending the position stated in

9    the brief; that the unfair punishment, I concede -- after

10   reading their brief and thinking about it -- would be, not

11   considering Title IX, a valid equal protection claim.

12       THE COURT:  All right.  In other words, the

13   distinction you're drawing is any allegation where it is

14   alleged -- because I can't rattle off all 150-some

15   allegations.  Any allegation where it is alleged that the

16   principals here intentionally -- and I use the term

17   discriminated, by virtue of either punishment or movement to

18   another school or anything that was in their direct

19   control --

20       MR. MARNEN:  Took affirmative action.

21       THE COURT:  -- you concede, for purposes of our

22   discussion here, the viability of the equal protection

23   claim.

24       MR. MARNEN:  Yes.  Independently of the issue of

25   whether Title IX subsumes that claim.

8

A000000045

1          THE COURT:  But you do not concede that Title IX

2     subsumes the claim.

3          MR. MARNEN:  I do concede that.  I have alleged

4     that.  They don't concede that.

5          THE COURT:  Let me say that again.  It is your

6     intention that Title IX subsumes the claim.

7          MR. MARNEN:  Yes, sir.

8          THE COURT:  But if it didn't subsume the claim, in

9     your view, they would at least have a partial legal

10    protection claim.

11         MR. MARNEN:  That's correct, Your Honor.

12         THE COURT:  All right.  Anything else you want to

13    tell me?

14         MR. MARNEN:  No, Your Honor, I think that's it.

15    Thank you.

16         THE COURT:  Well, one other thing, though.  If

17    they pled a viable claim for this direct type of harassment,

18    isn't that direct type of -- is the direct type of

19    harassment kind of a horse of a different color in terms of

20    a typical Title IX claim where you can be held responsible

21    for deliberate indifference for failing to discover conduct

22    by somebody else?

23         MR. MARNEN:  It's different in the area of sexual

24    harassment, yes.  But there are all sorts of Title IX causes

25    of action for affirmative actions by school people.

1          THE COURT:  Isn't there a stronger -- isn't

2     arguably a stronger argument for -- isn't there a stronger

3     argument that Title IX subsumes an equal protection claim,

4     where the equal protection claim is based solely on failing

5     to adequately monitor or supervise?

6          MR. MARNEN:  It is more compelling, Your Honor,

7     but I think it subsumes in both kinds of situations.  The

8     statute does talk -- I mean, it literally says no person in

9     the U.S. shall on the basis of sex be excluded from

10    participation in, et cetera, of education.

11         THE COURT:  All right.  Let me hear from Mr. Olds.

12         MR. OLDS:  Good afternoon, Your Honor.

13              I think that there probably -- after

14    reviewing the case law, the substantive due process claim

15    probably does have to go by the wayside.

16         THE COURT:  Not probably.

17         MR. OLDS:  So I won't spend too much time on that

18    one.

19         THE COURT:  I know a little bit about Stoneking,

20    and it does go.

21         MR. OLDS:  I understand that.  Okay.  I understand

22    that.  I saw your name there among the litigants in that,

23    so.  The --

24         THE COURT:  Among the lawyers.

25         MR. OLDS:  Among the lawyers, that's right.

A000000047

1    Your Honor, the equal protection claim, I
2 think, can really be -- let me just deal with the equal
3 protection claim first, and then I'll deal with Title IX.
4    The equal protection claim can be seen to
5 have two components.  One would be the component that you
6 discussed with Mr. Marnen, which is the punishment, the
7 distinctly separate treatment.  That the males here who
8 engaged in this sexual conduct stayed in the school; the
9 females were removed from the school.
10    THE COURT:  So that's your other class.
11    MR. OLDS:  That's right.  That's one.  That could
12 be one other class.  I think there could be other classes.
13 But say there was a fight, and they disciplined students who
14 were involved in a fight, but not involved in sex.  I mean,
15 it -- I don't know whether that would be strictly a
16 comparator, but it might be.  I mean, there might be similar
17 instances of student misconduct where if the school got
18 involved and disciplined the students for that kind of
19 activity, but did not discipline students for sexual
20 aggression, that might be equal --
21    THE COURT:  Clear enough for our purposes, for
22 present purposes, it's fair to say that there's no
23 allegations here that there were other comparators, if you
24 will, males, who were sexually abused, and yet they
25 responded promptly.

11

1          MR. OLDS:  That's correct.

2          THE COURT:  So the main thrust of your equal

3     protection argument is that girls were treated less

4     favorably than boys insofar as their treatment

5     post-revelation may have occurred here.  In other words, the

6     alleged perpetrators were treated better than the victims.

7     Is that essentially --

8          MR. OLDS:  That's correct.

9          THE COURT:  -- the essence of the claim?

10         MR. OLDS:  That's correct.

11         THE COURT:  Because they were women -- because

12    they were girls.

13         MR. OLDS:  That's right.  There was a

14    stereotypical outlook or standard that the administrators

15    had here that essentially punished the girls.

