54.    R████-P. suffered severe and significant injury as a result of the defamatory statement made by Cappabianca.    Her reputation was injured.

55.    The statements constitute slander per se, since they impugn R████ P.'s character and suggested that she was sexually promiscuous.

56.    WHEREFORE, R████ P. requests this Court assume jurisdiction over this state law claim and enter judgment in her favor in an amount in excess of $10,000.00 for compensatory and punitive damages.

### Injuries

57.    K████████ L. was subject to a violent sexual assault in spite of her repeated reports and efforts to secure relief from the sexually hostile educational environment to which she was subjected.    K████████ L. and R████ P. were subject to a persistent, intense and severe period of ostracism, taunting, teasing, threatened physical assault and other conduct at the hands of their peers, which centered on their being victims of the sexual assault. This harassment caused both R████ P. and K████████ L. to suffer severe emotional distress and mental illness.    Each was

A000000082

hospitalized on numerous occasions. K█████ L. attempted suicide and inflicted injuries upon herself. R█████ P. became withdrawn, violent, and spiraled into a period of self-loathing and engaged in self-destructive conduct. Each was denied educational opportunity and, in essence, deprived of the right to an education because of the conduct of the Defendants. The girls had to be separated from their families in order to receive residential therapeutic treatment.

## Relief

58.    R█████ P. and K█████ L. request this court assume jurisdiction over this case and enter judgment in their favor against the Defendants in an amount which compensates them for the injuries they have sustained. They also seek punitive damages against the individual Defendants and counsel fees, costs of this action, and such other relief as is just and appropriate.

Respectfully submitted,

_____
Edward A. Olds, Esquire
Pa. I.D. No. 23601
Carolyn Spicer Russ
Pa. I.D. No. 36232
Richard S. Matesic
Pa. I.D. No. 72211
1007 Mount Royal Boulevard
Pittsburgh, PA 15223
(412) 492-8975

A000000083

Richard P. v. School District                    Matthew Bogardus                    May 5, 2005

Page 1

1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    RICHARD P., by and for          :
     R██████ P., and DENISE L.,      :
4    by and for K██████ L.,          :
                 Plaintiffs          :
5                                    :
          v.                         :    Civil Action No. 03-390
6                                    :              Erie
     SCHOOL DISTRICT OF THE CITY     :
7    OF ERIE, PENNSYLVANIA; JANET    :
     WOODS, Individually and in      :
8    her Capacity as Principal of    :
     Strong Vincent High School;     :
9    and LINDA L. CAPPABIANCA,       :
     Individually and in her         :
10   Capacity as Assistant           :
     Principal of Strong Vincent     :
11   High School,                    :
                 Defendants          :
12

13

14

15

16          Deposition of MATTHEW BOGARDUS, taken before

17     and by Janis L. Ferguson, Notary Public in and

18     for the Commonwealth of Pennsylvania, on Thursday,

19     May 5, 2005, commencing at 10:23 a.m., at the

20     offices of Knox McLaughlin Gornall & Sennett, PC,

21     120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25          Reported by Janis L. Ferguson, RPR
            Ferguson & Holdnack Reporting, Inc.

A000000084

Richard P. v. School District          Matthew Bogardus                    May 5, 2005

---

Page 2

1    For the Plaintiffs:
2        Edward Olds, Esquire
         Lillian Akin, Esquire
3        1007 Mount Royal Boulevard
         Pittsburgh, PA 15223
4
5    For the Defendants:
6        James T. Marnen, Esquire
         Knox McLaughlin Gornall & Sennett, PC
7        120 West 10th Street
         Erie, PA 16501
8
9    For Sarah Reed Children's Center:
10       Marissa A. Savastana, Esquire
         MacDonald Illig Jones & Britton, LLP
11       100 State Street
         Suite 700
12       Erie, PA 16507
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1                    I N D E X
2
3    TESTIMONY OF MATTHEW BOGARDUS
4        Direct examination by Mr. Olds . . . . . . . 4
5        Cross-examination by Mr. Marnen . . . . . . . 39
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1    M A T T H E W   B O G A R D U S, first having
2    been duly sworn, testified as follows:
3
4        MR. OLDS:  This is the deposition of Matt
5    Bogardus.  But I want to just talk a little bit
6    about the document request that was served in
7    connection with the Rule 30(b)(6) deposition
8    notice of Sarah Reed Children's Center.
9        And we had a -- served a Rule 30(b)(6)
10   deposition notice concerning -- seeking documents,
11   I guess, that pertain to Sarah Reed's relationship
12   with the School District, Erie School District,
13   and documents pertaining to R▬▬ and K▬▬
14       So relative to -- we have received some
15   brochures, and I did receive those, and I
16   appreciate that.  There are -- there are no
17   contracts?
18   MS. SAVASTANA:  There are no contracts that we
19   have at all, so.
20   MR. OLDS:  Do you know -- well, I'll get into that
21   in the next deposition.
22       And then I asked for you to produce any
23   documents you received from the Erie School
24   District related to these two --
25   MS. SAVASTANA:  Right.  And, again, we don't have

---

Page 5

1    any of those documents.
2    MR. OLDS:  And then I asked for documents
3    evidencing the progress, therapy, the behavioral
4    modification program, the educational program,
5    IEP's, or any documents evidencing the education
6    and therapy provided to R▬▬ P. and K▬▬ L.
7    MS. SAVASTANA:  Correct.  The IEP's are produced
8    by the Erie School District, if I am correct.
9    MR. OLDS:  Right.
10   MS. SAVASTANA:  There are no documents regarding
11   the behavioral modification program, educational
12   program, per se.  As for the progress and therapy,
13   they are all produced by a psychiatrist and
14   therapist at the Sarah Reed Center.  We were
15   unsure at this time -- there are a number of
16   authorizations and steps that Sarah Reed has to go
17   through in order to produce those documents.
18       So it would be something we can discuss after
19   the depositions, if we want to go that route.
20   But, otherwise, due to the privilege, we have
21   to --
22   MR. OLDS:  That's fine.  And we might have those.
23   MS. SAVASTANA:  Right.
24   MR. OLDS:  I know that I asked for some, but I
25   didn't know if we had a complete set of the Sarah

---

Ferguson & Holdnack Reporting, Inc.

Page 6

```
 1      Reed records.
 2      MS. SAVASTANA:  Correct.  We can discuss that at
 3   any time.
 4      MR. OLDS:  And then I had -- there was a document
 5   request about, you know, the descriptions of the
 6   programs provided.  Nothing like that?
 7      MS. SAVASTANA:  We don't have any of that.  That's
 8   all covered in literature and brochures.  We don't
 9   keep statistic reports or descriptions regarding
10   the programs.
11         Same thing with regard to the program in
12   which K█████ and R████ were placed.  They don't
13   keep records regarding that, so it was a little --
14   we don't have them.
15      (Discussion held off the record.)
16
17            DIRECT EXAMINATION
18   BY MR. OLDS:
19
20      Q.  Mr. Bogardus, my name is Ed Olds, and I represent
21   R████ P. and K██████ L., who have filed a lawsuit against
22   the Erie School District, Linda Cappabianca, and Janet Woods
23   concerning circumstances that happened at the Erie School
24   District.  And the girls eventually were placed in Sarah
25   Reed, and so we wanted to take your deposition, just to see
```

Page 7

```
 1   what -- if you have any knowledge that's relevant to the
 2   case.
 3      A.  Okay.
 4      Q.  Okay?
 5      A.  Um-hum.
 6      Q.  I'm going to ask you some questions.  It's best if
 7   you let me finish a question before you start to answer.
 8   When we talk to each other, oftentimes we interrupt.  But
 9   when you do that at a deposition, the record is unclear.
10      A.  Okay.
11      Q.  So if you let me finish a question, I'll let you
12   finish an answer, and we'll have a clear record.
13      A.  Okay.
14      Q.  And you have to -- it's best, when there is a yes
15   or no question, if you answer yes or no, instead of uh-huh
16   or huh-uh, that might be spelled the same way, so.
17      A.  Okay.
18      (Discussion held off the record.)
19      Q.  Mr. Bogardus, for the record, what is your
20   business address?
21      A.  █████████, Erie, PA 16503.
22      Q.  And how do you -- your full name is Matthew --
23      A.  -- Robert Bogardus.
24      Q.  Bogardus.  How long have you worked for Sarah Reed
25   Children's Center?
```

Page 8

```
 1      A.  Almost 19 years.
 2      Q.  And what do you do -- currently what do you do for
 3   Sarah Reed?
 4      A.  I'm an intake supervisor.
 5      Q.  And how many people work under you?
 6      A.  Nobody.
 7      Q.  Are you the only intake supervisor?
 8      A.  For our outpatient program, yes.
 9      Q.  Are there other intake supervisors for other
10   programs?
11      A.  Yes.
12      Q.  And who are they?
13      A.  Dennis Walsh, Kathy Pelc.
14      Q.  Pelc, P-E-L-K?
15      A.  C.  P-E-L-C.
16      Q.  P-E-L-C.  And do you have the same position today
17   that you had in 2002 --
18      A.  Yes.
19      Q.  -- January of 2002?
20      A.  Yes.
21      Q.  And were Dennis Walsh and Kathy Pelc employed in
22   January of 2002?
23      A.  Yes.
24      Q.  What kind of intake does Dennis Walsh do?
25      A.  For residential services.
```

Page 9

```
 1      Q.  And what kind does Kathy Pelc do?
 2      A.  Our preschool program.
 3      Q.  Preschool.  Tell me, in terms of Sarah Reed, how
 4   many -- do you have an idea of how many students are offered
 5   education by Sarah Reed?
 6      A.  No.  I don't know the number.
 7      Q.  The outpatient -- I think that you said you were
 8   the intake supervisor of the outpatient program?
 9      A.  Yes.
10      Q.  And do you know how many students are in the
11   outpatient program?
12      A.  No.
13      Q.  Do you have an idea of -- well, maybe just to
14   start off with, tell me how prospective students come to
15   your attention, so that you can perform your intake
16   supervisor duties.
17      A.  Generally they are referred to us by the child's
18   school district.
19      Q.  And is there a -- does Sarah Reed offer
20   educational services, kindergarten through twelfth grade?
21      A.  Yes.
22      Q.  And do you deal with school districts statewide,
23   or is it more locally?
24      A.  Erie County.
25      Q.  Erie County.  Do you know, is Sarah Reed a private
```

Richard P. v. School District    Matthew Bogardus                        May 5, 2005

---

Page 10

1  entity, or does it not -- is it a governmental entity?
2      A.  Private.
3      Q.  Private.  Does Sarah Reed take students from
4  outside of Erie County?
5      A.  Yes.
6      Q.  Generally the Northwestern Pennsylvania area?
7      A.  Yes.
8      Q.  And a student comes to your attention, I think you
9  indicated, from -- as a result of a referral from the school
10  district?
11      A.  Yes.
12      Q.  Generally, can you describe for me what kinds of
13  students are referred to Sarah Reed.
14      A.  They would be experiencing social problems,
15  emotional problems, behavioral problems; somewhere in that
16  spectrum.
17      Q.  The problems that they are referred to you for,
18  are they problems associated with their education?
19      A.  I'm not sure I understand the question.
20      Q.  Well, I guess a child could have a social problem
21  at home, you know, and maybe not exhibit that social problem
22  in the school setting.  And do you take children who are
23  having social or emotional problems at home?
24      A.  Yes.
25      Q.  So they don't have to exhibit any kind of social

---

Page 11

1  or emotional problems at a school for Sarah Reed to take the
2  children.
3      A.  No.
4      Q.  So are there certain areas of, for instance,
5  social or emotional problems that you encounter more often
6  than others?  In other words, what kind of problems, what
7  degree of severity and what kind of problems do the children
8  present when they come to you?
9      A.  They could exhibit features of depression,
10  anxiety, some can be aggressive, some can be quite
11  noncompliant, some may have a psychosis.
12      Q.  Do all the children who come to you have IEP's?
13      A.  No.
14      Q.  Who makes the decision whether to admit a child to
15  Sarah Reed?
16      A.  We have a committee.
17      Q.  So in terms of the process of having a child
18  admitted to Sarah Reed, what is your job?
19      A.  If someone is going to make a referral, they would
20  contact me, and I would gather information from them and
21  take that then to the committee for the decision to be made
22  to accept.  And if we accept them, I meet with the client
23  and family to gather background information on the client.
24  And then there are consent and release forms that need to be
25  completed as well.

---

Page 12

1      Q.  So are you ever contacted initially by family
2  members?
3      A.  Yes.
4      Q.  So it's not always school districts that refer
5  students.
6      A.  No.
7      Q.  When school districts refer students, is it
8  typically the case that the students are having a social,
9  emotional, or behavioral problem relative to the school?
10      A.  Yes.
11      Q.  So do you get many referrals from school districts
12  of children who are having social problems at home?
13      A.  Yes.
14      Q.  Okay.  Without having problems at school.
15      A.  That would be rare.
16      Q.  Sarah Reed has different kinds of programs; is
17  that right?
18      A.  Yes.
19      Q.  Tell me what types of programs it has.
20      A.  We have the alternative education program; we have
21  outpatient services, which would be individual or family
22  therapy or psychiatric care; we have partial hospitalization
23  services.
24      Q.  Any others?
25      A.  And within the alternative education program,

---

Page 13

1  those outpatient or partial hospitalization services are
2  provided.
3      Q.  So you have an alternative ed. program.  An
4  outpatient therapy program?
5      A.  (Witness nods head.)
6      Q.  That's separate from the alternative ed.
7      A.  It can be, or it can be provided within the
8  program.
9      Q.  And then you have a partial hospitalization
10  program.
11      A.  Yes.
12      Q.  It can be or cannot be separate from the --
13      A.  Yes.
14      Q.  -- alternative ed. program.
15      A.  (Witness nods head.)
16      Q.  Can you tell me what you mean when you say
17  "alternative ed. program".  What is that?
18      A.  Alternative education would identify a placement
19  for a student outside of their home school or their home
20  district.  But then what is provided within the alternative
21  ed. program would depend upon the program or the agency
22  providing that placement.
23          So at Sarah Reed, we are providing clinical
24  services within the alternative education program.
25      Q.  And do you know what kind of clinical services are

---

Ferguson & Holdnack Reporting, Inc.

Richard P. v. School District                    Matthew Bogardus                    May 5, 2005

**Page 14**

1  provided?
2     A.  Psychiatric services, therapy services, and case
3  management services.
4     Q.  Why would a child come to Sarah Reed instead of
5  staying in their home school?
6     A.  It could be a variety of reasons.
7     Q.  Why don't you give me a couple.
8     A.  If they are experiencing emotional problems,
9  where, perhaps, they feel overwhelmed in the classroom,
10 can't really participate academically, they may look for an
11 alternate placement.  Behaviorally, if they are difficult to
12 manage, they may look for an alternate placement.  They may
13 look for assessment, if they are unsure of a difficulty,
14 such as a psychiatric assessment.
15    Q.  Are students admitted into the program to receive
16 a psychiatric assessment?
17    A.  In some cases, yes.
18    Q.  What kind of cases are those?
19    A.  If -- if they are uncertain if there is a
20 psychiatric disorder, but they may be displaying features
21 that have alerted someone, they would then look for the
22 psychiatric evaluation.
23    Q.  But would that be -- that would be a case where
24 they were exhibiting some kind of behavior in the classroom
25 that prompted somebody to have a concern that there needed

**Page 15**

1  to be a psychiatric evaluation?
2     A.  Yes.
3     Q.  Is it fair to say that the students admitted to
4  Sarah Reed, who are referred to Sarah Reed from other school
5  districts, who are having some problems in the classroom,
6  typically?
7     A.  Typically.
8     Q.  And that problem could either be an emotional
9  problem or a behavioral problem?
10    A.  Or social problem.
11    Q.  Social.  When you use the term "social", tell me
12 what you mean.
13    A.  If a child has anxiety, they may not be able to
14 interact with their peers, with teachers, and they may feel
15 overwhelmed and shut down.
16    Q.  Is there a certain level of severity of the social
17 problem that a child has to exhibit before they are a
18 candidate for Sarah Reed?
19    A.  No.
20    Q.  So, for instance, if a child isn't getting along
21 with a student next -- sitting next to them in class, that
22 child could be admitted into Sarah Reed?
23    A.  They could be referred.
24    Q.  Would Sarah Reed accept that child?
25    A.  It would -- we would need more information than --

**Page 16**

1  than that.
2     Q.  I mean, is it fair to say that there -- there's no
3  level of severity of problems that a child has to exhibit
4  before they are considered to be a candidate for Sarah Reed?
5     A.  Correct.
6     Q.  So any child who had a social problem -- for
7  instance, can't get along with the kid sitting next to them,
8  could be a candidate for Sarah Reed?
9     A.  We could consider them.
10    Q.  If you think that the child's only problem was
11 they couldn't get along with the kid sitting next to them,
12 they could be admitted to Sarah Reed?
13    A.  Possibly to outpatient therapy.  So what we would
14 provide, the level of care, might be determined by the
15 referral concern.
16    Q.  And what kind of behavioral problems do children
17 have to exhibit before they are admitted to Sarah Reed?
18    A.  Again, there's a variety.
19    Q.  Can you illustrate some for me?
20    A.  As I had mentioned, the aggressive behavior,
21 defiant behavior, not staying within the classroom.
22    Q.  In terms of children with IEP's, Sarah Reed is
23 considered an out-of-school placement; is that right?
24    A.  Yes.
25    Q.  So in the scheme of things for the

**Page 17**

1  least-restrictive educational placement, where does Sarah
2  Reed fit?
3     A.  We would be one of the most restrictive.
4     Q.  And I think that you said that -- do you
5  typically -- students with IEP's who were referred to Sarah
6  Reed, do you typically see a behavioral plan in the IEP?
7     A.  I don't review the IEP.
8     Q.  Okay.  So tell me what you review.
9     A.  Oftentimes there is not information, paperwork
10 sent to me.  It's sent to us after a student is admitted.
11 So it would be reviewed by the staff working with the child
12 at that time.  And I am no longer a part of the picture at
13 that point.
14    Q.  Do you remember K█████ L██ and R████ P█████?
15    A.  Yes.
16    Q.  Tell me how the referral of those two students
17 came to you.
18    A.  There has been more than one referral.  Which --
19    Q.  The first one.
20    A.  Um --
21    Q.  I think that was January of 2002, I believe.
22 Right?
23    A.  The school had contacted me at -- there had been
24 allegations made of sexual assault in school and also
25 harassment by other students.

A000000088

Richard P. v. School District　　　　Matthew Bogardus　　　　May 5, 2005

**Page 18**

1　Q.　Who contacted you from the school?
2　A.　I don't recall.
3　Q.　Would it have been someone from the school or
4　someone from the administration?
5　A.　I don't recall.
6　Q.　And you say there were allegations of sexual
7　assault and harassment from other students.  Is that the
8　first time that you encountered a referral to Sarah Reed
9　based upon harassment from other students?
10　A.　I guess I'm not quite understanding that question.
11　Q.　Well, someone from the School District called you
12　and said that there were two students with allegations of
13　assault and sexual harassment from other students.  Right?
14　A.　Okay.
15　Q.　And my question to you is, was that the first time
16　a school district called you for possible referral to Sarah
17　Reed because a student was being harassed by other students?
18　A.　I don't -- I really don't know.
19　Q.　Can you think of any other instances when that was
20　a basis of referral?
21　A.　I cannot.
22　Q.　And you don't recall who called you from the Erie
23　School District.
24　A.　I do not.
25　Q.　And what was the outcome of that conversation with

**Page 19**

1　the person from the Erie School District?
2　A.　The referral was made.
3　Q.　And do you know if the referral took a written
4　form?
5　A.　I don't believe so.
6　Q.　So what did you do after you had that conversation
7　with a person from the Erie School District?
8　A.　Then discussed the referral with our admissions
9　team.
10　Q.　And who was on the team?
11　A.　Back then, I don't recall.
12　Q.　And is that the entire amount of information that
13　you had; that there were two students who had been victims
14　of sexual assault and harassment from other students?
15　A.　Yes.
16　Q.　That was all you knew.
17　A.　Yes.
18　Q.　So what information did you take to the admissions
19　team?
20　A.　That information.
21　Q.　And what did the admissions team decide to do?
22　A.　To accept them.
23　Q.　What criteria did the admissions team use to
24　accept these students?
25　A.　The fact that there was a trauma.

**Page 20**

1　Q.　And then you got back to the Erie School District
2　with that information that the admissions team had decided
3　to accept the students?
4　A.　Yes.
5　Q.　Can you think of instances where the admissions
6　team has declined to accept students from a school district
7　referral?
8　A.　Yes.
9　Q.　Without revealing any names, maybe just give me a
10　general idea of the circumstances that that happened.
11　A.　A lack of consent.
12　Q.　On the part of the parent?
13　A.　Yes.
14　Q.　Any other instances?
15　A.　If there was already treatment involved.
16　Q.　Anything else?
17　A.　No.
18　Q.　And when you say if there was already treatment
19　involved, what do you mean?
20　A.　If there was already mental health treatment
21　involved, it might be assessed that we would be duplicating
22　a service; that we wouldn't need to provide a service at
23　that point.
24　Q.　What percentage of the day, if you know, is a
25　child given mental health therapy and counseling, once

**Page 21**

1　admitted to Sarah Reed?
2　A.　I don't know the percentage.
3　Q.　So after you got back to the Erie School District
4　and said the admissions team has agreed to accept these
5　students -- and by the way, do you remember when you called
6　to let the Erie School District know this was going to
7　happen?
8　A.　I don't recall.
9　Q.　What was the next step?
10　A.　For Sarah Reed?
11　Q.　Yes.
12　A.　At that point the School District will set up a
13　meeting with the parents to complete their paperwork.  And
14　also to offer them an intake time with me.
15　Q.　Now, you don't participate in the completion of
16　the paperwork; is that right?
17　A.　Not the Erie City School District paperwork.
18　Q.　And did you ever see the Erie City School District
19　paperwork on this case?
20　A.　Yes.
21　Q.　When was that?
22　A.　After the intake was set up with me, that packet
23　is given to me.
24　Q.　And what was in the packet, if you recall?
25　A.　They will include a release of information and a

Ferguson & Holdnack Reporting, Inc.

