**Page 25**

1  what happened that evening.
2      Q. I'm talking about what evening it was.  In other
3  words, I'm sure none of the kids said it was December 19th?
4      A. Yes.  I wouldn't have put a date on it, on my
5  write up if I had not got that date from them.
6      Q. You're saying one of the children said, actually
7  used the words December 19th?
8      A. Yes.
9      Q. But not A███████ because all he says is before
10 Christmas?
11     A. Right.
12     Q. Do you remember which of the students knew, which
13 one of the students said it was the 19th?
14     A. We talked to several of them so no.
15     Q. We had previously marked as Exhibit 8 C██████
16 B████, this was his P.A.S.S. attendance record; is that
17 right?
18     A. Yes.
19     Q. That record shows he was not in P.A.S.S. on
20 December 19th; is that right?
21     A. Correct.
22     Q. And I want to ask you another question about the
23 form.  On November 27th it says that he was in P.A.S.S. and
24 he was released.  What does that mean?
25     A. That means it would have been his last night of

**Page 26**

1  the P.A.S.S.  After he served his, whatever, three days, two
2  days, well, it would have been three, after he served his
3  three days that would have been the last night he served and
4  then he would be released from the P.A.S.S. program.
5      Q. Okay.  I'm going to show you --
6      MR. OLDS:  Let's mark this as Exhibit 13.
7      (PLAINTIFFS' EX. 13 - SV ATTENDANCE SHEET,
8         marked for identification.)
9      Q. Exhibit 13 is a document entitled Strong Vincent
10 High School attendance accounting sheet; is that right?
11     A. Yes.
12     Q. This isn't a P.A.S.S. attendance sheet is it or is
13 it?
14     A. No.  This would have been her homeroom teacher's.
15     Q. Now, this apparently involves R████ P██████.  I'm
16 looking at her attendance in December, and it looks like she
17 missed unexcused absences -- well, let me ask the question:
18 When there is an X in the field coming down, illegal, does
19 that mean she was absent from school?
20     A. Um-hmm.
21     Q. So it doesn't just mean she didn't appear in
22 homeroom, as far as you know, she wasn't in school that day?
23     A. Yes.
24     Q. It's illegal because there is no note?
25     A. Right.

**Page 27**

1      Q. Then I note that on December 20th and 21st there
2  is a legal absence, and it says per Capp.  Do you remember
3  the circumstances surrounding those entries?
4      A. No.  You do not have a recollection.  I mean,
5  apparently she wasn't in school.  The records indicate she
6  was not in school on 12/20 and 12/21 --
7      A. Yes.
8      Q. Is that correct?
9      A. Correct.
10     Q. Apparently somebody using your authority --
11     A. That even looks like my writing.
12     Q. It's your writing?
13     A. It looks like it.
14     Q. Do you recall why?
15     A. I do not.
16     Q. When a student such as R████ had that kind of
17 attendance record, would there be calls to her parents or
18 anything?
19     A. There's an automatic generated one in the middle
20 school and high school.
21     Q. How does that automatic generated call occur?
22     A. Well, we had an attendance office so whenever the
23 card came down it would just call and just say this is
24 Strong Vincent High School your student or your child is not
25 in school today.  Please call the school, something like

**Page 28**

1  that.  I don't know, I never actually listened to it.
2      The elementary schools don't have -- like we don't
3  have it at Harding.  But the middle and high schools, I
4  believe have that automatic one.  Yes, whenever somebody has
5  a -- not somebody such as R████ -- whenever a child has
6  that many days there are certain state laws you have to file
7  certain paperwork.  If a child misses ten days, it gets what
8  is called a ten-day letter.  Any day after that they have to
9  have a doctor's excuse, even if it's a sore throat they
10 still have to have a doctor's excuse.
11     If they had three illegal days they have three
12 days to bring in a note, so if they were off on Friday they
13 have Monday, Tuesday, Wednesday.  If they were absent on
14 Thursday, they have Friday, Monday, Tuesday to bring it in.
15 If they don't bring it in within three days, we mark it
16 illegal.  However, we do give a little leniency as long as
17 they bring in -- especially middle school students, they
18 might put it in their back pocket and go through the
19 wash.  If they don't bring in a note at all, at the end of
20 those three days you mark it illegal.  After three illegal
21 days, three times they are absent and haven't brought in a
22 note, you file what is called a first notice.  That's
23 letting the parent know that they have three illegal days.
24 If they have any other illegal days, then you are going to
25 get a second notice, and then it goes to the district

Page 29

1  justice.
2  Q. Did R███ have enough illegal days --
3  A. Absolutely she did. I don't know if anything was
4  filed or not.
5  Q. There should have at least been a notice?
6  A. There should have been a ten-day letter, I would
7  imagine, and a first notice. Yes. I'm assuming these ones
8  on the 17th and 18th says note, that they were legal
9  absences. Yes, she should have had -- at the bottom there's
10 another -- is there another page to this?
11 Q. I don't know if there is or not.
12 A. There should be somewhere on here where it says
13 first notice and then you can write the date. Homeroom
14 teacher will write the date when the first notice was,
15 ten-day letter, second notice.
16 Q. We will look for that.
17 A. Once a second notice then it goes to the district
18 justice and a court date is filed.
19 Q. Going back to picking this date, this December
20 19th day as the day for the incident, do you have a specific
21 recollection here today, can you take me through
22 step-by-step the thought process or reasoning that led to
23 the selection of that day?
24 A. Um, it was just what the children had told us.
25 Q. So it's your recollection that the children -- I

Page 30

1  guess what I want to understand is, do you think you and
2  Miss Woods reconstructed a date from what the children said
3  or do you think -- is it your testimony that the children
4  actually said this happened on a particular day?
5  A. The children actually said it.
6  Q. Happened on a particular day?
7  A. Right, right.
8  Q. But not A███F██████, he just said before
9  Christmas break?
10 A. Correct. We wouldn't have picked the day. It had
11 to be close to when we actually found out about it because
12 kids don't tend to keep things quiet. It would have been
13 something that, you know, right after that, the 19th, we
14 went on break on the 21st, we didn't get back till, what,
15 the 2nd?
16 Q. That's probably right. There's a calendar in here
17 someplace.
18 A. It came out fairly soon after it actually
19 happened, which is typically what it does.
20 MR. MARNEN: Off the record.
21 (Discussion held off he record.)
22 (Lunch recess.)
23 MR. OLDS: Can you pull out -- Jim, can you pull
24 out Woods' Deposition Exhibit 1, it's this
25 document here. Do you have an extra copy? I have

Page 31

1  an extra copy here. She can look at the original.
2  Q. Woods' Deposition Exhibit 1 is a January 10, 2000,
3  and that bears the date January 10, 2001. Did you prepare
4  this?
5  A. Um-hmm.
6  MR. MARNEN: Yes?
7  A. Yes -- sorry.
8  Q. And I take it that you prepared it -- do you
9  recall that you sent it to the police department?
10 A. I don't know if we sent it through Perfetto or if
11 we sent it right down to the police department. I don't
12 know that.
13 Q. And do you remember why you prepared this
14 document?
15 A. It was just summarizing the events that had taken
16 place.
17 Q. You start the document by saying, it's been
18 brought to your attention that on Wednesday, December 19th
19 several students were engaged in inappropriate sexual
20 behavior on the way home from the P.A.S.S. program, B██
21 C██████ R██ P██████, C██ A██████ Y██████ -- is
22 it H█████████████
23 A. H█████████
24 Q. H█████, K████ L███, ██ B███, A████
25 G██████, A██ K███ were the students in question.

Page 32

1  After interviewing all the persons involved, with the
2  exception of K████ L██ because she was hospitalized at
3  Millcreek Hospital for mental health reasons, it's apparent
4  that C██ Y██████ and A██████ did not participate in the
5  sexually -- you say defiant, did you mean deviant or did you
6  mean defiant behavior?
7  A. Deviant.
8  Q. Then you write R████P█████ admittedly went into
9  the bathroom at the laundromat with A███ K████ and
10 performed oral copulation on C██ B██ on December 19th.
11 She states that B██ C██████ had forced her to go into the
12 bathroom with A███ K████. Do you know what has been
13 blacked out?
14 A. I don't know. Do you have the original?
15 Q. No, we don't.
16 A. Who blacked this out?
17 Q. The police department did, I guess pursuant to a
18 court order. Did you write this memo at the same -- I mean,
19 on one sitting?
20 A. I don't know when I wrote it. I started writing
21 it January 10th, did I finish it January 10th, I don't know
22 that answer. I have to say it took me more than one day to
23 write this because it was after we had talked to everybody.
24 Q. You might have started, set it aside and then
25 continued with it?

Richard P. vs School District                                                                L. Cappabianca
Held: 4/29/05

---

**Page 33**

1   A. Yes.
2   Q. Did you -- tell me what your impression when you
3   originally talked to R▮▮▮▮ on January 9th, was it your
4   impression that her actions had been voluntary?
5   A. I didn't get that either way. When she said that
6   somebody had -- she had made it clear that B▮▮ was
7   antagonizing it, so did I get -- I don't think I thought
8   about it either way. I was just trying to gather the facts
9   to try to put together what had actually happened that
10  night.
11  Q. This memo contains the -- you relate that, down at
12  the bottom of the first page of this exhibit, Woods'
13  Exhibit 1, you relate that R▮▮▮ is being taunted by B▮▮
14  C▮▮▮▮▮ and B▮▮ is bothering her to perform this act on
15  other male students, and there was a second incident at the
16  water fountain. Do you recall whether a teacher reported
17  that to you, that second incident?
18  A. No. No. That's how I found out about it, R▮▮▮
19  had told me.
20  Q. Did you subsequently learn a teacher had observed
21  this incident?
22  A. I knew what I had written on there.
23  Q. What do you mean you knew what you had written on
24  there?
25  A. Whatever I wrote down is what R▮▮▮ had told me.

**Page 34**

1   Q. Okay. My question is: Did you subsequently learn
2   that a teacher had observed this incident?
3   A. No.
4   Q. What do you recall of your conversations with
5   K▮▮▮ L▮▮▮s mother about this incident?
6   A. I don't know if I ever spoke to the mother about
7   this incident.
8   Q. Do you remember that she came to school with her
9   sister?
10  A. Right, but I don't think I spoke with her. I
11  believe Miss Woods and her spoke together.
12  Q. Why wasn't B▮▮▮ C▮▮▮▮ disciplined or punished
13  for her conduct by the school district?
14  A. Her conduct that night, the 19th?
15  Q. Yes.
16  A. It happened after school hours.
17  Q. What about C▮▮▮ B▮▮ same thing?
18  A. Um-hmm.
19  Q. It did happen, though, on the way home from school
20  and the school district's policies cover that, don't they?
21  A. It's a gray area. He skipped P.A.S.S. also, if I
22  am not mistaken he wasn't in P.A.S.S. that night, was he?
23  Q. The records indicate he was not in P.A.S.S.
24  A. Right, so he skipped P.A.S.S.
25  Q. What about the incident that happened on Monday,

**Page 35**

1   1/7/02 when B▮▮ tried to force R▮▮ down the steps and
2   give oral sex to a male student. Why wasn't she disciplined
3   for that incident?
4   A. For two reasons, one, we found out at the same
5   time we found about the laundromat incident and that kind of
6   took precedence over everything else. Two, I don't think
7   there was any male mentioned as far as names. B▮▮ didn't
8   even admit to or took any responsibility for that night of
9   the laundromat. So it was R▮▮▮ word against B▮▮ on
10  the 7th.
11  Q. And in an instance like that the school district
12  won't discipline a student if it's one student's word
13  against another?
14  A. I can't -- if they have nothing to back up what
15  the person is saying, yes.
16  Q. Do you know if C▮▮▮ B▮▮ was in P.A.S.S. on
17  the 7th, we have that January 7th?
18  A. I don't know. Was he assigned P.A.S.S., I don't
19  know.
20  Q. That was his -- that's the calendar, it appears he
21  was in P.A.S.S. on the 7th, January 7th.
22  A. Yes.
23  Q. Was he punished for that incident?
24  A. What incident?
25  Q. The incident that occurred on January 7th after

**Page 36**

1   P.A.S.S.?
2   A. No.
3   Q. Now, after the third day of the investigation, the
4   11th, the police came that morning; is that right?
5   A. I believe so, yes.
6   Q. And after -- do you remember how long the police
7   were in school?
8   A. I do not.
9   Q. Were you present when the police met with the
10  students?
11  A. Some maybe.
12  Q. Do you remember what else you were doing that day,
13  the last day?
14  A. No. Like I said, all the, you know, the whole
15  entire time for these three days we were talking whether it
16  was to students, parents, school district officials.
17  Q. You can't distinguish. What involvement did you
18  have in this after January 11th? What did you do about the
19  incident that happened to K▮▮▮ L▮▮and R▮▮ P▮▮▮▮▮
20  after January 11th?
21  A. I don't think anything.
22  Q. I have a couple questions about what happened then
23  after that. I'm going to show you some documents that were
24  previously marked in a different deposition here. And I
25  have extra copies for you. This was a document that was

---

**Page 37**

1  marked as Deposition Exhibit 1 in Charlise Moore's, it's an
2  IEP revision review date 1/18/02.
3      MR. MARNEN:  I have a copy.
4      MR. OLDS:  That's good because I only have two.
5      Q.  Your name appears on this; is that right?
6      A.  Correct.
7      Q.  Was there an IEP review meeting?
8      A.  Yes, I guess.
9      Q.  Have you ever met Shelly P____
10     A.  Once.
11     Q.  When was that?
12     A.  I went over to her house one day.  I don't know
13  when it was, and we talked about R____ I had concern.
14     Q.  Tell me about that.  Do you remember was that
15  before this incident or after?
16     A.  It would have been before.  Miss Scully had
17  brought to our attention that she thought R____ was
18  suicidal, so I had gone over there and I had talked to her
19  about it.
20     Q.  Mrs. P____
21     A.  Yes.  It was during the school day.  And she was
22  aware of my concerns, she said that she knew, she was seeing
23  a counselor at the time.  That she had, I know she had a
24  journal that she kept herself, the daughter, R____ and I
25  think some of these things that are our same concerns were

**Page 38**

1  written in this journal and she assured me that she was
2  seeing a counselor.
3      Q.  The IEP review revision is signed by Shelly
4  P____.  Did she come down to the school for an IEP
5  meeting?
6      A.  I don't know that.  Someone may have went over to
7  her house and discussed this with her and got her signature.
8      Q.  You know the -- we had marked as exhibit -- marked
9  as exhibit, I guess this was 13 or 12?
10     A.  This one is 12.
11     Q.  We marked as Exhibit 12 SAP records.  I don't know
12  if you ever seen them, but apparently there was a SAP, a
13  referral for R____ at some point.  I think it was started
14  around December 4th or something.  Do you recall?
15     A.  I think there was one before that.  There was one
16  on December 4th, but there was one before that also.
17     Q.  11/15/01 Miss Scully?
18     A.  Um-hmm, yeah.
19     Q.  Do you remember whether either one of these two
20  events, either the one Miss Scully prepared in November,
21  November 15th, or the one that was prepared around
22  December 4th, and you actually prepared one around
23  December 4th as well.
24     A.  Right.
25     Q.  Do you recall whether it was one of those two

**Page 39**

1  events that prompted you to go see Mrs. P____
2      A.  I don't know that.
3      Q.  Would it -- do you think it would have been
4  sometime after November 15th that you would have gone to see
5  Mrs. Polancy?
6      A.  It was right after Miss Scully found out about her
7  having suicidal tendencies and she started having concerns.
8  Was it the first one, I'm not sure.  I believe she met with
9  Mr. P____ and they decided that it would be a good idea to
10  refer her to the student assistance program.
11     Q.  I noticed that Exhibit 12 has a message from
12  Dr. Joy, do you know who Dr. Joy is?
13     A.  A doctor.  I don't know if it's a male or female,
14  no.
15     Q.  Is that associated with the Erie School District?
16     A.  I don't believe so.
17     MR. MARNEN:  He's an Erie physician, it's a man.
18     I think he is a psychiatrist, I'm not sure.
19     Q.  Do you know whether Dr. Joy performed an
20  evaluation or test on R____
21     A.  I don't know.
22     MR. MARNEN:  His name is Charles Joy.
23     Q.  Okay.  So going back to this IEP review revision,
24  which was Moore Exhibit 1, concerning R____ P____.  Did
25  you -- do you recall whether you prepared any part of this

**Page 40**

1  document?
2      A.  Are you talking about the first couple pages?
3      Q.  Yes.
4      A.  No, I did not.
5      Q.  Do you know who signed it as classroom teacher?
6      A.  You know what, I don't know who that is.
7      Q.  Is that your signature?
8      A.  No, I'm down by principal.
9      Q.  Do you think you wrote that signature in; is that
10  your handwriting?
11     A.  You think that's my initials?  I don't think it
12  is.  I don't see the C.
13     Q.  Okay.
14     A.  I don't know that.
15     Q.  Do you know were there any teachers there, that
16  appears to be an L, were there any teachers there, the
17  classroom teachers, for R____ whose name did begin with L,
18  the first name?
19     A.  There's Larry Graham, he was a music teacher.  I
20  have to look at the roster.
21     Q.  You don't recognize that?
22     A.  I don't think it's mine, but I don't know.  I
23  don't think it is.  I don't see a C.  I don't know why I
24  would just put my initials and not the full name.
25     Q.  Who prompted the -- if you know, how did it come

Richard P. vs School District
Held: 4/29/05

Multi-Page™

L. Cappabianca

---

**Page 41**

1 about that there was an IEP review revision meeting?
2   A. They would have had to have done that before they
3 could change schools. That's all this is saying, see the
4 second page, notice of recommended educational placement.
5   Q. Yes.
6   A. That's what that's telling you is that you are
7 changing her placement, her educational placement.
8   Q. Who do you think would have been responsible for
9 starting that process?
10   A. Well, I think because of the circumstances that
11 Mr. Ruhl was involved, Miss Woods and I were involved, Frank
12 Scozzie, Charlise Moore, it was something that was discussed
13 amongst us what would be the best for both she and K████.
14   Q. Do you have a recollection of this, that there was
15 actually a meeting where this IEP revision review was
16 adopted that you actually sat down with Mrs. Gray was there,
17 you were there.
18   A. I don't recall a meeting.
19   Q. Then I would like you to look at, I guess I'm
20 going to show you what was marked as Exhibit 2 in Charlise
21 Moore's deposition.
22   A. Okay.
23   Q. This pertains to K████ L███ And there is a --
24 the third page of that is an IEP revision review pertaining
25 to K████ L███ and it's signed by Denise L███ Melissa

---

**Page 42**

1 Valimont, Mrs. Gray and Linda L. Cappabianca. Do you recall
2 a meeting occurring about K███ L███
3   A. Yes.
4   Q. And that might have been -- I don't know if that
5 made my question clear. Do you think there really was a
6 meeting, an IEP review, or might this document have just
7 been circulated among the people that signed it for their
8 signature?
9   A. It could have been. Is that typical standard, no,
10 you actually sit down with the parents, but it could have
11 been.
12   Q. There might not have been a meeting in this
13 instance?
14   A. No.
15   Q. Then I want to show you the documents that were
16 marked as 3 and 4 in Miss Moore's exhibit.
17   A. Okay, what I'm looking at, change in --
18   Q. These two documents, is that your handwriting on
19 these documents?
20   A. No.
21   Q. Have you ever seen these documents before?
22   A. No.
23   Q. Your name appears on that, but you have never seen
24 these before?
25   A. No.

---

**Page 43**

1   Q. You can give those back to me.
2   A. I'm sorry. I didn't look at this one, is this the
3 same thing?
4   Q. It's the same handwriting. One pertains to
5 K████ and one pertains to R████ Did you participate at
6 all in the decision making process that ended up with
7 K████ and R████ going to Sarah Reed?
8   A. We recommended, Jan Woods and I, that it might be
9 better to move the girls to a different building.
10   Q. Okay. Tell me about what you remember, first of
11 all, I guess your discussions with Janet Woods and then how
12 you communicated your recommendation.
13   A. Um, we discussed that probably if the kids knew
14 about this it may not be a good idea for the girls to be --
15 other students, that's what who I meant by kids knew about
16 it -- wouldn't be a good idea for the girls to be in the
17 building. So we had suggested that, Jan had actually
18 because proper protocol is she is the one in charge, had
19 actually mentioned that to Frank Scozzie. And being that
20 they were in special education it was something that the
21 special education supervisor would have to agree upon also.
22   Q. And do you remember when you reached that
23 conclusion?
24   A. I think it was in our heads the entire time even
25 on the 9th. I don't think we discussed it with anybody

---

**Page 44**

1 until the 10th.
2   Q. Okay. Now, you say the other kids knew about it.
3 Originally you said in your first deposition we talked a
4 little about how there was hall talk before Christmas that
5 there was this incident, sexual activity. After Christmas
6 how did you know that the students had acquired knowledge of
7 this?
8   A. Through R████ She had said people were taunting
9 her, the other two incidents.
10   Q. Did you have the impression that the circumstances
11 were widely known through the junior high?
12   A. No. Well, I wouldn't have found out about it if
13 it wasn't for R████, which is not typical among middle
14 school kids. They let you know whenever anything happens.
15   Q. Did it occur to either you or Miss Woods that
16 perhaps if you disciplined anyone who taunted or harassed
17 Rachel that she could remain in the school?
18   A. By this point it was after that we found out about
19 it the same day we found out about everything. So had kids
20 been disciplined -- we would have disciplined kids had it
21 been going on, but we didn't know it was going on.
22   Q. You decided to move them because you were afraid
23 it was going to go on or what, that's what I don't
24 understand?
25   A. Not necessarily. Part of it, part of it

---

1 absolutely, yes. Part of it was because we thought, I don't
2 know if you know anything about Sarah Reed, but they have a
3 strong like counseling component to it, therapeutic
4 component to it. So part of it was that maybe they could
5 have more services right there in the school to them.
6     Q. What do you know about Sarah Reed? I don't know
7 very much about Sarah Reed. What do you know about that
8 school? Is that part of the alt. ed. program for Erie?
9     A. No. Perseus House has the alternative education
10 program.
11     Q. Does Sarah Reed provide alternative education for
12 any other schools?
13     A. I think they do have -- there's different
14 components to Sarah Reed, and I do believe there is one for
15 behavioral issues.
16     Q. And have you ever talked to -- did you talk to
17 anyone at Sarah Reed about R████ or K██████?
18     A. No.
19     Q. No?
20     A. Unh-unh.
21     Q. Do you know whether either R████ or K████
22 became involved in rape counseling with the Rape Counseling
23 Center?
24     A. I don't know if I knew that at the time, I mean
25 through reading this stuff you find out things, but I don't

Page 45

1 know if I knew that at the time.
2     Q. So you think that you and Miss Woods -- you think
3 actually Miss Woods communicated to Frank Scozzie that you
4 thought it would be best to have the girls out of the school
5 partly because you were concerned that the other kids might
6 harass them?
7     A. That other kids would find out what happened, yes.
8     Q. And partly because you thought that Sarah Reed
9 might have a therapeutic program for them, right?
10     A. (Witness moved head up and down.)
11     Q. Do you know whether there -- are there any
12 therapeutic programs in any of the regular schools in the
13 Erie School District?
14     A. They would have what we had. They would have like
15 Chris Ruhl on staff, which is a mental health counselor.
16 They might have had an IJDPP person, intensive juvenile
17 delinquency prevention program. I don't think they had
18 anything other than those.
19     Q. Did you consider that as an alternative before you
20 thought, well, maybe we should recommend Sarah Reed for the
21 girls?
22     A. To move them to another building.
23     Q. Did you consider that?
24     MR. MARNEN: I am not sure you're communicating
25     here.

