A000000351

Richard P. v. School District                Vikki Scully                    March 18, 2005

Page 18

1  see K_____ or R_____ back in my classroom. So I didn't
2  see them after that incident happened.
3      Q. So once you learned about the incident, both of
4  the girls were out of your classroom by that time.
5      A. Um-hum.
6      Q. Is that right?
7      A. Yes.
8      Q. Okay. Now, did you have any knowledge about how
9  the girls were placed after -- I mean, what was your
10  knowledge about how it happened that the girls no longer
11  attended school at Strong Vincent?
12      A. I don't have a lot of knowledge about that,
13  because I wasn't -- I wasn't involved in that meeting. I
14  think that's where Charlise came in and met with the
15  parents, and it was determined that -- for the best
16  interests of the students, that they would be going to Sarah
17  Reed. They offer a therapeutic component that the girls
18  were in need of, and that we, you know, don't have it.
19      Q. Okay. We're going to take Charlise Moore's
20  deposition, and I think that -- you have the document that's
21  been marked as Moore's Deposition Exhibit 2.
22      A. Um-hum.
23      Q. The third page of that has you as the teacher for
24  Kristina Long. Do you see up there in the right-hand upper
25  corner?

Page 19

1      A. Um-hum.
2      Q. Do you recall seeing this -- have you ever seen
3  this document before?
4      A. After the fact. But Mrs. Gray -- I must not have
5  been in the building. Mrs. Gray is the one who --
6      Q. Signed it?
7      A. -- signed off on it.
8      Q. So you are listed as the teacher, but you didn't
9  sign the document.
10      A. Yeah.
11      Q. After the fact -- if you look at the document
12  that's been marked as Moore's Deposition Exhibit 2, do you
13  recall -- do you know if you saw any of these documents, any
14  of this paperwork back in January of 2002?
15      MR. MARNEN: You mean Exhibit 2?
16      MR. OLDS: Yes.
17      A. I don't -- I can't say that I saw it in January.
18  I don't --
19      Q. Do you think you might have seen it --
20      A. Yeah, after.
21      Q. -- sometime in 2002?
22      A. After the fact, yeah.
23      Q. Well, what do you mean by "after the fact"?
24      A. Well, after she had left the school.
25      Q. Okay. And why would it be shown to you after she

Page 20

1  had left the school?
2      A. That's probably when my copy was sent to me.
3      Q. Okay. So you got a copy of this --
4      A. Yes.
5      Q. -- at some point.
6      A. Yes.
7      Q. Okay. And you would have received a copy -- do
8  you know why you would have received a copy?
9      A. Because I was the teacher of record, and I had her
10  file.
11      Q. Okay. And that would be K_____ file.
12      A. Yes, K_____ file.
13      Q. And Moore Exhibit 1, which you also have over
14  there -- you have a copy of it?
15      A. Um-hum.
16      Q. Mr. Gray -- is it Ms. Gray?
17      A. Mrs. Gray, yes.
18      Q. Is listed as her teacher. Would you have received
19  that -- and that involves R_____ P_____. Would you have
20  received any of that?
21      A. I would not have received it, because I was not
22  her teacher. I wouldn't have gotten a copy of that.
23      Q. Now, so Miss Cappabianca told you that -- you
24  learned from Miss Cappabianca that there had been an
25  incident.

Page 21

1      A. Um-hum.
2      Q. And the girls were no longer in your class. How
3  did you learn -- how did you learn what happened to them
4  afterwards? In other words, you weren't involved.
5      A. Um-hum.
6      Q. Who told you the steps that had been taken?
7      A. Linda, as time went on in the investigation and as
8  we needed to know -- because some of the other kids were
9  students in our classes, so it would affect us.
10      Q. So eventually she told you who the alleged
11  assailants were as well; is that right?
12      A. I figured the one out, because he was no longer in
13  my class. I think his parents pulled him immediately from
14  the school. So I put two and two together.
15      Q. And who was that?
16      A. Charles Bibbs.
17      Q. Okay. And do you know whether he was suspended,
18  or did his parents pull him out?
19      A. That, I don't know.
20      Q. Do you know whether -- did you ever learn whether
21  he had a history, a disciplinary history of harassing female
22  students --
23      A. No.
24      Q. -- or sexually harassing?
25      A. I never learned of anything like that.

6 (Pages 18 to 21)

Richard P. v. School District    Vikki Scully    March 18, 2005

---

**Page 22**

1    Q.   When you received a new student like that at
2   Strong Vincent, and they -- K███ and R███ would have
3   been -- come in as seventh graders.
4    A.   Um-hum.
5    Q.   Do you know, did C███ B███ come in as a
6   seventh grader that year?
7    A.   I would have to look at the records.
8    Q.   You wouldn't know.
9    A.   Yeah.
10    Q.   Is it fair to say that you're not -- you don't
11   learn about the prior disciplinary records of students who
12   come to you?
13    A.   We learn the academic history and any information
14   that would be in an evaluation report.  They are -- we get
15   that information -- my understanding of it is that like
16   discipline files from year to year cannot follow.  Like you
17   can't keep that to hold it against a student, so.
18    Q.   Okay.
19    A.   But when you get a new student, you can figure out
20   rather quickly what their behavior is probably going to be
21   like, so.
22    Q.   Okay.  So the other students who were involved --
23   none of the -- well, was B███ C███ taken out of your
24   class after the --
25    A.   She was -- my understanding is she was prosecuted

---

**Page 23**

1   and sent away.
2    Q.   Did she continue to be in your class until that
3   happened?  Do you remember?
4    A.   Until the -- until the court case came up.
5    Q.   Okay.
6    A.   Or until the -- you know, whatever -- when they
7   charged her.  I think when she got charged, she was moved to
8   Edmund L., if I remember correctly.
9    Q.   But C███ B███, it was your understanding that
10   his parents withdrew him?
11    A.   That's my understanding, yes.
12    Q.   Okay.  And then tell me what Charlise Moore's job
13   was.
14    A.   In that situation, or what her --
15    Q.   I guess in general, and then we'll go to the
16   specifics of that situation.  She's a supervisor, right?
17    A.   She serves as the middle school life skills
18   supervisor.  She is the one who helps to translate legal --
19   you know, the legal interpretation of the law to us to make
20   sure that we're in line with, you know, following Federal
21   and State regulations.  She assists us if we have questions
22   about, you know, how we make adaptations for students or --
23   she's the main person we go to with questions that we are
24   unable to answer.
25    Q.   And she didn't -- did she have students?

---

**Page 24**

1    A.   No.  She had -- she works out of the
2   administration building.  She -- she goes to all the other
3   schools; you know, the middle -- that have seventh and
4   eighth grade and supervises all the teachers that deal with
5   those students.
6    Q.   Okay.  And does she still have the same position
7   now?
8    A.   Yes.
9    Q.   Now, is it fair to say that she took over after
10   the incident in terms of -- well, is it your understanding
11   that she took over in terms of changing the girls'
12   placement?
13    A.   She was called in and involved in it.  Because I
14   think that's above what the teacher of record's
15   responsibilities are.
16    Q.   What other professionals -- for instance, I take
17   it that you probably are part of an IEP team from time to
18   time.
19    A.   Um-hum.
20    Q.   Is that right?
21    A.   Well, we're responsible for writing the IEP, so.
22    Q.   The teachers are.
23    A.   The special education teachers.
24    Q.   Special education.
25    A.   The teacher of record.

---

**Page 25**

1    Q.   Okay.  And when do you write IEP for students?
2    A.   Our School District, most of them come due around
3   the first parent conference time, which is November.  But
4   you can write an IEP at any time, rewrite it.  But within --
5   they have been to be written within a year -- a year of each
6   one.
7    Q.   Right.  Do you recall whether you wrote the first
8   IEP for K███?
9    A.   I'm the teacher of record.  I don't --
10    Q.   We have identified that in the last deposition.
11   Let me -- it was part of 4 and 5.  No, it was part of 3 and
12   4.  And let me just show you -- that was marked as Manus
13   Deposition Exhibit 3 and 4.  The first page is the first
14   page of 3, and then the remainder of the IEP is marked as
15   Exhibit 4.
16    A.   Okay.
17    Q.   And I guess my question is, after you reviewed
18   that, if you can tell me whether you wrote it.
19    A.   Yes, I wrote -- this is the IEP that I wrote.
20    Q.   And are there different -- we noticed that
21   K███'s IEP seemed to be a different form than R███'s.
22   Just the format.  And Manus Exhibit 5 was R███.  Do you
23   have any idea why they are different forms?
24    A.   Can you explain the differences of forms?
25    Q.   Look at, like, for instance, Page 3 of 8 on

---

Ferguson & Holdnack Reporting, Inc.

Richard P. v. School District                    Vikki Scully                    March 18, 2005

Page 26

1  Exhibit 4, K█████
2      A.  (Witness complies.)
3      Q.  Yeah, that's R█████, 3 of 8.  And then look at
4  your 3 of 8.
5      A.  (Witness complies.)  It could be just the computer
6  that they wrote them on.  This (indicating) was written in
7  the summer --
8      Q.  Exhibit 5 was?
9      A.  Exhibit 5 was written in the summer, 7/23/01, in
10 the administrative office.  It wasn't -- it could be
11 something as --
12     Q.  Different program.
13     A.  -- simple as they have a different -- they did it
14 on their computer or -- yeah, it's a different -- it's the
15 same -- I think it's the same -- it has the same content.
16     Q.  Yeah.  I'm just curious if you know why there's
17 maybe a different format.  And it might just be the
18 computer?
19     A.  It's the computer.  I mean, it's got the same --
20 yeah.  It's got the same information.  It's just -- I mean,
21 sometimes -- and it's an unprotected document.  You can
22 unprotect it, because you have to submit information in
23 there, so sometimes when you unprotect it and make it
24 longer, that the numbers down below get all skewed, so.
25 This one was written in our administrative offices.

Page 27

1      Q.  Okay.  And then how did you write K█████
2  which was marked as Exhibit 4, in Manus's deposition?  Where
3  did you have the information to write hers?
4      A.  Well, like right here, it says, like -- I take
5  information from the classroom, what she's doing, and do
6  curriculum-based assessments.  And then you write it from
7  there.  And then you take where they are working at and what
8  goals do they need to work on.  And then you write the
9  goals.  That's like Pages 3 of 8.  You write a goal for
10 every subject that they are in for learning support.
11     Q.  Okay.
12     A.  And then Page 4, you discuss what accommodations
13 are made and what services would be provided, if needed;
14 nursing and psychological.  And then you address what is
15 going to happen when they take Districtwide assessments and
16 Statewide assessments on Page 5.  And then the last page is
17 just percentages; about how many class -- like when you're
18 in a special ed. class, that equals a certain percentage.
19 And so you add up.  So 68 percent of the day, she's in a
20 learning support environment.
21     Q.  On Page 4 of 8, I guess you say that you
22 recommended that she be examined by a psychologist every two
23 years.
24     A.  That's any student who is receiving special
25 education services gets re-evaluated.

Page 28

1      Q.  Do you recall whether you -- whether either
2  K█████ or R█████ needed -- or to what extent they needed
3  behavioral modification or emotional support when they were
4  in your class?
5      A.  Can I recall -- can you rephrase that.
6      Q.  I'm sorry.  Do you recall whether -- whether
7  either of them needed sort of psychological therapy or any
8  kind of behavior modification, you know, work when they were
9  in your class, before the incident?
10     A.  No, I cannot recall.  K█████ was a little
11 scattered and got lost.  So that was -- it was trying to
12 come up with different ways to help her make her way in the
13 building.  But there was no behavior problems, no -- I mean,
14 the work they received was adapted on to their grade level;
15 what their instructional level is.
16     Q.  And what about R█████  Were there behavioral
17 problems with her?
18     A.  No.
19     Q.  Did they get along well with the other students?
20     A.  That -- I don't recall them not getting along
21 well.  I don't recall them being -- I mean, and you can look
22 back and think of kids that had conflict, and they do not
23 stick out as students that had conflict with other students.
24         (Scully Deposition Exhibit 1.
25         marked for identification.)

Page 29

1      Q.  Okay.  Now, we had marked as Exhibit 1, Scully
2  Exhibit 1, just an IEP revision review --
3      A.  Um-hum.
4      Q.  -- that apparently you did.  I guess you did this
5  in --
6      A.  June.
7      Q.  -- June of 2002.
8      A.  Um-hum.
9      Q.  Did you have -- did you teach either K█████ or
10 R█████ after their first assignment at Sarah Reed?
11     A.  Sarah -- at Sarah Reed.  R█████ came back to
12 school the next year briefly, and she was in my classes
13 again.  But I don't recall her being there very long.
14     Q.  What do you recall of her behavior when she was
15 back?
16     A.  She wasn't in my -- my recollection, she wasn't
17 there long enough to -- I know there was an incident,
18 relatively early in the school year, and my knowledge of it
19 was she became aggressive with a police officer.  And my
20 understanding was that it started over a dress code
21 violation, but I remember that is she was -- she had
22 been in my class all morning, and I didn't notice the dress
23 code violation.  So that's how I -- and, then, again, after
24 that incident, that was the last that I had seen her.
25     Q.  Going back to Sarah Reed for a second, what

8 (Pages 26 to 29)

Ferguson & Holdnack Reporting, Inc.

A000000354

Richard P. v. School District
Vikki Scully
March 18, 2005

Page 30

1 programs did you -- well, what is Sarah Reed? I mean, to
2 your understanding.
3     A. I don't know much about Sarah Reed. I know
4 that -- I have never worked there. I know they offer a
5 therapeutic component to deal with students who may have
6 had, you know, issues or who were not struggling -- were
7 struggling in the regular schools. And then the academic
8 component. I know -- you know, we do that for
9 home tutoring. I thought we sent them work, but they have
10 their own curriculum there all day.
11     Q. Do you know whether it's principally a school for
12 kids with emotional problems?
13     A. I actually don't know to say for sure. I -- I
14 could say that I think, but I don't know.
15     Q. Okay. And do you know whether students that go
16 there are students who behaviorally can't fit into the
17 regular or mainstream schools?
18     A. I think there's a variety of different reasons why
19 students go there. I think each -- each instance is
20 specific to the individual student.
21     Q. Okay. And you had no input, or you didn't play
22 any role in the decision to transfer them to Sarah Reed.
23     A. No.
24     Q. In either in your educational background or your
25 experiential background, do you have to -- in terms of

Page 31

1 communication with students such as R▮▮▮ or K▮▮▮ what
2 is different about that than maybe communicating with
3 students who are not in learning support classes? Are there
4 problems that you have to be particularly aware of?
5     A. In communicating?
6     Q. Right.
7     A. Can you give me an example.
8     Q. Well, in terms of listening to them and having
9 them express their problems to you or their concerns.
10     A. I don't see a difference in the regular ed. kids
11 that I would know that -- I think it's an individual basis
12 on the kid. I don't think the disability necessarily has
13 anything to do --
14     Q. Okay. What was your impression of, I guess,
15 the -- general discipline at Strong Vincent in
16 2001/2002?
17     A. Meaning was it --
18     Q. Did you perceive discipline or order a significant
19 problem in the school?
20     A. Not significant, no. I would say typical --
21 typical of --
22     Q. An urban school?
23     A. Yeah.
24     Q. Did you ever have to -- were you ever involved in
25 like breaking up fights or that kind of activity?

Page 32

1     A. Yes.
2     Q. And did any involve either K▮▮▮ or R▮▮▮
3     A. That I broke up? No.
4     Q. Do you know whether -- have you ever heard that
5 learning support girls might be more vulnerable to sexual
6 assaults than other girls?
7     A. Have I ever heard that?
8     Q. Well, yeah. I mean, do you know that to be the
9 case, based upon your experiential or educational
10 background?
11     A. No, not --
12     Q. Okay. So you don't know whether, for instance,
13 they are more vulnerable to abuse than children in normal
14 mainstream classes?
15     A. In normal regular classes? No, I don't.
16     Q. Were there changes that the school made after the
17 2001/2002 school year concerning either how they handled
18 discipline or how they trained faculty to perceive issues
19 involving students?
20     A. Not that I know of, no.
21     Q. Not that you're aware of. Did you ever attend any
22 inservice that involved helping you recognize bullying kinds
23 of conduct or sexual harassment kinds of conduct?
24     A. I was trained to be on the Student Assistant
25 Program team, and that's where you get training on, you

Page 33

1 know, recognizing -- and we do have inservices throughout
2 the District of -- many schools are starting bullying
3 prevention programs and various things like that.
4     Q. And you were trained in the Student Assistant
5 Program?
6     A. I was a member on the Student Assistant team.
7     Q. And tell me about that team.
8     A. It's a team that meets and addresses needs of
9 students that have been referred for a variety of reasons.
10 Slipping in -- grades slipping, drastic behavior changes, if
11 a family member dies. We meet twice a week, and we send out
12 informational gathering sheets to teachers, get parent
13 permission, send out informational gathering sheets to find
14 out how they are doing in the classes. And then you come
15 back and reconvene as a team and talk about -- you know,
16 just compare.
17     Because it could be a child could be dropping in
18 grades, and you could look at it and try to figure out why
19 is their math grade dropping or why -- you kind of try to
20 investigate that, and then you come up with whether the
21 child needs to be seen by mental health, whether they can be
22 mentored. Maybe it was just a bad month. You know, their
23 parents were going through a fight or something. So -- and
24 we address those various needs.
25     Q. And does each school have a team like that?

9 (Pages 30 to 33)

Richard P. v. School District                     Vikki Scully                              March 18, 2005

**Page 34**

1    A. To my knowledge, yes.
2    Q. How many faculty -- were you on that team at
3  Strong Vincent or Roosevelt?
4    A. I'm on it both -- I was on it at both schools.
5    Q. Both. And how many faculty members were on the
6  team?
7    A. At Strong Vincent? Roughly eight. And our
8  probation officer was a member. The school nurse would
9  come, counselor, one of the administrators. And then the
10  psych -- the mental health -- I don't know what their
11  official title is. The counselor who deals with the mental
12  health issues would have been on our team as well.
13    Q. Did you know anything about the in-school
14  mediation program?
15    A. Peer mediation?
16    Q. Peer mediation, yeah. How did that program work?
17    A. Students were selected based on faculty
18  recommendations, and they went through a training program to
19  help students work out problems amongst themselves. And
20  then when you had students that had a conflict in your class
21  that you thought could be resolved through peer mediation,
22  you could submit that to the peer mediation person, and they
23  would pick peer mediators to come in and go into a private
24  setting and have the kids discuss it to try to see if they
25  could work the problems out themselves.

**Page 35**

1    Q. There was a faculty member who was the peer
2  mediator coordinator or something?
3    A. I don't know -- it was Mikelea Curtze was the
4  trainer of it. I don't know if she was on staff that year,
5  but I don't know who -- she was in the building frequently,
6  so she would address --
7    Q. Do you know if B▮▮ C▮▮▮▮▮ was a peer mediator?
8    A. No. To my knowledge, no.
9    Q. How about C▮▮ B▮▮?
10    A. No. The recommendations came from faculty, and it
11  was typically probably more students that would have been in
12  the honors programs and --
13    Q. Okay. Now, you indicated that your sort of --
14  your knowledge of this incident involving R▮▮▮and
15  K▮▮ arose after R▮▮ came into your classroom one
16  day --
17    A. Um-hum.
18    Q. -- and used a curse word. Before that happened,
19  were you aware of whether there were any students either
20  harassing R▮▮ or molesting her on school property?
21    A. No.
22    Q. You hadn't heard that?
23    A. No.
24    Q. And before she came in and used that -- the curse
25  word, had you heard any rumors that there had been -- that

**Page 36**

1  she was engaging in sexual activity?
2    A. No.
3    Q. You did not.
4    A. (Witness shakes head.)
5    Q. Do you have any idea what percentage of the
6  students at Strong Vincent were special ed. students?
7    A. I don't know off the top of my head.
8    Q. And do you know what grade C▮▮ B▮▮was in
9  when this incident happened?
10    A. I believe eighth grade. But I'm not sure on that
11  either.
12    Q. He was much older, wasn't he, than the other
13  students?
14    A. I don't -- I don't know his chronologic age.
15    Q. I've never met him. Do you recall when he looked
16  like physically? Was he a big kid, small kid?
17    A. No, he was not big. Shorter than me. Athletic.
18  Athletic build. Very personable. I think the kids would
19  say that he was an attractive student, attractive middle
20  school student, but not big.
21    Q. Did you ever talk to Linda Cappabianca
22  specifically about her ideas for disciplining C▮▮ B▮▮
23  or bringing him under control?
24    A. Yes. We tried behavior plans and offering
25  incentives and various things that you do for students that

**Page 37**

1  can be disruptive in class.
2    Q. We have a packet of papers here, sort of a C▮
3  B▮▮▮ discipline stuff. One of the things I noticed,
4  that there was a -- there's a behavior chart.
5    A. Um-hum.
6    Q. Can you tell me what a behavior chart is used for.
7  That's document 1912-Erie.
8    A. We use this for students who need some extra
9  motivation to control their behavior. We put their name on
10  it, their teacher -- they carry it throughout the day -- the
11  date. And then we target five different areas that we want
12  them to work on. For him it was these: On time completing
13  work, appropriate language, staying in seat, following
14  directions, not skipping classes.
15      And then throughout the day -- they only had four
16  periods at this time, because they had block scheduling. We
17  would kind of assess how he did throughout the day, make any
18  comments, and you do like a point system. If you get so
19  many X's after so many days, you know, there would be some
20  sort of reward for the student.
21    Q. Okay. And who would instigate something like
22  that? Would it be Cappabianca?
23    A. Actually, the teacher of record would be the one
24  who would -- but if a student was chronically sent to the
25  office, she could come to us and say, will you, you know,

10 (Pages 34 to 37)

Richard P. v. School District  
Vikki Scully

March 18, 2005

Page 38

1  develop -- the teacher of record would write the behavior
2  plan.
3      Q.  And this would be some sort of, like, positive
4  reward, sort of -- trying by giving him positive feedback?
5      A.  Um-hum.
6      Q.  Reward good behavior?
7      A.  Yeah, and help him to monitor his behavior as
8  well.
9      Q.  And there was another document with -- it's
10 Erie-1903. It's a Functional Behavior Assessment.
11     A.  Um-hum.
12     Q.  Do you recall on what occasions the Functional
13 Behavior Assessment was completed?
14     A.  On what occasion, or reason why?
15     Q.  Yes. Why would it be done?
16     A.  Basically to try to target what the challenging
17 behaviors are. You are taking data on a student for a
18 variety of days in a row, like five days in a row, and that
19 way you can kind of check -- maybe a student is being bad
20 second period. Is it the time of day, is it the content
21 that he doesn't like, is it a teacher conflict.
22        So as you go through their results, you can kind
23 of check to see what he's doing or what the student is doing
24 in what classes. And you try to -- that's -- this is what
25 drives the behavior plan. You take data first --

Page 39

1      Q.  Okay.
2      A.  -- and then you come up with a plan --
3      Q.  Okay.
4      A.  -- after that.
5      Q.  So -- and then who was it -- Miss Gray would have
6  been his teacher of record?
7      A.  No. That's the teacher that had him at that
8  class.
9      Q.  Okay. Do you recall who his teacher of record
10 was?
11     A.  I do not recall who his teacher of record was.
12     Q.  It wasn't you, though?
13     A.  I don't --
14     Q.  Or it might have been?
15     A.  It might have been, but I don't recall. I think
16 it might have been Mrs. Manus. But we all have him. See,
17 it says "staff reporter". This is the results from her
18 class --
19     Q.  I see.
20     A.  -- in LS math at this time.
21     Q.  Okay. So when something like this -- when it was
22 decided to do a Functional Behavior Assessment, all the
23 teachers would do one.
24     A.  Um-hum. Or if he was just posing trouble in a
25 certain class, that teacher would collect the data.

