IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD P. by and for | ) | No. 03-390 Erie |
| RACHEL P. AND DENISE L. by | ) | |
| and for KRISTINA L., | ) | |
| | ) | |
| Plaintiffs, | ) | ELECTRONICALLY FILED |
| | ) | |
| v. | ) | **Jury Trial Demanded** |
| | ) | |
| SCHOOL DISTRICT OF THE CITY | ) | |
| OF ERIE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' BRIEF IN OPPOSITION
TO DEFENDANTS PARTIAL SUMMARY JUDGMENT MOTION**

## TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE.................................................................. 1

STATEMENT OF FACTS.................................................................... 3

    1)    The Harassment and the First Sexual Assaults on KL and
           RP............................................................................................ 3

    2)    The School District's Knowledge of the Assault........................ 4

    3)    The Harassment of RP and KL after the Assault...................... *7*

    4)    The Cover-Up in the School District's Handling of the
           Assault...................................................................................... 8

    5)    The Stereotyping of RP and KL by the School District............. 10

    6)    The Failure to Discipline the Assailants..................................... 13

    7)    Plaintiffs' Perception that they were being disciplined............. 15

    8)    Decision to Move KL and RP to Sarah Reed............................. 16

    9)    The Explanation Given to the Parents for Placing Their
           Daughters at Sarah Reed............................................................ 20

    10)    Sarah Reed's Behavior Modification Teaching Modality
            and Typical Students................................................................. 21

    11)    The Improper Placement of KL and RP and the Injuries
            Sustained by Them................................................................... 22

ARGUMENT..................................................................................... 24

    1)    The Plaintiffs state a claim against the individual
           Defendants under the Pennsylvania Constitution...................... 24

        a)    There is an implied cause of action under the
                Pennsylvania Constitution................................................ 25

        b)    There is no indication the Pennsylvania Constitution
                would not allow an action for money damages................. 27

i

c)      **The right to equal protection of the law includes the right to be free of discrimination and sexual harassment**........................................................................ 29

d)  **The individual liability of Woods and Cappabianca**........... 30

2)     **Plaintiffs need not exhaust remedies under the IDEA to bring their action under  Title IX** ................................................ 32

**CONCLUSION**....................................................................... 34

## STATEMENT OF THE CASE

The Plaintiffs claim violation of their rights under two distinct but related factual

theories. The first theory is that Plaintiffs were subjected to harassment at the hands of other

students, including sexual assaults and sexual harassment in the school.  The harassment

occurred after a violent sexual assault and after the individual Defendants knew about the assault

The officials who had it within their power to curtail and stop the harassment of

Plaintiffs, Janet Woods and Linda Cappabianca, did nothing.  For them, a young girl's word that

she had been sexually assaulted and forced to perform oral sex on male students was insufficient

evidence to report such conduct or investigate the circumstances. Woods and Cappabianca did

nothing until the consequences of the sexual assault got out of hand.   KL was in the hospital

after having attempted to injure herself, and RP, who was facing daily harassment and who had,

in fact, been subjected to a second assault and a third attempted assault, exploded under the

pressure.  Woods, Cappabianca and other officials of the School District decided to immediately

remove KL and RP from the school and placed them in an alternative education program, where

KL and RP felt they were being punished.

The Defendants failed to take steps to end the harassment because of gender stereotyping.

Cappabianca and Woods failed to take the sexual assaults suffered by the Plaintiffs seriously

when they first learned of the incident before the winter break in December 2001.  They assumed

the Plaintiffs had been willing participants in a middle-school sex ring, instead of victims.

The consequences of the indifference and stereotyping were hurtful to both girls.  RP was

viciously harassed in the school, where another attempted sexual assault occurred.  In both cases

her attackers included the original assailants. She was forced to endure the humiliation and

1

injustice of hearing Cappabianca tell her father that she was a bad girl who needed to be punished for her sexual activity. She experienced the further humiliation of learning that her assistant principal had informed the mother of one of her friends that she was promiscuous and was engaging in multiple voluntary instances of sexual misconduct in various places around the school.

The second factual theory involves the School District's placement of the Plaintiffs in an alternative education program in an effort to modify what the school perceived to be sexually inappropriate behavior for girls.[1] The transfer of KL and RP to Sarah Reed not only violated their Title IX rights, it also violated their rights under the Pennsylvania Constitution.

There is also evidence that the transfer reflected an abrogation of the School District's duty to provide an educational atmosphere free of sexual harassment and discrimination. The Plaintiffs' parents were told that the girls had to be transferred from Strong Vincent because there was no other way to stop the harassment and because the Plaintiffs' safety would otherwise be jeopardized. The decision to transfer KL and RP also reflected an effort to cover up the sexual assault and discrimination against the victims of the assault. When the police were finally summoned, Cappabianca and Woods misled them about when the School District discovered the assault and about their actions after learning about the assault. By removing the evidence of the assault--the victims--the School District hoped to minimize the fall-out from the assault. Certainly, a transfer to cover up the School District's initial failure to deal with the assaults

---

[1]The defendants do not confront this question head-on in their summary judgment motion. They do not contend that Plaintiffs have insufficient evidence to show that the transfer violated their Title IX rights. Rather, they obliquely raise the issue by suggesting that Plaintiffs should not be able to also raise claims under the IDEA or the ADA. Plaintiffs will file a motion to amend, seeking leave to set forth claims under these acts.

would constitute arbitrary treatment.

Finally, there is considerable suggestion and evidence that the girls' transfer to Sarah Reed was in the nature of discipline for the way the girls handled the aftermath of the sexual attack. Sarah Reed's alternative education program was generally reserved for students K-8 who presented significant behavior problems in the normal classroom. A salient aspect of the stereotypical thinking of Woods and Cappabianca is the fact that none of the assailants were ever disciplined by the School District. While RP and KL were sent to an alternative education program that was the catch-basin for the School District's K-8 discipline problems, the assailants, who were ultimately adjudicated delinquents, were not disciplined by the School District.

The School District is not seeking summary judgment on either of the factual issues, insofar as Plaintiffs' Title IX claim is concerned. It acknowledges that the evidence would prevent the entry of summary judgment on the first issue. However, as to the second issue, the School District suggests that the Plaintiffs should not be permitted to argue that the School District violated rights secured Plaintiffs under the IDEA or the ADA , because they have failed to exhaust remedies under the IDEA. Finally, the individual defendants challenge whether Plaintiffs may assert a cause of action under the Pennsylvania Constitution for money damages against them. The summary judgment motion should be denied.


## STATEMENT OF FACTS

### 1)     The Harassment and the First Sexual Assaults on KL and RP

Sometime between Thanksgiving and Christmas 2001, KL and RP were sexually

3

assaulted at a laundromat across the street from the school by students who were on their way home from an after-school detention program known as P.A.S.S. (See police report for description of assault.)  RP was initially attacked by a female student, BC, in an effort to force her to perform oral sex on at least two male students, CB and AK. RP was subsequently hit with a belt by AGF, a male student who was present during the attack, to force her to continue performing oral sex on CB and AK.  KL , who had skipped PASS because she was afraid of CB, stumbled upon the scene in the midst of the attacks on RP and was herself forced to perform oral sex on CB.

