Student Name: _____

*Notice of Recommended Educational Placement*

_____

_____

_____

_____

| School District Superintendent | Signature | Date |
|---|---|---|

You have certain rights and protections under law that is described in a document titled **Procedural Safeguards Notice**. If you need more information or want a copy of the **Procedural Safeguards Notice**, you may contact:

*C. Moore*
Name

*Supervisor*
Position

*874-6050*
Phone Number

**DIRECTIONS FOR PARENTS:** Please check one of the options, sign this form, and return it within **10 days** to the person listed above.

- ☑ I **approve** this recommendation
- ❑ I **do not approve** this recommendation

    My reason for **disapproval is:**

    _____

I request:

- ❑ A Pre-hearing Conference
- ❑ Mediation
- ❑ Due-process Hearing

I will need the following accommodations to be made so that I may attend the above.

_____

| *Shelley P* | *1-18-02* | |
|---|---|---|
| Parent's Signature | Date | Daytime Phone |

Revised 9/2001

Isla

# MEMO

**TO:**      MR. JAMES PIEKANSKI, SUPERVISOR OF SPECIAL EDUCATION

**FROM:**    MRS. AUDREY PECORARO, CHILD STUDY DEPARTMENT

**SUBJECT:**  REQUEST FOR SPEECH SERVICES

**DATE:**     JANUARY 17, 2002

The following student has been assigned to attend the Sarah Reed Program at 1020 East 10th Street:    R█████ P██████

          D.O.B. █████

          ID# 963479

          Parent: Richard P█████

          Address: █████████████

          Phone: █████    cell █████

          School: Strong Vincent

          Grade: 7, LS

According to the Student Assignment Information, student is to receive Speech and Language Services 2%.

A request is made for student to receive the services at Sarah Reed. She will begin the program on 1/22/02.

Thank you for your consideration.

152a

E 000000422

I am requesting that my daughter
█████ █████ be transferred to the
school district's Alternative Education
Program. I wave all rights to a hearing.

Shelley ██████████

1-18-02

153a

E 000000442

Department of Pupil Learner Services
## Child Study Office

# Request For Home-School Visitor Service

Student ID # _____ 96 3479 _____

Name of Child ____ R███ P███ _____    Birthdate ████████████

Lives with ____ *Richard* _____    Address ████████████████████
(Name, Relationship)

Phone ███████    Present School, Grade _ *Strong Vincent* 7 __    Regular ☐
    Special ☒

Date of Request _____    Principal's Signature _ Referral _
    EPD cell 572-6299

PROBLEM/REASON FOR REFERRAL:    Referral to Sarah Reed
    by Marlene / Friends

Meet HSV
Fri - 11:00    Intake
    1/21/02 - 11:00
    Mon

---

Date received in Child Study _____    Assigned to: _____

REPORT OF HOME-SCHOOL VISITOR:

1/17/02 - Contact with parent. Intake will
be on 1/21/02 - 11:00 Am.
HSV will go to home 1/18/02 at 11:00.

1-18-02 - HSV went to home. Mother had difficulty
remembering our appt. Apparently she is
heavily medicated & has memory problems.
Forms signed. Intake is scheduled for 1/21/02
at 11:00. Student will begin the program on

Form 434-PLS-8-78    1/22/02    **154a**    E 000000443

# MEMO * School District of the City of Erie, PA

**TO:**       Mr. Frank Scozzie – Assistant to the Superintendent
              Mrs. Charlise Moore - Supervisor, Special Education
              Mrs. Marlene Chrisman – Supervisor, Special Education

**FROM:**    Mrs. Audrey Pecoraro, Home/School Visitor

**SUBJECT:**  PLACEMENT OF R████ P████████ AT SARAH REED CHILDREN'S
              CENTER

**DATE:**     January 17, 2002

     R████ P████, DOB ████████ referred to Sarah Reed, Behavior Modification Program, Special Education Tract, from Strong Vincent High School, Grade 7 LS, is scheduled for the intake process at Sarah Reed on Monday, January 21, 2002 at 11:00 A.M.  She will begin the program on Tuesday, January 22, 2002.

AP:cc

155a

*Special Education*
*TRact*
*Referral by*
*MR. Scozzie,*
*MRS. Chrisman*
*MRS. Mou*

NAME: R█████ P█████                    DOB: 11-6-88

ADDRESS: ███████████

SCHOOL:    *Strong Vincent gr. 7LS - 1/02*
           *Returns    gr. 8LS   6/02 - 8/02*

*1/21/02        Intake - 11:00 Am*

*1/22/02*        Student to start Sarah Reed Alternative

*6/7/02*        Student has completed Sarah Reed Alternative
               placement and will be returned to home school
               *Returns to    Strong Vincent gr. 8LS*

**ADDITIONAL COMMENTS:**

*- Speech services have been requested.*

*- CER dated 12-18-95.*

*- Two year Review - dated 3/2/98*

**156a**

E 000000454

**Special Education Department**

# Memo

**To:** Jo Barker, Director/Elementary-Middle School Programs

**From:** Marlene Chrisman, Special Education Supervisor

**CC:** F. Scozzie/Charlise Moore/Jim Piekanski

**Date:** 01/15/02

**Re:** B-Mod Referrals

---

The purpose of this memo is to provide information on two students who are being referred to Sarah Reed per Frank Scozzie. Both girls were involved in a recent situation at SV of the nature and intensity that staff, including Mr. Scozzie, feels this level of intervention is essential. Both girls are under age 14 and, therefore, not eligible for the Adolescent Partial program.

The girls are:

1. Blind due to placement in R██████ folder

2. R██████ ██████ (DOB: ██████) grade 7LS 

   

It is my understanding that Mr. Scozzie would like the girls to begin this placement as soon as possible. Please contact Charlise Moore or myself to assist in this process.

● Page 1

157a

E 000000446



# SARAH A. REED
## Children's Center

# PROGRAM HANDBOOK

# *SCHOOL DAY SERVICES*

EXHIBIT

158a    Iddings #1

**W**elcome to the Sarah A. Reed Children's Center. We are glad that you have chosen our Agency for help and support. Please remember that our goal is to help our students improve their behavior and make the needed progress that will enable them to successfully transition back to their home school.

Of course, we understand that parent(s)/guardian(s) or students may feel a bit anxious about starting at a new school program. To help answer some of your questions or concerns, we have developed a program handbook. In addition, this information will help familiarize you to the policies, expectations, and rules of the program.

However, it is important to understand that this handbook is only a guide and that treatment decisions are made on an individual, case by case basis, in order to help each student meet his/her treatment goals.

Remember, if you have any further questions or need specific information about your child's treatment progress, please call us at any time.

3

**O**ur Mission...

The mission of Sarah A. Reed Children's Center is to improve the quality of life for students with personal, social and emotional problems. Through teamwork, we provide a variety of high quality, innovative and effective mental health services, to help students realize their potential, and experience success in their families, schools and communities.



2

159a

YOUR CHILD'S PSYCHIATRIST:

CLASSROOM STAFF:

YOUR CHILD'S PROGRAM:

CLINICAL SUPERVISOR:

PROGRAM SUPERVISOR:

THERAPIST:

MEDICAL DEPARTMENT:

PROGRAM HOURS:

OFFICE HOURS:

MAIN OFFICE:  **Phone: 453-4309**

4

# Introduction

The Partial Hospitalization Program and the Therapeutic Alternative Education Program are based on the philosophy that all students have the potential to succeed. While some students have little or no trouble adjusting/learning in a traditional school setting, others may experience difficulties that make learning and personal adjustment hard for them. Our goal is to help students who experience such difficulties develop the skills necessary for greater success at home, school, and in the community.

**Parents as Partners in Treatment**

Parents/guardians are the most important members of the treatment team. They know more about their child than anyone else and have the greatest investment in their child's success. Therefore, we strive to involve parents and families in all aspects of their child's treatment.

Parents/family members are expected to participate in their child's treatment and are encouraged to contact his/her Therapist with any concerns regarding behavior issues, treatment recommendations, or academic progress. Regularly scheduled meetings with program staff are encouraged so parents can address any questions regarding their child's progress. Since these meetings are extremely important, please call us if you ever need to cancel or reschedule your appointment.

5

## Program Description

Our programs at Sarah A. Reed Children's Center provide individualized clinical and educational help for students needing a level of support beyond what is available in their home school environments. The reason we do this is so that we can identify and build upon each student's strengths and potentials to empower them with the skills and motivation necessary to experience success in school.

All students benefit from a structured therapeutic classroom environment. They receive social skill instruction, an individualized behavior management plan, and back-to-school transition services. Students who receive therapeutic alternative education services only, have access to psychiatric consultations when deemed necessary by the child's clinical treatment team.

In addition to the above services, students who receive therapeutic alternative education combined with partial hospitalization services, see our psychiatrist on a regular monthly basis, have an assigned Therapist, and have an individualized treatment plan which is reviewed and updated every 20 treatment days. Also, if the student is prescribed medication, he/she is closely monitored by our outpatient med. clinic.

Generally speaking, students attend our program on a short-term basis, as our ultimate goal is to transition them to their home school. Our Transition Team will work closely with parent(s)/guardian(s), home school personnel and other service providers (if needed) to plan and carry out a successful transition and discharge.

6

Open and active communication between Sarah Reed staff, parents, and home school personnel is considered essential while students are enrolled in our program. Individual achievement/improvements will be closely monitored and progress reports will be shared regularly with schools and parents.

## Classroom Level Program

As part of the overall program structure, and as a way to provide students with daily feedback on their progress in school, a levels system has been designed for each classroom. Students who show positive behavior in school are rewarded with advancement in the classroom level program. As they experience success and make progress in the levels, they achieve more independence and privileges. Privileges are determined by program staff and based on student age/ability.

### *Orientation Level:*

All incoming students are placed on the Orientation level for a minimum of one week and a maximum of two weeks as they enter the program. Orientation provides an opportunity for students to familiarize themselves with all aspects of the program.

### *Level I:*

Level I students continue to require constant supervision within the program and must be in staff sight at all times. With Level I status, students are eligible to participate in off-ground activities, such as field trips, as scheduled by the program staff. Students are expected to abide by all classroom rules and maintain appropriate behavior both on and off grounds.

7

161a

Students who are able to demonstrate a consistent level of performance by earning a weekly average of at least 80% for two consecutive program weeks will be considered for promotion to Level II. Students requesting promotion to Level II must submit requests in writing to the Promotion Review Board.

*Level II:*
Level II students who demonstrate a consistent level of self control and responsible behavior are rewarded with periodic opportunities to engage in independent activities apart from the classroom. These activities are designed and approved by the classroom teacher and must occur in the building. Level II students are expected to abide by all classroom rules and to maintain a weekly average of 80% or higher to maintain Level II status. If their weekly average drops below 80%, the student will return to Level I status.

Students who wish to be considered for promotion to Level III must average 85% for 3 consecutive program weeks, complete all assignments, and submit a written request to the Promotion Review Board. If the board agrees after reading the request and interviewing the student, the promotion will be granted.

*Level III:*
Level III students who continue to demonstrate responsible behavior and decision making are permitted more frequent opportunities to engage in independent activities. This independent time may be spent in academic or recreational areas of the program as approved by program staff. Level III students are expected to abide by all program rules, complete assignments, provide positive modeling/leadership for peers, and maintain a weekly average of 85% or higher to maintain Level III status. Students whose weekly average drops below 85% will return to Level II status. Students who wish to be

considered for promotion to Off-Levels status must demonstrate a consistently high level of performance. These students must maintain a weekly average of 90% for 4 consecutive weeks while meeting all other program expectations. Students must submit a written request to the Promotion Review Board. If the Board agrees after reviewing the request and interviewing the student, the promotion will be granted.

*Off-Levels:*
Students who wish to maintain Off-Level status must continue to follow all program rules and complete all course work assigned to them. Students who have achieved this level have shown that they have met their treatment goals and have been entrusted with the highest level of independence. Furthermore, Off-Level students are often chosen as peer mentors and participate on the Promotion Review Board. Students must continue to obtain a weekly average of 90% or higher to maintain Off-Level status. If the weekly average drops below 90%, the student will be returned to Level III status.

It is important to note that success in the level system is one of the many measures used to determine if a student has met criteria to start transition back to his/her home school (students attending the "45 day assessment program" use a modified Levels System, due to the limited time frame that they are at Sarah Reed).

8

9

162a

## Positive Behavior Programming

Our program is designed to help students make positive choices and to learn self-control techniques so that they can develop positive behavior at home, in school, and in the community. It is our intention to respond properly and effectively to disruptive and aggressive behavior.

Our goal is to ensure the safety of all. We will intervene in ways that display the principle that we do not hurt one another. When children engage in disruptive behavior, they are encouraged to use a "down time" away from others. Staff members help students talk through problems and promote calming down and making good decisions. A manual therapeutic hold by trained staff will be used only in an emergency situation and only when a student's behavior is very likely to result in injury to themselves or others. If this should occur, you will be notified as soon as possible.

If your son/daughter begins to show a pattern of aggressive and/or disruptive behavior, we will attempt to notify you as soon as possible.

163a



10

## Other Program Services

### Off-Ground Activities

Regularly scheduled therapeutic recreation activities will be provided to promote positive peer interactions, teamwork, and self-control. Periodically, off-ground educational activities will be scheduled for the students.

### Transportation

Transportation is provided to students by their home school districts, the Sarah A. Reed Children Center vans or the LIFT Transportation Program. Elementary and middle school students, who attend the Erie City School District, will be transported to and from the program by Sarah A. Reed Children Center staff. Secondary students who attend the Erie City School District will be transported to Sarah Reed by an Erie City School District bus, but will be transported home by the LIFT. All students attending a Millcreek or County school will be transported to and from the program by their home school district. Districts are responsible for establishing pick up and drop off locations and times with students and families. Individual districts' behavioral expectations and discipline policies will be in effect and enforced as necessary. No students are permitted to drive to school. Please report any changes in the transportation needs of your child as soon as possible. If you will be picking up your child early for an appointment, please call and let us know or send a note with your child. **All children will be expected to ride their normal bus or van home unless a note or phone call is received informing us differently.**

11

## BEHAVIORAL GUIDELINES

**Please review the following rules/guidelines with your son/daughter:**

**Transportation Guidelines:**

- Stay seated in assigned seats
- No use of obscene or verbally aggressive language
- No physically aggressive behaviors
- No eating or drinking on the vehicle
- No littering
- Be courteous to fellow students
- No pushing, fighting, or unruly behavior in or around the vehicle
- Do not mar, deface, or tamper with any part of the vehicle
- No smoking in or around the vehicle
- Wear a seat belt at all times

**Smoking Policy:**

Sarah A. Reed Children's Center has a NO SMOKING policy in effect throughout all facilities, grounds and vehicles owned, leased, or controlled by the Children's Center.

13

**Food Services**

All students will be provided with a morning snack and a nutritious lunch. The lunch menu includes hot and cold entrees. Lunch menus can be provided upon request. Students are permitted to bring packed lunches from home if they choose. Special meals can be provided for clients with food allergies.

**Medication**

If your child takes any medication prescribed by a physician other than a Sarah Reed doctor, you will need to bring in a supply of the medication for the nurse to give to your child while he/she is at Sarah Reed. **Medications cannot be sent in with your child or a van driver.** You must bring prescriptions to the Medical Department yourself. All medication must be in the **ORIGINAL PHARMACY BOTTLE.** It must be clearly marked with your child's name, the medication, and the dosage.

164a

12

**Prohibited Items/Substances:**

The following items are deemed inappropriate and unlawful possession of these articles will not be tolerated:

- Lighters, tobacco products, and tobacco paraphernalia
- Aerosol sprays
- Satanic or gang related items
- Drugs and related paraphernalia
- Knives, razors, and other potentially dangerous weapons
- Pornographic materials
- Beepers and cell phones
- Personal electronic items (Game Boys, CD players, etc.) unless otherwise permitted by staff in special incidents
- Toy or look-a-like weapons

Staff will determine and confiscate items deemed inappropriate. Items will be returned after a parent conference is held.

Students are strongly discouraged from bringing more than a few dollars to the program. The only items available for purchase are pop and candy from the vending machines and only students on Level 2 or higher may go to the vending machines. Sarah A. Reed Children's Center is not responsible for lost, stolen, or vandalized property brought to the Children's Center by students.

15

**Student Dress Code:**

- Wear clothes that are <u>not</u> revealing or suggestive; see-through blouses, halter tops, bare-midriffs, tank tops, cut-off shorts. Wide strap or sleeveless blouses are permitted
- No clothing, jewelry, or accessories that promote, encourage, or depict any form of drugs (including alcohol or cigarettes), obscene, suggestive or vulgar language or action will be permitted
- Wear clothing, jewelry, or accessories that do <u>not</u> indicate membership in a gang or cult, or cause a disruption to the program
- Pierced facial jewelry (excluding earings), is <u>not</u> permitted to be worn during school hours
- Key holders are <u>not</u> to be worn around the neck for safety reasons
- Wear pants that are <u>not</u> revealing or suggestive or expose underwear
- Wear shorts, dresses, or skirts of reasonable length
- Hats are <u>not</u> permitted to be worn during school hours
- Students must wear shoes in school
- Students are <u>not</u> to wear coats during school hours

**Students may be taken home to change objectionable clothes.**

**Lunchroom rules:**

- Be polite when requesting food
- Sit in areas designated by staff
- Stay seated and quiet
- No students allowed in the kitchen
- Ask staff for second helpings
- Ask staff to clear plate from table when finished
- Students will go to and from lunch in an orderly manner

14

## Client Bill of Rights

- Staff will take good care of you no matter what religion or culture you believe in, what color you are, or if you are a boy or a girl. ☺

- All the laws of Pennsylvania still protect you here at Sarah Reed. Kids have rights too! ☺

- Staff will be respectful to you at all times.

