Page 1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   RICHARD P., by and for           :
     R██████ P., and DENISE L.,       :
 4   by and for K██████ L.,           :
              Plaintiffs              :
 5                                    :
          v.                          :   Civil Action No. 03-390
 6                                    :           Erie
     SCHOOL DISTRICT OF THE CITY      :
 7   OF ERIE, PENNSYLVANIA; JANET     :
     WOODS, Individually and in       :
 8   her Capacity as Principal of     :
     Strong Vincent High School;      :
 9   and LINDA L. CAPPABIANCA,        :
     Individually and in her          :
10   Capacity as Assistant            :
     Principal of Strong Vincent      :
11   High School,                     :
              Defendants              :
12

13

14

15

16          Deposition of ROBERT R. IDDINGS, taken before

17   and by Janis L. Ferguson, Notary Public in and

18   for the Commonwealth of Pennsylvania, on Thursday,

19   May 5, 2005, commencing at 11:49 a.m., at the

20   offices of Knox McLaughlin Gornall & Sennett, PC,

21   120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
                 Reported by Janis L. Ferguson, RPR
25               Ferguson & Holdnack Reporting, Inc.
```

Page 10

1  1020. Second grade through twelfth.
2      Q.  Then what happens at 310?
3      A.  Preschool through first grade.
4          MR. OLDS:  I know I said I wasn't going to mark
5      this as an exhibit, but I think I will.
6          (Discussion held off the record.)
7          (Iddings Deposition Exhibit 1
8          marked for identification.)
9      Q.  We have been -- Mr. Iddings, we have been provided
10 several pamphlets.  As you know, as I said in the previous
11 deposition, I represent R███ P█████ and K█████ L█████
12 who were provided services by Sarah Reed Children's Center.
13 And I assume that the services they were provided were -- I
14 should have asked this before Mr. Marnen photocopied it --
15 were in the program that is described in the pamphlet that I
16 have marked as Exhibit 1?
17     A.  I believe so.
18     Q.  Your institution has also provided us with a
19 pamphlet called After-School Program and another pamphlet
20 called Community Outpatient Program.  And probably those
21 don't pertain to --
22     A.  Correct.
23     Q.  -- my two clients.  Is that right?
24     A.  That's right.
25     Q.  And the -- I guess the first topic that --

Page 11

1  identified in the Rule 30(b)(6) deposition notice is types
2  and parameters of educational behavior and therapeutic
3  programs offered and administered by SARCC.  So maybe
4  looking at that area of inquiry -- and this pamphlet, we
5  could try to understand the types of educational programs,
6  coupled with therapy programs that Sarah Reed offers.  Okay?
7      A.  Okay.
8      Q.  So, first of all, Exhibit 1, is this just a
9  pamphlet that is prepared to hand out to parents or other
10 educators, maybe?
11     A.  Right.
12     Q.  Just to identify the public or perhaps clients
13 with the services offered by Sarah Reed.
14     A.  That's right.
15     Q.  So at best, it's just a shorthand --
16     A.  That's right.
17     Q.  -- of what's going on here.  It describes a
18 page -- I guess I'm looking at Page 7 -- describes a
19 classroom level program.  And I guess my question is, do you
20 have -- do you have very much interface with the educational
21 side of Sarah Reed?
22     A.  Yes.
23     Q.  Well, and how does that happen?
24     A.  All of the supervisors try to integrate the
25 clinical aspects with the educational aspects.  Each team is

Page 12

1  made up of a teacher --
2      Q.  Okay.
3      A.  -- a counselor, and a therapist.
4      Q.  And does each team take responsibility for a
5  particular student?
6      A.  Yes.
7      Q.  I mean, they have more than one student, but --
8      A.  Right.
9      Q.  So do you know how many students a team might
10 have?
11     A.  Up to 13.
12     Q.  How many classrooms are there at Sarah Reed?  And
13 if it's changed dramatically since 2002, I'd like you to
14 focus on 2002.
15     A.  Okay.
16     Q.  I mean, if the size of the school has changed.
17     A.  Yeah, not -- not too dramatically.  There are
18 seven classrooms in 1020 East 10th Street, where both of the
19 girls would have been.
20     Q.  And are the students divided in the classroom
21 based upon age or based upon types of problems?
22     A.  Generally based upon grade level and developmental
23 level.
24     Q.  R███ and K███ were, I think, in seventh
25 grade in 2000 -- in January of 2002 when they were admitted

Page 13

1  to Sarah Reed.  What kinds of -- what classrooms would have
2  been available to them, given the fact that they were in
3  seventh grade?
4      A.  I don't know specifically, but I'm guessing it
5  would have been -- we have two pre-adolescent classrooms.
6      Q.  And would those classrooms -- they would be in one
7  or the other, depending upon their developmental level?
8      A.  Developmental level and space.
9      Q.  Okay.  And when you use the term "developmental
10 level", what are you referring to?
11     A.  Cognitive ability and emotional maturity.
12     Q.  And how many students would have been in those
13 pre-adolescent classrooms?
14     A.  I don't know specifically, but it would go up to
15 13.
16     Q.  No more than -- is it fair to say no more than 13?
17     A.  Yes.
18     Q.  And would there be one teacher assigned to each
19 classroom or more than one teacher?
20     A.  One teacher and one counselor.
21     Q.  And the therapist is part of the team.  Where did
22 the therapist conduct their work?
23     A.  Frequently, they will consult with the teacher and
24 the counselor.  We use what's call an ecological approach.
25 So a lot of the interventions are implemented by the teacher

4 (Pages 10 to 13)



Page 18

1  behavioral problems at their referring schools.
2      A.  We have children who have acted out behaviorally,
3  meaning they have come to someone's attention due to an
4  aggressive act.  And we also have children who are
5  withdrawn, which has also caused someone in their life to be
6  concerned.
7      Q.  Okay.
8      A.  The children who are more withdrawn are what we
9  would call internalizing.
10      Q.  Um-hum.
11      A.  Wouldn't necessarily be a behavior problem in
12  school.
13      Q.  Okay.  Are those children placed in this classroom
14  program that's described beginning at Page 7 of Exhibit 1?
15      A.  Yes.
16      Q.  And in terms of those children, what kinds of
17  behaviors are taught to those children?
18      A.  Identifying feelings, expressing feelings
19  verbally, initiating positive interactions with peers,
20  ignoring negative -- what we call negative leads of peers.
21      Q.  What does that mean, "negative leads"?
22      A.  Children who would engage in non-pro-social
23  behaviors, a lot of the times the kids will copy them or go
24  along with them.  Especially the children who are more
25  internalizing tend to be more into that.  They will go along

Page 19

1  with one of the leaders of the group.
2      Q.  So then do they all of a sudden have a behavior
3  problem when they do that?
4      A.  Right.
5      Q.  Okay.  And I -- what else?  We were at ignoring
6  negative leads.  You were listing the types of --
7      A.  Right.  The overall goal for any of the kids is to
8  increase self-efficacy, based on their developmental level.
9      Q.  Self-efficacy?
10      A.  Yes.
11      Q.  What does that mean?
12      A.  So depending on how old the child is, we help them
13  reach a level of independence that is appropriate for their
14  age, and self-regulation.
15      Q.  So independence and self-regulation?
16      A.  Um-hum.
17      Q.  Is that sort of the fundamental goal?
18      A.  Correct.
19      Q.  Now, the children who have had behavioral
20  problems -- not the children who are internalizing, but the
21  children who have had behavior problems, have these
22  typically been -- are they defiant or aggressive?  Is that
23  the kind of behavior problems that we're talking about?
24      A.  Yes.
25      Q.  Typically, would it be fair to say that a student

Page 20

1  in Sarah Reed as a result of behavioral problems is one who
2  couldn't adjust to the typical classroom situation or the
3  regular classroom situation?
4      A.  That's right.
5      Q.  And they couldn't adjust because they would either
6  be too disruptive or too aggressive for the regular
7  classroom --
8      A.  Correct.
9      Q.  -- situation?
10      A.  Yes.
11      Q.  And then the -- of the two classes of children
12  that you have identified, children with behavioral problems
13  and children who have problems with internalizing, can you
14  give me like a percentage breakdown of how many of the one
15  and how many of the other are in attendance, like in any
16  given year.
17      A.  Um-hum.  Generally, with the younger children,
18  they are children with behavioral problems.  It's a greater
19  percentage.  And as the children get older, it becomes more
20  of an even percentage.
21      Q.  And the seventh grade level, do you consider that
22  younger or older?
23      A.  That's more our older clientele.
24      Q.  So seventh grade, it might be 50 percent would be
25  children who are internalizing in one way or another, and --

Page 21

1      A.  Right.  I'd say maybe 60 who are externalizing,
2  acting out behaviorally; 40 internalizing.  But that's just
3  a guess, based on the adolescent program.
4      Q.  Okay.  And children who internalize, what kind of
5  behavior do you typically associate with that problem?
6      A.  Symptoms of anxiety or depression, excessive
7  worrying, suicidal thoughts, suicidal gestures, non-suicidal
8  attempts to harm self, isolation, negative self-talk,
9  inability to complete tasks.
10      Q.  Anything else?
11      A.  That's a pretty good --
12      Q.  Okay.  What kind of history do you expect to see
13  relative to receiving these students at Sarah Reed?
14      A.  For most students, there's generally a history of
15  trauma.
16      Q.  And when you say "history of trauma", what do you
17  mean?
18      A.  Some type of abuse; physical, sexual, or
19  emotional.  Or neglect.  Frequently there have been what we
20  call disrupted attachments.  That can result from either
21  parents leaving or children being separated from parents or
22  families experiencing frequent moves.
23      Q.  And what kinds of experience, educational
24  experience do you generally see for these students who are
25  internalizing problems?

6 (Pages 18 to 21)

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 2

 3   RICHARD P., by and for      :
     R██████ P., and DENISE L.,  :
 4   by and for K████████ L.,    :
              Plaintiffs         :

 5                               :
          v.                     :   Civil Action No. 03-390
 6                               :          Erie
     SCHOOL DISTRICT OF THE CITY :
 7   OF ERIE, PENNSYLVANIA; JANET:
     WOODS, Individually and in  :
 8   her Capacity as Principal of:
     Strong Vincent High School; :
 9   and LINDA L. CAPPABIANCA,   :
     Individually and in her     :
10   Capacity as Assistant       :
     Principal of Strong Vincent :
11   High School,                :
              Defendants         :

12

13

14

15

16           Deposition of ROBIN A. JOHNSON, taken before

17      and by Janis L. Ferguson, Notary Public in and

18      for the Commonwealth of Pennsylvania, on Wednesday,

19      April 26, 2005, commencing at 11:17 a.m., at the

20      offices of Knox McLaughlin Gornall & Sennett, PC,

21      120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25              Reported by Janis L. Ferguson, RPR
              Ferguson & Holdnack Reporting, Inc.
```

Page 26

1    Q.  Did you go up there on your own, or did somebody
2  walk with you?
3    A.  I think somebody walked with me.
4    Q.  Do you know who that was?
5    A.  Not offhand, I don't.
6    Q.  It wasn't one of the school police, was it?
7    A.  No.
8    Q.  Do you know them?
9    A.  No.  But I would have remembered if a policeman
10  walked me somewhere.
11    Q.  Anyway, somebody escorted you up to her office.
12    A.  Yes.
13    Q.  Had you ever been to her office before that time?
14    A.  No.
15    Q.  Had you ever met her before that day?
16    A.  No.
17    Q.  When she or someone else called you to ask you to
18  come in, did they just say I want to talk to you, or did
19  they tell you why?
20    A.  They needed to talk to me about my daughter T██
21    Q.  That's it?
22    A.  I assumed she was in trouble.
23    Q.  Okay.  So when you got there, was Linda
24  Cappabianca the only person in the room besides you?
25    A.  Hum-um.  There was a boy in the room.  And she

Page 27

1  made him leave the room.  He was out -- I remember, because
2  he was banging his desk on the wall out there.  He was being
3  bad.
4    Q.  Okay.  So he left the room.
5    A.  Um-hum.  She made him sit in the hallway at the
6  desk.
7    Q.  Now you're alone with Cappabianca.
8    A.  And T██
9    Q.  And T██  So either T██ was there when you
10  arrived, or she was called to come into the room.
11    A.  Um-hum.
12    Q.  How long did the meeting last?
13    A.  Probably 40 minutes.
14    Q.  Tell me as best you remember what was said during
15  that meeting, in the order in which it was said.  I know
16  it's been -- it's been -- it's been three years.  So --
17    A.  She wanted to let me know that T██ was hanging
18  around some girls that were -- were unappropriate.  They
19  were doing things that were unappropriate.  T██ -- T██ was
20  in the room the whole time.  So she said that some of the
21  girls that T██ was hanging with were -- do I have to say
22  the exact words?  Were --
23    Q.  If you -- yeah.  I know it's probably
24  embarrassing, but if you don't mind.  We're all -- except
25  for R██, all grown up.

Page 28

1    A.  Said that they were giving blow jobs in school to
2  boys.  They were caught doing it in the gym, and there
3  was -- it was either a Laundromat or it's a store on the
4  corner that the girls were doing it at, and my daughter was
5  with them when they were doing it.  And she wanted to let me
6  know that -- the kind of kids that my daughter was hanging
7  around, and she didn't think it was good.  That she wanted
8  me to be aware of what was going on.
9    Q.  And she was referring to "girls", like more than
10  one girl.
11    A.  She said their name.
12    Q.  What were their names?
13    A.  R██  But she said R██  I didn't realize
14  at the time -- I don't know her as R██  I know her as
15  R██  T██ when I had asked her, is the one that said,
16  mom, that's R██  R██ is R██  I know her as
17  R██
18    Q.  For the sake of the court reporter and the record,
19  I'd like to make clear the distinction you're making.  You
20  have now just pronounced the name R██ two different ways,
21  right?
22    A.  Yes.
23    Q.  One is with the accent on the first syllable, and
24  the other is with the accent on the second syllable?
25    A.  Right.

Page 29

1    Q.  And Miss Cappabianca put the accent on the second
2  one.  R██  Correct?
3    A.  Yes.
4    Q.  Did she mention any girl besides R██?
5    A.  I honestly don't think so.  I mean, I -- I can't
6  be positive, but I really don't remember.  I don't think so.
7  I remember -- I remember R██ -- R██ --
8    Q.  Early on in your description of the meeting, you
9  used the word "girls", I thought.
10    A.  Um-hum.
11    Q.  Not girl, but girls.
12    A.  Right.  But that's the only name I remember
13  hearing.
14    Q.  Oh, okay.  Do you remember that she used other
15  names, but you just don't remember the other names?
16    A.  I can't say for sure.  I don't --
17    Q.  All right.  Now, did she mention R██ last
18  name?
19    A.  P██  But I still didn't know who she was
20  then.  It's weird how I figured out who she was.
21    Q.  Let me -- let's look at the affidavit for a
22  second, Defendant's Exhibit O.
23    A.  Um-hum.
24    Q.  Paragraph 7 -- this may help your memory.
25    A.  My daughter kind of helps too.

```
 1          IN THE UNITED STATES DISTRICT COURT
 2      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3   RICHARD P., by and for          )
     R▄▄▄ P., and DENISE L., by      )
 4   and for K▄▄▄▄ L.,               )
                        Plaintiffs   ) Civil Action
 5               vs                  ) No: 03-390 Erie
     SCHOOL DISTRICT OF THE CITY OF  )
 6   ERIE, PENNSYLVANIA; JANET       )
     WOODS, Individually and in her  )
 7   Capacity as Principal of        )
     Strong Vincent High School;     )
 8   and LINDA L. CAPPABIANCA,       )
     Individually and in her         )
 9   Capacity as Assistant           )
     Principal of Strong Vincent     )
10   High School,                    )
                        Defendants   )
11
12
13          Deposition of DENISE L▄▄▄ taken before and
14   by Linda K. Rogers, Commissioner of Deeds in the
15   Commonwealth of Pennsylvania and Notary Public in
16   the State of New York, on Monday, March 21, 2005,
17   commencing at 12:01 p.m., at the law offices of
18   Knox McLaughlin Gornall & Sennett, PC, 120 West
19   10th Street, Erie, Pennsylvania 16501.
20
21
22
23
24
25              * * *
                                                Page 1
```

```
 1  For the Plaintiffs:
        Edward Olds, Esquire
 2      1007 Mount Royal Boulevard
 3     Pittsburgh, PA 15223
 4
 5
 6  For the Defendants:
        James T. Marnen, Esquire
 7      Knox McLaughlin Gornall & Sennett, PC
        120 West 10th Street
 8      Erie, PA 16501
 9
10
11
12
13              * * *
14
15
16
17
18
19
20
21
22
23
24
25
                                                Page 2
```

```
 1               DIRECT EXAMINATION
 2   BY MR. MARNEN:
 3
 4      Q. You are Denise L▄▄▄ correct?
 5      A. Yes.
 6      Q. What is your middle name?
 7      A. Jane.
 8      Q. Where do you presently reside?
 9      A. ▄▄▄▄▄▄▄▄▄▄▄
10      Q. In Erie?
11      A. Yes.
12      Q. What is the zip code?
13      A. ▄▄▄▄
14      Q. How long have you resided there?
15      A. Going on five years.
16      Q. Were you residing at ▄▄▄▄▄▄▄▄▄ on the
17   day that K▄▄▄ was harmed that is the subject of this
18   lawsuit?
19      A. Yes.
20      Q. You have been at a number of depositions in this
21   case so far, and I think you probably have the drill down,
22   but let me just remind you. I am here as the attorney for
23   the school district, Miss Cappabianca, Miss Woods. My only
24   purpose is to find out what you know about facts I think are
25   relevant to the case. You have the right to understand what
                                                Page 3
```

```
 1   I am asking. If you don't understand or hear me, let me
 2   know and I will rephrase it.
 3          We should try to avoid talking at the same time.
 4   The reporter is taking everything down, and you should use
 5   words when you communicate with me as opposed to gestures
 6   and sounds that are not words like um-hmm and unh-unh
 7   because it is difficult for the reporter to interpret what
 8   you mean by that.
 9          If at any time you want to take a break, we can
10   take a break. This is not an inquisition. Do you have any
11   questions of me?
12      A. No.
13      Q. Okay. So you lived at ▄▄▄▄▄▄▄▄▄ for
14   about five years?
15      A. Yes.
16      Q. Are you born and raised in Erie?
17      A. Yes.
18      Q. For a brief period of time I gather you lived in
19   Meadville?
20      A. I didn't live in Meadville.
21      Q. She did, K▄▄▄ did?
22      A. Yes, yes.
23      Q. What is K▄▄▄ father's name?
24      A. Junior.
25      Q. Is that his given name, Junior, or a nickname?
                                                Page 4
```



**Page 41**

1 Q. When was that, December, November, if you
2 remember?
3 A. I believe it was once in November -- once in
4 November, then I tried again in December.
5 Q. So you gave up sometime in December before
6 Christmas break?
7 A. Right.
8 Q. Did you ever try and call Janet Woods on the
9 telephone?
10 A. No.
11 Q. Did you ever write her a letter?
12 A. No.
13 Q. I am not suggesting you should have, I am just
14 trying to find out what you did. Did you ever try to get in
15 touch with anybody, aside from people at Strong Vincent,
16 about this harassment with C_____?
17 A. Pardon me?
18 Q. Did you ever try to talk with anybody besides
19 Cappabianca and Woods who worked for the school district
20 about C_____ harassing your daughter?
21 A. No.
22 Q. Never called the administration building or
23 anything like that?
24 A. No.
25 Q. You ever call the police about the harassment?

**Page 42**

1 A. No.
2 Q. Are you aware of any circumstance under which
3 anybody at Strong Vincent put K_____ in a room with
4 C_____ B_____ and/or C_____ or K_____ or A_____
5 F_____ to talk about the problems between them?
6 A. She said that --
7 Q. Who is she?
8 A. K_____ said that Mrs. Pastore ordered her to
9 peer mediation with B_____ C_____. I believe that one was
10 just for B_____ C_____, and she said C_____ B_____ came
11 into it somehow. I don't know how that came about.
12 Q. When did that take place, do you know?
13 A. I don't remember.
14 Q. When did K_____ tell you that?
15 A. It wasn't long after they started school.
16 Q. Long after what?
17 A. After they started school, so it might have even
18 been in October.
19 Q. Who is Mrs. Pastore?
20 A. That was her homeroom teacher.
21 Q. Was B_____ C_____ in K_____ homeroom?
22 A. I'm not sure.
23 Q. So Mrs. Pastore, K_____ homeroom teacher,
24 early on, maybe as early as October of 2001, required
25 K_____ to engage in peer mediation with B_____ C_____?

**Page 43**

1 A. Yes.
2 Q. How did the mediation work, was someone else there
3 besides those two?
4 A. Well, K_____ said it was just -- it was her,
5 B_____ and C_____ in the room.
6 Q. Nobody else, not a teacher, not another student?
7 A. She didn't say nobody else was there, just them.
8 She said they had to talk out what their problems were.
9 Q. How did that go, K_____ tell you?
10 A. K_____ said that it didn't work because he's
11 still picking on me and that she is scared of them.
12 Q. Are you telling me them, scared of them?
13 A. Yes.
14 Q. Both C_____ B_____ and B_____ C_____?
15 A. Yes.
16 Q. Did you ever spend any time at school with
17 K_____ accompanying her to classes and that sort of thing?
18 A. No.
19 Q. Was that permitted; do you know?
20 A. I don't think so. I think the only people that
21 can do that is TSS workers.
22 Q. TSF?
23 A. TSS, therapeutic staff support.
24 Q. I have heard that term, you may be right about
25 that. You said that on January 7, 2002 you went to Strong

**Page 44**

1 Vincent after K_____ told you about the sexual assault and
2 you confronted Linda Cappabianca?
3 A. Right.
4 Q. She was in the office with a tall, black guy and
5 you spoke with Cappabianca about the incident, right?
6 A. Right.
7 Q. Did the tall, black guy stay there?
8 A. Yes.
9 Q. What is his name; do you know?
10 A. No.
11 Q. Chris Rule? Do you have any idea if it was Chris
12 Rule?
13 A. No, because he's white.
14 Q. You know who Chris Rule is?
15 A. Yes, he was at the meeting at the hospital.
16 Q. What meeting at the hospital?
17 A. The discharge meeting.
18 Q. The discharge meeting meaning discharged from the
19 hospital?
20 A. Right.
21 Q. Who invited him?
22 A. I'm not sure. She had people involved with her, I
23 think she had mobile therapy at the time, I believe, and OCY
24 was there too. Maybe one of them invited him to come or the
25 doctor, I'm not sure.



**Page 45**

1  Q. Who was at the meeting?
2  A. Chris Rule, me, of course K███ Dr. --
3  Q. Borzon?
4  A. Yeah. I think that was it.
5  Q. B-O-R-C-Z-O-N?
6  A. B-O-R-Z-O-N, I think.
7  Q. Anybody else?
8  A. Stephanie Provoka (phonetic).
9  Q. How do you spell that, any idea?
10 A. I have no idea.
11 Q. What did Stephanie Provoka do?
12 A. She is from OCY. Office of Children and Youth,
13 and Sara French.
14 Q. Who is Sara French?
15 A. That was her mobile therapist.
16 Q. Mobile therapist?
17 A. Yeah.
18 Q. What is a mobile therapist?
19 A. It is like a therapist that comes to your house.
20 Q. Had Sara French seen K███ before she was
21 hospitalized or was her mobile therapy delivered after she
22 got out of the hospital?
23 A. I can't remember. I think it was before, shortly
24 before.
25 Q. Anybody else at that meeting? Chris Rule, Denise

**Page 46**

1  L███, K███ L███ Dr. Borzon, Stephanie Provoka, Sara
2  French?
3  A. There was a nurse there too, I don't know who that
4  was, though.
5  Q. At that meeting Chris Rule said what?
6  A. That K███ is going to be moved from Strong
7  Vincent for her safety.
8  Q. Did you ask him what he meant?
9  A. Yeah. And he said that -- he said, let me clarify
10 that. And he said that the other kids are picking on her
11 and due to the incident that K███ had mentioned. He
12 said that the school needed time for it to blow over.
13 Q. Did you ask Chris Rule what, if anything, was
14 going to happen to the other kids involved in the incident?
15 A. I asked him. I said, well, what is going to
16 happen to the boy, and he said he is not sure what is going
17 to happen.
18 Q. Did you know at that time that by the time of that
19 discharge meeting that R███ P███ had also been involved
20 in the incident?
21 A. No, I didn't find out until later.
22 Q. You knew that C███ B███ was involved?
23 A. Yes.
24 Q. Because K███ told you?
25 A. Yes.

