**Page 69**

1 happened, correct?
2    A. That's correct.
3    Q. Did Cappabianca admit that on November 28, 2001
4 R___ told her that?
5    A. She admitted that she knew about it prior to this
6 meeting. And she also admitted that she had known about it
7 for quite some time.
8    Q. She didn't give you a date?
9    A. She did not give me a date.
10    Q. Did she give you a month?
11    A. No.
12    Q. Did you get angry when she told you that?
13    A. Yeah.
14    Q. What did you say?
15    A. I said, well, if you've known about this since
16 November 27th, and that's the word I used, I said, why would
17 you not take an initiative to do something or at least call
18 me and then maybe we could have sat down and done something.
19 Something that serious needs to be taken care of.
20    Q. Her response was?
21    A. She said you can't take the word based on one
22 child. She said, kids all the time make up stories when
23 they do things. She said, there was no proof based on what
24 she said happened. But I said, even if there's no proof,
25 even if my child was lying, you know. Hypothetical let's

**Page 70**

1 say she was lying, you're still supposed to do something as
2 far as taking the initiative.
3    Q. Like tell the police?
4    A. Pardon me?
5    Q. Like tell the police?
6    A. Yeah, or call children's services or something or
7 at the very least call me and tell me because I would have
8 went right down there in a heartbeat to talk to her. I
9 would have been right down in a heartbeat.
10    Q. Did you at some point in time ask anybody at
11 Strong Vincent to make R___ the subject of the S-A-P team?
12    A. Huh? I'm not sure I understand what that is.
13    Q. Do you know what the S-A-P team is? The student
14 assistant program team?
15    A. Yeah.
16    Q. Chris Rule talked about it today.
17    A. Honestly, to be truthful with you, I really didn't
18 hear half of what he said.
19    Q. Well, do you know what S-A-P means?
20    A. No, I'm sorry.
21    Q. Have you heard the term before, S-A-P or SAP?
22    A. No, not that I remember of anyway.
23    Q. Have you heard of the term student assistance
24 program?
25    A. Yes.

**Page 71**

1    Q. When did you first hear about that?
2    A. Hard to remember where I heard that from. I
3 always thought the student assistance program was like when
4 you get involved with a kid that wanted to go on into
5 college and that, that's what I thought.
6    Q. Did R___ have any relationship at all with Chris
7 Rule before January 10, 2002?
8    A. I don't believe so.
9    Q. What I mean by relationship is whether she saw him
10 as a counselor.
11    A. I can't 100 percent -- I don't believe so.
12    Q. You have no knowledge?
13    A. I have no knowledge of it.
14    Q. The first time you ever met Chris Rule was
15 January 10, 2002?
16    A. Yeah. It was for a very brief time.
17    Q. Did you ever see Chris Rule after that day?
18    A. I don't believe so. I can't remember. I don't
19 think so.
20    Q. Mr. P___, please go to Exhibit K, specifically
21 Page 4, first paragraph. The pages aren't numbered
22 unfortunately.
23      MR. OLDS: That's the one that begins with January
24      10th?
25      MR. MARNEN: January 10.

**Page 72**

1    Q. If you go down to the very bottom of that. You've
2 taken R___, and I am going to read it to you. Third line
3 up from the bottom, R___ was in her room but said not much
4 of anything. I had a long talk with my wife, and we both
5 felt like it was our fault. We felt we should have done
6 something. If only I had come there earlier, the blame
7 game. That night I recalled the whole conversation over
8 again. I couldn't sleep, I cried. Okay?
9    A. Yes.
10    Q. Why did you both feel it was your fault?
11    A. It was more like a guilt feeling, you know,
12 because the day that I picked up R___ on the 27th we were
13 all supposed to go to a family movie. And my little girl
14 Mi___, we were having difficulty finding her clothes.
15 And so we were kind of consequently late picking R___ up.
16 And looking back on it, you know, if we had maybe laid out
17 her clothes a little bit early, if we had, you know, maybe
18 perhaps down something differently where we wouldn't have
19 been late picking her up this might never had happened.
20    Q. You are talking now about the day of the rape?
21    A. On November 27th, yes.
22    Q. Was your only job at that time a crossing guard
23 for the school district -- I'm sorry, for the police
24 department on November 27, 2001?
25    A. Yes.



**Page 85**

1  involved with it. I wasn't sure exactly. It made perfect
2  sense to me.
3      Q. So R____ was interviewed by Pamela Barber?
4      A. Yes.
5      Q. In the company of you and --
6      A. Detective Green.
7      Q. -- Stanley Green?
8      A. Yes.
9      Q. While that interview was going on you received a
10 cell phone telephone call from Jan Woods?
11     A. Correct.
12     Q. The content of that conversation is recounted on
13 Exhibit K on the page we are on?
14     A. Yes.
15         MR. MARNEN: Off the record.
16         (Discussion held off the record.)
17         MR. OLDS: While you were gone there was a
18         discussion, and he might need to change part of
19         his testimony.
20     Q. Go ahead. What part?
21     A. My daughter she said I didn't pick her up on the
22 27th. I picked her up on the second incident that happened.
23 So these times and dates it's so hard to remember.
24     Q. R____ did testify, I just read her deposition
25 recently, that she walked home the night of the rape.

**Page 86**

1      A. Right. She said, dad, no, you didn't pick me up,
2  you picked me up on the second incident.
3      Q. Okay.
4      A. I made an error.
5      Q. Fair enough. I understand, that happens. Well, I
6  think we were at R____ was being interviewed by Detective
7  Barber, whose first name is now escaping me.
8      A. Pamela.
9      Q. Pamela Barber, and you were there and Green was
10 there, right?
11     A. That's correct.
12     Q. You received a phone call from Jan Woods on your
13 cell phone.
14     A. Yes.
15     Q. Just go to Exhibit K, tell you what, give me your
16 copy of your Exhibit K and I am going to put some page
17 numbers on it.
18         (Brief pause.)
19     Q. I have handwritten on that exhibit pages one
20 through nine, I think. I am going to do the same thing to
21 my copy. Page 4.
22     A. Okay.
23     Q. You were recounting the telephone conversation in
24 the third paragraph of Page 4, were you not?
25     A. Yes.

**Page 87**

1      Q. With Jan Woods, right?
2      A. Yes.
3      Q. And was it your understanding based on that
4  conversation that Janet Woods had not yet contacted the
5  police?
6      A. That was any understanding, yes.
7      Q. Did you believe at that point in time that she had
8  no intention of contacting the police?
9      A. At that time, you mean?
10     Q. Yes.
11     A. I figured she probably would.
12     Q. Did Janet Woods say in that conversation that
13 there were police at Strong Vincent that day interviewing
14 people?
15     A. No, she didn't tell me.
16     Q. On January 10 or at any time after January 10 up
17 until the time you have this conversation with Janet Woods
18 on the morning of January 11, so between the meeting with
19 Woods on the morning of the 10th and the telephone
20 conversation with Woods on the morning of the 11th, did
21 anybody from Strong Vincent or anybody from the school
22 district tell you that they wanted to interview R____ that
23 the police wanted to interview R____.
24     A. From the school district?
25     Q. Yes.

**Page 88**

1      A. No. I went down there and detective --
2      Q. Did anybody from the school district tell you
3  during that period of time that the police wanted to
4  interview R____
5      A. May I make a footnote here?
6      Q. Sure.
7      A. When you ask me questions, could you keep the
8  paper down so I can see your mouth?
9      Q. I'm sorry.
10     A. I didn't want to be rude and say anything.
11     Q. You read lips. So keep my hand away from my face.
12     A. I'm trying to lean this way.
13     Q. I will ask you again.
14     A. Thank you.
15     Q. Between the time you met with Janet Woods on the
16 10th and the time that she had called you on the 11the when
17 you and R____ were being interviewed by the police at the
18 police station, during that roughly 24-hour period, did
19 anybody from the school district tell you that the police
20 wanted to interview R____ at Strong Vincent?
21     A. No.
22     Q. Okay. The next entry on Exhibit K on Page 4 is an
23 entry dated January 15, 2002 and that's about R____ I am
24 going to read it. R____ friend named T____ had come over
25 to our place and said, I can't hang with R____ anymore

**Page 89**

1 because she sucks dick. Is that exactly what T■■ said?
2   A. Yes.
3   Q. What is -- is that how you spell her first name,
4 T-■■■
5   A. I believe so, yes.
6   Q. Is that a nickname for something?
7   A. No.
8   Q. Do you know her last name?
9   A. I think it's N■■■
10   Q. I have an affidavit from someone named Robin
11 Johnson.
12   A. Yeah.
13   Q. It indicates that she's is T■■ mother, I
14 believe.
15   A. Yes, that's T■■ mom.
16   Q. So Toni's mother is named Robin Johnson?
17   A. That my understanding, yes.
18   Q. But T■■ last name is not Johnson?
19   A. I don't -- is it?
20   Q. What is her last name?
21   MISS R. P■■■: N■■■
22   Q. Do you have any idea how to spell that?
23   A. No.
24   MISS R. P■■■: I think it's, N-■■■
25   Q. N■■■

**Page 90**

1   MR. OLDS: Or N-■■■
2   A. I have no clue.
3   Q. Okay. Does T■■ -- did T■■ live with her mother
4 on January 15, 2002?
5   A. I guess so, I am not sure.
6   Q. What you knew at the time was T■■ you knew that
7 name and not --
8   A. Yeah.
9   Q. I think we talked about this, and I am not
10 remembering what our exchange was, but I asked you if T■■
11 was a nickname, I think.
12   A. Yes, you asked me that.
13   Q. You don't know, right?
14   A. No, I think her name is T■■
15   Q. Not Antonia or anything like that?
16   A. No. She's a girl, so T■■
17   Q. Well, there's A■■■ as a girl's name.
18   A. Oh, okay.
19   Q. Did T■■ say this to you?
20   A. What? Oh, yes, I thought you were reading
21 something.
22   Q. Did she say, I can't hang with R■■ anymore
23 because she sucks dick?
24   A. That is what she said to me.
25   Q. She said that to you?

**Page 91**

1   A. Yes, she told me that.
2   Q. In your house?
3   A. Yeah, she came over.
4   Q. If she wasn't allowed to play -- if she wasn't
5 allowed to hang out with Ra■■ anymore, what was she doing
6 at your house?
7   A. Probably sneaking around.
8   Q. Disobeying orders. And she told you, you asked
9 her for an explanation, and she said that the day that you,
10 Mr. Richard P■■ were at Vincent talking with Linda --
11 or with Janet Woods, T■■ and her mother were at Strong
12 Vincent talking with Linda Cappabianca?
13   A. That's correct. She called her Miss Cap.
14   Q. When you heard Miss Cap, you think that's Linda
15 Cappabianca?
16   A. That's correct.
17   Q. All the kids called Linda Cappabianca Miss Cap?
18   A. That's correct. That was my understanding, yes.
19   Q. How did you know that T■■ was talking about the
20 day that you were in there, January 10th?
21   A. Because when the meeting took place I saw Robin
22 and Toni there in the office where I had actually met with
23 Miss Woods. As I told you before, I met with Miss Woods in
24 the main office like. And it's not my business to know what
25 they are there for. I am not going to ask them, what are

**Page 92**

1 you here for.
2   Q. You saw them there that day?
3   A. Yes, I saw them there that day.
4   Q. Did you talk about the fact that you had seen
5 Robin and her -- I'm sorry T■■ and her mother that day?
6   A. Pardon me?
7   Q. Did you talk with T■■ on January 15th about
8 seeing her mother and her at Vincent on the 10th?
9   A. No.
10   Q. How did you put it together that it happened on
11 the 10th?
12   A. Because I hadn't seen Robin in almost, I would
13 say, a good ten years. So the only time I had ever known --
14 I haven't seen Robin in a long time. Back in 1992, I think
15 '93, I used to be next door neighbors with them and I used
16 to baby-sit their little girl, that was like for a year and
17 then we moved out.
18   Q. 1993 you were, what, 25 years old, 28?
19   A. Somewhere around there, I think. My math ain't
20 that great.
21   Q. You were married in '65, didn't you tell me?
22   A. Pardon me?
23   Q. You were married in 19 --
24   MR. OLDS: Born.
25   A. No, I was born in '64.

253a

**Page 93**

1  MR. OLDS: '85.
2  Q. I'm sorry, wrong life event. You were born in
3  '65?
4  A. I was born in '64.
5  Q. '64, you baby-sat for Johnson when?
6  A. I think it was '93, I think, but I am not sure.
7  Those years are so --
8  Q. That's about 28 or 29 years old?
9  A. Right around there. I was in the my 20s, I
10  believe. I can't remember exactly, it's been so long. I
11  didn't know who they were when I first bumped into them.
12  Q. Was Robin the kid you were babysitting?
13  A. Robin, no.
14  Q. Is Robin your age?
15  MR. OLDS: Robin is the mother.
16  A. I don't know how old Robin is.
17  Q. Back in '93 who were you babysitting?
18  A. I baby-sitted (sic), well, on and off once in a
19  great while I baby-sitted for Robin. I baby-sitted most of
20  the neighbors' kids over there.
21  Q. Did you babysit Robin or did you babysit --
22  A. Not Robin, Robin was an adult.
23  Q. How old is Robin, your age roughly?
24  A. I don't have no clue.
25  Q. But she's an adult?

**Page 94**

1  A. She's an adult.
2  Q. Were you babysitting T__ in 1993?
3  A. Once or twice, yes.
4  Q. When you talk about babysitting that's who you
5  were babysitting?
6  A. Yeah. If she had to go to the store or something
7  she'll say, hey, Rich, can you watch my kids for a minute.
8  I watch her kids for a little bit, wasn't even that long of
9  a time.
10  Q. How long were you neighbors with Robin?
11  A. About a year, maybe less than that.
12  Q. Is that the only time you had known Robin? Did
13  you know her before you became a neighbor of hers?
14  A. No.
15  Q. And you hadn't seen her since the time you stopped
16  being neighbors up until the time you saw her in Vincent
17  that day; is that what you're saying?
18  A. Yes.
19  Q. You hadn't seen her for nine years?
20  A. Pretty close to it, yeah.
21  Q. You ran into her at Vincent and she was with T__
22  and you were with Rachel?
23  A. That's correct.
24  Q. And is it the fact that you saw Robin at Vincent
25  on January 10th your basis for concluding that she must have

**Page 95**

1  had that conversation with Linda Cappabianca on January 10,
2  2002?
3  A. At that time, that point in time, yes.
4  Q. Did Robin later confirm that?
5  A. I was infuriated.
6  Q. What?
7  A. I was mad, okay.
8  Q. I am only trying to figure out why you knew it was
9  January 10th right now.
10  A. Because, as I said to you before, I hadn't seen
11  Robin in years. And I didn't even recognize Robin at that
12  point because it had been so long. I really didn't know
13  Robin that well anyways in the very beginning. When R__
14  met up with T__, you know, it was kind of like, wow, hey, I
15  haven't seen you in so long, you know what I mean? And they
16  wanted to be friends but --
17  Q. How did you decide that January 10th was the day
18  Robin was in Strong Vincent and Linda Cappabianca told her
19  this about R____?
20  A. Because when I asked Miss Cappabianca -- I'm
21  sorry, excuse me. When I asked Miss Woods, isn't Miss
22  Cappabianca going to be at this meeting too, because I
23  automatically assumed because they said we need to talk, on
24  January 9th they both were insinuating that both of them was
25  going to be at the meeting, which was the following day on

**Page 96**

1  January 10th. And when I got in the office, of course, it
2  was Mr. Rule, and that other woman with long, brown hair and
3  Miss Woods. And I asked Miss Woods, well, isn't
4  Miss Cappabianca going to show up. And she had said, she's
5  tending other business matters with other parents, and that
6  kind of put, you know, the two together.
7  Q. You saw Robin Johnson at Vincent on the 10th.
8  Cappabianca was dealing with other parents on the 10th, you
9  concluded from that she met with Johnson that day?
10  A. At that point in time, yes. It wasn't until I
11  actually called Robin, and I didn't even say to Robin in the
12  beginning I didn't say, hey, did you have a meeting. I
13  asked her, I said, I told her -- I can't remember the way I
14  phrased it. I said, what's up with T__. I said, you know,
15  are you aware of what T__ was saying. She said, what. I
16  said, well, she's talking about R____ sucking dick, what's
17  up with that? She said, well, Miss Cap -- Miss Cappabianca
18  and I were having a conversation and she said -- and she was
19  telling me about what R__ had done. I said, well, did
20  she explain to you that it might have been forced sex there?
21  Did she even explain to you -- I said, why in the world
22  would she be talking to you when she didn't even come to me.
23  Why would she go -- because, see, Robin would never have
24  known about that. I didn't tell Robin. I have no business
25  to tell Robin because I haven't seen Robin in years.



