IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD P. by and for ) | No. 03-390 Erie |
| RACHEL P. and DENISE L. by ) | |
| and for KRISTINA L., ) | |
| ) | Electronically Filed |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Jury Trial Demanded** |
| ) | |
| SCHOOL DISTRICT OF THE CITY ) | |
| OF ERIE, et al ) | |
| ) | |
| Defendants. ) | |

### BRIEF IN SUPPORT OF MOTION TO AMEND COMPLAINT

Plaintiffs seek to amend their complaint to assert claims under 42 U.S.C. Section 1983 to enforce the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act. The proposed amendment alleges that the Plaintiffs were damaged by the being excluded from the regular school setting once they reported being sexually assaulted and harassed, and that they became victims of discrimination when they were placed in an alternative educational setting.

1.  **Legal Standards for Ruling on a Motion to Amend**

Rule 15(a) of the Federal Rules of Civil Procedure states that leave to amend should be freely given. Under the liberal standards established in **Foman v. Davis**, 371 U.S. 178, 182 (1962), leave should only be denied if the amendment is motivated by bad faith, if allowing the amendment

would result in undue prejudice to the opposing party, or if the amendment is futile: "If the underlying facts or circumstances relied upon by a plaintiff may be the proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." **Id**.

**2.      The Proposed Amended Complaint Would Not Be Futile**

Plaintiffs may seek monetary damages directly under §504, as well as by using 42 USC §1983 to assert a claim predicated on §504. **W.B. v. Matula**, 67 F.3d 484, 495-96 (3rd Cir.1995). **Matula** also held that "the plain language of §1983 authorizes actions at law or equity, and .... that, as a matter of law, an aggrieved parent or disabled child is not barred from seeking monetary damages in such an action [seeking money damages for a violation of the ADEA]." Congress explicitly *approved* such actions. Accordingly, §1983 supplies a private right of action in the instant case for Plaintiffs' claims that their reassignment to the Sarah A. Reed Children's Center violated their right to a free public education, in spite of their disability, and that the reassignment to Sarah Reed involved discriminatory exclusion from the regular educational setting.

3.      **The Right of Disabled Persons to an Appropriate Education under the IDEA**

Title 20 U.S.C. Sec. 1415 outlines the procedural safeguards provided by the IDEA to implement its substantive protections. Among the procedures guaranteed by the IDEA is the right of parents with a child with a disability to "participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of the free appropriate public education to such child..." **(1415(b)1)** The IDEA also provides that written notice to the parents which complies with Section (c)1 of the Act must be provided "whenever the local educational

agency (A) proposes to initiate or change; or (B) refuses to initiate change, the identification, evaluation or educational placement of the child... **(1415(b)3(A)and (B))**[1]

A free appropriate public education is provided to a student pursuant to an IEP, a package of special education and related services designed to meet the unique needs of the disabled child. [FN4] See **Polk v. Central Susquehanna Intermediate Unit 16**, 853 F.2d 171, 173 (3d Cir.1988), cert. denied, 488 U.S. 1030, 109 S.Ct. 838, 1002 L.Ed.2d 970 (1989). A multidisciplinary team composed of the child's parents, both regular and special education instructors, a representative of the local educational agency, specialists, and other individuals with relevant knowledge creates the IEP. 20 U.S.C. §1414(B) (West 1999). The IEP takes the form of a detailed written statement summarizing the child's abilities, outlining the goals for the child's education, and specifying the services the child will receive. 20 U.S.C. §1414(A) (West 1999).

**4.     The Standards for Stating a Claim under Section 504**

Section 504 of the Rehabilitation Act is worded as a negative prohibition against disability discrimination in federally funded programs. The latter provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.... (29 U.S.C. §794(a))

---

[1] The notification requirements under Section 1415(c) are quite specific. Notice requirements include: a description of the "action proposed"; an explanation why the agency proposes or refuses to take the action, including a description "of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action," and a statement that the parents of the child with disability have protections under the procedural safeguards of the Chapter.

