Report of Progress on Annual Goals

IEP Date: 7/5/01

---

**Annual Goal:** R____ will improve language comprehension consistently within the school setting

---

Progress Report:

1st Quarter: R____ is completing fill-in-the-blank statements with 72% accuracy.

2nd Quarter: R____ is completing analogies with 66% accuracy. R____ names items/objects from verbal description with 70% accuracy.

3rd Quarter: R____ completes analogies with 80% accuracy. She names items/objects from verbal description with 75 - 80% accuracy.

4th Quarter: R____ has been either absent or sleeping when therapist is at school. She has made minimal progress this quarter; however, she has retained what she's already learned.

**Annual Goal:** R____ will improve expressive language skills consistently within the school setting

---

Progress Report:

1st Quarter: R____ answers how questions with 65% accuracy.

2nd Quarter: R____ makes sentences using target vocabulary with 75% accuracy.

3rd Quarter: R____ is using target vocabulary to make sentences 80 - 90% of the time.

4th Quarter: R____ has either been sleeping or absent most of this quarter. Progress is minimal R____ has retained what she's already learned.

**50a**

# IEP REVISION / REVIEW

Student's Name: ~~K___ L___~~    Date: 1-17-02

DOB: ~~_____~~    School: *Strong Vincent*    Teacher: *Mc Scully*

Program: *LS*    Current IEP date: *8-29-2001*

Purpose for meeting: Review of goals and objectives ❑    Change in percentage, ie., RRLS to PTLS ❑

Change from __*SV*__ to __*SRCC*__ Manifestation Determination ❑    Behavior Support Plan or

Adjustment ❑    Other ❑.

**MEASURABLE ANNUAL GOAL:** Identify appropriate solutions to interpersonal and self-related problem behaviors.

**SHORT-TERM INSTRUCTIONAL OBJECTIVES OR BENCHMARKS:**

**OBJECTIVE / BENCHMARK:** Develop consistent patterns of appropriate behavior through a program of therapeutic behavior support.

- **EXPECTED LEVEL OF ACHIEVEMENT** – a performance level system is used to increase expectations and responsibilities.

- **EVALUATION SCHEDULE** – daily and weekly

- **METHOD OF EVALUATION** – daily observations; charting of progress towards goals is communicated to the student as well as to the parents

- **SPECIALLY DESIGNED INSTRUCTION** – Consistent participation in social skills training and in counseling program as well as medication management. An individualized intervention plan will be developed in conjunction with IEP goals and objectives. Transition activities for the return to the home school are planned and carried out with a multidisciplinary team approach.

Signatures: ✕ Parent *Denise L___*

    ✕ Classroom Teacher *Melissa Vallument*

    ✕ Special Education Teacher *Mrs Gray*

    ✕ Principal *Linda A. Cappabianca*

    Other _____

    Other _____

Department of Pupil Learner Services
Child Study Office

# Request For Home-School Visitor Service

Student ID # _943020_____

Name of Child ___K___ ▓▓▓ L ▓▓▓___    Birthdate ▓▓▓▓▓▓

Lives with ___Denise__ L___    Address ▓▓▓▓▓▓▓▓▓▓
_(Name, Relationship)_

Phone ▓▓▓▓▓▓    Present School, Grade __Sr.V.__    7  LS    Regular ☐
Special ☑

Date of Request _____    Principal's Signature _____

**PROBLEM/REASON FOR REFERRAL:**    W F

Referral for Sarah Reed
by Marlene / Frank

Date received in Child Study _____    Assigned to: __A. Pecoraro__

**REPORT OF HOME-SCHOOL VISITOR:**

1-16-02 Contact with parent. She will come
to Child Study 1/17/02 at 2:30PM.

1-17-02 Parent came to Child Study
Forms signed

Matt will call with an Intake time

1-18- Intake is 1/21/02- Monday at
3:00 Pm. She begins the program
on Wednesday 1/23/02.

5aa

Form 434-PLS-8-78

E 000000743

I am requesting that my daughter, K_____ L__ be transferred to the Erie School District's Alternative Education program. I waive all rights to a Hearing.

1/17/02

Denise ▮▮▮▮

53a

## IEP REVISION / REVIEW

Student's Name: ~~K___ L___~~  Date: 1-17-02

DOB: ~~____~~  School: _Strong Vincent_  Teacher: _Ms Scully_

Program: _LS_  Current IEP date: _8-29-2001_

Purpose for meeting: Review of goals and objectives ❑    Change in percentage, ie., RRLS to PTLS ❑

Change from _SV_ to _SRCC_ Manifestation Determination ❑    Behavior Support Plan or Adjustment ❑    Other ❑ _____

**MEASURABLE ANNUAL GOAL:** Identify appropriate solutions to interpersonal and self-related problem behaviors.

**SHORT-TERM INSTRUCTIONAL OBJECTIVES OR BENCHMARKS:**

**OBJECTIVE / BENCHMARK:** Develop consistent patterns of appropriate behavior through a program of therapeutic behavior support.

- **EXPECTED LEVEL OF ACHIEVEMENT** – a performance level system is used to increase expectations and responsibilities.

- **EVALUATION SCHEDULE** – daily and weekly

- **METHOD OF EVALUATION** – daily observations; charting of progress towards goals is communicated to the student as well as to the parents

- **SPECIALLY DESIGNED INSTRUCTION** – Consistent participation in social skills training and in counseling program as well as medication management. An individualized intervention plan will be developed in conjunction with IEP goals and objectives. Transition activities for the return to the home school are planned and carried out with a multidisciplinary team approach.

Signatures: Parent _Denise L____

Classroom Teacher _Melissa ValClimont_

Special Education Teacher _Mrs Gray_

Principal _Linda A. Cappabianca_

Other _____

Other _____ **54a** _____

RECEIVED
FEB 01 2002
ERIE SCHOOL DISTRICT
SPECIAL ED. DEPT.

Copies:    White – Pupils School File    Yellow – Parent or Guardian    Pink – Teacher    Gold - other

E 000000818

The School District of the City of Erie, Pa.

# NOTICE OF RECOMMENDED *EDUCATIONAL* EVALUATION PLACEMENT
School Age

Date: 1-17-02

Name and Address of Parent: Denise L~~_____~~

Student's Name: K~~____~~ L~~____~~                    I.D. #: 943020

S.S. #: _____

Dear

This notice summarizes recommendations for your child's education program.

This notice is to be given to the parent of a child with a disability a reasonable time before the school district proposes to initiate or change, or refuses to initiate or change the identification, evaluation or educational placement of the child or the provision of a free appropriate public education to the child.

**1. Action proposed or refused:**
Sarah Reed Theraputic Program for psychological/psychiatric evaluation + possible intervention.

**2. Why the action is proposed or refused:**
1. Student's current high degree and intensity of stress as recorded by parents, student and the Erie School District Staff. Intensity + frequency of theraputic intervention exceed that which can be delivered in the regular school setting.

**3. A. Description of any other options that were considered:**
none

**B. Reasons why these options were rejected:**
N/A

**4. Evaluation procedure(s), test(s), record(s) or report(s) used as a basis for the proposed action or action refused:**
1. Verbal sharing at discharge summary from Sarah Reed/Millcreek Commi
2. Information provided by the student, parent, ESD staff including Mental Health staff.

**5. Other factor(s) relevant to proposal or refusal:**
N/A

The educational placement recommended for your child is:               **55a**
Appropriate Grouping: DTLS
Level (%): 68%
Location:
Other: Theraputic Support at Sarah Reed's Children's Center 000000819

Student Name: K_____ L_____

*Notice of Recommended Educational Placement*

Page 2

_____
_____
_____
_____

School District Superintendent            Signature                    Date

You have certain rights and protections under law that is described in a document titled **Procedural Safeguards Notice.** If you need more information or want a copy of the **Procedural Safeguards Notice,** you may contact:

C. Moore                          Supervisor                    874-6050
Name                              Position                      Phone Number

**DIRECTIONS FOR PARENTS:** Please check one of the options, sign this form, and return it within **10 days** to the person listed above.

☒   I **approve** this recommendation

☐   I **do not approve** this recommendation

My reason for **disapproval is:**

_____

I request:

☐   A Pre-hearing Conference

☐   Mediation

☐   Due-process Hearing

I will need the following accommodations to be made so that I may attend the above.

_____

Denise L_____              1/17/02
Parent's Signature              Date                          Daytime Phone

Revised 9/2001

56a

E 000000820

*Special Education*
*TRACT*

*Referral by MR. Scozzie,*
*MRS. Moore +*
*MRS. Chrisman*

NAME: K___ L___

DOB: _____

ADDRESS: _____

SCHOOL: *Strong Vincent    gr. 715*

*1/21/02    Intake - 3:00 PM*

*1/23/02* _____ **Student to start Sarah Reed Alternative**

_____ **Student has completed Sarah Reed Alternative placement and will be returned to home school**

**ADDITIONAL COMMENTS:**

*CER dated 5 15-95*

*2 yr. Reevel. dated 5-1-00*

**57a**

E 000000821

The School District of the City of Erie, Pa.

# NOTICE OF RECOMMENDED EDUCATIONAL EVALUATION PLACEMENT
**School Age**

Date: _1-17-02_

Name and Address of Parent: _Denise L_██████

Student's Name: _K_████ _L_████                    I.D. #: _943020_

S.S. #: _____

Dear

   This notice summarizes recommendations for your child's education program.

This notice is to be given to the parent of a child with a disability a reasonable time before the school district proposes to initiate or change, or refuses to initiate or change the identification, evaluation or educational placement of the child or the provision of a free appropriate public education to the child.

**1. Action proposed or refused:**
_Sarah Reed Therapeutic Program for psychological/psychiatric evaluation & possible intervention._

**2. Why the action is proposed or refused:**
_1. Student's current high degree and intensity of stress as recorded by parents, student and the Erie School District staff._
_2. Intensity & frequency of therapeutic intervention exceed that which can be delivered in the regular school setting._

**3. A. Description of any other options that were considered:**
_NONE_

   **B. Reasons why these options were rejected:**
   _N/A_

**4. Evaluation procedure(s), test(s), record(s) or report(s) used as a basis for the proposed action or action refused:**
_1. Verbal sharing of discharge summary from Metro Health/Millcreek Con_
_2. Information provided by the student, parent, ESD staff including Mental Health staff._

**5. Other factor(s) relevant to proposal or refusal:**
_N/A_

The educational placement recommended for your child is: **58a**    0000003419
Appropriate Grouping: _DTLS_
Level (%): _63%_
Location:
Other: _Therapeutic Support at Sarah Reed's Children's Center_

Student Name: ██████████████

*Notice of Recommended Educational Placement*                    Page 2

_____

_____

_____

_____

| School District Superintendent | Signature | Date |

You have certain rights and protections under law that is described in a document titled **Procedural Safeguards Notice.** If you need more information or want a copy of the **Procedural Safeguards Notice,** you may contact:

*C. Moore.*                    *Supervisor*                    *874-6057*
Name                           Position                        Phone Number

**DIRECTIONS FOR PARENTS:** Please check one of the options, sign this form, and return it within **10 days** to the person listed above.

☒ I approve this recommendation

☐ I do not approve this recommendation

My reason for disapproval is:

_____

I request:

☐ A Pre-hearing Conference

☐ Mediation

☐ Due-process Hearing

I will need the following accommodations to be made so that I may attend the above.

_____

*Denise ████████*                    *1/17/02*
Parent's Signature                    Date                    Daytime Phone

Revised 9/2001                    59a            0000003420        Page D

# MEMO * School District of the City of Erie, PA

**TO:**    Mr. Frank Scozzie – Assistant to the Superintendent
Mrs. Charlise Moore - Supervisor, Special Education
Mrs. Marlene Chrisman – Supervisor, Special Education

**FROM:**    Mrs. Audrey Pecoraro, Home/School Visitor

**SUBJECT:**    PLACEMENT OF K███ L████ AT SARAH REED CHILDREN'S CENTER

**DATE:**    January 17, 2002

    K███ L██ DOB ████, referred to Sarah Reed, Behavior Modification Program, Special Education Tract, from Strong Vincent High School, Grade 7 LS, is scheduled for the intake process at Sarah Reed on Monday, January 21, 2002 at 3:00 P.M.  She will begin the program on Wednesday, January 23, 2002.

AP:cc



The School District of the City of Erie, Pa.

# NOTICE OF RECOMMENDED EVALUATION PLACEMENT
EDUCATIONAL

School Age

Name and Address of Parent: _Danise_ _____    Date: _11/5/02_

Student's Name: _____    I.D. #: _____

S.S. #: _____

Dear:

This notice summarizes recommendations for your child's education program.

This notice is to be given to the parent of a child with a disability a reasonable time before the school district proposes to initiate or change, or refuses to initiate or change the identification, evaluation or educational placement of the child or the provision of a free appropriate public education to the child.

1. Action proposed or refused: _Temporary in home IEP  5 days  Friday 22nd Jan_

2. Why the action is proposed or refused: _No appropriate placement at this time_

3. A.  Description of any other options that were considered:

   B.  Reasons why these options were rejected:

4. Evaluation procedure(s), test(s), record(s) or report(s) used as a basis for the proposed action or action refused:

5. Other factor(s) relevant to proposal or refusal:

The educational placement recommended for your child is:
Appropriate Grouping: _____
Level (%): _____
Location: _____ to Temporary in home IEP
Other: _____

**DEPOSITION EXHIBIT**

_Moore #2_

Student Name: _____ K___ L_____

*Notice of Recommended Educational Placement*                                    Pag

_____ Temporary in new IEP 5 day _____

_____

_____

School District Superintendent                    Signature                    Date

You have certain rights and protections under law that is described in a document titled **Procedural Safeguards Notice**. If you need more information or want a copy of the **Procedural Safeguards Notice**, you may contact:

___Ken Mash___                        ___Supervisor___              _____
            Name                                    Position                    Phone Number

**DIRECTIONS FOR PARENTS:** Please check one of the options, sign this form, and return it within **10 days** to the person listed above.

☑    **I approve this recommendation**

☐    **I do not approve this recommendation**

My reason for **disapproval is:**

_____

I request:

☐    A Pre-hearing Conference

☐    Mediation

☐    Due-process Hearing

I will need the following accommodations to be made so that I may attend the above.

_____

_____          _____          _____
    Parent's Signature                    Date                    Daytime Phone

6da

0000003401

— See Marlene —

# Memo

**The School District of the City of Erie, Pa.**
**CHARLISE MOORE**, *Supervisor*
*Special Education Department*

Jan – 14 Jan 22:

In – Home IEP – 5 Days

No 1479.
11-14-88

— P▮▮▮ P▮▮▮                    Speech

— ▮▮▮▮▮▮▮▮

Phone
Address –

▮▮▮▮▮

9 598⁰⁰

See Marlene for
SR Partial Placement
Monday 1/14/02

6502

63a

# IEP REVISION / REVIEW

Student's Name: ~~R___ P___~~          Date: 1-8-02

DOB: ~~____~~     School: _Strong Vincent_      Teacher: _Ms. Gray_

Program: _Learning Support_ _____     Current IEP date: 7-23-01

Purpose for meeting:  Review of goals and objectives ❏     Change in percentage, ie., RRLS to PTLS ❏

Change from _SV_ to _SPCC_ Manifestation Determination ❏     Behavior Support Plan or Adjustment ❏  Other ❏ ___

**MEASURABLE ANNUAL GOAL:** Identify appropriate solutions to interpersonal and self-related problem behaviors.

**SHORT-TERM INSTRUCTIONAL OBJECTIVES OR BENCHMARKS:**

**OBJECTIVE / BENCHMARK:** Develop consistent patterns of appropriate behavior through a program of therapeutic behavior support.

