Page 46

1   that's who it's to. It's from Marlene Chrisman.
2       A.  Um-hum.
3       Q.  Who is Jo Barker?
4       A.  Mrs. Barker is the director of elementary/middle
5   school programs.
6       Q.  And so she would be -- well, she would be the
7   director of all of those programs --
8       A.  The principals in the elementary and the middle
9   schools. And also she had the -- she was managing the Sarah
10  Reed -- the big Sarah Reed umbrella.
11      Q.  Now, in this memo -- there's one for each of
12  R████ and K█████. And the memo says that, "Since they
13  are under age 14, they are not eligible for the adolescent
14  partial program." Do you know what program that is?
15      A.  The partial program is the mental health -- high
16  school mental health program.
17      Q.  And she indicated that they were not eligible for
18  that program?
19      A.  Um-hum. She did. That's what this memo says.
20      Q.  Right. And it also indicates that -- this, again,
21  sort of points to the fact that it was Mr. Scozzie who
22  instigated this move; is that right? "It's my understanding
23  that Mr. Scozzie would like the girls to begin this
24  placement as soon as possible."
25      A.  That's what she has written here. "It's my

Page 47

1   understanding that Mr. Scozzie would like the girls to begin
2   this placement as soon as possible."
3       Q.  So whose idea was it that the girls would be sent
4   home for a week? Was that your idea?
5       A.  No. There has to be a request from someone. I
6   can't recall the request; whether it came directly from
7   Mrs. Cappabianca. Because at that time, we always put the
8   person who is the administrator in the building dealing with
9   students, middle school students, their names on the form.
10  Because maybe there -- some places had more than one
11  assistant principal working with students, so I would know
12  where it came from.
13      Q.  Okay. So I guess that you had a meeting -- was it
14  January 14th -- can you tell by looking at your notes,
15  Exhibit 5, the date of your meeting with Mr. Scozzie?
16      A.  I don't know. This is -- this is my scribble from
17  a long time ago.
18      Q.  It does say -- there's a reference to the dates
19  January 14th through 22nd. Do you know what that refers to?
20      A.  I don't know. Let's see. Well, I do have that on
21  this discipline note. That's the beginning of the service
22  in-home. So maybe that's what I wrote down. If you look
23  at -- see the discipline note, No. 3?
24      Q.  Right. Yes.
25      A.  And maybe that's my note for this -- it says,

Page 48

1   "In-home, five days --"
2       Q.  Yes.
3       A.  -- then I have the note. I probably connect it
4   with that. That's the only thing I can put that with.
5       Q.  Now, you do have a date on this one, on the
6   discipline note.
7       A.  Um-hum.
8       Q.  That's 1/11/02.
9       A.  Yes.
10      Q.  Now, would it have been Miss Cappabianca who
11  requested this change in placement?
12      A.  It's possible that she did.
13      Q.  Okay. And then would the -- do the parents have
14  to consent to this placement?
15      A.  Yes, definitely. For someone to come into their
16  home.
17      Q.  Okay. Well, this would be -- would this be
18  considered a modification of the girls' IEP, this five-day
19  in-home placement?
20      A.  Well, we would work on their -- the things that
21  are in their IEP with them when that person --
22      Q.  I know that. But what I'm saying is that from the
23  point of view of the legal requirements associated with an
24  IEP, does this -- does this placement in their home, this
25  five-day placement in their home, does that require a whole

Page 49

1   new IEP --
2       A.  No.
3       Q.  -- revision?
4       A.  No, it doesn't require a revision. Just
5   permission for us to do instruction in the home.
6       Q.  And why doesn't it require a revision?
7       A.  Because we wouldn't be changing any of the goals
8   and objectives on the IEP.
9       Q.  But you are changing the placement.
10      A.  That's why we have documentation here. Temporary
11  in-home, right here on this one (indicating).
12      Q.  Right. So there is a temporary in-home evaluation
13  placement for --
14      A.  Um-hum.
15      Q.  -- K█████. There might be one for R████?
16      A.  I don't know.
17      Q.  Well, and I haven't presented it to you, so I
18  might not have seen it or maybe it's not in our files. But
19  in any event, so that's not -- the one that we have, that we
20  have marked as Exhibit 2, is not -- doesn't have the
21  parents' signature. Should the parents' signature be on
22  that?
23      A.  The parent should sign it. There's a check, "I
24  approve." I don't know if the parent forgot to sign or
25  what. Someone can't go in unless the parent gives

13 (Pages 46 to 49)

Page 1

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    RICHARD P., by and for      :  No. 03-390 Erie
     R███████ P., and DENISE L., by  :
4    and for K█████████ L.,       :
               Plaintiffs         :
5                                 :
6         v.                      :
                                  :
     SCHOOL DISTRICT OF THE CITY  :
7    OF ERIE, et al.,             :
               Defendants         :
8

9

10           Deposition of AUDREY PECORARO, taken before

11      and by Janis L. Ferguson, Notary Public in and for

12      the Commonwealth of Pennsylvania, on Thursday,

13      June 23, 2005, commencing at 2:16 p.m., at the

14      offices of Knox McLaughlin Gornall & Sennett, PC,

15      120 West 10th Street, Erie, Pennsylvania 16501.

16

17

18   For the Plaintiffs:
          Edward A. Olds, Esquire
19        1007 Mount Royal Boulevard
          Pittsburgh, PA 15223
20
     For the Defendants:
21        James T. Marnen, Esquire
          Knox McLaughlin Gornall & Sennett, PC
22        120 West 10th Street
          Erie, PA 16501
23

24
                Reported by Janis L. Ferguson, RPR
25              Ferguson & Holdnack Reporting, Inc.

Page 22

1      A.  The times, yes.
2      Q.  The times.  Okay.
3         MR. OLDS:  I have a packet of paper here.  I think
4      it's -- these are documents that have been marked
5      as deposition exhibits in other depositions.  I
6      have one copy and an extra copy.  I think mostly
7      what we'll be doing is referring to Miss Moore's
8      deposition, Jim.  Do you have those?
9         MR. MARNEN:  Yes.
10     Q.  I was looking at -- these documents have been
11  provided to us by the School District, and I'm going to draw
12  your attention to some that seem to either have been
13  prepared by you or --
14     A.  Right.
15     Q.  -- you know, you seem to be involved in.  And I
16  guess you've had a chance to review them as well, right?
17     A.  I guess, um-hum.
18     Q.  Looking at Moore Exhibit 1, there's a Document
19  442, Bates-stamped.  That's this little number down here
20  (indicating).  442.
21     A.  Okay.  That's a waiver.
22        (Discussion held off the record.)
23     Q.  422.  And this is -- is this what you prepared?
24     A.  Yes.
25     Q.  And tell me why you prepared this document.

Page 23

1      A.  As part of my role as a facilitator, if the child
2   is receiving speech services in the regular school setting,
3   I request those services at Sarah Reed.  And that's what
4   this was for.
5      Q.  And --
6      A.  The child was receiving speech at Strong Vincent,
7   so we wanted those services to continue.
8      Q.  This memo is directed to Mr. Piekanski, right?
9      A.  Right.  Because he's the head of the special ed.
10  department.
11     Q.  So --
12     A.  And he handles the speech services.
13     Q.  Okay.
14     A.  Okay?
15     Q.  So when you -- you wrote, "The following student
16  has been assigned to attend Sarah Reed program at 1020 East
17  10th Street," and you knew that the student had been
18  assigned to attend Sarah Reed.  How did you know that when
19  you wrote this memo?
20     A.  Well I must have had -- she must have signed it on
21  the -- well, I sent it on the 17th.  She signed it on the
22  18th.  I don't know how I know that.  I guess I just knew
23  that.
24     Q.  Okay.  And you visited Mrs. P▓▓▓▓; is that
25  right?

Page 24

1      A.  That's correct.
2      Q.  And do you recall that?
3      A.  I did make a phone call to the house, and there
4   was no answer.  So somehow I had gotten the phone call for
5   the father -- or the phone number for the father, and I did
6   call him at his place -- on his cell phone.  And he told me
7   I could meet with the mother.  So I did go -- I did talk to
8   the mom and made arrangements to go to the house.  When I
9   did go to the house, she was sleeping, but she did get up.
10  And she did sign the forms.
11     Q.  Okay.  What I'd like to know, do you recall what
12  forms she signed?
13     A.  It was that waiver that you saw.
14     Q.  This would be 442?
15     A.  The one that was after this -- right, 442.
16     Q.  Is that your handwriting or her handwriting?
17     A.  No, that's her handwriting.
18     Q.  But you told her what to write?
19     A.  We have a form that you copy from.  And that was
20  the form.
21     Q.  Okay.  And did she sign the IEP revision review at
22  that time as well?
23     A.  Yes.  I guess the special education department
24  wanted me to have her sign that also.
25     Q.  So Document 419, which is Moore Exhibit 1 --

Page 25

1      A.  Right.
2      Q.  -- that was signed at her house?
3      A.  Yes.
4      Q.  And were there other -- do you recall whether the
5   other people signed before or after --
6      A.  After.
7      Q.  After she signed?
8      A.  Yes.  Yes.
9      Q.  And do you recognize those signatures?
10     A.  Mrs. -- or Mrs. Cappabianca.
11     Q.  Right.
12     A.  Mrs. Gray is from Strong Vincent.  And I don't
13  recognize that other signature.
14     Q.  The classroom teacher's signature?
15     A.  Right.  I did not get them to sign it.
16     Q.  Okay.
17     A.  I gave this form to Mrs. Moore.
18     Q.  Okay.  Now, you noticed as 443, these are -- you
19  made some notes concerning your visit to Mrs. P▓▓▓; is
20  that right?
21     A.  Right.
22     Q.  You wrote that, quote, "Apparently she is heavily
23  medicated and has memory problems."
24     A.  Right.
25     Q.  Period.  "Forms signed."

7 (Pages 22 to 25)

Page 26

```
 1    A.  Right.
 2    Q.  Describe her condition when you met with her.
 3    A.  She was quite alert.  She told me that she had
 4  memory problems, and that's why she couldn't remember I was
 5  coming.  All right?  But when -- she was awake and talked
 6  with me.  She was quite alert.
 7    Q.  You say, "Apparently she is heavily medicated."
 8    A.  She told me she was medication.
 9    Q.  Did she tell you what kind of medication she was
10  on?
11    A.  No.  I didn't ask, no.
12    Q.  Why did you feel that you had to note that she
13  told you she was heavily medicated?
14    A.  That was probably just something that I needed to
15  write for the reason why I was kept waiting.  And because
16  she told me that.
17    Q.  You had her sign the IEP revision review.  Did you
18  go over the contents of that document to her?
19    A.  I explained what it was; that it was a review form
20  that's attached to the regular IEP.  All right?  Which I did
21  not have -- was not in my possession.  But she must have had
22  a copy of it when she signed that; the regular IEP.  This is
23  just a form that we attach, saying that the placement is
24  going to be at Sarah Reed and what -- the different types of
25  objectives, expected levels of achievement, that type of
```

Page 27

```
 1  thing.  I told her that that's what it was; was on this
 2  paper.  It was an addendum to the regular IEP.
 3    Q.  Did you have the Document 420, 421 -- that was
 4  another document, I take it, that you had that day, Notice
 5  of Recommended Educational Placement?
 6    A.  Right.
 7    Q.  Did you -- had you ever seen like an invitation to
 8  an IEP --
 9    A.  I didn't.
10    Q.  -- meeting?
11    A.  I never had one signed.  I never saw one.
12    Q.  Do you know if there was an IEP meeting?
13    A.  I really don't know, hum-um.
14    Q.  Did Mrs. P████ seem to understand what this IEP
15  review was about?
16    A.  I assumed that she did.  She didn't ask me any
17  questions about it.
18    Q.  Okay.
19    A.  Now, I went on the assumption that she was in
20  agreement with the placement.  If I feel a parent is
21  resistant, I don't go.  All right?  I would put that back in
22  the hands of the supervisor.  Because I don't feel it's my
23  place to force them to go.
24    Q.  I can understand that.  Do you recognize
25  these initials up at the top of 419?  It says "RT check".
```

Page 28

```
 1  Looks like RT --
 2    A.  I don't know what that means, no.
 3    Q.  And this IEP revision says, "Change from SV to
 4  SRCC."  Did you explain to Miss P████ what SRCC meant?
 5    A.  I don't think I did.  But I told her that the form
 6  is going to be the change of placement from Strong Vincent
 7  to Sarah Reed.  That's why we need to have the forms done.
 8    Q.  Okay.  I also represent K████ L████.  Did you
 9  ever meet her mother?  Did you have to go visit her mother?
10    A.  Her mother came to meet with me.
11    Q.  And --
12    A.  Is it permissible to talk about her?
13    Q.  We're not going to go into the details of the
14  placement, and yes, it is.  They are both Plaintiffs here.
15  We have talked about both people.  K████ and R████ are
16  both Plaintiffs in this case, so.
17        MR. MARNEN:  He's right.  Don't worry about it.
18        THE WITNESS:  Okay.
19    Q.  Where did she come to visit you?
20    A.  My office at the child study department at
21  Washington Center.
22    Q.  And I guess it would be Moore Exhibit 2.  I'm
23  looking into that.  There's the IEP review provision that
24  contains K████ L████ as well.  That would be Document 818.
25    A.  818.
```

