IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


RICHARD P., by and for R.P.,
and DENISE L., by and for K.L.,
          Plaintiffs


          v.                    CIVIL ACTION NO. 03-390 ERIE


SCHOOL DISTRICT OF THE CITY OF
ERIE, PENNSYLVANIA, et al.,
          Defendants


HEARING ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Tuesday, November 1, 2005.



APPEARANCES:
          EDWARD A. OLDS, Esquire, and CAROLYN SPICER
          RUSS, Esquire, appearing on behalf of the
          Plaintiffs.

          JAMES T. MARNEN, Esquire, appearing on behalf of

the Defendants.

Ronald J. Bench, RMR - Official Court Reporter

2

1           P R O C E E D I N G S

2

3           (Whereupon, the proceedings began at 9:50 a.m., on

4   Tuesday, November 1, 2005, in Courtroom C.)

5

6           THE COURT:  Why don't we take up the issue of the

7   motion first before we move to the settlement aspect.

8   All right, Mr. Marnen.

9           MR. MARNEN:  May it please the court, Mr. Olds, Ms.

10  Russ.  Your Honor, I have, as the court knows, filed a motion

11  for partial summary judgment.  The motion falls under three

12  separate areas, general areas.  One is we'd like the court to

13  adjudicate summarily certain aspects of the Title IX claim that

14  has been asserted against the Erie School District.

15        THE COURT:  It's almost in the nature, although it's

16  a 56(d), it's almost in the nature of -- let me check my notes

17  here.  It's almost in the nature of a motion in limine, isn't

18  it, with respect to damages?

19        MR. MARNEN:  Well --

20        THE COURT:  In other words, you are asking for a

21  judicial declaration that the defendant cannot be liable for

22   pre-assaultive conduct?

23        MR. MARNEN:  Yes, sir.  And for the assault itself.

24        THE COURT:  And the assault itself.

25        MR. MARNEN:  The Title IX claim, that would be the


                              3


1   school district alone.  The Pennsylvania constitutional claims,

2   I would also submit that neither individual defendant could be

3   responsible regardless of the theory adopted.  There's an issue

4   here as to whether there's an affirmative duty on the part of

5   state actors to protect private persons from the actions of

6   other private persons.  And I would submit there is no such

7   duty.

8          THE COURT:  Let's go backwards.  Rather than start

9    with Title IX, let's start with the equal protection claim.

10   Do I take it that your position on equal protection is that --

11   first of all, that the analysis of the state ERA claim

12   necessarily partakes of the same analysis as the federal

13   constitutional claim?

14          MR. MARNEN:  Yes, sir.

15          THE COURT:  And that first and foremost, there's no

16   evidence of purposeful discrimination in that there's no

17   evidence that another class was treated more favorably?

18          MR. MARNEN:  Yes.  Of course to get to that point,

19   your Honor, you have to get by the issue whether there's an

20   affirmative duty to protect.  There is an affirmative duty

21   under Title IX, I don't think there is under the Equal

22   Protection Clause or the -- well, the federal Equal Protection

23   Clause and it follows because of the interrelationship analysis

24   between state and federal, that there is no duty to protect

25   under the equal protection or Equal Rights Amendment.


                                4


1          THE COURT:  You're talking about the DeShaney
                        _____

2    substantive due process principle applied to the equal

3    protection analysis?

4         MR. MARNEN:  Yes.  There are no cases in this

5    circuit on that issue that I located.  I located a district

6    court case out of Pennsylvania, but not out of the Third

7    Circuit.  But I think the logic pertains to equal protection,

8    also.  And that, therefore, we have -- to establish an Equal

9    Protection Clause claim or an Equal Rights Amendment claim,

10   it's necessary to establish an equal treatment.  And there's no

11   evidence of that.  That's, in essence, my position.

12        THE COURT:  Let's go back to the Title IX claim

13   insofar as it relates to pre-assault and assault.  Is it your

14   position, then, that, at least for purposes of this motion,

15   that you would concede that there are material issues of fact

16   insofar as Title IX is concerned, as to the manner in which

17   supervisory personnel responded or did not respond to the

18   alleged harassing that went on post assault?

