# Middle and High School
# DISCIPLINE POLICY

## 2001 - 2002



*Creating a climate of care and respect*

*as we*

*Redesign for Success*

Dr. James E. Barker, *Superintendent of Schools*

**THE SCHOOL DISTRICT OF THE CITY OF ERIE, PENNSYLVANIA**
**148 WEST 21ST STREET**
**ERIE, PENNSYLVANIA  16502**



E 000000094

**D.**    **Out of School Suspension (O.S.S.)** - student is suspended from school for a period of three (3) to ten (10) days pending placement in the Alternative Education Program or other recommendations as per the administrator, and is in the custody of the parent/guardian from 8:10 AM to 3:00 PM. The appropriate Guidance Counselor will arrange for classroom assignments and parents may pick up assignments at the school office. Teachers must be given one day to prepare assignments. Students are not permitted on school grounds during the suspension and are excluded from participation in all school-sponsored activities including, but not limited to, sports events, band activities, academic challenges, and cooperative work experience. A conference will be held with the parent, student, and appropriate staff.

**E.**    **Alternative Education Program** - the Alternative Education Program serves as an intervention, the focus being on the development of pro-social behaviors. The program staff works with students in grades six through twelve whom have been removed from the regular school schedule because of serious disruptive behavior. Serious disruptive behavior is defined as assaultive behavior, behavior in violation of the weapon policy, or behavior in violation of the terroristic threats/terroristic acts policy. Other serious patterns of disruptive behaviors are determined by the Assistant Superintendent of Schools. While participating in the Alternative Education Program, needs are addressed through a behavioral assessment, behavior management techniques, individual counseling, and group therapeutic and psychoeducational exercises as prescribed in the Individual Behavioral Plan. The students' academic needs are served through multiple strategies based on a complete instructional evaluation and defined academic needs. The focus of the educational program is to provide the skills and knowledge necessary to be successful in the school setting and to concurrently provide life skills instruction and career guidance. The length of stay in the program will be based on the progress toward achieving the educational and behavioral goals outlined in the individual plan. **Students who violate their AEP contract will be recommended to the School Board for expulsion.**

**1.**    **Reasons for Referral**

  **a.**    Students may be referred to the Alternative Education Program for the following reasons:

   **(1)**    Students will be removed from their regular school because of serious disruptive behavior. Serious disruptive behavior is defined as assaultive behavior, behavior in violation of the weapon policy (not to supplant the expulsion policy), or behavior in violation of the terroristic threats/terroristic acts policy.

   **(2)**    Chronic patterns of disruptive behavior, where school interventions have failed, may result in petitioning the



E 000000110

Assistant Superintendent for placement in Alternative Education.

(3)     Violations of the District drug and alcohol policy that specify placement in Alternative Education.

(4)     Students returning from placement by the Juvenile Court for delinquent behaviors. Each case should be reviewed to determine appropriateness of placement.

F.     **Expulsion** - Expulsion is the consequence of a violent act including carrying or concealing a weapon on any school property, at any school-sponsored activity, or on any public conveyance providing transportation to a school or school-sponsored activity. The act is investigated by the School Board. A formal hearing will be conducted by members of the School Board to decide on a student's status. **Students who are expelled may not attend or participate in any school activities/events including Graduation and Proms.**

(1)     Students who have been expelled may petition the Superintendent (after one year) for return to the District through the Alternative Education Program.

G.     **Peer Mediation/Conflict Resolution** - This program is designed to create an awareness with students as to how to resolve differences by talking about them and by finding ways to control their anger. This process is used as a method of solving problems which arise among students before these problems reach a point where violence is likely.

H.     **Student Assistance Program (SAP)** - The Student Assistant Program process of working in concert with mental health and drug and alcohol providers maximizes the possibility that a student's problems are properly identified and that the student receives the appropriate services needed to improve his/her prognosis for educational success. The problems that at-risk students face are not always limited to school problems. Students may require services or support outside the realm of the school environment. SAP has proven to reduce student at-risk problems both in and out of the school environment.

I.     **Charges Filed with the Police Department** -any behavior which is in violation of civil or criminal law will be dealt with as the law permits.

J.     **School-Based Juvenile Probation Program** - school-based probation officer supervises the probation students with the focus on developing and implementing treatment and behavioral goals as designed with the student, parents, and the school. In addition, supervision includes compliance with court-ordered conditions and response to behavioral problems as reported by the school. School based probation officers are regular members of the Student Assistance Program (SAP). As a member of the SAP team, the school based probation officer works closely with other team members with regard to probation clients.

I am requesting that my daughter, K█████ L███ be transferred to the Erie School District's Alternative Education program I waive all rights to a Hearing.

1/17/02

Denise L█████

0000200441

I am requesting that my daughter
▮▮▮▮ ▮▮▮ be transferred to the
school destruct's Alternative Education
Program. I wave all rights to a hearing

Shelley ▮▮▮▮▮

1-18-02

5a



SARAH A. REED
**Children's Center**

PROGRAM HANDBOOK

## SCHOOL DAY
## SERVICES

**EXHIBIT**

6a    *Iddings #1*

## Positive Behavior Programming

Our program is designed to help students make positive choices and to learn self-control techniques so that they can develop positive behavior at home, in school, and in the community. It is our intention to respond properly and effectively to disruptive and aggressive behavior.

Our goal is to ensure the safety of all. We will intervene in ways that display the principle that we do not hurt one another. When children engage in disruptive behavior, they are encouraged to use a "down time" away from others. Staff members help students talk through problems and promote calming down and making good decisions. A manual therapeutic hold by trained staff will be used only in an emergency situation and only when a student's behavior is very likely to result in injury to themselves or others. If this should occur, you will be notified as soon as possible.

If your son/daughter begins to show a pattern of aggressive and/or disruptive behavior, we will attempt to notify you as soon as possible.

7a

## Other Program Services

### Off-Ground Activities

Regularly scheduled therapeutic recreation activities will be provided to promote positive peer interactions, teamwork, and self-control. Periodically, off-ground educational activities will be scheduled for the students.

### Transportation

Transportation is provided to students by their home school districts, the Sarah A. Reed Children Center vans or the LIFT Transportation Program. Elementary and middle school students, who attend the Erie City School District, will be transported to and from the program by Sarah A. Reed Children Center staff. Secondary students who attend the Erie City School District will be transported to Sarah Reed by an Erie City School District bus, but will be transported home by the LIFT. All students attending a Millcreek or County school will be transported to and from the program by their home school district. Districts are responsible for establishing pick up and drop off locations and times with students and families. Individual districts' behavioral expectations and discipline policies will be in effect and enforced as necessary. No students are permitted to drive to school. Please report any changes in the transportation needs of your child as soon as possible. If you will be picking up your child early for an appointment, please call and let us know or send a note with your child. **All children will be expected to ride their normal bus or van home unless a note or phone call is received informing us differently.**

10

11

Page 1

1              IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   RICHARD P., by and for        :
    R██████ P., and DENISE L.,    :
4   by and for K████████ L.,      :
              Plaintiffs           :
5                                  :
         v.                        :   Civil Action No. 03-390
6                                  :            Erie
    SCHOOL DISTRICT OF THE CITY    :
7   OF ERIE, PENNSYLVANIA; JANET   :
    WOODS, Individually and in     :
8   her Capacity as Principal of   :
    Strong Vincent High School;    :
9   and LINDA L. CAPPABIANCA,      :
    Individually and in her        :
10  Capacity as Assistant          :
    Principal of Strong Vincent    :
11  High School,                   :
              Defendants           :
12

13

14

15

16          Deposition of MATTHEW BOGARDUS, taken before

17      and by Janis L. Ferguson, Notary Public in and

18      for the Commonwealth of Pennsylvania, on Thursday,

19      May 5, 2005, commencing at 10:23 a.m., at the

20      offices of Knox McLaughlin Gornall & Sennett, PC,

21      120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
              Reported by Janis L. Ferguson, RPR
25            Ferguson & Holdnack Reporting, Inc.

Richard P. v. School District          Matthew Bogardus          May 5, 2005

Page 14

1  provided?
2      A.  Psychiatric services, therapy services, and case
3  management services.
4      Q.  Why would a child come to Sarah Reed instead of
5  staying in their home school?
6      A.  It could be a variety of reasons.
7      Q.  Why don't you give me a couple.
8      A.  If they are experiencing emotional problems,
9  where, perhaps, they feel overwhelmed in the classroom,
10  can't really participate academically, they may look for an
11  alternate placement.  Behaviorally, if they are difficult to
12  manage, they may look for an alternate placement.  They may
13  look for assessment, if they are unsure of a difficulty,
14  such as a psychiatric assessment.
15      Q.  Are students admitted into the program to receive
16  a psychiatric assessment?
17      A.  In some cases, yes.
18      Q.  What kind of cases are those?
19      A.  If -- if they are uncertain if there is a
20  psychiatric disorder, but they may be displaying features
21  that have alerted someone, they would then look for the
22  psychiatric evaluation.
23      Q.  But would that be -- that would be a case where
24  they were exhibiting some kind of behavior in the classroom
25  that prompted somebody to have a concern that there needed

Page 15

1  to be a psychiatric evaluation?
2      A.  Yes.
3      Q.  Is it fair to say that the students admitted to
4  Sarah Reed, who are referred to Sarah Reed from other school
5  districts, are having some problems in the classroom,
6  typically?
7      A.  Typically.
8      Q.  And that problem could either be an emotional
9  problem or a behavioral problem?
10      A.  Or social problem.
11      Q.  Social.  When you use the term "social," tell me
12  what you mean.
13      A.  If a child has anxiety, they may not be able to
14  interact with their peers, with teachers, and they may feel
15  overwhelmed and shut down.
16      Q.  Is there a certain level of severity of the social
17  problem that a child has to exhibit before they are a
18  candidate for Sarah Reed?
19      A.  No.
20      Q.  So, for instance, if a child isn't getting along
21  with a student next -- sitting next to them in class, that
22  child could be admitted into Sarah Reed?
23      A.  They could be referred.
24      Q.  Would Sarah Reed accept that child?
25      A.  It would -- we would need more information than --

Page 16

1  than that.
2      Q.  I mean, is it fair to say that there -- there's no
3  level of severity of problems that a child has to exhibit
4  before they are considered to be a candidate for Sarah Reed?
5      A.  Correct.
6      Q.  So any child who had a social problem -- for
7  instance, can't get along with the kid sitting next to them,
8  could be a candidate for Sarah Reed?
9      A.  We could consider them.
10      Q.  If you think that the child's only problem was
11  they couldn't get along with the kid sitting next to them,
12  they could be admitted to Sarah Reed?
13      A.  Possibly to outpatient therapy.  So what we would
14  provide, the level of care, might be determined by the
15  referral concern.
16      Q.  And what kind of behavioral problems do children
17  have to exhibit before they are admitted to Sarah Reed?
18      A.  Again, there's a variety.
19      Q.  Can you illustrate some for me?
20      A.  As I had mentioned, the aggressive behavior,
21  defiant behavior, not staying within the classroom.
22      Q.  In terms of children with IEP's, Sarah Reed is
23  considered an out-of-school placement; is that right?
24      A.  Yes.
25      Q.  So in the scheme of things for the

Page 17

1  least-restrictive educational placement, where does Sarah
2  Reed fit?
3      A.  We would be one of the most restrictive.
4      Q.  And I think that you said that -- do you
5  typically -- students with IEP's who were referred to Sarah
6  Reed, do you typically see a behavioral plan in the IEP?
7      A.  I don't review the IEP.
8      Q.  Okay.  So tell me what you review.
9      A.  Oftentimes there is not information, paperwork
10  sent to me.  It's sent to us after a student is admitted.
11  So it would be reviewed by the staff working with the child
12  at that time.  And I am no longer a part of the picture at
13  that point.
14      Q.  Do you remember K████L██, and R████P████
15      A.  Yes.
16      Q.  Tell me how the referral of those two students
17  came to you.
18      A.  There has been more than one referral.  Which --
19      Q.  The first one.
20      A.  Um --
21      Q.  I think that was January of 2002, I believe.
22  Right?
23      A.  The school had contacted me at -- there had been
24  allegations made of sexual assault in school and also
25  harassment by other students.

