IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD P. by and for | ) | No. 03-390 Erie |
| RACHEL P. and DENISE L. by | ) | |
| and for KRISTINA L., | ) | |
| | ) | |
| Plaintiffs, | ) | Electronically Filed |
| | ) | |
| v. | ) | **Jury Trial Demanded** |
| | ) | |
| SCHOOL DISTRICT OF THE CITY | ) | |
| OF ERIE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR NEW TRIAL
FILED UNDER RULE 59(a) FED.R.CIV.PRO.**

This is Plaintiffs' Motion for a New Trial. Plaintiffs seek a new trial because the verdict was against the weight of the evidence, because of error in the Court's charge to the jury, because of an error in the special interrogatories and because counsel for Defendants overstepped the boundaries of permissible argument in his summation.

***INTRODUCTION: LEGAL STANDARDS***

Federal Rule of Civil Procedure 59(a) governs a motion for a new trial. According to Rule 59(a), a court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a)(1). "A new trial may be granted where 'the verdict is contrary to the great weight of the evidence.'" **Wilson**

**v. Phila. Det. Ctr.**, 986 F.Supp. 282, 287 (E.D.Pa.1997) (quoting **Roebuck v. Drexel Univ.**, 852 F.2d 715, 735 (3d Cir.1988)). New trials may also be directed when the "conduct of counsel or the court has tainted the verdict." **Kiss v. K-mart Corp.**, No. CIV.A. 97-7090, 2001 WL 568974, at *1 (E.D.Pa. May 22, 2001) (citation omitted).

Generally, the decision whether or not to grant a new trial "is committed to the sound discretion of the district court." **Bonjorno v. Kaiser Aluminum & Chem. Corp.**, 752 F.2d 802, 812 (3d Cir.1984). The court's latitude varies, however, depending on the type of error alleged. **Klein v. Hollings**, 992 F.2d 1285, 1289-90 (3d Cir.1993). Its latitude "is broad when the reason for interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court," such as evidentiary rulings. **Id.** The court's discretion is more limited when granting a new trial on the basis that the jury's verdict is against the weight of the evidence; in such cases a new trial should be awarded "only when the record shows that the jury's verdict resulted in a miscarriage of justice or when the verdict, on the record, cries out to be overturned or shocks our conscience." **Williamson v. Consolidated Rail Corp.**, 926 F.2d 1344, 1353 (3d Cir.1991). **Moussa v. Commonwealth of Pennsylvania Dept. of Public Welfare**, 89 F.Supp.2d 639, 648 W.D.Pa.,2003.

2

In determining that the verdict is against the weight of the evidence, a different standard of review is applied from that which is applied in deciding a motion for judgment as a matter of law. A judge must "evaluate all significant evidence, deciding in the exercise of his own best judgment whether the jury has so disregarded the clear weight of the credible evidence that a new trial is necessary to prevent injustice." **Berndt v. Kaiser Aluminum & Chemical Sales, Inc.**, 789 F.2d 253, 258 (3d Cir.1986), *citing* **Zegan v. Central Railroad Company of New Jersey**, 266 F.2d 101 (3d Cir.1959). However, a court may not substitute its judgment for that of the jury. A new trial "cannot be granted ... merely because the court would have weighed the evidence differently and reached a different conclusion." **Markovich v. Bell Helicopter Textron, Inc.**, 805 F.Supp. 1231, 1235 (E.D.Pa.), aff'd, 977 F.2d 568 (3d Cir.1992).

A court analyzing a motion for a new trial because the verdict is against the weight of the evidence need not view the evidence in the light most favorable to the verdict winner.[1]   See **Magee v.**

---

[1]A new trial may be granted even when judgment n.o.v. is inappropriate. **American Bearing Co.**, 729 F.2d at 948 n. 11; see, e.g., **Rousseau v. Teledyne Movible Offshore, Inc.**, 812 F.2d 971, 972 (5th Cir.) (affirming grant of new trial even though there was "legally sufficient evidence to support the verdict, thus foreclosing a j.n.o.v."), cert. denied, --- U.S. ----, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987); 9 Wright & Miller § 2539 at 608 ("In many instances the judge might grant a new trial on th[e] ground

**General Motors Corp.**, 213 F.2d 899, 900 (3d Cir.1954). If the court finds the verdict is against the great weight of the evidence, or the amount of the verdict is excessive and "shocks the conscience" of the court, the court may grant a new trial. See **Williamson v. Consolidated Rail Corp.**, 926 F.2d 1344, 1353 (3d Cir.1991); **New Market Inv. Corp. v. Fireman's Fund Ins. Co.,** 774 F.Supp. 909, 917 (E.D.Pa.1991).

