IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Richard P., by and for **R.P.**, and Denise L.,   )
by and for **K.L.**,   )
   )
       Plaintiffs   )
   )
   v.   )
   )
**SCHOOL DISTRICT OF THE CITY**   )   Civil Action No.  03-390 Erie
**OF ERIE, PENNSYLVANIA; JANET**   )
**WOODS**, Individually and in her Capacity   )
as Principal of Strong Vincent High   )
School; and **LINDA L. CAPPABIANCA**,   )
Individually and in her Capacity as   )
Assistant Principal of Strong Vincent High   )
School,   )
   )
       Defendants   )

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR NEW TRIAL

Defendants The School District of the City of Erie, Pennsylvania and Linda L.

Cappabianca respectfully submit the following as Defendants' Brief in Opposition to Plaintiffs'

Motion for New Trial.

### Issues

    A.    Whether the verdict of the jury is against the weight of
the evidence.

    B.    Whether the Court's failure to read to the jury plaintiffs'
eleventh point for charge is a basis for awarding a new trial.

    C.    Whether the Court's failure to read to the jury plaintiffs'
seventeenth and twentieth points for charge is a basis for
awarding a new trial.

    D.    Whether interrogatories one and six of the special verdict
slip were plainly or fundamentally erroneous and highly
prejudicial or resulted in manifest injustice.

    E.    Whether defendants' counsel's closing argument contained
improper remarks that made it reasonably probable
that the jury was influenced by prejudice resulting
from the remarks.

**Facts**

The jury trial of this action commenced on January 23, 2006 and concluded on January 30, 2006 with a special verdict, the jury answering "no" to three interrogatories asking whether defendant Erie School District "had actual knowledge of the harassment of [R.P. or K.L.] after the December 19, 2001 rapes" (interrogatories 1 and 6) and whether defendant Cappabianca "made a defamatory communication to Robin [J.] and [T.N.] that related to plaintiff [R.]P" (interrogatory 11), which interrogatories were approved by the parties before they were submitted.  (Tr.5, p.28)  On January 31, 2006 the Court entered judgment for defendants on the special verdict.

On February 13, 2006 plaintiffs filed a motion for new trial, contending that the verdict was against the weight of the evidence; the Court erred in refusing to instruct the jury in accordance with paragraphs 11, 17 and 20 of Plaintiffs' Points for Charge; the Court committed plain error when it propounded the first and sixth interrogatories in the special verdict slip; and defense counsel's closing argument contained improper remarks that were prejudicial to plaintiffs.  The following is a discussion of the evidence at the trial of this action.

**Testimony of K.L.**

K.L testified that she attended Strong Vincent High School in the seventh grade, when she was twelve years old.  (Tr.3, pp.3-4)  One day C.B. and B.C. "hurt [her] over at the laundromat," where she was waiting for her mother to pick her up take her home.  C.B. forced her to "engage in oral sex. … It was very hurtful, and … very nasty."  The next day K.L. "told [Ms. Cappabianca] what happened and she said that's what people do when they're in love." K.L. thought Ms. Cappabianca was "[her] friend … [a]t first."  Thereafter she was afraid to be physically present in Strong Vincent.  (Tr.3, pp.6-7,9)

After the rape occurred most of the other students "bothered" her, "say[ing] sexual remarks at [her] in the classrooms."  She was not able to tell her mother about the rape or the verbal harassment because "[she] was scared."  However, she told Ms. Cappabianca "[a] few times" that other students were bothering her and she wanted her classes changed to get away from the harassers; Ms. Cappabianca promised to change her classes, but never did.  (Tr.3, pp.7-8)

K.L.'s sister "found out and … told [their] mother."  K.L. reacted to this by physically injuring herself, as a result of which she was admitted as an inpatient to Millcreek Community Hospital, where she received mental health treatment. While hospitalized and with difficulty she informed her mother of the rape and subsequent harassment.  She never returned to Strong Vincent.  (Tr.3, p.9)

**Testimony of R.P.**

R.P. testified that she attended the seventh grade at Strong Vincent High School, her family residing "close to" the school; she turned age 13 in the fall of that year.  On one evening during that seventh-grade year she was sexually assaulted on more than one occasion by other students, C.B. and A.K.  (Tr.3, pp.133-134, 148))

Other students "bother[ed] her in school" after the assaults.  As she walked in the Strong Vincent halls male students "would make gestures" and would ask her to perform oral sex. Every day other students students "were being mean to [her].  "On one occasion students "shoved [her] against the lockers and threatened [her]."  K.L. reported this to Ms. Cappabianca, who came to her assistance.  (Tr.3, pp.134-136, 138)  On another occasion in school B.C. told a male student in R.P.'s presence that R.P. wanted to perform oral sex on him, then B.C. shoved R.P. down some stairs.  Ms. Cappabianca assigned R.P. to PASS for five days when she found out about this incident.  On yet another occasion "another incident … happened after PASS with [C.B.] and another kid," although this time C.B. "didn't do anything to [her]."  (Tr.3, pp.138-140)

3

At a point in time R.P. ceased attending Strong Vincent and began attending Sarah Reed Children's Center.  Between the time of the sexual assaults and the time she began attending Sarah Reed, R.P. tried on "a lot" of occasions to "tell Ms. Cappabianca what was going on," but every time she tried, Ms. Cappabianca would make gestures and sounds that signaled R.P. not to talk.  "… [I]t was kind of hard to talk to her because she wouldn't let [R.P.] talk sexual or any gestures or to say what happened."  On one occasion Ms. Cappabianca told her that "she [knew] what happened."  R.P. did not tell her parents because she did not think "they would understand." (Tr.3, pp.136-138, 157)

She made no attempt to speak with Ms. Cappabianca about the sexual assaults before Christmas vacation began.  She tried to speak with Ms. Cappabianca almost every day after school opened again after the holiday.  (Tr.3, p.156)  While Ms. Woods repeatedly stated at assemblies and class meetings that students should come to her if they needed help, at no time did R.P. ask Ms. Woods for help.  (Tr.3, p.159)

On one occasion R.P. was in Ms. Cappabianca's office and Ms. Cappabianca telephoned R.P.'s father and said "something about filthy."  Ms. Cappabianca then gave the telephone to R.P. and R.P.'s father "yell[ed] at [her]."  This incident related to R.P. "saying out loud in music class, "I am tired of these kids asking me to suck dick," in response to verbal harassment by other students, resulting in her being sent to Ms. Cappabianca's office.  (Tr.3, pp.157-158)

On another occasion, on a morning in Ms. Scully's classroom,  R.P. used "the 'F' word" in frustrated reaction to verbal harassment.  She was sent to Ms. Cappabianca's office and, she believed, Ms. Cappabianca questioned her, after which R.P. returned to class.  She did not tell Ms. Cappabianca about the assaults during that meeting.  R.P. attended PASS that evening, her father picking her up and taking her home.  The next day R.P. and her father met with Ms. Woods, Mr. Ruhl and a woman she could not identify and Ms. Woods stated to her father in

R.P.'s presence, "Are you ready for this … [Y]our daughter has been giving blow jobs."  R.P.

was crying and "felt really hurt."  (Tr.3, pp.139-142, 156-157)

R.P. left Strong Vincent on the day of that meeting and did not return to Strong Vincent

until she entered the eighth grade.  At some point she was told by her friend, T.N., that her

mother would not permit her to associate with R.P. anymore because Ms. Cappabianca told T.N.

and her mother that R.P. "gave head somewhere in school … ."  (Tr.3, pp.142-143)

**Testimony of Denise L.**

Denise L. testified that she was K.L.'s mother and that Ms. Cappabianca did not

notify her before the Christmas 2001 vacation that she had heard reports that K.L. had a "sexual

encounter" with C.B.  During the Christmas vacation K.L. was "the same as she was, kind of

withdrawn."  She had been moody and cried since "a little before" November 2001, telling

Denise that other students were picking on her, but she was worse during the Christmas vacation.