16         THE COURT:  All right.

17         MR. OLDS:  Now, the other sort of component of

18    equal protection claim, which is what Mr. Marnen was

19    discussing, which we base on Andrews, is that it's

20    analogous -- I mean, the Complaint alleges that after the

21    incident, there was harassment against the girls, and that

22    the girls went to the administrators, told them about the

23    incident, and the administrators ignored that harassment.

24    And what we have done with that is we have analogized that

25    to the employment environment, and we said that kind of

12

1    conduct would be -- violate the equal protection clause in

2    the employment area, and it would violate the equal

3    protection clause in the education area also.

4                    That, to be honest with you, Your Honor, I

5    haven't seen any cases one way or the other on that issue.

6              THE COURT:  All right.

7              MR. OLDS:  And so if -- I would think that if -- I

8    don't know how that would play out in terms of a summary

9    judgment or anything like that, but it is -- it is a fact

10   that we have alleged in the Complaint.  And I don't know

11   that if -- if it's conceded by Mr. Marnen that the equal

12   protection clause -- if we don't -- we have to deal with

13   Title IX yet.  But if it's in there, I mean, that might be

14   relevant evidence to our equal protection claim.

15                    And if I could just deal with -- I mean, do

16   you have any questions on that?

17             THE COURT:  Not on that.

18             MR. OLDS:  Okay.  Title IX, you know, there has

19   not -- I tried to do -- hit every case that discussed Title

20   IX in this situation.

21             THE COURT:  Right.

22             MR. OLDS:  I had not seen one case that held that

23   you couldn't maintain the Section 1983 action against

24   individuals.  Every case that has been decided since

25   Pfeiffer has found one way or another to allow 1983 cases to

1    be maintained against individuals.  Even I cited that one

2    Third Circuit case.  I think it was a good -- the Warren

3    versus Reading School District, where in discussing its

4    opinion, well, here we have a 1983 case against individuals

5    and a Title IX case against the School District, and

6    admittedly, there's no -- it's not necessarily -- not

7    necessarily that the issue was raised, but there has not

8    been one case that has said you can't maintain a 1983

9    action --

10           THE COURT:  There may not have been, but think

11    about it conceptually, though.  Liability under Title IX,

12    since there is no individual liability, liability is, in

13    essence, vicarious.  So it requires conduct by underlying

14    subordinates.  So even though they can't be sued

15    individually, it is still their conduct, violative of Title

16    IX, which imposes liability on the principal.

17           Aren't I bound by Pfeiffer on this point,

18    until something else comes along?

19           MR. OLDS:  Well, I would think -- I would say that

20    you are bound by Powell, which we cited in -- which is a

21    later case then Pfeiffer, where the Third Circuit seemed to

22    pull back from Pfeiffer and say, well, we weren't really

23    announcing a sea-clammer's doctrine; we were saying that

24    it's a Constitutional doctrine that you reach the statutory

25    issues first.

1          I think that we set up -- I understand what

2     you're saying.  I mean --

3          THE COURT:  Because I'm limited to Circuit, and

4     I'm not on the Circuit, and I generally try to follow what

5     they do.

6          MR. OLDS:  Follow the Circuit, that's right.

7     Well, I think that we cited this case of Powell, which

8     indicates that the Third Circuit has drawn back from that.

9     We have also cited other cases, Stoneking for one, this

10    Warren v. Reading School District is another, where the

11    Third Circuit has, you know, looked at these kind of

12    situations with 1983 and Title IX --

13         THE COURT:  There was no -- in Stoneking, I can

14    assure you, there was no Title IX claim.  In Stoneking, the

15    critical difference between Stoneking and this case, insofar

16    as 1983 is concerned -- we are arguing about something that

17    I think has essentially been conceded -- is Stoneking

18    established -- Stoneking held out the possibility of

19    individual 1983 liability on the part of supervisory

20    individuals, only because the perpetrator was a state actor.

21    That was the lynch pin.  In fact, Middle Bucks says that;

22    that was the lynch pin of Stoneking.  This case is exactly

23    like Middle Bucks.

24         MR. OLDS:  Except in this case, what we have

25    alleged is that the administrators themselves partook in

1   discriminatory conduct.  And so this case is different, I

2   think, from Middle Bucks, and is -- it might be unique in

3   the cases that have been decided in the Circuit --

4           THE COURT:  Isn't that the essence of a Title IX

5   claim, though?

6           MR. OLDS:  Well, yeah.  But then I would go -- I

7   don't -- I don't -- I guess that --

8           THE COURT:  Let me ask a practical question, then

9   you can finish your thought.  As a practical matter -- as a

10  practical matter, don't you get your full loaf under Title

11  IX?  What do you gain by equal protection?

12          MR. OLDS:  Well, I might have a claim for punitive

13  damages under equal protection, whereas under Title IX, I am

14  not certain that there is a claim for punitive damages.