A000000089

Richard P. v. School District                Matthew Bogardus                May 5, 2005

---

Page 22

1  waiver.
2      Q.   A waiver of what?
3      A.   Parent must sign a waiver agreeing to the
4  placement at Sarah Reed and waiving their rights to a
5  hearing.
6      Q.   Okay.
7      A.   And if they are in special education, often the
8  packet will include an evaluation report.
9      Q.   Anything else?
10     A.   Anything additional would depend on the individual
11 student.
12     Q.   Do you recall specifically what you received
13 relative to R█████ P. -- R█████ P█████ or K█████ L█████
14     A.   I don't.
15     Q.   So at the intake meeting, who did you meet with?
16     A.   Parent and client.
17     Q.   Anyone from the School District?
18     A.   No.
19     Q.   Did you meet -- Rachel, did you meet with her
20 father or her mother?
21     A.   Father.
22     Q.   Do you ask typically, when you meet with a client,
23 do you ask, well, why are you coming here or what is your
24 interest in coming to this school?
25     A.   I ask if they have any questions pertaining to the

---

Page 23

1  placement.
2      Q.   Okay.  So when you meet with the -- tell me
3  what -- what you go through when you meet with the parent
4  and student.
5      A.   I ask for background information; the child's
6  mental health history, medical history, school history,
7  family --
8      Q.   Do you write that information down anywhere?
9      A.   Yes.
10     Q.   Then after you write that information down, what
11 do you do with that form?
12     A.   That's kept in the child's chart.
13     Q.   And do you remember any specific history that you
14 received from Mr. Polancy about R█████
15     A.   No.
16     Q.   What did they tell you about the incident that led
17 her to being considered for Sarah Reed?
18     A.   I don't recall.
19     Q.   And do you recall whether they had any questions
20 to you?
21     A.   I don't recall.
22     Q.   And then so what happens next?
23     A.   There are also consent and release forms that have
24 to be signed.
25     Q.   And where are those forms put?

---

Page 24

1      A.   Also in the child's chart.
2      Q.   And then Sarah Reed doesn't keep the chart when
3  the child leaves the school?
4      A.   Yes.
5      Q.   Oh, you do keep the chart.
6      A.   Yes.
7      Q.   And then after that admissions process, do you
8  have any further involvement with that case?
9      A.   No.
10     Q.   Do you know what happens after that admission
11 process with respect to creating a program for the child?
12     A.   I'm not a part of that.
13     Q.   And how many intakes do you do a year, do you
14 think?
15     A.   Between 2- and 400.
16     Q.   Do you know what program R█████ was put in?
17     A.   The alternative education program.
18     Q.   And that's a -- so she wasn't put in the partial
19 hospitalization program.
20     A.   That was provided in combination with the
21 alternative education program.
22     Q.   And do you know what a -- in terms of the
23 services, do you have any idea what services were provided
24 in connection with the partial hospitalization program?
25     A.   Partial provides the psychiatric assessment piece,

---

Page 25

1  the therapy piece, and the case management piece.
2      Q.   Now, do you remember the intake with K█████
3  Long?
4      A.   No.  Not specifically.
5      Q.   Do you have any idea -- do you know who paid for
6  the educational program that Sarah Reed provided to these
7  girls?
8      A.   The educational piece is paid for by the School
9  District.
10     Q.   What about the therapeutic piece; the psychiatric
11 assessment, therapy, case management piece?
12     A.   That would be insurance.
13     Q.   Whose insurance?
14     A.   The family's.
15     Q.   Do you have any idea what kinds of classes R█████
16 and K█████ were put into?
17     A.   No.
18     Q.   Do you have any idea concerning the percentage of
19 males and females, as they composed the student body?
20     A.   No.
21     Q.   When the Erie School District contacted you, they
22 mentioned both girls at the same time?
23     A.   I don't recall.
24     Q.   I have some documents that were previously marked
25 at a deposition, and I'm going to --

---

7 (Pages 22 to 25)

Richard P. v. School District                Matthew Bogardus                        May 5, 2005

Page 26

```
 1        MR. OLDS:  These were Moore and Manus, Jim.  Do
 2    you have those?
 3        MR. MARNEN:  Yes.
 4        Q.  I'm going to show you some documents, and as we go
 5    through there, I just have a couple questions about the
 6    document.
 7        Moore Deposition Exhibit 1 is an IEP Revision
 8    Review.  Do you ever seen that document, to your knowledge?
 9        A.  It may have been included in the packet that was
10    given to me.
11        Q.  There is a handwritten sheet of paper with a Bates
12    stamp at the bottom, 442.
13        A.  Yes.
14        Q.  You were referring to a consent or waiver form.
15    Is that the document, the waiver form that Sarah Reed
16    requests?
17        A.  We don't request it.  The waiver is -- the School
18    District has this done, not Sarah Reed.
19        Q.  But you won't accept the student unless the parent
20    signs it, right?
21        A.  The parent has to consent to placement with us
22    before we would accept them, before we would place them.
23        Q.  Right.  And my question is, is this the form of
24    consent that the parent signs?
25        A.  For the School District, not for Sarah Reed.
```

Page 27

```
 1        Q.  Not for Sarah Reed.  There is a different form
 2    that Sarah Reed has them sign?
 3        A.  Yes.
 4        Q.  That's a waiver.  Now, let me -- I'd like to
 5    direct your attention to the Document 445.  This is a -- you
 6    have probably never seen this document, but I just have a
 7    question about it.  This was a memo from Audrey Pecoraro,
 8    homeschool visitor.  Do you know her?
 9        A.  Yes.
10        Q.  Do you remember if you had any conversations with
11    her relative to these two students?
12        A.  I'm sure that I did.
13        Q.  And what might those conversations have been
14    about?
15        A.  To give her the intake dates.  She usually is the
16    one that meets with the family and gets the School District
17    paperwork signed and offers them an intake date with me.
18        Q.  Okay.  She wrote a memo to Frank Scozzie that
19    said -- this regards R▓▓▓▓ "R▓▓▓ P▓▓▓▓.  Date of
20    birth:  ▓▓▓▓88.  Referred to Sarah Reed:  Behavior
21    modification program, special education tract."
22        The term "behavior modification program", does
23    that have any meaning to you, as a Sarah Reed employee?
24        A.  No.
25        Q.  Do you know whether Sarah Reed offers a program in
```

Page 28

```
 1    terms -- that is designed for behavior modification?
 2        A.  That's a treatment modality.  It's a type of
 3    treatment that Sarah Reed does provide.
 4        Q.  So Sarah Reed does have a behavior modification
 5    program?
 6        A.  It's a part of treatment.
 7        Q.  Part of treatment.  So it's not a program --
 8        A.  No.
 9        Q.  -- it's a treatment.
10        A.  Type of treatment.
11        Q.  What other kinds of treatment does Sarah Reed
12    have?
13        A.  Individual therapy would be a type of treatment.
14    Group therapy, family therapy, psychiatric evaluation.
15    Those are all types of treatment.
16        Q.  Were you accepting R▓▓▓ P▓▓▓▓ for behavior
17    modification treatment?  Was that why she was admitted?
18        A.  No.
19        Q.  And she was admitted why?
20        A.  For the trauma that had occurred in school.
21        Q.  Well, that's why -- okay.  And I know you can't
22    speak for Miss Pecoraro.  Do you have any idea why she
23    thought Rachel was referred for the behavior modification
24    treatment?
25        A.  No.
```

Page 29

```
 1        Q.  I want to direct your attention to a document that
 2    was marked as Moore Deposition Exhibit 7.  So if you would
 3    go through there till you find that.
 4        A.  (Witness complies.)
 5        Q.  This is a memo to Jo Barker from Marlene Chrisman.
 6    Are you looking at the same document here?  Yeah, that's it.
 7    Dated 1/15/02.  It says, "Regarding b. mod. referrals."  It
 8    says, "The purpose of this memo is to provide information on
 9    the two students who are being referred to Sarah Reed per
10    Frank Scozzie.  Both girls were involved in a recent
11    situation at S.V. of that the nature and intensity of staff,
12    including Mr. Scozzie, feels this level of intervention is
13    essential.  Both girls are under the age of 15 and,
14    therefore, not eligible for the adolescent partial program,"
15    end quote.
16        Do you know what Miss Chrisman was talking about
17    when she said the girls weren't eligible for the adolescent
18    partial program?
19        A.  The adolescent program requires that a client is
20    14 years or older.
21        Q.  You have an adolescent program, I take it.  What
22    other programs are there?
23        A.  The elementary program, which would be under the
24    age of 14.
25        Q.  And that's a -- is that a partial hospitalization
```

Ferguson & Holdnack Reporting, Inc.

A000000091

Richard P. v. School District                Matthew Bogardus                                May 5, 2005

Page 30

1  program also?
2      A.  It can provide partial hospitalization.
3      Q.  And is it accurate that these girls were not
4  admitted into the adolescent partial program?
5      A.  If they were not 14.
6      Q.  Then do you know who at Sarah Reed would -- the
7  first document in this -- in Moore Exhibit 1 is an IEP
8  Review Revision. Do you know who at Sarah Reed would
9  interpret that and make sure that it was implemented?
10     A.  I do not.
11     Q.  Then what kind of -- after you complete the intake
12  process, just tell me the types of paperwork that you
13  complete and where the paperwork goes.
14     A.  All of the consent and release forms and the
15  intake that -- I complete. And then it is submitted to our
16  front office, where the chart is developed for the client.
17     Q.  Then the front office would take care of billing
18  or invoicing the insurance companies --
19     A.  Yes.
20     Q.  -- or invoicing the school district.
21     A.  Yes.
22         MR. OLDS:  Let's just take a break. I'm going to
23         take a break and look at my notes here, and maybe
24         we'll be done.
25         (Recess held from 11:07 a.m. till 11:20 a.m.)

Page 31

1      Q.  So I do have a couple more questions. Does Sarah
2  Reed have an outpatient program?
3      A.  Yes.
4      Q.  And what is the outpatient program?
5      A.  That would be the individual -- can be the
6  individual therapy, family therapy, can be psychiatric
7  medication management.
8      Q.  And a child who is taking advantage of that
9  wouldn't have to be in the educational component of Sarah
10  Reed; is that right?
11     A.  Correct. Correct.
12     Q.  So I guess a question arises in my mind, you
13  indicated that the committee accepted Rachel and Kristina
14  because they had trauma, right?
15     A.  (Witness nods head.)
16     Q.  You have to say yes or no.
17     A.  Yes. I'm sorry.
18     Q.  And why weren't they just accepted into the
19  outpatient program?
20     A.  They were referred specifically to the alternative
21  education program.
22     Q.  Now, when there is a referral to the alternative
23  education program, would you anticipate that the students --
24  that R█████ and K█████ were having some problems in their
25  classroom?

Page 32

1      A.  Not from the referral that I received. Because I
2  was specifically told the assault and the harassment.
3      Q.  But typically when you receive a referral for the
4  alternative education program, would you assume that
5  children are having some problems in their classes?
6      A.  I might assume.
7      Q.  Well, you don't even have to assume, because
8  you're the intake person. Isn't it always the case that
9  when kids are referred to the alternative education program,
10  that they are having some kind of social, emotional, or
11  behavioral problems in their classes?
12     A.  Yes.
13     Q.  Okay. And does it make a difference to Sarah Reed
14  whether the students are -- have an IEP or don't have an
15  IEP?
16     A.  No.
17     Q.  Okay. So you'll accept students in either
18  category.
19     A.  Yes.
20     Q.  Special ed. or non-special ed.
21     A.  Yes.
22     Q.  And did you ask the Erie School District why --
23  whoever you were dealing with at the Erie School District,
24  did you ask them why these girls who -- who had suffered
25  trauma, why they needed an alternative educational

Page 33

1  placement?
2      A.  No.
3      Q.  Okay. And is that because if you get a referral
4  for the alternative educational program, you will accept
5  that referral, even if the students don't need an
6  alternative education program?
7      A.  We would be looking at the clinical need, the
8  mental health need, or emotional needs.
9      Q.  But that could be satisfied on an outpatient
10  basis, right? Theoretically.
11     A.  Theoretically.
12     Q.  So, I mean, in terms of providing outpatient
13  services for students, is there anyone else in the Erie
14  area, aside from Sarah Reed, that offers those kinds of
15  programs?
16     A.  Outpatient?
17     Q.  Yes.
18     A.  Yes.
19     Q.  Who would that be?
20     A.  The Achievement Center, Safe Harbor, St. Vincent.
21     Q.  Do those institutions also offer alternative
22  education?
23     A.  Not that I'm aware of.
24     Q.  Now, I think there's an institution called Perseus
25  House that offers alternative education.

9 (Pages 30 to 33)

A000000092

Richard P. v. School District                Matthew Bogardus                May 5, 2005

Page 34

1    A. Yes.
2    Q. Would Perseus House and Sarah Reed be, to your
3 knowledge, the only schools in Erie that offer -- only
4 institutions in Erie that offer the alternative education
5 program?
6    A. At that time, I believe so.
7    Q. Since the referring comes to you for alternative
8 educational placement, do you consider whether it's
9 appropriate to just offer the partial -- the outpatient
10 hospitalization program?
11   A. Yes.
12   Q. You would consider that.
13   A. Within the alternative education program.
14   Q. Right. But in terms of, instead of, in lieu of
15 the alternative education program, would you consider
16 whether the outpatient therapy program would be sufficient
17 for these two? I mean --
18   A. That would be discussed in the --
19   Q. Among the committee.
20   A. Yes.
21   Q. You didn't recall who was on the committee at that
22 time.
23   A. No.
24   Q. How many people generally sit as that committee?
25   A. I would say an average number would be five.

Page 35

1    Q. Five. And what types of professionals sit on that
2 committee?
3    A. Supervisory staff, psychiatric staff.
4    Q. So there would be -- you were probably -- you
5 probably participated in that --
6    A. Yes.
7    Q. -- committee decision, right? And there would
8 probably be someone from the psychiatric staff who was also
9 there?
10   A. That would be a part of the decision making.
11   Q. Okay. And then would other supervisors be there?
12   A. Yes.
13   Q. So the other supervisors you named, might they
14 have been -- sat on that committee?
15   A. They may have.
16   Q. Okay. And in terms of the committee, as the
17 committee -- does it have periodic meetings, or does it --
18 are its meetings ad hoc?
19   A. At that time I don't recall how often we met.
20   Q. What about now? Are they ad hoc or --
21   A. Weekly.
22   Q. They are weekly.
23   A. Yes.
24   Q. Do you recall whether there were ad hoc meetings?
25   A. I don't recall.

Page 36

1    Q. Like someone walks in your door, you know, Monday
2 morning, saying I want to put my son or daughter in Sarah
3 Reed, could you convene a committee meeting that
4 afternoon --
5    A. No.
6    Q. -- to decide whether to accept?
7    A. No.
8    Q. So it would be put on some agenda, and it would
9 come up at the next meeting.
10   A. Yes.
11   Q. Next scheduled meeting.
12   A. Yes.
13   Q. Okay. And I think that -- excuse me if I'm -- I
14 just want to understand something. I think I asked you some
15 questions about the criteria that the committee used to
16 determine whether to accept these students.
17   A. Yes.
18   Q. Remember, I asked you that? I can't recall what
19 you said; what kind of criteria was used.
20   A. (No response.)
21   Q. I mean, what was the criteria that was used?
22   A. The referral concerns that were presented to us
23 would be considered. Other services that may already be in
24 place would be considered.
25   Q. Were you aware of whether or not either Rachel or

Page 37

1 Kristina were being counseled by Rape Crisis counseling?
2    A. No.
3    Q. Is that the kind of other services that you're
4 referring to that might be important for you to consider in
5 terms of whether to accept the student at Sarah Reed?
6    A. Yes.
7    Q. Do you know whether -- you don't know whether
8 Sarah Reed provided rape counseling therapy to Kristina or
9 Rachel; is that right?
10   A. No.
11   Q. You don't know. And the reason that these
12 students were considered for admission into the alternative
13 education program instead of the outpatient therapy program
14 is because the referral was made to the alternative
15 education program.
16   A. Yes.
17   Q. And I guess do you -- when you have a student --
18 it makes -- does it make a difference to you as an intake
19 supervisor whether a student has or doesn't have an IEP?
20   A. No.
21   Q. It makes no difference at all.
22   A. No.
23   Q. When you consider students for admission who have
24 IEP's, do you look at the IEP's?
25   A. I do not.

10 (Pages 34 to 37)

Ferguson & Holdnack Reporting, Inc.

Richard P. v. School District                Matthew Bogardus                May 5, 2005

Page 38

1    Q.   Okay.  And do you know whether the committee does?
2    A.   No.
3    Q.   You don't know, or it does not?
4    A.   I don't know.
5    Q.   Okay.  When students -- and if I'm revisiting old
6    ground, I apologize.  When students are referred to the
7    alternative education program, there is a behavior
8    modification modality, I think you said.  Is that right?
9    A.   It's a treatment modality.
10   Q.   Treatment modality, right.
11   A.   Yes.
12   Q.   And are there other educational modalities that
13   are offered by Sarah Reed, other than the behavior
14   modification program?  To your knowledge.
15   A.   Yes.
16   Q.   And what are they?
17   A.   That would be the individual therapy, family
18   therapy, group therapy, psychiatric services.
19        (Discussion held off the record.)
20        MR. OLDS:  I don't have any other questions.
21        MR. MARNEN:  I have a few, mainly because of a
22        poor memory.  But I will try to avoid overlap, but
23        I undoubtedly, inevitably will do that.
24
25

Page 39

1                    CROSS-EXAMINATION
2    BY MR. MARNEN:
3
4    Q.   Did you say you were on the committee that
5    determined whether these two girls would be admit or placed
6    at Sarah Reed?
7    A.   I present the case to the academic team.
8    Q.   You make the presentation to them, but you are not
9    part of the decision making --
10   A.   I am part of the decision making.
11   Q.   So it is about five people, and you are one of the
12   five?
13   A.   Yes.
14   Q.   Did I get this right?
15   A.   Yes.
16   Q.   And the referral here, if I remember this
17   correctly, was purely oral from someone at Erie School
18   District?
19   A.   Yes.
20   Q.   And the decision to accept or not accept was made
21   before you had the intake meeting with the families?
22   A.   Yes.
23   Q.   And the information that you made your decision --
24   you base your decision on was information supplied solely by
25   someone at the School District?

Page 40

1    A.   Yes.
2    Q.   And do you know whether that was one person or
3    more than one person?
4    A.   I don't recall.
5    Q.   Is there a person at the Erie School District with
6    whom you typically deal?
7    A.   Yes.
8    Q.   Who would that be?
9    A.   Audrey Pecoraro, the homeschool visitor.
10   Q.   Do you ever deal with Charlise Moore?
11   A.   Yes.
12   Q.   Do you ever deal with Marlene Chrisman?
13   A.   At that time, yes.
14   Q.   And do you ever deal with James Piekanski?
15   A.   No.
16   Q.   Charlise Moore, do you know if she's involved in
17   the special education at the School District?
18   A.   I believe she's the special education supervisor.
19   Q.   The referral here was to the alternative education
20   program?
21   A.   Yes.
22   Q.   And by "referral", what does that mean, exactly?
23   The District thinks the girls ought to go in that program?
24   Is that basically what that means?
25   A.   The referral would be -- if they feel -- that's

Page 41

1    their decision, then they would contact me, making that
2    referral, asking us would we consider that placement.
3    Q.   Them to that program.
4    A.   Yes.
5    Q.   And this may be an area where I'm getting into old
6    territory.  But is it possible to be at Sarah Reed in the
7    alternative education program only, without any therapeutic
8    services?
9    A.   We would -- we would be looking at providing
10   therapeutic services.  That's what Sarah Reed does.
11   Q.   Does anyone go to Sarah Reed ever and just get
12   educational services?
13   A.   Yes.
14   Q.   In this particular instance, would you be looking
15   at therapeutic services also?
16   A.   Yes.
17   Q.   With these two girls?
18   A.   Yes.
19   Q.   Why is that?
20   A.   Because the trauma that was reported to us
21   would -- would have indicated to our team that some type of
22   supportive service would be necessary.
23   Q.   In the absence of -- of a need for therapeutic
24   services, would these girls have been admitted?
25   A.   I don't know.

11 (Pages 38 to 41)

A000000094

Richard P. v. School District                 Matthew Bogardus                          May 5, 2005

Page 42

1    Q.  What therapeutic services were they admitted for?
2    A.  I don't recall.
3    Q.  That's in your records somewhere, that --
4    A.  Yes.
5    Q.  -- you don't -- you haven't decided -- you haven't
6  gone through all the hoops to produce yet.  Is that it?
7        MS. SAVASTANA:  Yes.
8    A.  Yes.
9    Q.  Would these girls have been placed at Sarah Reed
10  in the absence of consent from the families?
11   A.  No.
12   Q.  Why is that?
13   A.  Because we are providing mental health services,
14  we require the consent of the parent.  Under the Mental
15  Health Provisions Act, you have to have permission from a
16  parent for a minor.
17   Q.  And if I understand this correctly, Erie School
18  District does not dictate whether you accept a placement or
19  not?
20   A.  Correct.
21   Q.  That decision is made by Sarah Reed independently
22  of the District?
23   A.  Yes.
24   Q.  Were either of these girls at Sarah Reed at any
25  time prior to January of 2002, if you know?