Page 46

1     Q. Yeah, actually my question was: Did you consider
2 that maybe Chris Ruhl and Mrs. DiBello could have provided
3 counseling and support in the school or perhaps other
4 professionals could have provided counseling and support in
5 the school, in Sarah Reed?
6     A. I think we tried to look --
7     Q. I mean in Strong Vincent.
8     A. Right. And we tried to look at what was best for
9 them, and I mean we could have. Do I think it would have
10 been beneficial, no. I think the placement was appropriate
11 at the time.
12     Q. And so you were going, I think -- what did you --
13 you saw the language on the IEP revision review, I take it.
14 I'm sorry, I will give you that again, that's Moore
15 Exhibit 1 here. Develop consistent patterns of appropriate
16 behavior through a program of therapeutic behavior support.
17     A. I don't know what I am looking at.
18     Q. First page, right here, objective benchmark, I'm
19 reading that. I guess the short-term instructional
20 objectives of an IEP review revision was develop consistent
21 patterns of appropriate behavior through a program of
22 therapeutic behavior support. Is that what you and
23 Miss Woods talked about?
24     A. No.
25     Q. What did you and Miss Woods talk about?

Page 47

1     A. It was just a suggestion that we had made. I
2 wasn't -- I don't know if you're interpreting this to be
3 more because of behavioral issues.
4     Q. I don't know how to interpret that. How do you
5 interpret that IEP revision review document objective
6 benchmark; how do you interpret it?
7     A. I don't know if I understand it. Okay. I would
8 interpret that to be some of those aggressive behaviors that
9 she was displaying. I could be wrong, because I didn't
10 prepare this report, but this is how I interpret it is that
11 some of the behavioral -- behaviors that she was displaying
12 that she would learn to deal with things in a different way
13 than to act out. It might have been, I don't know,
14 there's -- a lot of this is stuff that I am reading too with
15 the pounding on the wall and things like that.
16     Q. Is that -- I'm not familiar with that reference,
17 that's something you have read in terms of the --
18     A. Yes, since this case came out.
19     Q. You didn't write that objective benchmark; is that
20 correct?
21     A. Correct.
22     Q. Do you know who did?
23     A. I'm assuming Charlise Moore, I don't know that.
24     Q. Do you have conversations with Charlise Moore
25 about Rachel?

Page 48

Richard P. vs School District
Held: 4/29/05

A000000132

Multi-Page™

L. Cappabianca

1    A. I didn't personally, I think I went through Jan on
2 everything.
3    Q. Do you know what a therapeutic behavioral support
4 program is? I think you have a special ed. background,
5 don't you?
6    A. Um-hmm.
7    Q. Who does a therapeutic behavior support program?
8    A. I would say it has more of a counseling component
9 to it.
10    Q. What do you know or are you speculating?
11    A. I'm speculating.
12    Q. So a program of therapeutic behavior support isn't
13 a term of art in special ed.?
14    A. No, not necessarily.
15    Q. Behavior support programs, that is a special --
16 that is a type of program for kids with severe behavior
17 problems; is that right?
18    A. I would imagine among other things, but I would
19 say yes.
20    Q. We spent some time, I think in your first
21 deposition, talking about -- you were taking steps to get
22 C▬ B▬ out of Strong Vincent.
23    A. Correct.
24    Q. And did you want to send him to Sarah Reed?
25    A. No.

Page 49

1    Q. Where did you want to send him?
2    A. Alternative education, which is Perseus House.
3    Q. Perseus House?
4    A. Yes.
5    Q. Is that a behavior support program at Perseus?
6    A. That's more a behavior modification program.
7    Q. Behavior modification. Okay. Is there -- to your
8 understanding is there a difference between a behavior
9 modification program and a program of therapeutic behavior
10 support?
11    A. I would say there was, to my understanding.
12    Q. Exhibit 2, which is the one -- if you want to take
13 this top clip off and go to the second that's Exhibit 2,
14 that's Moore Exhibit 2. And that's a temporary home
15 placement, and were you aware that K▬ was going to be
16 given a temporary home?
17    A. Right, same with R▬. That's what it says here
18 IEP in the home. Yes. They have to do a change of
19 placement whenever you are -- whenever they are not in the
20 school building.
21    Q. Had you ever seen a temporary home placement for
22 five days?
23    A. Yes.
24    Q. Is that something that is frequently used by the
25 Erie School District?

Page 50

1    A. We no longer use it, but that year we did do what
2 is called in home IEP.
3    Q. Why only that year, if you know?
4    A. I don't know why. I just found out we don't need
5 them -- I have not had to use them since that year. It
6 depends on the population of students that you have, but
7 when a child has an IEP you try to keep them in school, you
8 don't want to suspend them. If there is something that
9 warrants them being suspended, then we could do an in home
10 IEP. That way they are still getting their individual
11 education plan, but it is going to be in the home not at --
12    Q. So that's a device or procedure that was used in
13 2001, 2002?
14    A. Right. I don't know if you know anything about
15 special ed. laws, but there are very many of them and you
16 try not to exclude the child from school.
17    Q. Right.
18    A. So this was, I think, a way for us -- because, I
19 mean, sometimes you have special ed. kids that not because
20 of manifestation of their disability, but you have kids that
21 commit infractions that if it was the regular education the
22 student would be suspended right away and you can't do that
23 with a special ed. child.
24    Q. Did you know that -- I think we are going to find
25 this out, but do you know whether R▬ and K▬ were

Page 51

1 referred to a behavior modification program at Sarah Reed?
2    A. I don't know that.
3    Q. When you found out sometime in January that
4 K▬ was among the students who were at the laundromat
5 that night, and the other students that you interviewed
6 talked about the fact that K▬ had been engaged -- had
7 been forced to give oral sex to C▬ B▬ did you
8 relate that back to the conversation that you had with
9 K▬ in December?
10    A. Yes.
11    Q. Did you think that K▬ had problems
12 communicating? I mean, was she able to express what she
13 needed to express to get the ideas that she wanted to get
14 across across?
15    A. Yes.
16    Q. She was able to do that?
17    A. Yes.
18    Q. You didn't think she had trouble communicating?
19    A. No. I don't know how she was written. I don't
20 know if she could write her ideas out, but she was very -- I
21 mean, she was able to tell you how she was feeling.
22    Q. Actually I have another question here about this
23 exhibit, let me find the document. Once again returning
24 back to Moore Exhibit 1, document Bate stamped 442, it is a
25 handwritten statement signed by Shelly P▬. I'm

Page 52

**Page 53**

1 requesting that my daughter, R___ P___, be transferred
2 to Erie School District's alternative education program. I
3 waive all rights to a hearing, signed Shelly P___  Do
4 you have any idea how that document was prepared or signed?
5    A. I'm assuming that whoever went to get her
6 signature, if there wasn't a meeting, to my knowledge there
7 wasn't a meeting, there very well could have been, but I
8 don't recall one.
9    Q. You don't think there was a meeting?
10    A. I don't know that. I don't recall one.
11    Q. The only reason I said that is you said that so
12 fast I wanted to make sure the court reporter got it down.
13    A. I do talk fast.
14    Q. You talked a little fast that time. You don't
15 recall that there was a meeting?
16    A. I don't recall that. Again, going back to being
17 special education, whenever a child is in special education
18 I can recommend, you know, placing the child in another type
19 of educational atmosphere anywhere, another place. I can't
20 do that without the parents' permission.
21    Q. Have you ever seen a document similar to this one
22 that was signed by Shelly P___ handwritten, talking
23 about being transferred to Erie School District's
24 alternative education program; have you ever seen that kind
25 of form before?

**Page 54**

1    A. By Shelly P___
2    Q. No, relative to any other student. I mean, is
3 this --
4    A. Yes. I have had parents that have done this for
5 me when I have changed placements for their kids.
6    Q. Why do you have them handwrite out something like
7 this?
8    A. That's a very good question because on some of my
9 actual packets, let's say if I did the alternative
10 identification program at Perseus House, which is for
11 behavior modification, if I did that I actually have a form
12 where it is written out itself and the parent has to sign,
13 but then they ask you, they being the school district, but I
14 don't know who came up with it, asked them to copy it from
15 up here to down here. I am assuming so, it is in the
16 parents' handwriting, so it was something they were willing
17 to do. I don't know that answer.
18    Q. Well, I guess my question is: Shelly P___ was
19 authorizing R___ P___ to be transferred to Erie School
20 District's alternative education program, but you're saying
21 that alternative education program, as you know it, is at
22 Perseus House?
23    A. Right. I'm assuming, this is lot of assuming, I'm
24 assuming because any form of education other than in a
25 traditional school would be considered an alternative form

**Page 55**

1 of education.
2    Q. That's your assumption but you don't know?
3    A. I don't know.
4    Q. Then I notice that there was Exhibit 2, which is
5 right here, Moore Exhibit 2, there's a similar document
6 signed by Denise L___
7    A. I saw that, yes.
8    Q. That's at Bate 823 actually --
9    A. 744.
10    Q. I'm sorry, there's another one in there, but you
11 are right. Let me find that, 744. Did Denise L___ -- did
12 you meet with Denise L___ when she prepared that?
13    A. I don't believe so. I don't think I ever met with
14 her over this incident.
15    Q. Now --
16    A. I'm sorry, I was just reading something.
17    Q. You can finish if you want.
18    A. No, that's all right. I was just saying that I
19 know this was a decision that was made by -- I am looking at
20 3419, I don't know what your numbers are identifying. It
21 says evaluation procedures. I mean it looks like it was not
22 just the school discharge summary. Then it says Millcreek,
23 provided by student, parent, ESD staff, which I am assuming
24 Chris Ruhl rule was at this meeting, mental health staff.
25 I'm assuming it was all those people involved in the

**Page 56**

1 decision on what was best for her.
2    Q. This is K___ L___, and you're looking --
3    A. Right, but, I mean --
4    Q. Bate stamp 3419, right? The evaluation, verbal
5 sharing of discharge summary from Millcreek, information
6 provided by student, parent, ESD staff including mental
7 health staff.
8    A. I am just saying that I believe it was all these
9 people involved deciding on whether she should come back or
10 go to another placement.
11    Q. Okay, okay. Then had you ever just in this
12 process -- did you see this document back in January of
13 2002?
14    A. I have not, no.
15    Q. You never saw this document until what?
16    A. Now.
17    Q. This litigation?
18    A. I mean today, I think.
19    Q. Is that form, that notice of recommended
20 educational placement, is that part of the IEP process, the
21 special education process?
22    A. Yes.
23    Q. Would you have -- you signed the IEP revision.
24 Would you have expected in the normal course of affairs, if
25 this were a normal case, would you have expected at that

Page 57

1 time that you would have also seen the notice of recommended
2 educational placement?
3     A. Um-hmm.
4     Q. You would?
5     A. Yes.
6     Q. But today is the first day you saw it?
7     A. Today is the first day I saw it.
8     Q. Now, B███ C███████ stayed in school at Strong
9 Vincent until the police came and arrested her; is that
10 right?
11     A. Yes.
12     Q. We spent a little time in your first deposition
13 talking about C████ B███ and the disciplinary problems
14 that he presented. Did B███y C███████ present disciplinary
15 problems in school?
16     A. Yes.
17     Q. What kind of problems do you remember her
18 presenting?
19     A. I wish I had her discipline report in front of me.
20 Do you have them?
21     Q. No, I don't think. The only discipline reports we
22 have are C████ B███ right?
23     SPEAKER1: We have B███ in the car.
24     A. I mean, I don't know if I could give you
25 specifics. She had a lot of issues. She was actually

Page 58

1 placed in the alternative education program.
2     Q. Eventually or when?
3     A. It may have been the year before because I think
4 she was eighth grade that year.
5     Q. Eighth grade when she was in the alternative --
6     A. This year. No, the year that this took place. So
7 I think I put her in when she was in seventh grade. And
8 believe me, you try to put someone in the alternative
9 education as the last possible means of --
10     Q. Dealing with them?
11     A. Right.
12     Q. Because those are the worst students, right?
13     A. No. There are kids in there because they are
14 attendance problems. The district justice will court order
15 them there. They could be attendance problems. At the
16 public school you try to use every intervention possible
17 before you put a student somewhere else.
18     Q. Let me just -- we had marked as -- actually it had
19 been marked as Defendants' Exhibit C. You remember that we
20 talked about C in your deposition. The middle and high
21 school policy, and I'm looking at Page 9 of that policy
22 concerning the alternative education program and it says --
23 I just want you to let me know if you agree with this.
24     Quote, the alternative education program serves as
25 an intervention, the focus being on the development of

Page 59

1 prosocial behaviors. The program staff works with students
2 in grades sixth through twelfth whom have been removed from
3 the regular school because of serious disruptive behavior.
4 Serious disruptive behavior is defined as assaultive
5 behavior, behavior in violations of the weapons policy or
6 behavior in violation of terroristic threats, terroristic
7 acts policy. Other patterns of disruptive behavior are
8 determined by the assistant superintendent of school. Is
9 that -- one of those reasons is that why you put B███
10     A. Yes. May I see this? I think if you go down
11 further it doesn't have to be necessarily one, it could be
12 chronic disruptive behavior. Right here. Go down further,
13 chronic disruptive, which means they had a pattern of being
14 in trouble over and over and over again. Could be things
15 like swearing but, you know, they had Saturday detention for
16 it, and then the next time you swear it's three days of
17 P.A.S.S., and it could just be constantly being referred to
18 my office.
19     Q. Okay. Then you petition the assistant
20 superintendent, okay. I see that.
21     MR. OLDS: I am looking for something. Off the
22     record.
23     (Discussion held off the record.)
24     MR. OLDS: Back on the record.
25     Q. Let me -- we are almost done here, okay?

Page 60

1     A. That's okay.
2     Q. You were looking at B███ C███████ discipline
3 record, what sorts of discipline problems did she have?
4     A. Okay. I am just going to do the year she was in
5 seventh grade. We had threats to students, insubordination
6 skipping detention, fighting, excessive tardiness, excessive
7 tardiness, disorderly conduct, profanity, profanity,
8 disorderly conduct, dress code, disorderly conduct.
9     Q. Was she better in eighth grade?
10     A. She had skipping detention, profanity, profanity.
11 Yeah, the last time she was in trouble in eighth grade was
12 in October.
13     Q. Before this incident?
14     A. Right.
15     Q. Do you know who the Title IX officer was at Strong
16 Vincent?
17     A. (Witness moved head side to side.)
18     Q. Do you know anything about Title IX?
19     A. Very little.
20     Q. What do you know about Title IX?
21     A. Wasn't that sports and women's rights?
22     Q. Yes, partly. This lawsuit is under Title IX as
23 well. But anyway, you don't know who the Title IX officer
24 was?
25     A. Would we have one? I don't know.

1    Q. I think that you would, but I'm not certain. When
2 you -- were there particular rules in terms of guiding you
3 in dealing with complaints of sexual -- aside from this
4 instance that you investigated involving R███ and
5 K███ did you ever investigate any other sexual
6 harassment complaints at Strong Vincent?
7    A. No. I had one other incident, I don't know if it
8 was the same year, I was there for a two-and-a-half-year
9 period, where a boy actually grabbed a girl in an
10 inappropriate place.
11    Q. Did you conduct an investigation on that?
12    A. Yes.
13    Q. Was the boy disciplined?
14    A. He was out of the building the very next -- it
15 happened right in the hallway and he longer remained at that
16 school. She actually went to another school of her own
17 accord. The parents did not want her back in that building.
18    Q. Were there witnesses to this incident?
19    A. There was another boy, yes.
20    Q. In terms of the -- I understand that the
21 disciplinary records apparently were destroyed. I think
22 that you told me that or was it Miss Woods?
23    A. Think I did.
24    Q. When did that happen?
25    A. Probably the first year -- probably three years

Page 61

1    Q. We also, I think that we looked at, for instance,
2 that was Cappabianca Exhibit 9, which was K███ L███
3 discipline record. Did you and I agree the last time that
4 we did this deposition that those disciplinary records don't
5 seem to be very accurate, the computer generated ones?
6    A. Right. I told you that I didn't have a secretary
7 so I would have to go down to the main office and give
8 her -- she was going to put these in the computer. There's
9 actually a letter goes home to the parent, and that letter
10 also gets sent to our computer center and like the homeroom
11 teacher, so the homeroom teacher, like if it was a
12 suspension, would know how to mark the days. The counselor,
13 I believe got a copy of the letter. So, yes, these are not
14 accurate.
15    Q. I think it is just the top two there. And have
16 you continued destroying the records at the end of each year
17 or at the beginning of the year following the year that just
18 ended?
19    A. Either way.
20    Q. It is still the policy --
21    A. It is.
22    Q. -- to destroy disciplinary records --
23    A. It is.
24    Q. -- and just retain the computer records?
25    A. Yes.

Page 63

1 ago, whenever I left. I have been at Harding for three
2 years. I think it was that first year we got these big huge
3 shredders and they put everything in the shredders.
4    Q. So when you were at -- you were at Harding that
5 year you destroyed discipline records that had been
6 generated at Harding from prior years?
7    A. Um-hmm.
8    Q. Yes?
9    A. Yes. I'm sorry, yes.
10    Q. And so the disciplinary records were not -- were
11 no longer being retained even on -- you destroyed them for
12 the year before; is that right.
13    A. Yes.
14    Q. There's no longer a discipline record retention in
15 Erie?
16    A. Just these things.
17    MR. MARNEN: These things are what?
18    MR. OLDS: The computer printout.
19    A. Right. There's a computer printout, but this is
20 the only -- this isn't like a daily account. Like if
21 someone was sent to me on a daily account but it didn't go
22 to Saturday detention or P.A.S.S., then it would have been
23 in the computer.
24    Q. Could I see that for a second?
25    A. Yes.

Page 62

1    Q. Do you know why?
2    A. I think they don't want the, they being the school
3 district, doesn't want a person's discipline to follow them
4 from year to year. Like you can't hold it against them
5 because they might have been in all kinds of trouble when
6 they were in seventh grade to count against them when they
7 are in eighth grade. It's like a clean start, I believe.
8    Q. In this case do you remember when you and
9 Miss Woods decided to call the police?
10    A. Well, the school resource officers, which were
11 Erie police officers but hired through the district at the
12 time, they were informed right away. Perfetto was informed
13 right away. When the Erie Police Department -- they didn't
14 come in for a couple days. When they were actually called,
15 I don't know that.
16    Q. Do you know who called them?
17    A. I don't know if Perfetto did it or if Jan did it.
18    Q. Do you know when it was -- you don't know when it
19 was decided to call them?
20    A. I don't know that.
21    Q. When did you realize that you were actually
22 participating in a criminal investigation? When did you
23 realize this was a criminal assault?
24    A. First thing.
25    Q. First thing what?

Page 64

1   A. As soon as I found out about it on the 9th.
2   Q. Well, weren't you unclear when you found out about
3 it on the 9th, I mean, whether R███ had engaged in
4 consensual conduct or was coerced? I mean, wasn't that a
5 question in your mind?
6   A. It was a question in my mind, but any child, I'm
7 going to refer to her as a child, engaging in sexual
8 activity I think needs to be reported or addressed in some
9 manner, and it was very serious. Whether it was willingly,
10 I don't think I even thought about that. I mean, I had
11 people like A███ that think she was being punched in the
12 ribs.
13   Q. When you earlier indicated that girls will come to
14 you and say, I'm worried about being pregnant, and I think
15 you indicated that you would call their parents?
16   A. Yes.
17   Q. Would you have called the parents of the boys who
18 have impregnated the girls as well?
19   A. Yes. There was only one boy -- oh, you mean of
20 the girls that came to me. It depends, there were times I
21 have talked to the parent, and the parent would bring them
22 right down to the gynecologist and found out that the girl
23 never had sex. I mean, it depended on the situation.
24   Q. You called C███ B███ mother in this
25 situation, right?