Page 40

1      Q.  By any chance, do you remember who the gym teacher
2  was?
3      A.  Michelle Acke. She's now Michelle Bennett.
4      Q.  Do you recall whether you had meetings with either
5  the parents of K████ or R████
6      A.  I met with both of them.
7      Q.  And do you remember when you met with them?
8      A.  I met with Mr. P███ at conference -- open
9  house, I think it was. Which would have been about October.
10 And Mrs. L██ was in the building frequently, so I -- I had
11 seen her several times throughout that school year.
12     Q.  And do you remember why she was in the building?
13     A.  Not off the top of my head. She had two children
14 there too, so it could have been for --
15     Q.  Her other daughter.
16     A.  -- her other daughter.
17         MR. OLDS: Let's take a little break, okay? I
18     want to review stuff, and we'll come back.
19         (Recess held from 2:07 p.m. till 2:16 p.m.)
20     Q.  There was one document, and it had been marked
21 Erie-1932. And this was in C███ B███ disciplinary
22 file. I wonder if you can tell me if you ever saw that
23 document before.
24     A.  No, I never saw that.
25     Q.  And it's signed by an individual with --

Page 41

1  Richard Gokhale (phonetic) or something like that.
2      A.  It's -- I have no idea who that person is.
3      Q.  Okay. Substitute teacher. Cepak or C-E-P-A-K.
4  And you never heard of that individual?
5      A.  I don't know who that is.
6      Q.  Richard Cepak, maybe that would be --
7      A.  I don't know who a -- Dr. Richard --
8      Q.  Dr. Richard Cepak, yeah. Substitute teacher.
9      A.  We get a lot of substitutes, so.
10     Q.  Okay. Did you ever observe Charles using language
11 referring to female genitalia?
12     A.  I don't recall. I mean, he was -- he cussed and
13 stuff, but, you know -- but not to my recollection.
14     Q.  Now, do you remember an incident where Rachel was
15 crying and you sent her to the bathroom to compose herself?
16     A.  No, I don't remember that.
17     Q.  Did Linda Cappabianca ever tell you that she
18 thought Rachel was sexually promiscuous?
19     A.  No.
20     Q.  When she first described the -- what had happened
21 or what was going on, tell me as best as you can recollect
22 what she said to you.
23         MR. MARNEN: You're referring to Linda now?
24         MR. OLDS: Yeah, Linda Cappabianca.
25     A.  About the incident that happened?

11 (Pages 38 to 41)

Richard P. v. School District

A000000357
Vikki Scully

March 18, 2005

Page 42

1    Q.   Yes.
2    A.   She said that the girls were in the Laundromat,
3  and that they were -- she described what -- not in detail,
4  but alluded as to what they were doing.  And that was pretty
5  much all she said.
6    Q.   When you say she alluded to what they were doing,
7  what did she tell you?
8    A.   Oral sex.
9    Q.   And she said that the girls were engaged in oral
10 sex?
11   A.   She said that -- I didn't know which one was.  She
12 said there was an incident with oral sex, and B▮ was
13 involved.  And that's all.
14   Q.   But she did tell you it was K▮ and R▮
15   A.   Yes.
16   Q.   Did she tell you that she had information that
17 R▮ was involved with oral sex in other places?
18   A.   No.
19   Q.   Did she suggest to you that R▮ and K▮
20 had voluntarily engaged in oral sex?
21   A.   No, she didn't say -- I mean, she said that B▮
22 was there and that there was coercion.
23   Q.   Okay.
24   A.   But they don't always tell us -- I mean, there's
25 stuff that they know that we don't need to know, so

Page 43

1  there's --
2    Q.   In other words, the administrators?
3    A.   Yeah, the administrators.
4    Q.   I understand that.  And I'm just -- I was just
5  trying to understand what she told you.
6    A.   Oh, okay.
7    Q.   And this was in a one-on-one conversation that she
8  had with you?
9    A.   Um-hum.
10        MR. OLDS:  I guess I don't have any other
11        questions.
12        MR. MARNEN:  I have no questions, and we'll read
13        and sign.
14
15        (Deposition concluded at 2:20 p.m.)
16
17
18
19
20
21
22
23
24
25

12 (Pages 42 to 43)

Ferguson & Holdnack Reporting, Inc.

1

2

3                          SIGNATURE PAGE

4

5

6         I, VIKKI SCULLY, have read the foregoing

7    transcript of my deposition, and affix my signature in

8    approval of the correctness of my statement, except for

9    corrections noted on the Amendment Page.

10

11                        _____

12                        VIKKI SCULLY

13

14

15

16

17                    DATED: _4-15-05_____

18

19

20

21              Corrections Noted on Amend Page

22                    Yes _✓_____

23                    No  _____

24

25   JLF

1    <u>AMENDMENT PAGE</u>

2

3    <u>Page</u>        <u>Line</u>        <u>Correction</u>

4    41         16        I don't remember

5              a time when R████

6

7              was crying and I

8

9              sent her to the restroom

10             to compose herself, but

11

12             that is something I

13

14             would do if a student

15

16             was upset in my classroom.

17

Richard P. v. Erie School District         A000000000 Janet Woods         April 11, 2005

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    RICHARD P., by and for      :
      Rachel P., and DENISE L.,   :
 4    by and for K██████ L.,      :
               Plaintiffs         :
 5                                :
          v.                      :   Civil Action No. 03-390
 6                                :              Erie
      SCHOOL DISTRICT OF THE CITY :
 7    OF ERIE, PENNSYLVANIA; JANET:
      WOODS, Individually and in  :
 8    her Capacity as Principal of:
      Strong Vincent High School; :
 9    and LINDA L. CAPPABIANCA,    :
      Individually and in her     :
10    Capacity as Assistant       :
      Principal of Strong Vincent :
11    High School,                :
               Defendants         :
12

13

14

15

16              Deposition of JANET WOODS, taken before

17       and by Janis L. Ferguson, Notary Public in and

18       for the Commonwealth of Pennsylvania, on Monday,

19       April 11, 2005, commencing at 10:00 a.m., at the

20       offices of Knox McLaughlin Gornall & Sennett, PC,

21       120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
                 Reported by Janis L. Ferguson, RPR
25                Ferguson & Holdnack Reporting, Inc.
```

```
                                      Page 2
1    For the Plaintiffs:
2      Edward Olds, Esquire
       Carolyn Spicer Russ, Esquire
3      1007 Mount Royal Boulevard
       Pittsburgh, PA 15223
4
5    For the Defendants:
6      James T. Marnen, Esquire
       Knox McLaughlin Gornall & Sennett, PC
7      120 West 10th Street
       Erie, PA 16501
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                      Page 4
1    J A N E T  W O O D S, first having
2    been duly sworn, testified as follows:
3
4              DIRECT EXAMINATION
5    BY MR. OLDS:
6
7      Q.  Good morning, Miss Woods.  How are you?
8      A.  Good morning, Mr. Olds.
9      Q.  So I'm going to take your deposition in a lawsuit
10   that -- I represent the parents of K___ L___ Denise
11   L___ and R___ P___ -- Richard and Shelly P___
12   have sued the Erie School District, and they have named you
13   and Miss Cappabianca in that lawsuit as well.
14         I'm just going to take the deposition to see what
15   information you have about the events that, you know,
16   comprise or underlie the lawsuit and the --
17         Have you ever been deposed before?
18     A.  Yes.
19     Q.  Okay.  So you probably know the ground rules.  But
20   just to remind you that I guess the most important one from
21   my perspective is that you let me finish a question before
22   you start to answer it, and I'll let you finish an answer
23   before I start the next question.
24         Sort of the reason for that ground rule is that
25   even though you know where I'm going when I'm asking you the
```

```
                                      Page 3
1              I N D E X
2
3    TESTIMONY OF JANET WOODS
4      Direct examination by Mr. Olds  . . . . . . . 3
5
6
7
8
9
10   EXHIBITS:
11     Woods Deposition Exhibit 1 - Page 49
12     Woods Deposition Exhibit 2 - Page 72
13     Woods Deposition Exhibit 3 - Page 81
14     Woods Deposition Exhibit 4 - Page 81
15
16
17
18
19
20
21
22
23
24
25
```