## 2)    The School District's Knowledge of the Assault

The girls were too scared and embarrassed to tell their parents, but they made multiple efforts to tell Linda Cappabianca, the assistant principal assigned to the Strong Vincent middle school, about the attack.  KL tried to tell Cappabianca about the assault the morning after it happened (**Denise L 55).** Cappabianca and Woods both acknowledge that they learned of sexual activity involving KL before Christmas break 2001.[2] Cappabianca admitted that on December 20, "right after it happened," she overheard students talking about something of a sexual nature that had happened the night before involving KL and CB **(Cappabianca I:91)** and that when questioned, KL confirmed that it was true. (Cappabianca I:91) Cappabianca also questioned CB, KL's assailant, who denied it  **(Cappabianca I:93)**. CB testified that Cappabianca approached him asking, "[W]hat's going with all this--...I'm hearing this stuff about you having ... she said

---

[2]The Plaintiffs and their parents believe the attack occurred at the end of November, during the week after Thanksgiving. The Defendants have concluded that the attack occurred during the week before Christmas vacation. Plaintiffs are not willing to concede to the later date, but it is probably not critical to the Plaintiffs' argument.

4

like you're having oral sex**?" (CB** 51)   Woods testified that she learned from Cappabianca on December 20 that Cappabianca had overheard "some kids in the hall talking about KL and CB and of them being engaged in some kind of sexual activity" **(Woods 56-57)** and that KL said that the hall talk was true **(Woods 59)**  Apparently Cappabianca and Woods chose to believe CB over KL (**Capp I:93, Woods 59, 105),** in spite of CB's long history of troubling behavior including lying (**Woods 60, Capp I:93**), because they opted to do nothing about the information (**Woods 57**).

RP tried many times to tell Cappabianca about the sexual assault, but Cappabianca would not listen to her requests for help. **(RP 78-79)** RP indicated that Cappabianca's reaction to her attempts to apprize her of the sexual assault included telling RP to "suck it up" and "ignore it" regarding the harassment (**RP 60**), and making shushing noises to stop RP from saying what she was trying to say. **(RP 60)** At one point, Cappabianca stopped RP, telling her that she already knew what had happened. **(RP 60, 102)** Eventually, Cappabianca called RP's father in front of her and told him that RP was a bad girl who should be punished. **(RP 100)**   Finally, on January 9, RP could endure no more. When a student harassed her before class, she hurled an obscenity at him that caught her teacher's attention, and she was sent to the office (**Scully 13, 15**). Cappabianca finally listened to the full story, took RP to tell the story to Woods, and the two administrators began an investigation that included interviews of the students who witnessed or participated in the attack, as well as interviews with some parents.

Information about the assault continued  to filter in to school officials after the students returned from the  Christmas break.  On Friday, January 4, KL's sister informed their mother that she had heard at school that KL had performed oral sex (**KL I:48**). Hearing this made KL so

5

upset that she attempted to harm herself and was taken to the psychiatric ward at Millcreek Community Hospital (**KL I:48**). That weekend KL finally told her mother, Denise L, the full story. Denise L testified that she "confronted" Cappabianca about the situation on Monday, January 7, and Cappabianca "said she was dealing with it."  (**Denise L 44**). Denise L said she "was angry because [Cappabianca] should have told me first." (**Denise L 53**)

According to the police report, an incident of sexual harassment on January 7 at a water fountain came to Cappabianca's attention when "uninvolved parties...made the school aware something was going on because they heard and saw BC push RP into a boy and tell him that RP wanted to give him head." (**Police Report 11**).  Detective Green indicated that the school had learned about this situation from "a teacher and another student" who saw it occur. **(Green 43)** His memory is Cappabianca explained to him  that a teacher overheard the language being used and the comment about giving head and brought those children immediately to the office. **(Green 44)** Cappabianca assigned RP PASS for this incident, because she was "not in her classroom when she was supposed to be." (**RP 57)** [3]

When Cappabianca met with Richard P. on January 10, she admitted  that she had "known about it for quite sometime... She said she knew about it for a while."  (**Richard P. I:68**) Cappabianca explained her inaction by stating that "you can't take the word based on one child.  She said, kids all the time make up stories when they do things."  **Richard P. I:69.**  Later, when Woods met with RP's father, Richard P., she explained why she and Cappabianca had not

---

[3]  If Cappabianca did know by January 7 about the sexual attack on the girls at the laundromat and the attempted assault on RP at the school on January 7, she was then in a position to have prevented the attack that was accomplished on RP at the laundromat in the evening of January 7. See discussion below in part __

acted. "She [Woods] said she didn't- - there was no proof it ever existed or happened, it was just basically one word of a child. " **Richard P. I:67**  It is noteworthy that neither administrator notified the authorities that a crime against 12-year-old KL had been reported, even though they were mandatory reporters,[4] nor did they notify KL's mother before the Christmas break when the sexual act was first brought to their attention. **(Cappabianca I:58, Denise L 53)**

**3)**    **The Harassment of RP and KL after the Assault**

KL related that after the sexual assault, other students started calling her names, taunting her, and victimizing her. **(KL I:49, II:6-7, 11-12)** KL, who was just 12 years old and marginally mentally retarded (Schachner psych eval 5), had no defense mechanisms against such treatment. Her older sister, also a special education student, was bothered about the assault as well. **(KL II:10)**

RP testified about a number of incidents that occurred after the attack. She described one as the gym hallway incident where a "boy came out of her gym and said, 'hey this girl wants to give you head.'" **(RP 48)**  In fact, this incident was instigated by BC, the girl who orchestrated the first attack. On this occasion, BC told the boy that "the girl wants to give you head." **(RP 49)**  Yet another incident was described in a report that Cappabianca prepared at some point to summarize the findings of hers and Woods' investigation for the police:

---

[4] 23 Pa.C.S.A. Sec. 6311(a) provides that:

Persons who in the course of their employment, occupation or practice of their profession, come into contact with children, shall report or cause a report to be made in accordance with Sec. 6313 . . . when they have reasonable cause to suspect . . . that a child coming before them in their professional or official capacity is an abused child.

> On Monday, 1/7/02, there was a second incident. RP was at the water fountain.
> BC was in the hall asking RP to give head to a male student that walked by. RP
> refused. According to RP, BC had shoved her into the stairwell and pushed her to
> follow the male student. RP walked down the stairs in the same direction as the
> male student, but nothing had happened. **(Woods Dep Exh 1)**

On that instance, two girls held the door open so that BC could push RP down the stairs to the

basement. **(RP 53)** RP stated that on this occasion "one of the teachers came out of the classroom

and told us to get --- get back to class . . . I said that BC is trying to make me give people head

and she said, oh, this happened to my friend before; I understand how you feel.  And then she

told --- she must have told Miss Capp I walked out of class.  I don't remember me walking out of

class.  That's what she said.  And I got PASS that night." **(RP 52)**

RP described a third incident, occurring in her music class, where boys would not leave

her alone, and her response to them was so outraged that the teacher ejected her from the class

and sent her to the office. **(RP 100)**  RP testified that both boys and girls harassed her about her

participation in the sexual assault, and boys would come up to her and demand that she "give

them head." **(RP 112)**

The most serious incident occurred on January 7, in the same location as the first assault,

and also involving CB. Cappabianca described what she learned about that incident:

> The third incident to occur was after PASS on Monday 1/7/02.  CB and an
> unknown male student had left PASS.  They went to the laundromat.  RP was at
> the laundromat changing her clothes and waiting for her dad to pick her up.
> While in an alcove of the building, the unknown student had forced RP to sit
> down.  He put his hands up her shirt.  He brushed her air back.  He unzipped his
> pants and put his penis on her face.  RP was  unsure of the student's name, but
> was able to describe the student in detail. **(Woods dep Exh 1)**

4)    **The Cover-Up in the School District's Handling of the Assault**

Cappabianca and Woods did not begin their investigation until Wednesday, January 9,

when RP's classroom behavior left them no other choice. According to their testimony, they allegedly spent two full days interviewing students and parents about the assaults before calling the police (**Woods 45-46**, **Cappabianca 85**), If this is the case, they conducted on odd investigation.