- You can in private talk about things that are important to you. ☺

- You can talk to staff and your therapist about important things and they will not tell unless you or someone else can be hurt. ☺

- Staff will do everything they can to keep you safe at all times.

- You have the right to know the names of all staff that care for you and what they do. ☺

- We will tell you why you are here and what we will do to help you. ☺

- You will be able to help plan your care while at Sarah Reed.

- You will be taught the rules about your care. ☺

- You can let us know if you think you are not being taken care of. Your Therapist will help you do this. ☺

- You are allowed to have fun and go to special activities.

17

**Police Involvement:**

Sarah A. Reed Children's Center reserves the right to involve the police department when serious behaviors/events deem it necessary. Any behavior that is in violation of civil or criminal law will be dealt with as the law permits. Staff or students have the option to press charges against any student who physically assaults them or engages in terroristic threats.

We hope that this booklet has provided you with some useful information. Please remember we are always available to hear your concerns and discuss your child's treatment. Feel free to call or write your child's Therapist when you have questions or concerns about your child's care or regarding any of our Agency's policies.

16

166a

**NOTES**

19

---

**Parent/Client Right to Discuss Differences**

It is the intention of the Sarah A. Reed Children's Center to provide effective treatment and services to you and your child. As we are attempting to provide the best possible program, we would welcome any suggestions that would help us improve what we do. If you have any comments or ideas, please share them with us.

If there are any difficulties that you and your child's Therapist cannot resolve, please do not hesitate to contact the Program Supervisor. Our intent is to maintain an honest and open relationship with parents, and we want to be made aware of problems or difficulties that may arise.

If the issue continues to remain unresolved, you may further pursue resolution by contacting the following individuals in order as they appear below:

Program Supervisor: _____
Executive Vice-President: _____
President/CEO: _____
Erie County Director of Human Services: _____
_____

*At intake, the grievance process will be reviewed and you will be provided with the forms needed to facilitate resolution to any of your concerns.

167a

18



SARAH A. REED
Children's Center

**Main Residential Campus**
Residential Treatment &
Wrap Around Services
2445 West 34th Street
Erie, PA 16506
814-838-1954
fax 835-2196

**Early Intervention Center**
Out-Patient Clinic
Therapeutic Alternative Education & Partial Hospitalization
School Aged Services
1020 East 10th Street
Erie, PA 16503
814-453-4309
fax 459-1191

**St. Mary's School**
Therapeutic Kindergarten & Partial Hospitalization
Preschool Services
310 East 10th Street
Erie, PA 16503
814-455-6562
fax 453-4636

**www.sarahreed.org**

168a

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    RICHARD P., by and for
      R████ P., and DENISE L.,       :
 4    by and for K████████ L.,       :
                   Plaintiffs        :
 5                                   :
           v.                        :    Civil Action No. 03-390
 6                                   :              Erie
      SCHOOL DISTRICT OF THE CITY    :
 7    OF ERIE, PENNSYLVANIA; JANET   :
      WOODS, Individually and in     :
 8    her Capacity as Principal of   :
      Strong Vincent High School;    :
 9    and LINDA L. CAPPABIANCA,      :
      Individually and in her        :
10    Capacity as Assistant          :
      Principal of Strong Vincent    :
11    High School,                   :
                   Defendants        :
12