**Page 47**

1  Q. Did she also tell you that C███ was involved?
2  A. Yes.
3  Q. How about A███ Ki███, did you know A███
4  Ki███ was there that day?
5  A. K███ didn't tell me, but I heard later that he
6  was.
7  Q. How about A███ F███, were you told by
8  K███ that he was there?
9  A. No. And this is the first time I heard that he
10 was picking on her.
11 Q. What was the first time, in the hospital you mean?
12 A. No, right today.
13 Q. Today, oh. Today at the deposition was the first
14 time you heard about A███ F███ picking on K███?
15 A. That he was picking on K███
16 Q. Your information before this deposition was that
17 B███ C███ and C███ B███ were picking on K███
18 nobody else?
19 A. Right.
20 Q. Your information before today that the only sexual
21 assailant with respect to K███ was C███ B███?
22 A. Right.
23 Q. I guess, I mean the person who had her perform sex
24 on him, right?
25 A. Yes.

**Page 48**

1  Q. A███ K███ had nothing to do with K███,
2  is that right?
3  A. Right.
4  Q. Is it your understanding it was one time?
5  A. Right.
6  Q. One sex act?
7  A. Yes. And she did see him after that happened,
8  because I remember she said she didn't in the deposition
9  today. She seen him at court.
10 Q. She saw C███ B███ at court?
11 A. When we went to court, and then he laughed at her.
12 Q. You were here for K███ testimony and she
13 said, if I understood her correctly, I think I got this
14 right, and if I got it wrong tell me. You picked her up the
15 evening she was sexually assaulted by C███ B███?
16 A. Right.
17 Q. Is that an accurate statement by her?
18 A. Yeah. When I found her, she was hiding over
19 across the street by the school. There was a sign there.
20 Q. She was hiding on the block that the school was
21 located on?
22 A. Yeah. And I --
23 Q. Where was she hiding?
24 A. Over -- there was a sign there and --
25 Q. A sign in front of the school?

## Page 49

1  A. Not in front, it is on the side, there's a parking
2  lot.
3  Q. It is the side on the laundromat side?
4  A. Yes. There was a bunch of kids around, I know
5  that, and I was just looking amongst the kids to see if I
6  can see her because she wasn't in front of the school. And
7  I know like up a little bit there was a bunch of girls
8  standing there, and then I saw K____ and then she got in
9  the car and we went home.
10  Q. Do you agree with me that the front door of Strong
11  Vincent is on West 8th Street?
12  A. Yes.
13  Q. And then on both sides of Strong Vincent there are
14  streets?
15  A. Right.
16  Q. And then on the backside of Strong Vincent is the,
17  I guess you would call it a football field, right?
18  A. Right.
19  Q. That's down in kind of a little valley there,
20  right?
21  A. Yes.
22  Q. The laundromat is across the street from Strong
23  Vincent; do you degree with that?
24  A. Yes.
25  Q. The kids you saw, were they on the laundromat side

## Page 50

1  of the street or the school side of the street when you saw
2  them?
3  A. There was some on the laundromat side, and then
4  some down on the other side by the school on Washington.
5  Q. K____ was on the -- you know the name of the
6  street, Washington?
7  A. Right.
8  Q. I forgot that was K____ that didn't know that.
9  The laundromat is on one side of Washington, and Strong
10  Vincent is on the other side, right?
11  A. Right.
12  Q. Some of the kids were at the laundromat on the
13  laundromat side of Washington and some were on the school
14  side?
15  A. Yes.
16  Q. They were closer to the football field?
17  A. Yes.
18  Q. K____ was behind a sign that was on the school
19  grounds?
20  A. Yes.
21  Q. Is that a sign that said Strong Vincent or
22  something or something else?
23  A. I don't know.
24  Q. Don't know. How do you know she was, what, hiding
25  behind the sign?

## Page 51

1  A. I saw somebody. I didn't see K____ amongst the
2  girls so I drove down a little bit to see, and it was her.
3  And I told her to get in the car. She got in the car and
4  she was crying. And I thought she was just crying because
5  she wasn't where I told her to be, and I would be mad
6  because she wasn't in front of the school but --
7  Q. Did you ask her why she was crying?
8  A. Yeah. She said I just want to go home, I'm tired.
9  Q. You didn't pursue it any further?
10  A. Well, she was crying, I figured that she would
11  talk to me later, you know. If somebody was bothering her
12  or whatever, she would tell me later.
13  Q. It was dark out when you picked her up that night?
14  A. Yes.
15  Q. I think you told me that you went to see Linda
16  Cappabianca after K____ told you about the incident?
17  A. Right.
18  Q. I think my notes say you went to see Linda
19  Cappabianca on January 7th?
20  A. Right.
21  Q. That is the Monday following K____ admission
22  to the hospital?
23  A. Right.
24  Q. So K____ obviously told you about the incident
25  over the weekend?

## Page 52

1  A. Right.
2  Q. Did you ask -- you did tell me earlier, didn't
3  you, that you asked K____ why she didn't tell you before
4  and she said because she was scared, right?
5  A. Right.
6  Q. Did she explain to you what she was afraid of?
7  A. Yeah. I asked her, why were you scared to tell
8  me, and she goes, because they will beat me up.
9  Q. So you left Millcreek Community Hospital, you
10  drove to Strong Vincent, and you saw Linda Cappabianca on
11  the 7th, right?
12  A. Right.
13  Q. You used the word confront. Can you explain what
14  you mean by that? Well, I just basically went in and, you
15  know, asked to speak to her and she came down to the office
16  and I was on this side of the counter thing, me and my
17  sister, and she was on the other side. She was here and the
18  black guy was here.
19  Q. You were with your sister?
20  A. Right.
21  Q. I forgot your sister's name.
22  A. Darlene Griffin. Then that's when I told her what
23  K____ told me, and she said she was dealing with it.
24  Q. Well, what did you mean by the word confront?
25  Were you angry, for example?



**Page 53**

1  A. Yeah. I was angry because she should have told me
2 first. I mean, I told her, I said, you'll call me -- you
3 guys will call me if my daughter is like tugging on her ear
4 and she has an infection or something, but you won't call me
5 when my daughter is assaulted.
6  Q. Did Cappabianca tell you when she first became
7 aware of the incident?
8  A. No. Her basic words is, she's dealing with it
9 now. I forgot to put the now part in there.
10   (DEFENDANTS' EX. D - AMENDED COMPLAINT,
11   marked for idenification.)
12  Q. I am going to mark the amended complaint as
13 Exhibit D. Mrs. L██ have you seen this document before
14 today?
15  A. Yes.
16  Q. Would you go to Page 4 of that Exhibit D,
17 Paragraph 7. I'm going to read it out loud. Strong Vincent
18 tolerated a high level of offensive sexual conduct among its
19 students. Right?
20  A. Right.
21  Q. Do you agree with that statement?
22  A. Yes.
23  Q. Why do you agree with that statement?
24  A. Basically for what Mrs. Cappabianca told me, and
25 things that I saw even before this happened to my daughter.

**Page 54**

1 I would see people outside just grabbing each other and
2 everything. I mean, even in the hallways when I was in the
3 school you would see them, you know, like smack each other
4 on the butt. I call that offensive.
5  Q. Did you ask K████ when she told you over that
6 weekend in the hospital, you remember we talked about she
7 said she didn't tell you because -- and you said the reason
8 she didn't tell you was she was afraid of -- I forget your
9 language, but it was something you were afraid the kids
10 would do something to her.
11  A. Right.
12  Q. What did you say, help me out here.
13  MR. OLDS: Beat-up.
14  A. Um-hmm.
15  Q. Did you ask K████ whether she told Linda
16 Cappabianca or Janet Woods about the incident?
17  A. She said she told Mrs. Cappabianca what happened,
18 and she said that that is what people do when they are in
19 love.
20  MR. OLDS: Who is she?
21  A. Mrs. Cappabianca told her that's what people do
22 when they are in love.
23  Q. Did K████ tell you this when she was still
24 hospitalized?
25  A. Yes.

**Page 55**

1  Q. So she said that she did report it to Linda
2 Cappabianca at some time prior to the time she told you
3 about it?
4  A. That's how I knew who to talk to.
5  Q. She said -- did she say when she reported it to
6 Linda Cappabianca?
7  A. She said the day after it happened.
8  Q. Did you say anything to K████ like you told
9 Linda Cappabianca but you didn't tell me, why is that?
10  A. No, I didn't want to get into it too bad because
11 she was already hospitalized.
12  Q. Did she explain to you why she thought telling you
13 might lead to her getting beat-up?
14  A. Basically she knows my temper, but I calmed myself
15 before I went to the school because at first I wanted to
16 just go in there and rip the place a part, you know. But
17 then I went home and I calmed down, I had the whole weekend
18 to calm down.
19  Q. Didn't K████ tell you she did not tell you
20 before the hospitalization about the assault because she was
21 afraid other kids would beat her up, not that you would beat
22 her up?
23  A. No, other kids would beat her up.
24  Q. Did she explain to you why she thought telling you
25 might lead to other kids beating her up, and telling Linda

**Page 56**

1 Cappabianca about it would not? Did she explain that to
2 you?
3  A. No, no.
4  Q. In any event she said she told Linda Cappabianca
5 the day after the assault happened?
6  A. Right.
7  Q. Linda Cappabianca's response was that is what
8 people do when people are in love?
9  A. Yes.
10  Q. Did she tell you whether she explained to Linda
11 Cappabianca she was forced to perform oral sex on C████
12 B████?
13  A. Yes.
14  Q. And Cappabianca's response was that is what people
15 do when they are in love?
16  A. Yes.
17  Q. Did you discuss that conversation with Linda
18 Cappabianca on January 7th?
19  A. I mentioned it after I told her that K████ told
20 me this, and then I said that isn't what people do when
21 they are in love. Not when they are like forced to do
22 something like that.
23  Q. What, if anything, did Linda Cappabianca say to
24 that?
25  A. She just said that she is going to deal with it,


210a

| | |
|---|---|
| 1  Q. Okay. So Chris Rule came to the hospital at the | 1  Q. Really? Okay. |
| 2 time of discharge and told you and K█████ that K████ | 2  A. Mr. Rogers did it, and he gave me a yellow copy. |
| 3 was going to be placed in Sarah Reed for her own safety, | 3  Q. So you were there with Mr. Rogers, anybody else |
| 4 right? | 4 there? |
| 5  A. Right. | 5  A. No. |
| 6  Q. What, if anything, did you say in response to | 6  Q. Did you sign anything that indicated you agreed |
| 7 that? | 7 with the placement in Sarah Reed? |
| 8  A. I said, well, what is going to happen to the boys | 8  A. I had to sign a paper at Sarah Reed when I was at |
| 9 that did this? If you are removing K████, what is going | 9 Sarah Reed. |
| 10 to happen to them? | 10  Q. Okay. |
| 11  Q. And he said he didn't know? | 11  MR. MARNEN: I think I will get the exhibits you |
| 12  A. Right. And then that's when all the court | 12  marked last week, Ed. I will be right back. |
| 13 proceedings started. | 13  Let's take five minutes. |
| 14  Q. Court proceedings, you're talking about the | 14  (Brief recess.) |
| 15 juvenile delinquency proceedings? | 15  Q. I only have one copy. I will come over with you, |
| 16  A. Right. | 16 if you don't mind. Moore Deposition Exhibit 2 is an exhibit |
| 17  Q. K████ was, in fact, placed in Sarah Reed, | 17 that has a bunch of documents in it. Let me walk you |
| 18 correct? | 18 through it. There's a notice of the recommended educational |
| 19  A. Right. | 19 placement, that's the NOREP. Do you recognize that; did you |
| 20  Q. How did you feel about that? | 20 see that back then, if you know? |
| 21  A. I didn't think it was right have to remove | 21  A. Yeah. |
| 22 them. They should have been able to handle the situation. | 22  Q. There is the IEP revision review. There is a |
| 23 You know, if they got rid of the boys, they should have been | 23 request for home school visitor service, I guess that's not |
| 24 able to handle the rest of the school. Get things under | 24 necessarily a part of the IEP. On Page E744 there is a |
| 25 control -- | 25 statement that you appeared to have signed; do you remember |
| Page 65 | Page 67 |
| 1  Q. Did you tell -- I'm sorry, I didn't mean to | 1 signing that? |
| 2 interrupt you. | 2  A. Yes. This was signed at Sarah Reed. |
| 3  A. You know, so she would be able to stay in the | 3  Q. That was signed at Sarah Reed. Was that after |
| 4 school where she could learn and excel. | 4 Kristina was there? |
| 5  Q. Did you tell anybody at the Erie School District | 5  A. No, that was at an intake. |
| 6 that thought right there? | 6  Q. Intake, okay. |
| 7  A. I just said it at the meeting with Chris Rule. | 7  A. Said I have to write something for her to go |
| 8  Q. At the meeting in the hospital? | 8 there. |
| 9  A. Right, because he is the one that wanted to put | 9  Q. On Page E818 of that same exhibit the document is |
| 10 her there. | 10 entitled IEP revision review. Is that your signature on |
| 11  Q. You think it was Chris Rule's idea? | 11 there? |
| 12  A. Yes, that is what I was told. | 12  A. Yes. |
| 13  Q. That's fine. Chris Rule told you that? | 13  Q. I forget the person you said you met at your home |
| 14  A. Yeah. | 14 with. |
| 15  Q. K████ was in special education, correct? | 15  A. Mr. Rogers. |
| 16  A. Right. | 16  Q. Mr. Rogers. It doesn't appear that Rogers signed |
| 17  Q. And you would agree with me, won't you, that there | 17 that. You signed it, correct? |
| 18 is a process that relates to changing placements of special | 18  A. This one wasn't signed at my house. |
| 19 education kids? There's a process you have to go through? | 19  Q. No, it wasn't? Where was it signed? |
| 20  A. Yeah, IEP. | 20  A. I don't remember. I remember signing, I think it |
| 21  Q. IEP, that's the process. There was a new IEP for | 21 was this one here. |
| 22 K████, right? | 22  Q. That is the one with 3400 in the lower right |
| 23  A. Right. | 23 corner, that's the NOREP? |
| 24  Q. You were invited to that meeting, the IEP meeting? | 24  A. Yes. I remember this at my house. |
| 25  A. It was done at my house. | 25  Q. I don't see a signature on it. |
| Page 66 | Page 68 |

**Page 69**

1    A. This is the only thing I remember.
2    Q. Did you sign on the second page?
3    A. No. This is all he brought to me, and then he
4 pulled the yellow pages off and gave me the yellow one and
5 he kept these ones, he kept the top pages.
6    MR. OLDS: Did she say she did not sign 818 at her
7    house, that would be the fifth page?
8    MR. MARNEN: What is the page?
9    MR. OLDS: The fifth page of that.
10    Q. 818, you said you did not sign that at your house?
11    A. No, not at my house.
12    Q. Do you remember where you signed it?
13    A. No.
14    Q. You just signed that very first document at your
15 house, that is what you remember?
16    A. Right.
17    Q. Is that your signature on 818?
18    A. Yes.
19    Q. There is your signature on E820, NOREP, E820 you
20 signed it, right?
21    A. Right.
22    Q. Looks like multiple copies of the same thing.
23 Okay. Is it your recollection that you went along with the
24 placement at Sarah Reed?
25    A. Right.

**Page 70**

1    Q. You did not object to it?
2    A. No.
3    Q. You did not object, correct?
4    A. No.
5    Q. That's not correct or you didn't object?
6    A. I didn't object.
7    Q. Okay. Now I want --
8    A. Wasn't much of a choice.
9    Q. That's what I want to ask you, why didn't you
10 object?
11    A. Because he said that she would be better off
12 there.
13    Q. Chris Rule said that?
14    A. Right, than in school.
15    Q. Did he explain to you why he thought that was the
16 case?
17    A. He said because the kids need time to forget about
18 it. And if she went back to school that there might be
19 further, you know, taunting about what happened, stuff like
20 that. It would be better to give them a break.
21    MR. OLDS: Just for clarification, when you said
22    the kids need time to forget about it, what kids
23    was he talking about?
24    THE WITNESS: The students at school.
25    Q. The students besides C██████ and B██████

**Page 71**

1    A. Right.
2    MR. OLDS: R████ and K██████ too, they were kids
3    too. I just didn't understand it.
4    A. He mentioned student body.
5    Q. Because there was some harassment going on at the
6 high school, right?
7    A. Right.
8    Q. That harassment was coming from people in addition
9 to C████ B████ and B██ C██████?
10    A. Right.
11    Q. And you accepted Chris Rule's opinion on this, is
12 that what you are saying?
13    A. Yeah, he is professional so --
14    Q. That opinion was -- we are talking now about the
15 conversation at discharge day, right?
16    A. Right.
17    Q. As I remember your testimony earlier you said
18 Chris Rule did not know at the time of the discharge what
19 was going to happen with B██ and C██████
20    A. Right. He said there was a lot of police and
21 stuff coming into the school to talk to everybody, and it
22 would also be easier if they are not there.
23    Q. Did Chris Rule mention anything about Sarah Reed
24 being able to provide services that Strong Vincent could not
25 provide?

**Page 72**

1    A. No, that's all he said.
2    Q. All he said was get them out of there because we
3 need for it to cool down basically?
4    A. Yes.
5    Q. Did he say how long he thought the Sarah Reed
6 placement would last?
7    A. No.
8    Q. Did he say whether R███ P█████ was going to be
9 the subject of a Sarah Reed placement also?
10    A. I don't recall.
11    Q. Did you know by the time that Chris Rule was in
12 there for the discharge meeting, did you know by that time
13 that R███ had been a victim of a sexual assault also,
14 R███ P█████?
15    A. Yes, I think so.
16    Q. Did K█████ tell you that?
17    A. No, Chris Rule did.
18    Q. Chris Rule did?
19    A. Yeah.
20    Q. Did you know R███ P█████ before that day?
21    A. Yes.
22    Q. How did you know her?
23    A. K█████ and her were friends.
24    Q. Did they ever come to your house to hang out or
25 whatever they call it?

212a

**Page 73**

1   A. Yeah, and she went over there.  I also went over
2 there and talked to her parents.
3   Q. You knew Richard P▮▮▮ and Shelly P▮▮▮ too?
4   A. Yes.
5   Q. Is that the only way you knew them was through the
6 girls?
7   A. Right.
8   Q. You didn't know them before --
9   A. No.
10   Q. -- K▮▮▮ went to Vincent that year, right?
11   A. No.  I have a question.
12   Q. Okay.
13   A. When they are supposed to have like the five days
14 of -- I saw it in that thing where they had five days of
15 in-home schooling, are they supposed to work on the IEP; do
16 you know?
17   Q. I don't know.  Thank you for reminding --
18   A. They are not supposed to sit there and color, are
19 they?
20   Q. The girls, you mean?
21   A. Yeah.
22   Q. I think when they are in their home schooling they
23 are supposed to be getting an education.
24   A. Because whenever she was getting home schooling at
25 home he just gave her a coloring book and crayons.

**Page 74**

1   Q. The home school teacher?
2   A. Yeah, and they just colored.
3   Q. I understand K▮▮▮ after she got out of
4 Millcreek Community Hospital never returned to Strong
5 Vincent.
6   A. No.
7   Q. She was instead placed in the home before she went
8 to Sarah Reed?
9   A. Right.
10   Q. Did K▮▮▮ finish the school year at Sarah Reed?
11   A. Yes.
12   Q. When did she leave Sarah Reed after that school
13 year, did she leave at the end of a regular school year or
14 did she also go there in the summer?
15   A. No.  She didn't go there in the summer, then she
16 went to Wayne.
17   Q. So for 2002-2003, she went to Wayne Middle School?
18   A. Right.
19   Q. Why did she go to Wayne Middle School?
20   A. Because that was the school that was over there.
21   Q. Why didn't she go back to Strong Vincent?
22   A. She didn't want to go back there.
23   Q. Is that the reason she did not go back to Vincent?
24   A. Right.  She didn't want to go.  And then when she
25 went to Wayne there was problems there too.

**Page 75**

1   Q. What kind of problems?
2   A. Well, this boy said that she was hitting him in
3 the back of the head.  Her friends were sitting all in the
4 same room and said it didn't happen.  And the principal
5 wanted her to go to his office with him, and it would just
6 be him and her, and she didn't feel comfortable.  She said
7 you can talk right here.  He said you are going to go to my
8 office, and then he grabbed her to take her to his office
9 and then she pulled away.  He grabbed her by her thighs
10 twice, and then dropped her on the ground.  And then he
11 grabbed her wrist and took a piece of skin out of her wrist,
12 and I called the police.
13   Q. Were any charges filed?
14   A. No.  He doesn't work there anymore.
15   Q. What is his name?
16   A. Mr. Cranking (phonetic).
17   Q. Cranking?
18   A. He doesn't work there no longer as a principal.
19   Q. Is that the only, I am going to call it
20 harassment, at Wayne?
21   A. Kids picked on her.
22   Q. Did they pick on her for any reasons related to
23 the sexual assault by C▮▮▮ B▮▮▮?
24   A. No, just basically --
25   Q. Basically picked on her?