Page 97

1    Q. How did you decide it was January 10th?
2    A. Because that's the only time I could think of when
3    T___ said the other day, which was actually just a few short
4    time period, wasn't like she said last week or two weeks or
5    three weeks.  She said the other day and I knew, you know
6    what I mean?
7    Q. All right.
8    MR. OLDS: Can we take a minute break, Jim?
9    (Brief recess.)
10    Q. Did you ever find out from anybody why Linda
11    Cappabianca had that conversation with Robin Johnson and her
12    daughter?
13    A. Did I find out what?
14    Q. Did anybody ever tell you why Linda Cappabianca
15    met with Robin Johnson and her daughter, T___, and told her,
16    encouraged her, to keep T___ away from R___ because R___
17    was promiscuous?
18    A. No one came and told me about it, if that is what
19    you're asking me.
20    Q. Did you ever ask Cappabianca why she had such a
21    meeting and said such a thing?
22    A. I didn't talk to her after -- l don't believe I
23    talked to her after January 9th.  Yeah, well, except for the
24    time I met her in the hallway, but I don't remember going
25    back.  I know if I would have went back there I would have

Page 98

1    been saying some things I should not say.
2    Q. You said to Robin Johnson, why is she telling you,
3    what is your interest in this, right?
4    A. Yeah.  Well, I said to her why is she telling you
5    when, you know, she --
6    Q. What did Robin say about that?
7    A. She said she just wanted to make sure that she
8    knows who my daughter is hanging around with, what kind of
9    kid it is.
10    Q. Did anybody ever tell you that Linda Cappabianca
11    told other parents besides Robin Johnson the same kind of
12    thing?
13    A. I don't remember who it was that made notations.
14    I don't know who the other parents were.
15    Q. Was T___ J___ ever at your house before
16    January 15th, 2002?
17    A. I don't think so.
18    Q. Was T___ J___ at that time a Strong Vincent
19    student?
20    A. I think that -- I don't know.  We had just moved
21    in from Arizona.  We really didn't have no connections or
22    ties with anybody.  I can't say one way or the other whether
23    she went to school there or whether she was just starting
24    school there.  I don't know.  But my thoughts are if she
25    knew, she must have been pretty close to knowing who Robin

Page 99

1    was and who T___ was, otherwise the conversation wouldn't
2    have taken place.
3    Q. After Robin Johnson told you this -- I'm sorry.  I
4    guess the next day you confirmed with Robin Johnson that she
5    had been told this by Linda Cappabianca?
6    A. Yes.  I called her several times.  I wanted to
7    hear it from her mouth, not just the word of a kid.
8    Q. She confirmed it?
9    A. Right.
10    Q. Did you call Linda Cappabianca about this?
11    A. I don't remember if I did or not.  I was so
12    bitterly angry about it.
13    Q. Did you call anybody at the Erie School District
14    about this?
15    A. No, because R___ wasn't going back to school.
16    Q. You regarded that as an outrageous breach of
17    privacy, right?
18    A. Pardon me?
19    Q. You regarded what Cappabianca said to Toni Johnson
20    as an outrageous breach of privacy, did you not?  You
21    thought it was awful she's talking about your daughter like
22    this --
23    A. I thought it was horrible.
24    Q. -- to somebody else.  Why didn't you tell somebody
25    at Erie School District about it; why didn't you complain

Page 100

1    about it?
2    A. Because here's my thought and my sentiments on
3    that.  My daughter has been removed for something that was
4    not her fault.  I now have the belief that my daughter has
5    been talked about to other parents.  I'm at this point
6    believing that there is no police involvement outside of
7    what I'm saying.  And there is no reason for me to go back
8    there and talk to these people when they haven't done
9    anything in the very beginning.  I didn't see any reason why
10    to go back because it wouldn't have made a difference
11    anyway.  They weren't being responsible, in my opinion, to
12    do what they were supposed to do.  And to talk about it to
13    another parent that just made me all the more angry.  If I
14    had gone back there, I know I would have blown my stack.  I
15    am a very patient man.  I'm a very kind person, but I have
16    my limitations.
17    Q. It didn't cross your mind to complain to someone
18    about Linda Cappabianca?
19    A. The only time it crossed my mind to talk to
20    someone, other than, you know, the police department or
21    whatever, is on March 25th which was, slash, 26th, when my
22    daughter stabbed me and she had tried to commit suicide
23    because by that time it was so out of control with her, I
24    had lost all hope and everything.  The officer that had
25    taken her to Millcreek Community Hospital he said, you need



1 to go to Dr. Barber, I think it was John Barber his name he
2 used. He said, because whoever Miss Cappabianca was, he
3 said that it was not right what she did based on what your
4 kid said.
5    Q. You mean Dr. Barker the superintendent?
6    A. Yeah. I was going to do that, but by that time
7 R____ was -- I was dealing with the pressures of R____ and
8 the way she was slipping. I was losing my child fast.
9    Q. So at any time before you filed this lawsuit did
10 you lodge a complaint with anybody at the Erie School
11 District about the conduct of Janet Woods or Linda
12 Cappabianca relative to this matter?
13    A. I am not really following.
14    Q. At some point in time you filed a lawsuit, right,
15 that's why we're here?
16    A. Yes.
17    Q. At any time before you did that, did you make a
18 complaint to anybody at the school district about Woods and
19 Cappabianca and how they handled this whole thing?
20    A. No, not really, no. All I did was I just
21 basically told exactly like I had written up here before. I
22 said, look, you had ample opportunity. Even on the phone
23 call I had with Miss Woods at the police department, I said,
24 you had since November 27 to deal with this and you never
25 get around to doing it. You had plenty of opportunity to do

                            Page 101

---

1 something in between that time period, and you haven't done
2 till now. I said, that's it, I'm taking matters in my own
3 hands, and I did.
4    Q. Who is Michelle Hettrick?
5    A. That would be the juvenile probation officer for
6 B____ C____ and C____ B____
7    Q. At any time before the rape that occurred on
8 November 27, 2001, did R____ ever receive any counseling of
9 any kind?
10    A. She went to rape crisis.
11    Q. Listen to me carefully, though, before she was
12 raped.
13    A. I'm sorry.
14    Q. Before November 27th, 2001, the day she was raped,
15 did she ever receive any counseling from anybody?
16    A. No, unh-unh.
17    Q. After the rape you know she was -- she did receive
18 counseling at rape crisis?
19    A. Yes.
20    Q. And she also received counseling at Millcreek
21 Community Hospital?
22    A. That is also correct, I believe. There was a
23 psychiatrist there.
24    Q. Yes. That's what I mean by counseling. I am
25 trying to -- she has received some mental health attention

                            Page 102

---

1 after the whole thing was turned into the police in early
2 January of 2002, correct?
3    A. That's correct.
4    Q. She's received mental health attention from people
5 at Millcreek Community Hospital?
6    A. That's correct.
7    Q. Rape crisis?
8    A. That's correct.
9    Q. And I think other places?
10    A. Yes.
11    Q. Is one of those places Sarah Reed?
12    A. As far as Sarah Reed is concerned, I don't know
13 how much counseling they actually gave her. I know there
14 was a time period, and I can't remember exactly when it was,
15 but she there only for school purposes only, no attachment
16 to counseling or anything of that nature. She was only
17 there for school purposes only, and she did not receive
18 counseling. I don't remember if it was in eighth grade year
19 or her ninth grade year. I don't remember how that -- I
20 remember that there was a time period at Sarah Reed she did
21 not receive any counseling because she was not sent there
22 for any kind of problem, she was just sent there just to
23 remain in there for schooling only.
24    Q. When she went there in seventh grade in January of
25 2002 and finished out the year, during the rest of that

                            Page 103

---

1 seventh grade she received no counseling at all at Sarah
2 Reed?
3    A. I don't know if she received counseling. Again,
4 like I said before, I don't know. I think she received
5 counseling in the seventh, slash, eighth grade year. I
6 don't think it was in the ninth grade.
7    Q. I misunderstood you then. She did receive some
8 counseling in seventh grade at Sarah Reed?
9    A. That is my understanding.
10    Q. Did you attend intake at Sarah Reed?
11    A. I believe so, yeah. Well, I went to the meetings
12 there. I think I went to the intake meeting on the 25th of
13 January.
14    Q. R____ was there too?
15    A. Yes.
16    Q. Was Shelly there?
17    A. I don't believe so.
18    Q. Just you and R____?
19    A. That's my memory. The reason I say that is
20 because Shelly's involvement mostly was limited only because
21 of her health reasons. So a lot of times she was too sick
22 to do anything. So, I mean, if I remember her or not being
23 there is only because 80 percent of the time she is not.
24    Q. Does she have a physical health problem?
25    A. She has a lot of them.

                            Page 104

---



Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   RICHARD P., by and for          :
     R████ P., and DENISE L.,        :
 4   by and for K████████ L.,        :
              Plaintiffs             :
 5                                   :
          v.                         :   Civil Action No. 03-390
 6                                   :          Erie
     SCHOOL DISTRICT OF THE CITY     :
 7   OF ERIE, PENNSYLVANIA; JANET    :
     WOODS, Individually and in      :
 8   her Capacity as Principal of    :
     Strong Vincent High School;     :
 9   and LINDA L. CAPPABIANCA,       :
     Individually and in her         :
10   Capacity as Assistant           :
     Principal of Strong Vincent     :
11   High School,                    :
              Defendants             :
12