To establish a violation of §504, plaintiffs must demonstrate that (1) the student is disabled as defined by the Act; (2) the student is "otherwise qualified" to participate in school activities; (3) the school or the Board receives federal financial assistance; and (4) the student was excluded from participation in, denied the benefits of, or was subject to discrimination at the school. **Nathanson v. Medical College of Pennsylvania**, 926 F.2d 1368, 1380 (3d Cir.1991); 34 C.F.R. §104.4(a). In addition, to be liable, defendants "must know or be reasonably expected to know of" the student's disability. **Id**., 926 F.2d at 1381. However, the plaintiff "need not establish that there has been an intent to discriminate in order to prevail under §504." **Id**. at 1384. See **Alexander v. Choate**, 469 U.S. 287, 297, 105 S.Ct. 712, 718, 83 L.Ed.2d 661 (1985).

There are "few differences, if any, between IDEA's affirmative duty and §504's negative prohibition. Indeed, the regulations implementing §504 adopt the IDEA language, requiring that schools which receive or benefit from federal financial assistance 'shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction.' 34 C.F.R. §104.33(a)." **Matula**, **supra**, 67 Fed at 492,493.

5. **The School District's Reassignment of KL and RP Did Not Comply with the Provisions of the IDEA and Violated Section 504**

The School District violated the IDEA and Section 504 in several respects. The School District analyzed the assault and harassment of the Plaintiffs as an educational problem, but it did nothing in terms of assessing the effect of that educational problem on the individualized needs of the girls. The School District did not rely on its own personnel, such as the school psychologist, to evaluate the Plaintiffs, nor did it consult with obvious resources such as rape crisis counselors. Instead, the girls were referred to an extremely restrictive educational setting with a one-size-fits-all

treatment modality of behavior modification for assessment. Thus, responsibility for evaluation and assessment of the Plaintiffs' needs was handed off to a private institution in total abrogation of the Defendant's obligation under the law. The assessment and evaluation to determine whether a change was necessary was to be made after the change.

The decision to remove the Plaintiffs from their regular school setting, Strong Vincent, and place them in an alternative education program at Sarah A. Reed Children's Center occurred in the absence of any compliance whatsoever with the IDEA. The School District excluded the Plaintiffs' parents from any meaningful participation in the decision-making process that resulted in the change of placement of their daughters. As well, the School District failed to assemble an IEP team to consider what the most appropriate educational setting and educational and emotional supports would be for the Plaintiffs. Finally, and most significantly in terms of the harm done to the Plaintiffs, the School District failed to compose IEP revisions that would address the emotional and educational consequences of the trauma endured by the Plaintiffs.

Plaintiffs' exclusion from their regular school without a determination that their needs could not be met in that setting violated Section 504 of the Rehabilitation Act. The Defendants did not consider less restrictive options such as recommending psychotherapy in an after-school setting, nor did the Defendants consider the possibility of disciplining the assailants and harassers in order to make the regular school setting safe for the Plaintiffs.

The decision to place the Plaintiffs at Sarah Reed was made by Frank Scozzie, the School District's director of special education, **(110a, 99a)** based on information provided by the principal, Janet Woods. **(107a)** He directed Charlise Moore, special education supervisor for the middle schools, to prepare the necessary paperwork to send the Plaintiffs to Sarah Reed **(94a)**, based solely

on Janet Woods' recommendation. **(111a)** Consequently, Moore composed an IEP Revision/Review document that was identical for the two Plaintiffs. **(96a, 98a)** Moore never met the Plaintiffs or their parents. **(95a)** Nor did she consult with the Plaintiffs' teachers or the assistant principal. **(95a,85a)** In fact, she admits that she did not meet with anyone. **(95a)**

The School District employees responsible for moving the Plaintiffs from Strong Vincent to Sarah Reed all testified to their knowledge that such a move would require a meeting of an IEP team. **(95a, 110a, 84a, 123a)** However, of the four signatures on RP's and KL's IEP Revision/Review **(64a, 51a)**, at least two, the parent and the "principal," were not present at such a meeting. **(84a, 103a).** If an IEP meeting did take place, it occurred out of the presence of the parents, a fatal violation of the IDEA.