- **EXPECTED LEVEL OF ACHIEVEMENT** – a performance level system is used to increase expectations and responsibilities.

- **EVALUATION SCHEDULE** – daily and weekly

- **METHOD OF EVALUATION** – daily observations; charting of progress towards goals is communicated to the student as well as to the parents

- **SPECIALLY DESIGNED INSTRUCTION** – Consistent participation in social skills training and in counseling program as well as medication management. An individualized intervention plan will be developed in conjunction with IEP goals and objectives. Transition activities for the return to the home school are planned and carried out with a multidisciplinary team approach.

Signatures:  Parent _Shelley ____

DEPOSITION EXHIBIT

MOORE #1

Classroom Teacher _____

Special Education Teacher _Mrs. Gray_

Principal _____

Other _____

Other _____

RECEIVED
FEB 0 1 2002
ERIE SCHOOL DISTRICT
SPECIAL ED. DEPT.

Copies:   White – Pupils School File     Yellow – Parent or Guardian     Pink – Teacher     Gold - other

64a

E 000000419

The School District of the City of Erie, Pa.

# NOTICE OF RECOMMENDED EDUCATIONAL EVALUATION PLACEMENT

.chool Age

Date: _____

Name and Address of Parent: _Mr. & Mrs Richard P_███████

Student's Name: _R_███████ _P_███████       I.D. #: _963479_

S.S. #: _____

Dear _____

This notice summarizes recommendations for your child's education program.

This notice is to be given to the parent of a child with a disability a reasonable time before the school district proposes to initiate or change, or refuses to initiate or change the identification, evaluation or educational placement of the child or the provision of a free appropriate public education to the child.

**1. Action proposed or refused:**
_Sarah Reed Therapeutic Program for psychological / psychiatric_
_evaluation and possible interventions._

**2. Why the action is proposed or refused:**
_Student's current high degree of intensity of stress as reported_
_by the parents, student to & Erie School District Staff_
_Intensity & frequency of therapeutic interventions exceed that which_
_can be delivered in the regular school setting._

**3. A. Description of any other options that were considered:**
_none_

**B. Reasons why these options were rejected:** _NA_

**4. Evaluation procedure(s), test(s), record(s) or report(s) used as a basis for the proposed action or action refused:**
_Information provided by the student, parents, ESD Staff including_
_Mental Health Staff_

**5. Other factor(s) relevant to proposal or refusal:**
_NA_

The educational placement recommended for your child is:
Appropriate Grouping: _PTLS_
Level (%): _65%_
Location: _____
Other: _Therapeutic Support at Sarah Reed's Children's Center_

Revised 9/2001

E 000000420

65a

Student Name: ~~_____~~

*Notice of Recommended Educational Placement*

Page 2

_____

_____

_____

_____

_____    _____    _____
School District Superintendent          Signature                    Date

You have certain rights and protections under law that is described in a document titled **Procedural Safeguards Notice**. If you need more information or want a copy of the **Procedural Safeguards Notice**, you may contact:

*C. Moore* _____    *Supervisor* _____    *874-6050*
Name                          Position                        Phone Number

**DIRECTIONS FOR PARENTS:** Please check one of the options, sign this form, and return it within **10 days** to the person listed above.

☑ I **approve** this recommendation

☐ I **do not approve** this recommendation

My reason for **disapproval is:**

_____

I request:

☐ A Pre-hearing Conference

☐ Mediation

☐ Due-process Hearing

I will need the following accommodations to be made so that I may attend the above.

_____

*~~Shelly P~~* _____    *1-18-02* _____    _____
Parent's Signature              Date                    Daytime Phone

Revised 9/2001

6ba

MEMO

**TO:**  MR. JAMES PIEKANSKI, SUPERVISOR OF SPECIAL EDUCATION

**FROM:**  MRS. AUDREY PECORARO, CHILD STUDY DEPARTMENT

**SUBJECT:**  REQUEST FOR SPEECH SERVICES

**DATE:**  JANUARY 17, 2002

The following student has been assigned to attend the Sarah Reed Program at 1020 East 10th Street:

R████ P████
D.O.B. ████
ID# 963479
Parent: Richard P████
Address: ████████████
Phone: ████████  cell ████████
School: Strong Vincent
Grade: 7, LS

According to the Student Assignment Information, student is to receive Speech and Language Services 2%.

A request is made for student to receive the services at Sarah Reed. She will begin the program on  1/22/02.

Thank you for your consideration.

67a

E 000000422

I am requesting that my daughter ██████ ████████ be transferred to the school destrict's Alternative Education Program. I wave all rights to a hearing

Shelley ████████

1-18-02



Department of Pupil Learner Services
## Child Study Office

# Request For Home-School Visitor Service

Student ID # _____ 96.3479 _____

Name of Child ___ R████ P████ ___    Birthdate ████████

Lives with ___ *Richard* ███ ___    Address ████████████████
_____(Name, Relationship)_____

Phone ████████    Present School, Grade _Strong Vincent 7_  LS  Regular ☐
Special ☒

Date of Request _____    Principal's Signature _Referral_
EPD cell 572-6299

PROBLEM/REASON FOR REFERRAL:

Meet HSV
Fri - 11:00

*Intake*
1/21/02 - 11:00
Mon

Referral to Sarah Reed
by Marlene / Frank

---

Date received in Child Study _____    Assigned to: __████████__

REPORT OF HOME-SCHOOL VISITOR:

1/17/02 - Contact with parent. Intake will
be on 1/21/02 - 11:00 Am.
HSV will go to home 1/18/02 at 11:00.

1-18-02 - HSV went to home. Mother had difficulty
remembering our appt. Apparently she is
heavily medicated & has memory problems.
Forms signed. Intake is scheduled for 1/21/02
at 11:00. Student will begin the program on
1/22/02

Form 434-PLS-8-78

**69a**

E 000000443

# MEMO * School District of the City of Erie, PA

**TO:**        Mr. Frank Scozzie – Assistant to the Superintendent
Mrs. Charlise Moore - Supervisor, Special Education
Mrs. Marlene Chrisman – Supervisor, Special Education

**FROM:**   Mrs. Audrey Pecoraro, Home/School Visitor

**SUBJECT:**  PLACEMENT OF R███ P████████ AT SARAH REED CHILDREN'S
CENTER

**DATE:**     January 17, 2002

     R████ P█████, DOB ████████ referred to Sarah Reed, Behavior Modification Program, Special Education Tract, from Strong Vincent High School, Grade 7 LS, is scheduled for the intake process at Sarah Reed on Monday, January 21, 2002 at 11:00 A.M.  She will begin the program on Tuesday, January 22, 2002.

AP:cc

70a

E 000000445

*Special Education TRACT Referral by MR. Scozzie, MRS. Chrisman MRS. Mo.*

NAME: R▮▮▮▮▮▮ P.▮▮▮▮▮▮

ADDRESS: ▮▮▮▮▮▮▮▮▮▮▮

DOB: 11-6-88

SCHOOL: Strong Vincent gr. 7LS - 1/02
Returns gr. 8LS 6/02 - 8/02

1/21/02    Intake - 11:00 Am

1/22/02    **Student to start Sarah Reed Alternative**

6/7/02    **Student has completed Sarah Reed Alternative placement and will be returned to home school**

Returns to Strong Vincent gr. 8LS

ADDITIONAL COMMENTS:

- Speech services have been requested.

- CER dated 12-18-95

- Two year Review - dated 3/2/98

71a

E 000000454

**Special Education Department**

# Memo

**To:**   Jo Barker, Director/Elementary-Middle School Programs

**From:**   Marlene Chrisman, Special Education Supervisor

**CC:**   F. Scozzie/Charlise Moore/Jim Piekanski

**Date:**   01/15/02

**Re:**   B-Mod Referrals

---

The purpose of this memo is to provide information on two students who are being referred to Sarah Reed per Frank Scozzie. Both girls were involved in a recent situation at SV of the nature and intensity that staff, including Mr. Scozzie, feels this level of intervention is essential. Both girls are under age 14 and, therefore, not eligible for the Adolescent Partial program.

The girls are:

1.   Blind due to placement in ▬▬▬ folder

2.   R▬▬▬▬▬▬ (DOB: ▬▬▬▬ grade 7LS

▬▬▬▬▬▬▬▬▬

It is my understanding that Mr. Scozzie would like the girls to begin this placement as soon as possible. Please contact Charlise Moore or myself to assist in this process.

72a



E 000000446

Page 1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   RICHARD P., by and for        :
     R_____ P., and DENISE L.,    :
 4   by and for K_____ L.,        :
                 Plaintiffs        :
 5                                 :
          v.                       :   Civil Action No. 03-390
 6                                 :            Erie
     SCHOOL DISTRICT OF THE CITY   :
 7   OF ERIE, PENNSYLVANIA; JANET  :
     WOODS, Individually and in    :
 8   her Capacity as Principal of  :
     Strong Vincent High School;   :
 9   and LINDA L. CAPPABIANCA,     :
     Individually and in her       :
10   Capacity as Assistant         :
     Principal of Strong Vincent   :
11   High School,                  :
                 Defendants        :
12