Page 29

```
 1        MR. MARNEN:  739 maybe?
 2        (Discussion held off the record.)
 3    Q.  I guess there's two of those in there.
 4        MR. MARNEN:  Did you find it?
 5        THE WITNESS:  I don't know.
 6        (Discussion held off the record.)
 7    Q.  Did she sign that in your office?
 8    A.  Yes.
 9    Q.  And was there anyone else there?
10    A.  No.
11    Q.  Okay.  So that wasn't an IEP meeting --
12    A.  No.
13    Q.  -- that she came to in your office.
14    A.  No.
15    Q.  Did you explain to her what was going on?  Do you
16  recall whether you had any conversations with her about the
17  change in her daughter's educational placement?
18    A.  Yes.  I explained that the services for education
19  would be provided with the Sarah Reed program.
20    Q.  Right.  Did she have any questions?
21    A.  No, she didn't.  No.  Not that I recall.
22    Q.  Could you keep going until you get to Moore
23  Exhibit 7.  And that would be Document 847.  It's a memo
24  that looks like this (indicating).
25    A.  (Witness complies.)  Right.
```

8 (Pages 26 to 29)

Page 30

1    Q.  This is a memo from Marlene Chrisman to Jo Barker.
2  So Jo Barker is the lady you were talking about?
3    A.  Yes.
4    Q.  She's the director of elementary/middle school
5  programs.
6    A.  Um-hum.
7    Q.  This memo is -- the subject of this memo is B.
8  mod. referrals.
9    A.  Um-hum.
10   Q.  B. mod., does that refer to behavioral
11 modification?
12   A.  Yes. Yes.
13   Q.  And she says, "Both girls are under the age of 14
14 and, therefore, are not eligible for the adolescent partial
15 program."
16   A.  Right.
17   Q.  Did you understand the different structures at
18 Sarah Reed?
19   A.  Yes.
20   Q.  Okay. What was the -- can you explain to me
21 the -- what it means that they are not eligible for the
22 adolescent partial program?
23   A.  They had to be 14 years of age in order to attend
24 that program.
25   Q.  Okay. So what program did they attend, then?

Page 31

1    A.  The elementary behavior mod. program is what it's
2  termed. But we also take students that are in high school
3  under the age of 14.
4    Q.  Into what?
5    A.  The elementary program.
6    Q.  Okay.
7    A.  That's just the term that it has.
8    Q.  Okay. So regarding B. mod. referrals, does
9  that -- does that signify anything to you?
10   A.  It's the behavior modification program, as I read
11 it.
12   Q.  Okay.
13   A.  Right.
14   Q.  To your understanding, is that the program that
15 these girls were referred to; the behavior modification
16 program?
17   A.  Yes. It's also termed an alternative education
18 program, though. It has synonymous terms.
19   Q.  Okay. Now, is it your responsibility in
20 connection with coordinating the referrals to the Sarah Reed
21 program, is it your responsibility to make sure that any
22 necessary information -- educational records, for
23 instance --
24   A.  Right.
25   Q.  -- is sent to Sarah Reed?

Page 32

1    A.  The educational records, yes.
2    Q.  And how do you do that? How do you make sure that
3  that happens?
4    A.  I take them there.
5    Q.  Okay. And do you recall taking them there in this
6  case?
7    A.  I must have, yes. Yes.
8    Q.  Well, you say you must have.
9    A.  Well, otherwise Sarah Reed would, you know,
10 contact me and tell me they need them.
11   Q.  Okay. And you would just hand-deliver the
12 records?
13   A.  To the office, yes.
14   Q.  And --
15   A.  I now mail them. But at that time I
16 hand-delivered them.
17   Q.  And would that just be -- would you be visiting
18 Sarah Reed occasionally, or would you make a special trip
19 to -- whenever there was a referral?
20   A.  Well, I try to have the information there before
21 the intake date, so that Matt would have those records to
22 refer to and that they would know what the grade history was
23 of the child, what the attendance was, that type of thing.
24   Q.  Okay. Do you know whether that was the case
25 regarding these two girls?

Page 33

1    A.  Yes. Yes.
2    Q.  Okay. So what records do you remember taking to
3  Sarah Reed?
4    A.  Well, I must have taken a copy of the report card,
5  all right, the past grade history, which I would get off the
6  computer, the -- any type of achievement testing that was
7  done. Those were basically the forms that I would take.
8  Then I would also have the schools write out a list of work,
9  and I would take the books also from the schools over to
10 Sarah Reed. The schools now take it themselves, but at that
11 time I did.
12   Q.  What about the special education material?
13   A.  I don't deliver those.
14   Q.  Do you know who is responsible?
15   A.  It would be the supervisor's responsibility.
16   Q.  Okay.
17   A.  I would take a copy of the ER. At that time it
18 was the CER.
19   Q.  What is that?
20   A.  That would be the report by the psychologist, the
21 school psychologist.
22   Q.  Okay.
23   A.  I would take that report. But I did not take any
24 of the special education forms.
25   Q.  In terms of referrals to Sarah Reed, would there

Ferguson & Holdnack Reporting, Inc.            104a            902b3858-1a09-47b4-a048-3f1b6a509781

Page 34

1  typically be an evaluation report?
2      A.  No.  There didn't have to be.  No.
3      Q.  But would there typically be one?
4      A.  No.  No.  Many of the students were not evaluated.
5      Q.  If there was one, you would take it.
6      A.  That's correct.
7      Q.  And how did you happen upon that document?  Where
8  was that document maintained in the school system's
9  recordkeeping?
10     A.  The psychological report?
11     Q.  Yes.
12     A.  In the special education file.
13     Q.  So you would have access to the special education
14  file?
15     A.  Yes.
16     Q.  But you wouldn't take the IEP --
17     A.  No.
18     Q.  -- to Sarah Reed.
19     A.  No.
20     Q.  Is there a reason for that?
21     A.  Because I'm not -- I'm not a certified special ed.
22  person, all right?  And the supervisor needs to decide which
23  of those forms needs to be sent.
24     Q.  Okay.  So for whatever reason, you just don't deal
25  with that.

Page 35

1      A.  I don't do -- no.  And the supervisors would
2  always provide that to Sarah Reed.  And if they didn't get
3  it, they would ask for it.
4      Q.  Sarah Reed would ask the supervisors?
5      A.  The supervisors, yes.
6      Q.  Do you recall other cases when you had a parent
7  come to you and sign IEP documents?
8      A.  Yes.
9      Q.  Was that something that you typically did?
10     A.  I was asked to do that, and I was informed I was
11  to do that.
12     Q.  Okay.  Is that -- is that -- you're not certified
13  in special ed., though --
14     A.  No.
15     Q.  -- is that right?
16     A.  No.  But according to my lawyer from our
17  organization, you don't have to be.
18     Q.  The lawyer from what?
19     A.  PSEA.
20     Q.  PSEA?
21     A.  Um-hum.
22     Q.  So that was something that maybe you were
23  concerned about --
24     A.  Yes.
25     Q.  -- and you talked to --

Page 36

1      A.  Yes, I was concerned about it.
2      Q.  And in this particular case, you don't know if
3  there was an IEP meeting.
4      A.  I do not know.  I wasn't at it, if there was,
5  hum-um.
6          MR. OLDS:  I guess I don't have any other
7      questions.
8          MR. MARNEN:  I have no questions.
9          MR. OLDS:  Thank you for coming.  Sorry we kept
10     you waiting, but we were a little late this
11     morning, so.
12
13     (Deposition concluded at 3:03 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

10 (Pages 34 to 36)

Page 1

1                   IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    RICHARD P., by and for        :
     R██████ P., and DENISE L.,    :
4    by and for K███████ L.,       :
              Plaintiffs           :
5                                  :
          v.                       :    Civil Action No. 03-390
6                                  :            Erie
     SCHOOL DISTRICT OF THE CITY   :
7    OF ERIE, PENNSYLVANIA; JANET  :
     WOODS, Individually and in    :
8    her Capacity as Principal of  :
     Strong Vincent High School;   :
9    and LINDA L. CAPPABIANCA,     :
     Individually and in her       :
10   Capacity as Assistant         :
     Principal of Strong Vincent   :
11   High School,                  :
              Defendants           :
12

13

14

15

16          Deposition of FRANK SCOZZIE, taken before

17      and by Janis L. Ferguson, Notary Public in and

18      for the Commonwealth of Pennsylvania, on Monday,

19      April 11, 2005, commencing at 3:38 p.m., at the

20      offices of Knox McLaughlin Gornall & Sennett, PC,

21      120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25              Reported by Janis L. Ferguson, RPR
                Ferguson & Holdnack Reporting, Inc.

106a

08943872-aa94-43a5-8d55-aaf096e758f3

Page 10

1    A.  She told me that there was -- and, again, this is
2  a very difficult time. I'm going off a recollection here.
3  That there was a problem with two students and that it had
4  occurred off grounds.  And she was very, very concerned
5  about the two students.  The mental well-being.
6        In addition to that, she wanted to be aggressive
7  in dealing with everybody involved on the other team here.
8  But her immediate concern was for the personal well-being of
9  the two young ladies.  And there was a sense of urgency in
10  her voice.
11    Q.  But did she describe what -- what was the
12  situation that she described to you?
13    A.  She said that there were allegations being made of
14  sexual improprieties that had occurred at a Laundromat which
15  was located off the school property, but very close to
16  Strong Vincent, and that she was looking into it.  But in
17  the meantime, she had concerns about getting the young girls
18  some help to deal with the situation while we were
19  investigating.
20    Q.  And you indicated you're going from recollection
21  here.  Did you make notes about this --
22    A.  You know, I may have, but to be very honest with
23  you, I looked, and I can't find them, if I did.
24    Q.  Okay.  She indicated that -- we talked to
25  Miss Woods already, and she indicated that she also talked

Page 11

1  to Mr. Linden.
2    A.  We would have -- she probably did that, and I
3  probably did that.
4    Q.  Okay.  And did you give her -- what instructions
5  do you recall giving her when she first contacted you?
6    A.  I don't know that I gave her any.  I think I
7  listened to what she said she was doing.  I think I agreed
8  with that.  I said that I would assist her in getting an
9  intervention that could assist with the mental well-being of
10  these -- so that the mental well-being of these two female
11  students would be well taken care of.
12        (Discussion held off the record.)
13    Q.  So how many conversations do you think you had
14  with Miss Woods about what she was doing?
15    A.  I would assume, knowing my style, that I probably
16  was in touch with her pretty close to daily after this
17  became apparent to me.
18    Q.  And you indicated that she said that there was a
19  sexual -- allegation of sexual improprieties.  Was she more
20  explicit in terms of describing what happened?
21    A.  I can't recall that.  I -- I deal with the issues.
22  I don't deal with the delivery.  I -- I knew it was a
23  serious problem.  I can't recall how she described it to me,
24  really.
25    Q.  Okay.  Now, what resources do you have -- these

Page 12

1  were both special ed. students; is that right?
2    A.  That's correct.
3    Q.  So that would mean that there -- obviously, that
4  would mean there would be special education files about
5  these students.
6    A.  Um-hum.
7    Q.  You have to say yes or no.
8    A.  Yes, I'm sorry.
9    Q.  That's okay.  Would those files be in the central
10  office where you're located, or at the school, or would
11  there be two files?
12    A.  There would be two files.
13    Q.  And did you -- did you or did anyone at your
14  behest in the central office look at the students' files?
15    A.  I'm sure we did.
16    Q.  Well, specifically did you look at the files?
17    A.  I can't recall that.
18    Q.  And so Miss Woods tells you -- gives you a call,
19  says -- what you can recall is she said that there were
20  sexual improprieties.
21    A.  That's correct.
22    Q.  That's what you can recall today.
23    A.  Yes.
24    Q.  She says she's concerned about the girls.
25    A.  She states the situation, where it occurred, and

Page 13

1  then she said, I am concerned that both of these young girls
2  need help.  As I recall, it was an indication to me that she
3  felt that their self-concepts were significantly damaged and
4  that there was the potential that these girls could hurt
5  themselves.  And, that, I do recall.
6    Q.  Now, what resources are there available in the
7  community for children who might -- whose self-concept is
8  significantly damaged?  Are there community resources
9  available for that?
10    A.  Oh, there are certainly a lot of community
11  resources.  The District uses the program particularly at
12  Sarah Reed.  There's a therapeutic program there that we
13  use.  And they have the intervention and the people
14  available to work with the student, the families, tie it all
15  together, and basically to see what's going on.  It's a
16  program we recommend frequently.  It's a program that many
17  of the psychiatrists that work at the School District
18  recommend frequently.
19    Q.  What does the program cost the school?
20    A.  I think we pay them along the lines of -- it's
21  tough to say in that day and age.  But we probably paid them
22  about $45 a day to do something like that.
23        MR. MARNEN:  Per student?
24        THE WITNESS:  Per student.
25    A.  Each program varies a little bit.  There's a few

4 (Pages 10 to 13)

Page 14

1  different programs there.
2      Q.  What programs do they have at Sarah Reed?
3      A.  They have a partial hospitalization program, they
4  have an alternative education program, which is primarily
5  for regular class students.  They have a therapeutic
6  program, behavior mod.-type program, which is what we would
7  be looking at in this situation, and they do an early
8  intervention program for us also.
9      Q.  Now, the behavior modification program, tell me
10 what that program consists of.
11     A.  Well, it's a program where there is psychiatric
12 help available if they need it.  There are Master-level
13 therapists that are there available.  There are small class
14 sizes.  There is a family component, where they work with
15 the families to kind of tie everything together, because
16 many times we can solve an issue in the school, and there
17 still remains a problem at home, and the parents need to
18 know about that.  And we need the parents to partner with
19 us.  And they have a strong component that does that.
20     Q.  Okay.
21     A.  And there is the educational component that
22 carries on the IEP.
23     Q.  So behavior modifications, there is a psychiatric
24 component.  Master's with counseling, you said?
25     A.  There is a Master-level therapist program.