19        MR. MARNEN:  Yes.  Yes, I think we have to have a

20   trial on that.  I'm only addressing the harassment before the

21   sexual assault and the sexual assault itself.

22        THE COURT:  I guess I'm going to ask you to try to

23   prove a negative, but why aren't there material issues of fact

24   on the first point as well?

25          MR. MARNEN:  Because if you consider the plaintiffs'


                                5


1   testimony alone, for various reasons, the Title IX tests are

2   not met.  We have, of course, two plaintiffs, one as referred

3   to in the paperwork as K.L., may I refer to her name in this

4   proceeding or should I keep it as K.L.?

5          THE COURT:  It's on the record and she's a minor

6   still.

7          MR. MARNEN:  I'll refer to her as K.L.  The other

8   one is R.P.  With respect to K.L., she has complained about the

9   conduct of three separate minors at Strong Vincent during that

10   class year of 2001-2002.  One was B.C., one was C.B., and the

11   other was A.F.  The testimony of K.L. herself indicates that

12   B.C. called her, occasionally called her names in the hallway.

13   And that's the extent of the harassing conduct.  Granted the

14   names called were filthy and vulgar and were sexual in nature.

15   Namely, bitch, whore and slut, but I would respectfully submit

16   that we don't have here conduct that is so severe, pervasive or

17  objectively offensive that it deprived her of access to the

18  educational opportunities or benefits.

19          With respect to C.B., we have allegations that in a

20  science class taught by Vicky Skelly, a teacher, that C.B.

21  poked her with a pencil and tapped her on the back.  That

22  happened as she said "most days."  I would submit that's not

23  even sexual, so it couldn't be sexual harassment.

24          Lastly, she said A.F. followed her and made comments

25  like "you're going to get something," which frightened her.  It


6


1  wasn't sexual.  None of this is severe, pervasive and

2  objectively offensive.

3          With respect to R.P., on two occasions before the

4  assault, B.C. asked her, challenged her to a fight.  That's not

5  sexual misconduct, it's not objectively offensive or pervasive

6  or severe.  Moreover, there's no evidence that the Strong

7  Vincent or Erie School District employees knew about what was

8  going on there.

9          So for various reasons the harassment of which these

10  kids complained before the sexual assault does not meet the

11  various, the three-part test required by Title IX.  Since it

12  does not, then the assaults themselves cannot be the

13  responsibility either under Title IX of the Erie School

14  District.  Because you have to be deliberately indifferent to

15  sexual harassment of which you're actually aware, causing

16  additional harassment.  So the theory would be with respect to

17  the assault of these kids were enabled by the indifference of

18  the officials at Strong Vincent.  Since the pre-assault

19  harassment was not Title IX harassment, I'll call it, then

20  there cannot be responsibility for the sexual assault, either.

21  Or the sexual assaults which occurred in November, December,

22  depending on who you believe.

23      THE COURT:  Does the hostile environment, does the

24  Title VII hostile environment analysis as to pervasiveness,

25  severity, objective unreasonableness, inform my decision on the

7

1  Title IX side as well?

2      MR. MARNEN:  I think it does.  You're going to have

3  different kinds of conduct with kids, as opposed to adults.

4  But it's the same verbal test that has to be so severe,

5   persuasive or objectively offensive to deprive the victim of

6   access to, in the case of Title IX, educational opportunities

7   or benefits.

8           THE COURT:  Let me jump ahead, I know there's a

9   motion to amend, which isn't completely briefed up yet insofar

10  as the IDEA claim is concerned, but it does come up in the

11  papers.  So just by way of preliminary review --

12          MR. MARNEN:  Right now, your Honor, I think that's a

13  Title IX claim.

14          THE COURT:  Is that the way it's coming on, a Title

15  IX claim?

16          MR. MARNEN:  The amendment, motion to amend the

17  complaint, characterizes the claim as a Section 504 claim.