Ferguson & Holdnack Reporting, Inc.

9a

97e84326-1189-4172-abcb-3eb42266f250

Richard P. v. School District          Matthew Bogardus                    May 5, 2005

Page 38

1    Q.  Okay.  And do you know whether the committee does?
2    A.  No.
3    Q.  You don't know, or it does not?
4    A.  I don't know.
5    Q.  Okay.  When students -- and if I'm revisiting old
6  ground, I apologize.  When students are referred to the
7  alternative education program, there is a behavior
8  modification modality, I think you said.  Is that right?
9    A.  It's a treatment modality.
10   Q.  Treatment modality, right.
11   A.  Yes.
12   Q.  And are there other educational modalities that
13  are offered by Sarah Reed, other than the behavior
14  modification program?  To your knowledge.
15   A.  Yes.
16   Q.  And what are they?
17   A.  That would be the individual therapy, family
18  therapy, group therapy, psychiatric services.
19       (Discussion held off the record.)
20   MR. OLDS:  I don't have any other questions.
21   MR. MARNEN:  I have a few, mainly because of a
22  poor memory.  But I will try to avoid overlap, but
23  I undoubtedly, inevitably will do that.
24
25

Page 39

1              CROSS-EXAMINATION
2  BY MR. MARNEN:
3
4    Q.  Did you say you were on the committee that
5  determined whether these two girls would be admit or placed
6  at Sarah Reed?
7    A.  I present the case to the academic team.
8    Q.  You make the presentation to them, but you are not
9  part of the decision making --
10   A.  I am part of the decision making.
11   Q.  So it is about five people, and you are one of the
12  five?
13   A.  Yes.
14   Q.  Did I get this right?
15   A.  Yes.
16   Q.  And the referral here, if I remember this
17  correctly, was purely oral from someone at Erie School
18  District?
19   A.  Yes.
20   Q.  And the decision to accept or not accept was made
21  before you had the intake meeting with the families?
22   A.  Yes.
23   Q.  And the information that you made your decision --
24  you base your decision on was information supplied solely by
25  someone at the School District?

Page 40

1    A.  Yes.
2    Q.  And do you know whether that was one person or
3  more than one person?
4    A.  I don't recall.
5    Q.  Is there a person at the Erie School District with
6  whom you typically deal?
7    A.  Yes.
8    Q.  Who would that be?
9    A.  Audrey Pecoraro, the homeschool visitor.
10   Q.  Do you ever deal with Charlise Moore?
11   A.  Yes.
12   Q.  Do you ever deal with Marlene Chrisman?
13   A.  At that time, yes.
14   Q.  And do you ever deal with James Piekanski?
15   A.  No.
16   Q.  Charlise Moore, do you know if she's involved in
17  the special education at the School District?
18   A.  I believe she's the special education supervisor.
19   Q.  The referral here was to the alternative education
20  program?
21   A.  Yes.
22   Q.  And by "referral", what does that mean, exactly?
23  The District thinks the girls ought to go in that program?
24  Is that basically what that means?
25   A.  The referral would be -- if they feel -- that's

Page 41

1  their decision, then they would contact me, making that
2  referral, asking us would we consider that placement.
3    Q.  Them to that program.
4    A.  Yes.
5    Q.  And this may be an area where I'm getting into old
6  territory.  But is it possible to be at Sarah Reed in the
7  alternative education program only, without any therapeutic
8  services?
9    A.  We would -- we would be looking at providing
10  therapeutic services.  That's what Sarah Reed does.
11   Q.  Would anyone go to Sarah Reed ever and just get
12  educational services?
13   A.  Yes.
14   Q.  In this particular instance, would you be looking
15  at therapeutic services also?
16   A.  Yes.
17   Q.  With these two girls?
18   A.  Yes.
19   Q.  Why is that?
20   A.  Because the trauma that was reported to us
21  would -- would have indicated to our team that some type of
22  supportive service would be necessary.
23   Q.  In the absence of -- of a need for therapeutic
24  services, would these girls have been admitted?
25   A.  I don't know.

                                        11 (Pages 38 to 41)

97e84326-1189-4172-abcb-3eb42266f250

Page 1

1               IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   RICHARD P., by and for        :
    R█████ P., and DENISE L.,     :
4   by and for K███████ L.,       :
              Plaintiffs          :
5                                 :
         v.                       :   Civil Action No. 03-390
6                                 :              Erie
    SCHOOL DISTRICT OF THE CITY   :
7   OF ERIE, PENNSYLVANIA; JANET  :
    WOODS, Individually and in    :
8   her Capacity as Principal of  :
    Strong Vincent High School;   :
9   and LINDA L. CAPPABIANCA,     :
    Individually and in her       :
10  Capacity as Assistant         :
    Principal of Strong Vincent   :
11  High School,                  :
              Defendants          :
12

13

14

15

16          Deposition of ROBERT R. IDDINGS, taken before

17      and by Janis L. Ferguson, Notary Public in and

18      for the Commonwealth of Pennsylvania, on Thursday,

19      May 5, 2005, commencing at 11:49 a.m., at the

20      offices of Knox McLaughlin Gornall & Sennett, PC,

21      120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25          Reported by Janis L. Ferguson, RPR
            Ferguson & Holdnack Reporting, Inc.

Page 10

1  1020. Second grade through twelfth.
2     Q.  Then what happens at 310?
3     A.  Preschool through first grade.
4       MR. OLDS:  I know I said I wasn't going to mark
5       this as an exhibit, but I think I will.
6       (Discussion held off the record.)
7       (Iddings Deposition Exhibit 1
8       marked for identification.)
9     Q.  We have been -- Mr. Iddings, we have been provided
10 several pamphlets.  As you know, as I said in the previous
11 deposition, I represent R____ P____ and K____ L____
12 who were provided services by Sarah Reed Children's Center.
13 And I assume that the services they were provided were -- I
14 should have asked this before Mr. Marnen photocopied it --
15 were in the program that is described in the pamphlet that I
16 have marked as Exhibit 1?
17    A.  I believe so.
18    Q.  Your institution has also provided us with a
19 pamphlet called After-School Program and another pamphlet
20 called Community Outpatient Program.  And probably those
21 don't pertain to --
22    A.  Correct.
23    Q.  -- my two clients.  Is that right?
24    A.  That's right.
25    Q.  And the -- I guess the first topic that --

Page 11

1  identified in the Rule 30(b)(6) deposition notice is types
2  and parameters of educational behavior and therapeutic
3  programs offered and administered by SARCC.  So maybe
4  looking at that area of inquiry -- and this pamphlet, we
5  could try to understand the types of educational programs,
6  coupled with therapy programs that Sarah Reed offers.  Okay?
7     A.  Okay.
8     Q.  So, first of all, Exhibit 1, is this just a
9  pamphlet that is prepared to hand out to parents or other
10 educators, maybe?
11    A.  Right.
12    Q.  Just to identify the public or perhaps clients
13 with the services offered by Sarah Reed.
14    A.  That's right.
15    Q.  So at best, it's just a shorthand --
16    A.  That's right.
17    Q.  -- of what's going on here.  It describes a
18 page -- I guess I'm looking at Page 7 -- describes a
19 classroom level program.  And I guess my question is, do you
20 have -- do you have very much interface with the educational
21 side of Sarah Reed?
22    A.  Yes.
23    Q.  Well, and how does that happen?
24    A.  All of the supervisors try to integrate the
25 clinical aspects with the educational aspects.  Each team is

Page 12

1  made up of a teacher --
2     Q.  Okay.
3     A.  -- a counselor, and a therapist.
4     Q.  And does each team take responsibility for a
5  particular student?
6     A.  Yes.
7     Q.  I mean, they have more than one student, but --
8     A.  Right.
9     Q.  So do you know how many students a team might
10 have?
11    A.  Up to 13.
12    Q.  How many classrooms are there at Sarah Reed?  And
13 if it's changed dramatically since 2002, I'd like you to
14 focus on 2002.
15    A.  Okay.
16    Q.  I mean, if the size of the school has changed.
17    A.  Yeah, not -- not too dramatically.  There are
18 seven classrooms in 1020 East 10th Street, where both of the
19 girls would have been.
20    Q.  And are the students divided in the classroom
21 based upon age or based upon types of problems?
22    A.  Generally based upon grade level and developmental
23 level.
24    Q.  R____ and K____ were, I think, in seventh
25 grade in 2000 -- in January of 2002 when they were admitted

Page 13

1  to Sarah Reed.  What kinds of -- what classrooms would have
2  been available to them, given the fact that they were in
3  seventh grade?
4     A.  I don't know specifically, but I'm guessing it
5  would have been -- we have two pre-adolescent classrooms.
6     Q.  And would those classrooms -- they would be in one
7  or the other, depending upon their developmental level?
8     A.  Developmental level and space.
9     Q.  Okay.  And when you use the term "developmental
10 level", what are you referring to?
11    A.  Cognitive ability and emotional maturity.
12    Q.  And how many students would have been in those
13 pre-adolescent classrooms?
14    A.  I don't know specifically, but it would go up to
15 13.
16    Q.  No more than -- is it fair to say no more than 13?
17    A.  Yes.
18    Q.  And would there be one teacher assigned to each
19 classroom or more than one teacher?
20    A.  One teacher and one counselor.
21    Q.  And the therapist is part of the team.  Where did
22 the therapist conduct their work?
23    A.  Frequently, they will consult with the teacher and
24 the counselor.  We use what's call an ecological approach.
25 So a lot of the interventions are implemented by the teacher

Ferguson & Holdnack Reporting, Inc.