A new trial may also be ordered when counsel has used improper remarks in a closing argument. Where a party requests a new trial based on an allegation of improper remarks by counsel, the test is "whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." **Waldorf v. Shuta, 142 F.3d 601, 628 (3d Cir.1998)** (citations and internal quotations omitted).

Although different standards may apply depending upon the reasons advanced for the new trial, "[t]he decision to grant or deny a motion for a new trial 'is confided almost entirely to the discretion of the district court.'" **Wilson**, 986 F.Supp. at 287

---

[that the verdict is against the weight of the evidence] even though he is constrained to refuse to order judgment [n.o.v.]."). Such a motion should be granted when, in the opinion of the trial court, the verdict is contrary to the great weight of the evidence, thus making a new trial necessary to prevent a miscarriage of justice. See generally 9 Wright & Miller § 2531 at 575-76; 6A J. Moore, Moore's Federal Practice ¶ 49.08[5], at 59-140 to 59-150 (2d ed. 1986).  C.A.3 (Pa.),1988.

(quoting **Blancha v. Raymark Indus**., 972 F.2d 507, 512 (3d Cir.1992)).

I. __Verdict Was Against the Weight of Evidence__

Plaintiffs assert that they are entitled to a new trial because the verdict was against the weight of the evidence. In other words, the verdict as rendered should be set aside and a new trial ordered because the great weight of the evidence supported the fact that the School District officials had knowledge of harassment.

The jury was asked to respond to special interrogatories in connection with rendering its verdict. Interrogatories No. 1 and 6 were answered by the jury; no other interrogatories relative to Plaintiffs' Title IX claim were answered.

Interrogatories No. 1 and 6 posed the following questions:

1. Do you find that defendant Erie School District had actual knowledge of the harassment of plaintiff Rachel P. by other students after the December 19, 2001 rapes?

6. Do you find that defendant Erie School District had actual knowledge of the harassment of plaintiff Kristina L. by other students after the December 19, 2001 rapes?

The jury answered no to each.

It is evident that the answers to the Interrogatories were against the great weight of the evidence and, therefore, a new trial is warranted.

There was significant credible evidence that the Defendants had actual knowledge of the sexual harassment after December 19, 2001. That evidence included the following:

a)   Cappabianca admitted that she overheard hall talk on December 20, 2001, that was sufficiently startling and loud enough to catch her attention. She also admitted that the hall talk was sufficiently explicit that it tipped her off to sexual activity involving Kristina and Charles. Cappabianca and Woods also admitted that the information which came to their attention was sufficiently noteworthy that it caused Cappabianca to tell Woods about it, and that Woods instructed her to follow up on it. The hall talk concerned the rape that occurred the night before. The fact that there was startling, loud, explicit hall talk on December 20, regarding Kristina and sexual activity, was an instance of sexual harassment, and there is no dispute that Cappabianca became aware of it.

b)   The hall talk also tipped off Woods and Cappabianca to information about the rape. Had they followed up on the information, they could have prevented further harassment of Kristina and Rachel.

c)   Cappabianca testified that when she asked Kristina about the sexual encounter with Charles, Kristina acknowledged that there had been such an encounter. At the time, Kristina was 12 years old with the mental intelligence of an 8 or 9 year old. Cappabianca testified that she did not question Kristina further. Instead, she simply informed Kristina that "whatever" she had been doing, it was something for adults who were in love.

d)   One of the assailants, Charles B., testified that Cappabianca asked him on December 20, "What's this I hear about oral sex." (Charles B. deposition

6

testimony, presented at trial.)  The testimony at trial was a response to an open-ended question as to what she said to him.

e)   Cappabianca testified that she asked Charles, in front of Kristina and the other students in PASS (Program for After-School Suspension), whether it was true that something had happened the night before between him and Kristina.  This was after Kristina had confirmed for Cappabianca that there had been sexual activity involving her and Charles.

f)   Cappabianca testified that since Charles denied the activity, she had no way to take disciplinary action, because it was a he-said, she-said situation.

g)   Denise L. testified that she informed Cappabianca on Monday, January 7, 2002, that Kristina was hospitalized because of what had happened to her at school and advised her that Kristina had told her about the sexual assault.

h)   Rachel and her father testified about an encounter with Cappabianca which occurred on January 4, 2002, in which Cappabianca phoned Rachel's father, Richard, and told him that Rachel had a "filthy mouth."  Rachel testified that the January 4, 2002, encounter with Cappabianca occurred after she had been ejected from a music class for screaming out that she did not want boys to ask her to perform oral sex.

i)   Rachel testified that she was sent to the office after her outburst in music class, and that Cappabianca assigned her to PASS for her response to the harassment of the boys in her music class. The PASS records (offered as a Defense Exhibit) show that Rachel began serving the after-school detention on Monday, January 7. Cappabianca was the administrator who would assign students to PASS, and Cappabianca gave no alternative explanation for assigning Rachel to PASS. Because the School District destroyed Rachel's discipline records, it has no evidence as to why Rachel was assigned to PASS.