(Tr.2, pp.99-100, 116-117, 134)

K.L. returned to school on January 2, 2002 after Christmas vacation and, on the evening

of January 4, 2002, while at home, K.G. informed Denise that other students had been saying

that K.L. had had a "sexual encounter" with C.B.  When Denise questioned K.L. about it she

became very quiet, denied the allegation, then burned her wrist on a frying pan.  She locked

herself in the bathroom and Denise telephoned Crisis Services, whom K.L. threatened;  Crisis

Services telephoned the police, who took K.L. to Millcreek Community Hospital, where she

remained as an inpatient until her discharge on January 11, 2002.  Chris Ruhl of the Erie School

District attended the discharge meeting, informing Denise that K.L. would have to be "remove[d]

from [Strong Vincent] for her own safety."  (Tr.2, pp.118-121, 124-125, 134-135)

On the weekend of January 5-6, 2002 K.L. informed her mother about what C.B did to

her and that she had told Ms. Cappabianca what happened, Ms. Cappabianca responding that

"that's what people do when they're in love."  Denise became angry because no one from the school district had informed her of the rape.  On January 7, 2002 Denise went to Strong Vincent and demanded that Ms. Cappabianca tell her why she had not informed her of the rape after K.L. told her about it and why she told K.L. that "that's what people do who are in love."  She could not recall whether Ms. Cappabianca responded to these questions.  (Tr.2, pp.121-124, 135)

K.L. was schooled at home for five days after her discharge from Millcreek Community Hospital, after which she attended Sarah Reed.  K.L. did "okay" at Sarah Reed and K.L. was "glad she didn't have to go back [to Strong Vincent] to be picked on anymore" – she felt "safe" at Sarah Reed.  She had bouts of anger and could not control her conduct at times, which condition worsened over time.  (Tr.2, pp.125-127)

**Testimony of Richard P.**

Richard P. testified that he was R.P.'s father.  In 2001 R.P. was "a very sweet little girl" with a learning disability in mathematics and English, and she had a "speech delay."  Around Christmas 2001 her "outward behavior spiraled downward sharply. … There was bitterness, anger, fighting … ."  (Tr.1, pp.37, 41, 44)  Richard questioned R.P. about her conduct over the Christmas vacation and she told him nothing.  He did not learn about the fact that his daughter was raped on December 19, 2001 until the Strong Vincent principal, Janet Woods, informed him of that fact on January 10, 2002.  (Tr.2, pp.28-29)

Richard had no contact with the assistant principal, Linda Cappabianca, until she telephoned him and told him that R.P. had "a very filthy mouth" and was "filthy," and demanded that he immediately come to Strong Vincent, take her home and discipline her.  Richard testified on direct examination that this call was made to him in January 2002, but on cross examination he first said it was in late December 2001 or early January 2002, then he said it was before

Christmas vacation, and then he said he could not recall when it was.  (Tr.1, pp.44-45; Tr.2, pp.35-37)

Richard immediately went to Strong Vincent and met Ms. Cappabianca for the first time. R.P. was in her presence, crying.  Ms. Cappabianca repeated her earlier description of R.P., told Richard she had been "talking dirty" and again demanded that Richard take her home and discipline her.  He complied, first "yell[ing] at [R.P.] real hard" in front of persons who were, at that time, in the administrative offices at Strong Vincent.  R.P. did not discuss the matter with him when they got home.  While he thought it was odd that Ms. Cappabianca was asking him to take his daughter out of school to discipline her for in-school conduct, and while he thought Ms. Cappabianca was inappropriately "making [his] daughter out like a whore," he did not express those views to Ms. Cappabianca, nor did he complain to Ms. Woods.  At some point thereafter R.P. was given five days in PASS, which Richard assumed was punishment for the bad language.  (Tr.1, pp.42-43, 46-47; Tr.2, pp.37-41)

On January 9, 2002 at approximately 6:30 p.m. Richard was at Strong Vincent picking up R.P., who had attended PASS (an after-school suspension program) that day, from 3:30 p.m. to 6:30 p.m., when Ms. Woods and Ms. Cappabianca met him on the front steps of the school and invited him to a meeting with them.  He said he could meet with them the next day and they agreed to meet him then.  On the morning of January 10, 2002 Richard and R.P. met with Ms. Woods, Mr. Ruhl and another woman whom Richard could not identify;  Ms. Cappabianca was not at the meeting.  (Tr.1, pp.47-49)

Ms. Woods opened the meeting by stating, "[A]re you ready for this. …[R.P.] has been sucking dicks and giving blow jobs to boys."  When Richard denied that his daughter would do such a thing, Ms. Woods "proceeded to tell [him] that [R.P.] had been doing this and that they were looking into the issue."  Richard asked Ms. Woods if there had been any police

involvement and Ms. Woods said there had been none; Richard insisted that there should be police involvement and Ms. Woods "said just keep your mouth shut, we'll deal with it." At one point Ms. Woods told Richard that she had known about the assaults since December 2001 and had been investigating them since that time. The meeting lasted about thirty minutes while R.P., who was present the entire time, cried; when the meeting ended Ms. Woods told Richard that R.P. "was going to be sent to Sarah Reed for her safety … ." Mr. Ruhl then escorted Richard and R.P. to the Strong Vincent lunchroom for lunch, telling Richard on the way "that these days kids give blow jobs like adults give handshakes." Richard decided that R.P. was never going back to Strong Vincent. (Tr.1, pp.49-51, 65-67)

Richard testified on cross examination that Ms. Woods made it sound as though R.P. had been a voluntary participant in the oral sex. Then he admitted that Ms. Woods told him that R.P. had been coerced into providing oral sex. At one point Ms. Woods asked R.P. to tell Richard what happened. He also admitted that he did not think that Ms. Woods was going to cover up the incident and not contact the police. He said he was offended by Ms. Woods's use of vulgar language in front of his 13-year-old daughter, but he did not express an objection to Ms. Woods. (Tr.2, pp.47-50)

On the morning of January 11, 2002 Richard took R.P. to the Erie Police Department, where she was interviewed by Detective Stanley Green, then by Detective Pamela Barber. (Tr.1, pp.52-53) Several days later R.P. told Richard that her friend, T.N., told her that T.N.'s mother forbade T.N. from socializing with R.P. because her mother did not want her "hanging out with a person [who] was giving blow jobs to people." Richard telephoned T.N.'s mother, Robin J., and Robin told him that Ms. Cappabianca told her R.P. told her that R.P. was performing this act on boys "in the laundromat." This angered Richard, but he did not contact anyone and complain about Ms. Cappabianca's conduct. (Tr.1, pp.53-56; Tr.2, pp.3-4, 54-61)

R.P.'s last day at Strong Vincent during the seventh grade was January 10, 2002. She was schooled at home for a week, then entered Sarah Reed on January 25, 2002. (Tr.2, pp.4, 53-54)

**Testimony of Robin J.**

Robin J. testified that when her daughter, T.N., was in the seventh grade, Ms. Cappabianca telephoned her and asked her to come to her office at school and meet with her. T.N. and Robin met with Ms. Cappabianca in her office and Ms. Cappabianca told Robin in T.N.'s presence that she wanted Robin to know "what kind of … children [T.N.] was hanging around with, she didn't think it was appropriate." Ms. Cappabianca told Robin that R.P. had been "[g]iving blow jobs … to boys in school" and she used a gesture that simulated oral sex. Thereafter Robin forbade T.N. from socializing with R.P. (Tr.2, pp.69-71, 75-76)

**Testimony of Vikki M. Scully**

Ms. Scully testified that during the 2001-2002 school year she taught seventh and eighth-grade learning support Reading and Science classes in the middle school at Strong Vincent High School.(Tr.2, p.85)

R.P. "yelled out something using the 'F' word" in Ms. Scully's first period class, at the beginning of that class, as students were entering the classroom and Ms. Scully was working on administrative paperwork, on a day during the first week after school reconvened in January 2002 following the Christmas break. Because that kind of conduct was out of character for R.P. and, therefore, in Ms. Scully's judgment merited someone spending time on the matter, time that she, as a teacher, did not have, she instructed R.P. to go to Ms. Cappabianca's office. (Tr.2, pp.91-92, 94-96)

**Testimony of Linda L. Cappabianca**

Ms. Cappabianca testified that she was the assistant principal of the middle school at Strong Vincent High School during the 2001-2002 school year. (Tr.4, pp.100-101) The first day of the 2001-2002 Erie School District school year was August 27, 2001 and the school year ended on June 7, 2002. Christmas vacation began on Saturday, December 22, 2001 and ended on Tuesday, January 1, 2002. The rapes occurred on the evening of Wednesday, December 19, 2001. On Wednesday, January 9, 2002 R.P. had her outburst in Ms. Scully's classroom and was sent to see Ms. Cappabianca; an investigation of the rapes was conducted by Ms. Cappabianca and Janet Woods, the Strong Vincent principal, on January 9 and 10, 2002. Members of the Erie Police Department came to Strong Vincent on Friday, January 11, 2002 to commence their investigation. (Tr.4, pp.103-107; Defendant's Exhibit I)

"PASS" is an acronym for an Erie School District program named "Program, After-School Suspension," which is a program for students with disciplinary problems; it starts at 3:30 p.m. and ends at 6:30 p.m. In December 2001 R.P. was assigned PASS on December 7, 10-14 and 16-19, 2001, and attended PASS only on December 11. She was assigned to out-of-school suspension on December 20 and 21, 2001, not attending school on those days, but remaining home under the supervision of her parents; while R.P. was a special education student, she was not mentally retarded and, therefore, she could be punished with out-of-school suspension. In January 2002 she was also assigned and attended PASS on January 7 through 9, 2002. (Tr.107-110, 116-118,144; Defendant's Exhibits J and O)

In December 2001 C.B. was assigned to PASS on December 17, 18 and 20, 2001, he was absent from PASS on December 17 and, while he attended PASS on the other two days, he walked out of PASS early on December 20. (Tr.4, pp.111-112; Defendant's Exhibit L) In December 2001 B.C. was assigned to and attended PASS on December 3 and 5, 2001, after which

she was released from the program.  (Tr.4, pp.113-114; Defendant's Exhibit M.)  A.K. was

assigned to PASS in December 2001 on December 12 through 14 and 19, 2001;  he was present at

PASS on three of the four days – all but December 13.  (Tr.4, pp.115-116; Defendant's Exhibit N)

B.C. was reassigned from Strong Vincent to Perseus House in an alternative education

program effective January 28, 2002, but she was arrested and placed in a juvenile detention

center before she reached Perseus House.  (Tr.4, pp.119-122; Defendant's Exhibit P)  C.B.

informally withdrew from Strong Vincent immediately after his father and he were interviewed

by Ms. Cappabianca and Ms. Woods on January 9 or 10, 2002; it was not until January 21, 2002

that Strong Vincent discovered that he had enrolled in a private school, First Christian Assembly.