15  Other than that -- and there might be a slightly different

16  standard in terms of there could be a different evidentiary

17  standard.

18          THE COURT:  Both would require an element of

19  deliberateness, though.

20          MR. OLDS:  Right.  Title IX says actual knowledge.

21  1983 says deliberate indifferent.

22              You know, the last time we were up here, you

23  talked about DiSalvio.  DiSalvio says, well, these people

24  only filed a 1983 claim, so we're not going to throw it out.

25  We're not going to say that just because they filed a 1983

16

A000000053

1    claim --

2            THE COURT:  Now, if you withdrew your Title IX

3    claim, I might view it differently.

4            MR. OLDS:  Well, that was the argument, that under

5    the Federal Rules of pleading, where I can plead

6    alternative --

7            THE COURT:  Well, that doesn't make -- with all

8    respect, that doesn't make any sense.  Because at the end of

9    the day, I have to face the issue, and I might as well do it

10   earlier, rather than later.

11           MR. OLDS:  Not necessarily, because down the road

12   I might say, well, I would rather proceed under a 1983

13   standard than a Title IX standard.  Right now, the way this

14   case looks to me, based upon the facts that we allege, Title

15   IX, I think that we might have to be able to prove actual

16   knowledge, because we acknowledge that the administrators

17   did certain things, and -- but the -- the -- I think that

18   though other -- I mean, the issue has been raised whether

19   Title IX bars actions against individuals, and the Courts

20   have uniformly said no.  I mean, the District Courts.  And

21   we cite those in the briefs.  And so, I guess --

22           THE COURT:  I think you misspoke.  You said the

23   District Courts have uniformly said -- well, that's right,

24   Title IX bars actions against individuals.  You're right.

25   It does.

17

1           MR. OLDS:  Right.  But then they have also said,

2    but we're going to let you pursue 1983 -- we're not going to

3    extend Pfeiffer.  That's basically what they said and what

4    Powell said, that other Third Circuit case has said.

5           So I think that given that, that you, if

6    you're going to follow Third Circuit law -- and I know that

7    you have.  If you look at Powell, you would say, well, it

8    appears that the Third Circuit has pulled back from

9    Pfeiffer, because I think Pfeiffer has been criticized quite

10   a bit.  The Third Circuit has pulled back from Pfeiffer, and

11   I'll take my lead from the later Third Circuit case.  And if

12   Pfeiffer is going to be extended, it will be extended by the

13   Third Circuit and not by me.  And that would be the approach

14   that I would ask you to take on the Title IX, 1983 claim.

15           THE COURT:  So to put a capper on it, then, it's

16   true to say that at least in this Circuit, we're waiting for

17   the case from the Circuit that specifically addresses the

18   issue which you're talking about.

19           MR. OLDS:  That's right.  And I don't believe that

20   there has been a case that specifically addresses it, right.

21   And the most recent case is we're going to step back, and

22   maybe we didn't analyze Pfeiffer -- you know, maybe Pfeiffer

23   didn't analyze that sea-clammer's question as closely as it

24   should have.

25           And I know that's not for you to decide, but

18

1  I don't think that you have to -- what all the other

2  District Courts have said, it's extended.  I don't think you

3  have to make affirmative law in favor of Pfeiffer.

4       THE COURT:  Is there anything else you want to

5  tell me?

6       MR. OLDS:  No, I don't think so, Your Honor.

7       THE COURT:  Then you can have a seat.  I have some

8  just general questions.  Refresh my discovery.  Where are

9  you on the discovery here?

10       MR. OLDS:  Well, we have -- we have exchanged

11  documents.  We haven't -- we have taken one deposition, and

12  we haven't taken any other depositions.  We're going to

13  start taking the depositions now, I guess.  We might have to

14  ask for one more enlargement of discovery in the case.

15       THE COURT:  I don't have my docket sheet here.

16       MR. OLDS:  There's been one so far.

17       THE COURT:  When does discovery close?

18       MR. OLDS:  In the middle of February, I believe.

19  I have a trial that starts in the middle of February.  I can

20  get a little bit done before then, but then I'll have to --

21  you know, I'll be out for the latter part of February.  We

22  anticipate probably less than 10 depositions on the

23  liability phase of the case.

24       THE COURT:  To conclude everything?

25       MR. OLDS:  Yeah.

1     (Discussion held off the record.)

2     THE COURT:  This is an Order:

3            Presently pending before the Court is a

4     motion to reconsider order or sua sponte dismiss claim, as

5     well as a motion for judgment on the pleadings.  To the

6     extent that the issues raised in the motion to reconsider

7     track the issues raised in the motion for judgment on the

8     pleadings, my disposition of the motion for judgment of

9     pleading will necessarily involve the disposition of the

10    other motion.