Page 43

1    A.  Yes.
2    Q.  Do you have a recollection as to when they were
3  there?
4    A.  No.
5    Q.  Do you have a recollection as to whether they were
6  there more than one time?
7    A.  Prior to --
8    Q.  Yes.
9    A.  -- 2002?  No.
10   Q.  Do you have any recollection as to why they were
11  there?
12   A.  No.  I don't know the referral concerns.
13   Q.  Were they at Sarah Reed at any time after this
14  placement in January of 2002?
15   A.  Yes.
16   Q.  Can you remember the reasons and the numbers of
17  times?
18   A.  I don't recall the number of times.  I believe for
19  transition home from out-of-home placements.
20   Q.  At some point in time would Sarah Reed have
21  obtained medical records, including psychiatric records,
22  regarding these two girls, in terms of a history?
23   A.  Yes.
24   Q.  Would that have been within, let's say, 60 days of
25  their placement at Sarah Reed?

Page 44

1    A.  At intake, they would have signed releases to
2  obtain that information.
3    Q.  It's standard procedure to do that?
4    A.  Yes.
5    Q.  And you would have ascertained also where they had
6  received treatment?
7    A.  Yes.
8    Q.  And then those authorizations, requests for
9  information, would have been sent to places where they
10  received services at that time?
11   A.  Yes.
12   Q.  Did you take care of that process, or did somebody
13  else?
14   A.  I get the releases signed.  Our front office would
15  mail out those releases.
16   Q.  And when the information arrives, does it come to
17  you or does it come to someone else?
18   A.  It's usually -- comes to the front office.  If
19  it's addressed specifically to me, I would be given that
20  information.  If not, it's usually put into the child's
21  file.
22   Q.  Is that information used in some way at Sarah Reed
23  to provide services to residents -- to -- what do you call
24  them?  Patients?
25   A.  Clients.

Page 45

1    Q.  Clients, thank you.
2    A.  I myself do not know how the treatment team that
3  the child has would end up using that information.
4    Q.  All right.  The intake meeting -- I think I'm
5  covering old ground, but just to make sure, the intake
6  meeting, you had already made your decision whether these
7  girls would be placed there?
8    A.  Yes.
9    Q.  That is, the committee had made that decision.
10   A.  Yes.
11   Q.  Do you have any recollection inquiring of anyone
12  prior to the committee accepting the two girls in regard to
13  recent medical or psychiatric treatment of either of them?
14   A.  I'm sorry; could you repeat that?
15   Q.  Do you have any recollection today of inquiring of
16  anyone prior to the decision being made to accept these
17  girls as to whether these girls had received recent medical
18  or psychiatric treatment?
19   A.  I don't recall.
20   Q.  Would that be something you would inquire into?
21   A.  I would --
22   Q.  Typically?
23   A.  -- usually ask if they know --
24   Q.  If the family --
25   A.  If the referral source knows.

12 (Pages 42 to 45)

Richard P. v. School District                    Matthew Bogardus                              May 5, 2005

Page 46

1     Q.   If the referral source knows, okay.  Do you have
2   any recollection of finding out anything of that nature
3   concerning either K▇▇▇▇ or R▇▇▇▇?
4     A.   I do not.
5     Q.   When clients leave Sarah Reed, is any information
6   furnished to the referring source, such as Erie School
7   District, in this case?
8     A.   I don't know.
9     Q.   Not in your bailiwick?
10    A.   I'm not part of that.
11    Q.   You're at the front end, not the back end.
12    A.   Yes.
13       MR. MARNEN:  That's all I have.  Thank you.
14       MR. OLDS:  I don't have any other questions.
15          You can read this deposition, if you want, to
16       make sure that she's taken down your testimony
17       accurately, or you can waive signature.  It's up
18       to you.  Maybe you want to talk to your counsel
19       about making that decision whether -- you just
20       have to let the court reporter know whether you
21       want to read it or waive signature.
22    (Discussion held off the record.)
23    THE WITNESS:  I'll waive my signature.
24
25    (Deposition concluded at 11:40 a.m.)

Ferguson & Holdnack Reporting, Inc.

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 16 of 45

Richard P., et al, vs Eric School
Held: 4/4/05

Multi-Page™
A000000096

L. Cappabianca

```
 1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   RICHARD P., BY AND FOR      )
     R_____ P., AND DENISE L., BY )
 4   AND FOR K_____ L.,         )
           Plaintiffs            )
 5                               )
         vs                      ) Civil
 6                               )
     SCHOOL DISTRICT OF THE      )
 7   CITY OF ERIE, PENNSYLVANIA; )
     JANET WOODS, INDIVIDUALLY   )
 8   and in her Capacity as Principal )
     of Strong Vincent High School; )
 9   and LINDA L. CAPPABIANCA,   )
     Individually and in her Capacity )
10   as Assistant Principal of Strong )
     Vincent High School,        )
11           Defendants          )

12

13

14        Deposition of LINDA CAPPABIANCA, taken before

15   and by Linda K. Rogers, Commissioner of Deeds in

16   the Commonwealth of Pennsylvania and Notary Public

17   in the State of New York, on Monday, April 4,

18   2005, commencing at 1:04 p.m, at the law offices

19   of Knox, McLaughlin, Gornall & Sennett, 120 West

20   10th Street, Erie, Pennsylvania.

21

22

23

24

25            * * *
                                          Page 1
```

```
 1   For the Plaintiffs:
         Edward Olds, Esquire
 2       Carolyn Russ, Esquire
         1007 Mount Royal Boulevard
 3       Pittsburgh, PA 15223

 4

 5   For the Defendants:
         James T. Marnen, Esquire
 6       Knox McLaughlin Gornall & Sennett, PC
         120 West 10th Street
 7       Erie, PA  16501

 8

 9

10

11

12

13            * * *

14

15

16

17

18

19

20

21

22

23

24

25
                                          Page 2
```

```
 1        L I N D A   C A P P I A N   C A, first having

 2        been duly sworn, testified as follows:

 3

 4             DIRECT EXAMINATION

 5   BY MR. OLDS:

 6

 7   Q. Good afternoon, Mrs. Cappabianca.

 8   A. Good afternoon.

 9   Q. How are you?

10   A. Good, thank you.  And you?

11   Q. I'm pretty good.

12   A. And how was that ride?

13   Q. It was dry.  It was very pretty today.  What a

14   gorgeous day.

15        MR. OLDS:  Off the record.

16        (Discussion held off the record.)

17        MR. OLDS:  Back on the record.

18   Q. Ms. Cappabianca, for the record would you state

19   your full name and give us your address, your business

20   address will be fine.

21   A. Linda Louise Cappabianca, _____

22   Erie, Pennsylvania, 16505.

23   Q. Have you ever been deposed, Ms. Cappibianca, in a

24   deposition?

25   A. No.
                                          Page 3
```

```
 1   Q. Let me explain a couple of things here.  I am

 2   going to be asking you a series of questions.  I'm sure

 3   Mr. Marnen went over this, but I will be asking you a series

 4   of questions.  If any of my questions become too convoluted

 5   or don't make sense, tell me and I will try to rephrase

 6   them.

 7        If you let me finish a question before you start

 8   to answer, and I will let you finish an answer before I

 9   start the next question and this will help the reporter.  In

10   conversation we always interrupt each other because we sort

11   of know where we are going and we are just anxious to get

12   there.  But sometimes in a deposition when you look at a

13   question and you can't figure out what the question was if

14   you interrupt me, and I won't get your full answer if I

15   interrupt you.  So if you can just abide by that one ground

16   rule, and then the only other ground rule is it's best if

17   you say yes or no instead of unh-unh or um-hmm in the

18   appropriate -- when the occasion is appropriate, okay?

19        Have you lived in Erie all of your life?

20   A. All of my life.

21   Q. Are you a product of the Erie Public School

22   System?

23   A. No.

24   Q. Where did you to go high school?

25   A. Mercyhurst Prep.
                                          Page 4
```

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 17 of 45

Richard P, et al, vs Erie School
Held: 4/4/05

Multi-Page™
A000000097

L. Cappabianca

**Page 5**

1 Q. And you went to college at Edinboro; is that
2 right?
3 A. Edinboro University.
4 Q. When did you graduate from Edinboro?
5 A. Undergraduate May of 1991.
6 Q. And you pursued graduate studies there?
7 A. Yes, I did.
8 Q. When did you complete your graduate studies?
9 A. I think '99.
10 Q. And your graduate degree is in what area?
11 A. School administration.
12 Q. You started working with the Erie School District
13 in what year?
14 A. August of '91.
15 Q. What was your position?
16 A. Special education teacher, learning support sixth,
17 seventh and eighth grades.
18 Q. Your undergraduate degree was in what?
19 A. It was a dual certificate. It was elementary
20 education and special education.
21 Q. And you started in the learning support and you
22 started special education learning support, what kind of
23 classroom did you have?
24 A. A learning support classroom, which is LS, would
25 be initials for it, LS, and it was comprised of sixth,

**Page 6**

1 seventh and eighth grade students all in one classroom,
2 math. I taught strictly math that first year.
3 Q. How many students did you have in that classroom?
4 A. Roosevelt Middle School we had seven periods a day
5 so the numbers varied. My highest class I had 17 kids.
6 Q. You have taught in regular education classes as
7 well; is that right?
8 A. Yes.
9 Q. What is the difference between teaching in a
10 class, learning support class, and a regular classroom?
11 A. Learning support classroom you have an array of
12 different abilities, different levels. Many of them -- all
13 of them are below grade level. Regular classroom you have
14 an array of abilities, but many of them are on grade level,
15 above grade level, and below grade level. And then even in
16 the regular classroom you are still going to have kids that
17 are mainstreamed from the learning support classroom into
18 your regular classroom.
19 Q. In the learning support classroom is it all
20 individualized learning?
21 A. Yes.
22 Q. In a learning support classroom do you typically
23 have aides or are you the only --
24 A. I was the only one.
25 Q. And in the learning support classroom, say the one

**Page 7**

1 you had in 1991, what were the -- you taught sixth, seventh,
2 eighth grade?
3 A. Um-hmm.
4 Q. You indicated that everyone was below grade; is
5 that right?
6 A. Yes.
7 Q. Can you give me a range of the students'
8 capabilities or capacities?
9 A. I could. I had students that couldn't add single
10 digit numbers like one plus one and then I had kids that
11 could do like two digit multiplication.
12 Q. And you had, what, six or seven different classes
13 a day?
14 A. There was a seven period a day. I would have
15 taught six classes and one period would have been called a
16 prep period.
17 Q. And they were male and female in your class?
18 A. Yes.
19 Q. That first year that you taught in the learning
20 support classroom, did any of this children have emotional
21 problems in addition to learning problems?
22 A. Were they diagnosed with emotional problems?
23 Q. I guess, did you observe that there were emotional
24 problems?
25 A. No.

**Page 8**

1 Q. Does the school district provide learning support
2 for kids with emotional -- who are emotionally disturbed?
3 A. It wouldn't be called learning support, but, yes,
4 emotional support.
5 Q. That would be in a different classroom?
6 A. Yes. And not all buildings have emotional
7 support.
8 Q. What buildings have emotional support? Do you
9 know currently which buildings have emotional support?
10 A. Perry Elementary School, Roosevelt Middle School.
11 I don't know. We have 14 elementary schools, 3 middle
12 schools and 3 high schools.
13 Q. Another rule is --
14 A. Jefferson School, I think Lincoln School. I'm
15 sorry, I didn't mean -- I interrupted you. I did everything
16 you told me not to do.
17 Q. That's okay. I might have interrupted you. We
18 are only sort of looking for what you know. You don't have
19 to feel compelled. If you don't know what schools currently
20 have it, you don't have to feel compelled to give an answer.
21 After your first year of teaching where did you go next?
22 A. Glenwood Elementary School.
23 Q. What did you teach there?
24 A. Learning support, fourth and fifth.
25 Q. And did you stay there for one year or more than

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 18 of 45
Richard P, et al, vs Erie School    Multi-Page™
Held: 4/4/05    A000000098    L. Cappabianca

1 one year?
2   A. One year.
3   Q. After Glenwood where did you go?
4   A. I went back to Roosevelt Middle School.
5   Q. How long did you stay there?
6   A. Until I got my principal position.
7   Q. From approximately '92 to --
8   A. Let's see, '91, '92 I was at Roosevelt, '92-'93 I
9 would have been at Glenwood, then I would have been back '93
10 through, I believe I started at Vincent in '99-2000. Well,
11 it would have been 2000 because it was the latter half of
12 the year.
13   Q. When did you get your principal certificate?
14   A. '99.
15   Q. Would that have been May of '99 or was it at a
16 different time?
17   A. I think -- I am not sure, I think it was May.
18   Q. At that time you were teaching -- was it learning
19 support at Roosevelt Middle School?
20   A. No. When I left Glenwood and went back to
21 Roosevelt I was in sixth grade reading.
22   Q. Did you continue in this capacity for the
23 remainder of your time at Roosevelt?
24   A. Sixth or seventh, or both, yeah. Six and seven I
25 should say.

Page 9

1   Q. Did you get to pick the job you had in the sense
2 did you bid for that job?
3   A. The first two years when you are on like a
4 temporary contract the district places you where they need
5 you. After that, after your four semesters or your two
6 years, you do have what's called bidding rights, and I did
7 bid on Roosevelt, yes.
8   Q. You got your master's degree in May of '99, and
9 then do you recall when your administrative certificate came
10 in?
11   A. I'm not sure. It was basically around the same
12 time. I had to sit through a test -- no, they didn't have a
13 test that time, so it was all basically in May.
14   Q. You started at Vincent, that would be Strong
15 Vincent; is that right?
16   A. Yes, Strong Vincent High School.
17   Q. You started at Vincent sometime after January of
18 2000?
19   A. It was after President's Day because that's when I
20 actually got the phone call it was President's Day that they
21 asked me to go down to Vincent, it would have been 2000.
22   Q. Did you replace someone?
23   A. No, they added a position.
24   Q. At that time in 2000 what grades were there at
25 Vincent?

Page 10

1   A. Seventh through twelfth.
2   Q. Do you know if that is still the case?
3   A. No, ninth through twelfth.
4   Q. And you were -- tell me the process that you
5 followed in order to get the job at Vincent.
6   A. I had interviewed, it was actually the summer
7 before that or like September, it was right after school had
8 started. I was teaching at Roosevelt and I went down for an
9 interview and didn't hear anything from them. Then in --
10 President's Day is when I got the phone call from
11 Dr. Barker.
12   Q. Who did you receive a call from?
13   A. Did Dr. Burger, he is the superintendent of the
14 schools.
15   Q. Who interviewed you?
16   A. Ray Fiorelli, he is no longer with the district.
17 He was elementary curriculum director, I think it was
18 elementary and middle school curriculum director.
19 Dr. Linden, he was assistant superintendent. There was a
20 third person, I believe it was Frank Scozzie, who is now
21 assistant superintendent I don't know if at the time he
22 was.
23   Q. Who was the principal at Vincent when you --
24   A. Started?
25   Q. Started.

Page 11

1   A. Armendia Dixon.
2   Q. Did she leave at the end of that year?
3   A. Yes.
4   Q. And it became Janet Woods?
5   A. Um-hmm -- yes.
6   Q. And there was another assistant principal there;
7 is that right?
8   A. Two.
9   Q. Two other assistant principals; who were they?
10   A. There was a male principal his name was Patrick
11 Hart, he was for ninth through twelfth grade boys. And a
12 female principal, Mary Popadak and she was for the ninth
13 through twelfth grade girls.
14   Q. Principals, they were called principals?
15   A. Assistant principals.
16   Q. And they all reported to Armendia Dixon and then
17 Janet Woods?
18   A. Correct.
19   Q. And you did also; is that right?
20   A. Yes.
21   Q. Then you spent the rest of the 1999-2000 school
22 year at Vincent. And then did you spend the entire
23 2000-2001 year at Vincent?
24   A. Yes.
25   Q. And then how long after that did you continue to

Page 12

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 19 of 45
Richard P., et al, vs Erie School    Multi-Page™    L. Cappabianca
Held: 4/4/05    A000000099

1 work at Vincent?
2    A. 2001-2002 I was there. I was there two-and-a-half
3 years, then 2002-2003 I was at Harding.
4    Q. Is Armendia Dixon still an employee of the school
5 district; do you know?
6    A. She's a professor out at Edinboro University.
7    Q. What about Janet Woods?
8    A. She has retired.
9    Q. You went to Harding after you left Vincent?
10    A. Yes, I did.
11    Q. Where were you -- why don't you tell me, if you
12 can, what your duties as an assistant principal were?
13    A. At Vincent?
14    Q. Yes.
15    A. Because they are different now. I did mainly
16 discipline, seventh and eighth grade, attendance for the
17 seventh and eighth grade, some with the curriculum, that's
18 basically it.
19    Q. Physically where was, I guess your office. I've
20 never been in the building. If I walked in the front door,
21 where would I go to get to your office?
22    A. When you walk in the front door right on your left
23 would be the main office. Straight ahead of you would be
24 the auditorium, and then to your right would be the nurse's
25 office. Both to the left and the right are stairwells that

Page 13

1 go upstairs. I am located on the second floor, it was
2 actually a classroom. Once you get to the top of the steps,
3 okay -- I have to go back -- you turn left, there was a
4 short ways to get to the end of the hall. You take another
5 left, and I was like in the middle of that hall. It would
6 have been facing Washington Street, I would have been --
7    MR. MARNEN: Second floor, east wing?
8    THE WITNESS: Yes, yes.
9    MR. MARNEN: I'm just trying to shorten this up.
10    THE WITNESS: I'm sorry. I'm Italian, I'm long
11    winded.
12    Q. Don't worry. I just asked where you were to make
13 Jim happy here. He likes to put things in a geographic
14 area. So you had a classroom as an office?
15    A. I did.
16    Q. Did you have a secretary?
17    A. No.
18    Q. And how many -- do you remember how many middle
19 school students there were at Vincent in 2001-2002 school
20 year?
21    A. I can give you approximately.
22    Q. Why don't you do that?
23    A. I would say roughly 100 seventh graders, 100
24 eighth graders. I believe it's a little less than that,
25 but --

Page 14

1    MR. MARNEN: Did you say 100 seventh and 100
2    eighth, so a total of 200?
3    THE WITNESS: Right. I believe it is less than
4    that.
5    Q. Do you remember how many teachers there were who
6 taught the middle school students?
7    A. You want the whole middle school staff?
8    Q. At Strong Vincent.
9    A. Including related arts teachers?
10    Q. Yes.
11    A. Could I name them?
12    Q. Sure.
13    A. We had Mrs. -- Miss Scully, she was learning
14 support teacher, science and reading, I believe.
15 Mrs. Manus, English and social studies. Now these are LS
16 teachers. Mrs. Gray, reading and math LS. Miss Falkewitz,
17 science, regular science. Mr. Coburn, regular math. Now
18 these would be the related arts teachers. Mr. Graham,
19 music; Mr. Johnson, health; Mr. Burbee was the gym teacher,
20 I believe he did have a few middle school classes. Miss
21 Acke, gym; Mr. Lipchik, computer literacy. Art was Miss
22 Nischal, N-I-S-C-H-A-L, I believe it is, she did art. Okay.
23 Mr. Stubenhofer did a wood shop, may have had seventh and
24 eighth grade because sometimes they did and sometimes they
25 didn't depending on the schedule in the year. We had a

Page 15

1 Mrs. Burroughs who was a Title One teacher who provided
2 remedial math and reading to the kids. And then we had an
3 emotional support classroom. I'm not sure of the year, it
4 was either Mr. Romao (phonetic) or Mr. Glass, I am not sure
5 who was there that year. Miss Beard, she did science. Some
6 of these teachers only may have had one middle school class,
7 and the rest high school classes.
8    Q. Was the high school -- were the -- to what extent
9 were the high school and middle school students intermixed
10    A. Change of classes.
11    Q. They would be in the same hallway?
12    A. Yes. If they had to go to music, we were kind
13 of -- the whole east wing was just middle school. If the
14 high school student had to get to music class it was in the
15 corner of the east wing so they would have to travel through
16 the middle school. And, again, I am not sure if it was that
17 year, but I know like Mrs. Manus had a few high school
18 classes, so they would have to come through there to get to
19 Mrs. Manus' room. I this Miss Scully may have had a high
20 school class also.
21    Q. If Mrs. Manus and Miss Scully would have had a
22 high school class, would it have been a learning support
23 class?
24    A. Yes.
25    Q. Who was the music teacher?

Page 16

Case 1:03-cv-00390-SJM   Document 57-3   Filed 08/18/2005   Page 20 of 45
Richard P, et al, vs Erie School   Multi-Page™   L. Cappabianca
Held: 4/4/05   A000000100

**Page 17**

1   A. Mr. Graham. Mrs. Fisher, I think taught one
2   middle school class also.
3       Q. Who was the regular English teacher?
4       A. Mrs. Radov, I didn't say her. And Miss Pastore
5   taught reading, regular reading. What did I miss, social
6   studies? I may have missed social studies.
7       Q. Yes, social studies.
8       A. Okay. Mr. Pirrello, generally a high school
9   teacher, but I do believe he had one middle school class. I
10  am hoping I am not mixing my years up because I was there
11  two-and-a-half years. At one time he would have had middle
12  school, at least one class. Mr. Kitchen had social studies.
13      Q. Now, I think you indicated that your duties
14  consisted of discipline, attendance, something to do with
15  curriculum; is that right?
16      A. Um-hmm.
17      Q. Did you have -- were you a participant at all in
18  the IEP process?
19      A. Yes. On the back of an IEP there's required
20  signatures, and there's one that's called an LEA, and I'm
21  going to tell you I can't right now tell you what it stands
22  for, but that's usually an administrator's signature so,
23  yes, one of us is present.
24      Q. You indicated that -- I guess I have a couple
25  questions about the way the discipline process worked.