Page 65

1   A. Yes, but it was the father that came in. That was
2 the first time I ever met him.
3   Q. Last time we were here you indicated that, I think
4 that we talked a little bit about your efforts to meet with
5 Mrs. B███ and C███ and talk about the alternative
6 education placement for them; is that right?
7   A. Yes.
8   Q. And you actually did have a meeting with her about
9 that?
10   A. We did.
11   Q. You just don't know when it occurred?
12   A. I don't know.
13   Q. She didn't agree to the alternative education
14 placement; is that right?
15   A. Correct.
16   Q. Looking at R███ attendance records where you
17 indicated that it was okay per Mrs. Capp, do you think that
18 had anything to do with this sexual assault?
19   A. No. I didn't find out about it until she had her
20 outburst.
21   Q. Okay.
22   A. You know, unfortunately, like the notes and
23 everything that were written here for her being absent, we
24 have to keep those on file for a year. I would have wrote a
25 note -- we have to because we're audited -- I would have

Page 66

1 wrote a note as to why she would have been out. They would
2 have kept it with all -- you know, I don't know, each
3 teacher does it different, but I used to keep like an
4 envelope on each child and then anytime they brought in an
5 excuse I would have put it in there. So knowing that we
6 have to have documentation for a year, I would have wrote a
7 note as to why she had would have been out.
8   Q. That's destroyed after a year?
9   A. They throw them out after a year.
10   Q. When the police came -- from time to time I know
11 they came in to talk to A███ K███ and they arrested
12 him and B███ C███, did you talk to the police officers
13 each time they came in to investigate this?
14   A. I don't remember A███ K███ being arrested --
15 was he arrested from school? I don't even remember that.
16 B███, I was the one that went and got her and they took her
17 out in handcuffs. I do remember that day.
18   Q. Do you remember which police officers you talked
19 with?
20   A. I want to say it was Detective Green.
21   MR. OLDS: I don't think I have any other
22   questions, I think I'm done.
23   MR. MARNEN: I do not have any. We'll read.
24   (Examination concluded at 2:25 p.m.)
25                     * * *

Page 67

1          C E R T I F I C A T I O N
2
3
4   I, Linda K. Rogers, Shorthand Reporter and
5 Commissioner of Deeds in and for the Commonwealth of
6 Pennsylvania, do hereby certify that I recorded
7 stenographically the proceedings herein at the time and
8 place noted in the heading hereof, and that the foregoing is
9 an accurate and complete transcript of same to the best of
10 my knowledge and belief.
11
12
13
14
15
16
17
18      _____
19          Linda K. Rogers
20
21
22 Dated: May 16, 2005
23
24
25

Page 68

Richard P. vs School District
Held: 4/29/05

Multi-Page™

A000000137

L. Cappabianca

```
 1              INDEX
 2           EXAMINATION
 3  WITNESS NAME              PAGE  LINE
 4  LINDA L. CAPPABIANCE.............. 3         1
 5    Direct By Mr. Olds........................ 3        5
 6
 7              EXHIBITS
 8          DESCRIPTION     PAGE  LINE
    DEFENDANTS' EX. 12  SAP REPORT.................. 20        3
 9  DEFENDANTS' EX. 13  SV ATTENDANCE SHEET......... 26      7
10
11
12
13
14              * * *
15
16
17
18
19
20
21
22
23
24
25
                              Page 69
```

A000000138

Richard P. v. School District                 Robert Iddings                          May 5, 2005

1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   RICHARD P., by and for          :
    Rachel P., and DENISE L.,       :
4   by and for Kristina L.,         :
              Plaintiffs            :
5                                   :
        v.                          :
6                                   :   Civil Action No. 03-390
                                    :              Erie
7   SCHOOL DISTRICT OF THE CITY     :
    OF ERIE, PENNSYLVANIA; JANET    :
    WOODS, Individually and in      :
8   her Capacity as Principal of    :
    Strong Vincent High School;     :
9   and LINDA L. CAPPABIANCA,       :
    Individually and in her         :
10  Capacity as Assistant           :
    Principal of Strong Vincent     :
11  High School,                    :
              Defendants            :
12

13

14

15

16            Deposition of ROBERT R. IDDINGS, taken before

17       and by Janis L. Ferguson, Notary Public in and

18       for the Commonwealth of Pennsylvania, on Thursday,

19       May 5, 2005, commencing at 11:49 a.m., at the

20       offices of Knox McLaughlin Gornall & Sennett, PC,

21       120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25            Reported by Janis L. Ferguson, RPR
              Ferguson & Holdnack Reporting, Inc.

Ferguson & Holdnack Reporting, Inc.

A000000139

Richard P. v. School District                    Robert Iddings                         May 5, 2005

Page 2

```
1    For the Plaintiffs:
2        Edward Olds, Esquire
         Carolyn Spicer Russ, Esquire
3        1007 Mount Royal Boulevard
         Pittsburgh, PA 15223
4
5    For the Defendants:
6        James T. Marnen, Esquire
         Knox McLaughlin Gornall & Sennett, PC
7        120 West 10th Street
         Erie, PA 16501
8
9    For Sarah Reed Children's Center:
10       Marissa Savastana, Esquire
         MacDonald Illig Jones & Britton, LLP
11       100 State Street
         Suite 700
12       Erie, PA 16507
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1    R O B E R T  R.  I D D I N G S, first having
2    been duly sworn, testified as follows:
3
4                 DIRECT EXAMINATION
5
6    Q.  Mr. Iddings --
7    A.  Correct.
8    Q.  -- could you state your full name and spell it for
9    the record.
10   A.  Yes.  Robert, R-O-B-E-R-T, Ray, R-A-Y, Iddings,
11   I-D-D-I-N-G-S.
12   Q.  And you work for Sarah Reed; is that right?
13   A.  That's right.
14   Q.  And we have actually served a Rule 30(b)(6)
15   deposition notice on Sarah Reed, and I guess they have
16   designated you to testify on behalf of the institution.  Is
17   that correct?
18   A.  Right, yes.
19   Q.  What is your position at Sarah Reed?
20   A.  I'm the clinical supervisor.
21   Q.  Tell me, who do you report to?
22   A.  The director of clinical services.
23   Q.  And who is that?
24   A.  Dr. Eric Schwartz.
25   Q.  And is Dr. Schwartz a medical doctor?
```

Page 3

```
1                    I N D E X
2
3    TESTIMONY OF ROBERT R. IDDINGS
4        Direct examination by Mr. Olds . . . . . . . 4
5        Cross-examination by Mr. Marnen . . . . . . . 38
6
7
8
9    EXHIBITS:
10       Iddings Deposition Exhibit 1 - Page 10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1    A.  He is a licensed psychologist.
2    Q.  Ph.D.?
3    A.  Sci.D.
4    Q.  And you're the -- wait.  You're the clinical
5    supervisor, you say?
6    A.  Right.
7    Q.  And you report to the director of -- clinical
8    director.
9    A.  Right.
10   Q.  Who does he report to?
11   A.  The executive vice president.
12   Q.  And who is that?
13   A.  Mr. Dan Alessi.
14   Q.  A-L-L --
15   A.  A-L-E-S-S-I.
16   Q.  Then Mr. Alessi reports to --
17   A.  Mr. Mando.
18   Q.  Mr. Mando, okay.  And you're on the clinical side.
19   Are there other areas of -- in terms of the organizational
20   structure -- for instance, is there an educational
21   component?
22   A.  Right.  There is an educational supervisor.
23   Q.  Okay.  Who is that?
24   A.  Kevin Dildine, D-I-L-D-I-N-E.
25   Q.  And are there any other broad areas?
```

2 (Pages 2 to 5)

45c365d3-9173-4c30-adac-2667caf8eaed

A000000140

Richard P. v. School District                                          Robert Iddings                                          May 5, 2005

Page 6

1    A.   There's a program operations supervisor.
2    Q.   What does that person do?
3    A.   She oversees the counselors and the intakes and --
4    and kind of the financial end of things, to make sure that
5    we are all balanced and we're in compliance.
6    Q.   Are there just three broad areas like that?
7    A.   Right.
8    Q.   The clinical supervisor, what are your
9    responsibilities?
10   A.   I supervise the clinical services for the program,
11   for three-year-olds through twelfth grade.
12   Q.   And what kind of people -- who reports to you?
13   A.   All of the therapists within the program.
14   Q.   And how many therapists are there?
15   A.   11.  You mean from three-year-old through twelfth
16   grade?
17   Q.   Twelfth grade, yes.
18   A.   11.
19   Q.   Those would be -- are there other kind of
20   therapists that handle other kinds of either populations or
21   problems?
22   A.   There are people who do therapeutic recreation
23   activities, people who do therapeutic art activities.
24   Q.   What about, is there a therapeutic program for the
25   preschoolers?

Page 7

1    A.   Yes.
2    Q.   And --
3    A.   That falls under me.
4    Q.   That falls under you as well.  So when you said --
5    three-year-olds, okay.  I thought you said third grade.  And
6    do these other therapeutic areas report to you as well,
7    like --
8    A.   No.
9    Q.   They report to who?
10   A.   They report to -- actually, the one therapeutic
11   recreations person does report to me.  The art person, I
12   believe, reports to Lori Eaton, the program operations
13   supervisor.
14   Q.   And that would be -- that was the third area --
15   A.   Correct.
16   Q.   -- that you gave me.  Okay.  Then tell me what, to
17   your understanding, what the educational side looks like.
18   Kevin Dildine, you said?
19   A.   Correct.
20   Q.   Do you know how many teachers there are at Sarah
21   Reed, by any chance?
22   A.   Just in the alternative ed. and partial programs?
23   Q.   Yes.
24   A.   There are nine certified teachers.  At least nine.
25   Q.   Okay.  And is there a different educational

Page 8

1    program, aside from the alternative ed./partial program?  Is
2    there yet another educational program?
3    A.   Not within our programs.  There is one at the
4    residential facility, but that's different.
5    Q.   Residential, okay.  And do you know, the clinical
6    side, the side that reports to you, you provide therapy
7    to -- on an outpatient basis; is that right?  Your
8    clinicians or your therapists?
9    A.   Right.  I don't supervise the outpatient
10   therapists.
11   Q.   Who does that?
12   A.   That's a separate department.  Her name is Megan
13   Probst, P-R-O-B-S-T.
14   Q.   And does she report to Dr. Schwartz?
15   A.   Dr. Schwartz, correct.
16   Q.   Do you know how many therapists are supervised by
17   her?
18   A.   Three, I believe.
19   Q.   And there -- I think you said there are 11
20   therapists that you supervise, or nine?
21   A.   There are 11.
22   Q.   11.  And are there any other professionals, aside
23   from the recreational therapists, are there any other
24   professionals that you supervise?
25   A.   No.

Page 9

1    Q.   Now, describe for me the nature of your
2    supervision over these therapists.  Do you review cases with
3    them?
4    A.   Yes.
5    Q.   So it's sort of a case-management --
6    A.   Yes.
7    Q.   -- type position?  And how many -- what is the
8    caseload of the therapists that work for you -- or work
9    under you?
10   A.   Anywhere from 10 to 26 clients.
11   Q.   And their clients would all be students.
12   A.   Correct.
13   Q.   In the day program, not the residential program.
14   A.   Correct.
15   Q.   Is the residential program located at the same
16   geographic facility?
17   A.   No, it isn't.  No.
18   Q.   And where is Sarah Reed in Erie?
19   A.   We have two buildings; 1020 East 10th Street and
20   310 East 10th Street.
21   Q.   And what kinds of activities go on at the 1020
22   East 10th Street building?
23   A.   Our outpatient services.
24   Q.   And the 310, is that the school?
25   A.   No.  And then we do have school-based services at

3 (Pages 6 to 9)

45c365d3-9173-4c30-adac-2667caf8eaed

Richard P. v. School District                    Robert Iddings                                   May 5, 2005

Page 10

1  1020. Second grade through twelfth.
2      Q.  Then what happens at 310?
3      A.  Preschool through first grade.
4          MR. OLDS: I know I said I wasn't going to mark
5          this as an exhibit, but I think I will.
6          (Discussion held off the record.)
7          (Iddings Deposition Exhibit 1
8          marked for identification.)
9      Q.  We have been -- Mr. Iddings, we have been provided
10 several pamphlets.  As you know, as I said in the previous
11 deposition, I represent R█████ P█████ and K█████ L█████
12 who were provided services by Sarah Reed Children's Center.
13 And I assume that the services they were provided were -- I
14 should have asked this before Mr. Marnen photocopied it --
15 were in the program that is described in the pamphlet that I
16 have marked as Exhibit 1?
17     A.  I believe so.
18     Q.  Your institution has also provided us with a
19 pamphlet called After-School Program and another pamphlet
20 called Community Outpatient Program.  And probably those
21 don't pertain to --
22     A.  Correct.
23     Q.  -- my two clients.  Is that right?
24     A.  That's right.
25     Q.  And the -- I guess the first topic that --

Page 11

1  identified in the Rule 30(b)(6) deposition notice is types
2  and parameters of educational behavior and therapeutic
3  programs offered and administered by SARCC.  So maybe
4  looking at that area of inquiry -- and this pamphlet, we
5  could try to understand the types of educational programs,
6  coupled with therapy programs that Sarah Reed offers.  Okay?
7      A.  Okay.
8      Q.  So, first of all, Exhibit 1, is this just a
9  pamphlet that is prepared to hand out to parents or other
10 educators, maybe?
11     A.  Right.
12     Q.  Just to identify the public or perhaps clients
13 with the services offered by Sarah Reed.
14     A.  That's right.
15     Q.  So at best, it's just a shorthand --
16     A.  That's right.
17     Q.  -- of what's going on here.  It describes a
18 page -- I guess I'm looking at Page 7 -- describes a
19 classroom level program.  And I guess my question is, do you
20 have -- do you have very much interface with the educational
21 side of Sarah Reed?
22     A.  Yes.
23     Q.  Well, and how does that happen?
24     A.  All of the supervisors try to integrate the
25 clinical aspects with the educational aspects.  Each team is

Page 12

1  made up of a teacher --
2      Q.  Okay.
3      A.  -- a counselor, and a therapist.
4      Q.  And does each team take responsibility for a
5  particular student?
6      A.  Yes.
7      Q.  I mean, they have more than one student, but --
8      A.  Right.
9      Q.  So do you know how many students a team might
10 have?
11     A.  Up to 13.
12     Q.  How many classrooms are there at Sarah Reed?  And
13 if it's changed dramatically since 2002, I'd like you to
14 focus on 2002.
15     A.  Okay.
16     Q.  I mean, if the size of the school has changed.
17     A.  Yeah, not -- not too dramatically.  There are
18 seven classrooms in 1020 East 10th Street, where both of the
19 girls would have been.
20     Q.  And are the students divided in the classroom
21 based upon age or based upon types of problems?
22     A.  Generally based upon grade level and developmental
23 level.
24     Q.  R█████ and K█████ were, I think, in seventh
25 grade in 2000 -- in January of 2002 when they were admitted

Page 13

1  to Sarah Reed.  What kinds of -- what classrooms would have
2  been available to them, given the fact that they were in
3  seventh grade?
4      A.  I don't know specifically, but I'm guessing it
5  would have been -- we have two pre-adolescent classrooms.
6      Q.  And would those classrooms -- they would be in one
7  or the other, depending upon their developmental level?
8      A.  Developmental level and space.
9      Q.  Okay.  And when you use the term "developmental
10 level", what are you referring to?
11     A.  Cognitive ability and emotional maturity.
12     Q.  And how many students would have been in those
13 pre-adolescent classrooms?
14     A.  I don't know specifically, but it would go up to
15 13.
16     Q.  No more than -- is it fair to say no more than 13?
17     A.  Yes.
18     Q.  And would there be one teacher assigned to each
19 classroom or more than one teacher?
20     A.  One teacher and one counselor.
21     Q.  And the therapist is part of the team.  Where did
22 the therapist conduct their work?
23     A.  Frequently, they will consult with the teacher and
24 the counselor.  We use what's call an ecological approach.
25 So a lot of the interventions are implemented by the teacher

4 (Pages 10 to 13)

45c365d3-9173-4c30-adac-2667caf8eaed

Richard P. v. School District                    Robert Iddings                              May 5, 2005

---

**Page 14**

1  and the counselor in the most natural environment, which
2  would be the classroom.  Occasionally the therapist will do
3  individual therapy with the child.
4      Q.  When you say "occasionally", are you -- is it more
5  or less than 10 hours a week?
6      A.  Of the therapist's job?
7      Q.  Yes.
8      A.  Less.
9      Q.  Less.  Would it be more or less than five hours a
10  week?
11      A.  It would be probably about five hours.
12      Q.  Five hours a week.  And those therapy sessions
13  would take place in the therapist's office?
14      A.  Right.
15      Q.  Okay.  Now, does each student get five hours a
16  week, or is it --
17      A.  No.  That would be split between their caseload.
18      Q.  Oh.  So a therapist would give five hours of
19  individual therapy a week among the --
20      A.  26 clients.
21      Q.  -- 26 clients.  Okay.  And what is the -- the
22  counselors -- their reporting line is up through the --
23  Mr. Dildine?  They report to him?
24      A.  Right.
25      Q.  And what do they -- what are the counselors'

---

**Page 15**

1  responsibilities in the classroom?
2      A.  They provide social skills training daily, they
3  implement incentive programs, they help the kids learn
4  coping skills and self-regulation.  And they assist with
5  activities, educational activities, as well as therapeutic
6  activities.
7      Q.  Do you know if the counselors are -- are they
8  certified under Pennsylvania education law as counselors?
9  Are they those kind of counselors?
10      A.  Not necessarily.  Generally -- not always, but
11  generally they are Bachelor's-level employees.
12      Q.  Okay.  You were here, and I can show you the --
13  maybe that's the best way to -- I'll show you the piece of
14  paper that I was referring to.  There was a -- let's see if
15  I can find it.  It would be -- I think it's the fifth page
16  of this first exhibit.  It looks like this (indicating).
17  Keep going.  It's that one, yeah.
18      A.  Okay.
19      Q.  And I know you have probably never seen this
20  document, but I just want to ask you about the language in
21  it.
22      MR. MARNEN:  What's the Bates number?
23      MR. OLDS:  I'm sorry, Jim.  It's 445.  It's the
24  memo from Audrey Pecoraro to Frank Scozzie.
25      Q.  And it talks about referral to Sarah Reed, quote,

---

**Page 16**

1  behavior modification program, special education tract, end
2  quote.  Does that language have any meaning to you?
3      A.  It does not.
4      Q.  Okay.  Does Sarah Reed offer behavior
5  modification -- I guess Mr. Bogardus said that it was a
6  teaching modality.  Is that what it -- is that the correct
7  terminology?
8      A.  Right.  Yes.
9      Q.  Sarah Reed does offer that.
10      A.  Yes, we do.
11      Q.  Is it fair to say that -- do all of the students
12  who are in a classroom at Sarah Reed need that teaching
13  modality -- method modality?
14      A.  All of the children participate in it.
15      Q.  Okay.  And tell me what that is.
16      A.  If you want to look at this exhibit --
17      Q.  Sure.  This would be Exhibit 1?
18      A.  Right.
19      Q.  Of your --
20      A.  The -- on Page 7, the classroom level program.
21      Q.  Yes.
22      A.  That is one form of behavior modification.
23      Q.  Okay.
24      A.  It's a program-wide incentive program for the
25  clients to earn more privileges.  Basically a way of

---

**Page 17**

1  monitoring their progress.  So all of the children
2  participate in this -- this program.
3      Q.  Okay.
4      A.  And depending on need, the therapist will develop
5  an individualized behavior program for certain students.
6      Q.  And then are there any other -- I understand
7  there's a therapeutic component.  But are there any other
8  education modalities that are going on in the classroom?
9      A.  Such as direct instruction?
10      Q.  Well, I guess.  Is there direct instruction?
11      A.  Yes.
12      Q.  What other modalities are going on in the
13  classroom, besides direct instruction and the behavior
14  modification?
15      A.  Social skills training.  Group therapy.  And that
16  can be regarding a variety of topics.
17      Q.  Like for -- give me some examples, maybe.
18      A.  Peer relationships, coping with stress,
19  managing -- identifying and managing emotions.  Those are
20  three off the top of my head.
21      Q.  Is it fair to say that the children in the
22  educational program exhibited some kind of -- must have
23  exhibited some kind of behavior problems at their referring
24  schools?  I'm not saying must have.  I'm saying that's why
25  they are at Sarah Reed, because they exhibited some kind of

---

Ferguson & Holdnack Reporting, Inc.