```
                                      Page 5
1    question, and you don't have to wait for me to finish asking
2    the question when we're just conversing like this, when you
3    go back to look at the record, sometimes it's not clear what
4    the question was.
5          So just for purposes of preserving the record, I
6    would like you to let me finish the question.
7      A.  Um-hum.
8      Q.  Sometimes I go on and on and on, and you're saying
9    when is this guy going to let me give him his answer.  But
10   if you'll try to do that, I'll try to let you go on and
11   and on when you give answers.  Okay?
12         Why don't you -- you're retired now; is that
13   correct?
14     A.  I took early retirement, correct.
15     Q.  I guess for the record, if you could state your
16   full name and your home address.
17     A.  My name is Janet, J-A-N-E-T, M as in Mary, Woods,
18   W-O-O-D-S.  Home address is _____ Edinboro.
19     Q.  And how long did you work for the Erie School
20   District?
21     A.  I was employed at the Erie School District as an
22   administrator in 1990.  And I took early retirement to stay
23   home with my children in June -- on June 23rd of 2003.
24     Q.  And did you work for the Erie School District
25   prior to 1990?
```

Page 6

1   A.  In 1974, I worked as a -- in the Special Education
2   Department.  From 1974 to 1980 in the special services
3   department with special education students in a vocational
4   education program, and disadvantaged students in a
5   vocational education program.
6       (Discussion held off the record.)
7   A.  In 19 --
8   Q.  Go ahead.  I'm sorry.
9   A.  Yeah.  In 1990, I became a -- an administrator,
10  and I worked -- excuse me.  From 1980 to 1990, I was an
11  administrator at PENNCREST School District.  That's all
12  capitals, P-E-N-N-C-R-E-S-T.  PENNCREST School District.
13  It's in Crawford County, south of here.  I was a principal
14  there until 1990.  And in 1990, I came with the City of Erie
15  School District.
16  Q.  And you were with Erie for --
17  A.  13 years.
18  Q.  -- from 1990 to 2003.  Did you have the same
19  assignment those 13 years?
20  A.  In 1990, I was assigned to Wayne Middle School.
21  And for a one-year period, when the seventh and eighth
22  graders were added to Strong Vincent -- that was 1992.  I
23  was there for one year, and then I was reassigned back to
24  Wayne School until the year 2000.  In 2000, 2001, 2002, for
25  three years I was assigned to Strong Vincent High School.

Page 7

1   Then it was a middle/high school.  Middle and high school.
2   Got that?
3   Q.  Yes.
4   A.  Okay.
5   Q.  Was there -- in terms of the demographics, is
6   there much of a difference between the Wayne High School and
7   Strong Vincent?
8   A.  Well, Wayne Middle School was a middle school.
9   Q.  Wayne Middle School.
10  A.  That was sixth, seventh and eighth.
11  Q.  Okay.
12  A.  And it's now an elementary school, K-8.  But --
13  1-8.  And Strong Vincent was a seventh through 12 school.
14  Q.  Are there differences in the demographics between
15  the schools?
16  A.  Well, Strong Vincent had a middle school.  Those
17  kids were the same as Wayne School.  There was many students
18  I knew from both schools.
19  Q.  I guess by "demographics", I mean either in terms
20  of race or, you know, blue class or --
21  A.  No.
22  Q.  There's not.
23  A.  No.  It's an urban school district.
24  Q.  Okay.  In Erie, do parents get to select what
25  school -- there's more than one middle school, right?

Page 8

1   A.  Correct.
2   Q.  Do parents get to select what school they're going
3   to send the kids to?
4   A.  You're talking middle schools?
5   Q.  Um-hum.
6   A.  You're just talking middle schools.  To answer
7   that question, you have to honestly go back to elementary
8   schools, because some elementary schools are K-8, some are
9   K-6.  There -- the District doesn't have a standard pattern
10  yet throughout the district, I don't believe.
11      But attendance areas determine where a student
12  attends elementary school.  Attendance areas then follow
13  where the student attends -- generally attends middle
14  school.  However, occasionally a student will come from
15  another school for some reason from the other side of town.
16  That's not unusual at all.
17  Q.  And how many -- do you know how many -- there are
18  how many high schools in the School District?
19  A.  There are four.
20  Q.  And how many junior highs or middle schools?
21      (Brief interruption in proceedings.)
22  Q.  How many middle schools?
23  A.  You're talking about the time when I was employed,
24  correct, Mr. Olds?
25  Q.  Right.

Page 9

1   A.  Well, there was Wayne Middle School.  Strong
2   Vincent had middle school students.  There was Wilson Middle
3   School and Roosevelt Middle School.  And Roosevelt, Wayne,
4   and Wilson were all middle schools; six, seven, and eight.
5       MR. MARNEN:  Can we get a time frame here, more
6   specific time frame?  You were in the District
7   from '90 to '03.
8       THE WITNESS:  Correct.
9       MR. MARNEN:  Do you mean that whole 13 years?
10      THE WITNESS:  Yes.  I was in the Erie City School
11  District.
12      MR. MARNEN:  During those whole 13 years, there
13  was Wayne, Wilson, and Roosevelt?
14      THE WITNESS:  I was employed only at Wayne and
15  Strong Vincent during that time.
16      MR. MARNEN:  I mean the middle schools during that
17  period of time.  All I'm trying to do is --
18  BY MR. OLDS:
19  Q.  Was it the same schools -- were the same schools
20  middle schools throughout that period of time?
21  A.  Yes, um-hum.
22  Q.  And Strong Vincent was a -- at some point became a
23  high school/middle school; is that right?
24  A.  1992.
25  Q.  And it remained that until you left?

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2

**Page 10**

1  A. The -- the year 2000/2003 [sic], we had -- I
2  believe we had nine through 12. Or, excuse me, eight
3  through 12. And then in 2003, it became just the high
4  school, nine through 12. The students from Strong Vincent
5  were -- that's why I said, there aren't definitive --
6  definitive lines always change. Primarily the students in
7  the Strong Vincent, quote, attendance area or the
8  Emerson-Gridley attendance area, the old middle school,
9  probably a lot of them went to Wayne or to Roosevelt in
10  2003.
11  Q. How many students are there altogether in the Erie
12  School District? Within --
13  A. Oh, probably 12,000.
14  Q. 12,000. And when you were at Strong Vincent as a
15  principal the last period of time, 2000 to 2003, how many
16  students were in the high school, approximately?
17  A. Oh, 500. In the high school, nine through 12,
18  probably 500, I would say.
19  Q. And approximately 200 in the middle school?
20  A. Yes. Perhaps more, but that's generally correct.
21  Q. And then prior -- I think you said prior to Strong
22  Vincent, you were in the Wayne Middle School.
23  A. Correct.
24  Q. And that would be grades --
25  A. That was six, seven, and eight.

**Page 11**

1  Q. And how many students were in that school?
2  A. Probably 600.
3  Q. When you were in Wayne, did you have an assistant
4  principal or more than one assistant principal?
5  A. When I was employed there in 1990, I was the only
6  assistant principal. I was there from '90 to '92. Then
7  '92 to '93, I was at Strong Vincent. And then I went back
8  to Wayne after that. At times there was a second assistant
9  principal.
10  Q. Were you an assistant principal at Wayne?
11  A. At Wayne, yes, that's correct.
12  Q. Okay. And would the -- in terms of, again,
13  demographics -- you know, classwise, racewise -- would the
14  children attending Wayne Middle School, would it be a
15  similar population as the children attending Strong Vincent?
16  A. Correct.
17  Q. And as an assistant principal at Wayne, what were
18  your duties?
19  A. I was in -- I was in charge of the building
20  when -- in the principal's absence. I was responsible
21  largely for the daily routine of the building. I was in
22  charge of discipline of students, special programs, all
23  school projects. Anything that a principal does.
24  Probably the thing the principal did more of and I
25  did less of were teacher evaluations. I was in charge of

**Page 12**

1  the student assistance program, any kind of special program
2  that went on in the building; after-school programs.
3  Q. What was your role relative to the students in
4  special education classes as an assistant principal at
5  Wayne?
6  A. Well, they were -- like any other students, they
7  were part of the building, like any other student. Regular
8  and special education students were part of the building.
9  When you have a special education student, you have an
10  Individual Educational Plan that has to be followed, so
11  those students are different in that way, because you have a
12  specific plan that is set forth each year and reviewed by
13  the parents and the teachers and agreed upon.
14  Q. Typically, is there an administrator who is
15  involved in setting up the IEP meeting and devising the
16  plan?
17  A. Generally that's taken -- generally, the IEP
18  schedule is set up by the supervisors. And there is a --
19  each teacher is assigned -- each student is assigned a
20  teacher of record, and the supervisor works with those
21  teachers in the -- constructing the paperwork, and then the
22  teachers then have to have the IEP meeting with the parent.
23  An administrator has to sign, be present to sign.
24  Q. The administrator is present --
25  A. Yeah.

**Page 13**

1  Q. There is an administrator present at those
2  meetings?
3  A. Yes. Been to many.
4  Q. Pardon?
5  A. I've been to many.
6  Q. Administrators, are they -- is it one of your
7  duties as an administrator to be actively involved in
8  creating the IEP plan?
9  A. Only if we have input. Generally that is created
10  primarily based upon the student's educational goals. And
11  that is done traditionally with the teacher.
12  Q. Tell me, who was the -- when you were the
13  principal at Strong Vincent, who was the Title IX officer?
14  A. Well, the principal is the person that is in
15  charge of implementing and making sure that all, you know,
16  policies are followed in the School District. For example,
17  the discipline handbook has all the information that
18  students receive about Title IV. And it's our
19  responsibility to make sure that those are followed.
20  Q. Do you know, were you the officially designated --
21  A. I don't know. But I'm certain I was.
22  Q. But you don't know for certain -- you're certain
23  that you were, but you don't really know.
24  A. Right.
25  Q. Right? Is that fair?

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2

Richard P. v. Erie School District          A000000004s                    April 11, 2005

Page 14

1    A.  (No response.)
2    Q.  Did someone tell you that you were?
3    A.  I have always dealt with those issues.
4    Q.  Okay.  But that wasn't my question.  Did someone
5  tell you that you were?
6    A.  (Witness pauses.)  I'm going to say yes.
7    Q.  And who told you that?
8    A.  I don't know.  I'm thinking back to the original
9  meetings.
10   Q.  What original meetings were those?
11   A.  No, when I was assigned the building.
12   Q.  Who assigned the building to you?
13   A.  Transfers are made and assignments are made in
14  August or late July.  And generally the assistant to the
15  superintendent, Frank Scozzie, is the person who contacts
16  us.
17   Q.  Was Frank Scozzie the assistant to the
18  superintendent then --
19   A.  Yes.
20   Q.  -- in 2000?
21   A.  Yes.  Sorry.  I answered too quick.
22   Q.  But you don't recall a specific conversation with
23  him where he told you that you were the Title IX
24  coordinator; is that right?
25   A.  No.

Page 15

1    Q.  In the course of time that you were at Erie from
2  1990 to 2003, did you ever receive training on sexual
3  harassment, peer-to-peer sexual harassment?
4    A.  Yes.
5    Q.  What training did you receive?
6    A.  Very frequently -- we had inservices.  Principals
7  had meetings throughout the year.  We had inservices at the
8  beginning of each school year.  We were employed at the
9  beginning of August.  So we would have inservices at that
10  time, and throughout the year we would have inservices.
11        And one of the topics that very frequently came
12  up, we would have attorneys come and talk to us about sexual
13  harassment, federal laws, state laws, mandates, cases in
14  point, throughout the year.
15   Q.  And do you remember which attorneys made those
16  presentations?
17   A.  Would you --
18   Q.  Do you remember which attorneys made those
19  presentations?
20   A.  Jennifer Gornall-Rouch made presentations.  A
21  gentleman named Bernie Hoffman, and I -- don't hold me to
22  the last name.  Bernie Hoffman came and talked to us about
23  current litigations, about sexual harassment or harassment.
24  Bernie came and talked to us, I remember, once after
25  Columbine, for example.

Page 16

1        We had a lot of -- a lot of presentations
2  throughout the 13 years I was there.  There were many.  It
3  was always at the forefront of our minds.
4    Q.  Well, do you recall receiving handouts or, you
5  know, documents describing what the law was?
6    A.  Yes.
7        (Discussion held off the record.)
8        (Recess held from 11:00 a.m. till 11:02 a.m.)
9    Q.  I think I was asking you about --
10   A.  Go ahead.
11   Q.  -- the literature that you received from these
12  sexual harassment courses.  Were there handouts and stuff?
13   A.  Always.  Summaries of -- summaries of -- summaries
14  of the presenter's points that he wanted to make with us.
15   Q.  Did you retain any of that?
16   A.  I took early retirement and disbursed all of my
17  things to young administrators.  If they didn't have it, it
18  was disbursed.
19   Q.  Okay.  When you were the assistant principal at
20  Wayne, were there occasions when you dealt with sexual
21  harassment issues involving students?
22   A.  I don't recall -- I don't recall at Wayne.  That's
23  a pretty specific question to that time period.
24   Q.  I don't understand.
25   A.  Make it a broader question.  Have I dealt with

Page 17

1  sexual harassment cases or --
2    Q.  It was at Wayne, yeah.  I was just wanting the
3  period of time --
4    A.  I don't recall if at Wayne.
5    Q.  Okay.  Well, do you recall whether you dealt with
6  sexual harassment cases at Strong Vincent?
7    A.  I don't recall.  Without looking at my notes.
8    Q.  Do you have notes?
9    A.  No.  Not here.
10   Q.  Do you have notes anywhere?
11   A.  (No response.)
12   Q.  I mean, you couldn't recall without looking at
13  your notes.  What kind of -- what kind of notes were you
14  referring to?
15   A.  Yes, I -- while I was at Strong Vincent -- are you
16  talking about prior to this case, or are you talking about
17  this case?
18   Q.  Not --
19   A.  Ask the question again, Mr. Olds.
20   Q.  Not counting this case --
21   A.  Yes.
22   Q.  -- for the time being, excluding this case --
23   A.  Absolutely.
24   Q.  -- you dealt with sexual harassment at Strong
25  Vincent?

5 (Pages 14 to 17)

3a9d95d8-06da-4388-a818-43709425cad2

Page 18

1    A.   Correct.
2    Q.   Tell me what the situations were.
3    A.   Student bothering a girl on a bus.
4    Q.   And how did that situation come to your attention?
5    A.   Student came to see me, said I need help.
6         (Discussion held off the record.)
7    Q.   Do you recall any other incidents?
8    A.   In the three years I was at Strong Vincent, that's
9    the only one I can recall off the top of my head.
10   Q.   And what was the resolution of that incident?
11   A.   Criminal charges.  We followed the law and the
12   School District policy of no -- you know, no one bothers
13   anybody.  Criminal charges, and the student was sent to
14   alternative education.
15   Q.   How was the student bothering the girl?
16   A.   I feel very uncomfortable talking about that with
17   mixed company here.
18   Q.   I'm not asking you for names.
19   A.   I know that.  All right, how was the student
20   bothered?
21   Q.   Right.
22   A.   The student was at an after-school function,
23   sporting event, on the bus, and the male was taunting the
24   girl, intimidating her, making explicit sexual comments to
25   the girl.

Page 19

1    Q.   And the girl came to complain to you?
2    A.   Absolutely, um-hum.
3    Q.   Were there other witnesses to the incident?
4    A.   Yes.
5    Q.   Other people on the bus?
6    A.   Other students, yes.
7    Q.   And did you interview them?
8    A.   Yes.
9    Q.   And how was it that -- tell me -- describe the
10   process that you followed to send the student to alternative
11   school.  The assailant or the harasser in this instance.
12   A.   Well, you do -- you do an investigation, try to
13   get as many -- correct information as you can, as quickly as
14   you can.  Try to get the help -- get the victim some help.
15   Notify our in-house police officer, our school resource
16   officer, and notify the downtown administration and notify
17   the police.  As quickly and as swiftly as possible.  Then
18   you prepare the paperwork for alternative education.  And in
19   all this time, you've had the parents in, obviously, and go
20   for an expulsion.  I forget if we went for an expulsion or
21   not, but we may have done that.  But it went to a School
22   Board hearing.  And there are several avenues to get to a
23   School Board hearing, but it went to a School Board hearing,
24   and it was determined that the student would go to
25   alternative education.

Page 20

1    Q.   And aside from the events in this case, that's the
2    only incident of sexual harassment that you can think of --
3    A.   The only one I can think of right off the top of
4    my head.
5    Q.   While you were --
6    A.   There may have been more.  It's been three years,
7    you know.  It is something we certainly addressed a lot.
8    But that's the one time I can think of where there was a
9    criminal record.
10   Q.   When you say you addressed a lot, what do you mean
11   by that?
12   A.   We addressed -- we addressed -- anytime that a kid
13   would bother somebody else, we would often address -- it
14   wasn't sexual harassment.  It was just general bothering
15   somebody.  Those -- those situations were addressed
16   continually.
17        That was something that was always at kind of the
18   top of my -- you know, when somebody bothers somebody else,
19   that's always been sort of a pet peeve of mine.  Just no one
20   has -- kids were told, no one has permission to put their
21   hands on you without your permission, and no one is to
22   bother you.  And if you need help, you say I need help.
23   Q.   Well -- and when would this information be
24   conveyed?  You're suggesting that you provided communication
25   to the --

Page 21

1    A.   Right.
2    Q.   -- students.  When would that be conveyed?
3    A.   Well, it was conveyed in numerous ways.  At the
4    beginning of each year, each student got a student handbook.
5    I'm sure you have seen that.  We went over the student
6    handbook page by page over a period of time in homeroom.  I
7    had class meetings with students at the beginning of each
8    year by grade.  Sometimes even in smaller groups than that.
9    Students were told if they ever need help, to ask for help.
10   They only need to say to me, I need help.  Because that
11   conveys automatically that there is something that you need
12   help with.
13        Students were encouraged, if they didn't come
14   forth and need help, and they had a friend who needed help,
15   and they couldn't get the friend to come and say I need
16   help, they were to say my friend needs help.  I have used
17   that method for 23 years.  If the kid needs help and they
18   say I need help, they are going to get some help.  If they
19   say my friend needs help, then they are going to get some
20   help.
21   Q.   Well --
22   A.   We also -- if I could finish.
23   Q.   Go ahead.
24   A.   I also reiterated that in class meetings about no
25   one is to bother you, no one can put their hands on you

6 (Pages 18 to 21)

## Page 22

1  without your permission. And we then had each of the
2  student assistance counselor, the nurse, we had a school
3  resource — we had two school resource officers, we had a
4  probation officer in the building. All of these persons
5  were made known to students that they were someone that they
6  could count on if they needed help or if someone was
7  bothering them.
8        I made a point -- because, Mr. Olds, these were
9  seventh and eighth graders. This was a school that was
10  seven through 12. And when you have a wide breadth of
11  students, you have, you know, a wide spectrum of
12  developmental kids. You have anything from 12-year-olds to
13  20-year-olds. You have a wide breadth of kids when you have
14  that. There are a lot of high-need kids also. I mean, but
15  you have -- just when you have that kind of school. It's a
16  little bit different to manage than it is when you have
17  sixth, seventh and eighth graders.
18        And I made a point especially with these seventh
19  and eighth graders of going to their lunch every day. I
20  didn't sit down and eat lunch with them. I wasn't that kind
21  of person. But a presence has to be available to kids
22  always so that they know that the principal is a person
23  who -- that is going to get something done. That the
24  principal is someone that they can go to, that if their
25  parents need someone to go to. If there needs -- if we need

## Page 23

1  to address something.
2        Kids were told at lunch -- I made announcements at
3  lunch every day. It was the one time I could face kids --
4  you know, every school has an intercom. But when you go to
5  lunch, and you make announcements at lunch, every kid is
6  looking at you, every eye is on you. And you can spend 30
7  minutes with those students walking from table to table.
8        I also spent time talking to Linda Cappabianca,
9  the assistant principal for the seventh and eighth grade at
10  that time, because it was a time we could -- I could
11  sort of get caught up with things that she was working on,
12  and it was just a time that I knew that I could always catch
13  up with her, and I could see the seventh and eighth graders.
14        So as I walked through the cafeteria and spent
15  time -- I went to every seventh and eighth grade lunch
16  unless I was not in the building. If I wasn't in the
17  building, I wasn't there. But if I was in the building, I
18  was in every seventh and eighth grade lunch.
19        I made announcements in every seventh and eighth
20  grade lunch, because I wanted every student in that room to
21  be apprised of those announcements, to feel like they were
22  part of that school, to come and see me -- I even paid
23  attention to who picked up lunch tickets and didn't pick up
24  lunch tickets.
25        I would go through the lunch ticket -- the free

## Page 24

1  and reduced lunch box, and I would see what students weren't
2  picking up tickets, and I would go and find that student
3  during lunch and find out why they weren't picking up their
4  lunch ticket, why they weren't eating lunch or -- it just
5  gave me a great time to communicate with those students.
6        When I made announcements, very often I said, what
7  do you say in this building if you need help, and they would
8  give me a choral response; I need help. That's something I
9  have used for -- that I used when I started being an
10  assistant principal in 1980, and it always served me really
11  well. That's how they were informed.
12        I tried to be out in the hall. That's pretty hard
13  when you're the principal. Assistant principals were very
14  often out in the hall during class change, the resource
15  officers, probation officers. And I encouraged my
16  assistants to be available. But students were informed
17  repeatedly.
18        I can't emphasize this enough. The welfare and
19  safety of students in the building was always paramount to
20  me.
21    Q.  Was Linda Cappabianca an appropriate person for
22  students to take complaints to?
23    A.  Absolutely.
24    Q.  So she had the authority to deal with student
25  complaints?

## Page 25

1    A.  Yes. And always Linda was great about apprising
2  me of situations and trying to keep me up to speed on
3  things. When you have seventh graders in the building, not
4  only do you have young kids, when you have seventh and
5  eighth graders, but you also have kids that you hope will be
6  in that building for the next six years. And you want to
7  try to -- not all of them -- I mean, I knew very few of the
8  students when I went to Strong Vincent. There were a few
9  kids from Wayne that were there, so I did know a few; a
10  handful.
11        But you knew that those students might be there
12  for the next six years. And so if you could get everybody
13  on the right track, try to meet kids' needs, try to get an
14  educational plan for those kids, you know, that kid is going
15  to be in for a great six years. You're going to try to have
16  a good feel for that kid.
17    Q.  When you were at Wayne, did you have a perception
18  that the middle school kids -- let me start this way: Did
19  you have a perception that any of the middle school kids
20  were sexually active?
21    A.  I think kids in middle schools are sexually --
22  are -- there are sexually active kids in middle schools.
23    Q.  When you were at Wayne, did it come to your
24  attention that there were kids that were sexually active?
25    A.  (No response.)

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2

Page 26

1    Q.   Did you learn that there were kids who were
2   sexually active?
3    A.   Yes.
4    Q.   You did.
5    A.   Oh, sure.
6    Q.   And when you would learn that, would you do
7   anything with that information?
8    A.   Well, sometimes the information about -- yes. You
9   have to do something with that information. That, you
10   know -- when you know something, you have to do something
11   with that information.
12       We have -- we had a parenting program. We had
13   probably six -- in any given year, six to 12 students who
14   were parents -- girls who were parents. And then you had
15   boys who were parents. And --
16    Q.   Well, so --
17    A.   When you know things.
18    Q.   When you became aware of -- that students were
19   sexually active, did you do anything relative to the
20   students or their parents? Did you advise the parents, did
21   you talk to the students?
22    A.   They are young kids. We would always try to
23   involve a parent when we knew something. Because they are
24   young. They are minors. Absolutely.
25    Q.   So if you became aware that a middle school

Page 27

1   student was sexually active, you would involve the parent?
2    A.   Yes.
3    Q.   Now --
4    A.   Once we had -- once you have a little bit of
5   credible information -- I mean, middle school kids talk a
6   lot too. You know, they are interested in sometimes talking
7   bigger than the truth, and, you know, they are just -- they
8   are middle school kids. When you have kids that are 11, 12,
9   13, 14 years old, sometimes, you know, you had to sort out
10   what was true and not true. They are teenagers. Young
11   teens.
12    Q.   And did you have information at Strong Vincent
13   that there were -- aside from this case, excluding this
14   case, did you have information that there were middle school
15   students who were sexually active at Strong Vincent?
16    A.   Yes. Well, wait. Yes. When we came upon that
17   information, depending on what the information was, we would
18   deal with that. Absolutely. We also had a parenting
19   program at Strong Vincent for those students who were
20   parents. I mean, there's obvious sexual activity.
21    Q.   Aside from the one instance that you have talked
22   about involving the girl on the bus and the events of this
23   case, are you aware of any incidents that happened either at
24   Strong Vincent, happened after school, you know, on the way
25   home, or in the morning on the way to school, or happened at

Page 28

1   school-sponsored events that -- where there was a sexual
2   assault?
3    A.   Other than this -- the case that we're talking
4   about at hand, correct?
5    Q.   Yes.
6    A.   And other than the case of the girl on the bus?
7    Q.   Yes.
8    A.   The boy and the girl on the bus. I'm sure there
9   were, but I can't bring them to mind right now.
10    Q.   What was the School District's policy concerning
11   recordkeeping and discipline?
12    A.   They -- we're talking student discipline, correct?
13    Q.   Student discipline.
14    A.   We had a -- a teacher has, and all of us used a --
15   it was called Discipline Referral Sheet, I believe was the
16   title at the top. Discipline Referral Sheet. We tried to
17   keep our documentation on Discipline Referral Sheets so we
18   all had a common document.
19       If there was a problem, it was documented, and
20   then it was taken generally -- depending on -- you know, it
21   was given to an assistant principal, and the assistant
22   principal would generally deal with that. I would also deal
23   with them too, but. Depends on how busy you are.
24       (Discussion held off the record.)
25    Q.   And how would -- actually, maybe before I get to

Page 29

1   that, could you tell me how your role as a principal -- how
2   the duties were different than your duties when you were an
3   assistant principal. In other words, what is the difference
4   between being a principal and being an assistant principal?
5    A.   You're asking me that as a principal or as an
6   assistant?
7    Q.   No, I'm asking you that as a principal.
8    A.   As a principal. All right. I was asked to take
9   over Strong Vincent in 2000. All right? I had been a
10   principal in PENNCREST. I preferred being an assistant,
11   because I liked working with students and parents, and I
12   didn't like going to meetings. But I was asked to be the
13   principal at Strong Vincent in 2000.
14       That role involved the complete oversight of
15   Strong Vincent. I was -- I did less discipline as a
16   principal, because you had to do a lot of other things.
17   Mainly, you had to attend all the meetings downtown. That's
18   the number one thing that's different. I would attend a
19   meeting, and the assistant principals would be in the
20   building. Assistant principals rarely went to meetings.
21       As a principal, I was in charge of the entire
22   building, the entire program, of the planning, the
23   scheduling, long-range planning for the School District.
24   Strong Vincent is now a high school, not a middle/high
25   school. And I was -- that was an enormous task that I

**Page 30**

1  undertook, and assistants would not do that. Assistants
2  more -- would do more daily operation of the building in
3  regard to students. Discipline, for example. Bussing. All
4  the daily operational things that dealt with students, an
5  assistant principal would take care of.
6          Evaluation was my responsibility. The assistants
7  helped me with that. But any terminations, any -- any kind
8  of employment, I did all the hiring for the building. I was
9  in charge of all extracurricular and athletic programs.
10         I think, Mr. Olds, that the difference in a high
11  school -- there's a greater difference in a high school
12  between a principal and an assistant than there is in a
13  middle school.
14         In the middle school, there wasn't a lot of
15  difference between the principal and myself. The principal
16  went to meetings, but I was more in charge of the daily
17  operation of the building.
18         I think it differs more from middle school to high
19  school than it does from assistant to principal in a middle
20  school. If you follow me there.
21  Q.  Yes, I do.
22  A.  Yeah, okay. It's different. Each building has
23  its own configuration. And that changes a lot.
24         In a middle/high school, you don't have one
25  athletic team, you have two complete sets of athletic teams.

**Page 31**

1  That -- I'm oversimplifying it, so that you can understand
2  that -- the difference between -- Central High School would
3  have one set of athletic teams, because it's a nine through
4  12 school district -- nine through 12 school.
5          Strong Vincent has a middle/high school. So you
6  had two complete sets of everything. You had two complete
7  sets of curriculum, you had two complete sets of athletic
8  teams. So it was different in that way, because of the
9  configuration of the building. Not like in the middle
10  school, where the administrators worked together because
11  they have one common program.
12  Q.  Okay.
13         (Discussion held off the record.)
14  A.  Go ahead.
15  Q.  I have a question on -- actually, it's Page 1 of
16  the policy, on the introduction part.
17  A.  Okay.
18  Q.  It's the document marked 102. Right at the bottom
19  it says, "Student discipline records will remain a part of
20  the student's permanent files. When the student transfers
21  to this School District, a certified copy of the student's
22  discipline record is requested and obtained from the school
23  entity from which the student is transferring. The same is
24  true when the student transfers out of the Erie School
25  District. This record shall be maintained as part of the

**Page 32**

1  student's permanent discipline record and shall be made
2  available for inspection as required by law."
3          What was the -- tell me -- describe this permanent
4  student discipline record.
5  A.  You realize that that's been changed, because we
6  weren't able to get discipline records -- like I don't think
7  we got -- I don't think you guys were able to secure
8  Rachel's. Because in 2003 -- you can't hold me to the date,
9  because I'm not positive. But I would think in 2003, that
10  summer, after I took early retirement, there was a change in
11  that policy, and discipline records were destroyed or not
12  kept. And I -- I don't want to address it, because I wasn't
13  there.
14         But this is correct in that we would request --
15  when a student would come to enroll -- for example --
16  Q.  I'm not --
17  A.  Go ahead.
18  Q.  I'm more concerned about the student record that
19  Erie maintained and developed. And you're saying that --
20  you understand there was a change in policy in 2003?
21  A.  Correct.
22  Q.  Is that what you're saying?
23  A.  I think. I think that summer something changed.
24  You know, it might have been the next summer. But I'm not
25  positive.

**Page 33**

1  Q.  Well, where were the permanent discipline records
2  kept?
3  A.  When I was there --
4  Q.  When the policy was in effect.
5  A.  -- they were kept -- they were kept with the
6  assistant principal. For example, if a student was in
7  eighth grade, and let's say was going to ninth grade -- this
8  would be a good example. If a student was in eighth grade,
9  their discipline file would have been kept with the eighth
10  grade assistant principal, and then it was transferred the
11  following -- that summer to -- we did boys and girls. We
12  had a woman, Mary Popadak, who was in charge of girls'
13  discipline records, and then Pat Hart was in charge of the
14  boys' discipline records, and they would have those.
15         Now, sometimes if a student is in special
16  education, if we referred the student, let's say, to
17  alternative education, those records are kept down at
18  Special Education, and they are -- if they were referred for
19  some kind of services, like alternative education, their
20  record might be down at Special Education.
21         But we would still have -- the day that -- the
22  behavior sheet -- let's say the Discipline Referral, that
23  record is what I'm speaking of, is a Discipline Referral,
24  would be kept with the assistant principal.
25         Does that answer your question, Mr. Olds?

9 (Pages 30 to 33)

Richard P. v. Erie School District    A000000000ds    April 11, 2005

Page 34

1    Q.   Yes.
2    A.   Okay.
3    Q.   And so that was the practice when you were there.
4    A.   Yes.  Absolutely.  And we -- a lot of times --
5    this is a, you know -- anytime a student would enter -- I
6    have to say this:  Anytime a student would enter, the parent
7    would have to sign a -- and this started, I think, around
8    2000 that there was a new policy or law or something.  You
9    could -- that the student had to sign -- the parent had to
10   sign, has the student ever been expelled from another school
11   district, or just something relating to discipline.  I don't
12   know it verbatim.  But -- you know, and you could request
13   all you want, but you don't always get things from other
14   school districts.
15   Q.   Right.  I understand that.
16   A.   You understand that?  All right.
17   Q.   Some of the protagonists in this case -- did you
18   recall R█████ when you saw her today?
19   A.   Oh, sure.
20   Q.   So you remember Ra███
21   A.   Oh, sure.
22   Q.   And do you recall -- do you recall K█████
23   A.   I -- I recall her.  I don't know if I'd know her
24   now.  I mean, R████ doesn't look all that different.  She's
25   tall, thin, good-looking kid.  I just remember K████ was

Page 35

1    shorter.
2    Q.   Was she petite?  K█████
3    A.   Yeah, I'd say petite.  She wasn't a big kid.  She
4    wasn't a tall seventh grader.
5    Q.   And what about --
6    A.   R████ was a tall middle school kid.
7    Q.   What about C████ B███?  Do you recall him?
8    A.   He was little.
9    Q.   Were you ever involved in any discipline
10   concerning C███ B███
11   A.   Yeah.  C███ was a bad egg.  You know, he was
12   a -- he was a kid that we wanted to go to alternative
13   education, because we felt that that would give him the help
14   he needed.  He just was a bad egg.  We wanted him to go to
15   alt. ed.
16   Q.   How long was he in the school?
17   A.   Hum.  I don't know what grade he was in when this
18   incident happened.  Probably -- seventh or eighth.  I mean,
19   I knew C███ at least one year, maybe -- maybe two.
20   Q.   Was he at Wayne when you were at Wayne?
21   A.   No, hum-um.  I think -- I don't know where he went
22   to elementary school.  See, he wouldn't have gone to
23   Wayne -- that was a middle school.  So he wouldn't --
24   unless --
25   Q.   He was transferred?

Page 36

1    A.   Yeah, or they moved.  Perhaps somebody moved to
2    the other side of town.
3    Q.   And you indicated that there was a desire to send
4    C████ to alternative ed.?
5    A.   Well, once -- yes.  Once a student -- when we --
6    if a student has an accumulation of behavior, discipline
7    referrals, or PASS -- Program for After-School Suspension --
8    we would try to have the student go to alternative
9    education, see if we couldn't get some intervention.
10   Q.   How --
11   A.   Get them straightened out.
12   Q.   Yeah.  How was -- tell me how that decision -- you
13   know, the decision to refer a kid to alternative education,
14   how would it come about?  I mean --
15   A.   Well, it's very clear in the discipline handbook,
16   you just can't -- depending on the offense -- if the
17   offense -- some offenses are serious enough that you can
18   refer a student directly to -- you can refer a student to
19   alternative education without having a prior history, let's
20   say.  Some can be an accumulation of incidences.
21   Q.   On how many occasions do you think you talked
22   about Charles Bibbs with Mrs. Cappabianca?
23       MR. MARNEN:  During that school year, you mean?
24       MR. OLDS:  During that school year.
25   A.   During that school year?  That fall, I wouldn't

Page 37

1    have any idea.  I talked to her every single day at -- at
2    lunchtime, I met with her prior to school very briefly.
3    Usually, I would touch base with her in the morning.  But I
4    would talk with Linda a lot after school, because she was --
5    she and one of the other -- well, the assistants were in
6    charge of the program for after-school suspension.  So we
7    talked about a lot of kids.  I wouldn't have any idea how
8    many times I talked about a particular kid.
9    Q.   Okay.
10   A.   But a lot.  I mean, we talked every single day.
11   Especially after school, after 3:30, after students were
12   gone.  She was there until 6:30 for the PASS program.  I was
13   there till 9:00 or -- 9:00 at midnight, so.
14       That's all we talked about, were kids.  That's all
15   we talked about, was programming.
16   Q.   Was C████ B███ expelled, to your knowledge?
17   A.   No.  He was not expelled.
18   Q.   Was he ever disciplined for conduct arising out
19   of -- for conduct -- his conduct relative to R████ P███
20   and K████ L███
21   A.   Well, through the --
22       MR. MARNEN:  Do you mean the sexual assault?
23       MR. OLDS:  Right, the sexual assault, yes.
24   A.   What is the question again?
25   Q.   Was he disciplined?

10 (Pages 34 to 37)

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2

Richard P. v. Erie School District        A000300 3750ds        April 11, 2005

---

Page 38

1   A.  That incident did not happen on school property.
2   Q.  Okay.
3   A.  Could I --
4   Q.  Go ahead.
5   A.  Let me just finish.  That incident did not happen
6   on school property.  So, unfortunately, none of it falls
7   under the -- under the Discipline Code.  You know.  That
8   incident happened -- we're talking about the incident on the
9   19th of December, are we not?
10  Q.  Right.  And there was another incident on
11  January 7th.
12  A.  Yeah, we -- we were not made aware of that
13  incident until later in that week, and that's when the whole
14  thing kind of started to piece together, and we were able to
15  talk to all the parents and talk to the girls and talk to
16  Mr. Bibbs.
17      When I met with -- I remember when I met with
18  Mr. B███ relative to that incident -- and, trust me, I was
19  looking for something that he did on school property.  I was
20  looking for something in that whole mess.  But none of that
21  happened on school property, and we weren't aware of it.
22      But when I talked to the father -- and that was
23  the first time I had ever talked to the father.  We had
24  always talked with the mother prior to that.  We talked to
25  the father, and I let him know in no uncertain terms that if

---

Page 39

1   I could pursue criminal charges, they were going to be done,
2   and that we had the police involved in the -- in the
3   incident that happened over in the Laundromat.
4       And that father -- we didn't even talk about the
5   AEP thing, because we had talked to his mother about that
6   and couldn't get her to go for it.  But the reality was, the
7   father never brought that kid back to school.  And I had to
8   go hunting for him to know where he was.
9   Q.  You didn't know where he was, right?
10  A.  Well, we -- I finally got it down to he had tried
11  to enroll in Faith Assembly of God up on Oliver Road.  But
12  we couldn't get anyone at the house.  We sent the homeschool
13  visitor out.  I remember it was -- you know, because he is
14  still -- he is still on our books.  He was still our
15  student.  We still had -- he was a special education
16  student, he was still our student, he was on our books, and
17  we had a heck of a time.  I sent the homeschool visitor to
18  try to find him.  We had a heck of a time trying to even
19  keep track of him.  I didn't want to -- you know, you just
20  can't lose track of a kid.
21  Q.  Okay.  Would you go to Page 12 of this Exhibit C.
22  A.  (Witness complies.)  Yep.
23  Q.  At the top of that, it says Student Behavior, and
24  I'm going to read.  "All provisions regarding student
25  behavior are applicable to students while on school

---

Page 40

1   property, at any school-sponsored activity, including
2   graduation, dances, field trips, et cetera, on any public
3   conveyance providing transportation to a school or
4   school-sponsored activity, and for students going to and
5   returning from school," end quote.
6       Now, he was in PASS and going home on the incident
7   where he assaulted K████ and R████, wasn't he?
8   A.  Correct.
9   Q.  So this student behavior could have been
10  interpreted to cover that activity; is that right?
11  A.  Well, there was more than one incident here.
12  Q.  Right.
13  A.  Apparently two.  And --
14  Q.  In fact, wasn't he going home from PASS on both of
15  those incidents?  He was going home -- he had just been
16  released from PASS when those incidents occurred.  I mean,
17  is that your understanding of what happened?
18  A.  Well, generally, yes.  But when I -- because it
19  was off school property -- it was off school property.  And
20  they had wandered -- I'm talking about the 19th of December;
21  the one that we -- when we finally found out about it,
22  around, oh, the 9th of January, we started talking to the
23  kids about this incident that had happened in December.
24      These students hung around a long time -- in fact,
25  I don't know if one student had even gone home and come back

---

Page 41

1   or if they -- I don't know if all the kids had come from
2   PASS.  But a couple kids were waiting for rides.  But they