Both Cappabianca and Woods claim to have taken notes and gotten statements from students (**Woods 43, 67, Capp I:60, II:4**). Yet all their notes have disappeared or were destroyed (**Cappabianca 4-5**), with the exception of Cappabianca's summary (**Woods Exh. 1**), which was produced not by the School District but by the police, and the only student statement to survive the investigation was one which, again, was produced by the police and which was made while the police were interviewing the student after they had been summoned on Friday, January 11. 2002.  (**Antonio's statement**).

Both Woods and Cappabianca described the investigation scene as including the Strong Vincent police officers (**Woods 97, 102, Cappabianca I:60, II:14**), yet neither of the police officers recall having been present during the interviews **(Slupski 14-15, 18, Love 21-23)**. Seemingly the police officers would have nothing to hide, and thus the question is raised as to why Woods and Cappabianca are now trying to cloak their investigation with the authority of the school police.

Cappabianca and Woods misled the police about the assaults when the police were finally called in. They told the police they only learned of the sexual assault on January 9 (**Police Report**).[5] They told Detective Green that they learned about the attack on the date of the hallway

---

[5]The police report affirms that "Miss Woods says that on 1/9/02 at approximately 1500 hours, she became aware of a situation involving several Strong Vincent school students, the first of which allegedly occurred on December 19, 2001 at the Frontier Village Laundry, 1258 West

incident, and they affirmatively told him there was nothing else (**Green 45, 48**). They sidestepped the fact that they had received repeated reports in the days and weeks preceding that something bad of a sexual nature had happened.  Cappabianca failed in her report or in her discussions with the police to mention that KL had "admitted" to Cappabianca already in December that she had been involved in an incident involving oral sex.

Finally, although the investigation uncovered numerous allegations of incidents involving serious harassment and assaults, not one disciplinary action was taken against the students who assaulted and harassed the Plaintiffs, even though there is no dispute that the conduct occurred.

## 5)     The Stereotyping of RP and KL by the School District

The record is rife with evidence that the Plaintiffs were the victims of gender stereotyping. They, the victims, were seen as culpable for the sexual activity perpetrated against them. Cappabianca wrote that "KL **admitted** to the counselor that she participated in oral sex" (**Woods Exh. 1**; emphasis added). She begins her January 10, 2002, memo (allegedly written after at least a full day of interviewing witnesses and participants in what turned into a criminal investigation) by indicating that it had "been brought to my attention that on Wednesday, December 19, 2001, several students were engaged in inappropriate sexual behavior on the way home from the P.A.S.S. program." She fails to mention that two 12-year-olds had been subjected to criminal assault. Her notes indicate that a number of students were interviewed, and she concludes that "it is apparent that [three] of the students did not participate in sexually defiant

---

8th Street after P.A.S.S....She says that she and Linda Cappabianca became aware of the situation when one of the victims, RP, became upset during school hours yelling that some male students were picking on her asking her to 'suck their dicks.'"

[sic] behavior"--and she is not referring to RP and KL as two of the three. The results of

Cappabianca's investigation continue with her observation that "RP **admittedly** went into the

bathroom at the laundromat with AK and performed oral copulation on CB on December 19,

2001." **(Woods Exh 1;** emphasis added**)**

Cappabianca considered RP to be a perpetrator of sexual activity and underestimated the

effect of the harassment. RP testified that Cappabianca assigned her to PASS after the in-school

assault on January 7, 2002. **(RP 52)** After RP burst out in rage in her music class about a student

who was harassing her, Cappabianca called RP's father, Richard, in front of RP, to tell him that

his daughter was a "dirty little girl" and should be punished. **(Richard P. I:41, 42)**

Cappabianca told Richard P.. that RP was talking about "sucking dick." **(Richard P. II:20, 19-**

**22).**

Cappabianca's callous attitude toward Rachel was made excruciatingly clear during the

investigation of Rachel's rape claim, when she called in Robin J., the mother of one of Rachel's

friends, to tell her about Rachel's promiscuous activities. Ms. J testified that Linda Cappabianca:

> Wanted to let me know that [my daughter] was hanging around some girls that
> were ... unappropriate.  They were doing things that were unappropriate.... So she
> said that some of the girls that T was hanging with ---- do I have to say the exact
> words?  were --- ...giving blow jobs in school to boys.  They were caught doing it
> in the gym, and... a laundromat or ... a store on the corner that the girls were doing
> it at, and my daughter was with them when they were doing it.  And she wanted to
> let me know that--- the kinds of kids my daughter was hanging around, and she
> didn't think it was good.  That she wanted me to be aware of what was going on."
> **(Robin J  27-28)**

The conversation about RP and KL occurred in front of Robin J's daughter. **Id.** Ms. J confirmed

that Cappabianca gave her RP's name. **Id.** Robin J's daughter told RP about the meeting with

Cappabianca and said that because of what Cappabianca had said, the daughter wasn't allowed to associate with RP any more. (**Richard P I:88-91, 96-98**)

On the very day that RP finally got to tell Cappabianca and Woods the entire account of the rape, RP was assigned to after-school detention, as both administrators knew. (Cappabianca had given her PASS as a result of being out of class during the attempted sexual assault that had occurred in the school two days earlier.) The two administrators waited on the steps of the school for RP's father to pick her up after PASS so that they could ask him to meet with them to talk about RP's situation. (**Capp I:82; Woods 100**) It obviously had not occurred to them that they were investigating a girl's forcible rape, not her sexual misbehavior.

Unbelievably, while Woods and Cappabianca were investigating what they seemed to regard as a middle-school sex ring, they accepted the story of a male witness, AGF, who failed to tell them that he had actually participated in the attack by striking RP with his belt to coerce her to continue with the rape. (**Cappabianca II:22-24**) Had they questioned RP with any care, they might have found that out.[6]

Finally, the stereotyping of the girls led to the very top levels of the School District administration when Frank Scozzie, Assistant to the Superintendent, directed the special education staff to recommend that the girls be sent to Sarah Reed Children's Center in the "behavior modification" track. ***(        ) Charlise Moore, supervisor of special education for middle school students, was called in by Scozzie and briefed on the situation. She testified that it

---

[6]RP testified that when she and Cappabianca went to Woods' office so that RP could again relate what had happened, Woods kept hurrying her. ( **RP 80-81**) Their coddling of this boy during the investigation may have contaminated the investigation to such an extent that even the police failed to elicit from RP the information that he had been one of her attackers.

was her understanding that there were some emotional concerns regarding the girls' sexual

activity: "Boys and girls outside of the school environment having sexual contact with one

another. And there was concerns about the situation overall...the appropriateness of the

situation." (**Moore 20, 22, 30**)


**6)**    <u>**The Failure to Discipline the Assailants**</u>

KL and RP were immediately removed from the school by Cappabianca and Woods. As a

temporary measure, they were assigned to home schooling for a week, since it would take that

long to make arrangements for their assignment to Sarah A. Reed Children's Center, the

alternative education program for students eighth grade and younger.  Their assailants, however,

were not disciplined by the school in any manner. While CB disappeared, the other assailants

remained in the school until the Erie police arrested them over the coming weeks.   Eventually,

BC was arrested in the school, since she had been threatening witnesses.  ***(**Police Report**   )

Furthermore, there was little to no effort to identify any of the students who had harassed

the girls, or participated in the attempted assaults on RP or the successful assault that occurred on

January 7 at the laundromat, let alone to subject them to the school disciplinary system.