13

14

15

16         Videoconference Deposition of C█████ E. B████

17    JUNIOR, taken before and by Janis L. Ferguson, Notary

18    Public in and for the Commonwealth of Pennsylvania, on

19    Tuesday, April 26, 2005, commencing at 10:08 a.m.,

20    at the Erie County Bar Association, 302 West 9th

21    Street, Erie, Pennsylvania 16501.

22

23

24
                 Reported by Janis L. Ferguson, RPR
25              Ferguson & Holdnack Reporting, Inc.
```

169a

f4d05c3a-c3b9-4d24-ba5a-694bddcf9ac9

Page 50

1    A. Yes, it was -- yeah, it was the next day, after
2  the incident.
3    Q. The very next day. And you said that one of the
4  girls was telling other girls --
5    A. Yes.
6    Q. -- at Strong Vincent that that happened?
7    A. Yes.
8    Q. Was that girl R████ or K████
9        MR. OLDS: Objection. Hearsay.
10   A. It was both of them. Because they both was
11 telling they friends. And the friends would come to like
12 ask me, is that true, that you let them give you oral sex.
13   Q. And what I am trying to find out, though, is what
14 you were told by these girls about who was spreading this
15 around.
16   A. Could you say that again?
17   Q. Who was spreading the information around?
18 K████ or R████or both of them?
19   A. They was telling me both of them.
20       MR. OLDS: Objection. Hearsay. Lack of
21 foundation.
22   Q. Your information was both of them?
23   A. Yes.
24   Q. The conversation with Miss Cappabianca, that took
25 place before Christmas vacation?

Page 51

1    A. Yes.
2    Q. And that's the conversation during which she asked
3  you what happened?
4    A. Yes.
5    Q. And did she talk to you about either one of these
6  girls specifically by name?
7    A. No, she just said, what happened. You know,
8  what's going on.
9    Q. Well, did you have any idea what she was talking
10 about?
11   A. At first I didn't. Like, she was like, what's
12 going on with all this -- I'm hearing this -- like hearing
13 this stuff about you having -- like -- she said like you're
14 having oral sex.
15   Q. Oral sex with --
16   A. She asked me that.
17   Q. Oral sex with whom? Did she say any names?
18   A. I can't say that; if she did or not, because I
19 don't remember.
20   Q. Okay. Now, the conversation about going to
21 alternative education, did that take place before Christmas
22 or after?
23   A. After.
24   Q. And the conversation with Wally Love and with
25 Miss Woods where they accused you of doing something wrong,

Page 52

1  that also took place afterwards? After Christmas?
2    A. I think it was before.
3    Q. Before Christmas?
4    A. Yes.
5    Q. Okay. But you didn't talk to the police until
6  after Christmas?
7    A. Yes. Yes. But I was at the Christian Academy
8  when they came and got me.
9        MR. MARNEN: Okay. That's all I have. Thank you,
10 C████
11       MR. OLDS: Just one more.
12
13           RECROSS-EXAMINATION
14 BY MR. OLDS:
15
16   Q. I think I have just one question, G████
17   Did you say that Miss Cap asked you, what's this I
18 hear about you having oral sex? Is that -- I'm not sure I
19 heard whether you said that.
20   A. Yes.
21   Q. She did say that?
22   A. Yes.
23       MR. OLDS: That's -- no other questions.
24       MR. MARNEN: C████ you have a right as the
25 witness to review the transcript of your

Page 53

1  deposition after it has been prepared. The court
2  reporter has been working hard this morning here
3  taking notes. She is going to prepare a
4  typewritten transcript of every word that was said
5  this morning.
6    You have a right to review that and to sign
7  it and to indicate if there are any mistakes in
8  the transcript. You don't have to do that if you
9  don't want to. It's up to you. What would you
10 like to do?
11 THE WITNESS: I'd like to read it.
12 MR. MARNEN: Okay. Let me make sure I have your
13 address. It's █████████████████
14 █████████████████ Or is there a
15 mailing address that we ought to send it to?
16 Maybe the gentleman in the room could tell us.
17 THE WITNESS: That was it, what you said.
18 MR. MARNEN: I got it right? Okay.
19 THE WITNESS: Yes.
20 MR. MARNEN: So if we mailed something to you,
21 we've got to send it there. Do you know the Zip
22 Code, C████
23 THE WITNESS: █████
24 MR. MARNEN: Okay, C████ thanks a lot. Have a
25 nice day.

Ferguson & Holdnack Reporting, Inc.



f4d05c3a-c3b9-4d24-ba5a-694bddcf9ac9

Page 1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    RICHARD P., by and for        :
     R██████ P., and DENISE L.,    :
4    by and for K████████ L.,      :
              Plaintiffs            :
5                                   :
          v.                        :     Civil Action No. 03-390
6                                   :            Erie
     SCHOOL DISTRICT OF THE CITY   :
7    OF ERIE, PENNSYLVANIA; JANET  :
     WOODS, Individually and in    :
8    her Capacity as Principal of  :
     Strong Vincent High School;   :
9    and LINDA L. CAPPABIANCA,     :
     Individually and in her       :
10   Capacity as Assistant         :
     Principal of Strong Vincent   :
11   High School,                  :
              Defendants            :
12

13

14

15

16          Deposition of MATTHEW BOGARDUS, taken before

17      and by Janis L. Ferguson, Notary Public in and

18      for the Commonwealth of Pennsylvania, on Thursday,

19      May 5, 2005, commencing at 10:23 a.m., at the

20      offices of Knox McLaughlin Gornall & Sennett, PC,

21      120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25          Reported by Janis L. Ferguson, RPR
              Ferguson & Holdnack Reporting, Inc.

Page 10

1 entity, or does it not -- is it a governmental entity?
2    A.   Private.
3    Q.   Private.  Does Sarah Reed take students from
4 outside of Erie County?
5    A.   Yes.
6    Q.   Generally the Northwestern Pennsylvania area?
7    A.   Yes.
8    Q.   And a student comes to your attention, I think you
9 indicated, from -- as a result of a referral from the school
10 district?
11    A.   Yes.
12    Q.   Generally, can you describe for me what kinds of
13 students are referred to Sarah Reed.
14    A.   They would be experiencing social problems,
15 emotional problems, behavioral problems; somewhere in that
16 spectrum.
17    Q.   The problems that they are referred to you for,
18 are they problems associated with their education?
19    A.   I'm not sure I understand the question.
20    Q.   Well, I guess a child could have a social problem
21 at home, you know, and maybe not exhibit that social problem
22 in the school setting.  And do you take children who are
23 having social or emotional problems at home?
24    A.   Yes.
25    Q.   So they don't have to exhibit any kind of social

Page 11

1 or emotional problems at a school for Sarah Reed to take the
2 children.
3    A.   No.
4    Q.   So are there certain areas of, for instance,
5 social or emotional problems that you encounter more often
6 than others?  In other words, what kind of problems, what
7 degree of severity and what kind of problems do the children
8 present when they come to you?
9    A.   They could exhibit features of depression,
10 anxiety, some can be aggressive, some can be quite
11 noncompliant, some may have a psychosis.
12    Q.   Do all the children who come to you have IEP's?
13    A.   No.
14    Q.   Who makes the decision whether to admit a child to
15 Sarah Reed?
16    A.   We have a committee.
17    Q.   So in terms of the process of having a child
18 admitted to Sarah Reed, what is your job?
19    A.   If someone is going to make a referral, they would
20 contact me, and I would gather information from them and
21 take that then to the committee for the decision to be made
22 to accept.  And if we accept them, I meet with the client
23 and family to gather background information on the client.
24 And then there are consent and release forms that need to be
25 completed as well.

Page 12

1    Q.   So are you ever contacted initially by family
2 members?
3    A.   Yes.
4    Q.   So it's not always school districts that refer
5 students.
6    A.   No.
7    Q.   When school districts refer students, is it
8 typically the case that the students are having a social,
9 emotional, or behavioral problem relative to the school?
10    A.   Yes.
11    Q.   So do you get many referrals from school districts
12 of children who are having social problems at home?
13    A.   Yes.
14    Q.   Okay.  Without having problems at school.
15    A.   That would be rare.
16    Q.   Sarah Reed has different kinds of programs; is
17 that right?
18    A.   Yes.
19    Q.   Tell me what types of programs it has.
20    A.   We have the alternative education program; we have
21 outpatient services, which would be individual or family
22 therapy or psychiatric care; we have partial hospitalization
23 services.
24    Q.   Any others?
25    A.   And within the alternative education program,

Page 13

1 those outpatient or partial hospitalization services are
2 provided.
3    Q.   So you have an alternative ed. program.  An
4 outpatient therapy program?
5    A.   (Witness nods head.)
6    Q.   That's separate from the alternative ed.
7    A.   It can be, or it can be provided within the
8 program.
9    Q.   And then you have a partial hospitalization
10 program.
11    A.   Yes.
12    Q.   It can be or cannot be separate from the --
13    A.   Yes.
14    Q.   -- alternative ed. program.
15    A.   (Witness nods head.)
16    Q.   Can you tell me what you mean when you say
17 "alternative ed. program".  What is that?
18    A.   Alternative education would identify a placement
19 for a student outside of their home school or their home
20 district.  But then what is provided within the alternative
21 ed. program would depend upon the program or the agency
22 providing that placement.
23         So at Sarah Reed, we are providing clinical
24 services within the alternative education program.
25    Q.   And do you know what kind of clinical services are

4 (Pages 10 to 13)

172a

97e84326-1189-4172-abcb-3eb42266f250

Page 14

1  provided?
2      A.  Psychiatric services, therapy services, and case
3  management services.
4      Q.  Why would a child come to Sarah Reed instead of
5  staying in their home school?
6      A.  It could be a variety of reasons.
7      Q.  Why don't you give me a couple.
8      A.  If they are experiencing emotional problems,
9  where, perhaps, they feel overwhelmed in the classroom,
10  can't really participate academically, they may look for an
11  alternate placement.  Behaviorally, if they are difficult to
12  manage, they may look for an alternate placement.  They may
13  look for assessment, if they are unsure of a difficulty,
14  such as a psychiatric assessment.
15      Q.  Are students admitted into the program to receive
16  a psychiatric assessment?
17      A.  In some cases, yes.
18      Q.  What kind of cases are those?
19      A.  If -- if they are uncertain if there is a
20  psychiatric disorder, but they may be displaying features
21  that have alerted someone, they would then look for the
22  psychiatric evaluation.
23      Q.  But would that be -- that would be a case where
24  they were exhibiting some kind of behavior in the classroom
25  that prompted somebody to have a concern that there needed

Page 15

1  to be a psychiatric evaluation?
2      A.  Yes.
3      Q.  Is it fair to say that the students admitted to
4  Sarah Reed, who are referred to Sarah Reed from other school
5  districts, are having some problems in the classroom,
6  typically?
7      A.  Typically.
8      Q.  And that problem could either be an emotional
9  problem or a behavioral problem?
10      A.  Or social problem.
11      Q.  Social.  When you use the term "social", tell me
12  what you mean.
13      A.  If a child has anxiety, they may not be able to
14  interact with their peers, with teachers, and they may feel
15  overwhelmed and shut down.
16      Q.  Is there a certain level of severity of the social
17  problem that a child has to exhibit before they are a
18  candidate for Sarah Reed?
19      A.  No.
20      Q.  So, for instance, if a child isn't getting along
21  with a student next -- sitting next to them in class, that
22  child could be admitted into Sarah Reed?
23      A.  They could be referred.
24      Q.  Would Sarah Reed accept that child?
25      A.  It would -- we would need more information than --

Page 16

1  than that.
2      Q.  I mean, is it fair to say that there -- there's no
3  level of severity of problems that a child has to exhibit
4  before they are considered to be a candidate for Sarah Reed?
5      A.  Correct.
6      Q.  So any child who had a social problem -- for
7  instance, can't get along with the kid sitting next to them,
8  could be a candidate for Sarah Reed?
9      A.  We could consider them.
10      Q.  If you think that the child's only problem was
11  they couldn't get along with the kid sitting next to them,
12  they could be admitted to Sarah Reed?
13      A.  Possibly to outpatient therapy.  So what we would
14  provide, the level of care, might be determined by the
15  referral concern.
16      Q.  And what kind of behavioral problems do children
17  have to exhibit before they are admitted to Sarah Reed?
18      A.  Again, there's a variety.
19      Q.  Can you illustrate some for me?
20      A.  As I had mentioned, the aggressive behavior,
21  defiant behavior, not staying within the classroom.
22      Q.  In terms of children with IEP's, Sarah Reed is
23  considered an out-of-school placement; is that right?
24      A.  Yes.
25      Q.  So in the scheme of things for the

Page 17

1  least-restrictive educational placement, where does Sarah
2  Reed fit?
3      A.  We would be one of the most restrictive.
4      Q.  And I think that you said that -- do you
5  typically -- students with IEP's who were referred to Sarah
6  Reed, do you typically see a behavioral plan in the IEP?
7      A.  I don't review the IEP.
8      Q.  Okay.  So tell me what you review.
9      A.  Oftentimes there is not information, paperwork
10  sent to me.  It's sent to us after a student is admitted.
11  So it would be reviewed by the staff working with the child
12  at that time.  And I am no longer a part of the picture at
13  that point.
14      Q.  Do you remember K▬L▬ and R▬P▬? 
15      A.  Yes.
16      Q.  Tell me how the referral of those two students
17  came to you.
18      A.  There has been more than one referral.  Which --
19      Q.  The first one.
20      A.  Um --
21      Q.  I think that was January of 2002, I believe.
22  Right?
23      A.  The school had contacted me at -- there had been
24  allegations made of sexual assault in school and also
25  harassment by other students.

Page 18

1    Q.   Who contacted you from the school?
2    A.   I don't recall.
3    Q.   Would it have been someone from the school or
4  someone from the administration?
5    A.   I don't recall.
6    Q.   And you say there were allegations of sexual
7  assault and harassment from other students. Is that the
8  first time that you encountered a referral to Sarah Reed
9  based upon harassment from other students?
10    A.   I guess I'm not quite understanding that question.
11    Q.   Well, someone from the School District called you
12  and said that there were two students with allegations of
13  assault and sexual harassment from other students. Right?
14    A.   Okay.
15    Q.   And my question to you is, was that the first time
16  a school district called you for possible referral to Sarah
17  Reed because a student was being harassed by other students?
18    A.   I don't -- I really don't know.
19    Q.   Can you think of any other instances when that was
20  a basis of referral?
21    A.   I cannot.
22    Q.   And you don't recall who called you from the Erie
23  School District.
24    A.   I do not.
25    Q.   And what was the outcome of that conversation with

Page 19

1  the person from the Erie School District?
2    A.   The referral was made.
3    Q.   And do you know if the referral took a written
4  form?
5    A.   I don't believe so.
6    Q.   So what did you do after you had that conversation
7  with a person from the Erie School District?
8    A.   Then discussed the referral with our admissions
9  team.
10    Q.   And who was on the team?
11    A.   Back then, I don't recall.
12    Q.   And is that the entire amount of information that
13  you had; that there were two students who had been victims
14  of sexual assault and harassment from other students?
15    A.   Yes.
16    Q.   That was all you knew.
17    A.   Yes.
18    Q.   So what information did you take to the admissions
19  team?
20    A.   That information.
21    Q.   And what did the admissions team decide to do?
22    A.   To accept them.
23    Q.   What criteria did the admissions team use to
24  accept these students?
25    A.   The fact that there was a trauma.

Page 20

1    Q.   And then you got back to the Erie School District
2  with that information that the admissions team had decided
3  to accept the students?
4    A.   Yes.
5    Q.   Can you think of instances where the admissions
6  team has declined to accept students from a school district
7  referral?
8    A.   Yes.
9    Q.   Without revealing any names, maybe just give me a
10  general idea of the circumstances that that happened.
11    A.   A lack of consent.
12    Q.   On the part of the parent?
13    A.   Yes.
14    Q.   Any other instances?
15    A.   If there was already treatment involved.
16    Q.   Anything else?
17    A.   No.
18    Q.   And when you say if there was already treatment
19  involved, what do you mean?
20    A.   If there was already mental health treatment
21  involved, it might be assessed that we would be duplicating
22  a service; that we wouldn't need to provide a service at
23  that point.
24    Q.   What percentage of the day, if you know, is a
25  child given mental health therapy and counseling, once

Page 21

1  admitted to Sarah Reed?
2    A.   I don't know the percentage.
3    Q.   So after you got back to the Erie School District
4  and said the admissions team has agreed to accept these
5  students -- and by the way, do you remember who you called
6  to let the Erie School District know this was going to
7  happen?
8    A.   I don't recall.
9    Q.   What was the next step?
10    A.   For Sarah Reed?
11    Q.   Yes.
12    A.   At that point the School District will set up a
13  meeting with the parents to complete their paperwork. And
14  also to offer them an intake time with me.
15    Q.   Now, you don't participate in the completion of
16  the paperwork; is that right?
17    A.   Not the Erie City School District paperwork.
18    Q.   And did you ever see the Erie City School District
19  paperwork on this case?
20    A.   Yes.
21    Q.   When was that?
22    A.   After the intake was set up with me, that packet
23  is given to me.
24    Q.   And what was in the packet, if you recall?
25    A.   They will include a release of information and a

6 (Pages 18 to 21)

174a

97e84326-1189-4172-abcb-3eb42266f250

Page 22

1  waiver.
2      Q. A waiver of what?
3      A. Parent must sign a waiver agreeing to the
4  placement at Sarah Reed and waiving their rights to a
5  hearing.
6      Q. Okay.
7      A. And if they are in special education, often the
8  packet will include an evaluation report.
9      Q. Anything else?
10     A. Anything additional would depend on the individual
11 student.
12     Q. Do you recall specifically what you received
13 relative to R___ P. -- R___ P___ or K___ L___?
14     A. I don't.
15     Q. So at the intake meeting, who did you meet with?
16     A. Parent and client.
17     Q. Anyone from the School District?
18     A. No.
19     Q. Did you meet -- R___ did you meet with her
20 father or her mother?
21     A. Father.
22     Q. Do you ask typically, when you meet with a client,
23 do you ask, well, why are you coming here or what is your
24 interest in coming to this school?
25     A. I ask if they have any questions pertaining to the

Page 23

1  placement.
2      Q. Okay. So when you meet with the -- tell me
3  what -- what you go through when you meet with the parent
4  and student.
5      A. I ask for background information; the child's
6  mental health history, medical history, school history,
7  family --
8      Q. Do you write that information down anywhere?
9      A. Yes.
10     Q. Then after you write that information down, what
11 do you do with that form?
12     A. That's kept in the child's chart.
13     Q. And do you remember any specific history that you
14 received from Mr. P___ about R___?
15     A. No.
16     Q. What did they tell you about the incident that led
17 her to being considered for Sarah Reed?
18     A. I don't recall.
19     Q. And do you recall whether they had any questions
20 to you?
21     A. I don't recall.
22     Q. And then so what happens next?
23     A. There are also consent and release forms that have
24 to be signed.
25     Q. And where are those forms put?

Page 24

1      A. Also in the child's chart.
2      Q. And then Sarah Reed doesn't keep the chart when
3  the child leaves the school?
4      A. Yes.
5      Q. Oh, you do keep the chart.
6      A. Yes.
7      Q. And then after that admissions process, do you
8  have any further involvement with that case?
9      A. No.
10     Q. Do you know what happens after that admission
11 process with respect to creating a program for the child?
12     A. I'm not a part of that.
13     Q. And how many intakes do you do a year, do you
14 think?
15     A. Between 2- and 400.
16     Q. Do you know what program R___ was put in?
17     A. The alternative education program.
18     Q. And that's a -- so she wasn't put in the partial
19 hospitalization program.
20     A. That was provided in combination with the
21 alternative education program.
22     Q. And do you know what a -- in terms of the
23 services, do you have any idea what services were provided
24 in connection with the partial hospitalization program?
25     A. Partial provides the psychiatric assessment piece,

Page 25

1  the therapy piece, and the case management piece.
2      Q. Now, do you remember the intake with Kristina
3  Long?
4      A. No. Not specifically.
5      Q. Do you have any idea -- do you know who paid for
6  the educational program that Sarah Reed provided to these
7  girls?
8      A. The educational piece is paid for by the School
9  District.
10     Q. What about the therapeutic piece; the psychiatric
11 assessment, therapy, case management piece?
12     A. That would be insurance.
13     Q. Whose insurance?
14     A. The family's.
15     Q. Do you have any idea what kinds of classes R___
16 and K___ were put into?
17     A. No.
18     Q. Do you have any idea concerning the percentage of
19 males and females, as they composed the student body?
20     A. No.
21     Q. When the Erie School District contacted you, they
22 mentioned both girls at the same time?
23     A. I don't recall.
24     Q. I have some documents that were previously marked
25 at a deposition, and I'm going to --

Ferguson & Holdnack Reporting, Inc.



175a

97e84326-1189-4172-abcb-3eb42266f250

Page 26

1    MR. OLDS: These were Moore and Manus, Jim. Do
2    you have those?
3    MR. MARNEN: Yes.
4    Q. I'm going to show you some documents, and as we go
5    through there, I just have a couple questions about the
6    document.
7        Moore Deposition Exhibit 1 is an IEP Revision
8    Review. Do you ever seen that document, to your knowledge?
9    A. It may have been included in the packet that was
10   given to me.
11   Q. There is a handwritten sheet of paper with a Bates
12   stamp at the bottom, 442.
13   A. Yes.
14   Q. You were referring to a consent or waiver form.
15   Is that the document, the waiver form that Sarah Reed
16   requests?
17   A. We don't request it. The waiver is -- the School
18   District has this done, not Sarah Reed.
19   Q. But you won't accept the student unless the parent
20   signs it, right?
21   A. The parent has to consent to placement with us
22   before we would accept them, before we would place them.
23   Q. Right. And my question is, is this the form of
24   consent that the parent signs?
25   A. For the School District, not for Sarah Reed.

Page 27

1    Q. Not for Sarah Reed. There is a different form
2    that Sarah Reed has them sign?
3    A. Yes.
4    Q. That's a waiver. Now, let me -- I'd like to
5    direct your attention to the Document 445. This is a -- you
6    have probably never seen this document, but I just have a
7    question about it. This was a memo from Audrey Pecoraro,
8    homeschool visitor. Do you know her?
9    A. Yes.
10   Q. Do you remember if you had any conversations with
11   her relative to these two students?
12   A. I'm sure that I did.
13   Q. And what might those conversations have been
14   about?
15   A. To give her the intake dates. She usually is the
16   one that meets with the family and gets the School District
17   paperwork signed and offers them an intake date with me.
18   Q. Okay. She wrote a memo to Frank Scozzie that
19   said -- this regards R██████ "R██████ P█████ Date of
20   birth: ████████. Referred to Sarah Reed: Behavior
21   modification program, special education tract."
22       The term "behavior modification program", does
23   that have any meaning to you, as a Sarah Reed employee?
24   A. No.
25   Q. Do you know whether Sarah Reed offers a program in

Page 28

1    terms -- that is designed for behavior modification?
2    A. That's a treatment modality. It's a type of
3    treatment that Sarah Reed does provide.
4    Q. So Sarah Reed does have a behavior modification
5    program?
6    A. It's a part of treatment.
7    Q. Part of treatment. So it's not a program --
8    A. No.
9    Q. -- it's a treatment.
10   A. Type of treatment.
11   Q. What other kinds of treatment does Sarah Reed
12   have?
13   A. Individual therapy would be a type of treatment.
14   Group therapy, family therapy, psychiatric evaluation.
15   Those are all types of treatment.
16   Q. Were you accepting R███ P████ for behavior
17   modification treatment? Was that why she was admitted?
18   A. No.
19   Q. And she was admitted why?
20   A. For the trauma that had occurred in school.
21   Q. Well, that's why -- okay. And I know you can't
22   speak for Miss Pecoraro. Do you have any idea why she
23   thought R████ was referred for the behavior modification
24   treatment?
25   A. No.

Page 29

1    Q. I want to direct your attention to a document that
2    was marked as Moore Deposition Exhibit 7. So if you would
3    go through there till you find that.
4    A. (Witness complies.)
5    Q. This is a memo to Jo Barker from Marlene Chrisman.
6    Are you looking at the same document here? Yeah, that's it.
7    Dated 1/15/02. It says, "Regarding b. mod. referrals." It
8    says, "The purpose of this memo is to provide information on
9    the two students who are being referred to Sarah Reed per
10   Frank Scozzie. Both girls were involved in a recent
11   situation at S.V. of that the nature and intensity of staff,
12   including Mr. Scozzie, feels this level of intervention is