**Page 76**

1   A. Picked on her, they hit her sometimes.  One girl,
2 she is like 350 pounds, she would hit on her and she would
3 beat on her.  She pushed her into the heater one time and
4 black and blued her arm up on the back.
5   Q. Has there been any verbal or physical harassment
6 or bothering of K▮▮▮ since she entered Wayne school up
7 to the present day that has been related by the harassers to
8 the sexual assault by C▮▮▮ B▮▮▮?  Do you follow my
9 question, it was a long question?
10   A. No.
11   Q. What I am trying to find out is whether anybody
12 has bothered K▮▮▮ since she went back into school after
13 she left -- after she left Sarah Reed, whether anybody has
14 bothered her by accusing her of doing something wrong with
15 C▮▮▮ B▮▮▮ or calling her names that would suggest that
16 she is not a good girl, things of that nature?
17   A. Well, some people at East.  She don't go there
18 yet, but that's where they want to put her.  She don't go
19 there yet but my older daughter comes home and tells me.
20   Q. K▮▮▮?
21   A. They say stuff about K▮▮▮.
22   Q. About K▮▮▮ being, what, promiscuous?
23   A. They didn't say promiscuous.  They said that she
24 performed oral sex on C▮▮▮ I guess they were kids that
25 went to Strong Vincent that now go to East.  At Sarah Reed

213a

**Page 1**

```
 1         IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
 3  RICHARD P., by and for
    R___ P., and DENISE L., by
 4  and for K___ L.,
                  Plaintiffs      Civil Action
 5      vs                        No: 03-390 Erie
 6  SCHOOL DISTRICT OF THE CITY OF
    ERIE, PENNSYLVANIA; JANET
 7  WOODS, Individually and in her
    Capacity as Principal of
 8  Strong Vincent High School;
    and LINDA L. CAPPABIANCA,
 9  Individually and in her
    Capacity as Assistant
10  Principal of Strong Vincent
    High School,
11               Defendants
12
13        Deposition of K___ L., taken before and
14  by Linda K. Rogers, Commissioner of Deeds in the
15  Commonwealth of Pennsylvania and Notary Public in
16  the State of New York, on Monday, March 21, 2005,
17  commencing at 10:30 a.m., at the law offices of
18  Knox McLaughlin Gornall & Sennett, PC, 120 West
19  10th Street, Erie, Pennsylvania 16501.
20
21
22
23
24
25         * * *
```

**Page 2**

```
 1  For the Plaintiffs:
       Edward Olds, Esquire
 2     1007 Mount Royal Boulevard
 3  Pittsburgh, PA  15223
 4
 5
 6  For the Defendants:
       James T. Marnen, Esquire
 7     Knox McLaughlin Gornall & Sennett, PC
       120 West 10th Street
 8     Erie, PA 16501
 9
10
11
12
13         * * *
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1  K___ L___ first having been duly
 2  sworn, testified as follows.
 3
 4              DIRECT EXAMINATION
 5  BY MR. MARNEN:
 6
 7      Q. K___, would you tell me what your whole name
 8  is.
 9      A. K___ L___ L___
10      Q. L-___ is that it?
11      A. I don't know, ask my mom.
12      Q. Something like that.  When were you born, do you
13  remember?
14      A. Yes, ___
15      Q. Where do you live right now?
16      A. ___
17      Q. K___ I am the attorney for the school
18  district.  And I'm here today to ask you questions about
19  things that happened a couple years ago that are the subject
20  of a lawsuit that you and others have filed against the
21  school district and Miss Cappabianca and Mrs. Woods.
22         My purpose here today is simply to ask you
23  questions to find out what you know about various things.
24  I'm not here to trick you or to bully you or anything.  If
25  you don't understand what I'm asking you or you don't hear
```

**Page 4**

```
 1  me, please let me know, you have a right to understand the
 2  question, and I will try again.
 3         We ought to try and not talk at the same time
 4  because the lady next to my left and your right is the court
 5  reporter and she is going to take down everything we say.
 6  It will be very difficult on her if we talk at the same
 7  time.
 8         Also, another rule we ought to follow here is that
 9  when we communicate with each other we should both use
10  words, not sounds that could be misinterpreted by her, for
11  example, um-hmm, unh-unh.  She may not be able to tell what
12  we mean.  Say yes or no and things of that nature.  If you
13  want to take a break at any time, we can do that.  This is
14  not the Spanish Inquisition.  With that in mind, why don't
15  we proceed.  Okay, ready?
16         Are you in school right now, K___?
17      A. Yes, Sarah Reed.
18      Q. Sarah Reed.  What grade are you in?
19      A. I am in tenth.
20      Q. Tenth grade.  When did you start going to Sarah
21  Reed this year?  Do you remember?
22      A. I started in the summertime.
23      Q. Summer of last year, summer of 2004?
24      A. Yeah.
25      Q. When you started the summer of 2004, you started
```



**Page 45**

1    Q. She took you outside, right?
2    A. (Witness moved head up and down.)
3    Q. Yes?
4    A. Yes.
5    Q. It was dark?
6    A. Yes.
7    Q. Are we now behind the laundromat?
8    A. Yes.
9    Q. As I understand it there's a parking lot behind
10  the laundromat?
11  A. Yeah, people park their cars to go in for the
12  laundry.
13  Q. Right. By the way, were there any customers in
14  the laundromat when you and B▇▇ were scuffling in there?
15  A. No.
16  Q. When B▇▇ pulled you out that back door, was
17  anybody else out there in the parking lot besides you and
18  B▇▇?
19  A. Yeah, there was quite a few people.
20  Q. Does that mean more than five people?
21  A. I can't remember, but there was more than three or
22  four.
23  Q. Was there any lighting in the parking lot?
24  A. Just one light, and that was by the laundromat.
25  Q. By the door?

**Page 46**

1    A. Door.
2    Q. When you were pulled out there, did you recognize
3    anybody?
4    A. I recognized -- not A▇▇ but C▇▇ B▇▇
5    right off the bat. That's when I was forced to do -- I
6    can't say it.
7    Q. I don't want to get into all the details there,
8    all right?
9    A. Are we almost done?
10  Q. No.
11  A. I really am tired of this.
12  Q. We are going to have to work our way through it.
13  You're doing fine. Are you ready?
14  A. Yeah.
15  Q. I was trying to tell you I do not want to ask you,
16  nor do I want you to tell me about the details.
17  A. I just want to get this over with.
18  Q. C▇▇ B▇▇ grabbed you?
19  A. Um-hmm.
20  Q. What did he do; did he take you off somewhere?
21  A. Yeah.
22  Q. Did he say anything to you?
23  A. No.
24  Q. Where did he take you to?
25  A. There is a house -- there was a house right on the

**Page 47**

1    other side there by the laundromat, and he pulled me over
2    there.
3    Q. Did he hurt you one time and one time only?
4    A. Not really, he kneed me.
5    Q. Kneed you?
6    A. Yes.
7    Q. He struck you with his knee?
8    A. Yes.
9    Q. Did he strike you with anything else?
10  A. Yeah, his fist.
11  Q. How long were you back there with him?
12  A. I don't know. I don't know ten, fifteen.
13  Q. After C▇▇ was done with you what happened?
14  A. Then I was getting ready to run, then my mom
15  happened to drive by and seen me in tears and she had taken
16  me home.
17  Q. Was anybody else there when she picked you up?
18  A. I think -- yeah, there was still the crowd of
19  people that were right outside in the back of the
20  laundromat. They were standing on the sidewalk, there's a
21  sidewalk then the parking lot.
22  Q. So you got in the car with her and went?
23  A. Yes. My mom took me home and was trying to calm
24  me down, but I wouldn't tell her what had happened to me.
25  Then my sister found out and told my mom.

**Page 48**

1    Q. Your sister found out?
2    A. Yeah.
3    Q. What is your sister's name?
4    A. K▇▇ G▇▇
5    Q. When did your sister tell your mother?
6    A. I think it was a few days after that happened.
7    Then I had hurt myself and I got put in the hospital.
8    Q. Did you see R▇▇ that evening?
9    A. I saw her for a minute.
10  Q. Where was she when you saw her?
11  A. She was walking around.
12  Q. Behind the laundromat?
13  A. I don't know.
14  Q. So are you saying a couple days after your mom
15  picked you up that day K▇▇ G▇▇, your sister, told your
16  mom about it?
17  A. Someone had said something to my sister, and then
18  my sister came home and told my mom, and my mom started
19  crying, and then I burned myself on my wrist.
20  Q. Did you burn yourself on the wrist and then go
21  into Millcreek Community Hospital?
22  A. Yeah.
23  Q. Was that after Christmas or before Christmas?
24  A. I can't remember the exact date, but it was cold.
25  Q. You remember Christmas vacation was a week or so,

Page 49 / Page 50 / Page 51 layout:

**Page 49**

1  right? Were you off school for a while, about ten days?
2  You don't remember if it was after Christmas vacation?
3      A. It wasn't -- I have a question, what are we
4  talking about now?
5      Q. We're talking about when you hurt yourself and had
6  to go to the hospital.
7      A. It happened right after -- I can't remember,
8  but -- I can't remember. I am trying, but I can't.
9      Q. You can't remember if it was after Christmas
10  vacation.
11      A. I can't remember.
12      Q. After the day you were hurt by C▓▓▓and hit by
13  B▓▓▓did any kids bother you in school in any way?
14      A. Yeah, everyone would call me names.
15      Q. Did C▓▓▓ B▓▓▓call you names?
16      A. No, after that he -- I can't talk anymore.
17      MRS. LONG: You're doing good, keep it up. Go
18  ahead.
19      THE WITNESS: I want to go home.
20      MR. MARNEN: We can continue this another time.
21  That's fine.
22      MR. OLDS: So you're done for the day, K▓▓▓
23  (Examination concluded at 11:30 a.m.)
24              * * *
25

Page 49

**Page 51**

1                    INDEX
2               EXAMINATION
3  WITNESS NAME                         PAGE  LINE
4  K▓▓▓ L▓▓▓.............................  3    1
5  Direct By Mr. Marnen..........................  3    8
6
7
8
9               EXHIBITS
10      DESCRIPTION                 PAGE  LINE
11  DEFENDANTS' EX. A   SCHOOL RECORDS.............. 8          6
    DEFENDANTS' EX. B   CALENDAR................. 11          20
12  DEFENDANTS' EX. C   STUDENT HANDBOOK............. 38   15
13
14
15
16
17
18              * * *
19
20
21
22
23
24
25

Page 51

**Page 50**

1       C E R T I F I C A T I O N
2
3
4      I, Linda K. Rogers, Shorthand Reporter and
5  Commissioner of Deeds in and for the Commonwealth of
6  Pennsylvania, do hereby certify that I recorded
7  stenographically the proceedings herein at the time and
8  place noted in the heading hereof, and that the foregoing is
9  an accurate and complete transcript of same to the best of
10  my knowledge and belief.
11
12
13
14
15
16
17
18      _____
19           Linda K. Rogers
20
21  Dated: March 29, 2005
22
23              * * *
24
25

Page 50

216a



```
 1         IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   RICHARD P., BY AND FOR
 3 R        P., AND DENISE L., BY
   AND FOR K        L.,
 4            Plaintiffs
 5     vs              Civil Action No. 03-390
                             Erie
 6 SCHOOL DISTRICT OF THE
   CITY OF ERIE, PENNSYLVANIA;
 7 JANET WOODS, INDIVIDUALLY
   and in her Capacity as Principal
 8 of Strong Vincent High School;
   and LINDA L. CAPPABIANCA,
 9 Individually and in her Capacity
   as Assistant Principal of Strong
10 Vincent High School,
            Defendants
11
12
13
14      Deposition of K       L      , taken before and
15 by Linda K. Rogers, Commissioner of Deeds in the
16 Commonwealth of Pennsylvania and Notary Public in
17 the State of New York, on Friday, April 29, 2005,
18 commencing at 10:30 a.m., at the law offices of
19 Knox, McLaughlin, Gornall & Sennett, 120 West 10th
20 Street, Erie, Pennsylvania.
21
22
23
24
25        * * *
                                              Page 1
```

```
 1 For the Plaintiffs:
 2     Edward Olds, Esquire
       Carolyn Russ, Esquire
 3     1007 Mount Royal Boulevard
       Pittsburgh, PA 15223
 4
 5 For the Defendants:
       James T. Marnen, Esquire
 6     Knox McLaughlin Gornall & Sennett, PC
       120 West 10th Street
 7     Erie, PA  16501
 8
 9
10
11
12
13        * * *
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 2
```

```
 1 K       L       first having
 2    been duly sworn, testified as follows:
 3
 4            DIRECT EXAMINATION
 5 BY MR. MARNEN:
 6
 7    Q.  K       we are just continuing what we did last
 8 time.  I will try and make this brief.  Do you know T
 9 N       ?
10    A.  T    , yes.
11    Q.  How do you know T       ?
12    A.  She used to go to our school.
13    Q.  Strong Vincent?
14    A.  Yes, Strong Vincent.
15    Q.  Is that how you knew her?
16    A.  Yeah, plus we used to hang out.
17    Q.  Did you?  When you were going to Strong Vincent
18 you mean?
19    A.  Yes, I also knew her sister too.
20    Q.  Who is her sister?
21    A.  A
22    Q.  A       .  I forgot, you live on
23 don't you?
24    A.
25    Q.  Did you live on              when you were
                                              Page 3
```

```
 1 going to Strong Vincent?
 2    A.  Yes.
 3    Q.  Where did T    N       live?
 4    A.  I can't remember.
 5    Q.  Did she live near you, I mean walking distance?
 6    A.  Unh-unh.
 7    Q.  When you used to hang out, where did you hang out?
 8    MR. OLDS:  You mean with T
 9    MR. MARNEN:  Yes, right.
10    A.  We used to go to stores and stuff.
11    Q.  Is that before and after school?
12    A.  I used to call her and we would meet up somewhere
13 and just go to stores.
14    Q.  When was the last time you saw T
15    A.  Last time I saw T      I saw her I was at Andromeda
16 House.
17    Q.  You were both living there?
18    A.  Unh-unh.
19    Q.  No?
20    A.  She was there with her mother because her sister
21 was in there with me.
22    Q.  I see.  Did you, when you were going to Strong
23 Vincent, did you and T       and R      hang out together?
24    A.  Me and R      -- I don't know, did we?  I can't
25 ask.
                                              Page 4
```

**Page 5**

```
 1   Q. You can ask her, right. Whatever you remember, if
 2  you don't remember, that's fine too.
 3   A. I used to spend nights at R____ house.
 4   Q. Pardon?
 5   A. I used to spend nights at R____ house.
 6   Q. Did you ever spend any nights at T____ house?
 7   A. I don't think so.
 8   Q. The last time we met we talked about B____
 9  C____ calling you names, remember that?
10   A. (Witness moved head up and down.)
11   Q. Yes?
12   A. Yes.
13   Q. Remember you have to use words.
14   A. Sorry.
15   Q. That's all right. And you also talked about
16  C____ B____ poking you.
17   A. Um-hmm.
18   Q. With a pencil, I think or a pen, right?
19   A. Pencil.
20   Q. Did C____ do that poking stuff after -- I forget
21  how we talked about that. Let me work on this for a second.
22  The incident near the laundromat, you know the thing we
23  talked about?
24   A. Um-hmm.
25   Q. When C____ B____ made you -- made you do things
```

**Page 6**

```
 1  to him, that incident. Before that happened, K____, you
 2  testified before that C____ B____ poked you with a pencil
 3  in class, and he did that a lot, right?
 4   A. (Witness moved head up and down.)
 5   Q. Yes?
 6   A. Yes.
 7   Q. And before that incident when C____ B____ made
 8  you do things to him, B____ C____ also called you names?
 9   A. Yes.
10   Q. After that incident when C____ B____ made you do
11  things to him, in school did B____ still call you names, was
12  she still calling you names?
13   A. Everyone was calling me.
14   Q. Everyone was?
15   A. Because it got around the school what had happened
16  to me.
17   Q. I see.
18   A. It wasn't just her.
19   Q. Everyone in the whole school or everyone in your
20  class or --
21   A. People that they knew. Like the more popular
22  kids.
23   Q. The more popular kids in middle school?
24   A. Yeah, when I was at Strong Vincent.
25   Q. Right. What kind of things were they saying?
```

**Page 7**

```
 1   A. You nasty bitch, all that.
 2   Q. Did anyone try to get you -- after that night, did
 3  anyone try to get you to do that for them?
 4   A. (Witness moved head side to side.)
 5   Q. Did any of the boys, for example, say --
 6   A. They had said something to my sister.
 7   Q. What did they say?
 8   A. They said, oh, your sister can come over here any
 9  day and do that to me.
10   Q. And that's K____?
11   A. Yes.
12   Q. K____ told you?
13   A. K____ told my mother.
14   Q. Told your mother.
15   A. That's how she knew something was wrong.
16   Q. Okay. Do you know when K____ told your mother
17  that, was it around Thanksgiving, around Christmas, around
18  New Year's; do you remember?
19   A. I can't remember.
20   Q. Do you remember going to the hospital, Millcreek
21  Community Hospital --
22   A. Um-hmm.
23   Q. -- in January of 2002? I don't know if you
24  remember the date. I'm sorry, I asked too long of a
25  question. Was there a certain point in time that you went
```

**Page 8**

```
 1  to Millcreek Community Hospital?
 2   A. Yes.
 3   Q. Had you been there more than one time staying
 4  overnight?
 5      MR. OLDS: Can I interrupt just for a second?
 6      (Brief pause.)
 7   Q. K____, I know about your being at Millcreek
 8  Community Hospital on more than one occasion, right?
 9   A. Um-hmm.
10   Q. As I understand it you were in Millcreek Community
11  Hospital in January of 2002, that's in the seventh grade; do
12  you remember that?
13   A. I remember going to the hospital, yeah.
14   Q. You've stayed overnight there, haven't you?
15   A. Um-hmm.
16   Q. How many times have you done that, stayed
17  overnight at the hospital?
18   A. You mean like been there then they kept me more
19  than one day?
20   Q. Yes.
21   A. However many times I was there, I don't really
22  remember.
23   Q. You don't remember, okay.
24   A. They kept me more than one day every time I was
25  there.
```



**Page 9**

1    Q. Were you ever at Millcreek Hospital before
2  Christmas of seventh grade when you stayed overnight?
3       MR. OLDS: In other words, before you hurt
4       yourself.
5    Q. Maybe I ought to do it that way.
6    A. I can't remember.
7    Q. Do you remember going to Millcreek Hospital
8  because you hurt yourself?
9    A. Yeah, on my wrist.
10   Q. You burned yourself, I think.
11   A. Um-hmm.
12   Q. Tell me about that. How did you hurt yourself?
13   A. I burnt myself. I was cooking and then that's
14  when my sister broke the news. I was really mad, and I
15  took my wrist and I was putting it on this really hot pan
16  and I burnt my wrist.
17   Q. Were you at home when this happened?
18   A. Yes.
19   Q. Your mom was there?
20   A. My mom was in the living room.
21   Q. Mom was in the living room and your sister, the
22  one you're talking about is K___?
23   A. Yeah.
24   Q. K___ broke the news. What do you mean she broke
25  the news?

**Page 10**

1    A. She told my mom what the people had said to her.
2    Q. What did she say -- let me start again. Did you
3  hear what K___ said to your mom?
4    A. Yes.
5    Q. What did she say?
6    A. She said these kids at school said that K___
7  did something to someone else. I don't want to say what it
8  is -- but they can do it to them anytime.
9    Q. Okay. Did your mom ask you what K___ was talking
10  about?
11   A. Asked me?
12   Q. Yes.
13   A. She knew because my sister told her.
14   Q. Okay. Did your sister tell your mom that you had
15  been raped or anything like that?
16   A. No.
17   Q. Did your sister tell your mom that you did it
18  because you wanted to do it?
19   A. Unh-unh.
20   Q. No? She just said other kids were asking you
21  about it, is that it?
22   A. Other kids were telling her.
23   Q. Did your mom say anything to you about what your
24  sister told her?
25   A. She asked me, did anything happen to you. I'm

**Page 11**

1  like, no, I kept on denying it. And then that's when I
2  burnt my wrist.
3    Q. Did you burn your wrist because your mom was
4  asking you about it?
5    A. No.
6    Q. Why did you burn your wrist?
7    A. Because I was depressed, I kept on thinking of
8  what happened to me.
9    Q. You were taken to the hospital that night?
10   A. Yes, by the cops.
11   Q. What time?
12   A. I don't know.
13   Q. I thought you said a time.
14       MR. OLDS: She said by the cops.
15   Q. By the cops, okay.
16       MR. MARNEN: Off the record.
17       (Discussion held off the record.)
18   Q. Before that night when you burned yourself, what
19  kind of things were kids saying to you in school?
20   A. I think we already covered that where I said they
21  were calling me nasty bitch and stuff.
22   Q. I guess we did cover that. Were they saying
23  anything else besides that?
24   A. They were called me a hoe and all that but --
25   Q. Was anybody -- kids besides B___ C___ were

**Page 12**

1  doing this?
2    A. Yeah.
3    Q. Boys and girls?
4    A. Yeah.
5    Q. Were they saying things like that about R___
6  P___?
7    A. I don't know.
8    Q. Did C___ B___ say anything like that to you?
9    A. (Witness moved head up and down.)
10   Q. Yes?
11   A. Yes.
12   Q. That's after it happened?
13   A. After.
14   Q. After it happened, before you went to the
15  hospital?
16   A. (Witness moved head up and down.)
17   Q. Yes?
18   A. Yes.
19   Q. Did you talk to any of your teachers about these
20  kids saying these things about you?
21   A. I would tell them that the kids keep bothering me.
22  Then I asked to go down to see Miss Cappabianca.
23   Q. What teachers did you tell that to?
24   A. I told Mrs. Scully, and Mrs. Manus.
25   Q. And when you told -- did you tell Mrs. Scully that

219a

Page 1

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   RICHARD P., by and for          :
    R██████ P., and DENISE L.,      :
4   by and for K████████ L.,        :
              Plaintiffs            :
5                                   :
          v.                        :     Civil Action No. 03-390
6                                   :              Erie
    SCHOOL DISTRICT OF THE CITY     :
7   OF ERIE, PENNSYLVANIA; JANET    :
    WOODS, Individually and in      :
8   her Capacity as Principal of    :
    Strong Vincent High School;     :
9   and LINDA L. CAPPABIANCA,       :
    Individually and in her         :
10  Capacity as Assistant           :
    Principal of Strong Vincent     :
11  High School,                    :
              Defendants            :
12

13

14

15

16          Deposition of WALTER LOVE, taken before

17       and by Janis L. Ferguson, Notary Public in and

18       for the Commonwealth of Pennsylvania, on Tuesday,

19       April 26, 2005, commencing at 11:33 a.m., at the

20       offices of Knox McLaughlin Gornall & Sennett, PC,

21       120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25            Reported by Janis L. Ferguson, RPR
              Ferguson & Holdnack Reporting, Inc.

---

Page 18

1  an investigation concerning those incidents after they
2  occurred?
3      A.  No, sir.
4      Q.  Did you at any time question any students
5  concerning what happened?
6      A.  No, sir.
7      Q.  All right.  When did you first become aware of the
8  alleged assaults?
9      A.  From my understanding, the first incident took
10  place December 19th, 2001.  I didn't become aware of it
11  until after we came back from Christmas break, when
12  Miss Woods and Miss Cappabianca had been talking -- speaking
13  about it.
14      Q.  Did they speak about it with you?
15      A.  I was -- yes.  I got called to the office.  And
16  Miss Woods told -- explained to me what was going on and --
17  with Miss Cappabianca, you know, being there.
18      Q.  Miss Cappabianca was in the presence of
19  Miss Woods?
20      A.  In the principal's office.
21      Q.  Okay.  And Miss Woods explained to you what
22  happened?
23      A.  Yeah, correct.
24      Q.  Okay.  Can you put an exact date on that?
25      A.  Um --

---

Page 19

1      Q.  That's the first question.  If you can't, we'll
2  move on to a more --
3      A.  No, not really.
4      Q.  Okay.  Can you approximate for us.
5      A.  It was shortly -- within a few days after we
6  returned from Christmas break.
7      Q.  What does "shortly" mean?  A couple weeks, or
8  something else?
9      A.  Within a week.
10      Q.  How did Miss Woods get in touch with you?  By
11  radio?
12      A.  Yes.
13      Q.  And you responded.  What time of day was this?  Do
14  you remember?
15      A.  It was late afternoon.  School was getting ready
16  to get out.
17      Q.  So around 3:00?  Is that get-out time?
18      A.  Yes.  Because then we got out -- school was
19  dismissed at 3:05 or 3:10, I believe.
20      Q.  Okay.  You came down there, and tell me -- tell us
21  as best you remember what you were told by Miss Cap --
22  Miss Woods.
23      A.  That there was an incident that had occurred in
24  December sometime.  I don't -- they didn't have -- she
25  didn't have the date, the exact date then.  But she named

---

Page 20

1  several of the participants.
2      Q.  What names did she give you, as you remember?
3      A.  C██ B██, A███ K██, A███████
4  [sic], B██ C███, R███ P███ and -- I can't
5  remember the other girl's name.
6      Q.  K██ L██?
7      A.  Yes, correct.
8      Q.  Did she mention Y█████ H███████?
9      A.  No.
10      Q.  Did she mention C███ A███████?
11      A.  I don't remember.
12      Q.  Okay.  But the names you remember are B██,
13  K██, F█████, C█████, P██████, and L██?
14      A.  Yes.
15      Q.  What else did she say besides -- she didn't have a
16  date yet.  Did she tell you about when it happened,
17  allegedly?
18      A.  She said -- I asked when did this occur, and she
19  said it was sometime in December, before we got out of
20  school.
21      Q.  Okay.  Did she tell you anything else about it?
22      A.  No.
23      Q.  Did she explain to you why she was telling you
24  about this incident?
25      A.  Basically asking what direction to go with it.