13

14

15

16          Continued Deposition of RICHARD P████████

17      taken before and by Janis L. Ferguson, Notary

18      Public in and for the Commonwealth of Pennsylvania,

19      on Wednesday, April 27, 2005, commencing at 1:21 p.m.,

20      at the offices of Knox McLaughlin Gornall & Sennett,

21      PC,  120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
                 Reported by Janis L. Ferguson, RPR
25               Ferguson & Holdnack Reporting, Inc.
```

Page 22

1    Q.  Have we covered the educational type of
2  institutions, all of them?
3    A.  To the best of my knowledge.
4    Q.  Andromeda, Hermitage, Abraxas, Sarah Reed.  Any
5  others?
6    A.  Unless you include Rape Crisis, which is now
7  called Crime Victims.
8    Q.  Rape Crisis.  Good point.  She's been there too.
9  Has she been at any medical facilities besides Stairways
10  Base Service Unit and Millcreek Community Hospital?
11    A.  No.  Not that I remember of.
12    Q.  Okay.  Is she still taking medication?
13    A.  Yes.
14    Q.  What is she taking?
15    A.  Zyprexa.
16    Q.  Zyprexa.
17    A.  Yes.
18    Q.  Z-Y-P-R-E-X-A or something like that?
19    A.  Something like that.  I'm not sure.
20    Q.  And what else?
21    A.  I believe it's birth control pills.
22    Q.  Birth control pills?
23    A.  Yes.  But the birth control pills are basically
24  not for obvious reasons; the birth control.  It's because it
25  helps reduce the nose bleeds that she gets from her HHT.

Page 23

1  That's why she gets that medicine.
2    Q.  What is the condition?  HAT?
3    A.  Hemorrhagic hereditary telangiectasia.
4    Q.  Boy, oh boy.
5    A.  Don't ask me how to spell it.  I don't know.
6  Hemorrhagic hereditary telangiectasia.  HHT for short.  If
7  you want to find good information, I'd go to the website,
8  HHT Foundation.  Based out of Cleveland.
9    Q.  Let's call it HHT.  What is HHT?
10    A.  HHT is a bleeding disorder that -- that the
11  capillary veins are extremely close to the -- to the skin.
12    Q.  Right.
13    A.  And they easily break.
14    Q.  Right.
15    A.  And it causes -- in the female, it causes -- they
16  usually get the breaking in the skin and underneath the lip.
17    Q.  Yes.
18    A.  It gets into the lung, the heart, the brain.  And
19  it causes a lot of -- a lot of bleeding.  Usually treatment
20  is blood transfusion, iron fusion, which is one of the
21  reasons why my wife -- she got -- she got the more severe
22  case.
23    Q.  Schelly has that too?
24    A.  She has it in a real bad way.  And my daughter
25  M████ also has it.  My son shows the male form of it.

Page 24

1  There are two different types.  The male form usually get
2  scars, and the body gets like --
3    Q.  Scars easily?
4    A.  Yeah, it scars real easy.  In the female, they get
5  black and blue marks, usually in the forearms.  They can get
6  them in the base of the calves.  They black and blue real
7  easily.
8    Q.  So she takes birth control pills for that?
9    A.  Yeah.  Actually, oddly enough, it's a birth
10  control pill, but there's something that creates --
11    Q.  Contraction of the capillaries?
12    A.  Yeah.  And so it -- HHT, you can -- she can be
13  sitting there, and if -- let's say the temperature of this
14  room drops maybe ten -- you know, five, seven degrees, her
15  nose could start bleeding instantly.  You know?  She has
16  nose bleeds, I think, generally every day.
17    Q.  Does she have more problems in some kind of
18  weather than other kinds of weather?
19    A.  I'm going to say yes.  Because when we were in
20  Arizona, I don't remember her having as many nose bleeds as
21  we do living here.
22    Q.  So cold weather seems to aggravate it?
23    A.  I think it does a lot.  But, now, if you go
24  from -- let's say she goes outside, and -- in my wife's
25  case, anyways, you go from outside, the car is all nice and

Page 25

1  warmed up, you go in there, wham, she's got another nose
2  bleed.  And sometimes it bleeds horribly bad.
3    Q.  Okay.  Is she taking any drugs besides Zyprexa and
4  birth control pills?
5    A.  No.
6    Q.  Has she in the past taken any other kinds of
7  drugs?
8    A.  You mean like street drugs or --
9    Q.  No.  I don't mean that.  I mean prescription
10  drugs.  And I have some notes here.  Let me look at them.
11  It might help you.  My notes say that at some point she was
12  taking Zoloft?
13    A.  Yes.
14    Q.  For depression and anxiety?
15    A.  Yes.
16    Q.  Does that ring a bell?
17    A.  Yeah, I believe that was --
18    Q.  Any idea how long how long she was taking Zoloft?
19    A.  Not very long.  It didn't seem to have the -- it
20  didn't seem to work for her.
21    Q.  She was also taking, I think, Celexa, C-E-L-E-X-A.
22  Do you remember that?
23    A.  Yeah, I remember that.
24    Q.  Is it an anti-depressant?
25    A.  I think so, but I'm not a hundred percent sure.

## Page 30

1  she was showing you during that period of time?
2      A.  I'm trying to think, looking back on it.  She
3  would -- she would -- she kept saying that, I hate all
4  humans.  I mean, she made it very clear that she didn't like
5  humans.  That's the way she spoke.
6      Q.  Before she went to Strong Vincent in seventh
7  grade, tell me about her personality.  What was --
8      A.  Before she went to Strong Vincent?
9      Q.  Yes.
10      A.  Her personality was gentle.  She was easily going .
11  (sic), she was pleasant.
12      Q.  Was she talkative, or was she quiet?
13      A.  I consider R█████ more of a quiet child.  But, I
14  mean, if she wanted something or didn't understand
15  something, she would more or less -- the teachers would
16  always tell me that she would raise her hand, ask questions.
17  So she knew that she always had to ask.  If she had trouble
18  with a math problem, (indicating).
19      Q.  And before she went to Strong Vincent in seventh
20  grade, she had no mental health problems?
21      A.  No.
22      Q.  And she was -- she was quiet, but she was gentle
23  and pleasant, basically, right?
24      A.  Yes.
25      Q.  After the rape, that changed.  She became

## Page 31

1  depressed, angry, withdrawn, combative.
2      A.  Yes.
3      Q.  Have I covered it all?
4      A.  Yeah.
5      Q.  You find out about it from Janet Woods January 10,
6  2002.  She goes to Sarah Reed.  Did she become worse at
7  Sarah Reed or stay about the same?
8      A.  I think it added to the problem.
9      Q.  You think going to Sarah Reed added to the
10  problem?
11      A.  In my opinion, yeah.
12      Q.  Because she resented going to Sarah Reed?
13      A.  She resented it very deeply.
14      Q.  Did she articulate that to you?  Did she tell you
15  that; that she resented going to Sarah Reed?
16      A.  She said, I don't understand why I'm here.  You
17  know, she said, I didn't do anything wrong.  I mean, she was
18  very -- she even told the staff at Sarah Reed that.  She
19  said, why am I -- you know, she said, I'm not supposed to be
20  here.  And she -- for a period of time when Sarah Reed
21  was -- she was just so -- in a tailspin.  And she was angry.
22      Q.  Richard, did you at some point after the rape
23  approach Vikki Scully at Strong Vincent about getting R█████
24  into the SAP program?
25      A.  I'm sorry; what?

## Page 32

1      Q.  Did you approach Vikki Scully, the teacher at
2  Strong Vincent, after the rape -- you didn't know a rape had
3  happened.  But after her mood started going south, did you
4  approach Ms. Scully and talk to her about getting into the
5  SAP program or getting her some mental health attention at
6  school?
7      A.  Yeah.  I -- I had talked to her teacher -- I'm not
8  sure which one it was.
9      Q.  All right.
10      A.  But I did -- because she was going -- I didn't
11  understand what was going on with her.  I was concerned,
12  because -- I have always been that way with my kids.  If
13  something doesn't feel right or something doesn't -- I'm on
14  top of that.  You know, bar none, I'm there.
15      Q.  Was this after the rape that you did this?
16      A.  No --
17      Q.  In retrospect.  I know you didn't know a rape
18  happened --
19      A.  No, I didn't know a rape happened.  But I think it
20  was before that, because she was -- it wasn't in her nature
21  to be sad.  She just wasn't -- you know, she -- there was a
22  period -- when I went to the -- and I think it was -- and I
23  think that was the time when I actually talked to a
24  teacher -- I mean, I think I did it just before or just
25  after.  I can't remember the time period on that.  But there

## Page 33

1  was a -- there was someone I talked to --
2      Q.  Just before or just after the rape?
3      A.  No, of the parent/teacher conference.
4      Q.  Okay.
5      A.  And I -- she was -- my daughter was like sad.  I
6  mean, I don't really know how to -- and then -- and they
7  said, well we can put her in a program that would -- she
8  said she had noticed that R█████ was getting kind of
9  distant.
10      Q.  Okay.  Did they put her in a program?
11      A.  I don't know.  I know I had asked for it, but I
12  don't know if it -- and I don't remember if they did or not.
13  I do remember that I talked to -- I'm just guessing, but I'm
14  not really sure.  But I think I talked to Chris Ruhl about
15  that, but I'm not really a hundred percent sure if it was
16  him I talked to.  I know I talked to a guy.
17      Q.  So you talked to a teacher who was a woman?
18      A.  No, I went to -- I went physically there to talk
19  to someone, and then I talked to someone on the phone.
20      Q.  Right.
21      A.  About it.
22      Q.  And you also talked to Chris Ruhl?
23      A.  Yeah, I believe -- I believe it was him.  I'm not
24  a hundred percent sure of that.
25      Q.  And you don't know if anything happened, not

9 (Pages 30 to 33)

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    RICHARD P., by and for          :
     R█████ P., and DENISE L.,       :
4    by and for K█████ L.,           :
              Plaintiffs             :
5                                    :
         v.                          :    Civil Action No. 03-390
6                                    :              Erie
     SCHOOL DISTRICT OF THE CITY     :
7    OF ERIE, PENNSYLVANIA; JANET    :
     WOODS, Individually and in      :
8    her Capacity as Principal of    :
     Strong Vincent High School;     :
9    and LINDA L. CAPPABIANCA,       :
     Individually and in her         :
10   Capacity as Assistant           :
     Principal of Strong Vincent     :
11   High School,                    :
              Defendants             :
12

13

14

15

16           Deposition of FRANK SCOZZIE, taken before

17      and by Janis L. Ferguson, Notary Public in and

18      for the Commonwealth of Pennsylvania, on Monday,

19      April 11, 2005, commencing at 3:38 p.m., at the

20      offices of Knox McLaughlin Gornall & Sennett, PC,

21      120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
                 Reported by Janis L. Ferguson, RPR
25                Ferguson & Holdnack Reporting, Inc.

Page 6

1    Q.   And how long did you have that job?
2    A.   About five years.
3    Q.   And before that then?
4    A.   Five years as supervisor of special education.
5    Q.   And before that?
6    A.   You know what, I lied to you.  I was director of
7    special education and data services 10 years.
8    Q.   10 years.  So that takes us back about 20 years or
9    so.
10   A.   Yeah.  And then 16 years as teacher.
11   Q.   16 years as a teacher.  And the events of this
12   lawsuit sort of center around 2001, 2002.  Tell me from the
13   administrative viewpoint -- in other words, from the
14   position that you occupied -- what the special education
15   department looked like.  I guess there were teachers in the
16   schools, and then there was a centralized function as well?
17   A.   The special ed. department had a coordinator who
18   worked underneath me and probably was starting to move into
19   taking my day-to-day responsibility in that department, by
20   the name of Jim Piekanski.  There were supervisors of
21   special education that were involved; Charlise Moore, Grace
22   Sullivan, and Marlene Chrisman.  And they each had different
23   categories of responsibilities.
24   Q.   Can you tell me what Charlise Moore's
25   responsibilities were.

Page 7

1    A.   She would have been in charge of the middle school
2    programs particularly.  And she also would have had what are
3    known as the life skills support students under her
4    responsibility.
5    Q.   What about Marlene Chrisman?
6    A.   She would have dealt with the senior high schools
7    and particularly with the emotional support students.
8    Q.   And Mr. Sullivan?
9    A.   He had the elementary schools.  And Mr. Piekanski
10   took care of the gifted and the speech.
11   Q.   And what is Mr. Piekanski's current title?
12   A.   He is co-director of special education and
13   director of early childhood education.
14   Q.   When you were the -- let's see.  You were the
15   assistant to the superintendent in 2000?  I guess I'm just
16   trying to figure out --
17   A.   I was an assistant to the superintendent in 2000.
18   Q.   In 2000.  In addition to being director of special
19   ed.?
20   A.   Right.  That was a title that had not been
21   relinquished from me.
22   Q.   Okay.  And what were your responsibilities as a
23   director of special ed.?
24   A.   Well, in situations where -- as I said,
25   Mr. Piekanski was involved in the day-to-day.  But if there

Page 8

1    was an unusual situation that required an immediate decision
2    or swift action, then I would be directly contacted by the
3    building principal.  Or in Jim's absence.  In some cases
4    where it was a dual problem -- for example, an unusual
5    circumstance, and as special education student -- not
6    necessarily problem, but crisis, they would directly come to
7    me.
8    Q.   Can I derive from that, that you were more
9    concerned maybe with policy, except there were certain
10   situations that came to your attention that you dealt with
11   the situations?  Is that what you --
12   A.   No, I dealt many times with problems that were not
13   satisfied at the principal level, anyway.  That's one of my
14   responsibilities.  So if you were mad at the principal, and
15   you came downtown, it's a good possibility you got to see
16   me.
17   Q.   And what is the -- sort of the reporting
18   relationship between you and the principal when you're
19   wearing your hat as director of special ed.?
20   A.   Well, the principal is working directly for Dr. --
21   at the time, I believe Dr. Linden was the assistant -- was
22   my partner in crime there.  And she actually, in this
23   situation, if I -- are you speaking particularly to Strong
24   Vincent, or any school?
25   Q.   Well, yeah, let's just -- we can direct our

Page 9

1    attention to Strong Vincent.
2    A.   Okay.  The senior high principals would directly
3    be accountable, if you were talking about from a ratings
4    standpoint, to Dr. Linden.  That would have been his
5    responsibility to do that.
6         However, in issues where there were problems,
7    where there were certain circumstances that were going to be
8    administratively dealt with downtown, it would be a good
9    possibility that I would be more accessible to get to the
10   issue, so there really wasn't a line as to who you called.
11   If there was an emergency, you could call Frank Scozzie, you
12   could call John Linden.  It didn't really much matter.
13   Q.   Okay.  And then in this particular case, do you
14   recall the events involving my clients, R█████ P█████ and
15   K█████ L█████?  Do you recall how they came to your
16   attention?
17   A.   I received a phone call from Jan Woods, the
18   principal of Strong Vincent, alerting me to what she
19   perceived to be a situation that was developing that needed
20   to be -- we needed -- we needed to be made aware of.
21   Q.   Okay.
22   A.   She didn't know where it was going to go, but
23   there was some indications, in her mind anyway, that it was
24   a situation that would need some tending to.
25   Q.   Okay.  And so tell me what she told you.

3 (Pages 6 to 9)

*261a*

08943872-aa94-43a5-8d55-aaf096e758f3

Page 10

1    A.  She told me that there was -- and, again, this is
2  a very difficult time. I'm going off a recollection here.
3  That there was a problem with two students and that it had
4  occurred off grounds. And she was very, very concerned
5  about the two students. The mental well-being.
6        In addition to that, she wanted to be aggressive
7  in dealing with everybody involved on the other team here.
8  But her immediate concern was for the personal well-being of
9  the two young ladies. And there was a sense of urgency in
10  her voice.
11    Q.  But did she describe what -- what was the
12  situation that she described to you?
13    A.  She said that there was allegations being made of
14  sexual improprieties that had occurred at a Laundromat which
15  was located off the school property, but very close to
16  Strong Vincent, and that she was looking into it. But in
17  the meantime, she had concerns about getting the young girls
18  some help to deal with the situation while we were
19  investigating.
20    Q.  And you indicated you're going from recollection
21  here. Did you make notes about this --
22    A.  You know, I may have, but to be very honest with
23  you, I looked, and I can't find them, if I did.
24    Q.  Okay. She indicated that -- we talked to
25  Miss Woods already, and she indicated that she also talked

Page 11

1  to Mr. Linden.
2    A.  We would have -- she probably did that, and I
3  probably did that.
4    Q.  Okay. And did you give her -- what instructions
5  do you recall giving her when she first contacted you?
6    A.  I don't know that I gave her any. I think I
7  listened to what she said she was doing. I think I agreed
8  with that. I said that I would assist her in getting an
9  intervention that could assist with the mental well-being of
10  these -- so that the mental well-being of these two female
11  students would be well taken care of.
12        (Discussion held off the record.)
13    Q.  So how many conversations do you think you had
14  with Miss Woods about what she was doing?
15    A.  I would assume, knowing my style, that I probably
16  was in touch with her pretty close to daily after this
17  became apparent to me.
18    Q.  And you indicated that she said that there was a
19  sexual -- allegation of sexual improprieties. Was she more
20  explicit in terms of describing what happened?
21    A.  I can't recall that. I -- I deal with the issues.
22  I don't deal with the delivery. I -- I knew it was a
23  serious problem. I can't recall how she described it to me,
24  really.
25    Q.  Okay. Now, what resources do you have -- these

Page 12

1  were both special ed. students; is that right?
2    A.  That's correct.
3    Q.  So that would mean that there -- obviously, that
4  would mean there would be special education files about
5  these students.
6    A.  Um-hum.
7    Q.  You have to say yes or no.
8    A.  Yes, I'm sorry.
9    Q.  That's okay. Would those files be in the central
10  office where you're located, or at the school, or would
11  there be two files?
12    A.  There would be two files.
13    Q.  And did you -- did you or did anyone at your
14  behest in the central office look at the students' files?
15    A.  I'm sure we did.
16    Q.  Well, specifically did you look at the files?
17    A.  I can't recall that.
18    Q.  And so Miss Woods tells you -- gives you a call,
19  says -- what you can recall is she said that there were
20  sexual improprieties.
21    A.  That's correct.
22    Q.  That's what you can recall today.
23    A.  Yes.
24    Q.  She says she's concerned about the girls.
25    A.  She states the situation, where it occurred, and

Page 13

1  then she said, I am concerned that both of these young girls
2  need help. As I recall, it was an indication to me that she
3  felt that their self-concepts were significantly damaged and
4  that there was the potential that these girls could hurt
5  themselves. And, that, I do recall.
6    Q.  Now, what resources are there available in the
7  community for children who might -- whose self-concept is
8  significantly damaged? Are there community resources
9  available for that?
10    A.  Oh, there are certainly a lot of community
11  resources. The District uses the program particularly at
12  Sarah Reed. There's a therapeutic program there that we
13  use. And they have the intervention and the people
14  available to work with the student, the families, tie it all
15  together, and basically to see what's going on. It's a
16  program we recommend frequently. It's a program that many
17  of the psychiatrists that work at the School District
18  recommend frequently.
19    Q.  What does the program cost the school?
20    A.  I think we pay them along the lines of -- it's
21  tough to say in that day and age. But we probably paid them
22  about $45 a day to do something like that.
23        MR. MARNEN: Per student?
24        THE WITNESS: Per student.
25    A.  Each program varies a little bit. There's a few

Ferguson & Holdnack Reporting, Inc.

262a

08943872-aa94-43a5-8d55-aaf096e758f3

Page 14

1   different programs there.
2       Q.  What programs do they have at Sarah Reed?
3       A.  They have a partial hospitalization program, they
4   have an alternative education program, which is primarily
5   for regular class students. They have a therapeutic
6   program, behavior mod.-type program, which is what we would
7   be looking at in this situation, and they do an early
8   intervention program for us also.
9       Q.  Now, the behavior modification program, tell me
10  what that program consists of.
11      A.  Well, it's a program where there is psychiatric
12  help available if they need it. There are Master-level
13  therapists that are there available. There are small class
14  sizes. There is a family component, where they work with
15  the families to kind of tie everything together, because
16  many times we can solve an issue in the school, and there
17  still remains a problem at home, and the parents need to
18  know about that. And we need the parents to partner with
19  us. And they have a strong component that does that.
20      Q.  Okay.
21      A.  And there is the educational component that
22  carries on the IEP.
23      Q.  So behavior modifications, there is a psychiatric
24  component. Master's with counseling, you said?
25      A.  There is a Master-level therapist program.

Page 15

1       Q.  Master's level therapist.
2       A.  They have several Master's level therapists.
3       Q.  And what is the partial hospitalization program?
4       A.  That's a program they wouldn't have qualified for
5   by age, because they were not 14 years of age. But it is a
6   program, again, that has a lot of these same therapies,
7   intensive therapies, that are supported more clinically.
8   The psychiatrist is more involved in the program.
9       Q.  Okay. So they weren't old enough for the partial
10  hospitalization program.
11      A.  Correct.
12      Q.  Now, you have to -- as the director of special ed.
13  for the Erie School District, there is certain constraints
14  that are placed upon you in terms of where you can place
15  kids; is that right?
16      A.  I don't know that there's constraints put on me
17  about where I can place them. There's certainly constraints
18  placed on about who would take them and who we have
19  partnerships with. I guess, you know, like if I wanted to
20  put somebody into the Western Psychiatric program down at
21  Pittsburgh, we could recommend -- we could, you know, kind
22  of try to do that. We are just -- we make -- we cannot
23  place anybody anywhere. An IEP team does that.
24      Q.  Right.
25      A.  And, you know, but are there other resources and

Page 16

1   situations? It would depend on what the students' needs
2   are. We try to find -- we think out of the box. I don't
3   want to say that we're limited, but we try to find a program
4   that meets the needs that are presented to us. And then we
5   make that recommendation. Then a team looks at that. We
6   put nobody anywhere, but we use as many resources as we can
7   get our hands on.
8       Q.  Jim's already marked as Exhibit 1 a document that
9   I'm not ready to get to yet so I'm going to mark this as
10  Exhibit 2.
11      (Scozzie Deposition Exhibits 1 and 2
12      marked for identification.)
13      MR. OLDS:  And just for the record, that is
14  Bates-stamped 398 to 427. Is that right?
15      THE WITNESS:  I'm not sure I understand what
16  you're --
17      MR. OLDS:  No, I'm asking Jim. I'm just getting a
18  little stipulation of counsel here.
19      MR. MARNEN:  E-398 through E-427. Is that what
20  you said?
21      MR. OLDS:  Yes.
22      MR. MARNEN:  Except the page before E-427 doesn't
23  have a Bates stamp on it.
24      MR. OLDS:  Let's see what that is. Maybe it's
25  just a blank page.

Page 17

1       MR. MARNEN:  Maybe it was just copied crooked.
2       (Discussion held off the record.)
3       Q.  Now, I think that when I was talking about limits
4   that might be placed on you, you have to offer an education
5   to a child in the least-restrictive environment. Isn't that
6   true?
7       A.  That's true.
8       Q.  And, obviously, the least-restrictive environment
9   is the -- maybe you could help me. The first would just be
10  the regular classroom, right?
11      A.  Right.
12      Q.  And then the next least-restrictive environment
13  would be -- what would be the next level?
14      A.  The -- a regular classroom with intervention.
15      Q.  Okay. And then what would be the next level?
16      A.  This would be perhaps a split program; special ed.
17  and a regular classroom.
18      Q.  In the same school, right?
19      A.  Right.
20      Q.  And then --
21      A.  Then a special ed. classroom totally.
22      Q.  And then what would be the next level?
23      A.  Well, that -- a full-time special ed. program is
24  the most restrictive. And then -- in the building. And
25  then a full-time special ed. program outside of the

Page 18

1 building, where there is actually no capability to
2 participate with regular programs, would be the actual least
3 restrictive.
4     Q.  Okay.  Now, Sarah Reed isn't part of the Erie
5 School District, is it, or is it?
6     A.  It is not part of the Erie School District.
7     Q.  Okay.  So a placement in Sarah Reed is a placement
8 outside of the School District.  Is that right?
9     A.  That's correct.
10     Q.  So in that continuum that we just went through,
11 where does -- where would Sarah Reed -- would it even be in
12 that continuum?
13     A.  Yeah.  It's a restrictive placement.
14     Q.  A restrictive placement?
15     A.  Right.
16     Q.  It's below special ed. classes in the building; is
17 that right?  It's more restrictive than special ed. in the
18 building.
19     A.  Not necessarily, because -- and I would say I
20 misspoke.  There are regular students that are participating
21 at Sarah Reed, so there is the participation level with
22 regular students there.  When I say "regular", I'm talking
23 about from an educational component standpoint.  They are
24 not categorized as special education on an IEP.
25     Q.  Okay.  Those students are there because they have

Page 19

1 discipline problems; is that right?
2     A.  Some are there for that.
3     Q.  We had a conversation with Miss Woods, and I'm not
4 sure it was exactly clear, because the term "alternative
5 education program" appears to be used in several different