The absence of any evaluations, analysis, or thought into what would constitute an appropriate placement for KL and RP on the part of the Erie School District unfortunately was mirrored by Sarah Reed's admissions analysis. The Plaintiffs were accepted into Sarah Reed's behavior modification program, not because Sarah Reed's admissions committee could review the basis for the referral and make a reasoned decision on its appropriateness, but because the School District provided so little information that Sarah Reed was forced to rely on the School District's judgment. Of course, there was no basis for the School District's judgment, only a decision to remove KL and RP from the regular school. Thus the Defendants' failure to meet IDEA requirements set the stage for the subsequent harm inflicted on the Plaintiffs.

a. **The assignment to an in-home placement was made in the absence of any compliance with the IDEA.**

The first violation of the IDEA and Section 504 occurred immediately after the Defendants concluded that KL and RP had been involved in a sexual encounter. That violation set the tone for the other decisions and actions taken by the School District. As soon as the full story of the sexual assault and subsequent harassment was reported, KL and RP were immediately removed from the regular school setting and assigned to an in-home placement. Neither girl was given a new IEP for this initial reassignment.

Special education supervisor Moore stated that the placement in the home did not require a new IEP. **(100a)** According to her, it "doesn't require revision. Just revision for us to do instruction in the home." She testified that the change in educational placement did not require revision because the School District "wouldn't be changing any of the goals and objectives of the IEP." **(100a)** Principal Woods had a better understanding of IDEA law than did the special education supervisor: she had the impression that when a student is referred to Sarah Reed, "there's a temporary in-home IEP so the student still receives homework. **(126a)** In KL's case, home schooling consisted of coloring with crayons. **(92a)**.

There is actually a suggestion that the in-home placement was viewed as the handling of a disciplinary issue. Cappabianca testified, regarding the temporary in-home placement of KL and RP, that "[w]hen a child has an IEP you try to keep them in school, you don't want to suspend them. If there is something that warrants them being suspended, then they could do an in-home IEP. That is a device or procedure that was used in 2001-2002." **(85a)**

**b. The exclusion of the parents from the decision-making process violated the IDEA.**

The decision to effectuate the placement of the girls in Sarah Reed was not a decision that emanated from the bottom, i.e. from the IEP team with input by the parents. Rather, it was made at the top of the decision-making hierarchy. Woods, Cappabianca, and Scozzie decided that Plaintiffs would be placed in the most restrictive of educational placements.[2]

The decision to transfer their placement was outside the required IDEA channels. There was no IEP meeting, no assessment, and no involvement of the professionals who would normally construct an IEP. **(95a, 84a, 120a, 113a)**

The consent of the parents to the placement was hardly given knowingly or willingly. The parents were merely presented with paperwork constructed so as to make it appear the rules had been followed, and were asked to sign a consent for placement of their daughters in an alternative education program. **(68a, 53a)** RP's parents' consent to the IEP revision/review **(64a)** was gained when the home-school visitor took the document to RP's home and had the mother sign it. **(102a)** The home-school visitor noted at the time that "Mother had difficulty remembering our appt. Apparently she is heavily medicated & has memory problems." **(69a)** Likewise, it was the home-school visitor who acquired KL's mother's signature on KL's IEP revision/review document. **(130a)** There was no interaction between the parents and the decision-making officials in the context of an IEP team meeting. This is certainly not a procedure that meets the requirements for parental involvement in the

---

[2] The special education supervisor, Charlise Moore, testified that "the recommendation to be placed in Sarah Reed... came from the director of special ed [Frank Scozzie]..." **(99a)** She acknowledged that she was "directed by Mr. Scozzie to start the ... process... to get them in [to Sarah Reed]." **(99a)**

IEP process.

Frank Scozzie, the director of special education for the district, testified that he would not necessarily anticipate that there would be an IEP meeting before the IEP revision review document for RP was signed. "If there really is no structural change needed or any significant change... I don't think they would do anything more than a revision." Scozzie also said that it was not necessary to conduct an IEP meeting prior to a revision such as that which happened to the Plaintiffs "[i]f you're not changing what you are going to each them.... All they are doing is changing if I teach you something in room A or B it does not much matter." **(116a-117a)** However, Scozzie's point of view is not the law.