13

14

15

16           Deposition of MATTHEW BOGARDUS, taken before

17       and by Janis L. Ferguson, Notary Public in and

18       for the Commonwealth of Pennsylvania, on Thursday,

19       May 5, 2005, commencing at 10:23 a.m., at the

20       offices of Knox McLaughlin Gornall & Sennett, PC,

21       120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25           Reported by Janis L. Ferguson, RPR
               Ferguson & Holdnack Reporting, Inc.
```

Page 10

1  entity, or does it not -- is it a governmental entity?
2      A.  Private.
3      Q.  Private.  Does Sarah Reed take students from
4  outside of Erie County?
5      A.  Yes.
6      Q.  Generally the Northwestern Pennsylvania area?
7      A.  Yes.
8      Q.  And a student comes to your attention, I think you
9  indicated, from -- as a result of a referral from the school
10  district?
11      A.  Yes.
12      Q.  Generally, can you describe for me what kinds of
13  students are referred to Sarah Reed.
14      A.  They would be experiencing social problems,
15  emotional problems, behavioral problems; somewhere in that
16  spectrum.
17      Q.  The problems that they are referred to you for,
18  are they problems associated with their education?
19      A.  I'm not sure I understand the question.
20      Q.  Well, I guess a child could have a social problem
21  at home, you know, and maybe not exhibit that social problem
22  in the school setting.  And do you take children who are
23  having social or emotional problems at home?
24      A.  Yes.
25      Q.  So they don't have to exhibit any kind of social

Page 11

1  or emotional problems at a school for Sarah Reed to take the
2  children.
3      A.  No.
4      Q.  So are there certain areas of, for instance,
5  social or emotional problems that you encounter more often
6  than others?  In other words, what kind of problems, what
7  degree of severity and what kind of problems do the children
8  present when they come to you?
9      A.  They could exhibit features of depression,
10  anxiety, some can be aggressive, some can be quite
11  noncompliant, some may have a psychosis.
12      Q.  Do all the children who come to you have IEP's?
13      A.  No.
14      Q.  Who makes the decision whether to admit a child to
15  Sarah Reed?
16      A.  We have a committee.
17      Q.  So in terms of the process of having a child
18  admitted to Sarah Reed, what is your job?
19      A.  If someone is going to make a referral, they would
20  contact me, and I would gather information from them and
21  take that then to the committee for the decision to be made
22  to accept.  And if we accept them, I meet with the client
23  and family to gather background information on the client.
24  And then there are consent and release forms that need to be
25  completed as well.

Page 12

1      Q.  So are you ever contacted initially by family
2  members?
3      A.  Yes.
4      Q.  So it's not always school districts that refer
5  students.
6      A.  No.
7      Q.  When school districts refer students, is it
8  typically the case that the students are having a social,
9  emotional, or behavioral problem relative to the school?
10      A.  Yes.
11      Q.  So do you get many referrals from school districts
12  of children who are having social problems at home?
13      A.  Yes.
14      Q.  Okay.  Without having problems at school.
15      A.  That would be rare.
16      Q.  Sarah Reed has different kinds of programs; is
17  that right?
18      A.  Yes.
19      Q.  Tell me what types of programs it has.
20      A.  We have the alternative education program; we have
21  outpatient services, which would be individual or family
22  therapy or psychiatric care; we have partial hospitalization
23  services.
24      Q.  Any others?
25      A.  And within the alternative education program,

Page 13

1  those outpatient or partial hospitalization services are
2  provided.
3      Q.  So you have an alternative ed. program.  An
4  outpatient therapy program?
5      A.  (Witness nods head.)
6      Q.  That's separate from the alternative ed.
7      A.  It can be, or it can be provided within the
8  program.
9      Q.  And then you have a partial hospitalization
10  program.
11      A.  Yes.
12      Q.  It can be or cannot be separate from the --
13      A.  Yes.
14      Q.  -- alternative ed. program.
15      A.  (Witness nods head.)
16      Q.  Can you tell me what you mean when you say
17  "alternative ed. program".  What is that?
18      A.  Alternative education would identify a placement
19  for a student outside of their home school or their home
20  district.  But then what is provided within the alternative
21  ed. program would depend upon the program or the agency
22  providing that placement.
23      So at Sarah Reed, we are providing clinical
24  services within the alternative education program.
25      Q.  And do you know what kind of clinical services are

4 (Pages 10 to 13)

Page 14

1  provided?
2      A.  Psychiatric services, therapy services, and case
3  management services.
4      Q.  Why would a child come to Sarah Reed instead of
5  staying in their home school?
6      A.  It could be a variety of reasons.
7      Q.  Why don't you give me a couple.
8      A.  If they are experiencing emotional problems,
9  where, perhaps, they feel overwhelmed in the classroom,
10  can't really participate academically, they may look for an
11  alternate placement.  Behaviorally, if they are difficult to
12  manage, they may look for an alternate placement.  They may
13  look for assessment, if they are unsure of a difficulty,
14  such as a psychiatric assessment.
15      Q.  Are students admitted into the program to receive
16  a psychiatric assessment?
17      A.  In some cases, yes.
18      Q.  What kind of cases are those?
19      A.  If -- if they are uncertain if there is a
20  psychiatric disorder, but they may be displaying features
21  that have alerted someone, they would then look for the
22  psychiatric evaluation.
23      Q.  But would that be -- that would be a case where
24  they were exhibiting some kind of behavior in the classroom
25  that prompted somebody to have a concern that there needed

Page 15

1  to be a psychiatric evaluation?
2      A.  Yes.
3      Q.  Is it fair to say that the students admitted to
4  Sarah Reed, who are referred to Sarah Reed from other school
5  districts, are having some problems in the classroom,
6  typically?
7      A.  Typically.
8      Q.  And that problem could either be an emotional
9  problem or a behavioral problem?
10      A.  Or social problem.
11      Q.  Social.  When you use the term "social", tell me
12  what you mean.
13      A.  If a child has anxiety, they may not be able to
14  interact with their peers, with teachers, and they may feel
15  overwhelmed and shut down.
16      Q.  Is there a certain level of severity of the social
17  problem that a child has to exhibit before they are a
18  candidate for Sarah Reed?
19      A.  No.
20      Q.  So, for instance, if a child isn't getting along
21  with a student next -- sitting next to them in class, that
22  child could be admitted into Sarah Reed?
23      A.  They could be referred.
24      Q.  Would Sarah Reed accept that child?
25      A.  It would -- we would need more information than --

Page 16

1  than that.
2      Q.  I mean, is it fair to say that there -- there's no
3  level of severity of problems that a child has to exhibit
4  before they are considered to be a candidate for Sarah Reed?
5      A.  Correct.
6      Q.  So any child who had a social problem -- for
7  instance, can't get along with the kid sitting next to them,
8  could be a candidate for Sarah Reed?
9      A.  We could consider them.
10      Q.  If you think that the child's only problem was
11  they couldn't get along with the kid sitting next to them,
12  they could be admitted to Sarah Reed?
13      A.  Possibly to outpatient therapy.  So what we would
14  provide, the level of care, might be determined by the
15  referral concern.
16      Q.  And what kind of behavioral problems do children
17  have to exhibit before they are admitted to Sarah Reed?
18      A.  Again, there's a variety.
19      Q.  Can you illustrate some for me?
20      A.  As I had mentioned, the aggressive behavior,
21  defiant behavior, not staying within the classroom.
22      Q.  In terms of children with IEP's, Sarah Reed is
23  considered an out-of-school placement; is that right?
24      A.  Yes.
25      Q.  So in the scheme of things for the

Page 17

1  least-restrictive educational placement, where does Sarah
2  Reed fit?
3      A.  We would be one of the most restrictive.
4      Q.  And I think that you said that -- do you
5  typically -- students with IEP's who were referred to Sarah
6  Reed, do you typically see a behavioral plan in the IEP?
7      A.  I don't review the IEP.
8      Q.  Okay.  So tell me what you review.
9      A.  Oftentimes there is not information, paperwork
10  sent to me.  It's sent to us after a student is admitted.
11  So it would be reviewed by the staff working with the child
12  at that time.  And I am no longer a part of the picture at
13  that point.
14      Q.  Do you remember K██████ L██ and R█████ P██████? 
15      A.  Yes.
16      Q.  Tell me how the referral of those two students
17  came to you.
18      A.  There has been more than one referral.  Which --
19      Q.  The first one.
20      A.  Um --
21      Q.  I think that was January of 2002, I believe.
22  Right?
23      A.  The school had contacted me at -- there had been
24  allegations made of sexual assault in school and also
25  harassment by other students.

Page 18

1    Q.  Who contacted you from the school?
2    A.  I don't recall.
3    Q.  Would it have been someone from the school or
4    someone from the administration?
5    A.  I don't recall.
6    Q.  And you say there were allegations of sexual
7    assault and harassment from other students.  Is that the
8    first time that you encountered a referral to Sarah Reed
9    based upon harassment from other students?
10   A.  I guess I'm not quite understanding that question.
11   Q.  Well, someone from the School District called you
12   and said that there were two students with allegations of
13   assault and sexual harassment from other students.  Right?
14   A.  Okay.
15   Q.  And my question to you is, was that the first time
16   a school district called you for possible referral to Sarah
17   Reed because a student was being harassed by other students?
18   A.  I don't — I really don't know.
19   Q.  Can you think of any other instances when that was
20   a basis of referral?
21   A.  I cannot.
22   Q.  And you don't recall who called you from the Erie
23   School District.
24   A.  I do not.
25   Q.  And what was the outcome of that conversation with

Page 19

1    the person from the Erie School District?
2    A.  The referral was made.
3    Q.  And do you know if the referral took a written
4    form?
5    A.  I don't believe so.
6    Q.  So what did you do after you had that conversation
7    with a person from the Erie School District?
8    A.  Then discussed the referral with our admissions
9    team.
10   Q.  And who was on the team?
11   A.  Back then, I don't recall.
12   Q.  And is that the entire amount of information that
13   you had; that there were two students who had been victims
14   of sexual assault and harassment from other students?
15   A.  Yes.
16   Q.  That was all you knew.
17   A.  Yes.
18   Q.  So what information did you take to the admissions
19   team?
20   A.  That information.
21   Q.  And what did the admissions team decide to do?
22   A.  To accept them.
23   Q.  What criteria did the admissions team use to
24   accept these students?
25   A.  The fact that there was a trauma.

Page 20

1    Q.  And then you got back to the Erie School District
2    with that information that the admissions team had decided
3    to accept the students?
4    A.  Yes.
5    Q.  Can you think of instances where the admissions
6    team has declined to accept students from a school district
7    referral?
8    A.  Yes.
9    Q.  Without revealing any names, maybe just give me a
10   general idea of the circumstances that that happened.
11   A.  A lack of consent.
12   Q.  On the part of the parent?
13   A.  Yes.
14   Q.  Any other instances?
15   A.  If there was already treatment involved.
16   Q.  Anything else?
17   A.  No.
18   Q.  And when you say if there was already treatment
19   involved, what do you mean?
20   A.  If there was already mental health treatment
21   involved, it might be assessed that we would be duplicating
22   a service; that we wouldn't need to provide a service at
23   that point.
24   Q.  What percentage of the day, if you know, is a
25   child given mental health therapy and counseling, once

Page 21

1    admitted to Sarah Reed?
2    A.  I don't know the percentage.
3    Q.  So after you got back to the Erie School District
4    and said the admissions team has agreed to accept these
5    students -- and by the way, do you remember who you called
6    to let the Erie School District know this was going to
7    happen?
8    A.  I don't recall.
9    Q.  What was the next step?
10   A.  For Sarah Reed?
11   Q.  Yes.
12   A.  At that point the School District will set up a
13   meeting with the parents to complete their paperwork.  And
14   also to offer them an intake time with me.
15   Q.  Now, you don't participate in the completion of
16   the paperwork; is that right?
17   A.  Not the Erie City School District paperwork.
18   Q.  And did you ever see the Erie City School District
19   paperwork on this case?
20   A.  Yes.
21   Q.  When was that?
22   A.  After the intake was set up with me, that packet
23   is given to me.
24   Q.  And what was in the packet, if you recall?
25   A.  They will include a release of information and a

Ferguson & Holdnack Reporting, Inc.

97e84326-1189-4172-abcb-3eb42266f250

Page 22

1  waiver.
2     Q.  A waiver of what?
3     A.  Parent must sign a waiver agreeing to the
4  placement at Sarah Reed and waiving their rights to a
5  hearing.
6     Q.  Okay.
7     A.  And if they are in special education, often the
8  packet will include an evaluation report.
9     Q.  Anything else?
10    A.  Anything additional would depend on the individual
11 student.
12    Q.  Do you recall specifically what you received
13 relative to R‑‑‑‑ P. ‑‑ R‑‑‑‑ P‑‑‑‑ or K‑‑ L‑‑‑?
14    A.  I don't.
15    Q.  So at the intake meeting, who did you meet with?
16    A.  Parent and client.
17    Q.  Anyone from the School District?
18    A.  No.
19    Q.  Did you meet ‑‑ R‑‑‑‑ did you meet with her
20 father or her mother?
21    A.  Father.
22    Q.  Do you ask typically, when you meet with a client,
23 do you ask, well, why are you coming here or what is your
24 interest in coming to this school?
25    A.  I ask if they have any questions pertaining to the

Page 23

1  placement.
2     Q.  Okay.  So when you meet with the ‑‑ tell me
3  what ‑‑ what you go through when you meet with the parent
4  and student.
5     A.  I ask for background information; the child's
6  mental health history, medical history, school history,
7  family ‑‑
8     Q.  Do you write that information down anywhere?
9     A.  Yes.
10    Q.  Then after you write that information down, what
11 do you do with that form?
12    A.  That's kept in the child's chart.
13    Q.  And do you remember any specific history that you
14 received from Mr. P‑‑‑‑ about R‑‑‑‑?
15    A.  No.
16    Q.  What did they tell you about the incident that led
17 her to being considered for Sarah Reed?
18    A.  I don't recall.
19    Q.  And do you recall whether they had any questions
20 to you?
21    A.  I don't recall.
22    Q.  And then so what happens next?
23    A.  There are also consent and release forms that have
24 to be signed.
25    Q.  And where are those forms put?

Page 24

1     A.  Also in the child's chart.
2     Q.  And then Sarah Reed doesn't keep the chart when
3  the child leaves the school?
4     A.  Yes.
5     Q.  Oh, you do keep the chart.
6     A.  Yes.
7     Q.  And then after that admissions process, do you
8  have any further involvement with that case?
9     A.  No.
10    Q.  Do you know what happens after that admission
11 process with respect to creating a program for the child?
12    A.  I'm not a part of that.
13    Q.  And how many intakes do you do a year, do you
14 think?
15    A.  Between 2‑ and 400.
16    Q.  Do you know what program R‑‑‑‑ was put in?
17    A.  The alternative education program.
18    Q.  And that's a ‑‑ so she wasn't put in the partial
19 hospitalization program.
20    A.  That was provided in combination with the
21 alternative education program.
22    Q.  And do you know what a ‑‑ in terms of the
23 services, do you have any idea what services were provided
24 in connection with the partial hospitalization program?
25    A.  Partial provides the psychiatric assessment piece,

Page 25

1  the therapy piece, and the case management piece.
2     Q.  Now, do you remember the intake with Kristina
3  Long?
4     A.  No.  Not specifically.
5     Q.  Do you have any idea ‑‑ do you know who paid for
6  the educational program that Sarah Reed provided to these
7  girls?
8     A.  The educational piece is paid for by the School
9  District.
10    Q.  What about the therapeutic piece; the psychiatric
11 assessment, therapy, case management piece?
12    A.  That would be insurance.
13    Q.  Whose insurance?
14    A.  The family's.
15    Q.  Do you have any idea what kinds of classes R‑‑‑
16 and K‑‑‑‑ were put into?
17    A.  No.
18    Q.  Do you have any idea concerning the percentage of
19 males and females, as they composed the student body?
20    A.  No.
21    Q.  When the Erie School District contacted you, they
22 mentioned both girls at the same time?
23    A.  I don't recall.
24    Q.  I have some documents that were previously marked
25 at a deposition, and I'm going to ‑‑

7 (Pages 22 to 25)

77a

97e84326-1189-4172-abcb-3eb42266f250

Page 26

1    MR. OLDS: These were Moore and Manus, Jim. Do
2  you have those?
3    MR. MARNEN: Yes.
4    Q. I'm going to show you some documents, and as we go
5  through there, I just have a couple questions about the
6  document.
7    Moore Deposition Exhibit 1 is an IEP Revision
8  Review. Do you ever seen that document, to your knowledge?
9    A. It may have been included in the packet that was
10 given to me.
11   Q. There is a handwritten sheet of paper with a Bates
12 stamp at the bottom, 442.
13   A. Yes.
14   Q. You were referring to a consent or waiver form.
15 Is that the document, the waiver form that Sarah Reed
16 requests?
17   A. We don't request it. The waiver is -- the School
18 District has this done, not Sarah Reed.
19   Q. But you won't accept the student unless the parent
20 signs it, right?
21   A. The parent has to consent to placement with us
22 before we would accept them, before we would place them.
23   Q. Right. And my question is, is this the form of
24 consent that the parent signs?
25   A. For the School District, not for Sarah Reed.

Page 27

1    Q. Not for Sarah Reed. There is a different form
2  that Sarah Reed has them sign?
3    A. Yes.
4    Q. That's a waiver. Now, let me -- I'd like to
5  direct your attention to the Document 445. This is a -- you
6  have probably never seen this document, but I just have a
7  question about it. This was a memo from Audrey Pecoraro,
8  homeschool visitor. Do you know her?
9    A. Yes.
10   Q. Do you remember if you had any conversations with
11 her relative to these two students?
12   A. I'm sure that I did.
13   Q. And what might those conversations have been
14 about?
15   A. To give her the intake dates. She usually is the
16 one that meets with the family and gets the School District
17 paperwork signed and offers them an intake date with me.
18   Q. Okay. She wrote a memo to Frank Scozzie that
19 said -- this regards R████ "R████ P████ Date of
20 birth: ████████ Referred to Sarah Reed: Behavior
21 modification program, special education tract."
22   The term "behavior modification program", does
23 that have any meaning to you, as a Sarah Reed employee?
24   A. No.
25   Q. Do you know whether Sarah Reed offers a program in

Page 28

1  terms -- that is designed for behavior modification?
2    A. That's a treatment modality. It's a type of
3  treatment that Sarah Reed does provide.
4    Q. So Sarah Reed does have a behavior modification
5  program?
6    A. It's a part of treatment.
7    Q. Part of treatment. So it's not a program --
8    A. No.
9    Q. -- it's a treatment.
10   A. Type of treatment.
11   Q. What other kinds of treatment does Sarah Reed
12 have?
13   A. Individual therapy would be a type of treatment.
14 Group therapy, family therapy, psychiatric evaluation.
15 Those are all types of treatment.
16   Q. Were you accepting R████ P████ for behavior
17 modification treatment? Was that why she was admitted?
18   A. No.
19   Q. And she was admitted why?
20   A. For the trauma that had occurred in school.
21   Q. Well, that's why -- okay. And I know you can't
22 speak for Miss Pecoraro. Do you have any idea why she
23 thought Rachel was referred for the behavior modification
24 treatment?
25   A. No.

Page 29

1    Q. I want to direct your attention to a document that
2  was marked as Moore Deposition Exhibit 7. So if you would
3  go through there till you find that.
4    A. (Witness complies.)
5    Q. This is a memo to Jo Barker from Marlene Chrisman.
6  Are you looking at the same document here? Yeah, that's it.
7  Dated 1/15/02. It says, "Regarding b. mod. referrals." It
8  says, "The purpose of this memo is to provide information on
9  the two students who are being referred to Sarah Reed per
10 Frank Scozzie. Both girls were involved in a recent
11 situation at S.V. of that the nature and intensity of staff,
12 including Mr. Scozzie, feels this level of intervention is
13 essential. Both girls are under the age of 15 and,
14 therefore, not eligible for the adolescent partial program,"
15 end quote.
16   Do you know what Miss Chrisman was talking about
17 when she said the girls weren't eligible for the adolescent
18 partial program?
19   A. The adolescent program requires that a client is
20 14 years or older.
21   Q. You have an adolescent program, I take it. What
22 other programs are there?
23   A. The elementary program, which would be under the
24 age of 14.
25   Q. And that's a -- is that a partial hospitalization

**Page 30**

1   program also?

2      A.  It can provide partial hospitalization.

3      Q.  And is it accurate that these girls were not

4   admitted into the adolescent partial program?

5      A.  If they were not 14.

6      Q.  Then do you know who at Sarah Reed would -- the

7   first document in this -- in Moore Exhibit 1 is an IEP

8   Review Revision. Do you know what at Sarah Reed would

9   interpret that and make sure that it was implemented?

10     A.  I do not.

11     Q.  Then what kind of -- after you complete the intake

12   process, just tell me the types of paperwork that you

13   complete and where the paperwork goes.

14     A.  All of the consent and release forms and the

15   intake that -- I complete. And then it is submitted to our

16   front office, where the chart is developed for the client.

17     Q.  Then the front office would take care of billing

18   or invoicing the insurance companies --

19     A.  Yes.

20     Q.  -- or invoicing the school district.

21     A.  Yes.

22      MR. OLDS: Let's just take a break. I'm going to

23      take a break and look at my notes here, and maybe

24      we'll be done.

25      (Recess held from 11:07 a.m. till 11:20 a.m.)

**Page 31**

1     Q.  So I do have a couple more questions. Does Sarah

2   Reed have an outpatient program?

3     A.  Yes.

4     Q.  And what is the outpatient program?

5     A.  That would be the individual -- can be the

6   individual therapy, family therapy, can be psychiatric

7   medication management.

8     Q.  And a child who is taking advantage of that

9   wouldn't have to be in the educational component of Sarah

10   Reed; is that right?

11     A.  Correct. Correct.

12     Q.  So I guess a question arises in my mind, you

13   indicated that the committee accepted R█████ and K█████

14   because they had trauma, right?

15     A.  (Witness nods head.)

16     Q.  You have to say yes or no.

17     A.  Yes. I'm sorry.

18     Q.  And why weren't they just accepted into the

19   outpatient program?

20     A.  They were referred specifically to the alternative

21   education program.

22     Q.  Now, when there is a referral to the alternative

23   education program, would you anticipate that the students --

24   that R█████ and K█████ were having some problems in their

25   classroom?

**Page 32**

1     A.  Not from the referral that I received. Because I

2   was specifically told the assault and the harassment.

3     Q.  But typically when you receive a referral for the

4   alternative education program, would you assume that

5   children are having some problems in their classes?

6     A.  I might assume.

7     Q.  Well, you don't even have to assume, because

8   you're the intake person. Isn't it always the case that

9   when kids are referred to the alternative education program,

10   that they are having some kind of social, emotional, or

11   behavioral problems in their classes?

12     A.  Yes.

13     Q.  Okay. And does it make a difference to Sarah Reed

14   whether the students are -- have an IEP or don't have an

15   IEP?

16     A.  No.

17     Q.  Okay. So you'll accept students in either

18   category.

19     A.  Yes.

20     Q.  Special ed. or non-special ed.

21     A.  Yes.

22     Q.  And did you ask the Erie School District why --

23   whoever you were dealing with at the Erie School District,

24   did you ask them why these girls who -- who had suffered

25   trauma, why they needed an alternative educational

**Page 33**

1   placement?

2     A.  No.

3     Q.  Okay. And is that because if you get a referral

4   for the alternative educational program, you will accept

5   that referral, even if the students don't need an

6   alternative education program?

7     A.  We would be looking at the clinical need, the

8   mental health need, or emotional needs.

9     Q.  But that could be satisfied on an outpatient

10   basis, right? Theoretically.

11     A.  Theoretically.

12     Q.  So, I mean, in terms of providing outpatient

13   services for students, is there anyone else in the Erie

14   area, aside from Sarah Reed, that offers those kinds of

15   programs?

16     A.  Outpatient?

17     Q.  Yes.

18     A.  Yes.

19     Q.  Who would that be?

20     A.  The Achievement Center, Safe Harbor, St. Vincent.

21     Q.  Do those institutions also offer alternative

22   education?

23     A.  Not that I'm aware of.

24     Q.  Now, I think there's an institution called Perseus

25   House that offers alternative education.

9 (Pages 30 to 33)

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3  RICHARD P., BY AND FOR
    R██████ P., AND DENISE L., BY
 4  AND FOR K██████ L.,
              Plaintiffs,
 5
           vs                        )  Civil
 6
    SCHOOL DISTRICT OF THE
 7  CITY OF ERIE, PENNSYLVANIA;
    JANET WOODS, INDIVIDUALLY
 8  and in her Capacity as Principal
    of Strong Vincent High School;
 9  and LINDA L. CAPPABIANCA,
    Individually and in her Capacity
10  as Assistant Principal of Strong
    Vincent High School,
11              Defendants

12

13

14         Deposition of LINDA CAPPABIANCA, taken before

15    and by Linda K. Rogers, Commissioner of Deeds in

16    the Commonwealth of Pennsylvania and Notary Public

17    in the State of New York, on Monday, April 4,

18    2005, commencing at 1:04 p.m., at the law offices

19    of Knox, McLaughlin, Gornall & Sennett, 120 West

20    10th Street, Erie, Pennsylvania.

21

22

23

24

25              * * *
                                            Page 1
```

```
 1  For the Plaintiffs:
        Edward Olds, Esquire
 2      Carolyn Russ, Esquire
        1007 Mount Royal Boulevard
 3      Pittsburgh, PA 15223

 4

 5  For the Defendants:
        James T. Marnen, Esquire
 6      Knox McLaughlin Gornall & Sennett, PC
        120 West 10th Street
 7      Erie, PA  16501

 8

 9

10

11

12

13              * * *

14

15

16

17

18

19

20

21

22

23

24

25
                                            Page 2
```

```
 1      LINDA CAPPIAN CA, first having

 2      been duly sworn, testified as follows:

 3

 4              DIRECT EXAMINATION

 5  BY MR. OLDS:

 6

 7      Q. Good afternoon, Mrs. Cappabianca.

 8      A. Good afternoon.

 9      Q. How are you?

10      A. Good, thank you.  And you?

11      Q. I'm pretty good.

12      A. And how was that ride?

13      Q. It was dry.  It was very pretty today.  What a

14  gorgeous day.

15      MR. OLDS:  Off the record.

16      (Discussion held off the record.)

17      MR. OLDS:  Back on the record.

18      Q. Ms. Cappabianca, for the record would you state

19  your full name and give us your address, your business

20  address will be fine.

21      A. Linda Louise Cappibianca, 820 Lincoln Avenue,

22  Erie, Pennsylvania, 16505.

23      Q. Have you ever been deposed, Ms. Cappibianca, in a

24  deposition?

25      A. No.
                                            Page 3
```

```
 1      Q. Let me explain a couple of things here.  I am

 2  going to be asking you a series of questions.  I'm sure

 3  Mr. Marnen went over this, but I will be asking you a series

 4  of questions.  If any of my questions become too convoluted

 5  or don't make sense, tell me and I will try to rephrase

 6  them.

 7      If you let me finish a question before you start

 8  to answer, and I will let you finish an answer before I

 9  start the next question and this will help the reporter.  In

10  conversation we always interrupt each other because we sort

11  of know where we are going and we are just anxious to get

12  there.  But sometimes in a deposition when you look at a

13  question and you can't figure out what the question was if

14  you interrupt me, and I won't get your full answer if I

15  interrupt you.  So if you can just abide by that one ground

16  rule, and then the only other ground rule is it's best if

17  you say yes or no instead of unh-unh or um-hmm in the

18  appropriate -- when the occasion is appropriate, okay?

19      Have you lived in Erie all of your life?

20      A. All of my life.

21      Q. Are you a product of the Erie Public School

22  System?

23      A. No.

24      Q. Where did you to go high school?

25      A. Mercyhurst Prep.
                                            Page 4
```