Page 15

1      Q.  Master's level therapist.
2      A.  They have several Master's level therapists.
3      Q.  And what is the partial hospitalization program?
4      A.  That's a program they wouldn't have qualified for
5  by age, because they were not 14 years of age.  But it is a
6  program, again, that has a lot of these same therapies,
7  intensive therapies, that are supported more clinically.
8  The psychiatrist is more involved in the program.
9      Q.  Okay.  So they weren't old enough for the partial
10 hospitalization program.
11     A.  Correct.
12     Q.  Now, you have to -- as the director of special ed.
13 for the Erie School District, there is certain constraints
14 that are placed upon you in terms of where you can place
15 kids; is that right?
16     A.  I don't know that there's constraints put on me
17 about where I can place them.  There's certainly constraints
18 placed on about who would take them and who we have
19 partnerships with.  I guess, you know, like if I wanted to
20 put somebody into the Western Psychiatric program down at
21 Pittsburgh, we could recommend -- we could, you know, kind
22 of try to do that.  We are just -- we make -- we cannot
23 place anybody anywhere.  An IEP team does that.
24     Q.  Right.
25     A.  And, you know, but are there other resources and

Page 16

1  situations?  It would depend on what the students' needs
2  are.  We try to find -- we think out of the box.  I don't
3  want to say that we're limited, but we try to find a program
4  that meets the needs that are presented to us.  And then we
5  make that recommendation.  Then a team looks at that.  We
6  put nobody anywhere, but we use as many resources as we can
7  get our hands on.
8      Q.  Jim's already marked as Exhibit 1 a document that
9  I'm not ready to get to yet so I'm going to mark this as
10 Exhibit 2.
11         (Scozzie Deposition Exhibits 1 and 2
12          marked for identification.)
13     MR. OLDS:  And just for the record, that is
14 Bates-stamped 398 to 427.  Is that right?
15     THE WITNESS:  I'm not sure I understand what
16 you're --
17     MR. OLDS:  No, I'm asking Jim.  I'm just getting a
18 little stipulation of counsel here.
19     MR. MARNEN:  E-398 through E-427.  Is that what
20 you said?
21     MR. OLDS:  Yes.
22     MR. MARNEN:  Except the page before E-427 doesn't
23 have a Bates stamp on it.
24     MR. OLDS:  Let's see what that is.  Maybe it's
25 just a blank page.

Page 17

1      MR. MARNEN:  Maybe it was just copied crooked.
2         (Discussion held off the record.)
3      Q.  Now, I think that when I was talking about limits
4  that might be placed on you, you have to offer an education
5  to a child in the least-restrictive environment.  Isn't that
6  true?
7      A.  That's true.
8      Q.  And, obviously, the least-restrictive environment
9  is the -- maybe you could help me.  The first would just be
10 the regular classroom, right?
11     A.  Right.
12     Q.  And then the next least-restrictive environment
13 would be -- what would be the next level?
14     A.  The -- a regular classroom with intervention.
15     Q.  Okay.  And then what would be the next level?
16     A.  This would be perhaps a split program; special ed.
17 and a regular classroom.
18     Q.  In the same school, right?
19     A.  Right.
20     Q.  And then --
21     A.  Then a special ed. classroom totally.
22     Q.  And then what would be the next level?
23     A.  Well, that -- a full-time special ed. program is
24 the most restrictive.  And then -- in the building.  And
25 then a full-time special ed. program outside of the

108a

08943872-aa94-43a5-8d55-aaf096e758f3

Page 18

1  building, where there is actually no capability to
2  participate with regular programs, would be the actual least
3  restrictive.
4      Q.  Okay.  Now, Sarah Reed isn't part of the Erie
5  School District, is it, or is it?
6      A.  It is not part of the Erie School District.
7      Q.  Okay.  So a placement in Sarah Reed is a placement
8  outside of the School District.  Is that right?
9      A.  That's correct.
10     Q.  So in that continuum that we just went through,
11 where does -- where would Sarah Reed -- would it even be in
12 that continuum?
13     A.  Yeah.  It's a restrictive placement.
14     Q.  A restrictive placement?
15     A.  Right.
16     Q.  It's below special ed. classes in the building; is
17 that right?  It's more restrictive than special ed. in the
18 building.
19     A.  Not necessarily, because -- and I would say I
20 misspoke.  There are regular students that are participating
21 at Sarah Reed, so there is the participation level with
22 regular students there.  When I say "regular", I'm talking
23 about from an educational component standpoint.  They are
24 not categorized as special education on an IEP.
25     Q.  Okay.  Those students are there because they have

Page 19

1  discipline problems; is that right?
2      A.  Some are there for that.
3      Q.  We had a conversation with Miss Woods, and I'm not
4  sure it was exactly clear, because the term "alternative
5  education program" appears to be used in several different
6  ways in the documents.  And maybe you could tell me -- she
7  said that if I used AEP, the initials AEP, that would
8  signify something relative to the Erie School District.  Is
9  that --
10     A.  Well, first of all, I guess "alternative" is an
11 overused word and probably needs to be categorized, because
12 there are certainly different levels of alternative.
13         What she particularly was trying to describe to
14 you is that Erie School District partners with Perseus House
15 to run an alternative education program.  And students are
16 sent there for a whole litany of reasons.  But they are
17 categorized as being in an AEP program.
18     Q.  Now, did Sarah Reed ever partner with Erie
19 concerning an alternative --
20     A.  Sarah Reed has a program --
21     Q.  You have to let me finish.
22     A.  Sorry.
23     Q.  -- partner with the Erie School District
24 concerning providing an alternative education program?
25     A.  They have a partnership of that sort with the

Page 20

1  regular -- with the regular education component of the Erie
2  School District, not the special education program.
3      Q.  So certain regular education -- certain students
4  who receive regular education from the Erie School District
5  will go to Sarah Reed for alternative -- for an alternative
6  education program.
7      A.  That is correct.
8      Q.  And are those students referred to Sarah Reed as a
9  result of violating the Discipline Code?
10     A.  Can be.
11     Q.  What other reasons might they be sent to Sarah
12 Reed?
13     A.  Unusual behavior has been exhibited.  Parent comes
14 in with a significant concern of something that's going on
15 at home that has been corroborated by the student's teacher,
16 and then all of a sudden unusual behaviors are occurring.
17     Q.  And this might be unusual behavior that is not
18 necessarily a discipline problem, or would it --
19     A.  Might be both.  It could be a discipline problem.
20 It could be a discipline problem or just could be a bizarre
21 behavior.  I guess in a -- in a classroom setting, it could
22 be perceived as a discipline problem, depending on -- I
23 mean, there are just so many things that can occur, it's
24 very difficult to try to be specific on this thing.
25         But Sarah Reed basically deals with students who

Page 21

1  have mental health issues primarily, as far as special ed.
2  goes.  So I can be specific with that.
3      Q.  Okay.  Well, part of Sarah Reed does.  But then
4  part of it also deals with students who are behavioral
5  problems at the Erie School District, right?
6      A.  Elementary students.
7      Q.  Elementary students.  Does that mean one through
8  eight or one through six?
9      A.  One through eight.
10     Q.  So one through eight kids who have disciplinary
11 problems in the Erie School District might be referred to
12 Sarah Reed.
13     A.  Right.
14     Q.  And there is a contract between Sarah Reed and
15 Erie School District for Sarah Reed to provide an
16 alternative education program for those students.
17     A.  That is correct.
18     Q.  And then is there also contracts between Sarah
19 Reed and the Erie School District to provide alternative
20 education for other students?
21     A.  There is a contract with Sarah Reed to provide
22 partial hospitalization programming and therapeutic
23 programs, as I earlier described to you.
24     Q.  Therapeutic.
25     A.  I guess you would call -- anytime you have a

*109a*

Page 22

1  program where you are delivering outside of the school in
2  another setting, I guess you would call it an alternative
3  setting. We probably do too much of that, but that
4  currently is something that is the way the structure exists.
5      Q.  Well, I guess that, you know, if -- the
6  alternative education program, is that a term of art, or is
7  that just sort of a generic term that is used to describe
8  any placement that's placed outside of this Erie School
9  District?
10      A.  I guess initially it was supposed to be a term of
11  art, but it is now a generic comprehension; that if you are
12  not going to the Erie School District, you're going to an
13  alternative placement. And parents will say that. We have
14  students that are going to charter schools. The families
15  will say they are in an alternative school. I mean, an
16  alternative to the Erie School District.
17      (Discussion held off the record.)
18      Q.  Would you consider that a placement in -- of a
19  special ed. student in Sarah Reed is more restrictive than a
20  placement of special ed. student in one of the neighborhood
21  schools on the continuum of the least restrictive --
22      A.  Well, to the external -- to an external individual
23  from an educational standpoint, I guess the answer to that
24  would be yes. From a capability of benefiting from the
25  educational program, Sarah Reed generally would be, before

Page 23

1  we place them there, the appropriate placement. Therefore,
2  it would be the least-restrictive placement.
3      We would not put somebody there until a team had
4  looked at that and realized that -- from what they were
5  capable of benefiting at that time educationally, because of
6  whatever the reasons, that would be the least-restrictive
7  environment for them.
8      Q.  Okay. So, now, the therapeutic program offered by
9  Sarah Reed, is it simply a behavior modification program, or
10  are there other components to the therapeutic program?
11      A.  There is an educational component.
12      Q.  But the therapy is provided -- it's deemed
13  necessary because there's a behavioral issue?
14      A.  Because there is an emotional need, because there
15  is a -- that could -- would -- depending on the situation,
16  it could be emotional need, behavioral issue. Could be a
17  host of reasons that the team, you know, examines.
18      Q.  Okay. I'm going to refer you to a document that
19  was part of the documents marked Woods No. 4. It's Erie
20  Bates stamp 446, and it's a memo dated 1/14/02 from Marlene
21  Chrisman. You are shown as receiving a copy of this
22  January 15th, '02 memo from -- to Jo Barker from Marlene
23  Chrisman. And who is Jo Barker?
24      A.  Director of elementary and middle school programs.
25      Q.  Is that an Erie School program?