18          THE COURT:  Let me make sure, so we're not ships

19  passing in the night, because I don't have the motion in front

20  of me but, Mr. Olds, on this IDEA issue, what is the nature of

21  the proposed amendment, just so I --

22          MR. OLDS:  It was to have been a motion to assert a

23  1983 claim, that there had been a violation of the IDEA and the

24  Rehabilitation Act.

25          THE COURT:  So it's your typical 1983 claim riding

1   on the coattails of IDEA.

2        MR. MARNEN:  But right now we haven't addressed

3   that.  I think Mr. Olds is characterizing the claim as it

4   stands right now as a Title IX claim.

5        MR. OLDS:  Without the amendment, as the case stands

6   right now without the motion, if you disregard the motion.

7        THE COURT:  Let's do this now, now that I oriented

8   myself to space and time.  You addressed the Title IX claim in

9   your papers, didn't you, insofar as it relates to this issue?

10       MR. MARNEN:  I did.  But I also addressed -- when I

11  originally filed my motion, I did not anticipate that it would

12  be characterized as a Title IX claim.  Even though there is no

13  expressed mention of IDEA or a Section 504 in the complaint, I

14  nonetheless took it upon myself to move to dismiss those kinds

15  of claims based on exhaustion.

16       THE COURT:  Why don't you do this.  Hold your powder

17  on that, then when he gets up, he can flush that out a little

18  more and you'll have the opportunity to address it.  All right,

19  let's hear from Mr. Olds.

20       MR. OLDS:  Your Honor, I think on the assault

21  itself, the first sexual assault that involved the two girls, I

22  think that there is evidence that there was in-school

23  harassment, but I'm not certain there is sufficient evidence to

24  have that assault be part of the case.  I think that the

25  case --

9

1       THE COURT:  Let's get ourselves oriented here.  The

2  first assault occurred when?

3       MR. OLDS:  Well, our clients claim that the first

4  assault occurred at the end of November, the school district

5  claimed that the assault occurred on December 19th.

6       THE COURT:  All right.  Whenever, you concede, at

7  least insofar as the first assault of these kids is concerned,

8  that there wasn't sufficient notice to the school district of a

9  threat so as to make it actionable?

10      MR. OLDS:  That's correct.

11      THE COURT:  So that's off the table.  Now, tell

12  me -- at what point then on the temporal time line do you

13  contend that the school district was on notice such that all

14  subsequent events they could theoretically be liable for?

15        MR. OLDS:  I think that the next day Linda

16   Cappabianca learned of the sexual encounter involving at least

17   Kristina, and according to testimony of Rachel, also Rachel as

18   well.  So immediately after that the school district officials

19   learned of the assault.  Thereafter, there was significant

20   harassment in the school involving both of the girls.  Kristina

21   burned herself and ended up in the mental hospital.

22        THE COURT:  All right.  What's germane to me, Mr.

23   Olds -- hang on a second, what's germane to me, I think maybe

24   this will move our discussion along, if you could, summarize

25   for me from what is now a rather voluminous record, the

10

1   evidence, direct or circumstantial, which suggests that Ms.

2   Woods and/or Cappabianca were on actual notice of this ongoing

3   problem and in a deliberately indifferent fashion did nothing

4   about it; tick it off for me?

5        MR. OLDS:  Okay.  Well, first of all, they both

6   admit that Kristina told them that there was a sexual assault.

7   There's evidence that they knew it involved oral sex.  Kristina

8   and Rachel are 12-years-old.  Kristina and Rachel both

9   testified that they had ongoing attempts to, you know, go to

10  Cappabianca, primarily Cappabianca, and inform her of what was

11  going on with them and what happened.  There were several

12  incidents in the school that when they occurred, Cappabianca

13  was aware of, for instance, the incident where Rachel was

14  shoved down the steps and there was an attempt at a sexual

15  assault on that occasion.  And Kristina made a number of

16  reports to them as well.  They admitted in their testimony to

17  when they talked to Richard P. they had known about the

18  situation for a while.  Cappabianca made that admission.  On

19  January 7th, Kristina's mother, this was after Kristina was in

20  the hospital, Kristina's mother, K.L.'s mother, went to

21  Cappabianca and told her that she had heard from her daughter

22  that she had been sexually assaulted and that's why she was in

23  the hospital.  Even though that happened, Cappabianca didn't do

24  anything until the Wednesday of that week.  Wednesday of that

25  week when R.P. had this outburst in school, and they started

11

1   investigating it.