45c365d3-9173-4c30-adac-2667caf8eaed

Page 18

1  behavioral problems at their referring schools.
2      A.  We have children who have acted out behaviorally,
3  meaning they have come to someone's attention due to an
4  aggressive act.  And we also have children who are
5  withdrawn, which has also caused someone in their life to be
6  concerned.
7      Q.  Okay.
8      A.  The children who are more withdrawn are what we
9  would call internalizing.
10     Q.  Um-hum.
11     A.  Wouldn't necessarily be a behavior problem in
12 school.
13     Q.  Okay.  Are those children placed in this classroom
14 program that's described beginning at Page 7 of Exhibit 1?
15     A.  Yes.
16     Q.  And in terms of those children, what kinds of
17 behaviors are taught to those children?
18     A.  Identifying feelings, expressing feelings
19 verbally, initiating positive interactions with peers,
20 ignoring negative -- what we call negative leads of peers.
21     Q.  What does that mean, "negative leads"?
22     A.  Children who would engage in non-pro-social
23 behaviors, a lot of the times the kids will copy them or go
24 along with them.  Especially the children who are more
25 internalizing tend to be more into that.  They will go along

Page 19

1  with one of the leaders of the group.
2      Q.  So then do they all of a sudden have a behavior
3  problem when they do that?
4      A.  Right.
5      Q.  Okay.  And I -- what else?  We were at ignoring
6  negative leads.  You were listing the types of --
7      A.  Right.  The overall goal for any of the kids is to
8  increase self-efficacy, based on their developmental level.
9      Q.  Self-efficacy?
10     A.  Yes.
11     Q.  What does that mean?
12     A.  So depending on how old the child is, we help them
13 reach a level of independence that is appropriate for their
14 age, and self-regulation.
15     Q.  So independence and self-regulation?
16     A.  Um-hum.
17     Q.  Is that sort of the fundamental goal?
18     A.  Correct.
19     Q.  Now, the children who have had behavioral
20 problems -- not the children who are internalizing, but the
21 children who have had behavior problems, have these
22 typically been -- are they defiant or aggressive?  Is that
23 the kind of behavior problems that we're talking about?
24     A.  Yes.
25     Q.  Typically, would it be fair to say that a student

Page 20

1  in Sarah Reed as a result of behavioral problems is one who
2  couldn't adjust to the typical classroom situation or the
3  regular classroom situation?
4      A.  That's right.
5      Q.  And they couldn't adjust because they would either
6  be too disruptive or too aggressive for the regular
7  classroom --
8      A.  Correct.
9      Q.  -- situation?
10     A.  Yes.
11     Q.  And then the -- of the two classes of children
12 that you have identified, children with behavioral problems
13 and children who have problems with internalizing, can you
14 give me like a percentage breakdown of how many of the one
15 and how many of the other are in attendance, like in any
16 given year.
17     A.  Um-hum.  Generally, with the younger children,
18 they are children with behavioral problems.  It's a greater
19 percentage.  And as the children get older, it becomes more
20 of an even percentage.
21     Q.  And the seventh grade level, do you consider that
22 younger or older?
23     A.  That's more our older clientele.
24     Q.  So seventh grade, it might be 50 percent would be
25 children who are internalizing in one way or another, and --

Page 21

1      A.  Right.  I'd say maybe 60 who are externalizing,
2  acting out behaviorally; 40 internalizing.  But that's just
3  a guess, based on the adolescent program.
4      Q.  Okay.  And children who internalize, what kind of
5  behavior do you typically associate with that problem?
6      A.  Symptoms of anxiety or depression, excessive
7  worrying, suicidal thoughts, suicidal gestures, non-suicidal
8  attempts to harm self, isolation, negative self-talk,
9  inability to complete tasks.
10     Q.  Anything else?
11     A.  That's a pretty good --
12     Q.  Okay.  What kind of history do you expect to see
13 relative to receiving these students at Sarah Reed?
14     A.  For most students, there's generally a history of
15 trauma.
16     Q.  And when you say "history of trauma", what do you
17 mean?
18     A.  Some type of abuse; physical, sexual, or
19 emotional.  Or neglect.  Frequently there have been what we
20 call disrupted attachments.  That can result from either
21 parents leaving or children being separated from parents or
22 families experiencing frequent moves.
23     Q.  And what kinds of experience, educational
24 experience do you generally see for these students who are
25 internalizing problems?

Ferguson & Holdnack Reporting, Inc.                    13a

45c365d3-9173-4c30-adac-2667caf8eaed

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    RICHARD P., by and for     :
      R██████ P., and DENISE L.,  :
 4    by and for K██████ L.,      :
               Plaintiffs         :
 5                                :
             v.                   :   Civil Action No. 03-390
 6                                :            Erie
      SCHOOL DISTRICT OF THE CITY :
 7    OF ERIE, PENNSYLVANIA; JANET:
      WOODS, Individually and in  :
 8    her Capacity as Principal of:
      Strong Vincent High School; :
 9    and LINDA L. CAPPABIANCA,   :
      Individually and in her     :
10    Capacity as Assistant       :
      Principal of Strong Vincent :
11    High School,                :
               Defendants         :
12

13

14

15

16            Deposition of ROBIN A. JOHNSON, taken before

17       and by Janis L. Ferguson, Notary Public in and

18       for the Commonwealth of Pennsylvania, on Wednesday,

19       April 26, 2005, commencing at 11:17 a.m., at the

20       offices of Knox McLaughlin Gornall & Sennett, PC,

21       120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24
                    Reported by Janis L. Ferguson, RPR
25                Ferguson & Holdnack Reporting, Inc.
```

Page 26

1  Q.  Did you go up there on your own, or did somebody
2  walk with you?
3  A.  I think somebody walked with me.
4  Q.  Do you know who that was?
5  A.  Not offhand, I don't.
6  Q.  It wasn't one of the school police, was it?
7  A.  No.
8  Q.  Do you know them?
9  A.  No.  But I would have remembered if a policeman
10 walked me somewhere.
11 Q.  Anyway, somebody escorted you up to her office.
12 A.  Yes.
13 Q.  Had you ever been to her office before that time?
14 A.  No.
15 Q.  Had you ever met her before that day?
16 A.  No.
17 Q.  When she or someone else called you to ask you to
18 come in, did they just say I want to talk to you, or did
19 they tell you why?
20 A.  They needed to talk to me about my daughter T███
21 Q.  That's it?
22 A.  I assumed she was in trouble.
23 Q.  Okay.  So when you got there, was Linda
24 Cappabianca the only person in the room besides you?
25 A.  Hum-um.  There was a boy in the room.  And she

Page 27

1  made him leave the room.  He was out -- I remember, because
2  he was banging his desk on the wall out there.  He was being
3  bad.
4  Q.  Okay.  So he left the room.
5  A.  Um-hum.  She made him sit in the hallway at the
6  desk.
7  Q.  Now you're alone with Cappabianca.
8  A.  And T███
9  Q.  And T███  So either T███ was there when you
10 arrived, or she was called to come into the room.
11 A.  Um-hum.
12 Q.  How long did the meeting last?
13 A.  Probably 40 minutes.
14 Q.  Tell me as best you remember what was said during
15 that meeting, in the order in which it was said.  I know
16 it's been -- it's been -- it's been three years.  So --
17 A.  She wanted to let me know that T███ was hanging
18 around some girls that were -- were unappropriate.  They
19 were doing things that were unappropriate.  T███ -- T███ was
20 in the room the whole time.  So she said that some of the
21 girls that T███ was hanging with were -- do I have to say
22 the exact words?  Were --
23 Q.  If you -- yeah.  I know it's probably
24 embarrassing, but if you don't mind.  We're all -- except
25 for R███, all grown up.

Page 28

1  A.  Said that they were giving blow jobs in school to
2  boys.  They were caught doing it in the gym, and there
3  was -- it was either a Laundromat or it's a store on the
4  corner that the girls were doing it at, and my daughter was
5  with them when they were doing it.  And she wanted to let me
6  know that -- the kind of kids that my daughter was hanging
7  around, and she didn't think it was good.  That she wanted
8  me to be aware of what was going on.
9  Q.  And she was referring to "girls", like more than
10 one girl.
11 A.  She said their name.
12 Q.  What were their names?
13 A.  R███  But she said R███  I didn't realize
14 at the time -- I don't know her as R███  I know her as
15 R███  To███ when I had asked her, is the one that said,
16 mom, that's R███  R███ is R███  I know her as
17 R███
18 Q.  For the sake of the court reporter and the record,
19 I'd like to make clear the distinction you're making.  You
20 have now just pronounced the name R███ two different ways,
21 right?
22 A.  Yes.
23 Q.  One is with the accent on the first syllable, and
24 the other is with the accent on the second syllable?
25 A.  Right.

Page 29

1  Q.  And Miss Cappabianca put the accent on the second
2  one.  R███  Correct?
3  A.  Yes.
4  Q.  Did she mention any girl besides Ra███?
5  A.  I honestly don't think so.  I mean, I -- I can't
6  be positive, but I really don't remember.  I don't think so.
7  I remember -- I remember R███ -- R███
8  Q.  Early on in your description of the meeting, you
9  used the word "girls", I thought.
10 A.  Um-hum.
11 Q.  Not girl, but girls.
12 A.  Right.  But that's the only name I remember
13 hearing.
14 Q.  Oh, okay.  Do you remember that she used other
15 names, but you just don't remember the other names?
16 A.  I can't say for sure.  I don't --
17 Q.  All right.  Now, did she mention R███ last
18 name?
19 A.  P███  But I still didn't know who she was
20 then.  It's weird how I figured out who she was.
21 Q.  Let me -- let's look at the affidavit for a
22 second, Defendant's Exhibit O.
23 A.  Um-hum.
24 Q.  Paragraph 7 -- this may help your memory.
25 A.  My daughter kind of helps too.

Ferguson & Holdnack Reporting, Inc.



d367f76b-b087-40c6-a4bb-39dd1e333c58

Richard P. v School District
Held: 321705

Case 1:03-CV-00390-SJM    Document 96-3    Filed 11/10/2005    Page 16 of 31    D. L.

**Page 1**

```
 1         IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   RICHARD P., by and for            )
 3 R        P., and DENISE L., by    )
   and for K        L.,              )
 4         Plaintiffs       )  Civil Action
       vs                   )  No: 03-390 Erie
 5                          )
   SCHOOL DISTRICT OF THE CITY OF )
 6 ERIE, PENNSYLVANIA; JANET        )
   WOODS, Individually and in her   )
 7 Capacity as Principal of         )
   Strong Vincent High School;      )
 8 and LINDA L. CAPPABIANCA,        )
   Individually and in her          )
 9 Capacity as Assistant            )
   Principal of Strong Vincent      )
10 High School,                     )
          Defendants    )
11
12
13         Deposition of DENISE L     taken before and
14 by Linda K. Rogers, Commissioner of Deeds in the
15 Commonwealth of Pennsylvania and Notary Public in
16 the State of New York, on Monday, March 21, 2005,
17 commencing at 12:01 p.m., at the law offices of
18 Knox McLaughlin Gornall & Sennett, PC, 120 West
19 10th Street, Erie, Pennsylvania 16501.
20
21
22
23
24
25            * * *
```

**Page 2**

```
 1 For the Plaintiffs:
 2      Edward Olds, Esquire
        1007 Mount Royal Boulevard
 3   Pittsburgh, PA 15223
 4
 5
 6 For the Defendants:
 7      James T. Marnen, Esquire
        Knox McLaughlin Gornall & Sennett, PC
 8      120 West 10th Street
        Erie, PA 16501
 9
10
11
12
13            * * *
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              DIRECT EXAMINATION
 2 BY MR. MARNEN:
 3
 4      Q. You are Denise L       correct?
 5      A. Yes.
 6      Q. What is your middle name?
 7      A. Jane.
 8      Q. Where do you presently reside?
 9      A.
10      Q. In Erie?
11      A. Yes.
12      Q. What is the zip code?
13      A.
14      Q. How long have you resided there?
15      A. Going on five years.
16      Q. Were you residing at                 on the
17 day that K       was harmed that is the subject of this
18 lawsuit?
19      A. Yes.
20      Q. You have been at a number of depositions in this
21 case so far, and I think you probably have the drill down,
22 but let me just remind you. I am here as the attorney for
23 the school district, Miss Cappabianca, Miss Woods. My only
24 purpose is to find out what you know about facts I think are
25 relevant to the case. You have the right to understand what
```

**Page 4**