7

j) The only existing contemporaneous record that sheds light on the January 4 encounter between Cappabianca and Rachel is found in Rachel's bound diary entry in which Rachel references the fact that she was given PASS for her word choice when she tried to tell Cappabianca that boys were trying to force her to "suck dick."

k) Rachel testified that on one occasion Cappabianca had to rescue her from a group of students who had backed her into a locker and were demanding that she perform oral sex. Once again, this conduct is sexual harassment.

l) Woods and Cappabianca testified that as of January 9 they were in full possession of the "facts" about the December 19 rape. Nevertheless, they did not relieve Rachel of the obligation to attend PASS on January 9 with one of the rapists. At that point they were indisputably in possession of information that Rachel had been sexually harassed, yet they did not act to protect her from future harassment.

m) The police records (Plaintiff Exhibit) indicate that Cappabianca had heard from third sources earlier in the week of January 7 that Becky C. had pushed Rachel down the steps in an effort to force her to perform oral sex on a male in school.

n) Rachel's friend Toni N. and Toni's mother Robin J. presented testimony that a meeting occurred between them and Cappabianca in which Cappabianca informed them that Rachel was engaging in sexual activity around the school and across the street. Cappabianca and Woods testified they were meeting with all of the people who might have information about the December 19 incident and hence a plausible explanation for the meeting exists. Neither Cappabianca nor Woods would know which of Rachel's acquaintances were involved until they met with them. Cappabianca admittedly was not present during Woods' meeting with Rachel and her father on January 10, and she cannot explain what she was doing during that meeting. Robin J and her daughter Toni testified that after meeting with Cappabianca they encountered Rachel and her father, who had just emerged from their meeting with Woods. Robin J testified that she had information from no other

source than Cappabianca about any of Rachel's alleged sexual activities. Robin J testified that Cappabianca made Rachel sound like a "little whore."

o)   Rachel's father testified that Woods told him that "they" had known about the sexual activity for some time.

The substantial weight of the evidence shows that Cappabianca and Woods had actual knowledge of the harassment being experienced by Rachel and Kristina at school. The evidence further shows that it is likely that they viewed Rachel and Kristina as voluntary or consensual participants in sexually offensive conduct. For example, when Woods asked Rachel and her father to meet with Woods, she asked Rachel to tell Richard what had happened. Woods' explanation for this tactic was that "life is tough," and sometimes you have to handle difficult situations, but it is more likely that she handled the encounter as she would any student misbehavior, demanding that the student "confess" to the parent what she had done wrong.

Similarly, when Cappabianca met with Robin J. and Toni, she informed them that Rachel was engaging in sexual activity around the school and across the street and, in Robin J.'s words, acting like a "whore." This testimony bolsters the conclusion that Cappabianca was well aware of the sexual harassment which Rachel was experiencing, but she chose to characterize it as something Rachel invited.

9

Moreover, on January 9, the day that Woods and Cappabianca assert that they had the information that Rachel had been raped, they nevertheless sent her back to her classes with her assailants, and still expected her to serve her PASS assignment for repeating to Cappabianca the language Rachel had used in telling boys she would not perform oral sex. The PASS assignment was served with her rapist, Charles. This was not the action of administrators who believed they were dealing with a rape.

It can be seen that the substantial weight of the evidence is that the School District had actual knowledge of sexual harassment of both girls after the December 19 rape. Given this, it is clear that the verdict is against the weight of the evidence and that a new trial is warranted.

## II.  **Motion For New Trial Because of Errors in Charge**

The fact that the verdict was against the weight of the evidence stems in part from the Court's failure to charge on the subjective nature of the knowledge in the "deliberate indifference" standard, and on the Court's failure to adequately charge on a concept analogous to pretext.  Where the objection to a charge is properly preserved, the inquiry is whether the charge, "taken as a whole, properly apprises the jury of the issues and the applicable law." **Limbach Co. v. Sheet Metal Workers Int'l Ass'n,** 949 F.2d 1241, 1259 n. 15 (3d Cir.1991) (en banc).  This Court's charge did not accomplish this task.