(Tr.4, pp.122-124; Defendant's Exhibit Q)  A.K. was reassigned to alternative education at

Perseus House on February 26, 2002.  (Tr.4, pp.124-125; Defendant's Exhibit R.)  B.C. and C.B.

could not be suspended from school because both of them were mentally retarded special

education students.  (Tr.4, pp.145, 150)

C.B. was chronically involved in disciplinary infractions during the 2001-2002 school

year and, by December 2001, Ms. Cappabianca was trying to get him assigned to an alternative

education placement at a facility for middle school students with behavioral problems, known as

Perseus House, which placement was not possible without (1) his parents' consent or (2) after a

hearing resulting in a change in his IEP.  That attempt included meeting with C.B.'s mother in

December 2001.  (Tr.3, pp.109-112)

C.B. was "sneaky" and "had some challenging behaviors … ."  On the other hand, he was

"charming and very well liked."  K.L. and C.B. were mildly mentally retarded, but C.B. was

"personable."  K.L. had difficulty with expressing herself in writing, but she had no difficulty

expressing herself orally.  (Tr.3, pp.118-119)

In December 2001 the following resources were available to students at Strong Vincent High School if they needed help: two guidance counselors, the principal, three assistant principals besides Ms. Cappabianca, and Mrs. Cappabianca herself, the school nurse, Chris Ruhl, the mental health specialist, an intensive juvenile delinquency program representative, and the two school police officers. (Tr.4, pp.125-126)

At some time during the school day on December 20, 2001 Ms. Cappabianca heard a student whom she could not identify ask in a Strong Vincent hallway during change of classes something like, "Did you hear what happened between (or "with") [K.L.] and [C.B.] last night?" Ms. Cappabianca "inferred that [this comment] might have been of a sexual nature." She thought that C.B. and K.L. were an odd "combination," not having seen them "together" before, and she thought that the question suggested that there was "an attraction developing" between K.L. and C.B. (Tr.3, p.113; Tr.4, pp.127-129)

At about 3:15 p.m. the same day Ms. Cappabianca was on her way to the rooms where PASS was held to inspect them when she observed K.L. in the "front hallway" of the school; K.L. was on her way to PASS. Seeing K.L. reminded Ms. Cappabianca of the comment she overheard earlier in the day, so she approached K.L. and said something like, " … I was (or "I'm") hearing things about you and [C.B.], I don't know if they're true." K.L. replied, "[Y]es, they are." Ms. Cappabianca responded, " … [T]hese are things that you would do when you're older and care about each other." Ms. Cappabianca made this latter comment because K.L. indicated that "something had occurred" and, since K.L. was twelve years old, Ms. Cappabianca assumed that K.L. and C.B. had been holding hands or kissing. (Tr.3, pp.113-115; Tr.4, pp.129-130)

While K.L. was chronologically 12 years old, she functioned at the level of an eight or nine-year-old. She was academically challenged and mildly mentally retarded. Most of the

students involved in the rapes of December 19, 2001 were at that level.  (Tr.3, pp.115; Tr.4, pp.143, 147)  Ms. Cappabianca's intent in making this comment was not to encourage K.L. to be careful, but to tell her that she did not condone her involvement in that kind of activity.  (Tr.4, p.146)

K.L. was not "agitated or happy."  She was "very calm.  She looked darling because she was all made up, she had lipstick on, her hair down, she was very concerned about her appearance … "  Nothing about K.L.'s appearance or conduct made Ms. Cappabianca suspect that "something was wrong."  K.L. did not tell Ms. Cappabianca that on the previous evening she had been raped, or forced to perform sex acts, or that she had performed oral sex.  (Tr.4, pp.130-131)  Ms. Cappabianca admitted that girls who have been sexually assaulted have difficulty discussing what happened to them, adding that mature women have the same problem.  (Tr.3, p.115)

It did not occur to Ms. Cappabianca that K.L. might have been involved in a sex act like sexual intercourse or oral sex.  Nothing about what K.L. said or how she acted suggested that to Ms. Cappabianca on the afternoon of December 20, 2001.  (Tr.4, p.147)  However, in her opinion, K.L. and C.B. were too young to be holding hands or kissing, the kinds of things she suspected, which is why she told K.L. she was too young to be doing such things.  She thought that K.L. was sufficiently comfortable with her to discuss subjects such as this.  (Tr.3, pp.115-116)

Ms. Cappabianca did not ask K.L. to go to her office and discuss the matter further, nor did she send K.L. to a counselor to discuss the matter.  (Tr3, pp.116-117)  She accompanied K.L. to PASS and observed K.L. enter the PASS room and sit down next to C.B. without exhibiting any nervousness or fear around C.B.  In K.L.'s presence Ms. Cappabianca asked C.B. the same question she had asked K.L. and he replied that "nothing is going on , that she is saying things

because she likes me."  K.L. said nothing after C.B. said this.  Ms. Cappabianca "told [C.B.] they needed to stay away from each other," which was the end of the conversation.  (Tr.3, p.118); Tr.4, p.132)

The protocol was to contact parents of children "if you suspect something."  However, Ms. Cappabianca had no recollection of contacting Denise L. about this matter.  (Tr.3, p.117) Thereafter on December 21 Ms. Cappabianca visited Ms. Woods to discuss various matters – it was her practice to discuss current matters with Ms. Woods at the end of each day.  During that meeting she said to Ms. Woods, " … I think something is going between [K.L.] and [C.B.] … " Ms. Woods told her to "watch it, if something was, we'll know."  (Tr.4, p.133)

It is not the practice of the Erie School District never to impose discipline when doing so is based solely on the statement of one child.  Ms. Cappabianca investigates matters such as this beyond what the participants state happened and tries to determine what happened;  it is conceivable that uncorroborated allegations will not be regarded by her as sufficiently established to be a basis for discipline.  (Tr.3, pp.119-121)

On January 9, 2002 R.P. was sent to Ms. Cappabianca's office by Ms. Scully because she "said … the 'F' word"; when she came to Ms. Cappabianca's office she was angry.  After questioning R.P. about whether things or people were bothering her, R.P. told her that "[other students] wanted her to perform" oral sex.  When asked why other students wanted her to do that, R.P. disclosed the events of December 19, 2001.  Immediately upon being told this by R.P., Ms. Cappabianca escorted R.P. to Ms. Woods's office and, after Ms. Cappabianca disclosed to Ms. Woods what R.P. told her, the two of them met with R.P., and R.P. described what happened on the evening of December 19, identifying C.B., B.C. and A.K. as the assailants.  (Tr.3, p.124; Tr.4, pp.133-135)

On January 9 and 10, 2006 Ms. Cappabianca and Ms. Woods devoted all of their professional time to an investigation of the matter.  Ms. Woods contacted the central administration of the Erie School District and the special education supervisors, about eight students were interviewed, and the students' parents were contacted and the matter was discussed with them.  All of the students present at the time of the rapes were interviewed except for K.L., who was not in school.  During the investigation Ms. Cappabianca first learned of two additional incidents involving R.P.:  (1) the stairwell incident of January 7, 2002 and (2) the second assault upon R.P. at the laundromat.  On January 10, 2002 Ms. Cappabianca prepared a summary of the findings of the investigation dated January 10 at the request of Ms. Woods, which Ms. Woods intended to provide to the police when they arrived.  (Tr.4, pp.135-137; Plaintiff's Exhibit 58)

Ms. Cappabianca did not conclude during the investigation that the rapes did or did not occur; instead, she kept an open mind as they gathered facts.  The statements they received were contradictory and the assailants denied doing anything wrong, but at the conclusion of the investigation, as indicated in the January 10, 2002 report prepared by Ms. Cappabianca, she concluded that R.P. and K.L. had been victimized.  (Tr.3, pp.125-127; Plaintiff's Exhibit 58)

At no time between December 19, 2001 and her discussion with R.P. on January 9, 2002 did R.P. discuss the rapes with Ms. Cappabianca or any harassment she was suffering during that period of time, and at no time during that period of time did Ms. Cappabianca refuse to talk with R.P. after R.P. came to her to talk with her.  While Ms. Cappabianca had several telephone conversations with Richard P., at no time did she telephone him and tell him that R.P. was "dirty and filthy and needed discipline."  R.P. was "very quiet, kind of withdrawn … more introverted." (Tr.3, pp.124, 128; Tr.4, pp.138, 141)