11           Defendant moves for a -- what is technically

12    a partial motion for judgment on the pleadings, with respect

13    to both the Plaintiff's substantive due process and equal

14    protection claims.  With respect to the substantive due

15    process claim, Defendant contends that a viable claim has

16    not been stated, relying on D.R. Barry versus Middle Bucks

17    Area Vocational Technical School, 978 F2d. 1364 (Third

18    Circuit 1992), and Duschaney (phonetic) versus Winnebago

19    County, 489 U.S. 189, 1989.

20           As I indicated in connection with my ruling

21    on the discovery dispute, I was of the impression at that

22    time that a viable claim had not been stated.  At oral

23    argument, counsel for Plaintiff concedes that a viable

24    substantive due process claim has not been stated.  That in

25    light of the previously described case law, consequently the

20

1  motion is granted in that regard.

2          Secondly, the Defendant contends that a

3  viable equal protection claim has not been stated, and in so

4  doing, the Defendant essentially makes two arguments.

5  First, that the Complaint fails to demonstrate that the

6  Plaintiffs received treatment different from that received

7  by other individuals similarly situated.  See, for example,

8  Andrews versus City of Philadelphia, 895 F2d. 1469 (Third

9  Circuit 1990).

10          Secondly, the Defendant contends that the

11  equal protection claim, the 1983 equal protection claim as a

12  matter of law is subsumed within Plaintiff's separate Title

13  IX claim.  At oral argument, the Defendant concedes, absent

14  the issue of Title IX, that those allegations directed at

15  purposeful or affirmative conduct by the individuals, such

16  as, for example, punishing the Plaintiffs, moving them from

17  schools, or otherwise treating them differently than, for

18  instance, those people -- those individuals who had been the

19  perpetrators facially is stated by the viable equal

20  protection claim.  The argument is raised, however, that in

21  this Circuit, the claim is subsumed.

22          Having carefully taken another look at this

23  issue, it remains my view today that the equal protection

24  claim under controlling Third Circuit precedent is, in fact,

25  subsumed within the Title IX claim.  See Pfeiffer versus

21

1    Warren Center Area School District, 917 F2d. 779 (Third

2    Circuit 1991), holding that 1983 claim was subsumed within

3    Title IX.  See also Bougher versus University of Pittsburgh,

4    713 F.Supp. 139, 145, Western District of PA, 1989, to the

5    same effect.

6                 I also note parenthetically that unlike

7    DiSalvio versus Lower Marion High School District, 158

8    F.Supp. 2d. 533 (2001), a Title IX claim was, in fact,

9    asserted in this case, a factor which the Court found

10   pivotal in DiSalvio.

11                With respect to the equal protection claim,

12   therefore, I am also going to grant the motion as well.  Let

13   me simply say this, though:  That -- perhaps this is

14   unnecessary to add.  That is without prejudice to the

15   Plaintiff's right to revisit that issue with me on further

16   motion in the event that there should be any material

17   development in the case law during the pendency of this

18   particular case.

19                And let me just say for the record, the

20   motion for judgment in pleadings is granted, and the motion

21   for reconsideration is denied.

22                Now, is somebody going to send to me, then, a

23   revised discovery scheduled?

24                MR. OLDS:  I'll take care of that, Your Honor.

25                THE COURT:  Will you?  All right.  And these cases

1    start to run together on me.  But is this the case where

2    there was some -- there was some concern by some of the

3    parents of some of the perpetrators whether certain records

4    could be obtained and that type -- is that all cleared up?

5              MR. OLDS:  That's been cleared up, with the

6    exception of there's a video of one of the Plaintiffs that

7    we have to come back to you or maybe give you an Order.  But

8    the other aspects of that have been cleared up.

9              THE COURT:  Okay.

10             MR. MARNEN:  Yes, sir.

11             THE COURT:  So that's all -- and on the discovery

12    extension, on this thing, I would think an additional 30

13    days would be -- additional 40 -- what did you want,

14    anyways?  How much time do you want?

15             MR. OLDS:  Discovery ends February 5th.

16             THE COURT:  Always more.

17             MR. OLDS:  Discovery ends February 5th.  I would

18    say at a minimum 60 days, preferably 90.

19             THE COURT:  No, we're not going to do -- I'll give

20    you 60 days.  Prepare an Order with 60 days.

21             MR. OLDS:  Thank you.

22

23             (Hearing concluded at 2:10 p.m.)

24

25

23

A000000060

1

2

3                    C E R T I F I C A T I O N

4

5        I, Janis L. Ferguson, a Court Reporter and

6    Notary Public in and for the Commonwealth of

7    Pennsylvania, do hereby certify that the foregoing

8    is a true and accurate transcript of my

9    stenographic notes in the above-captioned matter.