**Page 18**

1       A. Okay.
2       Q. From a practical point of view you became involved
3   in discipline if a teacher referred a child to you; is that
4   right?
5       A. Most of the time.
6       Q. Sometimes you might observe your own?
7       A. Right. Between the changes of classes, walking by
8   a classroom if I saw a student acting up. I was always,
9   nine times out of ten, in the cafeteria unless for some
10  reason I was needed elsewhere, so, yes.
11      Q. In a given day how much time -- well, how much
12  time would you spend in your office as opposed to being in
13  some other part of the building? Is it possible to
14  estimate?
15      A. It's ideal to be out and be visible because that
16  prevents problems from happening when you are -- the more
17  adults that are visible in the building. However, you spend
18  a lot of time disciplining. I don't know if I could give
19  you a percentage. I would say over 50 percent.
20      Q. So over 50 percent of your time would be in your
21  office handling one discipline or another?
22      A. Or the main office. It wasn't always -- you
23  didn't always deal with the child right in my office. It
24  could be in a classroom, could be in the main office. A lot
25  of times I worked together with Miss Woods. Sometimes I'd

**Page 19**

1   be in the nurse's office, depending on the situation.
2   Sometimes I would be in the SAP office, student assistant
3   program.
4       Q. There was some exhibit marked as Defendants'
5   Exhibit C.
6       A. Okay.
7       Q. And I am just going to show you that.
8           MR. OLDS: And you don't mind sharing, do you,
9       Jim, or do you want to get your own copy? Can I
10      just see that?
11          THE WITNESS: Absolutely.
12          MR. MARNEN: Off the record.
13          (Discussion held off the record.)
14      Q. First of all, this document, Exhibit C, that is
15  the discipline policy?
16      A. Right, yes.
17      Q. How would a -- I'm sure that in terms of being the
18  assistant principal there you had to sort of probably know
19  the document pretty well; is that right?
20      A. Yes. (Witness moved head up and down.)
21      Q. How would a discipline problem, if it was a
22  teacher referral, how would that come to your attention?
23      A. We had discipline referral forms which were like
24  triplicate, and they would write down a brief description of
25  what took place and send that form to the office with the

**Page 20**

1   student.
2       Q. So by the time the discipline referral form was
3   created the teacher had already exhausted whatever methods
4   the teacher might use to control the child and would decide
5   to refer the child to you for handling; is that right?
6       A. Yes.
7       Q. On a given day how many students might come to
8   your office like that?
9       A. Ten.
10      Q. Was there a certain number of the students sort of
11  part of the student population that repeatedly came to your
12  office?
13      A. Some.
14      Q. When you would receive the teacher referral slip
15  along with the student, what would you typically do with the
16  referral slip?
17      A. I would read the referral, find out what the
18  actual infraction was. Most of the time you always listen
19  to both sides of the story. You want to hear what the
20  student has to say, and then you read the referral. Many
21  times you have to actually go to the teacher for a more
22  detailed explanation of what happened and then it was up to
23  me to decide, what, if any, punishment should be given.
24      Q. Now the referral process, the referral slip, you
25  say it was a document that included three copies?

Richard P, et al, vs Eric School
Held: 4/4/05

Multi-Page™
A000000101

L. Cappabianca

---

**Page 21**

1    A. Triplicate.

2    Q. Triplicate.

3    A. I'm sorry, I keep cutting you off. I would keep a

4 copy.

5    Q. You're doing very well.

6    A. I would keep a copy. There was like a white, a

7 yellow and a pink. I would keep a copy, the counselor would

8 get a copy, and then the referring teacher would get a copy.

9    Q. And the counselors, what counselors were there?

10    A. We had Mr. Bufalino and Mrs. Dillon.

11    Q. Now, I have heard the name Chris Rule.

12    A. He was a mental health counselor.

13    Q. Do you know what his duties were?

14    A. He was part of our student assistance program, so

15 he held different groups depending on the needs of the

16 student. It could be an anger management group. It could

17 be like a loss of a parent group, which we never had, but I

18 mean, depending on the needs of the students. We have

19 different groups. He would pull kids out of class and talk

20 to them. This was all once the child was referred to SAP,

21 it had a parent consent before you could do any of these

22 things.

23    Q. Do you -- the discipline, I guess they're called

24 discipline referral forms; is that right?

25    A. Yes.

---

**Page 22**

1    Q. Do you have any knowledge of whether the

2 discipline referral forms that pertained to my client,

3 either K█████ L█████ or R█████ P█████ were lost or

4 destroyed?

5    A. I believe they were destroyed.

6    Q. Tell me how that happened. First of all, you

7 indicated there were three copies or three triplicate,

8 prepared in triplicate. How were the documents destroyed?

9    A. When I was asked to go to Harding I had made two

10 boxes, Pat Hart and Mary Popadak were still going to

11 there. The reason why I was asked to go to Harding was they

12 were eliminating seventh and eighth grade from the high

13 school, so it was just going to be eighth grade, so my

14 services were no longer needed there. I did the files, and

15 I separated the boys for Pat and the girls for Mary.

16 However, we are supposed to start fresh every year, so we

17 are really not supposed to keep them.

18    Q. Okay. So who destroyed them?

19    A. At the beginning -- not the very beginning, but

20 some time toward the beginning of the year, which would have

21 been the next school year -- was it that 2002-2003 we got

22 these big shredders that the district gave us and everything

23 that we wanted shredded we put in these big things and then

24 some company comes and shreds them. Huge bins, I believe

25 they were put in there.

---

**Page 23**

1    Q. Well, so you destroyed your copy. Did you receive

2 the copies the teachers had or the guidance counselor had?

3    A. No.

4    Q. Do you know whether those other two copies of the

5 discipline referral involving K█████ L█████ and R█████

6 P█████ were destroyed, either the guidance counselor or the

7 teacher?

8    A. I don't know. As a classroom teacher I would

9 often -- I would start over each year. I can't imagine you

10 would keep that, but I can't speak for them.

11      MR. MARNEN: Ed, this morning I made -- great

12      minds think alike -- this morning I made another

13      request for them to go back and look again. I

14      can't tell you right now whether it is going to

15      bear fruit, but I thought a second look was worth

16      it for all the kids involved.

17    Q. Well, it is your belief that the discipline

18 referral forms for K█████ and R█████ were destroyed?

19    A. Yes.

20    Q. At least the ones you had?

21    A. Yes.

22    Q. Were there any other discipline records -- well,

23 what other records of discipline was kept at Vincent?

24    A. I know like when we assign P.A.S.S. we would keep

25 a book with all the - we called them P.A.S.S. letters. They

---

**Page 24**

1 would be letters parents would get that said your child has

2 P.A.S.S. from 3:30 to 6:30 on these days. We had that. It

3 was like a binder, a three-ring binder, and it had all the

4 P.A.S.S. letters in it. It had all the -- there was another

5 binder that has OSS letters and then another binder that had

6 the Saturday letters.

7    Q. The second binder had what kind of letters?

8    A. Out of school suspension.

9    Q. And do you know whether those records were

10 destroyed?

11    A. I do not.

12    Q. I seen, and we might get to it, computer printout

13 of discipline histories.

14    A. Yes.

15    Q. So would that be another form of the documentation

16 of discipline?

17    A. We have what is called Discipline Pro. So

18 anything I -- I use it for anything. We have lunch

19 detention at Harding, we didn't have it at Vincent. So even

20 if a student got like lunch detention I would put everything

21 in there, that way if I wanted a history for John Smith, a

22 parent came in and I said, well, you know, he's had lunch

23 detention, office detention, I could go right into that

24 Discipline Pro.

25    Q. Pro being program?

---

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 22 of 45
Richard P, et al, vs Erie School                Multi-Page™                        L. Cappabianca
Held: 4/4/05                                    A000000102

**Page 25**

1    A. Right.  I would imagine.  I never thought about
2  it.
3        MR. MARNEN: Maybe profile.
4    A. Well, no, because it's Grade Pro, so I bet it
5  would be program.
6    Q. Go ahead, you were going to tell me about the
7  Discipline Pro.
8    A. However, when I was up at Vincent, because I was
9  not in a typical office, mine didn't work very well and I
10 don't know if it was the way the room was wired so it never
11 worked.  I don't know what ever happened to the computer
12 after I left either.
13   Q. Did you attempt -- did you attempt to enter some
14 information --
15   A. Absolutely.
16   Q. -- into that program?
17   A. Yes.
18   Q. Do you know whether anyone else would enter
19 information into that program?
20   A. Not unless they were an administrator, and there
21 was a password thing you would have to have.
22   Q. Did you ever delegate the responsibility to
23 clerical staff to enter information into the program?
24   A. No.  I had had people help because I am not
25 very -- technologically I am not very literate, let's say,

**Page 26**

1  so they helped me like enter names, teachers' names and
2  other information in there, but not information regarding
3  the students, no.
4    Q. So would it be fair to say that you entered some
5  information into the Discipline Pro?
6    A. Yes.
7    Q. But you wouldn't think that it was comprehensive,
8  is that what you're trying to say?
9    A. Right, correct.  When it worked, I used it.
10   Q. And that computer that you entered that
11 information on was in your office?
12   A. Um-hmm.
13      MR. OLDS: Let me see something here.  Let's mark
14   a document here as Exhibit 2.  This is Exhibit 2,
15   I only brought like one copy for both of you to
16   share?
17      (L. CAPPABIANCA EX. 2 - COMPUTER PRINTOUT,
18      marked for identification.)
19   A. Okay.
20   Q. And this is appears to be a computer printout it
21 happens to be about -- pertains to the one of the, I guess
22 you could call them protagonists in this case, B█████
23 C█████, B███ C. at the top.  And can you identify for me
24 how this printout was made?
25   A. This isn't Discipline Pro.

**Page 27**

1    Q. It is not?
2    A. No, unh-unh.  At one time what we would do is
3  these letters that I was telling you about before that we
4  would keep in the binders for the P.A.S.S, the Saturday and
5  OSS, those letters would go down to the computer center and
6  the computer center would then feed it into a computer so
7  you could get a history of the kids.
8    Q. And then I notice on this particular form, this
9  Exhibit No. 2, each entry is begun with a form -- form 09 --
10 the first one is form 5983, the second form is 09933, the
11 third one is form 12048.  Do you have any idea what those
12 numbers --
13   A. No, I don't know what that is.
14   Q. -- signify?  In terms of the creation of that
15 form, Exhibit 2, you indicated that -- what material was
16 sent to the information center?
17   A. When a child receives P.A.S.S., a student receives
18 P.A.S.S. or Saturday, you send the parent a letter.  And it
19 will say your child has P.A.S.S. or program after school
20 suspension on whatever, 5/6, 5/7, 5/8, it will list the
21 reason why they have it, profanity, they are expected to be
22 at school between the hours of 3:30 and 6:30, that's
23 basically what is on it.
24   Q. On this document on the first page, let's just
25 look at where it is referring to the 2001 school year.

**Page 28**

1    A. Okay.
2    Q. That says suspension, that first entry.
3    A. Um-hmm.
4    Q. Form 12048.  That's in school suspension, does
5  that mean P.A.S.S.?
6    A. That means P.A.S.S.
7    Q. Parenthesis 37, end parenthesis, do you know what
8  that number signifies?
9    A. When -- I don't know if this is correct, but I am
10 making an educated guess, which could be wrong, where it
11 says like threats to a student.
12   Q. Yes.
13   A. Each discipline infraction has its own code, so
14 maybe insubordination was number ten.  Whoever typed it up
15 knew that -- you would put the code on it and they would
16 know it was insubordination.  I'm not sure if I'm correct on
17 that.
18   Q. Then this also has a form which is for B███
19 C█████, it appears to cover the years from 1996 through
20 2001-2002.
21   A. Okay.
22   Q. Is that right?
23   A. Yes.  Um-hmm.
24   Q. Did you have access to forms like this when you
25 were an assistant principal?

**Page 29**

1  A. There is a program that this came off of, I could
2  have accessed to it, wasn't real familiar with it, but, yes,
3  I would have had access to it.
4  Q. So as an assistant principal you would have been
5  able to basically look at the disciplinary history of any
6  student?
7  A. Yes.
8  Q. Do you recall whether you ever used that capacity
9  to look up the discipline history of any student?
10  A. No.
11  Q. You did not?
12  A. Unh-unh.
13  Q. Do you -- you sort of knew what this form was, how
14  did you learn what this form -- how did you learn about this
15  method of maintaining information?
16  A. Because I use it now.
17  Q. You use it now?
18  A. Um-hmm.
19  Q. Going back to the document that was marked as
20  Exhibit C, Defendants' Exhibit C, which is the middle and
21  high school discipline policy. Beginning on Page 7 of that
22  it refers to the disciplinary procedures.
23  A. Okay.
24  Q. It says on Page 7, teacher detention is the first
25  line method of attempting to formally correct inappropriate

**Page 30**

1  behaviors in the classroom. What is teacher detention?
2  A. It was different for each teacher, but if a child
3  did something in their classroom that didn't warrant them to
4  be sent to the office, a teacher would assign a teacher
5  detention, which was typically after school, usually gave 24
6  hours notice and you sent -- they had a triplicate sheet
7  too -- you would send them home with a copy of the note
8  telling the parents why they got detention, where the
9  detention would be served and the parent was supposed to
10  sign and send it back. So, yes, the teacher would have
11  detention. It would typically be 24 hours after it was
12  assigned, and depending on the teacher it would depend on
13  how long they would have it.
14  Q. Where would the child serve the teacher detention?
15  A. In the teacher's classroom.
16  Q. Might be a short period or long period depending
17  on the teacher?
18  A. Right.
19  Q. And then the next level on this -- next level of
20  discipline is administrative detention, that would be on
21  Page 8.
22  A. Um-hmm, yes.
23  Q. There's a Saturday detention, and then I notice
24  after that there is a program for after school suspension,
25  and there's a program for out of school suspension, then the

**Page 31**

1  alternative education program; is that right?
2  A. Yes.
3  MR. OLDS: I'm going to mark as an exhibit, even
4  though it is voluminous, I have copy for you here.
5  We'll mark this as Exhibit 3.
6  (DEFENDANTS' EX. 3 - DOCUMENT,
7  marked for identification.)
8  Q. Exhibit 3 is -- let me just for the record read
9  the Bate stamps. It's Bate stamped Erie 34 through, I guess
10  40, and then jumps to 1749, 1757, 1775, through 1781, 1775
11  to 1781 then it looks like 1809, 1840, 1852, looks like 1852
12  through 1863 and 1883.
13  MR. MARNEN: Looks like it goes to 1857, there's
14  no 1858, check me on that.
15  Q. 1857, you're right, and then 1959 to 1863. Looks
16  like probably -- I am not going to look at every page. It
17  looks likes it goes from 1883 encompasses, we'll just say
18  that it encompasses pages from 1883 through 1969. And then
19  it has 2182 at the end. Actually it looks like that was
20  1883 through 1934 then 1947, 1948, 1949, 1950, 1951, 1969,
21  and 2182. So that's Exhibit 3.
22  Exhibit 3 is some disciplinary information that
23  Erie School District provided us concerning C▇▇▇▇▇ or
24  another individual involved in this case. Now, these
25  documents appear to have some -- first of all, could you

**Page 32**

1  look at the documents that start with 1859.
2  A. Okay, that's Discipline Pro.
3  Q. That's Discipline Pro?
4  A. Um-hmm.
5  Q. And then, so is it your -- there would be some
6  Discipline Pro information that you would have entered on
7  your computer --
8  A. Um-hmm.
9  Q. -- at Vincent?
10  A. Yes.
11  Q. And this is a Discipline Pro on C▇▇▇▇▇ B▇▇
12  apparently from Harding?
13  A. Correct.
14  Q. Do you know if you ever saw this?
15  A. I didn't, and I wouldn't be able to retrieve this
16  from mine either. I'm at Harding now, and I couldn't
17  retrieve this because I have a different computer than what
18  was used when he was there.
19  Q. This document was presented to us during the
20  course of discovery and it looks like the date printed was,
21  up at the top, 1/18, 2001.
22  A. Um-hmm.
23  Q. Were you involved in printing this document?
24  A. No.
25  Q. Did you ever -- when you were at Vincent, did you

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 24 of 45
Richard P, et al, vs Erie School
Held: 4/4/05                    Multi-Page™
A000000104                        L. Cappabianca

1 ever see this document?
2    A. No.
3    Q. Was C___ B___ a student at Harding when you
4 were at Harding?
5    A. No.
6    Q. Now, in this set of documents which comprises
7 Exhibit 3 there are teacher SAP referral forms, for
8 instance, beginning with 1883 I think there is one.
9    A. I have an 1840.
10   Q. If you keep just going.
11   A. Oh, yes.
12   Q. There is actually, I think there probably are a
13 number of different discipline documents that pertain to
14 C___ B___ in here. Are these the teacher SAP referral
15 forms that we were talking --
16   A. If you look at the bottom, even though it's kind
17 of cutoff, it will tell you like the canary is for
18 counselor, pink copy for teacher and the white would be the
19 students file, which is what I would have kept.
20   Q. Do you have any idea as between the discipline
21 forms for -- that might have involved R___ P___ or
22 K___ and C___ B___, do you have any idea why or
23 how it is that discipline referral forms pertaining to
24 C___ B___ were not destroyed?
25   A. Because I attempted to have C___ placed in an
Page 33

1 alternative education program, but being he is in special
2 ed., I would have to have consent of his mother. I met with
3 his mother and she refused to sign him into it, that's why.
4 I would put all this together when I do an alternative
5 education packet.
6    Q. When did you attempt to do an alternative
7 education plan for C___ F___
8    A. Before you ever attempt that you have to make sure
9 you try everything possible in your building. So he would
10 have been through many different -- he would have had to
11 have so many P.A.S.S., so many Saturdays, so many OSSs. If
12 you look through here I know there's the behavior contract,
13 I would have tried that. I would have done the FBA, which
14 is a functional behavioral assessment. I would have
15 referred him to SAP. You have to employ every intervention
16 possible within your means before you can refer someone out
17 of your building, again, depending on the situation, but for
18 him.
19   Q. So you attempted to do that concerning C___
20 B___. Do you know how these records were preserved, let me
21 phrase it like that. This particular set of documents do
22 you know where it came from?
23   A. Charlise Moore is a special ed. supervisor. She's
24 a special ed. supervisor for the seventh, eighth grade
25 students. I would complete a referral packet for an
Page 34

1 alternative education program and send everything to her
2 because I would need her approval before I can actually do
3 that.
4    MR. MARNEN: Ed, I can tell you that these
5    documents came from C___ B___ special
6    education file as they were provided to me.
7    Q. Now, going back to Exhibit C on Page 9 the
8 alternative education program is a step in the discipline
9 program?
10   A. Yes, it is.
11   Q. You indicated that you were trying to refer
12 Charles Bibbs to that program?
13   A. Yes.
14   Q. When you were trying to refer him to that program,
15 was it pursuant to this step in the discipline program that
16 you were making the referral?
17   A. Um-hmm. It would have been under the number two,
18 the reasons for referral.
19   Q. Right.
20   A. They give you the reasons why you can refer a
21 child, it would have been because of disruptive -- chronic,
22 disruptive behavior.
23   Q. And you indicated that you needed to have his
24 parents' consent for that?
25   A. Yes.
Page 35

1    Q. Why is that?
2    A. Because he is EMR -- am I allowed to say this?
3    Q. Sure, the record here is confidential.
4    A. EMR is educable mentally retarded.
5    MR. MARNEN: Off the record.
6    (Discussion held off the record.)
7    Q. Did you meet with C___ B___ mother?
8    A. Yes.
9    Q. Do you remember when you met with her?
10   A. Can I look through these?
11   Q. Sure.
12   MR. MARNEN: I will say on the record we don't
13   know that that is the enter file.
14   MR. OLDS: That's fine. I can say for certain it
15   is not the entire file. I had the entire file in
16   a binder today but I forgot to put that in my car.
17   MR. MARNEN: I have it here if you would like to
18   use it.
19   THE WITNESS: This is not the entire alternative
20   education referral.
21   MR. MARNEN: Would you like to look at the special
22   ed. file on B___ that I have?
23   MR. OLDS: Why don't we do that, take a break and
24   do that because I would like to pin that date
25   down.
Page 36

**Page 37**

1  THE WITNESS: I don't know if I'll know it, but I
2  am going to try it.  Okay.  I don't know the exact
3  date.
4  (Brief recess.)
5  MR. OLDS: Let's go back on the record.
6  Q. Do you see anything in there that -- why don't you
7  tell me what you see.
8  A. I'm sorry.  There is a request for a home school
9  visitor, which says that I need the mother to call me ASAP,
10  and that I attempted to call her six times, and that I want
11  her to come, and this is like December 12th.
12  Q. Can you tell me the Bate stamp number of the
13  request?
14  A. I have to find it.
15  MR. MARNEN: He means this number down here.
16  THE WITNESS: Yeah, I figured that out.  I have to
17  find it.
18  MR. MARNEN: It's in chronological order.
19  THE WITNESS: You had it out of order.
20  MR. MARNEN: I did?
21  THE WITNESS: Yes, it wasn't at the right time.
22  A. Right here.  You have it 11/13, it would be 1758,
23  it's actually 12/12.
24  Q. Can I see 1758?
25  A. Absolutely.  You want me to put it in the right

**Page 38**

1  spot?
2  MR. MARNEN: Sure.
3  MR. OLDS: Can we get a copy of this marked as an
4  exhibit.  We will make that Exhibit 4.
5  (L. CAPPABIANCA EX. 4 - DOCUMENT.
6  marked for identification.)
7  Q. If you find anything else that you think might be
8  pertinent to this -- just the idea of pulling anything out
9  that might have a bearing on this attempt to get C████
10  B███ in the alternative education program.
11  A. I would have -- I wouldn't have filled out the
12  complete referral form without his mom signing.  Do you
13  know what I mean?  That is what I would normally prepare is
14  that Exhibit --
15  Q. 4.
16  A. No.
17  Q. This one, the invitation?
18  A. No.  Where are the ones that you gave me?  The one
19  with all the discipline history, 3, and then there's an
20  alternative education packet that I would send along with
21  all this stuff.
22  MR. OLDS: She pulled this out, maybe we could
23  mark that as Exhibit 5.
24  (L. CAPPABIANCA EX. 5 - INVITATION/IEP,
25  marked for identification.)