45c365d3-9173-4c30-adac-2667caf8eaed

A000000143

Richard P. v. School District                Robert Iddings                          May 5, 2005

Page 18

1  behavioral problems at their referring schools.
2      A.  We have children who have acted out behaviorally,
3  meaning they have come to someone's attention due to an
4  aggressive act.  And we also have children who are
5  withdrawn, which has also caused someone in their life to be
6  concerned.
7      Q.  Okay.
8      A.  The children who are more withdrawn are what we
9  would call internalizing.
10     Q.  Um-hum.
11     A.  Wouldn't necessarily be a behavior problem in
12 school.
13     Q.  Okay.  Are those children placed in this classroom
14 program that's described beginning at Page 7 of Exhibit 1?
15     A.  Yes.
16     Q.  And in terms of those children, what kinds of
17 behaviors are taught to those children?
18     A.  Identifying feelings, expressing feelings
19 verbally, initiating positive interactions with peers,
20 ignoring negative -- what we call negative leads of peers.
21     Q.  What does that mean, "negative leads"?
22     A.  Children who would engage in non-pro-social
23 behaviors, a lot of the times the kids will copy them or go
24 along with them.  Especially the children who are more
25 internalizing tend to be more into that.  They will go along

Page 19

1  with one of the leaders of the group.
2      Q.  So then do they all of a sudden have a behavior
3  problem when they do that?
4      A.  Right.
5      Q.  Okay.  And I -- what else?  We were at ignoring
6  negative leads.  You were listing the types of --
7      A.  Right.  The overall goal for any of the kids is to
8  increase self-efficacy, based on their developmental level.
9      Q.  Self-efficacy?
10     A.  Yes.
11     Q.  What does that mean?
12     A.  So depending on how old the child is, we help them
13 reach a level of independence that is appropriate for their
14 age, and self-regulation.
15     Q.  So independence and self-regulation?
16     A.  Um-hum.
17     Q.  Is that sort of the fundamental goal?
18     A.  Correct.
19     Q.  Now, the children who have had behavioral
20 problems -- not the children who are internalizing, but the
21 children who have had behavior problems, have these
22 typically been -- are they defiant or aggressive?  Is that
23 the kind of behavior problems that we're talking about?
24     A.  Yes.
25     Q.  Typically, would it be fair to say that a student

Page 20

1  in Sarah Reed as a result of behavioral problems is one who
2  couldn't adjust to the typical classroom situation or the
3  regular classroom situation?
4      A.  That's right.
5      Q.  And they couldn't adjust because they would either
6  be too disruptive or too aggressive for the regular
7  classroom --
8      A.  Correct.
9      Q.  -- situation?
10     A.  Yes.
11     Q.  And then the -- of the two classes of children
12 that you have identified, children with behavioral problems
13 and children who have problems with internalizing, can you
14 give me like a percentage breakdown of how many of the one
15 and how many of the other are in attendance, like in any
16 given year.
17     A.  Um-hum.  Generally, with the younger children,
18 they are children with behavioral problems.  It's a greater
19 percentage.  And as the children get older, it becomes more
20 of an even percentage.
21     Q.  And the seventh grade level, do you consider that
22 younger or older?
23     A.  That's more our older clientele.
24     Q.  So seventh grade, it might be 50 percent would be
25 children who are internalizing in one way or another, and --

Page 21

1      A.  Right.  I'd say maybe 60 who are externalizing,
2  acting out behaviorally; 40 internalizing.  But that's just
3  a guess, based on the adolescent program.
4      Q.  Okay.  And children who internalize, what kind of
5  behavior do you typically associate with that problem?
6      A.  Symptoms of anxiety or depression, excessive
7  worrying, suicidal thoughts, suicidal gestures, non-suicidal
8  attempts to harm self, isolation, negative self-talk,
9  inability to complete tasks.
10     Q.  Anything else?
11     A.  That's a pretty good --
12     Q.  Okay.  What kind of history do you expect to see
13 relative to receiving these students at Sarah Reed?
14     A.  For most students, there's generally a history of
15 trauma.
16     Q.  And when you say "history of trauma", what do you
17 mean?
18     A.  Some type of abuse; physical, sexual, or
19 emotional.  Or neglect.  Frequently there have been what we
20 call disrupted attachments.  That can result from either
21 parents leaving or children being separated from parents or
22 families experiencing frequent moves.
23     Q.  And what kinds of experience, educational
24 experience do you generally see for these students who are
25 internalizing problems?

6 (Pages 18 to 21)

45c365d3-9173-4c30-adac-2667caf8eaed

A000000144

Richard P. v. School District        Robert Iddings

May 5, 2005

Page 22

1    A.  Right.  All of the children receive the same
2    instruction --
3    Q.  No, I wasn't -- I was talking about their
4    educational background before they come to Sarah Reed.
5    A.  Oh.
6    Q.  I mean, what kind of problems would you anticipate
7    that they would manifest in the classrooms or in the
8    schools?
9    A.  Again, not completing tasks, difficulty with peer
10   relationships, possibly being behind achievementwise, if
11   they have had to move frequently, frequent absenteeism.
12   Sometimes just outright refusal to do work, which can be
13   seen as defiance.  Anxiety about going to school, severe
14   anxiety about going to school.
15   Q.  Then these problems that a teacher or a
16   professional might observe, they would -- the consequence
17   or, I guess, the -- the problem would be that the children
18   wouldn't be doing well at school?  Is that right?
19   A.  That -- right.  That could be that they are not
20   doing well.
21   Q.  What other problems might you expect to see at the
22   referring school district that the students might be
23   encountering?
24   A.  I guess we would have to define what "not doing
25   well" is.  Because we do have children who do well.  They

Page 23

1    meet their grades, they complete tasks.  But their peer
2    relationships are not healthy or are -- or they are very
3    isolated.  Teachers are frequently concerned with children
4    who engage or verbalize something about self-harm.  School
5    districts tend to have -- and not just with Erie, but any
6    school district tends to have difficulty with children who
7    are isolating themselves.  You know, they are not really
8    sure how to diagnose those types of --
9    Q.  Okay.  So then would you -- a student with those
10   kinds of -- with -- it's probably the wrong word --
11   diagnosis, but that's probably -- maybe symptomatology --
12   A.  Symptoms.
13   Q.  Symptoms.  Students with those symptoms, would you
14   expect before those -- the student is referred to Sarah
15   Reed, that they would have a -- there would be a history of
16   those symptoms being exhibited over a period of time?
17   A.  Generally, yes.
18   Q.  Okay.  I notice that in another brochure -- this
19   is called Overview of Services -- that you had provided to
20   us --
21   MR. OLDS:  It's this one, Jim (indicating).
22   Q.  I'm just going to read a statement here and ask
23   you if -- maybe what the statement means.  This is under the
24   partial hospitalization program.
25   A.  Okay.

Page 24

1    Q.  That program, it says, quote, "Comprehensive
2    mental health services are designed to promote structure and
3    individualized treatment for children and youth who have not
4    responded to traditional outpatient therapy or who are
5    transitioning from a more restrictive mental health
6    setting," end quote.  Now, is that -- you can look at that,
7    if you want.
8    A.  Um-hum.
9    Q.  Is that the -- when we talk about the educational
10   component -- I mean, the therapeutic component to the
11   alternative education, is that the -- the nature of the --
12   is that why the therapeutic component is -- well, strike
13   that.
14          In terms of a student getting into the alternative
15   education program --
16   A.  Um-hum.
17   Q.  -- do you typically expect to see that there has
18   been a failure of outpatient services in their home school
19   setting?
20   A.  Not necessarily.
21   Q.  Okay.  And tell me why that statement that I made
22   isn't true.
23   A.  Right.  The relationship that we have with the
24   school districts is one in which if they have a concern,
25   they will make a referral to our alternative education

Page 25

1    program.  That's their stream, I guess I would say.
2    Q.  So that's their call, in other words?
3    A.  Right.  That's their -- it's their language, it's
4    their -- it's their call.  Whether they receive partial
5    hospitalization services or outpatient services or no formal
6    clinical services, that is our call.
7    Q.  So the students refer the -- excuse me.  The
8    school district refers the student to the alternative
9    education program.
10   A.  Right.
11   Q.  And then you make the decision what therapeutic
12   services are being -- going to be provided to the student.
13   A.  That's right.
14   Q.  And relative to the Erie School District, how many
15   referrals does the Erie School District make to Sarah Reed's
16   alternative education program on an annual basis?
17   A.  I'd guess at maybe a hundred.
18   Q.  Okay.  Is it anticipated that when a student is
19   referred to Sarah Reed, that there will be a long -- the
20   student will be in attendance at Sarah Reed for a long
21   period of time?
22   A.  Our average length of stay is nine months.
23   Q.  Nine months.
24   A.  We have children who have stayed significantly
25   longer and children who are there for less than 45 days.

7 (Pages 22 to 25)

Ferguson & Holdnack Reporting, Inc.

A000000145

Richard P. v. School District                                                                    Robert Iddings                                                                    May 5, 2005

Page 26

1    Q.  Generally, can you categorize the types of
2  students that the Erie School District refers to Sarah Reed.
3    A.  It runs the entire gamut, from children who have
4  acted out one time aggressively, who have no previous
5  history, to children who have multiple diagnoses and have
6  long histories of mental health services.
7    Q.  And generally is there a -- would you say that
8  there's a mental health component to every referral?
9    A.  Our goal is to determine that.  So that the school
10  district will make the referral, and during the initial --
11  let's say phase will treatment, we would try to -- we need
12  to know that up front, that there is a mental health
13  component to it, or we would try to assess that.
14    Q.  So when the Erie School District made the referral
15  in this case, and it was -- apparently as described by
16  Mr. Bogardus, it was an oral referral, and he took it to the
17  admissions committee, is it -- was it enough for Sarah Reed
18  that Erie -- if you know, that the School District was
19  making the referral so that Sarah Reed, just based upon that
20  referral, would accept the students?
21    A.  If the parents were in agreement.
22    Q.  So to put it conversely, Sarah Reed wouldn't turn
23  down a referral from the Erie School District based upon
24  its -- assuming that there was parental consent, based upon
25  its own evaluation of the student's need, you would accept

Page 27

1  the student and do the evaluation after the student came.
2    A.  Right.  Unless we had previous history.  You know,
3  if we knew there was a reason that our program wasn't --
4  wouldn't be beneficial.
5    Q.  Okay.  Is there any problem with putting the
6  students who have aggressive behavioral tendencies with
7  students who are internalizing?
8    A.  Yes.
9    Q.  Does that present issues?
10    A.  It does.
11    Q.  Tell me, describe what those issues are.
12    A.  Children who have symptoms of severe anxiety can
13  sometimes have heightened symptoms with children who are
14  aggressive inside their own classroom.
15    Q.  And how do you deal with that at Sarah Reed?
16    A.  We try to work with both -- both populations.  If
17  a child is, you know -- presents significantly worse
18  symptoms, we'll try to move them to another classroom.
19    Q.  Okay.  Then how -- describe for me the evaluation
20  process that Sarah Reed follows when a student is referred
21  to it.
22    A.  Generally, within the first month or so -- well,
23  within the first five days, a psychiatrist will review the
24  case or what we know about the client.  And the therapist
25  will write an initial preliminary treatment plan.  Then

Page 28

1  every 20 days following that, the treatment team will
2  convene and review any symptoms that may be coming up,
3  history, as well as progress, and revise the treatment plan
4  on an ongoing basis.
5    Our therapeutic process generally is -- during the
6  first stage, within the first month or so, is just building
7  rapport, gathering information, designing an individualized
8  treatment plan.  From there, they will work on any
9  self-regulatory skills that may need to be developed; coping
10  skills, peer relationships.  And then the final stage is
11  transitioning back to a public school.
12    Q.  Okay.
13    (Discussion held off the record.)
14    MR. OLDS:  Let me take a break here of a couple
15  minutes, and I'll be right back.
16    (Recess held from 12:38 p.m. till 12:42 p.m.)
17    A.  Can I clarify one thing?
18    Q.  Sure, yes.
19    A.  You had asked if we generally accept referrals for
20  alternative ed.  We do turn referrals down.  I don't think
21  we would have in the case of K██████ and R██████ because we
22  had such limited information.  But depending on the
23  information that we get, we do make determinations that our
24  program won't be beneficial.
25    Q.  So the more information you have, the more able

Page 29

1  you are to evaluate whether the referral is appropriate or
2  not.
3    A.  Correct.
4    Q.  So in a situation where you get a telephone call
5  saying we want to refer two kids to your program, they have
6  been -- they are being harassed and they have been victims
7  of a sexual assault, you will accept those students, because
8  that's the only information you have.
9    A.  Right.
10    Q.  Okay.  And you're relying -- at that level, you're
11  relying on the school district to make the decision that
12  it's appropriate for these students to be placed in the
13  educational program at Sarah Reed, as well as perhaps get
14  the therapeutic programs that Sarah Reed offers.
15    A.  Because of our relationship, they know our -- the
16  therapeutic pieces that we offer at this point in time.  But
17  they really just rely on us to make that -- that
18  determination.
19    Q.  They rely on you as to what therapy will be
20  offered, but they could make a referral to you for
21  outpatient therapy, right?
22    A.  No.
23    Q.  Oh, they could not.
24    A.  No.
25    Q.  And why is that?

Ferguson & Holdnack Reporting, Inc.

Page 30

1    A. The way the referral sources are set up for
2    outpatient services, you have to go through -- especially if
3    it is County funding, you have to go through the -- what's
4    called the Base Service Unit. Or the parents make the
5    referral.
6        What the school could do is make an alternative
7    education referral to us, and if we felt that outpatient
8    services were the level of care, then we would talk with the
9    family about doing that.
10    Q. Okay. So if you had enough information -- say --
11    say the School District sent over an educational file;
12    IEP's, evaluations, classroom -- observations of classroom
13    behavior, your admissions committee could take a look at
14    that and say, well, we think that this student might very
15    well need therapeutic help, but it doesn't need to be in our
16    alternative education program. You could make that
17    decision; is that right?
18    A. Yes.
19    Q. But given the circumstances of this case, you
20    weren't able to do that, because you didn't have any
21    information other than an oral phone call.
22    A. I'm not really sure what information we did have.
23    Q. That's what Mr. Bogardus said.
24    A. Right.
25    Q. It has been four years, and maybe there was

Page 31

1    additional information, but that was his recollection today.
2    A. Right.
3    Q. So in his description of -- let's go back to
4    Exhibit 1 here real quick, if I can find it. Only one
5    exhibit, and I have lost it. His description of the
6    educational program offered -- the day program, educational
7    program offered by Sarah Reed is called an alternative
8    education program. Is that right?
9    A. Right.
10    Q. And then as part of that alternative education
11    program, the educational needs of the student are met, as
12    well as whatever therapeutic needs or hospital --
13    therapeutic needs of the students are met. Is that right?
14    A. No. Under the alternative education piece of it,
15    it's only their education needs are met.
16    Q. And after they are there in the alternative
17    education program, Sarah Reed makes a determination of what,
18    if any, therapeutic needs the children have.
19    A. Right. Generally we'll do that before they enter
20    the program, but sometimes they will come in, and we will
21    assess them and make that determination.
22    Q. And did you participate personally in the
23    admission of these two girls to Sarah Reed? Did you have
24    anything to do with them?
25    A. I generally sit on that committee. I'm not sure

Page 32

1    if I was there for this particular one.
2    Q. And then are all students -- as we look at the
3    educational program that is offered by Sarah Reed, which is
4    described at Page 7 of the -- of Exhibit 1, when -- I guess
5    the orientation level lasts for at least one week or a
6    maximum of two weeks. And when the student is in
7    orientation, what is the student doing on a daily basis?
8    A. They will be participating in whatever classroom
9    activities are occurring. Some of the special activities
10    they may be participating in. It's generally a time where
11    the teacher and counselor get to know the student, and they
12    get to know what the rules are, what the expectations are,
13    what the schedule is.
14    Q. Okay.
15    A. What the level system is about.
16    Q. Right. Then there are -- are there four levels or
17    three levels? Because I see there's an off level too.
18    A. Right. So there's actually four.
19    Q. Okay. Let's just go through the levels quickly.
20    Level one, are all students who come -- are all of them --
21    do they all start off at level one?
22    A. Right. They start off at orientation and work up
23    to level one, two, three, and four.
24    Q. So, for instance, a student such as Rachel would
25    go through level one after orientation.

Page 33

1    A. That's right.
2    Q. Do you ever determine that like students don't
3    need that kind of constant supervision and don't -- after
4    orientation, don't need to go to level one?
5    A. No. We have them all go through the levels in
6    sequence.
7    Q. Okay. And level one, it says, "Students continue
8    to require constant supervision within the program and must
9    be in staff sight at all times. They are eligible to
10    participate in off-grounds activity such as field trips.
11    They are expected to abide by all classroom rules and
12    maintain appropriate behavior both on and off grounds."
13    Is that level -- is that classification directed
14    principally at the students who are aggressive, or is that
15    both internalizing students and externalizing students?
16    A. Both.
17    Q. And how does an internalizing student go from
18    level one to level two?
19    A. If they are completing their assignments,
20    following the expectations of the -- the rules and the
21    structure of the program, and if they are participating
22    in -- they will probably have a personal goal of positive
23    peer interactions once per day or something like that. And
24    if they are able to demonstrate those on a sufficient
25    basis -- I believe it's 80 percent of the time -- then they

Richard P. v. School District

A000000147
Robert Iddings

May 5, 2005

Page 34

1  will move up to level two.
2      Q.  So you would expect a student who has an
3  internalizing problem to have at least one positive
4  interaction with another student on a day -- per day?
5      A.  That could be.  What the team has decided.
6      Q.  Or might it be more positive interactions?
7      A.  It may be more.
8      Q.  And the team -- the team would decide that at the
9  end of the orientation period?
10     A.  Yes.  Within the first five days they will come up
11 with -- at least an initial treatment plan.
12     Q.  Okay.  And then what is the difference between a
13 level one and level two student?
14     A.  They earn -- we have what's called a bank -- we
15 didn't back in 2002, but we have now what's called a bank.
16 So they earn, you know, better things; more enticing items
17 out of the bank.  They have a little bit more privilege.
18         For instance, the counselors or the teacher may
19 have them be the first in line or be the first one to go
20 choose something before the level one's.  They don't
21 necessarily -- I don't believe they necessarily have to be
22 in staff sight at all times.  Depending on their age.
23     Q.  You say you have a bank now.  Was there a similar
24 program in 2002?
25     A.  Yes, this was the same program.  We have just

Page 35

1  added additional incentives, because we found,
2  interestingly, that not all of the levels -- there weren't
3  sufficient incentives to go from level one to level two or
4  level two to level three, because it didn't really -- didn't
5  have that big of a difference for some of the kids.
6      Q.  Okay.
7      A.  So we have continually tried to update it.
8      Q.  Okay.  And level two requires that students --
9  students get to level two because they have to demonstrate,
10 quote, a consistent level of self-control and responsible
11 behavior?  Is that how they get to level two?
12     A.  Right.  The philosophy -- just an easy capture, we
13 have the kids focus on the three R's, which would be
14 relationships, responsibilities, and respect.  And generally
15 their goals fall under one of those categories.
16     Q.  And what kinds of behavior do those categories
17 describe?
18     A.  For instance, relationships would be, will
19 initiate one positive interaction per day with peers.
20 Respect would be, will follow staff directions with one or
21 two prompts.  Responsibility, will complete assignments
22 daily.  Those are just examples of each one.
23     Q.  And then a student can graduate to level three.
24 Level three is, "Students who demonstrate responsible
25 behavior and decision making are given more frequent

Page 36

1  opportunities to engage in independent activity.
2  Independent time may be spent in academic or recreational
3  areas of the program, as approved by the program staff."
4      Q.  Okay.  So -- and that's the criteria for becoming
5  a level three student?
6      A.  Right.  It's generally time.  You know, the more
7  time that they are able to demonstrate appropriate
8  behaviors, the higher the level.
9      Q.  Then what does off level mean?
10     A.  Off level would be what we consider level four at
11 this point in time.  They are able to, depending on their
12 age, go to various areas of the building independently, play
13 in the gym independently during free time.  They are also
14 expected to be more of mentors or role models for some of
15 the newer or younger kids.
16     Q.  Okay.  Do you think that -- Sarah Reed, the
17 program it offers, it's not a program that's meant for all
18 kids, is it?
19     A.  No.
20     Q.  What kind of kids is it meant for?
21     A.  We have a lot of success with children who have,
22 you know, difficulty identifying emotions and managing those
23 emotions on a daily basis.  Kids who have experienced
24 trauma, kids with anxiety and depression.  Some kids who
25 lack motivation, we're able to engage them into positive

Page 37

1  activities.  The kids that I think do best in our program
2  feel safe there, feel like they are successful in that
3  program.
4      Q.  Could it be the wrong program for some kids?
5      A.  Yes.
6      Q.  What kind of kids might it be the wrong program
7  for?
8      A.  Kids that don't do well in our program are kids
9  who are engaged in primarily delinquent behaviors that have
10 little remorse or interest in pleasing adults, as well as
11 children who experience severe anxiety reactions.  Sometimes
12 we can make things worse.
13     Q.  Oppositional defiant disorder, are you familiar
14 with that --
15     A.  Yes.
16     Q.  -- term?  What does that describe?
17     A.  That describes symptoms that -- or behaviors that
18 children exhibit for a variety of reasons.
19     Q.  And what kind of symptoms are they?
20     A.  Refusing to comply with directions.  You know,
21 leaving areas.  Pretty much just saying no to any type of
22 request.
23     Q.  So children having that diagnosis, those are the
24 type of children that aren't interested in pleasing adults?
25     A.  No, actually they frequently are.

10 (Pages 34 to 37)

Ferguson & Holdnack Reporting, Inc.

A000000148

Richard P. v. School District        Robert Iddings        May 5, 2005

Page 38

1    Q.   Are they?
2    A.   Yes.  They just have a difficult time, you know,
3    establishing those relationships and that trust.  Most of
4    our kids, I would think -- I'm not sure if it's over half,
5    but it's close to at least half -- have oppositional defiant
6    disorder as a diagnosis, yet they still are successful in
7    our program.
8    Q.   Okay.
9         (Discussion held off the record.)
10        MR. OLDS:  We're going to reconvene this
11        deposition after we get these records.
12        MS. SAVASTANA:  Correct.
13        MR. OLDS:  Probably the first week in June.  I
14        appreciate your coming over.  Thank you very much.
15             I appreciate your time as well.
16        MR. MARNEN:  May I follow up just a little bit
17        here with a couple questions?
18        MR. OLDS:  Yes.
19
20             CROSS-EXAMINATION
21    BY MR. MARNEN:
22
23    Q.   As I understand it, sometimes you take the
24    referring agency's reasons for referral at face value, and
25    sometimes you do not.