3   were in the Laundromat.
4   Q.  Right.
5   A.  They were in the Laundromat, they were -- had
6   walked over on school property, they had walked down to 7th
7   Street.  Quite a bit of time had passed.  Because they --
8   when we talked to the students, they weren't just in one
9   place on their way home.  They were actually down on 7th
10  Street --
11  Q.  Okay.  But I'm talking about C███ B███.  Is it
12  your understanding that he was released from PASS and he
13  went across the street and assaulted K████ and R█?
14  A.  Correct.
15  Q.  Okay.  And I think you indicated in your testimony
16  that you were looking for a way to expel him.  Is that
17  right?  Or discipline him?
18  A.  Well, I was interested in -- I don't want any bad
19  eggs in my school.  Why would I want to keep somebody in the
20  building that might interfere with the education of your --
21  of your child.
22  Q.  Okay.
23  A.  I'm not going to try to keep somebody in that
24  building.
25  Q.  Okay.  But you did not bring -- institute

---

11 (Pages 38 to 41)

3a9d95d8-06da-4388-a818-43709425cad2

Richard P. v. Erie School District          A000░░░Woods          April 11, 2005

**Page 42**

1  discipline proceedings against C▓▓ B▓▓ for either one
2  of the two incidents that involved R▓▓ or the incident
3  that involved K▓▓
4      A.  That's correct.  But I wasn't -- when I -- when we
5  became aware of the situation, when things started to --
6  when Rachel had her -- R▓▓ had an outburst in class, and
7  that's how it started.  R▓▓ talked to us -- talked to me
8  and talked to Mrs. Cap, and we were able to finally start
9  realizing that there was something that had gone on over at
10 the Laundromat.  And then we found out that B▓▓ C▓▓
11 was coercing, was forceful.  Another bad egg.  And that
12 A▓▓ K▓▓ was involved.
13     We realized it was what I thought was -- you know,
14 I'm an armchair -- I'm not a policeman.  I'm just an
15 armchair observer -- of criminal nature.  And we got enough
16 credible evidence, we called the police in, talked to the
17 parents, called them -- got the parents in first, talked to
18 the kids, talked to the parents, and then -- and by that
19 Friday morning, I had the police in my office.
20     I had called downtown on -- after I talked to
21 R▓▓ and realized that we had this situation on our
22 hands.  And I was interested in finding out something --
23 like I just stated, I was interested in finding something
24 that happened on school property, because that would have
25 given us all the ammo we needed to get some of these

**Page 43**

1  eggheads out.
2      But when you talk -- when I talked to the guys
3  downtown, we had -- because it was that far off school
4  property, and because of the time lapse, it -- they said,
5  it will -- you will have to wait until the police does their
6  investigation before we can see if there's any grounds for
7  us to press criminal charges on B▓▓ or K▓▓ or B▓▓
8  as far as the school goes.
9      Q.  Who did you talk to downtown?
10     A.  I talked to Dr. John Linden, the assistant
11 superintendent, and to Frank Scozzie, the assistant to the
12 superintendent.  I may have also talked to Dr. Bob Oliver.
13 I don't recall if he was in that position yet or not.  Those
14 were -- those were the standard two calls I made, to the
15 assistant superintendent and the assistant to the
16 superintendent.  Mr. Scozzie is also in charge of special
17 education, so.
18     Q.  Did you take notes, make notes when you had these
19 conversations or when you met with students?
20     A.  I took notes, but they would not have been kept,
21 because they were -- any -- any recording that we --
22 anything that I -- we have students write stuff down with a
23 witness there and sign it.  But anything that I have, I make
24 sure that that is translated into a -- into the police
25 report.  I don't keep separate anecdotal notes.  What I

**Page 44**

1  have, I want as a matter of record.
2      And so when the police come, we give them the
3  information, and -- because it was not -- it was not
4  something that happened on school property, and it wasn't
5  something that happened under my jurisdiction.
6      Q.  Okay.
7      A.  I couldn't pursue it to alternative education, I
8  couldn't pursue the criminal charges.
9      Q.  And who told you that?  Who told you, you couldn't
10 pursue it?
11     A.  Either -- either Mr. Scozzie or Dr. Linden.  They
12 said, wait until they have finished their report,
13 because it didn't take place on school property.
14     Q.  Did you tell them that, look, it happened when the
15 students were going to and returning from school and, that,
16 therefore, it's within the jurisdiction of the discipline
17 rules?
18     A.  I don't think at that time it was viewed as they
19 were returning -- going to or from school.  It happened
20 after PASS.  But I don't think all the students were -- I
21 think Rachel lived right down the street.
22     Q.  But she wasn't -- she wasn't the assailant.
23     A.  Correct.
24     Q.  Rachel wasn't the assailant, was she?
25     A.  No.

**Page 45**

1      Q.  Would there be any reason to discipline Rachel?
2      A.  No.  Not at all.
3      Q.  You mentioned B▓▓ C▓▓ as one of the --
4      A.  Yeah.
5      Q.  -- protagonists here.  Was she a bad egg also?
6      A.  She was a bad egg.  She was a student that needed
7  disciplined.
8      Q.  Was she ever expelled as a result of this incident
9  or anything pertaining to R▓▓
10     A.  No.
11     Q.  Was she ever disciplined for anything pertaining
12 to Rachel?
13     A.  You're talking about school discipline here,
14 right?
15     Q.  School discipline.
16     A.  No.  All -- all criminal charges were handled
17 through -- and we supported absolutely every way we could.
18 But as soon as we knew about it, I think that -- that is all
19 I did for three days, I'm telling you.  That is all I did.
20 We learned about it when R▓▓ blew up in Miss Scully's
21 room and told us what had happened.  That is all I did for
22 three days; was try to piece this together.
23     And by Friday morning -- that happened on
24 Wednesday.  And by Friday morning, we had all the kids'
25 statements, we had all the parents' statements -- except not

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2



Page 46

1  Mrs. L___, because K___ was in the hospital. But we had
2  all of the statements from all of the kids and their
3  parents. Although Mrs. L___ Denise, did come and talk to
4  me. And that was helpful also, because we were able to add
5  that piece to the puzzle.
6      And by Friday morning, we had all the information
7  that we thought was credible, so that we could give it to
8  the police, and we knew the police were going to act right
9  there and right then.
10     Q.   You indicated that you had statements from the
11  students. What form did those statements take?
12     A.   We have students write it down, and then --
13     Q.   And where are the -- have you ever seen those
14  statements since the students wrote them down?
15     A.   The only one -- and, again, I know a lot of the
16  stuff ended up getting pitched after I was gone, because of
17  the change in the discipline thing about keeping notes,
18  those anecdotals. The only one I've seen in the documents
19  that you have -- that Mr. Marnen has from is, I believe,
20  A___ F___
21         THE WITNESS: Is that right?
22     A.   A___ ___ [sic].
23     Q.   So the other students did statements, but they
24  were pitched.
25     A.   Well, they gave -- now, the police --

Page 47

1      Q.   Please. I want to know what they gave to you.
2  The other students actually wrote statements, you're saying?
3      A.   They gave -- and they gave -- all of that stuff
4  went to the police.
5      Q.   Okay.
6      A.   All -- everything went to the police.
7      Q.   Well, if the police don't have it, does that mean
8  that you didn't give it to the police? I mean, we got the
9  statement from A___ F___ from the police.
10     A.   From the police.
11     Q.   Right. So it's your testimony here today that you
12  met with the students for three days, and that each student
13  wrote a statement.
14     A.   My -- every student met with the police. I'm not
15  certain that every student would have written it.
16     Q.   Wait. You met with students for two days.
17     A.   Correct.
18     Q.   And is it your testimony that those students wrote
19  statements?
20     A.   Some of those students wrote statements.
21     Q.   Which students wrote statements?
22     A.   I don't know. I know A___ F___ did.
23     Q.   And where are those statements?
24     A.   Well, you just stated that the police had
25  Antonio's.

Page 48

1      Q.   Right. Where are the others?
2      A.   I don't know. I'm not -- I don't know that every
3  student would have written a statement. We would have had
4  the information, we would have had the parent in and gone
5  over the information with the parent. And I know that all
6  information -- we repeated the whole scenario again; the
7  conversation with the police and the student there, and
8  sometimes the parent was there talking with the policeman at
9  the same time.
10     Q.   Now, did you make notes as the students talked?
11     A.   Probably. I generally take notes while a student
12  talks. But I don't do the kind of documenting you're doing.
13     Q.   Right.
14     A.   I'm more interested in ascertaining information
15  and knowing what to do with that information.
16     Q.   Do you know where those notes are?
17     A.   My notes would be gone.
18     Q.   And who destroyed your notes?
19     A.   I would have destroyed them myself.
20     Q.   When?
21     A.   After the police were there. I wouldn't keep that
22  information. Now --
23     Q.   Go ahead.
24     A.   Linda Cap had her own set of notes. I mean, you
25  know, but that's -- you know.

Page 49

1      Q.   You say that this incident broke when R___ had
2  an outburst in Miss Scully's class?
3      A.   Right.
4      Q.   Now, R___ had not presented any behavioral
5  problems before that time; is that correct?
6      A.   Oh, she was hardheaded. She -- R___ sometimes
7  had her own -- she would -- not hardheaded. Maybe that's
8  too -- occasionally obstinate. How is that? That's not
9  hardheaded. Occasionally obstinate would be a better choice
10  of --
11     Q.   She couldn't be compared to C___ B___, could
12  she, in terms of behavioral problems?
13     A.   No. No.
14     Q.   Or B___ C___
15     A.   No. No. They were -- they were discipline
16  problems.
17     Q.   What about K___? Did she present behavioral
18  problems?
19     A.   No. K___ and R___ were pretty typical kids.
20  They were -- few problems here and there, but nothing --
21     Q.   Let's mark this as Exhibit 2. I mean, this will
22  be Exhibit 1. I'm sorry.
23         (Woods Deposition Exhibit 1
24          marked for identification.)
25     Q.   Have you ever seen Exhibit 1 before?

13 (Pages 46 to 49)

**Page 50**

1    A. I have.

2    Q. And who prepared it?

3    A. Linda -- this is Linda Cap did this. And I had

4    her prepare this so that we had something in just brief --

5    something that was as accurate as we could get it, to have

6    it ready for the police. And I probably sent this downtown.

7    Q. Okay.

8    A. I see it has a fax --

9    MR. MARNEN: Does "downtown" mean police or to the

10    administration?

11    A. Excuse me. Downtown means the downtown

12    administration. It would be Dr. Linden and Dr. Scozzie.

13    Q. And that number up there, 871-6374 --

14    A. We have changed phone numbers. We're now an 874

15    exchange. I don't know. It could be.

16    Q. Okay. That's okay.

17    A. Although it would have been before that date.

18    Q. So Linda Cappabianca prepared this.

19    A. I'm pretty sure. Um-hum. Yep.

20    Q. Well, I'd like to draw your attention to the third

21    paragraph on that first page. "R[███] is now being taunted

22    by B[███] at school. B[███] is bothering her to perform the

23    acts on other male students. On Monday, 1/7/02, there was a

24    second incident. R[███] was at the water fountain. B[███]

25    was in the hall asking R[███] to give head to a male student

**Page 51**

1    that walked by. R[███] refused. According to R[███], B[███]

2    had shoved her down into the stairwell and pushed her to

3    follow the male student. R[███] walked down the stairs in

4    the same direction as the male student, but nothing had

5    happened."

6    That information came to your attention during the

7    course of this investigation?

8    A. Right. When -- after R[███] had come down from

9    Miss Scully's room and we talked about -- well, a lot of

10    things kind of unraveled there. Both of these incidences,

11    the one on the 19th of December and this one, came out in

12    that conversation. This -- we didn't know about this before

13    that. We didn't know about it on the 7th, I can tell you.

14    Q. Now, this incident that happened on Monday,

15    March 7th [sic] that I have just read about, that did happen

16    on school property, right?

17    A. Yes.

18    Q. And that is -- you wouldn't dispute that that's

19    sexual harassment, would you?

20    A. What page is sexual harassment on here? (Brief

21    pause.) That is sexual harassment.

22    Q. Okay.

23    A. Absolutely.

24    Q. But B[███] wasn't disciplined -- or there was no

25    initiation of anything under the discipline policy against

**Page 52**

1    B[███] C[███] for that incident, was there?

2    A. We didn't know about this until the 9th, and then

3    we called the police.

4    Q. Well, after the 9th, did you institute any

5    disciplinary action against B[███] C[███] for that

6    incident?

7    A. I don't recall.

8    Q. If you did institute some kind of discipline

9    action against B[███] C[███] for that incident, would it

10    appear -- would you assume that it would appear in her

11    discipline file -- in her file?

12    A. Well, it might not have, because we had given the

13    police a lot of information about the -- this incident up

14    here (indicating). And the charges actually came down, and

15    we knew that there were going to be very, very large assault

16    charges, and, you know, we knew that this girl was going to

17    be sent away. I mean, there was --

18    Q. You didn't know that on January 9th, did you?

19    A. Boy. I couldn't see how it could not -- no. The

20    charges hadn't been filed. I don't know when they filed

21    charges. I mean, we asked them to file charges.

22    Q. B[███] C[███] stayed in school after that

23    incident. Isn't that right?

24    A. She was in school --

25    Q. She was not suspended, she was not expelled, there

**Page 53**

1    were no expulsion proceedings commenced against her. Is

2    that right?

3    A. Not at that time.

4    Q. Okay.

5    A. But there were criminal charges --

6    Q. After --

7    A. There were criminal charges.

8    Q. I want to know what the School District did. I

9    don't want to know what the Erie Police did.

10    A. Right.

11    Q. I want to know --

12    A. Well, they may have filed charges. I don't

13    think --

14    Q. Who is "they"?

15    A. The police department.

16    Q. Okay. What I want to know is what the School

17    District did. And --

18    A. Go ahead.

19    Q. You didn't -- you didn't discipline B[███]

20    C[███] did you?

21    A. I don't -- I don't know. I don't remember.

22    Q. Well --

23    A. This would be --

24    Q. Go ahead.

25    A. I don't know if I can say this. I would have to

Richard P. v. Erie School District    A000  xxxxxds    April 11, 2005

Page 54

1  look at this and decide if this is harassment or sexual
2  harassment. That's what I was looking for. Because there's
3  a difference between -- you know, there is a huge difference
4  between the two.
5      Q.  Right. Well, trying to get someone to perform
6  oral sex in the school, do you think that might be sexual
7  harassment?
8      A.  Well, that's a sexual nature. Absolutely. It's
9  sexually inappropriate behavior, it's harassment.
10 Absolutely.
11     Q.  Now, what about the student who --
12     A.  There were charges -- there were charges -- I am
13 99 percent sure there were charges filed in this, but not
14 with the School District. I see what you're asking. Go
15 ahead.
16     Q.  What about the male student who walked by? Was
17 that -- did you ever question that student?
18     A.  No. This information came to us by R█████ And
19 there -- I -- and this -- this, obviously, was taking -- the
20 19th was taking precedent, because we knew there were
21 some -- there were assaults. And we weren't able to
22 ascertain who those students were. There were a couple of
23 students. And nobody seemed to know -- have names, or we
24 would have had names in here.
25     Q.  Okay.

Page 55

1      A.  Because we had lot of names in here, and that's --
2      Q.  Okay. Now, you indicated that R█████ had this
3  outburst in Miss Scully's class. And then did she meet with
4  you and Miss Cappabianca, or did she meet with
5  Mrs. Cappabianca first?
6      A.  She went -- Mrs. Scully's room is right across the
7  hall from Miss Cap's room. And Rachel went over there,
8  talked to Miss Cap, then Miss Cap right away brought her
9  down to me.
10     Q.  Okay. Now, did Miss Cap tell you that she had
11 actually learned about the sexual activity before Christmas?
12     A.  Pardon me?
13     Q.  Did Miss Cap tell you -- Miss Cappabianca tell you
14 that she had learned about the sexual activity involving
15 K█████ L█████ before Christmas?
16         MR. MARNEN: About the assault, you mean?
17         MR. OLDS: About the sexual activity, yes.
18     A.  On --
19         MR. MARNEN: Well, there's a difference.
20         THE WITNESS: Yeah.
21         MR. MARNEN: Are you saying sexual activity
22 generally, or the assault?
23         MR. OLDS: Well, we'll break it down.
24     Q.  Did she tell you that she learned about the
25 assault before Christmas?

Page 56

1      A.  We did not know about that assault before
2  Christmas.
3      Q.  Did she tell you that she learned that --
4      A.  No.
5      Q.  -- she had information that K█████ L█████ was
6  engaged -- involved in some kind of sexual activity before
7  Christmas?
8      A.  A couple days before it was -- let's see. The
9  last day of school, then, was Friday the 21st. So back up
10 one day. We had found out -- we -- this incident allegedly
11 happened on the 19th. All right. We found that out in
12 January.
13         On the 20th, after school, I walked out into the
14 main hallway and saw Mrs. Cap talking -- or Miss Cap talking
15 to K█████. And I was on my way to do something else,
16 and -- and when I came back to my office, she said, I want
17 to talk to you about -- you know, and we always got
18 together, every day after school at some point before she
19 went home for the day, I spent time with each of the three
20 assistant principals.
21         And she says -- and so she went down through a
22 list of things that we had to cover. And she said that she
23 had overheard some -- there was some hall talk, we call
24 it -- you know, it was hall talk. She overheard some kids
25 in the hall talking about Kristina and Charles and of them

Page 57

1  being engaged in some kind of sexual activity.
2      I said, well, who have you talked to. She said,
3  well, I talked to K█████ and she says -- and she's gone
4  down to PASS to talk to C█████ and Q█████ said, well, she
5  likes me; that's why she's saying those things. Meaning,
6  K█████ likes me, that's why she's saying those things. I
7  said -- you know, we discussed if we should keep our ear to
8  the ground, if it was credible, and she said, well, let's
9  wait and see.
10     Well, C█████ wasn't even in school the next day.
11 That was the day before their Christmas vacation; the kids'
12 Christmas vacation. And that was about all we had -- we
13 didn't hear anything else. That would be something that I
14 would have said to her; just keep your ear to the ground and
15 see if you think there's anything else to it. And naturally
16 we would pursue it if we thought there was something to
17 pursue.
18     We did find out, though, when R█████ left
19 Miss Scully's room and started talking to Miss Cap and then
20 she came down and talked to me -- and she was very
21 forthright in -- in telling us about these couple of
22 incidences, and that's what got the ball rolling.
23         (Discussion held off the record.)
24         (Recess held from 12:01 p.m. till 12:07 p.m.)
25     Q.  So I want to get back to this conversation before

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2

Richard P. v. Erie School District          A0000009765          April 11, 2005

---

**Page 58**

1  the Christmas break. I think you indicated that Miss --
2  sometimes when we say Cap, Miss Cap, we're talking about
3  Mrs. Cappabianca, right?
4      A.  Yes.
5      Q.  Linda Cappabianca.
6      A.  Right.
7      Q.  I think you said that she came to you and said
8  that she heard hall talk. And that -- about K██████ and
9  C████ B████. Is that right?
10     A.  Um-hum.
11     Q.  And that the hall talk centered on the fact that
12  there was some sexual activity between the two of them. Is
13  that right?
14     A.  Yeah.
15     Q.  Okay. And --
16     A.  That's our -- that was what we ascertained from
17  what she heard, yeah.
18     Q.  Okay. And then she had a conversation with
19  K██████ Is that right?
20     A.  Yeah. I saw her talking to K██████ in the hall
21  after -- I think it was right after school, because I was
22  going down the hall.
23     Q.  And, in fact, is it true that Linda Cappabianca
24  told you that K██████ said there had been sexual contact
25  between her and C████ B████?

---

**Page 59**

1      A.  What Linda told me was -- what Mrs. -- Miss Cap
2  told me was that she had overheard what she said she
3  was talking to K██████ after school, and said, is this true
4  or something, and K██████ said yes. And Cap normally then
5  would, like, call the mother and inform me, and we would try
6  to talk to the other kid and see if we could -- you know.
7  But, again, they are middle school kids, and so you try to
8  listen with a discriminating ear.
9      Q.  Now, you indicated -- you made a statement in
10  there that -- you attributed a statement to C████ B████
11  saying C████ said something to the effect that she's just
12  saying that because she likes him. Is that right?
13     A.  That -- I didn't ask that. I think -- because I
14  said to Cap, go talk to C██████ and she -- or she had
15  talked to C██████
16     Q.  Okay.
17     A.  And then she reported back to me and said, well --
18     Q.  So essentially --
19     A.  Because I think he was in PASS too or something.
20     Q.  K██████ said something happened, and C██████
21  denied anything happened. Is that what you -- came from
22  that?
23     A.  Yeah.
24     Q.  Now, did you -- you indicated that C██████ was a
25  bad egg. Did you trust him?

---

**Page 60**

1      A.  (No response.)
2      Q.  Was he honest?
3      A.  Yeah. I -- he was the kind of kid that sometimes
4  he told the truth and sometimes he didn't. Like a lot of
5  kids, sometimes -- generally they tell the truth and
6  sometimes they don't tell the truth.
7          C██████ was the kind of kid that you always -- he
8  had a -- he had a discipline record. He would -- he would,
9  you know, talk out of turn in class, and he would -- I mean,
10  you always took everything --
11     Q.  We know that the discipline record involved theft,
12  right?
13     A.  At school?
14     Q.  Stealing from teachers? Stealing from teachers?
15     A.  I think he took some stuff off a teacher's desk or
16  something, yeah.
17     Q.  Had you spent much time with C██████
18     A.  Relative to other kids?
19     Q.  Yeah. In the sense that had you had him in your
20  office, trying to talk to him, trying to deal with him,
21  trying to change his behavior? Had that problem come up to
22  your office?
23     A.  I -- I was in the meeting when we were trying to
24  have him admitted to alternative education. I was in the
25  meeting with his mother and Charlise Moore, who was the

---

**Page 61**

1  supervisor of special education. I was aware of -- I had
2  talked to Charles, I'm sure.
3          Miss Cap was in charge of the seventh and eighth
4  graders, and I had two other assistants that each had half
5  of the high school. And Miss Cap was very capable of taking
6  care of -- of the number of kids that she had. If ever she
7  needed help, she would ask.
8          But I -- I probably talked to C██████ as well as
9  other students. I mean, I -- but my position in that
10  school, as I have stated, was -- wasn't such that I could do
11  discipline that I was accustomed to doing when I was
12  assistant principal. I mean, I certainly knew how to do all
13  that, but.
14          You know, there's 12 hours in every working day,
15  or 15, and you just don't -- but I knew C██████ And
16  C██████ could be charming. C██████ was a very, very social
17  kid. That was probably 90 percent of his problem, as a
18  seventh grader. Or eighth grader. He was just a -- a
19  middle school kid. He was just very social. He was very
20  social.
21     Q.  Now, do you know whether Miss Cappabianca talked
22  to B████ C██████ before Christmas about what had happened
23  the night on December 19th?
24     A.  No. We didn't -- we weren't aware of that
25  incident until after Christmas. We weren't aware of that

---

16 (Pages 58 to 61)

Ferguson & Holdnack Reporting, Inc.

Page 62

1  incident until school was in for a few days. After the New
2  Year.
3     Q.  Now, describe K░░░░ in terms of -- you recall
4  K░░░
5     A.  Yeah.
6     Q.  Describe --
7     A.  I'm not sure I'd recognize her if she walked in,
8  though. She was pretty -- she was a little -- she was kind
9  of a --
10    Q.  She's changed a little since then.
11    A.  Yeah, she's changed. She would have had to have
12  changed, because she's an adolescent. Grows a lot.
13    Q.  Describe her personality and her characteristics
14  as you recall them.
15    A.  Nice, sweet kid.
16    Q.  Do you know -- she was a special ed. student; is
17  that right?
18    A.  Yes. These were all special education students.
19    Q.  Did K░░░ have -- do you recall what specific
20  special ed. -- what specific problems she had that resulted
21  in her being in special ed.?
22    A.  I think she had -- was in the learning disabled
23  program. Learning support.
24    Q.  And do you recall what her learning disability
25  was?

Page 63

1     A.  No.
2     Q.  Do you recall in terms of her ability to express
3  herself, whether she could?
4     A.  Oh, yes. She was -- she was just a typical kid.
5     Q.  Now, I think that you indicated that you had
6  received lots of training on sexual harassment. Is that
7  right?
8     A.  We -- right.
9     Q.  Did that training -- did you ever learn whether
10  children who have been victimized have problems talking
11  about it?
12    A.  I -- that's -- I know that. Not from my training.
13  I know that as just a -- I also have a Master's in
14  counseling. I mean, I -- that's correct. Absolutely.
15    Q.  Now, after you talked to Miss Cappabianca about
16  this conversation she had before Christmas with K░░░
17  you said that you guys decided to wait and see what else
18  happened? Is that right?
19    A.  Well, her -- her standard practice would have been
20  to contact the parent -- I mean, like we talked about the
21  kids at Wayne, or any middle school kid. You try to keep
22  parents informed, especially those who are young kids.
23  And -- well, even high school kids. But there -- anything
24  of that nature.
25       But at that point she would have -- I would not

Page 64

1  have. She would have contacted -- maybe contacted the
2  parent. I know that she was in -- Mrs. L░░░ was in school a
3  lot. I remember seeing Mrs. L░░░ off and on at school. And
4  I know that she -- Miss Cap had conversations with her, as
5  she did with many parents. I mean, I've had probably
6  conversations with Mr. P░░░
7       I mean, we just had -- it wasn't a really big
8  class, and so we were in contact with parents a lot. Like I
9  said, it's really important that those middle school kids
10  are off to a good start, because they are going to be there
11  six years hopefully and -- and going to graduate.
12    Q.  But you don't know that she did talk to
13  Miss L░░░
14    A.  I wouldn't know -- I wouldn't have been -- I
15  wouldn't know that. If she talked to her that day or --
16    Q.  Now, you indicated that you remember talking to
17  Miss L░░░ Was it about this incident? The assault?
18    A.  Actually, Denise came in --
19       THE WITNESS:  And you correct me if I'm wrong.
20       Your sister came with you to school. I'm sorry,
21       she can't -- I'm sorry. I'm sorry. I don't know
22       the rules here, Denise.
23    Q.  But anyway --
24    A.  Yeah. On the 7th, when this unfolded, we talked
25  with as many students as we knew. And you've got a good

Page 65

1  list here.
2     Q.  Excuse me, on the 7th or on the 9th?
3     A.  On the 9th. Excuse me.
4     Q.  On the 9th.
5     A.  Regarding the incident on the 19th and then the
6  incident on the 7th. But mostly it was about the 19th.
7  This is the one that we were focusing on. We talked to as
8  many students as we could.
9       And Mrs. L░░░ had called earlier in that week to
10  request work, I know, for K░░░ Because we have a form
11  that we fill out when somebody is requesting work. And she
12  called to tell us that K░░░ was in Millcreek. And so
13  they had requested work. And we also have to have that
14  information for attendance purposes. So that's why I would
15  know that there was work being requested, because we would
16  have to have it for attendance purposes. And so that we
17  could mark the student present, but in a different setting.
18       What was the question?
19    Q.  Well, she came -- you recall an encounter or
20  meeting with her.
21    A.  Oh, Mrs. L░░░ Mrs. L░░░ came in on -- it was
22  either late on the 9th or it was the 10th. I kind of think
23  it was the 10th, because we talked to R░░░ and a lot of
24  students. I mean, I had students in and out of my office
25  for just about two days. And I know in the middle of that

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2

Richard P. v. Erie School District    A000000377    April 11, 2005
Deposition of ███ Woods

**Page 66**

1  somewhere, Mrs. L██ came with her -- I believe it was with
2  her sister. Because I had not met her. And then informed
3  us -- I guess K██ had talked to her at the hospital.
4  And so we got that important piece of information.
5       And at that time I told her that the -- that our
6  intent was to pursue criminal charges, but we couldn't do it
7  until we had all -- the information from all the kids and we
8  had talked to the parents and felt that we were -- I knew we
9  were going to do it, but I felt we were going to do it
10 Friday.
11      My goal was to get everything -- when something
12 unfolds on a Wednesday, and you have this kind of incident,
13 you want to get to Friday just as quick as you can with this
14 information on Friday morning so you have the police
15 involved. You don't want Friday to come and go and not have
16 done everything, absolutely everything you could. And you
17 want to do it quickly so that you didn't have all these kids
18 yapping to each other about changing their stories or
19 something.
20      I mean, we had kids in there, I had every single
21 person at my disposal working on this so that Friday
22 morning -- my goal was Friday morning to have the police at
23 my desk. And I remember calling the police on Thursday and
24 setting up a time for them to come Friday morning. And we
25 had all the information that we felt we had -- we had enough

**Page 67**

1  information that Becky could be charged, that C██ could
2  be charged, and these guys would be charged.
3       That is not our call, obviously. That is their
4  call. They do the charging, not us. But we felt we had
5  enough information that we could see them on Friday morning.
6  Denise was helpful. Every parent that came in was extremely
7  helpful.
8       Q.  Well, and so what do you recall actually -- what
9  physical information did you have for the police on Friday
10 morning?
11      A.  We had any of the reports from -- that was written
12 from the kids. I'm sure we had this from Cap (indicating).
13 We had every kid talk to the police. Some kids -- I think
14 probably the reason you have A██ F██ is we probably
15 wrote that for him. We -- and the police talked to -- I
16 think Mr. P██ talked to the police at the police
17 station. And every other parent talked to the police at
18 school, I think. And I can't speak for Mrs. L██. I don't
19 remember.
20      Q.  Okay. How was it determined that this incident
21 happened on December 19th? Where did that date come from?
22      A.  Came from R██.
23      Q.  And what did R██ say?
24      A.  She explained the second paragraph to us.
25      Q.  Well, but how did she -- I mean, R██ was a

**Page 68**

1  12-year-old girl. How did -- did she say December 19th, or,
2  I mean --
3       A.  Well, we got the date -- and it was -- the last
4  day of school before the Christmas break was the 21st. And
5  I can tell you that particular day, we have -- we don't --
6  it's not a regular/regular day of school. We have classes,
7  but then we have activities during that day. It's a very
8  lower-than-usual attendance day. And you would have more
9  kids absent that day. But we had activities that day.
10      And so I know the day that -- that Miss Cap
11 talked -- that's how we -- how I determined -- well, we
12 knew -- she told us it was the 19th. And we got back to
13 that date. There were things -- that was an easy time to
14 determine because of the activities we had. We knew the
15 20th -- the day before Christmas [sic] we had activities
16 that Rachel --
17      Q.  Well, you remember -- you indicated -- you were
18 starting to say that you remember when you had the
19 conversation with K██. Is that what you were going to
20 say?
21      A.  Well, that was -- that was how we came upon what
22 that date was. Because it was before the date -- the last
23 day before the vacation. And when we talked to R██
24 R██el gave us the date the 19th. That was -- we couldn't
25 manufacture something like that, because we didn't know what

**Page 69**

1  happened.
2       Q.  Well, I understand that, but.
3       A.  All right.
4       Q.  But I guess --
5       A.  Go ahead. Maybe I'm missing the question here.
6       Q.  No, you're not. We're just trying to work through
7  this.
8       A.  All right.
9       Q.  You're not missing the question.
10      A.  All right.
11      Q.  Don't worry about that. You said, R██ when
12 did it happen, and she said December 19th?
13      A.  Yes. We got that information from R██
14      Q.  So she knew the date from the top of her head?
15      A.  Some -- well, I don't know if she knew it from the
16 top of her head, but that's -- that's the date we got from
17 her. And then that's how we started the investigation.
18 Because we had something to -- we had -- we had something to
19 go on.
20      MR. MARNEN: Let me help out here.
21      THE WITNESS: All right.
22      MR. MARNEN: Forgive me for intruding on your
23 deposition.
24      MR. OLDS: Go ahead.
25      THE WITNESS: Sorry.

18 (Pages 66 to 69)

Ferguson & Holdnack Reporting, Inc.

Page 70

1    MR. MARNEN: I think he's trying to ask you
2    whether she gave you December 19th in a flat-out
3    statement, or whether you had to reconstruct it
4    from things she was telling you.
5    Q.  In other words, did she say this happened
6    December 19th, or did you infer from other events that it
7    must have been December 19th?
8    A.  Well, I feel very confident that this is the date,
9    no matter if we came to it by the fact that it was one
10   day -- or two days before that last Friday of events --
11   MR. MARNEN: You're not answering his question.
12   THE WITNESS: All right.
13   Q.  Yeah, I --
14   A.  I don't know.
15   Q.  Well, that's good.  But you're confident of the
16   date, but you don't know how --
17   A.  Yeah, I don't know.
18   Q.  As we sit here today, you don't know how you
19   specifically --
20   A.  I know it wasn't October, and I know it wasn't --
21   you know what I'm saying?
22   Q.  Right.
23   A.  That was -- and that was a date -- I'll answer --
24   I'll answer the question this way:  R▮▮▮ gave us this
25   date, and every other student we talked to confirmed that

Page 71

1    was the date.  When we talked to all of these students, when
2    we talked to -- oh, who was there?  Yessenia we talked to,
3    and Antonio Flemings we talked to.  There were several
4    students we talked to.
5    And the date -- and you have to remember,
6    Mr. Olds, these kids weren't actually that far away from
7    that date.  They had only been back in school a couple of
8    days.  Because school started, what, probably January 2nd
9    that year.  And they hadn't been out of school -- only a
10   couple days.  It isn't as if there were actual weeks had
11   passed.  Weeks had passed in time, calendar, but they had
12   been in school only about five days before that happened.
13   So it wasn't as if there was a -- their point of
14   reference is school days.  Our point of references is a
15   calendar.  But their school -- their reference to something
16   is school days.
17   Q.  Okay.
18   A.  There wasn't anyone that ever disputed that date
19   that we talked to.
20   (Discussion held off the record.)
21   Q.  I'm going to show you a set of exhibits.  And we
22   touched upon this briefly with Miss Cap --
23   A.  Okay.
24   Q.  -- when we started her deposition.  And these are
25   records that come out of C▮▮▮ B▮▮▮ student file.  We'll

Page 72

1    mark that as Exhibit 2 here.
2    MR. OLDS: Although, do you remember what the --
3    do you have what exhibit number it was in Cap's?
4    Because maybe we wouldn't have to mark it again.
5    (Discussion held off the record.)
6    (Woods Deposition Exhibit 2
7    marked for identification.)
8    Q.  Exhibit 2 is a series of documents --
9    A.  Um-hum.
10   Q.  -- concerning the discipline record of C▮▮▮▮▮
11   B▮▮▮
12   A.  Correct.
13   Q.  And do you recall why Miss Cap gathered these
14   documents together?
15   A.  Yeah.  This probably was for the alternative
16   education program.  We were trying to -- right.
17   Q.  And is it fair to say that this is the type of
18   documentation that you would gather in terms of making the
19   decision to refer to the alternative education program?
20   A.  That wouldn't be the only purpose of gathering
21   this.  There -- I see -- very typically if a special
22   education student is having difficulty, we do behavior
23   charts, and we do, you know -- you'll have one for -- you'll
24   have one piece of -- you'll have five pieces of paper for
25   the same day.  That's how you get the volume of these

Page 73

1    things.
2    We did behavior charts.  I see there's a
3    Functional Behavior Plan here.  These are all things that we
4    would do for any student in special education, not for the
5    purposes of AEP.  This would be for the purpose of the
6    student having better behavior and staying on task more and
7    following the rules more and meeting the goals in their IEP
8    more.
9    We would do this for any student who needs to have
10   a behavior checklist.  If a student is -- let's say a
11   student is -- can't find their -- student wanders in the
12   hall and doesn't get to class on time.  We would have a
13   check sheet for them that says that they got to class on
14   time and that they made it to class within the allotted time
15   and so forth.
16   So a behavior chart, if you just count the number
17   of referrals here -- I don't know how many referrals there
18   are.  There's plenty.  But there's a lot of behavior charts
19   in here which are interventions that we would attempt with
20   someone to try to get them on task.
21   Q.  Okay.  Well --
22   A.  This was -- to answer -- if I could just further
23   answer your question, though.  We would accumulate this
24   material, obviously, to show that even despite our best
25   efforts, the student hasn't complied, and that we feel that

19 (Pages 70 to 73)

Richard P. v. Erie School District     A000a00373als     April 11, 2005

---

**Page 74**

1  this student would be better served in the AEP program.
2      Q. Now, what was that program that you were
3  interested in referring █████to?
4      A. Alternative education?
5      Q. Yeah.
6      A. In special education, students can only go for a
7  limited amount of time. There are different guidelines for
8  special education students than there are for regular ed.
9  kids. But it's an alternative program that has an intensive
10  counseling component, to work on what we would determine is
11  their needs.
12      This -- that's why this packet would go to the AEP
13  program. This would go so that the -- the persons working
14  with Charles would be able to work on the different things,
15  like, you know, swearing or, you know, being disruptive.
16      Q. Well, I'm trying to understand. Like the
17  alternative education program would be some program that
18  would be offered by Sarah Reed. Is that right? Or not
19  necessarily?
20      A. Oh, no. Alternative -- Sarah Reed program is a
21  part of the Erie School District -- Sarah Reed offers, as
22  others -- do a lot of other places, offer programming for
23  students as part of the Erie School District.
24      Alternative education -- I'm going to use the term
25  "alternative education". I can see how someone could

---

**Page 75**

1  misconstrue Sarah Reed as alt. ed. Alternative education is
2  part of the Erie -- is -- I think at this time was Perseus
3  House. Boy, I shouldn't say that, because I'm not sure at
4  that time it would have been. But the alternative education
5  program follows the discipline policy, if a student has,
6  like I said, a serious infraction or an accumulation.
7      In █████case, an accumulation of fractions
8  [sic]. Right, it's in the discipline book. Sarah Reed
9  is --
10      Q. Let's stop for a second.
11      A. Go ahead.
12      Q. So let's --
13      A. Go ahead.
14      Q. There's a chart in here --
15      A. There you go. Right.
16      Q. -- in this -- let me see if I can find it. And
17  this would be what would have previously been marked as
18  Exhibit C, I guess, in Denise L███'s deposition. And it's
19  at Page 10.
20      A. Right. I was going to say, it's early in the
21  book.
22      Q. Page 11.
23      A. Yep. There you go.
24      Q. Okay. And in the continuum of consequences, right
25  before expulsion, there's a provision for alternative

---

**Page 76**

1  education. Right?
2      A. Correct.
3      Q. And, now, is that the alternative education
4  program that you were considering for █████ B███
5      A. Yes.
6      Q. So the alternative education program that you were
7  considering for him would have been pursuant to the
8  Discipline Code.
9      A. Correct.
10      Q. Progressive discipline.
11      A. Correct. Because he had gone through after-school
12  detention, Saturday detention, after-school suspension,
13  out -- he wouldn't have done out-of-school -- I don't know
14  if he did out-of-school suspension. But I see he had PASS
15  in here.
16      Q. Now, do you know where that alternative education
17  was provided?
18      A. I'll say Perseus House, but I -- but I won't say
19  that definitively. Because I don't know when Perseus took
20  over the alt. ed. program for the Erie School District. I
21  don't remember.
22      Q. Okay. So alt. ed., when it comes from discipline,
23  stems from discipline --
24      A. Right.
25      Q. -- would be at Perseus House. Before Perseus

---

**Page 77**

1  House, where would it have been provided?
2      A. I was trying to remember. I don't know for middle
3  school kids. I don't know.
4      Q. Was it ever provided at Sarah Reed?
5      A. Sarah Reed offers -- oh, as far as discipline?
6      Q. Yes.
7      A. I don't know. Primarily Sarah Reed, we -- when --
8  students we have that are enrolled in Sarah Reed would be
9  there for not disciplinary reasons. Now, perhaps they do
10  offer -- maybe they've contracted with the District, but I
11  wouldn't -- I don't recall if that's for middle school kids.
12  No, that would be for other programming; emotional support,
13  that kind of thing. Not for discipline.
14      (Discussion held off the record.)
15      A. Sarah Reed may -- maybe they offer it for middle
16  school kids. I'm trying to think.
17      (Discussion held off the record.)
18      Q. Were you -- after the meetings that you had on the
19  9th and 10th with the students, culminating in the referral
20  to the police on the 11th, K██ and R███ were removed
21  from the school building. Do you recall that?
22      A. Yeah, both -- I think both girls went to Sarah
23  Reed. And -- now, that is not for alternative education.
24  Like this is -- alternative education is really kind of a
25  misnomer. Charles went to an alternative education program,

---

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2

Page 78