The Student Discipline Code provided for discipline of students who engaged in either

assaultive or violent behavior, or who sexually harassed other students.  Students would be

removed from their regular school "because of serious disruptive behavior." ***(**Student

Discipline Code ___**)

Assault and physical acts of violence are high on the list of improper behavior and a "student who assaults or commits a physical act of violence on another student or personnel will be given a 10-day out-of-school suspension (o.s.s.) and will be referred to the Board of Education of the School District of the City of Erie for discipline, up to and including expulsion. Charges must be filed with the appropriate law enforcement agencies." **(at 113)** Additionally, sexual harassment is prohibited . **(Document 128-129)** The consequences of such a violation of the sexual harassment policy involve a minimum 5-day suspension.

The School District takes an expansive view of when it may punish conduct which occurs off school grounds.

> All provisions regarding student behavior are applicable to students while on school property, at any school sponsored activity (including graduation, dances, field trips, etc.) on any public conveyance providing transportation to a school or school sponsored activity, **and to students going to and returning from school**. Depending on the severity of the students  behavior, any student behavior offense may be treated as a second or third offense." (emphasis added) **(at 113)**

However, in spite of the broad language, and the obvious transgressions of the School District policy, none of the assailants and none of the children who participated in the harassment of KL and RP were disciplined.

Woods acknowledged that CB was on his way home from PASS when he assaulted  KL and RP. **(Woods 41)** Cappabianca also knew that the assaults occurred on the way home from PASS**.** On January 11, 2002, Cappabianca handwrote a statement for AGF, a witness to the attack, as he dictated it. His statement begins:

> Before Christmas break at 6:45, me, AK, CB left PASS and went walking down 8th Street.  BC, RP, Y started walking with us.  BC said "I know this girl that sucks dick.".... BC started forcing RP.  BC was saying if you don't go in there I'm going to beat you up.  RP went into the bathroom and AK followed." **(at 017)**

14

Allegedly, Woods and Cappabianca spent considerable time interviewing AGF.  If this was so, they could hardly have missed his claim, confirmed in his deposition, that BC and CB planned the attack while they were in PASS. **\*\*\*(AGF 21-24)**

Cappabianca knew on January 10 that BC was taunting RP in school and that other students were harassing her.  **(Woods dep Exh 1)** Cappabianca also knew that RP's second assault, which occurred "on Monday 1/7/02" occurred when "CB and an unknown male student had left PASS.  They went to the laundromat..." **(Woods dep Exh 1)**

In spite of all of this knowledge and the breadth of the School District's discipline code, none of the assailants and none of the students who harassed RP and KL were ever disciplined by the School District.   According to Frank Scozzie, Assistant to the Superintendent, Woods and Cappabianca were the decision-makers in terms of instigating discipline against the assailants. **\*\*\*(Scozzie ___)**

**7)**     <u>**Plaintiffs' Perception That They Were Being Disciplined**</u>

When the Plaintiffs realized that they were being placed in Erie's alternative education program, they perceived that they were being punished. **\*\*\*(     )** The School District now claims that the Sarah Reed was intended to help the girls, but contemporaneous evidence suggests otherwise.

On January 17, Denise Long completed a form dictated to her by officials at the School District, which states as follows:

> I am requesting that my daughter KL be transferred to the Erie School District's Alternative Education Program.  I waive all rights to a hearing.  1/17/02 Denise Long **(Document 744)**

When home school visitor Audrey Pecoraro visited Shelley P. at home on January 18, she had Shelley P. sign the exact same note.(**Document 442**)

The Alternative Education Program is a step in the progressive discipline system adopted by the School District for students. **\*\*\* (    )** It is the step which follows a ten-day out-of-school suspension and which precedes an expulsion. **\*\*\* (    )** As defined by the code, the Alternative Education Program serves "as an intervention, the focus being on the development of pro-social behaviors." **\*\*\*(    )** According to Erie's practice, alternative education either meant Sarah Reed, if the child was K-8, or Perseus House, if the child was grades 9-12.  Sarah Reed deals with elementary students who have been behavioral problems for the School District. **\*\*\*(Scozzie  19-21** )[7]

Consequently, Plaintiffs assumed that in fact they were the ones who were being disciplined. Ironically, KL and RP found themselves being directed to the same program in which the administrators had previously hoped to place CB. **(Capp I:33-43, II:49-50)**  RP thought she was being disciplined when she was referred to Sarah Reed.  She told her father, "I don't understand why I'm here....I didn't do anything wrong."  **(Richard P II:31)**

8)  **The Decision to Move KL and RP to Sarah Reed**

The decision to move RP and KL to Sarah Reed was made before the School District

acknowledged that the girls had been raped, and it was made because the School District viewed the girls' behavior as inappropriate. School District officials attempted to disguise the discriminatory action by manipulating the IEP process to make it appear that the move was being made to help the girls.

The decision took form no later than January 11, 2002. Cappabianca testified that removing the girls from the building was "in our heads the entire time even on the 9th." **(Cappabianca II:43)**. When Richard P met with Woods and Cappabianca on January 10, 2002, he was told then that RP would be sent to Sarah Reed. (**Richard P I:55-56**)

Highlighting the School District's perception that it was dealing with a discipline issue and not the trauma of a rape, Charlise Moore communicated with Linda Cappabianca on January 11, on a form entitled "Discipline Note." Her written communication records the decision to change the location of service for RP and KL: "Five days in-home IEP to begin Monday, January 14, through – ending Tuesday, January 22." The note indicates that "the school administrator, Miss Cappabianca, and with the agreement of parent, remove[d] the student from the building for a time." Identical notes were prepared for KL and RP. **(Moore 40)**

The decision to move the girls to Sarah Reed had its origins in the highest administrative levels of the School District. According to Frank Scozzie, Assistant to the Superintendent, Janet Woods called him and told him about the problem and indicated that she was concerned about the well-being of the students. ***(Scozzie 9-10, 26-29)** Scozzie decided that KL and RP would be placed in an alternative education setting, which meant placement at Sarah Reed.[8] Moore

---

[8]Scozzie acknowledged that RP and KL would not "have qualified for [the partial hospitalization program offered by Sarah Reed Children's Center] by age, because they were not 14 years of age." **(Scozzie I:15)**

testified that she was asked by Frank Scozzie to become involved in placing KL and RP in Sarah Reed. **(Moore 20, 43)**. She did not meet either the parents or the girls. **(Moore 23-24)**. Her task was to "start the process for placements for the students; to get them from that environment-- remove them from that environment." **(Moore 24)**

On 1/14/02, Moore, acting for Scozzie **(Moore 20),** confirmed that there would be an in-home IEP placement for KL and RP, expected to last five days, which "will begin January 14, 2002," and that she was to see Marlene Chrisman "for S[arah] R[eed] Partial Placement." **(Document 741)[9]**

Marlene Chrisman, another Special Education Supervisor, took the next step. In a memo dated January 15, the subject of which is "B-Mod [Behavior Modification] Referrals" **(Document 446),** Marlene Chrisman recorded that:

> [t]he purpose of this memo is to provide information on two students who are being referred to Sarah Reed per Frank Scozzie. Both girls were involved in a recent situation at SV of the nature and intensity that staff, including Mr. Scozzie, feels this level of intervention is essential.