13   essential. Both girls are under the age of 15 and,
14   therefore, not eligible for the adolescent partial program,"
15   end quote.
16       Do you know what Miss Chrisman was talking about
17   when she said the girls weren't eligible for the adolescent
18   partial program?
19   A. The adolescent program requires that a client is
20   14 years or older.
21   Q. You have an adolescent program, I take it. What
22   other programs are there?
23   A. The elementary program, which would be under the
24   age of 14.
25   Q. And that's a -- is that a partial hospitalization

8 (Pages 26 to 29)

Page 30

1  program also?
2      A.  It can provide partial hospitalization.
3      Q.  And is it accurate that these girls were not
4  admitted into the adolescent partial program?
5      A.  If they were not 14.
6      Q.  Then do you know who at Sarah Reed would -- the
7  first document in this -- in Moore Exhibit 1 is an IEP
8  Review Revision.  Do you know who at Sarah Reed would
9  interpret that and make sure that it was implemented?
10      A.  I do not.
11      Q.  Then what kind of -- after you complete the intake
12  process, just tell me the types of paperwork that you
13  complete and where the paperwork goes.
14      A.  All of the consent and release forms and the
15  intake that -- I complete.  And then it is submitted to our
16  front office, where the chart is developed for the client.
17      Q.  Then the front office would take care of billing
18  or invoicing the insurance companies --
19      A.  Yes.
20      Q.  -- or invoicing the school district.
21      A.  Yes.
22          MR. OLDS:  Let's just take a break.  I'm going to
23      take a break and look at my notes here, and maybe
24      we'll be done.
25          (Recess held from 11:07 a.m. till 11:20 a.m.)

Page 31

1      Q.  So I do have a couple more questions.  Does Sarah
2  Reed have an outpatient program?
3      A.  Yes.
4      Q.  And what is the outpatient program?
5      A.  That would be the individual -- can be the
6  individual therapy, family therapy, can be psychiatric
7  medication management.
8      Q.  And a child who is taking advantage of that
9  wouldn't have to be in the educational component of Sarah
10  Reed; is that right?
11      A.  Correct.  Correct.
12      Q.  So I guess a question arises in my mind, you
13  indicated that the committee accepted R▓▓▓ and K▓▓▓
14  because they had trauma, right?
15      A.  (Witness nods head.)
16      Q.  You have to say yes or no.
17      A.  Yes.  I'm sorry.
18      Q.  And why weren't they just accepted into the
19  outpatient program?
20      A.  They were referred specifically to the alternative
21  education program.
22      Q.  Now, when there is a referral to the alternative
23  education program, would you anticipate that the students --
24  that R▓▓▓ and K▓▓▓ were having some problems in their
25  classroom?

Page 32

1      A.  Not from the referral that I received.  Because I
2  was specifically told the assault and the harassment.
3      Q.  But typically when you receive a referral for the
4  alternative education program, would you assume that
5  children are having some problems in their classes?
6      A.  I might assume.
7      Q.  Well, you don't even have to assume, because
8  you're the intake person.  Isn't it always the case that
9  when kids are referred to the alternative education program,
10  that they are having some kind of social, emotional, or
11  behavioral problems in their classes?
12      A.  Yes.
13      Q.  Okay.  And does it make a difference to Sarah Reed
14  whether the students are -- have an IEP or don't have an
15  IEP?
16      A.  No.
17      Q.  Okay.  So you'll accept students in either
18  category.
19      A.  Yes.
20      Q.  Special ed. or non-special ed.
21      A.  Yes.
22      Q.  And did you ask the Erie School District why --
23  whoever you were dealing with at the Erie School District,
24  did you ask them why these girls who -- who had suffered
25  trauma, why they needed an alternative educational

Page 33

1  placement?
2      A.  No.
3      Q.  Okay.  And is that because if you get a referral
4  for the alternative educational program, you will accept
5  that referral, even if the students don't need an
6  alternative education program?
7      A.  We would be looking at the clinical need, the
8  mental health need, or emotional needs.
9      Q.  But that could be satisfied on an outpatient
10  basis, right?  Theoretically.
11      A.  Theoretically.
12      Q.  So, I mean, in terms of providing outpatient
13  services for students, is there anyone else in the Erie
14  area, aside from Sarah Reed, that offers those kinds of
15  programs?
16      A.  Outpatient?
17      Q.  Yes.
18      A.  Yes.
19      Q.  Who would that be?
20      A.  The Achievement Center, Safe Harbor, St. Vincent.
21      Q.  Do those institutions also offer alternative
22  education?
23      A.  Not that I'm aware of.
24      Q.  Now, I think there's an institution called Perseus
25  House that offers alternative education.

177a

97e84326-1189-4172-abcb-3eb42266f250

Page 34

1      A.  Yes.
2      Q.  Would Perseus House and Sarah Reed be, to your
3  knowledge, the only schools in Erie that offer -- only
4  institutions in Erie that offer the alternative education
5  program?
6      A.  At that time, I believe so.
7      Q.  Since the referring comes to you for alternative
8  educational placement, do you consider whether it's
9  appropriate to just offer the partial -- the outpatient
10 hospitalization program?
11     A.  Yes.
12     Q.  You would consider that.
13     A.  Within the alternative education program.
14     Q.  Right.  But in terms of, instead of, in lieu of
15 the alternative education program, would you consider
16 whether the outpatient therapy program would be sufficient
17 for these two?  I mean --
18     A.  That would be discussed in the --
19     Q.  Among the committee.
20     A.  Yes.
21     Q.  You didn't recall who was on the committee at that
22 time.
23     A.  No.
24     Q.  How many people generally sit at that committee?
25     A.  I would say an average number would be five.

Page 35

1      Q.  Five.  And what types of professionals sit on that
2  committee?
3      A.  Supervisory staff, psychiatric staff.
4      Q.  So there would be -- you were probably -- you
5  probably participated in that --
6      A.  Yes.
7      Q.  -- committee decision, right?  And there would
8  probably be someone from the psychiatric staff who was also
9  there?
10     A.  That would be a part of the decision making.
11     Q.  Okay.  And then would other supervisors be there?
12     A.  Yes.
13     Q.  So the other supervisors you named, might they
14 have been -- sat on that committee?
15     A.  They may have.
16     Q.  Okay.  And in terms of the committee, as the
17 committee -- does it have periodic meetings, or does it --
18 are its meetings ad hoc?
19     A.  At that time I don't recall how often we met.
20     Q.  What about now?  Are they ad hoc or --
21     A.  Weekly.
22     Q.  They are weekly.
23     A.  Yes.
24     Q.  Do you recall whether there were ad hoc meetings?
25     A.  I don't recall.

Page 36

1      Q.  Like someone walks in your door, you know, Monday
2  morning, saying I want to put my son or daughter in Sarah
3  Reed, could you convene a committee meeting that
4  afternoon --
5      A.  No.
6      Q.  -- to decide whether to accept?
7      A.  No.
8      Q.  So it would be put on some agenda, and it would
9  come up at the next meeting.
10     A.  Yes.
11     Q.  Next scheduled meeting.
12     A.  Yes.
13     Q.  Okay.  And I think that -- excuse me if I'm -- I
14 just want to understand something.  I think I asked you some
15 questions about the criteria that the committee used to
16 determine whether to accept these students.
17     A.  Yes.
18     Q.  Remember, I asked you that?  I can't recall what
19 you said; what kind of criteria was used.
20     A.  (No response.)
21     Q.  I mean, what was the criteria that was used?
22     A.  The referral concerns that were presented to us
23 would be considered.  Other services that may already be in
24 place would be considered.
25     Q.  Were you aware of whether or not either R███ or

Page 37

1  K███ were being counseled by Rape Crisis counseling?
2      A.  No.
3      Q.  Is that the kind of other services that you're
4  referring to that might be important for you to consider in
5  terms of whether to accept the student at Sarah Reed?
6      A.  Yes.
7      Q.  Do you know whether -- you don't know whether
8  Sarah Reed provided rape counseling therapy to K███ or
9  R███) is that right?
10     A.  No.
11     Q.  You don't know.  And the reason that these
12 students were considered for admission into the alternative
13 education program instead of the outpatient therapy program
14 is because the referral was made to the alternative
15 education program.
16     A.  Yes.
17     Q.  And I guess do you -- when you have a student --
18 it makes -- does it make a difference to you as an intake
19 supervisor whether a student has or doesn't have an IEP?
20     A.  No.
21     Q.  It makes no difference at all.
22     A.  No.
23     Q.  When you consider students for admission who have
24 IEP's, do you look at the IEP's?
25     A.  I do not.

Page 38

1    Q.  Okay.  And do you know whether the committee does?
2    A.  No.
3    Q.  You don't know, or it does not?
4    A.  I don't know.
5    Q.  Okay.  When students -- and if I'm revisiting old
6  ground, I apologize.  When students are referred to the
7  alternative education program, there is a behavior
8  modification modality, I think you said.  Is that right?
9    A.  It's a treatment modality.
10   Q.  Treatment modality, right.
11   A.  Yes.
12   Q.  And are there other educational modalities that
13 are offered by Sarah Reed, other than the behavior
14 modification program?  To your knowledge.
15   A.  Yes.
16   Q.  And what are they?
17   A.  That would be the individual therapy, family
18 therapy, group therapy, psychiatric services.
19       (Discussion held off the record.)
20       MR. OLDS:  I don't have any other questions.
21       MR. MARNEN:  I have a few, mainly because of a
22       poor memory.  But I will try to avoid overlap, but
23       I undoubtedly, inevitably will do that.
24
25

Page 39

1                CROSS-EXAMINATION
2  BY MR. MARNEN:
3
4    Q.  Did you say you were on the committee that
5  determined whether these two girls would be admit or placed
6  at Sarah Reed?
7    A.  I present the case to the academic team.
8    Q.  You make the presentation to them, but you are not
9  part of the decision making --
10   A.  I am part of the decision making.
11   Q.  So it is about five people, and you are one of the
12 five?
13   A.  Yes.
14   Q.  Did I get this right?
15   A.  Yes.
16   Q.  And the referral here, if I remember this
17 correctly, was purely oral from someone at Erie School
18 District?
19   A.  Yes.
20   Q.  And the decision to accept or not accept was made
21 before you had the intake meeting with the families?
22   A.  Yes.
23   Q.  And the information that you made your decision --
24 you base your decision on was information supplied solely by
25 someone at the School District?

Page 40

1    A.  Yes.
2    Q.  And do you know whether that was one person or
3  more than one person?
4    A.  I don't recall.
5    Q.  Is there a person at the Erie School District with
6  whom you typically deal?
7    A.  Yes.
8    Q.  Who would that be?
9    A.  Audrey Pecoraro, the homeschool visitor.
10   Q.  Do you ever deal with Charlise Moore?
11   A.  Yes.
12   Q.  Do you ever deal with Marlene Chrisman?
13   A.  At that time, yes.
14   Q.  And do you ever deal with James Piekanski?
15   A.  No.
16   Q.  Charlise Moore, do you know if she's involved in
17 the special education at the School District?
18   A.  I believe she's the special education supervisor.
19   Q.  The referral here was to the alternative education
20 program?
21   A.  Yes.
22   Q.  And by "referral", what does that mean, exactly?
23 The District thinks the girls ought to go in that program?
24 Is that basically what that means?
25   A.  The referral would be -- if they feel -- that's

Page 41

1  their decision, then they would contact me, making that
2  referral, asking us would we consider that placement.
3    Q.  Them to that program.
4    A.  Yes.
5    Q.  And this may be an area where I'm getting into old
6  territory.  But is it possible to be at Sarah Reed in the
7  alternative education program only, without any therapeutic
8  services?
9    A.  We would -- we would be looking at providing
10 therapeutic services.  That's what Sarah Reed does.
11   Q.  Does anyone go to Sarah Reed ever and just get
12 educational services?
13   A.  Yes.
14   Q.  In this particular instance, would you be looking
15 at therapeutic services also?
16   A.  Yes.
17   Q.  With these two girls?
18   A.  Yes.
19   Q.  Why is that?
20   A.  Because the trauma that was reported to us
21 would -- would have indicated to our team that some type of
22 supportive service would be necessary.
23   Q.  In the absence of -- of a need for therapeutic
24 services, would these girls have been admitted?
25   A.  I don't know.

11 (Pages 38 to 41)

1    IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2
3  RICHARD P., BY AND FOR        )
   R_____ P., AND DENISE L., BY )
4  AND FOR K_____ L.,           )
              Plaintiffs          )
5                                 )
         vs                       ) Civil
6                                 )
   SCHOOL DISTRICT OF THE         )
7  CITY OF ERIE, PENNSYLVANIA;    )
   JANET WOODS, INDIVIDUALLY      )
8  and in her Capacity as Principal )
   of Strong Vincent High School; )
9  and LINDA L. CAPPABIANCA,      )
   Individually and in her Capacity )
10 as Assistant Principal of Strong )
   Vincent High School,           )
11            Defendants           )
12
13
14       Deposition of LINDA CAPPABIANCA, taken before
15  and by Linda K. Rogers, Commissioner of Deeds in
16  the Commonwealth of Pennsylvania and Notary Public
17  in the State of New York, on Monday, April 4,
18  2005, commencing at 1:04 p.m., at the law offices
19  of Knox, McLaughlin, Gornall & Sennett, 120 West
20  10th Street, Erie, Pennsylvania.
21
22
23
24
25           * * *
                                              Page 1

For the Plaintiffs:
1   Edward Olds, Esquire
2   Carolyn Russ, Esquire
    1007 Mount Royal Boulevard
3   Pittsburgh, PA 15223
4
5  For the Defendants:
    James T. Marnen, Esquire
6   Knox McLaughlin Gornall & Sennett, PC
    120 West 10th Street
7   Erie, PA 16501
8
9
10
11
12
13           * * *
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 2

1        L I N D A  C A P P I A N  C A,  first having
2        been duly sworn, testified as follows:
3
4              DIRECT EXAMINATION
5  BY MR. OLDS:
6
7     Q. Good afternoon, Mrs. Cappabianca.
8     A. Good afternoon.
9     Q. How are you?
10    A. Good, thank you. And you?
11    Q. I'm pretty good.
12    A. And how was that ride?
13    Q. It was dry. It was very pretty today. What a
14 gorgeous day.
15    MR. OLDS: Off the record.
16    (Discussion held off the record.)
17    MR. OLDS: Back on the record.
18    Q. Ms. Cappabianca, for the record would you state
19 your full name and give us your address, your business
20 address will be fine.
21    A. Linda Louise Cappabianca, 820 Lincoln Avenue,
22 Erie, Pennsylvania, 16505.
23    Q. Have you ever been deposed, Ms. Cappibianca, in a
24 deposition?
25    A. No.
                                              Page 3

1     Q. Let me explain a couple of things here. I am
2  going to be asking you a series of questions. I'm sure
3  Mr. Marnen went over this, but I will be asking you a series
4  of questions. If any of my questions become too convoluted
5  or don't make sense, tell me and I will try to rephrase
6  them.
7        If you let me finish a question before you start
8  to answer, and I will let you finish an answer before I
9  start the next question and this will help the reporter. In
10 conversation we always interrupt each other because we sort
11 of know where we are going and we are just anxious to get
12 there. But sometimes in a deposition when you look at a
13 question and you can't figure out what the question was if
14 you interrupt me, and I won't get your full answer if I
15 interrupt you. So if you can just abide by that one ground
16 rule, and then the only other ground rule is it's best if
17 you say yes or no instead of unh-unh or um-hmm in the
18 appropriate -- when the occasion is appropriate, okay?
19       Have you lived in Erie all of your life?
20    A. All of my life.
21    Q. Are you a product of the Erie Public School
22 System?
23    A. No.
24    Q. Where did you to go high school?
25    A. Mercyhurst Prep.
                                              Page 4

180a

Richardson, et al, vs Erie School
Case 1:03-cv-00290-SJM    Document 77-5  Filed 09/28/2005    Page 31 of 50
Held: 4/4/05

**Page 33**

1 ever see this document?
2   A. No.
3   Q. Was C█████ B████ a student at Harding when you
4 were at Harding?
5   A. No.
6   Q. Now, in this set of documents which comprises
7 Exhibit 3 there are teacher SAP referral forms, for
8 instance, beginning with 1883 I think there is one.
9   A. I have an 1840.
10   Q. If you keep just going.
11   A. Oh, yes.
12   Q. There is actually, I think there probably are a
13 number of different discipline documents that pertain to
14 C█████ B████ in here.  Are these the teacher SAP referral
15 forms that we were talking --
16   A. If you look at the bottom, even though it's kind
17 of cutoff, it will tell you like the canary is for
18 counselor, pink copy for teacher and the white would be the
19 students file, which is what I would have kept.
20   Q. Do you have any idea as between the discipline
21 forms for -- that might have involved R████ P█████ or
22 K█████ L██ and C█████ B████, do you have any idea why or
23 how it is that discipline referral forms pertaining to
24 C█████ B████ were not destroyed?
25   A. Because I attempted to have C█████ B███ placed in an

**Page 34**

1 alternative education program, but being he is in special
2 ed., I would have to have consent of his mother.  I met with
3 his mother and she refused to sign him into it, that's why.
4 I would put all this together when I do an alternative
5 education packet.
6   Q. When did you attempt to do an alternative
7 education plan for C█████ B████?
8   A. Before you ever attempt that you have to make sure
9 you try everything possible in your building.  So he would
10 have been through many different -- he would have had to
11 have so many P.A.S.S., so many Saturdays, so many OSSs.  If
12 you look through here I know there's the behavior contract,
13 I would have tried that.  I would have done the FBA, which
14 is a functional behavioral assessment.  I would have
15 referred him to SAP.  You have to employ every intervention
16 possible within your means before you can refer someone out
17 of your building, again, depending on the situation, but for
18 him.
19   Q. So you attempted to do that concerning C█████
20 B███.  Do you know how these records were preserved, let me
21 phrase it like that.  This particular set of documents do
22 you know where it came from?
23   A. A Charlise Moore is a special ed. supervisor.  She's
24 a special ed. supervisor for the seventh, eighth grade
25 students.  I would complete a referral packet for an

**Page 35**

1 alternative education program and send everything to her
2 because I would need her approval before I can actually do
3 that.
4     MR. MARNEN:  Ed, I can tell you that these
5     documents came from C█████ B████ special
6     education file as they were provided to me.
7   Q. Now, going back to Exhibit C on Page 9 the
8 alternative education program is a step in the discipline
9 program?
10   A. Yes, it is.
11   Q. You indicated that you were trying to refer
12 C█████ B████ to that program?
13   A. Yes.
14   Q. When you were trying to refer him to that program,
15 was it pursuant to this step in the discipline program that
16 you were making the referral?
17   A. Um-hmm.  It would have been under the number two,
18 the reasons for referral.
19   Q. Right.
20   A. They give you the reasons why you can refer a
21 child, it would have been because of disruptive -- chronic,
22 disruptive behavior.
23   Q. And you indicated that you needed to have his
24 parents' consent for that?
25   A. Yes.

**Page 36**

1   Q. Why is that?
2   A. Because he is EMR -- am I allowed to say this?
3   Q. Sure, the record here is confidential.
4   A. EMR is educable mentally retarded.
5     MR. MARNEN:  Off the record.
6     (Discussion held off the record.)
7   Q. Did you meet with C█████ B████ mother?
8   A. Yes.
9   Q. Do you remember when you met with her?
10   A. Can I look through these?
11   Q. Sure.
12     MR. MARNEN:  I will say on the record we don't
13     know that that is the enter file.
14     MR. OLDS:  That's fine.  I can say for certain it
15     is not the entire file.  I had the entire file in
16     a binder today but I forgot to put that in my car.
17     MR. MARNEN:  I have it here if you would like to
18     use it.
19     THE WITNESS:  This is not the entire alternative
20     education referral.
21     MR. MARNEN:  Would you like to look at the special
22     ed. file on B███ that I have?
23     MR. OLDS:  Why don't we do that, take a break and
24     do that because I would like to pin that date
25     down.



1    THE WITNESS: I don't know if I'll know it, but I
2    am going to try it.  Okay.  I don't know the exact
3    date.
4    (Brief recess.)
5    MR. OLDS: Let's go back on the record.
6    Q. Do you see anything in there that -- why don't you
7    tell me what you see.
8    A. I'm sorry.  There is a request for a home school
9    visitor, which says that I need the mother to call me ASAP,
10   and that I attempted to call her six times, and that I want
11   her to come, and this is like December 12th.
12   Q. Can you tell me the Bate stamp number of the
13   request?
14   A. I have to find it.
15   MR. MARNEN: He means this number down here.
16   THE WITNESS: Yeah, I figured that out.  I have to
17   find it.
18   MR. MARNEN: It's in chronological order.
19   THE WITNESS: You had it out of order.
20   MR. MARNEN: I did?
21   THE WITNESS: Yes, it wasn't at the right time.
22   A. Right here.  You have it 11/13, it would be 1758,
23   it's actually 12/12.
24   Q. Can I see 1758?
25   A. Absolutely.  You want me to put it in the right

Page 37

1    spot?
2    MR. MARNEN: Sure.
3    MR. OLDS: Can we get a copy of this marked as an
4    exhibit.  We will make that Exhibit 4.
5    (L. CAPPABIANCA EX. 4 - DOCUMENT,
6    marked for identification.)
7    Q. If you find anything else that you think might be
8    pertinent to this -- just the idea of pulling anything out
9    that might have a bearing on this attempt to get C___
10   B___ in the alternative education program.
11   A. I would have -- I wouldn't have filled out the
12   complete referral form without his mom signing.  Do you
13   know what I mean?  That is what I would normally prepare is
14   that Exhibit --
15   Q. 4.
16   A. No.
17   Q. This one, the invitation?
18   A. No.  Where are the ones that you gave me?  The one
19   with all the discipline history, 3, and then there's an
20   alternative education form that I would send along with
21   all this stuff.
22   MR. OLDS: She pulled this out, maybe we could
23   mark that as Exhibit 5.
24   (L. CAPPABIANCA EX. 5 - INVITATION/IEP,
25   marked for identification.)

Page 38

1    Q. So what we tried to -- I think we started off by
2    saying that at some point in the 2001-2002 school year you
3    determined that you were going to try to refer C___ B___
4    to the alternative education program; is that right?
5    A. Yes.
6    Q. And you indicated that you wouldn't make the
7    referral unless you had parental consent.
8    A. Correct.
9    Q. Tell me why you need the parental consent.
10   A. Because he was EMR.
11   Q. Does that mean that you wouldn't otherwise be able
12   to discipline him if it involved changing his placement?
13   A. Correct.
14   Q. We were trying to determine an approximate time
15   when you were thinking about this, and we identified
16   Exhibit 4.  Can you tell me what Exhibit 4 is?
17   A. It's a home school visitor request, a request for
18   a home school visitor.  What I did was I -- visitor name is
19   at the top, Jackie.  What I did was I asked her to go to his
20   house because I wanted to meet with the mother and I had
21   called several times, six times.
22   Q. Six times.  Did you ever meet C___ B___
23   parents?
24   A. Yes.
25   Q. When did you meet them?

Page 39

1    A. The mother did come in.
2    Q. Go ahead, as a result --
3    A. Can I refer to another exhibit?
4    Q. Exhibit 5.
5    A. The reason why I pulled this one out is because
6    there was a time period where I kept trying to get the
7    mother in to discuss an alternative education placement,
8    unsuccessfully until I finally get her in.  I finally
9    involved Charlie Moore who was the special ed. supervisor.
10   Now, she does not need to be part of the process until after
11   I get all the paperwork done and then all this stuff will go
12   to her and she will determine whether it is an appropriate
13   decision or not for him to be there.
14   Q. Charlise Moore?
15   A. Yes.  And because I was unsuccessful I did call
16   her and I was hoping that maybe she would have more success
17   since the mother wasn't responding to me, and she did come
18   in.
19   Q. When you say she, it's the mother?
20   A. Mrs. Moore came in.
21   Q. Charlise Moore came in?
22   A. And ended up meeting with me, the mom, Mrs. Woods,
23   maybe Mrs. Manus.
24   Q. Okay.  Is that what Exhibit 5 is about?
25   A. Well, Exhibit 5 would have been you send an

Page 40



1 invitation home. It's a part of the paper trail that you
2 have to do, inviting the parent to come in and sit down and
3 meet with you. This would have had to go home, doesn't mean
4 it was the day we actually met, though.
5     Q. Just that the home school -- I noticed that on
6 Exhibit 4 it appears that the home school visitor made
7 attempts to --
8     A. Yes.
9     Q. -- contact the parents in December, December 12th
10 and December 13th, 2001; is that right?
11     A. Yes.
12     Q. And your request isn't dated, but I assume --
13 well, maybe it is the fax date up at the top.
14     A. Um-hmm.
15     Q. That's when you made the request for the home
16 school visitor?
17     A. Correct.
18     Q. And then Exhibit 5 is an invitation to participate
19 in the IEP team meeting, and can you see what the date is on
20 that on the top?
21     A. I think that's the 8th.
22     Q. January 8th?
23     MR. MARNEN: '02.
24     A. Um-hmm.
25     Q. Now, this schedules a meeting for Friday,

Page 41

1 that.
2     Q. What happened on -- what happened -- you say you