---

Page 21

1      Q.  She was asking you for advice?
2      A.  Yes.
3      Q.  And did she explain to you what she or anyone else
4  had done before they asked you for advice?
5      A.  No.  What I had -- this is an assumption on my
6  part.  But she had told Linda to gather the names of all the
7  students involved and to start interviewing them, to find
8  out what actually took place.
9      Q.  And she told Linda to do that before she talked
10  with you?
11      A.  She -- Miss Cappabianca, she was writing -- she
12  had a list of names.  And so I'm assuming on my part that's
13  what she was going to do.
14      Q.  Oh, okay.  That's okay.
15      A.  I shouldn't assume things, but --
16      Q.  No, you're a trained investigator, so I'm glad
17  you're being precise.  Most witnesses are not.
18          Linda Cappabianca, who at that time was an
19  assistant principal -- correct?
20      A.  Correct.
21      Q.  She was there, and she had a list of names?
22      A.  Um-hum.
23      Q.  And the names you just rattled off are the names
24  she had?
25      A.  I'm pretty sure.

---

Ferguson & Holdnack Reporting, Inc.                    d6c2be05-ebe8-4c46-a6f8-a1cf66017d56

Page 22

1    Q.  Okay.  And did anyone tell you -- did either Linda
2  Cappabianca or Janet Woods tell you during that meeting that
3  they had interviewed anyone yet?
4    A.  No.
5    Q.  Did they say they did not interview anyone yet?
6    A.  No, sir.
7    Q.  They just didn't tell you one way or the other.
8    A.  Right.  And, actually, at the time I -- me and
9  Sergeant Slupski started work at 3:30.  Normally, we were on
10  the way out by quarter after to get to work on time.  And so
11  I assumed it was an information-gathering session, which we
12  were going to attack in the morning anyhow, since most of
13  the students, they had already been dismissed, and all the
14  kids weren't there to speak with anyhow.
15    Q.  Okay.  You and Sergeant Slupski were going off to
16  your second job.
17    A.  Yeah.
18    Q.  At the Erie Police Department.
19    A.  Yes.
20    Q.  Was that an eight-hour shift too?
21    A.  Um-hum.
22    Q.  A long day.
23    A.  It was tough.
24    Q.  Okay.  Did Miss Woods tell you that the following
25  day something was going to happen, and she wanted you to

Page 23

1  participate?
2    A.  Not -- no.  When we reported to work the next day,
3  I believe she had A█████ F█████ in the office.  And then
4  shortly there -- afterwards, the police officers, criminal
5  investigators; John and Pam Barber.  And they were
6  in charge and handled all the sex crimes.
7        And so, therefore, me and Sergeant Slupski, we had
8  worked in fraud and counterfeiting and felonies.  We didn't
9  handle, per se, at school ourselves anyhow -- especially
10  pertaining to juveniles.  And rather than interview somebody
11  that might be a suspect, we might sit and listen and
12  observe, but wouldn't really have any input as far as any
13  questioning and stuff.
14    Q.  Did you sit in on any witness interviews?
15    A.  When -- not as far as when the police were there.
16  When Miss Woods -- when they were speaking with A█████,
17  they wrote out a statement; what he said.  And that was it.
18  Then I believe another parent had came.  It might have been
19  B████ C█████████ -- her and her mother that came.  And so
20  everything was -- I just got out -- got out of the way,
21  basically.
22    Q.  So you sat in as they talked with A█████
23  F█████?
24    A.  Miss Cappabianca and Miss Woods.
25    Q.  They interviewed him, not you.

Page 24

1    A.  Not me, no.
2    Q.  You sat there and just listened.
3    A.  Right.
4    Q.  Why were you there?
5    A.  It was basically at the beckoning of Miss Woods.
6    Q.  Did you give Miss Woods -- did she tell you why
7  she wanted you there?
8    A.  No.  Just it was basically a continuation of the
9  day before.
10    Q.  Okay.  Were you there to give technical advice
11  on --
12    A.  No, I didn't give any advice.  I just --
13    Q.  You just sat there and listened?
14    A.  -- just listened.
15    Q.  Okay.  And who did the questioning, if you
16  remember?  Did Miss Woods do the questioning, or --
17    A.  Basically Miss Woods.
18    Q.  Not Miss Cappabianca?
19    A.  No.  They were going back and forth asking the
20  questions.  And -- because I had no input as far as any
21  information to even question.
22    Q.  Well, the Barbers were there too, right?
23    A.  Yes.
24    Q.  That's John Barber and Pam Barber.
25    A.  Pam Barber.

Page 25

1    Q.  And their specialty at that time was sex crimes.
2    A.  Yes.
3    Q.  Not juveniles, but sex crimes generally.
4    A.  Right.  Yes.  Normally they handle adults.
5    Q.  Normally adults.  Okay.
6    A.  Yes.
7    Q.  Were you there when John Barber and Pam Barber
8  arrived at Strong Vincent to meet with anyone there?
9    A.  (No response.)
10    Q.  Were you there -- I'm sorry --
11    A.  I was in the area.  I remember seeing them when
12  they first came.  I don't remember if I was in the office
13  with Miss Cappabianca and Miss Woods, or if I had left and
14  went to my office and they came over in that area.  But I
15  remember seeing them before things got started, as far as
16  them interviewing.
17    Q.  Okay.  Before they interviewed Mr. F█████?
18    A.  Yes.
19    Q.  Before they did that, what happened, if anything,
20  between the Barbers on the one hand and Miss Woods and
21  Miss Cappabianca on the other hand?
22    A.  I don't know.  Because when they got there and
23  they went to her office, I didn't --
24    Q.  Oh, you didn't go in.
25    A.  -- I didn't go back in again.

Ferguson & Holdnack Reporting, Inc.                      d6c2be05-ebe8-4c46-a6f8-a1cf66017d56

Page 1

1                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    RICHARD P., by and for        :
     R██████ P., and DENISE L.,    :
4    by and for K██████████ L.,    :
              Plaintiffs           :
5                                  :
          v.                       :    Civil Action No. 03-390
6                                  :             Erie
     SCHOOL DISTRICT OF THE CITY   :
7    OF ERIE, PENNSYLVANIA; JANET  :
     WOODS, Individually and in    :
8    her Capacity as Principal of  :
     Strong Vincent High School;   :
9    and LINDA L. CAPPABIANCA,     :
     Individually and in her       :
10   Capacity as Assistant         :
     Principal of Strong Vincent   :
11   High School,                  :
              Defendants           :
12

13

14

15

16         Deposition of CHARLISE MOORE, taken before

17    and by Janis L. Ferguson, Notary Public in and

18    for the Commonwealth of Pennsylvania, on Friday,

19    March 18, 2005, commencing at 2:37 p.m., at the

20    offices of Knox McLaughlin Gornall & Sennett, PC,

21    120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25         Reported by Janis L. Ferguson, RPR
          Ferguson & Holdnack Reporting, Inc.

233a          90f9aabf-8504-42cb-99d0-00e76041f214

Page 10

1    MR. MARNEN: My information, for whatever it's
2    worth, is there were three.
3        Q.   I guess we have identified some documents that
4    we're going to show you.  And, actually, I suppose -- you
5    have those right here.
6            (Moore Deposition Exhibits 1 and 2 marked for
7            identification.)
8        Q.   You have those right there.  They're Moore 1 and
9    2.  These are copies of documents.  I just want to show you
10   Exhibit 2.  Look at the third page of Exhibit 2.
11       A.  (Witness complies.)
12       Q.   There is a teacher that signed that.  I guess
13   maybe that's not the special ed. teacher, Miss Vallimont.
14       A.  Miss Vallimont is a classroom teacher, is a
15   general education teacher.
16       Q.   Okay.  So there were three special ed. teachers.
17   And they would -- would they -- what subjects would they
18   teach?
19       A.  The special -- the middle school special education
20   program provided instruction in the five basic areas;
21   reading, English, math, social studies, and science.
22       Q.   And depending upon the needs of the special ed.
23   student, the special ed. student might not -- might take one
24   or more of those subjects in a learning support class and
25   then other subjects with the general population?  Is that

Page 11

1    right?
2        A.  That is correct.
3        Q.   What qualified a student to be in one of the
4    classes taught by special ed. teachers?  In other words,
5    what would a -- what either academic needs would the student
6    have or behavioral needs would a student have before they
7    would be put in the classrooms taught by Miss Manus or
8    Miss Gray or Miss Scully?
9        A.  First of all, behavior is not a reason to -- is
10   not a placement.  It's not -- how can I put this?  It is not
11   a handicapping condition or a disability that would place a
12   child in a learning support classroom, as I mentioned
13   before.
14       Q.   Okay.
15       A.  Behaviors can be addressed in an Individualized
16   Education Program for a child.  The --
17       Q.   But not necessarily by putting them in a special
18   ed. class.
19       A.  The subject areas that I mentioned before, the
20   reading, English, math, social studies, and science, were
21   the support classes that we provided students.  That was
22   dependent on what their individual needs were that is
23   determined by their evaluation reports that were done to
24   identify them as students with special needs.
25       Q.   Okay.  So there would be an evaluation report that

Page 12

1    would identify the problem, and based upon that evaluation
2    report, the student would either be placed in -- a student
3    could have an IEP that would either result in being placed
4    in one of the special ed. classes -- that would be one
5    option, right?
6        A.  That's correct.
7        Q.   A student could have an IEP that addressed
8    academic needs that would be met in the regular classroom
9    situation.  Is that --
10       A.  The Individualized Education Program only has
11   goals and objectives for those classes in which the special
12   education department addresses.
13       Q.   Okay.
14       A.  For example, if a child is in a general ed. math
15   class, there would not be any math goals on his or her IEP.
16       Q.   Okay.  I see.  And is there a -- and so if a child
17   had any special -- if there were any special requirements
18   that a child needed in any of the academic subjects, that
19   would be addressed in the special ed. classroom.
20       A.  Would you repeat that, please.
21       Q.   Yes.  If the child had any areas that had been
22   identified as needing support academicwise, that would be
23   provided in the special ed. classroom?
24       A.  If the child had an identified need, it would be
25   addressed in the special ed. class.  But let me qualify

Page 13

1    that.
2        Q.   Go ahead.
3        A.  The decisions that are made in regard to placing
4    students and what the needs were depended on the IEP team.
5    They make a determination as to the information from the
6    evaluation report and the student's ongoing progress, what
7    particular class they would recommend support in.  That's an
8    IEP team decision.
9        Q.   And behaviors -- a child who has a behavior
10   problem, but not an academic problem, would not be placed in
11   a special ed. class.
12       A.  Only students who are identified that have serious
13   emotional disturbances would be students who would be placed
14   in a special education class.  There's a distinction.
15       Q.   Right.  Okay.  And I thank you for making that
16   distinction.  Do you -- there is an alternative school,
17   Sarah Reed, and that's part of the Erie School District as
18   well; is that right?
19       A.  We have classes that we -- that students attend
20   there, but the Sarah Reed does not belong to the Erie City
21   School District.
22       Q.   So tell me what your -- you say that the Erie
23   School -- you have classes.
24       A.  Um-hum.
25       Q.   The Erie School District has classes there?

Ferguson & Holdnack Reporting, Inc.

224a

90f9aabf-8504-42cb-99d0-00e76041f214

Page 14

1    A.   There are classes that Erie School District
2  students attend at Sarah Reed Children's Center.
3    Q.   Okay.  And is Sarah Reed Children's Center, is
4  that a -- would that be a private center, or is that a --
5    A.   It's an independent agency.
6    Q.   Do you know where it gets its funding?  Is that --
7    A.   I'm sorry, I don't know that.
8    Q.   Okay.  That's fine.  And are you involved in -- in
9  any aspect of the decision that might result in an Erie
10  student being sent to classes at Sarah Reed?
11    A.   Decisions, placement decisions are made by IEP
12  teams.
13    Q.   Now, is Sarah Reed Children's Center, is that --
14  well, let me phrase it like this:  What kind of students
15  from the Erie School District go to Sarah Reed?  In other
16  words, what problems must a child have before they are
17  referred to the Sarah Reed Children's Center?
18    A.   Sarah Reed services a variety of students and a
19  variety of children with different needs; whether it's
20  behavioral, emotional.  They have many, many programs.
21    Q.   Does Erie have an alternative school program?
22    A.   We have several alternative school programs.
23    Q.   And tell me which alternative school programs Erie
24  has.
25    A.   We have an alternative education program for

Page 15

1  students in about -- let's see -- sixth grade through
2  twelfth grade that we have -- we do jointly with Perseus
3  House.  We also have an alternative program with Sarah
4  Reed.
5    Q.   Is there a difference between those two programs?
6  I know there's an obvious difference; one is at Perseus
7  House, and one is at Sarah Reed.  But are they -- are they
8  different categories of alternative education provided at
9  the two schools?
10    A.   The designs of the programs are a bit different.
11    Q.   What is the design at Sarah Reed Children's
12  Center?
13    A.   They have an array of services to choose from,
14  depending upon what a child qualifies for.  Whether it's a
15  mental health service, whether it's just general counseling;
16  inpatient, outpatient.  They have a wide range of services
17  that they can offer to students.
18    Q.   And what about Perseus House?
19    A.   Perseus House, our alternate program, works --
20  students are on a point system, point system of behavior
21  management, and they had to have counseling sessions.
22    Q.   And do you know whether the -- say, for instance,
23  Sarah Reed Children's Center.  Will it accept all students
24  from the Erie School District that are referred to it, or is
25  there a waiting list?  I mean, how does that work?
26    A.   Well, first we release information to Sarah Reed.

Page 16

1  Parents give us permission to release information to Sarah
2  Reed.  They have a review committee, and they let us know
3  whether or not they feel that they can provide services for
4  that child.
5    Q.   So from the Erie School District point of view,
6  who would be -- who would you expect or who would you
7  anticipate would be the professional or administrator that
8  would say, well, we have a student that maybe would benefit
9  from Sarah Reed, from the programs offered by Sarah Reed?
10  How would the topic come up?
11    A.   It depends upon what the child's needs were at the
12  time.  You know, what we saw in the individual.  What
13  programs we think that would benefit the child.  That would
14  be just in general discussion with maybe the parents and
15  administration as to what the needs were.
16    Q.   Can you give me like an idea or example of what
17  kind of needs a child might exhibit when you would start
18  thinking about a referral to Sarah Reed.
19    A.   Maybe a child that had a real chronic disruptive
20  behavior.  They were -- in the sense that they had a very,
21  very difficult time behaviorally within the general school
22  environment.  You know, within the classroom, outside the
23  classroom, the hallways, cafeteria, difficult time relating
24  to peers, and things like that.  And not -- you know,
25  inappropriateness in that sense.  And maybe that particular

Page 17

1  child might be someone that they would consider a candidate
2  for their program.  That's -- but they have many programs.
3  So that's just in one area of the behavioral program.
4    Q.   Do you have any idea how many students attend
5  Sarah Reed?
6    A.   No, I don't.  Sorry.
7    Q.   Do you know how many students at any given time
8  are -- from the Erie School District are referred to Sarah
9  Reed?
10    A.   No.  Only the ones that I -- that I deal with
11  directly in my responsible area.
12    Q.   Are you still responsible for middle schools
13  today?
14    A.   Yes.
15    Q.   Do you think that every student who is an Erie
16  middle school student who ends up at Sarah Reed, would every
17  one of those students at some point go through you?  In the
18  sense would you become aware of the fact that they were
19  being referred to Sarah Reed?
20    A.   If they are a special education student, yes.
21    Q.   Okay.  And there might be some students who aren't
22  special education students who are also referred to Sarah
23  Reed.  I take it from the answer that you gave me.
24    A.   I'm only responsible for the special education
25  middle school students.



Page 18

1    Q.   Okay.  This year, do you know how many special
2    education middle school students from the middle schools are
3    attending Sarah Reed?
4    A.   That I'm responsible for at that age?  I think we
5    only have four this year.
6        (Discussion held off the record.)
7    A.   We have four students there right now.
8    Q.   And would you -- would it be fair to say -- well,
9    would it typically be the case that it would be less than a
10   dozen that -- you know, in any given year that would be
11   referred to Sarah Reed?  From your area.
12   A.   Depends upon the year.
13   Q.   Okay.  So some years it might be more than that?
14   A.   It might be more.
15   Q.   Okay.  Is there someone at Sarah Reed that you
16   communicate with?  Like do you have particular contact
17   people at Sarah Reed that you know that you would discuss
18   whether a student should be sent to Sarah Reed?
19   A.   They have an intake person you have to call.
20   Q.   And is that who you deal with?
21   A.   Um-hum.
22   Q.   Which intake person, if you can recall, have you
23   dealt with?
24   A.   Matt -- Matthew Bogardus.
25       MR. MARNEN:  Bogart?

Page 19

1        THE WITNESS:  Bogardus.
2        MR. MARNEN:  Bogardus.
3    Q.   And when you're trying to send someone to Sarah
4    Reed, what information do you provide to Matthew Bogardus?
5    A.   Well, first I have the parents sign a release of
6    information, and then we usually provide the parent with the
7    child's evaluation report and their Individualized Education
8    Program.  And those are the two basic things that I provide.
9    Unless there is some additional information that is
10   necessary.  If there's any medical information necessary.
11   Q.   Now, we're here about -- you know, my clients are
12   K█████ L███ and R█████ P█████.  And I think that you had
13   dealings with their case or some involvement with their case
14   back in 2002.  Do you recall that?
15   A.   Yes.
16   Q.   So prior to January of 2002, they were in Strong
17   Vincent, in learning support classes.  Do you know whether
18   you had any contact or supervision or review or dealings
19   with either of the girls or their families?
20   A.   I don't recall anything specifically.
21   Q.   Would it be fair to say that it would be possible
22   that a student would be assigned to a learning support class
23   at Strong Vincent, and you might not meet that student or
24   meet the family or become involved in any issues concerning
25   that student?

Page 20

1    A.   That is correct.
2    Q.   And your involvement might be more if there were
3    problems.  Is that fair?
4    A.   If there was a concern by maybe the parent or a
5    concern by the teacher, or if I was observing the classroom
6    and I noticed something about a student.
7    Q.   Okay.  Right.  You might become involved, for
8    instance, if there was a disagreement about the
9    appropriateness of an educational placement or, you know,
10   disagreement about services being provided.  That would more
11   fall within your jurisdiction.
12   A.   That's correct.
13   Q.   Okay.  So, you know, you did become involved with
14   K█████ and R█████  Tell me what your recollection is of
15   how you became involved.
16   A.   I believe it was before the beginning of the
17   second semester.  And I was made aware of an incident at
18   school and -- by the director of special education.  That
19   was Mr. Scozzie.  And then I was given a directive to do
20   some paperwork in regard to the needs of students.
21   Q.   Okay.  Now, who is Mr. Scozzie?
22   A.   He is the Director of Special Education.
23   Q.   And he told you to do some paperwork for the
24   students?
25   A.   Um-hum.  That's correct.

Page 21

1    Q.   So aside from talking to Mr. Scozzie, who did you
2    talk to about the two students?
3    A.   Let's see.  I believe it probably was as to
4    information that may be needed or what needed to be
5    addressed, would be with the assistant principal who usually
6    works with the students; whatever person worked with the --
7    the administrator in the building that worked with the
8    students, I usually made contact with that individual.
9    Q.   So in this case, it would have been
10   Mrs. Cappabianca?
11   A.   Mrs. Cappabianca.  Miss Cappabianca.
12   Q.   Miss Cappabianca.  And how long -- do you know
13   when she started -- Miss Cappabianca, do you know when she
14   started with the Erie School District?
15   A.   I don't know.
16   Q.   Do you remember when you first met her?
17   A.   I don't recall.
18   Q.   Was she -- was she a special ed. teacher, do you
19   know?
20   A.   I'm trying to remember.  It's been so many years.
21   I'm sorry.
22   Q.   You know what, it's very fair for you to say "I
23   don't remember", and that's an answer I can live with, so.
24   And you don't have to apologize for that.  Okay?
25       Do you know when she became a principal, an

Ferguson & Holdnack Reporting, Inc.

226a

90f9aabf-8504-42cb-99d0-00e76041f214

Page 22

1  administrator?
2      A.  I don't know what year.
3      Q.  Aside from her assignment at Strong Vincent, do
4  you recall what school -- which school she was assigned to
5  as an administrator?
6      A.  I can't recall.  I know before she came to, I
7  believe, Strong Vincent.  I don't remember whether she was
8  an administrator before Strong Vincent.  She might have
9  been.  I don't remember.  I just remember working with her
10  there at Strong Vincent.  That's what I can remember.
11     Q.  Do you know if she is still an administrator?
12     A.  Yes, she is.
13     Q.  Where is she assigned now?
14     A.  I believe she is at Harding Elementary.
15     Q.  Now, so did Mr. Scozzie -- what did Mr. Scozzie
16  tell you about the two girls?
17     A.  There was an incident at school, and that he
18  wanted me to look at placements for the students and start
19  the process for students -- the students.
20     Q.  Did he tell you what the incident at the school
21  was?
22     A.  He indicated that there was something sexual in
23  nature that had occurred, and that to start the process for
24  looking at an alternative placement.
25     Q.  Was this an oral conversation, or did he give you

Page 23

1  anything in writing about the incident?
2      A.  No, it was an oral conversation.  It took place at
3  his office.
4      Q.  And did he specifically describe this actual
5  incident?
6      A.  No, he did not.
7      Q.  Eventually, I would assume that you learned what
8  the sexual incident was.
9      A.  Well, I knew it was off school grounds and it
10  involved several students.
11     Q.  And how did you know that?
12     A.  Just from me working on the case, going through
13  the case, what do I need to do, how many kids do I need
14  to -- you know, what are the names of the students, do I
15  need to contact parents and things like that.
16     Q.  Now, were you asked to contact the parents of the
17  victims and the assailants?  Just the victims?  Just the
18  assailants?  Or do you not recall?
19     A.  All I know is that I -- I can remember is working
20  with the two -- two females.  And working with two students
21  that were middle school special education girls.
22     Q.  And did you meet with either of the girls?
23     A.  No, I did not.
24     Q.  Did you meet with their parents?
25     A.  I don't quite remember meeting with anyone.  I was

Page 24

1  doing paperwork.
2      Q.  Did you meet with Miss Cappabianca?  Did you
3  either meet with her or talk to her?
4      A.  I might have called her on the phone.  I may have
5  called her on the phone to get general information to make
6  sure I had the right phone numbers or addresses or things
7  like that.
8      Q.  Did you meet with or talk about the two girls with
9  any of the teachers there?
10     A.  No.
11     Q.  So you wouldn't have talked to Miss Scully or
12  Miss Manus?
13     A.  No, hum-um.
14     Q.  So basically you were told to do the paperwork?
15     A.  Yes.  To start the process for placements for the
16  students; to get them from that environment -- remove them
17  from that environment.
18     Q.  There was no IEP team convened when they were
19  moved from that environment, was there?
20     A.  You have to have a new IEP to go into any other
21  alternative placements.
22     Q.  But that wasn't my question.  Did an IEP team meet
23  concerning this?
24     A.  It's right here (indicating).
25     Q.  Okay.  Let's look at 1 and 2, so maybe you can

Page 25

1  help me -- help me through this.  So let me find it.  I
2  suppose we could look at Exhibit No. 1 first.
3      A.  Um-hum.
4      Q.  And I'll tell you what, Ms. Moore, we have the --
5  we have the file here, and so I'm not going to vouch that
6  this is a comprehensive, you know, set of paperwork; at
7  least the thing that has been marked as Exhibit 2.  But we
8  do have the file that has been provided to us by the Erie
9  School District, and we can look through it if this doesn't
10  appear to be the -- sort of the comprehensive documentation
11  that you worked on.
12     So, first of all, I take it that -- let's look at
13  Exhibit -- this would be Moore Exhibit 1, Document 419, Erie
14  Document 419.  This is a document dated January 18th, 2002.
15  And tell me what this document is.
16     A.  This is a revision to R█████ P████████
17  Individualized Education Program, to include participation
18  in the therapeutic support program at Sarah Reed.
19     Q.  Now, tell me, does that say that on the first page
20  of Exhibit 1, or is that something that you derived from
21  the -- all of the -- all of the content?  In other words,
22  you're reading between the lines, right, or --
23     A.  It's here.
24     Q.  Okay.  So you indicated that this is an IEP
25  review -- IEP revision that provides for a therapeutic

Ferguson & Holdnack Reporting, Inc.