6 ways in the documents.  And maybe you could tell me -- she
7 said that if I used AEP, the initials AEP, that would
8 signify something relative to the Erie School District.  Is
9 that --
10     A.  Well, first of all, I guess "alternative" is an
11 overused word and probably needs to be categorized, because
12 there are certainly different levels of alternative.
13         What she particularly was trying to describe to
14 you is that Erie School District partners with Perseus House
15 to run an alternative education program.  And students are
16 sent there for a whole litany of reasons.  But they are
17 categorized as being in an AEP program.
18     Q.  Now, did Sarah Reed ever partner with Erie
19 concerning an alternative --
20     A.  Sarah Reed has a program --
21     Q.  You have to let me finish.
22     A.  Sorry.
23     Q.  -- partner with the Erie School District
24 concerning providing an alternative education program?
25     A.  They have a partnership of that sort with the

Page 20

1 regular -- with the regular education component of the Erie
2 School District, not the special education program.
3     Q.  So certain regular education -- certain students
4 who receive regular education from the Erie School District
5 will go to Sarah Reed for alternative -- for an alternative
6 education program.
7     A.  That is correct.
8     Q.  And are those students referred to Sarah Reed as a
9 result of violating the Discipline Code?
10     A.  Can be.
11     Q.  What other reasons might they be sent to Sarah
12 Reed?
13     A.  Unusual behavior has been exhibited.  Parent comes
14 in with a significant concern of something that's going on
15 at home that has been corroborated by the student's teacher,
16 and then all of a sudden unusual behaviors are occurring.
17     Q.  And this might be unusual behavior that is not
18 necessarily a discipline problem, or would it --
19     A.  Might be both.  It could be a discipline problem.
20 It could be a discipline problem or just could be a bizarre
21 behavior.  I guess in a -- in a classroom setting, it could
22 be perceived as a discipline problem, depending on -- I
23 mean, there are just so many things that can occur, it's
24 very difficult to try to be specific on this thing.
25         But Sarah Reed basically deals with students who

Page 21

1 have mental health issues primarily, as far as special ed.
2 goes.  So I can be specific with that.
3     Q.  Okay.  Well, part of Sarah Reed does.  But then
4 part of it also deals with students who are behavioral
5 problems at the Erie School District, right?
6     A.  Elementary students.
7     Q.  Elementary students.  Does that mean one through
8 eight or one through six?
9     A.  One through eight.
10     Q.  So one through eight kids who have disciplinary
11 problems in the Erie School District might be referred to
12 Sarah Reed.
13     A.  Right.
14     Q.  And there is a contract between Sarah Reed and
15 Erie School District for Sarah Reed to provide an
16 alternative education program for those students.
17     A.  That is correct.
18     Q.  And then is there also contracts between Sarah
19 Reed and the Erie School District to provide alternative
20 education for other students?
21     A.  There is a contract with Sarah Reed to provide
22 partial hospitalization programming and therapeutic
23 programs, as I earlier described to you.
24     Q.  Therapeutic.
25     A.  I guess you would call -- anytime you have a

6 (Pages 18 to 21)

Page 22

1  program where you are delivering outside of the school in
2  another setting, I guess you would call it an alternative
3  setting. We probably do too much of that, but that
4  currently is something that is the way the structure exists.
5      Q.  Well, I guess that, you know, if -- the
6  alternative education program, is that a term of art, or is
7  that just sort of a generic term that is used to describe
8  any placement that's placed outside of this Erie School
9  District?
10     A.  I guess initially it was supposed to be a term of
11  art, but it is now a generic comprehension; that if you are
12  not going to the Erie School District, you're going to an
13  alternative placement. And parents will say that. We have
14  students that are going to charter schools. The families
15  will say they are in an alternative school. I mean, an
16  alternative to the Erie School District.
17     (Discussion held off the record.)
18     Q.  Would you consider that a placement in -- of a
19  special ed. student in Sarah Reed is more restrictive than a
20  placement of special ed. student in one of the neighborhood
21  schools on the continuum of the least restrictive --
22     A.  Well, to the external -- to an external individual
23  from an educational standpoint, I guess the answer to that
24  would be yes. From a capability of benefiting from the
25  educational program, Sarah Reed generally would be, before

Page 23

1  we place them there, the appropriate placement. Therefore,
2  it would be the least-restrictive placement.
3      We would not put somebody there until a team had
4  looked at that and realized that -- from what they were
5  capable of benefiting at that time educationally, because of
6  whatever the reasons, that would be the least-restrictive
7  environment for them.
8      Q.  Okay. So, now, the therapeutic program offered by
9  Sarah Reed, is it simply a behavior modification program, or
10  are there other components to the therapeutic program?
11     A.  There is an educational component.
12     Q.  But the therapy is provided -- it's deemed
13  necessary because there's a behavioral issue?
14     A.  Because there is an emotional need, because there
15  is a -- that could -- would -- depending on the situation,
16  it could be emotional need, behavioral issue. Could be a
17  host of reasons that the team, you know, examines.
18     Q.  Okay. I'm going to refer you to a document that
19  was part of the documents marked Woods No. 4. It's Erie
20  Bates stamp 446, and it's a memo dated 1/14/02 from Marlene
21  Chrisman. You are shown as receiving a copy of this
22  January 15th, '02 memo from -- to Jo Barker from Marlene
23  Chrisman. And who is Jo Barker?
24     A.  Director of elementary and middle school programs.
25     Q.  Is that an Erie School program?

Page 24

1      A.  Um-hum.
2      Q.  She's an Erie School District employee?
3      A.  She is.
4      Q.  And do you recall receiving this memo?
5      A.  Um-hum.
6      Q.  Okay. And this says -- this memo --
7      MR. MARNEN: Yes or no?
8      THE WITNESS: I apologize.
9      MR. MARNEN: That's all right.
10     A.  Yes.
11     Q.  "The purpose of this memo is to provide
12  information on two students who are being referred to Sarah
13  Reed per Frank Scozzie. Both girls were involved in a
14  recent situation at S.V. of the nature and intensity that
15  staff, including Mr. Scozzie, feels this level of
16  intervention is essential. Both girls are under the age of
17  14 and, therefore, not eligible for the adolescent partial
18  program."
19     I take it that Miss Chrisman wrote that. To your
20  knowledge, is that an accurate statement or an accurate
21  description of how the girls got referred to Sarah Reed?
22     A.  Yes.
23     Q.  Then it says at the bottom, "It is my
24  understanding that Mr. Scozzie would like the girls to begin
25  this placement as soon as possible. Please contact Charlise

Page 25

1  Moore or myself to assist in this process." And this is
2  a -- the subject of this memo is B. Mod. Referral. So that
3  must mean Behavior Modification Referrals.
4      A.  That's correct.
5      Q.  Why would Jo Barker need this information?
6      A.  As I told you before, anything we do with Sarah
7  Reed, we do through a team.
8      Q.  Okay.
9      A.  And we just -- Jo basically is the liaison between
10  Sarah Reed and the School District, controlling the number
11  of students that go to the facility, so that we don't exceed
12  a particular number. And she would have gotten it for that
13  reason.
14     Q.  Okay. So she's keeping count of how many students
15  go to Sarah Reed.
16     A.  Right.
17     Q.  Do you know what that number is?
18     A.  I think we probably generally in various programs
19  have 50 -- a cap of about 50 students there.
20     Q.  And of those 50 students, how many might be in the
21  therapeutic program? The behavior modification therapeutic
22  program.
23     A.  I'm going to say 12. But that -- that could vary.
24  But it's in that zone.
25     Q.  So I'm looking at the documents that have been

Page 26

1    marked as Exhibit 1. And the first part of those documents
2    are the IEP for R‑‑‑ P‑‑‑ stemming from a 7/23/01 NORA
3    and IEP. But what I would like to do is draw your attention
4    to the document numbered 419.
5        A. I don't think I have that one.
6        Q. It's in Exhibit 2.
7        A. Okay. That, I do have it.
8        Q. It would be 419.
9            MR. MARNEN: Woods 2 or Scozzie 2?
10           MR. OLDS: Scozzie 2.
11       Q. Can you tell me what this is.
12       A. It's a revision of the IEP.
13       Q. And the date is 1/18/02?
14       A. Yes.
15       Q. Okay. Now, that, actually -- is this the
16   indication that an IEP team met?
17       A. It's an indication that a team met to review
18   the -- a group met to review the IEP.
19       Q. Okay. The memo that we had previously looked at,
20   which was part of Woods 4 and dated 1/15/02, is an
21   indication that you -- apparently you had decided to send
22   the girls to Sarah Reed as of January 15th, '02. Is that
23   right?
24       A. I had been requested to do that. After I listened
25   to her request and the reason for her request, I then began

Page 27

1    to move on that placement. Yes, I did.
2        Q. Okay. So when you say "her request", you're
3    talking about Mrs. Woods?
4        A. That's correct.
5        Q. But I thought I heard you say that it had to be
6    the IEP team that made the recommendation.
7        A. As I said, I started to move on it. That's the
8    process, I started it. I called the supervisor, who then
9    would gather everybody together and start getting, you know,
10   all the paperwork done and decision-making done. All I can
11   do is assist with the placements. If Sarah Reed were to say
12   I don't have room or I'm going to take a longer period of
13   time, the IEP team had to make that ultimate decision, not
14   me.
15       Q. So when -- going back to this January 15th,
16   '02 memo, in which Miss Chrisman writes, "The purpose of
17   this memo is to provide information on two students who are
18   being referred to Sarah Reed per Frank Scozzie," is that an
19   inaccurate statement? You weren't referring them to Sarah
20   Reed or were you referring them to Sarah Reed?
21       A. I was referring -- what she means by that is that
22   I have called her and said, listen, take a look at these two
23   kids for Sarah Reed. And the general statement might have
24   been, well, it's mid year, there's no -- there's no room at
25   the inn or we can't get them in right now, and my calling

Page 28

1    her tells her that if the IEP team so deemed, I would see to
2    it that there was an accommodation made by Sarah Reed. That
3    would be my involvement to that.
4        Q. It's not a -- but you don't -- you wouldn't make a
5    referral of K‑‑‑ and R‑‑‑ to Sarah Reed without some
6    kind of in-depth information, would you?
7        A. As I recall, Jan Woods told me there were issues
8    there that she was concerned that these young girls were
9    going to hurt themselves, and that that was an issue which
10   is something that I would have brought to the attention of
11   the supervisor and said, listen, this is the reason why I
12   want to move on this quickly.
13           But when I get a sense of urgency -- when you deal
14   with a principal, and they call you up, you get to know
15   them. You get to know when their reactions are just normal
16   and when it's abnormal. Jan Woods expressed to me
17   significant concern about the mental health of these two
18   young ladies in a way that caused me to take a look at -- or
19   have the supervisor take a look at -- I can't recall at the
20   time -- we would have seen whether there would be a
21   potential that might require an immediate intervention, and
22   I think that we did do that and we did see that.
23           And, again, there are a lot of safeguards in the
24   special education process. If we were overreacting, the
25   team would have looked at that and said, no, that's not

Page 29

1    appropriate.
2            So when you start this process, it's not -- it's
3    not a daring move, because I might think and Jan Woods might
4    think, but the team might say no. So there's checks and
5    balances built in the system.
6        Q. Okay. Let's go back to Item No. 419 here, Page
7    No. 419.
8            MR. MARNEN: Scozzie 2?
9            MR. OLDS: Yes, Scozzie 2. Bates stamp 419. This
10           is the IEP revision review.
11           THE WITNESS: Yes.
12       Q. So the IEP team met here and the objective
13   benchmark is quote, "Develop consistent patterns of
14   appropriate behavior through a program of therapeutic
15   support."
16           When language is placed in the objective benchmark
17   part of an IEP revision review document, what is the
18   significance of that?
19       A. Well, we want to alter some type of behavior,
20   whether it be a person who might be spouting off
21   belligerently, a person who threatens to harm themselves, a
22   person who threatens to harm others. And, again, I'm being
23   general, not specific here.
24       Q. Right.
25       A. But that's the kind of technique we utilize to try

8 (Pages 26 to 29)



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD P., BY AND FOR
R█████ P., AND DENISE L., BY
AND FOR K█████ L.,
            Plaintiffs

        vs                              ) Civil

SCHOOL DISTRICT OF THE
CITY OF ERIE, PENNSYLVANIA;
JANET WOODS, INDIVIDUALLY
and in her Capacity as Principal
of Strong Vincent High School;
and LINDA L. CAPPABIANCA,
Individually and in her Capacity
as Assistant Principal of Strong
Vincent High School,
            Defendants

        Deposition of FRANK SCOZZIE, taken before and
by Linda K. Rogers, Commissioner of Deeds in the
Commonwealth of Pennsylvania and Notary Public in
the State of New York, on Wednesday, May 18, 2005,
commencing at 12:10 p.m., at the law offices of
Knox, McLaughlin, Gornall & Sennett, 120 West 10th
Street, Erie, Pennsylvania.

                    * * *

                                            Page 1

For the Plaintiffs:
    Edward Olds, Esquire
    Carolyn Russ, Esquire
    1007 Mount Royal Boulevard
    Pittsburgh, PA 15223

For the Defendants:
    James T. Marnen, Esquire
    Knox McLaughlin Gornall & Sennett, PC
    120 West 10th Street
    Erie, PA  16501

                    * * *

                                            Page 2

FRANK SCOZZIE, first having
been duly sworn, testified as follows:

                DIRECT EXAMINATION

BY MR. OLDS:

   Q. Mr. Scozzie, I wanted to talk to you about the
issue of records and the change in school district policy
concerning retention of records.
   A. Okay.
   Q. As I understand it, at some point there was a
change in policy concerning discipline records?
   A. Regarding?
   Q. Destruction of discipline records.
   A. That very well may be true.  Was that when I was
running the department or.
   Q. I don't know.  I guess I'm asking you.  Do you
know if there has been -- if the Erie School District has
changed its policy concerning discipline records and
retention of discipline records?
   A. I don't believe that I am aware of that.  I think
we follow a certain policy.  It seems to me that there was a
situation that we decided that certain records would be kept
in certain areas.  And we do review what is kept under lock
and key, and what is kept out for daily perusal.  And we

                                            Page 3

do -- Dr. Tempestini, who is our child study director, does
control what is destroyed and what is not by following
policies.  I would say she may have made me aware that she
made a change or there was a change.  I can't say that it
was something that I'm -- that's off the top of my head.
That doesn't mean it didn't occur.
   Q. Well, let me -- we marked, I guess this was marked
as Defendants' Exhibit C, which was middle and high school
discipline policy for 2001-2002, and at document Bate stamp
102.  In the introduction it says, student discipline
records will remain a part of the student's permit files.
When a student transfers to this school district a certified
copy of the student's discipline record is required and
obtained from the school entity from which the student is
transferring.  The same is true when a student transfers out
of the Erie School District.  This record shall be
maintained as part of the student's permanent discipline
record and shall be made available for inspection as
required by law.  Do you know if that policy has changed?
   A. As I said, this policy is reviewed yearly, there
probably are yearly changes.  Is that a major change, again,
that is something someone else does.
   Q. Who might that be?
   A. I mean, the maintenance of records are done by two
people.  The director of special education, Jim Pacansky,

                                            Page 4

267a

Richard B., et al., vs. Erie School
Held: 5/18/05

Document Multi-Page™   Filed 09/28/2005   Page 18 of 38   F. Scozzie

1  parents?
2      A. I would imagine -- I would hope it would be in a
3  reasonable fashion. I'm sure she needed to sort through
4  some things. I am not going to speak for her, but it would
5  be my hope that she would do it as quickly as she had
6  determined what had actually occurred in the situation.
7  It's not good to call a parent and say, listen, I just heard
8  this and I am just going to start -- because it sometimes
9  turns out not to be true or not to be factual. So you have
10  to make sure you have the facts in order and then the call
11  should be made as soon as that is determined.
12      Q. Did either -- did you ever talk to
13  Miss Cappabianca about what happened to K█████and R█████
14      A. I believe my conversations were with Jan Woods,
15  but I can't say I never did speak to Miss Cappabianca, I may
16  have.
17      Q. But you don't recall what you said to her, if you
18  did speak to her? Or do you have a recollection of what was
19  said?
20      A. Let me, again, say that whether it came from both
21  Cappabianca and Woods or Woods, which is my recollection,
22  there was a certainty that mental health intervention needed
23  to be invoked immediately, as quickly as we could do it.
24      Q. And what do you recall the information that they
25  gave you that indicated that mental health had to be

Page 13

1  that other thing, I have every confidence that the
2  department would take care of those. If necessary a new
3  NORA, rather an evaluation needs to be done. But
4  Sarah Reed is very good before they do an intake they know
5  the rules.
6      Q. I have several questions to follow up on that
7  answer. Number one, when you refer to the department, are
8  you referring to the special education department?
9      A. What I'm referring to there would be the special
10  ed. department in conjunction with the child study which I
11  referred to earlier that would be Marianne Tempestini's
12  pupil personnel services department. But the acronyms have
13  changed through the years, but you still use the same
14  terminology. But, yes, they would work together to see that
15  all the necessary paperwork. That is somebody else's job,
16  at that point I was not doing an assessment, worrying about
17  who was going to do the paperwork. I was worried about Jan
18  Woods had described the situation with a sense of urgency,
19  my function at that point was to get the process going so
20  that -- assuming that the paperwork was done -- the
21  placement was capable of being done.
22      Q. I think you made a statement that Jan Woods
23  conveyed the notion to you it couldn't wait two weeks for
24  this to be done.
25      A. No, I didn't say -- what I said was, it could wait

Page 15

1  invoked?
2      A. I think Jan was concerned that there could be some
3  issue with the individual student hurting herself, doing
4  some damage to her body, to herself.
5      Q. R█████ and K█████were both special ed.
6  students, was there any discussion about doing an evaluation
7  or reevaluation of their condition?
8      A. Well, I guess there's two things. When someone
9  tells me about an emergency situation, I'm not going to sit
10  back and say, well, let's take about three weeks to do an
11  evaluation of the situation. The processes will take care
12  of themselves before the placement could be done that had to
13  be done, things had to be done.
14      Q. What do you mean before what had to be done?
15      A. There was a period of time where a new NORA would
16  be issued. And the department would -- or a placement
17  letter would be done. And the department would do an
18  evaluation, that would be a departmental thing before the
19  placement is done to make sure all the things you're talking
20  about were done. My assessment at that time was if it took
21  two weeks traditionally based to go to Sarah Reed, she gave me a
22  sense of urgency based on what I'm telling you that it
23  couldn't be two weeks. This needed to be done immediately,
24  and I acquiesced to what she had requested.
25      The other issues of whether the safeguards and all

Page 14

1  two -- what she was saying that this needs to be done right
2  now. Jan has -- many principals will call with situations,
3  and you have to sort through that. Is this a real
4  situation. And I could tell by her tone of voice, and her
5  sincerity that she really believed that this needed
6  immediate attention.
7      Q. I would assume that you have visited or been
8  present at Sarah Reed Children's Center?
9      A. Yes.
10      Q. And have you observed their classroom settings and
11  stuff?
12      A. I have on occasion.
13      Q. I mean in terms of an emergency situation what
14  would you expect that Sarah Reed could do on an emergency
15  basis?
16      A. I told you before about Sarah Reed, they have a
17  lot of mental health specialists there that are trained in
18  looking for certain types of behavior, that would be one
19  thing. Number two, it is a structural change in
20  environment. There is a significant difference between
21  being with 800 students in a -- I don't how many square foot
22  Strong Vincent is, but it's a very large facility, and going
23  to a school that is much smaller with a much smaller class
24  size and many more adults paying attention to your actions.
25  You get a lot more attention, lot smaller class size and the

Page 16

1 level of the expertise of the people that are dealing with
2 you are more attuned to mental health issues.
3    Q. Do you know whether Janet Woods had any background
4 that she could diagnose mental health problems? She's just
5 an educator, right?
6    A. She's an educator. Obviously when you work in a
7 building of that nature and you can see the differences in
8 cases, and you can certainly have a good professional
9 judgment in that sense, there's a professional staff there
10 that has some skill level.
11    Q. You're talking about Strong Vincent?
12    A. Um-hmm -- yes.
13    Q. It is fair to say that -- it is fair to say that
14 typically the children that are referred to Sarah Reed have
15 very severe behavioral problems?
16    A. Not always. There's a range of what -- I mean,
17 there are students who for some reason are in need of a
18 level of expertise that the district doesn't have the
19 ability to provide for a period of time.
20    Q. I think you mentioned something about that Sarah
21 Reed intake knew the procedures, you also made a reference
22 to their intake. What did you expect Sarah Reed's intake to
23 do.
24    A. Sarah Reed took a look at this situation and the
25 student. And when they were sitting down talking to the

Page 17

1 student and doing the assessment, they're not going to
2 say -- if they see a student doesn't belong there or there's
3 no need for their type of intervention -- there's checks and
4 balances in there, that's why I have a tremendous comfort
5 level. The staff is a very professional staff. If they
6 would have done the intake and called me back and said,
7 listen, neither of these students should be leaving Strong
8 Vincent, they belong in their main school there, you need to
9 look internally rather than externally, we would have done
10 that.
11    Q. Once these students went to Sarah Reed, did you
12 receive any information or feedback or reports from Sarah
13 Reed about their progress?
14    A. Did I personally?
15    Q. Yes.
16    A. No.
17    Q. You wouldn't expect to, that's not the way the
18 system works; is that correct?
19    A. I am not the daily practitioners that would be
20 working with students, that's not my function.
21    Q. Okay. After they were referred to Sarah Reed,
22 R█████ and K█████, were you involved at all in the
23 consideration of whether to discipline the students who
24 assaulted them?
25    A. No.

Page 18

1    Q. And that's because that would have been
2 Miss Woods' responsibility to take those steps?
3    A. It would have been Miss Woods' responsibility to
4 take those steps. If she needed assistance with that, for
5 example, she were going to refer them for expulsion then she
6 would have utilized the procedure and that would go to
7 somebody else.
8    Q. Who would an expulsion go to?
9    A. She would have to take the packet, fill it out to
10 Dr. Linden at the time, he was the assistant superintendent
11 in the office next to mine. And that was his
12 responsibility.
13       MR. MARNEN: John Linden, right? Dr. John Linden,
14 L-I-N-D-E-N?
15       THE WITNESS: Correct.
16    Q. Did you ever have any -- do you know whether that
17 impact happened or whether -- did you ever talk to
18 Mr. Linden about this situation -- Dr. Linden, excuse me.
19    A. I really can't say I recall, I certainly may have.
20 They certainly may have done that, but I do not have a
21 recollection.
22    Q. Is Dr. Linden still with the Erie School District?
23    A. He has retired.
24    Q. At that time did you have any responsibility
25 relative to the discipline policy of the school district?

Page 19

1    A. Did I have any responsibility? Depending on the
2 circumstance I could. If John Linden was out of town, if
3 the principal wasn't in, substitute principal didn't know
4 what to do, they could have called me. Was that one of my
5 job functions? Absolutely not.
6    Q. There was a -- I want to ask you your information
7 concerning some procedural issues. I don't know what I did
8 with that first page here. As you know, and we've looked at
9 them before, and I'll just refer you to Moore Deposition
10 Exhibit 1, and this pertains to R█████ P██████ Although
11 Moore Deposition Exhibit 2, and there's similar
12 documentation pertaining to K█████ I█████
13    A. Um-hmm.
14    Q. There was an IEP review revision, this document
15 was completed on 1/18/02 for R█████ P██████
16    A. Okay.
17    Q. That would be Moore Exhibit 1. Would you
18 anticipate that there would be actually an IEP meeting
19 before this document was prepared and signed?
20    A. Not necessarily, could.
21    Q. Under what circumstances is it permissible not to
22 have an IEP meeting before changing the IEP?
23    A. If there really is no structural change needed or
24 any significant change, or at this moment if the teacher and
25 a parent do not determine a pressing need, I don't think

Page 20


269a

Page 1