In **Big Beaver Falls Area School Dist. v. Jackson By and Through Nesmith**, 150 Pa.Cmwlth. 268, 275, 615 A.2d 910, 913 Pa.Cmwlth., 1992, the Commonwealth Court held that a meeting between a parent and school district official "is not a meeting of an IEP "team" as ensured and required by 22 Pa.Code §§14.32 and 342.32." **Id**. Moreover, even if a parent signs a new IEP, that does not validate an improper process if "she was not given an opportunity to provide any input into its development and it was presented as a finished product." 22 Pa.Code §§14.32 and 342.32 require that parents "be allowed to give input to develop the IEP as part of an IEP team meeting." Moreover, "22 Pa.Code §14.35(a) requires that the IEP team, including the parent, meet whenever an IEP is revised."

> **c. The IEP Revision/Reviews which justified the Plaintiffs' assignment to Sarah A. Reed Children's Center were a formulaic document whose purpose was to justify the referral to Sarah Reed, not to describe an individualized beneficial educational program.**

An IEP Revision/Review was created by special education supervisor Charlise Moore to

justify placement of KL and RP in a "program of therapeutic behavior support" at Sarah Reed.[3] **(64a, 51a)** The provisions of the IEP were created by Moore without consultation with teachers, parents, or the students. Moore admitted that "I don't quite remember meeting with anyone. I was doing paperwork." **(95a)**. Her instructions came from Frank Scozzie, whose only consultation was with the principal (not even with the vice principal, who at least had daily contact with the Plaintiffs).

The IEP Revision/Reviews written for KL and RP were defective in the most basic of ways. First of all, the student's teacher of record is responsible for writing the student's IEP. **(121a)** Yet KL's teacher of record testified that she was not involved in the decision to place the girls at Sarah Reed, and did not even see the paperwork until sometime after KL had left the school. **(120a)**

Second, the inescapable impression given by the IEP Revision/Reviews is that the Plaintiffs needed behavior modification, yet neither Plaintiff had presented behavior problems prior to the assault. **(119a, 81a-82a, 124a)** When Moore wrote the IEP revision documents, she produced wording for both girls which <u>only</u> addressed behavioral issues. **(739, 419a)** The goal was to "identify appropriate solutions to <u>interpersonal</u> <u>and</u> <u>self-related</u> <u>problem</u> <u>behaviors</u>," and the short-term instructional objectives were to "<u>develop</u> <u>consistent</u> <u>patterns</u> <u>of</u> <u>appropriate</u> <u>behavior</u> through a program of therapeutic behavior support."(emphasis added) **(Id.)**  The specifically designed

---

[3] It is evident that the school's referral of KL and RP was to the "behavior modification program" at Sarah Reed. Marlene Chrisman sent a memo, dated 01/15/02, to Jo Barker, regarding the Plaintiffs' referral to Sarah Reed's "B-Mod" program **(72a)**, which Moore acknowledged referred to the behavior modification program. Audrey Pecoraro, the home-school visitor responsible for coordinating admission of ESD students to Sarah Reed, stated that "behavior modification program" and "alternative education program" are used synonymously by the School District. **(104a)** In Sarah Reed's institutional mind the girls were admitted to Sarah Reed's alternative education program. **(79a)** Robert Iddings, the director of Sarah Reed, acknowledged that "all of the children participate in behavior modification." **(87a)**

instruction would include "consistent participation in social skills training."[4]

Third, School District officials claimed that they were referring the Plaintiffs to Sarah Reed because Sarah Reed had the capability of providing the emotional support and therapy needed by the girls **(125a, 107a)**, but this claim is nowhere reflected in the IEP Revision/Reviews. There is <u>no indication</u> in the IEPs that the girls had undergone a major trauma that needed to be addressed.

There was absolutely no assessment by any School District professional as to KL and RP's special educational needs to help them deal with the trauma they had experienced. Had experts been present at the table when the Plaintiffs' IEPs were being revised, we could expect to see an acknowledgment that the girls had been victims of violent sexual assault and would need special treatment as a result. (See **Plaintiffs' Supplemental Pretrial Statement, Letter dated 8/3/05 to Edward A. Olds** for a description of the trauma and subsequent educational needs.) The School District was in such a hurry to remove the girls that it failed to acquire such assessments. ("When someone tells me about an emergency situation, I'm not going to sit back and say, well, let's take about three weeks to do an evaluation of the situation." **(108a)** It is clear from the course of events that the School District's only goal was to move the Plaintiffs out of their regular school as quickly as possible, regardless of the consequences.