**Page 49**

```
 1   withdrew him from the Erie schools?
 2      A. I didn't.  I sent home school visitors trying to
 3   find him.  And then if you look at the different home school
 4   visitors' report, we had different, um, whereabouts.  Once I
 5   heard he was at GECAC.  Once I heard he was at Sacred Heart,
 6   then I heard he was at First Assembly of God.  So we
 7   didn't -- it was like a two-week span before we actually
 8   found out where he was.
 9      Q. I want to show you -- I will mark this as
10   Exhibit 8.
11         (L. CAPPABIANCA EX. 8 - ATTENDANCE CARD,
12          marked for identification.)
13      Q. That's Exhibit 8.
14      A. Okay.  Do you have a particular question?
15      Q. Yes.  My first question is:  Can you tell me what
16   that form is?
17      A. This is a white attendance card.  We used them for
18   the program after school suspension or P.A.S.S. program.
19   And they would let us know when they were actually present
20   in the program or absent from the program.
21      Q. This particular form doesn't have anything to do
22   with his school attendance, C██████, this is for P.A.S.S.?
23      A. Correct.
24      Q. So Exhibit 8 is for P.A.S.S., and was he assigned
25   to P.A.S.S. every day where there is a notation?
```

**Page 50**

```
 1      A. Right.  What they would do is this bottom part
 2   would be the back of the white card.  The top is the front,
 3   the bottom is the back.  And what the P.A.S.S. supervisor,
 4   who was a teacher in the building, would do was on the back
 5   of the card would put three -- do you see the A-T-T?
 6      Q. Yes.
 7      A. That means attendance P.A.S.S.  You had two
 8   different kinds of P.A.S.S.  One was called attendance
 9   P.A.S.S. and one was called regular P.A.S.S.  Attendance
10   P.A.S.S. means that the child had to come to school during
11   the school day and then stay from 3:30 to 6:30, so their day
12   was extended.  Regular P.A.S.S. was they just stayed home
13   during the school day and then they came 3:30 to 6:30 at
14   night only --
15         Typically I would assign attendance P.A.S.S.
16   especially if the child had been in special education
17   because obviously they are below grade level and you would
18   want to have them in getting the instruction.
19      Q. The ABS, there is notation over here on the right,
20   ABS, what is that?
21      A. Absent.
22      Q. So would you assume that all of the -- was C████
23   B███ assigned to P.A.S.S. each day where there is an
24   indication -- where an X or P appears?
25      A. Yes.  The P means he was actually physically
```

**Page 51**

```
 1   there, the X means he was absent.
 2      Q. He was there -- I know someplace in there it says
 3   released.
 4      A. That means that he served his three days or five
 5   days, however many days he was assigned.
 6      Q. Okay.  I know he wasn't always in P.A.S.S., but he
 7   was in P.A.S.S. quite a bit; is that right?
 8      A. Yes.
 9      Q. So this case involves K██████ L███ and R██████
10   P█████.  Do you remember them from your days at Strong
11   Vincent?
12      A. Yes.
13      Q. Do you remember each of the girls?
14      A. Yes.
15      Q. Did K██████ L███ -- did you have -- how many
16   times do you think you had either meetings or encounters or
17   talks with her?
18      A. With K██████?  Daily, but not for behavioral
19   issues, but I had seen her daily.
20      Q. Describe her.  Not physically, but describe the
21   contact that you had with her, the different types of
22   reasons that you might meet with her.
23      A. She would just stop in periodically.  I was in a
24   classroom, it was kind of an unusual setup, not your typical
25   office where there's like a counter and you would have to
```

**Page 52**

```
 1   wait, the secretary would have you have a seat before you,
 2   know, announcing the student was there.  So mine was just a
 3   typical classroom, and she would frequently just walk in --
 4   whether it was to say hello.  Very few occasions she was
 5   referred to me for behavior reasons, but there were some.
 6   She had difficulty adjusting -- not adjusting as far as
 7   socially, she was very social.  She had trouble making it
 8   from one class to the next.
 9      Q. And I have never been there, so is it because it
10   is a big building and it might be confusing?
11      A. It is a big building.  All the middle school
12   classes are basically down a hall that was not very long and
13   they were one right across from each other.  Probably just
14   very overwhelming for her.
15      Q. Do you recall whether she ever complained to you
16   about C████ B███?
17      A. No.
18      Q. You don't recall that?
19      A. No.
20      Q. Do you recall what reasons that she was sent to
21   you as a disciplinary problem?
22      A. Could have been a range of things.  I don't recall
23   anything specifically.  There's only one incident that I
24   actually recall, and I remember she was not in class so they
25   let me know and I had to go find her.  And I did, I found
```

1  her and took her to class.
2      Q. Where was she?
3      A. Locker room in the gym.
4      Q. Did you talk to her?
5      A. I did.
6      Q. What was her explanation?
7      A. Wasn't an explanation, just wasn't in class.
8      Q. And she was in the locker room?
9      A. Yes.
10     Q. Do you have any idea what time -- what part of the
11  year that was?
12     A. I would say middle.
13     Q. What about R███ P███ do you recall -- you do
14  recall her as a student there, right?
15     A. Yes.
16     Q. What about referrals for discipline concerning
17  her?
18     A. I don't think she had many problems in class.
19  There were a few times that she had used profanity, once in
20  the hallway I recall -- actually twice that she used it.
21  There was a discipline -- not discipline, I'm sorry, a dress
22  code violation. She was in, I think it was jeans and then
23  she was also with R███ in the locker room -- I'm sorry,
24  K█████
25     Q. That same day?

Page 53

1      A. Yes.
2      Q. They were both there?
3      A. Yes.
4      Q. And did you ask -- did either one of them have an
5  explanation for being there?
6      A. No.
7      Q. Did you ever talk to K█████ about the fact that
8  C███ B████ assaulted her?
9      A. No. She was not in our building at that time.
10     Q. She never came to you and told you that she had
11  been assaulted?
12     A. Never.
13     Q. Did you ever talk to R███ about whether R████
14  had been assaulted?
15     A. After she had an episode in Miss Scully's class
16  Miss Scully brought her to me.
17     Q. Tell me about that episode.
18     A. It was January 9th very, very beginning of class.
19  She had screamed at another student in the room. I believe
20  it was the F-word, Miss Scully referred her to me. That's
21  when she had told me that they were -- boys were asking her
22  to do things and that something had taken place over at the
23  laundromat.
24     Q. How do you know it is January 9th?
25     A. Because I actually had to write up the incident

Page 54

1  and submit it to the Erie Police Department.
2      Q. What time of day was that?
3      A. I believe it was fifth block, which would have
4  been first period.
5      Q. So Miss Scully brought her to your office?
6      A. Correct.
7      Q. And describe what R████ looked like, her
8  demeanor?
9      A. That day?
10     Q. Yes.
11     A. She was angry. I couldn't tell you what she had
12  on. She was just very angry.
13     Q. And how many -- that would not have been the
14  first -- you would have had interactions with her before
15  January 9th --
16     A. I have.
17     Q. -- on other matters. I take it you would know
18  her?
19     A. Absolutely.
20     Q. And what was the nature of the conversation that
21  you had with her that day? Tell me what you recall her
22  saying and what you said.
23     A. I know that she had told me that boys were asking
24  her to do things and --
25     Q. Did she say what they were asking her to do?

Page 55

1      A. I believe it was perform oral sex. And then I
2  took her -- right after she had told me that and then I
3  said, well, why would they ask you that. And she had told
4  me about the laundromat incident and I went right down to
5  Ms. Woods' office.
6      Q. So what did she tell you about the laundromat
7  incident?
8      A. She had told me that B███ C█████ had coerced
9  her into giving oral sex to A█████ K█████, who was a high
10  school student, and C███ B███ who was a middle school
11  student. They were in the laundromat at one time. There
12  was a laundry attendant there. They went into the
13  bathroom, nothing happened in the bathroom, then they went outside.
14  B███ threatened her, and then I know that they walked down
15  the street and were in between houses.
16     Q. This is something that R███ told you that day?
17     A. She did.
18     Q. How long did that take for her to tell you the
19  story?
20     A. Well, we were in Mrs. Woods' office.
21     Q. She told the story in Miss Woods' office?
22     A. Yes. We interviewed all the people together.
23     Q. Did you take any notes of these interviews?
24     A. Yeah. Actually we had students, not R███ but
25  we had other students that were there that actually wrote

Page 56

82a



```
1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2
   RICHARD P., BY AND FOR
3  R_____ P., and DENISE L., BY
   AND FOR K_____ L.,
4              Plaintiffs        )
5       vs              ) Civil Action No. 03-390
                        )   Erie
6  SCHOOL DISTRICT OF THE
   CITY OF ERIE, PENNSYLVANIA;
7  JANET WOODS, INDIVIDUALLY
   and in her Capacity as Principal
8  of Strong Vincent High School;
   and LINDA L. CAPPABIANCA,
9  Individually and in her Capacity
   as Assistant Principal of Strong
10 Vincent High School,
              Defendants
11
12
13
14      Deposition of LINDA CAPPABIANCA, taken before
15  and by Linda K. Rogers, Commissioner of Deeds in
16  the Commonwealth of Pennsylvania and Notary Public
17  in the State of New York, on Friday, April 29,
18  2005, commencing at 11:15 a.m, at the law offices
19  of Knox, McLaughlin, Gornall & Sennett, 120 West
20  10th Street, Erie, Pennsylvania.
21
22
23
24
25           * * *
                                              Page 1
```

```
1  For the Plaintiffs:
       Edward Olds, Esquire
2      Carolyn Russ, Esquire
       1007 Mount Royal Boulevard
3      Pittsburgh, PA 15223
4
5  For the Defendants:
       James T. Marnen, Esquire
6      Knox McLaughlin Gornall & Sennett, PC
       120 West 10th Street
7      Erie, PA 16501
8
9
10
11
12
13           * * *
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 2
```

```
1       LINDA CAPPABIANCA, first having
2       been duly sworn, testified as follows:
3
4               DIRECT EXAMINATION
5  BY MR. OLDS:
6
7       Q. Good morning, Miss Cappabianca, how are you?
8       A. Wonderful. How are you?
9       Q. Pretty good. I don't think we are going to be --
10 I don't think it's going to be an all day thing or anything
11 like that. We'll be here for a little while, just for your
12 anticipation, I guess.
13      I guess maybe one thing I would like to talk about
14 is to come to an understanding about the documents that
15 might have been created as you and Miss Woods conducted your
16 investigation. And just so you can understand, I guess,
17 maybe where we are coming from, we conducted the deposition
18 of some of the police officers and one of the police
19 officers said that there were -- testified, and the police
20 records indicate there were two documentary or physical
21 items of evidence in this case. One being a videotape of
22 R_____ P_____ and, the second, being a statement that
23 actually you wrote for A_____ F_____ And so that is
24 what was turned over to the police, at least that's what the
25 police indicate was turned over to them. You and Miss Woods
                                              Page 3
```

```
1  conducted at least two days of interviews, right, or was it
2  three days?
3       A. Two.
4       Q. And the first day was it the students that you
5  were interviewing?
6       A. Yes.
7       Q. And when you interviewed the students, aside from
8  A_____ F_____ did you ask any of them to write anything?
9       A. I know that Jan and I made -- had written things
10 down for our own memory notes. I believe that the students
11 did.
12      Q. What's that, I'm sorry, go ahead.
13      A. It's typical whenever, no matter what the
14 circumstances are, whenever you are talking with a child to
15 have them write down their side of the story.
16      Q. That was going to be my question, that would have
17 been the practice?
18      A. Yes.
19      Q. Do you have any explanation as to why the
20 students' statements don't exist anymore?
21      A. (Witness moved head side to side.)
22      Q. I guess that's my question: Do you have any
23 explanation why those statements apparently don't exist?
24      A. I know that everything that I have had, my whole
25 file of those kids, their discipline files are no longer in
                                              Page 4
```

**Page 41**

1 about that there was an IEP review revision meeting?