Page 24

1      A.  Um-hum.
2      Q.  She's an Erie School District employee?
3      A.  She is.
4      Q.  And do you recall receiving this memo?
5      A.  Um-hum.
6      Q.  Okay. And this says -- this memo --
7      MR. MARNEN:  Yes or no?
8      THE WITNESS:  I apologize.
9      MR. MARNEN:  That's all right.
10      A.  Yes.
11      Q.  "The purpose of this memo is to provide
12  information on two students who are being referred to Sarah
13  Reed per Frank Scozzie. Both girls were involved in a
14  recent situation at S.V. of the nature and intensity that
15  staff, including Mr. Scozzie, feels this level of
16  intervention is essential. Both girls are under the age of
17  14 and, therefore, not eligible for the adolescent partial
18  program."
19      I take it that Miss Chrisman wrote that. To your
20  knowledge, is that an accurate statement or an accurate
21  description of how the girls got referred to Sarah Reed?
22      A.  Yes.
23      Q.  Then it says at the bottom, "It is my
24  understanding that Mr. Scozzie would like the girls to begin
25  this placement as soon as possible. Please contact Charlise

Page 25

1  Moore or myself to assist in this process." And this is
2  a -- the subject of this memo is B. Mod. Referral. So that
3  must mean Behavior Modification Referrals.
4      A.  That's correct.
5      Q.  Why would Jo Barker need this information?
6      A.  As I told you before, anything we do with Sarah
7  Reed, we do through a team.
8      Q.  Okay.
9      A.  And we just -- Jo basically is the liaison between
10  Sarah Reed and the School District, controlling the number
11  of students that go to the facility, so that we don't exceed
12  a particular number. And she would have gotten it for that
13  reason.
14      Q.  Okay. So she's keeping count of how many students
15  go to Sarah Reed.
16      A.  Right.
17      Q.  Do you know what that number is?
18      A.  I think we probably generally in various programs
19  have 50 -- a cap of about 50 students there.
20      Q.  And of those 50 students, how many might be in the
21  therapeutic program? The behavior modification therapeutic
22  program.
23      A.  I'm going to say 12. But that -- that could vary.
24  But it's in that zone.
25      Q.  So I'm looking at the documents that have been

7 (Pages 22 to 25)

Page 26

1  marked as Exhibit 1. And the first part of those documents
2  are the IEP for R█████ P██████ stemming from a 7/23/01 NORA
3  and IEP. But what I would like to do is draw your attention
4  to the document numbered 419.
5      A.  I don't think I have that one.
6      Q.  It's in Exhibit 2.
7      A.  Okay. That, I do have it.
8      Q.  It would be 419.
9          MR. MARNEN:  Woods 2 or Scozzie 2?
10         MR. OLDS:  Scozzie 2.
11     Q.  Can you tell me what this is.
12     A.  It's a revision of the IEP.
13     Q.  And the date is 1/18/02?
14     A.  Yes.
15     Q.  Okay. Now, that, actually -- is this the
16 indication that an IEP team met?
17     A.  It's an indication that a team met to review
18 the -- a group met to review the IEP.
19     Q.  Okay. The memo that we had previously looked at,
20 which was part of Woods 4 and dated 1/15/02, is an
21 indication that you -- apparently you had decided to send
22 the girls to Sarah Reed as of January 15th, '02. Is that
23 right?
24     A.  I had been requested to do that. After I listened
25 to her request and the reason for her request, I then began

Page 27

1  to move on that placement. Yes, I did.
2      Q.  Okay. So when you say "her request", you're
3  talking about Mrs. Woods?
4      A.  That's correct.
5      Q.  But I thought I heard you say that it had to be
6  the IEP team that made the recommendation.
7      A.  As I said, I started to move on it. That's the
8  process, I started it. I called the supervisor, who then
9  would gather everybody together and start getting, you know,
10 all the paperwork done and decision-making done. All I can
11 do is assist with the placements. If Sarah Reed were to say
12 I don't have room or I'm going to take a longer period of
13 time, the IEP team had to make that ultimate decision, not
14 me.
15     Q.  So when -- going back to this January 15th,
16 '02 memo, in which Miss Chrisman writes, "The purpose of
17 this memo is to provide information on two students who are
18 being referred to Sarah Reed per Frank Scozzie," is that an
19 inaccurate statement? You weren't referring them to Sarah
20 Reed or were you referring them to Sarah Reed?
21     A.  I was referring -- what she means by that is that
22 I have called her and said, listen, take a look at these two
23 kids for Sarah Reed. And the general statement might have
24 been, well, it's mid year, there's no -- there's no room at
25 the inn or we can't get them in right now, and my calling

Page 28

1  her tells her that if the IEP team so deemed, I would see to
2  it that there was an accommodation made by Sarah Reed. That
3  would be my involvement to that.
4      Q.  It's not a -- but you don't -- you wouldn't make a
5  referral of K█████ and R█████ to Sarah Reed without some
6  kind of in-depth information, would you?
7      A.  As I recall, Jan Woods told me there were issues
8  there that she was concerned that these young girls were
9  going to hurt themselves, and that that was an issue which
10 is something that I would have brought to the attention of
11 the supervisor and said, listen, this is the reason why I
12 want to move on this quickly.
13         But when I get a sense of urgency -- when you deal
14 with a principal, and they call you up, you get to know
15 them. You get to know when their reactions are just normal
16 and when it's abnormal. Jan Woods expressed to me
17 significant concern about the mental health of these two
18 young ladies in a way that caused me to take a look at -- or
19 have the supervisor take a look at -- I can't recall at the
20 time -- we would have seen whether there would be a
21 potential that might require an immediate intervention, and
22 I think that we did do that and we did see that.
23         And, again, there are a lot of safeguards in the
24 special education process. If we were overreacting, the
25 team would have looked at that and said, no, that's not

Page 29

1  appropriate.
2          So when you start this process, it's not -- it's
3  not a daring move, because I might think and Jan Woods might
4  think, but the team might say no. So there's checks and
5  balances built in the system.
6      Q.  Okay. Let's go back to Item No. 419 here, Page
7  No. 419.
8          MR. MARNEN:  Scozzie 2?
9          MR. OLDS:  Yes, Scozzie 2. Bates stamp 419. This
10         is the IEP revision review.
11         THE WITNESS:  Yes.
12     Q.  So the IEP team met here and the objective
13 benchmark is quote, "Develop consistent patterns of
14 appropriate behavior through a program of therapeutic
15 support."
16         When language is placed in the objective benchmark
17 part of an IEP revision review document, what is the
18 significance of that?
19     A.  Well, we want to alter some type of behavior,
20 whether it be a person who might be spouting off
21 belligerently, a person who threatens to harm themselves, a
22 person who threatens to harm others. And, again, I'm being
23 general, not specific here.
24     Q.  Right.
25     A.  But that's the kind of technique we utilize to try

Page 34

1    Q.  Are there Wrap-Around programs in Erie?
2    A.  Yes, there are.
3    Q.  And are children who have Wrap-Around -- what
4    kinds of children might have Wrap-Around services?
5    A.  Students with emotional needs.  But we don't
6    provide those Wrap-Around services.  They are provided
7    through the local agencies.  And they are determined by
8    teams external to the Erie School District and brought into
9    the school system externally.  We just have to get the
10   people approved to work in our schools.
11   Q.  Generally, before a referral is made to an
12   institution such as Sarah Reed for a behavior modification
13   program, would you expect that the special ed. student would
14   be given an opportunity in the -- inside the Erie School
15   District in an emotional support classroom?
16   A.  An emotional support classroom isn't an option for
17   someone who has a problem on a specific issue.  The
18   emotional support classroom is done through a process of the
19   IEP.  That the IEP team has sat down and made the
20   recommendation, and then there are evaluations done by a
21   psychiatrist or -- and then the recommendation is brought
22   back to the IEP team.
23       But a person that exhibits a problem with a
24   specific situation or a specific time frame, we don't just
25   take those individuals and immediately put them into an

Page 35

1    emotional support class, and we don't place anybody without
2    recommendations and processes being followed.  That would
3    be -- if we did this every time there was a specific
4    instance that a student exhibited a differential behavior,
5    we would be -- every student in the District would be in an
6    emotional support class.
7    Q.  Okay.  Now, again, looking at -- this would be
8    Exhibit 2.  I want to refer your attention to Exhibit 420 --
9    Bates stamp 420.  Now, this is the Notice of Recommended
10   Educational Placement.  And do you recognize that that --
11   recognize Charlise Moore's handwriting there?
12   A.  I can't say that I recognize that as Charlise's.
13   It may be, but I don't know that.
14   Q.  Now, the action proposed here is Sarah Reed
15   therapeutic program for psychological/psychiatric evaluation
16   and possible interventions.  Now, when "therapeutic program"
17   is referred to there, do you know if that's -- is that a
18   referral to the behavior modification program at Sarah Reed?
19   Language is sort of important, and --
20   A.  Well, the language -- the language indicates that
21   when the IEP team -- excuse me one second.  Again, I was not
22   a participant.  I'm going to give you an assessment of what
23   I think is happening here.  They want to make sure that when
24   Sarah Reed receives -- in this case R████ that they are
25   prepared to implement that component rapidly and make

Page 36

1    decisions as to what needs to be done.  And that is what I
2    think the IEP team was attempting to accomplish there.
3    Q.  Under Item 3-A, there, description of any other
4    options that were considered, do you find it surprising that
5    the IEP team didn't consider any other options?
6    A.  I think that the IEP team has a great deal of
7    respect that you go with what you know, for the Sarah Reed
8    program.  And when you have a person who is in need of
9    intervention beyond what the Erie School District can
10   deliver, our first thought process -- and pretty much in a
11   situation like this, we've had a lot of success with it.  So
12   I think that's what their -- that's a fallback position, and
13   that's what they are going to.
14   Q.  Okay.  When you say "situation like this", what do
15   you mean?  What do you mean, a situation like this?
16   A.  I mean a situation where individuals -- we have
17   been alerted to the fact that individuals are in stressful
18   situations and could hurt themselves.  This is obviously --
19   when you deal with 13,000 students, this is not the only
20   time this occurs, and you try to make a move as quick as you
21   can.  And the success that Sarah Reed has had in assisting
22   in these situations has been very good.
23   Q.  It's not your testimony that every time a student
24   either expresses a desire to hurt themselves or maybe even
25   acts on the desire to hurt themselves, that you refer them

Page 37

1    to Sarah Reed, is it?
2    A.  No.
3    Q.  So you don't make that kind of referral in every
4    situation where a student might either express it or even
5    act out on that.
6    A.  We don't patently do anything.  We take situation
7    by situation.
8    Q.  Okay.  Every student is different?
9    A.  That is correct.
10   Q.  Okay.  This IEP revision review, apparently the
11   parent who signed it was Shelley P████?
12   A.  Where are you?
13   Q.  Right here on -- this is 419.
14   A.  I'm sorry.
15   Q.  Appears to be Shelley P████
16   A.  Yes.
17   Q.  Would you assume that Shelley P████ actually
18   attended this IEP meeting, or do you think that she might
19   have signed this at some other time?
20   A.  I wouldn't make any assumption.  As I said, I was
21   not there, so I can't say who wasn't there or who was there.
22   She may have not been able to be there, and it may have been
23   conveyed to her.  I would prefer that she would have been
24   there.
25   Q.  Look at Item 422.  That's the next page here.

Ferguson & Holdnack Reporting, Inc.

112a

08943872-aa94-43a5-8d55-aaf096e758f3

Page 38

1  This is a memo from Mrs. Audrey Pecoraro, child study
2  department, to Mr. James Piekanski, supervisor of special
3  education.
4      A.  Um-hum.
5      Q.  Who is Audrey Pecoraro?
6      A.  She is a home and school visitor.
7      Q.  Okay.
8      A.  For the Erie School District.
9      Q.  And this is a request for speech services, and
10  it's dated January 17th, 2002. Is that right?
11     A.  Yes.
12     Q.  So -- and Miss Pecoraro writes on January 17th,
13  2002, that, quote, "The following student has been assigned
14  to attend the Sarah Reed program at 1020 East 10th Street,"
15  and she mentions R███ P██████. Is that right?
16     A.  Yes.
17     Q.  Now, she indicates that that assignment was made
18  on January 17th, and the IEP team didn't make their -- have
19  their meeting until January 18th. Do you have any idea how
20  Miss Audrey Pecoraro knew that the IEP team was going to
21  recommend the placement at Sarah Reed program?
22     A.  I don't think -- I think she made an assumption.
23  She sent that. She's not in a position of any authority,
24  and it would not be the first time that Mrs. Pecoraro had
25  jumped the gun and put something down on paper that probably

Page 39

1  didn't belong there.
2      Q.  I would like you to look at -- we did mark -- do
3  you have Exhibit 2 there? Because there is a document -- I
4  mean, Exhibit 1.
5      (Discussion held off the record.)
6      Q.  This is Scozzie Exhibit 1, which was marked. I'd
7  like you to look at the last page of this exhibit, which
8  is -- it's Bates-stamped out of order. It's Bates-stamped
9  E-454.
10     A.  Um-hum.
11     Q.  And is this an Erie School District document? Or
12  is this a Sarah Reed document? Do you know?
13     A.  I don't know the answer to that question. I
14  really don't. Again, the department itself deals with these
15  documents on a daily basis. Unfortunately, with my
16  different-- I can't even make an assumption. I don't know.
17     Q.  Okay. And do you recognize the handwriting on
18  this document?
19     A.  I do not.
20     Q.  Going back to Exhibit 2 now, which is the -- I'd
21  like to just glance at the first part of that exhibit. I
22  had marked a bunch of documents together. The IEP, I guess,
23  for R███ P██████ that's dated -- it begins at Page 405. I
24  believe that's the IEP for her.
25     A.  Okay.