2        THE COURT:  Didn't one of the parents, the father go

3    to Ms. Cappabianca allegedly, per the record --

4         MR. OLDS:  Yes.  As a matter of fact, well, there

5    had been a conversation between Cappabianca and R.P.'s father

6    concerning that Cappabianca telling him that his daughter had a

7    dirty mouth, that she needed to be disciplined.  That happened

8    earlier in the record.  We're not, because of the uncertainty

9    of time, we're not exactly certain when that happened.  That's

10   an actual event that actually occurred.  And then you have a

11   situation where Cappabianca had a meeting with the other parent

12   of the friend of R.P.'s and said R.P. is, you know, having oral

13   sex in the gym, you ought to keep your daughter away from her.

14   So there's ample evidence that there was actual knowledge and I

15   think that --

16        THE COURT:  How many times did these children go --

17   what does the record reflect on this point.  How many times did

18   one or both of these kids go to Cappabianca individually in an

19   attempt to tell her about this ongoing situation?

20        MR. OLDS:  Well, I think that the evidence is that

21   Rachel went on more than one occasion, I would say several.

22        THE COURT:  What does she say, meaning Rachel, in

23   her deposition as to what she told her?

24          MR. OLDS:  She would say that when she attempted to

25   talk about it, Ms. Cappabianca would make noise, shush her, say


                              12


1   don't talk about it, I know it happened, I don't want to hear

2   about it.  And wouldn't let her express what had happened to

3   her.  K.L., Kristina, told the whole incident to Cappabianca

4   before Christmas.  There's no dispute about that.  Both

5   Kristina says that Cappabianca -- well, Cappabianca admits that

6   Kristina admitted to a sexual encounter before Christmas.

7   Cappabianca equivocated when she said I don't, you know, I

8   don't know if it was oral sex, she equivocated about that.

9   C.B., the assailant, said that Cappabianca came up to him and

10   says what did I hear about oral sex.  And that all happened

11   before Christmas.  It all happened in fact the day after the

12   assault, if you take the assault on the date the school

13   district says --

14          THE COURT:  Thereafter, after the assault, then

15   there began, according to the plaintiffs, this period of

16   harassment as a result of the assaults?

17          MR. OLDS:  That's correct.  And then plaintiffs say

18  that Kristina said she talked to Ms. Cappabianca on more than

19  one occasion.  Rachel says that she talked to Cappabianca on

20  more than one occasion.  And then Kristina put herself in a

21  mental institution by inflicting harm on herself.  Rachel

22  suffered additional harassment, including a second sexual

23  assault at the laundromat.  That would be on the same day that

24  Kristina's mother came in --

25          THE COURT:  This is by the same children that were


13


1  involved in the original assault?

2          MR. OLDS:  Yes.  And so then --

3          THE COURT:  When were the police first notified, I

4  mean, in December the record reflects someone, Ms. Cappabianca,

5  was advised of the sexual assault, is that correct?

6          MR. OLDS:  That's correct.

7          THE COURT:  And the parent or parents were there as

8  well?

9          MR. OLDS:  No, the parent came in at the beginning

10  of January, that would be January 7th.

11          THE COURT:  Did the child tell Ms. Cappabianca as to

12    the identity of the perpetrators?

13         MR. OLDS:  Yes, because Cappabianca went and talked

14    to the perpetrators.

15         THE COURT:  When were the police involved, when did

16    they become involved?

17         MR. OLDS:  January 10th.  If you accept the school

18    district dates, it would be three weeks after Cappabianca

19    learned about the sexual assault.

20         THE COURT:  How were they involved and what was the

21    impetus for their involvement?