```
 1 I am asking. If you don't understand or hear me, let me
 2 know and I will rephrase it.
 3      We should try to avoid talking at the same time.
 4 The reporter is taking everything down, and you should use
 5 words when you communicate with me as opposed to gestures
 6 and sounds that are not words like um-hmm and unh-unh
 7 because it is difficult for the reporter to interpret what
 8 you mean by that.
 9      If at any time you want to take a break, we can
10 take a break. This is not an inquisition. Do you have any
11 questions of me?
12      A. No.
13      Q. Okay. So you lived at                 for
14 about five years?
15      A. Yes.
16      Q. Are you born and raised in Erie?
17      A. Yes.
18      Q. For a brief period of time I gather you lived in
19 Meadville?
20      A. I didn't live in Meadville.
21      Q. She did, K       did?
22      A. Yes, yes.
23      Q. What is K       father's name?
24      A. Junior.
25      Q. Is that his given name, Junior, or a nickname?
```

1   Q. Who was at the meeting?
2   A. Chris Rule, me, of course K████ Dr. --
3   Q. Borzon?
4   A. Yeah. I think that was it.
5   Q. B-O-R-C-Z-O-N?
6   A. B-O-R-Z-O-N, I think.
7   Q. Anybody else?
8   A. Stephanie Provoka (phonetic).
9   Q. How do you spell that, any idea?
10   A. I have no idea.
11   Q. What did Stephanie Provoka do?
12   A. She is from OCY. Office of Children and Youth,
13 and Sara French.
14   Q. Who is Sara French?
15   A. That was her mobile therapist.
16   Q. Mobile therapist?
17   A. Yeah.
18   Q. What is a mobile therapist?
19   A. It is like a therapist that comes to your house.
20   Q. Had Sara French seen K████ before she was
21 hospitalized or was her mobile therapy delivered after she
22 got out of the hospital?
23   A. I can't remember. I think it was before, shortly
24 before.
25   Q. Anybody else at that meeting? Chris Rule, Denise

Page 45

1 L███, K████ L████ Dr. Borzon, Stephanie Provoka, Sara
2 French?
3   A. There was a nurse there too, I don't know who that
4 was, though.
5   Q. At that meeting Chris Rule said what?
6   A. That K████ is going to be moved from Strong
7 Vincent for her safety.
8   Q. Did you ask him what he meant?
9   A. Yeah. And he said that -- he said, let me clarify
10 that. And he said that the other kids are picking on her
11 and due to the incident that K████ had mentioned. He
12 said that the school needed time for it to blow over.
13   Q. Did you ask Chris Rule what, if anything, was
14 going to happen to the other kids involved in the incident?
15   A. I asked him. I said, well, what is going to
16 happen to the boy, and he said he is not sure what is going
17 to happen.
18   Q. Did you know at that time that by the time of that
19 discharge meeting that R███ P████ had also been involved
20 in the incident?
21   A. No, I didn't find out until later.
22   Q. You knew that C███ B███ was involved?
23   A. Yes.
24   Q. Because K████ told you?
25   A. Yes.

Page 46

1   Q. Did she also tell you that C████ was involved?
2   A. Yes.
3   Q. How about A████ K█ did you know A████
4 K█ was there that day?
5   A. K█ didn't tell me, but I heard later that he
6 was.
7   Q. How about A████ F█ were you told by
8 K█ that he was there?
9   A. No. And this is the first time I heard that he
10 was picking on her too.
11   Q. What was the first time, in the hospital you mean?
12   A. No, right today.
13   Q. Today, oh. Today at the deposition was the first
14 time you heard about A████ F█ picking on K████?
15   A. That he was picking on K████.
16   Q. Your information before this deposition was that
17 B████ P█ and C████ B███ were picking on K█
18 nobody else?
19   A. Right.
20   Q. Your information before today that the only sexual
21 assailant with respect to K████ was C█ B███?
22   A. Right.
23   Q. I guess, I mean the person who had her perform sex
24 on him, right?
25   A. Yes.

Page 47

1   Q. A████ K████ had nothing to do with K████,
2 is that right?
3   A. Right.
4   Q. Is it your understanding it was one time?
5   A. Right.
6   Q. One sex act?
7   A. Yes. And she did see him after that happened,
8 because I remember she said she didn't in the deposition
9 today. She seen him at court.
10   Q. She saw C███ B█ at court?
11   A. When we went to court, and then he laughed at her.
12   Q. You were here for K████ testimony and she
13 said, if I understood her correctly, I think I got this
14 right, and if I got it wrong tell me. You picked her up the
15 evening she was sexually assaulted by C████ B███?
16   A. Right.
17   Q. Is that an accurate statement by her?
18   A. Yeah. When I found her, she was hiding over
19 across the street by the school. There was a sign there.
20   Q. She was hiding on the block that the school was
21 located on?
22   A. Yeah. And I --
23   Q. Where was she hiding?
24   A. Over -- there was a sign there and --
25   Q. A sign in front of the school?

Page 48


17a

**Page 69**

1   A. This is the only thing I remember.
2   Q. Did you sign on the second page?
3   A. No. This is all he brought to me, and then he
4 pulled the yellow pages off and gave me the yellow one and
5 he kept these ones, he kept the top pages.
6     MR. OLDS: Did she say she did not sign 818 at her
7   house, that would be the fifth page?
8     MR. MARNEN: What is the page?
9     MR. OLDS: The fifth page of that.
10   Q. 818, you said you did not sign that at your house?
11   A. No, not at my house.
12   Q. Do you remember where you signed it?
13   A. No.
14   Q. You just signed that very first document at your
15 house, that is what you remember?
16   A. Right.
17   Q. Is that your signature on 818?
18   A. Yes.
19   Q. There is your signature on E820, NOREP, E820 you
20 signed it, right?
21   A. Right.
22   Q. Looks like multiple copies of the same thing.
23 Okay. Is it your recollection that you went along with the
24 placement at Sarah Reed?
25   A. Right.

**Page 70**

1   Q. You did not object to it?
2   A. No.
3   Q. You did not object, correct?
4   A. No.
5   Q. That's not correct or you didn't object?
6   A. I didn't object.
7   Q. Okay. Now I want --
8   A. Wasn't much of a choice.
9   Q. That's what I want to ask you, why didn't you
10 object?
11   A. Because he said that she would be better off
12 there.
13   Q. Chris Rule said that?
14   A. Right, than in school.
15   Q. Did he explain to you why he thought that was the
16 case?
17   A. He said because the kids need time to forget about
18 it. And if she went back to school that there might be
19 further, you know, taunting about what happened, stuff like
20 that. It would be better to give them a break.
21     MR. OLDS: Just for clarification, when you said
22   the kids need time to forget about it, what kids
23   was he talking about?
24     THE WITNESS: The students at school.
25   Q. The students besides G_____ and B_____

**Page 71**

1   A. Right.
2     MR. OLDS: R____ and K____ too, they were kids
3   too. I just didn't understand it.
4   A. He mentioned student body.
5   Q. Because there was some harassment going on at the
6 high school, right?
7   A. Right.
8   Q. That harassment was coming from people in addition
9 to C_____ B____ and B____ C_____?
10   A. Right.
11   Q. And you accepted Chris Rule's opinion on this, is
12 that what you are saying?
13   A. Yeah, he is professional so --
14   Q. That opinion was -- we are talking now about the
15 conversation at discharge day, right?
16   A. Right.
17   Q. As I remember your testimony earlier you said
18 Chris Rule did not know at the time of the discharge what
19 was going to happen with B____ and C_____?
20   A. Right. He said there was a lot of police and
21 stuff coming into the school to talk to everybody, and it
22 would also be easier if they are not there.
23   Q. Did Chris Rule mention anything about Sarah Reed
24 being able to provide services that Strong Vincent could not
25 provide?

**Page 72**

1   A. No, that's all he said.
2   Q. All he said was get them out of there because we
3 need for it to cool down basically?
4   A. Yes.
5   Q. Did he say how long he thought the Sarah Reed
6 placement would last?
7   A. No.
8   Q. Did he say whether R____ P____ was going to be
9 the subject of a Sarah Reed placement also?
10   A. I don't recall.
11   Q. Did you know by the time that Chris Rule was in
12 there for the discharge meeting, did you know by that time
13 that R____ had been a victim of a sexual assault also,
14 R____ P____?
15   A. Yes, I think so.
16   Q. Did K____ tell you that?
17   A. No, Chris Rule did.
18   Q. Chris Rule did?
19   A. Yeah.
20   Q. Did you know R____ P____ before that day?
21   A. Yes.
22   Q. How did you know her?
23   A. K____ and her were friends.
24   Q. Did they ever come to your house to hang out or
25 whatever they call it?



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

RICHARD P., BY AND FOR )
R. P., AND DENISE L., BY )
AND FOR K. L., )
    Plaintiffs )
        )
    vs ) Civil
        )
SCHOOL DISTRICT OF THE )
CITY OF ERIE, PENNSYLVANIA; )
JANET WOODS, INDIVIDUALLY )
and in her Capacity as Principal )
of Strong Vincent High School; )
and LINDA L. CAPPABIANCA, )
Individually and in her Capacity )
as Assistant Principal of Strong )
Vincent High School, )
    Defendants )

* * *

Deposition of RICHARD P., taken before and by Linda K. Rogers, Commissioner of Deeds in the Commonwealth of Pennsylvania and Notary Public in the State of New York, on Wednesday, April 6, 2005, commencing at 12:38 p.m., at the law offices of Knox, McLaughlin, Gornall & Sennett, 120 West 10th Street, Erie, Pennsylvania.

Page 1

For the Plaintiffs:
    Edward Olds, Esquire
    1007 Mount Royal Boulevard
    Pittsburgh, PA 15223

For the Defendants:
    James T. Marnen, Esquire
    Knox McLaughlin Gornall & Sennett, PC
    120 West 10th Street
    Erie, PA 16501

* * *

Page 2

RICHARD P., first having been duly sworn, testified as follows:

DIRECT EXAMINATION
BY MR. MARNEN:

Q. Mr. P. would you state your full name, please.
A. Richard William P.
Q. What is the date of your birth?
A. October 25, 1964.
Q. Where do you presently reside?
A.
Q. How long have you resided there?
A. I think about -- well, a year.
Q. About a year?
A. About a year, yeah.
Q. Where did you reside before that?
A.
Q. During what period of time did you reside there?
A. Between December -- it was like December, slash, January of 2003. So it would be 2002, December and 2003, January because we were cross mixing between the move over the holiday season.

Page 3

Q. From that time until about a year ago?
A. That's correct.
Q. Before East 10th Street?
A. Before East 10th Street?
Q. Yes.
A. It was 1205 West 8th Street, that was also in Erie.
Q. What was the period of time when you lived there?
A. From, I want to say, March of 2001 to, again, it was, slash, December.
Q. Of '02 or January '03?
A. Right.
Q. Did you live in Arizona before then?
A. Yes. Mesa.
Q. Mesa, Arizona?
A. Um-hmm.
Q. And how long were you in Arizona?
A. I'm thinking we were there for two years.
Q. Before Arizona were you living in Erie?
A. That's correct, yes.
Q. Where did you live in Erie?
A. 1914 Linwood Avenue.
Q. 1914 Linwood?
A. Yes. L-I-N-W-O-O-D, Avenue.
Q. How long did you live there?

Page 4

1 placement?

2    A. No.

3    Q. You don't remember?

4    A. I don't remember. Because -- well, go ahead.

5    Q. Okay. Did you in the past ever object to an IEP

6 that was formulated for R_____?

7    A. Object to it?

8    Q. Yes.

9    A. Not before, no.

10    Q. Did you understand there was a formal procedure

11 for objecting to an IEP concerning your child?

12    A. I think it's something like a -- it was my

13 understanding it was some kind of -- I don't want to say

14 hearing.

15    Q. Due process?

16    A. Pardon me?

17    Q. A due process hearing?

18    A. I think that's what it was called.

19    Q. You were aware of that process?

20    A. Yes. Well, I am not really fully aware of it

21 because I never went through it before.

22    Q. Right. Did you know, though, that if you objected

23 to an IEP you would end up with a due process hearing?

24    A. It wasn't fully explained to me that way, but I am

25 assuming that that's probably correct.

Page 61

---

1    Q. If I understand you correctly, you did not ask for

2 a due process hearing concerning R_____ placement at Sarah

3 Reed in 2002?

4    A. That's correct, I did not.

5    Q. Did Miss Woods explain to you what she meant by

6 getting R____ into Sarah Reed for her own safety?

7    A. Well, yeah. She said because -- she said that

8 B___ was -- and she used a paraphrase, B____s one bad

9 little mother. She's just bad. She's a very bad kid. And

10 she said C____ B__ has a long history of being bad too.

11 And she said given the fact of what happened to her, she

12 said, I think we need to remove her for her safety.

13    Q. Did Miss Woods says anything about R____ going to

14 Sarah Reed so she could receive more treatment than she

15 could receive at Strong Vincent?

16    A. No. She didn't put it that way, no.

17    Q. Did Miss Woods tell you that anybody besides

18 C____ B___ and B___ C____ were bothering R_____?

19    A. She said there was another person, and I believe

20 she used his name, A____ F_____ is the way she put it.

21 I understood his name was T___ because that's what R____

22 had called him.

23    Q. I am trying to distinguish now between the rape,

24 and that's what it was a rape.

25    A. Yes, it was.

Page 62

---

1    Q. I am trying to distinguish between the rape and

2 any harassment that happened after the rape. Okay?

3    A. Okay.

4    Q. Anybody to your knowledge harassing R____ after

5 the rape besides C_____, B___ and R_____?

6    A. I personally saw an individual at the meeting. I

7 can't remember the exact significance. I think we were

8 going down to the cafeteria. Mr. Rule asked us if we were

9 hungry. I am always willing to take a little break to eat

10 if someone offers it to me. I said, okay, and we went down

11 there. It was me, R____ and Chris Rule and we walked down

12 to the cafeteria. He had gotten us a free meal ticket so we

13 could get something to eat. Before we got into the

14 cafeteria, I don't know who the kid was, it was a black male

15 and he walked up and said something kind of nasty to R____

16 but I couldn't make out what he was saying. It was kind of

17 like, you know, snap attitude type. He smacked her on the

18 hind end. And he did it right in front of me and he did it

19 in front of Chris Rule.

20    I said to Chris -- or Mr. Rule, I said, are you

21 going to say anything to this kid because this is why you

22 have a problem. And he said, oh, see me after school. The

23 kid's like yeah, yeah, yeah, and blew him off. He didn't

24 get the kid's name, he didn't -- and so we -- he said, I got

25 to go and talk to someone, I will be right back. We sat and

Page 63

---

1 we ate and I couldn't make out what people were saying, but

2 I could tell they were saying something derogatory in our

3 direction.

4    And then Chris Rule had come back and said we are

5 not going to continue on with the meeting upstairs, we are

6 done for the day and you can take R____ home with you. And

7 that's when I took her home. I met with Miss Cappabianca in

8 the hallway, and I said that we were going -- that R____

9 was going to be referred to Sarah Reed for her safety. So I

10 witnessed people harassing her even when I was there. They

11 were blatant.

12    Q. Did anything happen that day besides the two

13 incidents you mentioned, the talking in the cafeteria and

14 the student touching her and saying something to her?

15    A. That day?

16    Q. Yes.

17    A. No, not that I remember.

18    Q. Are you aware of any other harassing of R____ at

19 Strong Vincent after the rape besides what you saw that day

20 and besides the two instances that are recounted in the

21 police report, the water fountain thing and the incident

22 over there at the laundromat?

23    A. I know now. I know now that there were other

24 instances as far as like people wanted her to -- make

25 derogatory statements to her about giving head. And at one

Page 64

---



1  involved with it.  I wasn't sure exactly.  It made perfect
2  sense to me.
3      Q. So R___ was interviewed by Pamela Barber?
4      A. Yes.
5      Q. In the company of you and --
6      A. Detective Green.
7      Q. -- Stanley Green?
8      A. Yes.
9      Q. While that interview was going on you received a
10  cell phone telephone call from Jan Woods?
11      A. Correct.
12      Q. The content of that conversation is recounted on
13  Exhibit K on the page we are on?
14      A. Yes.
15      MR. MARNEN:  Off the record.
16      (Discussion held off the record.)
17      MR. OLDS:  While you were gone there was a
18          discussion, and he might need to change part of
19          his testimony.
20      Q. Go ahead.  What part?
21      A. My daughter said I didn't pick her up on the
22  27th.  I picked her up on the second incident that happened.
23  So these times and dates it's so hard to remember.
24      Q. R___ did testify, I just read her deposition
25  recently, that she walked home the night of the rape.

Page 85

1      A. Right.  She said, dad, no, you didn't pick me up,
2  you picked me up on the second incident.
3      Q. Okay.
4      A. I made an error.
5      Q. Fair enough.  I understand, that happens.  Well, I
6  think we were at R___ was being interviewed by Detective
7  Barber, whose first name is now escaping me.
8      A. Pamela.
9      Q. Pamela Barber, and you were there and Green was
10  there, right?
11      A. That's correct.
12      Q. You received a phone call from Jan Woods on your
13  cell phone.
14      A. Yes.
15      Q. Just go to Exhibit K, tell you what, give me your
16  copy of your Exhibit K and I am going to put some page
17  numbers on it.
18      (Brief pause.)
19      Q. I have handwritten on that exhibit pages one
20  through nine, I think.  I am going to do the same thing to
21  my copy.  Page 4.
22      A. Okay.
23      Q. You were recounting the telephone conversation in
24  the third paragraph of Page 4, were you not?
25      A. Yes.

Page 86

1      Q. With Jan Woods, right?
2      A. Yes.
3      Q. And was it your understanding based on that
4  conversation that Janet Woods had not yet contacted the
5  police?
6      A. That was any understanding, yes.
7      Q. Did you believe at that point in time that she had
8  no intention of contacting the police?
9      A. At that time, you mean?
10      Q. Yes.
11      A. I figured she probably would.
12      Q. Did Janet Woods say in that conversation that
13  there were police at Strong Vincent that day interviewing
14  people?
15      A. No, she didn't tell me.
16      Q. On January 10 or at any time after January 10 up
17  until the time you have this conversation with Janet Woods
18  on the morning of January 11, so between the meeting with
19  Woods on the morning of the 10th and the telephone
20  conversation with Woods on the morning of the 11th, did
21  anybody from Strong Vincent or anybody from the school
22  district tell you that they wanted to interview R___ that
23  the police wanted to interview R___
24      A. From the school district?
25      Q. Yes.

Page 87

1      A. No.  I went down there and detective --
2      Q. Did anybody from the school district tell you
3  during that period of time that the police wanted to
4  interview R___
5      A. May I make a footnote here?
6      Q. Sure.
7      A. When you ask me questions, could you keep the
8  paper down so I can see your mouth?
9      Q. I'm sorry.
10      A. I didn't want to be rude and say anything.
11      Q. You read lips.  So keep my hand away from my face.
12      A. I'm trying to lean this way.
13      Q. I will ask you again.
14      A. Thank you.
15      Q. Between the time you met with Janet Woods on the
16  10th and the time that she had called you on the 11the when
17  you and R___ were being interviewed by the police at the
18  police station, during that roughly 24-hour period, did
19  anybody from the school district tell you that the police
20  wanted to interview R___ at Strong Vincent?
21      A. No.
22      Q. Okay.  The next entry on Exhibit K on Page 4 is an
23  entry dated January 15, 2002 and that's about R___  I am
24  going to read it.  R___ friend named T___ had come over
25  to our place and said, I can't hang with R___ anymore

Page 88

Richard P█████ et al, vs Erie School
Held: 4/6/05
Case 1:03-cv-00390-SJM   Document 98-3   Filed 11/10/2005   Page 22 of 31
Multi-Page™
R. P█████

**Page 89**