Plaintiffs presented the Court with proposed points for charge Nos. 11, 17, and 20. These proposed points for charge are as follows:

11. The knowledge element of deliberate indifference is subjective, not objective knowledge. **Farmer v. Brennan,** 511 U.S. 825, 837-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). See **id.** at 837-38, 114 S.Ct. 1970. However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk. See **Farmer** at 842, 114 S.Ct. 1970. Finally, a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring. See **id.** at 844, 114 S.Ct. 1970. **Beers-Capitol v. Whetzel**, 256 F.3d 120, 132 (3d Cir. 2001)

17. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the party who has given it is dissembling to cover up a material fact which would make the party culpable. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." **Wright v. West**, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); see also **Wilson v. United States**, 162 U.S. 613, 620-621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); 2 J. Wigmore, Evidence §278(2), p. 133 (J. Chadbourn rev. 1979). **Reeves v. Sanderson Plumbing Products, Inc.**, 530 U.S. 133, 147, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105, 68 USLW 4480, (2000)

20. In making your judgments about the evidence, you may consider the documentary evidence that the parties have presented. You may give more weight to items prepared before the present litigation commenced. If you conclude that the Defendants have been less than truthful and forthcoming with regard to the reasons that they have advanced for the actions they took, you may conclude that

the lack of candor or forthrightness conceals illicit or illegal motives. Thus, if you find that the Defendants' testimony is less than forthright, you may conclude that the Defendants are attempting to conceal their true actions and motives, and that they were guided by illicit reasons in their conduct. **Chipollini**, **supra**. **Reeves v Sanderson Plumbing Products, Inc.,** \_\_\_U.S. \_\_\_, 120 S.Ct. 2097 (2000)

The charges were necessary for the jury to have an understanding of the context of the evidence presented. The failure to instruct the jury on these areas of law is grounds for a new trial because the charge taken as a whole fails to apprize the jury of the law and the issues for it to decide.

**(a)    Inferring Actual Knowledge from Circumstantial Evidence**

The failure to provide the first portion of requested charge No. 11 was error because the jury was not instructed that it could infer "actual knowledge" from circumstantial evidence. While deliberate indifference to events about which the school district administrator has "actual knowledge" is the norm in a Title IX case, the law is settled that the "knowledge" element of the "deliberate indifference" standard is subjective knowledge. **Farmer v Brennan**, 511 US 825, 837-38, 114 S.Ct. 1970, 128 L.Ed 2d 811 (1994).  As set out in *Farmer, supra,* 511 U.S. at 842, 114 S.Ct. 1970, "*subjective knowledge on the part of the official [in a case where the issue is deliberate indifference] can be proved by*

12

*circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk.*" See **Farmer** at 842, 114 S.Ct. 1970." (Italics supplied)

There was ample circumstantial evidence that Woods and Cappabianca had "actual knowledge" of sexual activity involving 13-year-old Rachel and 12-year-old Kristina sufficient to satisfy the **Farmer** test. Both Cappabianca and Woods admitted that Cappabianca had heard hall talk about sexual activity between Kristina and Charles. This information came to them before the Christmas break in 2001. Kristina was a child who was cognitively impaired. Charles, two years older than Kristina, was a known troublemaker with an extensive discipline record. When Kristina confirmed that there had been sexual activity, Cappabianca did not even bother to ask her what had happened! Instead, Cappabianca and Woods relied on Charles' denial of the sexual activity to make a judgment that they did not have to take action to investigate further. There was also evidence that by virtue of school district practice the school district's hands were tied whenever administrators were presented with a he-said, she-said situation. Cappabianca testified that in such a case, the school district would take no steps to dig deeper, because it could not choose between conflicting versions of an episode. The existence of this practice would be an important tool in judging the subjective knowledge of Cappabianca and Woods, because they were, in essence

13

precluded by practice or custom from believing Kristina, because she had no corroboration and because Charles denied the act.

Cappabianca described Kristina as a girl who was wearing make-up and looking darling, who, Cappabianca claimed, chose to sit by Charles the evening after he had raped Kristina. This evidence suggests that Cappabianca viewed 12-year-old Kristina as presenting a provocative appearance; an appearance which led to Cappabianca's view of her as a willing sexual partner of Charles. Cappabianca admitted that she told Kristina that what Kristina had done with Charles was something adults in love do -- the adult, the equivalent of calling a pre-adolescent girl immoral. Woods apparently accepted Cappabianca's reading of the situation since she did not direct Cappabianca to pursue the matter further, other than to "keep [her] ear to the ground." Hence, the evidence shows that Cappabianca and Woods assumed Kristina was a consensual participant in the sexual activity, and they therefore did nothing to protect her. She was below the age of consent at this time.