Ms. Cappabianca's practice in regard to addressing the use of profanity by students in school is to follow the "discipline handbook."  Saturday detention is the punishment for the first such offense, followed by PASS and out-of-school suspension.  Whenever these punishments are meted out for these offenses the parents are contacted by telephone and notified of the offense and the punishment or, if contact in that manner is not possible, a representative of the Erie School District (a home school visitor) personally visits the home and notifies the parents.  (Tr.4, pp.138-139)

If R.P. used the term "sucking dick" on January 4, 2002 as indicated in her diary, she would have been disciplined, although Ms. Cappabianca does not recall discussing any such incident with R.P.  If R.P. had an outburst in music class saying "quit asking me to suck dick," Ms. Cappabianca would have questioned her about the basis for her saying that and, if R.P. had disclosed the rapes then, Ms. Cappabianca would not have assigned her to PASS.  Moreover, R.P.'s diary states that R.P. did not disclose the rapes to Ms. Cappabianca on January 4, 2002. (Tr.4, pp.141-144)

Ms. Cappabianca's only contact with Denise L. during the week of January 7, 2002 was a telephone conversation initiated by Denise, who notified her that K.L. "hurt herself" over the weekend and was in the hospital, and Denise would come to the school to collect work for K.L. to do while she was absent.  At no time during that conversation did Denise accuse Ms. Cappabianca of withholding information about the rapes.  (Tr.4, pp.139-140)

Ms. Cappabianca did not meet with Robin J. and T.N. during the week of January 7, 2002.  She devoted all of her time on January 9 through 11 to the investigation of the rapes.  Ms. Cappabianca had no recollection of ever meeting Robin at any time regarding any subject.  (Tr.3, pp.128-130; Tr.4, p.140)

Ms. Cappabianca does not use language such as "dirty" and "filthy" when describing students to parents. She regards language of that kind as unprofessional and insensitive. At no time did she tell any parent, including Robin J., to keep his or her child away from R.P. because she was promiscuous. She does not use language like that Robin accuses her of using in front of children or parents, and she never uses the gesture she is accused of using in front of anyone. (Tr., pp.139-141)

**Testimony of Janet M. Woods**

Ms. Woods testified that she was the principal of Strong Vincent High School during the 2001-2002 school year. At the beginning of the school year at she met with each class and told them that no one could touch them without their permission or bother them. She met with the middle school students each day at lunch and repeated the same statement. They were repeatedly told by Ms. Woods that if they "need[ed] help" or if a friend needed help, they were to contact Ms. Woods. (Tr.3, pp.47-48, 53-54)

On the Wednesday before the beginning of the Christmas 2001 vacation Ms. Cappabianca had her daily after-school meeting with Ms. Woods and told her that during a change of classes she had heard "hall talk that there had been some sexual activity between [C.B.] and [K.L.]" That is, Ms. Cappabianca heard someone say, " …[D]id you hear about so and so" and inferred that there was some sexual activity. However, there was no specific indication as to what kind of sexual activity. Ms. Cappabianca approached K.L. and asked her if the statement she heard was true and K.L. said it was. (Tr.3, pp.67-83)

Ms. Woods instructed Ms. Cappabianca to discuss the matter with C.B., who was in PASS that night; Ms. Cappabianca did so and C.B. denied that there was anything between K.L. and him. Ms. Woods told Ms. Cappabianca to "keep [her] ear to the ground. … [I]f there's something to be taken care of, we would certainly know about it sooner or later. Kids talk."

There was insufficient information at that time upon which to act.  It could have been hand holding or kissing.  They did not choose to do nothing about the matter simply because of C.B.'s denial;  they instead chose to monitor the situation.  (Tr.3, pp.70-72, 74, 83)

Ms. Woods said that normally the parents of a child would be contacted about sexual activity, but K.L.'s mother was not contacted because there was nothing to report; for the same reason the police were not contacted then.  There was no need to have K.L. discuss the matter with a counselor or the school nurse, as Ms. Cappabianca was professionally knowledgeable about such matters and she had a good relationship with K.L.  (Tr.3, pp.81-82, 84-85)

On January 9, 2002 R.P. had an outburst in a classroom, was sent to Ms. Cappabianca and Ms. Cappabianca first learned about the rapes.  Ms. Cappabianca brought R.P. to Ms. Woods's office and they discussed the matter with her; R.P. was "sullen" and "quiet," but she was not crying.  On January 9 Ms. Woods informed the central administration of the Erie School District of the situation and over the rest of January 9 and on January 10 Ms. Cappabianca and Ms. Woods conducted an investigation of the matter; the police arrived at 8:00 a.m. on January 11 after being summoned by Ms. Woods.  On January 9 Ms. Cappabianca and Ms. Woods encouraged R.P. to inform her father of the matter that evening and on the evening of January 9 they met Richard P. after PASS and asked to meet with him; he was unable to meet with them that evening, but agreed to come into school the following day for a meeting.  (Tr.3, pp.85-89; Tr.4, p.94)

They interviewed all of the students present at the time of the rapes except K.L., who was an inpatient in Millcreek Community Hospital, taking notes during the interviews, although Ms. Woods no longer has her notes.  One student prepared a written statement, but no others did.  By the afternoon of January 10 they concluded that the "hall talk" of which they learned on December 20, 2001 had been in reference to the rapes.  They also discussed the matter with the

parents of the students.  At the end of January 10 Ms. Woods instructed Ms. Cappabianca to prepare a document setting forth the identities of the students and what their investigation uncovered so that they could give that to the police when they arrived.  (Tr.3, pp.89-93, 104-105)

On January 10, 2002 they learned that B.C. had been verbally harassing R.P. at school, encouraging her to perform oral sex on other male students; on January 7, 2002 B.C. did this, pushing R.P. down a stairwell, although nothing came of the incident beyond the verbal harassment and the shoving.  (Tr.3, pp.93-94; Plaintiff's Exhibit 58, p.1)

A.K. and B.C. were punished by the School District for the rapes, both being sent to alternative education, although B.C. may have been arrested for the rapes before she arrived at alternative education.  (Tr.3, pp.94-97, 101; Plaintiff's Exhibit 62, p.12)  On January 29, 2002 A.F. complained to the Erie Police Department that B.C. was harassing him because he supplied information concerning the rapes to the police.  Ms. Woods was not aware of this harassment when it was happening.  (Tr.3, pp.99-100; Plaintiff's Exhibit 52, p.12)

On the morning of January 10, 2002 Ms. Woods and Mr. Chris Ruhl, a counselor in the Student Assistance Program ("SAP"), met with Richard P. and R.P. in Mr. Ruhl's office at Strong Vincent;  R.P. had been in the SAP, working with Mr. Ruhl, since November 2001.  Mr. Ruhl was a certified counselor and the SAP coordinator at Strong Vincent.  Ms. Woods wanted Mr. Ruhl at the meeting because he had developed a relationship with R.P. and he was a counselor, and the subject of the meeting was a very delicate one.  The purpose of the meeting was to inform Richard of the status of the investigation and to encourage him to get help for R.P.; Ms. Woods knew that R.P. had been seeing a Sarah Reed counselor.  (Tr.4, pp.83-88)

Ms. Woods did not know whether Richard was aware of the rapes.  She opened the meeting by saying, … "[T]here is going to be some unbelievable information here, this is going to be very difficult but, [R.P.], you got to tell your dad what happened here … ."  Ms. Woods

then "informed [Richard P] that something had gone on over at the laundromat, that [she] felt [R.P.] had been violated, that did [R.P.] talk to you about this. And the answer was no." There followed a discussion of the situation. While she could not recall what words she used to describe what happened to R.P., she made it very clear to Richard that "some very bad things had happened to his daughter at that laundromat." (Tr.4, pp.89, 96-97)

R.P. provided "a little more information," but not much. Ms. Woods informed Richard what R.P. had told Ms. Cappabianca and her on January 9. She told Richard that they had identified the assailants and that the police would be involved – "we were just gathering the rest of our material that day and we were going to have the police involved very shortly." (Tr.4, pp.90, 92-93)

Richard asked that Ms. Woods try to find an alternative placement for R.P. as he felt she should not return to Strong Vincent. Ms. Woods promised to investigate that issue and get back in touch with him. Ms. Woods asked Richard to have R.P. contact her counselor. Richard said that R.P. was still involved with a counselor and he was going to take her to the counselor that day. (Tr.4, pp.89-90, 93)

Ms. Woods categorically denied saying to Richard at the meeting, "Are you ready for this? [R.P.] has been sucking dicks and giving blow jobs." Ms. Woods initiated the subject of the police and at no time did she tell Richard "to shut his mouth." She does not conduct any conferences with parents that way and, in any case, this particular situation was "very … delicate, serious [and she] wanted [R.P.] to be able to talk to her father. … [S]he hadn't talked to him yet. And it was difficult material to get through, but we had to get through it." (Tr.4, pp.90-91)

**Testimony of Pamela A. Barber**

Detective Sergeant Barber testified that she is a detective sergeant with the Criminal Investigation Division of the Erie Police Department. She was involved in the investigation of

the rapes in question, Plaintiff's Exhibit 52 being the Police Department report of the investigation. Pages 5 through 11 of that report were prepared by her and include statements made to her by Principal Janet Woods. (Tr.1, pp.3-6)