10

11

12

13

14        Registered Professional Reporter

15

16

17        Dated:  1-20-05

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD P. by and for R████ P. AND DENISE L. by and for K████ L., | ) ) ) ) | No. 03-390 Erie |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **Jury Trial Demanded** |
| SCHOOL DISTRICT OF THE CITY OF ERIE, PENNSYLVANIA; JANET WOODS, individually and in her capacity as Principal of Strong Vincent High School; LINDA L. CAPPABIANCA, individually and in her capacity as Assistant Principal of Strong Vincent High School, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

## Preliminary Statement

1. The Plaintiffs bring this action under Title IX of the Education Amendments of 1972, §901(a), *as amended*, 20 U.S.C. §1681, *et sequitur*; 42 U.S.C. §1983; and Article I, §26 and §28 of the Pennsylvania Constitution. Plaintiffs, who are female minors, were victimized by severe and outrageous sexual harassment in the fall and winter of 2001 while they were students at Strong Vincent High School, located in Erie, Pennsylvania. The harassment culminated in their being victims of a violent and criminal sexual assault

perpetrated by older students. Before and after the assault, Plaintiffs reported the peer to peer sexual harassment. The individual Defendants recklessly and intentionally violated state and federal law and did nothing to ensure that Plaintiffs would not be victims of sexual harassment. In fact, the individual Defendants eventually exacerbated the situation, by treating the Plaintiffs, who were 12 years old at the time, as if they were sexually promiscuous and willing participants in the violent sexual assault. Once the Plaintiffs' victimization became known throughout the school community, the Plaintiffs were treated to threats, taunts and teasing, and the Defendants did nothing to curtail this continued harassment, either. The boys who raped the Plaintiffs were not even removed from the school, and continued to be assigned to classes to which the Plaintiffs were assigned. Plaintiffs were unable to continue participating in the educational programs offered by the Erie School District and suffered profound mental, emotional and educational injury as a result of the events which are the subject of this action.

## Jurisdiction

2. This court has jurisdiction by virtue of 28 U.S.C. §1331 as the claims raised by Plaintiffs arise under federal law. Plaintiffs also request this court assume supplemental jurisdiction over their state law claims by virtue of 28 U.S.C. §1367.

## Parties

3.  Richard P., the father of R████ P., brings this action on her behalf.  R████ P. is a resident of the Western District of Pennsylvania.  She is currently fifteen years old.  Her date of birth is ████████ 1988.  Denise L., the mother of K██████L., brings this action on behalf of K██████ L.  K██████ L. is a resident of the Western District of Pennsylvania, and her birth date is ████████ 1989.  She is currently fourteen years old.


4.  The Defendants are: the School District of the City of Erie, Pennsylvania ("Erie School District"), which is a public and governmental entity charged with providing public education to residents of the city of Erie; Janet Woods, who was Principal of the Strong Vincent High School at the time of the events giving rise to these actions; and Linda Cappabianca, who was Vice Principal of the school at the time of the events giving rise to this action.


5.  The Erie School District, Cappabianca, and Woods acted under color of state law with respect to the actions which are the subject of this Complaint.  Cappabianca and Woods were policymakers for the Erie School District insofar as they were the highest administrators assigned to Strong Vincent.  Cappabianca and Woods

3

A000000064

were also the administrators with the power and authority to curtail the sexual harassment from which the Plaintiffs suffered.


## Statement of the Facts

### General Statement Applicable to Both Plaintiffs

6.  Plaintiffs were twelve-year-old girls in 2001.  R██████ P. and K███████ L. enrolled at the Erie School District's Strong Vincent High School at the beginning of 2001 as seventh graders. They each had resided outside the Erie School District the year before.  Both R█████ P. and K███████ L. were special education students whose education was governed by an Individualized Education Program (IEP).


7.  Strong Vincent High School tolerated a high level of offensive sexual conduct among its students.


8.  Enrolled as a seventh grader, the Plaintiff K███████ L. was sexually harassed by older students in the school throughout the fall of 2001. She reported the incidents to the Defendant Cappabianca who ignored K███████ concerns.  Cappabianca took no steps to stop the harassment directed at K███████

9.  Eventually, the unchecked sexual harassment culminated in a violent sexual assault on each of the Plaintiffs on November 27, 2001.  The assault was carried out by the older students who had been harassing K███████ L.

10.  Defendant Cappabianca was the school administrator responsible for discipline.  K██████ L. and R█████ P. immediately reported the assaults.  However, Cappabianca ignored the report of the violent sexual assault, as she had ignored the earlier reports of harassment.  She failed to report the assaults to appropriate criminal or child welfare authorities.  She also failed or refused to initiate school disciplinary policies and procedures that would have required an investigation and discipline of the offending students.  She even failed to remove the sexual predators from the Plaintiffs' classes.  The perpetrators of the assault were allowed to remain not only in the school but in the Plaintiffs' very classes, without any controls on their conduct or contacts with the Plaintiffs.

11.  After the rapes, K██████ L. and R█████ P. became the victims of vicious taunting by male students, which were accompanied by additional threatened sexual assaults.

5

12. Knowing that the assault had occurred, Vice Principal Cappabianca and Principal Janet Woods in turn victimized the Plaintiffs by suggesting, or insinuating, that they were at fault for the sexual assault.