**Page 39**

1  Q. So what we tried to -- I think we started off by
2  saying that at some point in the 2001-2002 school year you
3  determined that you were going to try to refer C████ B████
4  to the alternative education program; is that right?
5  A. Yes.
6  Q. And you indicated that you wouldn't make the
7  referral unless you had parental consent?
8  A. Correct.
9  Q. Tell me why you need the parental consent.
10  A. Because he was EMR.
11  Q. Does that mean that you wouldn't otherwise be able
12  to discipline him if it involved changing his placement?
13  A. Correct.
14  Q. We were trying to determine an approximate time
15  when you were thinking about this, and we identified
16  Exhibit 4.  Can you tell me what Exhibit 4 is?
17  A. It's a home school visitor request, a request for
18  a home school visitor.  What I did was I -- visitor name is
19  at the top, Jackie.  What I did was I asked her to go to his
20  house because I wanted to meet with the mother and I had
21  called several times, six times.
22  Q. Six times.  Did you ever meet C████ B████
23  parents?
24  A. Yes.
25  Q. When did you meet them?

**Page 40**

1  A. The mother did come in.
2  Q. Go ahead, as a result --
3  A. Can I refer to another exhibit?
4  Q. Exhibit 5.
5  A. The reason why I pulled this one out is because
6  there was a time period where I kept trying to get the
7  mother in to discuss an alternative education placement,
8  unsuccessfully I was trying to get her in.  I finally
9  involved Charlise Moore who was the special ed. supervisor.
10  Now, she does not need to be part of the process until after
11  I get all the paperwork done and then all this stuff will go
12  to her and she will determine whether it is an appropriate
13  decision or not for him to be there.
14  Q. Charlise Moore?
15  A. Yes.  And because I was unsuccessful I did call
16  her and I was hoping that maybe she would have more success
17  since the mother wasn't responding to me, and she did come
18  in.
19  Q. When you say she, it's the mother?
20  A. Mrs. Moore came in.
21  Q. Charlise Moore came in?
22  A. And ended up meeting with me, the mom, Mrs. Woods,
23  maybe Mrs. Manus.
24  Q. Okay.  Is that what Exhibit 5 is about?
25  A. Well, Exhibit 5 would have been you send an

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 26 of 45
Richard P, et al, vs Eric School                Multi-Page ™                              L. Cappabianca
Held: 4/4/05                          A000000106

1 invitation home. It's a part of the paper trail that you
2 have to do, inviting the parent to come in and sit down and
3 meet with you. This would have had to go home, doesn't mean
4 it was the day we actually met, though.
5    Q. Just that the home school -- I noticed that on
6 Exhibit 4 it appears that the home school visitor made
7 attempts to --
8    A. Yes.
9    Q. -- contact the parents in December, December 12th
10 and December 13th, 2001; is that right?
11    A. Yes.
12    Q. And your request isn't dated, but I assume --
13 well, maybe it is the fax date up at the top.
14    A. Um-hmm.
15    Q. That's when you made the request for the home
16 school visitor?
17    A. Correct.
18    Q. And then Exhibit 5 is an invitation to participate
19 in the IEP team meeting, and can you see what the date is on
20 that on the top?
21    A. I think that's the 8th.
22    Q. January 8th?
23       MR. MARNEN: '02.
24    A. Um-hmm.
25    Q. Now, this schedules a meeting for Friday,

Page 41

1 that.
2    Q. What happened on -- what happened -- you say you
3 know that you never saw them again.
4    A. After we found out about the incident at the
5 laundromat he never came back to school. You will see other
6 home school visitor requests trying to locate him.
7    Q. When do you think it was -- do you think -- let me
8 put it like this. Who was present at the meeting where the
9 mother came?
10    A. Jan Woods who was the principal, Charlise Moore,
11 who was a special ed. supervisor, myself, the assistant
12 principal and his teacher of record, which means the person
13 who wrote his IEP. I want to say that was Connie Manus.
14    Q. At the time you had that meeting had you heard
15 about the incident at the laundromat?
16    A. No. That would have been automatic removal, you
17 wouldn't have to go through -- he had charges against him.
18 When you have something that significant, you don't need to
19 go through all the --
20    Q. If you would have had a meeting with the mother,
21 you, Miss Moore, Miss Manus and Miss Woods, how would that
22 meeting have been documented? How would the actual meeting
23 have been documented so that there would be a record that
24 the meeting occurred?
25    A. Well, the teacher of record should have a copy of

Page 43

1 January 11th.
2    A. Correct.
3    Q. Now, do you know whether you had had contact with
4 the mother before January 8th when you sent this out?
5    A. Well, that's what I'm not sure between this time
6 and this time.
7    Q. You have to make --
8    A. Make sure.
9    Q. No, no. You can make sure, but for the record you
10 can't say this time and this time. You have to make
11 reference to either the exhibit number or the date.
12    A. Okay. Exhibit 4, I obviously really wanted to see
13 the mother. But we had met with the mother, but I don't
14 know if it was between these two times.
15    Q. Between the preparation of the Exhibit 4 and
16 Exhibit 5?
17    A. Yes -- I'm sorry.
18    Q. In other words, you recall that you had at least
19 one meeting with the mother?
20    A. Yes.
21    Q. You don't recall whether it was between
22 December 13th, 2001, and what, January 11, 2002?
23    A. Correct.
24    Q. Or might it have been after January 11, 2002?
25    A. No, because I know I never saw him again after

Page 42

1 it.
2    Q. What should she have a copy of?
3    A. There would something that looks like this,
4 Exhibit 5.
5    Q. It would be an invitation to participate --
6    A. Yes.
7    Q. -- or some other form?
8    A. No. It should be an invitation to participate.
9    Q. How would it be known that -- how would that form,
10 the invitation to participate, document that the meeting had
11 actually occurred?
12    A. Mother would have signed it.
13    Q. Where would the mother have signed it?
14    A. If you look, I believe on the back, parents'
15 signature and it says whether they will attend or not.
16    Q. You have looked through the file that Mr. Marnen
17 has, and you didn't see a document where the parent,
18 Ms. B████ had signed?
19    A. I didn't see it, no.
20    Q. That doesn't mean it is not there, you didn't see
21 it.
22    A. Okay.
23    Q. Did you communicate to Ms. B████ the fact the
24 allegations that C████ had committed the sexual assault?
25 Did you ever communicate that to Ms. B████

Page 44

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 27 of 45
Richard P, et al, vs Erie School                    Multi-Page™                     L. Cappabianca
Held: 4/4/05                              A000000107

1  A. Mr. B███ but it was after many attempt to try to
2  get her in to get him placed somewhere else.
3     Q. Do you know whether Mr. and Mrs. B███ did they
4  reside together?
5     A. To my knowledge.
6     Q. And were there other children in the B███ family
7  in the Erie school system?
8     A. There were siblings, I know. I'm not sure how
9  many, but there were some at the GECAC charter school.
10    Q. What is that, GE --
11       MR. MARNEN: It's an acronym.
12    A. Greater Erie -- I don't know.
13       MR. MARNEN: Community action center, I think.
14       Excuse me a moment for butting in --
15       MR. OLDS: All right.
16       MR. MARNEN: I see a notice of recommended
17       educational placement in the file concerning
18       C███ B███ dated November 13, 2001; did you see
19       that?
20       THE WITNESS: I did see that.
21       MR. OLDS: What is the Bate stamp on that, Jim?
22       THE WITNESS: 1823. In November --
23       MR. MARNEN: She has signed that too.
24    A. She did. In November when we have parent
25  conferences is when an IEP is usually written. So this
                                                    Page 45

1  could have been -- I don't know if that's the date of the
2  parent conference -- this could have been when she came in
3  to sit down and write and sign the IEP.
4        MR. OLDS: Let's mark that as Exhibit 6.
5        (L. CAPPABIANCA EX. 6 - IEP,
6        marked for identification.)
7     A. Can I go back to something?
8     Q. Yes, you can.
9     A. You had asked me after the time of the assault if
10  I still needed the parent's permission to get him out, and I
11  believe it is easier to do so but we still may have needed a
12  signature. I am not sure. I know when there are serious
13  charges and allegations that's it a lot easier to remove the
14  child from your building.
15    Q. You're not certain as to all the technicalities?
16    A. Yes.
17    Q. So we just marked Exhibit 6, which is the notice
18  of recommended educational placement. That is a document
19  that was signed by Ms. B███ 11/12/01.
20    A. Correct.
21    Q. And do you know whether you met with Ms. B███ at
22  that time?
23    A. If this was during the parent conference, I did
24  not.
25       MR. MARNEN: It's your deposition, but I have the
                                                    Page 46

1       IEP here, that would help I'm sure.
2     A. Yes, my signature is on it.
3     Q. Is your signature on it?
4     A. It's on it.
5     Q. What is the date of that?
6     A. 11/13/01.
7        MR. OLDS: I couldn't do the deposition without
8        you.
9     Q. So 11/13/01 there was an IEP for C███. You
10  must have attended the meeting; is that right?
11    A. Um-hmm.
12    Q. Bate stamp of that is what?
13    A. 1825.
14       MR. MARNEN: 1825 and -- it's longer than that,
15       that's the first page.
16       MR. OLDS: 1825 to what's the last page?
17       MR. MARNEN: 1837, I'm assuming they are
18       consecutive. Do you want me to check?
19       MR. OLDS: That's fine. We won't mark that as an
20       exhibit at this time because I didn't bring
21       copies.
22       MR. MARNEN: I will make you a copy if you want,
23       don't worry about it. Do you want me to?
24       MR. OLDS: Yeah, I guess.
25       (L. CAPPABIANCA EX. 7 - IEP,
                                                    Page 47

1       marked for identification.)
2        MR. OLDS: Ms. Cappibianca made a comment while
3        you were gone about something relative to 1128.
4     A. Um-hmm. I was saying that the last part of this
5  packet was 1128, so --
6        MR. OLDS: Part of what packet?
7        MR. OLDS: Exhibit 3.
8     A. Yes. That may have been the time that I was
9  trying to refer him to the alternative education program.
10    Q. Some time after 11/28; is that right?
11    A. (Witness moved head up and down.)
12    Q. You have to say yes or no or I don't know.
13    A. I'm not sure.
14    Q. That's good enough. But anyway, so you did
15  participate in his IEP program --
16    A. Yes.
17    Q. -- because you signed the IEP form. Do you recall
18  whether you talked at all about his discipline, the
19  disciplines problems he presented? Do you recall whether
20  you talked about those at the IEP meeting?
21    A. I don't recall the meeting. I can tell you
22  typically when you have a child that has that thick of a
23  discipline record that you're going to discuss it whenever
24  you have the parent with you.
25    Q. How did you know that C███ mother and father
                                                    Page 48

Richard P, et al, vs Erie School
Held: 4/4/05

Multi-Page™
A000000108

L. Cappabianca

---

**Page 49**

1 withdrew him from the Erie schools?
2    A. I didn't. I sent home school visitors trying to
3 find him. And then if you look at the different home school
4 visitors' report, we had different, um, whereabouts. Once I
5 heard he was at GECAC. Once I heard he was at Sacred Heart,
6 then I heard he was at First Assembly of God. So we
7 didn't -- it was like a two-week span before we actually
8 found out where he was.
9    Q. I want to show you -- I will mark this as
10 Exhibit 8.
11       (L. CAPPABIANCA EX. 8 - ATTENDANCE CARD,
12       marked for identification.)
13    Q. That's Exhibit 8.
14    A. Okay. Do you have a particular question?
15    Q. Yes. My first question is: Can you tell me what
16 that form is?
17    A. This is a white attendance card. We used them for
18 the program after school suspension or P.A.S.S. program.
19 And they would let us know when they were actually present
20 in the program or absent from the program.
21    Q. This particular form doesn't have anything to do
22 with his school attendance, C████ this is for P.A.S.S.?
23    A. Correct.
24    Q. So Exhibit 8 is for P.A.S.S., and was he assigned
25 to P.A.S.S. every day where there is a notation?

---

**Page 50**

1    A. Right. What they would do is this bottom part
2 would be the back of the white card. The top is the front,
3 the bottom is the back. And what the P.A.S.S. supervisor,
4 who was a teacher in the building, would do was on the back
5 of the card would put three -- do you see the A-T-T?
6    Q. Yes.
7    A. That means attendance P.A.S.S. You had two
8 different kinds of P.A.S.S. One was called attendance
9 P.A.S.S. and one was called regular P.A.S.S. Attendance
10 P.A.S.S. means that the child had to come to school during
11 the school day and then stay from 3:30 to 6:30, so their day
12 was extended. Regular P.A.S.S. was they just stayed home
13 during the school day and then they came 3:30 to 6:30 at
14 night only --
15    Typically I would assign attendance P.A.S.S.
16 especially if the child had been in special education
17 because obviously they are below grade level and you would
18 want to have them in getting the instruction.
19    Q. The ABS, there is notation over here on the right,
20 ABS, what is that?
21    A. Absent.
22    Q. So would you assume that all of the -- was C████
23 B████ assigned to P.A.S.S. each day where there is an
24 indication -- where an X or P appears?
25    A. Yes. The P means he was actually physically

---

**Page 51**

1 there, the X means he was absent.
2    Q. He was there -- I know someplace in there it says
3 released.
4    A. That means that he served his three days or five
5 days, however many days he was assigned.
6    Q. Okay. I know he wasn't always in P.A.S.S., but he
7 was in P.A.S.S. quite a bit; is that right?
8    A. Yes.
9    Q. So this case involves K████, L████ and R████
10 P████. Do you remember them from your days at Strong
11 Vincent?
12    A. Yes.
13    Q. Do you remember each of the girls?
14    A. Yes.
15    Q. Did K████ L████ -- did you have -- how many
16 times do you think you had either meetings or encounters or
17 talks with her?
18    A. With K████ Daily, but not for behavioral
19 issues, but I had seen her daily.
20    Q. Describe her. Not physically, but describe the
21 contact that you had with her, the different types of
22 reasons that you might meet with her.
23    A. She would just stop in periodically. I was in a
24 classroom, it was kind of an unusual setup, not your typical
25 office where there's like a counter and you would have to

---

**Page 52**

1 wait, the secretary would have you have a seat before, you
2 know, announcing the student was there. So mine was just a
3 typical classroom, and she would frequently just walk in
4 whether it was to say hello. Very few occasions she was
5 referred to me for behavior reasons, but there were some.
6 She had difficulty adjusting -- not adjusting as far as
7 socially, she was very social. She had trouble making it
8 from one class to the next.
9    Q. And I have never been there, so is it because it
10 is a big building and it might be confusing?
11    A. It is a big building. All the middle school
12 classes are basically down a hall that was not very long and
13 they were one right across from each other. Probably just
14 very overwhelming for her.
15    Q. Do you recall whether she ever complained to you
16 about C████ B████?
17    A. No.
18    Q. You don't recall that?
19    A. No.
20    Q. Do you recall what reasons that she was sent to
21 you as a disciplinary problem?
22    A. Could have been a range of things. I don't recall
23 anything specifically. There's only one incident that I
24 actually recall, and I remember she was not in class so they
25 let me know and I had to go find her. And I did, I found

---

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 29 of 45
Richard P, et al, vs Erie School    Multi-Page™    L. Cappabianca
Held: 4/4/05    A000000109

1  her and took her to class.
2    Q. Where was she?
3    A. Locker room in the gym.
4    Q. Did you talk to her?
5    A. I did.
6    Q. What was her explanation?
7    A. Wasn't an explanation, just wasn't in class.
8    Q. And she was in the locker room?
9    A. Yes.
10    Q. Do you have any idea what time -- what part of the
11  year that was?
12    A. I would say middle.
13    Q. What about R█████ P█████ do you recall -- you do
14  recall her as a student there, right?
15    A. Yes.
16    Q. What about referrals for discipline concerning
17  her?
18    A. I don't think she had many problems in class.
19  There were a few times that she had used profanity, once in
20  the hallway I recall -- actually twice that she used it.
21  There was a discipline -- not discipline, I'm sorry, a dress
22  code violation.  She was in, I think it was jeans and then
23  she was also with R████ in the locker room -- I'm sorry,
24  K█████
25    Q. That same day?

                                                    Page 53

1    A. Yes.
2    Q. They were both there?
3    A. Yes.
4    Q. And did you ask -- did either one of them have an
5  explanation for being there?
6    A. No.
7    Q. Did you ever talk to K████ about the fact that
8  C███ B███ assaulted her?
9    A. No.  She was not in our building at that time.
10    Q. She never came to you and told you that she had
11  been assaulted?
12    A. Never.
13    Q. Did you ever talk to R████ about whether R████
14  had been assaulted?
15    A. After she had an episode in Miss Scully's class
16  Miss Scully brought her to me.
17    Q. Tell me about that episode.
18    A. It was January 9th very, very beginning of class.
19  She had screamed at another student in the room.  I believe
20  it was the F-word, Miss Scully referred her to me.  That's
21  when she had told me that they were -- boys were asking her
22  to do things and that something had taken place over at the
23  laundromat.
24    Q. How do you know it is January 9th?
25    A. Because I actually had to write up the incident

                                                    Page 54

1  and submit it to the Erie Police Department.
2    Q. What time of day was that?
3    A. I believe it was fifth block, which would have
4  been first period.
5    Q. So Miss Scully brought her to your office?
6    A. Correct.
7    Q. And describe what R████ looked like, her
8  demeanor?
9    A. That day?
10    Q. Yes.
11    A. She was angry.  I couldn't tell you what she had
12  on.  She was just very angry.
13    Q. And how many -- that would not have been the
14  first -- you would have had interactions with her before
15  January 9th --
16    A. I have.
17    Q. -- on other matters.  I take it you would know
18  her?
19    A. Absolutely.
20    Q. And what was the nature of the conversation that
21  you had with her that day?  Tell me what you recall her
22  saying and what you said.
23    A. I know that she told me that boys were asking
24  her to do things and --
25    Q. Did she say what they were asking her to do?

                                                    Page 55

1    A. I believe it was perform oral sex.  And then I
2  took her -- right after she had told me that and then I
3  said, well, why would they ask you that.  And she had told
4  me about the laundromat incident and I went right down to
5  Ms. Woods' office.
6    Q. So what did she tell you about the laundromat
7  incident?
8    A. She had told me that B███ C█████ had coerced
9  her into giving oral sex to A███ K█████ who was a high
10  school student, and C███ B███, who was a middle school
11  student.  They were in the laundromat at one time.  There
12  was a laundry attendant there.  They went into the bathroom,
13  nothing happened in the bathroom, then they went outside.
14  B███ threatened her, and then I know that they walked down
15  the street and were in between houses.
16    Q. This is something that R████ told you that day?
17    A. She did.
18    Q. How long did that take for her to tell you the
19  story?
20    A. Well, we were in Mrs. Woods' office.
21    Q. She told the story in Miss Woods' office?
22    A. Yes.  We interviewed all the people together.
23    Q. Did you take any notes of these interviews?
24    A. Yeah.  Actually we had students, not R████, but
25  we had other students that were there that actually wrote

                                                    Page 56

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 30 of 45
Richard P, et al, vs Erie School
Held: 4/4/05
Multi-Page™
A000000110
L. Cappabianca

**Page 57**

1 down statements about what actually happened, which was all
2 turned over to the police.
3    Q. Did you make notes?
4    A. Yes.
5    Q. Do you still have those notes?
6    A. No, they were all in her discipline file.
7    Q. They were in R_____ discipline file?
8    A. Um-hmm -- yeah. They would have stayed in there.
9    Q. What is a discipline file?
10   A. Whenever someone is referred to me with the
11 teacher referral, the discipline referral that the teacher
12 sends, as soon as a student is referred to me I get a
13 manilla folder, put the child's name on it so anytime I see
14 that child I would put that in a folder, then I keep it. At
15 the end of each year I get rid of them and I start new ones
16 the following year.
17    MR. MARNEN: Ed, so you are not mislead, there are
18       two documents that we got from the police
19       department that were prepared by Miss Cappibianca.
20    MR. OLDS: Right. I think --
21    MR. MARNEN: I didn't want that testimony to be
22       misleading.
23    MR. OLDS: Because she indicated that she turned
24       over stuff to the police department. I think we
25       will get to those two documents.