Page 39

1    A.   That's correct.
2    Q.   Is that a timing issue?
3    A.   (No response.)
4    Q.   Whether you have the opportunity to do it?
5    A.   Whether we have the opportunity and whether the
6    referring entity actually has access to history.  Sometimes
7    they don't.  Frequently they don't.
8    Q.   And if the basis for referral, as expressed by the
9    referral agency, indicates to you that the referral is
10   inappropriate, would you accept the referral?
11   A.   That it is not appropriate?
12   Q.   Yes.
13   A.   Yes.  No, we would not accept it.
14   Q.   So when you take it at face value, that means you
15   analyze the content and don't go beyond it.
16   A.   Right.
17   Q.   But then thereafter, even if you take that at face
18   value, you conduct your own independent analysis.
19   A.   Yes.
20   Q.   And determine whether you think the referral --
21   not only what treatment is appropriate, but whether the
22   referral is appropriate.
23   A.   That's right.
24   Q.   And how long does that process take?
25   A.   I recall one little girl that it took a day, and

Page 40

1    they knew that this wasn't going to be the right program for
2    her.  Others, it will take months, because we want to work
3    with the child and we want to work with the parent, but we
4    keep running into obstacles.
5    Q.   Do you know today, can you remember today, without
6    the looking at records, whether there was a determination
7    about the appropriateness of the referrals here with respect
8    to Kristina and Rachel?  Or would you rather look at
9    records?
10   A.   I would rather look at records.
11   Q.   Okay, fair enough.
12   A.   I would be guessing.
13   Q.   If Sarah Reed does determine that the referral is
14   appropriate after they conduct their own analysis, and if
15   hypothetically thereafter the family decided that they do
16   not want the child at Sarah Reed anymore, what happens?
17   A.   We would then coordinate with the family and
18   school district to find some alternative that was agreeable
19   to all.
20   Q.   But if the family -- if the parents decided that
21   the child did not belong at Sarah Reed, would that be the
22   end of the story with respect to the Sarah Reed referral?
23   A.   Yes.  We have had parents who pull their children
24   out, and that's the end of our involvement at that point.
25   Q.   Thank you.

Page 41

1    A.   Except to do aftercare to try to help them.
2    Q.   Right.
3        MR. MARNEN:  Okay, that's all I have right now.
4        Thank you.
5        THE WITNESS:  One thing that I would want
6        clarification on also is that I know that R████
7        and K████ are friends, but if we do go over the
8        records, if we could have it private.
9        (Discussion held off the record.)
10
11        (Deposition adjourned at 1:03 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

11 (Pages 38 to 41)

Page 1

1          IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3  RICHARD P., by and for     :  No. 03-390 Erie
   RACHEL P., and DENISE L., by :
4  and for KRISTINA L.,     :
        Plaintiffs       :
5                      :
     v.               :
6                      :
   SCHOOL DISTRICT OF THE CITY  :
7  OF ERIE, et al.,        :
        Defendants       :
8

9

10          Deposition of ROBERT IDDINGS, taken before

11    and by Janis L. Ferguson, Notary Public in and for

12    the Commonwealth of Pennsylvania, on Thursday,

13    June 23, 2005, commencing at 11:10 a.m., at the

14    offices of Knox McLaughlin Gornall & Sennett, PC,

15    120 West 10th Street, Erie, Pennsylvania 16501.

16

17

18  For the Plaintiffs:
      Edward A. Olds, Esquire
19     1007 Mount Royal Boulevard
      Pittsburgh, PA 15223
20

  For the Defendants:
21     James T. Marnen, Esquire
      Knox McLaughlin Gornall & Sennett, PC
22     120 West 10th Street
      Erie, PA 16501
23

24

           Reported by Janis L. Ferguson, RPR
25       Ferguson & Holdnack Reporting, Inc.

**Page 2**

1                 I N D E X
2
3    TESTIMONY OF ROBERT IDDINGS
4      Direct examination by Mr. Olds . . . . . . . . 3
5      Cross-examination by Mr. Marnen . . . . . . . 36
6      Redirect examination by Mr. Olds . . . . . . . 39
7      Recross-examination by Mr. Marnen . . . . . . 41
8      Further redirect examination by Mr. Olds . . . 42
9      Further recross-examination by Mr. Marnen . . . 59
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1    R O B E R T  I D D I N G S, first having
2    been duly sworn, testified as follows:
3
4              DIRECT EXAMINATION
5    BY MR. OLDS:
6
7      Q.  Mr. Iddings, we have had the records reproduced
8    from my clients, K████ L███ and R████ P██████. I guess
9    I have a couple questions about the records themselves.
10         Do you know how the -- the process by which they
11   were reproduced?
12     A.  To a limited extent.
13     Q.  Tell me what you know.
14     A.  That when a request for documents is received, our
15   medical records department forwards that to a corporation
16   called Smart Corp., who we subcontract with, who then
17   reproduces the records in some form and sends them out.
18     Q.  Okay.
19     A.  But I'm not sure how that actually occurs. I
20   think they send them down to their corporate headquarters,
21   and then they send them out.
22     Q.  The records that you have at Sarah Reed, are they
23   in a -- describe how they are kept at Sarah Reed.
24     A.  In a folder -- or in a binder similar to this
25   (indicating), in a locked storage cabinet in a locked room.

**Page 4**

1      Q.  And so each child would have one or as many
2    binders as it took to maintain all of their records.
3      A.  Correct.
4      Q.  Okay.  So I wanted to just ask you some specific
5    questions about these records that have now been produced.
6    I would like to start with K████. And do you have
7    Kristina open?
8      A.  Um-hum.
9      Q.  I'd like you to go to 200290.
10     A.  Okay.
11     Q.  Are you there?  And that would be the Discharge
12   Instruction Sheet --
13     A.  Yes.
14     Q.  -- concerning K████ L███. And I have a couple
15   questions about that sheet.  I notice that in -- at the top
16   of the sheet, it's marked that she was in the alt. ed.
17   program.
18     A.  Correct.
19     Q.  And there appears to be five programs listed at
20   the top of the sheet.  OP, what program does that describe?
21     A.  Outpatient.
22     Q.  Alt. ed.  Then there is a block for preschool,
23   then there's a block for adolescent.
24     A.  Correct.
25     Q.  What program does the adolescent describe?

**Page 5**

1      A.  Children 14 and over.
2      Q.  Is that the partial hospitalization program?
3      A.  Actually, the alt. ed. preschool, adolescent, and
4    after school are all partial, considered partial.
5      Q.  Okay.  And let's see.  I noticed that -- let me
6    just jump ahead a little bit before I ask you other
7    questions about that.  Going to Document 309 -- we'll come
8    back to 290, but going to 309 for a second, this is called a
9    Narrative Addendum.
10     A.  Yes.
11     Q.  And then Document 310 is an intake narrative.
12   Right?
13     A.  Right.
14     Q.  Do you know, can you tell me, looking at the
15   documents, whether this narrative addendum is an addendum
16   to -- which is 309 -- is an addendum to the intake narrative
17   at 310?
18     A.  Most likely it would be.
19     Q.  Okay.  Now, the intake narrative at 310 indicates
20   that K████ was seen at Sarah Reed's Children's Center in
21   1995.
22     A.  Right.
23     Q.  So she had had an earlier -- your agency had an
24   earlier involvement with her.  Is that right?
25     A.  That's right.

Richard P. v. School District

A000000151

Robert Iddings

June 23, 2005

Page 6

1    Q. And so if there is a situation where there is a
2 second contact with the student, the narrative -- the
3 intake -- there wouldn't be a new intake narrative. It
4 would just be an addendum to the original intake.
5    A. Correct. Correct.
6    Q. And so the -- this narrative addendum is -- can
7 you tell me the circumstances -- how it's prepared and why
8 it's prepared.
9    A. Matt Bogardus is our intake supervisor. He
10 interviews the child and parent upon intake and creates the
11 document.
12    Q. Okay. And the purpose of -- why does he create a
13 document narrative?
14    A. It is our initial information to the treatment
15 teams.
16    Q. Okay. I notice that the initial -- the document
17 at 310, the intake narrative, was -- had a family history, a
18 history of psychiatric and psychological behavior disorders.
19 There is no history to this narrative addendum. Is that
20 because, as we discussed last time, the way in which these
21 children came to Sarah Reed the second time?
22    A. Let me see if it's -- generally, it's -- at the
23 end of the first paragraph on 309.
24    Q. Yes.
25    A. "Please refer to previous intakes for historical

Page 7

1 information."
2    Q. For historical information, okay.
3    A. So that's the standard. If we have done a
4 psychosocial history and it's available, then usually we
5 don't redo it.
6    Q. Okay. So even though there was a seven-year
7 interval between the first intake and this intake, you
8 wouldn't generally do an update on the history? I guess
9 K█████ was five years old when she first came and 12 years
10 old when she comes the second time. 13 years old. There
11 wouldn't be any interest in what had happened to her in
12 those seven or eight years?
13    A. There would be interest. I'm not sure why Matt
14 didn't include that in here.
15    Q. Okay. And this is -- "The referral concerns a
16 referral was made by the Erie School District for the
17 special education tract. It was reported that K█████ was
18 victimized in school by other students and also suffered
19 harassment by her peers," end quote. That was the basis of
20 the referral. And then apparently the School District also
21 reported that the CYS is conducting an investigation of
22 K█████ father for allegations of sexual abuse.
23    And do you know if that -- you probably don't
24 know what that means, right? Whether it's sexual abuse of
25 her or sexual abuse of some other sibling, sexual abuse of a

Page 8

1 third child, right?
2    A. Right.
3    Q. Okay. And then referral concerns, this would be
4 Mr. Bogardus advising -- making note of why the -- Kristina
5 was referred. Is that right?
6    A. Right.
7    Q. Okay. And so going to Document 332, is this a --
8 I see your letterhead at the top or your insignia at the
9 top. Tell me what just this page is, 332.
10    A. This -- it's a proposed service plan that we
11 submit to the Base Service Unit.
12    Q. Okay. So 332 is submitted with what else? I
13 mean, it's -- when you submitted 332 to the Base Service
14 Unit, what other information went, do you know?
15    A. I'm not sure.
16    Q. What information would typically go?
17    A. I'm not sure. That's more of a billing issue.
18    Q. Okay. So this was a -- this information --
19 something was submitted to the Base Service Unit to make
20 sure that the services -- some services would be provided --
21    A. Correct.
22    Q. -- is that right? Okay. And it refers to an
23 initial report, but you don't know what the initial -- what
24 initial report -- I see that "initial report" is checked on
25 this form.

Page 9

1    A. Right. I don't know what that would refer to.
2    Q. Okay. Now, we're going to go back to that first
3 sheet again, that Discharge Instruction Sheet. That's 290.
4 What is the purpose of preparing the Discharge Instruction
5 Sheet?
6    A. It is -- it's prepared for the treatment team, as
7 well as the family.
8    Q. And is this prepared at the time of discharge?
9    A. Yes.
10    Q. And I guess what information were you trying to
11 give to the treatment team at the time of discharge? Or why
12 is it prepared --
13    A. It's pretty much just a summary as to why the
14 child is being discharged. It would go to the 291.
15    Q. Yes.
16    A. The supervisor, who is myself, the psychiatrist,
17 the nurse. And this page is copied and given to the parents
18 for recommendations (indicating).
19    Q. The second page is given.
20    A. Right.
21    Q. And the recommendations at the time of K█████
22 discharge are, "Will continue with Wrap-Around services via
23 CII."
24    A. Yes.
25    Q. What is CII?

Ferguson & Holdnack Reporting, Inc.

398b0d01-2ddd-4476-9847-1db54614cde8

A000000152

Richard P. v. School District                    Robert Iddings                              June 23, 2005

---

Page 10

1    A.   Community Integration Services.
2    Q.   Okay. And that's not your agency; is that right?
3    A.   That's right.
4    Q.   "And Kristina will be referred for Sarah Reed
5    Children's Center through fall of 2002/2003 school year.
6    Medication management will be provided by Dr. Wilson."
7    A.   Yes.
8    Q.   I misread that. "K███ will be referred for
9    the SARCC after-school to begin in the summer and continue
10   through the fall of the 2002/2003 school year.  Medication
11   management will be provided by Dr. Wilson."
12   A.   Right.
13   Q.   What is that after-school program?
14   A.   We also run an after-school program.  It's just --
15   it's a partial hospitalization program.  It does not provide
16   educational services for the children.  So it runs from
17   2:30 till 6:30.
18   Q.   And in general, what happens -- you referred --
19   someone referred K███ to that program.  What was going
20   to happen in that program?
21   A.   She would continue with individual and group
22   therapy, social skills in a peer setting; setting with
23   same-age peers.  And have psychiatric follow-up.
24   Q.   And the treatment goals that are listed on 290,
25   those six treatment goals, are those the treatment goals

---

Page 11

1    that were developed when K███ came in January of 2002,
2    or are they the treatment goals that you are recommending
3    for the after-school program?
4    A.   Those would have been the goals that we addressed
5    while she was in treatment.
6    Q.   Okay. Can you tell me which one of those goals
7    related to the reason for her referral, which was the --
8    that she had been victimized sexually in school by other
9    students and had suffered harassments by her peers.  Which
10   one of those goals addressed the reason for her referral?
11   A.   I'm not sure if I can answer that.  I don't see
12   the goals that would address that.
13   Q.   Okay. Going to the -- going to 333, which is the
14   Master Treatment Plan.
15        MR. MARNEN:  What is the number again?
16        MR. OLDS:  That would be 333.
17   Q.   Tell me what a Master Treatment Plan is.
18   A.   Within the first five days of treatment, the
19   therapist develops a treatment plan and submits it to the
20   psychiatrist for approval.
21   Q.   Is the treatment plan generally -- this is one
22   page.  So is it generally one page?
23   A.   The initial one frequently is.
24   Q.   Okay. And then 334, would that be like the back
25   side of 333, or is it --

---

Page 12

1    A.   Right.  That's the accompanying -- that would be
2    the back side, right.
3    Q.   So, actually, the Master Treatment Plan is a
4    double-sided document; the original of it would be a
5    double-sided document?
6    A.   Right.
7    Q.   And on the back --
8    A.   And it could be -- it could be longer as well.
9    Q.   So there might be more contained in the problems
10   needed to be addressed or the goals statement.
11   A.   Um-hum.
12   Q.   Do you know, looking at the documents in front of
13   you, whether Kristina's treatment plan was contained on one
14   page?  Her initial treatment plan.
15   A.   It appears so.
16   Q.   Okay. Now, is there anything in that Master
17   Treatment Plan that addresses the reason for her referral,
18   which was the sexual assault and the student harassment?
19   A.   Not for that specific problem.
20   Q.   Okay.
21   A.   That may be addressed by her mobile therapy.
22   Q.   You mention "mobile therapy".  What is that?
23   A.   It's a service for families where the therapist
24   goes into the home and works with the family and the child
25   in the home.

---

Page 13

1    Q.   Do the mobile therapists visit Sarah Reed
2    Children's Center?
3    A.   Occasionally.
4    Q.   Do you know whether they did for K███?
5    A.   I don't.
6    Q.   And when you say "occasionally", what would be the
7    occasions of their visit?
8    A.   It depends on the mobile therapist.
9    Q.   Okay. I notice that the -- in terms of the Master
10   Treatment Plan, there is a column for problems, there's a
11   column for the goals or objectives, and then there is a
12   problem -- there's a column for methods or interventions of
13   what the staff is supposed to do.  Is that right?
14   A.   Right.
15   Q.   Okay. And so -- and basically the third column
16   or -- that's under methods/interventions, frequency, timing,
17   responsible staff --
18        MR. OLDS:  And for the record, I'm still referring
19        to 333.
20   Q.   -- those are the methods or the tools that the
21   staff is going to be using to achieve the goals that have
22   been set for this child.  Is that right?
23   A.   Right.
24   Q.   Okay. And the -- the first method here is that,
25   "The PHP staff will educate K███ to the classroom rules

---

4 (Pages 10 to 13)

398b0d01-2ddd-4476-9847-1db54614cdc8

A000000153

Richard P. v. School District                Robert Iddings                          June 23, 2005

Page 14

1  and expectations during her orientation period." Is that
2  right?
3      A.  Um-hum.
4      Q.  And then they will maintain a daily point card
5  that will reflect her day at Sarah Reed Children's Center.
6      A.  Yes.
7      Q.  And I think we discussed that the last time,
8  although we now have the cards.
9      A.  Right.
10     Q.  But we discussed that process; that children went
11 from one level to the next.
12     A.  Right.
13     Q.  And the next one is that, "Sarah Reed will utilize
14 behavior modification techniques on a daily basis, will use
15 praise, positive reinforcement, encouragement, and earned
16 incentives to help K██████ make positive choices." Is that
17 right?
18     A.  That's right.
19     Q.  "Dr. Brunner, the DO, will meet with K██████
20 every 20 days for a psychiatric consultation."
21     A.  Right.
22     Q.  Did Dr. Brunner meet with kids in the after-school
23 program?
24     A.  I believe Dr. Carlson was the psychiatrist at the
25 time for that program.

Page 15

1      Q.  But kids in the after-school program would be able
2  to meet with the psychiatrist as well?
3      A.  Right.
4      Q.  Item 4 under the Methods of Intervention says, "J.
5  Vaglia, MS/CM, will meet with K██████ once per week to
6  discuss her compliance with the classroom and authority
7  figures."
8      A.  Yes.
9      Q.  Who is J. Vaglia?
10     A.  Jennifer Vaglia was the therapist assigned to the
11 case.
12     Q.  Case manager?
13     A.  Case manager.
14     Q.  She will meet with K██████ once a week to make
15 sure that she's complying with classroom rules.
16     A.  Right.  That could be an initial goal.
17     Q.  And then if it were changed, that change would be
18 reflected in some other --
19     A.  Right.
20     Q.  -- modification to the plan --
21     A.  Right.
22     Q.  -- is that right?  And then under Item -- that's
23 all under Problem Category (a)(1), "K██████ has
24 difficulties following the rules and expectations.  She
25 typically requires more than one prompt to complete a task."

Page 16

1      A.  Right.
2      Q.  That's Item 1; is that right?
3      A.  Right.  So the initial treatment plan is based on
4  the first five days of observation.
5      Q.  Okay.  And then (a)(2), "K██████ has difficulty
6  staying on task.  She needs to be prompted several times to
7  begin her work or to comply." That's Item 2; is that right?
8      A.  Right.
9      Q.  And then the methods of intervention under Column
10 3 of 333 is that, "The PHP staff will use behavior
11 modification techniques on a daily basis, along with praise,
12 prompting, reinforcement, and hurdle help to assist K██████
13 staying on task and making good choices." Is that right?
14     A.  That's right.
15     Q.  And the staff, in terms of the -- based upon these
16 described methods of intervention, the staff at Sarah Reed
17 wasn't really dealing with the harassment that K██████ had
18 suffered at school or the sexual assault; is that right?
19     A.  That's right.
20     Q.  Okay.  Looking through the -- can I see that for
21 just a second.
22     A.  Um-hum.
23     Q.  I see that, looking at -- and I'm going to show
24 you this in a second.  But looking at 337, 338, those two
25 pages --

Page 17

1      A.  Um-hum.
2      Q.  -- those appear to be changes in the treatment
3  plan or modifications to the treatment plan.  Is that right?
4      A.  That's right.
5      Q.  And the changes are in the goals or in the
6  problems; is that right?
7      A.  Right.
8      Q.  Okay.  And, first of all, looking at those
9  records, I saw that there were those two modifications to
10 the treatment plan.  Could you leaf through there and see if
11 there is any others that I might have missed that pertain to
12 Kristina.
13     A.  No, that would be it.
14     Q.  Okay.  And the -- okay.  So that over the course
15 of that first period of time when she was at Sarah Reed's
16 Children Center, there were -- the treatment plan was
17 reviewed two times after her initial -- after the initial
18 plan.
19     A.  Three.
20     Q.  Three.  What are the dates of those reviews?
21     A.  February 28th, April 5th, May 30.
22     Q.  Yeah, I missed that.  Okay.  And let me ask you a
23 question:  In terms of the initial plan, which is done after
24 the five-day review --
25     A.  Right.

Ferguson & Holdnack Reporting, Inc.

Richard P. v. School District             Robert Iddings                        June 23, 2005

---

Page 18

1  Q.  -- is it generally the case that each child would
2  have an individualized distinct master plan, or is there a
3  similarity between the --
4      A.  There are frequently similarities.
5      Q.  In essence, your school is used to dealing with
6  children that present behavioral problems in the -- in the
7  school that has referred them; is that right?
8      A.  That's right.
9      Q.  That's its primary sort of -- its primary niche,
10 is dealing with a -- I know we went through two; there were
11 two types of students; externalizing and internalizing.
12     A.  Right.  Right.
13     Q.  I remember that.  But your niche is dealing with
14 those students that have had -- presented some kind of
15 classroom problem; is that right?
16     A.  Right.  That their mental health needs -- the way
17 I think we have it written -- I didn't bring it with me.
18 But their mental health needs -- their social and emotional
19 and behavioral needs cannot be met in their public school.
20     Q.  Okay.  Now, I notice that K███, if you go to
21 Document 340 -- 340, and actually if you look at 340 and
22 341, these are -- tell me what these documents are.
23     A.  These would be the daily point cards, as -- these
24 are just the daily point cards.
25     Q.  Okay.  Is there something else that should

---

Page 19

1  accompany the daily point cards?
2      A.  Yeah.  Within our chart, the daily point card, and
3  on the back is the daily note that goes with this.
4      Q.  And, actually, the daily notes have been provided.
5  I guess that they come up at a different place.  Let's see
6  if we can find those; a sample of those.  That might be --
7  are they the Clinical Case Progress Notes?  Is that --
8      A.  Right.
9      Q.  Okay.  Then I'm not sure I can find the
10 corresponding -- the way these were copied.  Let's see if we
11 can find the -- see if you can find the corresponding
12 clinical notes to those first -- her first week there.  Oh,
13 here, it is.  It would be -- oh that's -- yeah.  If you look
14 at --
15         (Discussion held off the record.)
16     A.  Here they are.
17     Q.  What number is that?  Oh, I see.  It would be 385
18 and 384?
19     A.  Yes.
20     Q.  So in terms of her report cards, looking -- going
21 back to 340, the report cards from her first three dates,
22 there's 90/90, then there's one for 98.  And there is a
23 daily point total of 100.  Does that -- those point totals,
24 do they indicate that -- that's the highest level of
25 achievement available for K███, right?