```
 1   okay, for discipline purposes or something.
 2       Q.  Well, he never went anywhere.
 3       A.  Right.  But -- he was referred.  Excuse me.
 4   When -- I'll take -- I'll take each of the girls separately.
 5       Because K███ was in Millcreek.  When a student
 6   goes to -- to Millcreek, for example, for mental health
 7   issues, it kind of kicks in another whole level of planning
 8   for the student's IEP.  The main goal is to keep -- and I --
 9   the main goal is to write an IEP appropriate for that child.
10   All right?  With the parents' input and consent.
11       When we learned that -- when we learned that
12   K███ was in Millcreek, or any student was in a facility
13   like that, the student assistant person and the special
14   ed. -- someone from downtown, probably special ed.
15   supervisor, would try to determine with the staff, upon the
16   recommendations of the staff of Millcreek and their doctors,
17   where that student would be best served to meet their needs.
18       And so at that point it was determined, apparently
19   by Millcreek -- and we don't send them there.  It doesn't
20   happen that way.  I don't say you're going to go here.  That
21   does not happen.
22       K███ with the input of her doctors and
23   only -- and only with the consent and agreement of the
24   parent, would have -- would a student be sent to -- for
25   example, Sarah Reed has an excellent emotional support
```

Page 79

```
 1   program where a student can receive the services they need
 2   and still get credit and be part of the School District.
 3   It's a program that is contracted by the Erie School
 4   District for those students.  Erie has many programs around
 5   the city for different reasons.  We have charter schools, we
 6   have different contracted things.  So Sarah Reed is just one
 7   of a multitude of those.
 8       Q.  Okay.
 9       A.  Now, R███s dad, when R███ and Mr. P███
10   came in and talked to Mr. Ruhl and myself, he had actually
11   requested she not return, and I certainly could understand
12   that.  I felt terrible about what had happened.  I was
13   furious at B███ and A███ and C███
14       But, anyway, R███ didn't want to return.  And I
15   certainly understood that.  And I had told Mr. P███ that
16   we had put into motion request for any -- you know, any
17   placement for her, if that's what he wanted anyway.  We
18   talked about Sarah Reed.  And he -- he or his wife would
19   have met to change her IEP, and she went to Sarah Reed also.
20       We don't send kids there.  I can't turn to a
21   student and say, I'm sending you somewhere.  It doesn't
22   happen.
23       I was interested in, more than anything, in these
24   two girls, getting some help with this.
25       Q.  Okay.  Well --
```

Page 80