Chrisman's memo indicates that Scozzie "would like the girls to begin this placement as soon as possible." Scozzie admitted the memo accurately described how the girls got referred to Sarah Reed. ***(Scozzie 24)** This represented a deviation from the norm, since placement decisions were normally a product of a meeting of the IEP team. **(Moore 13)** ("The decisions that are made in regard to placing students...That's an IEP team decision.") There never was an

---

[9]Moore identified Document No. 741 as her note which she "took when I was in the office with Mr. Scozzie when he gave me the directive. I was trying to figure out what I needed to do or get information from someone." **(Moore 44)**

IEP meeting to change the placements of either of the girls. **(Richard P. II:58)** ("We had a meeting in Sarah Reed, but there wasn't an IEP prior to that that I remember of.")

Audrey Pecoraro, a home school visitor, traveled to the homes of KL and RP so that she could secure signatures on IEP documents and have each of the parents draft a handwritten consent to be placed in the Erie School District's "Alternative Education Program."[10]

**(Document 45)**

The handwritten note indicates that Moore is working on the "referral for Sarah Reed by Marlene/Frank" **(Document 743).** It shows a history of contact with Denise L. and a similar visit to the home of RP, where Pecoraro met Shelley P., the mother.

Shelley P had not previously participated in any of the decisions concerning her daughter because she had life-threatening medical conditions that made it difficult for her to participate in school activities and meetings. **(Richard P II:104)**[11] The School District's dealings concerning RP had been solely with RP **(Richard P, id.)**   In the notes recording the circumstances of the home visit to Shelley P., Pecoraro observed that "Mother had difficulty remembering our appt. Apparently she is heavily medicated and has memory problems. Forms signed. Intake is

---

[10].    The instructions which led her to visit the parents of RP and KL were written and identical for each girl, except for the time of the intake meeting.
RP, [KL] DOB ____, referred to Sarah Reed Behavior Modification Program, Special Education Tract, from Strong Vincent High School, Grade 7 LS, is scheduled for the intake process at Sarah Reed on Monday, January 21, 2002, at 11:00 A.M.  She will begin the program on Tuesday, January 22, 2002.**(444 and a)**

[11]  Shelley P suffers "in a real bad way" from Hemorrhagic Hereditary Telangiectasia, which is "bleeding disorder" which causes "a lot of bleeding.  Usually treatment is blood transfusions."  **(Richard P II: 23)**

scheduled for 1/21/02 at 11:00.  Student will begin program on 1/22/02."

### 9)    The Explanation Given to the Parents for Placing Their Daughters at Sarah Reed

_____Denise L was told by Chris Ruhl that KL was going to be moved to Sarah Reed. Ruhl,

who was not a teacher, coordinated the student assistance program at Strong Vincent.  He

attended the discharge meeting when KL was released from  Milcreek Community Hospital on

January 11.  Ruhl told Denise L that KL "is going to be moved from Strong Vincent for her

safety... And he said that the other kids are picking on her and due to the incident that KL had

mentioned.  He said the school needed time for it to blow over." **(Denise L 46)**

The matter was put to Denise L by Ruhl that "the kids need time to forget about it.  And if

she went back to the school that there might be further, you know, taunting about what happened,

stuff like that.  It would be better to give them a break." **(Denise L 70)**   In fact, Denise L testified

that Ruhl was referring to the student body because there was harassment going on at the school.

**(Denise L 71)**   She accepted Chris Ruhl's opinion on this because "he is professional. . . . He

said there was a lot of police and stuff coming into the school to talk to everybody, and it would

also be easier if they are not there." **(Denise L 71)**

Richard P was given a similar explanation.  After bluntly telling him that his daughter

was "sucking dicks" Woods explained to Richard P that RP was being transferred to Sarah Reed

for her safety.  "She said... BC's ..just bad.  She's a very bad kid.  And she said the CB has a long

history of being bad too.  And she said given the fact of what happened to her, she said I think

that we need to remove her for her safety" **(Richard P 1:62)**  Woods did not mention at that time

the RP was being sent to Sarah Reed for treatment.  **Id**.[12]

**10)**    **Sarah Reed's Behavior Modification Teaching Modality and Typical Students**

RP's perception that she was being disciplined was based on the nature of the program to

which she was referred. Children who are sent to Sarah Reed are "children who have acted out

behaviorally, meaning they have come to someone's attention due to an aggressive act. And we

also have children who are withdrawn, which has caused someone in their life to be concerned."

(**Iddings 18**) "The younger children at the school were typically children with behavior

problems." (**Iddings 20**) That the Sarah Reed setting is one for behaviorally disruptive students is

confirmed by the literature distributed to parents upon their child's admission to the program,

where the program is described as one "designed to help students make positive choices and to

learn self-control techniques so they can develop positive behavior at home, in school, and in the

community. It is our intention to respond properly and effectively to disruptive and aggressive

behavior." (**Iddings 29**) The literature goes on to say that "[t]he program's staff works with

students in grades 6 through 12 who have been removed from the regular school schedule

because of serious disruptive behavior." (**doc 110**)

There is one educational modality at Sarah Reed, and that is the behavior modification

program. (Bogardus 38) In giving examples of the types of students who were referred there,

Bogardus noted students "experiencing emotional problems which, perhaps, they feel

--------------------------------------------------

[12] Richard P observed harassment of RP while he was in the school building learning that
RP was being removed from the school.  A "black male ...walked up and said something kind of
nasty to RP...He smacked her on the hind end.  And he did it right in front of me and he did it in
front of Chris Rule."  (**Richard P. I:63**)

overwhelmed in the classroom, can't really participate academically, they may look for an

alternative placement. Behaviorally, if they're difficult to manage, they may look for an

alternative placement. They may look for an assessment, if they are unsure of a difficulty such as

a psychiatric assessment." Bogardus agreed with the following question:

> Q       Is it fair to say that the students admitted to Sarah Reed, who are referred to Sarah
>         Reed from other School Districts, are having some problems in the classroom,
>         typically?
> A       Typically.
> Q       And that problem could either be an emotional problem or a behavioral problem?
> A       Or social problem.
> Q       Social. When you use the term "social," tell me what you mean.
> A       If a child has anxiety, they may not be able to interact with their peers, with
>         teachers, and they may feel overwhelmed and shut down. **(Bogardus 15)**

The types of behavior that are exhibited by children at Sarah Reed are "aggressive behavior,

defiant behavior, not staying within the classroom." **(Bogardus 16)** Sarah Reed considers a

placement at its facility"one of the most restrictive" placements. **(Bogardus 17)** In describing

Sarah Reed programs, Scozzie identified the "behavior mod-type program, which is what we

would be looking at in this situation**." (Scozzie I:14)** Thus the Plaintiffs were thrust into an

alternative education setting with students whose behavior was so extreme that they could not be

managed in the regular school setting.