3 know that you never saw them again.
4     A. After we found out about the incident at the
5 laundromat he never came back to school. You will see other
6 home school visitor requests trying to locate him.
7     Q. When do you think it was -- do you think -- let me
8 put it like this. Who was present at the meeting where the
9 mother came?
10     A. Jan Woods who was the principal, Charlise Moore,
11 who was a special ed. supervisor, myself, the assistant
12 principal and his teacher of record, which means the person
13 who wrote his IEP. I want to say that was Connie Manus.
14     Q. At the time you had that meeting had you heard
15 about the incident at the laundromat?
16     A. No. That would have been automatic removal, you
17 wouldn't have to go through -- he had charges against him.
18 When you have something that significant, you don't need to
19 go through all the --
20     Q. If you would have had a meeting with the mother,
21 you, Miss Moore, Miss Manus and Miss Woods, how would that
22 meeting have been documented? How would the actual meeting
23 have been documented so that there would be a record that
24 the meeting occurred?
25     A. Well, the teacher of record should have a copy of

Page 43

1 January 11th.
2     A. Correct.
3     Q. Now, do you know whether you had had contact with
4 the mother before January 8th when you sent this out?
5     A. Well, that's what I'm not sure between this time
6 and this time.
7     Q. You have to make --
8     A. Make sure.
9     Q. No, no. You can make sure, but for the record you
10 can't say this time and this time. You have to make
11 reference to either the exhibit number or the date.
12     A. Okay. Exhibit 4, I obviously really wanted to see
13 the mother. But we had met with the mother, but I don't
14 know if it was between these two times.
15     Q. Between the preparation of the Exhibit 4 and
16 Exhibit 5?
17     A. Yes -- I'm sorry.
18     Q. In other words, you recall that you had at least
19 one meeting with the mother?
20     A. Yes.
21     Q. You don't recall whether it was between
22 December 13th, 2001, and what, January 11, 2002?
23     A. Correct.
24     Q. Or might it have been after January 11, 2002?
25     A. No, because I know I never saw him again after

Page 42

1 it.
2     Q. What should she have a copy of?
3     A. There would something that looks like this,
4 Exhibit 5.
5     Q. It would be an invitation to participate --
6     A. Yes.
7     Q. -- or some other form?
8     A. No. It should be an invitation to participate.
9     Q. How would it be known that -- how would that form,
10 the invitation to participate, document that the meeting had
11 actually occurred?
12     A. Mother would have signed it.
13     Q. Where would the mother have signed it?
14     A. If you look, I believe on the back, parents'
15 signature and it says whether they will attend or not.
16     Q. You have looked through the file that Mr. Marnen
17 has, and you didn't see a document where the parent,
18 Ms. B███, had signed?
19     A. I didn't see it, no.
20     Q. That doesn't mean it is not there, you didn't see
21 it.
22     A. Okay.
23     Q. Did you communicate to Ms. B███ the fact the
24 allegations that Charles had committed the sexual assault?
25 Did you ever communicate that to Ms. R███

Page 44

**Page 57**

1 down statements about what actually happened, which was all
2 turned over to the police.
3    Q. Did you make notes?
4    A. Yes.
5    Q. Do you still have those notes?
6    A. No, they were all in her discipline file.
7    Q. They were in R____ discipline file?
8    A. Um-hmm -- yeah. They would have stayed in there.
9    Q. What is a discipline file?
10   A. Whenever someone is referred to me with the
11 teacher referral, the discipline referral that the teacher
12 sends, as soon as a student is referred to me I get a
13 manilla folder, put the child's name on it so anytime I see
14 that child I would put that in a folder, then I keep it. At
15 the end of each year I get rid of them and I start new ones
16 the following year.
17    MR. MARNEN: Ed, so you are not mislead, there are
18    two documents that we got from the police
19    department that were prepared by Miss Cappabianca.
20    MR. OLDS: Right. I think --
21    MR. MARNEN: I didn't want that testimony to be
22    misleading.
23    MR. OLDS: Because she indicated that she turned
24    over stuff to the police department. I think we
25    will get to those two documents.

**Page 58**

1    Q. So the first thing in the day R____ comes and
2 talks to you --
3    A. Um-hmm.
4    Q. -- and describes this incident?
5    A. Um-hmm -- yes.
6    Q. Had you talked to Denise L____ about the incident
7 ever?
8    A. Not to my recollection.
9    Q. You knew Denise L____ is that right?
10   A. Yes. I wouldn't have talked to her. I didn't
11 know about it until after R____ brought it to our
12 attention.
13   Q. So the first thing is R____ comes to you and
14 explains this behavior and said something happened to her at
15 the laundromat. Is that when you took her down to see Miss
16 Woods?
17   A. Um-hmm.
18   Q. You have to say yes or no.
19   A. Yes, I'm sorry.
20   Q. It's best if you say yes or no. And then was it
21 in front of Miss Woods that she gave her full story?
22   A. Yes. Miss Woods and I interviewed anyone that was
23 involved in that night.
24   Q. You interviewed R____ Do you recall who else
25 that you interviewed on that day?

**Page 59**

1    A. C____ A____, B____, C____, A____
2 G____, A____, K____, Y____, Y-
3 A____
4    Q. I had seen the -- maybe when we get to that. Did
5 you interview C____ B____?
6    A. Yes.
7    Q. So all the kids were in school that day?
8    A. Yes.
9    Q. How long did it take you to talk to all these
10 kids?
11   A. We spent from the time we found out, which was the
12 morning of the 9th, we spent the entire day of the 9th
13 interviewing the kids. We actually talked to them three
14 different times. And then parents came in on the 10th, and
15 we talked to them as well with the kids.
16   Q. So which parents came in?
17   A. Okay. A____ mother came in. We had
18 Mrs. C____ in. We had Mr. P____ in. At one point
19 within those three days, because we spent three days, the
20 9th, 10th and 11th talking to the students and the parents.
21 Mrs. L____ was in. I don't recall C____ parents being in,
22 but they would have -- but would have had to have been. I
23 don't remember Y____ but they would have had to have
24 been or at least called.
25   Q. What about O____?

**Page 60**

1    A. His father came in, yes.
2    Q. And you and Miss Woods attended these meetings;
3 did anyone else from the school district attend the
4 meetings?
5    A. Yes. Detective Love, he was our school resource
6 officer. He is an Erie police officer that was contracted
7 out through the school district.
8    Q. Anyone else from the school district?
9    A. We notified Jim Perfetto, who was the chief of
10 security. He came -- he didn't come in the first day. I
11 think he came in towards maybe the -- I think the 11th he
12 was in.
13   Q. Did Detective Love -- was he present at all the
14 meetings?
15   A. I believe so, yes. We would have had him or
16 officer -- actually Sergeant Slupski, another school
17 resource officer.
18   Q. And do you recall whether anyone, any of the
19 school district representatives, took notes at these
20 meetings?
21   A. I did, Jan usually takes notes.
22   Q. Yours were destroyed?
23   A. Right.
24   Q. You recall whether the detectives did?
25   A. I don't recall.

1  Q. Talked to him in person. What day did you meet
2  with him?
3  A. The 9th.
4  Q. How did you meet with him on the 9th?
5  A. He was at school.
6  Q. Why was he at the school?
7  A. Picking up R█████
8  Q. You talked to him the day -- tell me when you saw
9  him that day on the 9th.
10  A. It would have been -- she was in P.A.S.S. that
11  day, so it would have been after that.
12  Q. After 6:30?
13  A. Um-hmm.
14  Q. Did you stay till 6:30 every night?
15  A. Myself or Mrs. Popadak.
16  Q. You weren't one of the P.A.S.S. teachers?
17  A. No, but one of us had to be on along with the
18  teachers.
19  Q. And so you took turns with Miss Popadak?
20  A. Yes.
21  Q. When you were in the building on those P.A.S.S. --
22  on those days where you had to stay late, where did you
23  stay?
24  A. My office.
25  Q. Why did one of you have to stay?

Page 81

1  A. In case any problems would arise.
2  Q. So R█████ was in P.A.S.S. that day?
3  A. Yes.
4  Q. And do you recall why she was in P.A.S.S.?
5  A. No.
6  Q. Had you assigned her P.A.S.S. as a result of the
7  outbreaks she had in Miss Scully's room?
8  A. No. That would have been the same day, I don't
9  assign it on the same day.
10  Q. When you saw Richard P█████ that day on
11  January 9, where did you meet with him?
12  A. Outside.
13  Q. Tell me what you remember of that conversation.
14  A. I just asked if he would come in to discuss
15  something. I don't know if we were more specific than that,
16  but to come in and discuss something with us.
17  Q. The next day, you just made the appointment; is
18  that what you are saying?
19  A. Um-hmm.
20  Q. You didn't get into the substance of -- you don't
21  recall whether you did?
22  A. No, no.
23  Q. Had you ever met Mr. P█████ before January 9th?
24  A. Yes. I talked to him on the phone, but I had seen
25  him. I don't know if we actually had talked face-to-face,

Page 82

1  but I talked to him on the phone a few times.
2  Q. Tell me about what you remember talking to him on
3  the phone about.
4  A. One occasion would have been when I assigned
5  her -- although I thought it was Saturday detention -- for
6  swearing. Another time was dress code violation. She had
7  jeans on. And then I would have called when she and
8  K█████ were in the locker room.
9  Q. Would you call a parent anytime a child didn't go
10  to class?
11  A. Yes.
12  Q. Tell me what you remember about the incident
13  involving R█████ swearing.
14  A. Which time?
15  Q. Well, the time that you talked to Mr. P█████
16  A. One time it was just down the hall, it was just
17  the F-word and it was down the hall. I don't know what
18  precipitated it. I don't know. She was just swearing.
19  Q. So you called him up and told him what?
20  A. That she would receive a consequence, which would
21  have been a Saturday detention for swearing, unless there
22  was more than one time then it goes to three nights of
23  P.A.S.S..
24  Q. When you have -- do you have a specific
25  recollection of what was said in that conversation?

Page 83

1  A. No.
2  Q. It would have been your practice to use the
3  telephone -- use that communication to what, advise the
4  parent that their child had been assigned to P.A.S.S. and
5  you would explain-
6  A. Why.
7  Q. -- why they were assigned?
8  A. I would tell them the words they would use,
9  absolutely.
10  Q. That was an indication where you heard her use
11  those words, right?
12  A. Yes.
13  Q. It was in the hallway. And if that was the first
14  instance, it would be a Saturday P.A.S.S.?
15  A. Um-hmm -- yes, Saturday detention.
16  Q. Saturday detention. And then the first time that
17  you ever met Mr. P█████ relative to -- a face-to-face
18  meeting with him relative to discipline wasn't until
19  January 9th.
20  A. I have seen him, I talked to him. I don't think
21  it was of anything that was regarding -- I am sure I said
22  hello to him. He came if in for parent conferences. I know
23  he's met with Miss Scully and things like that. I don't
24  think I have ever sat there and had a conversation with him
25  except on those instances.

Page 84

Page 85

1  Q. You did meet with him on January 10th when he met
2  with Miss Woods?
3  A. Correct.
4  Q. Do you recall where you were during that meeting?
5  A. Miss Woods' office.
6  Q. Why didn't you attend the meeting with him and
7  Miss Woods?
8  A. There probably was another parent or student in
9  the room.
10  Q. You mean in your room?
11  A. No. I stayed with Miss Woods for those three
12  days, 9th, 10th and 11th. That's all we did was this. We
13  worked on this for the three days. We didn't do anything
14  else outside of this.
15  Q. But so would you and Miss Woods both be in her
16  office meeting with someone?
17  A. Yes.
18  Q. So while she was -- is there a partition or
19  something?
20  A. They were in Mr. Rule's room, which was SAP,
21  student assistant program room, which was down the hall from
22  Miss Woods.
23  Q. So that particular meeting involved Mr. Rule, Miss
24  Woods and Mr. P█████
25  A. I believe R███ was there.

Page 86

1  Q. And R███ And then you were meeting with
2  someone, maybe some other parent or -- but about this case?
3  A. Absolutely.
4  Q. You don't remember who you were meeting; is that
5  right?
6  A. No.
7  Q. When did you find out that K████ had injured
8  herself?
9  A. The 7th.
10  Q. How did you find that out?
11  A. Mrs. L██ called me.
12  Q. She called?
13  A. Um-hmm. She wanted me to know that she was in the
14  hospital and asked for work.
15  Q. Did she tell you what K████ had done?
16  A. She did.
17  Q. How do you know that was on the 7th?
18  A. Because it was the day -- she didn't get admitted
19  until, I think it was the 4th, so she called me to let me
20  know.
21  Q. You are certain she called you the first day
22  following the weekend after K████ was admitted?
23  A. Yes.
24  Q. She told you that K████ had injured herself?
25  A. Yes.

Page 87

1  Q. Did she tell you that K████ told her about this
2  sexual assault?
3  A. No.
4  Q. There was an incident on the 7th that involved
5  R███ do you remember that?
6  A. From R███ telling me on the 9th.
7  Q. Did you ever have occasion to see R███ being
8  cornered, menaced or harassed by any students?
9  A. No.
10  Q. R███ told you about the incident that happened
11  on the 7th, and I am talking about the incident that
12  happened in the school.
13  A. Right.
14  Q. Do you remember there was an incident that she
15  told you about, an incident that happened in the school?
16  A. Yes.
17  Q. What did she -- when did she tell you about that
18  incident?
19  A. On the 9th.
20  Q. Did she tell you on the 9th that a teacher had
21  broken up that incident on the 7th?
22  A. I don't know.
23  Q. Let me -- let's go back and make sure we are
24  talking about the same thing. What do you recall her
25  telling you on the 9th about what happened on the 7th in

Page 88

1  school?
2  A. People were at the water fountain and they were
3  asking -- I have all that written down, because I was the
4  one that wrote that up. Should we refer to that?
5  Q. I would like to get your memory and then you can
6  look at it. I will give you a chance to look at it, but I
7  would like to get your memory first.
8  A. Okay. I think they were asking her to do things,
9  perform oral sex.
10  Q. And do you recall whether she told you a teacher
11  broke that up?
12  A. I don't recall.
13  Q. Do you recall that it went from the water fountain
14  to the stairwell that incident?
15  A. No.
16  Q. Then did she tell you about another incident that
17  happened outside of the school --
18  A. Yes.
19  Q. -- on the 7th? I mean, did she tell you on the
20  9th about an incident that happened on the 7th?
21  A. There was something that also happened again at
22  the laundromat.
23  Q. A second incident at the laundromat?
24  A. Yes. Um-hmm.
25  Q. And what did she tell you about that incident?



**Page 89**

1  A. I think she was over there waiting for her father
2 to pick her up and someone, a boy, approached her and pushed
3 her down and tried touching her under her shirt, and
4 unzipped his pants and showed his penis.
5  Q. She didn't know who that boy was; is that right?
6  A. Yes.
7  Q. You had an idea who the boy was?
8  A. Miss Woods.
9  Q. Ms. Woods had that.  His first name was R████?
10  A. Yes.
11  Q. What was his last name?
12  A. H████████.
13  Q. Why did Miss Woods suspect that it was R████
14 H█████?
15  A. I don't know.  Maybe by the description she had
16 given.  I am not sure.
17  Q. Was C████ B███ -- did R████ tell you that
18 C████ B███ was allegedly involved in that incident as
19 well?
20  A. I don't recall.
21  Q. Did you talk to any faculty members to see whether
22 they had observed anything?
23  A. Yes.
24  Q. Who did you talk to?
25  A. Anyone that would have had any contact with

**Page 90**

1 R████
2  Q. Would this have been during the three-day period,
3 the 9th, 10th and 11th?
4  A. Um-hmm.
5  Q. Specifically do you remember which faculty members
6 you talked to?
7  A. It would have been Mrs. Scully, Miss Gray -- did I
8 mention her earlier?  I may have forgotten her.
9  Q. I think you did.
10  A. Miss Scully, Miss Gray, Mrs. Manus were the three
11 main people that worked with them day-to-day.  And Miss
12 Gray -- I'm sorry.
13  Q. You said Miss Gray.  Do you have a recollection of
14 what Miss -- what, if anything, Miss Scully told you?
15  A. No.
16  Q. Do you have a recollection of what, if anything,
17 Miss Gray told you?
18  A. No.
19  Q. Do you have a recollection of what, if anything,
20 Miss Manus told you?
21  A. No.
22  Q. Was it -- what is your perception or your feeling
23 or your belief about what students knew about this?  I guess
24 that's an ambiguous question.  It's not only -- the student
25 body, let's just say, did you have any sense that

**Page 91**

1 information about this incident had become common knowledge
2 among the student body?
3  A. No, but after it came out, yes.
4  Q. When you say no, but after it came out, what do
5 you mean?
6  A. There was -- December 20th right after the
7 incident had happened I had overheard some kids talking
8 about K████ and C██████  Wasn't very specific, they were
9 in the hallway.  I told them to get to class, but I could
10 tell where the conversation was going.  So the next time I
11 saw K████ she was on her way to P.A.S.S.  We were
12 standing in the front hallway.  I said, I am hearing things
13 about you, and I knew it was of a sexual nature.  I said, I
14 don't know if they are true or not, and she goes, well,
15 they're true.  Then I said, well, these are things that
16 people share when they really care about each other and they
17 are in love.  In hindsight after that came out then I could
18 put it together that there was something that had gone on.
19  Q. You did have a conversation with K████ on
20 December 20th?
21  A. I did.  And then I talked to C████ also.
22  Q. So, again, the conversation with K████ was that
23 you approached her and you said you heard --
24  A. Things.
25  Q. Heard things, and are you saying you didn't

**Page 92**

1 specify what the things were?
2  A. No, I did not.  I didn't know what the things
3 were.  I just knew that something may have transpired
4 between them the night before.
5  Q. Did you ask her what had happened?
6  A. No.
7  Q. But you must have had some sense because what was
8 the next thing you said?
9  A. When two people love and care about each other
10 that they -- these are things that people do when they love
11 and care about each other.
12  Q. You must have had some sense it was a sexual
13 thing?
14  A. Right, that's what I said.  I know it was of a
15 sexual nature.  But whether it was kissing or anything more,
16 that's very serious.  To an adult -- when they're 12 years
17 old they can't handle the repercussions.  Kissing sometimes
18 leads to more.
19  Q. So K██████ response was what?
20  A. It was true.
21  Q. But did you hear anything about R████ and
22 C████ --
23  A. No.
24  Q. -- on the 20th?
25  A. No.  Actually I even talked to C████  Typically



1 when I hear something like that you want to talk to both
2 parties involved.  And I said, C████ I'm hearing things
3 about you and K█████.  And he denied that anything ever
4 happened between them.  He said she liked him -- and not his
5 words -- but made me believe that she would tell people
6 these things so they thought they were boyfriend and
7 girlfriend.  He did not say that, but he led me to believe
8 that she was the one telling people these things.
9     Q.  Did you talk to B███ C██████ at all --
10    A.  No.
11    Q.  -- before Christmas?
12    A.  No.
13    Q.  What was your impression of C████?
14    A.  C████ was very sneaky.  Very little in physique,
15 his stature, he was very little, although muscular, but very
16 sneaky.  He would do things like take passes off of a
17 teacher's desk, passes to go to the bathroom, hallway
18 passes.  And then fill them out and forge the teacher's name
19 and then you'd find them playing, he and a group of people,
20 in the gym, basketball.  Or he would go into Miss Scully's
21 room -- one time he went into Miss Scully's room -- we have
22 video cameras in the hallways and it was 3:30 and we saw him
23 go in there on the video camera, they're not in the
24 classroom the video cameras, and he stole her candy.  He was
25 very sneaky.

Page 93

1     Q.  The conversation that you had with C████?
2     A.  Yes.
3     Q.  Did that occur in the hallway or did you bring her
4 to your office?
5     A.  No.  It was actually -- she was on her way to
6 P.A.S.S., we are in the front hall.  It was right before
7 Christmas break so the hall was pretty much cleared out.
8 Kids don't want to be there any longer than they have to be
9 right before a break.  P.A.S.S. starts at 3:30, she was on
10 her way down.  I did stop her there.
11    Q.  Then that is when you had this conversation with
12 her?
13    A.  Yes.  It was like there's the front doors, and a
14 vestibule, then there's a hallway.  We were in the hallway.
15    MR. OLDS:  This might be an appropriate time to
16 postpone for the day.
17    MR. MARNEN:  Okay.
18    (Examination concluded at 3:45 p.m.)
19           *  *  *
20
21
22
23
24
25

Page 94

1        C E R T I F I C A T I O N
2
3
4     I, Linda K. Rogers, Shorthand Reporter and
5 Commissioner of Deeds in and for the Commonwealth of
6 Pennsylvania, do hereby certify that I recorded
7 stenographically the proceedings herein at the time and
8 place noted in the heading hereof, and that the foregoing is
9 an accurate and complete transcript of same to the best of
10 my knowledge and belief.
11
12
13
14
15
16
17
18          _____
19          Linda K. Rogers
20
21
22 Dated:  April 15th, 2005
23
24
25

Page 95

1              INDEX
2            EXAMINATION
3 WITNESS NAME              PAGE  LINE
4 LINDA CAPPABIANCA.................  3   1
    Direct By Mr. Olds...............  3   5
5
6            EXHIBITS
7   DESCRIPTION             PAGE  LINE
8 LC EX. 2  COMPUTER PRINTOUT........ 26   17
  LC EX. 3  C. BIBBS DISCIPLINARY INFO.... 31  6
9 LC EX. 4  DOCUMENT................. 38   24
  LC EX. 5  INVITATION TO IEP....... 38   24
10 LC EX. 6  IEP..................... 46    3
  LC EX. 7  IEP..................... 47   25
11 LC EX. 8  ATTENDANCE CARD......... 49   11
  LC EX. 9  COMPUTER REPORT......... 66    6
12 LC EX. 10 COMPUTER REPORT......... 66    7
  LC. EX. 11 P.A.S.S. ATTENDANCE.... 72   25
13
14
15
16
17
18           *  *  *
19
20
21
22
23
24
25

Page 96

188a

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   RICHARD P., BY AND FOR            )
 3 R_____ P., AND DENISE L., BY      )
   AND FOR K_____ L.,                )
 4            Plaintiffs             )
                                     )
 5        vs                         ) Civil Action No. 03-390
                                     )      Erie
 6 SCHOOL DISTRICT OF THE            )
   CITY OF ERIE, PENNSYLVANIA;       )
 7 JANET WOODS, INDIVIDUALLY         )
   and in her Capacity as Principal  )
 8 of Strong Vincent High School;    )
   and LINDA L. CAPPABIANCA,         )
 9 Individually and in her Capacity  )
   as Assistant Principal of Strong  )
10 Vincent High School,              )
            Defendants               )
11
12
13
14        Deposition of LINDA CAPPABIANCA, taken before
15    and by Linda K. Rogers, Commissioner of Deeds in
16    the Commonwealth of Pennsylvania and Notary Public
17    in the State of New York, on Friday, April 29,
18    2005, commencing at 11:15 a.m, at the law offices
19    of Knox, McLaughlin, Gornall & Sennett, 120 West
20    10th Street, Erie, Pennsylvania.
21
22
23
24
25            * * *
                                              Page 1
```

```
 1 For the Plaintiffs:
       Edward Olds, Esquire
 2     Carolyn Russ, Esquire
       1007 Mount Royal Boulevard
 3     Pittsburg, PA 15223
 4
 5 For the Defendants:
       James T. Marnen, Esquire
 6     Knox McLaughlin Gornall & Sennett, PC
       120 West 10th Street
 7     Erie, PA  16501
 8
 9
10
11
12
13            * * *
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 2
```

```
 1        L I N D A C A P P A B I A N C A, first having
 2        been duly sworn, testified as follows:
 3
 4            DIRECT EXAMINATION
 5 BY MR. OLDS:
 6
 7    Q. Good morning, Miss Cappabianca, how are you?
 8    A. Wonderful.  How are you?
 9    Q. Pretty good.  I don't think we are going to be --
10 I don't think it's going to be an all day thing or anything
11 like that.  We'll be here for a little while, just for your
12 anticipation, I guess.
13        I guess maybe one thing I would like to talk about
14 is to come to an understanding about the documents that
15 might have been created as you and Miss Woods conducted your
16 investigation.  And just so you can understand, I guess,
17 maybe where we are coming from, we conducted the deposition
18 of some of the police officers and one of the police
19 officers said that there were -- testified, and the police
20 records indicate there were two documentary or physical
21 items of evidence in this case.  One being a videotape of
22 R_____ P_____ and, the second, being a statement that
23 actually you wrote for A_____ F_____  And so that is
24 what was turned over to the police, at least that's what the
25 police indicate was turned over to them.  You and Miss Woods
                                              Page 3
```

```
 1 conducted at least two days of interviews, right, or was it
 2 three days?
 3    A. Two.
 4    Q. And the first day was it the students that you
 5 were interviewing?
 6    A. Yes.
 7    Q. And when you interviewed the students, aside from
 8 A_____ F_____, did you ask any of them to write anything?
 9    A. I know that Jan and I made -- had written things
10 down for our own memory notes.  I believe that the students
11 did.
12    Q. What's that, I'm sorry, go ahead.
13    A. It's typical whenever, no matter what the
14 circumstances are, whenever you are talking with a child to
15 have them write down their side of the story.
16    Q. That was going to be my question, that would have
17 been the practice?
18    A. Yes.
19    Q. Do you have any explanation as to why the
20 students' statements don't exist anymore?
21    A. (Witness moved head side to side.)
22    Q. I guess that's my question:  Do you have any
23 explanation why those statements apparently don't exist?
24    A. I know that everything that I have had, my whole
25 file of those kids, their discipline files are no longer in
                                              Page 4
```