90f9aabf-8504-42cb-99d0-00e76041f214

Page 26

```
 1   plan --
 2        A.  Um-hum.
 3        Q.  -- at Sarah Reed.
 4        A.  Yes.
 5        Q.  And which page of that Exhibit 1 are you looking
 6   at where that says that?
 7        A.  Well, working on solutions to interpersonal
 8   self-related problems, behaviors.  You have annual goals,
 9   short-term objectives that address the particular plan.
10        Q.  Wait.  You have to go slower so I can follow.
11            (Discussion held off the record.)
12        Q.  So you are looking at 0419.
13        A.  Right.  And this is the additional goal added to
14   the child's current IEP at that time; to work on -- identify
15   appropriate solutions to interpersonal and self-related
16   problem behaviors.
17        Q.  Okay.  So --
18        A.  That's an annual goal.  Short-term objectives are
19   there.  Develop consistent patterns --
20            (Proceedings interrupted by reporter.)
21        Q.  You have to --
22        A.  I'm sorry.
23        Q.  People read faster than they talk, so.
24        A.  And then you see the objective there, the
25   benchmark.
```

Page 27

```
 1        Q.  So develop consistent patterns of appropriate
 2   behavior through a program of therapeutic behavior report
 3   [sic].
 4        A.  Support.
 5        Q.  Support.  I'm sorry.
 6        A.  All right.  And then expected levels and so on.
 7   And then the specially designed instruction that goes along
 8   with being in a program; consistent participation and social
 9   skills training and counseling program, as well as a
10   medication management.  An individualized intervention plan
11   will be developed in conjunction with IEP goals and
12   objectives.  And transition activities for the return to the
13   home school are planned or carried out with the
14   multi-disciplinary team approach.  And then --
15        Q.  Before we go on to the next page, there is a
16   couple questions I would have so you could explain that to
17   me.
18            The objective is to develop consistent patterns of
19   appropriate behavior through a program of therapeutic
20   behavior support.
21        A.  Um-hum.
22        Q.  Now, who came up with that, to your knowledge,
23   objective?
24        A.  That would be a very generalized, I would say,
25   objective, in order that we can move into the placement so
```

Page 28

```
 1   that we know we want to have a particular plan, a
 2   therapeutic plan that will be developed in more detail once
 3   the child is placed at Sarah Reed.
 4        Q.  Okay.  But did you come up with that language,
 5   "Develop consistent patterns of appropriate behavior through
 6   a program of therapeutic behavior support," or did
 7   Miss Gray?
 8        A.  I think departmentally, we tried to look at
 9   different types of wording that will allow us to work
10   specifically with students.
11        Q.  Okay.  But I'm talking about this -- this actual
12   language on this actual piece of paper under Objective
13   Benchmark.  Do you know who created that?
14        A.  I would have advised them of this.  When they
15   met -- as you can see, my signature is not on this page.  So
16   we talk about the fact that I was working on paperwork,
17   these are some of the things that I advised them on when
18   they had to come down and sit with the parent to do the
19   revision to the IEP to make the placement for the student.
20            So I would have advised them on suggested annual
21   goals, objectives, and so on in order to do this placement.
22        Q.  Now, what was the -- if you know, what was the
23   appropriate behavior -- quote, appropriate behavior, end
24   quote -- that was referred to in the objective benchmark?
25   What behavior was considered appropriate that you wanted to
```

Page 29

```
 1   help R_____ achieve?
 2        A.  In particular, when we said develop appropriate
 3   patterns of appropriate behavior, those things would be more
 4   clearly defined once the child was at Sarah Reed.  They did
 5   some observation, and they looked at the critical areas --
 6   the more critical areas of need.
 7        Q.  How did you know that patterns of appropriate
 8   behavior had to be developed?
 9        A.  Well, if students are having any difficulty, no
10   matter whether it's emotional, socially emotional, or
11   whatever -- it could be any type of pattern of inappropriate
12   behavior; if it's social behavior, it's emotional behavior.
13   There are a lot of different types of behavior to be
14   addressed.
15        Q.  What behavior of R_____ was -- needed addressed?
16   Do you know, as we sit here today, do you know what behavior
17   of R_____ needed to be addressed?
18        A.  There were -- at this particular time, it was my
19   understanding that there were some emotional concerns
20   involving the incidents that had taken place at school, to
21   provide some support for the child because of the emotional
22   concerns or the experiences that the child may have
23   encountered.
24        Q.  And do you specifically -- do you know what
25   emotional concerns there were?
```

90f9aabf-8504-42cb-99d0-00e76041f214

Page 30

1   A.   There was some sexual activity.
2   Q.   What kind of sexual activity?
3   A.   I'm not sure of the details of everything, but
4   there was sexual activity.
5   Q.   Tell me what you recall.
6   A.   Boys and girls outside of the school environment
7   having sexual contact with one another. And there was
8   concerns about the situation overall. You know, naturally,
9   the appropriateness of the situation. And that was
10  affecting the female students.
11  Q.   Okay. Do you know whether the males who were
12  involved in the activity outside the school, whether their
13  IEP's were changed?
14  A.   I don't know. These are -- these are the two
15  students that I worked with.
16  Q.   Now, the specially designed instruction, let me
17  just look at that for a second. It says, "Consistent
18  participation in social skills training and in counseling
19  program, as well as medication management."
20  A.   Um-hum.
21  Q.   Could that instruction, could that have been
22  provided in the Erie schools?
23  A.   The intensity of counseling services or -- we have
24  counseling services. I mean, we have what you call behavior
25  specialists in the building. And that they may work with

Page 31

1   students and counsel them, whatever. We have student
2   support teams, or student SAP teams; Student Assistant
3   Programs. But the intensity of services in counseling and
4   so on is greater at Sarah Reed than it would be directly in
5   the school building.
6   Q.   Okay. Then the next -- but this doesn't -- this
7   particular page of the document doesn't say you're referring
8   the -- the student to Sarah Reed. Now, answer that question
9   first. Page 1 doesn't say that; is that right?
10  A.   No, it doesn't say that.
11  Q.   Okay. But Page 2, I guess where it says Notice of
12  Recommended Educational Placement, that does refer to Sarah
13  Reed.
14  A.   Yes, it does.
15  Q.   So when I look at this document, I can't just look
16  at the first page. I have to look at the entire document.
17  A.   That's correct.
18  Q.   Actually, it says -- it does say, "Change from
19  Strong Vincent to Sarah Reed," on this document at the top.
20  A.   Um-hum.
21  Q.   The top page of Exhibit 1, does that now become
22  part of R████ IEP?
23  A.   Yes. That goes with the other part of her IEP;
24  with her academic goals and objectives.
25  Q.   So this is actually -- this document is

Page 32

1   actually -- could be said, this is an IEP plan; the top
2   page --
3   A.   It's a part of the plan.
4   Q.   A part of the plan, okay. And then it says, "An
5   individualized --" going back to the first page, it says,
6   "An individualized intervention plan will be developed in
7   conjunction with IEP goals and objectives."
8   A.   Um-hum.
9   Q.   Now, you're not -- you're not creating that with
10  this IEP. What you're saying is we're changing the
11  placement, and they are going to create that individualized
12  intervention plan; is that right?
13  A.   Yes. They have individual plans for students.
14  Once they arrive, they develop a treatment plan.
15  Q.   Now, do they send that back to you so that it
16  becomes part of the Erie School District's permanent record?
17  A.   What we do have is the finalized -- the discharge
18  and summary information about the goals that they worked on.
19  Q.   So you get that at the end?
20  A.   Yes, we do.
21  Q.   Okay. Now, then the second page of Exhibit --
22  second and third page of Exhibit 2, is that your handwriting
23  on this page?
24  A.   No, it is not.
25  Q.   Okay. Do you know who wrote that?

Page 33

1   A.   Specifically, someone who was there -- who has
2   their signatures there. Either Mrs. Gray, teacher of
3   record -- or special education teacher, or someone who's
4   participated on that -- on the IEP team.
5   Q.   The way this has been provided to us, it's been
6   provided as 420, and then the next page is numbered 421.
7   And I don't see anyone who has signed that document from the
8   School District. I see your name on there, C. Moore, on the
9   second page. But you're indicating that you didn't write
10  the first page.
11  A.   Hum-um.
12  Q.   Is that your signature on the second page?
13  A.   No. Someone printed my name there, because I'm
14  the supervisor of the program. That's who you refer to if
15  you have any questions.
16  Q.   Is there someplace on this form, the Notice of
17  Recommended Educational Placement, where an Erie School
18  District representative is supposed to sign?
19  A.   No. It is not required by law for a
20  representative, other than to affix the superintendent's
21  signature.
22  Q.   Okay.
23  A.   Other than that, no one else's signature is there
24  but the parent, because it shows that the parent approves of
25  the placement by the parent signature. This is issued to



90f9aabf-8504-42cb-99d0-00e76041f214

Page 34

1  the parent; that he or she agrees with the change in
2  placement.
3      Q.  Okay.
4          (Discussion held off the record.)
5      Q.  Now, the first -- well, I guess what we're looking
6  at in terms of Exhibit 1, the first three pages of this
7  exhibit, are the IEP revision review and the Notice of
8  Recommended Educational Placement.  Are there any other
9  letters or documents that are needed to legally accomplish
10 the change in educational setting?
11     A.  After this is received in the special education
12 office, then information is given to Sarah Reed.  The parent
13 has agreed to the program, and they usually set up a time
14 and date to do an intake.  And they get basic information
15 from parents through the intake process, and then we issue a
16 placement letter to let the parent know, you know, the
17 effective date of the change in placement.
18     Q.  Now, looking at the document -- it's part of that
19 exhibit -- I think it's the fourth page --
20     A.  Um-hum.
21     Q.  -- 442.  It's a handwritten statement.  It appears
22 to be signed by Shelley P██████.
23     A.  Um-hum.
24     Q.  And do you know who asked Miss P█████ to write
25 that up?

Page 35

1      A.  This was probably written as a part of the process
2  that the Sarah Reed -- paperwork that Sarah Reed would need.
3  There's information that in addition to -- this, that
4  Sarah Reed wants in order to take students into their
5  program.  They have their own paperwork.  They requested
6  that a waiver be signed in order to do the placement in
7  their program.
8      Q.  Okay.  Then can you look at the next page.  This
9  is a Request for Home-School Visitor Service.
10     A.  Um-hum.
11     Q.  And can you tell me, is that an Erie School
12 District form?
13     A.  Yes, it is.
14     Q.  What's a Request for Home-School Visitor Service?
15     A.  A home-school visitor is an individual who works
16 like a social worker for us, to make contact with parents to
17 help facilitate things that we need done in the District.
18 Making home visits and so on and so forth for us, giving
19 parents information, sharing information.  And, also, one of
20 our home-school visitors works closely with us in doing the
21 Sarah Reed placements.
22     Q.  Okay.  And then would this Marlene Frank, would
23 she be the -- who would be the home-school visitor here?
24 Can you tell?
25     A.  "Assigned to".  See at the bottom there?

Page 36

1      Q.  Yeah.
2      A.  O. Pecoraro.
3      Q.  Okay.
4      A.  Or A. Pecoraro, rather.
5      Q.  And that would be the -- Audrey --
6      A.  Pecoraro.
7      Q.  So that would be -- and is she -- do you know
8  whether she's an employee of the Erie School District?
9      A.  Yes, she is.
10     Q.  Then do you know whether you ever saw this Request
11 for Home-School Visitor Service or the commentary that was
12 on it?
13     A.  This would have to be somewhere -- this has to be
14 in her file.
15     Q.  Okay.  But my question was, did this ever come to
16 your attention?  This particular document.
17     A.  No.
18     Q.  I note that on -- the home-school visitor wrote on
19 1/18/02 that, "HSV went to home.  Mother had difficulty
20 remembering our appointment.  Apparently she is heavily
21 medicated and has memory problems.  Form signed.  Intake is
22 scheduled for 1/21/02 at 11:00.  Student will begin program
23 on 1/22/02."
24     A.  Um-hum.
25     Q.  That would be something probably that Miss Audrey

Page 37

1  Pecoraro wrote; is that right?
2      A.  Um-hum.
3      Q.  Okay.
4      A.  Yes.  I'm sorry.
5      Q.  Now, and then you brought a document today that
6  pertained to R████ which we'll -- you brought one
7  concerning K██████along and one concerning R█████  And
8  this is a document which we'll mark as an exhibit.
9          MR. OLDS:  And we could get copied, you know, when
10         we take a break here.
11     Q.  This is a -- the copy's entitled Discipline Note,
12 and it's dated 1/11/02; is that right?
13         (Discussion held off the record.)
14         (Recess held from 3:30 p.m. to 3:40 p.m.)
15         (Moore Deposition Exhibits 3, 4, 5, 6, 7, and 8
16         marked for identification.)
17     Q.  So we were talking, I think, about this document
18 that's now been marked as Exhibit 3 that is a Discipline
19 Note.  And you brought this to the deposition today.
20     A.  Um-hum.
21     Q.  And the Discipline Note pertains to R████
22 P█████.  And then Exhibit 4 is a similar Discipline Note
23 that pertains to K██████ █████
24     A.  Um-hum.
25     Q.  And tell me what this is about.

10 (Pages 34 to 37)

Page 38

1    A.  I made up the form myself, in order to manage what
2  was going on with students when people make requests for
3  assistance with students.  So I put that in, and I use it
4  basically for when we were working with students, we needed
5  to provide any services in school for students while we were
6  working on different things.  That's why I call it a
7  discipline note.  Because usually it's used when there is a
8  discipline problem.
9        This -- I just used this note to correspond the
10  request that the school administrator, Mrs. Cappabianca, and
11  with the agreement of the parent, remove the student from
12  the building for a time period.  Okay?  To provide some
13  services in the home.  That's why it says at the bottom,
14  "Five days in-home IEP to begin Monday, January 14,
15  through -- ending Tuesday, January 22nd."  I always provide
16  the address, the parents' phone number, and the parents'
17  name, so that the individuals providing the in-house support
18  will know who to contact, how long they are supposed to
19  provide services, and set the schedule up with the parent.
20        So once I fax that out -- that's just for me to
21  let me know I did it, you know, and what the reason was.
22  And here, the incident, I didn't put the incident.  I just
23  put change in location of service because of the severe
24  confidential nature of the situation.
25    Q.  Okay.  And then would you have -- who would have

Page 39

1  received this?  You had distributed this to who?
2    A.  The support person, Mr. Rogers at the time.  Paul
3  Rogers.
4    Q.  So we hadn't talked about Exhibit 2 yet.  We sort
5  of got to 3 and 4 before we got -- and Exhibit 2 is a --
6  this is a -- I see.  This -- this one pertains to K█████
7  L█████.
8    A.  Um-hum.
9    Q.  And, actually, the top page of Exhibit 2 is Notice
10  of Recommended Functional -- does that say functional
11  placement?
12    A.  No.  That was -- it says Notice of Recommended
13  Evaluation.  That was a print shop error.
14    Q.  Okay.
15    A.  And we decided we would keep the error, instead of
16  throwing all the papers away, and fix it with handwriting.
17    Q.  Okay.  That's fine.  What did you write in there
18  on top?  Is that functional or educational?
19    A.  It should be educational.
20    Q.  Educational, okay.  Now, this one is a -- the
21  action proposed is temporary in-home IEP, five days, ending
22  January 22nd.
23    A.  Um-hum.
24    Q.  Again, your name is affixed here; is printed on
25  this form.  Did you create this form?

Page 40

1    A.  Oh, no.  This form is State-mandated.
2    Q.  Not the form.  I mean, did you -- is this your
3  printing on this form?
4    A.  No.  This appears -- it appears to be Mr. Rogers'
5  printing.  It appears to me to be that.
6    Q.  Okay.  Then the third page of this exhibit,
7  Exhibit 2, is Bates-stamped 739.
8    A.  Um-hum.
9    Q.  And this is the IEP revision review; is that
10  right?
11    A.  That's correct.
12    Q.  And is it fair to say that the IEP revision
13  review, the language on this -- on this one is precisely
14  the same language as appeared on the IEP revision review for
15  Rachel?
16    A.  That is correct.
17    Q.  Okay.  I mean, they are both -- the new education
18  plan for K█████ was, "Develop consistent patterns --"
19  excuse me.  The objective was, "Develop consistent patterns
20  of appropriate behavior through a program of therapeutic
21  support."
22    A.  Um-hum.
23    Q.  And that's exactly the same language that appears
24  on R█████ IEP.
25    A.  That is correct.

Page 41

1    Q.  Okay.  And on this one, I guess the fifth page of
2  this exhibit, this handwritten page here -- it would be
3  Bates-stamped 744 down at the bottom.  This is Exhibit 2.
4    A.  744?
5    Q.  It's the fifth page of the exhibit, I think.
6    A.  Um-hum.
7    Q.  The handwritten thing.
8    A.  Um-hum.
9    Q.  This was apparently a document signed by Denise
10  L█████ saying she wants her daughter transferred to the Erie
11  School District's alternative education program.
12    A.  Um-hum.
13    Q.  And that means --
14    A.  The Sarah Reed program.
15    Q.  Sarah Reed program.  That appeared just to be a
16  duplicate.
17    A.  Um-hum.
18    Q.  Then 819 is the Notice of Recommended Educational
19  Placement.  And, again, is that your printing on this
20  document?
21    A.  No, it is not.
22    Q.  And this says why the action is proposed or
23  refused.  It reads, "Student's current high degree and
24  intensity of stress as recorded by parents, student, and the
25  Erie School District staff.  Intensity and frequency of

Page 42

1  therapeutic intervention exceed that which can be delivered
2  in the regular school setting."
3       And then the evaluation procedure, test records,
4  report, a verbal sharing of discharge summary from Millcreek
5  Community, and information provided by the student, parent,
6  ESD staff, including mental health staff.  Which mental
7  health staff provided information for this Notice of
8  Recommended Educational Placement?
9       A.  I'm not quite sure.  It could be mental health
10  staff either from -- they have Millcreek information, and
11  there's also -- I mentioned before mental health staff in
12  the building.
13      Q.  And do you remember which mental health staff was
14  assigned to the Strong Vincent School?
15      A.  I'm trying to remember.  I can't remember the
16  name.  I'm sorry.
17      Q.  Now, you didn't print the reasons for change.  Do
18  you remember, did you -- where it's printed, your name is
19  printed, C. Moore --
20      A.  Yes.
21      Q.  -- did you put your initials there -- I mean,
22  your --
23      A.  No.  Someone printed my name here as the
24  supervisor.
25      Q.  Did you supervise the preparation of this

Page 43

1  document?  For instance, did you tell whoever made it what
2  to say?
3       A.  I don't recall whether someone consulted with me
4  or not.  Maybe, maybe not.  I'm not sure.
5       Q.  Well, you must have given -- whoever -- do
6  you know who prepared it -- the specific person who prepared
7  this?
8       A.  I don't know the -- I can't tell whose handwriting
9  this is specifically.
10      Q.  You must have given someone the authority to print
11  your name on it, though; is that right?
12      A.  Well, it is because of the procedural safeguards,
13  and I'm the program supervisor.  It's always indicative to
14  put the program supervisor's name if anyone has any
15  questions or concerns.
16      Q.  Okay.  So your name goes on there as standard
17  procedure.
18      A.  Yes.
19      Q.  And if I asked you this question, I apologize.  Do
20  you -- the decision to place these girls at Sarah Reed, how
21  did that -- who made that decision?
22      A.  The recommendation to be placed at Sarah Reed, I
23  do believe came from the Director of Special Education, to
24  take a look at the situation and, you know, that's an option
25  you can provide a parent.  You know, to have that particular

Page 44

1  placement.  You can offer that to them.
2       Q.  So it would be your testimony that it wasn't
3  necessarily the teacher or the assistant principal or even
4  you that came up with the idea of Sarah Reed originally.  It
5  would be your boss, the director.
6       A.  I was directed by Mr. Scozzie to start the --
7       Q.  Process.
8       A.  -- process --
9       Q.  -- to get them in.
10      A.  -- to get them in.  Now, the decision, I don't
11  know.  I'm just following my directive from my supervisor.
12      Q.  All right.  And you don't know what information
13  Mr. Scozzie had; who talked to him?
14      A.  No, I do not.
15      Q.  Okay.  We have marked as Exhibit 5, it looks like
16  some notes that you made.
17      A.  It's from my personal note pad.  That's probably
18  the notes I took when I was in the office with Mr. Scozzie
19  when he gave me directive.  I was trying to figure out what
20  I needed to do or got information from someone.  But this is
21  just from my own personal note pad where I make notes of
22  things I need to do.
23      Q.  Okay.  And at the top, it says, it looks like "See
24  Marlene."?
25      A.  Um-hum.