```
 1                 IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3     RICHARD P., by and for      :
       R_____ P., and DENISE L., :
 4     by and for K_____ L.,     :
                   Plaintiffs      :
 5                                 :
           v.                      :   Civil Action No. 03-390
 6                                 :            Erie
       SCHOOL DISTRICT OF THE CITY :
 7     OF ERIE, PENNSYLVANIA; JANET:
       WOODS, Individually and in  :
 8     her Capacity as Principal of:
       Strong Vincent High School; :
 9     and LINDA L. CAPPABIANCA,    :
       Individually and in her     :
10     Capacity as Assistant       :
       Principal of Strong Vincent :
11     High School,                :
                   Defendants      :
12

13

14

15

16              Deposition of VIKKI SCULLY, taken before

17          and by Janis L. Ferguson, Notary Public in and

18          for the Commonwealth of Pennsylvania, on Friday,

19          March 18, 2005, commencing at 1:14 p.m., at the

20          offices of Knox McLaughlin Gornall & Sennett, PC,

21          120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25              Reported by Janis L. Ferguson, RPR
                Ferguson & Holdnack Reporting, Inc.
```

270a

c76de80c-e5fa-458f-8e18-d7ed8c20ab99

Page 10

1    Q. Okay. Describe the conduct that he engaged in
2  that you remember.
3    A. It would be stuff like he would repeat stuff that
4  they said or interrupt when they were talking or, you know,
5  you're looking at me, stop looking at me. You moved my pen.
6  Stuff like that.
7    Q. Did you have to -- let me ask it this way: In
8  terms of maintaining order in your classroom, what tools did
9  you have as a teacher to make sure that all the students
10  were on task?
11    A. I would separate students who I considered to be
12  distracting. I would put them closer in proximity to me so
13  I could monitor what they're doing, and I kept them very
14  busy. I had stuff to do from -- immediately when you walked
15  in, there was stuff on the board. It was called a "do now",
16  where they had to sit down and get to work. Try to reduce
17  downtime at all -- at all costs, because that's when middle
18  school students get into trouble, is when they have
19  unstructured time.
20    I encourage the students to tell me, you know, if
21  things were going on, and then we would address it and worry
22  about stuff in the classroom. And then if the kids were
23  violating the rules, there was the discipline measures;
24  teacher detention, phone call home. And if it would
25  persist, then it would be referred to the office and the

Page 11

1  administrators.
2    Q. Teacher detention, what kind of -- what did that
3  imply?
4    A. They would come after school the next day or the
5  day after, and I would either give them an assignment, or we
6  would talk about what was going on. Basically they had to
7  stay after school a half hour for -- you know, some
8  punishment was doled out during that time period.
9    Q. And that's different from the -- we've run across
10  a term called the PASS.
11    A. Um-hum. Program for After-School Suspension.
12    Q. Okay. Program for After-School Suspension. So
13  the teacher suspension was a different tool?
14    A. That was the first kind of notch on the discipline
15  belt.
16    Q. And did you find that you were referring -- using
17  the referral system to refer C█████ B█████ to
18  Miss Cappabianca for help?
19    A. C█████ -- C█████ was referred to the office
20  frequently, I would say.
21    Q. Did you talk to -- when you referred C█████,
22  would Miss Cappabianca talk to you, or would there be
23  communications between the two of you?
24    A. Yes. She was very open and, you know, wanted to
25  know what was going on, or would give us feedback as to

Page 12

1  what, you know, she did.
2    Q. And do you remember B███ C█████?
3    A. Yes, I do.
4    Q. Was she in any classes with either R███ or
5  K█████?
6    A. That, I would have to look at my -- I don't
7  remember.
8    Q. And what kind of discipline problems did B███
9  C█████ present?
10    A. Defiant to authority. If she wanted to do
11  something, she would do it. If she didn't, then she
12  wouldn't.
13    Q. And was she friends with C███ B████, do you
14  know?
15    A. I don't know. I -- they interacted. I don't know
16  if I could call them friends.
17    Q. In terms of your -- either your background, you
18  know, your educational background, your experiential
19  background, is it fair to say that learning support kids
20  might be more vulnerable than other kids, in terms of abuse
21  or harassment? Is that a fair statement, do you think?
22    A. I don't know, because as I have gone on in my
23  career, I -- I have seen kids in the regular ed., regular
24  education students who are often targets to -- I don't think
25  so much it's, per se, because they are a learning support

Page 13

1  student. Because there's many learning support students
2  that go through school fine without ever being the target
3  or, you know, getting picked on.
4    Q. Do you recall whether either K█████ or R███
5  were targets of either harassment or bullying by other
6  students?
7    A. Not to my recollection, no. K█████ was
8  social -- K█████ had a sister at the school who she was
9  protective of. And R███ was very quiet. R███ was the
10  kind of student that went in the back of the room, sat
11  there, did her work, and didn't -- didn't cause much of a
12  scene. So I didn't -- you know, she was one of the quiet
13  ones.
14    Q. Do you remember whether you ever had to refer
15  either R███ or K█████ to Miss Cappabianca?
16    A. R███ I sent to the office -- the one time that
17  I recall is when she had walked into the room and yelled
18  a curse word at a student, which was surprising, because I
19  had not heard R███ talk like that. And I sent her over to
20  the office.
21    I don't think I ever referred K█████ or R███
22  for any other reason. For discipline -- discipline for -- I
23  mean, if, you know, kids come up and say I have a problem or
24  something, I would send them to the office so they could
25  talk. But K█████ and R███ were, in my opinion, no way



Page 14

1  behavior problems.
2      Q.  Do you know whether K▇▇▇ ever talked to you
3  and asked your permission to go to the office so that she
4  could talk to Mrs. Cappabianca?
5      A.  There were a couple times where she would go and
6  talk with her.  K▇▇▇ had a very good relationship with
7  Linda.  She was open and willing to talk.  R▇▇▇ was a
8  little more shy, quiet, kept to herself.
9      Q.  And when you say that K▇▇▇ had a good
10 relationship with Mrs. Cappabianca, how do you know that?
11     A.  They were talking a lot.  Miss Cappabianca spent a
12 lot of time with her, you know, walking down the hall.  I
13 would see them talking.  Or if K▇▇▇ needed to go talk to
14 her -- my room was literally right across the hall, so I
15 could look in, and I knew who was in the office, because I
16 usually keep my door open.
17     Q.  At some point did you learn that K▇▇▇ and
18 R▇▇▇ had been molested?
19     A.  Yes.
20     Q.  Okay.  How did you learn that?
21     A.  That was the day after -- it was after the day
22 that R▇▇▇ had come in and, out of character, screamed at a
23 student.  And when I sent her over to the office, shortly
24 thereafter, news of the incident was -- we were told certain
25 things about what had happened.

Page 15

1      Q.  Okay.  Tell me who told you and what was told to
2  you.
3      A.  Linda Cappabianca let us know that the girls were
4  assaulted in the back of the -- what was that?  The
5  Laundromat on 8th Street.  And we weren't told a lot about
6  it.  I didn't know which boys were involved.  But we were
7  just, you know, instructed to keep the kids on task and to,
8  you know, keep -- you know, keep it -- you know, usual
9  typical day.  Try to keep the kids redirected -- so I
10 didn't know many of the details of what happened.
11     Q.  You said that you learned the day after R▇▇▇ had
12 come in and used the -- a curse word.
13     A.  Um-hum.
14     Q.  What do you recall of that incident; R▇▇▇ coming
15 in the classroom?
16     A.  It was the very beginning of class.  I believe it
17 was the first thing in the morning.  And the kids were
18 walking in and getting settled.  And all I heard was R▇▇▇
19 you know, yell at this other student.  And I was surprised.
20 I remember being like, this isn't like her, and I just said,
21 you need to go to the office.  And then --
22     Q.  What word did she use?
23     A.  The "F" word.
24     Q.  And you don't remember the student, or you do?
25     Q.  Who said it to?

Page 16

1      Q.  Yes.
2      A.  No, I don't.
3      Q.  Okay.  And then it's your testimony that the next
4  day following that, that you learned -- Miss Cappabianca
5  told you that there had been an incident involving the
6  girls.
7      A.  Yes.  And I'm not sure if it was the next day, but
8  somewhere -- because the investigation had begun.  And
9  somewhere in that time period, we were told, you know, the
10 facts that we needed to know, which weren't many.
11     Q.  So it might not have been -- it might have been
12 the next day, or it might not have been.
13     A.  It was in that -- the first couple days.
14     Q.  Okay.  And do you remember when that was?
15     A.  I believe it was right after we returned from
16 school.  After the Christmas holidays.  So that was 2002.
17     Q.  Okay.  Now, were you aware whether any of the
18 other students were talking about the incident?
19     A.  A couple of days there was chatter, you know,
20 amongst the kids.  But we just kept trying to redirect and
21 say, you know, people are taking care of it and -- and when
22 an incident happens in a middle school, you know, it's --
23 you know, people talk and rumors start to --
24     Q.  Right.
25     A.  So we just tried to keep it to a minimum.

Page 17

1      Q.  And then when you say "we", who are you -- who is
2  "we"?
3      A.  Other teachers that -- the learning support
4  teachers; Connie Manus, Jodie Gray, who taught across the
5  hall.
6      Q.  Okay.  Now, when Miss Cappabianca told you about
7  the incident, did she gather all of you together to talk to
8  you, or did she just talk to you?
9      A.  She told me on a one-to-one basis.
10     Q.  And then you're assuming that she also told the
11 other teachers?
12     A.  Yes.  Yeah.
13     Q.  And she didn't mention who the assailants were to
14 you.
15     A.  No.
16     Q.  Okay.  And do you recall whether either K▇▇▇
17 or -- and if I asked you this, I apologize.  Did either
18 K▇▇▇ or R▇▇▇ talk to you about the incident
19 themselves?
20     A.  No.
21     Q.  Did you observe anyone -- after the incident, did
22 you observe any students, you know, taunting, harassing, or
23 bothering either R▇▇▇ or K▇▇▇?
24     A.  No, because when I became aware of it was after
25 the -- the blowup in my classroom.  And after that, I didn't

Page 1

1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    RICHARD P., by and for          :
     R██████ P., and DENISE L.,      :
4    by and for K████████ L.,        :
                    Plaintiffs       :
5                                    :
          v.                         :    Civil Action No. 03-390
6                                    :              Erie
     SCHOOL DISTRICT OF THE CITY     :
7    OF ERIE, PENNSYLVANIA; JANET    :
     WOODS, Individually and in      :
8    her Capacity as Principal of    :
     Strong Vincent High School;     :
9    and LINDA L. CAPPABIANCA,       :
     Individually and in her         :
10   Capacity as Assistant           :
     Principal of Strong Vincent     :
11   High School,                    :
                    Defendants       :
12

13

14

15

16            Deposition of RONALD SLUPSKI, taken before

17       and by Janis L. Ferguson, Notary Public in and

18       for the Commonwealth of Pennsylvania, on Tuesday,

19       April 26, 2005, commencing at 1:13 p.m., at the

20       offices of Knox McLaughlin Gornall & Sennett, PC,

21       120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25            Reported by Janis L. Ferguson, RPR
              Ferguson & Holdnack Reporting, Inc.

273a

bb58db96-7556-450b-9880-4272f5a90d74

Richard P. v. School District          Ronald Slupski

April 26, 2005

Page 14

1   Pam Barber, Jim Perfetto, Janet Woods, and then you, of
2   course. Anybody else you can remember?
3       A.  I might have -- Detective Love -- or Wally Love
4   might have walked over also. I know -- I'm not sure if he
5   came over at the same time I did, but I know -- as I said
6   earlier, you know, when we have -- when police officers or
7   whoever come into the building, usually we're there to greet
8   them. And I'm sure Wally Love would have been there also,
9   although, I don't recall seeing him in there.
10      Q.  Did you ever --
11      A.  But I know he -- he would have sooner or later
12  been in the office at the same time.
13      Q.  What time of day was this, do you remember?
14      A.  I think it was in the morning.
15      Q.  Can you be more specific?
16      A.  No, I can't.
17      Q.  Okay. Sometime in the morning?
18      A.  Sometime in the morning.
19      Q.  How long did you stay in the room?
20      A.  Just enough to get some -- just to get an inkling
21  of what they were doing there.
22      Q.  Okay.
23      A.  Yeah.
24      Q.  What were you told?
25      A.  Well, I -- I learned that there was an

Page 15

1   investigation; that they were there to make inquiries into
2   some sexual misconduct allegations.
3       Q.  Against students?
4       A.  Against -- yeah, well, I -- again, I don't recall
5   exactly.
6       Q.  You just remember sexual misconduct?
7       A.  Yeah. I knew there was something going on and
8   these people were there to conduct the investigation.
9       Q.  Is it fair to say you were there less than 30
10  minutes in the office?
11      A.  No. I -- it's --
12      Q.  You don't know?
13      A.  Oh, I was there less than that. I had other
14  things going on, yeah.
15      Q.  Okay. It was a brief of -- to brief you on what's
16  going on, and --
17      A.  And I don't even think it was a formal brief.
18  Hey, guys, what's going on; you know, what brings you here.
19  Well, we're here for this. Okay. Any way I can help? Fill
20  me in what's going on later on, and I'll talk to you guys
21  later.
22      Q.  And you're on your way.
23      A.  I went back across the hall. If you need me for
24  something, get in touch.
25      Q.  Okay.

Page 16

1       A.  Usually -- you know, if I can expand that answer a
2   little bit. Usually what happens is -- if detectives are
3   working on something that we don't -- we don't jump in on
4   their investigation. They conduct their investigation. If
5   they need our help, you know, they will come in -- or they
6   will ask us for it. If there's something -- you know, can
7   you guys add something, you know, they will ask for it. And
8   that's just the way -- unwritten rule in the police
9   department is, you know.
10      Q.  Did you or Detective Love ever conduct criminal
11  investigations at Strong Vincent?
12      A.  Oh, yeah, um-hum.
13      Q.  Were there certain kinds of things you
14  investigated?
15      A.  Thefts. We do a lot of those. We did a lot of
16  thefts. Vandalisms. Kids pulling fire alarms. Criminal
17  trespass; people coming into the building that don't belong
18  there. Fights in the school. Things -- things like that.
19      Q.  Okay. Do you know why you didn't investigate this
20  particular incident?
21      A.  I have no idea.
22      Q.  Have you ever, during the time you have been
23  there, investigated an alleged sexual assault?
24      A.  Outside of -- well, as a matter of fact, I have
25  one going on now. Yeah, I have in the past.

Page 17

1       Q.  What is the general nature of that one?
2       A.  Well, usually I'm called in by one of the
3   principals. And the first point of contact a student would
4   have is generally with the principal, one of the principals,
5   or their teacher and then to the principal, and then it will
6   filter back down to us.
7       Q.  But the one you're investigating right now, that's
8   a sexual assault?
9       A.  Yes, it is.
10      Q.  Is it rape?
11      A.  No. No.
12      Q.  Something less serious?
13      A.  Indecent. It's an indecent assault.
14      Q.  Okay.
15      A.  Along with there are some other charges that are
16  going on with that also.
17      Q.  All right. As you sit here today, do you know why
18  you did not investigate this matter?
19      A.  No. I -- I couldn't speculate. No, I don't know
20  why.
21      Q.  Okay.
22      A.  There are -- there are times when we're not called
23  in. Some matters are settled between the principal and
24  student. We're not brought in on it. We're not brought in
25  on every little thing that goes on.

Ferguson & Holdnack Reporting, Inc.          274a          bb58db96-7556-450b-9880-4272f5a90d74

Page 18
1    Q.  Did you participate to any extent in the
2  investigation of this incident?
3    A.  No.  I just hate to give you short answers, but
4  what do you mean by "participate"?  I'm trying to be --
5    Q.  No, that's a legitimate question.
6    A.  I'm trying to be specific.
7    Q.  I appreciate your interest in -- in providing the
8  information.  All right.  You walked out of the room after
9  you were introduced and then briefly briefed.  And did you
10  have any -- did you talk with any students concerning this
11  matter in the nature of interviewing them?
12    A.  I didn't talk to any students that I recall.  I
13  imagine, you know, we might have had conversations with --
14  with the detectives who were assigned this case.  At some
15  point in time I'm sure, you know, they would ask if there
16  was anything that I could add.  Do I know these kids; you
17  know, are they credible; things like that.  I'm sure they
18  asked me that.
19    Q.  You are talking a general protocol on what usually
20  happens.  You're not --
21    A.  Basically, right.
22    Q.  Again, I'm gathering you're not talking about your
23  specific memory about this incident.
24    A.  Well, okay.  I don't recall any -- any specific
25  incidents where they directly asked me about this case.

Page 19
1    Q.  Okay.  But it would be typical for them to ask you
2  things, I gather.
3    A.  Typically, yes, they would.  Yeah.
4    Q.  Okay.  In the course of your work as security at
5  Strong Vincent, I think you said over 25 years -- it has
6  been 25 years, right?  Is that what you said?
7    A.  That's right.
8    Q.  Do you do any patrolling of the grounds, the
9  school grounds?
10    A.  Oh, yes.  Yes, we do.
11    Q.  Now, Strong Vincent is bordered on the west by
12  Weschler Avenue, right?
13    A.  Yes.
14    Q.  And on the north by 8th Street?
15    A.  That's right.
16    Q.  I'm sorry, the south.
17    A.  That's right.
18    Q.  You and I both screwed up there.  On the south,
19  8th Street, right?
20    A.  Yeah.
21    Q.  And on the east by Washington?
22    A.  Yes.
23    Q.  And then behind it is -- immediately behind it,
24  there's no street.  There's a field back there, right?
25    A.  That's right.

Page 20
1    Q.  Did you stay within that perimeter of Weschler,
2  8th, Washington, and the football field when you patrolled?
3    A.  I would say 99 percent of the time.
4    Q.  Did you ever go beyond that perimeter?
5    A.  Yes, we did.
6    Q.  Where would you go, when you did?
7    A.  Well, I'll give you an example.  We had a call at
8  the Way2Go store, where kids were stealing, and they were
9  identified as Strong Vincent -- retail theft -- Strong
10  Vincent students.  We get complaints from neighbors up over
11  on 10th and Washington where the kids get off the school bus
12  that they are loitering around, just causing all kinds of
13  disturbances.  I would take a drive up there, break them up,
14  send them on their way.  Down into the football field; kids
15  skipping school.  I went over to Frontier Park; kids running
16  around.  So, yeah, occasionally, I get off of school
17  property.
18    Q.  The Way2Go, is that the plaza that's at the corner
19  of Washington and 8th?
20    A.  Yeah.  That's right.
21    Q.  And also in there, I guess, also --
22    A.  I think it's on Cranberry and 8th.
23    Q.  Oh, Cranberry?
24    A.  Yeah.
25    Q.  Okay.  You're right.

Page 21
1    A.  Actually, it's 6th.  6th and Cranberry.
2    Q.  You're right.  It is.  Okay.  Do you ever go over
3  to the -- there's a Laundromat at 8th and Washington.  Do
4  you go there?
5    A.  I go there every day.
6    Q.  What do you go there for?  Pick up your clothes?
7    A.  Well, in the morning -- in the morning, I kick the
8  kids off the corner, tell them it's time to go to school.
9  And after school, kick them off the corner, tell them to
10  leave the corner.  People don't want you hanging around,
11  take a walk.
12    Q.  Does after school mean around 3:00 in the
13  afternoon?
14    A.  School lets out about 3:25, and I'm there until --
15  five, good five to 10 minutes until the bus comes.  And
16  after that, kids generally start breaking up.
17    Q.  You're familiar with the PASS program, are you?
18    A.  Yeah.  Yes, I am.
19    Q.  That let out later than 3:00, right?
20    A.  Yeah.  It -- I think it was 6:00.  I'm not sure.
21    Q.  Would you ever be around that late?
22    A.  No.
23    Q.  Would Detective Love also be gone by that time,
24  typically?
25    A.  Yeah.  We would punch a clock, and we were out of

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    RICHARD P., by and for
      R_____ P., and DENISE L.,      :
 4    by and for K_____ L.,          :
                  Plaintiffs          :
 5                                     :
            v.                         :     Civil Action No. 03-390
 6                                     :                Erie
      SCHOOL DISTRICT OF THE CITY     :
 7    OF ERIE, PENNSYLVANIA; JANET    :
      WOODS, Individually and in      :
 8    her Capacity as Principal of    :
      Strong Vincent High School;     :
 9    and LINDA L. CAPPABIANCA,       :
      Individually and in her         :
10    Capacity as Assistant           :
      Principal of Strong Vincent     :
11    High School,                    :
                  Defendants          :
12

13

14

15

16              Deposition of JANET WOODS, taken before

17        and by Janis L. Ferguson, Notary Public in and

18        for the Commonwealth of Pennsylvania, on Monday,

19        April 11, 2005, commencing at 10:00 a.m., at the

20        offices of Knox McLaughlin Gornall & Sennett, PC,

21        120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
                     Reported by Janis L. Ferguson, RPR
25                  Ferguson & Holdnack Reporting, Inc.
```