Scozzie testified that his expectation was that Sarah Reed would take "a look at the situation and the student....[I]if they see a student doesn't belong there or there's no need for their type of

---

[4] When queried about what types of behavior problems needed to be addressed, Moore testified that "it was my understanding that there were some emotional concerns involving incidents that had taken place at school... [that] there was some kind of sexual activity... boys and girls outside of the school environment having sexual contact with one another. And there was concerns about the overall situation. You know, naturally, the appropriateness of the situation. And that was affecting the female students." **(96a-97a)**

intervention [and said] neither of these students should be leaving Strong Vincent, they belong in their main school... we would have done that." **(116a)** In other words, he passed responsibility for the Plaintiffs to Sarah Reed.

.   Moore, who took her cues from Scozzie, echoed his lack of involvement in what would happen to the girls once they were gotten out of Strong Vincent. When asked what she meant when she wrote that the educational placement of the plaintiffs would "develop appropriate patterns of appropriate behavior" **(96a)**, Moore testified that "those things would be more clearly defined once the child was at Sarah Reed." **(96a)** As to what behaviors needed to be addressed, she equivocated, saying that "it could be any type of pattern of inappropriate behavior." **(96a)**

Obviously, the IEP did not meet substantive requirements on the most basic level. "[I]t was not individualized to meet [the plaintiffs'] social and emotional needs." **Big Beaver Falls Area School Dist. v. Jackson By and Through Nesmith** 150 Pa.Cmwlth. 268, 277, 615 A.2d 910, 914, Pa.Cmwlth.,1992. In order to provide a student with FAPE, an IEP must be "reasonably calculated to enable the child to receive educational benefits." **Bd. of Ed. of Hendrick Hudson Sch. Distr., Westchester County v. Rowley**, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). In **Polk v. Central Susquehanna Intermediate Unit 16**, 853 F.2d 171 (3d Cir.1988), the Third Circuit stated that the IDEA "calls for more than a trivial educational benefit" and further explained that an appropriate IEP should provide "significant learning" to and confer "meaningful benefit" upon a student. **Id.** at 182-84. **Lauren W. ex rel. James W. and Jean W. v. DeFlaminis Slip Copy, 2005 WL 1353643 (E.D.Pa.) E.D.Pa.,2005.**

### d. Sarah Reed accepted the referral of Plaintiffs <u>because</u> it lacked information about their status, and in reliance on the judgment of the School District

Sarah Reed has a committee that determines whether placement at their facility is appropriate. **(74a)** Normally, a referral is made to Matthew Bogardus, the intake person, who "gather[s] information from them and take[s] that then to the committee for the decision to be made to accept." **(74a)** In this case, the only information the committee received was that conveyed in a phone call to Bogardus. "The school had contacted me at --- there had been allegations made of sexual assault in school and also harassment by other students." **(75a)**

Scozzie testified that in making the referral, he was relying on Sarah Reed to provide a fail-safe review of the placement of KL and RP: "[I]f they see a student doesn't belong there or there's no need for their type of intervention -- there's checks and balances in there, that's why I have a tremendous comfort level." **(116a)**. In other words, he assumed that the Erie School District could ignore such IDEA requirements as assessments, evaluations, and IEP meetings, and bypass giving any thoughtful consideration as to whether the reassignment of KL and RP to Sarah Reed would be appropriate, because he believed that Sarah Reed would not accept the Plaintiffs if it could not provide an appropriate setting. In fact, the opposite was true. Sarah Reed decided to accept the referral of Plaintiffs because it was provided no information about their needs, and it assumed that the School District knew what the needs of the girls were before making the referral. **(88a)**

In fact, the lack of any information about KL and RP actually mitigated in favor of Sarah Reed accepting KL and RP. Robert Iddings, director of Sarah Reed, noted that Sarah Reed might "turn referrals down [if it had more information]. I don't think we would have in the case of KL and RP, because we had such limited information." **(88a)** In other words, Sarah Reed would accept such a

referral, according to Iddings, based solely on the limited content of the telephone referral to Bogardus. **(88a)**