2    A. They would have had to have done that before they

3 could change schools. That's all this is saying, see the

4 second page, notice of recommended educational placement.

5    Q. Yes.

6    A. That's what that's telling you is that you are

7 changing her placement, her educational placement.

8    Q. Who do you think would have been responsible for

9 starting that process?

10    A. Well, I think because of the circumstances that

11 Mr. Ruhl was involved, Miss Woods and I were involved, Frank

12 Scozzie, Charlise Moore, it was something that was discussed

13 amongst us what would be the best for both she and K▓▓▓▓

14    Q. Do you have a recollection of this, that there was

15 actually a meeting where this IEP revision review was

16 adopted that you actually sat down with Mrs. Gray was there,

17 you were there.

18    A. I don't recall a meeting.

19    Q. Then I would like you to look at, I guess I'm

20 going to show you what was marked as Exhibit 2 in Charlise

21 Moore's deposition.

22    A. Okay.

23    Q. This pertains to K▓▓▓▓ L▓▓▓ And there is a --

24 the third page of that is an IEP revision review pertaining

25 to K▓▓▓▓ L▓▓▓ and it's signed by Denise L▓▓ Melissa

**Page 42**

1 Valimont, Mrs. Gray and Linda L. Cappabianca. Do you recall

2 a meeting occurring about K▓▓▓▓ L▓▓▓?

3    A. Yes.

4    Q. And that might have been -- I don't know if that

5 made my question clear. Do you think there really was a

6 meeting, an IEP meeting, or might this document have just

7 been circulated among the people that signed it for their

8 signature?

9    A. It could have been. Is that typical standard, no,

10 you actually sit down with the parents, but it could have

11 been.

12    Q. There might not have been a meeting in this

13 instance?

14    A. No.

15    Q. Then I want to show you the documents that were

16 marked as 3 and 4 in Miss Moore's exhibit.

17    A. Okay, what I'm looking at, change in --

18    Q. These two documents, is that your handwriting on

19 these documents?

20    A. No.

21    Q. Have you ever seen these documents before?

22    A. No.

23    Q. Your name appears on that, but you have never seen

24 these before?

25    A. No.

**Page 43**

1    Q. You can give those back to me.

2    A. I'm sorry. I didn't look at this one, is this the

3 same thing?

4    Q. It's the same handwriting. One pertains to

5 K▓▓and one pertains to R▓▓▓ Did you participate at

6 all in the decision making process that ended up with

7 K▓▓▓ and R▓▓▓going to Sarah Reed?

8    A. We recommended, Jan Woods and I, that it might be

9 better to move the girls to a different building.

10    Q. Okay. Tell me about what you remember, first of

11 all, I guess your discussions with Janet Woods and then how

12 you communicated your recommendation.

13    A. Um, we discussed that probably if the kids knew

14 about this it may not be a good idea for the girls to be --

15 other students, what who I meant by kids knew about

16 it -- wouldn't be a good idea for the girls to be in the

17 building. So we had suggested that, Jan had actually

18 because proper protocol is she is the one in charge, had

19 actually mentioned that to Frank Scozzie. And being that

20 they were in special education it was something that the

21 special education supervisor would have to agree upon also.

22    Q. And do you remember when you reached that

23 conclusion?

24    A. I think it was in our heads the entire time even

25 on the 9th. I don't think we discussed it with anybody

**Page 44**

1 until the 10th.

2    Q. Okay. Now, you say the other kids knew about it.

3 Originally you said in your first deposition we talked a

4 little about how there was hall talk before Christmas that

5 there was this incident, sexual activity. After Christmas

6 how did you know that the students had acquired knowledge of

7 this?

8    A. Through R▓▓▓ She had said people were taunting

9 her, the other two incidents.

10    Q. Did you have the impression that the circumstances

11 were widely known through the junior high?

12    A. No. Well, I wouldn't have found out about it if

13 it wasn't for R▓▓▓ which is not typical among middle

14 school kids. They let you know whenever anything happens.

15    Q. Did it occur to either you or Miss Woods that

16 perhaps if you disciplined anyone who taunted or harassed

17 R▓▓that she could remain in the school?

18    A. By this point it was after that we found out about

19 it the same day we found out about everything. So had kids

20 been disciplined -- we would have disciplined kids had it

21 been going on, but we didn't know it was going on.

22    Q. You decided to move them because you were afraid

23 it was going to go on or what, that's what I don't

24 understand?

25    A. Not necessarily. Part of it, part of it



1  A. I didn't personally, I think I went through Jan on
2 everything.
3  Q. Do you know what a therapeutic behavioral support
4 program is? I think you have a special ed. background,
5 don't you?
6  A. Um-hmm.
7  Q. Who does a therapeutic behavior support program?
8  A. I would say it has more of a counseling component
9 to it.
10  Q. What do you know or are you speculating?
11  A. I'm speculating.
12  Q. So a program of therapeutic behavior support isn't
13 a term of art in special ed.?
14  A. No, not necessarily.
15  Q. Behavior support programs, that is a special --
16 that is a type of program for kids with severe behavior
17 problems; is that right?
18  A. I would imagine among other things, but I would
19 say yes.
20  Q. We spent some time, I think in your first
21 deposition, talking about -- you were taking steps to get
22 C___ B___ out of Strong Vincent.
23  A. Correct.
24  Q. And did you want to send him to Sarah Reed?
25  A. No.

Page 49

1  Q. Where did you want to send him?
2  A. Alternative education, which is Perseus House.
3  Q. Perseus House?
4  A. Yes.
5  Q. Is that a behavior support program at Perseus?
6  A. That's more a behavior modification program.
7  Q. Behavior modification. Okay. Is there -- to your
8 understanding is there a difference between a behavior
9 modification program and a program of therapeutic behavior
10 support?
11  A. I would say there was, to my understanding.
12  Q. Exhibit 2, which is the one -- if you want to take
13 this top clip off and go to the second that's Exhibit 2,
14 that's Moore Exhibit 2. And that's a temporary home
15 placement, and were you aware that K___ was going to be
16 given a temporary home?
17  A. Right, same with R___. That's what it says here
18 IEP in the home. Yes. They have to do a change of
19 placement whenever you are -- whenever they are not in the
20 school building.
21  Q. Had you ever seen a temporary home placement for
22 five days?
23  A. Yes.
24  Q. Is that something that is frequently used by the
25 Erie School District?

Page 50

1  A. We no longer use it, but that year we did do what
2 is called in home IEP.
3  Q. Why only that year, if you know?
4  A. I don't know why. I just found out we don't need
5 them -- I have not had to use them since that year. It
6 depends on the population of students that you have, but
7 when a child has an IEP you try to keep them in school, you
8 don't want to suspend them. If there is something that
9 warrants them being suspended, then we could do an in home
10 IEP. That way they are still getting their individual
11 education plan, but it is going to be in the home not at --
12  Q. So that's a device or procedure that was used in
13 2001, 2002?
14  A. Right. I don't know if you know anything about
15 special ed. laws, but there are very many of them and you
16 try not to exclude the child from school.
17  Q. Right.
18  A. So this was, I think, a way for us -- because, I
19 mean, sometimes you have special ed. kids that not because
20 of manifestation of their disability, but you have kids that
21 commit infractions that if it was the regular education the
22 student would be suspended right away and you can't do that
23 with a special ed. child.
24  Q. Did you know that -- I think we are going to find
25 this out, but do you know whether R___ and K___ were

Page 51

1 referred to a behavior modification program at Sarah Reed?
2  A. I don't know that.
3  Q. When you found out sometime in January that
4 K___ was among the students who were at the laundromat
5 that night, and the other students that you interviewed
6 talked about the fact that K___ had been engaged -- had
7 been forced to give oral sex to C___ B___ did you
8 relate that back to the conversation that you had with
9 K___ in December?
10  A. Yes.
11  Q. Did you think that K___ had problems
12 communicating? I mean, was she able to express what she
13 needed to express to get the ideas that she wanted to get
14 across across?
15  A. Yes.
16  Q. She was able to do that?
17  A. Yes.
18  Q. You didn't think she had trouble communicating?
19  A. No. I don't know how she was written. I don't
20 know if she could write her ideas out, but she was very -- I
21 mean, she was able to tell you how she was feeling.
22  Q. Actually I have another question here about this
23 exhibit, let me find the document. Once again returning
24 back to Moore Exhibit 1, document Bate stamped 442, it is a
25 handwritten statement signed by Shelly P___ I'm

Page 52


85a

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    RICHARD P., by and for      :
      R██████ P., and DENISE L.,  :
 4    by and for K████████ L.,    :
                 Plaintiffs       :
 5                                :
           v.                     :   Civil Action No. 03-390
 6                                :          Erie
      SCHOOL DISTRICT OF THE CITY :
 7    OF ERIE, PENNSYLVANIA; JANET:
      WOODS, Individually and in  :
 8    her Capacity as Principal of:
      Strong Vincent High School; :
 9    and LINDA L. CAPPABIANCA,   :
      Individually and in her     :
10    Capacity as Assistant       :
      Principal of Strong Vincent :
11    High School,                :
                 Defendants       :
12