Page 40

1      Q.  And that IEP has -- places her in the learning
2  support classroom. Is that right?
3      A.  My knowledge of this situation, yes. I don't see
4  that, but yes.
5      Q.  Yes, if you look at 399, Notice of Recommended
6  Assignment, it's appropriate grouping, learning support.
7      A.  Yes.
8      Q.  If you could just sort of glance through that
9  document, is there any indication in that document that
10  R████ has problems that require emotional support in
11  addition to learning support?
12     A.  No.
13     (Discussion held off the record.)
14     Q.  Okay. Now, let's go back to Exhibit 1 now, which
15  I think this is the IEP that followed R████ placement in
16  Sarah Reed. This is -- there's an evaluation report dated
17  10/28/2002. And that's Bates-stamped 349. Appears to go up
18  to 356. Is that right? 358?
19     A.  358.
20     Q.  Now, what's an evaluation report?
21     A.  Well, in this particular situation, they take all
22  the pertinent facts into consideration before they do the
23  enrollment or the change in placement.
24     Q.  Would you have expected that prior to R████
25  referral to Sarah Reed from the Erie School District there,

Page 41

1  that there would have been an evaluation report or an
2  examination by a psychologist to see if she needed the
3  behavioral modification program?
4      A.  I would expect that when she is put at Sarah Reed,
5  that the evaluation team -- and, again, we're dealing with
6  people that are -- as I look at that team, Jim Gray and
7  people like Linda Cappabianca, who has special education
8  background, to put her there, they felt there was a need.
9  They knew once she got there, there would be the people that
10  would be interacting with her, to make sure that the
11  placement was, if she were to be placed there, an
12  appropriate one. If the psychologist or the psychiatrist on
13  staff there felt there would be some kind of a mistake made,
14  we would have known about it rather rapidly.
15     Q.  Okay. Now, do you know who prepared this
16  evaluation report?
17     A.  I do not.
18     Q.  Would this have been done by an employee of the
19  Erie School District?
20     A.  I would say yes, I would think -- yeah.
21     Q.  Is it Rosetta Manus? Would that be it?
22     A.  Rose Manus is a school psychologist, and she would
23  have been part of the development of that ER, yeah.
24     Q.  And then she writes on the first page of this
25  evaluation report that, "The current educational program is

11 (Pages 38 to 41)

113a

08943872-aa94-43a5-8d55-aaf096e758f3

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3    R█████ P., BY AND FOR                    )
     R█████ P., AND DENISE L., BY            )
4    AND FOR K█████ L.,                       )
            Plaintiffs                        )
5                                             )  Civil
     vs                                       )
6    SCHOOL DISTRICT OF THE                   )
     CITY OF ERIE, PENNSYLVANIA;             )
7    JANET WOODS, INDIVIDUALLY                )
     and in her Capacity as Principal        )
8    of Strong Vincent High School;           )
     and LINDA L. CAPPABIANCA,               )
9    Individually and in her Capacity         )
     as Assistant Principal of Strong        )
10   Vincent High School,                     )
            Defendants                        )

11

12

13

14        Deposition of FRANK SCOZZIE, taken before and

15   by Linda K. Rogers, Commissioner of Deeds in the

16   Commonwealth of Pennsylvania and Notary Public in

17   the State of New York, on Wednesday, May 18, 2005,

18   commencing at 12:10 p.m., at the law offices of

19   Knox, McLaughlin, Gornall & Sennett, 120 West 10th

20   Street, Erie, Pennsylvania.

21

22

23

24

25            * * *

Page 1

---

1    For the Plaintiffs:
2        Edward Olds, Esquire
         Carolyn Russ, Esquire
3        1007 Mount Royal Boulevard
         Pittsburgh, PA 15223

4

5    For the Defendants:
         James T. Marnen, Esquire
6        Knox McLaughlin Gornall & Sennett, PC
         120 West 10th Street
7        Erie, PA  16501

8

9

10

11

12

13            * * *

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

---

1     F R A N K   S C O Z Z I E, first having
2    been duly sworn, testified as follows:

3

4            DIRECT EXAMINATION

5    BY MR. OLDS:

6

7    Q. Mr. Scozzie, I wanted to talk to you about the
8    issue of records and the change in school district policy
9    concerning retention of records.

10   A. Okay.

11   Q. As I understand it, at some point there was a
12   change in policy concerning discipline records?

13   A. Regarding?

14   Q. Destruction of discipline records.

15   A. That very well may be true.  Was that when I was
16   running the department or.

17   Q. I don't know.  I guess I'm asking you.  Do you
18   know if there has been -- if the Erie School District has
19   changed its policy concerning discipline records and
20   retention of discipline records?

21   A. I don't believe that I am aware of that.  I think
22   we follow a certain policy.  It seems to me that there was a
23   situation that we decided that certain records would be kept
24   in certain areas.  And we do review what is kept under lock
25   and key, and what is kept out for daily perusal.  And we

Page 3

---

1    do -- Dr. Tempestini, who is our child study director, does
2    control what is destroyed and what is not by following
3    policies.  I would say she may have made me aware that she
4    made a change or there was a change.  I can't say that it
5    was something that I'm -- that's off the top of my head.
6    That doesn't mean it didn't occur.

7    Q. Well, let me -- we marked, I guess this was marked
8    as Defendants' Exhibit C, which was middle and high school
9    discipline policy for 2001-2002, and at document Bate stamp
10   102.  In the introduction it says, student discipline
11   records will remain a part of the student's permit files.
12   When a student transfers to this school district a certified
13   copy of the student's discipline record is required and
14   obtained from the school entity from which the student is
15   transferring.  The same is true when a student transfers out
16   of the Erie School District.  This record shall be
17   maintained as part of the student's permanent discipline
18   record and shall be made available for inspection as
19   required by law.  Do you know if that policy has changed?

20   A. As I said, this policy is reviewed yearly, there
21   probably are yearly changes.  Is that a major change, again,
22   that is something someone else does.

23   Q. Who might that be?

24   A. I mean, the maintenance of records are done by two
25   people.  The director of special education, Jim Pacansky,

Page 4

1 parents?
2    A. I would imagine -- I would hope it would be in a
3 reasonable fashion. I'm sure she needed to sort through
4 some things. I am not going to speak for her, but it would
5 be my hope that she would do it as quickly as she had
6 determined what actually occurred in the situation.
7 It's not good to call a parent and say, listen, I just heard
8 this and I am just going to start -- because it sometimes
9 turns out not to be true or not to be factual. So you have
10 to make sure you have the facts in order and then the call
11 should be made as soon as that is determined.
12    Q. Did either -- did you ever talk to
13 Miss Cappabianca about what happened to K█████ and R█████
14    A. I believe my conversations were with Jan Woods,
15 but I can't say I never did speak to Miss Cappabianca, I may
16 have.
17    Q. But you don't recall what you said to her, if you
18 did speak to her? Or do you have a recollection of what was
19 said?
20    A. Let me, again, say that whether it came from both
21 Cappabianca or Woods or Woods, which is my recollection,
22 there was a certainty that mental health intervention needed
23 to be invoked immediately, as quickly as we could do it.
24    Q. And what do you recall the information that they
25 gave you that indicated that mental health had to be

Page 13

1 invoked?
2    A. I think Jan was concerned that there could be some
3 issue with the individual student hurting herself, doing
4 some damage to her body, to herself.
5    Q. R█████ and K█████ were both special ed.
6 students, was there any discussion about doing an evaluation
7 or reevaluation of their condition?
8    A. Well, I guess there's two things. When someone
9 tells me about an emergency situation, I'm not going to sit
10 back and say, well, let's take about three weeks to do an
11 evaluation of the situation. The processes will take care
12 of themselves before the placement could be done that had to
13 be done, things had to be done.
14    Q. What do you mean before what had to be done?
15    A. There was a period of time where a new NORA would
16 be issued. And the department would -- or a placement
17 letter would be done. And the department would do an
18 evaluation, that would be a departmental thing before the
19 placement is done to make sure all the things you're talking
20 about were done. My assessment at that time was if it took
21 two weeks traditionally to go to Sarah Reed, she gave me a
22 sense of urgency based on what I'm telling you that it
23 couldn't be two weeks. This needed to be done immediately,
24 and I acquiesced to what she had requested.
25    The other issues of whether the safeguards and all

Page 14

1 that other thing, I have every confidence that the
2 department would take care of those. If necessary a new
3 NORA, a new ER, rather an evaluation needs to be done. But
4 Sarah Reed is very good before they do an intake they know
5 the rules.
6    Q. I have several questions to follow up on that
7 answer. Number one, when you refer to the department, are
8 you referring to the special education department?
9    A. What I'm referring to there would be the special
10 ed. department in conjunction with the child study which I
11 referred to earlier that would be Marianne Tempestini's
12 pupil personnel services department. But the acronyms have
13 changed through the years, but you still use the same
14 terminology. But, yes, they would work together to see that
15 all the necessary paperwork. That is somebody else's job,
16 at that point I was not doing an assessment, worrying about
17 who was going to do the paperwork. I was worried about Jan
18 Woods had described the situation with a sense of urgency,
19 my function at that point was to get the process going so
20 that -- assuming that the paperwork was done -- the
21 placement was capable of being done.
22    Q. I think you made a statement that Jan Woods
23 conveyed the notion to you it couldn't wait two weeks for
24 this to be done.
25    A. No, I didn't say -- what I said was, it could wait

Page 15

1 two -- what she was saying that this needs to be done right
2 now. Jan has -- many principals will call with situations,
3 and you have to sort through that. Is this a real
4 situation. And I could tell by her tone of voice, and her
5 sincerity that she really believed that this needed
6 immediate attention.
7    Q. I would assume that you have visited or been
8 present at Sarah Reed Children's Center?
9    A. Yes.
10    Q. And have you observed their classroom settings and
11 stuff?
12    A. I have on occasion.
13    Q. I mean in terms of an emergency situation what
14 would you expect that Sarah Reed could do on an emergency
15 basis?
16    A. I told you before about Sarah Reed, they have a
17 lot of mental health specialists there that are trained in
18 looking for certain types of behavior, that would be one
19 thing. Number two, it is a structural change in
20 environment. There is a significant difference between
21 being with 800 students in a -- I don't how many square foot
22 Strong Vincent is, but it's a very large facility, and going
23 to a school that is much smaller with a much smaller class
24 size and many more adults paying attention to your actions.
25 You get a lot more attention, lot smaller class size and the

Page 16

**Page 17**

1 level of the expertise of the people that are dealing with
2 you are more attuned to mental health issues.
3    Q. Do you know whether Janet Woods had any background
4 that she could diagnose mental health problems? She's just
5 an educator, right?
6    A. She's an educator. Obviously when you work in a
7 building of that nature and you can see the differences in
8 cases, and you can certainly have a good professional
9 judgment in that sense, there's a professional staff there
10 that has some skill level.
11    Q. You're talking about Strong Vincent?
12    A. Um-hmm -- yes.
13    Q. It is fair to say that -- it is fair to say that
14 typically the children that are referred to Sarah Reed have
15 very severe behavioral problems?
16    A. Not always. There's a range of what -- I mean,
17 there are students who for some reason are in need of a
18 level of expertise that the district doesn't have the
19 ability to provide for a period of time.
20    Q. I think you mentioned something about that Sarah
21 Reed intake knew the procedures, you also made a reference
22 to their intake. What did you expect Sarah Reed's intake to
23 do.
24    A. Sarah Reed took a look at this situation and the
25 student. And when they were sitting down talking to the

**Page 18**

1 student and doing the assessment, they're not going to
2 say -- if they see a student doesn't belong there or there's
3 no need for their type of intervention -- there's checks and
4 balances in there, that's why I have a tremendous comfort
5 level. The staff is a very professional staff. If they
6 would have done the intake and called me back and said,
7 listen, neither of these students should be leaving Strong
8 Vincent, they belong in their main school there, you need to
9 look internally rather than externally, we would have done
10 that.
11    Q. Once these students went to Sarah Reed, did you
12 receive any information or feedback or reports from Sarah
13 Reed about their progress?
14    A. Did I personally?
15    Q. Yes.
16    A. No.
17    Q. You wouldn't expect to, that's not the way the
18 system works; is that correct?
19    A. I am not the daily practitioners that would be
20 working with students, that's not my function.
21    Q. Okay. After they were referred to Sarah Reed,
22 R██ and K██, were you involved at all in the
23 consideration of whether to discipline the students who
24 assaulted them?
25    A. No.

**Page 19**

1    Q. And that's because that would have been
2 Miss Woods' responsibility to take those steps?
3    A. It would have been Miss Woods' responsibility to
4 take those steps. If she needed assistance with that, for
5 example, she were going to refer them for expulsion then she
6 would have utilized the procedure and that would go to
7 somebody else.
8    Q. Who would an expulsion go to?
9    A. She would have to take the packet, fill it out to
10 Dr. Linden at the time, he was the assistant superintendent
11 in the office next to mine. And that was his
12 responsibility.
13    MR. MARNEN: John Linden, right? Dr. John Linden,
14 L-I-N-D-E-N?
15    THE WITNESS: Correct.
16    Q. Did you ever have any -- do you know whether that
17 impact happened or whether -- did you ever talk to
18 Mr. Linden about this situation -- Dr. Linden, excuse me.
19    A. I really can't say I recall, I certainly may have.
20 They certainly may have done that, but I do not have a
21 recollection.
22    Q. Is Dr. Linden still with the Erie School District?
23    A. He has retired.
24    Q. At that time did you have any responsibility
25 relative to the discipline policy of the school district?