22         MR. OLDS:  Well, the school district, after meeting

23    with -- the students, now see, the record is a little unclear

24    because there is no documentary evidence of what the school

25    district did.  In their testimony they said we had two days of


                              14


1    investigations where we met with all the students to get to the

2    bottom of the story.  What they didn't do, they didn't meet

3    with Rachel's father until -- if I could go by the days of the

4    week.  On Monday, the 7th, K.L.'s mother came in and said my

5    daughter is in the hospital, she was sexually assaulted, and I

6  think Cappabianca told her we know about it, we're on it.

7  That day there was a second in-school assault on R.P.

8  And at the laundromat that night R.P. was assaulted by the same

9  student.  There was an additional incident on Tuesday, and then

10  on Wednesday of that week, R.P. exploded.  At some point on

11  Thursday, I think it's Thursday, on Thursday the school

12  district finally told R.P.'s father that, well, we're

13  investigating this incident and we're going to call in the

14  police.  And the police came in the next morning.  The police

15  conducted their investigation.  They didn't make any arrests

16  initially.  And in fact what happened was that R.P. and K.L.

17  were, as of that Friday, that would be January 11th, were out

18  of the school entirety.  Their assailants, including the two

19  male assailants, nothing was done to discipline them.  And they

20  remained in school.  About two weeks later, B.C., the girl who

21  sort of was behind it, was arrested by the police and taken out

22  because she was intimidating other kids.  C.B., the one male

23  assailant, was removed by his parents and put into a private

24  school.  And then the other assailant, I guess the juvenile

25  court process went on, he was taken out of the school.

15

1      THE COURT:  All right, that tells me what I need to

2   know.  Let's get back to the legal parts so I can wrap this up

3   and maybe get an order on the record.  So to move off of Title

4   IX and move to your other claim, you concede that anything,

5   that anything prior to the first assault is not actionable?

6      MR. OLDS:  I don't believe that we have evidence --

7      THE COURT:  So your position would be anything that

8   occurred, including any subsequent assaults that occurred after

9   the first assault, that's what your claim is based on?

10      MR. OLDS:  That's what the claim is based on.

11      THE COURT:  Let me jump to your last claim.  I

12   understand that claim perfectly well, but I don't understand

13   your Title IX claim insofar as it relates to IDEA at all -- the

14   problem is probably mine, but I've never seen a claim cast that

15   way?

16      MR. OLDS:  Well, I think, it's not like, let's just

17   forget about the IDEA for a second.  The Title IX claim is that

18   after the school district finally dealt with this issue, it put

19   the two girls in an alternative educational setting, Sarah Reed

20   school.  Which was the setting that they basically, they put

21   behaviorally disturbed kids into that setting.  We considered

22  that a Title IX violation because the school district took out

23  the two victims, left the assailants in school, took out the

24  two female victims and placed them in an alternative setting,

25  excluded them from a regular classroom.  Incidentally, both of

16

1  these girls had IEPs.  They were both learning support

2  students, not behavioral support students, but learning support

3  students.

4       THE COURT:  Forgive me for interrupting you, but

5  it's helpful.  The amended complaint which you propose to file,

6  is a classic 1983 claim?

7       MR. OLDS:  Right.  Well, let me see if I can tell

8  you how we get to that point.  We saw the case as a Title IX

9  case when they excluded the girls and they put them in this

10  alternative educational setting, in essence, punishing them for

11  being the victims.

12       THE COURT:  But there's no discrimination on the

13  basis of --

14       MR. OLDS:  If you look at the sexual activity, the

15  males get to stay in the school district --

16          THE COURT:  Why don't you get everything that you

17   think you should get under a straight Title IX analysis -- you

18   know, people always think they get something when they throw

19   kitchen sinks into a lawsuit, but sometimes it just muddies the

20   waters.