```
 1   because she sucks dick.  Is that exactly what T██ said?
 2      A.  Yes.
 3      Q.  What is -- that how you spell her first name,
 4   T█████
 5      A.  I believe so, yes.
 6      Q.  Is that a nickname for something?
 7      A.  No.
 8      Q.  Do you know her last name?
 9      A.  I think it's N██████
10      Q.  I have an affidavit from someone named Robin
11   Johnson.
12      A.  Yeah.
13      Q.  It indicates that she's is T████ mother, I
14   believe.
15      A.  Yes, that's T████ mom.
16      Q.  So Toni's mother is named Robin Johnson?
17      A.  That my understanding, yes.
18      Q.  But T████ last name is not Johnson?
19      A.  I don't -- is it?
20      Q.  What is her last name?
21      MISS R. P██████: N██████
22      Q.  Do you have any idea how to spell that?
23      A.  No.
24      MISS R. P██████: I think it's, N-█████████.
25      Q.  N-█████████
```

**Page 90**

```
 1      MR. OLDS:  Or N-█████  ██████
 2      A.  I have no clue.
 3      Q.  Okay.  Does T██ -- did T██ live with her mother
 4   on January 15, 2002?
 5      A.  I guess so, I am not sure.
 6      Q.  What you knew at the time was T██ you knew that
 7   name and not --
 8      A.  Yeah.
 9      Q.  I think we talked about this, and I am not
10   remembering what our exchange was, but I asked you if T██
11   was a nickname, I think.
12      A.  Yes, you asked me that.
13      Q.  You don't know, right?
14      A.  No, I think her name is T██
15      Q.  Not Antonia or anything like that?
16      A.  No.  She's a girl, so T██
17      Q.  Well, there's A██████ as a girl's name.
18      A.  Oh, okay.
19      Q.  Did T██ say this to you?
20      A.  What?  Oh, yes, I thought you were reading
21   something.
22      Q.  Did she say, I can't hang with R████ anymore
23   because she sucks dick?
24      A.  That is what she said to me.
25      Q.  She said that to you?
```

**Page 91**

```
 1      A.  Yes, she told me that.
 2      Q.  In your house?
 3      A.  Yeah, she came over.
 4      Q.  If she wasn't allowed to play -- if she wasn't
 5   allowed to hang out with Ra███ anymore, what was she doing
 6   at your house?
 7      A.  Probably sneaking around.
 8      Q.  Disobeying orders.  And she told you, you asked
 9   her for an explanation, and she said that the day that you,
10   Mr. Richard P██████ were at Vincent talking with Linda --
11   or with Janet Woods, T██ and her mother were at Strong
12   Vincent talking with Linda Cappabianca?
13      A.  Because that's correct.  She called her Miss Cap.
14      Q.  When you heard Miss Cap, you think that's Linda
15   Cappabianca?
16      A.  That's correct.
17      Q.  All the kids called Linda Cappabianca Miss Cap?
18      A.  That's correct.  That was my understanding, yes.
19      Q.  How did you know that T██ was talking about the
20   day that you were in there, January 10th?
21      A.  Because when the meeting took place I saw Robin
22   and Toni there in the office where I had actually met with
23   Miss Woods.  As I told you before, I met with Miss Woods in
24   the main office like.  And it's not my business to know what
25   they are there for.  I am not going to ask them, what are
```

**Page 92**