Similar evidence was presented concerning Rachel's plight. Rachel was kicked out of music class because she shouted at boys who were torturing her that she would not perform oral sex. Cappabianca disciplined Rachel for trying to defend herself against the aggression of her tormentors and blithely ignored the potential for harm to Rachel. The only contemporaneous record of that episode exists in Rachel's bound, dated diary where she indicates that

14

Cappabianca gave her PASS and called her father because Rachel was using vulgar language to describe what the boys had been trying to get her to do.  Cappabianca maintains that she did not ask Rachel about why Rachel had the outburst in music class.

Even on the day when the school administrators now claim that they acquired "actual" knowledge of the sexual harassment--January 9, 2002--they sent Rachel to PASS, to serve detention with her rapist, Charles, for the offense of telling boys that she would not perform oral sex.

Our jurisprudence would permit the jury to infer that Cappabianca's response to all of  this information was inadequate and amounted to circumstantial evidence to the effect "*that the excessive risk was so obvious that the official must have known of the risk*," as permitted by the **Farmer** decision.  Hence, the Court's failure to charge on the **Farmer** standard, as adopted in **Beers-Capital v Whetsel**, 256 F.3d 120, 132 (3d Cir. 2001), led to the failure to instruct the jury about the inferences it could draw about knowledge from the evidence presented.

**(b)   Role of Untruthfulness in Determining Witness's Subjective Knowledge**

The Court's failure to adequately explain to the members of the jury that the untruthfulness of the witness or conflicts in the witnesses' testimony is a tool that can be used to determine the witness's subjective knowledge represents a crucial error, also.

A party must be able to prove a individual's state of mind by circumstantial evidence.    An important tool for the use of circumstantial evidence about an individual's state of mind is proof that an individual has not been forthright when describing their state of mind.   A plaintiff to a Title IX case ought to be able to prove the state of mind of a school district official "by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk."   See **Farmer** at 842, 114 S.Ct. (1970).

The Third Circuit held in **Smith v Borough of Wilkinsburg**, 147 F.3d 272 (3d Cir. 1998) in the context of a Title VII case that:

> it is clear that the jury must be given the legal context in which it is to find and apply the facts. ...[A} jury is entitled to infer discrimination from pretext as we instructed in **Fuentes v Persky**, 32 F.3d 759, 764-65 (3d Cir. 1994), ...[ and must be] informed that they may do so. Accordingly, we join the Second Circuit in holding that jurors must be instructed that they are entitled to infer, but need not, that plaintiff's ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence can be met if they found the facts needed to make up the prima facie case have been established and they disbelieve the employer's explanation for its decision.  **Id.** at 280.

The principles announced in **Smith** are obviously applicable in this Title IX case because the "actual knowledge" element of a Title IX case is similar to the "discriminatory intent" element of a Title VII case. Both involve the defendant's state of mind. Therefore instructions about "pretext" which must be given in a

16

Title VII case are also appropriate for a Title IX case, where the issue is subjective "knowledge," a state of mind as much as an "intent to discriminate" is a state of mind. The veracity of the decision makers' explanation for actions they took, once they became aware of sexual activity between and among pre-adolescents, is an important question.

It is crucial, therefore, that the Court's charge provide the jurors with an instruction that they may tie a lack of honesty to a defendant's culpable state of mind.  By not instructing the jury in this area, the court deprived the jury of an important tool which it could have used to test the testimony of school district administrators.   These administrators professed not to have "actual" knowledge of events, even though they had ample knowledge of circumstances and occurrences "to the effect that the excessive risk was so obvious that the official must have known of the risk." **Farmer**, supra, id. The absence of any charge to the jurors that they could judge the state of mind of Cappabianca and Woods in relation to their honesty requires a new trial.

The information contained in proposed charges Nos. 17 and 18 was precisely the type of information noted by the court in **Smith**, supra, that a jury could use to test the credibility of a witness who professes not to have "actual knowledge" of harassment as a state of mind.  When the official is not forthright about what they did, and when there is evidence which suggests that an official is

17

not being honest in describing the events about which the official has knowledge, our jurisprudence allows a jury to infer that the lack of honesty or forthrightness is emblematic of an effort to conceal what the official knew.[2]  The presence of these emblems of dishonesty permit a fact finder to infer an official had subjective "actual knowledge" of the dangers associated with the conduct.  But the jury does not know about this jurisprudence unless the court explains it to them.  This is the essence of the holding of **Smith**, supra*,* and the basis of the Plaintiffs' claim that they are entitled to a new trial because of the Court's error in instructing the jury.