On January 11, 2002 she and her partner were assigned to the investigation by Captain Skindell. They arrived at Strong Vincent shortly before 8:30 a.m. and met with Ms. Woods "and one of the teachers" at about 8:30 a.m. (Tr.1, pp.4-5)

Ms. Woods told Detective Barber that she first became aware of the rapes on the afternoon of January 9, 2002 after R.P. had an outburst in class. Neither Ms. Woods nor Ms. Cappabianca told Detective Barber that that on December 20, 2001 K.L. told Ms. Cappabianca that there had been sexual contact between C.B. and her. Ms. Woods also said that Ms. Cappabianca learned upon questioning R.P. that several students were involved in this "inappropriate sexual behavior after the PASS program." Ms. Cappabianca said she interviewed all of the students involved except for K.L., who was hospitalized at Millcreek Community Hospital for mental health treatment, which may have been related to the incidents in question. (Tr.1, pp.7-9, 13)

Ms. Cappabianca and Ms. Woods informed Detective Barber that on December 19, 2001 R.P. and B.C., who were friends, went to Strong Vincent after school was out to meet with B.C.'s older sister and, while at a nearby laudromat, B.C. approached three boys, A.F., C.B. and A.K., and asked them "if they would like head, meaning oral sex," from R.P., whom B.C. then coerced to go into the laundromat restroom and have oral sex with one of the boys. R.P. said she was in the restroom with the boy, but nothing happened. Thereafter, R.P. and C.B. went behind the laundromat and R.P. performed oral sex on him. One of the students present at the time told Ms. Cappabianca that R.P. and K.L. "took turns giving oral sex … to [C.B.]." After the students

returned to school B.C. was taunting R.P. in school to "give oral sex to other boys." (Tr.1, pp.9-10, 12)

On Monday, January 7, 2002 B.C. asked R.P. to "give head" to a nearby boy, then pushed R.P. into a stairwell and forced her to follow the boy down the stairs, "but nothing happened." On the same day, after PASS, a male student whose identity was unknown to R.P., in the company of C.B., entered the same laundromat, where R.P. was waiting for her father to pick her up, and placed his penis against R.P.'s face. Ms. Woods and Ms. Cappabianca identified the assailant. (Tr.1, pp.10-12)

R.P. informed Ms. Cappabianca and Ms. Woods that the rapes of R.P. and K.L. occurred on December 19, 2001. Detective Barber interviewed R.P. twice on January 11, 2002 at the police station, the second interview being videotaped. R.P. told Detective Barber during those interviews that the rapes occurred on the evening of December 19, 2001. All of the information Detective Barber acquired in the course of her investigation indicated that the rapes occurred on December 19, 2001, which was the date of the rapes set forth on the police report. (Tr.1, pp.12-13, 18-20; Defendant's Exhibit A)

Ms. Cappabianca and Ms. Woods provided Detective Barber with a two-page typewritten summary dated January 10, 2001; Detective Barber did not know who prepared that document, marked Plaintiff's Exhibit 58. A.F. provided a signed handwritten statement in the presence of Detective Barber, Plaintiff's Exhibit 59: A.F. dictated the statement and Ms. Cappabianca wrote it, then A.F. signed it. After Detective Barber interviewed R.P. the investigation was turned over to Detective Stan Green, because it was by that time determined that the matter involved only juveniles and Detective Barber and her partner did not handle juvenile matters. Detective Green made all the decisions in regard to whom to charge. (Tr.1, pp.13-17, 25)

**Testimony of Robert J. Blakely**

Mr. Blakely testified that he is the Chief Juvenile Probation Officer for Erie County, Pennsylvania.  (Tr.1, p.26)  The records of his office indicate that C.B., B.C. and A.K. were adjudicated in juvenile delinquency proceedings as having committed various offenses on the evening of December 19, 2001  B.C. and C.B. were committed to juvenile detention facilities. While the police decided whether to file a petition for delinquency alleging the occurrence of certain behavior, the office of the district attorney decided what charges to bring.  (Tr.1, pp.28-31, 34; Plaintiff's Exhibits 234-236)

R.P. testified at the hearing regarding B.C., indicating that the rapes occurred during the hours of darkness at about 6:30 p.m. on December 19, 2001.  (Tr.1, pp.34-36; Defendant's Exhibit B)

**Testimony of C.B.**

C.B. testified that he attended Strong Vincent in the eighth grade during the 2001-2002 school year.  He left Strong Vincent in January 2002 and attended First Assembly Christian Academy and, in January 2002, he was charged with the rapes of R.P. and K.L.  (Tr.Dep., pp.6-8, 10-12)

The sexual assaults occurred right before Christmas break, between December 17 and 19, 2001, across the street from Strong Vincent, on Washington Place, near the Frontier Village Laundry, located near the corner of West 8th Street and Washington Place.  (Tr.Dep., pp.16-18, 45-46, 49)  He said his mother found out about the incident before Christmas vacation and she was angry with him about it because the School District wanted him to go to alternative education ("AEP").  (pp.45-46)

He attended PASS on the day of the sexual assaults, and they occurred after PASS, inside and outside the laundromat, between about 6:30 p.m. and 7:00 p.m.  (Tr.Dep., pp.17-19)

First he said his mother and he met with Ms.Cappabianca, a teacher named Ms. Manus and another woman in January 2002, several weeks after the assaults, at which meeting Ms. Cappabianca said she wanted him to go to AEP because of the assaults and his behavior generally.  His mother was opposed to AEP because he had been there before and learned nothing;  therefore, she removed him from the Erie School District and placed him in First Assembly Christian Academy.  (Tr.Dep., pp.12-16)

Then he said his conversation about the incident and AEP with Ms. Cappabianca was only with her present, it occurred in her office and, while he was not sure, he thought it took place before Christmas vacation.  (Tr.Dep., pp.31-32)

Then he said the meeting was attended by his mother, Ms. Cappabianca, Ms. Manus and him, and it occurred before Christmas vacation.  Then he said there was no discussion of the assaults.  Then he said they discussed the assaults and, that night, his mother and he discussed them, and he told her he did nothing wrong.  (Tr.Dep., pp.37-38)

First he said no one accused him of improper conduct before Christmas vacation.  Then he said that before Christmas vacation Ms. Cappabianca pulled him into her office and asked him "what was going on."  Two days later, also before Christmas vacation, Ms. Woods in the presence of Officer Love accused him of doing something wrong; this was the first time anyone made that accusation.  He was arrested after Christmas vacation.  (Tr.Dep., pp.32-34)

Then he said the meeting with Ms. Cappabianca about AEP was not the same meeting he had with her about K.L.  Ms. Cappabianca told him she had heard kids talking and wondered what was going on.  C.B. told her he did not know what she was talking about.  Ms. Cappabianca did not ask him if he had had any kind of sex with K.L., including oral sex.  (Tr.Dep., pp.39-40)

Then he said that before Christmas vacation Ms. Cappabianca asked him what happened, telling him she had been hearing he was having oral sex, although he did not recall who supposedly was providing oral sex to him.  (Tr.Dep., pp.50-52)

Officer Love, in the presence of Ms. Woods, questioned him about the assaults, then several days later he was questioned by the police at the Erie Police Department. (Tr.Dep., pp.28-30) Officer Love and Ms. Woods asked him what happened and he told them. Ms. Woods accused him of assaulting the two girls and asked him if he knew one of the girls was under the age of consent. (Tr.Dep., pp.48-49) This meeting with Officer Love and Ms. Woods took place before Christmas vacation. (Tr.Dep., pp.51-52) The police came to First Assembly Christian Academy after Christmas vacation and arrested him, at which time, for the first time, he discussed it with them. (Tr.Dep., p.52)

**Testimony of Matthew R. Bogardus**

Mr. Bogardus testified that he was an intake supervisor at Sarah Reed Children's Center, which works with children with emotional, behavioral and mental health problems. It provides an outpatient program consisting of individual therapy, family therapy, psychiatric services and medication mangement services; it also runs an alternative education program, which is a day program – the students return home each evening. (Tr.3, pp.16-17)

Erie School District contacted Mr. Bogardus by telephone and told him that R.P. and K.L. had been sexually victimized in school, then harassed by other students in the school. He was given no educational files or discipline records. Mr. Bogardus took this information to the Sarah Reed admissions committee and the two girls were admitted to Sarah Reed based on that information with the consent of their parents. (Tr.3, pp.19-21)

**Testimony of Robert R. Iddings**

Mr. Iddings testified that he is the clinical supervisor of the partial hospitalization and alternative education program at Sarah Reed, supervising therapists. The students attending Sarah Reed are in the second through twelfth grades and have a range of diagnoses and behavioral problems, although most have behavioral problems, having difficulty adapting to the regular school setting. A significant number have been acting out, posing discipline problems.