13. On at least two occasions in December 2001, R███ P. only narrowly avoided further sexual assaults in the school building by the same group of aggressors. The Erie School District's failure to take remedial steps encouraged other students to join in the harassment of the Plaintiffs.

14. Eventually, criminal charges were filed against the individuals who perpetrated and organized the sexual assault. The males who had assaulted R███ P. and K███ L. were convicted of delinquency in juvenile court proceedings and the female who had organized the activity was convicted, as well. Upon information and belief, the School District was aware that one of the boys who was involved with assaulting Plaintiffs had a prior history of sexual molestation of young girls.

15. Each of the Plaintiffs was severely psychologically damaged by the conduct not only of the aggressors but of school officials as well. The girls were forced to withdraw from Strong Vincent and were placed in residential treatment centers for

disturbed juveniles. Their educational progress has been significantly and, in all likelihood, permanently disrupted.


## Particularized Facts Applicable to the Plaintiffs

### K███████ L. v All Defendants

16. K█████ L. is currently 14 years old. Her date of birth is ███████ 1989. K███████ moved to Erie, Pennsylvania, from Meadville, Pennsylvania, as she was beginning seventh grade. K███████ was enrolled in Strong Vincent High School in Erie at the beginning of the 2001-2002 school year. Because of language problems and borderline normal intelligence, she was placed in the Learning Support program.


17. Almost immediately upon enrollment, K███████ then 12 years old, a petite, pretty, and slow-learning girl, became the prey for a group of predatory older students who bullied her. At first they called her stupid and retarded, then escalated by saying sexually aggressive things to her. K███████ followed school instructions by reporting the harassment to Assistant Principal Linda L. Cappabianca as well as to various teachers. K███████ was told to "suck it up" and ignore her harassers. K███████ mother also talked to the Defendant Cappabianca, to no avail.

18. K█████ continued to bring the increasingly frightening behavior to the attention of teachers and administrators, but her complaints were routinely disregarded. For example, K█████ told the Principal, Mrs. Woods, the Assistant Principal, Ms. Cappabianca, and a teacher, Ms. Scully, that an older student, C█████ B., had threatened to take her into the bathroom and force her to perform oral sex on him. When K█████ became increasingly emotional about the harassment, the response of the teachers and administrators was to criticize her for complaining.

19. The students who were harassing K█████ -- C█████ B., A█████ K., and B███ C. -- were also in K█████ classes. K█████ became so frightened of the group that one day she hid in the restroom rather than encounter the students in her class. For this action, Ms. Cappabianca punished K█████ by placing her on after school detention ("P.A.S.S." (Program for After-School Suspension)) for one week. This punishment required K█████ to remain after school until 6:30 p.m.

20. On Tuesday, November 27, 2001, K█████ was serving the first day of her "P.A.S.S." discipline. For some reason, K█████ was released early from detention, with no notification given to her mother. Even though the school was responsible for the "P.A.S.S." students until 6:30 p.m., there were no teachers or

8

administrators posted outside the school to protect a student such
as K███████ who was released early.

21.    While waiting for her mother, K███████ was grabbed by
C██████ B.  He pulled her into a corner behind the laundromat that
was across the street from the school. He forced her head back and
violently compelled her to engage in forced oral sex.

22.    K████████ got away from C██████ B. and ran into the
laundromat. Ordinarily there was an attendant at the laundromat and
K██████ felt safe waiting there.  Unfortunately, on that day there
was no attendant.  Instead, B█████ C., another student who had been
harassing K█████████ was there.  She hit K█████████ in the head with
an object and threatened to hurt K████████ if she told anyone about
what C██████B. had done.  Again, K████████ ran away, this time to
an area outside the school.  When K████████ mother found her,
K███████was still hiding.  She did not tell her mother what had
happened.

23.    The day after the attack, K████████ told one of her
teachers and Ms. Cappabianca about the attack.  Ms. Cappabianca's
response was that K███████ should not have engaged in this
activity, that it was something done by people in love.  Ms.
Cappabianca failed to follow mandatory procedures for reporting

9

abuse of a minor to appropriate juvenile authorities.  She failed to initiate school discipline policy regarding assaults and sexual harassment.  The perpetrators of the violent sexual assault were not removed from the school, the police and child welfare workers were not contacted, and no effort was made to separate K█████ from C█████ B. and B████ C.  K█████ was forced to sit in the classroom with her assailants on a daily basis.

24.  When it became clear that school officials and teachers would not help her, and that C█████ B. and B████ C. would be free to continue to victimize her, K█████ became very withdrawn and severely depressed.  On January 4, 2002, she intentionally burned herself and was admitted to Millcreek Community Hospital.  She finally told her mother, Denise L., about the rape and advised her of the knowledge of Ms. Cappabianca and her teachers.  The next day Denise L. went to the school and confronted school officials with this information.  Ms. Cappabianca and another school official admitted to knowing about the rape and told Mrs. L███ that they were "dealing" with it.