**Page 58**

1    Q. So the first thing in the day R____ comes and
2 talks to you --
3    A. Um-hmm.
4    Q. -- and describes this incident?
5    A. Um-hmm -- yes.
6    Q. Had you talked to Denise L____ about the incident
7 ever?
8    A. Not to my recollection.
9    Q. You knew Denise L____ is that right?
10   A. Yes. I wouldn't have talked to her. I didn't
11 know about it until after R____ brought it to our
12 attention.
13   Q. So the first thing is R____ comes to you and
14 explains this behavior and said something happened to her at
15 the laundromat. Is that when you took her down to see Miss
16 Woods?
17   A. Um-hmm.
18   Q. You have to say yes or no.
19   A. Yes, I'm sorry.
20   Q. It's best if you say yes or no. And then was it
21 in front of Miss Woods that she gave her full story?
22   A. Yes. Miss Woods and I interviewed anyone that was
23 involved in that night.
24   Q. You interviewed R____ Do you recall who else
25 that you interviewed on that day?

**Page 59**

1    A. C____ A____, B____ C____, A____
2 G____, A____, K____, Y____
3 A____
4    Q. I had seen the -- maybe when we get to that. Did
5 you interview C____ B____
6    A. Yes.
7    Q. So all the kids were in school that day?
8    A. Yes.
9    Q. How long did it take you to talk to all these
10 kids?
11   A. We spent from the time we found out, which was the
12 morning of the 9th, we spent the entire day of the 9th
13 interviewing the kids. We actually talked to them three
14 different times. And then parents came in on the 10th, and
15 we talked to them as well with the kids.
16   Q. So which parents came in?
17   A. Okay. A____ mother came in. We had
18 Mrs. C____ in. We had Mr. P____ in. At one point
19 within those three days, because we spent three days, the
20 9th, 10th and 11th talking to the students and the parents.
21 Mrs. L____ was in. I don't recall C____ parents being in,
22 but they would have -- but would have had to have been. I
23 don't remember Y____, but they would have had to have
24 been or at least called.
25   Q. What about C____

**Page 60**

1    A. His father came in, yes.
2    Q. And you and Miss Woods attended these meetings;
3 did anyone else from the school district attend the
4 meetings?
5    A. Yes. Detective Love, he was our school resource
6 officer. He is an Erie police officer that was contracted
7 out through the school district.
8    Q. Anyone else from the school district?
9    A. We notified Jim Perfetto, who was the chief of
10 security. He came -- he didn't come in the first day. I
11 think he came in towards maybe the -- I think the 11th he
12 was in.
13   Q. Did Detective Love -- was he present at all the
14 meetings?
15   A. I believe so, yes. We would have had him or
16 officer -- actually Sergeant Slupski, another school
17 resource officer.
18   Q. And do you recall whether anyone, any of the
19 school district representatives, took notes at these
20 meetings?
21   A. I did, Jan usually takes notes.
22   Q. Yours were destroyed?
23   A. Right.
24   Q. You recall whether the detectives did?
25   A. I don't recall.

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 31 of 45
Richard P, et al, vs Erie School                Multi-Page™                    L. Cappabianca
Held: 4/4/05                          A0000001116

1  Q. Now, did you determine that the first incident
2 occurred after P.A.S.S., after C▮▮▮ had been in P.A.S.S.?
3 Maybe I shouldn't put words in your mouth and you should
4 tell me what you did determine.
5  A. This was going by R▮▮▮ and then the other
6 students that we had talked to. It happened on December
7 19th. Out of the students, I believe K▮▮▮▮ had P.A.S.S.,
8 although she didn't go to P.A.S.S. I know C▮▮▮ had
9 P.A.S.S. He went to P.A.S.S. -- no, he did not go to
10 P.A.S.S. according to this. I think A▮▮▮ K▮▮▮ had
11 P.A.S.S. Do you want to know whether they went to P.A.S.S.?
12  Q. My question was: Did you, and not necessarily
13 looking at this exhibit, was it your understanding that this
14 happened after a number of the kids had P.A.S.S.?
15  A. Yes.
16  Q. It happened as they were going home from P.A.S.S.?
17  A. Correct.
18  Q. And your recollection, not looking at the P.A.S.S.
19 record sheet, but your recollection had been that C▮▮▮
20 was in P.A.S.S.?
21  A. No, that's not my recollection.
22  Q. What is your recollection?
23  A. It wasn't anything regarding P.A.S.S.; is that
24 what you're asking me?
25  Q. My question was: Did the incident happen after --

Page 61

1 that was the first question -- did the incident happen after
2 P.A.S.S.?
3  A. And it did.
4  Q. Were some of the students who were involved in the
5 incident in P.A.S.S.?
6  A. Yes.
7  Q. At least my question had been -- I think you said
8 you thought C▮▮▮ had been in P.A.S.S., but then you
9 looked at the P.A.S.S. attendance and said apparently he
10 wasn't in P.A.S.S.
11  A. Correct.
12  Q. But your recollection before you looked at the
13 sheet was that he had been in P.A.S.S.?
14  A. Right.
15  Q. And you believe that A▮▮▮ K▮▮▮ had been in
16 the P.A.S.S.?
17  A. Yes.
18  Q. And the incident happened on the way home as the
19 kids were going home from P.A.S.S.?
20  A. Yes.
21  Q. Do you recall whether B▮▮▮ or R▮▮▮ were in
22 P.A.S.S.?
23  A. I don't think B▮▮▮ was even assigned P.A.S.S. at
24 that point, so no.
25  Q. K▮▮▮▮ your recollection was that she had been

Page 62

1 assigned to P.A.S.S. but had not gone?
2  A. Right. I know that because -- and she's the only
3 one that I knew for sure was because before I even walked in
4 the building, we have P.A.S.S. obviously attendance, which I
5 check every morning to make sure all the kids go. Mrs.
6 Popadak and myself take turns. One night I would stay until
7 6:30, the next night she would stay until 6:30.
8  Q. So are you saying you were the one that supervised
9 the P.A.S.S.?
10  A. No. I'm saying that the next morning when I
11 walked in from school the first thing I do is check the
12 book.
13  Q. I am not understanding so --
14    MR. MARNEN: I don't think she has finished her
15      thought is the problem.
16  Q. Okay. Well, then maybe I should let you finish
17 your thought.
18  A. The first thing I do is I check the P.A.S.S. book.
19 We have a binder, and in the binder we have attendance. We
20 have kids that actually sign in when they come there. You
21 will have release forms so if any child is released from
22 P.A.S.S. I pick it up in this binder and then I can give
23 them the P.A.S.S. release form that they take around to
24 their classes so the teachers know they are released from
25 P.A.S.S. and they completed their work. So as I was going

Page 63

1 in, that's the first thing I usually do in the morning when
2 I come into the school, Mrs. L▮▮▮ had been waiting for me.
3 She is the one that told me, because I didn't have a chance
4 to get the P.A.S.A. book, that K▮▮▮ did not go to
5 P.A.S.S. last night. And she had punished her. She had
6 made her scrub the kitchen floor with -- or the floors with
7 a toothbrush. I remember her telling me that.
8  Q. Who?
9  A. The mother, Mrs. L▮▮▮
10  Q. Mrs. L▮▮▮ And you recall this is an incident
11 that happened before Christmas?
12  A. December 19th.
13  Q. December 19th. Is it your testimony that you
14 recall on December 20th that you knew K▮▮▮ L▮▮ had not
15 gone to P.A.S.S.?
16  A. Correct.
17  Q. Because you checked the book?
18  A. Well, first Mrs. L▮▮ told me and then I checked
19 the book.
20  Q. Why did you happen to talk to Mrs. L▮▮▮
21  A. She was waiting for me.
22  Q. In the morning?
23  A. Um-hmm.
24  Q. On December 20th?
25  A. Um-hmm.

Page 64

Case 1:03-cv-00390-SJM   Document 57-3   Filed 08/18/2005   Page 32 of 45
Richard P, et al, vs Erie School   Multi-Page™   L. Cappabianca
Held:  4/4/05   A000000112

1    MR. MARNEN:  Verbalize your answers.
2    A.  Yes -- I'm sorry.
3    Q.  How do remember this to be -- how do you know
4  today that you met with Miss L▮ on December 20th?
5    A.  Because I remember it was night after she had
6  skipped P.A.S.S.
7    Q.  Was that the first time K▮ had been assigned
8  to P.A.S.S.?
9    A.  No.  First time she skipped it.
10    Q.  Was K▮ in the kind of P.A.S.S. that she
11  didn't go to school?
12    A.  No, she would have been there during the day.
13    Q.  She would have had attendance P.A.S.S.  How was it
14  that Miss L▮, Denise I▮ was at school sometime on
15  December 20th?
16    A.  It was the very first period of the day.  Because
17  she wanted to talk to me because she wanted me to know that
18  K▮ didn't go to P.A.S.S. and that she was fully aware
19  of it.  She was very supportive as far as --
20    Q.  Do you recall why K▮ was in P.A.S.S.?
21    A.  I do not.
22    Q.  Do you recall having any conversations with
23  Ms. L▮ about why K▮ was in P.A.S.S.?
24    A.  I would have called her because that's part of the
25  protocol that you have to call the parent and let them know

Page 65

1  when their child receives P.A.S.S. or Saturday detention.
2  So, yes, I would have called her to inform her, I can't tell
3  you what it was.
4    MR. OLDS:  Can we mark this as Exhibit 9, and
5       let's mark this as Exhibit 10.
6       (L. CAPPABIANCA EX. 9 - COMPUTER RECORDS,
7       L. CAPPABIANCA EX. 10 - COMPUTER RECORDS,
8       marked for identification.)
9    Q.  Exhibit 9 and 10 appear to be the computer
10  generated records that we talked about earlier that would
11  have been prepared by the information center?
12    A.  Yes.
13    Q.  Exhibit 9 says no suspension information on file.
14  Can you -- when you look at that, can you tell me what year
15  that pertains to?
16    A.  Would have been grade nine.
17    Q.  So that would not -- she was in grade seven?
18    A.  Grade seven, this was two years after.
19    Q.  Exhibit 10, what grade does that pertain to?
20    A.  This would have been -- well, wait, I'm sorry,
21  grade seven.
22    Q.  Now, I think, and it's your deposition not my
23  deposition, but I don't -- I think that this is the extent
24  of the computer generated information concerning K▮
25  L▮ suspension for her seventh grade?

Page 66

1    A.  Right.
2    Q.  And it doesn't indicate that she was in P.A.S.S.
3    A.  The letter was never sent to the computer center
4  for them to have put it in the computer.
5    Q.  Why is that?
6    A.  It could have been -- we have -- I was located
7  upstairs.  Although I had no secretary on the second floor
8  with me, I often used -- there were two secretaries in the
9  main office.  So I would have to bring down -- they are the
10  ones that did the letters and sent them to the computer
11  office.  I would have had to bring down the form to them.
12    Q.  Somehow the parents have to know; is that right?
13    A.  Phone call.  If you don't get them on the phone
14  then you send a school visitor.  You always make contact.
15  By the time these letters it is after the fact.
16    Q.  The letters advising P.A.S.S., and I think that
17  there were some, I know we are jumping around a little bit
18  but let's go to C▮ B▮' file, that was Exhibit 3, for
19  instance, document 1910.
20    A.  Yes.  That's what it would look like.
21    Q.  That's the letter notifying a parent that their
22  student is going to be in suspension -- or in P.A.S.S.?
23    A.  Yes.
24    Q.  That particular letter which pertains to C▮
25  B▮ doesn't have your name on it?

Page 67

1    A.  I'm at the top.
2    Q.  Yes, I saw your name up at the top but it doesn't
3  have a signature for you.
4    A.  No.
5    Q.  At the bottom were those stamped signatures or did
6  the assistant principals actually sign this document?
7    A.  I didn't see them do it, so I don't know.
8    Q.  You don't know whether stamps were used or not?
9    A.  No.
10    Q.  Would you complete forms like this for students
11  who you were assigning to P.A.S.S.?
12    A.  I was probably the one that assigned him to
13  P.A.S.S.
14    Q.  Your name doesn't appear.  Can I -- do you have
15  any explanation why if you assigned him to P.A.S.S. why you
16  didn't sign the document?
17    A.  Because this is a computer generated one.  What
18  happens is the secretary sends this out and then she
19  actually sends it to all the people down at the bottom, the
20  school office, the homeroom teacher and the director.  What
21  I'm saying is that things that aren't on this computer
22  generated sheet means the secretary never sent it to these
23  places.
24    Q.  Would this, to your knowledge -- well, this
25  particular piece of paper, 1910, which is part of Exhibit 3,

Page 68

Case 1:03-cv-00390-SJM     Document 57-3     Filed 08/18/2005     Page 33 of 45
Richard P, et al, vs Erie School          Multi-Page™                    L. Cappabianca
Held: 4/4/05                         A000000113

Page 69

1 is a document that you say you probably originated; is that
2 right?
3     A. No. I would have done the assigning of P.A.S.S.
4 I do nothing with the actual form. These are forms that the
5 office has. I would have let them known she had P.A.S.S.
6 and then would have typed this in and sent it to the
7 appropriate people.
8     Q. So how did you let the secretaries know that you
9 were assigning a student to P.A.S.S.?
10     A. I had a white sheet, it was like a half of this,
11 and it was called a transmittal sheet and it would tell who
12 the student was, what the form of discipline was, why, and
13 then I would turn that into them.
14     Q. You would have to turn in -- would you have to
15 turn in the transmittal sheet on every student that was
16 assigned to P.A.S.S.?
17     A. P.A.S.S., Saturday or OSS.
18     Q. Would that be the -- what I want to understand
19 here is the recordkeeping situation. A teacher refers a
20 student to you and you decide that the student is going to
21 be assigned to P.A.S.S.; is that right?
22     A. Yes.
23     Q. And the effective day of that assignment would be
24 the next school day?
25     A. Yes.

Page 70

1     Q. Now, you would have to communicate that decision
2 to the -- was a there a teacher assigned to the P.A.S.S.,
3 actually the P.A.S.S. classroom?
4     A. There were two teachers assigned.
5     Q. So somehow those two teachers would have to know
6 to expect that one or ten students had been assigned by you
7 to P.A.S.S. that day?
8     A. Yes.
9     Q. Is that right?
10     A. Yes.
11     Q. How would they know that?
12     A. We had a sheet that was in that binder I was
13 telling you about that I usually picked up every morning.
14 In that binder was a sheet of everyone that was assigned and
15 the numbers of days they were assigned.
16     Q. Who would enter that information?
17     A. One of the three assistant principals. Whoever
18 Mr. Hart assigned, he would add. Whoever I assigned, I
19 would add.
20     Q. When would you do that, at the end of the day?
21     A. Not necessarily. If I had time to come down -- it
22 was located in the office -- if I had time to come down and
23 do it during the day, I would. If not, then I would do it
24 at the end of the day.
25     Q. So that document, those binders, would have the

Page 71

1 names of the students and the days that the students would
2 be expected to attend P.A.S.S.?
3     A. Yes.
4     Q. They you would also do a transmittal form that you
5 would give to the secretaries?
6     A. Yes.
7     Q. Would you do that transmittal form on every
8 occasion that you assigned a student to P.A.S.S.?
9     A. Yes.
10     Q. But you're not certain that the secretaries
11 actually generated a notice to the parents?
12     A. Correct.
13     Q. How would the parents know that their students
14 were assigned to the P.A.S.S. program?
15     A. Because I would always call them. I usually call
16 them right with the child in the room. They would have to
17 know because these letters would be after the fact. Even if
18 the secretary got to it by the end of the day, by the time
19 they were mailed and everything the assignment may have been
20 over. Then if I couldn't get a hold of them I would -- say
21 they didn't have an answering machine or something, I would
22 call the home school visitor to go out and let the parent
23 know. They always had to know if their child was going to
24 be there till 6:30.
25     Q. When you called the home school visitor, would you

Page 72

1 complete one of these forms that we've seen, for instance,
2 that?
3     A. Right.
4     Q. That would be Exhibit 4?
5     A. Exhibit 4, I'm sorry, yes.
6     Q. And the home school visitor -- okay. Then how
7 would you -- the teachers who were supervising the P.A.S.S.
8 program would indicate which students came and which
9 students didn't come to the P.A.S.S.?
10     A. Okay. They would do this (indicating) every day.
11 This is Exhibit 8, I'm sorry, they would do this every day,
12 the attendance card.
13     Q. Each student in the P.A.S.S. program would have an
14 attendance card?
15     A. An attendance card. They would make them sign
16 in, so there would be a sheet where they actually sign that
17 would say like, whatever, September 9th, 2000 and then
18 they'd actually have to sign that sheet. As soon as they
19 walked in the room they signed it and they sat down. There
20 was actually another attendance form, like, when you take
21 daily attendance, just like an eight-and-a-half by eleven
22 sheet that they kept it on as well.
23     Q. I think we have --
24         MR. OLDS: Let's mark this exhibit.
25         (L. CAPPABIANCA EX. 11 - P.A.S.S. ATTENDANCE,

1    marked for identification.)
2    Q. So this is Exhibit 11, and these are documents
3 that have been provided to us by the Erie School District.
4 And can you tell me what that first page is on Exhibit 1?
5    A. It's a calendar for P.A.S.S. for the school year
6 2000-2001, and Saturday.
7    Q. 2000-2001, okay. The second page after that first
8 page, I think what we have is some various sign in sheets.
9    A. Okay -- yes.
10    Q. You indicated the sign in sheet was actually one
11 of three sheets that documented attendance at P.A.S.S.?
12    A. Yes.
13    Q. That would be the sheet that the students would
14 sign?
15    A. Um-hmm.
16    Q. The teachers would also -- or there would be the
17 card --
18    A. Um-hmm.
19    Q. -- that the teachers would mark. And there would
20 be a card for each student; is that right?
21    A. Yes.
22    Q. And then you're saying that the teachers had an
23 attendance sheet as well?
24    A. Yes.
25    Q. What happened to the attendance sheet that the

Page 73

1 teacher maintained?
2    A. There was a folder with all the P.A.S.S. stuff in
3 it that they kept. They kept the records after each year
4 so --
5    Q. What did that -- we have haven't seen all of those
6 records because there are confidentiality issues, but what
7 did those records look like?
8    A. I thought I saw you had an attendance sheet for
9 someone, I think it was C▓▓▓▓▓▓
10    Q. C▓▓▓▓▓▓ That was the -- right, that was the
11 card, right?
12    A. Not the card. It's an actual eight-and-a-half by
13 eleven type of sheet and you put an X or a P. It's the same
14 thing as the card. It's just what teachers would do their
15 daily attendance on.
16    MR. MARNEN: Exhibit 8.
17    THE WITNESS: No, that's not it. They use that as
18    well, but that's not what I'm referring to.
19    MR. MARNEN: You think you saw that today?
20    THE WITNESS: I thought I saw, you know, the
21    attendance where the teachers kept children's
22    attendance on, on attendance record.
23    Q. Is that it?
24    A. Oh, yeah. Something like that. It wouldn't have
25 been this exact sheet, but it was very similar to.

Page 74

1    Q. Well, so there would be a sheet with each student
2 who had been assigned to P.A.S.S. that the teachers would --
3    I guess the sheet would be created the first time the
4 student was assigned to P.A.S.S.?
5    A. Are you asking me if there's an individual sheet
6 for each child?
7    Q. Well, I am trying to get you to describe this
8 eight-and-a-half by eleven sheet of paper the --
9    A. It would have been just like this except it would
10 have like the different columns. And then it would have had
11 on one side it would have like all the children's names, and
12 then it would have like, say this was -- it would have
13 October at the top, and maybe October 1st, 2nd, 3rd and then
14 say this was K▓▓▓ L▓▓▓, October 1st, they might have put
15 a P. It's the very same thing as this except it's in a
16 different --
17    Q. It had all the -- well, what students' named did
18 it have on it?
19    A. Whoever was in attendance who was assigned
20 P.A.S.S.
21    Q. That would be -- are you indicating that there was
22 one sheet that covered the month of October?
23    A. Yes.
24    Q. And not every student's name would be listed on
25 that sheet because not every student would be assigned to

Page 75

1 P.A.S.S.; is that right?
2    A. Right.
3    Q. It would be as students were assigned to P.A.S.S.
4 their names were added to the sheet?
5    A. Right.
6    Q. The teachers, whoever were supervising the
7 P.A.S.S., would indicate whether the student had attended
8 P.A.S.S.?
9    A. Correct.
10    Q. Do you know who added -- how actually the
11 students' names were added to that sheet?
12    A. We had two teachers that were on every night there
13 was P.A.S.S.
14    Q. Okay. These teachers would know -- I might have
15 forgotten it -- they got the P.A.S.S. referral sheet, is
16 that how they knew who was on?
17    A. They would pick up the binder before they went to
18 P.A.S.S.
19    Q. You had entered the information about who was
20 going to be in P.A.S.S. in the binder?
21    A. Yes.
22    Q. And then they would transfer that information from
23 the binder to this sheet that they kept attendance on?
24    A. Yes.
25    Q. Do you know what happened to those sheets?