---

Page 20

1      A.  Right.
2      Q.  On those days.  In looking at this report card,
3  weekly point card, I notice that the target behaviors,
4  Behavior No. 1 is, "Meet classroom expectations."  Behavior
5  No. 2 is, "Get along with staff and peers."  And those are
6  typed in.  And then there is blanks for handwritten stuff to
7  appear.  Are those first two target behaviors, are they the
8  same for all of the students in the school?
9      A.  Yes.
10     Q.  Okay.  So they are uniform; that the first two
11 target areas would be to meet classroom expectations and get
12 along with staff and peers.
13     A.  Right.
14     Q.  And it seems like, going back to -- okay.  If you
15 look at the progress notes for that first week, the Clinical
16 Case Progress Notes at 385, I mean, it seems like K███
17 did pretty -- I mean, could you ask for more?  I guess
18 that's the way I would --
19     A.  That was a very good first week for her.
20     Q.  Is it typically the case that kids' first weeks at
21 Sarah Reed's Children Center are so successful?
22     A.  Yeah, it's not unusual.
23     Q.  Why is that?  Is that because they are new there
24 or --
25     A.  Right.

---

Page 21

1      Q.  Then I notice in the clinical case notes for the
2  next week, 384, there is -- there's a reference on
3  1/30/02 to, "K███," quote, "was prompted to focus on
4  task and ignore negative leads," period, end quote.  I think
5  you and I discussed negative leads last time.  Do you
6  recall?
7      A.  I don't recall, but we probably did.
8      Q.  Okay.  Negative leads are that maybe a child who
9  is internalizing is negatively influenced by some of these
10 children who have aggressive behavior problems.  Is that
11 right?
12     A.  Could be either way.  Negative leads are when one
13 of the other children is behaving in a maladaptive manner,
14 whatever that is -- and, for instance, in this case,
15 Kristina would follow that and add to that.
16     Q.  Okay.  Going back to 341, that would be the --
17 that would correspond to -- those -- that report would
18 correspond to the -- K███s performance the next -- next
19 week or her second -- her first full week, the second week
20 she was there.  Right?
21     A.  Right.
22     Q.  And it would be at some point in that week that
23 the master plan -- Master Treatment Plan would have been
24 prepared.
25     A.  Right.

Ferguson & Holdnack Reporting, Inc.

Richard P. v. School District
A000000155
Robert Iddings
June 23, 2005

**Page 22**

1  Q.   After five full days.  Okay.  I think that we --
2  we discussed last time that the children progressed through
3  certain levels at Sarah Reed.  And correct me if I'm wrong.
4  When they are in the first level -- first there is the
5  orientation level, and then there's the first level; is that
6  right?
7  A.   That's right.
8  Q.   I think we said that when they are in the first
9  level, you expect one positive interaction between a student
10 and their peers on a daily basis?
11 A.   That would be an example.
12 Q.   Well, is that what the expectations are, or are
13 the expectations higher than that?
14 A.   It's individualized.
15 Q.   Can you tell, looking at this information that
16 we've looked at pertaining to C█████, what the
17 expectations for her were when she went to the first level?
18 Or haven't we got to the first level yet?
19 A.   If I go back and look at her treatment plan, I
20 might be able to tell you.  No, I wouldn't -- I wouldn't be
21 able to tell you what the expectation is.
22 Q.   Should that be something you should be able to
23 tell me from the treatment plan; what the expectations of
24 her are?
25 A.   That doesn't appear to be one of her goals they

**Page 23**

1  were working on, so, no, I wouldn't expect to be able to
2  tell you that, if it wasn't a goal that they were working
3  on.
4  Q.   Okay.  Do you know if any of the behaviors that
5  are addressed in the report cards -- the score cards, I
6  think you called -- weekly point cards?
7  A.   Right.
8  Q.   Are any of the behaviors addressed in the weekly
9  point cards -- can you discern whether they have anything to
10 do with the sexual assault that she suffered or the
11 harassment that she was undergoing at the Erie School
12 District?
13 A.   The only one that I would guess -- or the two that
14 I would guess, get along with peers and increase
15 self-esteem.  But those are only guesses.
16 Q.   Okay.  Can you tell, who was her -- by looking at
17 this, who her teacher was?  I guess that would be the
18 Clinical --
19 A.   Right.
20 Q.   -- Case Notes.
21 A.   Jill Houston was the counselor, Kelly Hogue was
22 the teacher.
23 Q.   Could you look at Document 362.
24 A.   (Witness complies.)  Um-hum.
25 Q.   362 and 363, one of the reasons that I had -- I

**Page 24**

1  had asked you about the document preparation here is that
2  these are the Clinical Case Progress Notes, right?
3  A.   Right.
4  Q.   And these would be made by the case manager?
5  A.   That's right.
6  Q.   And they are different than the notes that we have
7  been looking at, which are called -- the classroom notes.
8  Although those are called Clinical Case Progress Notes as
9  well.
10 A.   Right.
11 Q.   They are all completed on the same form.
12 A.   They are -- they were at the time.  They are not
13 anymore, because of that confusion.
14 Q.   I just wanted to ask you, there seems to be a gap
15 between these notes.  If you look at 362 and 363, they go
16 from 2/15/02 on Page 362 to 5/2/02; that being the date --
17 A.   Right.
18 Q.   -- on 363.  And there doesn't seem to be any notes
19 of any case management involvement with K████ for in
20 between those two periods of time.  Was the case manager
21 supposed to meet with her on a weekly basis?
22 A.   She documented that she was to do that.  But I'm
23 aware that she didn't.
24 Q.   And how are you aware that she didn't?
25 A.   It was addressed in supervision with her.

**Page 25**

1  Q.   Okay.
2  A.   There was a time that she was documenting that she
3  was doing certain things that she wasn't able to perform.
4  Q.   Okay.  So in this particular case, it's not that
5  there is a gap in the records.  It's the fact that there
6  wasn't a contact between the case manager and K████ for
7  10 weeks or approximately 10 weeks.
8  A.   Right.  And if there was, it wasn't documented.
9  Q.   Wasn't documented, okay.  Now, who -- the case
10 manager, in the hierarchy of Sarah Reed Children's Center,
11 what is the case manager's job?
12 A.   To coordinate treatment.
13 Q.   Okay.  So the case manager is to meet with --
14 would do that between the teacher and the counselor and the
15 student and perhaps the therapist as well?
16 A.   They are the therapist.
17 Q.   Oh, they are the therapist.
18 A.   Right.
19 Q.   Okay.  And in terms of being the -- I think that
20 we discussed this the last time.  That the therapist had --
21 they had five hours a week to conduct therapy?
22 A.   Approximately.
23 Q.   Okay.  Which was split up among their various
24 students.
25 A.   Right.

7 (Pages 22 to 25)

Ferguson & Holdnack Reporting, Inc.

Richard P. v. School District
Robert Iddings
June 23, 2005

**Page 26**

1    Q.  And so what we can conclude from these records is
2  that if there were therapy between February 15th, '02 and
3  May 13th, '02, it's not documented.
4    A.  Right.
5    Q.  And we don't know if there was therapy.  As we sit
6  here today, you don't know if there was any therapy given to
7  Kristina.
8    A.  Right.
9    Q.  Okay.
10       (Discussion held off the record.)
11    Q.  Looking at those notes of -- the therapist notes,
12  is there any indication that K▮▮▮▮ received therapy
13  surrounding the sexual assault or the harassment that she
14  had suffered at the Erie schools?
15    A.  No.
16    Q.  Would it be fair to say that for whatever -- that
17  the reasons for the referral, whatever reasons the Erie
18  School District had for referring K▮▮▮▮ to Sarah Reed,
19  her tenure at Sarah Reed sort of took on a life of its own,
20  and you guys dealt with whatever problems you perceived?
21    A.  Correct.
22    Q.  Would that be fair to say that?  Okay.  And then
23  look at Document 394.
24    A.  (Witness complies.)
25    Q.  Okay.  And tell me what that document is.

**Page 27**

1    A.  That's our psychiatrist's initial psychiatric
2  evaluation.
3    Q.  And what psychiatrist conducted that?  That would
4  be Christine Brunner?  Christine Brunner Martinez?
5    A.  Correct.
6    Q.  She is on staff at Sarah Reed Children's Center?
7    A.  She is our medical director.
8    Q.  Take a look at -- okay.  The mental status exam
9  that the doctor concluded, which would be at Page 395,
10  "Patient is very small and slightly chubby and was noted not
11  to be able to button the top button on her pants.  She has
12  shoulder-length brown hair, and her hair is disheveled, but
13  she does have on silver lip gloss, which is identical to a
14  peer's silver lip gloss.  She was pleasant and cooperative
15  and fairly verbal, but was very soft-spoken.  She denies
16  suicidal or homicidal ideation, and there is no evidence of
17  thought disorder."
18       I have trouble seeing any sort of diagnosis of a
19  mental illness in that mental status exam.  Can you help me
20  with that?  I mean, what is there about that mental status
21  exam that makes it necessary for K▮▮▮ to be in your
22  partial hospitalization program?
23    A.  I wouldn't be able to answer that.  Our
24  psychiatrist would have to answer.
25    Q.  Okay.  After the psychiatrist conducts his initial

**Page 28**

1  psychiatric evaluation, what happens?  What is the process
2  at Sarah Reed concerning K▮▮▮?
3    A.  I'm not sure if I understand the question.
4    Q.  Well, I mean, what -- what is the point of this
5  evaluation?  What results from it?  Or what consequences
6  flow from the psychiatric evaluation?  Or, in other words,
7  for what purpose is there a psychiatric evaluation?
8    A.  From my standpoint, the purpose is every 20 days.
9  Within the first five days, a psychiatrist has to meet with
10  the child and do an evaluation.  So this meets that
11  requirement.  And then every 20 days following that, they
12  have to review the treatment plan.
13    Q.  Okay.  Well, I understand that there has to be a
14  meeting.  And, actually, there wasn't within the first five
15  days, because this is dated 2/13/02.  Although it does say
16  that there was an initial -- I guess she signed it 2/13/02.
17  Apparently the initial psychiatric examination was done on
18  2/01/02.
19    A.  Right.
20    Q.  Okay.  Well, so I understand, that it is part of
21  the procedure to have a psychiatric evaluation.  But what is
22  the -- after you have the evaluation, what is done with it?
23  How does the evaluation convert into like something that the
24  school is doing?
25    A.  It would have very -- very little connection with

**Page 29**

1  the school.  And, in fact, we wouldn't share it with the
2  school unless there was a specific release signed.
3    Q.  I'm talking about your school.
4    A.  Oh, for our school, okay.
5    Q.  Right.
6    A.  The psychiatrist is the team leader.  So based on
7  her evaluation, then she would meet with the therapist and
8  the teacher and probably the parent, if she could, and
9  develop -- further refine the treatment plan.
10    Q.  Okay.
11    A.  And determine if medications were necessary.  Or
12  if she was on medication, if they were appropriate.
13    Q.  Are you able, looking at this psychiatric
14  evaluation, to determine whether it was appropriate for
15  Kristina to be at Sarah Reed Children's Center?
16    A.  Based on this information, I would say that she's
17  eligible for our services.
18    Q.  Eligible in the sense of what?  What makes her
19  eligible?
20    A.  She has a past psychiatric history and the
21  previous trauma that she's experienced, plus a suspected
22  history of abuse.
23    Q.  So you need to explain.  She has a past
24  psychiatric history?
25    A.  Right.

Ferguson & Holdnack Reporting, Inc.

398b0d01-2ddd-4476-9847-1db54614cdc8

Richard P. v. School District                Robert Iddings                          June 23, 2005

Page 30

1    Q.  But the past -- and she does have a past
2   psychiatric history.  But it does appear that the last
3   involvement with Sarah Reed was seven or eight years before
4   this involvement.  Is that right?
5    A.  Right.  Yet she's also had family-based mental
6   health, which is a fairly significant service.
7    Q.  Okay.
8    A.  And she's had what is called the Living in Family
9   Environment Services, LIFE, which is for the most severe
10  percentage of children in Erie County.  And she also
11  currently had Wrap services.
12   Q.  Well, it says that her sister has had LIFE
13  services?
14   A.  I'm sorry.  Okay.
15   Q.  Right?
16   A.  So then she was currently receiving Wrap-Around
17  services.
18   Q.  Okay.  So those -- those kind -- but that's --
19  that makes her appropriate for Sarah Reed, but what in --
20  what, in this report, indicates to you that she's
21  appropriate for the -- an educational placement at Sarah
22  Reed?
23   A.  That probably -- I'm not sure.
24   Q.  Because there's a difference between being
25  eligible for your services; perhaps the after-school program

Page 31

1   or the therapy -- you know, the outpatient program, as
2   opposed to the educational program.
3    A.  Right.
4    Q.  Is that right?
5    A.  Right.
6    Q.  Looking at this report, what makes her eligible --
7   or appropriate for the educational program at Sarah Reed?
8    A.  That would have been a determination by the
9   school.
10   Q.  Erie.
11   A.  Right.
12   Q.  And I think we talked about this.  I don't know.
13  Did you have a chance to look at your deposition from the
14  last time?
15   A.  No.
16   Q.  Did we send you a copy?
17       (Discussion held off the record.)
18   Q.  But in any event, I think that we -- if you
19  recall -- and I just went through it once, and I haven't
20  committed it to memory.  But I think that we broached the
21  subject that sometimes kids might be sent to Sarah Reed,
22  that it's not appropriate that they be sent to Sarah Reed.
23  That not all children are Sarah Reed material.
24   A.  Right.
25   Q.  And if you recall in this case, I think that

Page 32

1   K█████ was referred by Erie by virtue of a phone call.
2    A.  I'm not sure of that, but.
3    Q.  Okay.  Well, that's what Mr. Bogardus testified
4   to.
5    A.  Okay.
6    Q.  And if you look at the -- if you go to beginning
7   at the Page 200409, I guess up through 49 -- wait.  Excuse
8   me.  Up through 435.  If you just sort of peruse those, does
9   that appear to be the records from the Erie School District
10  that pertained to K█████?
11   A.  Right, it is likely to be that.
12   Q.  And I think that -- can I just see the -- I just
13  want to see if there were any other records.  Actually, it
14  goes up to Page 456.  It doesn't appear to me that -- and
15  those would be records that you would have obtained from the
16  School District?
17   A.  Right.
18   Q.  It doesn't appear to me that those records contain
19  any discipline information concerning K█████ or any
20  information pertaining to her acting out or her behavioral
21  problems in class.  And you could take a look -- and I want
22  you to take a look at that before you answer that, as to
23  whether you agree or not agree with me.
24   A.  Okay.
25       (Discussion held off the record.)

Page 33

1    Q.  Have you had a chance to look at those?
2    A.  Yes, I did.
3    Q.  Is there anything that indicates that K█████ was
4   ever a behavioral problem at the Erie School District?
5    A.  No.  But to help answer the previous question as
6   far as the psychiatrist report and this report, I was able
7   to remember something when I looked back at the intake.
8    Q.  Yes.
9    A.  The addendum.
10   Q.  Yes.  What is the Bates stamp on that?
11   A.  Oh, here it is.  310.  Oh, I'm sorry, it's --
12   Q.  309?
13   A.  Right.  "K█████ had a recent inpatient stay at
14  Millcreek Hospital and was discharged on January 11, 2002."
15  That would almost automatically trigger for us that she was
16  eligible for partial services.
17   Q.  Okay.  But, again, are the -- the therapy and the
18  hospitalization services that accompanied the placement in
19  the alternative education program, are those same services
20  available as an after-school program?
21   A.  They are, but it's common for kids who come out of
22  residential or inpatient to automatically go into a daytime
23  partial hospitalization program.
24   Q.  Okay.  Common in the -- well, if that's why
25  K█████ went into your program, your education program --

Ferguson & Holdnack Reporting, Inc.

398b0d01-2ddd-4476-9847-1db54614cdc8

A000000158

Richard P. v. School District
Robert Iddings
June 23, 2005

Page 34

1    A.  I'm not saying that that's why she went in, but
2  that's why we would have accepted her without much of a
3  question.
4    Q.  Right.  Well, I think you testified last time
5  about that you accepted her because you relied on Erie to --
6  I mean, they called you up, and you assumed that they had
7  made a judgment that the referral was appropriate.
8    A.  Right.  Even if they didn't have a lot of
9  information, if they called us and said, you know, this
10  child is coming out of an inpatient hospitalization, would
11  you evaluate her, then we would take her.
12    Q.  All right.  But if you look at your Master
13  Treatment Plan -- and I think that that was 333 -- there is
14  nothing in that Master Treatment Plan that relates to
15  Kristina's hospitalization, is there?
16    A.  No.  That would have been based on the
17  observations during the first five days.
18    Q.  Okay.  Well, actually, let me just look at the
19  Master Treatment Plan.  Could you go to 333 -- well, before
20  we get to that, it is true that in what appears to be the
21  section of your records that pertain to information provided
22  by the School District --
23    A.  Right.
24    Q.  -- that there is no indication that K████ had a
25  behavioral problem at the School District.

Page 35

1    A.  Right.  I couldn't find anything here.
2    Q.  All right.  And there's no indication -- okay.  So
3  if -- talking about what you said, in terms of the
4  development of the Master Treatment Plan, which is at 333,
5  based upon Kristina's first five days at the school, the
6  first thing that is noted is that -- in the Master Treatment
7  Plan -- this is Problems/Needs, quote, "K████ has
8  difficulty following the rules and expectations.  She
9  typically requires more than one prompt to complete a task."
10  If you look at the point cards for her first five days, she
11  got 90 out of 90, 98 out of 100, 100 out of 100, 100 out of
12  100, and 95 out of 100.  And what, in those -- and I see on
13  the fifth day, which is at 341, Tuesday, that there is a
14  handwritten note, "Needed several prompts to stay on task;
15  one time out of five."
16        How can you discern that that's a problem that she
17  has, based upon -- on one day she needed more than one
18  prompt to -- or at least that's the observation -- she
19  needed more than one prompt to complete a task?
20    A.  Yeah, I'm not -- I wasn't part of that team, so
21  I'm not sure how they did that.
22    Q.  Okay.  And certainly, that is -- that kind of
23  behavior would be different -- different from the typical
24  behavior of a student referred to the alternative education
25  program by School District -- I mean, these kids were

Page 36

1  really -- many of them were out of control, right?
2    A.  Some of them were.
3    Q.  And I think that your doctor, going back to 395,
4  Dr. Brunner Martinez, who conducted an initial psychiatric
5  evaluation, indicated that K████ denies suicidal or
6  homicidal ideations, and your doctor also found that there
7  was no evidence of thought disorder.
8    A.  Right.
9        (Discussion held off the record.)
10
11            CROSS-EXAMINATION
12  BY MR. MARNEN:
13
14    Q.  Mr. Iddings, as I understand it, then, the
15  original referral from -- from Erie School District was
16  based on two things; one was harassment by -- of K████ by
17  other students, and two was the sexual assault she had been
18  involved in.
19    A.  That's what it appears to be.
20    Q.  You were not personally involved in her treatment;
21  is that --
22    A.  That's correct.
23    Q.  -- a fair statement?
24    A.  Right.
25    Q.  Did you supervise anyone that was?

Page 37

1    A.  Yes.  Jennifer Vaglia.
2    Q.  How do you spell Jennifer's last name?
3    A.  V-A-G-L-I-A.  She was the case manager/therapist.
4    Q.  So when you responded, then, you're talking about
5  you reviewed records.  You were not personally involved, so
6  your response was based on review of records.
7    A.  Correct.
8    Q.  All right.  And as you reviewed the records, those
9  records indicated to you that both the treatment plan and
10  the actual treatment were unrelated to harassment by other
11  students and a sexual assault on K████?
12    A.  Yes.
13    Q.  Is that your testimony?
14    A.  Yes.
15    Q.  What kinds of things would you expect to see in
16  the treatment plan and the treatment if they were related to
17  harassment by other students and a sexual assault of
18  Kristina?
19    A.  There would be a goal, for instance, to say, "Will
20  identify feelings regarding previous trauma."
21    Q.  Would that be about it, then?  Have you just
22  summarized everything that would be in there?
23    A.  And then there may be objectives under that.  One
24  objective would be to write out feelings, to develop coping
25  skills to deal with feelings, and to identify -- and I'm

Ferguson & Holdnack Reporting, Inc.

Richard P. v. School District
Robert Iddings
June 23, 2005

Page 38

1 just doing this for instance, but identify strength based on
2 personal capabilities.
3      Q.   Is it fair to say the details of the objectives
4 would vary from person to person?
5      A.   That's right.
6      Q.   Would they be of a general nature that would be
7 recognizable to you?
8      A.   Yes.
9      Q.   And you don't see any of those kinds of things in
10 the objective, in the plan here.
11     A.   I do not.
12     Q.   What, if anything, does that suggest to you
13 relative to any effects sustained by K██████ as a result of
14 student harassment or a sexual assault?
15     A.   Two things: One, that the treatment team didn't
16 feel that that was the primary -- her primary need at the
17 time. And/or that those needs were being addressed by
18 another therapist.
19     Q.   Is another possibility that there weren't any
20 needs?
21     A.   Or there were no -- there were no needs regarding
22 previous trauma.
23     Q.   The other therapist would be someone outside the
24 Sarah Reed program?
25     A.   Right.