```
 1       A.  I knew that was an option.  I knew that Sarah Reed
 2   was an option for us.  I wanted -- when I called downtown, I
 3   wanted to know how we could help these kids.
 4       Q.  And when you called downtown, you talked to --
 5       A.  I would have talked to Frank Scozzie and Charlise
 6   Moore and Jim Piekanski.  I, in fact, did talk to those
 7   three individuals.  Mr. Piekanski and Charlise Moore are
 8   special ed. supervisors, and --
 9       Q.  How many conversations do you think you had with
10   them over those several days?
11       A.  Well, it was over two days, and I know I probably
12   talked to Frank Scozzie a half a dozen times.  And I talked
13   to -- I know I talked to Mr. Piekanski and Mrs. Moore in
14   person.  And I'm sure I talked to them on the phone.  I
15   would have had to talk to them a couple times.
16       Anytime that you have a special education student,
17   you talk many times to them, because nothing can be done
18   without their consent.  And those -- Mr. Olds, we don't
19   make -- I don't make arrangements with Sarah Reed.  That's
20   not my -- when you talk about the responsibilities of a
21   principal, that is not one of them.
22       Q.  Okay.
23       A.  That is not in my juris., you know.  That is done
24   in concert with someone downtown and with a parental
25   consent.
```

Page 81