**11)      The Improper Placement of KL and RP and the Injuries Sustained by Them**

        The placement of RP and KL was not appropriate and caused a drastic deterioration in

their lives.  Both spiraled into delinquent, self-destructive behavior.  RP and KL were suffering

from post-traumatic stress syndrome at the time of their placement at Sarah Reed. **(Supplement**

**to Pretrial Statement, 8/3/05 letter to Edward A. Olds)**  They did not need to be placed in a

behavior modification program centered on children who could not function in the public school. There was no reason to think that the placement was appropriate. Dr. Stephen Schachner, in his report, states, "Prior to the rapes, KL and RP had been assigned to special education classes and received IEP's for learning problems. They were not demonstrably children with behavioral problems in the classroom prior to the initiation of the sexual harassment at Strong Vincent High School." Schachner also reports that:

> the girls were sent to a partial hospitalization program an alternative educational school as if they were the troublemakers in class. Necessary information that should have been sent to the new school was not forwarded. Instead, two memos were written that merely stated, for RP, that she was involved in a 'recent situation.' Two previously well-behaved students perceived that they were being punished for being raped. The procedures that insure proper assessment and treatment for the psychological trauma were not followed. There was no definitive report to Sarah A. Reed Center (school based program) stating that these girls were victims of rape. In fact, KL had already required hospitalization for self-inflicted wounds and RP was soon to follow. Neither descriptors of the girls, generated almost a month after the rapes, were accurate in diagnosis or in report of academic weaknesses, language skills, or level of cognitive functioning. Yet these very same descriptors that are so crucial in planning treatment modalities, both in psychotherapy and in class. The result and failure to treat the girls immediately subsequent to their trauma, clearly led to KL's self-injuries and RP's building aggressive and self-injurious behavior. The failure to treat or even offer appropriate treatment for post-traumatic stress disorder, anxiety, and depression was linked to severe behavioral problems as the girls' lives spiraled downward into the abyss of teenage delinquency, one might find written in a text book describing the failure to treat trauma. KL and RP lived this night terror for more than two years in various stages of emotional  social turmoil.

Schachner also wrote that:

> loss of faith and trust in adults subsequent to their reporting to school officials was joined with their confusion, anxiety when finding themselves removed from the school and placed into a strict educational alternative environment with acting-out students. Had they been sent to an appropriate placement with a diagnosis for their conditions, improvements in their functioning would have been based on the standard treatments for post-traumatic stress disorder, anxiety and depression. Failure to properly diagnose and treat, however, their reactions which

compounded the initial trauma of the assault.  Thus we find gross acts of
endangerment to two children, beginning with their experience of dangerous
school environment and culminating with their removal to a placement where the
professionals did not know how or why to treat them.  It is with beyond a
reasonable doubt that I view these girls' experience at Strong-Vincent High
School and at the Sarah Reed partial hospitalization program alternative education
program as causative factors for their social, emotional and academic sufferings
and failures.  **(Schachner, p ___)**

## ARGUMENT

**1)      The Plaintiffs State a Claim Against the Individual Defendants under the Pennsylvania Constitution**

Defendants Woods and Cappabianca have moved for summary judgment on Plaintiffs' rights

to bring an action under the Pennsylvania Constitution, Article I, Sections 26 and 28.  Although,

Defendants contend there is no right to privately enforce rights emanating from Pennsylvania's

Constitution.  However, analysis of Pennsylvania and federal cases support a private cause of action

under the Pennsylvania Constitution.

Plaintiffs' case proceeds under Article I, Sections 26[13] and 28 of the Pennsylvania

Constitution.  Article I, Section 26 of the Pennsylvania Constitution provides that:

Neither the Commonwealth nor any political subdivision thereof shall deny to any
person the enjoyment of any civil right, nor discriminate against any person in the
exercise of any civil right.

The Pennsylvania Constitution, Art. I, Section 28 provides: "Equality of rights under the law shall

not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the

---

[13]Article I, Section 26, in combination with Article I, Section 1 has been identified as the
source of the right to equal protection under the Pennsylvania Constitution, which "protects an
individual from state action that selects him out for discriminatory treatment by subjecting him to
a provision in the law not imposed on others of the same class." **Correll v. Dep't of Transp.**,
726 A.2d 427 (Pa.Cmwlth.1999), aff'd, 564 Pa. 470, 769 A.2d 442 (2001).

individual."[14]

### a)    There is an implied cause of action under the Pennsylvania Constitution

The argument that there can be private enforcement of Article I, Sections 26 and 28 of the Pennsylvania Constitution is clearly without merit, since: (1) Pennsylvania courts have consistently recognized private rights of actions asserting claims under the Pennsylvania Constitution; (2) the text of the Constitution provides that there is a companion remedy for every right protected in the Constitution; and, Pennsylvania courts have recognized claims of Article I, Sections 26 or 28 violations by state and local authorities in the following cases: **Hartford Accident and Indemnity Company v. Insurance Commissioner of the Commonwealth of Pennsylvania**, 482 A.2d 542 (PA 1984), **Fisher v. Department of Public Welfare**, 502 A.2d 114 (PA 1985), (challenge to Commonwealth law prohibiting funding abortions by medicaid); **Love v. Borough of Straudsburg**, 597 A.2d 1137 (PA 1991), (challenge to borough parking ordinance restricting parking to holders of residential permits); **Cline v. Commonwealth of Pennsylvania State Retirement Board**, 555 A.2d 1216 (PA 1989) (challenge to Commonwealth practice of tying judicial compensation to date judge entered office); **Wilkinsburg Police Officers Association v. Commonwealth**, 636 A.2d 134 (PA 1983) (the court ruled on whether fiscal recovery plan adopted distressed borough violated Pennsylvania Constitution by impinging upon collective bargaining agreement); **McCusker v.**

_____

[14]In **Pfeiffer v. Marion Center Area School District**, 917 F.2d 779 (1990), the Third Circuit Court of Appeals, in dicta, stated that "a private right of action is available for cases of gender discrimination under the Pennsylvania ERA." **Id**. at 789.  Also in **Kemether v. Pennsylvania Interscholastic Athletic Association, Inc.**, 15 F.Supp.2d 740 (1998), the )District Court held that "there is a private right of action for cases of gender discrimination under the Pennsylvania ERA." **Id**. at 755.  See also **Barrett v. Greater Hatboro Chamber of Commerce, Inc.** Not Reported in F.Supp.2d, 2003 WL 22232869 (E.D.Pa.)*3

**Workers Compensation Appeal Board** (Rushton Mining Company), 639 A.2d 776 (PA 1994) (the court considered equal protection challenge  to whether or not a section of the Workers Compensation Act which provided that widow or widower would have their benefits terminated if it was ascertained that the had entered into a meretricious relationship with another person violated the Equal Protection Clause); **Hoffman v. Township of Whitehall**, 677 A.2d 1200 (PA 1996) (the court examined whether veterans preference in state civil service promotion violated Pennsylvania Constitution); **Torbik v. Lucerne County**, 696 A.2d 1141 (1997) (whether a hotel tax assessed to finance a convention center violated Article III Section 32 of the Pennsylvania Constitution); **Smith v. Coyne**, 722 A.2d 1022 (PA 1999) (whether the requirement that tenants post bond of three months rent violated equal protection); **Small v. Horn**, 722 A.2d 664 (whether rules of the Department of Corrections concerning dresses violated Article I Section 26 of the Pennsylvania Constitution).  The Pennsylvania Courts have never rejected a challenge to the constitutionality of a statute or state or local action based upon the fact that Pennsylvania citizens do not have  resort to the courts to enforce rights afforded them by the Pennsylvania Constitution.