189α

Page 5

1 existence. There would have been copies for my own personal
2 file. And then whatever I had put together I had sent to, I
3 believe Jim Perfetto had it, he would be the chief of
4 security for the district.
5 Q. Do you remember what time, going back to Wednesday
6 the 9th, which would be the day that you met with R____, do
7 you remember what time of the day that was when you started?
8 A. I believe it was first thing in the morning.
9 First period or fifth period, whatever it was A or B day.
10 Q. Do you remember if R____ was asked to write
11 anything out?
12 A. I do not.
13 Q. You started off with you personally started off
14 with R____because she was referred to you by Miss Scully?
15 A. Yes.
16 Q. There had been an outburst; is that right?
17 A. Yes.
18 Q. Do you remember how long you spent with R____
19 before you went down and talked with Mrs. Woods?
20 A. I do not.
21 Q. Do you remember what R____ was like that day?
22 A. She was angry when she first came to me, but
23 obviously to, say, scream the F word out at someone you
24 would have to be pretty upset with them.
25 Q. As you talked to her what was her demeanor?

Page 6

1 A. Angry.
2 Q. How long -- if I just asked you this, I'm sorry --
3 you don't recall how long your initial meeting was with her?
4 A. No, I do not.
5 Q. You went -- you took her down to Mrs. Woods'
6 office; is that right?
7 A. Yes.
8 Q. And then tell me your best recollection of what
9 happened when you and Miss Woods were meeting with Rachel.
10 A. It would have been Miss Woods just trying to
11 figure out what had happened, so she would have been asking
12 Rachel questions.
13 Q. When you met with R____ first before you went
14 down to Miss Woods did R____ -- she admitted -- did she
15 tell you that she had -- that there was an instance of oral
16 sex?
17 A. Yes.
18 Q. More than one?
19 A. Do you mean on that same evening?
20 Q. Yeah, that same evening.
21 A. I don't know that.
22 Q. Did she identify any of the other students
23 involved in that incident?
24 A. Yeah. I don't know if it was at that point or if
25 it was once we went to Miss Woods' office, but, yes.

Page 7

1 Q. And up until that time when you had this
2 conversation with R____, and not counting the conversation
3 that you talked about earlier in your deposition with
4 K____ before Christmas --
5 A. Okay.
6 Q. -- up until that time had you learned that any of
7 the other students in the middle school, had you learned of
8 any instances where those students were sexually active?
9 A. No.
10 Q. My question is: This was the first instance then
11 where you encountered an issue of middle school students
12 being sexually active after you came to Strong Vincent? It
13 is a very confusing question.
14 A. It is a very confusing question.
15 Q. Let me try to rephrase it. Had you ever
16 investigated before this conversation with R____ and not
17 counting the one with K____ had you ever investigated an
18 instance of sexual activity involving the middle school
19 students at Strong Vincent?
20 A. Yes. I don't know -- I'm sorry to interrupt. I
21 don't know if it was before or after this because I was
22 there for a two-and-a-half-year period.
23 Q. What was the nature of the other incident that you
24 investigated?
25 A. I actually had an eighth grade boy that came to me

Page 8

1 to tell me that he got his girlfriend pregnant. I have had
2 other middle school student girls come to me because they
3 thought they were pregnant.
4 Q. If girls come to you and confide to you that they
5 are concerned about being pregnant, do you report that
6 conversation to their parents?
7 A. Absolutely, and the nurse.
8 Q. Who was the nurse?
9 A. Jan Dean.
10 Q. Do you know -- we have been given some more
11 records and there was a name Mrs. DiBello.
12 A. She was IJDPP person, which stands for intensive
13 juvenile delinquency prevention program.
14 Q. Did she have an office at Strong Vincent?
15 A. She did.
16 Q. What was her job? Was she a school district
17 employee to your knowledge?
18 A. Perseus House.
19 Q. Perseus House. So why was there a Perseus House
20 employee at Strong Vincent?
21 A. Many times it could be court ordered from the
22 district justice. She worked with kids. It was a way to
23 get kids that were at risk before they actually would do
24 anything that could get them into the system like probation,
25 that's why it was intensive juvenile prevention program.



1 last time we were here at the deposition you had a
2 conversation with K██████ before Christmas in which she
3 indicated that something happened. Did she say that it was
4 bad, something bad happened?
5    A. No. It was a very short conversation in the hall
6 right outside -- there is the main office and then there is
7 like the front doors, the auditorium, and then she was on
8 her way to the P.A.S.S. program. I actually had stopped her
9 to ask her about it, nothing in detail, it was just that I
10 had overheard something about her and C█████, I don't know
11 if it's true. And she had said, yes, it is.
12    Q. You made the comment to her that is what grownups
13 do?
14    A. People that care and love each other, yes.
15    Q. Had K██████ -- do you recall her coming to you on
16 any other occasions and complaining that students were
17 harassing her?
18    A. No, and I saw her a lot.
19    Q. When you saw her, what did you and her talk about?
20    A. She would just stop in even to say hello, very
21 friendly, very social, had a very good rapport with the
22 other kids. Very unorganized, you know, just getting her
23 from one classroom to another.
24    Q. Did she ever complain to you she was being picked
25 on?

Page 13

1    A. No.
2    Q. Did she ever complain to you that students were
3 taunting her or calling her names?
4    A. No. She was very well liked. Her sister was more
5 so made fun of.
6    Q. And then at the end of the first day you had
7 interviewed all these students, and Mr. Hart may have been
8 there for one interview or maybe for more than one?
9    A. He could have been there for more than one. I
10 don't know why he would have been, but he could have been
11 there.
12    Q. It was you and Miss Woods together; is that right?
13    A. Yes.
14    Q. Maybe Mr. Hart?
15    A. Maybe.
16    Q. Was there anyone else at those interviews that
17 first day?
18    A. I want to say Wally Love was there. He was the
19 detective that we had for the Erie School District. It was
20 typical to have a police officer in the room even in less
21 significant events.
22    Q. Do you think he could have been in the room but
23 not paying attention or not listening?
24    A. I can't speak for him, but I don't know how in the
25 nature of this incident you couldn't pay attention, but I

Page 14

1 mean is it possible, I guess.
2    Q. Was there anyone else there aside from Mr. Love
3 that you can recall?
4    A. You mean during the actual interviews?
5    Q. Yes.
6    A. I don't think so.
7    Q. When you did the interviews, you would bring a
8 student down to the office. When the student -- when you
9 were done talking to the student, would the student be sent
10 back to class?
11    A. Yes.
12    Q. And were all the students pulled out of class at
13 the same time?
14    A. No.
15    Q. So one would come down, go back, and then the next
16 one would come down?
17    A. Yes.
18    Q. And then at the end of that day after you
19 conducted all the interviews, tell me what you and
20 Miss Woods decided to do next.
21    A. Okay. It's very hard to distinguish that day from
22 the two days after that because it was kind of very long
23 days that that's all we worked on from the time we got to
24 school till the time we left school was this is all we did
25 for three days. I guess I don't know what you're asking me.