Page 45

1       Q.  Who is Marlene?
2       A.  She's Mrs. Chrisman.
3       Q.  Mrs. Chrisman?
4       A.  The other special education supervisor.
5       Q.  Okay.  And it says, "See Marlene for SR partial
6  placement."
7       A.  Sarah Reed partial placement.
8       Q.  Partial placement.
9       A.  Um-hum.
10      Q.  What is a partial placement?
11      A.  It's a different program.  It's students who are
12  identified with mental health issues.  Sarah Reed has a
13  multitude of programs, and this was just one of them.  And I
14  probably -- I probably wrote that just to get more detail,
15  because at the time she was the supervisor of the partial --
16  district supervisor of the partial program.
17      Q.  Do you know what program eventually R████ and
18  K████ were placed into?
19      A.  From my review, it was the -- I don't want to call
20  it the behavior support.  It's called the therapeutic
21  program.
22      Q.  We have marked as Exhibit 6 a document I guess
23  that we have already talked about that was part of Exhibit
24  2.  Exhibits 7 and 8 are documents from Jo Barker, director,
25  elementary/middle school programs.  Who is Jo Barker?  Oh,

232a

Page 46

1 that's who it's to. It's from Marlene Chrisman.
2    A. Um-hum.
3    Q. Who is Jo Barker?
4    A. Mrs. Barker is the director of elementary/middle
5 school programs.
6    Q. And so she would be -- well, she would be the
7 director of all of those programs --
8    A. The principals in the elementary and the middle
9 schools. And also she had the -- she was managing the Sarah
10 Reed -- the big Sarah Reed umbrella.
11    Q. Now, in this memo -- there's one for each of
12 R█████ and K█████ And the memo says that, "Since they
13 are under age 14, they are not eligible for the adolescent
14 partial program." Do you know what program that is?
15    A. The partial program is the mental health -- high
16 school mental health program.
17    Q. And she indicated that they were not eligible for
18 that program?
19    A. Um-hum. She did. That's what this memo says.
20    Q. Right. And it also indicates that -- this, again,
21 sort of points to the fact that it was Mr. Scozzie who
22 instigated this move; is that right? "It's my understanding
23 that Mr. Scozzie would like the girls to begin this
24 placement as soon as possible."
25    A. That's what she has written here. "It's my

Page 47

1 understanding that Mr. Scozzie would like the girls to begin
2 this placement as soon as possible."
3    Q. So whose idea was it that the girls would be sent
4 home for a week? Was that your idea?
5    A. No. There has to be a request from someone. I
6 can't recall the request; whether it came directly from
7 Mrs. Cappabianca. Because at that time, we always put the
8 person who is the administrator in the building dealing with
9 students, middle school students, their names on the form.
10 Because maybe there -- some places had more than one
11 assistant principal working with students, so I would know
12 where it came from.
13    Q. Okay. So I guess that you had a meeting -- was it
14 January 14th -- can you tell by looking at your notes,
15 Exhibit 5, the date of your meeting with Mr. Scozzie?
16    A. I don't know. This is -- this is my scribble from
17 a long time ago.
18    Q. It does say -- there's a reference to the dates
19 January 14th through 22nd. Do you know what that refers to?
20    A. I don't know. Let's see. Well, I do have that on
21 this discipline note. That's the beginning of the service
22 in-home. So maybe that's what I wrote down. If you look
23 at -- see the discipline note, No. 3?
24    Q. Right. Yes.
25    A. And maybe that's my note for this -- it says,

Page 48

1 "In-home, five days --"
2    Q. Yes.
3    A. -- then I have the note. I probably connect it
4 with that. That's the only thing I can put that with.
5    Q. Now, you do have a date on this one, on the
6 discipline note.
7    A. Um-hum.
8    Q. That's 1/11/02.
9    A. Yes.
10    Q. Now, would it have been Miss Cappabianca who
11 requested this change in placement?
12    A. It's possible that she did.
13    Q. Okay. And then would the -- do the parents have
14 to consent to this placement?
15    A. Yes, definitely. For someone to come into their
16 home.
17    Q. Okay. Well, this would be -- would this be
18 considered a modification of the girls' IEP, this five-day
19 in-home placement?
20    A. Well, we would work on their -- the things that
21 are in their IEP with them when that person --
22    Q. I know that. But what I'm saying is that from the
23 point of view of the legal requirements associated with an
24 IEP, does this -- does this placement in their home, this
25 five-day placement in their home, does that require a whole

Page 49

1 new IEP --
2    A. No.
3    Q. -- revision?
4    A. No, it doesn't require a revision. Just
5 permission for us to do instruction in the home.
6    Q. And why doesn't it require a revision?
7    A. Because we wouldn't be changing any of the goals
8 and objectives on the IEP.
9    Q. But you are changing the placement.
10    A. That's why we have documentation here. Temporary
11 in-home, right here on this one (indicating).
12    Q. Right. So there is a temporary in-home evaluation
13 placement for --
14    A. Um-hum.
15    Q. -- K█████ There might be one for R█████
16    A. I don't know.
17    Q. Well, and I haven't presented it to you, so I
18 might not have seen it or maybe it's not in our files. But
19 in any event, so that's not -- the one that we have, that we
20 have marked as Exhibit 2, is not -- doesn't have the
21 parents' signature. Should the parents' signature be on
22 that?
23    A. The parent should sign it. There's a check, "I
24 approve." I don't know if the parent forgot to sign or
25 what. Someone can't go in unless the parent gives

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   RICHARD P., by and for       :
     R█████ P., and DENISE L.,    :
 4   by and for K████████ L.,     :
                Plaintiffs        :
 5                                :
         v.                       :    Civil Action No. 03-390
 6                                :              Erie
     SCHOOL DISTRICT OF THE CITY  :
 7   OF ERIE, PENNSYLVANIA; JANET :
     WOODS, Individually and in   :
 8   her Capacity as Principal of :
     Strong Vincent High School;  :
 9   and LINDA L. CAPPABIANCA,    :
     Individually and in her      :
10   Capacity as Assistant        :
     Principal of Strong Vincent  :
11   High School,                 :
                Defendants        :
12

13

14

15

16           Deposition of R█████ P████████, taken before

17      and by Janis L. Ferguson, Notary Public in and

18      for the Commonwealth of Pennsylvania, on Wednesday,

19      March 23, 2005, commencing at 10:12 a.m., at the

20      offices of Knox McLaughlin Gornall & Sennett, PC,

21      120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
                Reported by Janis L. Ferguson, RPR
25              Ferguson & Holdnack Reporting, Inc.
```



234a

14e5a276-1f6d-4158-8a63-bfab4ddecec4

Page 46

1    Q.  Extending your time at Thomas, you mean?
2    A.  No.
3    Q.  Extending your probation.  Well, I wandered off on
4  a tangent, only to go back to where we were over an hour
5  ago, I think.  And I may, in the course of this, R████ ask
6  questions that I have asked before, and I really don't mean
7  to do that intentionally.  It's just because my memory is
8  not perfect either.
9        You told me that, as I remember, that you had
10  difficulties with B████ C████████ in a class where your class
11  and her class got together to listen to a speaker or watch a
12  movie; one of the two.
13    A.  Yeah.
14    Q.  And she wanted to fight you.
15    A.  Yeah.
16    Q.  What, if you know, caused that to happen?  Did
17  something happen?  Did you bump into her or anything?
18  What --
19    A.  No.
20    Q.  Just out of the blue, she said she wanted to fight
21  you?
22    A.  Yeah.
23    Q.  What exactly did she say, if you remember?
24    A.  There was a couple times.  When we were in the gym
25  room, she said, we're going to get -- I'm going to give you

Page 47

1  head up after school.
2    Q.  "Head up" means hitting you?
3    A.  Fight.
4    Q.  So now we have two occasions.  One is for the
5  movie or the speaker, and one for the gym?
6    A.  No, that -- there was one in the classroom, one in
7  the gym, and one in the gym hall.
8    Q.  In the hallway outside the gym?
9    A.  Yeah.
10    Q.  When you were going to Strong Vincent -- I went
11  there too, and I know there are two gyms.
12    A.  Um-hum.
13    Q.  Right?
14    A.  Yes.
15    Q.  Is one for girls and one for boys?  They were when
16  I was there.
17    A.  No.  I think there's boys in my class.
18    Q.  Okay.  So they mix them now.
19    A.  Yeah.
20    MR. MARNEN:  Probably Title 9.
21    Q.  The first event was the classroom, where she
22  wanted to fight you?
23    A.  That I can remember, yeah.
24    Q.  All right.  And that's all I'm asking for.  And
25  the other two events were after that.  The gym and the

Page 48

1  hallway outside the gym.
2    A.  Yeah.
3    Q.  In the gym, she said she was going to give you
4  head up after school?
5    A.  Yeah.
6    Q.  What about the time in the hallway outside the
7  gym?  What did she say then?
8    A.  Well, this boy came out of her gym and said, hey,
9  this girl wants to give you head.
10    Q.  Wants to give you what?
11    A.  Head.
12    Q.  What does that mean?
13    A.  Oral sex.
14    Q.  Was that before or after the assault by B████ and
15  K████████
16    A.  Yeah, I think it was.
17    MR. OLDS:  He said before or after.
18    Q.  Before or after.  You have a choice here.
19    A.  Oh.  After.
20    Q.  After.  So it wasn't C████████ that said that to
21  you, it was someone else?
22    A.  No, it was B████ C████████
23    Q.  Oh.  She came out and said that there's a boy in
24  there that --
25    A.  No.  The boy came out of her gym room, and she

Page 49

1  told him that this, hey, this girl wants to give you head.
2    Q.  I see.
3    A.  Meaning me.
4    Q.  I see.  So the boy was there and you were there,
5  and she gestured toward a boy.
6    A.  Yeah.
7    Q.  Do you know the boy's name?
8    A.  No.
9    (Discussion held off the record.)
10    (Defendant's Deposition Exhibit J
11    marked for identification.)
12    Q.  R████ I have marked as Defendant's Exhibit J a
13  copy of -- at least a portion of the police report in this
14  case that related to the assaults.
15    MR. OLDS:  Probably -- I don't know if she has
16    ever seen this, but --
17    MR. MARNEN:  She may not have.
18    MR. OLDS:  Just so -- he might direct your
19    attention to something, but you might have never
20    seen this.  This was the police report that was
21    done after the police came and investigated.
22    Okay?
23  BY MR. MARNEN:
24    Q.  I guess I'll ask you, have you ever seen it
25  before?

Ferguson & Holdnack Reporting, Inc.                    235a                    14e5a276-1f6d-4158-8a63-bfab4ddecec4

Page 50

1    A.  No.
2    Q.  I'd like to -- do you notice, R█████ in the lower
3  right-hand corner, there's some page numbers.  The very
4  first page is PO, and then there are a bunch of zeros
5  following --
6          MR. OLDS:  Right down here (indicating).
7    A.  Yeah.
8    Q.  Go to PO-6, if you don't mind.
9    A.  (Witness complies.)
10    Q.  And right in the middle of the page -- let me just
11  read it aloud to you.
12          (Discussion held off the record.)
13    Q.  "R█████ related --" do you see that part?
14    A.  Yeah.
15    Q.  "R█████ related to Ms. Cappabianca that B█████ is
16  now taunting her at school, bothering her to perform oral
17  sex on other male students.
18          "On Monday, January 7, 2002, there was a second
19  incident.  R█████ was at the water fountain, and B█████
20  approached her, asking her to give head to a male student
21  that had walked by.  Allegedly after R█████ refused, B█████
22  shoved her into the stairwell and pushed her to follow the
23  male student.  R█████ followed down the stairs in the same
24  direction as the male student, but nothing had happened."
25  Okay?

Page 51

1    A.  Yeah.
2    Q.  Now, does that sound like an event that occurred
3  to you with B█████ C█████?
4    A.  Yeah.
5    Q.  Does that have anything to do with the gym -- the
6  two gyms -- the one in the hallway outside the gym, the gym
7  itself, or in the class, or is this a fourth event?
8    A.  No.  That's the hallway from the gym.
9    Q.  So that paragraph describes the hallway incident,
10  then.
11    A.  Yeah.
12    Q.  Okay.  Do you know whether that happened on
13  January 7, 2002?
14    A.  I don't know what date.
15    Q.  Did it happen after you came back from Christmas
16  vacation?
17    A.  I don't remember.
18    Q.  Did R█████ as this indicates, shove you into a
19  stairwell --
20          MR. OLDS:  Not R█████, but B█████.
21          MR. MARNEN:  I'm sorry.
22    Q.  I apologize.  Did B█████ force you into a
23  stairwell, push you into a stairwell?
24    A.  Yeah.
25    Q.  Tell me what happened, in your own words, if you

Page 52

1  don't mind.
2    A.  I went out to get a drink of water from gym, and
3  B█████ came out in the hall with two of her friends, and --
4    Q.  Who were the two friends?
5    A.  I don't know.
6    Q.  Were they girls or boys?
7    A.  Girls.  And then -- then this boy came out of the
8  room, her gym room, and she said, hey, this girl wants to
9  give you head.  And she -- he's like, really?  And he's
10  like -- and then she was like, yeah; we'll follow you.  And
11  he started going down the stairs, and she started pushing me
12  down -- in the stairway.  And when we got down there, he was
13  like, well, are you ready; come on.  And I said no.  And I
14  turned around to walk away, and they kept blocking me to go
15  up the stairwell.
16          And then one of the teachers came out of the
17  classroom and told us to get -- get back to class.  And then
18  when we got back upstairs, the teacher told -- no.  I said
19  that B█████ is trying to make me give people head.  And she
20  said, oh, this happened to my friend before; I understand
21  how you feel.  And then she told -- she -- she must have
22  told Miss Cap I walked out of class.  I don't remember me
23  walking out of class, but that's what she said.  And I got
24  PASS that night.
25    Q.  So let me move back and go a little more slowly.

Page 53

1  The boy went down the stairs first?
2    A.  Yeah.
3    Q.  And B█████ pushed you down to follow him.
4    A.  Yeah.
5    Q.  So B█████ was behind you.
6    A.  Yeah.
7    Q.  On the stairs.
8    A.  Um-hum.
9    Q.  How about the other two girls?  What happened to
10  them?
11    A.  They were holding the door.
12    Q.  The door to the stairwell?
13    A.  Yeah.
14    Q.  Holding it closed?
15    A.  Holding it open.
16    Q.  Holding it open?
17    A.  So she could push me down there.
18    Q.  Oh, okay.  Is this one staircase straight down, or
19  does it have a landing and turn the corner and go down?
20    A.  Yeah, like that.
21    Q.  It has a landing?
22    A.  Yeah.
23    Q.  The gym is on the first floor, isn't it?
24    A.  No.  They were taking me down to the basement.
25    Q.  That's my point.  They were going down to the

14 (Pages 50 to 53)

Page 54

1  basement.  What is down there?
2      A.  There is a couple classrooms, the lunchroom.
3  Yeah.
4      Q.  So if you were going to the cafeteria, that's
5  where -- you might go down those stairs?
6      A.  Yeah.
7      Q.  And this was during gym class, your gym class.
8      A.  Yeah.
9      Q.  What time of day?  Before lunch or after?
10     A.  I can't remember.
11     Q.  Who was your gym teacher?  Miss Acke?
12     A.  Acke, yeah.
13     Q.  And at some point in all this, a teacher got
14  involved here?
15     A.  Yeah.
16     Q.  Who was the teacher?
17     A.  I don't remember her name.  She was a substitute
18  for Ms. Acke.
19     Q.  Oh.  She was the gym teacher?
20     A.  She was the substitute gym teacher.
21     Q.  That day?
22     A.  Yeah.
23     Q.  Okay.  And did she actually walk into the
24  stairwell also?
25     A.  No.  She was in the gym room, but she came out,

Page 55

1  and she saw me up there, and she asked me why I was out of
2  class.
3      Q.  Then had you left B███ P█████████and the boy and
4  the two girls by then?  You had left?
5      A.  They went back in the gym room.
6      Q.  Okay.  Well, how did you get out of your
7  predicament?  That's what I'm trying to understand.
8      A.  When the teacher came out -- when we were in the
9  basement, the teacher came out of the classroom and told us
10  to get back to class.
11     Q.  This substitute gym teacher?
12     A.  No.  The teacher downstairs.
13     Q.  Oh, okay.  Was that a man or a woman?
14     A.  A man.
15     Q.  Name?
16     A.  I don't know.
17     Q.  He came -- he just happened to come out?
18     A.  Yeah.  He -- yeah.
19     Q.  And he told you to get back in class.
20     A.  Yeah.
21     Q.  Were you all wearing gym outfits?
22     A.  Yeah.
23     Q.  So he could tell you were gym kids at that time.
24     A.  Yeah.
25     Q.  All right.  Did that cause everybody to go back up

Page 56

1  the stairs then?
2      A.  Yeah.  Except for the boy.  He went to his
3  classroom downstairs.
4      Q.  He was not in gym stuff; gym --
5      A.  No.  I don't know why he went down there, but --
6      Q.  So he went to a class in the basement.
7      A.  Yeah.
8      Q.  You and B██ and the two girls went back up the
9  stairs.
10     A.  Yeah.
11     Q.  Went through the door and back into the gym?
12     A.  I didn't go in the gym yet.  They did.  They went
13  in their gym.  But the teacher came out before I went in the
14  gym and asked me why wasn't I in class.
15     Q.  So that --
16     MR. OLDS:  Just so you understand, I think there
17     were two gym classes.  B███ was in one, and she
18     was in the other.  Is that correct?
19     THE WITNESS:  Yeah.
20     Q.  As I remember, when you go to those gyms, you walk
21  down the hall, and one gym is on the left, and one is on the
22  right.
23     A.  Yeah.
24     Q.  So which one was B██ in?  Left or --
25     A.  Right.

Page 57

1      Q.  You were in left?
2      A.  Yeah.
3      Q.  So B██ and the other girls were ahead of you,
4  and they went to the right?
5      A.  Yeah.
6      Q.  And then you dabbled a little bit out there in the
7  hallway?
8      A.  Yeah.  And then the teacher came out.
9      Q.  And told you to get back in the gym.
10     A.  No.  She asked me why was I out of class.
11     Q.  Okay.  What did you say?
12     A.  I didn't respond to the question.  I just said,
13  B██ is trying to make me give head to people.
14     Q.  And she said?
15     A.  Well, I know how you feel, because this happened
16  to my friend.
17     Q.  The gym teacher said that?
18     A.  Yeah.
19     Q.  Did she say anything else to you?
20     A.  No.
21     Q.  What did you then do?
22     A.  I just went back to class.  And then eventually
23  Miss Cap wanted to talk to me, and she said I have PASS.
24     Q.  Is "Miss Cap" Miss Cappabianca?
25     A.  Yeah.

15 (Pages 54 to 57)



Page 58

1    Q.   Did everybody call her Miss Cap?
2    A.   Yeah.
3    Q.   So Miss Cappabianca -- I'm sorry, I lost track.
4    What did she do then?
5    A.   She said I have PASS.
6    Q.   When did she say that?
7    A.   That day that I went to go get a drink of water.
8    Q.   All right.  Where were you when she told you that?
9    A.   In her office.
10   Q.   Were you summoned to her office?
11   A.   Yeah.
12   Q.   Now, some of your classes were on the second
13   floor, weren't they?
14   A.   Yeah.
15   Q.   Do you know east, west, north, south on that
16   building?
17   A.   No.
18   Q.   Was it the side of the building that's closest to
19   where the Laundromat was located?
20   A.   Where her classroom -- I mean, where her --
21   Q.   No, where your classes were.  Most of them.
22   A.   It was in the back.  It was in the back.
23   Q.   Was Miss Cappabianca's office in the same area as
24   some of your classes?
25   A.   Yeah.  Miss Manus and Miss Scully and Miss Gray.

Page 59

1    Q.   Okay.  The classes you had with Miss Manus,
2    Miss Scully, and Miss Gray were in the same hallway as
3    Miss Cappabianca's office?
4    A.   And my music.
5    Q.   And your music teacher too.  Okay.  So did
6    Miss Cappabianca tell you this after gym class was over?
7    A.   I don't remember when.
8    Q.   But at some point she summoned you to her office?
9    A.   Yeah.  That day.
10   Q.   And informed you that you had PASS.
11   A.   Yeah.
12   Q.   Did she tell you why you had PASS?
13   A.   Because I walked out of class.  Which I asked to
14   get a drink.
15   Q.   All right.  Did you tell her that?
16   A.   Yeah.
17   Q.   What did she say?
18   A.   She didn't respond.
19   Q.   Did you discuss with her what B████ and her
20   friends had done in the stairwell?
21   A.   I tried, but she -- she wouldn't let me.
22   Q.   Okay.  As best you remember, tell me what you said
23   to her and what she said to you in regard to that.
24   A.   Well, I didn't say anything that time, but
25   every -- when I did try, she just kind of -- well, once she

Page 60

1    told me that you need to suck it up and ignore it.  Another
2    time she just, like, kind of made noises -- noises with her
3    mouth to stop me from what I was going to say.  And then
4    there was another time that she says, I know what happened.
5    And there was another time she called my dad when I went to
6    her office to tell her.
7    Q.   Okay.  But on the day with the stairwell event --
8    A.   Yeah.
9    Q.   -- you did not tell her what -- am I understanding
10   you correctly, you did not tell her what B████ and the other
11   kids had done?
12   A.   No.  Not that day.
13   Q.   Okay.  If you go back to Exhibit J, please.  And
14   the very next paragraph after the one that I read to you
15   before on Page PO-6.
16   (Discussion held off the record.)
17   Q.   I'm going to read it to you so we can go -- it
18   will force us to go slowly through it.
19   "The third incident that Ms. Cappabianca found out
20   about by interviewing all of the listed students was that
21   also on Monday, 1/7/02, after PASS, C████ B████ and an
22   unknown male student had left PASS.  They both went into the
23   Frontier Village Laundromat, where R█████ P█████ was.
24   R████ was there changing her clothes and waiting for her
25   father to pick her up.  While in an alcove of the building,

Page 61

1    the unknown male student had forced R████ to sit down, and
2    then he put his hands up under her shirt and pushed her hair
3    back away from her face.  This male then unzipped his pants
4    and put his penis on R████ face."
5    Q.   Okay?  Does that sound like an event that had
6    happened to you?
7    A.   I don't remember him putting my hair back.
8    Q.   Otherwise, it sounds like something that happened
9    to you?
10   A.   Yeah.
11   Q.   This paragraph says it happened on the same day as
12   the stairwell incident that we just talked about, but that
13   doesn't mean it did.  Did it happen the same day?
14   A.   I don't remember.
15   Q.   Did it happen after the day that you were
16   assaulted by B████ and K████ and C██████?
17   A.   Yeah.
18   Q.   Did you have PASS that day; the day it happened?
19   A.   Yeah, I did.
20   Q.   And PASS, as I understand it, begins typically at
21   3:30 p.m.?
22   A.   Yeah.
23   Q.   And it ends at 6:30 p.m.?
24   A.   Yeah.
25   Q.   And so after PASS is when this happened.  Right?

Ferguson & Holdnack Reporting, Inc.

238a

14e5a276-1f6d-4158-8a63-bfab4ddecec4

Richard P. v. School District                                March 23, 2005

<table>
<tr><td valign="top">

Page 78

1 would not stop bothering you?
2   A.  Yeah.
3   Q.  Was there any other -- any other thought you
4 communicated to her besides that?
5   A.  (No response.)
6   Q.  Before she interrupted you.
7   A.  There was times where I --
8   Q.  I just want to talk about this one time.
9   A.  I don't know.
10   Q.  You don't know?
11   A.  No.
12   Q.  All right.  She cut you off.  And what did she do
13 besides -- what did she say, if anything, besides cutting
14 you off?
15   A.  Nothing.  I just left.
16   Q.  Were you just in there a couple minutes?
17   A.  Yeah.  I mean, I can't force her to listen to me.
18 And I --
19   Q.  You had been in her office before that time?
20   A.  No.  The -- I think that was my first time.
21   Q.  My notes say there was a second occasion when you
22 tried to talk to her about that subject, and she made noises
23 to stop.  Or is that the same visit?
24   A.  She did that a couple times when I tried to tell.
25   Q.  How many times did you try to -- how many separate

</td><td valign="top">

Page 80

1   A.  Yeah.  This one time she took me out of PASS to
2 talk to me and tell me what happened.  Or ask me what
3 happened.
4   Q.  Was that the only time you told her what did
5 happen?
6   A.  Yeah.
7   Q.  Was that the last time you tried to talk to her
8 about the subject?
9   A.  After that day, that they tried to talk to me,
10 they had a meeting with my dad.
11   Q.  Is this after Christmas vacation?
12   A.  Yeah.
13   Q.  Now, PASS is after school hours, between 3:30 and
14 6:30, right?
15   A.  Yeah.
16   Q.  So Miss Cappabianca came to you at some time after
17 the Christmas holidays and took you out of PASS?
18   A.  Yeah.
19   Q.  And did she take you to her office or someplace
20 else to talk to you?
21   A.  I think it was Miss Woods' office.
22   Q.  I'm sorry?
23   A.  I think it was Miss Woods' office.  Miss Woods was
24 there too.
25   Q.  All right.  So Miss Cappabianca took you

</td></tr>
<tr><td valign="top">

Page 79

1 incidents were there where you tried to tell
2 Miss Cappabianca that you had been sexually assaulted on
3 November 27th?
4   A.  I don't know.
5   Q.  Was it more than one time?
6   A.  Yeah.
7   Q.  Was it more than two times?
8   A.  Probably.
9   Q.  Was it more than three?
10   A.  Yeah.
11   Q.  More than four?
12   A.  I'm not sure.  It felt like a lot of times.
13   Q.  I just need to get a sense of how many times.
14 There's a big difference between, for example, three and 20.
15 So I want to know, is it less than five or more than five?
16   A.  10, 15.
17   Q.  10 or 15 times?
18   A.  Yeah.
19   Q.  So 10 or 15 separate occasions, you went to see
20 Miss Cappabianca at her office?
21   A.  Yeah.
22   Q.  Is that where it happened?
23   A.  Yeah.
24   Q.  And were you ever able to tell her what happened
25 without her interrupting you?

</td><td valign="top">

Page 81

1 somewhere -- you think it was Miss Woods' office -- and she
2 asked you what happened.
3   A.  Yeah.
4   Q.  And this is the first time she ever let you talk
5 about it?
6   A.  Yeah.
7   Q.  What did Miss Cappabianca ask you?
8   A.  She said -- she sat me down and said, tell me what
9 happened.
10   Q.  And, I mean, that is kind of general.  Did she get
11 into specifics?  Did she --
12   A.  No.
13   Q.  What did you tell her?
14   A.  I just told her what happened.
15   Q.  What happened during the assault, you mean?
16   A.  Yeah.  And she kept rushing me.
17   Q.  What does that mean?
18   A.  She just -- Miss Woods kept wanting me to hurry up
19 with talking about it.
20   Q.  Cappabianca didn't want you to hurry up; Woods
21 did?
22   A.  Yeah.
23   Q.  How long did you spend talking with
24 Miss Cappabianca and Miss Woods about the assault?
25   A.  Probably -- I don't know.

</td></tr>
</table>

Ferguson & Holdnack Reporting, Inc.                 039a          14e5a276-1f6d-4158-8a63-bfab4ddecec4

**Page 98**

1　　　Miss Cap called her father while Ra——— was in the
2　office.
3　　　MR. MARNEN: That's right. Thank you very much,
4　Ed.
5　　Q.　You met with Miss Woods and Miss Cappabianca in
6　the afternoon, and they took you out of PASS. And at some
7　point someone said they were going to call your father.
8　Right?
9　　A.　Yeah.
10　　Q.　Did they call him in front of you?
11　　A.　Once. Miss Cap did.
12　　Q.　Oh, on one occasion. But that was not in Janet
13　Woods' office. That was some other time.
14　　A.　Yeah.
15　　Q.　Was that before or after the assault?
16　　A.　After.
17　　Q.　And why were you in Linda Cappabianca's office?
18　　A.　Trying to tell her that the kids were bothering
19　me.
20　　Q.　And she cut you off?
21　　A.　Yeah.
22　　Q.　Did she then call your father?
23　　A.　Yeah.
24　　Q.　In your presence?
25　　A.　Yeah.

**Page 99**

1　　Q.　And what did you hear about the -- what part of
2　the conversation did you hear? Recount the conversation you
3　heard, please.
4　　A.　I didn't hear everything. She said that, "Your
5　daughter is being a filthy little girl."
6　　Q.　Is that the only thing you remember her saying to
7　your father?
8　　A.　Yeah. And then she gave the phone to me.
9　　Q.　Okay. Up to that time, you had only -- if I
10　understand it correctly -- and please correct me if I'm
11　wrong -- you had only told Miss Cappabianca that kids were
12　bothering you, and then she would cut you off?
13　　A.　Huh?
14　　Q.　I think you said -- but maybe I'm wrong -- that up
15　until the very last time you had the conversation in
16　Miss Woods' office, every time you tried to bring up the
17　subject of kids bothering you, and you would say kids are
18　bothering me or things to that -- that effect,
19　Miss Cappabianca would cut you off, and you would never be
20　able to tell her what they were doing to you. Right?
21　　A.　Yeah. I would try to tell her that they were
22　making me give head.
23　　Q.　You would try, but you never got it out of your
24　mouth, because she would cut you off. Right?
25　　A.　Yeah.

**Page 100**

1　　Q.　Okay. So why in the world was she saying you were
2　a filthy little girl, then?
3　　A.　I don't know. Probably -- probably because that
4　was the day that my music teacher took me out of class, told
5　me to get out of class because the kids kept bothering me,
6　saying, oh, yeah, you gave C——— B———head and stuff.
7　And then the other boys in the class were asking if I would
8　do that to them. And at that point I was getting very
9　angry, and I went up to the teacher, and I said, if they say
10　stuff to me one more time, I'm going to end up throwing
11　chairs. And he said, I want you out of this classroom.
12　　　So I went to Miss Cap's office, and then that's
13　when she called my dad.
14　　Q.　Who was the music teacher?
15　　A.　I don't remember. It's --
16　　Q.　A man?
17　　A.　Yeah.
18　　Q.　Did that music teacher hear -- was he close enough
19　to hear what the other kids were saying to you?
20　　A.　I don't know. I know he's in the room, though.
21　　Q.　Did he say anything that led you to believe that
22　he overheard what they said to you?
23　　A.　No.
24　　Q.　Did you then go directly from music class to
25　Miss Cappabianca's office?

**Page 101**

1　　A.　Yeah.
2　　Q.　Did you go with -- were you escorted by the music
3　teacher?
4　　A.　No.
5　　Q.　You went by yourself?
6　　A.　Yeah.
7　　Q.　Was it just down the hall?
8　　A.　Yeah.
9　　Q.　So you got there without the music teacher, right?
10　　A.　Yeah.
11　　Q.　Are there telephones in the teachers' rooms?
12　　A.　I can't remember.
13　　Q.　And when you got there, what did you say to
14　Miss Cappabianca?
15　　A.　Well, I tried to tell her that they kept bothering
16　me. That's why I got kicked out of class.
17　　Q.　Did you tell Miss Cappabianca on that occasion
18　that the other kids were bothering you in the sense that
19　they were asking you to give head? Did you tell
20　Miss Cappabianca then?
21　　A.　No, she wouldn't let me.
22　　Q.　But then she called your father and said you're a
23　dirty little girl.
24　　A.　I'm a filthy little girl.
25　　Q.　Filthy little girl. So I gather, then, you don't

240a

14e5a276-1f6d-4158-8a63-bfab4ddecec4


Page 102

1  know what she was basing that on.
2      A.  No.
3      Q.  It certainly wasn't based on anything you told
4  her, right?
5      A.  Right.
6      Q.  Because you never told her anything.  You just
7  said they were bothering you.
8      A.  Yes.
9      Q.  And my notes also tell me that at some point --
10 and I'm just -- here is what the note says.  "I know what
11 happened," and I'm not sure what that means.  Did
12 Miss Cappabianca say something to you like that at one time?
13     A.  Yeah.  When I was trying to tell her again, she
14 said, "I know what happened."
15     Q.  Oh.  When was this, R████
16     A.  I don't remember when.
17     Q.  Was it the meeting with your dad?
18     A.  No.  It was before my dad knew.
19     Q.  Remember, we talked about the meeting with
20 Miss Woods and Miss Cappabianca where you were taken out of
21 PASS.  Was it before that?
22     A.  Yeah, it was before.
23     Q.  So Miss Cappabianca said sometime before that, "I
24 know what happened."?  That's when she cut you off this one
25 time?  Is that what you mean?

Page 103

1      A.  Can you --
2      Q.  I'm going too fast.  I'm sorry.  Was this a
3  meeting with Miss Cappabianca in her office?
4      A.  No, I went to her office again.
5      Q.  What?
6      A.  I went to her office again.
7      Q.  Whose office?
8      A.  Miss Cap's.
9      Q.  So you were in Miss Cappabianca's office when she
10 said this?
11     A.  Yeah.  I wanted to talk to her.
12     Q.  Did you go there again to tell her you were being
13 bothered?
14     A.  Yeah.
15     Q.  Did you tell her you were being bothered?
16     A.  She wouldn't let me get it out.
17     Q.  You didn't even get that out?
18     A.  No.
19     Q.  You just walked in the room, and she said, "I know
20 what happened."?
21     A.  No.  I tried to keep telling her, and she tried to
22 keep cutting me off.  And then she just said, "I know what
23 happened."
24     Q.  Did she explain that?
25     A.  No.

Page 104

1      Q.  What did you say?
2      A.  I just looked at her; gave her a blank look and
3  left.
4      Q.  Did you know on the evening of -- the night you
5  were assaulted that K█████ was also assaulted?
6      A.  Yeah.
7      Q.  I don't want to know anything about the details of
8  that one either.  But did you witness it?
9      A.  I seen her from a distance.  She was shaking her
10 head no and going like this (indicating).
11     Q.  Did you and K█████ ever talk about that, that
12 day, between yourselves after that day?
13     A.  No.  I asked her how she felt about it.  She
14 didn't answer me.
15     Q.  Did she ever ask you anything or say anything to
16 you about it, ever?
17     A.  No.
18     Q.  A couple hours ago, you and I started talking
19 about difficulties you had with B███ C█████ before the
20 assault.  And the one I remember right now is I think you
21 said was the first one.  It was in a class where someone was
22 speaking about something or they showed a movie, and they
23 brought -- someone brought two classes together for that to
24 happen.
25     A.  Yeah.

Page 105

1      Q.  And during that session, B███ C█████ said she
2  wanted to fight you.
3      A.  Yeah.
4      Q.  And I think you talked about another occasion.  I
5  think it might have been the cafeteria.  Where she said she
6  was going to get --
7      A.  No.  In the gym room.
8      Q.  The gym room.  But that's the one where you end up
9  going down the stairwell, right?  No, I'm sorry.  You just
10 reminded me what your testimony was.  There were three
11 events you talked about.  One was in the classroom, one in
12 the gym, and the third one was outside the gym, and they
13 push you down the stairwell.  Right?
14     A.  Yeah.
15     Q.  Okay.  In the gym itself, tell me a little more
16 about that.
17     A.  I was sitting on the bleachers, and she said --
18 she was talking -- I saw her talking to these girls and
19 looking at me.  And she was like, I want to give you head up
20 after school; meet me after school.  And I said, well, I got
21 detention.  I didn't -- I didn't really.  I just wanted to
22 get out of that situation.  She's like, well, I'll be here
23 after detention.  And I said okay.  But I went a different
24 way home.  A long way.
25     Q.  All right.  Were those the only three problems you



Page 110

1    A.  Yeah.
2        MR. MARNEN:  Give me a couple minutes, if you
3    would.  I think I'm about done.
4        (Recess held from 2:57 p.m. till 3:12 p.m.)
5    Q.  Ra‖‖, do you remember at some time after the
6    assault, the first assault, being told to leave
7    Miss Scully's class and go see Miss Cappabianca because
8    you --
9    A.  Yes.
10    Q.  -- told someone to stop bothering you?
11    A.  Yeah.
12    Q.  Do you remember that event?
13    A.  Yeah.
14    Q.  And you used some bad language?
15    A.  Yeah.
16    Q.  One of those -- did one of the words you used
17    begin with the letter "F"?
18    A.  Yeah.
19    Q.  Was that after Christmas break?
20    A.  I can't remember.
21    Q.  Did she send you to see Miss Cappabianca or
22    someone else?
23    A.  She gave me a counselor.
24    Q.  Miss Scully sent you to a counselor?
25    A.  Yeah.

Page 111

1    Q.  Which one?
2    A.  The lady that --
3    Q.  You talked to before?
4    A.  Yeah.
5    Q.  Was that the time you talked with the counselor?
6    A.  Yeah.
7    Q.  So you did not see Miss Cappabianca that day, or
8    did you?
9    A.  I think I went to her office.  I don't remember.
10    Q.  Cappabianca's office, you mean?
11    A.  Yeah.
12    Q.  Did you have a conversation with Miss Cappabianca
13    that day?
14    A.  Not that I remember.
15    Q.  Okay.  After the first assault, which you said
16    happened on November 27th, 2001, you said that there were
17    times when B‖‖ C‖‖‖ bothered you.  Right?
18    A.  Yeah.
19    Q.  Did anybody besides B‖‖ C‖‖‖ bother you
20    after the assault?
21    A.  A lot -- practically -- a lot of people.  Like the
22    whole school knew.  And everybody was bothering me.  Like
23    when I walked down the halls.  Some people I didn't even
24    know, they will just start saying stuff to me.
25    Q.  And the kinds of things they were saying, give me

Page 112

1    some idea what they were saying.  I don't want to -- mean to
2    relive all the gory details, but I do to some extent have to
3    do that.
4    A.  Like I heard -- the girls would be like, I heard
5    you gave C‖‖ B‖‖ head.  Or the guys being -- they will
6    be asking me if I would give them head.  If I didn't -- if I
7    would say no, some of them would get mad.
8    Q.  Did anyone after the assault, aside from that
9    incident in the stairwell, physically threaten you?
10    A.  This boy named T‖‖ --
11        K‖‖ L‖‖ A‖‖
12    A.  I can't remember.
13        K‖‖ L‖‖.  That's his real name.  His name is
14    T‖‖
15    Q.  There is an A‖‖ F‖‖  Was he --
16    A.  Not the one that was there that night.
17    Q.  Okay.  Someone else named T‖‖?
18    A.  Yeah.
19    Q.  And not A‖‖ K‖‖ either.
20    A.  No.
21    Q.  The night of the assault, were there two T‖‖
22    there; one A‖‖ one A‖‖
23    A.  Yeah.  One T‖‖ and one A‖‖
24    Q.  Was T‖‖ real name A‖‖ if you know?
25    A.  I don't know.

Page 113

1    Q.  But it was neither one of those guys.
2    A.  No.
3    Q.  It was somebody else.
4    A.  Yeah.
5    Q.  What did he do in the nature of physical -- an
6    attempt to physically assault you?
7    A.  No, he said, if you don't give me head, I'm -- I'm
8    going to get -- I'm going to get B‖‖ to give you head up.
9    Q.  And that was it?
10    A.  Yeah.
11    Q.  All of this bothering you took place during school
12    hours?
13    A.  Yeah.
14    Q.  And when you went to see Miss Cappabianca, I
15    gather those are the kinds of things you were trying to talk
16    to her about, and she would cut you off.
17    A.  Yeah.
18    Q.  I want to move on to the treatment you have
19    received.  But before I do that, I want to ask you about the
20    date of the assault.  You have very clearly testified -- and
21    I respect your testimony -- very clearly testified that it
22    occurred on November 27, 2001.  But if you'll look at
23    Exhibit J, which --
24        MR. OLDS:  That's this one (indicating).
25    Q.  -- which Mr. Olds is showing you, please note that

29 (Pages 110 to 113)

242a

14e5a276-1f6d-4158-8a63-bfab4ddecec4

Richard P., et al. vs Erie School
Held: 4/6/05
Case: 1:03-cv-00096-SJM    Document 7    Multi-Page    Filed 09/28/2005    Page 43 of 50    R. P.

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   RICHARD P., BY AND FOR          )
 3 R___ P., AND DENISE L., BY      )
   AND FOR K___ L.,                )
 4        Plaintiffs               )
 5        vs                       ) Civil
 6 SCHOOL DISTRICT OF THE          )
   CITY OF ERIE, PENNSYLVANIA;     )
 7 JANET WOODS, INDIVIDUALLY       )
   and in her Capacity as Principal )
 8 of Strong Vincent High School;  )
   and LINDA L. CAPPABIANCA,       )
 9 Individually and in her Capacity )
   as Assistant Principal of Strong )
10 Vincent High School,            )
          Defendants               )
11
12
13
14        Deposition of RICHARD P___, taken before
15 and by Linda K. Rogers, Commissioner of Deeds in
16 the Commonwealth of Pennsylvania and Notary Public
17 in the State of New York, on Wednesday, April 6,
18 2005, commencing at 12:38 p.m., at the law offices
19 of Knox, McLaughlin, Gornall & Sennett, 120 West
20 10th Street, Erie, Pennsylvania.
21
22
23
24
25        * * *
```