2760a                    3a9d95d8-06da-4388-a818-43709425cad2

Page 38

1    A. That incident did not happen on school property.
2    Q. Okay.
3    A. Could I --
4    Q. Go ahead.
5    A. Let me just finish. That incident did not happen
6    on school property. So, unfortunately, how it falls
7    under the -- under the Discipline Code. You know. That
8    incident happened -- we're talking about the incident on the
9    19th of December, are we not?
10   Q. Right. And there was another incident on
11   January 7th.
12   A. Yeah, we -- we were not made aware of that
13   incident until later in that week, and that's when the whole
14   thing kind of started to piece together, and we were able to
15   talk to all the parents and talk to the girls and talk to
16   Mr. B████
17        When I met with -- I remember when I met with
18   Mr. B████ relative to that incident -- and, trust me, I was
19   looking for something that he did on school property. I was
20   looking for something in that whole mess. But none of that
21   happened on school property, and we weren't aware of it.
22        But when I talked to the father -- and that was
23   the first time I had ever talked to the father. We had
24   always talked with the mother prior to that. We talked to
25   the father, and I let him know in no uncertain terms that if

Page 39

1    I could pursue criminal charges, they were going to be done,
2    and that we had the police involved in the -- in the
3    incident that happened over in the Laundromat.
4        And that father -- we didn't even talk about the
5    AEP thing, because we had talked to his mother about that
6    and couldn't get her to go for it. But the reality was, the
7    father never brought that kid back to school. And I had to
8    go hunting for him to know where he was.
9    Q. You didn't know where he was, right?
10   A. Well, we -- I finally got it down to he had tried
11   to enroll in Faith Assembly of God up on Oliver Road. But
12   we couldn't get anyone at the house. We sent the homeschool
13   visitor out. I remember it was -- you know, because he is
14   still -- he is still on our books. He was still our
15   student. We still had -- he was a special education
16   student, he was still our student, he was on our books, and
17   we had a heck of a time. I sent the homeschool visitor to
18   try to find him. We had a heck of a time trying to even
19   keep track of him. I didn't want to -- you know, you just
20   can't lose track of a kid.
21   Q. Okay. Would you go to Page 12 of this Exhibit C.
22   A. (Witness complies.) Yep.
23   Q. At the top of that, it says Student Behavior, and
24   I'm going to read. "All provisions regarding student
25   behavior are applicable to students while on school

Page 40

1    property, at any school-sponsored activity, including
2    graduation, dances, field trips, et cetera, on any public
3    conveyance providing transportation to a school or
4    school-sponsored activity, and for students going to and
5    returning from school," end quote.
6        Now, he was in PASS and going home on the incident
7    where he assaulted K████ and R████ wasn't he?
8    A. Correct.
9    Q. So this student behavior could have been
10   interpreted to cover that activity; is that right?
11   A. Well, there was more than one incident here.
12   Q. Right.
13   A. Apparently two. And --
14   Q. In fact, wasn't he going home from PASS on both of
15   those incidents? He was going home -- he had just been
16   released from PASS when those incidents occurred. I mean,
17   is that your understanding of what happened?
18   A. Well, generally, yes. But when I -- because it
19   was off school property -- it was off school property. And
20   they had wandered -- I'm talking about the 19th of December;
21   the one that we -- when we finally found out about it,
22   around, oh, the 9th of January, we started talking to the
23   kids about this incident that had happened in December.
24        These students hung around a long time -- in fact,
25   I don't know if one student had even gone home and come back

Page 41

1    or if they -- I don't know if all the kids had come from
2    PASS. But a couple kids were waiting for rides. But they
3    were in the Laundromat.
4    Q. Right.
5    A. They were in the Laundromat, they were -- had
6    walked over on school property, they had walked down to 7th
7    Street. Quite a bit of time had passed. Because they --
8    when we talked to the students, they weren't just in one
9    place on their way home. They were actually down on 7th
10   Street --
11   Q. Okay. But I'm talking about C████ B████. Is it
12   your understanding that he was released from PASS and he
13   went across the street and assaulted K████ and R████
14   A. Correct.
15   Q. Okay. And I think you indicated in your testimony
16   that you were looking for a way to expel him. Is that
17   right? Or discipline him?
18   A. Well, I was interested in -- I don't want any bad
19   eggs in my school. Why would I want to keep somebody in the
20   building that might interfere with the education of your --
21   of your child.
22   Q. Okay.
23   A. I'm not going to try to keep somebody in that
24   building.
25   Q. Okay. But you did not bring -- institute

11 (Pages 38 to 41)



Page 42

1  discipline proceedings against C██ B███ for either one
2  of the two incidents that involved R██ or the incident
3  that involved K███
4      A.  That's correct.  But I wasn't -- when I -- when we
5  became aware of the situation, when things started to --
6  when R██ had her -- R██ had an outburst in class, and
7  that's how it started.  R██ talked to us -- talked to me
8  and talked to Mrs. Cap, and we were able to finally start
9  realizing that there was something that had gone on over at
10 the Laundromat.  And then we found out that B██ C██████
11 was coercing, was forceful.  Another bad egg.  And that
12 A████ K██ was involved.
13     We realized it was what I thought was -- you know,
14 I'm an armchair -- I'm not a policeman.  I'm just an
15 armchair observer -- of criminal nature.  And we got enough
16 credible evidence, we called the police in, talked to the
17 parents, called them -- got the parents in first, talked to
18 the kids, talked to the parents, and then -- and by that
19 Friday morning, I had the police in my office.
20     I had called downtown on -- after I talked to
21 R██, and realized that we had this situation on our
22 hands.  And I was interested in finding out something --
23 like I just stated, I was interested in finding something
24 that happened on school property, because that would have
25 given us all the ammo we needed to get some of these

Page 43

1  eggheads out.
2      But when you talk -- when I talked to the guys
3  downtown, we had -- because it was that far off school
4  property, and because of the time lapse, it -- they said,
5  it will -- you will have to wait until the police does their
6  investigation before we can see if there's any grounds for
7  us to press criminal charges on B██ or K██ or B██
8  as far as the school goes.
9      Q.  Who did you talk to downtown?
10     A.  I talked to Dr. John Linden, the assistant
11 superintendent, and to Frank Scozzie, the assistant to the
12 superintendent.  I may have also talked to Dr. Bob Oliver.
13 I don't recall if he was in that position yet or not.  Those
14 were -- those were the standard two calls I made, to the
15 assistant superintendent and the assistant to the
16 superintendent.  Mr. Scozzie is also in charge of special
17 education, so.
18     Q.  Did you take notes, make notes when you had these
19 conversations or when you met with students?
20     A.  I took notes, but they would not have been kept,
21 because they were -- any -- any recording that we --
22 anything that I -- we have students write stuff down with a
23 witness there and sign it.  But anything that I have, I make
24 sure that that is translated into a -- into the police
25 report.  I don't keep separate anecdotal notes.  What I

Page 44

1  have, I want as a matter of record.
2      And so when the police come, we give them the
3  information, and -- because it was not -- it was not
4  something that happened on school property, and it wasn't
5  something that happened under my jurisdiction.
6      Q.  Okay.
7      A.  I couldn't pursue it to alternative education, I
8  couldn't pursue the criminal charges.
9      Q.  And who told you that?  Who told you, you couldn't
10 pursue it?
11     A.  Either -- either Mr. Scozzie or Dr. Linden.  They
12 said, wait until the police have finished their report,
13 because it didn't take place on school property.
14     Q.  Did you tell them that, look, it happened when the
15 students were going to and returning from school and, that,
16 therefore, it's within the jurisdiction of the discipline
17 rules?
18     A.  I don't think at that time it was viewed as they
19 were returning -- going to or from school.  It happened
20 after PASS.  But I don't think all the students were -- I
21 think Rachel lived right down the street.
22     Q.  But she wasn't -- she wasn't the assailant.
23     A.  Correct.
24     Q.  R██ wasn't the assailant, was she?
25     A.  No.

Page 45

1      Q.  Would there be any reason to discipline R██
2      A.  No.  Not at all.
3      Q.  You mentioned B██C██████ as one of the --
4      A.  Yeah.
5      Q.  -- protagonists here.  Was she a bad egg also?
6      A.  She was a bad egg.  She was a student that needed
7  disciplined.
8      Q.  Was she ever expelled as a result of this incident
9  or anything pertaining to Rachel?
10     A.  No.
11     Q.  Was she ever disciplined for anything pertaining
12 to Rachel?
13     A.  You're talking about school discipline here,
14 right?
15     Q.  School discipline.
16     A.  No.  All -- all criminal charges were handled
17 through -- and we supported absolutely every way we could.
18 But as soon as we knew about it, I think that -- that is all
19 I did for three days, I'm telling you.  That is all I did.
20 We learned about it when R██ blew up in Miss Scully's
21 room and told us what had happened.  That is all I did for
22 three days; was try to piece this together.
23     And by Friday morning -- that happened on
24 Wednesday.  And by Friday morning, we had all the kids'
25 statements, we had all the parents' statements -- except not

12 (Pages 42 to 45)

278a

3a9d95d8-06da-4388-a818-43709425cad2

Page 46

1 Mrs. L▮▮ because K▮▮▮was in the hospital. But we had
2 all of the statements from all of the kids and their
3 parents. Although Mrs. L▮▮, Denise, did come and talk to
4 me. And that was helpful also, because we were able to add
5 that piece to the puzzle.
6      And by Friday morning, we had all the information
7 that we thought was credible, so that we could give it to
8 the police, and we knew the police were going to act right
9 there and right then.
10     Q.  You indicated that you had statements from the
11 students. What form did those statements take?
12     A.  We have students write it down, and then --
13     Q.  And where are the -- have you ever seen those
14 statements since the students wrote them down?
15     A.  The only one -- and, again, I know a lot of the
16 stuff ended up getting pitched after I was gone, because of
17 the change in the discipline thing about keeping notes,
18 those anecdotals. The only one I've seen in the documents
19 that you have -- that Mr. Marnen has is from, I believe,
20 A▮▮▮ F▮▮▮▮▮.
21     THE WITNESS:  Is that right?
22     A.  A▮▮▮ F▮▮▮▮▮ [sic].
23     Q.  So the other students did statements, but they
24 were pitched.
25     A.  Well, they gave -- now, the police --

Page 47

1     Q.  Please. I want to know what they gave to you.
2 The other students actually wrote statements, you're saying?
3     A.  They gave -- and they gave -- all of that stuff
4 went to the police.
5     Q.  Okay.
6     A.  All -- everything went to the police.
7     Q.  Well, if the police don't have it, does that mean
8 that you didn't give it to the police?  I mean, we got the
9 statement from A▮▮▮ F▮▮▮▮▮ from the police.
10     A.  From the police.
11     Q.  Right. So it's your testimony here today that you
12 met with the students for three days, and that each student
13 wrote a statement.
14     A.  My -- every student met with the police. I'm not
15 certain that every student would have written it.
16     Q.  Wait. You met with students for two days.
17     A.  Correct.
18     Q.  And is it your testimony that those students wrote
19 statements?
20     A.  Some of those students wrote statements.
21     Q.  Which students wrote statements?
22     A.  I don't know. I know A▮▮▮ F▮▮▮▮▮ did.
23     Q.  And where are those statements?
24     A.  Well, you just stated that the police had
25 A▮▮▮▮▮.

Page 48

1     Q.  Right. Where are the others?
2     A.  I don't know. I'm not -- I don't know that every
3 student would have written a statement. We would have had
4 the information, we would have had the parent in and gone
5 over the information with the parent. And I know that all
6 information -- we repeated the whole scenario again; the
7 conversation with the police and the student there, and
8 sometimes the parent was there talking with the policeman at
9 the same time.
10     Q.  Now, did you make notes as the students talked?
11     A.  Probably. I generally take notes while a student
12 talks. But I don't do the kind of documenting you're doing.
13     Q.  Right.
14     A.  I'm more interested in ascertaining information
15 and knowing what to do with that information.
16     Q.  Do you know where those notes are?
17     A.  My notes would be gone.
18     Q.  And who destroyed your notes?
19     A.  I would have destroyed them myself.
20     Q.  When?
21     A.  After the police were there. I wouldn't keep that
22 information. Now --
23     Q.  Go ahead.
24     A.  Linda Cap had her own set of notes. I mean, you
25 know, but that's -- you know.

Page 49

1     Q.  You say that this incident broke when R▮▮▮had
2 an outburst in Miss Scully's class?
3     A.  Right.
4     Q.  Now, R▮▮▮had not presented any behavioral
5 problems before that time; is that correct?
6     A.  Oh, she was hardheaded. She -- R▮▮▮sometimes
7 had her own -- she would -- not hardheaded. Maybe that's
8 too -- occasionally obstinate. How is that? That's not
9 hardheaded. Occasionally obstinate would be a better choice
10 of --
11     Q.  She couldn't be compared to C▮▮▮ B▮▮▮, could
12 she, in terms of behavioral problems?
13     A.  No. No.
14     Q.  Or B▮▮▮ C▮▮▮▮?
15     A.  No. No. They were -- they were discipline
16 problems.
17     Q.  What about K▮▮▮? Did she present behavioral
18 problems?
19     A.  No. K▮▮▮and R▮▮▮were pretty typical kids.
20 They were -- few problems here and there, but nothing --
21     Q.  Let's mark this as Exhibit 2. I mean, this will
22 be Exhibit 1. I'm sorry.
23     (Woods Deposition Exhibit 1
24     marked for identification.)
25     Q.  Have you ever seen Exhibit 1 before?