Iddings' testimony made it clear that the appropriateness of a decision to refer children to Sarah Reed was intimately and ultimately based on the School District's decision that Sarah Reed was the appropriate setting for the children. In other words, Sarah Reed assumed that the School District had given some thought or careful consideration to the referrals and Sarah Reed could thus rely on the assumed good faith of the referring School District, "[b]ecause of our relationship, they know our --- the therapeutic pieces that we offer at this point in time. But they really just rely on us to make that --- that determination." **(88a)** Assuming parental consent, Sarah Reed would not turn down a referral from the Erie School District "unless we had previous history. You know, if we knew there was a reason that our program wasn't -- wouldn't be beneficial." **(88a)** There was never an assessment of either KL or RP to determine whether they were appropriate for Sarah Reed. As will be discussed, the placement was a disaster for KL and RP.

**e. Plaintiffs' placement at Sarah Reed was illegal and harmful.**

Not only was the IEP process totally ignored, the placement at Sarah Reed was illegal. The School District placed the Plaintiffs in one of the most restrictive of all educational settings, without determining whether there was a valid educational need for such a placement.

Sadly, their placement at Sarah Reed was not only illegal, it was wildly inappropriate. As described by Stephen P. Schachner, PhD., a clinical and school psychologist who evaluated the Plaintiffs and the records:

When K and R were placed at Sarah Reed Alternative Educational Program, they were

treated for symptomatology that had not been present prior to their placement at Sarah Reed. They were not afforded the necessary treatment for Post-Traumatic Stress Disorder, anxiety and depression, which led to the emergence of new symptoms and acting out behaviors." **(Plaintiffs' Supplemental Pretrial Statement, Letter dated 8/3/05 to Edward A. Olds pp. 2)**

Schachner goes on to say:

> [T]hey were placed into a Partial Hospitalization Program and Alternative Educational Program without the benefit of an assessment of their cognitive, social and emotional status....
>
> ... The girls were sent to a Partial Hospitalization Program and Alternative Educational School as if they were troublemakers in class....Two previously well-behaved students perceived that they were punished for being raped...Neither descriptors of the girls, generated almost a month after the rapes, were accurate in diagnosis or in report of academic weaknesses, language skills or level of cognitive functioning. Yet it is these very same descriptors that are so crucial in planning treatment modalities, both in psychotherapy and in class.
>
> ... The failure to treat or even offer appropriate treatment for Post-Traumatic Stress Disorder, anxiety and depression was apparent as the girls' lives spiraled downward into the abyss of teenage delinquency, like a nightmare one might find written in a textbook describing a failure to treat trauma....
>
> The initial response of the school district caused injury to the girls and exacerbated their emotional reactions to the trauma of rape. The loss of trust and faith in adults subsequent to their reporting to school officials was joined with their confusion and anxiety when finding themselves removed from school and placed into a strict educational alternative environment with acting-out students. Had they been sent to an appropriate placement with a diagnosis for their conditions, improvements in their functioning would have been based on the standard treatments for Post-Traumatic Stress Disorder, anxiety and depression. The failure to properly diagnose and treat, however, generated severe reactions which compounded the initial trauma of the assault. It is with beyond a reasonable doubt that I view these girls' experiences at Strong Vincent High School and at the Sarah A. Reed Partial Hospitalization Program and Alternative Educational Program as causative factors for their social, emotional and academic sufferings and failure.
> **(Plaintiffs' Supplemental Pretrial Statement, Letter dated 8/3/05 to Edward A. Olds pp. 2-3)**

5.  **There Is No Remedy That an Administrative Tribunal Could Award in Favor of the Plaintiffs, and Therefore Exhaustion Would Be Futile.**

The School District's principal argument against the Plaintiffs' advancing claims under the ADA and the IDEA is that the Plaintiffs failed to exhaust remedies before asserting this damage action. Obviously, resort to administrative remedies at this point would be futile. Exhaustion is excused where recourse to the IDEA administrative proceedings would be futile or inadequate, or where the relief sought in a civil action is unavailable in an IDEA administrative proceeding. **W.B. v. Matula**, 67 F.3d 484, 495-96 (3rd Cir.1995).