13

14

15

16          Deposition of ROBERT R. IDDINGS, taken before

17     and by Janis L. Ferguson, Notary Public in and

18     for the Commonwealth of Pennsylvania, on Thursday,

19     May 5, 2005, commencing at 11:49 a.m., at the

20     offices of Knox McLaughlin Gornall & Sennett, PC,

21     120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
                 Reported by Janis L. Ferguson, RPR
25               Ferguson & Holdnack Reporting, Inc.
```

Page 14

1 and the counselor in the most natural environment, which
2 would be the classroom. Occasionally the therapist will do
3 individual therapy with the child.
4     Q. When you say "occasionally", are you -- is it more
5 or less than 10 hours a week?
6     A. Of the therapist's job?
7     Q. Yes.
8     A. Less.
9     Q. Less. Would it be more or less than five hours a
10 week?
11     A. It would be probably about five hours.
12     Q. Five hours a week. And those therapy sessions
13 would take place in the therapist's office?
14     A. Right.
15     Q. Okay. Now, does each student get five hours a
16 week, or is it --
17     A. No. That would be split between their caseload.
18     Q. Oh. So a therapist would give five hours of
19 individual therapy a week among the --
20     A. 26 clients.
21     Q. -- 26 clients. Okay. And what is the -- the
22 counselors -- their reporting line is up through the --
23 Mr. Dildine? They report to him?
24     A. Right.
25     Q. And what do they -- what are the counselors'

Page 15

1 responsibilities in the classroom?
2     A. They provide social skills training daily, they
3 implement incentive programs, they help the kids learn
4 coping skills and self-regulation. And they assist with
5 activities, educational activities, as well as therapeutic
6 activities.
7     Q. Do you know if the counselors are -- are they
8 certified under Pennsylvania education law as counselors?
9 Are they those kind of counselors?
10     A. Not necessarily. Generally -- not always, but
11 generally they are Bachelor's-level employees.
12     Q. Okay. You were here, and I can show you the --
13 maybe that's the best way to -- I'll show you the piece of
14 paper that I was referring to. There was a -- let's see if
15 I can find it. It would be -- I think it's the fifth page
16 of this first exhibit. It looks like this (indicating).
17 Keep going. It's that one, yeah.
18     A. Okay.
19     Q. And I know you have probably never seen this
20 document, but I just want to ask you about the language in
21 it.
22         MR. MARNEN: What's the Bates number?
23         MR. OLDS: I'm sorry, Jim. It's 445. It's the
24     memo from Audrey Pecoraro to Frank Scozzie.
25     Q. And it talks about referral to Sarah Reed, quote,

Page 16

1 behavior modification program, special education tract, end
2 quote. Does that language have any meaning to you?
3     A. It does not.
4     Q. Okay. Does Sarah Reed offer behavior
5 modification -- I guess Mr. Bogardus said that it was a
6 teaching modality. Is that what it -- is that the correct
7 terminology?
8     A. Right. Yes.
9     Q. Sarah Reed does offer that.
10     A. Yes, we do.
11     Q. Is it fair to say that -- do all of the students
12 who are in a classroom at Sarah Reed need that teaching
13 modality -- method modality?
14     A. All of the children participate in it.
15     Q. Okay. And tell me what that is.
16     A. If you want to look at this exhibit --
17     Q. Sure. This would be Exhibit 1?
18     A. Right.
19     Q. Of your --
20     A. The -- on Page 7, the classroom level program.
21     Q. Yes.
22     A. That is one form of behavior modification.
23     Q. Okay.
24     A. It's a program-wide incentive program for the
25 clients to earn more privileges. Basically a way of

Page 17

1 monitoring their progress. So all of the children
2 participate in this -- this program.
3     Q. Okay.
4     A. And depending on need, the therapist will develop
5 an individualized behavior program for certain students.
6     Q. And then are there any other -- I understand
7 there's a therapeutic component. But are there any other
8 education modalities that are going on in the classroom?
9     A. Such as direct instruction?
10     Q. Well, I guess. Is there direct instruction?
11     A. Yes.
12     Q. What other modalities are going on in the
13 classroom, besides direct instruction and the behavior
14 modification?
15     A. Social skills training. Group therapy. And that
16 can be regarding a variety of topics.
17     Q. Like for -- give me some examples, maybe.
18     A. Peer relationships, coping with stress,
19 managing -- identifying and managing emotions. Those are
20 three off the top of my head.
21     Q. Is it fair to say that the children in the
22 educational program exhibited some kind of -- must have
23 exhibited some kind of behavior problems at their referring
24 schools? I'm not saying must have. I'm saying that's why
25 they are at Sarah Reed, because they exhibited some kind of

Page 26

1      Q.  Generally, can you categorize the types of
2  students that the Erie School District refers to Sarah Reed.
3      A.  It runs the entire gamut, from children who have
4  acted out one time aggressively, who have no previous
5  history, to children who have multiple diagnoses and have
6  long histories of mental health services.
7      Q.  And generally is there a -- would you say that
8  there's a mental health component to every referral?
9      A.  Our goal is to determine that.  So that the school
10 district will make the referral, and during the initial --
11 let's say phase will treatment, we would try to -- we need
12 to know that up front, that there is a mental health
13 component to it, or we would try to assess that.
14     Q.  So when the Erie School District made the referral
15 in this case, and it was -- apparently as described by
16 Mr. Bogardus, it was an oral referral, and he took it to the
17 admissions committee, is it -- was it enough for Sarah Reed
18 that Erie -- if you know, that the School District was
19 making the referral so that Sarah Reed, just based upon that
20 referral, would accept the students?
21     A.  If the parents were in agreement.
22     Q.  So to put it conversely, Sarah Reed wouldn't turn
23 down a referral from the Erie School District based upon
24 its -- assuming that there was parental consent, based upon
25 its own evaluation of the student's need, you would accept

Page 27

1  the student and do the evaluation after the student came.
2      A.  Right.  Unless we had previous history.  You know,
3  if we knew there was a reason that our program wasn't --
4  wouldn't be beneficial.
5      Q.  Okay.  Is there any problem with putting the
6  students who have aggressive behavioral tendencies with
7  students who are internalizing?
8      A.  Yes.
9      Q.  Does that present issues?
10     A.  It does.
11     Q.  Tell me, describe what those issues are.
12     A.  Children who have symptoms of severe anxiety can
13 sometimes have heightened symptoms with children who are
14 aggressive inside their own classroom.
15     Q.  And how do you deal with that at Sarah Reed?
16     A.  We try to work with both -- both populations.  If
17 a child is, you know -- presents significantly worse
18 symptoms, we'll try to move them to another classroom.
19     Q.  Okay.  Then how -- describe for me the evaluation
20 process that Sarah Reed follows when a student is referred
21 to it.
22     A.  Generally, within the first month or so -- well,
23 within the first five days, a psychiatrist will review the
24 case or what we know about the client.  And the therapist
25 will write an initial preliminary treatment plan.  Then

Page 28

1  every 20 days following that, the treatment team will
2  convene and review any symptoms that may be coming up,
3  history, as well as progress, and revise the treatment plan
4  on an ongoing basis.
5          Our therapeutic process generally is -- during the
6  first stage, within the first month or so, is just building
7  rapport, gathering information, designing an individualized
8  treatment plan.  From there, they will work on any
9  self-regulatory skills that may need to be developed; coping
10 skills, peer relationships.  And then the final stage is
11 transitioning back to a public school.
12     Q.  Okay.
13         (Discussion held off the record.)
14         MR. OLDS:  Let me take a break here for a couple
15         minutes, and I'll be right back.
16         (Recess held from 12:38 p.m. till 12:42 p.m.)
17     A.  Can I clarify one thing?
18     Q.  Sure, yes.
19     A.  You had asked if we generally accept referrals for
20 alternative ed.  We do turn referrals down.  I don't think
21 we would have in the case of K████ and R████, because we
22 had such limited information.  But depending on the
23 information that we get, we do make determinations that our
24 program won't be beneficial.
25     Q.  So the more information you have, the more able

Page 29

1  you are to evaluate whether the referral is appropriate or
2  not.
3      A.  Correct.
4      Q.  So in a situation where you get a telephone call
5  saying we want to refer two kids to your program, they have
6  been -- they are being harassed and they have been victims
7  of a sexual assault, you will accept those students, because
8  that's the only information you have.
9      A.  Right.
10     Q.  Okay.  And you're relying -- at that level, you're
11 relying on the school district to make the decision that
12 it's appropriate for these students to be placed in the
13 educational program at Sarah Reed, as well as perhaps get
14 the therapeutic programs that Sarah Reed offers.
15     A.  Because of our relationship, they know our -- the
16 therapeutic pieces that we offer at this point in time.  But
17 they really just rely on us to make that -- that
18 determination.
19     Q.  They rely on you as to what therapy will be
20 offered, but they could make a referral to you for
21 outpatient therapy, right?
22     A.  No.
23     Q.  Oh, they could not.
24     A.  No.
25     Q.  And why is that?

8 (Pages 26 to 29)

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
 3   RICHARD P., by and for
     R____ P.., and DENISE L., by
 4   and for K____ L.,,
              Plaintiffs      ) Civil Action
 5                            ) No: 03-390 Erie
           vs
 6   SCHOOL DISTRICT OF THE CITY OF
     ERIE, PENNSYLVANIA; JANET
 7   WOODS, Individually and in her
     Capacity as Principal of
 8   Strong Vincent High School;
     and LINDA L. CAPPABIANCA,
 9   Individually and in her
     Capacity as Assistant
10   Principal of Strong Vincent
     High School,
11            Defendants

12

13        Deposition of DENISE L____, taken before and

14   by Linda K. Rogers, Commissioner of Deeds in the

15   Commonwealth of Pennsylvania and Notary Public in

16   the State of New York, on Monday, March 21, 2005,

17   commencing at 12:01 p.m., at the law offices of

18   Knox McLaughlin Gornall & Sennett, PC, 120 West

19   10th Street, Erie, Pennsylvania 16501.

20

21

22

23

24

25            * * *
                                              Page 1
```

```
 1   For the Plaintiffs:
         Edward Olds, Esquire
 2       1007 Mount Royal Boulevard

 3     Pittsburgh, PA  15223

 4

 5

 6   For the Defendants:
         James T. Marnen, Esquire
 7       Knox McLaughlin Gornall & Sennett, PC
         120 West 10th Street
 8       Erie, PA 16501

 9

10

11

12

13            * * *

14

15

16

17

18

19

20

21

22

23

24

25
                                              Page 2
```

```
 1                  DIRECT EXAMINATION

 2   BY MR. MARNEN:

 3

 4       Q. You are Denise L____ correct?

 5       A. Yes.

 6       Q. What is your middle name?

 7       A. Jane.

 8       Q. Where do you presently reside?

 9       A. _____

10       Q. In Erie?

11       A. Yes.

12       Q. What is the zip code?

13       A. ____

14       Q. How long have you resided there?

15       A. Going on five years.

16       Q. Were you residing at _____ on the

17   day that K____ was harmed that is the subject of this

18   lawsuit?

19       A. Yes.

20       Q. You have been at a number of depositions in this

21   case so far, and I think you probably have the drill down,

22   but let me just remind you.  I am here as the attorney for

23   the school district, Miss Cappabianca, Miss Woods.  My only

24   purpose is to find out what you know about facts I think are

25   relevant to the case.  You have the right to understand what
                                              Page 3
```

```
 1   I am asking.  If you don't understand or hear me, let me

 2   know and I will rephrase it.

 3          We should try to avoid talking at the same time.

 4   The reporter is taking everything down, and you should use

 5   words when you communicate with me as opposed to gestures

 6   and sounds that are not words like um-hmm and unh-unh

 7   because it is difficult for the reporter to interpret what

 8   you mean by that.

 9          If at any time you want to take a break, we can

10   take a break.  This is not an inquisition.  Do you have any

11   questions of me?

12       A. No.

13       Q. Okay.  So you lived at _____ for

14   about five years?

15       A. Yes.

16       Q. Are you born and raised in Erie?

17       A. Yes.

18       Q. For a brief period of time I gather you lived in

19   Meadville?

20       A. I didn't live in Meadville.

21       Q. She did, K____ did?

22       A. Yes, yes.

23       Q. What is K____ father's name?

24       A. Junior.

25       Q. Is that his given name, Junior, or a nickname?
                                              Page 4
```

| | |
|---|---|
| Page 65 | Page 67 |

**Page 65**

1 Q. Okay. So Chris Rule came to the hospital at the
2 time of discharge and told you and K⬛ that K⬛
3 was going to be placed in Sarah Reed for her own safety,
4 right?
5 A. Right.
6 Q. What, if anything, did you say in response to
7 that?
8 A. I said, well, what is going to happen to the boys
9 that did this? If you are removing K⬛, what is going
10 to happen to them?
11 Q. And he said he didn't know?
12 A. Right. And then that's when all the court
13 proceedings started.
14 Q. Court proceedings, you're talking about the
15 juvenile delinquency proceedings?
16 A. Right.
17 Q. K⬛ was, in fact, placed in Sarah Reed,
18 correct?
19 A. Right.
20 Q. How did you feel about that?
21 A. I didn't think it was right to have to remove
22 them. They should have been able to handle the situation.
23 You know, if they got rid of the boys, they should have been
24 able to handle the rest of the school. Get things under
25 control --

**Page 66**

1 Q. Did you tell -- I'm sorry, I didn't mean to
2 interrupt you.
3 A. You know, so she would be able to stay in the
4 school where she could learn and excel.
5 Q. Did you tell anybody at the Erie School District
6 that thought right there?
7 A. I just said it at the meeting with Chris Rule.
8 Q. At the meeting in the hospital?
9 A. Right, because he is the one that wanted to put
10 her there.
11 Q. You think it was Chris Rule's idea?
12 A. Yes, that is what I was told.
13 Q. That's fine. Chris Rule told you that?
14 A. Yeah.
15 Q. K⬛ was in special education, correct?
16 A. Right.
17 Q. And you would agree with me, won't you, that there
18 is a process that relates to changing placements of special
19 education kids? There's a process you have to go through?
20 A. Yeah, IEP.
21 Q. IEP, that's the process. There was a new IEP for
22 K⬛, right?
23 A. Right.
24 Q. You were invited to that meeting, the IEP meeting?
25 A. It was done at my house.

**Page 67**

1 Q. Really? Okay.
2 A. Mr. Rogers did it, and he gave me a yellow copy.
3 Q. So you were there with Mr. Rogers, anybody else
4 there?
5 A. No.
6 Q. Did you sign anything that indicated you agreed
7 with the placement in Sarah Reed?
8 A. I had to sign a paper at Sarah Reed when I was at
9 Sarah Reed.
10 Q. Okay.
11     MR. MARNEN: I think I will get the exhibits you
12     marked last week, Ed. I will be right back.
13     Let's take five minutes.
14     (Brief recess.)
15 Q. I only have one copy. I will come over with you,
16 if you don't mind. Moore Deposition Exhibit 2 is an exhibit
17 that has a bunch of documents in it. Let me walk you
18 through it. There's a notice of the recommended educational
19 placement, that's the NOREP. Do you recognize that; did you
20 see that back then, if you know?
21 A. Yeah.
22 Q. There is the IEP revision review. There is a
23 request for home school visitor service, I guess that's not
24 necessarily a part of the IEP. On Page E744 there is a
25 statement that you appeared to have signed; do you remember

**Page 68**

1 signing that?
2 A. Yes. This was signed at Sarah Reed.
3 Q. That was signed at Sarah Reed. Was that after
4 K⬛ was there?
5 A. No, that was at an intake.
6 Q. Intake, okay.
7 A. Said I have to write something for her to go
8 there.
9 Q. On Page E818 of that same exhibit the document is
10 entitled IEP revision review. Is that your signature on
11 there?
12 A. Yes.
13 Q. I forget the person you said you met at your home
14 with.
15 A. Mr. Rogers.
16 Q. Mr. Rogers. It doesn't appear that Rogers signed
17 that. You signed it, correct?
18 A. This one wasn't signed at my house.
19 Q. No, it wasn't? Where was it signed?
20 A. I don't remember. I remember signing, I think it
21 was this one here.
22 Q. That is the one with 3400 in the lower right
23 corner, that's the NOREP?
24 A. Yes. I remember this at my house.
25 Q. I don't see a signature on it.


90a

1   A. This is the only thing I remember.
2   Q. Did you sign on the second page?
3   A. No.  This is all he brought to me, and then he
4 pulled the yellow pages off and gave me the yellow one and
5 he kept these ones, he kept the top pages.
6     MR. OLDS: Did she say she did not sign 818 at her
7       house, that would be the fifth page?
8     MR. MARNEN:  What is the page?
9     MR. OLDS: The fifth page of that.
10  Q. 818, you said you did not sign that at your house?
11  A. No, not at my house.
12  Q. Do you remember where you signed it?
13  A. No.
14  Q. You just signed that very first document at your
15 house, that is what you remember?
16  A. Right.
17  Q. Is that your signature on 818?
18  A. Yes.
19  Q. There is your signature on E820, NOREP, E820 you
20 signed it, right?
21  A. Right.
22  Q. Looks like multiple copies of the same thing.
23 Okay.  Is it your recollection that you went along with the
24 placement at Sarah Reed?
25  A. Right.

Page 69

1   Q. You did not object to it?
2   A. No.
3   Q. You did not object, correct?
4   A. No.
5   Q. That's not correct or you didn't object?
6   A. I didn't object.
7   Q. Okay.  Now I want --
8   A. Wasn't much of a choice.
9   Q. That's what I want to ask you, why didn't you
10 object?
11  A. Because he said that she would be better off
12 there.
13  Q. Chris Rule said that?
14  A. Right, than in school.
15  Q. Did he explain to you why he thought that was the
16 case?
17  A. He said because the kids need time to forget about
18 it.  And if she went back to school that there might be
19 further, you know, taunting about what happened, stuff like
20 that.  It would be better to give them a break.
21     MR. OLDS: Just for clarification, when you said
22       the kids need time to forget about it, what kids
23       was he talking about?
24     THE WITNESS: The students at school.
25  Q. The students besides C____ and B____?

Page 70

1   A. Right.
2     MR. OLDS: R____ and K____ too, they were kids
3       too.  I just didn't understand it.
4   A. He mentioned student body.
5   Q. Because there was some harassment going on at the
6 high school, right?
7   A. Right.
8   Q. That harassment was coming from people in addition
9 to C____ B____ and B____ C____?
10  A. Right.
11  Q. And you accepted Chris Rule's opinion on this, is
12 that what you are saying?
13  A. Yeah, he is professional so --
14  Q. That opinion was -- we are talking now about the
15 conversation at discharge day, right?
16  A. Right.
17  Q. As I remember your testimony earlier you said
18 Chris Rule did not know at the time of the discharge what
19 was going to happen with B____ and C____?
20  A. Right.  He said there was a lot of police and
21 stuff coming into the school to talk to everybody, and it
22 would also be easier if they are not there.
23  Q. Did Chris Rule mention anything about Sarah Reed
24 being able to provide services that Strong Vincent could not
25 provide?

Page 71

1   A. No, that's all he said.
2   Q. All he said was get them out of there because we
3 need for it to cool down basically?
4   A. Yes.
5   Q. Did he say how long he thought the Sarah Reed
6 placement would last?
7   A. No.
8   Q. Did he say whether R____ P____ was going to be
9 the subject of a Sarah Reed placement also?
10  A. I don't recall.
11  Q. Did you know by the time that Chris Rule was in
12 there for the discharge meeting, did you know by that time
13 that R____ had been a victim of a sexual assault also,
14 R____ P____?
15  A. Yes, I think so.
16  Q. Did K____ tell you that?
17  A. No, Chris Rule did.
18  Q. Chris Rule did?
19  A. Yeah.
20  Q. Did you know R____ P____ before that day?
21  A. Yes.
22  Q. How did you know her?
23  A. K____ and her were friends.
24  Q. Did they ever come to your house to hang out or
25 whatever they call it?