**Page 20**

1    A. Did I have any responsibility? Depending on the
2 circumstance I could. If John Linden was out of town, if
3 the principal wasn't in, substitute principal didn't know
4 what to do, they could have called me. Was that one of my
5 job functions? Absolutely not.
6    Q. There was a -- I want to ask you your information
7 concerning some procedural issues. I don't know what I did
8 with that first page here. As you know, and we've looked at
9 them before, and I'll just refer you to Moore Deposition
10 Exhibit 1, and this pertains to R██ P██. Although
11 Moore Deposition Exhibit 2, and there's similar
12 documentation pertaining to K██ L██.
13    A. Um-hmm.
14    Q. There was an IEP review revision, this document
15 was completed on 1/18/02 for R██ P██.
16    A. Okay.
17    Q. That would be Moore Exhibit 1. Would you
18 anticipate that there would be actually an IEP meeting
19 before this document was prepared and signed?
20    A. Not necessarily, could.
21    Q. Under what circumstances is it permissible not to
22 have an IEP meeting before changing the IEP?
23    A. If there really is no structural change needed or
24 any significant change, or at this moment if the teacher and
25 a parent do not determine a pressing need, I don't think



1  they would do anything more than a revision.
2      Q.  Well, but this involved the transfer of the
3  students from the Erie School District to its alternative
4  education program.  Is that a structural change that would
5  require a meeting?
6      A.  If you're not changing what you are going to teach
7  them, no.  All they are doing is changing if I teach you
8  something in room A or B it does not much matter.
9      Q.  So would that be that your read of what happened here
10  that the actual IEP didn't change, only the location of the
11  educational placement changed?
12      A.  At this time.
13      Q.  At this time meaning 1/18/02?
14      A.  (Witness moved head up and down.)  Right.
15      Q.  Because when you say this time, that could mean
16  this time as you and I sit here today.
17      A.  At this time 1/18/02.
18      Q.  Okay.  You're looking at R████ IEP review and
19  revision which was Moore Exhibit 1 the second page -- excuse
20  me, the third page of Moore Exhibit 2 was the IEP review
21  revision of K████ L████
22      A.  Um-hmm.
23      Q.  And I have noted, I think maybe in another
24  deposition, but the language concerning the two girls is
25  identical.  The measurable annual goal is, for both of them,

Page 21

1  is quote, identify appropriate solutions, interpersonal and
2  self-related problem behaviors.  And the IEP review revision
3  is identical for both girls.  Do you know whether these
4  professionals decided that maybe there were differences or
5  distinctions between the two girls that should have been
6  noted in this IEP revision review?
7      A.  I can't speak for the people that sat on this IEP.
8  They have the ability to add to those statements there.
9      Q.  What do you mean?
10      A.  If they wanted to put something, write something
11  into those things, if they felt that those encompassed what
12  they need to cover and their explanation to mom she
13  understood it then this would be a document that's fine.  If
14  they wanted to add something, evaluation scheduled daily,
15  weekly, hourly, they could do that.  They chose not to.  I
16  can't speak to why people do what they do.
17      Q.  If a classroom teacher didn't sign this IEP
18  revision review, do you think that would present a problem
19  from the paperwork side of the question?  I'm referring to
20  Moore Exhibit 1.
21      A.  A classroom teacher didn't sign --
22      Q.  Right, the IEP revision review.
23      A.  I don't know what type of problem it would
24  present.
25      Q.  Well, is the classroom teacher supposed to be part

Page 22

1  of the team?
2      A.  Should be.
3      Q.  Generally when there is an IEP meeting or a
4  meeting to review or revise an IEP, is there an invitation
5  to the IEP meeting sent to the parent, a written invitation?
6      A.  There's notification.
7      Q.  You don't need to have a written invitation?
8      A.  No.  Obviously mom in both cases was there so
9  somehow she was communicated to.  Would that be a better way
10  to do it, certainly if someone said I wasn't invited and you
11  have something verifying the written request that's
12  certainly a much more expeditious way to do that.
13      Q.  I can take those back now, I'm done with those.
14      There was testimony by -- and Mr. Marnen can correct me if
15  I'm mischaracterizing his testimony, because lawyers don't
16  always hear things right.  In the course of the depositions
17  that we've taken, I believe there was testimony from one of
18  the former students who indicated that the assault was
19  planned by the students while they attended P.A.S.S.  In
20  other words, B████ C████ one of the -- sort of the
21  instigator of the assault, in essence planned the assault
22  with other students while they were in the P.A.S.S. program.
23      Now, if that information came to your attention,
24  would that be a violation of the -- would you determine that
25  to be a violation of the student discipline policy?

Page 23

1      A.  That's a pretty broad statement.  I don't know.  I
2  mean, you would have to give me a more specific.  I would
3  have to know who said what to who, when, who heard it rather
4  than to say it the way you just described it.  It's very
5  difficult for me to make an assessment on it.
6      Q.  I appreciate that.  I don't need to ask any other
7  questions about that.  In terms of the school district
8  policy about -- or the practice of a principal investigating
9  an incident such as this, it's reported to the principal
10  that a number of students engaged in this kind of conduct
11  and Miss Woods has testified she had the students in her
12  office asking them questions.  Is it the practice of the
13  Erie School District that the students would be asked to
14  write out statements, you know, either explaining their
15  personal knowledge or explaining what they observed?
16      A.  I imagine that there was a reason she determined
17  to do that.  I don't know what it would be.  It's not
18  necessarily a practice, it is certainly not something that
19  would be forbidden.
20      Q.  We've never seen anything, and I was just
21  wondering if, in fact, it was a practice for that to happen?
22      A.  There are times we ask students to write things
23  out because of circumstances.  And there are other times
24  when an investigation is going to be done and basically
25  controlled by another agency.  And in this case she may have

Page 24



Page 1

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    RICHARD P., by and for       :
     R██████ P., and DENISE L.,   :
4    by and for K███████ L.,      :
                Plaintiffs        :
5                                 :
          v.                      :   Civil Action No. 03-390
6                                 :            Erie
     SCHOOL DISTRICT OF THE CITY  :
7    OF ERIE, PENNSYLVANIA; JANET :
     WOODS, Individually and in   :
8    her Capacity as Principal of :
     Strong Vincent High School;  :
9    and LINDA L. CAPPABIANCA,    :
     Individually and in her      :
10   Capacity as Assistant        :
     Principal of Strong Vincent  :
11   High School,                 :
                Defendants        :
12

13

14

15

16          Deposition of VIKKI SCULLY, taken before

17       and by Janis L. Ferguson, Notary Public in and

18       for the Commonwealth of Pennsylvania, on Friday,

19       March 18, 2005, commencing at 1:14 p.m., at the

20       offices of Knox McLaughlin Gornall & Sennett, PC,

21       120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25            Reported by Janis L. Ferguson, RPR
               Ferguson & Holdnack Reporting, Inc.

1180a

c76de80c-e5fa-458f-8e18-d7ed8c20ab99

Page 10

1    Q.  Okay.  Describe the conduct that he engaged in
2  that you remember.
3    A.  It would be stuff like he would repeat stuff that
4  they said or interrupt when they were talking or, you know,
5  you're looking at me, stop looking at me.  You moved my pen.
6  Stuff like that.
7    Q.  Did you have to -- let me ask it this way:  In
8  terms of maintaining order in your classroom, what tools did
9  you have as a teacher to make sure that all the students
10  were on task?
11    A.  I would separate students who I considered to be
12  distracting.  I would put them closer in proximity to me so
13  I could monitor what they're doing, and I kept them very
14  busy.  I had stuff to do from -- immediately when you walked
15  in, there was stuff on the board.  It was called a "do now",
16  where they had to sit down and get to work.  Try to reduce
17  downtime at all -- at all costs, because that's when middle
18  school students get into trouble, is when they have
19  unstructured time.
20    I encourage the students to tell me, you know, if
21  things were going on, and then we would address it and worry
22  about stuff in the classroom.  And then if the kids were
23  violating the rules, there was the discipline measures;
24  teacher detention, phone call home.  And if it would
25  persist, then it would be referred to the office and the

Page 11

1  administrators.
2    Q.  Teacher detention, what kind of -- what did that
3  imply?
4    A.  They would come after school the next day or the
5  day after, and I would either give them an assignment, or we
6  would talk about what was going on.  Basically they had to
7  stay after school a half hour for -- you know, some
8  punishment was doled out during that time period.
9    Q.  And that's different from the -- we've run across
10  a term called the PASS.
11    A.  Um-hum.  Program for After-School Suspension.
12    Q.  Okay.  Program for After-School Suspension.  So
13  the teacher suspension was a different tool?
14    A.  That was the first kind of notch on the discipline
15  belt.
16    Q.  And did you find that you were referring -- using
17  the referral system to refer G█████ B████ to
18  Miss Cappabianca for help?
19    A.  C█████ -- C█████ was referred to the office
20  frequently, I would say.
21    Q.  Did you talk to -- when you referred G█████
22  would Miss Cappabianca talk to you, or would there be
23  communications between the two of you?
24    A.  Yes.  She was very open and, you know, wanted to
25  know what was going on, or would give us feedback as to

Page 12

1  what, you know, she did.
2    Q.  And do you remember B████ C████████?
3    A.  Yes, I do.
4    Q.  Was she in any classes with either R████ or
5  K████?
6    A.  That, I would have to look at my -- I don't
7  remember.
8    Q.  And what kind of discipline problems did B████
9  C████████ present?
10    A.  Defiant to authority.  If she wanted to do
11  something, she would do it.  If she didn't, then she
12  wouldn't.
13    Q.  And was she friends with C█████ B████ do you
14  know?
15    A.  I don't know.  I -- they interacted.  I don't know
16  if I would call them friends.
17    Q.  In terms of your -- either your background, you
18  know, your educational background, your experiential
19  background, is it fair to say that learning support kids
20  might be more vulnerable than other kids, in terms of abuse
21  or harassment?  Is that a fair statement, do you think?
22    A.  I don't know, because as I have gone on in my
23  career, I -- I have seen kids in the regular ed., regular
24  education students who are often targets to -- I don't think
25  so much it's, per se, because they are a learning support

Page 13

1  student.  Because there's many learning support students
2  that go through school fine without ever being the target
3  or, you know, getting picked on.
4    Q.  Do you recall whether either K████ or R████
5  were targets of either harassment or bullying by other
6  students?
7    A.  Not to my recollection, no.  K████ was
8  social -- K████ had a sister at the school who she was
9  protective of.  And R████ was very quiet.  R████ was the
10  kind of student that went in the back of the room, sat
11  there, did her work, and didn't -- didn't cause much of a
12  scene.  So I didn't -- you know, she was one of the quiet
13  ones.
14    Q.  Do you remember whether you ever had to refer
15  either R████ or K████ to Miss Cappabianca?
16    A.  R████ I sent to the office -- the one time that
17  I recall is when she had walked into the room and had yelled
18  a curse word at a student, which was surprising, because I
19  had not heard R████ talk like that.  And I sent her over to
20  the office.
21    I don't think I ever referred K████ or R████
22  for any other reason.  For discipline -- discipline for -- I
23  mean, if, you know, kids come up and say I have a problem or
24  something, I would send them to the office so they could
25  talk.  But K████ and R████ were, in my opinion, no way

Page 18

1    see K█████ or R██████ back in my classroom. So I didn't
2    see them after that incident happened.
3        Q. So once you learned about the incident, both of
4    the girls were out of your classroom by that time.
5        A. Um-hum.
6        Q. Is that right?
7        A. Yes.
8        Q. Okay. Now, did you have any knowledge about how
9    the girls were placed after -- I mean, what was your
10   knowledge about how it happened that girls no longer
11   attended school at Strong Vincent?
12       A. I don't have a lot of knowledge about that,
13   because I wasn't -- I wasn't involved in that meeting. I
14   think that's where Charlise came in and met with the
15   parents, and it was determined that -- for the best
16   interests of the students, that they would be going to Sarah
17   Reed. They offer a therapeutic component that the girls
18   were in need of, and that we, you know, don't have it.
19       Q. Okay. We're going to take Charlise Moore's
20   deposition, and I think that -- you have the document that's
21   been marked as Moore's Deposition Exhibit 2.
22       A. Um-hum.
23       Q. The third page of that has you as the teacher for
24   Kristina Long. Do you see up there in the right-hand upper
25   corner?