21          MR. OLDS:  What the story is is that Mr. Marnen

22   raised the issue in his summary judgment motion, saying that,

23   well, you can't have your Title IX remedies because there's

24   another statute here that said you had to exhaust.  I mean, if

25   you challenge this placement in this alternative education

17

1   setting, well, you had a chance to exhaust.  That's what

2   prompted us to believe that --

3          THE COURT:  Let me ask you this.  Would it be fair

4   to say insofar as any claim is based upon a violation of IDEA,

5   you are willing to put all your eggs in the 1983 basket, such

6   as it's pled in your amended complaint?

7          MR. OLDS:  Just let me -- I think that that's

8   probably the case.  I can envision --

9          THE COURT:  Well, you don't have to envision.  I'm

10  not trying to cut you off, because we have a settlement

11  conference we have to get to after this.  Okay.

12       MR. OLDS:  The IDEA claim does add something --

13       THE COURT:  One point on the IDEA claim which

14  strikes me as a bit unusual.  In most of the IDEA claims that I

15  have handled here, they are child find cases.  Where the

16  complaint by the parents is you didn't find my child and didn't

17  place him in a program.  This is a complaint that you found my

18  child and placed her in a program.  It's the world turned on it

19  head, isn't it?

20       MR. OLDS:  What it is -- it's almost a coincidence

21  that they had IEPs.

22       THE COURT:  Most people are complaining they didn't

23  get an IEP and didn't get placed.  Your kids got an IEP and got

24  placed, right?

25       MR. OLDS:  That's correct.  Except they were placed


18


1  and the evidence suggests that they were placed because we

2  can't keep you safe in the school district, rather than for an

3  educational reason.

4        THE COURT:  Did the IEP adjudicate them with

5    children with disabilities within the meaning of IDEA, were

6    they adjudicated that way?

7        MR. OLDS:  See they already had IEPs before -- what

8    had happened was in order to change the placement from the

9    regular school setting to this alternative education setting,

10    this highly restrictive setting, the school district changed

11    the IEPs.  And, you know, I think yes, the case is a Title IX

12    case.  And as part, the motion to amend was defensive as

13    opposed to offensive.

14        THE COURT:  All right, but I'm still going to have

15    to address the motion to amend later.  The last point, equal

16    protection.  Once again, you're entitled to plead it, but you

17    get all your remedy under Title IX.  How do you have an equal

18    protection claim here?

19        MR. OLDS:  The equal protection claim, I agree with

20    you, I'll concede I think Mr. Marnen was right on the DeShaney

_____

21    issue, that that probably should apply here.  There was an

22    equal protection violation in the sense that they, Cappabianca

23    and Woods, removed these two girls from this school.  The

24    denial of equal protection is that they, the victims, were

25  placed in an alternative --


                              19


1        THE COURT:  But there's either an actionable equal

2   protection claim or not, if you concede the liability of

3   DeShaney, then there's not an equal protection claim?
    _____

4        MR. OLDS:  Except for the fact that they put the

5   kids in an alternative education setting.  They said we're not

6   going to let you stay in regular schools, we're going to put

7   you in the alternative education setting.  We're going to treat

8   you differently because you're a victim.

9        THE COURT:  All right.  I got your point, thank you.

10  Anything else you want to say briefly before I rule on this?

11        MR. MARNEN:  Very briefly, your Honor.  I don't know

12  where we are on the placement issue right now, but the Sarah

13  Reed placement issue under Title IX --

14        THE COURT:  I think Title IX, that has been

15  conceded.  And that issue is going to come on by way of, that

16  aspect of the Title IX claim insofar as it relates to IDEA will

17  be taken up under a 1983 rubric.

18          MR. MARNEN:  I can say nothing on that then.  I'd

19    just like to make clear, your Honor, the relief we're asking

20    for here is the dismissal of Janet Woods, one of the

21    individuals from this case.  The only way she's in here is

22    under Count Two of the Equal Rights Amendment.

23          THE COURT:  Isn't Cappabianca in there under that as

24    well?

25          MR. MARNEN:  Yes, she is.


20


1          THE COURT:  They would both go under that count if

2    you're right?

3          MR. MARNEN:  Yes, your Honor, both of them would.

4    Cappabianca should stay in under the defamation claim.  We

5    haven't talked about that, but there's a defamation claim here.