```
 1   you here for.
 2      Q.  You saw them there that day?
 3      A.  Yes, I saw them there that day.
 4      Q.  Did you talk about the fact that you had seen
 5   Robin and her -- I'm sorry T██ and her mother that day?
 6      A.  Pardon me?
 7      Q.  Did you talk with T██ on January 15th about
 8   seeing her mother and her at Vincent on the 10th?
 9      A.  No.
10      Q.  How did you put it together that it happened on
11   the 10th?
12      A.  Because I hadn't seen Robin in almost, I would
13   say, a good ten years.  So the only time I had ever known --
14   I haven't seen Robin in a long time.  Back in 1992, I think
15   '93, I used to be next door neighbors with them and I used
16   to baby-sit their little girl, that was like for a year and
17   then we moved out.
18      Q.  1993 you were, what, 25 years old, 28?
19      A.  Somewhere around there, I think.  My math ain't
20   that great.
21      Q.  You were married in '65, didn't you tell me?
22      A.  Pardon me?
23      Q.  You were married in 19 --
24      MR. OLDS:  Born.
25      A.  No, I was born in '64.
```



Richard P. et al vs Eric School
Held: 4/6/05

Case 1:03-cv-00390-SJM    Document 92-3    Filed 11/10/2005    Page 23 of 31    R. P.

1    MR. OLDS: '85.
2    Q. I'm sorry, wrong life event. You were born in
3  '65?
4    A. I was born in '64.
5    Q. '64, you baby-sat for Johnson when?
6    A. I think it was '93, I think, but I am not sure.
7  Those years are so --
8    Q. That's about 28 or 29 years old?
9    A. Right around there. I was in the my 20s, I
10  believe. I can't remember exactly, it's been so long. I
11  didn't know who they were when I first bumped into them.
12    Q. Was Robin the kid you were babysitting?
13    A. Robin, no.
14    Q. Is Robin your age?
15    MR. OLDS: Robin is the mother.
16    A. I don't know how old Robin is.
17    Q. Back in '93 who were you babysitting?
18    A. I baby-sitted (sic), well, on and off once in a
19  great while I baby-sitted for Robin. I baby-sitted most of
20  the neighbors' kids over there.
21    Q. Did you babysit Robin or did you babysit --
22    A. Not Robin, Robin was an adult.
23    Q. How old is Robin, your age roughly?
24    A. I don't have no clue.
25    Q. But she's an adult?
                                                    Page 93

1    A. She's an adult.
2    Q. Were you babysitting T⬤in 1993?
3    A. Once or twice, yes.
4    Q. When you talk about babysitting that's who you
5  were babysitting?
6    A. Yeah. If she had to go to the store or something
7  she'll say, hey, Rich, can you watch my kids for a minute.
8  I watch her kids for a little bit, wasn't even that long of
9  a time.
10    Q. How long were you neighbors with Robin?
11    A. About a year, maybe less than that.
12    Q. Is that the only time you had known Robin? Did
13  you know her before you became a neighbor of hers?
14    A. No.
15    Q. And you hadn't seen her since the time you stopped
16  being neighbors up until the time you saw her in Vincent
17  that day; is that what you're saying?
18    A. Yes.
19    Q. You hadn't seen her for nine years?
20    A. Pretty close to it, yeah.
21    Q. You ran into her at Vincent and she was with T⬤
22  and you were with Rachel?
23    A. That's correct.
24    Q. And is it the fact that you saw Robin at Vincent
25  on January 10th your basis for concluding that she must have
                                                    Page 94

1  had that conversation with Linda Cappabianca on January 10,
2  2002?
3    A. At that time, that point in time, yes.
4    Q. Did Robin later confirm that?
5    A. I was infuriated.
6    Q. What?
7    A. I was mad, okay.
8    Q. I am only trying to figure out why you knew it was
9  January 10th right now.
10    A. Because, as I said to you before, I hadn't seen
11  Robin in years. And I didn't even recognize Robin at that
12  point because it had been so long. I really didn't know
13  Robin that well anyways in the very beginning. When R⬤
14  met up with T⬤, you know, it was kind of like, wow, hey, I
15  haven't seen you in so long, you know what I mean? And they
16  wanted to be friends but --
17    Q. How did you decide that January 10th was the day
18  Robin was in Strong Vincent and Linda Cappabianca told her
19  this about R⬤
20    A. Because when I asked Miss Cappabianca -- I'm
21  sorry, excuse me. When I asked Miss Woods, isn't Miss
22  Cappabianca going to be at this meeting too, because I
23  automatically assumed because they said we need to talk, on
24  January 9th they both were insinuating that both of them was
25  going to be at the meeting, which was the following day on
                                                    Page 95

1  January 10th. And when I got in the office, of course, it
2  was Mr. Rule, and that other woman with long, brown hair and
3  Miss Woods. And I asked Miss Woods, well, isn't
4  Miss Cappabianca going to show up. And she had said, she's
5  tending other business matters with other parents, and that
6  kind of put, you know, the two together.
7    Q. You saw Robin Johnson at Vincent on the 10th.
8  Cappabianca was dealing with other parents on the 10th, you
9  concluded from that she met with Johnson that day?
10    A. At that point in time, yes. It wasn't until I
11  actually called Robin, and I didn't even say to Robin in the
12  beginning I didn't say, hey, did you have a meeting. I
13  asked her, I said, I told her -- I can't remember the way I
14  phrased it. I said, what's up with T⬤ I said, you know,
15  are you aware of what T⬤ was saying. She said, what. I
16  said, well, she's talking about R⬤sucking dick, what's
17  up with that? She said, well, Miss Cap -- Miss Cappabianca
18  and I were having a conversation and she said -- and she was
19  telling me about what R⬤had done. I said, well, did
20  she explain to you that it might have been forced sex there?
21  Did she even explain to you -- I said, why in the world
22  would she be talking to you when she didn't even come to me.
23  Why would she go -- because, see, Robin would never have
24  known about that. I didn't tell Robin. I have no business
25  to tell Robin because I haven't seen Robin in years.
                                                    Page 96

Richard P. et al vs Erie School
Held: 4/6/05
Case 1:03-cv-00390-SJM    Document 98-3    Filed 11/10/2005    Page 24 of 31
R. P.
Multi-Page™

**Page 97**

1  Q. How did you decide it was January 10th?
2  A. Because that's the only time I could think of when
3  T— said the other day, which was actually just a few short
4  time period, wasn't like she said last week or two weeks or
5  three weeks. She said the other day and I knew, you know
6  what I mean?
7  Q. All right.
8  MR. OLDS: Can we take a minute break, Jim?
9  (Brief recess.)
10  Q. Did you ever find out from anybody why Linda
11  Cappabianca had that conversation with Robin Johnson and her
12  daughter?
13  A. Did I find out what?
14  Q. Did anybody ever tell you why Linda Cappabianca
15  met with Robin Johnson and her daughter, T—, and told her,
16  encouraged her, to keep T— away from R— because R—
17  was promiscuous?
18  A. No one came and told me about it, if that is what
19  you're asking me.
20  Q. Did you ever ask Cappabianca why she had such a
21  meeting and said such a thing?
22  A. I didn't talk to her after -- I don't believe I
23  talked to her after January 9th. Yeah, well, except for the
24  time I met her in the hallway, but I don't remember going
25  back. I know if I would have went back there I would have

**Page 98**

1  been saying some things I should not say.
2  Q. You said to Robin Johnson, why is she telling you,
3  what is your interest in this, right?
4  A. Yeah. Well, I said to her why is she telling you
5  when, you know, she --
6  Q. What did Robin say about that?
7  A. She said she just wanted to make sure that she
8  knows who my daughter is hanging around with, what kind of
9  kid it is.
10  Q. Did anybody ever tell you that Linda Cappabianca
11  told other parents besides Robin Johnson the same kind of
12  thing?
13  A. I don't remember who it was that made notations.
14  I don't know who the other parents were.
15  Q. Was T— J— ever at your house before
16  January 15th, 2002?
17  A. I don't think so.
18  Q. Was T— J— at that time a Strong Vincent
19  student?
20  A. I think that -- I don't know. We had just moved
21  in from Arizona. We really didn't have no connections or
22  ties with anybody. I can't say one way or the other whether
23  she went to school there or whether she was just starting
24  school there. I don't know. But my thoughts are if she
25  knew, she must have been pretty close to knowing who Robin

**Page 99**

1  was and who T— was, otherwise the conversation wouldn't
2  have taken place.
3  Q. After Robin Johnson told you this -- I'm sorry. I
4  guess the next day you confirmed with Robin Johnson that she
5  had been told this by Linda Cappabianca?
6  A. Yes. I called her several times. I wanted to
7  hear it from her mouth, not just the word of a kid.
8  Q. She confirmed it?
9  A. Right.
10  Q. Did you call Linda Cappabianca about this?
11  A. I don't remember if I did or not. I was so
12  bitterly angry about it.
13  Q. Did you call anybody at the Erie School District
14  about this?
15  A. No, because R— wasn't going back to school.
16  Q. You regarded that as an outrageous breach of
17  privacy, did you not?
18  A. Pardon me?
19  Q. You regarded what Cappabianca said to Toni Johnson
20  as an outrageous breach of privacy, did you not? You
21  thought it was awful she's talking about your daughter like
22  this --
23  A. I thought it was horrible.
24  Q. -- to somebody else. Why didn't you tell somebody
25  at Erie School District about it; why didn't you complain

**Page 100**

1  about it?
2  A. Because here's my thought and my sentiments on
3  that. My daughter has been removed for something that was
4  not her fault. I now have the belief that my daughter has
5  been talked about to other parents. I'm at this point
6  believing that there is no police involvement outside of
7  what I'm saying. And there is no reason for me to go back
8  there and talk to these people when they haven't done
9  anything in the very beginning. I didn't see any reason why
10  to go back because it wouldn't have made a difference
11  anyway. They weren't being responsible, in my opinion, to
12  do what they were supposed to do. And to talk about it to
13  another parent that just made me all the more angry. If I
14  had gone back there, I know I would have blown my stack. I
15  am a very patient man. I'm a very kind person, but I have
16  my limitations.
17  Q. It didn't cross your mind to complain to someone
18  about Linda Cappabianca?
19  A. The only time it crossed my mind to talk to
20  someone, other than, you know, the police department or
21  whatever, is on March 25th which was, slash, slash, 26th, when my
22  daughter stabbed me and she had tried to commit suicide
23  because by that time it was so out of control with her, I
24  had lost all hope and everything. The officer that had
25  taken her to Millcreek Community Hospital he said, you need

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    RICHARD P., by and for        :
      R_____ P., and DENISE L.,    :
 4    by and for K_____ L.,        :
                  Plaintiffs        :
 5                                  :
          v.                        :     Civil Action No. 03-390
 6                                  :             Erie
      SCHOOL DISTRICT OF THE CITY   :
 7    OF ERIE, PENNSYLVANIA; JANET  :
      WOODS, Individually and in    :
 8    her Capacity as Principal of  :
      Strong Vincent High School;   :
 9    and LINDA L. CAPPABIANCA,     :
      Individually and in her       :
10    Capacity as Assistant         :
      Principal of Strong Vincent   :
11    High School,                  :
                  Defendants        :
12

13

14

15

16              Deposition of FRANK SCOZZIE, taken before

17       and by Janis L. Ferguson, Notary Public in and

18       for the Commonwealth of Pennsylvania, on Monday,

19       April 11, 2005, commencing at 3:38 p.m., at the

20       offices of Knox McLaughlin Gornall & Sennett, PC,

21       120 West 10th Street, Erie, Pennsylvania 16501.

22

23

24

25              Reported by Janis L. Ferguson, RPR
              Ferguson & Holdnack Reporting, Inc.
```

Richard P. v. Erie School District                Frank Scozzie
                                                                    April 11, 2005