There was abundant evidence that the Defendants were less than honest or truthful in their recounting of events before the jury. The Plaintiffs presented evidence that Woods and Cappabianca concealed the date when they first knew about the sexual assaults from the police.  Hence, in the police report, it was indicated

---

[2]In **Smith***,* the Circuit had the following to say about the effect of a lack of honesty in Title VII cases.

> Because "an employer who knowingly discriminates ... may leave no written records revealing the forbidden motive and may communicate it orally to no one," ***Chipollini,*** 814 F.2d at 899 (quotation omitted), it is only natural that the focus of a discrimination trial in accordance with **McDonnell Douglas** will be the veracity of the justification offered by the employer to explain its conduct.  If the employer fails to tell the truth, "it does so at its own peril .... [and] the jury [may] infer that the real motivation is the one that the plaintiff has charged." **Sheridan***,* 100 F.3d at 1069.

that Woods and Cappabianca advised the police that they had learned of the assault on January 9.  However, they both admitted that they failed to tell the police that they had learned of the sexual activity concerning Kristina in December.

Woods provided a detailed account of the setting in which she recounted what she and Cappabianca had learned about Rachel to Richard P -- until she was asked to recount what words she used to tell Rachel's father that Rachel had been raped. She stumbled when answering the question, finally coming up with words such as "violated" and "abused," and stumbled when trying to describe exactly what she did tell Richard P.  Plaintiffs argue that Woods' lack of forthrightness about that meeting was an effort on her part to avoid telling the truth: that she attempted to have Rachel confess to engaging in voluntary sexual activity.

Cappabianca likewise denied that a meeting with Rachel and her father took place in the week before January 7, 2002.  It is, however, undisputed that Rachel was assigned to PASS by Cappabianca for some event that occurred on January 4. Because Rachel's discipline records were destroyed, the school has no explanation as to why Rachel was assigned to detention. Rachel and her father testified it resulted from Rachel's outburst in music class on Friday, January 4, 2002, when Rachel rebuffed additional attempts to compel her to engage in oral sex. Cappabianca's call to Rachel's father, Richard, advised him that he needed to discipline his

daughter because she had a dirty mouth. Rachel offered the contemporaneously created evidence contained in her diary that the meeting occurred as she related, with the outcome that she related.

Similarly, Cappabianca denied that she met with Robin Johnson and Toni N. The jury was not instructed that if it did not believe Cappabianca and Woods in these instances it could reject their descriptions of their state of mind concerning their purported lack of knowledge and their indifference to the plight of Kristina and Rachel.

In **Smith**, at 278, the court held:

It is black letter law that "[i]t is the inescapable duty of the trial judge to instruct the jurors, fully and correctly, on the applicable law of the case, and to guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in their search for the truth." 9A Charles A. Wright and Arthur Miller, Federal Practice and Procedure § 2556 at 438 (2d ed.1995).

The jurors here were never explicitly instructed that if they found a lack of honesty or forthrightness in the testimony of Woods or Cappabianca about their handling of the information they received about Kristina and Rachel, an inference could be drawn permitting the jury to conclude that Cappabianca and Woods had subjective "actual knowledge" that Kristina and Rachel were being harassed by their fellow students. **Smith** requires that such an instruction be given in a Title VII case. Since the evidentiary issues in a Title IX case are so similar to those involved in Title VII proceedings,

20

similar explicit instructions about how to handle a lack of honesty are required in a Title IX case.

A charge concerning the ability to reject a witness's testimony, such as that given by this Court in its final charge, was not deemed adequate by the circuit court in **Smith** for conveying the point what inferences might be drawn from such testimony. In **Smith** the court noted that the Borough pointed to a portion of the charge which "instructed the jury that it could discredit a witness's testimony if it found inconsistencies or discrepancies therein." **Smith** as 280. The Court rejected the argument that such a charge was sufficient because the instruction "merely instructed the jurors as to when they may disbelieve a witness. It said nothing about what the jury may do or infer once the jurors had decided to disbelieve the employer's proffered reason." This case is analogous to **Smith,** since the jury was not instructed that it could infer subjective "actual knowledge" if it found the defendant's witnesses to be untruthful. A new trial is required.


**III.     The Verdict Slip Misstated the Title IX Elements and Constitutes Plain Error**

The first and sixth special interrogatories queried as follows:

1.  Do you find that defendant Erie School District had actual knowledge of the harassment of plaintiff Rachel P. by other students after the December 19, 2001 rapes?