The Sarah Reed program includes a system of rewards and punishments to modify the behavior of students.  (Tr.3, pp.23, 26-27, 29-31; Plaintiff's Exhibit 36)

The "referral concern" relating to K.L. when she was admitted to Sarah Reed was her having been sexually victimized in school.  However, when K.L. was examined by a Sarah Reed psychiatrist on February 1, 2002 there was no diagnosis of post-traumatic stress disorder ("PTSD").  Moreover, there was nothing in the Sarah Reed treatment plan that mentioned that K.L. had suffered any problems as a result of being sexually assaulted.  During the first two weeks K.L. did very well.  (Tr.3, pp.31-36, 41; Plaintiff's Exhibits 2, 5, 8-9)

On February 1, 2002 R.P. was evaluated by a psychiatrist, her diagnoses including dysthymia and oppositional defiant disorder, but no mention being made of PTSD.  She had a "fairly low global assessment functioning" ("GAF") of 45, meaning that she would have difficulty functioning independently in the community.  There was no mention in R.P.'s treatment plan that she had sustained trauma.  The clinical notes of the therapist assigned to R.P. indicate that she saw R.P. only twice between January 30 and April 16, 2002.  (Tr.3, pp.38-39, 43-44; Plaintiff's Exhibits 30, 34, 127)

On July 16, 2003 R.P. was evaluated by a Sarah Reed psychiatrist, who diagnosed dysthymia and oppositional defiant disorder, but not PTSD.  Her GAF remained at 45.  On June 8, 2004 K.L. returned to Sarah Reed and on June 17, 2004 she was evaluated by a psychiatrist, who found essentially the same problems as she had on February 1, 2002:  anxiety disorder, attention deficit/hyperactivity disorder and oppositional defiant disorder.  Her GAF was 45. (Tr.3, pp.45-46; Plaintiff's Exhibits 136, 141)

**Testimony of Stephen P. Schachner**

Dr. Schachner testified that he is a licensed clinical psychologist and a certified school pyschologist, practicing as each.  (Tr.4, pp.3-8)  He reviewed the records relating to this matter

and he interviewed R.P. and K.L.:  he interviewed R.P. on April 19, May 15 and June 15, 2005, and he interviewed K.L. on March 14, April 15 and April 28, 2005.  He provided no care to the girls, taking the position that doing so would be improper; he limited his involvement to conducting an evaluation of the case for plaintiffs' counsel for purposes of this action, charging $175 per hour to do so.  (Tr.4, pp.3-4, 9-10, 72, 74-75)

K.L. was 12 years old in December 2001, but "functionally [she was] at a mild level of retardation or able to learn at a lower than average level."  She was functioning in school at "between two and three years below [her] grade placement … based on [her] age."  She was able to communicate "in reading, writing and perhaps verbal expression [at] between eight and nine years of age level."  R.P. "had been treated for a good part of her life for speech and language deficits" and, while she was 13 years old at the time of the rapes, her "ability to communicate … would be at best [that of] a 9 or 10-year-old."  It was typical that R.P. and K.L. were not able to inform their parents of the rapes after they happened.  Typically child victims of sexual abuse feel guilty and embarrassed about those experiences.  (Tr.4, pp.11-13)

Both girls suffered PTSD as a result of their experiences, PTSD being an anxiety disorder.  Their going back to school after the rapes and being near the assailants caused heightened levels of anxiety and fear; the harassment they experienced upon their return had the same effect; nonetheless, the placement of the girls at Sarah Reed was not beneficial, at least in the case of R.P., as she regarded it as indicative of her having done something wrong.  It is important with PTSD victims to treat them for PTSD as soon as possible, which did not happen in the case of these girls.  Sarah Reed did not provide the psychotherapy and behavior therapy required to specifically address PTSD; instead, they were the subjects of behavior modification techniques that are appropriate for children with a history of behavior problems in school.  (Tr.4, pp.17-20, 22-27, 72-73)

27

As time progressed both girls "spiraled downhill." R.P. became rebellious and essentially a street person, manifesting sleep disturbance, anxiety and fearfulness. She avoided people and places that scared and depressed her. She became sexually hyperaroused and aggressive and engaged in inappropriate sexual behavior, and she used drugs. All of this is typical of PTSD in a child. (Tr.4, pp.27-28)

K.L. was hospitalized and unable to communicate with her mother. She became very upset when the rapes were revealed, she hurt herself and became suicidal. Her effort on December 20 to tell Ms. Cappabianca of the rapes and the response of the latter, a person whom she viewed as her protector, wounded her emotionally and had an effect on any attempts to treat her. (Tr.4, pp.28-29)

R.P.'s diary demonstrates that while she was positive, loving and hopeful before the rapes, afterward she had anger, dismay and guilt. There are repetitive statements of her not being able to trust people and about her being angry with people who hurt her, including those who did not believe her. There is a January 4, 2002 entry indicating that Ms. Cappabianca "wanted [her] to call home about saying sucking dick," her father yelling at her and her getting five days of PASS. She became very angry about being rejected by adults and about being punished, also making it very difficult for her to communicate with adults. She has engaged in violent acting-out conduct and experiences difficulties communicating, making her more angry and frustrated. (Tr.4, pp.30-36)

Kristina cannot trust males and she does not want to be in the female role, where she regards herself as an object, because she was treated as though she was at fault for the rapes. Her intellectual functioning has improved, but she is still very immature. She remains very afraid and emotionally in pain. Her acting-out behavior and difficulties in school are part of her PTSD. K.L. has grown educationally, but the Sarah Reed program was not good for her in this regard.

Her reading was at about a fifth grade level when he interviewed her; she has the potential for functioning at a very low average level. (Tr.4, pp.36-38)

R.P. still needs individual psychotherapy that includes creative writing and the development of her diary, and an ongoing evaluation by a physician to determine the value of medicine for her problem. She still needs help with language development and she needs group therapy. He cannot give a prognosis until she undergoes treatment for six months to a year. (Tr.4, pp.47-48)

K.L. needs to be seen by a psychotherapist one or twice per week and she should receive nonverbal therapy, including art therapy, play therapy and group therapy. She still needs special education and she should be seen by a physician to assess what drug therapy, if any, would be beneficial. She needs to undergo that level of treatment for one year before a prognosis is possible. (Tr.4, pp.40-47)

On May 8, 2001 Richard P. took R.P. to the Base Service Unit seeking mental health treatement for R.P., who had experienced problems with another student at school and had, as a result, cut her own stomach with a knife. R.P. began to experience problems in school with B.C. wanting to fight with her before the rapes and she "was going down hill from when she first went to school" that year. Her diary contains entries between October 18 and November 6, 2001 suggesting low self esteem, extreme sadness and suicidal thoughts, although there are entries during this time period suggesting she was being harassed at school. (Tr.4, pp.49-54, 75-78, 81-82; Plaintiff's Exhibit 228; Defendant's Exhibit H)

A February 1, 2002 psychiatric evaluation of K.L. indicates a history preceding the rapes involving physical aggression directed at family members, fire setting, physical abuse of her by her stepfather and sexual abuse by her father and an older sister. However, Dr. Schachner felt, generally, that a lot of the information in the records did not identify the source of the

information or provide evidence that it was accurate, and the history in some of the Sarah Reed records did not jibe with that in earlier records.  (Tr.4, pp.54-57, 79; Plaintiff's Exhibit 9)

## Argument

### A.    The verdict of the jury is not against the weight of the evidence.

When reviewing a motion for new trial that asserts that the jury's verdict was against the weight of the evidence the trial court cannot substitute its view of the facts and the credibility of the witnesses for that of the jury.  **Shanno v. Magee Industrial Enterprises, Inc.**, 856 F.2d 562, 567 (3d Cir.1988).  A new trial should be granted on the basis of the weight of the evidence only where the "great weight" of the evidence is contrary to the verdict and "where a miscarriage of justice would result if the verdict were to stand."  **Springer v. Henry**, 435 F.3d 268, 274 (3d Cir. 2006).  Such a stringent standard is necessary "to ensure that a district court does not substitute its 'judgment of the facts and the credibility of the witnesses for that of the jury,'" usurping the function of the jury as the finder of the facts, denigrating the jury system.  **Sheridan v. E.I. DuPont de Nemours and Co.**, 100 F.3d 1061, 1076 (3d Cir. 1996).  Where there is a rational basis for the verdict, a new trial may not be ordered on the basis that the verdict is against the weight of the evidence.  **Delli Santi v. CNA Insurance Companies**, 88 F.3d 192, 202 (3d Cir. 1996).  Instead, the application of that remedy requires that "the jury's verdict result … in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience" of the Court.  **Williamson v. Consolidated Rail Corp.**, 926 F.2d 1344, 1353 (3d Cir. 1991).  That is not our situation here.

Plaintiffs assert that the jury's negative answers to interrogatories 1,6 and and 11 of the special verdict slip were against the weight of the evidence, those questions asking whether Erie School District "had actual knowledge of the harassment of " plaintiffs "by other students after

the December 19, 2001 rapes" (interrogatories 1 and 6) and whether Ms. Cappabianca "made a

defamatory communication to Robin [J.] and [T.N.] that related to … [R.P.]" (interrogatory 11).