25.  The school counselor came to a meeting at the hospital and said K█████ was being removed from Strong Vincent because other students were harassing her because of the rape.  K█████ was then removed from the school and placed at Sarah A. Reed

10

Children's Center, ostensibly for her safety.  Following that placement she was enrolled in a different Erie public school.  Her behavior became increasingly violent and suicidal and she is now in a residential treatment center, as a result of the conduct complained of herein.  K█████ was driven from the Erie School District by the sexual harassment from which she suffered and can no longer attend public school in the Erie School District.


## R█████ P. v All Defendants

26.  R█████ P. also was enrolled as a seventh grader in Strong Vincent High School in September of 2001.  She and her family had recently moved to Erie from Arizona.


27.  R█████ P.  had become friends with K█████ L., and on November 27, 2001, when Denise L. could not find K█████ because K█████ had been released early and assaulted by other students, R█████ P. became involved in looking for K█████ L.  R█████ P. stumbled upon the students who had sexually assaulted K█████ L., and became the second victim of a violent predatory sexual assault that night.  The assault of R█████ P. included forced oral sex undertaken by two males, C█████ B. and A█████ K.  The sexual assault also occurred near the laundromat, across the street from Strong Vincent High School.  The incident also involved a physical

assault by the same female student, B█████ C.  R█████ did not confide in her parents concerning the assault.

28.    Within days of the sexual assault, R█████ P. also advised Assistant Principal Cappabianca as well as a substitute teacher  of the incident. She reported to  Cappabianca that two males had forced her to engage in oral sex against her will, and that a female student had attacked her and threatened to attack her for resisting the sexual assault.

29.    R█████ began seeking Cappabianca's protection as she became the target of taunts and threats  from other students who learned that she had been sexually assaulted.   When R█████ complained that students were taunting her, threatening her and harassing her over the incident, Cappabianca called R█████ P. a "filthy little girl" and told R█████ P. that she was aware of what R█████ P. was doing.

30.    Cappabianca, although empowered to discipline the students who assaulted R█████ P. and who were harassing  her on an ongoing basis, did nothing.    Cappabianca, however, imposed an after-school detention on R█████ P., apparently for reporting the sexual attack which had victimized her.

12

31.  Several days later, Cappabianca telephoned Richard P. in R██████ P.'s presence and referred to R██████ P. as a "dirty little girl" and stated that Rachel had a "foul mouth" and advised Richard P. to punish or discipline his daughter.  She told Richard P. that R██████ P. was engaging in oral sex, without providing any other information to illuminate R████'s plight.  She gave him no information about the rape.

32.  Knowledge of the fact that R██████ P. and K███████ L. were victims of rape quickly spread throughout the school.  The fact that R██████ P., a 12-year-old, had been sexually assaulted became known to most, if not all, of the students and upon information and belief to most, if not all, of the faculty.  R██████ P. was shunned by female students and sexually harassed by male students. Throughout the month of December 2001, students at the Strong Vincent High School ridiculed, taunted and teased R██████ P., and repeatedly suggested, in lascivious and threatening fashion, that R██████ P. engage in oral sex.  Male students would accost her demanding sex.

33.  R██████ P. continued to seek the help or protection of Ms. Cappabianca on repeated occasions in December 2001.  She advised Ms. Cappabianca of the unbearable harassment she was experiencing. Ms. Cappabianca took no steps to end the harassment.  Instead,

13

Cappabianca once again referred to R██████P. as a "filthy little girl who needs to grow up."

34.  On at least two occasions in December, R██████P. was cornered by groups of students in the school and threatened with an impending sexual assault.  On one occasion, R██████P. was forced into a stairwell where she was surrounded by students, while a young male began threatening an imminent sexual assault.  As a teacher walked by the stairwell, R█████ seized the serendipitous opportunity to escape from the students.  When she tried to explain what had happened to the teacher, Ms. Cappabianca, who was in the vicinity, intervened and told R█████ to go to class.  On another occasion, a group of students cornered R██████P. in a hallway.  The students were sexually threatening and taunting R█████ in the plain view of Defendant Cappabianca.  Cappabianca yanked R█████ P. from the students' presence but did nothing to discipline the students who were harassing R██████ P.

35.  Cappabianca was aware of the rape incidents, by virtue of having been told by both R█████ P. and K███████ L.  After K█████ L. attempted to injure herself in early January 2002, Cappabianca scheduled a meeting with Richard P. and R██████P.  At that meeting, Principal Woods used graphic vulgar language to describe R██████ conduct.  The discussion occurred in the presence of R██████ P. and

14

her father.  Woods and other administrators advised Richard P. that the School District officials had been aware of the sexual assault but had done nothing about it.  A counselor informed Richard P. that oral sex was as common among students as shaking hands.  At this time, Woods told Richard P. that R████ P. had to be removed from the school for her safety.  The boys who assaulted her were allowed to remain in the school.

36.  After this meeting, Richard P. confronted Cappabianca who acknowledged and admitted that she was aware of the assault but had done nothing to report it.