Page 76

Richard P, et al, vs Erie School
Held: 4/4/05

Multi-Page™
A000000115

L. Cappabianca

**Page 77**

1  A. No. They would have been with wherever you got
2  this, and the cards, the attendance cards that you showed me
3  earlier unless they didn't use them that year because we
4  have been doing P.A.S.S. forever, but that's the typical way
5  to keep attendance also. Kind of repetitive, so they may
6  have discontinued them. I don't know.
7      Q. And the P.A.S.S. program did that involve students
8  from the junior high and the regular high?
9      A. Yes.
10     Q. All the students would be mixed together?
11     A. Yes.
12     Q. And might you expect to see more than ten or less
13  than ten students in P.A.S.S. on a given night back in
14  2001-2002?
15     A. I would say more than ten. We used two
16  classrooms, though, and we had two teachers.
17     Q. What happened in P.A.S.S.?
18     A. They came in, they signed their names, they sat
19  down, supplemental work was assigned to them, which I was
20  responsible for getting. Well, responsible for putting a
21  note in the teacher's box to send enough work for three
22  days. It would be whatever they are working on during the
23  day, but not the same work, supplemental work. And there
24  was like a P.A.S.S. box they put it in then the P.A.S.S.
25  teachers would pick it up. Then the students would come in,

**Page 78**

1  they would sign in, they would sit at their seats and the
2  teachers would pass out this P.A.S.S. work. And they were
3  expected to work.
4      Q. Can I see Exhibit 11?
5      A. Absolutely.
6      (Brief pause.)
7      Q. So one of -- I guess one of the documents part of
8  Exhibit 11 is Bate stamped Erie 75 and that would be
9  P.A.S.S. for 12/19/01. The fifth name there is B█████
10  C█████. There is no signature there, does that mean he
11  might not have been there?
12     A. They may have whited it out.
13         MR. MARNEN: Because of privacy.
14     A. Well, yes, I am assuming he signed in. I assume
15  he was there.
16     Q. K█████ and R█████ were also scheduled for
17  P.A.S.S. that day.
18     A. Okay.
19     Q. She didn't go. You went down that path because
20  you recall that Denise L█████ came in and told you that --
21  came in first thing in the morning to talk about K█████
22  not attending P.A.S.S. that day.
23     A. Yes.
24     Q. Was she apologizing to you?
25     A. She wanted to inform me.

**Page 79**

1      Q. Did she tell you how she found out?
2      A. It may have been when she came to pick her up.
3  I'm not sure.
4      Q. How did --
5      A. They called, I'm sorry. They call. If a child is
6  not in P.A.S.S. the parents have to be notified because
7  that's where they are assigned till 6:30.
8      Q. Do you recall when you talked to Denise L█████ about
9  the incident that happen to K█████?
10     A. The 10th of January.
11     Q. 10th of January, how was it that -- did you call
12  her in?
13     A. She actually came into the building. She actually
14  came into our building.
15     Q. And why did she come in?
16     A. Not sure if Miss Woods called her in or if she had
17  to come in on her own. I am not sure.
18     Q. Did you meet with her -- who was involved in the
19  meeting with her?
20     A. I don't recall. I don't recall.
21     Q. Was she alone or was she accompanied by anyone?
22     A. I think she had her sister, Griffin.
23     Q. How do you know she came in on January 10th?
24     A. We found out about the incident on the 9th. We
25  questioned all the kids on the 9th. We had all the parents

**Page 80**

1  in on the 10th, and then the actual Barbers, Detective
2  Barbers were in on the 11th.
3      Q. How did you find out that K█████ was involved in
4  this incident, because she wasn't in school, right?
5      A. She was not in school. R█████
6      Q. When did R█████ tell you about K█████
7      A. The 9th she told me about everybody that was
8  there.
9      Q. Do you think that you called Ms. L█████ or did she
10  just show up on her own?
11     A. If I would have a made a phone call, Miss
12  Woods have, we both worked on it.
13     Q. Then tell me what you recall about your
14  conversation with Denise L█████
15     A. I don't recall it.
16     Q. You don't recall it?
17     A. Unh-unh -- no, sorry.
18     Q. Do you recall your conversation with Richard
19  P█████
20     A. I don't think I actually talked to him regarding
21  this incident. I think I talked to him beforehand. I know
22  I talked to him beforehand asking him to come in to discuss
23  the incident.
24     Q. You talked to him beforehand on the phone?
25     A. In person.

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 36 of 45
Richard P, et al, vs Eric School
Held: 4/4/05                                A000000116                L. Cappabianca

1  Q. Talked to him in person. What day did you meet
2 with him?
3  A. The 9th.
4  Q. How did you meet with him on the 9th?
5  A. He was at school.
6  Q. Why was he at the school?
7  A. Picking up R████
8  Q. You talked to him the day -- tell me when you saw
9 him that day on the 9th.
10  A. It would have been -- she was in P.A.S.S. that
11 day, so it would have been after that.
12  Q. After 6:30?
13  A. Um-hmm.
14  Q. Did you stay till 6:30 every night?
15  A. Myself or Mrs. Popadak.
16  Q. You weren't one of the P.A.S.S. teachers?
17  A. No, but one of us had to be on along with the
18 teachers.
19  Q. And so you took turns with Miss Popadak?
20  A. Yes.
21  Q. When you were in the building on those P.A.S.S. --
22 on those days where you had to stay late, where did you
23 stay?
24  A. My office.
25  Q. Why did one of you have to stay?

Page 81

1  A. In case any problems would arise.
2  Q. So R████ was in P.A.S.S. that day?
3  A. Yes.
4  Q. And do you recall why she was in P.A.S.S.?
5  A. No.
6  Q. Had you assigned her P.A.S.S. as a result of the
7 outbreaks she had in Miss Scully's room?
8  A. No. That would have been the same day, I don't
9 assign it on the same day.
10  Q. When you saw Richard P████ that day on
11 January 9, where did you meet with him?
12  A. Outside.
13  Q. Tell me what you remember of that conversation.
14  A. I just asked if he would come in to discuss
15 something. I don't know if we were more specific than that,
16 but to come in and discuss something with us.
17  Q. The next day, you just made the appointment; is
18 that what you are saying?
19  A. Um-hmm.
20  Q. You didn't get into the substance of -- you don't
21 recall whether you did?
22  A. No, no.
23  Q. Had you ever met Mr. P████ before January 9th?
24  A. Yes. I talked to him on the phone, but I had seen
25 him. I don't know if we actually had talked face-to-face,

Page 82

1 but I talked to him on the phone a few times.
2  Q. Tell me about what you remember talking to him on
3 the phone about.
4  A. One occasion would have been when I assigned
5 her -- although I thought it was Saturday detention -- for
6 swearing. Another time was dress code violation. She had
7 jeans on. And then I would have called when she and
8 K████ were in the locker room.
9  Q. Would you call a parent anytime a child didn't go
10 to class?
11  A. Yes.
12  Q. Tell me what you remember about the incident
13 involving R████ swearing.
14  A. Which time?
15  Q. Well, the time that you talked to Mr. P████.
16  A. One time it was just down the hall, it was just
17 the F-word and it was down the hall. I don't know what
18 precipitated it. I don't know. She was just swearing.
19  Q. So you called him up and told him what?
20  A. That she would receive a consequence, which would
21 have been a Saturday detention for swearing, unless there
22 was more than one time then it goes to three nights of
23 P.A.S.S..
24  Q. When you have -- do you have a specific
25 recollection of what was said in that conversation?

Page 83

1  A. No.
2  Q. It would have been your practice to use the
3 telephone -- use that communication to what, advise the
4 parent that their child had been assigned to P.A.S.S. and
5 you would explain-
6  A. Why.
7  Q. -- why they were assigned?
8  A. I would tell them the words they would use,
9 absolutely.
10  Q. That was an indication where you heard her use
11 those words, right?
12  A. Yes.
13  Q. It was in the hallway. And if that was the first
14 instance, it would be a Saturday P.A.S.S.?
15  A. Um-hmm -- yes, Saturday detention.
16  Q. Saturday detention. And then the first time that
17 you ever met Mr. P████ relative to -- a face-to-face
18 meeting with him relative to discipline wasn't until
19 January 9th.
20  A. I have seen him, I talked to him. I don't think
21 it was of anything that was regarding -- I am sure I said
22 hello to him. He came if in for parent conferences. I know
23 he's met with Miss Scully and things like that. I don't
24 think I have ever sat there and had a conversation with him
25 except on those instances.

Page 84

**Page 85**

1  Q. You did meet with him on January 10th when he met
2  with Miss Woods?
3  A. Correct.
4  Q. Do you recall where you were during that meeting?
5  A. Miss Woods' office.
6  Q. Why didn't you attend the meeting with him and
7  Miss Woods?
8  A. There probably was another parent or student in
9  the room.
10 Q. You mean in your room?
11 A. No.  I stayed with Miss Woods for those three
12 days, 9th, 10th and 11th.  That's all we did was this.  We
13 worked on this for the three days.  We didn't do anything
14 else outside of this.
15 Q. But so would you and Miss Woods both be in her
16 office meeting with someone?
17 A. Yes.
18 Q. So while she was -- is there a partition or
19 something?
20 A. They were in Mr. Rule's room, which was SAP,
21 student assistant program room, which was down the hall from
22 Miss Woods.
23 Q. So that particular meeting involved Mr. Rule, Miss
24 Woods and Mr. P█████
25 A. I believe R████ was there.

**Page 86**

1  Q. And R████ And then you were meeting with
2  someone, maybe some other parent or -- but about this case?
3  A. Absolutely.
4  Q. You don't remember who you were meeting; is that
5  right?
6  A. No.
7  Q. When did you find out that K████ had injured
8  herself?
9  A. The 7th.
10 Q. How did you find that out?
11 A. Mrs. L████ called me.
12 Q. She called?
13 A. Um-hmm.  She wanted me to know that she was in the
14 hospital and asked for work.
15 Q. Did she tell you what K████ had done?
16 A. She did.
17 Q. How do you know that was on the 7th?
18 A. Because it was the day -- she didn't get admitted
19 until, I think it was the 4th, so she called me to let me
20 know.
21 Q. You are certain she called you the first day
22 following the weekend after K████ was admitted?
23 A. Yes.
24 Q. She told you that K████ had injured herself?
25 A. Yes.

**Page 87**

1  Q. Did she tell you that K████ told her about this
2  sexual assault?
3  A. No.
4  Q. There was an incident on the 7th that involved
5  R████, do you remember that?
6  A. From R████ telling me on the 9th.
7  Q. Did you ever have occasion to see R████ being
8  cornered, menaced or harassed by any students?
9  A. No.
10 Q. R████ told you about the incident that happened
11 on the 7th, and I am talking about the incident that
12 happened in the school.
13 A. Right.
14 Q. Do you remember there was an incident that she
15 told you about, an incident that happened in the school?
16 A. Yes.
17 Q. What did she -- when did she tell you about that
18 incident?
19 A. On the 9th.
20 Q. Did she tell you on the 9th that a teacher had
21 broken up that incident on the 7th?
22 A. I don't know.
23 Q. Let me -- let's go back and make sure we are
24 talking about the same thing.  What do you recall her
25 telling you on the 9th about what happened on the 7th in

**Page 88**

1  school?
2  A. People were at the water fountain and they were
3  asking -- I have all that written down, because I was the
4  one that wrote that up.  Should we refer to that?
5  Q. I would like to get your memory and then you can
6  look at it.  I will give you a chance to look at it, but I
7  would like to get your memory first.
8  A. Okay.  I think they were asking her to do things,
9  perform oral sex.
10 Q. And do you recall whether she told you a teacher
11 broke that up?
12 A. I don't recall.
13 Q. Do you recall that it went from the water fountain
14 to the stairwell that incident?
15 A. No.
16 Q. Then did she tell you about another incident that
17 happened outside of the school --
18 A. Yes.
19 Q. -- on the 7th?  I mean, did she tell you on the
20 9th about an incident that happened on the 7th?
21 A. There was something that also happened again at
22 the laundromat.
23 Q. A second incident at the laundromat?
24 A. Yes.  Um-hmm.
25 Q. And what did she tell you about that incident?

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 38 of 45
Richard P, et al, vs Erie School                    Multi-Page™                    L. Cappabianca
Held:  4/4/05                                         A000000118

**Page 89**

1    A. I think she was over there waiting for her father
2  to pick her up and someone, a boy, approached her and pushed
3  her down and tried touching her under her shirt, and
4  unzipped his pants and showed his penis.
5    Q. She didn't know who that boy was; is that right?
6    A. Yes.
7    Q. You had an idea who the boy was?
8    A. Miss Woods.
9    Q. Ms. Woods had that.  His first name was R████
10   A. Yes.
11   Q. What was his last name?
12   A. H█████
13   Q. Why did Miss Woods suspect that it was R████
14 H█████
15   A. I don't know.  Maybe by the description she had
16 given.  I am not sure.
17   Q. Was C████ B████ -- did R████ tell you that
18 C████ B████ was allegedly involved in that incident as
19 well?
20   A. I don't recall.
21   Q. Did you talk to any faculty members to see whether
22 they had observed anything?
23   A. Yes.
24   Q. Who did you talk to?
25   A. Anyone that would have had any contact with

**Page 90**

1  R████
2    Q. Would this have been during the three-day period,
3  the 9th, 10th and 11th?
4    A. Um-hmm.
5    Q. Specifically do you remember which faculty members
6  you talked to?
7    A. It would have been Mrs. Scully, Miss Gray -- did I
8  mention her earlier?  I may have forgotten her.
9    Q. I think you did.
10   A. Miss Scully, Miss Gray, Mrs. Manus were the three
11 main people that worked with them day-to-day.  And Miss
12 Gray -- I'm sorry.
13   Q. You said Miss Gray.  Do you have a recollection of
14 what Miss -- what, if anything, Miss Scully told you?
15   A. No.
16   Q. Do you have a recollection of what, if anything,
17 Miss Gray told you?
18   A. No.
19   Q. Do you have a recollection of what, if anything,
20 Miss Manus told you?
21   A. No.
22   Q. Was it -- what is your perception or your feeling
23 or your belief about what students knew about this?  I guess
24 that's an ambiguous question.  It's not only -- the student
25 body, let's just say, did you have any sense that

**Page 91**

1  information about this incident had become common knowledge
2  among the student body?
3    A. No, but after it came out, yes.
4    Q. When you say no, but after it came out, what do
5  you mean?
6    A. There was -- December 20th right after the
7  incident had happened I had overheard some kids talking
8  about K████ and C████ Wasn't very specific, they were
9  in the hallway.  I told them to get to class, but I could
10 tell where the conversation was going.  So the next time I
11 saw K████ she was on her way to P.A.S.S.  We were
12 standing in the front hallway.  I said, I am hearing things
13 about you, and I knew it was of a sexual nature.  I said, I
14 don't know if they are true or not, and she goes, well,
15 they're true.  Then I said, well, these are things that
16 people share when they really care about each other and they
17 are in love.  In hindsight after that came out then I could
18 put it together that there was something that had gone on.
19   Q. You did have a conversation with K████ on
20 December 20th?
21   A. I did.  And then I talked to C████ also.
22   Q. So, again, the conversation with K████ was that
23 you approached her and you said you heard --
24   A. Things.
25   Q. Heard things, and are you saying you didn't

**Page 92**

1  specify what the things were?
2    A. No, I did not.  I didn't know what the things
3  were.  I just knew that something may have transpired
4  between them the night before.
5    Q. Did you ask her what had happened?
6    A. No.
7    Q. But you must have had some sense because what was
8  the next thing you said?
9    A. When two people love and care about each other
10 that they -- these are things that people do when they love
11 and care about each other.
12   Q. You must have had some sense it was a sexual
13 thing?
14   A. Right, that's what I said.  I know it was of a
15 sexual nature.  But whether it was kissing or anything more,
16 that's very serious.  To an adult -- when they're 12 years
17 old they can't handle the repercussions.  Kissing sometimes
18 leads to more.
19   Q. So K████ response was what?
20   A. It was true.
21   Q. But did you hear anything about R████ and
22 C████-
23   A. No.
24   Q. -- on the 20th?
25   A. No.  Actually I even talked to C████  Typically

Richard P., et al, vs Eric School
Held: 4/4/05

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 39 of 45
Multi-Page™
A000000119

L. Cappabianca

**Page 93**

1 when I hear something like that you want to talk to both
2 parties involved. And I said, C___ I'm hearing things
3 about you and K___ And he denied that anything ever
4 happened between them. He said she liked him -- and not his
5 words -- but made me believe that she would tell people
6 these things so they thought they were boyfriend and
7 girlfriend. He did not say that, but he led me to believe
8 that she was the one telling people these things.
9 Q. Did you talk to B___ C___ at all --
10 A. No.
11 Q. -- before Christmas?
12 A. No.
13 Q. What was your impression of C___
14 A. C___ was very sneaky. Very little in physique,
15 his stature, he was very little, although muscular, but very
16 sneaky. He would do things like take passes off of a
17 teacher's desk, passes to go to the bathroom, hallway
18 passes. And then fill them out and forge the teacher's name
19 and then you'd find them playing, he and a group of people,
20 in the gym, basketball. Or he would go into Miss Scully's
21 room -- one time he went into Miss Scully's room -- we have
22 video cameras in the hallways and it was 3:30 and we saw him
23 go in there on the video camera, they're not in the
24 classroom the video cameras, and he stole her candy. He was
25 very sneaky.

**Page 94**

1 Q. The conversation that you had with C___
2 A. Yes.
3 Q. Did that occur in the hallway or did you bring her
4 to your office?
5 A. No. It was actually -- she was on her way to
6 P.A.S.S., we are in the front hall. It was right before
7 Christmas break so the hall was pretty much cleared out.
8 Kids don't want to be there any longer than they have to be
9 right before a break. P.A.S.S. starts at 3:30, she was on
10 her way down. I did stop her there.
11 Q. Then that is when you had this conversation with
12 her?
13 A. Yes. It was like there's the front doors, and a
14 vestibule, then there's a hallway. We were in the hallway.
15    MR. OLDS: This might be an appropriate time to
16    postpone for the day.
17    MR. MARNEN: Okay.
18    (Examination concluded at 3:45 p.m.)
19         * * *
20
21
22
23
24
25

**Page 95**

1         C E R T I F I C A T I O N
2
3
4    I, Linda K. Rogers, Shorthand Reporter and
5 Commissioner of Deeds in and for the Commonwealth of
6 Pennsylvania, do hereby certify that I recorded
7 stenographically the proceedings herein at the time and
8 place noted in the heading hereof, and that the foregoing is
9 an accurate and complete transcript of same to the best of
10 my knowledge and belief.
11
12
13
14
15
16
17
18
19         _____
20         Linda K. Rogers
21
22 Dated: April 15th, 2005
23
24
25

**Page 96**

1                 INDEX
2             EXAMINATION
3 WITNESS NAME                    PAGE  LINE
4 LINDA CAPPABIANCA..................... 3   1
5   Direct By Mr. Olds.................. 3   5
6             EXHIBITS
7    DESCRIPTION              PAGE  LINE
8 LC EX 2  COMPUTER PRINTOUT......... 26   17
  LC EX 3  ___ DISCPLINARY INFO... 31   6
9 LC EX 4  DOCUMENT................. 38   24
  LC EX 5  INVITATION TO IEP....... 38   24
10 LC EX 6  IEP..................... 46   3
   LC EX 7  IEP..................... 47   25
11 LC EX 8  ATTENDANCE CARD......... 49   11
   LC EX 9  COMPUTER REPORT......... 66   6
12 LC EX 10 COMPUTER REPORT......... 66   7
   LC EX 11 P.A.S.S. ATTENDANCE.... 72   25
13
14
15
16
17
18         * * *
19
20
21
22
23
24
25

Richard P. vs School District
Held: 4/29/05

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 40 of 45

Multi-Page™
A000000120

L. Cappabianca



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD P., BY AND FOR
R█████ P., AND DENISE L., BY
AND FOR K████ L.,
          Plaintiffs

          vs                          Civil Action No. 03-390
                                              Erie
SCHOOL DISTRICT OF THE
CITY OF ERIE, PENNSYLVANIA;
JANET WOODS, INDIVIDUALLY
and in her Capacity as Principal
of Strong Vincent High School;
and LINDA L. CAPPABIANCA,
Individually and in her Capacity
as Assistant Principal of Strong
Vincent High School,
          Defendants

          Deposition of LINDA CAPPABIANCA, taken before

and by Linda K. Rogers, Commissioner of Deeds in

the Commonwealth of Pennsylvania and Notary Public

in the State of New York, on Friday, April 29,

2005, commencing at 11:15 a.m, at the law offices

of Knox, McLaughlin, Gornall & Sennett, 120 West

10th Street, Erie, Pennsylvania.