Page 39

1      Q.   But even though there was no relationship between
2 the treatment plan and the actual treatment and the basis
3 for referral by Erie School District, K██████ did remain in
4 the Sarah Reed program through some date in June, did she
5 not?
6      A.   That's right.
7      Q.   And her remaining in that program, was that --
8 what was that based on? Was that based on an evaluation of
9 her needs by Sarah Reed?
10     A.   Yes. The treatment team would determine when they
11 thought she was -- she was prepared to go back to a public
12 school and be successful.
13     Q.   And what role, if any, did the parents' wishes
14 play in her remaining at Sarah Reed?
15     A.   I'm not real sure, but in general, we wouldn't
16 continue to provide treatment if the parents aren't in
17 agreement.
18          MR. MARNEN: I have no other questions. Thanks.
19
20          REDIRECT EXAMINATION
21 BY MR. OLDS:
22
23     Q.   If a need -- if there was a treatment need because
24 of the prior trauma -- in this case, a sexual assault or
25 harassment -- do you know if the methods for addressing that

Page 40

1 need, would they be behavioral modification therapy or
2 behavior modification methods?
3      A.   In general, I would not say that behavioral
4 modification methods would address previous trauma.
5      Q.   Okay. And if the reason for the referral doesn't
6 exist, why wouldn't you just send her back?
7      A.   Based on our evaluation, we -- and, again, this is
8 in general. Based on our evaluation, we wouldn't say that
9 she would be successful -- we wouldn't predict that she
10 would be successful going back.
11     Q.   Even though there was no information from the
12 School District that there were any behavioral problems
13 associated with her prior history at the school. At least
14 that you knew of, right?
15     A.   Right.
16     Q.   So even though there were no behavioral problems
17 in the past, your institution made a determination that she
18 couldn't succeed in the school?
19     A.   Right.
20     Q.   Based upon what?
21     A.   I'm imagining -- and I'm guessing that it would be
22 her current behavior within our program.
23     Q.   Which the first week was all 100's, right?
24     A.   Right.
25          MR. OLDS: Let's do R██████

Page 41

1          MR. MARNEN: Before you do, a couple more things
2          occurred to me, as often happens to lawyers.
3
4          RECROSS-EXAMINATION
5 BY MR. MARNEN:
6
7      Q.   Mr. Olds questioned you about -- about the two
8 components -- as I understand it, the two components --
9 well, let me try it that way. There are two basic
10 components of -- there were two basic components of
11 K██████ treatment by Sarah Reed; one was educational, one
12 was therapeutic? Is that a fair general statement?
13     A.   Yes.
14     Q.   And he questioned you about whether the same --
15 the treatment goals and whether the treatment, actual
16 treatment provided could be fulfilled if she were just in an
17 outpatient program, as opposed to actually going to -- going
18 to school there.
19          I guess I'm trying to -- I'm trying to distinguish
20 between someone just receiving therapy at Sarah Reed and
21 someone getting education and therapy. Does anyone just get
22 therapy there?
23     A.   Yes.
24     Q.   Would that have been appropriate here, if you
25 know, based on your review of the records, to provide

Ferguson & Holdnack Reporting, Inc.

398b0d01-2ddd-4476-9847-1db54614cdc8

A000000160

Richard P. v. School District                Robert Iddings                           June 23, 2005

---

Page 42

1  K█████ only therapy and not education too?
2      A.  I don't know for K█████ in particular, but
3  generally our treatment team, if the psychiatrist and the
4  therapist thought that her needs could be met on an
5  outpatient basis back in the public school, then they would
6  have made that recommendation.
7      Q.  So that's one of the things they consider when
8  they evaluate her needs.
9      A.  Right.
10     Q.  And Sarah Reed determined, then, after the
11  referral was made, whether -- they determined not only that
12  therapy was needed, but also education.
13     A.  Correct.
14     MR. MARNEN:  Thanks.
15
16         FURTHER REDIRECT EXAMINATION
17  BY MR. OLDS:
18
19     Q.  One follow-up.  Just so the record is not
20  confused, while Mr. Marnen asked about whether K████
21  received therapy, if K█████ received therapy from Sarah
22  Reed, it would be from her case manager.
23     A.  That's right.
24     Q.  And there's no record of her receiving any therapy
25  for a period of 10 weeks.

---

Page 43

1      A.  That's right.
2      Q.  And she was receiving outside therapy.
3      A.  It appears so.
4      Q.  Wrap-Around services, mobile therapy.
5      A.  Right.
6      Q.  And that was in the home, right?
7      A.  It appears.
8      Q.  Okay.
9      MR. OLDS:  Nothing else.  Are you done?
10     MR. MARNEN:  I'm done.
11     (Discussion held off the record.)
12  BY MR. OLDS:
13     Q.  Can you tell -- we're going to talk about R████
14  P█████ history at Sarah Reed now.  But can you tell
15  whether there was -- what level of communication there was
16  between Sarah Reed and the Erie School District concerning
17  the progress of these girls -- you can specifically refer to
18  R████ if you want -- after the initial referral to the
19  School District -- after the initial referral to Sarah Reed.
20     A.  In 2002, I can't -- I can't specifically.
21  Currently, we meet with school districts on at least a
22  quarterly basis to review progress.  In 2002, I can't
23  remember if it was more frequent than that.
24         There was a time when I first started there that
25  they were meeting with the school districts on a monthly

---

Page 44

1  basis.  And I'm not sure if we had changed that by that time
2  or not.
3      Q.  If we look -- concerning R████ if we look at
4  Document 031.
5      A.  Okay.
6      Q.  That's the narrative addendum of -- that involves
7  R████ P█████.  Is that right?
8      A.  Yes.
9      Q.  Her referral from the School District.
10     A.  That's right.
11     Q.  And the referral concerns are, quote, "Referral
12  was made by the Erie City School District for special
13  education tract.  It was purported that R████ was
14  victimized sexually in school and was suffering harassment
15  by peers.  The incidents in school are currently under
16  police investigation, and charges are pending against
17  perpetrator or perpetrators.  Please refer to intake dated
18  5/08/01 for further historical information resulting in the
19  referral for outpatient services."
20         So with Rachel, there was a prior contact with
21  Sarah Reed; is that correct?
22     A.  That is correct.
23     Q.  And that was 6/15/02.  And that's the 160,
24  Document 160, I think.  Wait.  Is that right?  No, that's
25  not Document 160.  That would be Document -- no, that's the

---

Page 45

1  wrong one.  Let me see if I can find that in the record.
2  Oh, actually, it would be Document 272.  That would be dated
3  12/20/01.  Okay?
4      A.  Okay.
5      Q.  And does that -- and that was a -- apparently, it
6  looks like that Mr. P█████ brought R████ in to seek
7  outpatient care; is that right?
8      A.  Outpatient psychiatric care, yes.
9      Q.  Outpatient psychiatric care.  And if you look at
10  the impression, she was seen by Dr. Charles Joy.  And does
11  he work for Sarah Reed?
12     A.  Yes, he does.
13     Q.  Okay.  She was seen by Dr. --
14     MR. MARNEN:  Are you talking about the document
15  that's 272 to 274?
16     MR. OLDS:  Yes.
17     MR. MARNEN:  The date next to the signature is not
18  12/20/01.  It's 1/17/02.
19     MR. OLDS:  Apparently there was a lapse.  And this
20  was the same as the other one involving K████
21  that there was a lapse between the date seen and
22  when it was signed by the psychiatrist.
23     MR. MARNEN:  Oh, okay.
24     MR. OLDS:  Okay?
25     MR. MARNEN:  Okay.

---

398b0d01-2ddd-4476-9847-1db54614cdc8

Page 46

1    MR. OLDS:  Because the date seen is 12/20/01.
2        MR. MARNEN:  The DOA, you mean?
3        MR. OLDS:  Yeah. Date of appointment.  I suppose
4    that is what that means.
5    Q.  Is that what that means?
6        MR. MARNEN:  I guess it must be.
7    A.  Right. It's not unusual for the doctors to
8    dictate, and then when they get the dictation back, they
9    sign it and date it.  So it could be a month later.
10       MR. MARNEN:  Okay.  So I'm sorry for the
11   interruption.
12   Q.  Maybe you could explain on 274, at the bottom of
13   the page there is a D:, a T:, a C:.  Do you see that?  You
14   have 12/20/01, 1/8/02, 1/11/02.  Do you know what those
15   refer to?
16   A.  I don't.  But I would guess that one is dictation,
17   one is typed, and one is corrected.  But I'm not positive.
18   Q.  Okay.  That might make sense.  Okay.  So Dr. Joy
19   saw R▇▇▇ on 12/20/01.  Notes that -- the impression is,
20   "R▇▇▇ has significant emotional and behavioral difficulty
21   at this time and minimal previous history.  Although her
22   older brother had a significant history of involvement with
23   intensive mental health services.  At this time there does,
24   indeed, appear to be significant stress issues in her life."
25       But do you know whether R▇▇▇ was scheduled to be

Page 47

1    seen as an outpatient by Sarah Reed as a result of this
2    initial intake?
3    A.  Yes, she was scheduled back in June, previous to
4    this.
5    Q.  Previous to this.
6    A.  For outpatient.
7    Q.  Okay.  And so this was a -- oh.  So she came in,
8    in June, and then it took until December to see the
9    psychiatrist.  Is that -- there was a delay?  Is that right?
10   A.  Right. There was a -- an initial intake, I
11   believe, in May, an appointment for therapy scheduled in
12   June, and an appointment for a psychiatric evaluation.
13   Somewhere in here is 12/20/01.  And that the
14   family wasn't able to make those appointments.
15   Q.  Okay.  And so -- but the family eventually did
16   make an appointment for December --
17   A.  By December, right.
18   Q.  And then -- and was there a course of therapy --
19   can you tell, looking at this, whether there was an
20   agreement on behalf on Sarah Reed that it would provide some
21   kind of psychiatric treatment to R▇▇▇ as a result of her
22   coming to Sarah Reed?
23   A.  Let me see.  Yes.
24   Q.  And what was that?
25   A.  If you look at Document 32.

Page 48

1    Q.  Yes.
2    A.  The Base Service Unit completed an assessment, an
3    intake assessment.
4    Q.  Okay.  And what is your connection with the Base
5    Service Unit?
6    A.  For children who are going to receive mental
7    health services that are publicly funded, the Base Service
8    Unit pretty much brokers those services.  So a family would
9    first contact the Base Service Unit.  They would then
10   identify the agency that has the opening and set up and
11   arrange for an outpatient evaluation.
12   Q.  Okay.  And that might be how it happened that
13   Rachel came to you.  Because originally they had gone to the
14   Base Service Unit.
15   A.  Right.  Right.  And at the end of that document,
16   Document 38, an outpatient psychiatric appointment was
17   scheduled for 7/17/01, and an outpatient counseling
18   appointment was 6/11/01.
19   Q.  But R▇▇▇ didn't attend those.  But eventually
20   she did attend the psychiatric appointment on 12/20/01.
21   A.  Right.
22   Q.  And after that, what was the therapy that was
23   going to be provided to R▇▇▇ from Sarah Reed?
24   A.  Let me see if I can find that.  I can't find what
25   Dr. Joy's recommendations are in here.  They should be in

Page 49

1    here somewhere.
2    Q.  So let's look at R▇▇▇ initial treatment plan.
3    That would be 199.
4    A.  Okay.
5    Q.  Rachel's -- it's the -- it says, quote,
6    "R▇▇▇--" the problem/need, under that column, it says,
7    "R▇▇▇ has difficulties following the rules and
8    expectations.  She typically requires more than one prompt
9    to complete a task.  She is also oppositional and defiant to
10   staff's requests."  Is that right?
11   A.  Um-hum.
12   Q.  And the second problem/need that was identified
13   was that, "R▇▇▇ has difficulty staying on task.  She needs
14   to be prompted several times to begin her work or to
15   comply."  Is there any other treatment plan -- is that the
16   entire original treatment plan for R▇▇▇
17   A.  No.
18   Q.  What else is there?  Can I see that for a second.
19   A.  Yeah.  19 -- I think is it 7?
20   Q.  197.
21       (Discussion held off the record.)
22   Q.  So in R▇▇▇ case, there was a note that,
23   "R▇▇▇ suffers from poor self-esteem and has difficulty
24   expressing positive thoughts."  And the methods of
25   intervention there are that, "Staff will ask Rachel to make

Richard P. v. School District                Robert Iddings                June 23, 2005

**Page 50**

1  one positive statement about herself daily and record it on
2  a chart." Is that right? And I'm looking at it, so how
3  could you tell me.
4      A.  I bet you you're right.
5      Q.  I tried to read it quickly.
6      A.  Yes.
7      Q.  Can I see that for a second.
8      A.  Sure.
9      Q.  Looking at R____ master plan, what was the --
10 what kind of student was R____? Was she -- if you can fit
11 her into one of the two broad categories that we discussed
12 earlier, did she seem to be one of the students who was an
13 internalizer, or was she a student who had behavioral
14 problems?
15     A.  Based on this or our experience with her?
16     Q.  Well, that is based upon your experience with her,
17 right? The initial plan.
18     A.  Just during the first five days.
19     Q.  Right. Yeah, based upon the first five days, what
20 was the -- categorize R____ for me.
21     A.  Okay. Based on this, it would appear that she was
22 more of an interalizing child.
23     Q.  Now, R____ had -- if you look at the revisions to
24 the treatment plan or the treatment plan review -- and I'm
25 looking at 200, 201 and 202 --

**Page 51**

1      A.  Okay.
2      Q.  -- did her treatment plan -- are these -- is there
3  more than one page to the review of the treatment plan?
4      A.  Yes. They are out of order.
5      Q.  We missed those. And did R____-- can you tell
6  whether R____ had the same case manager that K____ had?
7      A.  She did.
8      Q.  And there does appear to be a lapse in the therapy
9  that was provided to R____ by the case manager; is that
10 right? Or at least the documentation doesn't appear to be
11 there; that there was continued case management services or
12 therapeutic services?
13     A.  Right.
14     Q.  Let me see if I could find that. You could look
15 for it also. But I just hadn't put my hands on it. 235.
16     A.  Yeah.
17     Q.  So apparently there was a lapse of interaction
18 between the case manager -- at least documentation of the
19 interaction between the case manager and R____ between
20 February 7th and April 16th.
21     A.  Right.
22     Q.  And do you know whether -- is it that -- do you
23 know whether the case manager had any contact with R____ in
24 between those two days?
25     A.  I don't know that.

**Page 52**

1      Q.  And that was a -- that was an issue that you had
2  with this case manager? Was she just too busy, or what was
3  the story?
4      A.  In these particular cases, I'm not sure if it was
5  the case manager's -- the responsibility was on the case
6  manager, or if the children's behavior didn't -- you know,
7  wasn't stable enough for therapy to begin. But for that
8  particular therapist, there were some personal issues going
9  on that interfered with her.
10     Q.  Looking at R____s initial treatment plan, what
11 components of the plan were -- refer to the reasons for
12 R____ referral?
13     A.  "R____ suffers from poor sense of self-esteem has
14 and difficulty expressing positive thoughts about herself.
15 R____ has difficulty engaging in appropriate activities
16 with peers. She tends to act older than she really is."
17 These are probably the two.
18     Q.  And relative to the first one, to the self-esteem,
19 that was the -- she was going to be directed to say one
20 positive thing about herself on a daily basis?
21     A.  (No response.)
22     Q.  Is that the treatment goal?
23     A.  Yeah. It says, "Will decrease the frequency of
24 negative self-descriptions. Identify positive traits and
25 talents about herself, and develop an ability to identify

**Page 53**

1  and express her needs verbally."
2      Q.  Okay. Going back to your therapist notes, again
3  at 235, the case manager's notes --
4      A.  Um-hum, okay.
5      Q.  -- the initial contact between the therapist and
6  R____, the therapist wrote, "Case manager met with R____
7  for an individual therapy session. Case manager and R____
8  were discussing some behavioral concerns that R____ was
9  having. R____ is very angry about being at Sarah Reed
10 Children's Center and feels that she does not belong here.
11 Case manager discussed with R____ that she may not be here
12 via the same route that the other students came here, but
13 she still has to follow the rules and adhere to the program
14 at Sarah Reed Children's Center. Case manager encouraged
15 R____ to try and work with the staff at Sarah Reed
16 Children's Center, rather than fight. Case manager will
17 continue to meet with R____ on a weekly basis. J. Vaglia,
18 case manager."
19         Do you know, the case manager discussed with
20 R____ that, quote, she may not be here via the same route
21 that the other students have come.
22     A.  Um-hum.
23     Q.  End quote. Do you have any idea what the case
24 manager was referring to when she made those notes?
25     A.  I'm not sure what, you know, R____ -- I'm

14 (Pages 50 to 53)

Richard P. v. School District                     Robert Iddings                                June 23, 2005

Page 54

1  imagining here that R███ told her something about, you
2  know, why she was there. But I'm not sure.
3      Q.  Okay. Can you look at R███ point cards. And
4  I think that they begin at 208.
5      A.  Okay.
6      Q.  Again, the target behaviors are, number one, meet
7  classroom expectations; two, get along with staff and peers;
8  three, be on task; four, increase self-esteem; and five,
9  PPI." Do you know what PPI means?
10      A.  Positive peer interactions.
11      Q.  The first full week that R███ was there or the
12  second week of her attendance, beginning 1/28 through
13  2/01 -- that would be Document 209 -- R███ had some
14  problems that week. Can you, by looking at these records,
15  can you tell what the problems were?
16      A.  It appears that -- I would have to look at the
17  daily notes, but it appears something happened on Friday.
18      Q.  That would be -- the date for that would be?
19      A.  The 25th; 1/25. So that she was in refocus that
20  following Monday, which is kind of like time-out.
21      Q.  Okay.
22      A.  And then on Tuesday, the 29th, she threatened to,
23  quote, murder staff, slice your throat, close quote. Again,
24  in quotes, if you touch my purse, I'll punch you in the
25  face, close quotes. So threatening staff.

Page 55

1      Q.  Okay.
2      A.  And then on Wednesday the 30th, she appeared to
3  have threatened to punch a peer.
4      Q.  The date that she had her first meeting with the
5  therapist was 1/30/02 as well; is that right?
6      A.  Can you tell me the number of that?
7      Q.  That would be 235. I'm sorry.
8      A.  That's right.
9      Q.  Okay. Can I see -- okay. You answered my
10  question. I'd like to see -- I'm sorry to do that. Were
11  you looking for the daily notes for that first week?
12      A.  Yeah.
13      Q.  Are they in here?
14      A.  I haven't found them yet.
15          (Discussion held off the record.)
16      Q.  Were you able to find --
17      A.  I was not. The earliest documentation we have is
18  January 30th, 2002. So it appears that we either missed a
19  page that we sent to you, or documentation started late.
20      Q.  Okay. Well, characterize R███'s performance at
21  Sarah Reed. You have had a chance to look at some of these
22  records. Can you characterize her performance at Sarah Reed
23  the first three or four months she was there.
24      A.  Um-hum.
25      Q.  Go ahead.

Page 56

1      A.  I think at first R███ was, you know, angry and
2  defiant within the program. Then there was an inpatient
3  hospitalization. And when she came out of inpatient, she
4  actually performed very well. Started to make progress,
5  seemed to be benefiting from all of the activities for about
6  a month. And then her behavior became much more explosive
7  and aggressive.
8          So from -- I can't remember the dates, but I'm
9  thinking -- I think it was about a month after her
10  hospitalization, which I believe was in March. So from
11  March to mid April, she did relatively well.
12      Q.  Do you have any -- you indicated that when she
13  initially came, there was anger. Was it anger about being
14  at Sarah Reed? Is that what the anger was about?
15      A.  That's what it appears in the record to say, yes.
16      Q.  And how do you deal with that as an institution?
17  How do you deal with a child's anger at being there?
18      A.  Well, you know, talk to them about it, and
19  about -- you know, we'll validate their feelings; that it's
20  a difficult place to be and a difficult -- you know, it's
21  difficult for kids, I think, because they don't know all of
22  the expectations when they first get there. So we certainly
23  validate that for them. And we help them start identifying
24  triggers. But also provide consequences for inappropriate
25  expression of anger; throwing objects, breaking property,

Page 57

1  threatening, aggressive behaviors.
2      Q.  What are --
3      A.  Such as time away, time-out, out-of-school -- or
4  in-school suspension -- or in-program suspension,
5  out-of-program suspension.
6      Q.  Do you know if the gaps that appeared to exist in
7  the records we're looking at today, if they are -- if -- can
8  you explain them in the sense that either, one, perhaps the
9  entire file wasn't sent, perhaps Smart made mistakes in
10  copying the file that was sent, or perhaps the documentation
11  that doesn't appear to be here was never created?
12      A.  For -- prior to January 30th?
13      Q.  Yeah.
14      A.  Once the notes --
15      Q.  I think there are a couple other gaps, too, to be
16  honest with you. You know, if you look after January 30th,
17  there doesn't appear to be clinical case notes for early
18  February. They go to February 18th. And --
19      A.  It looks like what they might have done was just
20  copied one side.
21      Q.  Okay.
22      A.  Yeah. But I would say that one of those three.
23      Q.  Maybe we'll talk to your counsel about making sure
24  that we have the record. Because that might account for it.
25  Because I notice on the 1/30, that sheet of paper says --

15 (Pages 54 to 57)

Ferguson & Holdnack Reporting, Inc.