```
 1       The IEP, as you know, being an attorney, the IEP
 2   is everything.
 3       Q.  Right.
 4       A.  The NORA, Notification of Recommended Assignment,
 5   is everything.  It is everything.
 6       Q.  So.
 7           (Woods Deposition Exhibits 3 and 4
 8           marked for identification.)
 9       So 739 -- the exhibit would be 4.
10       A.  Okay.
11       Q.  And I'm looking at the Bates stamp --
12       MR. MARNEN:  Exhibit 3 starts with 739.  Exhibit 4
13   with 441.
14       Q.  Now, did you have anything -- well, let me just --
15   let me start this by saying, this is a -- the first page of
16   Exhibit 3 is an IEP revision review.  Is that right?
17       A.  Right.  Of K███?
18       Q.  Right.
19       A.  Yeah.
20       Q.  Bates-stamped 739.
21       A.  17th?  Yeah.  January 17th?
22       Q.  Yes.
23       A.  Um-hum.
24       Q.  And if you go to the document that's Bates-stamped
25   744 in there.
```

21 (Pages 78 to 81)

Page 82

1    A.   (Witness complies.)  Yep.
2    Q.   This is a handwritten statement by Denise L▉
3  saying, "I am requesting that my daughter K▉▉▉ L▉▉ be
4  transferred to the Erie School District's alternative
5  education program.  I waive all rights to a hearing."
6  That's dated 1/17/02.
7    A.   Right.
8    Q.   Do you have any idea what Miss L▉was referring
9  to when she said she wanted her daughter referred to Erie's
10 alternative education program?
11   A.   Yeah.  That would have been the partial program.
12 It wouldn't have been the alternative education program like
13 we were talking about with C▉▉
14   Q.   Well, I mean, you're saying that -- is Miss L▉
15 not knowing what she's writing when she writes alternative
16 education program?
17   A.   No.  Anytime a student -- anytime a parent is
18 requesting a change, there is a statement they copy.
19 And -- or that there's a statement if they agree with it.
20 We give it to them in writing so that they can copy it, in
21 case they don't want to -- they have to write -- in their
22 own handwriting, they must write it.
23   Q.   Okay.
24   A.   And, often, the one that is used for -- this
25 should say like partial hospitalization at Sarah Reed.

Page 83

1  That's the program I assume we're talking about, because
2  that's what the IEP is for.  And -- correct?
3    Q.   Well, we didn't --
4    A.   Do these two go together?
5    Q.   Yeah, they do go together.
6    A.   Mr. Olds, look at me.  This document goes with
7  this document (indicating).
8    Q.   Yes.
9    A.   Right.  That's what she's talking about.  She's
10 talking about the partial hospitalization program.  Not AEP.
11       Let's talk about alternative education using the
12 letters AEP, because that's the one like we're talking about
13 for Charles.  That's called AEP.  Okay?
14   Q.   Okay.
15   A.   An alternate program would be -- and like I said,
16 that's a -- that's a -- earlier, before you even brought
17 this up, that's a poor choice of words.  Because when you
18 talk about partial hospitalization -- when you talk about a
19 kid who breaks their leg -- let's talk about a kid who has a
20 physical disability, who has to go to a more accessible
21 school for three weeks.  A parent would still have to, if
22 it's under Chapter 15 or whatever it's under, the parent
23 still has to agree.  And it's an alternative site.  It's a
24 lousy choice of words.
25   Q.   Okay.

Page 84

1    A.   But for -- if that clears it up.
2    Q.   Okay.
3    A.   That --
4    Q.   And then you indicated that the -- the document in
5  the front --
6    A.   IEP.
7    Q.   -- IEP --
8    A.   Right.
9    Q.   -- then that would be the IEP revision review
10 document.
11   A.   Right.
12   Q.   Is for the partial hospitalization program.
13   A.   Right.
14   Q.   Where do you see that --
15   A.   And that was held at Sarah Reed.
16   Q.   Where do you see that partial hospitalization
17 program?
18   A.   It's stands -- it's called Sarah
19 Reed Children's -- I think it's Center.  SRCC.  Sarah Reed
20 Children's Center.
21   Q.   Okay.
22   A.   And there's a --
23        MR. MARNEN:  You were referring to --
24        THE WITNESS:  I'm sorry.
25        MR. MARNEN:  -- 739?

Page 85

1        THE WITNESS:  I am.  739.
2    A.   If you look at 740 -- no, that's the intake.
3    Q.   Yeah, there might be some others documents.
4    A.   These (indicating) go together.  Right.
5    Q.   Well, but let's look at 742.
6    A.   All right.  Yeah.  SRCC.
7    Q.   Behavior modification program?
8    A.   There is a --
9    Q.   That is just out of context.  Let me read that, so
10 that your question will make sense.  742 is a memo to
11 Scozzie from Audrey Pecoraro.  Says, "K▉▉▉ L▉▉ date of
12 birth 7/5/89, is referred to Sarah Reed behavior
13 modification program, special education tract."
14   A.   Right.
15   Q.   Okay.  Now, is the -- do you know whether the
16 behavior modification program is the partial hospitalization
17 program?
18   A.   I don't know, but I would certainly assume so,
19 because she was referred to partial to get help.
20   Q.   Well, there might be more than one program at
21 Sarah Reed, right?
22   A.   I can't answer to that.
23   Q.   Okay.
24   A.   I'm sure that if you haven't done the deposition
25 with Mrs. Moore yet, you could probably ask her that

22 (Pages 82 to 85)

Page 86

1  question. Or Mr. Scozzie. Scozzie will know that hands
2  down.
3      Q.  We'll ask Mr. Scozzie.
4      A.  Right.
5      Q.  And then the other document, I guess is
6  Bates-stamped --
7          (Discussion held off the record.)
8      Q.  Looking at No. 4, Exhibit No. 4 --
9      A.  Yep.
10     Q.  -- which would be the document Bates-stamped
11  441 --
12     A.  Got it.
13     Q.  -- beginning with 441 -- and these, by the way,
14  are documents that have been provided to us by the Erie
15  School District, I think.
16     A.  Oh, sure. Right.
17     Q.  Now, that document, 441 --
18     A.  Right.
19     Q.  -- should that be accompanied by some other -- I
20  mean, it makes reference to this notice described to your
21  rights and procedures. Do you know whether there would be
22  some other document that would be -- accompany this?
23     A.  I can't answer that question.
24     Q.  Okay.
25     A.  That's -- that was done by the homeschool visitor.

Page 87

1  Again, you should ask that question, Mr. Olds, to
2  Mr. Scozzie. All right? This is his territory, not mine.
3      Q.  Okay.
4      A.  As I stated before, my -- my jurisdiction as a
5  principal is not -- if there is an IEP, I follow that IEP.
6  It's not for me to say where that student goes. This --
7  this is taken care of at the -- by the supervisor's level,
8  not mine.
9      Q.  Okay.
10     A.  There are dozens of programs. If you could look
11  at Page 443, right there --
12     Q.  Right. Yes.
13     A.  Right? You see Mr. Scozzie's name there. It says
14  Sarah Reed -- right.
15     Q.  Referral by Sarah Reed.
16     A.  Someone has to pay the bill. He's the one that
17  has to give approval for that, I would think. If we have a
18  treatment -- if a student is going to receive treatment,
19  someone's got to pay the bill. And he's the one that has to
20  authorize that.
21     Q.  Okay.
22     A.  And the other person's name is Marlene Chrisman,
23  who is a supervisor.
24     Q.  Then if you look at Page 446 of this exhibit, the
25  Bates-stamp 446 --

Page 88

1      A.  Yeah.
2      Q.  -- says that --
3      A.  Let's see.
4      Q.  It says that the girls are not eligible for the
5  adolescent partial program. Do you know what the adolescent
6  partial program was?
7      A.  It says both girls are under age 14. They are not
8  eligible for the adolescent partial -- so there had to have
9  been -- you'll have to ask Frank Scozzie about that.
10     Q.  Okay. Again --
11     A.  There's something about -- they probably have an
12  elementary, as opposed to an LS or something. There would
13  have to be some reason that it -- as you know, 14 is --
14  there's a lot of things that happen in -- in the law at 14.
15  You know, that's kind of a -- one of those cut points, and
16  I'm sure that's one of the funding things also.
17     Q.  So, now, I take it -- and we'll just do a couple
18  more questions --
19     A.  Okay. Go ahead.
20     Q.  -- and then we'll take a break. It will be a
21  convenient time.
22         You were aware that the girls would be leaving
23  Strong Vincent. Is that fair to say? After -- after
24  January 10th, you were aware that they were leaving Strong
25  Vincent.

Page 89

1      A.  Yes. I would say that -- if not then, probably by
2  the -- well, I knew -- I knew that K███ was in Sarah
3  Reed. I didn't know what would happen until I actually --
4  you know, until you really know -- no, I wouldn't know where
5  they were going to be. I assumed Rachel was coming back.
6      Q.  Okay.
7      A.  I assumed she was going to be there, because when
8  I met with her dad, I said, listen, if kids talk to you, if
9  anything happens -- and he said, well, she's not coming back
10  here. Well, right then, we went into a different type of
11  conversation. And until I -- I don't know where a student
12  is going to be until I either get notice from downtown --
13  like I may get a copy -- generally, I'll get a copy that --
14  not generally. You get a notification. I get a
15  Notification of Recommended Assignment, because if they are
16  not in your building, then you know where they are going.
17  They are in your building until you are notified that they
18  are somewhere else. I would not have made that assumption,
19  because that is the official document we go by.
20         My hope was that we got some help for them. My
21  hope was that we nailed the other guys; that we nailed
22  B███, and we nailed A███, and we nailed -- and we did it
23  swiftly and quickly and that we got these girls the help
24  that they deserved. They were victimized, for crying out
25  loud.

23 (Pages 86 to 89)

3a9d95d8-06da-4388-a818-43709425cad2

Richard P. v. Erie School District        Sharon Woods        April 11, 2005



Page 90

1    (Discussion held off the record.)
2    (Recess held from 12:56 p.m. till 1:48 p.m.)
3    BY MR. OLDS:
4    Q.    Okay.  So I guess what I'd like to do is
5    concentrate on this investigation, the incidents that
6    comprise the investigation.
7        Earlier you indicated that the -- you hadn't --
8    that you hadn't -- well, that you talked to someone downtown
9    about disciplining the students.  Do you remember you
10   testified to that, or something?  You had a conversation
11   about whether to discipline C■■■ and -- C■■■ B■■■.
12   A.    Um-hum.
13   Q.    Do you remember that?  You must have thought that
14   there was something there, because you did conduct two days
15   of investigations, according to your testimony.  Is that
16   right?
17   A.    Yes.  We spent the 9th and 10th talking to
18   students and parents.
19   Q.    Okay.  So let's go -- it's your testimony that you
20   found out about it on the 9th?
21   A.    Correct.
22   Q.    And it's because R■■■ acted out in Miss Scully's
23   class.
24   A.    Right.  She came down and talked to me, um-hum.
25   Q.    Miss Scully or Miss Cap?

Page 91

1    A.    Miss Cap came with R■■■.  Miss Scully let her go
2    to Miss Cap's room, um-hum.
3    Q.    And so tell me what happened in that first meeting
4    that involved you, Miss Cap, and R■■■?
5    A.    Well, we talked to Rachel.  She -- I had to find
6    out why she was mad in class.  She had sworn in class and --
7    and had had an outburst.  And so during that conversation,
8    she started talking about the incident that happened in the
9    Laundromat.  And we got the details of -- about B■■
10   coercing her, who was involved, how K■■■ was a victim,
11   she was a victim, and we sort of got her assessment and
12   information about the incident.  And then we started talking
13   to other kids.
14   Q.    And then did she tell you about A■■■ I guess,
15   F■■■ or G■■■.  Do you remember that name?
16   A.    I know A■■■ G■■■■■■■um-hum.
17   Q.    Okay.  Did she tell you that he had done anything?
18   A.    I don't -- no.  The only ones that I -- that we
19   were able to -- that I remember her telling us about was --
20   Antonio was there, because A■■■ gave us a lot of
21   information.  The only ones that I know that were --
22   performed a sexual assault was A■■■ K■■■ and C■■■
23   B■■s, and that B■■ C■■■■■ was forcing her.
24   Q.    Okay.  Now, after R■■■ told you her story -- how
25   long do you think it took to get through that?

Page 92

1    A.    Through with R■■■.
2    Q.    Um-hum.
3    A.    Oh, I don't know.  Half hour, hour.
4    Q.    Where did you have her when you were interviewing
5    the other kids?
6    A.    We had her somewhere safe, where -- that she would
7    be -- I don't recall exactly where she was, but.
8    Q.    Did she return to class?
9    A.    I don't recall.  She may have.  We made sure she
10   was safe.  I don't know where she went when she left my
11   office.  Because we talked to her a couple different times
12   that day.
13   Q.    Do you think she might have just hung around your
14   office?
15   A.    Oh, no.  No one does that.  She would have been
16   somewhere, where she was safe and supervised.  We don't let
17   people hang around.
18   Q.    Was she in PASS that week?  R■■■.  Do you
19   remember?
20   A.    On the 7th, I don't recall.
21   Q.    Do you recall whether she was on the 9th, when you
22   started talking to her?
23   A.    Say that again.
24   Q.    Was she --
25   A.    In PASS on the 9th?

Page 93

1    Q.    Right.
2    A.    When I talked to her.
3    Q.    Yeah.
4    A.    On the day she had the outburst.
5    Q.    Yeah.  I mean, that evening, was she assigned to
6    PASS?
7    A.    I don't recall.  Sorry.
8    Q.    So after you talked to her, who did you talk to
9    next?
10   A.    Oh, I don't know the order.  But I know we talked
11   to all the kids that are listed in this exhibit, No. 1.
12   Because we talked to A■■■ F■■■■■■ -- let's see.  That
13   would be Y■■■ -- I think her last name was H■■■■
14   maybe.  C■■■■■
15   Q.    What was the first conversation that you had with
16   either Mr. Scozzie or Mr. Linden?
17   A.    When was that?
18   Q.    Yes.
19   A.    Right after I talked to R■■■.
20   Q.    Okay.  And do you remember who you called?
21   A.    I would have called both of them.
22   Q.    Would they have both been on the line at the same
23   time or --
24   A.    No.  No.
25   Q.    So tell me what your conversation -- the best that

24 (Pages 90 to 93)

Ferguson & Holdnack Reporting, Inc.

Page 94

1  you can recollect, what you said to them and what they said
2  to you.
3      A.  That there was an incident over at the Laundromat;
4  that we had a couple kids that were victims; we had several
5  perpetrators; and that we were gathering information and
6  were going to be calling parents; that all the students were
7  in special education.
8      Q.  And did they give you any advice or tell you what
9  to do?
10     A.  Keep us apprised.
11     Q.  Who --
12     A.  The standard stuff is the -- are the resource
13  officers available and so forth.  Wanted to know if I needed
14  any support.
15     Q.  Who are the resource officers?
16     A.  Detective Wally Love and -- I believe Ron Slupski
17  is a detective also.  I think that's his rank.
18     Q.  Okay.  What is the hierarchy of the School
19  District above the principal?  Who was your -- who did you
20  report to?
21     A.  Assistant Superintendent John Linden.
22     Q.  And you say that Scozzie was the assistant to the
23  superintendent?
24     A.  Yes, but we report to him also regarding --
25  especially if the student is in special education.

Page 95

1      Q.  Do you know, do one of them report to the other,
2  or are they on the same level; Linden and Scozzie?
3      A.  I don't know if they are on the same level.  They
4  have different titles.  They are both management downtown.
5      Q.  And is there anyone else above the principals
6  downtown that -- you know, in terms of the principals report
7  to --
8      A.  Dr. Oliver was director of high schools, but I'm
9  not sure when he took that position over.  If he was the --
10  if he was the -- he would have been informed, but I dealt
11  with -- he would have been informed, but I dealt with
12  Dr. Linden and Mr. Scozzie.
13     Q.  There's mandatory reporting laws in Pennsylvania;
14  is that right?
15     A.  Um-hum.
16     Q.  In terms of a school administrator uncovering
17  sexual abuse or suspecting sexual abuse.  Are there
18  mandatory reporting laws?
19     A.  Sure.  If you suspect abuse, you call the hotline.
20     Q.  Okay.  Did you call the hotline?
21     A.  No.  We called the police.
22     Q.  Well, but on the 9th, when it first happened that
23  you first talked with Rachel, did you call the hotline that
24  day?
25     A.  No.  That day, Mr. Olds, we had information on our

Page 96

1  hands that two kids were assaulted.  I was interested in
2  getting the police involved, getting enough credible
3  evidence that the police were involved directly.
4      When you call the hotline -- I don't know if you
5  have ever called the hotline.  But when you call the
6  hotline, the hotline calls OCY, and OCY calls the police,
7  and there you go.  I wasn't -- I was interested in a
8  shortcut, not a longcut.
9      I felt that we needed to take action -- you know,
10  get our information together and -- because at that time I
11  wasn't -- we weren't sure what happened.  I mean, we were
12  just running as fast as we could, because we wanted to get
13  as much clear information as we could and get the parents
14  informed.
15     Q.  Now, the first day that you conducted this
16  investigation, did you just meet with students or did you
17  meet with parents also?
18     A.  I could have met with parents.  I don't know the
19  order -- exact order of each kid and each -- each parent.
20  But we -- over the period of about a day and a half --
21  because Rachel -- that was first period.  So that would have
22  been up till about 10:30.  So in a period of a day and a
23  half, we met with all students and all parents, with the
24  exception of Kristina Long, because she was hospitalized.
25     And the police were -- and the resource officers,

Page 97

1  our police officers, our Erie Police Department Officers.
2      Q.  Were they present at all these interviews?
3      A.  I'm not certain, but probably.
4      Q.  Now, when you say they are Erie Police Officers,
5  does that mean that they are employees of the City of Erie?
6      A.  They are police officers employed by the City of
7  Erie, and then the District contracts with them.  And this
8  might be a question for Mr. Scozzie.  But they are
9  contracted with the School District, I think probably mostly
10  through Safe -- Safe Schools Grant, or something like that.
11  And sometimes they were in uniform, sometimes they weren't.
12  Depends if they had court or something that day.  They
13  were -- they are apprised of the situation right away.
14     Regarding your hotline call, we would have, you
15  know, done that if we felt that was absolutely necessary
16  right then.  We were more interested in getting the
17  information and getting a full-blown police investigation on
18  this.  Because it didn't happen on our property, so we
19  wanted to get the ball rolling.
20     Q.  So you had -- I think you indicated that you had
21  as many as a half a dozen phone calls with Scozzie and
22  Linden over those two days?
23     A.  Over three days.  I'm sure.
24     Q.  Over three days.
25     A.  It would have included that Friday when we had the

**Page 98**

1  police in too. We had the chief of police -- excuse me.
2  Chief of security for the District, Jim Perfetto, came over
3  for much of the interviews.
4  Q. Did he take notes?
5  A. I wouldn't know. You'd have to ask him.
6  Q. And you're saying your notes were destroyed.
7  A. Yes.
8  Q. You did take notes?
9  A. I took some anecdotal notes, but I would have not
10 kept those notes. When something becomes property of the
11 police, that's -- they take the reports of the kids, and
12 they -- once the information gets to them -- because this
13 was really their bailiwick, not mine. It's -- you know,
14 after --
15 Q. Well, it was your bailiwick because you didn't
16 turn the investigation over to the police in the first
17 instance. You conducted two days of investigation yourself
18 before you turned it over to the police. Is that right?
19 A. Right. We were just trying to get full names so
20 that they knew who they -- who they needed to talk to. And
21 they -- perhaps even they talked -- I'm sure they talked to
22 more people. I have seen the police report. It's volumes.
23 They talked to a lot of people.
24 Q. Okay. But it was your --
25 A. I wanted -- I wanted to get -- I wanted them to

**Page 99**

1  get the information about -- about R___ and B___ -- or
2  R___ and K___ and I wanted them -- I wanted us to
3  feel like that we had gotten information prepared for
4  them -- prepared -- just give them the names, talk to the
5  kids, get the parents apprised. Because we owe it to the
6  parents to try to keep them up to speed when we know
7  something like this. And then the information goes to them.
8  This is -- this is volumes, this police report. I read this
9  over lunch, and I just -- I'm -- they did a lot of work. We
10 had Mr. and Mrs. Barber, the detectives, in there. I mean,
11 we're not policemen, Mr. Olds.
12 Q. Right.
13 A. We're trying to run a school and keep a safe
14 place. And detective work is not something that I am
15 skilled in, but something that you try to -- you want to
16 have something credible so that when you have the police
17 come to your building, you have some kind of order and
18 fashion. You have correct information that you best can get
19 for them.
20 Q. Well, I mean, I'm sure if there was a shooting at
21 the school, you wouldn't conduct the investigation before
22 calling the police, would you? I mean, the police are
23 competent to conduct an investigation, aren't they?
24 A. We have a very competent police department.
25 Q. Okay. So, now, were you and Miss Cappabianca

**Page 100**

1  together for these two days that you had these meetings with
2  students and parents?
3  A. I had her pretty much shut her room down upstairs.
4  I said everybody in this building that we need -- I had the
5  other -- I got the other two assistants in, and I had Cap
6  pretty much shut her door upstairs. I said, you know -- she
7  was up and downstairs. But we had to try to use every
8  resource that we had available and still keep a school
9  going, to try to have at -- some -- find out what happened,
10 number one, and get accurate information.
11 Q. Tell me the first time you spoke to Mr. P___
12 A. I think we saw Mr. P___ on -- we saw him after
13 school outside -- yeah. We were going to PASS or -- for
14 some reason, we saw him outside. Told him I wanted to talk
15 to him, and he said, I'll see you tomorrow morning. And I
16 think we saw him Wednesday night. Right. It would have
17 been Wednesday night. Because we saw him out Friday, and he
18 said, I can't talk to you now, but I'll come back in the
19 morning. And he did. He came back with R___ in the
20 morning. So he would have come on the 10th.
21 Q. So R___ was in PASS that day.
22 A. It was on the 10th. I -- I don't know. But I
23 think she was in PASS. Because we saw -- I remember seeing
24 him outside, because I talked to him on the front steps.
25 Yeah.

**Page 101**

1  Q. Do you have any idea why you sent R___ to PASS
2  after she told you she had been a victim of a sexual
3  assault?
4  A. That would have been on the 9th, we're talking
5  about?
6  Q. Right.
7  A. I don't know why she was assigned to PASS, but we
8  wouldn't have sent her if we felt she was in jeopardy. I
9  can tell you that. I forget why she was assigned PASS. I
10 don't -- I don't know why she was assigned PASS.
11 Q. Was C___ in PASS that night?
12 A. I don't know.
13 Q. Did you talk to C___ that first day?
14 A. Yes. Well, I don't know. First or second day. I
15 don't know. One of those two days. Those days, Mr. Olds,
16 run together.
17 Q. Okay. Tell me what --
18 A. They were pretty busy.
19 Q. Tell me about the conversation you had with
20 Charles Bibbs.
21 A. I had a conversation with his father. That was
22 the first time I met his father. And his father came in. I
23 apprised his father of what -- what we thought was
24 happening. I wanted to get C___ side of it. And I
25 informed the father that -- that -- that we were going to

Page 102

1  pursue every -- that there were going to be police charges,
2  there were going to be criminal charges -- I felt that there
3  was enough evidence that we were going to -- that he would
4  be charged.
5      Q.  Well, did you meet with C_____ alone?
6      A.  I think -- I'm pretty sure we would have met with
7  him. I don't remember meeting with him alone. Although I'm
8  sure we would have. Because we met with all the kids -- all
9  the kids, with at least one or two adults in the room.
10  There would be myself and Miss Cap or myself and the police
11  officer. We were trying to keep the kids separate so we
12  could get -- get a straight story the best we could from
13  all -- each one of the kids. And I would have met with him
14  with no other student in the room, absolutely.
15      Q.  And I just want to --
16      A.  Go ahead.
17      Q.  The picture is that you're investigating an
18  incident that happened off school, that you didn't think
19  that you had jurisdiction to discipline kids for, but it was
20  criminal activity. Essentially, you were investigating
21  criminal activity, which according to you, occurred off
22  school grounds. Is that right?
23      A.  Well, I -- you know, from R____ description
24  and -- and what went on -- I'm not a policeman. I'm not the
25  person that has -- that files the charges.

Page 103

1      Q.  Well, that wasn't my --
2      A.  Anytime there --
3      Q.  That wasn't my question. I'm just trying to
4  understand. You didn't -- earlier today I asked you if you
5  disciplined Charles Bibbs, and you said no, because it
6  happened off school. Is that right?
7      A.  Correct.
8      Q.  Okay. So --
9      A.  Regarding this incident -- did I discipline
10  Charles regarding this incident? No.
11      Q.  It happened off school.
12      A.  Right.
13      Q.  It's criminal activity that happened off school.
14  Right?
15      A.  (Witness nods head.)
16      Q.  When was the last time you conducted an
17  investigation of criminal activity that occurred off school?
18      A.  Well, it was a school -- the bus incident that I
19  told you about was a school function, so technically that is
20  on school property. When is the last time? I don't know.
21      Q.  Did you ever conduct an investigation about
22  criminal activity that didn't occur on school grounds --
23      A.  I don't conduct -- I don't conduct criminal
24  investigations. I will try to get information about
25  something that is related to school. You're making it sound

Page 104

1  like I'm a policeman. I conduct criminal -- I don't -- you
2  know, this was -- this was blatant criminal activity that
3  any -- any reasonable person would -- would identify as
4  criminal activity. And if something looks like it's related
5  to school, we may try to -- we may try to act -- talk to
6  kids about something like that.
7      Mr. Olds, what happens -- and I tell kids this all
8  the time. You may think something happens out here, but
9  eventually it makes its way back to school one way or
10  other. You know, a few days can pass, a week can pass. But
11  if there's something that happens outside school, a lot of
12  times it drifts back into school.
13      When was the last time? I investigated something
14  with a kid who -- kid came to school, and he had an
15  outburst. He had an outburst in class or in the hall.
16  Somewhere in the school he had an outburst. And when he
17  relayed the incident to us, what he was really mad about was
18  something that happened off school property. You can't
19  ignore that. You have to go and get the parties together,
20  ascertain what the problem is. Sometimes, if there's
21  something of a -- of a criminal nature, you call the
22  resource officer in, and you tell them, and you say, what do
23  you make of this, and they advise -- they will tell us, this
24  needs to go to the police or this doesn't need to go to the
25  police. And at that time we'll have the police -- we'll

Page 105

1  have the school resource officers conduct an investigation.
2      We don't like to spend our time doing that,
3  because we have kids to educate. But depending on what
4  happens outside of school, you might actually -- what
5  happens is, it comes into school sooner or later. I tell
6  kids it's like snow at the top of a mountain. What happens
7  when snow is at the top of the mountain and the sun comes
8  out and it's 80 degrees? Water goes downhill. And a
9  problem is just like that. A problem will stay cold for a
10  long time, and the sun comes out, somebody sheds lights on
11  it, and it comes right back into the school building.
12      Q.  Do you have any recollection of your conversation
13  with Charles Bibbs; what was said?
14      A.  Well, I asked him about the incident.
15      Q.  What did he say?
16      A.  Charles was always in the habit of denying
17  everything.
18      Q.  Okay. So --
19      A.  It was consensual, that kind of stuff. He denies
20  everything. But I told his father that there were -- that
21  this wasn't going to go away, we had tried AEP, so forth and
22  so forth, and that we were going to cooperate fully. And he
23  never came back.
24      Q.  What about B____ C_____? What do you recall of
25  your meeting with her?

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2



Page 106

```
1    A.  She also denied a lot of stuff.  I don't recall,
2  you know, everything that's said in those conversations,
3  because there were -- many of the students we interviewed
4  more than once.  I didn't interview B████ C█████ just
5  once.  We would have talked to B███ C██████ more than
6  once.  Because you're trying to get information so that you
7  at least have the correct names, the correct -- and so that
8  we could help the two girls that were violated.  Becky
9  Campbell was a big denier.
10    Q.  You indicated that Miss L███ came -- you recall
11  that Miss L███ came into the school.  Is that because you
12  called her?
13    A.  No.  She came -- I don't remember -- I don't
14  remember if I made any of the phone calls to her then.
15  But she came one day -- she called us and let us know to get
16  some work for K███.  And she came in right after -- and
17  I think it was the same day I talked -- when R████ came
18  down.
19        Because I remember when Mrs. L██ came, she sat
20  next to the window, and then her sister sat in the next
21  chair over.  And she apparently had gotten some information
22  from Kristina.  And it was right in the middle of us
23  talking.  Because I remember I had to make her wait, because
24  there were other people that we were talking to; either a
25  kid or somebody else.  And I -- and I was concerned that she
```

Page 107

```
1  would leave, and I wanted -- we really needed to talk to
2  her.  But you kind of had to finish up what you were doing
3  with the kid you were talking with.
4        And so she came and gave us information from
5  K███ and I informed her that we were going to do
6  everything we could to get those kids that wronged her
7  child.
8    Q.  Well --
9    A.  It literally unfolded in about -- in about nine
10  hours' time of talking with the kids.
11    Q.  Do you remember what Y████ said?
12    A.  No, not off the top of my head.  But she, I know,
13  was one of the kids we talked to.
14    Q.  Do you remember what C███ said?
15    A.  No, not without looking at the reports.
16    Q.  And there are no reports, because the records
17  don't exist.  Right?
18    A.  Without looking at the police reports.
19    Q.  The police reports.
20    A.  Right.  I read the police report, and this tells a
21  lot more than I even knew.  The police did the
22  investigation.  Alls we did was collect up the names and
23  numbers and the parents and the permission to talk to the
24  kids.  And the parents came in -- the parents were all
25  really good about talking to the -- talking to the police.
```

Page 108

```
1  And the parents were good about having their kids talk to
2  the police.
3    Q.  Were you aware that Linda Cappabianca had a
4  conversation with Robin Johnson?
5    A.  I don't know who Robin Johnson is.  Who is Robin
6  Johnson?
7    Q.  I think she's a parent of a student.
8    A.  No.  No.
9    Q.  T██ N█████.  Do you remember T██ N█████?
10    A.  I don't know why she would have a conversation
11  with her.  No.
12    Q.  So you conduct these --
13    A.  Short --
14    Q.  Go ahead, I'm sorry.
15    A.  No, Toni was short.  I remember T██
16    Q.  Do you remember, did Chris Ruhl participate in any
17  of these conversations?
18    A.  Chris Ruhl was the counselor for the Student
19  Assistance Program, and I don't know -- the one conversation
20  that Chris Ruhl and I had with R████ I think that might
21  have been the only one that he was in on.  I don't think we
22  would have involved him.  He had other things to do.
23        But occasionally, in the instance of R█
24  because of the nature of the -- of the -- her assault, he's
25  a mental health counselor.
```

Page 109