Article I, Section 11, of the Pennsylvania Constitution explicitly provides, by its own terms, that every person shall have a claim for every injury done to its "lands, goods, person, or reputation." Article I Section11 of the Pennsylvania Constitution provides:

> Courts to be open; suits against the Commonwealth.  All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law and right and justice administered without sale, denial or delay.  Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the legislature made by law direct.

Given the fact that Pennsylvania state courts have recognized Constitutional claims asserted in private causes of action, it is apparent that there is an implied cause of action under the Pennsylvania

Constitution.

### b)    There is no indication the Pennsylvania Constitution would not allow an action for money damages

The next question is whether the right to bring an action to enforce the Pennsylvania Constitution extends to the right to claim money damages.  Under similar circumstances, the United States Supreme Court decided that there is an implied cause of action to enforce the provisions in the Bill of Rights directly.  **Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics**, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed. 2d 619 (1971).  The reasoning of the court is persuasive in connection with demonstrating why an implied cause of action under the Pennsylvania Constitution would likely be found by the Pennsylvania Supreme Court.

> That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. See **Nixon v. Condon**, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); **Nixon v. Herndon**, 273 U.S. 536, 540, 47 S.Ct. 446, 71 L.Ed. 759 (1927); **Swafford v. Templeton**, 185 U.S. 487, 22 S.Ct. 783, 46 L.Ed. 1005 (1902); **Wiley v. Sinkler**, 179 U.S. 58, 21 S.Ct. 17, 45 L.Ed. 84 (1900)... Of course, the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation. But 'it is * * * well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' **Bell v. Hood**, 327 U.S., at 684, 66 S.Ct., at 777 (footnote omitted.)... 'The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.' **Marbury v. Madison**, 1 Cranch 137, 163, 2 L.Ed. 60 (1803). Having concluded that petitioner's complaint states a cause of action under the Fourth Amendment, supra, at 2001--2004, we hold that petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment.  U.S.N.Y. 1971.

**Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics**, 403 U.S. 388, 395,396 91 S.Ct. 1999, 29 L.Ed.2d 619

One can safely predict that the Pennsylvania Supreme Court would adopt the rationale of the United States Supreme Court in Bivens. In the analogous situation on the question of whether an implied cause of action is created by a statute, the Pennsylvania Supreme Court has noted it will follow the example of the United States Supreme Court to decided whether such an action exists. **Estate of Witthoeft**, 733 A.2d 623 (PA Supreme 1999). [15] In fact, the question is even stronger in Pennsylvania, since Article I Section11 states that there should be a remedy for every wrong done. Presumably this would include constitutional wrongs done also.

The paradox presented by dearth of cases on this issue is solved when one consider that the Commonwealth of Pennsylvania and local governments are immune from actions asserting damage claims for intentional torts. Consequently, an action seeking damages for an intentional violation of the constitutional rights could not be brought against the Commonwealth or a local government entity. However, the immunity granted local agencies and local officials does not apply in the case of:

> an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused injury and that such act constituted a crime, actual fraud, actual malice, or wilful misconduct. (42 PA.C.S.A. §8550)

The conduct of Woods and Cappabianca would support a finding of wilful misconduct. See **DiSalvia v Lower Marien High School**, 168 F.Supp. 2d 553, E.D.Pa. (2001). (The court determined that the alleged sexual harassment of female student manager by the assistant football coach amounted to wilful misconduct for which the coach was not entitled to official immunity

---

[15]**Witthoeft** involved the question of whether to impose liability on a physician for failing to make a report required under the Motor Vehicle Code. The fact that the Pennsylvania Supreme Court would follow the guidelines set forth in **Cort v. Ash** suggests that it would also follow the guidelines set forth in **Bivens**.

under the Political Subdivision Tort Claim Act.)   Therefore, Plaintiffs have a claim against Woods

and Cappabianca under the Pennsylvania Constitution.

c)    **The right to equal protection of the law includes the right to be free of discrimination and sexual harassment**

The Defendants have questioned whether an equal protection claim under the Pennsylvania

Constitution can include what is, in essence, a hostile educational environment claim, or whether

such a cause of action is limited to direct disparate treatment.  As noted above, both factual scenarios

are present here.  Plaintiffs claim that the inaction to the assaults, coupled with their removal from

regular classes, constitutes the violation of equal protection.  The Third Circuit has addressed the

question of whether harassment violates the Fourteenth Amendment, Equal Protection Clause  42

U.S.C. §1983 in the case of **Andrews v City of Philadelphia**, 895 F.2d 1469 (3d Cir. 1990)**.**

**Andrews** was a hostile work environment case where the Plaintiffs brought claims under 42

U.S.C.  §1983,  claiming  that  their  rights  to  equal  protection  as  guaranteed  by  the  Fourteenth

Amendment to the United States Constitution was violated.  There were jury verdicts entered in the

plaintiffs' favor.   The two plaintiffs claimed that the "squad room where they worked for the

Philadelphia Police Department was "charged with sexism." **Id.** at 1472.  The plaintiffs also claimed

that they were "regularly referred to in an offensive and obscene manner and they were personally

addressed by obscenities."  Both plaintiffs complained about the "loss of case file."  **Id.** at 1473.

Andrews claimed that "male officers refused to assist her in her work, further hindering her efforts...

[and] experienced some vandalism of her personal property."  **Id.**  She received anonymous phone

calls at home and, at one point, there was lime placed on her clothing, causing her to be burned.  **Id.**

The other plaintiff, Conn, was propositioned by a male and harassed by another officer.  Her peer

placed "sexual devices and pornographic magazines in her desk drawers and gather[ed] around and laugh[ed] at her reaction." **Id.** at 1475. There was also "sexually foul and lascivious language addressed to her." **Id.** She also experienced vandalism and missing files.

**Andrews** noted that for a successful claim under 42 U.S.C. §1983 for denial of equal protection, plaintiffs must prove existence of purposeful discrimination... Specifically to prove sexual discrimination, a plaintiff must show that any disparate treatment was based upon her gender." **Id.** at 1478. Since it found a constitutional violation, it is established that a hostile work environment violates U.S.C. §1983, at least so far as public employment is concerned. The court also analyzed whether the verdicts against supervisory officials for the harassment perpetrated by peers could support liability on the supervisory officials. Concerning one of the supervisors, the court noted that:

> there is evidence that he personally participated in the harassment of Andrews... [and] there is also evidence that Doyle condoned the action of Andrews' male colleagues... Doyle also did very little to remedy the missing case file program... [and] the jury reasonably could have determined that Doyle's failure to investigate the source of the problem implicitly encouraged squad members to continue their abuse of Andrews. **Id.** at 1478-1479.

In regards to other individual defendant, Lou Liciardello, the court determined that he could be found liable by the jury because he was "aware of the problems concerning foul language and pornographic material but did nothing to stop them." **Id.** at 1479. It is clear from this ruling, that the Third Circuit has determined that a hostile work environment could violate the Fourteenth Amendment Equal Protection Clause and that supervisors can be liable for the actions of their subordinates when they failed to stop the harassment.