Page 15

1    Q. When you were done with those first days of
2 interviews, did you know what you were going to do the next
3 day?
4    A. We wanted -- I know we wanted to talk to the
5 parents. We had been on the phone off and on for those
6 three days, you know, between school district officials,
7 Mr. Scozzie, Jim Perfetto, chief of security, so, yeah.
8    Q. Did Mr. Perfetto ever come down?
9    A. He did come in, but I don't know what day it was.
10 Yes, he did come in.
11    Q. And when conversations would occur between
12 Mr. Scozzie and you guys, would it be like on a speaker
13 phone so you could both hear?
14    A. No, Miss Woods would be on the phone.
15    Q. Miss Woods would be talking. So the next day
16 apparently some parents came in; is that right?
17    A. Yes.
18    Q. The phone calls to the parents, do you know
19 whether they were made the previous day or did you make the
20 phone calls the morning when the parents came in?
21    A. I don't know that for sure. I want to say that
22 even on the 9th -- I want to say that we were in contact
23 with the parents from the 9th, 10th and even the 11th.
24    Q. At some point Chris Ruhl got involved in this
25 investigation; is that right?

Page 16

**Page 21**

1    A. I met with her about several things, I mean on a
2 regular basis because she worked with several of our
3 students. I don't know, I would imagine, but I don't know
4 that for sure. She, I believe, was working with R▇▇ too
5 for a period of time. So, I mean, yes, I could have.
6    Q. On the page before on this, it would be 2246 Bate
7 stamp, second page of Exhibit 12, there is a -- Mr. Ruhl
8 indicates that he met with you and then there's something
9 blacked out. It looks like it begins with a P, I don't know
10 if that's --
11    MR. MARNEN: It was. I was the one that redacted
12    it and that was P▇▇ I was just following the
13    judge's order.
14    Q. Do you recall talking to Chris Ruhl on January 9th
15 about R▇▇ P▇▇?
16    A. Like I said, the three days --
17    Q. Run together?
18    A. It is very hard to determine what happened on this
19 day and what happened on this day. Because, like I said,
20 there was nothing else I worked on for those three days. So
21 do I know it was the 9th, no. Did I talk to Chris Ruhl
22 regarding this situation, absolutely I did.
23    Q. What do you remember the conversation with
24 Mr. Ruhl being about?
25    A. What was the best interest of the girls from here

**Page 22**

1 on, and whatever we could do to help them.
2    MR. MARNEN: Off the record.
3    (Discussion held off the record.)
4    Q. Do you remember what parents you actually -- were
5 actually in the room with you and Miss Woods?
6    A. Um, no, but I remember when A▇▇ G▇▇
7 mother came in. I remember when she came in. I remember
8 when B▇▇ C▇▇'s mother came in.
9    Q. When A▇▇ mother came in, what you recall
10 of that discussion?
11    A. We had kind of discussed things on the phone
12 earlier so she knew what the situation was about. It was
13 just more for her to come in. And I took a statement down,
14 not -- I think it says something about time wise, which I
15 guess in essence it would be time wise, but he was very
16 limited in his skills. So it was something for -- he
17 wouldn't have been able to write that himself.
18    So it was just more of her coming in to sit there,
19 you know, I knew at one point that it may have even been
20 when the police were coming in, just to be present and
21 supportive. She was very cooperative. She just wanted him
22 to be forthright and not afraid to tell what happened.
23    MR. OLDS: Do you remember what A▇▇
24    statement, what exhibit number you gave that?
25    MR. MARNEN: I marked it as Defendants' Exhibit M.

**Page 23**

1    Q. This document, which is a statement, is dated
2 1/11/02.
3    A. Um-hmm.
4    Q. And it's your handwriting --
5    A. Um-hmm.
6    Q. -- is that correct?
7    A. Um-hmm.
8    Q. You have to say yes.
9    A. Yes. I'm sorry, yes.
10    Q. It was signed by A▇▇ apparently he signed it,
11 his name is blacked out there.
12    A. Okay.
13    Q. Do you think that you prepared this statement on
14 January 11?
15    A. Yes. I wouldn't have put that date on it if I
16 didn't.
17    Q. This is actually -- this was prepared when the
18 police were interviewing him?
19    A. Yes.
20    Q. And how did you -- did he dictate this?
21    A. Yes.
22    Q. Tell me how it was prepared.
23    A. He sat across -- I was at Miss Woods' desk -- he
24 sat across from me and he told me what happened that
25 evening. I was writing it.

**Page 24**

1    Q. Did you try to do a verbatim thing or does this
2 include your editing?
3    A. No. I would have done what he had told me.
4    Q. He says before Christmas break at 6:45 me, A▇▇
5 K., C▇▇ left P.A.S.S. and went walking down 8th Street.
6 B▇▇ R▇▇, Y▇▇ started walking with us, and B▇▇
7 said I know this girl that sucks dick.
8    A. Right. If I would have edited it, I wouldn't have
9 put that in there.
10    Q. Now, how was it determined that this happened on
11 December 19th?
12    A. It was actually determined from when R▇▇ had
13 talked to Miss Woods and when it happened, and then after we
14 had everybody down.
15    Q. When you say you had everyone down, what do you
16 mean?
17    A. Talked to the other kids.
18    Q. Who put the date on it, was it you and Miss Woods
19 or was it one of the kids -- the kids probably didn't know
20 what day it was.
21    A. Oh, they knew what day it was. They were very
22 clear about this.
23    Q. What were they clear about?
24    A. The whole evening. I mean, basically it was all,
25 from what I recall, they all had the same recollection of

192a

Page 41

1 about that there was an IEP review revision meeting?
2    A. They would have had to have done that before they
3 could change schools. That's all this is saying, see the
4 second page, notice of recommended educational placement.
5    Q. Yes.
6    A. That's what that's telling you is that you are
7 changing her placement, her educational placement.
8    Q. Who do you think would have been responsible for
9 starting that process?
10    A. Well, I think because of the circumstances that
11 Mr. Ruhl was involved, Miss Woods and I were involved, Frank
12 Scozzie, Charlise Moore, it was something that was discussed
13 amongst us what would be the best for both she and K██████
14    Q. Do you have a recollection of this, that there was
15 actually a meeting where this IEP revision review was
16 adopted that you actually sat down with Mrs. Gray was there,
17 you were there.
18    A. I don't recall a meeting.
19    Q. Then I would like you to look at, I guess I'm
20 going to show you what was marked as Exhibit 2 in Charlise
21 Moore's deposition.
22    A. Okay.
23    Q. This pertains to K██████ L████ And there is a --
24 the third page of that is an IEP revision review pertaining
25 to K██████ L████ and it's signed by Denise L████ Melissa

Page 42

1 Valimont, Mrs. Gray and Linda L. Cappabianca. Do you recall
2 a meeting occurring about K██████ L████?
3    A. Yes.
4    Q. And that might have been -- I don't know if that
5 made my question clear. Do you think there really was a
6 meeting, an IEP meeting, or might this document have just
7 been circulated among the people that signed it for their
8 signature?
9    A. It could have been. Is that typical standard, no,
10 you actually sit down with the parents, but it could have
11 been.
12    Q. There might not have been a meeting in this
13 instance?
14    A. No.
15    Q. Then I want to show you the documents that were
16 marked as 3 and 4 in Miss Moore's exhibit.
17    A. Okay, what I'm looking at, change in --
18    Q. These two documents, is that your handwriting on
19 these documents?
20    A. No.
21    Q. Have you ever seen these documents before?
22    A. No.
23    Q. Your name appears on that, but you have never seen
24 these before?
25    A. No.

Page 43

1    Q. You can give those back to me.
2    A. I'm sorry. I didn't look at this one, is this the
3 same thing?
4    Q. It's the same handwriting. One pertains to
5 K██████ and one pertains to R████ Did you participate at
6 all in the decision making process that ended up with
7 K██████ and R████ going to Sarah Reed?
8    A. We recommended, Jan Woods and I, that it might be
9 better to move the girls to a different building.
10    Q. Okay. Tell me about what you remember, first of
11 all, I guess your discussions with Janet Woods and then how
12 you communicated your recommendation.
13    A. Um, we discussed that probably if the kids knew
14 about this it may not be a good idea to be --
15 other students, that's what who I meant by kids knew about
16 it -- wouldn't be a good idea for the girls to be in the
17 building. So we had suggested that, Jan had actually
18 because proper protocol is she is the one in charge, had
19 actually mentioned that to Frank Scozzie. And being that
20 they were in special education it was something that the
21 special education supervisor would have to agree upon also.
22    Q. And do you remember when you reached that
23 conclusion?
24    A. I think it was in our heads the entire time even
25 on the 9th. I don't think we discussed it with anybody

Page 44

1 until the 10th.
2    Q. Okay. Now, you say the other kids knew about it.
3 Originally you said in your first deposition we talked a
4 little about how there was hall talk before Christmas that
5 there was this incident, sexual activity. After Christmas
6 how did you know that the students had acquired knowledge of
7 this?
8    A. Through R████ She had said people were taunting
9 her, the other two incidents.
10    Q. Did you have the impression that the circumstances
11 were widely known through the junior high?
12    A. No. Well, I wouldn't have found out about it if
13 it wasn't for R████ which is not typical among middle
14 school kids. They let you know whenever anything happens.
15    Q. Did it occur to either you or Miss Woods that
16 perhaps if you disciplined anyone who taunted or harassed
17 R██ that she could remain in the school?
18    A. By this point it was after that we found out about
19 it the same day we found out about everything. So had kids
20 been disciplined -- we would have disciplined kids had it
21 been going on, but we didn't know it was going on.
22    Q. You decided to move them because you were afraid
23 it was going to go on or what, that's what I don't
24 understand?
25    A. Not necessarily. Part of it, part of it

193a

**Page 49**

1  A. I didn't personally, I think I went through Jan on
2 everything.
3  Q. Do you know what a therapeutic behavioral support
4 program is? I think you have a special ed. background,
5 don't you?
6  A. Um-hmm.
7  Q. Who does a therapeutic behavior support program?
8  A. I would say it has more of a counseling component
9 to it.
10  Q. What do you know or are you speculating?
11  A. I'm speculating.
12  Q. So a program of therapeutic behavior support isn't
13 a term of art in special ed.?
14  A. No, not necessarily.
15  Q. Behavior support programs, that is a special --
16 that is a type of program for kids with severe behavior
17 problems; is that right?
18  A. I would imagine among other things, but I would
19 say yes.
20  Q. We spent some time, I think in your first
21 deposition, talking about -- you were taking steps to get
22 C▮▮▮▮ B▮▮▮ out of Strong Vincent.
23  A. Correct.
24  Q. And did you want to send him to Sarah Reed?
25  A. No.

**Page 50**

1  Q. Where did you want to send him?
2  A. Alternative education, which is Perseus House.
3  Q. Perseus House?
4  A. Yes.
5  Q. Is that a behavior support program at Perseus?
6  A. That's more a behavior modification program.
7  Q. Behavior modification. Okay. Is there -- to your
8 understanding is there a difference between a behavior
9 modification program and a program of therapeutic behavior
10 support?
11  A. I would say there was, to my understanding.
12  Q. Exhibit 2, which is the one -- if you want to take
13 this top clip off and go to the second that's Exhibit 2,
14 that's Moore Exhibit 2. And that's a temporary home
15 placement, and were you aware that K▮▮▮ was going to be
16 given a temporary home?
17  A. Right, same with R▮▮▮ That's what it says here
18 IEP in the home. Yes. They have to do a change of
19 placement whenever you are -- whenever they are not in the
20 school building.
21  Q. Had you ever seen a temporary home placement for
22 five days?
23  A. Yes.
24  Q. Is that something that is frequently used by the
25 Erie School District?

**Page 51**

1  A. We no longer use it, but that year we did do what
2 is called in home IEP.
3  Q. Why only that year, if you know?
4  A. I don't know why. I just found out we don't need
5 them -- I have not had to use them since that year. It
6 depends on the population of students that you have, but
7 when a child has an IEP you try to keep them in school, you
8 don't want to suspend them. If there is something that
9 warrants them being suspended, then we could do an in home
10 IEP. That way they are still getting their individual
11 education plan, but it is going to be in the home not at --
12  Q. So that's a device or procedure that was used in
13 2001, 2002?
14  A. Right. I don't know if you know anything about
15 special ed. laws, but there are very many of them and you
16 try not to exclude the child from school.
17  Q. Right.
18  A. So this was, I think, a way for us -- because, I
19 mean, sometimes you have special ed. kids that not because
20 of manifestation of their disability, but you have kids that
21 commit infractions that if it was the regular education the
22 student would be suspended right away and you can't do that
23 with a special ed. child.
24  Q. Did you know that -- I think we are going to find
25 this out, but do you know whether R▮▮▮ and K▮▮▮ were

**Page 52**

1 referred to a behavior modification program at Sarah Reed?
2  A. I don't know that.
3  Q. When you found out sometime in January that
4 K▮▮▮ was among the students who were at the laundromat
5 that night, and the other students that you interviewed
6 talked about the fact that K▮▮▮ had been engaged -- had
7 been forced to give oral sex to C▮▮▮ B▮▮▮ did you
8 relate that back to the conversation that you had with
9 K▮▮▮ in December?
10  A. Yes.
11  Q. Did you think that K▮▮▮ had problems
12 communicating? I mean, was she able to express what she
13 needed to express to get the ideas that she wanted to get
14 across across?
15  A. Yes.
16  Q. She was able to do that?
17  A. Yes.
18  Q. You didn't think she had trouble communicating?
19  A. No. I don't know how she was written. I don't
20 know if she could write her ideas out, but she was very -- I
21 mean, she was able to tell you how she was feeling.
22  Q. Actually I have another question here about this
23 exhibit, let me find the document. Once again returning
24 back to Moore Exhibit 1, document Bate stamped 442, it is a
25 handwritten statement signed by Shelly R▮▮▮ I'm

194a

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    RICHARD P., by and for         :
      R_____ P., and DENISE L.,     :
 4    by and for K_____ L.,         :
              Plaintiffs             :
 5                                   :
           v.                        :   Civil Action No. 03-390
 6                                   :          Erie
      SCHOOL DISTRICT OF THE CITY    :
 7    OF ERIE, PENNSYLVANIA; JANET   :
      WOODS, Individually and in     :
 8    her Capacity as Principal of   :
      Strong Vincent High School;    :
 9    and LINDA L. CAPPABIANCA,      :
      Individually and in her        :
10    Capacity as Assistant          :
      Principal of Strong Vincent    :
11    High School,                   :
              Defendants             :
12