**Page 2**

```
 1 For the Plaintiffs:
          Edward Olds, Esquire
 2        1007 Mount Royal Boulevard
 3        Pittsburgh, PA 15223
 4
 5 For the Defendants:
          James T. Marnen, Esquire
 6        Knox McLaughlin Gornall & Sennett, PC
          120 West 10th Street
 7        Erie, PA  16501
 8
 9
10
11
12
13
14
15
16
17
18
19              * * *
20
21
22
23
24
25
```

**Page 3**

```
 1        R I C H A R D  P___, first having
 2 been duly sworn, testified as follows:
 3
 4              DIRECT EXAMINATION
 5 BY MR. MARNEN:
 6
 7    Q. Mr. P___ would you state your full name,
 8 please.
 9    A. Richard William P___
10    Q. What is the date of your birth?
11    A. October 25, 1964.
12    Q. Where do you presently reside?
13    A. ___
14
15    Q. How long have you resided there?
16    A. I think about -- well, a year.
17    Q. About a year?
18    A. About a year, yeah.
19    Q. Where did you reside before that?
20    A. ___
21    Q. During what period of time did you reside there?
22    A. Between December -- it was like December, slash,
23 January of 2003.  So it would be 2002, December and 2003,
24 January because we were cross mixing between the move over
25 the holiday season.
```

**Page 4**

```
 1    Q. From that time until about a year ago?
 2    A. That's correct.
 3    Q. Before East 10th Street?
 4    A. Before East 10th Street?
 5    Q. Yes.
 6    A. It was 1205 West 8th Street, that was also in
 7 Erie.
 8    Q. What was the period of time when you lived there?
 9    A. From, I want to say, March of 2001 to, again, it
10 was, slash, December.
11    Q. Of '02 or January '03?
12    A. Right.
13    Q. Did you live in Arizona before then?
14    A. Yes.  Mesa.
15    Q. Mesa, Arizona?
16    A. Um-hmm.
17    Q. And how long were you in Arizona?
18    A. I'm thinking we were there for two years.
19    Q. Before Arizona were you living in Erie?
20    A. That's correct, yes.
21    Q. Where did you live in Erie?
22    A. 1914 Linwood Avenue.
23    Q. 1914 Linwood?
24    A. Yes. L-I-N-W-O-O-D, Avenue.
25    Q. How long did you live there?
```

1  A. Miss Cappabianca had called me up and said R.
2  was being dirty and filthy. She was being a filthy little
3  girl and she needed to be disciplined, and you need to come
4  down and get her now.
5  Q. Did you come down immediately?
6  A. Within about 15 minutes.
7  Q. So the telephone call was made in the morning of
8  January, whatever that date was?
9  A. Yes.
10  Q. You were at the school in 15 minutes?
11  A. Within 15 minutes, it's just a couple blocks up.
12  Q. During the telephone conversation did she say
13  anything beside R. is a filthy little girl, you need to
14  come down and get her now?
15  A. And she said she needed to be disciplined.
16  Q. Did she say anything besides those things?
17  A. No.
18  Q. So did you walk down, drive down?
19  A. I drove.
20  Q. Were you alone in the car -- were you alone?
21  A. Yes.
22  Q. Did Miss Cappabianca tell you where to meet her?
23  A. I just went to the front office.
24  Q. Was Miss Cappabianca in that complex of the front
25  office?

Page 17

1  A. Yes.
2  Q. And was this meeting in an office within that
3  administrative office?
4  A. There was -- inside the office when you go in the
5  main doors when you come up, I think it's off to the left.
6  There is a big office area. I went up to the front desk and
7  I asked to speak to Miss Cappabianca, and she actually met
8  me part way out.
9  Q. Was she on the other side of this counter or this
10  front desk?
11  A. She was in another room near the -- there is the
12  secretary over here, and then there's the PA system, and she
13  was back behind like another office room.
14  Q. She came out and met you?
15  A. Yes.
16  Q. This is at the desk, front desk, is that like -- I
17  have heard the word counter, is that the right word for
18  that?
19  A. It was a counter, yes.
20  Q. It's something that's solid all the way to the
21  floor and it's long?
22  A. Yeah.
23  Q. And after she greeted you at that counter -- is
24  that what she did?
25  A. We went back in the office and she said --

Page 18

1  Q. She led you back to some other office?
2  A. Right behind -- as you go into the counter there's
3  a little thing you can walk back in there. We went back
4  there, and she said R. needs to go home.
5  Q. When she told you that, was a door to the room
6  closed?
7  A. I don't remember that, no.
8  Q. In the room was Linda Cappabianca, R. you and
9  some other people you can't identify?
10  A. No, not in that room.
11  Q. Oh. In that room who was there?
12  A. Just myself, R. and Miss Cappabianca.
13  Q. All right. She said that R. must go home?
14  A. She said she needs to go home.
15  Q. Did she say anything else?
16  A. Just repeated what she told me on the phone. She
17  needs to suck it up, ignore it. And she's got a dirty,
18  filthy little mouth. I started yelling at R. in the
19  room as we were walking out towards the main office area.
20  Q. Did you ask Miss Cappabianca what she was talking
21  about, why she was saying that R. was a filthy little
22  girl and needs to suck it up?
23  A. Yes.
24  Q. Tell me, as best you remember, the words you used
25  when you made that inquiry.

Page 19

1  A. Best I can remember she was talking -- she said
2  something about R. being -- talking about sucking dick.
3  THE WITNESS: Can I say that?
4  Q. If you are quoting, go ahead and say it.
5  MR. OLDS: This is a court record, you can say
6  that.
7  (Discussion held off the record.)
8  Q. Are you quoting Linda Cappabianca?
9  A. Yes.
10  Q. Linda Cappabianca -- would you please repeat that,
11  I'm sorry, I'm not being --
12  A. She said R. was sucking dick. Said that
13  R. had talked about sucking dick.
14  Q. Did it go any further than that; did you ask more
15  questions; did she give you more details?
16  A. No. I told her that's out of R. context,
17  that she doesn't normally talk like that or anything of that
18  nature. I started yelling at R. though, because I just
19  took it at her face value what R. was saying.
20  Q. Did you get the impression that Linda Cappabianca
21  was talking about R. actually performing this act on
22  other people or was she simply talking about the act as an
23  act that people perform in general?
24  A. I'm sorry, repeat that, please.
25  Q. In your mind was she accusing R. of talking

Page 20



Richard P., et al, vs Erie School
Held: 4/6/05
Case 1:03-cv-00390-SJM   Document 7  Multi-Page  09/28/2005   Page 45 of 50   R. P.