Page 50

1     A.  I have.
2     Q.  And who prepared it?
3     A.  Linda -- this is Linda Cap did this.  And I had
4  her prepare this so that we had something in just brief --
5  something that was as accurate as we could get it, to have
6  it ready for the police.  And I probably sent this downtown.
7     Q.  Okay.
8     A.  I see it has a fax --
9        MR. MARNEN:  Does "downtown" mean police or to the
10      administration?
11     A.  Excuse me.  Downtown means the downtown
12  administration.  It would be Dr. Linden and Dr. Scozzie.
13     Q.  And that number up there, 871-6374 --
14     A.  We have changed phone numbers.  We're now an 874
15  exchange.  I don't know.  It could be.
16     Q.  Okay.  That's okay.
17     A.  Although it would have been before that date.
18     Q.  So Linda Cappabianca prepared this.
19     A.  I'm pretty sure.  Uh-hum.  Yep.
20     Q.  Well, I'd like to draw your attention to the third
21  paragraph on that first page.  "R▓▓ is now being taunted
22  by B▓▓ at school.  B▓▓ is bothering her to perform the
23  acts on other male students.  On Monday, 1/7/02, there was a
24  second incident.  R▓▓ was at the water fountain.  B▓▓
25  was in the hall asking R▓▓ to give head to a male student

Page 51

1  that walked by.  R▓▓ refused.  According to R▓▓, B▓▓
2  had shoved her down into the stairwell and pushed her to
3  follow the male student.  R▓▓ walked down the stairs in
4  the same direction as the male student, but nothing had
5  happened."
6        That information came to your attention during the
7  course of this investigation?
8     A.  Right.  When -- after R▓▓ had come down from
9  Miss Scully's room and we talked about -- well, a lot of
10  things kind of unraveled there.  Both of these incidences,
11  the one on the 19th of December and this one, came out in
12  that conversation.  This -- we didn't know about this before
13  that.  We didn't know about it on the 7th, I can tell you.
14     Q.  Now, this incident that happened on Monday,
15  March 7th [sic] that I have just read about, that did happen
16  on school property, right?
17     A.  Yes.
18     Q.  And that is -- you wouldn't dispute that that's
19  sexual harassment, would you?
20     A.  What page is sexual harassment on here?  (Brief
21  pause.)  That is sexual harassment.
22     Q.  Okay.
23     A.  Absolutely.
24     Q.  But B▓▓ wasn't disciplined -- or there was no
25  initiation of anything under the discipline policy against

Page 52

1  B▓▓ C▓▓ for that incident, was there?
2     A.  We didn't know about this until the 9th, and then
3  we called the police.
4     Q.  Well, after the 9th, did you institute any
5  disciplinary action against B▓▓ C▓▓ for that
6  incident?
7     A.  I don't recall.
8     Q.  If you did institute some kind of discipline
9  action against B▓▓ C▓▓ for that incident, would it
10  appear -- would you assume that it would appear in her
11  discipline file -- in her file?
12     A.  Well, it might not have, because we had given the
13  police a lot of information about the -- this incident up
14  here (indicating).  And the charges actually came down, and
15  we knew that there were going to be very, very large assault
16  charges, and, you know, we knew that this girl was going to
17  be sent away.  I mean, there was --
18     Q.  You didn't know that on January 9th, did you?
19     A.  Boy.  I couldn't see how it could not -- no.  The
20  charges hadn't been filed.  I don't know when they filed
21  charges.  I mean, we asked them to file charges.
22     Q.  B▓▓ C▓▓ stayed in school after that
23  incident.  Isn't that right?
24     A.  She was in school --
25     Q.  She was not suspended, she was not expelled, there

Page 53

1  were no expulsion proceedings commenced against her.  Is
2  that right?
3     A.  Not at that time.
4     Q.  Okay.
5     A.  But there were criminal charges --
6     Q.  After --
7     A.  There were criminal charges.
8     Q.  I want to know what the School District did.  I
9  don't want to know what the Erie Police did.
10     A.  Right.
11     Q.  I want to know --
12     A.  Well, they may have filed charges.  I don't
13  think --
14     Q.  Who is "they"?
15     A.  The police department.
16     Q.  Okay.  What I want to know is what the School
17  District did.  And --
18     A.  Go ahead.
19     Q.  You didn't -- you didn't discipline B▓▓
20  C▓▓, did you?
21     A.  I don't -- I don't know.  I don't remember.
22     Q.  Well --
23     A.  This would be --
24     Q.  Go ahead.
25     A.  I don't know if I can say this.  I would have to

280a

Page 54

1  look at this and decide if this is harassment or sexual
2  harassment. That's what I was looking for. Because there's
3  a difference between -- you know, there is a huge difference
4  between the two.
5      Q. Right. Well, trying to get someone to perform
6  oral sex in the school, do you think that might be sexual
7  harassment?
8      A. Well, that's a sexual nature. Absolutely. It's
9  sexually inappropriate behavior, it's harassment.
10 Absolutely.
11     Q. Now, what about the student who --
12     A. There were charges -- there were charges -- I am
13 99 percent sure there were charges filed in this, but not
14 with the School District. I see what you're asking. Go
15 ahead.
16     Q. What about the male student who walked by? Was
17 that -- did you ever question that student?
18     A. No. This information came to us by R███. And
19 there -- I -- and this -- this, obviously, was taking -- the
20 19th was taking precedent, because we knew there were
21 some -- there were assaults. And we weren't able to
22 ascertain who those students were. There were a couple of
23 students. And nobody seemed to know -- have names, or we
24 would have had names in here.
25     Q. Okay.

Page 55

1      A. Because we had lot of names in here, and that's --
2      Q. Okay. Now, you indicated that R███ had this
3  outburst in Miss Scully's class. And then did she meet with
4  you and Miss Cappabianca, or did she meet with
5  Mrs. Cappabianca first?
6      A. She went -- Mrs. Scully's room is right across the
7  hall from Miss Cap's room. And R███ went over there,
8  talked to Miss Cap, and then Miss Cap right away brought her
9  down to me.
10     Q. Okay. Now, did Miss Cap tell you that she had
11 actually learned about the sexual activity before Christmas?
12     A. Pardon me?
13     Q. Did Miss Cap tell you -- Miss Cappabianca tell you
14 that she had learned about the sexual activity involving
15 K███ L███ before Christmas?
16        MR. MARNEN: About the assault, you mean?
17        MR. OLDS: About the sexual activity, yes.
18     A. On --
19        MR. MARNEN: Well, there's a difference.
20        THE WITNESS: Yeah.
21        MR. MARNEN: Are you saying sexual activity
22 generally, or the assault?
23        MR. OLDS: Well, we'll break it down.
24     Q. Did she tell you that she learned about the
25 assault before Christmas?

Page 56

1      A. We did not know about that assault before
2  Christmas.
3      Q. Did she tell you that she learned that --
4      A. No.
5      Q. -- she had information that K███ L███ was
6  engaged -- involved in some kind of sexual activity before
7  Christmas?
8      A. A couple days before it was -- let's see. The
9  last day of school, then, was Friday the 21st. So back up
10 one day. We had found out -- we -- this incident allegedly
11 happened on the 19th. All right. We found that out in
12 January.
13        On the 20th, after school, I walked out into the
14 main hallway and saw Mrs. Cap talking -- or Miss Cap talking
15 to K███. And I was on my way to do something else,
16 and -- and when I came back to my office, she said, I want
17 to talk to you about -- you know, and we always got
18 together, every day after school at some point before she
19 went home for the day, I spent time with each of the three
20 assistant principals.
21        And she says -- and so she went down through a
22 list of things that we had to cover. And she said that she
23 had overheard some -- there was some hall talk, we call
24 it -- you know, it was hall talk. She overheard some kids
25 in the hall talking about K███ and C███ and of them

Page 57

1  being engaged in some kind of sexual activity.
2         I said, well, who have you talked to. She said,
3  well, I talked to K███, and she says -- and she's gone
4  down to PASS to talk to C███, and C███ said, well, she
5  likes me; that's why she's saying those things. Meaning,
6  K███ likes me, that's why she's saying those things. I
7  said -- you know, we discussed if we should keep our ear to
8  the ground, if it was credible, and she said, well, let's
9  wait and see.
10        Well, C███ wasn't even in school the next day.
11 That was the day before their Christmas vacation, the kids'
12 Christmas vacation. And that was about all we had -- we
13 didn't hear anything else. That would be something that I
14 would have said to her; just keep your ear to the ground and
15 see if you think there's anything else to it. And naturally
16 we would pursue it if we thought there was something to
17 pursue.
18        We did find out, though, when R███ left
19 Miss Scully's room and started talking to Miss Cap and then
20 she came down and talked to me. And she was very
21 forthright in -- in telling us about these couple of
22 incidences, and that's what got the ball rolling.
23        (Discussion held off the record.)
24        (Recess held from 12:01 p.m. till 12:07 p.m.)
25     Q. So I want to get back to this conversation before

Page 58

1  the Christmas break. I think you indicated that Miss --
2  sometimes when we say Cap, Miss Cap, we're talking about
3  Mrs. Cappabianca, right?
4      A. Yes.
5      Q. Linda Cappabianca.
6      A. Right.
7      Q. I think you said that she came to you and said
8  that she heard hall talk. And that -- about K█████and
9  C█████ B████. Is that right?
10     A. Um-hum.
11     Q. And that the hall talk centered on the fact that
12 there was some sexual activity between the two of them. Is
13 that right?
14     A. Yeah.
15     Q. Okay. And --
16     A. That's our -- that was what we ascertained from
17 what she heard, yeah.
18     Q. Okay. And then she had a conversation with
19 K█████ Is that right?
20     A. Yeah. I saw her talking to K█████ in the hall
21 after -- I think it was right after school, because I was
22 going down the hall.
23     Q. And, in fact, is it true that Linda Cappabianca
24 told you that K█████ said there had been sexual contact
25 between her and C█████ B████?

Page 59

1      A. What Linda told me was -- what Mrs. -- Miss Cap
2  told me was that she had overheard some hall talk, and she
3  was talking to K█████ after school, and said, is this true
4  or something, and K█████ said yes. And Cap normally then
5  would, like, call the mother and inform me, and we would try
6  to talk to the other kid and see if we could -- you know.
7  But, again, they are middle school kids, and so you try to
8  listen with a discriminating ear.
9      Q. Now, you indicated -- you made a statement in
10 there that -- you attributed a statement to C█████ B████
11 saying C█████said something to the effect that she's just
12 saying that because she likes him. Is that right?
13     A. That -- I didn't ask that. I think -- because I
14 said to Cap, go talk to C█████ and she -- or she had
15 talked to C█████
16     Q. Okay.
17     A. And then she reported back to me and said, well --
18     Q. So essentially --
19     A. Because I think he was in PASS too or something.
20     Q. K█████ said something happened, and C█████
21 denied anything happened. Is that what you -- came from
22 that?
23     A. Yeah.
24     Q. Now, did you -- you indicated that C█████ was a
25 bad egg. Did you trust him?

Page 60

1      A. (No response.)
2      Q. Was he honest?
3      A. Yeah. I -- he was the kind of kid that sometimes
4  he told the truth and sometimes he didn't. Like a lot of
5  kids, sometimes -- generally they tell the truth and
6  sometimes they don't tell the truth.
7          C█████was the kind of kid that you always -- he
8  had a -- he had a discipline record. He would -- he would,
9  you know, talk out of turn in class, and he would -- I mean,
10 you always took everything --
11     Q. We know that the discipline record involved theft,
12 right?
13     A. At school?
14     Q. Stealing from teachers? Stealing from teachers?
15     A. I think he took some stuff off a teacher's desk or
16 something, yeah.
17     Q. Had you spent much time with C█████?
18     A. Relative to other kids?
19     Q. Yeah. In the sense that had you had him in your
20 office, trying to talk to him, trying to deal with him,
21 trying to change his behavior? Had that problem come up to
22 your office?
23     A. I -- I was in the meeting when we were trying to
24 have him admitted to alternative education. I was in the
25 meeting with his mother and Charlise Moore, who was the

Page 61

1  supervisor of special education. I was aware of -- I had
2  talked to C█████ I'm sure.
3          Miss Cap was in charge of the seventh and eighth
4  graders, and I had two other assistants that each had half
5  of the high school. And Miss Cap was very capable of taking
6  care of -- of the number of kids that she had. If ever she
7  needed help, she would ask.
8          But I -- I probably talked to C█████as well as
9  other students. I mean, I -- but my position in that
10 school, as I have stated, was -- wasn't such that I could do
11 discipline that I was accustomed to doing when I was
12 assistant principal. I mean, I certainly knew how to do all
13 that, but.
14         You know, there's 12 hours in every working day,
15 or 15, and you just don't -- but I knew C█████ And
16 C█████could be charming. C█████was a very, very social
17 kid. That was probably 90 percent of his problem, as a
18 seventh grader. Or eighth grader. He was just a -- a
19 middle school kid. He was just very social. He was very
20 social.
21     Q. Now, do you know whether Miss Cappabianca talked
22 to B████ C█████ before Christmas about what had happened
23 the night on December 19th?
24     A. No. We didn't -- we weren't aware of that
25 incident until after Christmas. We weren't aware of that

Ferguson & Holdnack Reporting, Inc.          ə82ə          3a9d95d8-06da-4388-a818-43709425cad2

Page 62

1  incident until school was in for a few days. After the New
2  Year.
3      Q.  Now, describe K██████ in terms of -- you recall
4  K███████?
5      A.  Yeah.
6      Q.  Describe --
7      A.  I'm not sure I'd recognize her if she walked in,
8  though. She was pretty -- she was a little -- she was kind
9  of a --
10     Q.  She's changed a little since then.
11     A.  Yeah, she's changed. She would have had to have
12 changed, because she's an adolescent. Grows a lot.
13     Q.  Describe her personality and her characteristics
14 as you recall them.
15     A.  Nice, sweet kid.
16     Q.  Do you know -- she was a special ed. student; is
17 that right?
18     A.  Yes. These were all special education students.
19     Q.  Did K██████ have -- do you recall what specific
20 special ed. -- what specific problems she had that resulted
21 in her being in special ed.?
22     A.  I think she had -- was in the learning disabled
23 program. Learning support.
24     Q.  And do you recall what her learning disability
25 was?

Page 63

1      A.  No.
2      Q.  Do you recall in terms of her ability to express
3  herself, whether she could?
4      A.  Oh, yes. She was -- she was just a typical kid.
5      Q.  Now, I think that you indicated that you had
6  received lots of training on sexual harassment. Is that
7  right?
8      A.  We -- right.
9      Q.  Did that training -- did you ever learn whether
10 children who have been victimized have problems talking
11 about it?
12     A.  I -- that's -- I know that. Not from my training.
13 I know that as just a -- I also have a Master's in
14 counseling. I mean, I -- that's correct. Absolutely.
15     Q.  Now, after you talked to Miss Cappabianca about
16 this conversation she had before Christmas with K██████
17 you said that you guys decided to wait and see what else
18 happened? Is that right?
19     A.  Well, her -- her standard practice would have been
20 to contact the parent -- I mean, like we talked about the
21 kids at Wayne, or any middle school kid. You try to keep
22 parents informed, especially those who are young kids.
23 And -- well, even high school kids. But there -- anything
24 of that nature.
25         But at that point she would have -- I would not

Page 64

1  have. She would have contacted -- maybe contacted the
2  parent. I know that she was in -- Mrs. L██ was in school a
3  lot. I remember seeing Mrs. L██ off and on at school. And
4  I know that she -- Miss Cap had conversations with her, as
5  she did with many parents. I mean, I've had probably
6  conversations with Mr. P██████
7         I mean, we just had -- it wasn't a really big
8  class, and so we were in contact with parents a lot. Like I
9  said, it's really important that those middle school kids
10 are off to a good start, because they are going to be there
11 six years hopefully and -- and going to graduate.
12     Q.  But you don't know that she did talk to
13 Miss L██--
14     A.  I wouldn't know -- I wouldn't have been -- I
15 wouldn't know that. If she talked to her that day or --
16     Q.  Now, you indicated that you remember talking to
17 Miss L██. Was it about this incident? The assault?
18     A.  Actually, Denise came in --
19         THE WITNESS:  And you correct me if I'm wrong.
20         Your sister came with you to school. I'm sorry,
21         she can't -- I'm sorry. I'm sorry. I don't know
22         the rules here, Denise.
23     Q.  But anyway --
24     A.  Yeah. On the 7th, when this unfolded, we talked
25 with as many students as we knew. And you've got a good

Page 65

1  list here.
2      Q.  Excuse me, on the 7th or on the 9th?
3      A.  On the 9th. Excuse me.
4      Q.  On the 9th.
5      A.  Regarding the incident on the 19th and then the
6  incident on the 7th. But mostly it was about the 19th.
7  This is the one that we were focusing on. We talked to as
8  many students as we could.
9         And Mrs. L██ had called earlier in that week to
10 request work, I know, for K██████. Because we have a form
11 that we fill out when somebody is requesting work. And she
12 called to tell us that K██████ was in Millcreek. And so
13 they had requested work. And we also have to have that
14 information for attendance purposes. So that's why I would
15 know that there was work being requested, because we would
16 have to have it for attendance purposes. And so that we
17 could mark the student present, but in a different setting.
18         What was the question?
19     Q.  Well, she came -- you recall an encounter or
20 meeting with her.
21     A.  Oh, Mrs. L██ -- Mrs. L██ came in on -- it was
22 either late on the 9th or it was the 10th. I kind of think
23 it was the 10th, because we talked to R██████ and a lot
24 of students. I mean, I had students in and out of my office
25 for just about two days. And I know in the middle of that

Page 66

1  somewhere, Mrs. L█ came with her -- I believe it was with
2  her sister. Because I had not met her. And then informed
3  us -- I guess K█████ had talked to her at the hospital.
4  And so we got that important piece of information.
5        And at that time I told her that the -- that our
6  intent was to pursue criminal charges, but we couldn't do it
7  until we had all -- the information from all the kids and we
8  had talked to the parents and felt that we were -- I knew we
9  were going to do it, but I felt we were going to do it
10 Friday.
11       My goal was to get everything -- when something
12 unfolds on a Wednesday, and you have this kind of incident,
13 you want to get to Friday just as quick as you can with your
14 information on Friday morning so you have the police
15 involved. You don't want Friday to come and go and not have
16 done everything, absolutely everything you could. And you
17 want to do it quickly so that you didn't have all these kids
18 yapping to each other about changing their stories or
19 something.
20       I mean, we had kids in there, I had every single
21 person at my disposal working on this so that Friday
22 morning -- my goal was Friday morning to have the police at
23 my desk. And I remember calling the police on Thursday and
24 setting up a time for them to come Friday morning. And we
25 had all the information that we felt we had -- we had enough

Page 67

1  information that B██ could be charged, that C████ could
2  be charged, and these guys would be charged.
3        That is not our call, obviously. That is their
4  call. They do the charging, not us. But we felt we had
5  enough information that we could see them on Friday morning.
6  Denise was helpful. Every parent that came in was extremely
7  helpful.
8        Q.  Well, and so what do you recall actually -- what
9  physical information did you have for the police on Friday
10 morning?
11       A.  We had any of the reports from -- that was written
12 from the kids. I'm sure we had this from Cap (indicating).
13 We had every kid talk to the police. Some kids -- I think
14 probably the reason you have A███ F█████ is we probably
15 wrote that for him. We -- and the police talked to -- I
16 think Mr. P█████ talked to the police at the police
17 station. And every other parent talked to the police at
18 school, I think. And I can't speak for Mrs. L█. I don't
19 remember.
20       Q.  Okay. How was it determined that this incident
21 happened on December 19th? Where did that come from?
22       A.  Came from R████
23       Q.  And what did R████ say?
24       A.  She explained the second paragraph to us.
25       Q.  Well, but how did she -- I mean, R████ was a

Page 68

1  12-year-old girl. How did -- did she say December 19th, or,
2  I mean --
3        A.  Well, we got the date -- and it was -- the last
4  day of school before the Christmas break was the 21st. And
5  I can tell you that particular day, we have -- we don't --
6  it's not a regular/regular day of school. We have classes,
7  but then we have activities during that day. It's a very
8  lower-than-usual attendance day. And you would have more
9  kids absent that day. But we had activities that day.
10       And so I know the day that -- that Miss Cap
11 talked -- that's how we -- how I determined -- well, we
12 knew -- she told us it was the 19th. And we got back to
13 that date. There were things -- that was an easy time to
14 determine because of the activities we had. We knew the
15 20th -- the day before Christmas [sic] we had activities
16 that R█████ --
17       Q.  Well, you remember -- you indicated -- you were
18 starting to say that you remember when you had the
19 conversation with K████. Is that what you were going to
20 say?
21       A.  Well, that was -- that was how we came upon what
22 that date was. Because it was before the date -- the last
23 day before the vacation. And when we talked to R████
24 R████ gave us the date the 19th. That was -- we couldn't
25 manufacture something like that, because we didn't know what

Page 69

1  happened.
2        Q.  Well, I understand that, but.
3        A.  All right.
4        Q.  But I guess --
5        A.  Go ahead. Maybe I'm missing the question here.
6        Q.  No, you're not. We're just trying to work through
7  this.
8        A.  All right.
9        Q.  You're not missing the question.
10       A.  All right.
11       Q.  Don't worry about that. You said, R████ when
12 did it happen, and she said December 19th?
13       A.  Yes. We got that information from R████
14       Q.  So she knew the date from the top of her head?
15       A.  Some -- well, I don't know if she knew it from the
16 top of her head, but that's -- that's the date we got from
17 her. And then that's how we started the investigation.
18 Because we had something to -- we had -- we had something to
19 go on.
20       MR. MARNEN:  Let me help out here.
21       THE WITNESS:  All right.
22       MR. MARNEN:  Forgive me for intruding on your
23 deposition.
24       MR. OLDS:  Go ahead.
25       THE WITNESS:  Sorry.