> Beginning with the plain language of [§ 1415(l) ] ... it is apparent that the exhaustion requirement is limited to actions seeking relief "also available" under IDEA. We held *supra* that damages are available in a §1983 action, but IDEA itself makes no mention of such relief. Hence by its plain terms [§1415(l) ] does not require exhaustion where the relief sought is unavailable in an administrative proceeding. Moreover, the legislative history of [§1415(l) ]clarifies that "[e]xhaustion of the [IDEA] administrative remedies would ... be excused where ... resort to those proceedings would be futile ." (citation omitted). Accordingly, we have held that, where the relief sought in a civil action is *not* available in an IDEA administrative proceeding, recourse to such proceedings would be futile and the exhaustion requirement is excused. (citation omitted). **Matula**, 67 F.3d at 496.

Furthermore, the School District's assertion that exhaustion would be required is untenable in light of its conduct in totally subverting the IEP process.

The context of the transfer of the Plaintiffs is most significant, when considering the question of why there is no administrative record for this court to review.  c.f., **Richter School District of Erie**, 2002 WL 6556674 (W.D.Pa.).  Both of the Plaintiffs had been victims of violent sexual assaults. Each of the girls had been subject to in-school harassment. The School District concealed information about the sexual assaults from the parents and did not report the sexual assaults to

appropriate authorities. In the panic that followed the final event, ultimate full disclosure of the assaults, the School District told the parents that it could not keep their daughters safe in the School District. (See, generally, Plaintiffs' Brief In Response to Defendants' Summary Judgment Motion.) The School District dispensed with all of the procedural steps that it might have taken to ensure that the proposed reassignment was appropriate. There was no IEP meeting. The decision makers who decided that a referral to Sarah Reed was appropriate never spoke to the Plaintiffs, never spoke to the Plaintiffs' teachers, and failed to order assessments or tests or take other steps that might have assured a proper placement, and given the court some record on which to evaluate the propriety of the educational placement.

In fact, it is the Defendants' failure to abide by the entire IEP process following the sexual assault of the Plaintiffs that has led to the damages in this case. The Defendants made a decision to place Plaintiffs in an alternative education setting and then created paperwork under the IDEA to justify a decision made upon impermissible criteria. They subverted a legal process which would have provided evaluation, assessment, and consultation in order to determine the most appropriate kind of educational placement and services needed by the two Plaintiffs.

In essence, there is no record concerning the appropriateness of the placement, because the decision to reassign the Plaintiffs to Sarah Reed involved criteria and considerations totally divorced from the typical issues that govern the placement of children with special needs. The School District found itself in a situation where two young women were injured because school officials had ignored their reports of sexual assault and sexual harassment. The School District officials had ignored the reports because they assumed the twelve-year-old girls were sexually active and welcomed the sexual interactions. By January 11, 2002, after having ignored the girls's plight for several weeks, the

School District officials panicked and decided that the girls would have to be immediately removed from the regular school. A jury could determine that the School District's violation of the Plaintiffs' IDEA and ADA rights was the cause of the harm that ensued from the decision.

There is no remedy that could be achieved by a resort to administrative procedures. Defendants' own conduct brought us to this situation. There was not informed consent by the parents. Rather, the parents were told that their daughters could not be kept safe in the regular schools, and thereby they had to agree to the improvident transfers.

## CONCLUSION

It would not be futile to allow Plaintiffs to amend their complaint and the motion should be granted.

Respectfully submitted,

s/ Edward A. Olds
Edward A. Olds, Esquire
Pa. I.D. No. 23601
Carolyn Spicer Russ
Pa. I.D. No. 36232
Richard S. Matesic
Pa. I.D. No. 72211

1007 Mount Royal Boulevard
Pittsburgh, PA 15223
(412) 492-8975
(412) 492-8971 (facsimile)
edolds@earthlink.net

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

    I hereby certify that on October 13, 2005, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

James T. Marnen, Esquire
KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.
120 West Tenth Street
Erie, PA 16501-1461

                                                  S/ Edward A. Olds
                                                  Edward A. Olds, Esquire