Page 72

**Page 73**

1  A. Yeah, and she went over there. I also went over
2  there and talked to her parents.
3  Q. You knew Richard P____ and Shelly P____ too?
4  A. Yes.
5  Q. Is that the only way you knew them was through the
6  girls?
7  A. Right.
8  Q. You didn't know them before --
9  A. No.
10  Q. -- K____ went to Vincent that year, right?
11  A. No. I have a question.
12  Q. Okay.
13  A. When they are supposed to have like the five days
14  of -- I saw it in that thing where they had five days of
15  in-home schooling, are they supposed to work on the IEP; do
16  you know?
17  Q. I don't know. Thank you for reminding --
18  A. They are not supposed to sit there and color, are
19  they?
20  Q. The girls, you mean?
21  A. Yeah.
22  Q. I think when they are in their home schooling they
23  are supposed to be getting an education.
24  A. Because whenever she was getting home schooling at
25  home he just gave her a coloring book and crayons.

**Page 74**

1  Q. The home school teacher?
2  A. Yeah, and they just colored.
3  Q. I understand K____ after she got out of
4  Millcreek Community Hospital never returned to Strong
5  Vincent.
6  A. No.
7  Q. She was instead placed in the home before she went
8  to Sarah Reed?
9  A. Right.
10  Q. Did K____ finish the school year at Sarah Reed?
11  A. Yes.
12  Q. When did she leave Sarah Reed after that school
13  year, did she leave at the end of a regular school year or
14  did she also go there in the summer?
15  A. No. She didn't go there in the summer, then she
16  went to Wayne.
17  Q. So for 2002-2003, she went to Wayne Middle School?
18  A. Right.
19  Q. Why did she go to Wayne Middle School?
20  A. Because that was the school that was over there.
21  Q. Why didn't she go back to Strong Vincent?
22  A. She didn't want to go back there.
23  Q. Is that the reason she did not go back to Vincent?
24  A. Right. She didn't want to go. And then when she
25  went to Wayne there was problems there too.

**Page 75**

1  Q. What kind of problems?
2  A. Well, this boy said that she was hitting him in
3  the back of the head. Her friends were sitting all in the
4  same room and said it didn't happen. And the principal
5  wanted her to go to his office with him, and it would just
6  be him and her, and she didn't feel comfortable. She said
7  you can talk right here. He said you are going to go to my
8  office, and then he grabbed her to take her to his office
9  and then she pulled away. He grabbed her by her thighs
10  twice, and then dropped her on the ground. And then he
11  grabbed her wrist and took a piece of skin out of her wrist,
12  and I called the police.
13  Q. Were any charges filed?
14  A. No. He doesn't work there anymore.
15  Q. What is his name?
16  A. Mr. Cranking (phonetic).
17  Q. Cranking?
18  A. He doesn't work there no longer as a principal.
19  Q. Is that the only, I am going to call it
20  harassment, at Wayne?
21  A. Kids picked on her.
22  Q. Did they pick on her for any reasons related to
23  the sexual assault by C____ B____?
24  A. No, just basically --
25  Q. Basically picked on her?

**Page 76**

1  A. Picked on her, they hit her sometimes. One girl,
2  she is like 350 pounds, she would hit on her and she would
3  beat on her. She pushed her into the heater one time and
4  black and blued her arm up on the back.
5  Q. Has there been any verbal or physical harassment
6  or bothering of K____ since she entered Wayne school up
7  to the present day that has been related by the harassers to
8  the sexual assault by C____ B____? Do you follow my
9  question, it was a long question?
10  A. No.
11  Q. What I am trying to find out is whether anybody
12  has bothered K____ since she went back into school after
13  she left -- after she left Sarah Reed, whether anybody has
14  bothered her by accusing her of doing something wrong with
15  C____ B____ or calling her names that would suggest that
16  she is not a good girl, things of that nature?
17  A. Well, some people at East. She don't go there
18  yet, but that's where they want to put her. She don't go
19  there yet but my older daughter comes home and tells me.
20  Q. K____?
21  A. They say stuff about K____.
22  Q. About K____ being, what, promiscuous?
23  A. They say promiscuous. They said that she
24  performed oral sex on C____. I guess they were kids that
25  went to Strong Vincent that now go to East. At Sarah Reed

Page 1

1                IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    RICHARD P., by and for        :
     R██████ P., and DENISE L.,    :
4    by and for K█████████ L.,     :
              Plaintiffs           :
5                                  :
          v.                       :   Civil Action No. 03-390
6                                  :        Erie
     SCHOOL DISTRICT OF THE CITY   :
7    OF ERIE, PENNSYLVANIA; JANET  :
     WOODS, Individually and in    :
8    her Capacity as Principal of  :
     Strong Vincent High School;   :
9    and LINDA L. CAPPABIANCA,     :
     Individually and in her       :
10   Capacity as Assistant         :
     Principal of Strong Vincent   :
11   High School,                  :
              Defendants           :
12

13

14

15

16          Deposition of CHARLISE MOORE, taken before

17       and by Janis L. Ferguson, Notary Public in and

18       for the Commonwealth of Pennsylvania, on Friday,

19       March 18, 2005, commencing at 2:37 p.m., at the

20       offices of Knox McLaughlin Gornall & Sennett, PC,

21       120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
                  Reported by Janis L. Ferguson, RPR
25                Ferguson & Holdnack Reporting, Inc.

Page 18

1    Q.  Okay.  This year, do you know how many special
2    education middle school students from the middle schools are
3    attending Sarah Reed?
4    A.  That I'm responsible for at that age?  I think we
5    only have four this year.
6        (Discussion held off the record.)
7    A.  We have four students there right now.
8    Q.  And would you -- would it be fair to say -- well,
9    would it typically be the case that it would be less than a
10   dozen that -- you know, in any given year that would be
11   referred to Sarah Reed?  From your area.
12   A.  Depends upon the year.
13   Q.  Okay.  So some years it might be more than that?
14   A.  It might be more.
15   Q.  Okay.  Is there someone at Sarah Reed that you
16   communicate with?  Like do you have particular contact
17   people at Sarah Reed that you know that you would discuss
18   whether a student should be sent to Sarah Reed?
19   A.  They have an intake person you have to call.
20   Q.  And is that who you deal with?
21   A.  Um-hum.
22   Q.  Which intake person, if you can recall, have you
23   dealt with?
24   A.  Matt -- Matthew Bogardus.
25       MR. MARNEN:  Bogart?

Page 19

1        THE WITNESS:  Bogardus.
2        MR. MARNEN:  Bogardus.
3    Q.  And when you're trying to send someone to Sarah
4    Reed, what information do you provide to Matthew Bogardus?
5    A.  Well, first I have the parents sign a release of
6    information, and then we usually provide the parent with the
7    child's evaluation report and their Individualized Education
8    Program.  And those are the two basic things that I provide.
9    Unless there is some additional information that is
10   necessary.  If there's any medical information necessary.
11   Q.  Now, we're here about -- you know, my clients are
12   K█████ L███ and R█████ P█████.  And I think that you had
13   dealings with their case or some involvement with their case
14   back in 2002.  Do you recall that?
15   A.  Yes.
16   Q.  So prior to January of 2002, they were in Strong
17   Vincent, in learning support classes.  Do you know whether
18   you had any contact or supervision or review or dealings
19   with either of the girls or their families?
20   A.  I don't recall anything specifically.
21   Q.  Would it be fair to say that it would be possible
22   that a student would be assigned to a learning support class
23   at Strong Vincent, and you might not meet that student or
24   meet the family or become involved in any issues concerning
25   that student?

Page 20

1    A.  That is correct.
2    Q.  And your involvement might be more if there were
3    problems.  Is that fair?
4    A.  If there was a concern by maybe the parent or a
5    concern by the teacher, or if I was observing the classroom
6    and I noticed something about a student.
7    Q.  Okay.  Right.  You might become involved, for
8    instance, if there was a disagreement about the
9    appropriateness of an educational placement or, you know,
10   disagreement about services being provided.  That would more
11   fall within your jurisdiction.
12   A.  That's correct.
13   Q.  Okay.  So, you know, you did become involved with
14   K█████ and R█████.  Tell me what your recollection is of
15   how you became involved.
16   A.  I believe it was before the beginning of the
17   second semester.  And I was made aware of an incident at
18   school and -- by the director of special education.  That
19   was Mr. Scozzie.  And then I was given a directive to do
20   some paperwork in regard to the needs of students.
21   Q.  Okay.  Now, who is Mr. Scozzie?
22   A.  He is the Director of Special Education.
23   Q.  And he told you to do some paperwork for the
24   students?
25   A.  Um-hum.  That's correct.

Page 21

1    Q.  So aside from talking to Mr. Scozzie, who did you
2    talk to about the two students?
3    A.  Let's see.  I believe it probably was as to
4    information that may be needed or what needed to be
5    addressed, would be with the assistant principal who usually
6    works with the students; whatever person worked with the --
7    the administrator in the building that worked with the
8    students, I usually made contact with that individual.
9    Q.  So in this case, it would have been
10   Mrs. Cappabianca?
11   A.  Mrs. Cappabianca.  Miss Cappabianca.
12   Q.  Miss Cappabianca.  And how long -- do you know
13   when she started -- Miss Cappabianca, do you know when she
14   started with the Erie School District?
15   A.  I don't know.
16   Q.  Do you remember when you first met her?
17   A.  I don't recall.
18   Q.  Was she -- was she a special ed. teacher, do you
19   know?
20   A.  I'm trying to remember.  It's been so many years.
21   I'm sorry.
22   Q.  You know what, it's very fair for you to say "I
23   don't remember", and that's an answer I can live with, so.
24   And you don't have to apologize for that.  Okay?
25       Do you know when she became a principal, an

Page 22

1  administrator?
2      A.  I don't know what year.
3      Q.  Aside from her assignment at Strong Vincent, do
4  you recall what school -- which school she was assigned to
5  as an administrator?
6      A.  I can't recall.  I know before came to, I
7  believe, Strong Vincent.  I don't remember whether she was
8  an administrator before Strong Vincent.  She might have
9  been.  I don't remember.  I just remember working with her
10  there at Strong Vincent.  That's what I can remember.
11      Q.  Do you know if she is still an administrator?
12      A.  Yes, she is.
13      Q.  Where is she assigned now?
14      A.  I believe she is at Harding Elementary.
15      Q.  Now, so did Mr. Scozzie -- what did Mr. Scozzie
16  tell you about the two girls?
17      A.  There was an incident at school, and that he
18  wanted me to look at placements for the students and start
19  the process for students -- the students.
20      Q.  Did he tell you what the incident at the school
21  was?
22      A.  He indicated that there was something sexual in
23  nature that had occurred, and that to start the process for
24  looking at an alternative placement.
25      Q.  Was this an oral conversation, or did he give you

Page 23

1  anything in writing about the incident?
2      A.  No, it was an oral conversation.  It took place at
3  his office.
4      Q.  And did he specifically describe this actual
5  incident?
6      A.  No, he did not.
7      Q.  Eventually, I would assume that you learned what
8  the sexual incident was.
9      A.  Well, I knew it was off school grounds and it
10  involved several students.
11      Q.  And how did you know that?
12      A.  Just from me working on the case, going through
13  the case, what do I need to do, how many kids do I need
14  to -- you know, what are the names of the students, do I
15  need to contact parents and things like that.
16      Q.  Now, were you asked to contact the parents of the
17  victims and the assailants?  Just the victims?  Just the
18  assailants?  Or do you not recall?
19      A.  All I know is that I -- I can remember is working
20  with the two -- two females.  And working with two students
21  that were middle school special education girls.
22      Q.  And did you meet with either of the girls?
23      A.  No, I did not.
24      Q.  Did you meet with their parents?
25      A.  I don't quite remember meeting with anyone.  I was

Page 24

1  doing paperwork.
2      Q.  Did you meet with Miss Cappabianca?  Did you
3  either meet with her or talk to her?
4      A.  I might have called her on the phone.  I may have
5  called her on the phone to get general information to make
6  sure I had the right phone numbers or addresses or things
7  like that.
8      Q.  Did you meet with or talk about the two girls with
9  any of the teachers there?
10      A.  No.
11      Q.  So you wouldn't have talked to Miss Scully or
12  Miss Manus?
13      A.  No, hum-um.
14      Q.  So basically you were told to do the paperwork?
15      A.  Yes.  To start the process for placements for the
16  students; to get them from that environment -- remove them
17  from that environment.
18      Q.  There was no IEP team convened when they were
19  moved from that environment, was there?
20      A.  You have to have a new IEP to go into any other
21  alternative placements.
22      Q.  But that wasn't my question.  Did an IEP team meet
23  concerning this?
24      A.  It's right here (indicating).
25      Q.  Okay.  Let's look at 1 and 2, so maybe you can

Page 25

1  help me -- help me through this.  So let me find it.  I
2  suppose we could look at Exhibit No. 1 first.
3      A.  Um-hum.
4      Q.  And I'll tell you what, Ms. Moore, we have the --
5  we have the file here, and so I'm not going to vouch that
6  this is a comprehensive, you know, set of paperwork; at
7  least the thing that has been marked as Exhibit 2.  But we
8  do have the file that has been provided to us by the Erie
9  School District, and we can look through it if this doesn't
10  appear to be the -- sort of the comprehensive documentation
11  that you worked on.
12          So, first of all, I take it that -- let's look at
13  Exhibit -- this would be Moore Exhibit 1, Document 419, Erie
14  Document 419.  This is a document dated January 18th, 2002.
15  And tell me what this document is.
16      A.  This is a revision to R███ P███████
17  Individualized Education Program, to include participation
18  in the therapeutic support program at Sarah Reed.
19      Q.  Now, tell me, does that say that on the first page
20  of Exhibit 1, or is that something that you derived from
21  the -- all of the -- all of the content?  In other words,
22  you're reading between the lines, right, or --
23      A.  It's here.
24      Q.  Okay.  So you indicated that this is an IEP
25  review -- IEP revision that provides for a therapeutic

7 (Pages 22 to 25)

Page 26

```
 1  plan --
 2      A.  Um-hum.
 3      Q.  -- at Sarah Reed.
 4      A.  Yes.
 5      Q.  And which page of that Exhibit 1 are you looking
 6  at where that says that?
 7      A.  Well, working on solutions to interpersonal
 8  self-related problems, behaviors.  You have annual goals,
 9  short-term objectives that address the particular plan.
10      Q.  Wait.  You have to go slower so I can follow.
11          (Discussion held off the record.)
12      Q.  So you are looking at 0419.
13      A.  Right.  And this is the additional goal added to
14  the child's current IEP at that time; to work on -- identify
15  appropriate solutions to interpersonal and self-related
16  problem behaviors.
17      Q.  Okay.  So --
18      A.  That's an annual goal.  Short-term objectives are
19  there.  Develop consistent patterns --
20          (Proceedings interrupted by reporter.)
21      Q.  You have to --
22      A.  I'm sorry.
23      Q.  People read faster than they talk, so.
24      A.  And then you see the objective there, the
25  benchmark.
```

Page 27

```
 1      Q.  So develop consistent patterns of appropriate
 2  behavior through a program of therapeutic behavior report
 3  [sic].
 4      A.  Support.
 5      Q.  Support.  I'm sorry.
 6      A.  All right.  And then expected levels and so on.
 7  And then the specially designed instruction that goes along
 8  with being in a program; consistent participation and social
 9  skills training and counseling program, as well as a
10  medication management.  An individualized intervention plan
11  will be developed in conjunction with IEP goals and
12  objectives.  And transition activities for the return to the
13  home school are planned or carried out with the
14  multi-disciplinary team approach.  And then --
15      Q.  Before we go on to the next page, there is a
16  couple questions I would have so you could explain that to
17  me.
18          The objective is to develop consistent patterns of
19  appropriate behavior through a program of therapeutic
20  behavior support.
21      A.  Um-hum.
22      Q.  Now, who came up with that, to your knowledge,
23  objective?
24      A.  That would be a very generalized, I would say,
25  objective, in order that we can move into the placement so
```