Page 19

1        A. Um-hum.
2        Q. Do you recall seeing this -- have you ever seen
3    this document before?
4        A. After the fact. But Mrs. Gray -- I must not have
5    been in the building. Mrs. Gray is the one who --
6        Q. Signed it?
7        A. -- signed off on it.
8        Q. So you are listed as the teacher, but you didn't
9    sign the document.
10       A. Yeah.
11       Q. After the fact -- if you look at the document
12   that's been marked as Moore's Deposition Exhibit 2, do you
13   recall -- do you know if you saw any of these documents, any
14   of this paperwork back in January of 2002?
15       MR. MARNEN: You mean Exhibit 2?
16       MR. OLDS: Yes.
17       A. I don't -- I can't say that I saw it in January.
18   I don't --
19       Q. Do you think you might have seen it --
20       A. Yeah, after.
21       Q. -- sometime in 2002?
22       A. After the fact, yeah.
23       Q. Well, what do you mean by "after the fact"?
24       A. Well, after she had left the -- the school.
25       Q. Okay. And why would it be shown to you after she

Page 20

1    had left the school?
2        A. That's probably when my copy was sent to me.
3        Q. Okay. So you got a copy of this --
4        A. Yes.
5        Q. -- at some point.
6        A. Yes.
7        Q. Okay. And you would have received a copy -- do
8    you know why you would have received a copy?
9        A. Because I was the teacher of record, and I had her
10   file.
11       Q. Okay. And that would be K██████ file.
12       A. Yes, K██████ file.
13       Q. And Moore Exhibit 1, which you also have over
14   there -- you have a copy of it?
15       A. Um-hum.
16       Q. Mr. Gray -- is it Ms. Gray?
17       A. Mrs. Gray, yes.
18       Q. Is listed as her teacher. Would you have received
19   that -- and that involves R████ P██████ Would you have
20   received any of that?
21       A. I would not have received it, because I was not
22   her teacher. I would have gotten a copy of that.
23       Q. Now, so Miss Cappabianca told you that -- you
24   learned from Miss Cappabianca that there had been an
25   incident.

Page 21

1        A. Um-hum.
2        Q. And the girls were no longer in your class. How
3    did you learn -- how did you learn what happened to them
4    afterwards? In other words, you weren't involved.
5        A. Um-hum.
6        Q. Who told you the steps that had been taken?
7        A. Linda, as time went on in the investigation and as
8    we needed to know -- because some of the other kids were
9    students in our classes, so it would affect us.
10       Q. So eventually she told you who the alleged
11   assailants were as well; is that right?
12       A. I figured the one out, because he was no longer in
13   my class. I think his parents pulled him immediately from
14   the school. So I put two and two together.
15       Q. And who was that?
16       A. C██████ B█████.
17       Q. Okay. And do you know whether he was suspended,
18   or did his parents pull him out?
19       A. That, I don't know.
20       Q. Do you know whether -- did you ever learn whether
21   he had a history, a disciplinary history of harassing female
22   students --
23       A. No.
24       Q. -- or sexually harassing?
25       A. I never learned of anything like that.

1 20a

c76de80c-e5fa-458f-8e18-d7ed8c20ab99

Page 22

1   Q.   When you received a new student like that at
2 Strong Vincent, and they -- K███ and R███ would have
3 been -- come in as seventh graders.
4   A.   Um-hum.
5   Q.   Do you know, did C███ B███ come in as a
6 seventh grader that year?
7   A.   I would have to look at the records.
8   Q.   You wouldn't know.
9   A.   Yeah.
10   Q.   Is it fair to say that you're not -- you don't
11 learn about the prior disciplinary records of students who
12 come to you?
13   A.   We learn the academic history and any information
14 that would be in an evaluation report.  They are -- we get
15 that information -- my understanding of it is that like
16 discipline files from year to year cannot follow.  Like you
17 can't keep that to hold it against a student, so.
18   Q.   Okay.
19   A.   But when you get a new student, you can figure out
20 rather quickly what their behavior is probably going to be
21 like, so.
22   Q.   Okay.  So the other students who were involved --
23 none of the -- well, was B███ C███ taken out of your
24 class after the --
25   A.   She was -- my understanding is she was prosecuted

Page 23

1 and sent away.
2   Q.   Did she continue to be in your class until that
3 happened?  Do you remember?
4   A.   Until the -- until the court case came up.
5   Q.   Okay.
6   A.   Or until the -- you know, whatever -- when they
7 charged her.  I think when she got charged, she was moved to
8 Edmund L., if I remember correctly.
9   Q.   But C███ B███ it was your understanding that
10 his parents withdrew him?
11   A.   That's my understanding, yes.
12   Q.   Okay.  And then tell me what Charlise Moore's job
13 was.
14   A.   In that situation, or what her --
15   Q.   I guess in general, and then we'll go to the
16 specifics of that situation.  She's a supervisor, right?
17   A.   She serves as the middle school life skills
18 supervisor.  She is the one who helps to translate legal --
19 you know, the legal interpretation of the law to us to make
20 sure that we're in line with, you know, following Federal
21 and State regulations.  She assists us if we have questions
22 about, you know, how we make adaptations for students or --
23 she's the main person we go to with questions that we are
24 unable to answer.
25   Q.   And she didn't -- did she have students?

Page 24

1   A.   No.  She had -- she works out of the
2 administration building.  She -- she goes to all the other
3 schools; you know, the middle -- that have seventh and
4 eighth grade and supervises all the teachers that deal with
5 those students.
6   Q.   Okay.  And does she still have the same position
7 now?
8   A.   Yes.
9   Q.   Now, is it fair to say that she took over after
10 the incident in terms of -- well, is it your understanding
11 that she took over in terms of changing the girls'
12 placement?
13   A.   She was called in and involved in it.  Because I
14 think that's above what the teacher of record's
15 responsibilities are.
16   Q.   What other professionals -- for instance, I take
17 it that you probably are part of an IEP team from time to
18 time.
19   A.   Um-hum.
20   Q.   Is that right?
21   A.   Well, we're responsible for writing the IEP, so.
22   Q.   The teachers are.
23   A.   The special education teachers.
24   Q.   Special education.
25   A.   The teacher of record.

Page 25

1   Q.   Okay.  And when do you write IEP for students?
2   A.   Our School District, most of them come due around
3 the first parent conference time, which is November.  But
4 you can write an IEP at any time, rewrite it.  But within --
5 they have been to be written within a year -- a year of each
6 one.
7   Q.   Right.  Do you recall whether you wrote the first
8 IEP for K███?
9   A.   I'm the teacher of record.  I don't --
10   Q.   We have identified that in the last deposition.
11 Let me -- it was part of 4 and 5.  No, it was part of 3 and
12 4.  And let me just show you -- that was marked as Manus
13 Deposition Exhibit 3 and 4.  The first page is the first
14 page of 3, and then the remainder of the IEP is marked as
15 Exhibit 4.
16   A.   Okay.
17   Q.   And I guess my question is, after you reviewed
18 that, if you can tell me whether you wrote it.
19   A.   Yes, I wrote -- this is the IEP that I wrote.
20   Q.   And are there different -- we noticed that
21 K███ IEP seemed to be a different form than R███
22 Just the format.  And Manus Exhibit 5 was R███  Do you
23 have any idea why these are different forms?
24   A.   Can you explain the differences of forms?
25   Q.   Look at, like, for instance, Page 3 of 8 on

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    RICHARD P., by and for        :
      R██████ P., and DENISE L.,    :
 4    by and for K██████ L.,        :
                 Plaintiffs         :
 5                                  :
             v.                     :   Civil Action No. 03-390
 6                                  :          Erie
      SCHOOL DISTRICT OF THE CITY   :
 7    OF ERIE, PENNSYLVANIA; JANET  :
      WOODS, Individually and in    :
 8    her Capacity as Principal of  :
      Strong Vincent High School;   :
 9    and LINDA L. CAPPABIANCA,     :
      Individually and in her       :
10    Capacity as Assistant         :
      Principal of Strong Vincent   :
11    High School,                  :
                 Defendants         :
12