6    Cappabianca has to stay in for that.  On the rest of it, and

7    both of them get out on Count Two, equal protection, Equal

8    Rights Amendment.  That leaves the Title IX claim against the

9    district only for post assault events.

10          THE COURT:  All right, this is order.

11                    ORDER

12          Presenting pending before the court is a motion for

13   partial summary judgment filed by the defendants in the case.

14   First, the defendant contends that the record does not raise a

15   triable issue of fact as to the liability of the school

16   district under Title IX for the sexual assaults and any

17   harassment that preceded those assaults.  By way of further

18   clarification, at oral argument plaintiff concedes -- if I have

19   this incorrectly, you correct me, Mr. Olds -- plaintiff

20   concedes that they are seeking damages under Title IX only for

21   harassment for assaults that occurred after the initial

22   assault, is that correct?

23          MR. OLDS:  That's correct, your Honor.

24          THE COURT:  In order to state a cause of action

25   under Title IX, it is necessary and, by the way, Title IX


                              21


1   involves sexual harassment of one student by another, it is

2   necessary that evidence establish that supervisory personnel

3   were deliberately indifferent to sexual harassment of which

4   they had actual knowledge; that the harassment was so severe,

5   pervasive and objectively offensive that it deprived the victim

6   of access to the educational opportunities or benefits provided

7   by the school; and three, the record must reflect deliberate

8   indifference which caused the victim to undergo harassment or

9   made her more vulnerable to harassment.  That would be Davis_v.
                              _____ __

10  Monroe_County_Board_of_Education, 526 U.S. 629, (1999).
    _____ _____ _____ __ _____

11        Having carefully reviewed the record on this point,

12  I find that there are material issues of fact which preclude

13  and would render inappropriate the defendants' motion for

14  summary judgment on this aspect of the Title IX claim.

15  Consequently, the defendants' motion under Rule 56(d) is

16  denied.

17        The defendants also move for summary judgment on the

18  Equal Protection Clause under the Fourteenth Amendment of the

19  United States Constitution, as well as the Equal Rights

20  Amendment of the Pennsylvania Constitution.  While the

21  defendant concedes that the Pennsylvania ERA would support a

22  private cause of action in the abstract, see page three of its

23  reply brief and, parenthetically, it appears that the Third

24  Circuit as in dictum so indicated as well, Pfeiffer_v._Marion
                              _____ __ _____

25  Center_Area_School_District, 917 F.2d 779, (3rd Cir. 1990),
    _____ ____ _____ _____

22

1   they contend the equal protection claim fails here as there is

2   no evidence of purposeful discrimination as that term has been

3   interpreted in the context of an equal protection claim.  The

4   federal equal protection claim and the state equal protection

5   claims are analyzed in the same fashion.  See Williams_v.
                                              _____ __

6   School_District_of_Bethlehem, 998 F.2d 168,179 (3rd Cir. 1993).
    _____ _____ __ _____

7   The defendant argues that purposeful discrimination within the

8   meaning of the Equal Protection Clause has not been made out as

9   there is no evidence on this record of disparate treatment,

10  i.e., male students having been subjected to harassment who

11  were treated more favorably than the plaintiffs.  As stated in

12  Brown_v._Borough_of_Mahaffey,_Pennsylvania, 35 F.3d 846 (3rd
    _____ __ _____ __ _____ _____

13  Cir. 1994):

14          "A government action is subject to 'strict scrutiny'

15  under the Equal Protection Clause of the Fourteenth Amendment

16  if it discriminates against a 'suspect class' or if it

17  interferes with a 'fundamental right'."  Citing cases.  "The

18  plaintiffs argue that the violation of their fundamental right

19  to free exercise of religion constitutes an equal protection

20  violation.  However, in order to maintain an equal protection

21  claim with any significance independent of the free exercise

22  count which has already been raised, the plaintiffs must also

23  allege and prove that they received different treatment from

24  other similarly situated individuals or groups."  Citing cases.