**Page 18**

1  building, where there is actually no capability to
2  participate with regular programs, would be the actual least
3  restrictive.
4      Q.  Okay.  Now, Sarah Reed isn't part of the Erie
5  School District, is it, or is it?
6      A.  It is not part of the Erie School District.
7      Q.  Okay.  So a placement in Sarah Reed is a placement
8  outside of the School District.  Is that right?
9      A.  That's correct.
10      Q.  So in that continuum that we just went through,
11  where does -- where would Sarah Reed -- would it even be in
12  that continuum?
13      A.  Yeah.  It's a restrictive placement.
14      Q.  A restrictive placement?
15      A.  Right.
16      Q.  It's below special ed. classes in the building; is
17  that right?  It's more restrictive than special ed. in the
18  building.
19      A.  Not necessarily, because -- and I would say I
20  misspoke.  There are regular students that are participating
21  at Sarah Reed, so there is the participation level with
22  regular students there.  When I say "regular", I'm talking
23  about from an educational component standpoint.  They are
24  not categorized as special education on an IEP.
25      Q.  Okay.  Those students are there because they have

**Page 19**

1  discipline problems; is that right?
2      A.  Some are there for that.
3      Q.  We had a conversation with Miss Woods, and I'm not
4  sure it was exactly clear, because the term "alternative
5  education program" appears to be used in several different
6  ways in the documents.  And maybe you could tell me -- she
7  said that if I used AEP, the initials AEP, that would
8  signify something relative to the Erie School District.  Is
9  that --
10      A.  Well, first of all, I guess "alternative" is an
11  overused word and probably needs to be categorized, because
12  there are certainly different levels of alternative.
13          What she particularly was trying to describe to
14  you is that Erie School District partners with Perseus House
15  to run an alternative education program.  And students are
16  sent there for a whole litany of reasons.  But they are
17  categorized as being in an AEP program.
18      Q.  Now, did Sarah Reed ever partner with Erie
19  concerning an alternative --
20      A.  Sarah Reed has a program --
21      Q.  You have to let me finish.
22      A.  Sorry.
23      Q.  -- partner with the Erie School District
24  concerning providing an alternative education program?
25      A.  They have a partnership of that sort with the

**Page 20**

1  regular -- with the regular education component of the Erie
2  School District, not the special education program.
3      Q.  So certain regular education -- certain students
4  who receive regular education from the Erie School District
5  will go to Sarah Reed for alternative -- for an alternative
6  education program.
7      A.  That is correct.
8      Q.  And are those students referred to Sarah Reed as a
9  result of violating the Discipline Code?
10      A.  Can be.
11      Q.  What other reasons might they be sent to Sarah
12  Reed?
13      A.  Unusual behavior has been exhibited.  Parent comes
14  in with a significant concern of something that's going on
15  at home that has been corroborated by the student's teacher,
16  and then all of a sudden unusual behaviors are occurring.
17      Q.  And this might be unusual behavior that is not
18  necessarily a discipline problem, or would it --
19      A.  Might be both.  It could be a discipline problem.
20  It could be a discipline problem or just could be a bizarre
21  behavior.  I guess in a -- in a classroom setting, it could
22  be perceived as a discipline problem, depending on -- I
23  mean, there are just so many things that can occur, it's
24  very difficult to try to be specific on this thing.
25          But Sarah Reed basically deals with students who

**Page 21**

1  have mental health issues primarily, as far as special ed.
2  goes.  So I can be specific with that.
3      Q.  Okay.  Well, part of Sarah Reed does.  But then
4  part of it also deals with students who are behavioral
5  problems at the Erie School District, right?
6      A.  Elementary students.
7      Q.  Elementary students.  Does that mean one through
8  eight or one through six?
9      A.  One through eight.
10      Q.  So one through eight kids who have disciplinary
11  problems in the Erie School District might be referred to
12  Sarah Reed.
13      A.  Right.
14      Q.  And there is a contract between Sarah Reed and
15  Erie School District for Sarah Reed to provide an
16  alternative education program for those students.
17      A.  That is correct.
18      Q.  And then is there also contracts between Sarah
19  Reed and the Erie School District to provide alternative
20  education for other students?
21      A.  There is a contract with Sarah Reed to provide
22  partial hospitalization programming and therapeutic
23  programs, as I earlier described to you.
24      Q.  Therapeutic.
25      A.  I guess you would call -- anytime you have a

26ᴏ

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD P., BY AND FOR
P., AND DENISE L., BY
AND FOR K.    L.,
            Plaintiffs

        vs                    ) Civil

SCHOOL DISTRICT OF THE
CITY OF ERIE, PENNSYLVANIA;
JANET WOODS, INDIVIDUALLY
and in her Capacity as Principal
of Strong Vincent High School;
and LINDA L. CAPPABIANCA,
Individually and in her Capacity
as Assistant Principal of Strong
Vincent High School,
            Defendants

Deposition of FRANK SCOZZIE, taken before and

by Linda K. Rogers, Commissioner of Deeds in the

Commonwealth of Pennsylvania and Notary Public in

the State of New York, on Wednesday, May 18, 2005,

commencing at 12:10 p.m., at the law offices of

Knox, McLaughlin, Gornall & Sennett, 120 West 10th

Street, Erie, Pennsylvania.

                * * *

Page 1

For the Plaintiffs:
    Edward Olds, Esquire
    Carolyn Russ, Esquire
    1007 Mount Royal Boulevard
    Pittsburgh, PA 15223

For the Defendants:
    James T. Marnen, Esquire
    Knox McLaughlin Gornall & Sennett, PC
    120 West 10th Street
    Erie, PA 16501

                * * *

Page 2

---

1  F R A N K   S C O Z Z I E, first having

2  been duly sworn, testified as follows:

3

4        DIRECT EXAMINATION

5  BY MR. OLDS:

6

7    Q. Mr. Scozzie, I wanted to talk to you about the

8  issue of records and the change in school district policy

9  concerning retention of records.

10    A. Okay.

11    Q. As I understand it, at some point there was a

12  change in policy concerning discipline records?

13    A. Regarding?

14    Q. Destruction of discipline records.

15    A. That very well may be true. Was that when I was

16  running the department or.

17    Q. I don't know. I guess I'm asking you. Do you

18  know if there has been -- if the Erie School District has

19  changed its policy concerning discipline records and

20  retention of discipline records?

21    A. I don't believe that I am aware of that. I think

22  we follow a certain policy. It seems to me that there was a

23  situation that we decided that certain records would be kept

24  in certain areas. And we do review what is kept under lock

25  and key, and what is kept out for daily perusal. And we

Page 3

---

1  do -- Dr. Tempestini, who is our child study director, does

2  control what is destroyed and what is not by following

3  policies. I would say she may have made me aware that she

4  made a change or there was a change. I can't say that it

5  was something that I'm -- that's off the top of my head.

6  That doesn't mean it didn't occur.

7    Q. Well, let me -- we marked, I guess this was marked

8  as Defendants' Exhibit C, which was middle and high school

9  discipline policy for 2001-2002, and at document Bate stamp

10  102. In the introduction it says, student discipline

11  records will remain a part of the student's permit files.

12  When a student transfers to this school district a certified

13  copy of the student's discipline record is required and

14  obtained from the school entity from which the student is

15  transferring. The same is true when a student transfers out

16  of the Erie School District. This record shall be

17  maintained as part of the student's permanent discipline

18  record and shall be made available for inspection as

19  required by law. Do you know if that policy has changed?

20    A. As I said, this policy is reviewed yearly, there

21  probably are yearly changes. Is that a major change, again,

22  that is something someone else does.

23    Q. Who might that be?

24    A. I mean, the maintenance of records are done by two

25  people. The director of special education, Jim Pacansky,

Page 4

---

Page 13

```
 1   parents?
 2       A. I would imagine -- I would hope it would be in a
 3   reasonable fashion. I'm sure she needed to sort through
 4   some things. I am not going to speak for her, but it would
 5   be my hope that she would do it as quickly as she had
 6   determined what had actually occurred in the situation.
 7   It's not good to call a parent and say, listen, I just heard
 8   this and I am just going to start -- because it sometimes
 9   turns out not to be true or not to be factual. So you have
10   to make sure you have the facts in order and then the call
11   should be made as soon as that is determined.
12       Q. Did either -- did you ever talk to
13   Miss Cappabianca about what happened to K█████ and R█████
14       A. I believe my conversations were with Jan Woods,
15   but I can't say I never did speak to Miss Cappabianca, I may
16   have.
17       Q. But you don't recall what you said to her, if you
18   did speak to her? Or do you have a recollection of what was
19   said?
20       A. Let me, again, say that whether it came from both
21   Cappabianca and Woods or Woods, which is my recollection,
22   there was a certainty that mental health intervention needed
23   to be invoked immediately, as quickly as we could do it.
24       Q. And what do you recall the information that they
25   gave you that indicated that mental health had to be
```

Page 15

```
 1   that other thing, I have every confidence that the
 2   department would take care of those. If necessary a new
 3   NORA, a new ER, rather an evaluation needs to be done. But
 4   Sarah Reed is very good before they do an intake they know
 5   the rules.
 6       Q. I have several questions to follow up on that
 7   answer. Number one, when you refer to the department, are
 8   you referring to the special education department?
 9       A. What I'm referring to there would be the special
10   ed. department in conjunction with the child study which I
11   referred to earlier that would be Marianne Tempestini's
12   pupil personnel services department. But the acronyms have
13   changed through the years, but you still use the same
14   terminology. But, yes, they would work together to see that
15   all the necessary paperwork. That is somebody else's job,
16   at that point I was not doing an assessment, worrying about
17   who was going to do the paperwork. I was worried about Jan
18   Woods had described the situation with a sense of urgency,
19   my function at that point was to get the process going so
20   that -- assuming that the paperwork was done -- the
21   placement was capable of being done.
22       Q. I think you made a statement that Jan Woods
23   conveyed the notion to you it couldn't wait two weeks for
24   this to be done.
25       A. No, I didn't say -- what I said was, it could wait
```

Page 14

```
 1   invoked?
 2       A. I think Jan was concerned that there could be some
 3   issue with the individual student hurting herself, doing
 4   some damage to her body, to herself.
 5       Q. R█████ and K█████ were both special ed.
 6   students, was there any discussion about doing an evaluation
 7   or reevaluation of their condition?
 8       A. Well, I guess there's two things. When someone
 9   tells me about an emergency situation, I'm not going to sit
10   back and say, well, let's take about three weeks to do an
11   evaluation of the situation. The processes will take care
12   of themselves before the placement could be done that had to
13   be done, things had to be done.
14       Q. What do you mean before what had to be done?
15       A. There was a period of time where a new NORA would
16   be issued. And the department would -- or a placement
17   letter would be done. And the department would do an
18   evaluation, that would be a departmental thing before the
19   placement is done to make sure all the things you're talking
20   about were done. My assessment at that time was if it took
21   two weeks traditionally to go to Sarah Reed, she gave me a
22   sense of urgency based on what I'm telling you that it
23   couldn't be two weeks. This needed to be done immediately,
24   and I acquiesced to what she had requested.
25           The other issues of whether the safeguards and all
```

Page 16

```
 1   two -- what she was saying that this needs to be done right
 2   now. Jan has -- many principals will call with situations,
 3   and you have to sort through that. Is this a real
 4   situation. And I could tell by her tone of voice, and her
 5   sincerity that she really believed that this needed
 6   immediate attention.
 7       Q. I would assume that you have visited or been
 8   present at Sarah Reed Children's Center?
 9       A. Yes.
10       Q. And have you observed their classroom settings and
11   stuff?
12       A. I have on occasion.
13       Q. I mean in terms of an emergency situation what
14   would you expect that Sarah Reed could do on an emergency
15   basis?
16       A. I told you before about Sarah Reed, they have a
17   lot of mental health specialists there that are trained in
18   looking for certain types of behavior, that would be one
19   thing. Number two, it is a structural change in
20   environment. There is a significant difference between
21   being with 800 students in a -- I don't how many square foot
22   Strong Vincent is, but it's a very large facility, and going
23   to a school that is much smaller with a much smaller class
24   size and many more adults paying attention to your actions.
25   You get a lot more attention, lot smaller class size and the
```