21

6.  Do you find that defendant Erie School District had
actual knowledge of the harassment of plaintiff Kristina
L. by other students after the December 19, 2001 rapes?

These questions misstated the first element of the Title IX claim,
since they precluded the jury from analyzing the actual knowledge
acquired by Woods and Cappabianca about the rapes of Kristina and
Rachel.

There was undisputed evidence that Cappabianca and Woods
learned that there was sexual activity involving Charles and
Kristina.  There was evidence that Cappabianca questioned Charles
about engaging in oral sex with Kristina.  There was also evidence
that by virtue of school district practice the school district's
hands were tied whenever administrators were presented with a he-
said, she-said situation.  Cappabianca testified that in such a
case, the school district would take no steps to dig deeper, because
it could not choose between conflicting versions of an episode.
Given this, the school district can be seen to violate Title IX when
it did nothing after learning about sexual activity between Charles
and Kristina.

After all, the sexual activity about which Ms. Cappabianca
learned was, underlyingly, the rape of Kristina and Rachel.
Cappabianca, therefore, had actual knowledge of sexual activity the
day following the rape, but, given the fact that Charles denied the
rape, felt that she could not act on the information that she had
from Kristina.  Based on what Charles said, she assumed that

22

Kristina's involvement was consensual. Her indifference to Kristina's plight was a function of the school district's failure to implement a Title IX procedure. The special interrogatories precluded the jury from viewing the case in this light.

A hypothetical will suffice to elucidate this point. A female student is gang raped by a number of male students after a school function. The administrator learns of the event the next day. There might not have been anything the administrator could have done to prevent the rape, but Title IX imposes duties on the administrator once she learns of the assault. It is not enough for her to brush off the event by saying that "boys will be boys" or that "every dog is entitled to its first bite." Title IX imposes the obligation on the administrator to not be deliberately indifferent to known sexual harassment. Certainly a gang rape is sexual harassment. Therefore the administrator's deliberate indifference to the gang rape becomes actionable.

The special interrogatories posed did not permit the jury to pass judgment on Cappabianca for her deliberate indifference to information about the event of the December 19 rape, since they limited her liability to harassment which occurred after December 19, 2001, the date of the sexual assault.

The special interrogatories misstated the case, they constituted plain error, and a new trial should be ordered.

23

## IV.    __Improper Remarks of Defense Counsel__

The long closing of counsel for Defendants was littered with prejudicial statements and claims unsupported by any evidence. Defense counsel repeatedly inserted remarks into his closing that were an attempt to prejudice the jury against the Plaintiffs not on the facts of the case but on prejudices and biases.  (See attached transcript.)

The defense counsel stated that the Plaintiffs, by bringing this lawsuit, were attempting to smear the reputation of two good educators.  Hence, after remarking that Plaintiffs had the right to feel angry about being raped, counsel stated:

> But that does not justify what they are trying to do in this courtroom.  And that is smear the reputation and character of two people, two good professional educators, who are trying to do the right thing.  (Defendants' Closing Argument, p 2)

Thereafter, rather than address Plaintiffs' claims, counsel characterized their assertions as "baseless," "nasty," and "vicious." With these inflammatory words, counsel painted Title IX plaintiffs as individuals whose claims-regardless of the facts--are baseless, nasty and vicious. At the end of the closing argument, counsel again used inflammatory language to refer emotionally to "the plaintiffs and their witnesses parading this preposterous story" in front of the jury.

> The obvious fact that we did not have here deliberate indifference, is met with baseless accusations and testimony that is so absurd it would be comical if it weren't so nasty and vicious. (Defense Closing Argument, p 4)

Counsel talked about "piling on" in relation to the testimony of Robin J. and Toni N. Then he stated:

> I don't know what's going on, but that's ridiculous and it's outrageous. (Defendants' Closing Argument, p 9)

These remarks overstepped the bounds of appropriate argument and slid into the area of improper argument whose purpose was to incite to prejudice, not to argue the evidence.

Defense counsel's effort to incite the jury to base its decision on prejudices and emotions unrelated to the relevant evidence continued when he maligned the expert testimony of Plaintiffs by claiming that Plaintiffs' expert did not provide treatment to Plaintiffs.

> ...he doesn't see them until the middle of 2005, and then he doesn't even recommend treatment. He doesn't provide any treatment. The first time he recommends treatment is in this courtroom for $175 an hour. (Defendants' Closing Argument, p 11)

However, Plaintiffs expert was never engaged to provide treatment and was not under any obligation to do so. In fact, he testified that it would be unethical for him to do so.