However, the evidence provided a reasonable basis for the jury to conclude that on December 20,

2001 Ms. Cappabianca heard an unidentified student in a hallway of Strong Vincent ask, "Did

you hear what happened between (or "with") [K.L.] and [C.B.] last night?"  She thought that this

comment suggested the possibility of some kind of consensual sexual contact between K.L. and

C.B., such as handholding or kissing, which concerned her because of the young ages of K.L.

and C.B.  That aftenoon she observed K.L. in a hallway going to PASS and she asked her, "I was

(or "I'm") hearing things about you and [C.B.], I don't know if they're true."  K.L. replied, "[Y]es,

they are."  Ms. Cappabianca responded, " [T]hese are things that you would do when you're older

and care about each other."  K.L. was calm and nothing about her conduct made Ms.

Cappabianca suspect that "something was wrong."

Ms. Cappabianca walked with K.L. to PASS and, when they arrived at the classroom,

K.L. sat beside C.B., exhibiting no nervousness or fear.  In K.L.'s presence Ms. Cappabianca

asked C.B. the same question he asked K.L. and he replied, [N]othing is going on, …she is

saying things because she likes me."  Ms. Cappabianca replied to this, stating that K.L. and C.B.

"needed to stay away from each other."  Thereafter, on the same day, at their daily meeting, Ms.

Cappabianca reported these events to Ms. Woods, who instructed her to monitor the situation.

Although it was her practice in such situations to notify the parents of events such as these, she

could not recall whether she notified Denise L.

Christmas vacation began on Saturday, December 22, 2001 and ended on Tuesday,

January 1, 2002.  On Wednesday, January 9, 2002, R.P. had an outburst in a class taught by Ms.

Scully, who sent her to see Ms. Cappabianca, who questioned R.P. and learned, for the first time,

of the rapes of December 19, 2001.  Ms. Cappabianca escorted R.P. to Ms. Woods's office,

where R.P. was questioned further. Over the next two days Ms. Cappabianca and Ms. Woods interviewed students and met with their parents, then summoned the police, who arrived at Strong Vincent to commence their investigation on the morning of January 11. During that same investigation Ms. Cappabianca and Ms. Woods learned for the first time about the two incidents involving R.P. on January 7: the verbal harassment and physical assault in the Strong Vincent stairwell and the second sexual assault at the laundromat.

At no time between December 20, 2001 and Janurary 9, 2002 were Ms. Cappabianca or Ms. Woods aware of the rapes of December 19 or any verbal or physical harassment of K.L. or R.P. At no time during that period of time did Ms. Cappabianca refuse to discuss these matters with either girl. At no time did Ms. Cappabianca refer to R.P. as "dirty" and "filthy," Denise L. did not inform Ms. Cappabianca on January 7 of K.L.'s rape and at no time did Ms. Cappabianca meet with Robin J. and T.N. and tell them that R.P. had been voluntarily engaging in sexual activity. Ms. Woods did not tell Richard P. on January 10 that she had known about the rapes since December 2001. When Ms. Cappabianca and Ms. Woods became aware of the rapes they immediately and effectively addressed the situation by investigating it, turning the matter over to the police and arranging the placement of K.L. and R.P. in Sarah Reed, away from the harassment where, to their knowledge, the girls would also receive emotional support.

The jury concluded with ample justification that Erie School District, in the persons of Linda Cappabianca and Janet Woods, had no knowledge of harassment of K.L. and R.P. after the December 19, 2001 rapes and that Ms. Cappabianca did not defame R.P. to Robin J. and T.N. Accordingly, plaintiff's motion for new trial on the basis of the verdict being against the weight of the evidence should be refused.

> **B.    The Court's failure to read to the jury plaintiffs' eleventh point for charge is not a basis for awarding a new trial.**

Plaintiffs assert that the Court erred when it refused to read their eleventh point for charge to the effect that actual knowledge could be proved by circumstantial evidence. However, the Court was not required to adopt plaintiffs' point verbatim.  The issue is, instead, whether the charge taken as a whole accurately instructed the jury on the applicable law. **Colegrove v. Cameron Machine Co.**, 172 F.Supp.2d 611, 634 (W.D.Pa. 2001).  The courts review the totality of the jury instructions, not a particular sentence or paragraph in isolation. **Citizens Financial Group, Inc. v. Citizens National Bank of Evans City**, 383 F.3d 110, 133 (3d Cir. 2004).  The Court's instructions are reviewed to determine whether, taken as a whole and in light of the evidence, they fairly and adequately submitted the issues of the case to the jury; a new trial is to be granted only where the instruction was capable of confusing and thereby misleading the jury.  **Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.**, 247 F.3d 79, 100 (3d Cir. 2001).  The Court's instructions in this regard were accurate and not misleading.

The Court instructed the jury on the requirement that plaintiffs prove that Erie School District had actual knowledge of the sexual harassment and that the District was "deemed " to have such knowledge if the jury found that "Ms. Cappabianca or Ms. Woods had knowledge of facts sufficiently indicating substantial danger to the plaintiffs such that the institution can reasonably be said to be aware of the danger."  (Tr.5, p.30)  This instruction was later supplemented by instructions on the use of inferences (Tr.5, pp.35-36) and circumstantial evidence (tr.5, pp.44-45).  Thus, the jury was instructed that plaintiffs' burden of proof of actual knowledge could be satisfied by the use of inferences and consideration of circumstantial evidence, all that plaintiffs requested in their eleventh point for charge and, therefore, the failure to read that point is not a basis for a new trial.

       **C.**      **The Court's failure to read to the jury plaintiffs'
seventeenth and twentieth points for charge is not**

**a basis for awarding a new trial.**

Plaintiffs assert that the court's refusal to read paragraphs 17 and 20 of their points for charge requires that a new trial be awarded, as those paragraphs would have informed the jury that if it found a lack of honesty on the part of Mmes. Cappabianca and Woods, it could find that they had actual knowledge of the harassment of plaintiffs after the rapes, an instruction to which the jury was entitled. The first problem with this contention is that points 17 and 20 do not say that the jury can infer knowledge of harassment from dishonest testimony; instead, in essence, they say that the jury can infer from dishonest testimony that the School District violated Title IX. The second problem goes more to plaintiffs' argument in support of their position than to the points for charge themselves. While **Smith v. Borough of Wilkinsburg**, 147 F.3d 272, 280 (3d Cir. 1998), and **Reeves v. Sanderson Plumbing Products, Inc.**, 530 U.S. 133, 120 S.Ct. 2097, 2108 (2000), require that juries be instructed on the inference they can draw from a party's dishonesty regarding a fact material to the issue in question, plaintiffs indiscriminately contend that the alleged dishonesty of the two Strong Vincent administrators with respect to events that bear no relationship to whether they had actual knowledge of harassment should be used to construct an inference with respect to that knowledge: *see* plaintiffs' brief, pp.18-20.

Moreover, **Smith** and **Reeves** relate to the use of a special scheme for structuring the presentation of evidence in discriminatory treatment cases under Title VII of the Civil Rights Act of 1964 created by the United States Supreme Court in **McDonnell Douglas Corp. v. Green**, 411 U.S. 792, 93 S.Ct. 1817 (1973), and extended by the courts to other kinds of discriminatory treatment cases. *See* **Reeves**. It is designed to allow a plaintiff to proceed with his case for discriminatory treatment despite the unavailability of direct evidence. **Chipollini v. Spencer Gifts, Inc.**, 814 F.2d 893, 898 (3d Cir. 1987). The **McDonnell Douglas** shifting burdens of production and proof serve no purpose in Title VII sexually-hostile work environment cases or in

Title IX student peer harassment cases where the issues are completely different from those in discriminatory treatment cases. *See* **Andrews v. City of Philadelphia**, 895 F.2d 1469 (3d Cir. 1990) and **Davis v. Monroe County Board of Education**, 526 U.S. 629, 119 S.Ct. 1661 (1999).

Furthermore, **Smith** and **Reeves** do not stand for the proposition advanced by plaintiffs that the jury should be instructed that dishonest testimony alone can be used to infer knowledge of sexual harassment. Instead, **Reeves** holds that "[t]he factfinder's disbelief of the reasons put forward by the defendant … may, *together with* the elements of the prima facie case, suffice to show intentional discrimination." 120 S.Ct. at 2108. **Smith** holds that "the jurors must be instructed that they are entitled to infer, but need not, that the plaintiff's ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence can be met if they find that the facts needed to make up the prima facie case have been established *and* they disbelieve the employer's explanation for its decision." 147 F.3d at 280. (Emphasis supplied.) Plaintiffs' instructions make no mention of plaintiffs having to make out a prima facie case for the jury to infer anything from testimony they find to be dishonest.

> **D.     Interrogatories one and six of the special verdict slip were not plainly or fundamentally erroneous and highly prejudicial and they did not result in manifest injustice.**

Plaintiffs contend that the first and sixth interrogatories to the jury were erroneous, requiring a new trial. Since plaintiffs did not object to those interrogatories and, in fact, consented to their being propounded to the jury (Tr.5, p.28), they assert "plain error in the [interrogatories] affecting [their] substantial rights," without which they cannot base their motion for new trial on the content of those interrogatories. **Fed.R.Civ.P. 51(d)**. The plain error doctrine is to be used sparingly and is applied only where (1) an error is committed in the jury instructions or interrogatories, (2) the error is plain or fundamental and (3) it was highly prejudicial or resulted in manifest injustice. **Simmons v. City of Philadelphia**, 947 F.2d 1042,

1078 (3d Cir. 1991); **Bowley v. Stotler & Co.**, 751 F.2d 641, 652 (3d Cir. 1985); **Mazer v. Lipschutz**, 327 F.2d 42, 52 (3d Cir. 1963).