37.  R████ P. was assigned to Sarah Reed in January 2002, which is a school for troubled children.  Following R████ P.'s reassignment from Strong Vincent, Richard P. learned that Defendant Cappabianca was advising other parents to keep their children away from R████ P. because of her purported sexual activity.

38.  During the course of the next several months, R████ P. suffered severe and significant emotional distress, depression, anxiety, self-hatred, and self-loathing, and threatened suicide. She was involved in violent incidents with her parents and committed to a psychiatric hospital on several occasions.

15

39.  In the fall of 2002, R⬛ P. was once again assigned to Strong Vincent High School.   On her first day there, she was subject to taunting, teasing and ridicule by the students and a police officer was called to escort her out of the school when she violently reacted to the sexual harassment.   R⬛ P. has been excluded from the educational program offered by the Erie School District because of the sexual harassment which she endured.

## Causes of Action

### Count I

### R⬛ P. and K⬛ L. v Erie School District, Claim Under Title IX

40.  Title IX of the Education Act provides, with certain exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."  20 U.S.C. §1681(a).

41.  The Erie School District receives federal financial assistance.

42.  The Erie School District had elaborate disciplinary policies that related to sexual harassment and assaults, among other disciplinary issues.  However, the policies did not spell out

16

how a victim was to report the assault or harassment. K███████ and R███followed the sparse directions given to students regarding reporting of problems, telling the Assistant Principal assigned to seventh graders, Ms. Cappabianca. There apparently was no effective investigative procedure in place because Erie School District officials did not undertake an investigation upon learning of the sexual harassment or the assaults.

43. The Erie School District had actual knowledge of the circumstances of the rape and subsequent treatment of R█████ P. and K███████ L. by teachers. Cappabianca and Woods were aware that K███████ L. and R██████ P. were victims of sexual harassment and the violent sexual assault. Knowledge of the rape and the sexual taunting and teasing faced by R█████ P. and K███████ L. on a daily basis had spread among the teachers, guidance counselors, and students. In the face of that knowledge, the administrators, teachers and counselors who had the ability to alter the situation, were deliberately indifferent to the harassment directed at R██████ P. and K███████ L. Consequently, the perpetrators were emboldened by the discovery that their activities would not be curtailed or punished. In effect, school officials became sponsors of the perpetrators' behavior. The misconduct in this case occurred on school property, during school time, and, in K█████████ case, immediately after school. The Defendants retained substantial

17

control over the conduct of the students who perpetrated the sexual harassment and assault.


44.    Rather than taking steps to immediately terminate the harassment and discrimination and devise ways that K██ L. and R██ P. would not be deprived of their right to education and their ability to enjoy a free and public education in an environment appropriate for them, the School District in fact turned the tables and treated R██ P. and K██ L. as if they were the sexual predators instead of the victims of a violent, degrading, and painful sexual assault, and the unbearable experience of taunting, shunning and sexual harassment that followed the assault.


45.    R██ P. and K██ L. have been excluded from the educational programs offered by the Erie School District because the sexual harassment  inflicted on them was so severe that they could not continue to bear the day-to-day trauma of being in school.

18

## Count II

### R████ P. and K██████ P. vs.
### Cappabianca and Woods
### Article I, §§26 and 28 Pennsylvania Constitution –
### Prohibition Against Discrimination Based on Gender

46.   Article I, §26 of the Pennsylvania Constitution outlaws discrimination by the Commonwealth or any political subdivision thereof.

47.   Article I, §28 of the Pennsylvania Constitution outlaws discrimination based on sex or gender.

48.   By virtue of having placed the Plaintiffs in harm's way, and by failing to protective the Plaintiffs from sexual assault, the Defendants abridged the Plaintiffs' rights under Article I, §§26 and 28 of the Pennsylvania Constitution.

## Count III

### R██████ P. vs. Linda Cappabianca

49.   After the incidents described in the Complaint, Linda Cappabianca had a meeting with a parent of a friend of R█████ P. The meeting occurred at Linda Cappabianca's instigation.

19

50.    In that meeting, Cappabianca said that "R███ was 'giving head' to boys or performing 'blow jobs' in school. She mentioned that this conduct was occurring in the gym, the basement, the bathroom, and the cafeteria." While she was telling the parent this, Cappabianca made a sucking motion with her mouth to show Johnson what R████had been doing to boys. Ms. Cappabianca also told Johnson that R████ had been caught doing these kinds of things in school. She also told Johnson that Cappabianca knew that R████ was engaging in sexual conduct at the "smokers' corner" or the laundromat near the school.

51.    These statements were not true.

52.  There was no privilege to confide the information to the parent.

53.  The statements were defamatory and suggested that R█████ P., a twelve-year-old girl, was sexually promiscuous, when, in fact, the opposite was the case, and she was a victim of a sexual assault. They were intended to ruin the reputation of R████ and cause her to be held in contempt and low esteem by her peers and the community, because they were made in front of one of R█████ friends.

20