          * * *

**Page 2**

For the Plaintiffs:
     Edward Olds, Esquire
     Carolyn Russ, Esquire
     1007 Mount Royal Boulevard
     Pittsburgh, PA 15223

For the Defendants:
     James T. Marnen, Esquire
     Knox McLaughlin Gornall & Sennett, PC
     120 West 10th Street
     Erie, PA 16501

          * * *

**Page 3**

1  LINDA CAPPABIANCA, first having
2  been duly sworn, testified as follows:
3
4          DIRECT EXAMINATION
5  BY MR. OLDS:
6
7      Q. Good morning, Miss Cappabianca, how are you?
8      A. Wonderful. How are you?
9      Q. Pretty good. I don't think we are going to be --
10 I don't think it's going to be an all day thing or anything
11 like that. We'll be here for a little while, just for your
12 anticipation, I guess.
13         I guess maybe one thing I would like to talk about
14 is to come to an understanding about the documents that
15 might have been created as you and Miss Woods conducted your
16 investigation. And just so you can understand, I guess,
17 maybe where we are coming from, we conducted the deposition
18 of some of the police officers and one of the police
19 officers said that there were -- testified, and the police
20 records indicate there were two documentary or physical
21 items of evidence in this case. One being a videotape of
22 R█████ P█████ and, the second, being a statement that
23 actually you wrote for A████ F████ And so that is
24 what was turned over to the police, at least that's what the
25 police indicate was turned over to them. You and Miss Woods

**Page 4**

1  conducted at least two days of interviews, right, or was it
2  three days?
3      A. Two.
4      Q. And the first day was it the students that you
5  were interviewing?
6      A. Yes.
7      Q. And when you interviewed the students, aside from
8  A████ F████ did you ask any of them to write anything?
9      A. I know that Jan and I made -- had written things
10 down for our own memory notes. I believe that the students
11 did.
12     Q. What's that, I'm sorry, go ahead.
13     A. It's typical whenever, no matter what the
14 circumstances are, whenever you are talking with a child to
15 have them write down their side of the story.
16     Q. That was going to be my question, that would have
17 been the practice?
18     A. Yes.
19     Q. Do you have any explanation as to why the
20 students' statements don't exist anymore?
21     A. (Witness moved head side to side.)
22     Q. I guess that's my question: Do you have any
23 explanation why those statements apparently don't exist?
24     A. I know that everything that I have had, my whole
25 file of those kids, their discipline files are no longer in

Richard PC vs School District
Held: 4/29/05

Document 57-3    Filed 08/18/2005    Page 41 of 45
Multi-Page
A00000012 P

L. Cappabianca

**Page 5**

1 existence. There would have been copies for my own personal
2 file. And then whatever I had put together I had sent to, I
3 believe Jim Perfetto had it, he would be the chief of
4 security for the district.
5    Q. Do you remember what time, going back to Wednesday
6 the 9th, which would be the day that you met with R████, do
7 you remember what time of the day that was when you started?
8    A. I believe it was first thing in the morning.
9 First period or fifth period, whatever it was A or B day.
10    Q. Do you remember if R████ was asked to write
11 anything out?
12    A. I do not.
13    Q. You started off with you personally started off
14 with R████ because she was referred to you by Miss Scully?
15    A. Yes.
16    Q. There had been an outburst; is that right?
17    A. Yes.
18    Q. Do you remember how long you spent with R████
19 before you went down and talked with Mrs. Woods?
20    A. I do not.
21    Q. Do you remember what R████ was like that day?
22    A. She was angry when she first came to me, but
23 obviously to, say, scream the F word out at someone you
24 would have to be pretty upset with them.
25    Q. As you talked to her what was her demeanor?

**Page 7**

1    Q. And up until that time when you had this
2 conversation with R████ and not counting the conversation
3 that you talked about earlier in your deposition with
4 K████ before Christmas --
5    A. Okay.
6    Q. -- up until that time had you learned that any of
7 the other students in the middle school, had you learned of
8 any instances where those students were sexually active?
9    A. No.
10    Q. My question is: This was the first instance then
11 where you encountered an issue of middle school students
12 being sexually active after you came to Strong Vincent? It
13 is a very confusing question.
14    A. It is a very confusing question.
15    Q. Let me try to rephrase it. Had you ever
16 investigated before this conversation with R████ and not
17 counting the one with K████ had you ever investigated an
18 instance of sexual activity involving the middle school
19 students at Strong Vincent?
20    A. Yes. I don't know -- I'm sorry to interrupt. I
21 don't know if it was before or after this because I was
22 there for a two-and-a-half-year period.
23    Q. What was the nature of the other incident that you
24 investigated?
25    A. I actually had an eighth grade boy that came to me

**Page 6**

1    A. Angry.
2    Q. How long -- if I just asked you this, I'm sorry --
3 you don't recall how long your initial meeting was with her?
4    A. No, I do not.
5    Q. You went -- you took her down to Mrs. Woods'
6 office; is that right?
7    A. Yes.
8    Q. And then tell me your best recollection of what
9 happened when you and Miss Woods were meeting with R████
10    A. It would have been Miss Woods just trying to
11 figure out what had happened, so she would have been asking
12 R████ questions.
13    Q. When you met with R████ first before you went
14 down to Miss Woods did R████ -- she admitted -- did she
15 tell you that she had that there was an instance of oral
16 sex?
17    A. Yes.
18    Q. More than one?
19    A. Do you mean on that same evening?
20    Q. Yeah, that same evening.
21    A. I don't know that.
22    Q. Did she identify any of the other students
23 involved in that incident?
24    A. Yeah. I don't know if it was at that point or if
25 it was once we went to Miss Woods' office, but, yes.

**Page 8**

1 to tell me that he got his girlfriend pregnant. I have had
2 other middle school student girls come to me because they
3 thought they were pregnant.
4    Q. If girls come to you and confide to you that they
5 are concerned about being pregnant, do you report that
6 conversation to their parents?
7    A. Absolutely, and the nurse.
8    Q. Who was the nurse?
9    A. Jan Dean.
10    Q. Do you know -- we have been given some more
11 records and there was a name Mrs. DiBello.
12    A. She was IJDPP person, which stands for intensive
13 juvenile delinquency prevention program.
14    Q. Did she have an office at Strong Vincent?
15    A. She did.
16    Q. What was her job? Was she a school district
17 employee to your knowledge?
18    A. Perseus House.
19    Q. Perseus House. So why was there a Perseus House
20 employee at Strong Vincent?
21    A. Many times it could be court ordered from the
22 district justice. She worked with kids. It was a way to
23 get kids that were at risk before they actually would do
24 anything that could get them into the system like probation,
25 that's why it was intensive juvenile prevention program.

Richard F. vs School District                                      L. Cappabianca
Held: 4/29/05                     Multi-Page™
                                  A000000122

**Page 9**

1  Q. Did you in the course of your talking with R████
2  that morning and then with R████ and Miss Woods, did anyone
3  call in the nurse or send R████ to the nurse?
4  A. Not that I remember.
5  Q. And after you finished talking to R████ that
6  morning, January 9th, after you and Miss Woods -- first you
7  talked to her and then Miss Woods talked to her, what
8  happened to R████
9  A. I don't know. I don't know.
10  Q. Now, do you remember the order of the way that you
11  interviewed the other students?
12  A. Unh-unh, no.
13  Q. Do you remember today which other students you
14  interviewed?
15  A. Yes.
16  Q. Which other students did you interview?
17  A. C███ A████
18  MR. MARNEN: That's C███, right?
19  A. Y███ H███, C███ B███, A████
20  G████ B███ C████ A████ K████
21  Q. Okay.
22  A. I think that's it.
23  Q. Do you have a recollection of what C███
24  A████told you?
25  A. Not specifically.

**Page 10**

1  Q. What about Y████ H███?
2  A. I don't know. I mean it was basically the event
3  that had taken place that there was oral sex going on. I
4  can't give you any details.
5  Q. For instance, let me go down the list first and
6  then we will go back to the individuals. Do you recall what
7  C███ B███ said?
8  A. I am trying to put myself back at that time. No.
9  Q. Do you recall -- now, you had talked to him before
10  Christmas about -- talked to him, C███ B███ before
11  Christmas about the hall talk that you heard. And at that
12  point he denied having done anything sexual with K████
13  is that right?
14  A. Correct.
15  Q. Do you recall whether he was still denying that
16  anything sexual had gone on?
17  MR. MARNEN: On January 9th you mean?
18  Q. Yeah, when you met with him on January 9th.
19  A. I don't think any of them denied what happened
20  that night. They may have denied -- I think B████ denied
21  ever touching R████, but never denied the actual oral sex
22  taking place.
23  Q. So, Becky -- what was B████s explanation of those
24  events?
25  A. They were just over at the laundromat, and she led

**Page 11**

1  us, meaning Miss Woods and I, to believe that it was more
2  them willingly doing it than her actually intimidating them
3  or coercing them or threatening them.
4  Q. A████ K████ did he deny that anything had
5  happened?
6  A. No. I think at first he did. He knew when we
7  called him in what we wanted. I believe his first words
8  were, I know what you want and I had nothing to do with it,
9  but then he admitted to it afterwards.
10  Q. Was A████ K████, in the 12th grade, do you
11  remember?
12  A. I believe he was.
13  Q. You weren't -- you hadn't been familiar with him
14  since he was in the high school, you hadn't had any
15  discipline issues with him; is that right?
16  A. No.
17  Q. There was a male principal, vice principal,
18  associated with the high school. Did that person
19  participate in these meetings?
20  A. He may have especially with A████ being
21  involved.
22  Q. What was his name?
23  A. P████ H███
24  Q. H███ And then A████ G████ did you
25  remember what he said, A████ G████ H███

**Page 12**

1  A. That he was there that evening. He said that
2  B███ had basically went up to them and said that she knows
3  somebody that would perform oral sex on them if they were
4  willing. And I believe he said at one point she actually
5  was punching R████ in the -- I think the ribs, she was
6  actually punching her to make her follow through with what
7  B███ was telling the boys.
8  Q. And then you do not have -- is it fair to say you
9  don't have a vivid recollection of what either C███ or
10  Y████ said specifically; is that right?
11  A. Right.
12  Q. You have a clear recollection of, for instance,
13  B███ who said -- B████ said something to the effect that it
14  was willing or voluntary or consensual, and I didn't
15  instigate it. So B████ denied having a responsibility for
16  it; is that right?
17  A. Right.
18  Q. A████ H███ you think he acknowledged that it
19  happened --
20  A. Yes.
21  Q. -- at that point. Originally A████ K████
22  denied but then later on admitted --
23  A. Um-hmm.
24  Q. -- that it happened. And you told us what you
25  remember about A████ G████ You indicated that the

Richard F. vs School District
Held: 4/29/05

Case 1:03-cv-00390-SJM    Document 57-3    Filed 08/18/2005    Page 43 of 45
A000000123

Multi-Page ™

L. Cappabianca

**Page 13**

1 last time we were here at the deposition you had a
2 conversation with K____ before Christmas in which she
3 indicated that something happened. Did she say that it was
4 bad, something bad happened?
5     A. No. It was a very short conversation in the hall
6 right outside -- there is the main office and then there is
7 like the front doors, the auditorium, and then she was on
8 her way to the P.A.S.S. program. I actually had stopped her
9 to ask her about it, nothing in detail, it was just that I
10 had overheard something about her and C____ don't know
11 if it's true. And she had said, yes, it is.
12     Q. You made the comment to her that is what grownups
13 do?
14     A. People that care and love each other, yes.
15     Q. Had K____ -- do you recall her coming to you on
16 any other occasions and complaining that students were
17 harassing her?
18     A. No, and I saw her a lot.
19     Q. When you saw her, what did you and her talk about?
20     A. She would just stop in even to say hello, very
21 friendly, very social, had a very good rapport with the
22 other kids. Very unorganized, you know, just getting her
23 from one classroom to another.
24     Q. Did she ever complain to you she was being picked
25 on?

**Page 14**

1     A. No.
2     Q. Did she ever complain to you that students were
3 taunting her or calling her names?
4     A. No. She was very well liked. Her sister was more
5 so made fun of.
6     Q. And then at the end of the first day you had
7 interviewed all these students, and Mr. Hart may have been
8 there for one interview or maybe for more than one?
9     A. He could have been there for more than one. I
10 don't know why he would have been, but he could have been
11 there.
12     Q. It was you and Miss Woods together; is that right?
13     A. Yes.
14     Q. Maybe Mr. Hart?
15     A. Maybe.
16     Q. Was there anyone else at those interviews that
17 first day?
18     A. I want to say Wally Love was there. He was the
19 detective that we had for the Erie School District. It was
20 typical to have a police officer in the room even in less
21 significant events.
22     Q. Do you think he could have been in the room but
23 not paying attention or not listening?
24     A. I can't speak for him, but I don't know how in the
25 nature of this incident you couldn't pay attention, but I

**Page 15**

1 mean is it possible, I guess.
2     Q. Was there anyone else aside from Mr. Love
3 that you can recall?
4     A. You mean during the actual interviews?
5     Q. Yes.
6     A. I don't think so.
7     Q. When you did the interviews, you would bring a
8 student down to the office. When the student -- when you
9 were done talking to the student, would the student be sent
10 back to class?
11     A. Yes.
12     Q. And were all the students pulled out of class at
13 the same time?
14     A. No.
15     Q. So one would come down, go back, and then the next
16 one would come down?
17     A. Yes.
18     Q. And then at the end of that day after you
19 conducted all the interviews, tell me what you and
20 Miss Woods decided to do next.
21     A. Okay. It's very hard to distinguish that day from
22 the two days after that because it was kind of very long
23 days that that's all we worked on from the time we got to
24 school till the time we left school was this is all we did
25 for three days. I guess I don't know what you're asking me.

**Page 16**

1     Q. When you were done with those first days of
2 interviews, did you know what you were going to do the next
3 day?
4     A. We wanted -- I know we wanted to talk to the
5 parents. We had been on the phone off and on for those
6 three days, you know, between school district officials,
7 Mr. Scozzie, Jim Perfetto, chief of security, so, yeah.
8     Q. Did Mr. Perfetto ever come down?
9     A. He did come in, but I don't know what day it was.
10 Yes, he did come in.
11     Q. And when conversations would occur between
12 Mr. Scozzie and you guys, would it be like on a speaker
13 phone so you could both hear?
14     A. No, Miss Woods would be on the phone.
15     Q. Miss Woods would be talking. So the next day
16 apparently some parents came in; is that right?
17     A. Yes.
18     Q. The phone calls to the parents, do you know
19 whether they were made the previous day or did you make the
20 phone calls the morning when the parents came in?
21     A. I don't know that for sure. I want to say that
22 even on the 9th -- I want to say that we were in contact
23 with the parents from the 9th, 10th and even the 11th.
24     Q. At some point Chris Ruhl got involved in this
25 investigation; is that right?

Case 1:03-cv-00390-SJM   Document 57-3   Filed 08/18/2005   Page 44 of 45

Richard P. vs School District
Held: 4/29/05

Multi-Page ™
A000000124

L. Cappabianca

**Page 17**

1    A. Yes.

2    Q. Do you remember what brought him into it?

3    A. He was working with R█████ already. And he, being

4 part of the mental health component, I believe when we knew

5 K█████ was in Millcreek Community and so they usually --

6 the hospital and the mental health person work together.

7    Q. Did he sit in on any of the interviews with the

8 students, do you remember?

9    A. Not that I recall.

10    Q. Do you remember whether he sat in on any of the

11 interviews with parents?

12    A. I never met with Mr. P█████ It was Miss Woods

13 and Mr. Ruhl who met with her (sic), and he may have been --

14 I think Miss Woods met with Mrs. L█████ also, so he may have.

15    Q. Do you remember why you were not available to meet

16 with Mr. P█████

17    A. I do not.

18    Q. How many times in that year do you think you had

19 had conversations with Mr. P█████

20    A. I had a few phone conversations with him whenever

21 she was assigned Saturday detention or P.A.S.S. I would have

22 called him.

23    Q. I forget in the progression of the discipline,

24 does Saturday detention, does that come before or after

25 P.A.S.S.?

**Page 18**

1    A. Typically before, but it depends on the severity

2 of the infraction and the number of infractions.

3    Q. Saturday detention was seen as a lesser --

4    A. Yes.

5    Q. -- punishment. Do you remember meeting with T█████

6 N█████ mother, Robin Johnson?

7    A. No.

8    Q. You don't remember meeting with her at all?

9    A. Unh-unh.

10    MR. MARNEN: Verbalize your answer.

11    A. No. I'm sorry.

12    Q. She prepared an affidavit in this case, has your

13 counsel ever shared that affidavit with you?

14    A. Yes.

15    Q. You have no recollection of that incident or the

16 events that she describes?

17    A. Correct. On the 9th, 10th and 11th we worked on

18 nothing but this case. I wouldn't have met with people that

19 weren't involved on this case. I never even went to my

20 office for those three days.

21    Q. Do you recall ever meeting with Robin Johnson?

22    A. No. I don't recall T█████ N█████

23    Q. She had a sister A█████ N█████; do you recall

24 her?

25    A. No. Was she in seventh or eighth grade?

**Page 19**

1    A. No. She might have been in eighth grade but I'm

2 not sure. Did you meet with the parents -- do you recall

3 whether you met with the parents of Y█████ or C█████

4    A. I don't know if we met with them in person or if

5 we talked to them on the phone, but they would have been

6 called.

7    Q. You say they would have been called, what would

8 have been the purpose of calling them?

9    A. Because of the nature of the situation, especially

10 with the police being involved, they were going to have to

11 be questioned by the police.

12    Q. So you're not certain -- as we sit here today you

13 don't recollect whether they came in the next day, the 10th,

14 when you started meeting with parents?

15    A. I don't.

16    Q. When did you first talk to Richard P█████

17    A. I think, I don't know if I ever really spoke to

18 him, but I know we had asked him to come in. I think it was

19 the 9th we had asked him to come in the next day.

20    Q. Was it -- that might not have been you, it might

21 have been Miss Woods that talked to him?

22    A. I remember a time that I had talked to him outside

23 of the school, but I don't know if it was involving this

24 incident or not but, yes.

25    MR. OLDS: Let's mark this as exhibit --

**Page 20**

1    off the record.

2    (Discussion held off the record.)

3    (EX. 12 - SAP DAILY REPORT FORMS.

4    marked for identification.)

5    Q. These are SAP daily report forms. I don't know if

6 you have seen these before?

7    A. No, today.

8    Q. And I am not going to ask you to identify any of

9 the information. I want to call your attention to, I guess

10 it would be the third page Bate stamp 2248 of Exhibit 12

11 which is dated 1/10/02.

12    I think these are the activity sheets of Chris

13 Ruhl. It indicates that -- it seams to indicate that Chris

14 Ruhl met with Mr. P█████ about R█████ for two hours on that

15 day. I'm assuming that is also when R█████ dad met

16 with Miss Woods because I'm assuming they met together. I

17 guess my question is: Do you recall there being a time on

18 that day when for two hours you weren't participating in

19 meetings with Miss Woods and Mr. Ruhl you in other words,

20 does this refresh your recollection? Does it help you in

21 terms of refreshing your recollection about accounting for

22 your time on that day?

23    A. No.

24    Q. Did you ever meet Miss DiBello about this

25 incident?

1  A. I met with her about several things, I mean on a
2  regular basis because she worked with several of our
3  students. I don't know, I would imagine, but I don't know
4  that for sure. She, I believe, was working with R████ too
5  for a period of time. So, I mean, yes, I can tell
6     Q. On the page before on this, it would be 2246 Bate
7  stamp, second page of Exhibit 12, there is a -- Mr. Ruhl
8  indicates that he met with you and then there's something
9  blacked out. It looks like it begins with a P, I don't know
10 if that's --
11    MR. MARNEN: It was. I was the one that redacted
12    it and that was P████y. I was just following the
13    judge's order.
14    Q. Do you recall talking to Chris Ruhl on January 9th
15 about R████ P████
16    A. Like I said, the three days --
17    Q. Run together?
18    A. It is very hard to determine what happened on this
19 day and what happened on this day. Because, like I said,
20 there was nothing else I worked on for those three days. So
21 do I know it was the 9th, no. Did I talk to Chris Ruhl
22 regarding this situation, absolutely I did.
23    Q. What do you remember the conversation with
24 Mr. Ruhl being about?
25    A. What was the best interest of the girls from here

Page 21

1  on, and whatever we could do to help them.
2     MR. MARNEN: Off the record.
3     (Discussion held off the record.)
4     Q. Do you remember what parents you actually -- were
5  actually in the room with you and Miss Woods?
6     A. Um, no, but I remember when A████ G██████
7  mother came in. I remember when she came in. I remember
8  when B██████████'s mother came in.
9     Q. When A████ mother came in, what do you recall
10 of that discussion?
11    A. We had kind of discussed things on the phone
12 earlier so she knew what the situation was about. It was
13 just more for her to come in. And I took a statement down,
14 not -- I think it says something about time wise, which I
15 guess in essence it would be time wise, but he was very
16 limited in his skills. So it was something for -- he
17 wouldn't have been able to write that himself.
18    So it was just more of her coming in to sit there,
19 you know, I knew at one point that it may have even been
20 when the police were coming in, just to be present and
21 supportive. She was very cooperative. She just wanted him
22 to be forthright and not afraid to tell what happened.
23    MR. OLDS: Do you remember what A████
24    statement, what exhibit number you gave that?
25    MR. MARNEN: I marked it as Defendants' Exhibit M.

Page 22

1     Q. This document, which is a statement, is dated
2  1/11/02.
3     A. Um-hmm.
4     Q. And it's your handwriting --
5     A. Um-hmm.
6     Q. -- is that correct?
7     A. Um-hmm.
8     Q. You have to say yes.
9     A. Yes. I'm sorry, yes.
10    Q. It was signed by A████, apparently he signed it,
11 his name is blacked out there.
12    A. Okay.
13    Q. Do you think that you prepared this statement on
14 January 11?
15    A. Yes. I wouldn't have put that date on it if I
16 didn't.
17    Q. This is actually -- this was prepared when the
18 police were interviewing him?
19    A. Yes.
20    Q. And how did you -- did he dictate this?
21    A. Yes.
22    Q. Tell me how it was prepared.
23    A. He sat across -- I was at Miss Woods' desk -- he
24 sat across from me and he told me what happened that
25 evening. I was writing it.

Page 23

1     Q. Did you try to do a verbatim thing or does this
2  include your editing?
3     A. No. I would have done what he had told me.
4     Q. He says before Christmas break at 6:45 me, A████
5  K., C████ left P.A.S.S. and went walking down 8th Street.
6  B███, R███, Y████ started walking with us, and B█
7  said I know this girl that sucks dick.
8     A. Right. If I would have edited it, I wouldn't have
9  put that in there.
10    Q. Now, how was it determined that this happened on
11 December 19th?
12    A. It was actually determined from when R████ had
13 talked to Miss Woods and when it happened, and then after we
14 had everybody down.
15    Q. When you say you had everyone down, what do you
16 mean?
17    A. Talked to the other kids.
18    Q. Who put the date on it, was it you and Miss Woods
19 or was it one of the kids -- the kids probably didn't know
20 what day it was.
21    A. Oh, they knew what day it was. They were very
22 clear about this.
23    Q. What were they clear about?
24    A. The whole evening. I mean, basically it was all,
25 from what I recall, they all had the same recollection of

Page 24