A000000164

Richard P. v. School District

Robert Iddings

June 23, 2005

Page 58

1 starts off with "continued".
2    A. Oh, does it?
3    Q. Yeah. And so it --
4    A. Oh, yeah.
5    Q. -- suggests that there was something contained
6 before it.
7        (Discussion held off the record.)
8    A. But it does appear that the first two weeks of
9 each month are missing.
10    Q. Okay. So maybe that's -- we could explain that.
11 I mean, maybe we can deal with that with talking with your
12 counsel.
13        I notice one other thing about R█████ records
14 that was different from K█████. There doesn't appear to
15 be any information about R█████ IEP from the Erie School
16 District. Or there -- there doesn't appear to be any
17 information about the -- from the Erie School District in
18 her records. And I'm talking about this particular time
19 frame; her first referral.
20    A. Right.
21    Q. Could you see if I'm wrong when I make that
22 statement.
23    A. That's right. In this document, I don't see
24 documents generated by the school.
25    Q. Would you expect that to be -- documents from the

Page 59

1 School District, would you expect that to be in Sarah Reed's
2 file?
3    A. Somewhere, yes.
4    Q. So you would expect, for instance, if R████ had
5 an IEP, that you would have a -- that Sarah Reed would have
6 a copy of that IEP.
7    A. Right.
8        MR. OLDS: I don't have any other questions.
9        MR. MARNEN: Just a couple.
10
11        FURTHER RECROSS-EXAMINATION
12 BY MR. MARNEN:
13
14    Q. Mr. Iddings, you just recently made some general
15 statements about Sarah Reed being a difficult place to be,
16 and that someone newly arrived at Sarah Reed, a client,
17 would not at that time know everything to expect when they
18 get there, and after a while, I guess -- there's a learning
19 curve.
20    A. Correct.
21    Q. Would you elaborate a bit on it being a difficult
22 place to be; not knowing what to expect when you arrive.
23    A. The types of children that are there are -- have
24 challenging behaviors, many of them. The expectations are
25 quite high, and it's very structured. So it's much

Page 60

1 different than a public school, which can be kind of
2 intimidating to some of the kids.
3        And then just the unknown, as to, you know, what
4 the expectations are, how -- what skills do they need in
5 order to be successful, where are they -- you know, are they
6 going to be safe there. Those all contributed to, I think,
7 some of the kids' anxiety.
8    Q. Anxiety anyone would undergo, I guess, if they
9 went into a new situation.
10    A. Right. Right.
11    Q. The structured environment, you said it's
12 different from that of a public school. Do you mean the
13 level of tolerance from misconduct is more severe, or do you mean
14 the discipline is more severe? Or in what nature is it more
15 structured?
16    A. Well, there's more -- there's a smaller ratio of
17 students to staff. Students are called on behaviors
18 probably because there's less students. You know, the
19 teacher can identify behaviors that are problematic. But I
20 would say that we have a higher tolerance for maladaptive
21 behaviors. You generally don't eject kids out of the
22 program because of their behavior, unless it is so severe or
23 so bad that we can't manage them.
24    Q. So fundamentally there's the teacher-to-student
25 ratio.

Page 61

1    A. Teacher-to-student ratio, the therapist being
2 right in the building, and a psychiatrist that continuously
3 follows the child's progress.
4    Q. In the public school setting, there certainly
5 would be a teacher, but there wouldn't be as many students
6 in the classroom?
7    A. There would be more students in the classroom.
8    Q. I'm sorry. There would be more in the public
9 school.
10    A. Right.
11    Q. There would also be a counselor, would there not?
12    A. Possibly.
13    Q. In a public school.
14    A. Public school.
15    Q. But that counselor would be serving more students
16 than in the case of Sarah Reed?
17    A. Generally, yes.
18    Q. But there would not be a psychiatrist on the
19 school premises.
20    A. That's right.
21    Q. You have a staff psychiatrist who is there all the
22 time?
23    A. All but one day a week.
24    Q. What hours? Just daylight hours?
25    A. Yes. Yeah. Yeah, we don't have -- well, our

16 (Pages 58 to 61)

398b0d01-2ddd-4476-9847-1db54614cdc8

A000000165

Richard P. v. School District

Robert Iddings

June 23, 2005

Page 62

1  residential program has children who stay at night, and
2  there isn't a psychiatrist.  There's nursing coverage 24
3  hours.
4      Q.  But there's a psychiatrist in the building 365
5  days a year during the daytime.
6      A.  Just when the students are in --
7      Q.  When the students are there.  Which is Monday
8  through Friday.
9      A.  Monday through Friday, yeah.
10     Q.  Roughly 8:30 in the morning until 4:00 in the
11  afternoon?
12     A.  8:30 until 2:30 for this particular program.
13     Q.  Okay.
14         MR. MARNEN:  Okay.  Thanks a lot.
15         MR. OLDS:  I don't have anything else.  Thank you.
16
17         (Deposition concluded at 1:30 p.m.)
18
19
20
21
22
23
24
25

398b0d01-2ddd-4476-9847-1db54614cdc8

Case 1:03-cv-00390-SJM    Document 57-4    Filed 08/18/2005    Page 41 of 45
A000000166

Richard P., et al, v School Dist.    Multi-Page™    D. Long
Held: 3/21/05



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD P., by and for
R█████ P., and DENISE L., by
and for K█████ L.,
          Plaintiffs          ) Civil Action
     vs                       ) No: 03-390 Erie
                              )
SCHOOL DISTRICT OF THE CITY OF)
ERIE, PENNSYLVANIA; JANET      )
WOODS, Individually and in her )
Capacity as Principal of       )
Strong Vincent High School;    )
and LINDA L. CAPPABIANCA,      )
Individually and in her        )
Capacity as Assistant          )
Principal of Strong Vincent    )
High School,                   )
          Defendants           )

          Deposition of DENISE L█████, taken before and

by Linda K. Rogers, Commissioner of Deeds in the

Commonwealth of Pennsylvania and Notary Public in

the State of New York, on Monday, March 21, 2005,

commencing at 12:01 p.m., at the law offices of

Knox McLaughlin Gornall & Sennett, PC, 120 West

10th Street, Erie, Pennsylvania 16501.

                    * * *

Page 1

For the Plaintiffs:
     Edward Olds, Esquire
     1007 Mount Royal Boulevard
     Pittsburgh, PA  15223

For the Defendants:
     James T. Marnen, Esquire
     Knox McLaughlin Gornall & Sennett, PC
     120 West 10th Street
     Erie, PA 16501

                    * * *

Page 2

1                    DIRECT EXAMINATION
2 BY MR. MARNEN:
3
4      Q. You are Denise L█████ correct?
5      A. Yes.
6      Q. What is your middle name?
7      A. Jane.
8      Q. Where do you presently reside?
9      A. ██████████████████
10     Q. In Erie?
11     A. Yes.
12     Q. What is the zip code?
13     A. 16503.
14     Q. How long have you resided there?
15     A. Going on five years.
16     Q. Were you residing at ██████████████ on the
17 day that Kristina was harmed that is the subject of this
18 lawsuit?
19     A. Yes.
20     Q. You have been at a number of depositions in this
21 case so far, and I think you probably have the drill down,
22 but let me just remind you.  I am here as the attorney for
23 the school district, Miss Cappabianca, Miss Woods.  My only
24 purpose is to find out what you know about facts I think are
25 relevant to the case.  You have the right to understand what

Page 3

1 I am asking.  If you don't understand or hear me, let me
2 know and I will rephrase it.
3         We should try to avoid talking at the same time.
4 The reporter is taking everything down, and you should use
5 words when you communicate with me as opposed to gestures
6 and sounds that are not words like um-hmm and unh-unh
7 because it is difficult for the reporter to interpret what
8 you mean by that.
9         If at any time you want to take a break, we can
10 take a break.  This is not an inquisition.  Do you have any
11 questions of me?
12     A. No.
13     Q. Okay.  So you lived at ████████████████
14 about five years?
15     A. Yes.
16     Q. Are you born and raised in Erie?
17     A. Yes.
18     Q. For a brief period of time I gather you lived in
19 Meadville?
20     A. I didn't live in Meadville.
21     Q. She did, K█████ did?
22     A. Yes, yes.
23     Q. What is K█████ father's name?
24     A. Junior.
25     Q. Is that his given name, Junior, or a nickname?

Page 4

Case 1:03-cv-00390-SJM     Document 57-4     Filed 08/18/2005     Page 42 of 45

Richard P., et al, v School Dist.     Multi-Page™
Held: 3/21/05                          A000000167                          D. Long

**Page 5**

1   A. That's all I know.
2   Q. L____ or something else?
3   A. I don't know his last name.
4   Q. Do you have any other children?
5   A. Yes, I have two other ones.
6   Q. What are their names?
7   A. K____
8   Q. K-____
9   A. Yes.
10  Q. What is her last name?
11  A. ____
12  Q. And --
13  A. James L____ Junior.
14  Q. What is James L____ Junior's father's name, James
15  L____ then?
16  A. Yes.
17  Q. Are you residing with James L____ now?
18  A. No.
19  Q. When did you last reside with him, years ago?
20  A. Yeah, number of years ago.  It had to be probably
21  more than eight years ago.
22  Q. Is K____ older than K____ or younger?
23  A. Older.
24  Q. What is K____ age?
25  A. Seventeen.

**Page 6**

1   Q. What is J____ age, your son?
2   A. Thirteen.
3   Q. Is K____ in school?
4   A. Yes.
5   Q. Where does she go to school?
6   A. East High School.
7   Q. How about J____?
8   A. Peiffer Burley.
9   Q. That's a middle school, isn't it?
10  A. Elementary, I think.
11  Q. One through eight?
12  A. I'm not sure.
13  Q. Are you presently married?
14  A. No.
15  Q. Were you married at the time of the incident in
16  the fall/winter of 2001?  I'm talking about the incident
17  that's part of the subject of this lawsuit.
18  A. No.
19  Q. Were you living with anyone at this time, any man?
20  A. Andrew Cash.
21  Q. Gash, G-A-S-H?
22  A. Cash, like money.
23  Q. Were you ever married to Andrew?
24  A. No.
25  Q. When did Andrew leave -- when did you separate

**Page 7**

1   from Andrew, cease living with him?
2   A. Three years ago.
3   Q. Are you presently employed?
4   A. No.
5   Q. How far did you go in school?
6   A. GED.
7   Q. So you dropped out of school at some time?
8   A. Yeah, twelfth grade.
9   Q. Did you go to school in Erie?
10  A. Yes.
11  Q. What high school did you attend?
12  A. East High School and Tech Memorial High School at
13  the time.
14  Q. You dropped out and got your GED?
15  A. Yes.
16  Q. When did you get your GED, roughly, I don't need
17  an exact date?
18  A. I think it was 2000 -- I think about 2001.
19  Q. What is the date of your birth?
20  A. __/69.
21  Q. So you are 36?
22  A. Yes.
23  Q. What kind of jobs have you had in the past?
24  A. I worked at a laundromat.  Prep cook at Gannon,
25  janitorial through Arconetics, and I worked out of G.E. for

**Page 8**

1   that.  And a personal care attendant.
2   Q. Who did you work for when you were a personal care
3   attendant, yourself?
4   A. Joanne Richards.
5   Q. Is that taking care of someone who is sick or
6   someone that is old?
7   A. Someone that is disabled.  Actually I worked for
8   two different places, it was CII and Voices for
9   Independence.
10  Q. At the time of the 2001 incident involving your
11  daughter, K____ were you employed?
12  A. Yes.
13  Q. Were you a prep cook at Gannon then?
14  A. Yes.
15  Q. How long did you hold that job?
16  A. About six, seven months.
17  Q. Can you give me some dates so I can -- beginning
18  and ending?
19  A. I know my ending date was February of 2002.  It
20  was six or seven months before that when it started.
21  Q. Did you stop working at Gannon because of what
22  happened to K____?
23  A. Yes, I lost my job.
24  Q. Because of your taking care of her?
25  A. Right.

Case 1:03-cv-00390-SJM    Document 57-4    Filed 08/18/2005    Page 43 of 45
Richard F., et al, v School Dist.    Multi-Page™    D. Long
Held: 3/21/05    A000000168

1    Q. You said K[████]when she was in school in
2 Meadville was not living with you, she was living with
3 someone else?
4    A. Yes.
5    Q. Was she in foster care?
6    A. Yes.
7    Q. How long was she in Meadville in foster care?
8    A. About eight months.
9    Q. Before she was in foster care in Meadville was she
10 in Erie?
11    A. Yes.
12    Q. Was she with you?
13    A. She was with James.
14    Q. James L[████]
15    A. Yes.
16    Q. She was born in 1989?
17    A. Yes.
18    Q. [██████]
19    A. Yes.
20    Q. And she has lived with you except, I guess when
21 she was in residential treatment facilities since the
22 incident that happened in late 2001.  When I say the
23 incident, I don't want to get graphic about it, I'm trying
24 to refer to the sexual assault.
25    A. Yes.

Page 9

1    Q. From the time of the assault to the present time,
2 aside from the time she was in residential treatment
3 facilities, she lived with you?
4    A. Yes.
5    Q. And when did she come back to live with you after
6 leaving foster care in Meadville?
7    A. It was 2001, it was before -- it was like right
8 when school was starting, right before.
9    Q. About August of 2001?
10    A. Yes, I believe it was August 26th, I think.
11    Q. I showed K[████]the calendar and it says, for
12 whatever it is worth, that school began in 2001, 2002 for
13 that year on August 27th.
14        You think it was the very day -- but she also
15 said, to be fair here, that the papers were late in
16 arriving, and it was a while before she went to Vincent that
17 year.
18    A. Might not have been the 26th because it was a
19 weekday, so it had to have been the 24th.  I know it was
20 right before school started.
21    Q. Why was she in foster care?
22    A. She was removed from where she was at because of
23 neglect.
24    Q. Where was she?
25    A. With James.

Page 10

1    Q. With James?
2    A. Yes.
3    Q. What was the nature of the neglect, as far as you
4 know?
5    A. He didn't let them bathe properly, they had lice.
6    Q. They, K[████]and someone else?
7    A. All of them.
8    Q. All three kids were with him, with James?
9    A. Right.
10    Q. So it was a bathing issue and something else?
11    A. Unclean --
12    Q. Premises?
13    A. -- premises, yes, and missing school due to the
14 nature --
15    Q. Due to what?
16    A. Due to the nature of their cleanliness.
17    Q. During what period of time was James in custody of
18 the three kids?  Ballpark it if you have to.
19    A. About four years.
20    Q. Were they four years in a row?
21    A. Yes.
22    Q. And they ended with K[████]going to Meadville
23 for foster care?
24    A. Exactly.
25    Q. Did the other two kids go to foster care too?

Page 11

1    A. Yes.
2    Q. Did they go the same place K[████]went?
3    A. K[███]and K[████]were together, and my son was
4 still here in Erie.
5    Q. Why were they with James for those four years and
6 not with you?
7    A. Because I was having some mental health problems
8 because -- well, he -- my son's dad used to hit me, but he
9 never hit them.  He would call me names and stuff like that.
10    Q. What is your son's dad's name?
11    A. James L[████]Senior.
12    Q. He is the one that had custody or am I getting
13 mixed up?
14    A. Yes.
15    Q. I am getting mixed up?
16    A. No.
17    Q. You had mental health problems because of what
18 James did to you?
19    A. Yes.
20    Q. Did you go into an institution?
21    A. Yes, I was in the hospital several times.
22    Q. Which hospital?
23    A. Hamot.
24    Q. As an inpatient?
25    A. Yes.

Page 12

Case 1:03-cv-00390-SJM     Document 57-4     Filed 08/18/2005     Page 44 of 45
Richard P., et al, v School Dist.
Held: 3/21/05                      A000000169                          D. Long

1   Q. Were you in there the whole four years the kids
2 were with James?
3   A. Off and on, then he would let me see them when he
4 chose to.
5   Q. So I gather when you were not in an institution
6 during those four years you were not living with James?
7   A. No.
8   Q. Before those four years, I guess that is roughly
9 1995, 1995 you started having mental health problems?  The
10 ones we are talking about, the ones that caused you to --
11   A. Yes.
12   Q. -- James to have sole custody?
13   A. Yes.
14   Q. Was that sole custody per court order or just by
15 agreement with James?
16   A. OCY said for them to stay there.
17   Q. When were you married to James?
18   A. When was I?
19   Q. Yes.
20   A. September 29th, 1989.
21   Q. So a couple months after K███ was born?
22   A. Right.
23   Q. From that time until -- were you with him from '89
24 to '95?
25   A. Yes.

Page 13

1   Q. And then you split at that time and you started --
2 did you actually live in a different house from him?
3   A. Well, first of all, I was in the hospital, and
4 then I got an apartment, and then I went to a Stairways
5 facility, then I got another apartment.
6   Q. When you lived in those apartments, did you live
7 by yourself?
8   A. Yes.  At one point I lived with my sister when I
9 lived on Raspberry.
10   Q. Did K███ have any mental health problems
11 before she came back to live with you in '91 -- I'm sorry,
12 2001?
13   A. Well, she had ADHD.
14   Q. Anything else?
15   A. And ODD.
16   Q. If I understand these correctly, ADHD is attention
17 deficit hyperactivity disorder?
18   A. Yes.
19   Q. And ODD is opposition defiant disorder?
20   A. Yes.
21   Q. Did she have any other mental health problems
22 besides those?
23   A. No.
24   Q. She receives learning support, correct?
25   A. Yes.

Page 14

1   Q. Was there any -- before she came back to live with
2 you in August of 2001, was there any sexual abuse of
3 Kristina that you are aware of?
4   A. No.
5   Q. So when K███ enrolled in Strong Vincent in
6 August of 2001 you were living on East 9th Street?
7   A. Yes.
8   Q. Why was it that K███ went to Strong Vincent
9 when you lived on East 9th Street, it doesn't sound like it
10 was in the area?
11   A. Everybody was just telling me it was a good
12 school.  And I went to East and I didn't really like it.  I
13 thought that, you know, with them going there for --
14   Q. Are you allowed to pick whatever school you want
15 or your child wants to go to wherever you live --
16   A. I don't know.
17   Q. -- regardless of where you live?
18   A. I don't know.
19   Q. When I went to school in the dark ages, you went
20 in the same area.  You went to schools in the geographical
21 area where you lived.
22   A. I know it changed at one point.
23   Q. Okay.  And when she went to school, how did she
24 get there, walk, get a ride from you --
25   A. I took her.

Page 15

1   Q. -- took the bus?  Why did you take her?
2   A. I always did ever since I had a car.
3   Q. That way that isn't, it wasn't because you didn't
4 think she was able to take a bus by herself?
5   A. Well, she never took a bus, but, you know, I would
6 rather take my kids if I could.
7   Q. James, her younger brother, was attending what
8 school then, is he at Peiffer Burley?
9   A. No.  I believe he was at Irving.
10   Q. Were you also driving him to school?
11   A. No, he lives with his dad.
12   Q. Okay.  James Long?
13   A. Yes.
14   Q. Does he still live there with his dad?
15   A. Yes.
16   Q. After foster care he went back to his dad and has
17 been with his dad ever since?
18   A. Yes.
19   Q. K███ has been with you?
20   A. Yes.
21   Q. Did K███ come back to you in August of 2001 also?
22   A. Yes.
23   Q. Has K███ been with you ever since?
24   A. Yes.
25   Q. Did K███ go to Strong Vincent in the fall of

Page 16

1 2001?
2    A. Yes, with her sister.
3    Q. You drove them there?
4    A. Yes.
5    Q. At a point in time, I think we can all agree
6 K____ was sexually abused or assaulted by C___ B__
7 correct?
8    A. Yes.
9    Q. When did you first become aware of that event
10 occurring?
11    A. When she burned herself, and that was the
12 beginning of January.
13    Q. Of 2002?
14    A. Yes.  It wasn't on that day, it was after she was
15 in the hospital.
16    Q. Were you present when she burned herself?
17    A. Yes.
18    Q. What did she do?
19    A. She stuck her arm on a skillet.
20    Q. Were you present when she did that?
21    A. I was in the other room.  She said she was going
22 to the bathroom, and then I went in the kitchen because I
23 heard the stove.
24    Q. You heard the stove, what, go on?
25    A. It has click, click, click.

Page 17

1    Q. Gas stove?
2    A. Yes.
3    Q. So that's the click, click, click that is
4 associated with igniting the burner?
5    A. Exactly.
6    Q. Did that draw your attention?
7    A. Yes.
8    Q. Why?
9    A. Because she said she was going to the bathroom.
10    Q. Was she allowed to use the stove?
11    A. Yeah.
12    Q. But that was just inconsistent with what you've
13 been told and you went to check it out?
14    A. Right.
15    Q. When you got there, what did you see?
16    A. She had her arm over the stove like that
17 (indicating) on the skillet.
18    Q. It was on the skillet when you got there?
19    A. Yes.
20    Q. Was she making any sounds?
21    A. No, she was just standing there.
22    Q. What did you do, if anything?
23    A. I pulled her arm off there, and then she ran to
24 the bathroom.
25    Q. What happened next?

Page 18

1    A. Then I called Crisis Services, and then they came
2 and the police came.
3    Q. What are Crisis Services?
4    A. It's like if a kid is doing something to hurt
5 themselves or hurt somebody else you call this number and
6 they will come and help you.
7    Q. Had you had contact with them before that evening?
8    A. Yes.
9    Q. Crisis Services?
10    A. Not regarding her.
11    Q. Regarding what?
12    A. My other daughter.
13    Q. That was K____?
14    A. Yes.
15    Q. What happened there?
16    A. She has outbursts all the time, and sometimes they
17 get uncontrollable and she has to be put in a hospital.
18    Q. You were familiar with Crisis Services with K__
19 your experience with her?
20    A. Right.
21    Q. You called Crisis -- what time of night was that,
22 or day, did she burn herself, K____, morning, afternoon,
23 night?
24    A. It wasn't in the morning, I know that.
25    Q. I will try to help you a little bit.  I looked at

Page 19

1 the medical records in preparing for this, and if you take
2 my word for it --
3    A. It's been so long ago.
4    Q. If I can find it now, 10:14 p.m. she was admitted
5 to Millcreek Community Hospital emergency room; does that
6 ring a bell?
7    A. Yes.
8    Q. Does that sound about right?
9    A. Yes.
10    Q. Does that help you figure out or answer my
11 question when K____ hurt herself?
12    A. Yeah, because we were there for a while.
13    Q. You were where for a while, at the house?
14    A. No, down in the emergency room part.  We were
15 there for a while, so it must have happened about probably
16 7:00, 7:30.
17    Q. So it was after dinner?
18    A. Yeah.
19    Q. Who arrived first, Crisis Services or the police?
20    A. I believe Crisis Services did first.
21    Q. You didn't call 911, you called Crisis Services?
22    A. Right.
23    Q. Did they call the police?
24    A. Yes.  'Cuz she said she would pour hot water on
25 them.

Page 20