```
1  And Linda Cap was involved in talking to somebody
2  else.  When Mr. P████ [sic] came in the next morning and
3  Rachel and I and Mr. P████ went down to Chris Ruhl's
4  office -- and that's where I talked to Rachel and her
5  father.  It's kind of a long, skinny office.  It's about
6  half this wide.  It's quite long (indicating).  It's an old
7  book room.  And R███ was -- was very quiet.  And I tried
8  to be very understanding.
9        I tried to explain to Mr. P████ where we were;
10  what we thought was happening.  I told him that we had
11  talked to R████ about that the day before and got him up to
12  speed on what we perceived had been happening, and that they
13  would be talking to the police.  I don't know if he had
14  talked to the police before that or after the police [sic].
15        I remember once I talked to him at the police
16  station, because I think R████ wasn't in school, and I was
17  concerned that we didn't have -- we didn't have -- we hadn't
18  had Rachel and her father together -- or her mom; someone,
19  in getting their statement together.  And I think that one
20  conversation I had with Mr. P████, actually he was at the
21  police station.  I said, good, the police are going to need
22  to talk to you.  And I know he did that there.
23        But I know that Chris Ruhl and I did talk to her.
24  It was not very long.  We did talk about her not wanting to
25  come back there, and -- because I had said, this is
```

28 (Pages 106 to 109)

**Page 110**

1  Mr. Ruhl. You know, assuming that she may return, that, you
2  know, this is a person -- and she had been referred to the
3  Student Assistance Program, I think -- I think Mr. P█████
4  requested it in the fall or something.
5       So we were interested in making sure -- and then
6  he -- that she would be okay when she came back, and that's
7  when he said he wanted her to go somewhere else, and so we
8  made some arrangements.  It wasn't a real long conversation.
9  By then, Mr. P████ was, I think, already in contact with
10  the police.  I think he was at the police station before --
11  I don't know.  I'm sorry.
12  Q.   Well, let me -- so did you, when you were down at
13  Chris Ruhl's office, did you ask R██ to go over again
14  what had happened to her?
15  A.   Not a lot, no.  We talked about what happened
16  there.
17  Q.   Take me through that conversation, that you met
18  with him.
19  A.   Well, I -- you know, it was not long, I can tell
20  you that.  Because I wasn't interested in victimizing her
21  any further.  I was interested in trying to be supportive
22  and understanding at that point.
23       We had a conversation about what had happened over
24  there.  She did talk more about it, but she wasn't really
25  willing to talk.

**Page 111**

1       Sometimes R██ even prior to this incident,
2  was -- not obstinate, but sometimes she just wouldn't talk.
3  You couldn't get her to always talk.  Sometimes she just
4  didn't talk.  And she wouldn't talk to you sometimes, if she
5  didn't want -- if she didn't want to talk, she didn't talk.
6  And I wasn't about to push the issue at this particular
7  time.
8       I did talk to Mr. P████ about it, but R██ was
9  there, and I wasn't interested in -- in upsetting her in any
10  way.  I was more interested in being compassionate and
11  understanding at that time.
12  Q.   But tell me what you had said to Mr. P████ about
13  why you had -- you had seen him the night before after PASS,
14  correct?
15  A.   Yeah.  He was on his way to somewhere -- it
16  wasn't -- he did not have time.  He had somewhere he had to
17  be.  It was very obvious that was a bad time.
18  Q.   So you met with him the next morning --
19  A.   Very early.
20  Q.   -- down at Chris Ruhl's office.
21  A.   Right.
22  Q.   Tell me what you said to him.
23  A.   To him?
24  Q.   Yes.
25  A.   That I was sorry that this has happened.  I was

**Page 112**

1  trying to be compassionate.
2  Q.   I want you to tell me exactly how you started the
3  conversation with him.  What did you say to him?
4  A.   That this was unbelievable.
5  Q.   Okay.  And who told him -- he didn't know what had
6  happened yet, did he?  Or do you think he did?
7  A.   I don't think he knew the extent of what had gone
8  on.
9  Q.   Okay.  And so tell me what you told him that you
10  had learned.
11  A.   That there was some inappropriate sexual behavior
12  going on over at the Laundromat, and that R███ and
13  K████ -- that R██ had talked to us the day before
14  about it.
15  Q.   And did you describe to him what you thought the
16  inappropriate sexual behavior was?
17  A.   There was some inappropriate sexual behavior that
18  dealt -- that involved oral sex.
19  Q.   As best you can recollect, tell me exactly what
20  you said to him about oral sex and R███.  Tell me what you
21  said.
22  A.   That she was involved in some oral sex with
23  probably A████ K████ was the kid that I -- that was the
24  kid that I knew about.  It was very difficult.  She was --
25  you know, there was a broken kid there.

**Page 113**

1  Q.   Was she crying?
2  A.   No.  She was very quiet.  Very, very quiet.
3  Q.   And what did Mr. P████ say?
4  A.   I think he was as surprised as I was that this had
5  transpired; that this whole thing happened.  R███ was very
6  sad.  Was she crying?  I don't think she was crying.  She
7  was very sad.  Very, very quiet.  Weepy?  Might have been
8  weepy sad.  Not crying/crying.  Weepy sad.  Quiet.
9  Q.   Now, the 10th was a Thursday.  Is that right?
10  A.   Yep.
11  Q.   Did she leave the school at that point -- or after
12  you met with her and her father?  What happened to the two
13  of them?
14  A.   I think her -- I think her -- you say she went to
15  PASS.  You tell me.
16  Q.   No, no, that was the 9th.
17  A.   Oh, I'm sorry.
18  Q.   I can't tell you anything.  It's your deposition.
19  You are testifying.
20  A.   You have more notes than I do.  You have more
21  notes.
22  Q.   You indicated that you met with him the evening of
23  the 9th --
24  A.   She didn't stay that day.  No, she did not stay
25  that day.

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2

Page 114

1    Q.  But the day before, you met with him in the
2  evening.
3    A.  Yeah.
4    Q.  He came to pick up R___
5    A.  Yeah.
6    Q.  And you think it was after PASS.
7    A.  I'm not certain. It would have been after PASS or
8  after school. I was trying to remember if it was daylight
9  or not.
10   Q.  You can't remember if it was dark or not.
11   A.  It was January. It was always dark. It was in
12  the dark, because it's always dark in January.
13   Q.  And then she didn't stay in school that day.
14  Okay. Do you recall why you didn't call him on the 9th, the
15  first day that -- I mean, I know that you met with him after
16  school.
17   A.  I may very well have tried to call him or
18  something on that day, but we --
19   Q.  The first day.
20   A.  But we -- yeah. I may very well have tried to
21  call him. I mean, we were calling parents right and left.
22  Some parents, I'm sure, even came in that day. I know
23  Mrs. F___ did. I'm pretty sure she came in that day.
24  We were in conversation with parents -- and we talked to --
25  you know, we probably talked to a lot of kids that aren't

Page 115

1  even listed here.
2       I mean, you're trying to talk to kids that -- but
3  what I'm saying is when you're trying to get some
4  information, you may talk to a kid for two minutes or
5  something and ask them, and say, do you know anything about
6  something. But you know what I'm -- you're just -- you're
7  trying to get to the key people.
8    Q.  Well, did you talk to any of the teachers?
9    A.  We talked to Mrs. Scully at length. Because even
10  though sometimes R___ could be a little maybe obstinate or
11  something, or have an outburst or something, that was not --
12  it was not common knowledge around -- among the teachers.
13  So we did -- we talked to Scully. You know, I --
14   Q.  What was not common knowledge among the teachers?
15   A.  No one knew that we were -- after -- after R___
16  had an outburst, she came down and we were talking to her, I
17  didn't go to any teachers and say what do you know. That
18  wasn't -- our purpose was to find out what had happened to
19  these two kids. So I didn't talk to, you know --
20   Q.  But you did talk to Scully.
21   A.  Oh, yeah. Absolutely. Because R___ had had the
22  outburst there, and we wanted to know exactly what -- what
23  she had said; what had precipitated -- what precipitated
24  that or --
25   Q.  What did Miss Scully say that R___ had said?

Page 116

1    A.  I think she used the "F" word or something. She
2  just blew up at another kid in class.
3    Q.  Now, was that uncommon, that kind of language at
4  Strong Vincent among the middle school --
5    A.  Is it common?
6    Q.  Uncommon. Was it uncommon --
7    A.  Yeah. Kids don't go around -- I mean, kids --
8  kids are kids, but it's certainly not something we condone.
9  And it's something I would deal with. I don't --
10   Q.  So that kind of vulgar language would warrant a
11  referral to the office --
12   A.  Yeah. Absolutely.
13   Q.  -- in every case, as far as you know.
14   A.  You have got 25 kids sitting in the room, and the
15  kid blows up. And you're trying to start a lesson, you're
16  trying to teach, you're trying to have kids -- to learn.
17   Q.  Okay. Now, you indicated that you might have
18  talked to some students who aren't even listed in Miss Cap's
19  record, which I guess is Exhibit 1. Is that right?
20       MR. OLDS:  Jim, is that --
21   A.  Well, I don't even know --
22       MR. MARNEN:  It's Exhibit 1.
23   Q.  Exhibit 1. You might have talked to some other
24  kids?
25   A.  Well, let's say C___ would have said, well, Joe

Page 117

1  Schmo was there. I might send the cop to go talk to Joe for
2  a second, and he says, no, I wasn't, or I was somewhere
3  else, or something like that. I mean, when you get one
4  name, you try to garner information. And so you're not
5  trying to interview 7, 800, 900 kids. You're trying to get
6  down to the nitty-gritty of it.
7    Q.  Do you know whether information about the
8  investigation that you were conducting percolated out into
9  the student body?
10   A.  Well, I think that's -- I think sometime between
11  when it happened in late December, and there was the holiday
12  over there, and kids were out and about in their
13  neighborhoods, you know, you would -- kids talk, but it did
14  not come to our attention.
15       We went back to school the 2nd, and we finally got
16  wind of this thing that Wednesday, when -- you know --
17       MR. MARNEN:  He's asking if your investigation
18  percolated out.
19   A.  Not that I know of, but I don't know.
20       (Discussion held off the record.)
21   Q.  I want to show you just what was marked as Exhibit
22  2 in the Moore deposition. And I just want to direct your
23  attention to that first page there.
24   A.  Okay.
25   Q.  Did you become aware that K___ and, in fact,

30 (Pages 114 to 117)

Page 118

1   R___ were given -- their IEP was changed to reflect the
2   placement at home?
3       A.  Yeah, traditionally -- and, again, you know what,
4   Mr. Olds, you might want to ask Mr. Scozzie about the
5   details of this.  Because when a -- occasionally --
6   occasionally, mostly, I don't know.  A student -- it can be
7   placed before their placement takes place in Sarah Reed,
8   when all the paperwork gets there, there's a period of time
9   so that the paperwork gets to the next placement.  There is
10  a temporary in-home IEP so that the student still receives
11  homework, some kind of instruction.  It's very temporary
12  until the paperwork gets to like Sarah Reed or to another --
13  to wherever the placement is.  The in-home IEP is an interim
14  placement before the next placement.
15      Q.  Okay.  And --
16      A.  I'm not sure how long it was in-home.  I said it
17  was five days, and --
18      Q.  Have you ever seen that in any other case?
19      A.  In-home IEP?
20      Q.  Yes.
21      A.  Oh, sure.  In-home IEP, um-hum.  Is this yours
22  (indicating)?
23      Q.  Yes.
24      A.  Yeah, in-home IEP is used -- again, take the kid
25  with the broken leg.  Before -- if there's a kid that has

Page 119

1   some kind of physical something, and maybe their placement
2   is going to be -- let's say the Lake Erie Rehab or
3   something, there may be an in-home IEP or something -- there
4   could easily -- there's -- it covers the time period so that
5   there's no break in the education plan.
6       Mr. Scozzie could probably talk to you about that;
7   about the details of how long -- I don't think it ever
8   exceeds five days.  And a lot of times it could be within
9   for five, and it ends up two or something.  It depends on
10  how long the paper trail gets here.  It's always temporary.
11      (Discussion held off the record.)
12      Q.  Now, again, referring to the document that was
13  marked as Exhibit 1 in Miss Moore's deposition, which is --
14  I'm just going to show it to you.
15      A.  Okay.
16      Q.  Did you participate in the preparation of that --
17  that IEP revision?
18      A.  Top page?  On the top page?
19      Q.  Yes.
20      A.  You know, I think that was a teacher inservice
21  day.
22      Q.  1/18/02?
23      A.  Yeah, I think so.  But I would have to see a
24  school calendar.  But I think that might have been a teacher
25  inservice day.  Mrs. Cap did -- Miss Cap did the -- if her

Page 120

1   signature is here, she was at the meeting.  And I think that
2   was an inservice day.  Yeah, the 18th.
3       Q.  So you didn't prepare that?
4       A.  No.  No.  This was prepared -- who did this?  I
5   don't know whose signature that is, where it says "classroom
6   teacher".  I can't help you with that.  Mrs. Gray would have
7   been Rachel's teacher of record at Strong Vincent.  I can't
8   even tell what the letters are.  You might want to ask
9   Mr. Scozzie then.  Maybe it's Charlise Moore.
10      It might have been a classroom teacher.  It could
11  be -- I'm guessing here.  It could be a classroom -- it
12  could be someone from Sarah Reed Children's Center.  Are you
13  talking about the second signature down, Mr. Olds?
14      Q.  Right.  Yeah.
15      A.  Are you talking about right there (indicating)?
16      Q.  Yeah.
17      A.  You know what, I'm guessing here, but I think
18  that's probably someone from Sarah Reed.
19      Q.  Okay.
20      A.  Because they would have to be involved, because
21  that's a -- I think.
22      Q.  You're saying that Sarah Reed would have to
23  prepare the IEP.
24      A.  No, I'm saying it could be a signature from
25  someone from Sarah Reed.

Page 121

1       Q.  Okay.  So you don't recognize that signature.
2       A.  You've got to -- you've got ask somebody else that
3   question.
4           MR. MARNEN:  For whatever it's worth, that's
5       before the Sarah Reed intake.
6           THE WITNESS:  Right.
7           MR. MARNEN:  I doubt that it's Sarah Reed.
8           (Discussion held off the record.)
9       Q.  So, now, just because K___ was in Millcreek,
10  that doesn't mean that her placement has to change, does it?
11      A.  No.  They -- that decision is made by -- between
12  the parent and Millcreek Hospital.  They make educational
13  recommendations at a discharge.  They formulate what they
14  feel is in the best interest of that student.
15          MR. OLDS:  Let me see if I have that.
16          (Discussion held off the record.)
17          (Recess held from 2:36 p.m. till 2:44 p.m.)
18      Q.  Were you in Strong Vincent the next year -- that
19  would be September 2002.  Were you still the principal then?
20      A.  Yes.
21      Q.  Okay.  And tell me what your involvement was in
22  the decision that R___ and K___ would be returned to
23  Strong Vincent.
24      A.  That wouldn't be my decision.  If they were in --
25  where was their placement in May?  That placement --

31 (Pages 118 to 121)

3a9d95d8-06da-4388-a818-43709425cad2

Page 122

1  wherever they were in May, and then throughout the summer --
2  and you can ask Mr. Scozzie this -- all students -- we
3  receive placement letters at the beginning of the year. And
4  that is when we know where a student is placed. I had no
5  involvement. I had none. Because that is determined.
6      Q.  And do you recall that -- do you recall that
7  R█████ and K█████ did come back to Strong Vincent? Did
8  you know that?
9      A.  I knew R█████ came back. I -- K█████ didn't
10  come back to Strong Vincent. I don't believe so.
11      Q.  What happened -- do you recall what happened to
12  Rachel when she came back to Strong Vincent? How long she
13  stayed?
14      A.  She was there a very short period of time. Maybe
15  a week.
16      Q.  And --
17      A.  Not that long.
18      Q.  And were you involved --
19      A.  No.
20      Q.  -- when she was removed? What happened?
21      A.  No, I can tell you, I was not involved in that,
22  because it was during -- there's a period of time called the
23  adjustment period. First day of school, there are 60 kids
24  standing in the lobby that have never been registered. And
25  during the first week of school, that is almost entirely

Page 123

1  what I did. I know that she had an incident with somebody,
2  assistant principal or somebody, and our school resource
3  officer was involved. But I was not involved in any of
4  that.
5      Q.  Who was that assistant principal?
6      A.  It -- I understand it was a man, so it would have
7  been Pat Hart, H-A-R-T.
8      Q.  Is he no longer with the District?
9      A.  No. He's at East High School, teaching at East.
10  We have a huge number of kids that enroll at the beginning
11  of the year. Huge.
12      Q.  Tell me what the process is for a discipline
13  proceeding, an expulsion proceeding. How does that come
14  about?
15      A.  (No response.)
16      Q.  I know that it wasn't -- it didn't happen in this
17  case. But if as a principal you become aware of conduct
18  that, you know, you think is going to require Board
19  involvement, Board of Education involvement and perhaps
20  expulsion, tell me what the process that you follow to
21  achieve that end is.
22      A.  Once you determine that the offense was -- offense
23  for which a student could be expelled, you call the
24  assistant superintendent, director of curriculum, if that
25  person is different, like Dr. Oliver, if he happened to be

Page 124

1  involved.
2      But you would -- there is a form that -- there is
3  a whole packet you fill out. Just like there's a packet for
4  AEP, there's a packet for expulsion. And that packet is
5  filled out and is submitted to the School Board -- I don't
6  know if it goes to -- probably goes to the secretary or the
7  designee, and has to go through those channels. And then
8  they set up a Board hearing.
9      Q.  Do you have --
10      A.  It's conducted like -- excuse me for interrupting
11  you. But it's pretty much conducted like a -- like this.
12      Q.  A judicial proceeding.
13      A.  Yeah. I was going to say the word, like a
14  judicial process, but I didn't want to say that, because
15  it's not really --
16      Q.  Well, do you have -- in terms of -- I would assume
17  that conduct -- you have authority as principal to affect
18  suspensions; is that right? Suspensions of students?
19      A.  As long as it's within the guidelines of the
20  Discipline Code.
21      Q.  Right. Well, let's just assume that it's within
22  the guidelines of the Discipline Code. Does the assistant
23  superintendent have authority to suspend a student?
24  Out-of-school suspension.
25      A.  The assistant superintendent?

Page 125

1      Q.  Assistant principal.
2      A.  Well, assistant principal is on -- would have to
3  be -- the principal would have to approve that.
4      Q.  Okay. So if you're in the building, and Linda
5  Cappabianca comes up to you and says, Student X just
6  smacked -- or Student X had a weapon, say --
7      A.  Okay. We have a weapons search, and a kid has a
8  weapon. There you go.
9      Q.  Student X has a weapon. If you're in the
10  building, you have to make the decision to get the kid out.
11  Is that right?
12      A.  We have to make the decision --
13      Q.  You. I'm talking you as the principal.
14      A.  Absolutely.
15      Q.  Linda Cappabianca would have to come to you --
16      A.  Absolutely. She couldn't make that decision.
17      Q.  Okay.
18      A.  She would have to make it in concert with me.
19      Q.  Now, do you have the -- assuming that scenario,
20  you don't have to go to the assistant superintendent to
21  effectuate the suspension, do you, or do you?
22      A.  Yes. Yes. You have to go right up through -- you
23  go right up through the channels. If it's a special
24  education student, if it's a regular ed. student, it has to
25  go downtown, absolutely.

32 (Pages 122 to 125)

3a9d95d8-06da-4388-a818-43709425cad2

Page 126

1    Q.   So if there is an incident you think is serious
2   enough to warrant an out-of-school suspension --
3        A.   Um-hum.
4        Q.   -- you would -- before -- you would calm the
5   incident down, but before you made the decision, you would
6   advise the people --
7        A.   Absolutely.
8        Q.   -- downtown --
9        A.   Correct.
10       Q.   -- that you were going to do it.
11       A.   Correct.
12       Q.   And advise them of the circumstances.
13       A.   What you would do, Mr. Olds, is you would call
14  downtown, and you'd say, I'm going to request for an
15  expulsion.
16       Q.   Okay.
17       A.   And then you would have the criminal charges and
18  all that --
19            MR. MARNEN:   I'd like to remind you he's talking
20            about out-of-school suspension --
21       A.   Oh, you are?
22       Q.   Either one.  Yeah.  Out-of-school suspension.
23       A.   No, no.  Well, the two --
24       Q.   Out-of-school suspension.
25       A.   Or?

Page 127

1        Q.   Out-of-school suspension.
2        A.   Are we talking about out-of-school suspension?
3        Q.   That was my question.
4        A.   I'm sorry.  Then ask me the question again.
5        Q.   Would you have to --
6        A.   I thought you were still talking about expulsion.
7   I'm sorry.
8        Q.   No.  I'm sorry.  Would you have to contact the
9   assistant superintendent for an out-of-school suspension?
10       A.   No.
11       Q.   So that decision would stop at your doorstep?
12       A.   Correct.
13       Q.   And in this time frame, did --
14       A.   Unless it is special education.
15       Q.   Okay.  And if it's special education, what is
16  required?
17       A.   Well, rarely was a student suspended out of school
18  that was in special education, because they had to be in
19  school.  So we might use PASS instead of out-of-school
20  suspension.
21       Q.   When you were the -- those three years when you
22  were principal at Strong Vincent, were there any middle
23  school kids who were expelled?
24       A.   I don't recall.  I don't know.
25       Q.   Okay.  Was the use of out-of-school suspension,

Page 128

1   was that a tool that you recall frequently using?
2        A.   We would use that with regular education kids,
3   yes.
4        Q.   Okay.
5        A.   If the -- if the infraction warranted it,
6   absolutely.
7        Q.   What kinds of infractions warranted out-of-school
8   suspensions?
9        A.   There -- am I allowed to use these?  Because these
10  are exhibits now?  They are all listed in there --
11       Q.   Okay.
12       A.   -- for out-of-school suspension.  We followed the
13  Discipline Handbook.
14       Q.   Okay.  You followed the Discipline Handbook.
15       A.   Sure.  It's not -- Mr. Olds, it's not arbitrary.
16       Q.   Okay.
17       A.   We have to have it -- students need to know what
18  the guidelines are in the school.  And this -- and that
19  handbook was a common language between the students and
20  their behavior.
21       Q.   And just so that I understand it, once that --
22  once you finish your investigation, the issue of where the
23  girls were going to go; i.e., R█████ and K█████ that was
24  handled by either Mr. Scozzie or someone else.  You weren't
25  involved in that --

Page 129

1        A.   No.
2        Q.   -- in that decision.
3        A.   No.  Only in that we wanted to make sure they got
4   the support that they needed.
5        Q.   Did you think that it would have been impossible
6   for you to provide a safe environment in that school for
7   these girls?
8        A.   Ask me the question again.
9        Q.   Would you have been able to ensure a safe
10  environment at Strong Vincent for these girls after
11  January 10th, 2001.  '2.  Excuse me.
12       A.   '2.  I know you meant '2.  My goal was always a
13  safe school environment prior to that incident.  That
14  incident didn't happen in my building.  And that incident
15  happened somewhere else.  It didn't happen in my building.
16  I would try absolutely my -- as I do every day, we try to
17  provide the absolute -- every student knows the welfare and
18  safety of that student and other students in that
19  building -- and I would extend that to families too when I
20  talk to a kid.  That I would have provided a safe
21  environment.  Absolutely I would have provided a safe
22  environment.
23            I would have certainly wanted B███ C████ and
24  Kincaid -- which we got out of there pronto.  And Mr. Bibbs.
25  They were out of there.

33 (Pages 126 to 129)

3a9d95d8-06da-4388-a818-43709425cad2

Richard P. v. Erie School District          A0000000000ds                         April 11, 2005

Page 130

1      Q.  They were out of there because the police took
2   them out of there, not the School District.
3      A.  That's correct.
4          MR. OLDS:  I don't have any other questions here.
5          MR. MARNEN:  And I have none.  We will read and
6      sign.
7
8      (Deposition concluded at 2:55 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2

1
2
3                    SIGNATURE PAGE
4
5
6        I, JANET WOODS, have read the foregoing
7    transcript of my deposition, and affix my signature in
8    approval of the correctness of my statement, except for
9    corrections noted on the Amendment Page.
10
11    _____
12    JANET WOODS
13
14
15
16
17
18    DATED: _____
19
20
21
22        Corrections Noted on Amend Page
23            Yes _____
24            No _____
25

JLF

## AMENDMENT PAGE

| Page | Line | Correction |
|------|------|------------|
| 10 | 1 | old    "The year 2000 - 2003" |
|    |    | corrected    "2002 - 2003" |
| 13 | 18 | old    "Title iv" |
|    |    | corrected    "Title IX" |
| 25 | 7 | old    "not all of them" |
|    |    | corrected    "Know all of them" |
| 51 | 15 | old    "March 7" |
|    |    | corrected    "January 7" |

Questions by ceds
not my testimony

| 100 | 17 | old    "him at Sunday" |
|     |    | corrected    "him outside" |
|     |    | or |
|     |    | corrected    "him out front" |
|     |    | (of the school) |