### d) **The individual liability of Woods and Cappabianca**

The Pennsylvania Supreme Court has stated that the protections of the Pennsylvania Equal Protection Clause are to be interpreted in the same manner the U.S. Supreme Court construes the Fourteenth Amendment Equal Protection Clause.  In particular, the Supreme Court in **Love v Borough of Straudsburg** held that "[t]he equal protection provisions of the Pennsylvania Constitution are analyzed by this court under the same standards used by the United States Supreme Court when reviewing equal protection claims under the Fourteenth Amendment." **Love**, 597 A.2d at 1139.  Therefore, the discussion contained in **Andrews** would likely be found to be applicable.

Woods and Cappabianca were aware of the harassment inflicted upon KL and RP.  They were in a position to control the student body and discipline those guilty of infractions, insofar as the School District's sexual harassment policy was concerned.  The state action question is not an issue here.  While the harassers in **Andrews**, supra, were police officers, Pennsylvania Constitution, Article 28, does not require state action.  **Imboden v. Chowns Communications**, 182 F.Supp.2d 453. (E.d. Pa. 2002)(There is no requirement to allege state action for a claim under Pennsylvania Equal Rights Amendment (PERA)) See also, **Bartholomew on Behalf of Bartholomew v. Foster**, 541 A.2d 393, 115 Pa.Cmwlth. 430, Cmwlth.1988, affirmed 563 A.2d 1390, 522 Pa. 489, reconsideration denied 570 A.2d 508.


Cappabianca and Woods would, therefore, be liable under Article 1, Section 28, of the Pennsylvania Constitution for the harassment of Plaintiffs, since they ignored the original assault and harassment, and under Article I, Section 26, since Woods decided that RP and KL should be sent to Sarah Reed, since both Woods and Cappabianca stereotyped the girls.  Both Cappabianca and Woods misled the Erie Police Department concerning when they knew about the assault and Cappabianca

31

engaged in cruel conduct directed towards RP by, in essence, defaming RP to her a mother and friend of RP.  For these reasons, the claim against the individual Defendants should be permitted to proceed to court.

2)    **Plaintiffs need not exhaust remedies under the IDEA to bring their action under Title IX**

      The School District states that that Plaintiffs have no IDEA or the ADA claims because of failure to exhaust. The Plaintiffs have not raised claims directly under these acts yet, but do assert that their transfer from the regular public schools to an "alternative education program" which utilized a behavior modification education modality to educate children with behavior problems violated Plaintiffs' rights under Title IX.  The Plaintiffs were victims of discrimination by virtue of their placement in such a school, while their male assailants were not even disciplined.  They were victims of discrimination, since their placement in the Alternative Education Program was made to keep them safe from harassment.

      Were the Plaintiffs to bring an action under the IDEA or the ADA such an action would not be precluded by a failure to exhaust remedies.   While the IDEA requires exhaustion "before the filing of the civil action... seeking relief that is also available under this sub-chapter" (20 U.S.C. §1415(f)), recourse to the IDEA administrative proceedings is not required where "it would be futile or inadequate."  **WB vs Matula**, 67 F.3d 484,495.  §1415(f) does not provide for a recovery of damages under damages, "by its plain terms §1415(f) does not require exhaust where the relief sought is unavailable in an administrative proceeding." **Id.** at 496.  The **Matula** court also held that exhaustion is not required if it would be futile.

Exhaustion would be excused in this case for several reasons. First, the Plaintiffs are only seeking money damages. Neither of the Plaintiff resides in the Erie School District now, so neither can seek perspective relief. Moreover, as is outlined in the brief, the School District itself subverted the potential for an administrative process. In the course of changing Plaintiffs' placement, it advised the Richard P. And Denise L. that their children had to be removed from the school district for their personal safety. Moreover, in the case of RP, the school district's home school visitor, who secured the "consents" of the parents to the change in educational placements dealt with Shelly P., whose medical condition was such that any consent would not be knowing and intelligent. There is no indication, moreover, that the School District even explained the nature of the educational program to which they were transferring the girls to the parents of KL or RP. There was no IEP meeting for either girl, the IEP paper work describing the nature of the educational needs of the girls was identical. The sole purpose of the IEP was not to address bonafide educational needs, but to leave a post hac paper trail to justify the decision of Woods and Scozzie to place the girls in a behavior modification program. The process was a sham. To urge that somehow the Plaintiffs parents knowingly and intelligently waived objections to the placement, given the fact that their daughters had been subject to sexual assaults, the indifference of the school officials and told that their daughters had to be transferred for their safety would be a subversion of the requirement of exhaustion.

The court in **Matula** held that "where the relief sought in a civil action is not *available* in an IDEA administrative proceeding, recourse of such proceeding would be futile and the exhaustion requirement is excused. **Matula**, at 496.

In **Lindsley ex rel. Kolodziejczack v. Girard School Dist.**, 213 F.Supp.2d 523, 536 (W.D. Pa,

2002, this court rejected an effort to amend a complaint, since it found that a plaintiff could secure

relief if administrative procedures were pursued.

> In this instance, we find that Plaintiff has failed to demonstrate that resort to the available administrative remedies would be futile. Unlike *Matula*, in which all of the rights that could have been obtained through the administrative process had been pursued and settled by a binding settlement agreement, there is relief that could be obtained through the administrative process in this case that has not been pursued.

However, this case in not like **Lindsley**; it is more similar to **Hicks, ex rel. Hicks v. Purchase Line**

**School Dist.,** 251 F.Supp.2d 1250, 1253, (W.D. Pa 2003)  where the court held that exhaustion is

not required.

> Hicks, however, has graduated from the district and is seeking retrospective relief only in the form of money damages that are unavailable through any administrative process. [Footnote omitted.] See **Ronald D. v. Titusville Area Sch. Dist.,** 159 F.Supp.2d 857, 862 (W.D.Pa.2001). Therefore, plaintiffs' are excused from IDEA's exhaustion requirement, and this court has subject-matter jurisdiction over this action

**Id** at 1253.

The **Hick's** court distinguished Lindlsey by noting that:

> In **Lindsley** the court refused to excuse a plaintiff's failure to exhaust administrative remedies in an IDEA case because such remedies where still available to correct the alleged § 1983 violation. Id. at 537; citing inter alia **Corpus Christi Indep. Sch. Dist**., 31 IDELR 41 (1991) (holding that parent's claims for compensatory education was premature in light of fact that child had not been determined eligible for special education services; school district was ordered to assess the student in all suspected areas of disability as soon as practicable).

**Id**.  The present case is like **Hicks**, because there is no remedy that the plaintiffs could achieve in

the administrative process.

## CONCLUSION

For the foregoing reasons, Defendants' Summary Judgment Motion should be denied.

Respectfully submitted,


s/ Edward A. Olds
Edward A. Olds, Esquire
Pa. I.D. No. 23601
Carolyn Spicer Russ
Pa. I.D. No. 36232
Richard S. Matesic
Pa. I.D. No. 72211

1007 Mount Royal Boulevard
Pittsburgh, PA 15223
(412) 492-8975
(412) 492-8971 (facsimile)
edolds@earthlink.net


*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on _____, 2005, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

James T. Marnen, Esquire
KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.
120 West Tenth Street
Erie, PA 16501-1461

S/ Edward A. Olds
Edward A. Olds, Esquire

36

37