13

14

15

16            Deposition of STANLEY D. GREEN, JR., taken

17      before and by Janis L. Ferguson, Notary Public in

18      and for the Commonwealth of Pennsylvania, on Tuesday,

19      April 26, 2005, commencing at 3:32 p.m., at the

20      offices of Knox McLaughlin Gornall & Sennett, PC,

21      120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24                 Reported by Janis L. Ferguson, RPR
25                 Ferguson & Holdnack Reporting, Inc.
```

195a

28cf21d2-4b90-4af4-bb46-0fc5425cd85d

Page 42

1   by the school. And for some reason -- I don't remember
2   where it came from. But one of the witnesses told the
3   school that B███ had punched R███ either in the stomach
4   or in the shoulder.
5        Now, honestly, whether -- whether I got that
6   information passed on to me from Detective Barber from what
7   she heard prior to coming to the station -- because we do
8   talk to each other.
9   Q.   Right.
10  A.   Because, obviously, I knew nothing about this case
11  whatsoever. So before I go in to interview B███, Detective
12  Barber is going to sit down with me, and she's going to give
13  me everything she has up to that point. Because, I mean,
14  basically, I go into an interview without any ammunition --
15  if I don't have any facts or any accusations of what this
16  girl allegedly did.
17       So it's going to be -- it's going to be my
18  educated guess that Detective Barber gave me that
19  information probably verbally from her -- from her interview
20  with the school that she had done prior to her arriving at
21  the police station at this time.
22  Q.   Okay. And then I want to ask you another question
23  from that same paragraph.
24  A.   Which paragraph is that, sir?
25  Q.   This would be the third paragraph --

Page 43

1   A.   Third paragraph.
2   Q.   -- on Page 12.
3   A.   Okay.
4   Q.   The last part of that, it says, "She was also
5   unable to answer as to why she was harassing Rachel in
6   school about this, also denying that this occurred. It was,
7   in fact, uninvolved parties that made the school aware that
8   something was going on, because they heard and saw B███
9   push R███ into a boy and tell him that Ra███ wanted to
10  give him head."
11       First of all, do you know where you got that
12  information? Would that probably be from Detective Barber
13  again?
14  A.   Yes. When I -- as he asked me earlier, when I
15  became involved in this, my memory of this whole situation
16  as far as how this all came about -- and, again, this would
17  have been verbally from Detective Barber -- was that the
18  school became aware of this because of the incident that's
19  in this paragraph.
20  Q.   Okay.
21  A.   That a teacher and another student seeing this
22  activity occur, which would have been on the date of this
23  report, on the 11th, they actually witnessed this in a
24  hallway.
25  Q.   Actually, the -- her report says that this -- it

Page 44

1   was -- this happened on January 7th. And I'll show you
2   where that was, because I want to get the dates down. In
3   her report on Page 6 --
4   A.   Okay.
5   Q.   -- the second full paragraph, there -- there is a
6   reference to the report that it occurred on Monday, 1/7.
7   There was a second incident with R███ at the water
8   fountain. B███ approached her, asking her to give head to
9   a male student. R████-- and she shoved her down the
10  stairs. Do you see where I'm reading that?
11  A.   Yes.
12  Q.   So you asked -- you had the information when you
13  were interviewing B███ on 1/11 --
14  A.   Correct.
15  Q.   -- that uninvolved parties had reported this
16  incident to the School District. Is that right?
17  A.   Correct.
18  Q.   Okay. And you thought it was a teacher that
19  reported it?
20  A.   From memory, I thought it was a teacher that had
21  overheard the -- the language that was being used and the
22  comment about giving head and made a -- brought the --
23  brought those children immediately to the -- the office.
24  And it was -- again, I'm just -- I'm going by memory from
25  how I thought this had occurred.

Page 45

1   Q.   Okay, that's fine.
2   A.   That it was brought to the School District's --
3   well, not School District, but it was brought to the
4   school's attention. The attention gathered -- the
5   attention. The school gathered the information, they called
6   us and got us involved from that incident.
7   Q.   Okay.
8   A.   And as far as I was aware, in any of my -- any of
9   my conversations with Miss Cappabianca or any school
10  officials, that was -- that was their initial involvement
11  themselves.
12  Q.   Okay.
13  A.   In my investigation, in speaking with them, they
14  stated that was -- that was the point they become aware
15  this was happening.
16  Q.   Okay.
17  A.   Because I had asked them in the investigation if
18  there was any -- anything else. And that -- that I got from
19  them that they were not aware.
20  Q.   Okay. So you -- you -- actually you talked to
21  Miss Cappabianca. Would that -- do you remember when you
22  talked to her?
23  A.   It would have been after I was assigned this case.
24  Q.   Okay. You went up to the school and talked to
25  some of the students the same day you made the arrest. It

Ferguson & Holdnack Reporting, Inc.

196a

28cf21d2-4b90-4af4-bb46-0fc5425cd85d

Page 46

1　looks like you had this interview with R‑‑‑‑ ‑‑ excuse me,
2　with B‑‑‑‑ on the 11th.
3　　　A.　Um-hum.
4　　　Q.　And then the ‑‑ the next entry about your activity
5　indicates that on January 29th, '02, you went to Strong
6　Vincent.　Do you think that there was activity on this case
7　between the 11th and the 29th?
8　　　A.　Well, from the 11th to the 18th, it was assigned
9　to the Barbers.
10　　　Q.　Then you got it?
11　　　A.　Right.　From the 18th to the 29th ‑‑ let me see
12　something here.　What day?　I'm trying to jog my memory.
13　One second.　Yeah.　Because this is ‑‑ for whatever reason,
14　again, these ‑‑ these things are not correct in their order.
15　　　Q.　Okay.
16　　　A.　If you go to Page PO-14, you'll read that on the
17　23rd ‑‑
18　　　Q.　Right.
19　　　A.　‑‑ I went to Strong Vincent, and I picked up
20　A‑‑‑‑K‑‑‑‑
21　　　Q.　K‑‑‑‑ okay.
22　　　A.　So the way the report is put together as far as
23　pages ‑‑
24　　　Q.　Yeah.
25　　　A.　‑‑ and staplings, it looks like nothing was done

Page 47

1　from the 18th to the 29th.　Because that's ‑‑ if you're
2　following these ‑‑
3　　　Q.　Right.
4　　　A.　‑‑ supplements here, you would think they would be
5　in order, when, in fact, they are not.
6　　　Q.　Okay.　I understand.
7　　　A.　Okay.
8　　　Q.　So you went there on the 23rd.
9　　　A.　So I went ‑‑ yes.
10　　　Q.　And then you went again on the 29th.　And would it
11　be on one of those two occasions when you would have talked
12　to Miss Cappabianca about ‑‑
13　　　A.　Yeah, I'm going to guess.　Or in between there
14　somewhere I talked to her.
15　　　Q.　Okay.　And you've already told us what the
16　substance of that conversation was.　Basically ‑‑
17　　　A.　Yeah, we basically ‑‑ just the sharing of
18　information.　Her sharing everything she had with me,
19　because it was ‑‑ it was a very confusing case.
20　　　Q.　Okay.
21　　　A.　Different people were saying different things, and
22　we were trying to get to the ‑‑ to the bottom of it and to
23　the truth of it.
24　　　Q.　Do you recall that ‑‑ whether she told you she had
25　actually had the first whiff of ‑‑ that something had

Page 48

1　happened before Christmas?　Did she ever make that statement
2　to you?
3　　　A.　No.　That I was aware, from what she said to me,
4　the school became aware of this on the date that this
5　hallway incident occurred and these uninvolved parties went
6　to the office.
7　　　Q.　Okay.
8　　　A.　The way she explained it to me, back when I was
9　doing this investigation, was that it was at that time that
10　they became aware of the incident.
11　　　　　You know, in reading some of these statements or
12　parts of the report, at times it seems to me that some of
13　what's being done is kind of like you're saying here, where
14　I ‑‑ someone is relaying something to me.
15　　　　　I think in the school, looking into this matter,
16　they became aware ‑‑ and this is what I ‑‑ this is what I
17　gathered, anyways, when I was doing my investigation.　As
18　the school started to investigate the accusation the day the
19　shoving match went into the hallway, they started to get
20　names.　They started to also interview some of these people,
21　and it was at that time that they started to become aware of
22　prior incidents that had occurred.　At least that's the way
23　it was explained to me.
24　　　Q.　Okay.　Did you find it unusual that the School
25　District had conducted, in essence, an investigation before

Page 49

1　the police were called?
2　　　A.　No.　It actually is not unusual.　In fact, it
3　always happens.　Well, let me ‑‑ let me restate that.　It
4　always happens that they conduct their own investigation,
5　obviously, into a school matter.　To also ‑‑ to also get
6　witnesses and to find out if something did occur as far as
7　expulsions and suspensions and things like that.
8　　　　　As far as what date they found out about it and
9　what date they called us ‑‑
10　　　Q.　Yes.
11　　　A.　‑‑ you know, I don't know if you're asking me if I
12　agree with it or not or what your question is.
13　　　Q.　Well, I guess, first of all, do you know if there
14　was a delay between when the School District found out about
15　it and when they called the police?
16　　　A.　I can't tell you anything but what I'm reading in
17　the report.
18　　　Q.　Okay.　So whatever ‑‑
19　　　A.　Okay.　And it says here that ‑‑ let me see.　I'm
20　trying to find the date.　Page 2 ‑‑ or, well, let me
21　rephrase.　PO-5, second paragraph, "Miss Woods says that on
22　1/9, at approximately 15:00 ‑‑" that's 3:00 "‑‑ she became
23　aware."
24　　　Q.　Okay.
25　　　A.　Now, to be fair, I don't have a calendar here.　I

197a

Page 1

```
 1                 IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    RICHARD P., by and for        :
      R█████ P., and DENISE L.,     :
 4    by and for K████████ L.,      :
                Plaintiffs          :
 5                                  :
           v.                       :     Civil Action No. 03-390
 6                                  :            Erie
      SCHOOL DISTRICT OF THE CITY   :
 7    OF ERIE, PENNSYLVANIA; JANET  :
      WOODS, Individually and in    :
 8    her Capacity as Principal of  :
      Strong Vincent High School;   :
 9    and LINDA L. CAPPABIANCA,     :
      'Individually and in her      :
10    Capacity as Assistant         :
      Principal of Strong Vincent   :
11    High School,                  :
                Defendants          :

12

13

14

15

16         Deposition of A██████ F████████ taken before

17    and by Janis L. Ferguson, Notary Public in and

18    for the Commonwealth of Pennsylvania, on Wednesday,

19    April 27, 2005, commencing at 10:14 a.m., at the

20    offices of Knox McLaughlin Gornall & Sennett, PC,

21    120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
                  Reported by Janis L. Ferguson, RPR
25                Ferguson & Holdnack Reporting, Inc.
```

Page 18

1    Q.  When you say --
2    A.  That's how we -- that's how we met up at the
3  Laundromat.  Because she was across the street.  We came out
4  the front doors, we walked out, and we seen her.
5    Q.  Okay.  So the group of you, not including R████
6  came out the front door of the school after PASS?
7    A.  Not including R████, her other friend -- what --
8  C████████
9    Q.  K██████
10   A.  And Y████████  Is that her name?
11   Q.  Y████████ yes.  So those three weren't with you.
12   A.  No.
13   Q.  But the rest of you walked out the front door
14  after PASS?
15   A.  Yes.
16   Q.  And you then walked over toward the Laundromat?
17   A.  Yes.
18   Q.  Why were you going there?
19   A.  But I stayed down by the -- I stayed on West 4th
20  and Myrtle.
21   Q.  You lived at 4th and Myrtle?
22   A.  Yes, at the time.
23   Q.  Okay.
24   A.  And we was walking.  Because we used to walk down
25  the street, just -- 8th Street, just walk straight down.

Page 19

1    Q.  Until you got to Myrtle, and turned left?
2    A.  Yes.
3    Q.  Okay.  And you got to -- you got to the --
4    A.  The Laundromat.
5    Q.  The Laundromat.
6    A.  So that's when we got to walking.  And we like --
7  I think it was a house away from the Laundromat is when all
8  these questions started getting asked.  And like B████ was
9  hitting -- trying to hit her, convince her to suck dude off
10  and all that.  A██████ K██████ and C████ B████
11   Q.  Okay.  Now, "her" is who, R████?
12   A.  B████ tried to have R████ do it.
13   Q.  Okay.  And how was she trying to do that?
14   A.  Like hitting on her and trying to make her do it.
15   Q.  Physically punching her?
16   A.  Yes, physical.
17   Q.  Where did she punch her, A██████
18   A.  I think in the arm and in the face too.  It's been
19  a long time.  In the face.
20   Q.  All right.  How many times did she hit her?
21   A.  A couple times.  I could say a couple.  More than
22  once.  Twice.
23   Q.  And this was at the Laundromat.
24   A.  No, this is like a house away from the Laundromat.
25   Q.  Which way?  Toward Myrtle or back towards Strong

Page 20

1  Vincent?
2    A.  Towards Myrtle going down.
3    Q.  Okay.  So you walked past the Laundromat.  Toward
4  Myrtle?
5    A.  Yes.  And it's the house right there.
6    Q.  Right next to the Laundromat?
7    A.  That's where it happened.
8    Q.  Okay.  Right about there, B████ is punching R██████
9  and trying to get her --
10   A.  No, she asking her first.
11   Q.  She asked her first?
12   A.  Then R████ wouldn't do it.  So that's when B████
13  got mad and started hitting on her; said she gonna do it.
14  But she ain't do it.  I know she didn't.
15   Q.  Okay.  Now, when B████ did that, did she ask or
16  tell R████ to do it with respect to any person, or just
17  anybody?
18   A.  I ain't -- I ain't want her to do -- I wasn't into
19  all that.
20   Q.  Who did B████ want her to do it on?
21   A.  To C████ B████ and A██████ K██████
22   Q.  Okay.  And R████ refused.
23   A.  Yes.
24   Q.  Were C████ B████ and A██████ K██████ saying
25  anything about it?

Page 21

1    A.  (Witness shakes head.)
2    Q.  Nothing?  It was all B████?
3    A.  Yeah, it was all B████.  B████ was like, I got
4  this little freak.
5    Q.  I'm sorry; what?
6    A.  She said she had a little freak.  Her friend was a
7  freak.
8    Q.  Okay.
9    A.  She was telling us this.  I'm like, I ain't with
10  all that.  And that's when A██████ and C████, they was
11  talking.  I wasn't in their conversation, because I was
12  doing my work, trying to get out of PASS.  That's when they
13  was talking.  So I just went out there with them.
14   Q.  Are we back in PASS now?  You kind of lost me.
15   A.  No.  I'm telling you like how it went down.
16   Q.  Yeah.
17   Q.  Like how they was talking, how they planned it.
18   Q.  Were they talking about it in PASS?
19   A.  They were talking about it in PASS.
20   Q.  Okay.  What were they talking about?  Tell me
21  about that.
22   A.  She was like, her friend is coming after school,
23  telling C████ and that.  She was coming to meet her.
24   Q.  Yeah.
25   A.  And I think C████ knew her or something.  And he


199a

**Page 22**

1   said she was a freak too, telling us that. And I'm like, I
2   don't -- I ain't with all that.
3      Q.   What does "freak" mean?
4      A.   Like nasty. She was nasty.
5      Q.   We talking about sex?
6      A.   Like just nasty in general. Sexwise, yes.
7      Q.   Okay. I'm not your age, so I'm not up with the
8   language.
9      A.   It's kind of hard to explain.
10      Q.   It's pretty obvious I'm not your age, isn't it?
11      A.   It's -- it's real hard to explain.
12      Q.   Well, we'll go through it slowly. You'll get it
13   out. So you heard them talking about this in PASS. You
14   wanted no part of it.
15      A.   Hum-um.
16      Q.   Did you tell them that?
17      A.   Tell who that?
18      Q.   Did you tell B████ you wanted no part of it in
19   PASS?
20      A.   Oh, they already knew -- I told them, I ain't with
21   that.
22      Q.   Okay.
23      A.   That's like -- what they was doing -- that's
24   considered rape and all that. I wasn't with all that. I
25   ain't with that.

**Page 23**

1      Q.   So where was R████ when you first saw her that
2   day?
3      A.   R████ was outside, like -- I don't -- I think she
4   went to school. Or if she didn't go to school -- well, when
5   6:00 came, when we got out of PASS, she was right at that
6   Laundromat waiting for B████
7      Q.   How do you know she was waiting for B████
8      A.   Because. It had to happen in school, like when
9   they was talking about meeting each other. Because B████
10   had PASS, and she ain't have PASS.
11      A.   R████ didn't have PASS?
12      A.   And they used to talk. Her and B████ was friends.
13      Q.   Okay.
14      A.   So B████ told her to meet her. And that's how she
15   came to the Laundromat with the little girl and Y██████
16      Q.   Right.
17      A.   Because they all was -- like they all associated
18   with each other.
19      Q.   How do you know that -- how do you know that
20   R████ and B████ agreed to meet at the Laundromat? Did you
21   hear them make that agreement?
22      A.   B████ told me in PASS.
23      Q.   B████ told you. Okay.
24      A.   Yeah, she told all of us.
25      Q.   Okay. I got you.

**Page 24**

1      A.   In PASS.
2      Q.   Okay. So you get over there to the Laundromat,
3   and you spot R████ right?
4      A.   Um-hum.
5      Q.   Did you see K████
6      A.   Yeah. I seen all three of them.
7      Q.   All three of them are there.
8      A.   All three of them.
9      Q.   And where were they, exactly? Standing out in
10   front of the Laundromat, inside?
11      A.   They were standing out in front of the Laundromat,
12   smoking a cigarette.
13      Q.   Okay. All three of them were smoking.
14      A.   I don't know about all three.
15      Q.   All right.
16      A.   But one of the three was smoking.
17      Q.   Then you got there, and you kept walking toward
18   Myrtle?
19      A.   No, I didn't keep walking. I stopped. We was all
20   talking. Next thing you know, that's when B████ asked her
21   to do it. So she wouldn't do it. So we got to walking away
22   from the school, trying to get off the school property.
23   B████ started hitting on her. Because one of them probably
24   said hit her, then, because she didn't want to do it. I
25   think C████ said that. Just beat her up then, since she

**Page 25**

1   ain't going to do it. That's when B████ started attacking
2   her.
3      Q.   What happened next?
4      A.   And that's when I think she probably went home or
5   went back to the school or something, and her peoples -- I
6   think her mom or dad called up to the school complaining
7   about this; that her daughter -- it's like late at night.
8   Because 6:00, it gets dark. And I think her mom was
9   complaining about that. I don't know. It's -- it's hard to
10   explain. It's too hard.
11      Q.   Was there any sex that night, A██████?
12      A.   Huh-uh. Wasn't no sex. No sex at all. No
13   contact or nothing. It was just when B████ was hitting her,
14   that was all.
15      Q.   That was all. No sexual contact?
16      A.   No sexual contact.
17      Q.   Was there ever sexual contact between R████ and
18   K████ or B████
19      A.   I don't know about that. I don't know. Can't
20   tell you that.
21      Q.   Why don't we go to your statement.
22      A.   All right.
23      Q.   Let's read along with me. Okay? Right at the
24   first page, "Before Christmas break, at 6:45, me, A████
25   K████ C████ B████ left PASS and went walking down 8th

7 (Pages 22 to 25)