Page 21

```
 1   about R___ performing this act on other people?
 2      A.  Yeah.
 3      MR. OLDS:  Do you understand the question?  What
 4   he is asking is --
 5      MR. MARNEN:  I am trying to be polite.
 6      MR. OLDS:  What he is asking you is was she saying
 7   that R___ was talking about it or was she saying
 8   that R___ was describing what she was doing?
 9      That's your question, right?
10      Q.  Was she accusing R___ of sucking dicks?
11      A.  Was she accusing her?
12      Q.  Yes.  Or was she accusing R___ only about
13   talking about doing that?
14      A.  No, she said R___ had talked about that.
15      Q.  When R___ talked about it, did she talk about
16   R___ doing it or talking about was she talking about it in
17   general?
18      A.  In general.
19      Q.  Okay.  If you know, was she trying to quote what
20   R___ said or was that language she selected on her own,
21   Linda Cappabianca?
22      A.  In all fairness I can't answer that question
23   truthfully because I don't know how her perception is.
24      Q.  Did you ask Linda Cappabianca where R___ said
25   this?
```

Page 22

```
 1      A.  I'm not sure I follow that question.
 2      Q.  Did you ask whether it happened in gym class or at
 3   cafeteria or in the hallway or in assembly?
 4      A.  No.  I didn't ask anything like that, no.
 5      Q.  Did you ask her who she was talking about this sex
 6   act with and under what circumstances?
 7      A.  No.  Not at that time, no.
 8      Q.  So you began you said yelling at R___?
 9      A.  That's correct.
10      Q.  Yelling what?
11      A.  I don't remember exactly what I was yelling.  I
12   mean, just kind of just bawled her out.  I don't remember
13   exactly how -- like how could you say such things, that type
14   of thing.  I don't understand what's going on in your mind,
15   that type of -- I yelled at her.
16      Q.  Did she give you a response?
17      A.  No, she just cried.
18      Q.  Did you then leave with R___ leave the school?
19      A.  Yes.
20      Q.  And drove R___ home?
21      A.  Yes.
22      Q.  When you got home, did you discuss the subject any
23   further?
24      A.  No.  R___ took a shower.
25      Q.  After she finished taking a shower did you
```

Page 23

```
 1   interrogate her on what Cappabianca was talking about?
 2      A.  No.
 3      Q.  Is that the last that was ever discussed about
 4   that subject that day, about the accusation that R___ was
 5   saying such things?
 6      A.  I don't know how to approach that.  I mean, it was
 7   something, you know what I mean, I didn't know how to
 8   communicate with her.  She was upset, obviously I was angry,
 9   you know, I didn't know how to approach it.
10      Q.  So you let it go?
11      A.  Not really let it go.  I wouldn't say let it go.
12   I mean, I just sort of talked to my mom.
13      Q.  For advice?
14      A.  Um-hmm.
15      Q.  Did she give you some advice?
16      A.  All my mom had to tell me was you need to really
17   just put your arms around her and tell her you love her and
18   everything is going to be okay, you know.
19      Q.  By this time you were unaware of the sexual
20   assault that took place near the laundromat?
21      A.  No.
22      Q.  You were not aware of it, right?
23      A.  No, I was not.
24      Q.  So as far as you knew that day all Linda
25   Cappabianca was talking about was R___ using bad language
```

Page 24

```
 1   in school; am I understanding this correctly?
 2      A.  That's correct.
 3      Q.  Was this a new thing to you, R___ using language
 4   like that?
 5      A.  Yes.
 6      Q.  So you were surprised?
 7      A.  Shocked.
 8      Q.  Shocked.  And you got advice from your mother to
 9   give R___ a little bit of love essentially, right?
10      A.  Yes.
11      Q.  You did?
12      A.  Yeah.
13      Q.  Did you gently question R___ thereafter as to
14   why she was using language like that?
15      A.  She said that everybody just won't leave her
16   alone.
17      Q.  R___ -- you did follow up with R___ and she
18   said people wouldn't leave her alone?
19      A.  Um-hmm.
20      Q.  Is this before the meeting with Miss Woods on the
21   steps of Strong Vincent on January 9 that Rachel told you
22   kids wouldn't leave her alone?
23      A.  She said -- how can I put this to be truthful.  I
24   don't -- she would just -- she told us -- I don't really --
25   I can't remember how it was that she placed herself.  She
```



1 meeting with Linda Cappabianca, did you discuss with Linda
2 Cappabianca the issue of whether students were bothering
3 R████?
4    A. No, because I had no reason. As far as I was
5 concerned R████ had always been a really good person as far
6 as being a really well behaved child, and she was always
7 well liked in school, that never come across to me.
8    Q. Let me point out to you that the third paragraph,
9 second page of Exhibit K, the fourth line down.
10    A. Um-hmm.
11    Q. I said, what do you think needs to be done. And
12 she said, well, she is a very dirty little girl. And I told
13 R████ that if people are picking on you, R████ needs to
14 suck it up and ignore it.
15    A. That's correct.
16    Q. Did you discuss with Cappabianca on November 30,
17 2001 students picking on R████?
18    A. Well, not really discussed it but she said, I told
19 R████ and she went (verbal noise), suck it up and ignore it
20 and that's how she expressed it.
21    Q. At any time prior to November 30, 2001 did R████
22 ever tell you the kids were picking on her?
23    A. No.
24    Q. This is the first time you ever heard that?
25    A. Yes.

Page 41

1    Q. Did you ask R████ what Cappabianca was talking
2 about?
3    A. Trying to think. I just bawled her out, I mean --
4    Q. You bawled her out for using the dirty language?
5    A. Yes, because it was not in her context nature.
6 She just wasn't like that. We didn't practice any kind of
7 bad language in our home, so it was really out of her nature
8 to be like that.
9    Q. If you move on in that November 30, 2001 entry,
10 right after the entry, suck it up, ignore it; do you see
11 that right there?
12    A. Yes.
13    Q. It says R████ was given four days P.A.S.S. On
14 the fourth day she was sent home because everyone was
15 harassing her about sucking dicks and asking to fuck her.
16    A. That's correct.
17    Q. R████ was feeling very overwhelmed. She got
18 really mad and left, this would be approximately December 7,
19 2001, right?
20    A. Yeah.
21    Q. Did R████ tell you that, that everyone was
22 harassing her about sucking dicks and asking her to fuck her
23 on December 7, 2001?
24    A. Yes, yes.
25    Q. When R████ told you that, did you contact anybody

Page 42

1 at the school!?
2    A. No.
3    Q. Why not?
4    A. Because I felt they would have been aware of it
5 already. Every time R████ would go back it didn't seem
6 like anything was getting done. In my opinion, I think the
7 Strong Vincent kids were kind of ruly (sic).
8    Q. I'm sorry?
9    A. They were unruly, they weren't very nice.
10    Q. Well, when you found out about kids doing this and
11 saying this to her, you didn't call up anybody at the school
12 to complain about their doing nothing about it?
13    A. I don't recall ever doing it, no.
14    Q. Did R████ say she had told Linda Cappabianca
15 about that?
16    A. She said she tried several times and she was
17 always cutoff.
18    MR. OLDS: Can I -- I want to make this -- clarify
19    this a little bit. Because I don't know if
20    he's -- it's your deposition -- but I don't
21    know whether he's talking about conversations that
22    he had with R████ in December 2001 or
23    conversations that he had later.
24    MR. MARNEN: Your point is well taken, I don't
25    know that either.

Page 43

1    MR. OLDS: I think you should clarify that because
2    it is not clear.
3    Q. Okay. I am trying to focus on November 30, 2001,
4 you may be moving ahead. I don't know.
5    A. Okay.
6    Q. Let's focus on November 30 -- actually between
7 November 30, 2001 and December 7, 2001. First week in
8 December 2001.
9    MR. OLDS: He wants to know what R████ told you
10    that week. What you knew that week as opposed to
11    what you learned about it later on and then wrote
12    what happened that week.
13    A. R████ said people had been picking on her,
14 harassing her. And I told her, look, I said, at the time I
15 didn't know the heavy extent of what was going on because, I
16 mean -- I told her if you just let things go people will
17 stop. I said, but if you really feel strongly about it, you
18 need to go back and tell the proper people, like the
19 principal, vice principal.
20    Q. Did you know in the first week of December of 2001
21 that kids were saying to R████ they wanted her to suck
22 their dicks and they wanted to fuck her?
23    A. Not at that time, no.
24    Q. When did you first learn that?
25    A. I learned about that after I had sat down with

Page 44

246a

**Page 53**

1    Q. Did R▮▮ get a drink of water?
2    A. Yes, they went up to get a drink of water.
3    Q. Any conversation after R▮▮ walked out of the
4  room to get water?
5    A. Yes.
6    Q. Who walked out, Miss Woods and R▮▮?
7    A. Yes.
8    Q. And that left you and Chris Rule and the counselor
9  there?
10   A. Yes.  The counsel she didn't stay in the room or
11  the office.  She didn't stay there for very long.
12   Q. You and Chris Rule were alone?
13   ʹA. Yes.
14   Q. What conversation, if any, took place between the
15  two of you?
16   A. He gave me kind of a casual smile.  He said, you
17  know, kids give blow jobs like adults give handshakes these
18  days.  It's really nothing to think about.  I'm like, not my
19  daughter.
20   Q. Is that a quote?
21   A. Yes.
22   Q. Did you say to him, not my daughter?
23   A. Yes, I did.
24   Q. What did he say?
25   A. He told me I just needed to relax and let things

**Page 54**

1  take its course.  He said everything will workout.
2    Q. Okay.  Was that it between you and Rule?
3    A. Yeah.
4    Q. Did Woods and R▮▮ come back?
5    A. Yeah.
6    Q. What happened then?
7    A. Well, R▮▮ refused to talk about it at any
8  further length.  She didn't want to say anything more.  I
9  asked Miss Woods, well, have you gone to the police about
10  it.  And she had said, no, that there was no police
11  involvement at this time.  And I asked her should I go to
12  the media or something.  I wasn't sure what to do and she
13  told me basically to keep my mouth shut.
14   Q. Why did you suggest the possibility of going to
15  the media?
16   A. Looking back on that I just thought some kind of
17  outlet.  I was angry.
18   Q. You wanted the media to know your daughter's been
19  raped?
20   A. No, not that, no.  I just wanted -- I just
21  wanted -- maybe looking back on it I was just so angry.
22   Q. Were you angry in that meeting?
23   A. I was irritated.
24   Q. What were you angry about?
25   A. I was angry at a lot of things.

**Page 55**

1    Q. Were you angry at Miss Woods?
2    A. Yeah, I was.
3    Q. Why were you angry at her?
4    A. Because I felt that she probably had some
5  knowledge of it.
6    Q. You thought she had probably had some knowledge of
7  it?
8    A. Of the incident.
9    Q. Did she tell you she did?
10   A. No.  But her response was to me, are you ready for
11  this, and then she said R▮▮ has been sucking dicks.
12   Q. Was anything said in that meeting about changing
13  Rachel's school placement?
14   A. Yes.  She had said R▮▮ would not be finishing
15  school here that she'd be going to Sarah Reed.
16   Q. Did Woods bring that subject up or did you bring
17  it up?
18   A. No, I did not bring it up.
19   Q. You didn't ask Miss Woods if R▮▮ placement
20  could be changed?
21   A. No.
22   Q. Miss Woods then just announced to you that
23  R▮▮ placement would be changed to Sarah Reed?
24   A. Would be changed, and that she would be going to
25  Sarah Reed.

**Page 56**

1    Q. What did you say in response to that?
2    A. I asked her why.  I mean, because Sarah Reed, in
3  my opinion, was for kids with mental disturbances.  My
4  daughter's not mentally disturbed, at least she wasn't.
5    Q. Did you tell Miss Woods you objected to R▮▮
6  being placed at Sarah Reed?
7    A. No.
8    Q. Why did you not object then?
9    A. At that point?
10   Q. Yes.
11   A. At that time I just wanted time to think about
12  things and get thing together, my thoughts together.
13   Q. Did you ever object to the placement at Sarah
14  Reed?
15   A. At one point, yes, I did.
16   Q. When did that happen?
17   A. When Mr. Rogers came over.
18   Q. That was when R▮▮ was in home school?
19   A. She was being tutored, or supposed to be tutored.
20   Q. When did her home schooling begin, do you
21  remember?
22   A. I don't.  It was sometime in January, but I don't
23  remember the exact.
24   Q. We don't need to go over exact dates, I guess.
25  That was about a week, wasn't it, four or five days?


247a

**Page 57**

1  A. Yes, it was a very short period of time.
2  Q. R█████ never went back to school, did she, after
3 the meeting with Woods?
4  A. No, she did not.
5  Q. She went right from Strong Vincent --
6  A. To Sarah Reed.
7  Q. Let me see if I can shorten this up a little bit.
8 As I understand it, you tell me if I'm wrong, you took
9 R█████ home that day and Rachel was never in Strong Vincent
10 again during seventh grade?
11  A. During seventh grade, no.
12  Q. Is that right?
13  A. That's correct.
14  Q. The next place she went to get school was at home
15 for about a week?
16  A. That's correct.
17  Q. Then after that it was Sarah Reed for a couple
18 months?
19  A. That's correct.
20  Q. Until the school ended that year?
21  A. That's correct.
22  Q. At some point, however, you objected to R█████
23 going to Sarah Reed?
24  A. I voiced my opinion.
25  Q. I'm sorry, I interrupted you. I'm trying to move

**Page 58**

1 quickly and I was rude. You voiced your opinion to whom?
2  A. To Mr. Rogers, I said I don't understand why she
3 has to go there.
4  Q. Mr. Rogers was the home school guy?
5  A. He was the home school teacher, tutor.
6  Q. Home school tutor?
7  A. Yes.
8  Q. So while Mr. Rogers was in there one day you said
9 to him, I don't know why she has to go there?
10  A. Yes, I did tell him that.
11  Q. Did you go further than that? What else did you
12 say, if anything?
13  A. No. His visits were extremely short, they didn't
14 last very long.
15  Q. Did he respond to that?
16  A. He said he is -- he said he was not aware of the
17 incident and not he's not at liberty to discuss it either.
18  Q. Was there an IEP meeting concerning R█████
19 placement at Sarah Reed?
20  A. We had a meeting in Sarah Reed, but there wasn't
21 an IEP prior to that that I remember of.
22  Q. That was an intake meeting for Sarah Reed?
23  A. I think that was on January 25 -- yes.
24  Q. R█████ had an IEP, did she not?
25  A. She had a prior IEP, yes.

**Page 59**

1  Q. Right. And wasn't that amended to get her into
2 Sarah Reed?
3  A. That I don't know.
4  Q. Did you ever in objecting to the Sarah Reed
5 placement ever voice that objection in any way besides
6 telling Mr. Rogers you had a problem with it?
7  A. What do you mean, like to other people?
8  Q. Yes, to other people or did you write a letter or
9 did you tell anybody on the telephone or any way?
10  A. I told the people when she got into Sarah Reed, I
11 told these people I don't understand why. I said, she's
12 here because Miss Woods said she's going here for her
13 safety. I said, I don't understand why my child is being
14 placed here when the people that did this are still in the
15 school.
16  Q. You said this to the Sarah Reed people?
17  A. Yes, I did.
18  Q. Was this during the intake?
19  A. I think it was. I think it was not really at the
20 intake, but there was one of the meetings that we had there.
21 In the beginning R█████ was not very cooperative with Sarah
22 Reed.
23  Q. Have you in the past, not this change of
24 placement, but have you before that ever participated in an
25 IEP team meeting regarding R█████

**Page 60**

1  A. Just about every school year she's had.
2  Q. You were invited, weren't you, as a parent?
3  A. Yes.
4  Q. So you had gone to IEP team meetings before
5 January of '02 concerning R█████?
6  A. Yeah, I believe so.
7  Q. Each time there was a placement or an IEP that was
8 prepared regarding R█████, did you sign off on that saying
9 you consented to it?
10  A. I never signed off. I don't believe I signed off
11 on anything for her to go to Sarah Reed.
12  Q. I don't mean that, I mean before Sarah Reed.
13  A. I am lost.
14  Q. Over the years there were IEP's concerning R█████
15 were there not?
16  A. Yes.
17  Q. And each time you had a new IEP you were asked to
18 sign on it to consent to it, were you not?
19  A. Yes.
20  Q. And in the past you personally had signed your
21 consent to IEP's that R█████ had?
22  A. Correct.
23  Q. This time, this change of placement to Sarah Reed,
24 you're telling me you don't remember there being any consent
25 form given to you to consent or not consent to that

248a

**Page 61**

1 placement?

2   A. No.

3   Q. You don't remember?

4   A. I don't remember. Because -- well, go ahead.

5   Q. Okay. Did you in the past ever object to an IEP

6 that was formulated for R...?

7   A. Object to it?

8   Q. Yes.

9   A. Not before, no.

10   Q. Did you understand there was a formal procedure

11 for objecting to an IEP concerning your child?

12   A. I think it's something like a -- it was my

13 understanding it was some kind of -- I don't want to say

14 hearing.

15   Q. Due process?

16   A. Pardon me?

17   Q. A due process hearing?

18   A. I think that's what it was called.

19   Q. You were aware of that process?

20   A. Yes. Well, I am not really fully aware of it

21 because I never went through it before.

22   Q. Right. Did you know, though, that if you objected

23 to an IEP you would end up with a due process hearing?

24   A. It wasn't fully explained to me that way, but I am

25 assuming that that's probably correct.

**Page 62**

1   Q. If I understand you correctly, you did not ask for

2 a due process hearing concerning R... placement at Sarah

3 Reed in 2002?

4   A. That's correct, I did not.

5   Q. Did Miss Woods explain to you what she meant by

6 getting R... into Sarah Reed for her own safety?

7   A. Well, yeah. She said because -- she said that

8 B... was -- and she used a paraphrase, B...s one bad

9 little mother. She's just bad. She's a very bad kid. And

10 she said G... B... has a long history of being bad too.

11 And she said given the fact of what happened to her, she

12 said, I think we need to remove her for her safety.

13   Q. Did Miss Woods says anything about R... going to

14 Sarah Reed so she could receive more treatment than she

15 could receive at Strong Vincent?

16   A. No. She didn't put it that way, no.

17   Q. Did Miss Woods tell you that anybody besides

18 C... B... and B... C... were bothering R...?

19   A. She said there was another person, and I believe

20 she used his name, A... F... is the way she put it.

21 I understood his name was T... because that's what R...

22 had called him.

23   Q. I am trying to distinguish now between the rape,

24 and that's what it was was a rape.

25   A. Yes, it was.

**Page 63**

1   Q. I am trying to distinguish between the rape and

2 any harassment that happened after the rape. Okay?

3   A. Okay.

4   Q. Anybody to your knowledge harassing R... after

5 the rape besides C..., B... and F...?

6   A. I personally saw an individual at the meeting. I

7 can't remember the exact significance. I think we were

8 going down to the cafeteria. Mr. Rule asked us if we were

9 hungry. I am always willing to take a little break to eat

10 if someone offers it to me. I said, okay, and we went down

11 there. It was me, R... and Chris Rule and we walked down

12 to the cafeteria. He had gotten us a free meal ticket so we

13 could get something to eat. Before we got into the

14 cafeteria, I don't know who the kid was, it was a black male

15 and he walked up and said something kind of nasty to R...

16 but I couldn't make out what he was saying. It was kind of

17 like, you know, snap attitude type. He smacked her on the

18 hind end. And he did it right in front of me and he did it

19 in front of Chris Rule.

20   I said to Chris -- or Mr. Rule, I said, are you

21 going to say anything to this kid because this is why you

22 have a problem. And he said, oh, see me after school. The

23 kid's like yeah, yeah, yeah, and blew him off. He didn't

24 get the kid's name, he didn't -- and so we -- he said, I got

25 to go and talk to someone, I will be right back. We sat and

**Page 64**

1 we ate and I couldn't make out what people were saying, but

2 I could tell they were saying something derogatory in our

3 direction.

4   And then Chris Rule had come back and said we are

5 not going to continue on with the meeting upstairs, we are

6 done for the day and you can take R... home with you. And

7 that's when I took her home. I met with Miss Cappabianca in

8 the hallway, and I said that we were going -- that R...

9 was going to be referred to Sarah Reed for her safety. So I

10 witnessed people harassing her even when I was there. They

11 were blatant.

12   Q. Did anything happen that day besides the two

13 incidents you mentioned, the talking in the cafeteria and

14 the student touching her and saying something to her?

15   A. That day?

16   Q. Yes.

17   A. No, not that I remember.

18   Q. Are you aware of any other harassing of R... at

19 Strong Vincent after the rape besides what you saw that day

20 and besides the two instances that are recounted in the

21 police report, the water fountain thing and the incident

22 over there at the laundromat?

23   A. I know now. I know now that there were other

24 instances as far as like people wanted her to -- make

25 derogatory statements to her about giving head. And at one

1 point she got really mad in a classroom. I'm not sure which
2 classroom it was, but she used profanity and she was sent
3 down, I believe -- I think it was Miss Cap's office and she
4 was given P.A.S.S. for the profanity. I mean it was from
5 when she -- I'll be jumping ahead of myself if I say that,
6 though.
7         There was an incident when she had went back to
8 Strong Vincent in the eighth grade year. She was arrested
9 for the assault on the police officer for hitting him with
10 the handcuffs. The officer told me that she was very well
11 behaved up until she got by the auditorium where he said a
12 group of black individuals had made some sexual comments to
13 her, and that's when she lost it. He said, I don't think
14 she would have gotten out of control if those black kids
15 hadn't made the comments that they made to her.
16    Q. What was the name of that police officer?
17    A. I don't know. He was the one that worked at the
18 school at the office. I can't remember his name.
19    Q. There were two there.
20    A. Pardon me?
21    Q. There were two there, I'll throw out the names.
22 Slupski and Love -- Slupski and Love?
23    A. Slupski sounds --
24    Q. Slupski is white and Love is black.
25    A. The white one, yeah. What happened was, and I

Page 65

1 didn't want to sound rude and arrogant, but I said, look --
2 because he was reluctant to press charges against R       for
3 throwing the handcuffs at her (sic). I said, look, if we
4 don't do something with her now, because she's so off
5 balance, she needs to be taken care of where she gets some
6 kind of psychiatric help. I said, I can't get her involved
7 with these types of therapies unless I get some kind of
8 help. And with that I said, look, if you have to press
9 charges against her, do so, but we can get her some help
10 that way and that's what happened.
11    Q. When Janet Woods told you on January 10, 2001 that
12 R       needed to get out of Strong Vincent for her own
13 safety, did she only mention threats from B       C       and
14 C       B       or did she mention threats from other people
15 too?
16    A. No. She only mentioned the assailants.
17    Q. So your understanding was the safety issue related
18 to B       C       and C       B       ?
19    A. That was my understanding, yes, that's my
20 understanding.
21    Q. On your way out of that meeting -- well, I'm
22 sorry. Chris Rule took you downstairs to the cafeteria to
23 have some food?
24    A. Yes.
25    Q. Did you run into Cappabianca on the way out of the

Page 66

1 building?
2    A. No. I ran into her, if I remember correctly, I
3 think maybe it might have been on our way out of the
4 building. I can't remember exactly when.
5    Q. That meeting is mentioned I gather --
6    A. It was mentioned, but I can't remember the exact
7 time.
8    Q. If you look at Exhibit K, it's on the fourth page,
9 first paragraph.
10    A. Okay. Which paragraph?
11    Q. First paragraph of the fourth page.
12    A. Okay.
13    Q. Is that it?
14    A. Yeah, that's what I'm talking about right there.
15    Q. You're essentially saying in there that
16 Cappabianca admitted to you that she knew about the rape,
17 she knew about the allegations of rape but did nothing about
18 them because it wasn't verified; is that basically it?
19    A. That's correct. She had said she didn't -- there
20 was no proof it ever existed or happened, it was just
21 basically one word of a child. But I was always taught,
22 even when I worked at DBC, if someone reports any kind of
23 sexual assault or any kind of allegation it's to be
24 investigated.
25    Q. Did Miss Cappabianca tell you when she first

Page 67

1 became aware of the allegation that R       had been raped?
2    A. Did she tell me exactly what -- she said she had
3 known about it for quite some time.
4    Q. Is that what she told you?
5    A. She said she knew about it for a while.
6    Q. What words did she use as best you remember?
7    A. Best I remember?
8    Q. Yes.
9    A. I will make sure I say it correctly. She said she
10 has known about this. If I remember correctly, it's been so
11 long, she's known about this for a while. That's all I can
12 remember, I can't quite remember.
13    Q. Let me just follow up a little bit. Did she say
14 whether she had known about it since before Christmas or
15 after Christmas?
16    A. Well, she said she'd known about it since early
17 onset.
18    Q. Early on?
19    A. Like I assume that means from November. She's
20 known about it -- she said R       had come to her and would
21 tell her about situations, but at that time she didn't
22 really go into detail of situations that R       had talked
23 about.
24    Q. R       told you, and it's in this Exhibit 17, that
25 two days after the rape R       told Cappabianca what

Page 68

2500a