Page 70

1    MR. MARNEN: I think he's trying to ask you
2  whether she gave you December 19th in a flat-out
3  statement, or whether you had to reconstruct it
4  from things she was telling you.
5    Q.  In other words, did she say this happened
6  December 19th, or did you infer from other events that it
7  must have been December 19th?
8    A.  Well, I feel very confident that this is the date,
9  no matter if we came to it by the fact that it was one
10  day -- or two days before that last Friday of events --
11    MR. MARNEN: You're not answering his question.
12    THE WITNESS: All right.
13    Q.  Yeah, I --
14    A.  I don't know.
15    Q.  Well, that's good. But you're confident of the
16  date, but you don't know how --
17    A.  Yeah, I don't know.
18    Q.  As we sit here today, you don't know how you
19  specifically --
20    A.  I know it wasn't October, and I know it wasn't --
21  you know what I'm saying?
22    Q.  Right.
23    A.  That was -- and that was a date -- I'll answer --
24  I'll answer the question this way: R████ gave us this
25  date, and every other student we talked to confirmed that

Page 71

1  was the date. When we talked to all of these students, when
2  we talked to -- oh, who was there? Y████ we talked to,
3  and A████ F████ we talked to. There were several
4  students we talked to.
5    And the date -- and you have to remember,
6  Mr. Olds, these kids weren't actually that far away from
7  that date. They had only been back in school a couple of
8  days. Because school started, what, probably January 2nd
9  that year. And they hadn't been out of school -- only a
10  couple days. It isn't as if there were actual weeks had
11  passed. Weeks had passed in time, calendar, but they had
12  been in school only about five days before that happened.
13    So it wasn't as if there was a -- their point of
14  reference is school days. Our point of references is a
15  calendar. But their school -- their reference to something
16  is school days.
17    Q.  Okay.
18    A.  There wasn't anyone that ever disputed that date
19  that we talked to.
20    (Discussion held off the record.)
21    Q.  I'm going to show you a set of exhibits. And we
22  touched upon this briefly with Miss Cap --
23    A.  Okay.
24    Q.  -- when we started her deposition. And these are
25  records that come out of C████ B████ student file. We'll

Page 72

1  mark that as Exhibit 2 here.
2    MR. OLDS: Although, do you remember what the --
3  do you have what exhibit number it was in Cap's?
4  Because maybe we wouldn't have to mark it again.
5    (Discussion held off the record.)
6    (Woods Deposition Exhibit 2
7  marked for identification.)
8    Q.  Exhibit 2 is a series of documents --
9    A.  Um-hum.
10    Q.  -- concerning the discipline record of C████
11  B████.
12    A.  Correct.
13    Q.  And do you recall why Miss Cap gathered these
14  documents together?
15    A.  Yeah. This probably was for the alternative
16  education program. We were trying to -- right.
17    Q.  And is it fair to say that this is the type of
18  documentation that you would gather in terms of making the
19  decision to refer to the alternative education program?
20    A.  That wouldn't be the only purpose of gathering
21  this. There -- I see -- very typically if a special
22  education student is having difficulty, we do behavior
23  charts, and we do, you know -- you'll have one for -- you'll
24  have one piece of -- you'll have five pieces of paper for
25  the same day. That's how you get the volume of these

Page 73

1  things.
2    We did behavior charts. I see there's a
3  Functional Behavior Plan here. These are all things that we
4  would do for any student in special education, not for the
5  purposes of AEP. This would be for the purpose of the
6  student having better behavior and staying on task more and
7  following the rules more and meeting the goals in their IEP
8  more.
9    We would do this for any student who needs to have
10  a behavior checklist. If a student is -- let's say a
11  student is -- can't find their -- student wanders in the
12  hall and doesn't get to class on time. We would have a
13  check sheet for them that says that they got to class on
14  time and that they made it to class within the allotted time
15  and so forth.
16    So a behavior chart, if you just count the number
17  of referrals here -- I don't know how many referrals there
18  are. There's plenty. But there's a lot of behavior charts
19  in here which are interventions that we would attempt with
20  someone to try to get them on task.
21    Q.  Okay. Well --
22    A.  This was -- to answer -- if I could just further
23  answer your question, though. We would accumulate this
24  material, obviously, to show that even despite our best
25  efforts, the student hasn't complied, and that we feel that

Ferguson & Holdnack Reporting, Inc.

3a9d95d8-06da-4388-a818-43709425cad2

Page 94

1  you can recollect, what you said to them and what they said
2  to you.
3      A.  That there was an incident over at the Laundromat;
4  that we had a couple kids that were victims; we had several
5  perpetrators; and that we were gathering information and
6  we were going to be calling parents; that all the students were
7  in special education.
8      Q.  And did they give you any advice or tell you what
9  to do?
10     A.  Keep us apprised.
11     Q.  Who --
12     A.  The standard stuff is the -- are the resource
13 officers available and so forth.  Wanted to know if I needed
14 any support.
15     Q.  Who are the resource officers?
16     A.  Detective Wally Love and -- I believe Ron Slupski
17 is a detective also.  I think that's his rank.
18     Q.  Okay.  What is the hierarchy of the School
19 District above the principal?  Who was your -- who did you
20 report to?
21     A.  Assistant Superintendent John Linden.
22     Q.  And you say that Scozzie was the assistant to the
23 superintendent?
24     A.  Yes, but we report to him also regarding --
25 especially if the student is in special education.

Page 95

1      Q.  Do you know, do one of them report to the other,
2  or are they on the same level; Linden and Scozzie?
3      A.  I don't know if they are on the same level.  They
4  have different titles.  They are both management downtown.
5      Q.  And is there anyone else above the principals
6  downtown that -- you know, in terms of the principals report
7  to --
8      A.  Dr. Oliver was director of high schools, but I'm
9  not sure when he took that position over.  If he was the --
10 if he was the -- he would have been informed, but I dealt
11 with -- he would have been informed, but I dealt with
12 Dr. Linden and Mr. Scozzie.
13     Q.  There's mandatory reporting laws in Pennsylvania;
14 is that right?
15     A.  Um-hum.
16     Q.  In terms of a school administrator uncovering
17 sexual abuse or suspecting sexual abuse.  Are there
18 mandatory reporting laws?
19     A.  Sure.  If you suspect abuse, you call the hotline.
20     Q.  Okay.  Did you call the hotline?
21     A.  No.  We called the police.
22     Q.  Well, but on the 9th, when it first happened that
23 you first talked with R████, did you call the hotline that
24 day?
25     A.  No.  That day, Mr. Olds, we had information on our

Page 96

1  hands that two kids were assaulted.  I was interested in
2  getting the police involved, getting enough credible
3  evidence that the police were involved directly.
4      When you call the hotline -- I don't know if you
5  have ever called the hotline.  But when you call the
6  hotline, the hotline calls OCY, and OCY calls the police,
7  and there you go.  I wasn't -- I was interested in a
8  shortcut, not a longcut.
9      I felt that we needed to take action -- you know,
10 get our information together and -- because at that time I
11 wasn't -- we weren't sure what happened.  I mean, we were
12 just running as fast as we could, because we wanted to get
13 as much clear information as we could and get the parents
14 informed.
15     Q.  Now, the first day that you conducted this
16 investigation, did you just meet with students or did you
17 meet with parents also?
18     A.  I could have met with parents.  I don't know the
19 order -- exact order of each kid and each -- each parent.
20 But we -- over the period of about a day and a half --
21 because R████ -- that was first period.  So that would have
22 been up till about 10:30.  So in a period of a day and a
23 half, we met with all students and all parents, with the
24 exception of K████ L████ because she was hospitalized.
25     And the police were -- and the resource officers,

Page 97

1  our police officers, our Erie Police Department Officers.
2      Q.  Were they present at all these interviews?
3      A.  I'm not certain, but probably.
4      Q.  Now, when you say they are Erie Police Officers,
5  does that mean that they are employees of the City of Erie?
6      A.  They are police officers employed by the City of
7  Erie, and then the District contracts with them.  And this
8  might be a question for Mr. Scozzie.  But they are
9  contracted with the School District, I think probably mostly
10 through Safe -- Safe Schools Grant, or something like that.
11 And when they are in uniform, sometimes they weren't.
12 Depends if they had court or something that day.  They
13 were -- they are apprised of the situation right away.
14     Regarding your hotline call, we would have, you
15 know, done that if we felt that was absolutely necessary
16 right then.  We were more interested in getting the
17 information and getting a full-blown police investigation on
18 this.  Because it didn't happen on our property, so we
19 wanted to get the ball rolling.
20     Q.  So you had -- I think you indicated that you had
21 as many as a half a dozen phone calls with Scozzie and
22 Linden over those two days?
23     A.  Over three days.  I'm sure.
24     Q.  Over three days.
25     A.  It would have included that Friday when we had the

**Page 98**

1  police in too. We had the chief of police -- excuse me.
2  Chief of security for the District, Jim Perfetto, came over
3  for much of the interviews.
4  Q. Did he take notes?
5  A. I wouldn't know. You'd have to ask him.
6  Q. And you're saying your notes were destroyed.
7  A. Yes.
8  Q. You did take notes?
9  A. I took some anecdotal notes, but I would have not
10  kept those notes. When something becomes property of the
11  police, that's -- they take the reports of the kids, and
12  they -- once the information gets to them -- because this
13  was really their bailiwick, not mine. It's -- you know,
14  after --
15  Q. Well, it was your bailiwick because you didn't
16  turn the investigation over to the police in the first
17  instance. You conducted two days of investigation yourself
18  before you turned it over to the police. Is that right?
19  A. Right. We were just trying to get full names so
20  that they knew who they -- who they needed to talk to. And
21  they -- perhaps even they talked -- I'm sure they talked to
22  more people. I have seen the police report. It's volumes.
23  They talked to a lot of people.
24  Q. Okay. But it was your --
25  A. I wanted -- I wanted to get -- I wanted them to

**Page 99**

1  get the information about -- about R████ and B███ -- or
2  R████ and K██████, and I wanted them -- I wanted us to
3  feel like that we had gotten information prepared for
4  them -- prepared -- just give them the names, talk to the
5  kids, get the parents apprised. Because we owe it to the
6  parents to try to keep them up to speed when we know
7  something like this. And then the information goes to them.
8  This is -- this is volumes, this police report. I read this
9  over lunch, and I just -- I'm -- they did a lot of work. We
10  had Mr. and Mrs. Barber, the detectives, in there. I mean,
11  we're not policemen, Mr. Olds.
12  Q. Right.
13  A. We're trying to run a school and keep a safe
14  place. And detective work is not something that I am
15  skilled in, but something that you try to -- you want to
16  have something credible so that when you have the police
17  come to your building, you have some kind of order and
18  fashion. You have correct information that you best can get
19  for them.
20  Q. Well, I mean, I'm sure if there was a shooting at
21  the school, you wouldn't conduct the investigation before
22  calling the police, would you? I mean, the police are
23  competent to conduct an investigation, aren't they?
24  A. We have a very competent police department.
25  Q. Okay. So, now, were you and Miss Cappabianca

**Page 100**

1  together for these two days that you had these meetings with
2  students and parents?
3  A. I had her pretty much shut her room down upstairs.
4  I said everybody in this building that we need -- I had the
5  other -- I got the other two assistants in, and I had Cap
6  pretty much shut her door upstairs. I said, you know -- she
7  was up and downstairs. But we had to try to use every
8  resource that we had available and still keep a school
9  going, to try to have at -- some -- find out what happened,
10  number one, and get accurate information.
11  Q. Tell me the first time you spoke to Mr. P████
12  A. I think we saw Mr. R███ on -- we saw him after
13  school outside -- yeah. We were going to PASS or -- for
14  some reason, we saw him outside. Told him I wanted to talk
15  to him, and he said, I'll see you tomorrow morning. And I
16  think we saw him Wednesday night. Right. It would have
17  been Wednesday night. Because we saw him out Friday, and he
18  said, I can't talk to you now, but I'll come back in the
19  morning. And he did. He came back with R███ in the
20  morning. So he would have come on the 10th.
21  Q. So Rachel was in PASS that day.
22  A. It was on the 10th. I -- I don't know. But I
23  think she was in PASS. Because we saw -- I remember seeing
24  him outside, because I talked to him on the front steps.
25  Yeah.

**Page 101**

1  Q. Do you have any idea why you sent R███ to PASS
2  after she told you she had been a victim of a sexual
3  assault?
4  A. That would have been on the 9th, we're talking
5  about?
6  Q. Right.
7  A. I don't know why she was assigned to PASS, but we
8  wouldn't have sent her if we felt she was in jeopardy. I
9  can tell you that. I forget why she was assigned PASS. I
10  don't -- I don't know why she was assigned PASS.
11  Q. Was C████ in PASS that night?
12  A. I don't know.
13  Q. Did you talk to C███ that first day?
14  A. Yes. Well, I don't know. First or second day. I
15  don't know. One of those two days. Those days, Mr. Olds,
16  run together.
17  Q. Okay. Tell me what --
18  A. They were pretty busy.
19  Q. Tell me about the conversation you had with
20  C████ B███.
21  A. I had a conversation with his father. That was
22  the first time I met his father. And his father came in. I
23  apprised his father of what -- what we thought was
24  happening. I wanted to get C████ side of it. And I
25  informed the father that -- that -- that we were going to

26 (Pages 98 to 101)

**Page 102**

1  pursue every -- that there were going to be police charges,
2  there were going to be criminal charges -- I felt that there
3  was enough evidence that we were going to -- that he would
4  be charged.
5      Q.  Well, did you meet with C████ alone?
6      A.  I think -- I'm pretty sure we would have met with
7  him. I don't remember meeting with him alone. Although I'm
8  sure we would have. Because we met with all the kids -- all
9  the kids, with at least one or two adults in the room.
10  There would be myself and Miss Cap or myself and the police
11  officer. We were trying to keep the kids separate so we
12  could get -- get a straight story the best we could from
13  all -- each one of the kids. And I would have met with him
14  with no other student in the room, absolutely.
15     Q.  And I just want to --
16     A.  Go ahead.
17     Q.  The picture is that you're investigating an
18  incident that happened off school, that you didn't think
19  that you had jurisdiction to discipline kids for, but it was
20  criminal activity. Essentially, you were investigating
21  criminal activity, which according to you, occurred off
22  school grounds. Is that right?
23     A.  Well, I -- you know, from R█████ description
24  and -- and what went on -- I'm not a policeman. I'm not the
25  person that has -- that files the charges.

**Page 103**

1      Q.  Well, that wasn't my --
2      A.  Anytime there --
3      Q.  That wasn't my question. I'm just trying to
4  understand. You didn't -- earlier today I asked you if you
5  disciplined C████ B████ and you said no, because it
6  happened off school. Is that right?
7      A.  Correct.
8      Q.  Okay. So --
9      A.  Regarding this incident -- did I discipline
10  C████ regarding this incident? No.
11     Q.  It happened off school.
12     A.  Right.
13     Q.  It's criminal activity that happened off school.
14  Right?
15     A.  (Witness nods head.)
16     Q.  When was the last time you conducted an
17  investigation of criminal activity that occurred off school?
18     A.  Well, it was a school -- the bus incident that I
19  told you about was a school function, so technically that is
20  on school property. There was the last time? I don't know.
21     Q.  Did you ever conduct an investigation about
22  criminal activity that didn't occur on school grounds --
23     A.  I don't conduct -- I don't conduct criminal
24  investigations. I will try to get information about
25  something that is related to school. You're making it sound

**Page 104**

1  like I'm a policeman. I conduct criminal -- I don't -- you
2  know, this was -- this was blatant criminal activity that
3  any -- any reasonable person would -- would identify as
4  criminal activity. And if something looks like it's related
5  to school, we may try to -- we may try to act -- talk to
6  kids about something like that.
7      Mr. Olds, what happens -- and I tell kids this all
8  the time. You may think something happens out here, but
9  eventually it makes its way back to school one way or the
10  other. You know, a few days can pass, a week can pass. But
11  if there's something that happens outside school, a lot of
12  times it drifts back into school.
13     When was the last time? I investigated something
14  with a kid who -- kid came to school, and he had an
15  outburst. He had an outburst in class or in the hall.
16  Somewhere in the school he had an outburst. And when he
17  relayed the incident to us, what he was really mad about was
18  something that happened off school property. You can't
19  ignore that. You have to go and get the parties together,
20  ascertain what the problem is. Sometimes, if there's
21  something of a -- of a criminal nature, you call the
22  resource officer in, and you tell them, and you say, what do
23  you make of this, and they advise -- they will tell us, this
24  needs to go to the police or this doesn't need to go to the
25  police. And at that time we'll have the police -- we'll

**Page 105**

1  have the school resource officers conduct an investigation.
2      We don't like to spend our time doing that,
3  because we have kids to educate. But depending on what
4  happens outside of school, you might actually -- what
5  happens is, it comes into school sooner or later. I tell
6  kids it's like snow at the top of a mountain. What happens
7  when snow is at the top of the mountain and the sun comes
8  out and it's 80 degrees? Water goes downhill. And a
9  problem is just like that. A problem will stay cold for a
10  long time, and the sun comes out, somebody sheds lights on
11  it, and it comes right back into the school building.
12     Q.  Do you have any recollection of your conversation
13  with C████ B████; what was said?
14     A.  Well, I asked him about the incident.
15     Q.  What did he say?
16     A.  C████ was always in the habit of denying
17  everything.
18     Q.  Okay. So --
19     A.  It was consensual, that kind of stuff. He denies
20  everything. But I told his father that there were -- that
21  this wasn't going to go away, we had tried AEP, so forth and
22  so forth, and that we were going to cooperate fully. And he
23  never came back.
24     Q.  What about B████ C███████? What do you recall of
25  your meeting with her?

Ferguson & Holdnack Reporting, Inc.          288a          3a9d95d8-06da-4388-a818-43709425cad2