Page 28

```
 1  that we know we want to have a particular plan, a
 2  therapeutic plan that will be developed in more detail once
 3  the child is placed at Sarah Reed.
 4      Q.  Okay.  But did you come up with that language,
 5  "Develop consistent patterns of appropriate behavior through
 6  a program of therapeutic behavior support," or did
 7  Miss Gray?
 8      A.  I think departmentally, we tried to look at
 9  different types of wording that will allow us to work
10  specifically with students.
11      Q.  Okay.  But I'm talking about this -- this actual
12  language on this actual piece of paper under Objective
13  Benchmark.  Do you know who created that?
14      A.  I would have advised them of this.  When they
15  met -- as you can see, my signature is not on this page.  So
16  we talk about the fact that I was working on paperwork,
17  these are some of the things that I advised them on when
18  they had to come down and sit with the parent to do the
19  revision to the IEP to make the placement for the student.
20          So I would have advised them on suggested annual
21  goals, objectives, and so on in order to do this placement.
22      Q.  Now, what was the -- if you know, what was the
23  appropriate behavior -- quote, appropriate behavior, end
24  quote -- that was referred to in the objective benchmark?
25  What behavior was considered appropriate that you wanted to
```

Page 29

```
 1  help Rachel achieve?
 2      A.  In particular, when we said develop appropriate
 3  patterns of appropriate behavior, those things would be more
 4  clearly defined once the child was at Sarah Reed.  They did
 5  some observation, and they looked at the critical areas --
 6  the more critical areas of need.
 7      Q.  How did you know that patterns of appropriate
 8  behavior had to be developed?
 9      A.  Well, if students are having any difficulty, no
10  matter whether it's emotional, socially emotional, or
11  whatever -- it could be any type of pattern of inappropriate
12  behavior; if it's social behavior, it's emotional behavior.
13  There are a lot of different types of behavior to be
14  addressed.
15      Q.  What behavior of R████was -- needed addressed?
16  Do you know, as we sit here today, do you know what behavior
17  of R████ needed to be addressed?
18      A.  There were -- at this particular time, it was my
19  understanding that there were some emotional concerns
20  involving the incidents that had taken place at school, to
21  provide some support for the child because of the emotional
22  concerns or the experiences that the child may have
23  encountered.
24      Q.  And do you specifically -- do you know what
25  emotional concerns there were?
```

Ferguson & Holdnack Reporting, Inc.

96a

90f9aabf-8504-42cb-99d0-00e76041f214

Page 30

1   A.  There was some sexual activity.
2   Q.  What kind of sexual activity?
3   A.  I'm not sure of the details of everything, but
4   there was sexual activity.
5   Q.  Tell me what you recall.
6   A.  Boys and girls outside of the school environment
7   having sexual contact with one another.  And there was
8   concerns about the situation overall.  You know, naturally,
9   the appropriateness of the situation.  And that was
10  affecting the female students.
11  Q.  Okay.  Do you know whether the males who were
12  involved in the activity outside the school, whether their
13  IEP's were changed?
14  A.  I don't know.  These are -- these are the two
15  students that I worked with.
16  Q.  Now, the specially designed instruction, let me
17  just look at that for a second.  It says, "Consistent
18  participation in social skills training and in counseling
19  program, as well as medication management."
20  A.  Um-hum.
21  Q.  Could that instruction, could that have been
22  provided in the Erie schools?
23  A.  The intensity of counseling services or -- we have
24  counseling services.  I mean, we have what you call behavior
25  specialists in the building.  And that they may work with

Page 31

1   students and counsel them, whatever.  We have student
2   support teams, or student SAP teams; Student Assistant
3   Programs.  But the intensity of services in counseling and
4   so on is greater at Sarah Reed than it would be directly in
5   the school building.
6   Q.  Okay.  Then the next -- but this doesn't -- this
7   particular page of the document doesn't say you're referring
8   the -- the student to Sarah Reed.  Now, answer that question
9   first.  Page 1 doesn't say that; is that right?
10  A.  No, it doesn't say that.
11  Q.  Okay.  But Page 2, I guess where it says Notice of
12  Recommended Educational Placement, that does refer to Sarah
13  Reed.
14  A.  Yes, it does.
15  Q.  So when I look at this document, I can't just look
16  at the first page.  I have to look at the entire document.
17  A.  That's correct.
18  Q.  Actually, it says -- it does say, "Change from
19  Strong Vincent to Sarah Reed," on this document at the top.
20  A.  Um-hum.
21  Q.  The top page of Exhibit 1, does that now become
22  part of R█████ IEP?
23  A.  Yes.  That goes with the other part of her IEP,
24  with her academic goals and objectives.
25  Q.  So this is actually -- this document is

Page 32

1   actually -- could be said, this is an IEP plan; the top
2   page --
3   A.  It's a part of the plan.
4   Q.  A part of the plan, okay.  And then it says, "An
5   individualized --" going back to the first page, it says,
6   "An individualized intervention plan will be developed in
7   conjunction with IEP goals and objectives."
8   A.  Um-hum.
9   Q.  Now, you're not -- you're not creating that with
10  this IEP.  What you're saying is we're changing the
11  placement, and they are going to create that individualized
12  intervention plan; is that right?
13  A.  Yes.  They have individual plans for students.
14  Once they arrive, they develop a treatment plan.
15  Q.  Now, do they send that back to you so that it
16  becomes part of the Erie School District's permanent record?
17  A.  What we do have is the finalized -- the discharge
18  and summary information about the goals that they worked on.
19  Q.  So you get that at the end?
20  A.  Yes, we do.
21  Q.  Okay.  Now, then the second page of Exhibit --
22  second and third page of Exhibit 2, is that your handwriting
23  on this page?
24  A.  No, it is not.
25  Q.  Okay.  Do you know who wrote that?

Page 33

1   A.  Specifically, someone who was there -- who has
2   their signatures there.  Either Mrs. Gray, teacher of
3   record -- or special education teacher, or someone who's
4   participated on that -- on the IEP team.
5   Q.  The way this has been provided to us, it's been
6   provided as 420, and then the next page is numbered 421.
7   And I don't see anyone who has signed that document from the
8   School District.  I see your name on there, C. Moore, on the
9   second page.  But you're indicating that you didn't write
10  the first page.
11  A.  Hum-um.
12  Q.  Is that your signature on the second page?
13  A.  No.  Someone printed my name there, because I'm
14  the supervisor of the program.  That's who you refer to if
15  you have any questions.
16  Q.  Is there someplace on this form, the Notice of
17  Recommended Educational Placement, where an Erie School
18  District representative is supposed to sign?
19  A.  No.  It is not required by law for a
20  representative, other than to affix the superintendent's
21  signature.
22  Q.  Okay.
23  A.  Other than that, no one else's signature is there
24  but the parent, because it shows that the parent approves of
25  the placement by the parent signature.  This is issued to

Page 38

1      A.  I made up the form myself, in order to manage what
2   was going on with students when people make requests for
3   assistance with students.  So I put that in, and I use it
4   basically for when we were working with students, we needed
5   to provide any services in school for students while we were
6   working on different things.  That's why I call it a
7   discipline note.  Because usually it's used when there is a
8   discipline problem.
9          This -- I just used this note to correspond the
10  request that the school administrator, Mrs. Cappabianca, and
11  with the agreement of the parent, remove the student from
12  the building for a time period.  Okay?  To provide some
13  services in the home.  That's why it says at the bottom,
14  "Five days in-home IEP to begin Monday, January 14,
15  through -- ending Tuesday, January 22nd."  I always provide
16  the address, the parents' phone number, and the parents'
17  name, so that the individuals providing the in-house support
18  will know who to contact, how long they are supposed to
19  provide services, and set the schedule up with the parent.
20         So once I fax that out -- that's just for me to
21  let me know I did it, you know, and what the reason was.
22  And here, the incident, I didn't put the incident.  I just
23  put change in location of service because of the severe
24  confidential nature of the situation.
25      Q.  Okay.  And then would you have -- who would have

Page 39

1   received this?  You had distributed this to who?
2      A.  The support person, Mr. Rogers at the time.  Paul
3   Rogers.
4      Q.  So we hadn't talked about Exhibit 2 yet.  We sort
5   of got to 3 and 4 before we got -- and Exhibit 2 is a --
6   this is a -- I see.  This -- this one pertains to K█████
7   L████.
8      A.  Um-hum.
9      Q.  And, actually, the top page of Exhibit 2 is Notice
10  of Recommended Functional -- does that say functional
11  placement?
12      A.  No.  That was -- it says Notice of Recommended
13  Evaluation.  That was a print shop error.
14      Q.  Okay.
15      A.  And we decided we would keep the error, instead of
16  throwing all the papers away, and fix it with handwriting.
17      Q.  Okay.  That's fine.  What did you write in there
18  on top?  Is that functional or educational?
19      A.  It should be educational.
20      Q.  Educational, okay.  Now, this one is a -- the
21  action proposed is temporary in-home IEP, five days, ending
22  January 22nd.
23      A.  Um-hum.
24      Q.  Again, your name is affixed here; is printed on
25  this form.  Did you create this form?

Page 40

1      A.  Oh, no.  This form is State-mandated.
2      Q.  Not the form.  I mean, did you -- is this your
3   printing on this form?
4      A.  No.  This appears -- it appears to be Mr. Rogers'
5   printing.  It appears to me to be that.
6      Q.  Okay.  Then the third page of this exhibit,
7   Exhibit 2, is Bates-stamped 739.
8      A.  Um-hum.
9      Q.  And this is the IEP revision review; is that
10  right?
11      A.  That's correct.
12      Q.  And is it fair to say that the IEP revision
13  review, the language on this is -- on this one is precisely
14  the same language as appeared on the IEP revision review for
15  R█████
16      A.  That is correct.
17      Q.  Okay.  I mean, they are both -- the new education
18  plan for K█████ was, "Develop consistent patterns --"
19  excuse me.  The objective was, "Develop consistent patterns
20  of appropriate behavior through a program of therapeutic
21  support."
22      A.  Um-hum.
23      Q.  And that's exactly the same language that appears
24  on R█████ IEP.
25      A.  That is correct.

Page 41

1      Q.  Okay.  And on this one, I guess the fifth page of
2   this exhibit, this handwritten page here -- it would be
3   Bates-stamped 744 down at the bottom.  This is Exhibit 2.
4      A.  744?
5      Q.  It's the fifth page of the exhibit, I think.
6      A.  Um-hum.
7      Q.  The handwritten thing.
8      A.  Um-hum.
9      Q.  This was apparently a document signed by Denise
10  L███ saying she wants her daughter transferred to the Erie
11  School District's alternative education program.
12      A.  Um-hum.
13      Q.  And that means --
14      A.  The Sarah Reed program.
15      Q.  Sarah Reed program.  That appeared just to be a
16  duplicate.
17      A.  Um-hum.
18      Q.  Then 819 is the Notice of Recommended Educational
19  Placement.  And, again, is that your printing on this
20  document?
21      A.  No, it is not.
22      Q.  And this says why the action is proposed or
23  refused.  It reads, "Student's current high degree and
24  intensity of stress as recorded by parents, student, and the
25  Erie School District staff.  Intensity and frequency of

11 (Pages 38 to 41)


98a

90f9aabf-8504-42cb-99d0-00e76041f214

## Page 42

1 therapeutic intervention exceed that which can be delivered
2 in the regular school setting."
3      And then the evaluation procedure, test records,
4 report, a verbal sharing of discharge summary from Millcreek
5 Community, and information provided by the student, parent,
6 ESD staff, including mental health staff. Which mental
7 health staff provided information for this Notice of
8 Recommended Educational Placement?
9      A. I'm not quite sure. It could be mental health
10 staff either from -- they have Millcreek information, and
11 there's also -- I mentioned before mental health staff in
12 the building.
13      Q. And do you remember which mental health staff was
14 assigned to the Strong Vincent School?
15      A. I'm trying to remember. I can't remember the
16 name. I'm sorry.
17      Q. Now, you didn't print the reasons for change. Do
18 you remember, did you -- where it's printed, your name is
19 printed, C. Moore?
20      A. Yes.
21      Q. -- did you put your initials there -- I mean,
22 your --
23      A. No. Someone printed my name here as the
24 supervisor.
25      Q. Did you supervise the preparation of this

## Page 43

1 document? For instance, did you tell whoever made it what
2 to say?
3      A. I don't recall whether someone consulted with me
4 or not. Maybe, maybe not. I'm not sure.
5      Q. Okay. Well, you must have given -- whoever -- do
6 you know who prepared it -- the specific person who prepared
7 this?
8      A. I don't know the -- I can't tell whose handwriting
9 this is specifically.
10      Q. You must have given someone the authority to print
11 your name on it, though; is that right?
12      A. Well, it is because of the procedural safeguards,
13 and I'm the program supervisor. It's always indicative to
14 put the program supervisor's name if anyone has any
15 questions or concerns.
16      Q. Okay. So your name goes on there as standard
17 procedure.
18      A. Yes.
19      Q. And if I asked you this question, I apologize. Do
20 you -- the decision to place these girls at Sarah Reed, how
21 did that -- who made that decision?
22      A. The recommendation to be placed at Sarah Reed, I
23 do believe came from the Director of Special Education, you
24 take a look at the situation and, you know, that's an option
25 you can provide a parent. You know, to have that particular

## Page 44

1 placement. You can offer that to them.
2      Q. So it would be your testimony that it wasn't
3 necessarily the teacher or the assistant principal or even
4 you that came up with the idea of Sarah Reed originally. It
5 would be your boss, the director.
6      A. I was directed by Mr. Scozzie to start the --
7      Q. Process.
8      A. -- process --
9      Q. -- to get them in.
10      A. -- to get them in. Now, the decision, I don't
11 know. I'm just following my directive from my supervisor.
12      Q. All right. And you don't know what information
13 Mr. Scozzie had; who talked to him?
14      A. No, I do not.
15      Q. Okay. We have marked as Exhibit 5, it looks like
16 some notes that you made.
17      A. It's from my personal note pad. That's probably
18 the notes I took when I was in the office with Mr. Scozzie
19 when he gave me directive. I was trying to figure out what
20 I needed to do or got information from someone. But this is
21 just from my own personal note pad where I make notes of
22 things I need to do.
23      Q. Okay. And at the top, it says, it looks like "See
24 Marlene."?
25      A. Um-hum.

## Page 45

1      Q. Who is Marlene?
2      A. She's Mrs. Chrisman.
3      Q. Mrs. Chrisman?
4      A. The other special education supervisor.
5      Q. Okay. And it says, "See Marlene for SR partial
6 placement."
7      A. Sarah Reed partial placement.
8      Q. Partial placement.
9      A. Um-hum.
10      Q. What is a partial placement?
11      A. It's a different program. It's students who are
12 identified with mental health issues. Sarah Reed has a
13 multitude of programs, and this was just one of them. And I
14 probably -- I probably wrote that just to get more detail,
15 because at the time she was the supervisor of the partial --
16 district supervisor of the partial program.
17      Q. Do you know what program eventually R█████and
18 K█████ were placed into?
19      A. From my review, it was the -- I don't want to call
20 it the behavior support. It's called the therapeutic
21 program.
22      Q. We have marked as Exhibit 6 a document I guess
23 that we have actually talked about that was part of Exhibit
24 2. Exhibits 7 and 8 are documents from Jo Barker, director,
25 elementary/middle school programs. Who is Jo Barker? Oh,