13

14

15

16            Deposition of JANET WOODS, taken before

17         and by Janis L. Ferguson, Notary Public in and

18         for the Commonwealth of Pennsylvania, on Monday,

19         April 11, 2005, commencing at 10:00 a.m., at the

20         offices of Knox McLaughlin Gornall & Sennett, PC,

21         120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
                  Reported by Janis L. Ferguson, RPR
25              Ferguson & Holdnack Reporting, Inc.
```

Page 10

1    A.  The -- the year 2000/2003 [sic], we had -- I
2  believe we had nine through 12.  Or, excuse me, eight
3  through 12.  And then in 2003, it became just the high
4  school, nine through 12.  The students from Strong Vincent
5  were -- that's why I said, there aren't definitive --
6  definitive lines always change.  Primarily the students in
7  the Strong Vincent, quote, attendance area or the
8  Emerson-Gridley attendance area, the old middle school,
9  probably a lot of them went to Wayne or to Roosevelt in
10  2003.
11    Q.  How many students are there altogether in the Erie
12  School District?  Within --
13    A.  Oh, probably 12,000.
14    Q.  12,000.  And when you were at Strong Vincent as a
15  principal the last period of time, 2000 to 2003, how many
16  students were in the high school, approximately?
17    A.  Oh, 500.  In the high school, nine through 12,
18  probably 500, I would say.
19    Q.  And approximately 200 in the middle school?
20    A.  Yes.  Perhaps more, but that's generally correct.
21    Q.  And then prior -- I think you said prior to Strong
22  Vincent, you were in the Wayne Middle School.
23    A.  Correct.
24    Q.  And that would be grades --
25    A.  That was six, seven, and eight.

Page 11

1    Q.  And how many students were in that school?
2    A.  Probably 600.
3    Q.  When you were in Wayne, did you have an assistant
4  principal or more than one assistant principal?
5    A.  When I was employed there in 1990, I was the only
6  assistant principal.  I was there from '90 to '92.  Then
7  '92 to '93, I was at Strong Vincent.  And then I went back
8  to Wayne after that.  At times there was a second assistant
9  principal.
10    Q.  Were you an assistant principal at Wayne?
11    A.  At Wayne, yes, that's correct.
12    Q.  Okay.  And would the -- in terms of, again,
13  demographics -- you know, classwise, racewise -- would the
14  children attending Wayne Middle School, would it be a
15  similar population as the children attending Strong Vincent?
16    A.  Correct.
17    Q.  And as an assistant principal at Wayne, what were
18  your duties?
19    A.  I was in -- I was in charge of the building
20  when -- in the principal's absence.  I was responsible
21  largely for the daily routine of the building.  I was in
22  charge of discipline of students, special programs, all
23  school projects.  Anything that a principal does.
24        Probably the thing the principal did more of and I
25  did less of were teacher evaluations.  I was in charge of

Page 12

1  the student assistance program, any kind of special program
2  that went on in the building; after-school programs.
3    Q.  What was your role relative to the students in
4  special education classes as an assistant principal at
5  Wayne?
6    A.  Well, they were -- like any other students, they
7  were part of the building, like any other student.  Regular
8  and special education students were part of the building.
9  When you have a special education student, you have an
10  Individual Educational Plan that has to be followed, so
11  those students are different in that way, because you have a
12  specific plan that is set forth each year and reviewed by
13  the parents and the teachers and agreed upon.
14    Q.  Typically, is there an administrator who is
15  involved in setting up the IEP meeting and devising the
16  plan?
17    A.  Generally that's taken -- generally, the IEP
18  schedule is set up by the supervisors.  And there is a --
19  each teacher is assigned -- each student is assigned a
20  teacher of record, and the supervisor works with those
21  teachers in the -- constructing the paperwork, and then the
22  teachers then have to have the IEP meeting with the parent.
23  An administrator has to sign, be present to sign.
24    Q.  The administrator is present --
25    A.  Yeah.

Page 13

1    Q.  There is an administrator present at those
2  meetings?
3    A.  Yes.  Been to many.
4    Q.  Pardon?
5    A.  I've been to many.
6    Q.  Administrators, are they -- is it one of your
7  duties as an administrator to be actively involved in
8  creating the IEP plan?
9    A.  Only if we have input.  Generally that is created
10  primarily based upon the student's educational goals.  And
11  that is done traditionally with the teacher.
12    Q.  Tell me, who was the -- when you were the
13  principal at Strong Vincent, who was the Title IX officer?
14    A.  Well, the principal is the person that is in
15  charge of implementing and making sure that all, you know,
16  policies are followed in the School District.  For example,
17  the discipline handbook has all the information that
18  students receive about Title IV.  And it's our
19  responsibility to make sure that those are followed.
20    Q.  Do you know, were you the officially designated --
21    A.  I don't know.  But I'm certain I was.
22    Q.  But you don't know for certain -- you're certain
23  that you were, but you don't really know.
24    A.  Right.
25    Q.  Right?  Is that fair?

Page 46

1  Mrs. L▮▮ because K▮▮ was in the hospital. But we had
2  all of the statements from all of the kids and their
3  parents. Although Mrs. L▮▮ Denise, did come and talk to
4  me. And that was helpful also, because we were able to add
5  that piece to the puzzle.
6      And by Friday morning, we had all the information
7  that we thought was credible, so that we could give it to
8  the police, and we knew the police were going to act right
9  there and right then.
10     Q. You indicated that you had statements from the
11 students. What form did those statements take?
12     A. We have students write it down, and then --
13     Q. And where are the -- have you ever seen those
14 statements since the students wrote them down?
15     A. The only one -- and, again, I know a lot of the
16 stuff ended up getting pitched after I was gone, because of
17 the change in the discipline thing about keeping notes,
18 those anecdotals. The only one I've seen in the documents
19 that you have -- that Mr. Marnen has is from, I believe,
20 A▮▮ F▮▮▮.
21     THE WITNESS: Is that right?
22     A. A▮▮ F▮▮▮ [sic].
23     Q. So the other students did statements, but they
24 were pitched.
25     A. Well, they gave -- now, the police --

Page 47

1      Q. Please. I want to know what they gave to you.
2  The other students actually wrote statements, you're saying?
3      A. They gave -- and they gave -- all of that stuff
4  went to the police.
5      Q. Okay.
6      A. All -- everything went to the police.
7      Q. Well, if the police don't have it, does that mean
8  that you didn't give it to the police? I mean, we got the
9  statement from A▮▮ F▮▮ from the police.
10     A. From the police.
11     Q. Right. So it's your testimony here today that you
12 met with the students for three days, and that each student
13 wrote a statement.
14     A. My -- every student met with the police. I'm not
15 certain that every student would have written it.
16     Q. Wait. You met with students for two days.
17     A. Correct.
18     Q. And is it your testimony that those students wrote
19 statements?
20     A. Some of those students wrote statements.
21     Q. Which students wrote statements?
22     A. I don't know. I know A▮▮ F▮▮▮ did.
23     Q. And where are those statements?
24     A. Well, you just stated that the police had
25 A▮▮▮▮

Page 48

1      Q. Right. Where are the others?
2      A. I don't know. I'm not -- I don't know that every
3  student would have written a statement. We would have had
4  the information, we would have had the parent in and gone
5  over the information with the parent. And I know that all
6  information -- we repeated the whole scenario again; the
7  conversation with the police and the student there, and
8  sometimes the parent was there talking with the policeman at
9  the same time.
10     Q. Now, did you make notes as the students talked?
11     A. Probably. I generally take notes while a student
12 talks. But I don't do the kind of documenting you're doing.
13     Q. Right.
14     A. I'm more interested in ascertaining information
15 and knowing what to do with that information.
16     Q. Do you know where those notes are?
17     A. My notes would be gone.
18     Q. And who destroyed your notes?
19     A. I would have destroyed them myself.
20     Q. When?
21     A. After the police were there. I wouldn't keep that
22 information. Now --
23     Q. Go ahead.
24     A. Linda Cap had her own set of notes. I mean, you
25 know, but that's -- you know.

Page 49

1      Q. You say that this incident broke when R▮▮ had
2  an outburst in Miss Scully's class?
3      A. Right.
4      Q. Now, R▮▮ had not presented any behavioral
5  problems before that time; is that correct?
6      A. Oh, she was hardheaded. She -- R▮▮ sometimes
7  had her own -- she would -- not hardheaded. Maybe that's
8  too -- occasionally obstinate. How is that? That's not
9  hardheaded. Occasionally obstinate would be a better choice
10 of --
11     Q. She couldn't be compared to C▮▮ B▮▮, could
12 she, in terms of behavioral problems?
13     A. No. No.
14     Q. Or B▮▮ C▮▮?
15     A. No. No. They were -- they were discipline
16 problems.
17     Q. What about K▮▮? Did she present behavioral
18 problems?
19     A. No. K▮▮ and R▮▮ were pretty typical kids.
20 They were -- few problems here and there, but nothing --
21     Q. Let's mark this as Exhibit 2. I mean, this will
22 be Exhibit 1. I'm sorry.
23         (Woods Deposition Exhibit 1
24          marked for identification.)
25     Q. Have you ever seen Exhibit 1 before?

13 (Pages 46 to 49)

124a

Page 78

1 okay, for discipline purposes or something.
2     Q. Well, he never went anywhere.
3     A. Right. But -- he was referred. Excuse me.
4 When -- I'll take -- I'll take each of the girls separately.
5     Because K▓▓▓ was in Millcreek. When a student
6 goes to -- to Millcreek, for example, for mental health
7 issues, it kind of kicks in another whole level of planning
8 for the student's IEP. The main goal is to keep -- and I --
9 the main goal is to write an IEP appropriate for that child.
10 All right? With the parents' input and consent.
11     When we learned that -- when we learned that
12 K▓▓▓ was in Millcreek, or any student was in a facility
13 like that, the parent assistant person and the special
14 ed. -- someone from downtown, probably special ed.
15 supervisor, would try to determine with the staff, upon the
16 recommendations of the staff of Millcreek and their doctors,
17 where that student would be best served to meet their needs.
18     And so at that point it was determined, apparently
19 by Millcreek -- and we don't send them there. It doesn't
20 happen that way. I don't say you're going to go here. That
21 does not happen.
22     K▓▓▓ with the input of her doctors and
23 only -- and only with the consent and agreement of the
24 parent, would have -- would a student be sent to -- for
25 example, Sarah Reed has an excellent emotional support

Page 79

1 program where a student can receive the services they need
2 and still get credit and be part of the School District.
3 It's a program that is contracted by the Erie School
4 District for those students. Erie has many programs around
5 the city for different reasons. We have charter schools, we
6 have different contracted things. So Sarah Reed is just one
7 of a multitude of those.
8     Q. Okay.
9     A. Now, R▓▓▓ dad, when R▓▓▓ and Mr. P▓▓▓
10 came in and talked to Mr. Ruhl and myself, he had actually
11 requested she not return, and I certainly could understand
12 that. I felt terrible about what had happened. I was
13 furious at B▓▓▓ and A▓▓▓ and C▓▓▓.
14     But, anyway, R▓▓▓ didn't want to return. I
15 certainly understood that. And I had told Mr. P▓▓▓ that
16 we had put into motion request for any -- you know, a
17 placement for her, if that's what he wanted anyway. We
18 talked about Sarah Reed. And he -- he or his wife would
19 have met to change her IEP, and she went to Sarah Reed also.
20     We don't send kids there. I can't turn to a
21 student and say, I'm sending you somewhere. It doesn't
22 happen.
23     I was interested in, more than anything, in these
24 two girls, getting some help with this.
25     Q. Okay. Well --

Page 80

1     A. I knew that was an option. I knew that Sarah Reed
2 was an option for us. I wanted -- when I called downtown, I
3 wanted to know how we could help these kids.
4     Q. And when you called downtown, you talked to --
5     A. I would have talked to Frank Scozzie and Charlise
6 Moore and Jim Piekanski. I, in fact, did talk to those
7 three individuals. Mr. Piekanski and Charlise Moore are
8 special ed. supervisors, and --
9     Q. How many conversations do you think you had with
10 them over those several days?
11     A. Well, it was over two days, and I know I probably
12 talked to Frank Scozzie a half a dozen times. And I talked
13 to -- I know I talked to Mr. Piekanski and Mrs. Moore in
14 person. And I'm sure I talked to them on the phone. I
15 would have had to talk to them a couple times.
16     Anytime that you have a special education student,
17 you talk many times to them, because nothing can be done
18 without their consent. And those -- Mr. Olds, we don't
19 make -- I don't make arrangements with Sarah Reed. That's
20 not my -- when you talk about the responsibilities of a
21 principal, that is not one of them.
22     Q. Okay.
23     A. That is not in my juris., you know. That is done
24 in concert with someone downtown and with a parental
25 consent.

Page 81

1     The IEP, as you know, being an attorney, the IEP
2 is everything.
3     Q. Right.
4     A. The NORA, Notification of Recommended Assignment,
5 is everything. It is everything.
6     Q. So.
7     (Woods Deposition Exhibits 3 and 4
8     marked for identification.)
9     Q. So 739 -- the exhibit would be 4.
10     A. Okay.
11     Q. Now I'm looking at the Bates stamp --
12     MR. MARNEN: Exhibit 3 starts with 739. Exhibit 4
13 with 441.
14     Q. Now, did you have anything -- well, let me just --
15 let me start this by saying, this is a -- the first page of
16 Exhibit 3 is an IEP revision review. Is that right?
17     A. Right. Of K▓▓▓?
18     Q. Right.
19     A. Yeah.
20     Q. Bates-stamped 739.
21     A. 17th? Yeah. January 17th?
22     Q. Yes.
23     A. Um-hum.
24     Q. And if you go to the document that's Bates-stamped
25 744 in there.



Page 118

1  Re█████were given -- their IEP was changed to reflect the
2  placement at home?
3      A. Yeah, traditionally -- and, again, you know what,
4  Mr. Olds, you might want to ask Mr. Scozzie about the
5  details of this. Because when a -- occasionally --
6  occasionally, mostly, I don't know. A student -- it can be
7  placed before their placement takes place in Sarah Reed,
8  when all the paperwork gets there, there's a period of time
9  so that the paperwork gets to the next placement. There is
10  a temporary in-home IEP so that the student still receives
11  homework, some kind of instruction. It's very temporary
12  until the paperwork gets to like Sarah Reed or to another --
13  to wherever the placement is. The in-home IEP is an interim
14  placement before the next placement.
15      Q. Okay. And --
16      A. I'm not sure how long it was in-home. I said it
17  was five days, and --
18      Q. Have you ever seen that in any other case?
19      A. In-home IEP?
20      Q. Yes.
21      A. Oh, sure. In-home IEP, um-hum. Is this yours
22  (indicating)?
23      Q. Yes.
24      A. Yeah, in-home IEP is used -- again, take the kid
25  with the broken leg. Before -- if there's a kid that has

Page 119

1  some kind of physical something, and maybe their placement
2  is going to be -- let's say the Lake Erie Rehab or
3  something, there may be an in-home IEP or something -- there
4  could easily -- there's -- it covers the time period so that
5  there's no break in the education plan.
6      Mr. Scozzie could probably talk to you about that;
7  about the details of how long -- I don't think it ever
8  exceeds five days. And a lot of times it could be written
9  for five, and it ends up two or something. It depends on
10  how long the paper trail gets here. It's always temporary.
11      (Discussion held off the record.)
12      Q. Now, again, referring to the document that was
13  marked as Exhibit 1 in Miss Moore's deposition, which is --
14  I'm just going to show it to you.
15      A. Okay.
16      Q. Did you participate in the preparation of that --
17  that IEP revision?
18      A. Top page? On the top page?
19      Q. Yes.
20      A. You know, I think that was a teacher inservice
21  day.
22      Q. 1/18/02?
23      A. Yeah, I think so. But I would have to see a
24  school calendar. But I think that might have been a teacher
25  inservice day. Mrs. Cap did -- Miss Cap did the -- if her

Page 120

1  signature is here, she was at the meeting. And I think that
2  was an inservice day. Yeah, the 18th.
3      Q. So you didn't prepare that?
4      A. No. No. This was prepared -- who did this? I
5  don't know whose signature that is, where it says "classroom
6  teacher". I can't help you with that. Mrs. Gray would have
7  been Re█████ teacher of record at Strong Vincent. I can't
8  even tell what the letters are. You might want to ask
9  Mr. Scozzie that. Maybe it's Charlise Moore.
10      It might have been a classroom teacher. It could
11  be -- I'm guessing here. It could be a classroom -- it
12  could be someone from Sarah Reed Children's Center. Are you
13  talking about the second signature down, Mr. Olds?
14      Q. Right. Yeah.
15      A. Are you talking about right there (indicating)?
16      Q. Yeah.
17      A. You know what, I'm guessing here, but I think
18  that's probably someone from Sarah Reed.
19      Q. Okay.
20      A. Because they would have to be involved, because
21  that's a -- I think.
22      Q. You're saying that Sarah Reed would have to
23  prepare the IEP?
24      A. No, I'm saying it could be a signature from
25  someone from Sarah Reed.

Page 121

1      Q. Okay. So you don't recognize that signature.
2      A. You've got to -- you've got ask somebody else that
3  question.
4      MR. MARNEN: For whatever it's worth, that's
5  before the Sarah Reed intake.
6      THE WITNESS: Right.
7      MR. MARNEN: I doubt that it's Sarah Reed.
8      (Discussion held off the record.)
9      Q. So, now, just because K█████ was in Millcreek,
10  that doesn't mean that her placement has to change, does it?
11      A. No. They -- that decision is made by -- between
12  the parent and Millcreek Hospital. They make educational
13  recommendations at a discharge. They formulate what they
14  feel is in the best interest of that student.
15      MR. OLDS: Let me see if I have that.
16      (Discussion held off the record.)
17      (Recess held from 2:36 p.m. till 2:44 p.m.)
18      Q. Were you in Strong Vincent the next year -- that
19  would be September 2002. Were you still the principal then?
20      A. Yes.
21      Q. Okay. And tell me what your involvement was in
22  the decision that Re█████ and K█████ would be returned to
23  Strong Vincent.
24      A. That wouldn't be my decision. If they were in --
25  where was their placement in May? That placement --

31 (Pages 118 to 121)



3a9d95d8-06da-4388-a818-43709425cad2