25  And similarly, in Soper_v._Hoben, 195 F.3d 845, (6th Cir,
        _____ __ _____


23


1  1999), the court observed:

2       "In order to establish an equal protection

3  violation, the Sopers must show that Renee's complaints were

4  treated differently by the defendant than were complaints by

5  Renee's male counterparts."  Citing cases.

6       Having carefully reviewed the record, I find no

7  evidence of disparate treatment within the meaning of those

8  previously-described cases.  I find for that reason the equal

9  protection claim in all of its contours fails.

10      Finally and alternatively, the defendant argues that

11  the equal protection claim runs afoul of DeShaney.  I'm

12  inclined to agree.  In Beltran_v._City_of_El_Paso, 367 F.3d

13  299, (6th Cir. 2004), the court observed:

14       "The Due Process Clause does not require a state to

15  provide its citizens with particular protective services."

16  Citing DeShaney.  "Therefore, 'a state's failure to protect an

17  individual against private violence does not violate the Due

18  Process Clause.'  At the same time, however, DeShaney noted 'a

19  state may not, of course, selectively deny its protective

20  services to certain disfavored minorities without violating the

21  Equal Protection Clause.'  This court has cautioned that the

22  Equal Protection Clause should not be used to make an end-run

23  around the DeShaney principle that there is no constitutional

24  right to state protection for acts carried out by a private

25  actor."  Citing McKee_v._City_of_Rockwell, 877 F.2d 409, 413


                              24


1  (5th Cir. 1989), (noting that DeShaney might easily be

2   circumvented if plaintiffs were allowed to convert 'every due

3   process claim into an equal protection claim, via an allegation

4   that state officers exercised their discretion to act in one

5   situation and not another'."  That's at page 304.

6          I should also note for the record that the plaintiff

7   concedes that to the extent that there is a claim, a viable

8   claim arising out of the children's placement under IDEA, that

9   would come on via 1983.  And I note for the record that a

10  motion to amend and supporting brief has been filed and we are

11  awaiting a reply brief and we'll take it up at a later point.

12         So, to summarize then, the defendants' motion is

13  granted in part and denied in part.  The present posture of the

14  case is that there remains a viable Title IX claim for the

15  student on student sexual harassment against the school

16  district.  And there remains a defamation claim against

17  defendant Cappabianca.  And the court will take up as its

18  earliest opportunity the motion to amend the complaint insofar

19  as it relates to placement.

20         MR. MARNEN:  Point of clarification?

21         THE COURT:  Yes.

22         MR. MARNEN:  I'm a little unclear on this.  If the

23  court dismissed the Title IX claim with respect to the

24  assault --

25        THE COURT:  Yes, if I didn't, I implicitly did.  I


                              25


1  am right now on the basis of the concession that was made at

2  oral argument.

3        THE COURT:  All right.

4        MR. OLDS:  Your Honor, if I might, just to avoid

5  making confusion later on and I understand you made your

6  decision.  I would just like to point out that we do see the

7  transfer of the girls from a regular school system to an

8  alternative education placement, I mean, I think that would be

9  a classic Title IX case.  That if you're a victim of sexual

10  assault, we're going to move you, the female victim, we're

11  going to let the male perpetrators stay in school.  I

12  understand we also have this IDEA claim, but I think, I don't

13  know if you mean to say that --

14        THE COURT:  I mean to say that to the extent you are

15  claiming a distinct, you are basing a distinct damage claim for

16  what is an IDEA violation, that your remedy for that is via

17  1983.

18          MR. OLDS:  Do you also mean to say that a transfer

19   of victims of sexual assault to an alternative education

20   setting could not be discriminatory --

21          THE COURT:  I'm saying that if it's actionable, it's

22   actionable under 1983, okay.  Now, we're off the record here.

23          (Whereupon, at 10:32 a.m., the proceedings were

24   concluded in Courtroom C.)

25                  - - -


                              26


1          C E R T I F I C A T E

2

3

4     I, Ronald J. Bench, certify that the foregoing is a

5   correct transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10   _____

11   Ronald J. Bench

12

13

14

15

16

17

18

19

20

21

22

23

24

25