28a

```
 1         IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3  RICHARD P., BY AND FOR        )
    ██████ P., AND DENISE A., BY  )
 4  AND FOR K██████ L.,           )
              Plaintiffs           )
 5                                 )
         vs                        ) Civil
 6                                 )
    SCHOOL DISTRICT OF THE         )
 7  CITY OF ERIE, PENNSYLVANIA;    )
    JANET WOODS, INDIVIDUALLY      )
 8  and in her Capacity as Principal)
    of Strong Vincent High School; )
 9  and LINDA L. CAPPABIANCA,      )
    Individually and in her Capacity)
10  as Assistant Principal of Strong)
    Vincent High School,           )
11            Defendants           )

12

13

14       Deposition of LINDA CAPPABIANCA, taken before

15   and by Linda K. Rogers, Commissioner of Deeds in

16   the Commonwealth of Pennsylvania and Notary Public

17   in the State of New York, on Monday, April 4,

18   2005, commencing at 1:04 p.m., at the law offices

19   of Knox, McLaughlin, Gornall & Sennett, 120 West

20   10th Street, Erie, Pennsylvania.

21

22

23

24

25              * * *

                                            Page 1
```

```
 1  For the Plaintiffs:
        Edward Olds, Esquire
 2      Carolyn Russ, Esquire
        1007 Mount Royal Boulevard
 3      Pittsburgh, PA 15223

 4

 5  For the Defendants:
        James T. Marnen, Esquire
 6      Knox McLaughlin Gornall & Sennett, PC
        120 West 10th Street
 7      Erie, PA  16501

 8

 9

10

11

12

13              * * *

14

15

16

17

18

19

20

21

22

23

24

25
                                            Page 2
```

```
 1         L I N D A  C A P P I A N  C A,  first having

 2         been duly sworn, testified as follows:

 3

 4              DIRECT EXAMINATION

 5  BY MR. OLDS:

 6

 7    Q. Good afternoon, Mrs. Cappabianca.

 8    A. Good afternoon.

 9    Q. How are you?

10    A. Good, thank you.  And you?

11    Q. I'm pretty good.

12    A. And how was that ride?

13    Q. It was dry.  It was very pretty today.  What a

14  gorgeous day.

15         MR. OLDS:  Off the record.

16         (Discussion held off the record.)

17         MR. OLDS:  Back on the record.

18    Q. Ms. Cappabianca, for the record would you state

19  your full name and give us your address, your business

20  address will be fine.

21    A. Linda Louise Cappibianca, 820 Lincoln Avenue,

22  Erie, Pennsylvania, 16505.

23    Q. Have you ever been deposed, Ms. Cappibianca, in a

24  deposition?

25    A. No.
                                            Page 3
```

```
 1    Q. Let me explain a couple of things here.  I am

 2  going to be asking you a series of questions.  I'm sure

 3  Mr. Marnen went over this, but I will be asking you a series

 4  of questions.  If any of my questions become too convoluted

 5  or don't make sense, tell me and I will try to rephrase

 6  them.

 7       If you let me finish a question before you start

 8  to answer, and I will let you finish an answer before I

 9  start the next question and this will help the reporter.  In

10  conversation we always interrupt each other because we sort

11  of know where we are going and we are just anxious to get

12  there.  But sometimes in a deposition when you look at a

13  question and you can't figure out what the question was if

14  you interrupt me, and I won't get your full answer if I

15  interrupt you.  So if you can just abide by that one ground

16  rule, and then the only other ground rule is it's best if

17  you say yes or no instead of unh-unh or um-hmm in the

18  appropriate -- when the occasion is appropriate, okay?

19         Have you lived in Erie all of your life?

20    A. All of my life.

21    Q. Are you a product of the Erie Public School

22  System?

23    A. No.

24    Q. Where did you to go high school?

25    A. Mercyhurst Prep.
                                            Page 4
```



**Page 89**

1   A. I think she was over there waiting for her father
2 to pick her up and someone, a boy, approached her and pushed
3 her down and tried touching her under her shirt, and
4 unzipped his pants and showed his penis.
5   Q. She didn't know who that boy was; is that right?
6   A. Yes.
7   Q. You had an idea who the boy was?
8   A. Miss Woods.
9   Q. Ms. Woods had that. His first name was R████?
10   A. Yes.
11   Q. What was his last name?
12   A. H██████.
13   Q. Why did Miss Woods suspect that it was R████
14 H██████?
15   A. I don't know. Maybe by the description she had
16 given. I am not sure.
17   Q. Was C████ B████ -- did R████ tell you that
18 C████ B████ was allegedly involved in that incident as
19 well?
20   A. I don't recall.
21   Q. Did you talk to any faculty members to see whether
22 they had observed anything?
23   A. Yes.
24   Q. Who did you talk to?
25   A. Anyone that would have had any contact with

**Page 90**

1 R████
2   Q. Would this have been during the three-day period,
3 the 9th, 10th and 11th?
4   A. Um-hmm.
5   Q. Specifically do you remember which faculty members
6 you talked to?
7   A. It would have been Mrs. Scully, Miss Gray -- did I
8 mention her earlier? I may have forgotten her.
9   Q. I think you did.
10   A. Miss Scully, Miss Gray, Mrs. Manus were the three
11 main people that worked with them day-to-day. And Miss
12 Gray -- I'm sorry.
13   Q. You said Miss Gray. Do you have a recollection of
14 what Miss -- what, if anything, Miss Scully told you?
15   A. No.
16   Q. Do you have a recollection of what, if anything,
17 Miss Gray told you?
18   A. No.
19   Q. Do you have a recollection of what, if anything,
20 Miss Manus told you?
21   A. No.
22   Q. Was it -- what is your perception or your feeling
23 or your belief about what students knew about this? I guess
24 that's an ambiguous question. It's not only -- the student
25 body, let's just say, did you have any sense that

**Page 91**

1 information about this incident had become common knowledge
2 among the student body?
3   A. No, but after it came out, yes.
4   Q. When you say no, but after it came out, what do
5 you mean?
6   A. There was -- December 20th right after the
7 incident had happened I had overheard some kids talking
8 about K████ and C████ Wasn't very specific, they were
9 in the hallway. I told them to get to class, but I could
10 tell where the conversation was going. So the next time I
11 saw K████ she was on her way to P.A.S.S. We were
12 standing in the front hallway. I said, I am hearing things
13 about you, and I knew it was of a sexual nature. I said, I
14 don't know if they are true or not, and she goes, well,
15 they're true. Then I said, well, these are things that
16 people share when they really care about each other and they
17 are in love. In hindsight after that came out then I could
18 put it together that there was something that had gone on.
19   Q. You did have a conversation with K████ on
20 December 20th?
21   A. I did. And then I talked to C████ also.
22   Q. So, again, the conversation with K████ was that
23 you approached her and you said you heard --
24   A. Things.
25   Q. Heard things, and are you saying you didn't

**Page 92**

1 specify what the things were?
2   A. No, I did not. I didn't know what the things
3 were. I just knew that something may have transpired
4 between them the night before.
5   Q. Did you ask her what had happened?
6   A. No.
7   Q. But you must have had some sense because what was
8 the next thing you said?
9   A. When two people love and care about each other
10 that they -- these are things that people do when they love
11 and care about each other.
12   Q. You must have had some sense it was a sexual
13 thing?
14   A. Right, that's what I said. I know it was of a
15 sexual nature. But whether it was kissing or anything more,
16 that's very serious. To an adult -- when they're 12 years
17 old they can't handle the repercussions. Kissing sometimes
18 leads to more.
19   Q. So K████ response was what?
20   A. It was true.
21   Q. But did you hear anything about R████ and
22 C████ --
23   A. No.
24   Q. -- on the 20th?
25   A. No. Actually I even talked to C████ Typically

30a

1 when I hear something like that you want to talk to both
2 parties involved. And I said, C████ I'm hearing things
3 about you and K█████. And he denied that anything ever
4 happened between them. He said she liked him -- and not his
5 words -- but made me believe that she would tell people
6 these things so they thought they were boyfriend and
7 girlfriend. He did not say that, but he led me to believe
8 that she was the one telling people these things.
9    Q. Did you talk to B███ C███████ at all --
10    A. No.
11    Q. -- before Christmas?
12    A. No.
13    Q. What was your impression of C█████?
14    A. C████ was very sneaky. Very little in physique,
15 his stature, he was very little, although muscular, but very
16 sneaky. He would do things like take passes off of a
17 teacher's desk, passes to go to the bathroom, hallway
18 passes. And then fill them out and forge the teacher's name
19 and then you'd find them playing, he and a group of people,
20 in the gym, basketball. Or he would go into Miss Scully's
21 room -- one time he went into Miss Scully's room -- we have
22 video cameras in the hallways and it was 3:30 and we saw him
23 go in there on the video camera, they're not in the
24 classroom the video cameras, and he stole her candy. He was
25 very sneaky.

Page 93

1    Q. The conversation that you had with C██████?
2    A. Yes.
3    Q. Did that occur in the hallway or did you bring her
4 to your office?
5    A. No. It was actually -- she was on her way to
6 P.A.S.S., we are in the front hall. It was right before
7 Christmas break so the hall was pretty much cleared out.
8 Kids don't want to be there any longer than they have to be
9 right before a break. P.A.S.S. starts at 3:30, she was on
10 her way down. I did stop her there.
11    Q. Then that is when you had this conversation with
12 her?
13    A. Yes. It was like there's the front doors, and a
14 vestibule, then there's a hallway. We were in the hallway.
15    MR. OLDS: This might be an appropriate time to
16    postpone for the day.
17    MR. MARNEN: Okay.
18    (Examination concluded at 3:45 p.m.)
19       * * *
20
21
22
23
24
25

Page 94

C E R T I F I C A T I O N

I, Linda K. Rogers, Shorthand Reporter and
Commissioner of Deeds in and for the Commonwealth of
Pennsylvania, do hereby certify that I recorded
stenographically the proceedings herein at the time and
place noted in the heading hereof, and that the foregoing is
an accurate and complete transcript of same to the best of
my knowledge and belief.




_____

Linda K. Rogers


Dated: April 15th, 2005

Page 95

INDEX

EXAMINATION

| WITNESS NAME | PAGE | LINE |
| --- | --- | --- |
| LINDA CAPPABIANCA | 3 | 1 |
| Direct By Mr. Olds | 3 | 5 |

EXHIBITS

| | DESCRIPTION | PAGE | LINE |
| --- | --- | --- | --- |
| LC EX. 2 | COMPUTER PRINTOUT | 26 | 17 |
| LC EX. 3 | C. BIBBS DISCIPLINARY INFO | 31 | 6 |
| LC EX. 4 | DOCUMENT | 38 | 24 |
| LC EX. 5 | INVITATION TO IEP | 38 | 24 |
| LC EX. 6 | IEP | 46 | 3 |
| LC EX. 7 | IEP | 47 | 25 |
| LC EX. 8 | ATTENDANCE CARD | 49 | 11 |
| LC EX. 9 | COMPUTER REPORT | 66 | 6 |
| LC EX. 10 | COMPUTER REPORT | 66 | 7 |
| LC EX. 11 | P.A.S.S. ATTENDANCE | 72 | 25 |

* * *

Page 96

31a