The Defendants' counsel also attempted to incite regional prejudice against Plaintiffs' expert by noting that Plaintiffs'

expert was from Pittsburgh and had come to Erie to say that everything that the Erie people had done was wrong.

> And then we have this psychologist who comes in here from Pittsburgh, and he says that everybody that tried to help these girls did it wrong, made them worse. The Erie School District, Sarah Reed, Millcreek Community Hospital, every mental health specialist who gave these kids counseling, tried to help them, they all did it wrong and made it worse. (Defendants' Closing Argument, p 11)

Likewise, in a statement apparently designed to elicit prejudice based on cognitive ability, defense counsel dismissed the assailants as being mentally retarded -- a claim unsubstantiated by any evidence -- and that risked leading the jury to connect the assailants with Kristina, who was mildly mentally retarded.

Defense counsel's effort to distract the jury from the case at hand led him to argue facts that were not in evidence in another instance. Counsel argued that if Rachel thought Linda Cappabianca was "rebuffing her,"

> There were 10 or 15 people at a minimum in that building that she could have talked to. She could have talked to Chris Ruhl, the mental health specialist. She could have talked to the school nurse. She could have talked to Vicky Scully, the teacher. She could have talked to Janet Woods, who even Rachel admitted, constantly went around saying if you need help, let me know. Nobody can bother you, that's not allowed around here. But no, she didn't talk to anybody else. (Defense Closing Argument, pp 8-9)

There was no evidence presented to this effect.

Generally, new trials are only granted where the attorney misconduct was pervasive. *See, e.g.,* **Blanch Road Corp. v. Bensalem Township,** 57 F.3d 253, 264 (3d Cir.1995) (affirming grant of new trial based on finding that "counsel for Plaintiffs pursued a pattern of misconduct from opening statement through final argument" and that "the record is replete with examples of counsel misconduct that might have influenced the jury"); **Fineman v. Armstrong World Industries,** 980 F.2d 171, 206-07 (3d Cir.1992) (affirming grant of new trial based on finding that counsel misconduct was pervasive, and stating that "often...a combination of improper remarks are required to persuade us of prejudicial impact"; **Draper v. Airco, Inc.**, 580 F.2d 91, 96-97 (3d Cir.1978) ("Where, however, a closing address to the jury contains such numerous and serious violations of so many rules of proper argument as occurred here, we must conclude that it is more than reasonably probable that the verdict was influenced by the prejudicial statements").

The remarks of counsel amount to plain error and require a new trial.

## V.  Verdict of Jury on Defamation Case was Tainted by the Errors Described Herein

The jury's verdict was against the weight of the evidence concerning Rachel's defamation claim, also.  Rachel's friend Toni N. and Toni's mother Robin J. presented testimony that a meeting occurred between them and Cappabianca in which Cappabianca informed

27

them that Rachel was engaging in sexual activity around the school and across the street.  Robin J and her daughter Toni testified that after meeting with Cappabianca they encountered Rachel and her father, who had just emerged from their meeting with Woods. Robin J testified that she had information from no other source than Cappabianca about any of Rachel's alleged sexual activities.  Robin J testified that Cappabianca made Rachel sound like a "little whore."

Cappabianca's testimony was that she did  not recall such a meeting.  Cappabianca and Woods testified they were meeting with all of the people who might have information about the December 19 incident.  They would not know which of Rachel's acquaintances were involved until they met with them. Cappabianca was not present during Woods' meeting with Rachel and her father on January 10, and she cannot explain what she was doing during that meeting.

However, the constellation of circumstances which resulted in Rachel learning of the defamation was too complex to permit fabrication in this area.  Toni told Rachel in a phone conversation that she would not be able to "hang out" with her anymore, because of what Cappabianca had shared with her and her mother.  Cappabianca would have met with Toni and her mother, because she was meeting with all of the students  potentially involved in the incident. Once she found out that Toni  was not present, she would feel compelled to explain why she called Toni and her mother in.

_____Wherefore, Plaintiffs seek a new trial on all issues.


                                    Respectfully submitted,


                                    /s/ Edward A. Olds
                                    Edward A. Olds, Esquire
                                    Pa. I.D. No. 23601
                                    Carolyn Spicer Russ
                                    Pa. I.D. No. 36232
                                    Richard S. Matesic
                                    Pa. I.D. No. 72211

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

James T. Marnen, Esquire
KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.
120 West Tenth Street
Erie, PA 16501-1461

S/ Edward A. Olds
Edward A. Olds, Esquire