Plaintiffs contend in their brief that interrogatories one and six deprived the jury of the ability to determine whether Ms. Cappabianca was deliberately indifferent to the rapes of which she allegedly became aware on December 20, 2001. However, the significance of the rapes was discussed at length at the trial with respect to the court's jury instructions and interrogatories (Tr.5, pp.2-28; Plaintiff's Proposed Supplemental Jury Instructions), plaintiffs' contention being that the rapes had to be considered by the jury as evidence of the occurrence of "severe or pervasive" harassment. The Court accepted that argument and prepared the special verdict slip, with which plaintiffs agreed, and the Court specifically discussed the significance of the rapes at pages 41 and 42 of its charge. If plain error occurred, plaintiffs' position on this issue does not per se prohibit their taking their present position, but the care given to this issue at trial belies their present position and, a fortiori, demonstrates that if an error occurred, it was not plain or fundamental.

Moreover, a major portion of the evidence at trial and the arguments of counsel were addressed to the issue of what Ms. Cappabianca knew on December 20 and what she should have done in response to that knowledge. That context makes it clear that interrogatories one and six do not exclude the jury's consideration of the rapes as part of the harassment of which the School District allegedly had actual knowledge. Furthermore, '[m]anifest injustice … result[s] only if the evidence could not support the verdict, not simply where a different charge might have resulted in a different verdict." **Mazer**, 327 F.2d at 52. It is clear that the evidence at the trial of this action supports the conclusion that Ms. Cappabianca and Ms. Woods and, consequently, the Erie School District, did not have actual knowledge of the December 19, 2001 rapes until January 9, 2002.

E.    **Defendants' counsel's closing argument did not contain improper remarks that made it reasonably probable that the jury was influenced by prejudice resulting from the remarks.**

Plaintiffs assert that defendants' counsel's closing argument (Tr.Cl., pp.2-11) contained multiple prejudicial remarks justifying a new trial, even though plaintiffs did not object to those remarks, again invoking the plain error doctrine. The test applied to remarks of counsel if the other party objects consists of two parts: (1) whether the remarks were improper and (2) whether the improper remarks made it reasonably probable that the verdict was influenced by the prejudice resulting from the remarks. **Forrest v. Beloit Corp.**, 424 F.3d 344, 351 (3d Cir. 2005). Often a combination of remarks, not one isolated remark, is required to demonstrate prejudicial impact. **Fineman v. Armstrong World Industries, Inc.**, 980 F.2d 171, 207 (3d Cir.1992). Advocacy is not required to be "devoid of passion," but there are limits to "pleas of pure passion and there must be restraints against blatant appeals to bias and prejudice. These bounds of conduct are defined by the Code of Professional Responsibility and the case law." **Draper v. Airco, Inc.**, 580 F.2d 91, 95 (3d Cir. 1978). While the plain error doctrine applies to remarks of counsel, its use is "seldom justified" in a civil case. **Dunn v. HOVIC**, 1 F.3d 1371, 1377 (3d Cir. 1993).

Defense counsel characterized plaintiffs' claims as "baseless," "nasty" and "vicious," the testimony of plaintiffs and "their witnesses" as a "preposterous story," the testimony of Robin J. and her daughter as "piling on" with "ridiculous and … outrageous claims," and the lawsuit as an attempt to "smear the reputation and character of two people, two good professional educators, who are trying to do the right thing." Plaintiffs contend that these claims were unsupported by the evidence and their purpose was to prejudice the jury, not argue the evidence.

However, defense counsel made his closing after four days of assertions by plaintiffs, their parents, Robin J., T.N. and plaintiffs' counsel that Ms. Cappabianca and Ms. Woods ignored the pleas for help of two little girls who had been brutally raped and who were thereafter verbally and, in the case of R.P., physically sexually harassed; they lied to the girls' parents and the police and tried to cover up what had happened; they contemptuously accused the girls of voluntarily performing oral sex on male students – in the case of R.P., on multiple occasions; Ms. Cappabianca gratuitously encouraged a stranger to the situation to keep her daughter away from R.P. because of her promiscuity; Ms. Woods tried to get R.P. to confess to her father to voluntarily performing oral sex; and they communicated with plaintiffs, their parents and Robin J. and her daughter with casual vulgarity and insensitivity.  Plaintiffs' case cried out for an impassioned and indignant response in defense counsel's closing argument.

Plaintiffs' and their parents' testimony, and that of Robin and T.N., could not have been passed off as mere mistake or poor memory.  It did not deal with matters of judgment or difference of viewpoint.  It made allegations of gross misconduct that were either true or were intentionally fabricated.  That the record contains abundant evidence that they were fabricated cannot be denied.  Defendants' counsel merely pointed this out, and he did so with the passion and indignation the allegations deserved and which the jury would expect if those allegations were, in fact, untrue.

Defendants complain that defense counsel's closing "maligned" Dr. Schachner for not providing treatment and that it "attempted to incite regional prejudice" against Dr. Schachner.  However, the point made was a valid one and was well-grounded in the evidence:  Dr. Schachner was hired by plaintiffs' counsel to do one thing and only one thing, provide testimony that was helpful to plaintiffs' case.  This is the kind of arrangement that bears on credibility.  **Reed v. Philadelphia Transportation Co.**, 171 Pa.Super. 60, 90 A.2d 371, 373 (1952).  That Dr.

Schachner was from Pittsburgh and not the Erie area, where plaintiffs received all of their treatment, was factually accurate and underscored the fact that he was retained to provide opinions helpful to plaintiffs.

Plaintiffs assert that defense counsel contended without evidentiary support that the assailants were mentally retarded and that there was a risk that this would lead the jury to "connect the assailants with [K.L.], who was mildly mentally retarded." First, there was evidence that C.B. and B.C. were mentally retarded. (Tr.3, p.118;Tr.4, pp.145, 150) Second, it is difficult to discern plaintiffs' point concerning the risk of "connection" with K.L. The statement made was: "[R.L.] and [K.L.] were the victims of despicable acts of brutality. That these kids were mentally retarded, that is the assailants, does not excuse what happened." (Tr.Cl., p.2) It is inconceivable that this comment would elicit any emotional antipathy toward plaintiffs.

Lastly, plaintiffs assert that there was no evidence supporting the argument that there were ten or fifteen people at Strong Vincent with whom R.P. could have talked if she believed Ms. Cappabianca was rebuffing her. However, Ms. Cappabianca identified twelve such people to whom R.P. could have gone. (Tr.4, pp.125-126) Moreover, the point being made was a legitimate one – that the testimony of R.P. that Ms. Cappabianca refused to discuss the rapes and harassment with her was not credible, and that the more logical conclusion was that R.P. did not complain to anyone.

Defendants' counsel was aggressive and passionate when he delivered his closing, but at no time were his remarks unsupported by the evidence nor did he breach any other rules established by case law or the disciplinary rules governing the conduct of attorneys. His closing argument was that of a person determined to convince the jury of the sincerity of his clients in counterpoint to the absence of concern for the truth evidenced by plaintiffs and their witnesses.

It did not overstep the bounds of zealous advocacy, but simply attempted to deliver the defendants' position in a colorful and compelling manner.

## Conclusion

The verdict of the jury was not against the great weight of the evidence, the court's failure to read plaintiffs' eleventh, seventeenth and twentieth points for charge is not a basis for ordering a new trial, nor is the wording of interrogatories one and six of the verdict slip, and defendants' counsel's closing argument was not improper or prejudicial to plaintiffs and, therefore, plaintiffs' motion for new trial should be denied.

> /s/ *James T. Marnen*
> James T. Marnen
> PA I.D. No. 15858
> KNOX McLAUGHLIN GORNALL &
> SENNETT, P.C.
> 120 West 10th Street
> Erie, PA 16501
> General Tel:  814-459-2800
> Direct Dial Tel: 814-459-9886, ext. 203
> Fax:  814-453-4530
> E-mail:jmarnen@kmgslaw.com
>
> Attorney for Defendants,
> The School District of the City of Erie,
> Pennsylvania and Linda L. Cappabianca

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Richard P., by and for **RACHEL P.**, and | ) | |
| Denise L., by and for **KRISTINA L.**, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **SCHOOL DISTRICT OF THE CITY** | ) | Civil Action No.  03-390 Erie |
| **OF ERIE, PENNSYLVANIA; JANET** | ) | |
| **WOODS**, Individually and in her Capacity | ) | |
| as Principal of Strong Vincent High | ) | |
| School; and **LINDA L. CAPPABIANCA**, | ) | |
| Individually and in her Capacity as | ) | |
| Assistant Principal of Strong Vincent High | ) | |
| School, | ) | |
| | ) | |
| Defendants | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of July, 2006, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system which will send notification of such filing to

the following:  Edward A. Olds, counsel of record for plaintiffs.


/s/ *James T. Marnen*
James T. Marnen


679827

41