REDACTED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


RICHARD P., by and for R.P.,
and DENISE L., by and for K.L.,
          Plaintiffs

          v.                    CIVIL ACTION NO. 03-390 ERIE

SCHOOL DISTRICT OF THE CITY OF
ERIE, PENNSYLVANIA, et al.,
          Defendants


JURY TRIAL - DAY NO. 1
(TRIAL TESTIMONY)



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Monday, January 23, 2006.



APPEARANCES:
          EDWARD A. OLDS, Esquire, and CAROLYN SPICER
          RUSS, Esquire, appearing on behalf of the
          Plaintiffs.

JAMES T. MARNEN, Esquire, appearing on behalf of
the Defendants.


Ronald J. Bench, RMR - Official Court Reporter


2


1                   I N D E X

2

3      WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS

4   FOR THE PLAINTIFFS:

5   Pamela Barber           3    16      --       --

6   Robert Blakely         25    31      --       --

7   Richard P.             36    --      --       --

8

9                  - - -

10

11     EXHIBITS:            IDENTIFIED     ADMITTED

12   FOR THE PLAINTIFFS:

13   Plaintiff's Exhibit 52          4          6

| 14 | Plaintiff's Exhibit 58 | 13 | 16 |
| 15 | Plaintiff's Exhibit 59 | 13 | 16 |
| 16 | Plaintiff's Exhibit 234 | 27 | 31 |
| 17 | Plaintiff's Exhibit 235 | 27 | 31 |
| 18 | Plaintiff's Exhibit 236 | 30 | 31 |
| 19 | | | |
| 20 | FOR THE DEFENSE: | | |
| 21 | Defendant's Exhibit A | 19 | -- |
| 22 | Defendant's Exhibit B | 34 | 36 |
| 23 | | | |
| 24 | | | |
| 25 | - - - | | |

3

1          P R O C E E D I N G S

2

3          (Whereupon, the following excerpt of Jury Trial

4    proceedings occurred on Monday, January 23, 2006, in

5    Courtroom C.)

6

7          THE COURT:  Mr. Olds, are you prepared to call your

8    first witness?

9         MR. OLDS:  Yes, your Honor.

10        THE COURT:  Raise your right hand.

11        PAMELA A. BARBER, PLAINTIFFS' WITNESS, SWORN

12             DIRECT EXAMINATION

13   BY MR. OLDS:

14   Q.    Detective Barber, would you state your full name and tell

15   the jury where you work?

16   A.    Detective Sergeant Pamela A. Barber, and I work at the

17   Erie Police Department, I'm a detective sergeant in the

18   Criminal Investigation Division.

19   Q.    And how long have you worked for the Erie Police

20   Department?

21   A.    Over 22 years.

22   Q.    How long have you been with the Criminal Investigation

23   Department?

24   A.    It was five years in November.

25   Q.    You're here to testify concerning this case involving

4

1    R.P. and K.L., were you with the detective department at that

2   time?

3   A.   Yes, I was.

4   Q.   And I guess the appropriate place to start, did you bring

5   your file with you?

6   A.   Yes, I did.

7        MR. OLDS:  Okay.  Your Honor, we have marked as

8   Exhibit 52, the police report.  And I'm going to show that, if

9   I can, to the witness.

10       THE COURT:  All right.

11  BY MR. OLDS:

12  Q.   I know that the report in your file is a slightly

13  different format than this one that's marked as Plaintiff's

14  Exhibit 52, but at some point in January of 2002, you were

15  assigned an investigation, is that right?

16  A.   That's correct.

17  Q.   Would you tell the jury how you were assigned that

18  investigation?

19  A.   It was on January 11th of 2002.  My partner and I had

20  come into work that morning and we were told by our boss, which

21  then I believe it was Captain Skindell, now it's Deputy Chief

22  Skindell, he told us to go over to Strong Vincent High School

23  and meet the principal regarding an incident that happened.

24  Q.    We had identified a time line here, I think that -- it's

25   showing that you, on January 11th you arrived at the school at

                                5

1   approximately 8:30 in the morning?

2   A.    It was a little bit before 8:30 when we got there.  About

3   8:30 was when the principal had come in the office.

4   Q.    Now, are there any of your police officers that are

5   assigned to the school district?

6   A.    They're off-duty officers that work there.

7   Q.    And do you know them, they're Officers Love and Slupski,

8   is that right?

9   A.    Yes, I do.

10   Q.    Does the school district have its own police department?

11   A.    Yes, they do.

12   Q.    Is the head of that department Jim Perfetto?

13   A.    That's correct.

14   Q.    Okay.  So you arrive at the scene a little bit before

15   8:30 and Ms. Woods wasn't there.  Did you know anything about

16   the crime that you were going to be investigating?

17   A.    Nothing, no.

18  Q.   Did you meet with Ms. Woods or Mr. Perfetto, who did you

19  meet with?

20  A.   When I first got there about 8:30, Principal Woods came

21  in and one of the teachers.

22  Q.   In terms of the format of this exhibit, I believe

23  beginning on page five of Plaintiff's Exhibit 52, there's a

24  narrative, is that right?

25  A.   Correct.


6


1  Q.   As I understand, did you create that narrative?

2  A.   Yes, I did.  Under where it says Detective P. Barber.

3  Q.   Would that be up through page 11 of the actual narrative

4  part, is that all of your work?

5  A.   Yes, it is.

6  Q.   Okay.  The narrative includes certain statements that Ms.

7  Woods made to you, is that right?

8  A.   Correct.

9       MR. OLDS:  Okay.  Your Honor, I just would move for

10  the admission of Plaintiff's Exhibit 52.

11       MR. MARNEN:  No objection.

12          THE COURT:  It's admitted.

13          MR. OLDS:  I'd like to display part of this so that

14   the jury can follow this.

15   BY MR. OLDS:

16   Q.    We've had -- this exhibit has a number of redactions in

17   it, parts of it have been crossed out; do you know why that's

18   happened?

19   A.    It's my understanding it was because it involves

20   juveniles.

21   Q.    Okay.  And juvenile records are secret by statute, so

22   these records take away the last name of the juveniles?

23   A.    Correct.

24   Q.    We're going to try to refer to the juveniles who were

25   involved here by their first name?

7

1   A.   Okay.

2   Q.   Okay.  It indicates that, let's see -- the first thing

3   I'd like to draw your attention to -- it says, that first

4   sentence there, first sentence of the second paragraph, it says

5   "Ms. Woods says that on January 9th at approximately 1500 hours

6  she became aware of a situation involving several Strong

7  Vincent school students," is that right?

8  A.   That's correct.

9  Q.   Did Ms. Woods ever tell you that she had learned about a

10  sexual encounter, sexual activity before January 9, 2002?

11  A.   No.

12  Q.   Okay.  And then Ms. Woods relates that she and -- I'm

13  drawing your attention to -- I'm referring you to right here,

14  could you read what Ms. Woods told you beginning with "she says

15  that?"

16  A.   "She says that she and Linda Cappabianca became aware of

17  the situation when one of the victims, R.P., became upset

18  during school hours yelling that some male students were

19  picking on her, asking her to 'suck their dicks.'"

20  Q.   Go on, read what else Ms. Woods said to you in that next

21  sentence?

22  A.   "Upon questioning R.P., Ms. Cappabianca discovered that

23  several other students were involved in these incidents, which

24  involved inappropriate sexual behavior after the PASS program."

25  Q.   Do you recall what Ms. Cappabianca meant when she used

1   the words "inappropriate sexual behavior after the PASS

2   program?"

3   A.   I don't know what she meant, I just assumed that students

4   were involved in inappropriate sexual behavior.  And then she

5   went into it.

6   Q.   Now, she mentioned also at this time, she advises you

7   that school officials have interviewed a number of students --

8   by the way, do you have a clear recollection of everything that

9   she said without reviewing your notes?

10   A.   I went over the report, but I don't have a specific

11   recollection because it's from 2002.

12   Q.   And in 2002 you were writing down what Ms. Cappabianca

13   and Ms. Woods were telling you about this situation?

14   A.   Correct.

15   Q.   Read where it says, beginning with right there, "Ms.

16   Cappabianca states?"

17   A.   "Ms. Cappabianca states that she interviewed all of the

18   students involved, with the exception of one of the victims,

19   K.L., who was hospitalized at Millcreek Community Hospital for

20   mental health reasons, that may or may not have to do with

21  these incidents."

22  Q.    And do you recall any conversation with Ms. Cappabianca

23  about her uncertainty concerning whether K.L.'s

24  hospitalization had to do with these incidents?

25  A.    I don't recollect anything.  I'm sure that's why I put it


9


1  in my report because she wasn't sure if it had anything to do

2  with it or not.

3  Q.    Okay.  Did Ms. Cappabianca and Ms. Woods -- you can look

4  at your report, did Ms. Cappabianca and Ms. Woods then tell you

5  about the details of that sexual assault that occurred on

6  December 19th; in other words, what they had learned about that

7  sexual assault?

8  A.    Yes, they did.

9  Q.    Either by reviewing the report and summarizing it or

10  reading appropriate parts of the report you think best sort of

11  encapsulates what they said to you, tell the jury what you

12  learned about that incident?

13  A.    Okay.  On that day Prinicpal Woods and Ms. Cappabianca

14  told me that on December 19th of 2001, R.P. and her friend,

15  B.C., had gone to Strong Vincent High School after school to

16  meet B.C.'s older sister, who was in the PASS program.  R.P.

17  and B.C. had seen a 15-year-old male by the name of A.F.,

18  another boy named C.B., and another boy named A.K., they were

19  walking by the laundromat.  B.C. had approached the three boys

20  and asked them if they would like head, meaning oral sex, from

21  R.P.  Do you want me to continue?

22  Q.    Yes.

23  A.    Okay.  Ms. Cappabianca told me that all the kids were

24  going to the laundromat, B.C. coerces and cajoles R.P. to go

25  into the bathroom and have oral sex with one of the boys.


10


1  R.P. didn't want to, and B.C. had threatened to beat her up if

2  she didn't.  Apparently, R.P. tells Ms. Cappabianca that she

3  and one of the boys go into the bathroom, they stayed in the

4  bathroom of the laundromat for about 15 minutes, but nothing

5  happened.  They, R.P. and the boy, came out, and B.C. asked

6  R.P. if she had given the boy oral sex.  At first R.P. told her

7  yes.  But then she told B.C. no, that she hadn't.  R.P. told

8  Ms. Cappabianca that after they left the laundromat, she and a

9  boy named C.B. went behind a house and she did perform oral sex

10  on the boy C.B.  She told Ms. Cappabianca that now B.C. is

11  taunting her at school in the hallways, asking her if she wants

12  to give oral sex to other boys in school.

13  Q.    Let me refer to that part of your police report.  That's

14  right here, so the jury can see that, that would be at page

15  six.  That report relates -- could you read where it says "on

16  Monday, 1-7-02?"

17  A.    "On Monday, 1-7-02, there was a second incident.  R.P.

18  was at the water fountain and B.C. approached her asking her to

19  give head to a male student that had walked by.  Allegedly,

20  after R.P. refused, B.C. shoved her into the stairwell and

21  pushed her to follow the male student.  R.P. walked down the

22  stairs in the same direction as the male student, but nothing

23  had happened."

24  Q.    Do you recall whether you learned that any faculty

25  members interrupted that incident?


11


1  A.    I wasn't aware of any, no.

2  Q.    Then a third incident happened that night, and I would

3  like you to read your report, that paragraph where it talks

4  about the third incident that Ms. Cappabianca found out about?

5  A.  "The third incident that Ms. Cappabianca found out about,

6  by interviewing all of the listed students, was that also on

7  Monday, 1-7-02, after PASS C.B. and an unknown male student had

8  PASS.  They both went into the Frontier Village Laundromat,

9  where R.P. was.  R.P. was there changing her clothes and

10  waiting for her father to pick her up.  While in an alcove of

11  the building, the unknown male student had forced R.P. to sit

12  down and then he put his hands up under her skirt, and pushed

13  her hair back away from her face.  This male then unzipped his

14  pants and put his penis on R.P.'s face."

15  Q.  When you interviewed Ms. Cappabianca, did you learn that

16  the school district had a good idea of who that person was, who

17  that student was?

18  A.  I believe they thought they knew, I believe Ms. Woods

19  said from what the descriptions she had gotten, they thought

20  she knew who it was.

21  Q.  Did you bring the notes you took at the time you

22  interviewed Ms. Woods and Ms. Cappabianca?

23  A.  Yes.

24  Q.  Could you look at those -- I don't want you to give the

25  name, I would like to ask you if they gave you the name of the

12

1  person that they thought did this to R.P.?

2  A.    Yes.

3  Q.    Okay.  Now --

4          THE COURT:  Mr. Olds, while you're orienting

5  yourself there, I think this is probably a good time to take a

6  five-minute break.  If I forget at the end of the day, I might

7  as well tell you right now, we're going to start tomorrow sharp

8  at 9:00 a.m.

9          (Recess from 2:50 p.m.; until 3:03 p.m.)

10          THE COURT:  All right, Mr. Olds.

11  BY MR. OLDS:

12  Q.    This would be page six of the report, next to last

13  paragraph at the bottom of the page.  Ms. Cappabianca I think

14  also talked to you about the other victim of these assaults,

15  that would be K.L.  Could you read what you wrote that Ms.

16  Cappabianca said?

17  A.    "Ms. Cappabianca relates that the other victim,

18  12-year-old K.L. was unavailable to be interviewed, but

19   according to another student that was there, Y.H. on 12-19-01,

20   both R.P. and K.L. took turns giving oral sex, mouth to penis,

21   to C.B."

22   Q.   Now, do you recall how it came up that they thought these

23   events happened on 12/19, December 19th?

24   A.   Because that was the date that I believe R.P. told them

25   that it happened.


13


1   Q.   Did they tell you that -- did either Ms. Woods or Ms.

2   Cappabianca tell you that they had had a conversation with K.L.

3   on December 20th, this would be the day after the assault, in

4   which K.L. related that there had been some sexual activity or

5   contact between her and C.B.?

6   A.   No.

7   Q.   They didn't tell you that?

8   A.   No.

9   Q.   Ms. Barber, I'm going to show you another document, which

10   is Plaintiff's Exhibit 58, and actually to save time I'll show

11   you Exhibit 59 as well.  Here's 58, and then here's 59.

12   Plaintiff's Exhibit 58, have you ever seen Plaintiff's Exhibit

13  58?

14  A.   Yes, I have.

15  Q.   And tell the jury what that exhibit is?

16  A.   It's a typed statement dated January 10, 2001.

17  Q.   And do you know who typed it?

18  A.   It's not signed.

19  Q.   It's part of the police file, is that right?

20  A.   I believe this was a probation office copy.

21  Q.   Do you know whether Ms. Cappabianca prepared this Exhibit

22  58?

23  A.   It's not signed, I couldn't tell you if it was Ms.

24  Cappabianca or the principal, Ms. Woods.

25  Q.   I also want to show you Exhibit 59 --


                                14


1  A.   Okay.

2  Q.   Now, do you recognize Exhibit 59?

3  A.   Yes, I do.

4  Q.   And how did this document get created?

5  A.   This is a statement written by Ms. Cappabianca for A.F.

6  Q.   And did you see her prepare it?

7   A.   I'm not sure if I was there when she did it or not.  I

8   believe I was -- I believe, according to my report, I was

9   there.

10  Q.   Did A.F. sign it?

11  A.   Yes, he did.

12  Q.   Did you walk away from that first part of your

13  investigation with this report in your hand or statement in

14  your hand?

15  A.   Yes.

16  Q.   Okay.  Now, looking at your report, can you tell the jury

17  what other activities you engaged in, in terms of the

18  investigation that first day?

19  A.   After we spoke to Ms. Cappabianca and Principal Woods,

20  A.F. gave the written statement to Ms. Cappabianca.  Ms.

21  Cappabianca wrote it, but it was dictated by A.F.  B.C., while

22  we were still at the school, B.C. and her mom arrived for a

23  pre-scheduled meeting there.  After their meeting, B.C. and her

24  mom agreed to come into the Erie Police Department for a

25  statement.  Meanwhile, R.P. and her dad had arrived at the Erie

15

1  Police Department to be interviewed for this, so my partner and

2  I went back to the police department where I interviewed R.P.

3  Q.   Who is your partner?

4  A.   Detective Sergeant John Barber.

5  Q.   Okay.  If you could look at page -- the bottom of page

6  11, just to see how this interview of B.C. starts.  And the top

7  of page 12 --

8       THE COURT:  This is what exhibit?

9       MR. OLDS:  I'm sorry, Exhibit 52, your Honor.  This

10  would be page 11 of Exhibit 52.

11  BY MR. OLDS:

12  Q.   Now, down here where it says "S. Green," that would be a

13  different detective?

14  A.   Correct, that is Sergeant Stan Green.

15  Q.   Were you present -- excuse me, were you present when Stan

16  Green and I guess Detective John Barber interviewed B.C.?

17  A.   No, I was not.

18  Q.   And then what other involvement did you have in this

19  case?

20  A.   After interviewing R.P., I videotaped her interview, and

21  then everything was turned over to Detective Sergeant Stan

22  Green because we determined that all of the individuals

23  involved were juveniles.  At that time my partner and I didn't

24  handle juvenile cases.

25         MR. OLDS:  Okay.  No other questions.  We would move


                              16


1  for the admission of Exhibits 58 and 59, your Honor.

2         THE COURT:  They're admitted.

3                  CROSS-EXAMINATION

4  BY MR. MARNEN:

5  Q.    Good afternoon, Detective Barber.

6  A.    Good afternoon.

7  Q.    Plaintiff's Exhibit 58, do you still have that there?

8  A.    Yes.

9  Q.    I think you said you do not remember if that was provided

10  to you by Linda Cappabianca or Janet Woods?

11  A.    I'm not sure.

12  Q.    But one of them did, is that right?

13  A.    Yes.

14  Q.    When you were at Strong Vincent on January 11, 2002, that

15  document was handed to you by one of them?

16   A.   I believe so, yes.

17   Q.   All right.  But Exhibit 59, the handwritten document,

18   that was a statement that A.F. adopted in your presence,

19   according to your report, by signing it after it was read,

20   after he dictated it?

21   A.   He dictated it, Ms. Cappabianca wrote it.

22   Q.   Linda Cappabianca, that's her handwriting?

23   A.   Yes.

24   Q.   Now, as I understand it, you were instructed by Captain

25   Skindell on the morning of January 11th to go to Strong

                              17

1   Vincent, and you arrived there sometime -- before 8:30 in the

2   morning?

3   A.   Correct.

4   Q.   You met with Linda Cappabianca and Janet Woods at 8:30?

5   A.   Yes.

6   Q.   And the first thing that happened upon your arrival was

7   that Linda Cappabianca and Janet Woods provided you information

8   as to what they learned?

9   A.   That's correct.

10  Q.   About the events and those facts are recited in the

11  police reports, are they not?

12  A.   Yes, they are.

13  Q.   What they told you begins on page five, as I understand

14  it, and ends at the bottom of page six, where the report talks

15  about your talking to A.F. at that point?

16  A.   Correct.

17  Q.   All right.  So at the bottom of page six, it indicates

18  that you -- I'm sorry, at the top of page seven, it indicates

19  that at 9:23 A.F. was brought to the principal's office, do you

20  see that?

21  A.   Yes.

22  Q.   So that, therefore, your discussion with Janet Woods and

23  Linda Cappabianca began at 8:30 and ended up about 9:23?

24  A.   That sounds about right.

25  Q.   Almost an hour you talked with them?


                              18


1  A.   Yes.

2  Q.   And then the interview with A.F. began, if you look at

3  page seven, at 9:30 in the morning, did it not -- the second to

4  last paragraph?

5  A.    Yes, that's the one he agreed to give a written

6  statement.

7  Q.    And then at 10:30 in the morning, B.C. showed up with her

8  mother to be interviewed?

9  A.    Correct.

10  Q.    And, then, as I understand it from the report on page

11  eight, you interviewed R.P. at 11:25 a.m.?

12  A.    That's correct.

13  Q.    And that interview was at the police department?

14  A.    Yes, it was.

15  Q.    You got a statement from A.F. and B.C. at the high

16  school, but R.P.'s was done at the police department,

17  correct?

18  A.    Correct.

19  Q.    And as I understand it, you conducted a preliminary

20  interview of R.P. at the police department, that was followed

21  by a videotaped statement?

22  A.    Yes.

23  Q.    And the videotaped statement was commenced at 1:35 p.m.,

24  wasn't it -- page 11 of your report?

25  A.    That's correct.

19

1  Q.   I'd like to show you what I'm going to mark as

2  Defendant's Exhibit A, I don't know if you can identify this,

3  but maybe you can -- does this appear to be a copy of that

4  videotape, the videotape of R.P.'s interview on January 11,

5  2002?

6  A.   Yes, it does.

7  Q.   On that videotape there is a number there, is that the

8  case number of this particular investigation, Erie Police

9  Department?

10  A.   Yes, it is.

11  Q.   Okay.  Case No. 02-1419?

12  A.   That's correct.

13       MR. MARNEN:  Your Honor, I'd like to offer this into

14  evidence -- may I play a portion of it for the jury, not the

15  whole thing?

16       THE COURT:  All right.

17       (Whereupon, Defendant's Exhibit A was played for the

18  Jury.)

19       MR. MARNEN:  That's all I want to show, your Honor.

20        THE COURT:  All right.

21  BY MR. MARNEN:

22  Q.    Detective Barber, was that the videotape of that

23  statement you took of R.P. that day?

24  A.    Yes, it is.

25  Q.    And as you stated in that tape, the sexual assault of the

20

1  rapes occurred two days before Christmas vacation?

2  A.    Yes.

3  Q.    During the course of your interview of Linda Cappabianca,

4  isn't it true that she characterized the event as coerced sex?

5  A.    Yes.

6  Q.    She did not characterize it as consensual sex?

7  A.    No.

8  Q.    And on this report, is the date of occurrence of December

9  19, 2001?

10  A.    Yes.

11  Q.    And were you ever provided -- you interviewed R.P., but

12  as understand it you never interviewed K.L.?

13  A.    No, I did not.

14  Q.    R.P. told you December 19th and never contradicted that

15  date?

16  A.    December 19th was the date she told us.

17  Q.    All the information you received was the event occurred

18  on December 19th, isn't that right?

19  A.    That's correct.

20  Q.    Exhibit 58, that is the memorandum that was provided to

21  you by either Janet Woods or Linda Cappabianca, that looks like

22  a page and a third long?

23  A.    Yes.

24  Q.    And it's typewritten, correct?

25  A.    Yes, it is.


                                    21


1  Q.    And it's dated January 10, 2001?

2  A.    Yes, it is.

3  Q.    Would you please, it's not that long, read that to the

4  jury slowly?

5        THE COURT:  How long is it -- can you put it on the

6  screen?

7        MR. MARNEN:  I can, your Honor.

8        THE COURT:  So the jury can hear it and see it at

9    the same time.

10    BY MR. MARNEN:

11    Q.    Detective Barber, that's the top of the first page, is it

12    not?

13    A.    Yes, it is.

14    Q.    Why don't you commence your recitation?

15    A.    Dated January 10, 2001.  "It has been brought to my

16    attention that on Wednesday, December 19, 2001, several

17    students were engaged in inappropriate sexual behavior on their

18    way home from the PASS program.  B.C., R.P., C.A., Y.H., K.L.,

19    C.B., A.G. and A.K., were the students in question.  After

20    interviewing all persons involved, with the exception of K.L.,

21    because she was hospitalized at Millcreek Hospital for mental

22    health reasons, it is apparent that C.A., Y.H. and A.F. did not

23    participate in sexually defiant behavior.

24        R.P. admittedly went into the bathroom at the laundromat

25    with A.K. and performed oral copulation on C.B. on December 19,

22

1    2001.  She states that B.C. had forced her to go into the

2   bathroom with A.K.  The girls had gone to Strong Vincent to

3   meet B.C.'s older sister, who was staying late at PASS.  They

4   had seen A.F., C.B. and A.K. walking towards the laundromat on

5   West 8th Street.  B.C. approached the boys and asked them if

6   they would like head from R.P.  They entered the laundromat,

7   corner of 8th and Washington next to the school, where B.C.

8   continued to coerce R.P. into performing oral sex on the boys.

9   R.P. was uncomfortable with the idea of having oral sex and was

10  hesitant.  A.F. states that at this point, B.C. started hitting

11  R.P.  R.P. conceded and walked into the bathroom with A.K.

12  They were alone in the bathroom with the lights out for almost

13  15 minutes and then came out of the bathroom.  At some point

14  they were asked to leave the laundromat because B.C. was

15  swearing and throwing things.  Once outside, R.P. and C.B. went

16  behind a house that is located on Washington Street.  R.P. had

17  given fellatio to C.B.  According to A.F., she had performed

18  this act on both A.K. and C.B. a couple of times.  A.K. denies

19  that he engaged in any sexual activity with R.P.  He claims

20  that he saw the girls on the steps of Strong Vincent and they

21  started walking east on 8th Street.  He went into the

22  laundromat to smoke a cigarette and talk to his friend, A.F.

23  After his cigarette, he went home.  He said that he did not go

24  into the bathroom or outside with R.P. at anytime that evening.

25  C.A., B.C., R.P., C.B., and A.F. all saw A.K. and R.P. go into

23

1  the bathroom.  When called into the office, A.K.'s first

2  statement was, 'you want to talk to me about what happened and

3  I didn't do anything.'

4      R.P. is now being taunted by B.C. at school.  B.C. is

5  bothering her to perform this act on other male students.  On

6  Monday, 1/7/02, there was a second incident.  R.P. was at the

7  water fountain.  B.C. was in the hall asking R.P. to give head

8  to a male student that walked by.  R.P. refused.  According to

9  R.P., B.C. had shoved her into the stairwell and pushed her to

10  follow the male student.  R.P. walked down the stairs in the

11  same direction as the male student, but nothing had happened.

12      The third incident to occur was after PASS on Monday,

13  1/7/02.  C.B. and an unknown male student had left PASS.  They

14  went to the laundromat.  R.P. was at the laundromat changing

15  her clothes and waiting for her dad to pick her up.  While in

16  an alcove of the building, the unknown student had forced R.P.

17  to sit down.  He put his hands up her shirt.  He brushed her

18  hair back.  He unzipped his pants and put his penis on her

19  face.  R.P. was unsure of the student's name, but was able to

20  describe the student in detail.

21      K.L. was unable to be interviewed because she was

22  hospitalized at Millcreek Hospital for mental health reasons.

23  While at Millcreek, K.L.'s mom had said that she admitted to

24  the counselor that she participated in oral sex with a student

25  at Strong Vincent High School.  Y.H. had stated in her


                                24


1  interview that R.P. and K.L. had taken turns doing it to C.B."

2  Q.    Your involvement in the investigation terminated, about a

3  week later you wrote your report, and that was it, isn't that

4  right?

5  A.    That's correct.

6  Q.    That was I think on the 17th -- on page 11 it indicates,

7  looks like you signed it, it was countersigned by Captain

8  Skindell on January 17, 2002?

9  A.    That's correct.

10  Q.    The matter was turned over to Detective Sergeant Green

11    because it involved juveniles, at that time you weren't

12    involved in that?

13    A.    Correct.

14    Q.    So you didn't participate thereafter in any investigation

15    or prosecution?

16    A.    No, I did not.

17    Q.    Anything that happened after that, in terms of

18    investigation, was determined by Detective Green and perhaps

19    others, but not you?

20    A.    That's correct.

21    Q.    Who would have made the decisions relative to prosecution

22    of the assailants?

23    A.    That would have been Detective Sergeant Green.

24    Q.    So Detective Sergeant Green would have also determined

25    who to charge concerning the December 19th incident, December


25


1    19, 2001, correct?

2    A.    Correct.

3    Q.    He would have also determined who to charge relative to

4    the January 7, 2002 incidents?

5   A.   Yes.

6   Q.   You played no role in that, correct?

7   A.   No, I did not.

8        MR. MARNEN:  Thank you, very much.

9        THE COURT:  Anything further, Mr. Olds?

10       MR. OLDS:  Nothing further, your Honor.

11       THE COURT:  Thank you, detective.  Call your next

12  witness.  Sir, do you want to come on down here, stand in front

13  of the bench and my clerk will swear you in.

14       THE CLERK:  Please raise your right hand.

15       ROBERT BLAKELY, PLAINTIFFS' WITNESS, SWORN

16            DIRECT EXAMINATION

17  BY MR. OLDS:

18  Q.   Could you state and spell your name and give us your

19  business address?

20  A.   My name is Robert J. Blakely, B-l-a-k-e-l-y, I'm the

21  Chief Juvenile Probation Officer for Erie County.

22  Q.   And how long have you had that position?

23  A.   I've been the chief probation officer since 1999.  And

24  I've been a probation officer since 1981.

25  Q.   What is your job?

1  A.    My job is the overall administrative function of the

2  juvenile court.

3  Q.    I guess the juvenile court would be both criminal

4  dependency or just criminal?

5  A.    No, juvenile court or the Juvenile Probation Department

6  only handles matters of delinquency between the ages of 10 and

7  21.  The crime being committed prior to their 18th birthday.

8  Q.    You have some familiarity with the children who

9  perpetrated the assaults that are the subject of this case, is

10  that right?

11  A.    I have some familiarity with the records regarding that.

12  Q.    Okay.  I want to show you -- maybe you could explain to

13  the jury what a juvenile delinquency proceeding is like, what

14  it involves?

15  A.    The juvenile court process basically starts with a

16  petition of delinquency.  Some sort of crime occurs in the

17  community, a police officer would file a petition of

18  delinquency, and that would be filed with our office.  The

19  first step really is what we call an intake appointment.  The

20  charges are presented to the juvenile, they're asked to admit

21   or deny the charges.  Depending on whether they admit or deny

22   determines what happens in the juvenile system.  If they admit,

23   and it also depends on the severity of the cases.  For a charge

24   that is relatively serious, we would go into a court

25   proceedings.  There are a number of charges that come to the


27


1    juvenile court.  Minor charges that we divert out because of

2    the nature of juveniles.  But the court process is broken into

3    really two stages, two main stages.  The first is what we call

4    adjudicatory, an adjudication hearing, which really details

5    whether someone is found guilty or not guilty of the charge.

6    The second part of that is what we call a disposition hearing.

7    A disposition hearing is when a juvenile court judge makes a

8    finding of whether someone goes on probation or they're placed

9    by the courts.  That's very rudimentary.

10   Q.    Okay.  I want to show you two exhibits, one will be

11   Plaintiff's Exhibit 234 and the other will be Plaintiff's

12   Exhibit 235.  I only have the original of 235 --

13          THE COURT:  In any event, Exhibit 234 is an

14   adjudication order relative to one individual, 235 is the

15  other.  You can just ask him questions about it.

16        MR. MARNEN:  I have the same exhibits that I was

17  going to use, I can give them to Mr. Olds.

18        THE COURT:  Let me make a suggestion, just in terms

19  of moving this thing along.  It seems to me this is just a

20  matter of stipulated fact.  Why don't you just read and ask

21  this officer or chief probation officer whether or not this

22  individual was adjudicated delinquent with respect to these

23  issues, and then move on to the next one.

24  BY MR. OLDS:

25  Q.   Looking at Exhibit 234, which is the adjudication hearing


                                28


1  and order of C.B., along with the allegations of delinquency

2  that is a part of that; what allegations of delinquency were

3  brought against C.B.?

4  A.   Allegation two, criminal conspiracy; allegation three,

5  involuntary deviate sexual intercourse; allegation four,

6  involuntary deviate sexual intercourse; allegation five,

7  intimidation of victim or witness; and allegation six,

8  terroristic threats.

9   Q.   Okay.  And was C.B. adjudicated delinquent?

10  A.   On the exhibit that I have in front of me, he was not

11  adjudicated delinquent, he was found guilty of certain charges.

12  The adjudication of delinquency would come at the disposition

13  hearing.  By the judge in this case, Judge Kelly actually heard

14  the case, the adjudication of delinquency would have happened

15  at the disposition.

16  Q.   But he was found guilty, what was C.B. found guilty of?

17  A.   The following allegations were sustained.  Allegation

18  two, criminal conspiracy.  Allegation three, involuntary

19  deviate sexual intercourse.  Allegation six, terroristic

20  threats.  And seven and eight are redacted on mine, I can't

21  tell what happened on those charges.

22  Q.   Then Exhibit 234, the involuntary deviate sexual

23  intercourse and the criminal conspiracy, there is an (F) by

24  those on that exhibit, does that mean felony?

25  A.   Are you on 234?


29


1   Q.   Exhibit 234, yes?

2   A.   Yes, the (F) and (M), the (F) corresponds to felony

3  offenses, and the (M) corresponds to misdemeanors.

4        MR. OLDS:  Your Honor, Mr. Marnen was gracious

5  enough to give me extra copies of the charge involving B.C.,

6  that has a defendant's sticker on it.  I'll substitute this

7  Plaintiff's 235 for the one that you have.

8  BY MR. OLDS:

9  Q.   What criminal charges were brought against B.C. -- I'm

10  sorry, against B.C.?

11  A.   B.C. was charged with allegation two, criminal

12  conspiracy; allegation three, criminal solicitation; allegation

13  four, simple assault; and allegation five, harassment and

14  stalking.

15  Q.   And what was she convicted of?

16  A.   Allegation three, criminal solicitation was sustained.

17  Allegation -- allegation two was withdrawn.  Allegation three

18  was sustained.  Four and five were dismissed.

19        THE COURT:  That was confusing, tell the jury again

20  what exactly was the conviction that was sustained?

21        THE WITNESS:  The recommendation of the Master was

22  allegation two, which was the criminal conspiracy, was

23  withdrawn.  Allegation three, criminal solicitation to commit

24  involuntary deviate sexual intercourse, was sustained.

25  Allegation four, simple assault, was dismissed.  As well as

30

1  allegation five, harassment and stalking, was dismissed.

2  BY MR. OLDS:

3  Q.  I'll show you what's been marked as Plaintiff's Exhibit

4  236, this involves A.K.?

5  A.  Okay.

6  Q.  What was A.K. charged with?

7  A.  A.K. was charged with allegation one, criminal conspiracy

8  to commit involuntary deviate sexual intercourse.  Allegation

9  two is involuntary deviate sexual intercourse.

10  Q.  Was he convicted?

11  A.  The charges were sustained.  I guess it's semantics in

12  the juvenile and adult system.  We don't use the term

13  convicted.  But the charges, allegation two, which was the

14  involuntary deviate sexual intercourse, was sustained.

15  Allegation one, the criminal conspiracy, was withdrawn.  So he

16  was found, in essence, found guilty, but he was not adjudicated

17  at that time, at least with that document there.

18          MR. OLDS:  We would move for the admission of

19   Exhibits 234, 235 and 236, your Honor.

20          THE COURT:  They're admitted.

21   BY MR. OLDS:

22   Q.    Do you know whether either B.C. or C.B. were subsequently

23   committed to any juvenile institution?

24   A.    It's my understanding that they were, yes.

25   Q.    And your records would show that, is that right?


                                31


1    A.    That's correct.

2    Q.    And then once they became, what 18 or is it 21, are they

3    released?

4    A.    No.  The juvenile system works on the basis that they are

5    committed for an indefinite period of time, depending on their

6    behavior within, whether it be probation or some sort of

7    placement.  In this case I believe that both of these young men

8    were in some sort of placement.  And they would not be released

9    until a judge ordered them released from an institution based

10   on their behavior and progress within the programs.

11          MR. OLDS:  No other questions, your Honor.

12    THE COURT:  All right.

13              CROSS-EXAMINATION

14  BY MR. MARNEN:

15  Q.    Mr. Blakely, what did you say the term was, adjudication,

16  when you determine they committed the offense?

17  A.    There are really two parts to this, it's kind of

18  confusing.  The hearing is an adjudication hearing, some of the

19  information that I read to the court and to the jury is from

20  the adjudication hearing.  The actual adjudication of

21  delinquency has to occur in front of a judge.  Some of our

22  adjudication hearings are heard in front of a master, who's an

23  attorney who works for the juvenile court.

24  Q.    If I'm reading Exhibit 235 correctly, Judge Kelly, of the

25  Erie County Court of Common Pleas, on February 11, 2002,


                              32


1  determined that she would sustain criminal conspiracy and

2  criminal solicitation with respect to B.C., I'm sorry -- I

3  didn't read that correctly, did I -- she did whatever she did

4  on February 11, 2002?

5  A.    That is correct.  The judge confirms the finding of the

6    master.  The master basically -- I'm probably confusing people

7    here.

8    Q.   At sometime thereafter the judge then decides the

9    disposition of what she's going to do or he's going to do?

10   A.   That is correct.

11   Q.   On February 11th, '02, B.C. was determined to have

12   committed certain offenses?

13   A.   The judge confirmed the findings of the master, which is

14   what I had testified to.  That allegation three was sustained.

15   Allegation two was withdrawn, four and five were dismissed.

16   Q.   Exhibit 236 indicates on that very same day, Judge

17   Trucilla, in the Erie County Court of Common Pleas, did the

18   same thing with respect to A.K. -- that would be Exhibit 236?

19   A.   That is correct.

20   Q.   And with respect to C.B., his was not adjudicated, the

21   judge did not find he committed offenses until September 3,

22   2002, that's Exhibit 234?

23   A.   That is correct.

24   Q.   Is the explanation for the difference in time there the

25   fact that C.B. insisted upon a hearing and the other two agreed

33

1  to the offenses -- if you know?

2  A.   I would say -- I can't testify to certainty there, I

3  would suggest two alternatives.  One, that the parents at a

4  master's hearing in the juvenile court, the parents have the

5  right to have a hearing heard in front of a Court of Common

6  Pleas judge.  So if they choose not to have the hearing heard

7  in front of the master, it could go that way.  Or it could have

8  been a denial.  And I don't want to guess.

9  Q.   What is this process called, it's not called a

10  prosecution?

11  A.   Well, it is a prosecution, yes.

12  Q.   The prosecution, the person that controls the prosecution

13  are the persons where, in the DA's office?

14  A.   An assistant district attorney would represent the

15  Commonwealth in these proceedings.

16  Q.   The assistant district attorney makes the decisions on

17  what will or will not be withdrawn?

18  A.   And charged, yes.

19  Q.   And charged, too?

20  A.   Yes.

21  Q.   Even the police don't make that decision?

22  A.    The police do not.  They file a petition of delinquency

23  alleging certain behaviors.  But the assistant district

24  attorney makes those decisions as to the charge.

25  Q.    Certainly the Erie School District didn't make those

34

1  decisions?

2  A.    The Erie School District does not make those.

3  Q.    Let me show you what I'm going to mark as Defendant's

4  Exhibit B -- can you identify Defendant's Exhibit B, Mr.

5  Blakely?

6  A.    Yes, this would be a court transcript involving the

7  proceeding held before the Master, Robert Murray, on February

8  22, 2002.

9  Q.    Does this relate to B.C.?

10  A.    This relates to B.C.

11  Q.    Does this relate to the charges arising out of the

12  December 19, 2001 incidents?

13  A.    Yes, that is correct.

14  Q.    I'd like to direct your attention to page 19 of that

15  transcript --

16  A.   Yes, I have it.

17  Q.   The number in the lower right is 182, but the number in

18  the upper right corner is 19?

19  A.   Yes.

20  Q.   That appears to be the first page of the direct

21  examination of R.P., do you agree with that?

22  A.   Yes.

23  Q.   If you turn to the next page, page 20, I'd like to drop

24  you down to line 10, okay?

25  A.   Yes.

35

1  Q.   I will read the question, you will read the answer.

2  "Q.   In December -- on December 19th this past year, where

3  were you, do you remember?

4  "A.   I went to Strong Vincent."

5  Q.   And then if you turn to page 21, top of the page, I'll

6  read the question, you read the answer.

7  "Q.   And on December 19th you said you that you were at Strong

8  Vincent High School?

9  "A.   (Nodded head to the affirmative.)

file:///A|/RICHDAY1.TXT

10   "Q.   Who were you with?

11   "A.   December 19th?

12   "Q.   Um-hum.

13   "A.   B.C., Y.H., A.K., A.F., C.B., and C.A. and K.L.

14   "Q.   Where were you?

15   "A.   By the laundromat.

16   "Q.   Was this later in the afternoon?

17   "A.   No.

18   "Q.   At what time was this?

19   "A.   It was around, I don't know, around 6:30.

20   "Q.   Was it dark out?

21   "A.   (Nodded head yes.)

22   "Q.   Could you tell me what happened at the laundromat?

23   "A.   B.C. came over and she said her friend wants the -- for

24   me to give him head.  And I -- I didn't believe her, and I said

25   no.  I walked away."


36


1        MR. MARNEN:  That's all I need you to read, please.

2   Thank you, very much.  I think I forgot of offer this, your

3   Honor.

4        THE COURT:  How is it identified?

5        MR. MARNEN:  Defendant's Exhibit B, and I would

6   offer it into evidence.

7        THE COURT:  It's admitted.

8        MR. MARNEN:  Thank you, I have no other questions,

9   your Honor.

10        THE COURT:  Anything further of this witness?

11        MR. OLDS:  No, your Honor.

12        THE COURT:  Thank you, sir.

13        THE CLERK:  Raise your right hand.

14           RICHARD P., PLAINTIFF HEREIN, SWORN

15               DIRECT EXAMINATION

16   BY MR. OLDS:

17   Q.   For the record, state your name and spell it?

18   A.   My name is Richard P.

19   Q.   You're the father of R.P.?

20   A.   That's correct, yes.

21   Q.   You are married, is that right?

22   A.   I'm sorry.

23   Q.   You're married -- your Honor, he read lips.

24        THE COURT:  Would it be easier if he came up and

25  stood right in front of you?


37


1          THE WITNESS:  Yes.  Thank you.

2  BY MR. OLDS:

3  Q.    You're married?

4  A.    Yes.

5  Q.    And what's your wife's name?

6  A.    S.P.

7  Q.    How long have you been married?

8  A.    Twenty years.

9  Q.    And is S.P. in the courtroom?

10  A.    Yes, she is.

11  Q.    What's your age, Mr. P.?

12  A.    I'm 41.

13  Q.    And you have a hearing problem?

14  A.    Yes.

15  Q.    What is it?

16  A.    It's 70 percent deaf in the right ear, and 60 percent

17  deaf in the left ear.

18  Q.    And have you had a deafness problem all of your life?

19  A.  Yes, since birth.

20  Q.  And how many children do you have?

21  A.  I have three.

22  Q.  What are their names and ages?

23  A.  J.P. is 18; R.P. is 17; and M.P. is 9.

24  Q.  R.P. is, I've been calling her R.P., she goes by both

25  names, is that right?

38

1  A.  Yes.

2  Q.  You call her R.P.?

3  A.  Yes.

4  Q.  What do most people call her?

5  A.  I think most people call her R.P., but I call her R.P.

6  Q.  Okay.  Now, are you currently employed?

7  A.  Yes.

8  Q.  Who do you work for?

9  A.  I work for Wal-Mart as a sales associate.  And I'm also a

10  crossing guard for the Erie School District.

11  Q.   Back in 2001 when these events happened, 2001-2002, did

12  you have a job?

13  A.    Yes.

14  Q.    Who did you work for then?

15  A.    I worked for -- I worked for the Erie School District as

16  a crossing guard.  I was hired by the police department to do

17  that.  And then they in turn, I guess they contract you out to

18  different areas to be a crossing guard for children.  I also

19  worked at Plastek in 2001.

20        THE COURT:  Mr. P., pull in a little bit and keep

21  your voice up and speak right into the microphone.  Don't go

22  too fast.  All right, go ahead.

23  BY MR. OLDS:

24  Q.    So you worked for Plastek?

25  A.    Yes.


39


1  Q.    And what kind of job was that?

2  A.    That was a laborer.  Injecting and molding.

3  Q.    Okay.  Now, your wife doesn't work, does she?

4  A.    No.

5  Q.    Your wife has some physical problems, what are they?

6  A.    She's had a blood and liver transplant.  She has a

7    disease called hereditary --

8    Q.    Can you spell that by any chance?

9    A.    HT for short.

10   Q.    And that's a hereditary disease you say?

11   A.    They call it hereditary.

12   Q.    And how does that affect her?

13   A.    The disease itself with the liver and blood transplant,

14   the disease itself affects all the major organs.

15          MR. MARNEN:  Your Honor, I object to this, it's not

16   relevant.

17          THE COURT:  Sustained.

18          MR. OLDS:  Okay.

19   BY MR. OLDS:

20   Q.    In terms of dealing with the schools for your children,

21   who's been the principal person that handles that kind of

22   stuff?

23   A.    I have.

24   Q.    Does your wife get out much?

25   A.    No.

40

1  Q.   And is she on medication?

2  A.   Yes.

3  Q.   And you have three children, J.P., R.P. and M.P.?

4  A.   That's correct.

5  Q.   Now, were you originally from this area, from the Erie

6  area?

7  A.   I'm originally from Erie, but we actually relocated to

8  Mesa, Arizona for a while.

9  Q.   Do you remember when you lived in Mesa, Arizona?

10  A.   January of 1999.

11  Q.   And when did you come back to Erie?

12  A.   March of 2000 -- 2001.  I think 2000.

13  Q.   Was it 2001 the year?

14  A.   2001, I'm sorry.

15  Q.   And when you were in Mesa, what did you do?

16  A.   I worked at a group home, I was a public behavior

17  consultant, and also at a correctional training academy.

18  Q.   And R.P. attended school in Mesa?

19  A.   Yes.

20  Q.   Going back to 2001, tell the jury what kind of kid R.P.

21  was?

22  A.   R.P. growing up, she was a very sweet little girl.

23  I mean, she's what I would consider to be like a teacher's pet.

24  She always asked questions if she had problems.  She always

25  would do things that would be an overachiever as she could.


41


1  She always wanted to do more than what she was asked to do.

2  Q.    Did she have educational issues herself, was she in

3  special ed?

4  A.    Yes, and she had an acute learning disability.  And then

5  she also had a speech delay and she was learning disabled in

6  math, English.

7  Q.    When you came back from Arizona -- how did she do in

8  schools out in Arizona?

9  A.    In Arizona she actually was doing a lot better.  She

10  worked, they put her in a program where they worked with her

11  one on one in a small setting of a classroom, she was getting

12  moved up into more of an academic grade level for her age

13  level.

14  Q.    Before she went to Arizona with you, she attended school

15  here in Erie?

16  A.    Yes.

file:///A|/RICHDAY1.TXT

17   Q.   Do you remember what school she was in?

18   A.   I know that she was in Diehl, then she went I believe to

19   Harding -- I can't remember the other school's name.

20   Q.   When she came back from Arizona, what grade was she in?

21   A.   She was in 7th.

22   Q.   Did she finish up that first school year in Erie, you say

23   you came back in March, did she go to an Erie school when you

24   came back?

25   A.   Yes.

42

1   Q.   What school did she go to?

2   A.   I think it was Harding.

3   Q.   And then in September of 2001, where did she go?

4   A.   In September of 2001 she went to Strong Vincent.

5   Q.   Strong Vincent?

6   A.   Yes.

7   Q.   And where did you live in 2001?

8   A.   I moved back up here in March of 2001, we resided with my

9   mom and dad until we could find a place, an apartment where we

10   moved to on West 8th Street, 1205 West 8th Street.

11  Q.    Is that near Strong Vincent?

12  A.    About two blocks away.

13  Q.    And I take it that R.P. would walk to and from school?

14  A.    Sometimes, most of the time if I could, I took her.  Most

15  of the times she'd walk.

16  Q.    In those early months of 2001, did you have much contact

17  with either the administration or R.P.'s teachers about R.P.?

18  A.    Most of the contact I had with them, I think was in

19  September -- R.P. was having some difficulties, I went to a

20  parent-teachers conference at their request, something had to

21  be done with her, she was acting abnormally.

22        THE COURT:  Sir, try to keep your voice up.  Go a

23  little slower, I know it's hard, but I want to make sure the

24  jurors here can get everything you're saying.  Go ahead.

25  BY MR. OLDS:


                                43


1  Q.    Would that have been in November at the parent-teachers

2  conferences?

3  A.    Yes.

4  Q.    Do you remember who you talked to?

5    A.    I believe it was Ms. Scully.

6    Q.    Was that R.P.'s teacher?

7    A.    Yes.

8    Q.    Now, as some point you learned that R.P. had been

9    sexually assaulted, is that correct?

10   A.    Yes.

11   Q.    Did R.P. tell you?

12   A.    No.

13   Q.    In November and December and January of -- well, let me

14   narrow that down.  Christmas time, 2001, how was R.P. acting at

15   that time?

16   A.    Her outward behavior spiraled downward sharply.  It

17   was -- I didn't know what to do with her.  There was

18   bitterness, anger, fighting -- her outward look of everything

19   was just spiraling downward out of control.

20         THE COURT:  Do you have that blown up on the bigger

21   chart?

22         MR. OLDS:  Yes, I do.

23         THE COURT:  Why don't you hold it up -- as a matter

24   of fact, why don't you get down off the stand, you hold the

25   thing up -- really keep your voice up down there and that way

44

1   the jurors are going to be able to see it.  Go on down there.

2   BY MR. OLDS:

3   Q.   So you had a telephone conversation with Ms. Cappabianca,

4   is that right?

5   A.   Yes.

6   Q.   Do you know when that conversation was, specifically?

7   A.   That was in -- January.

8   Q.   Okay.  And let me ask you a question.  That's Ms.

9   Cappabianca, the defendant, is that right?

10  A.   Yes.

11  Q.   Had you ever had any telephone conversations, meetings

12  with her or other interactions with her before this

13  conversation that we're going to talk about?

14  A.   No.

15  Q.   So tell the jury what happened in this conversation?

16  A.   The phone rang, I answered the phone, and she identified

17  herself as Linda Cappabianca from Strong Vincent.

18        THE COURT:  Start that again, please, I couldn't

19  hear what you were saying?

20          THE WITNESS:  I'm sorry.  The phone rang, I answered

21  the phone, Ms. Cappabianca addresses who she was.  And that she

22  had some difficulty with R.P., she called her R.P. actually, I

23  call her R.P.  I asked her what kind of difficulties was she

24  having.  She said R.P. had a very filthy mouth and that she

25  needed to be disciplined.  And she said you need to come down


45


1  here and get your daughter, she's filthy.  So I said what do

2  you mean, I don't understand.  She said you just need to come

3  down here, get your daughter now, she's filthy.  So I hung up

4  the phone --

5  BY MR. OLDS:

6  Q.    Before you get to that next thing, do you know if R.P.

7  was in the office with Ms. Cappabianca when she had that

8  conversation with you?

9  A.    Yes, she was.

10  Q.    How do you know that?

11  A.    Because R.P. was --

12          THE COURT:  I apologize for interrupting, if you

13  could go back up to the stand and use the mike, all right.

14         THE WITNESS:  Yes, your Honor.

15  BY MR. OLDS:

16  Q.    How do you know that R.P. was in the office when Ms.

17  Cappabianca had that conversation with you?

18  A.    Because when I went down there, R.P. was in the office

19  with her.  She was crying.

20  Q.    So after this telephone conversation with Ms.

21  Cappabianca, you went down to get R.P.?

22  A.    That's correct, yes.

23  Q.    And you were in her office, and this is the first time

24  you ever met her?

25  A.    Ms. Cappabianca, yes.


                              46


1  Q.    Okay.  And what was R.P. doing?

2  A.    She was sitting there crying.

3  Q.    Okay.  Did Ms. Cappabianca say anything to either you or

4  R.P. when you were in her office?

5  A.    When I went in the office, Ms. Cappabianca said that your

6  daughter, you need to take her home, you need to discipline

7  her, she's filthy.  We went out into the main area of the

8   office, I yelled at R.P. real hard.

9   Q.   You say you yelled at her?

10  A.   I yelled at her hard.  I yelled at her real hard in front

11  of all those people.  Because I -- I thought she was being bad,

12  you know.  I took her home, I was so angry with her, I thought

13  she was being evil, bad.

14  Q.   Was she able to talk to you that night, R.P.?

15  A.   No.

16  Q.   Now, shortly after that did you have a meeting with

17  either Ms. Cappabianca or Ms. Woods, an encounter?

18  A.   When R.P. had gotten PASS and I went to pick up R.P., I

19  met Ms. Cappabianca and Ms. Woods on the steps.  And they said

20  if I could meet with them, I said sure.

21       MR. OLDS:  Your Honor, I don't know that Richard P.

22  has to leave the stand, but on this chart --

23       THE COURT:  Just show the witness and ask him the

24  question you wanted to ask him.

25  BY MR. OLDS:


47


1   Q.   Richard P., this would be -- we have it on January 9,

2  2002?

3  A.    Yes.

4  Q.    You picked up R.P. because she was in PASS that day?

5  A.    That's correct, yes.

6  Q.    Now, what was PASS?

7  A.    It was when they have an after-school suspension program,

8  basically.

9  Q.    What time did PASS get out?

10  A.    6:30.

11  Q.    What time did school typically get out for R.P.?

12  A.    I believe it was 3:30.

13  Q.    And so it was a program that R.P. had to stay an extra

14  three hours that day?

15  A.    That's correct, yes.

16  Q.    This was January 9, 2002?

17  A.    That's correct, yes.

18  Q.    So Ms. Woods and Ms. Cappabianca, after PASS, they come

19  up come up to you -- I'm sorry, but just say once again what

20  they said to you?

21  A.    They asked me if I could meet with them, they need to

22  talk with me.

23  Q.    Okay.  Did you arrange to have a meeting with them?

24  A.   I told them I could do it after work the next day if they

25  wanted it.


48


1  Q.   And so did they tell you anything about what they had

2  discovered had happened to R.P. at that time?

3  A.   No.

4  Q.   So what happened at the meeting that you had with Ms.

5  Woods and/or Ms. Cappabianca the next day?

6  A.   I went to the meeting, I met with Ms. Woods and Chris

7  Ruhl was there and another woman, I don't know who she was, and

8  R.P. was there.  And I asked if Ms. Cappabianca was going to be

9  at the meeting, and Ms. Woods had told me that Ms. Cappabianca

10  was busy tending to other matters.

11  Q.   So Ms. Cappabianca couldn't be at this meeting?

12  A.   No.

13  Q.   Only Ms. Woods was there?

14  A.   Yes.

15  Q.   Was Mr. Ruhl there?

16  A.   Yes.

17  Q.   And do you know who he was?

18   A.   At the time I didn't know who he was.

19   Q.   Were there any police officers or school district police

20   there?

21   A.   No.

22   Q.   Tell the jury what Ms. Woods said to you that day, this

23   would be in the morning of January 10th?

24   A.   I went in there and Ms. Woods was standing in front of

25   me, and I remember her looking right at me and she sat down,

49

1   crossed her legs, put her hands on her knee and said are you

2   ready for this.  I was just sitting there and she said R.P. has

3   been sucking dicks and giving blow jobs to boys.  And I was in

4   shock.  And I told her not my daughter, not my daughter.  And

5   then she proceeded to tell me that she had been doing this and

6   that they were looking into the issue.

7   Q.   Do you remember anything else that either you said or she

8   said that day?

9   A.   I asked her if there was any police involvement, she said

10   no.

11          THE COURT:  She meaning who?

file:///A|/RICHDAY1.TXT

Case 1:03-cv-00390-SJM    Document 140    Filed 08/07/2006    Page 63 of 75

12  BY MR. OLDS:

13  Q.   Who said there was no police involvement?

14  A.   Ms. Woods said there was no police involvement.

15  Q.   What did you say to that?

16  A.   Well, I said, I told her, I said there should be some

17  kind of police involvement, there should be, somebody should be

18  notified of something.  And she said just keep your mouth shut,

19  we'll deal with it.

20  Q.   Okay.  Now, do you remember how long that meeting took?

21  A.   Felt like forever.  But if I remember right, I think it

22  only lasted a half-hour.

23  Q.   And was R.P. there while Ms. Woods spoke to you?

24  A.   Yes.

25  Q.   And what was R.P. doing?


50


1  A.   She was crying.

2  Q.   Where did you and R.P. go when that meeting concluded?

3  A.   After the meeting was over with, R.P. wanted to go home

4  and we followed her.  And then I was told that R.P. was going

5  to be sent to Sarah Reed for her safety, and we went home.  But

6    that was it.

7    Q.    Did you have lunch a Strong Vincent that day?

8    A.    Yes.

9    Q.    Okay.  Who took you to the lunchroom?

10   A.    Chris Ruhl.

11   Q.    And had you found out yet what his job was?

12   A.    No.

13   Q.    Okay.  Did he have any conversation with you about what

14   you had just learned about R.P.?

15   A.    Yeah, he told me that these days kids give blow jobs like

16   adults give handshakes.

17   Q.    You better slow that down.

18         THE COURT:  You're going to have to answer that

19   question again.  Ask that question again.

20         THE WITNESS:  I'm sorry.

21         THE COURT:  Would you ask it again and then answer

22   it.

23   BY MR. OLDS:

24   Q.    What did Mr. Ruhl say to you as he accompanied you to the

25   lunchroom, and say it very slow?

51

1  A.   He said that these days kids give blow jobs like adults

2  give handshakes.

3  Q.   Did you have a comment to that?

4  A.   Yeah, I told him not my kid, no.

5  Q.   Okay.  Now, there's a person that at one time -- well,

6  strike that.  You took R.P. home that day?

7  A.   Yes.

8  Q.   And she never went back to Strong Vincent again, is that

9  right?

10  A.   No.

11  Q.   What did you decide to do?

12  A.   I decided she's not going back to Strong Vincent.

13  Q.   Did you decide to do anything about the police?

14  A.   Yes, I went down the next day when I picked up my

15  paycheck.

16  Q.   You have to slow down.

17  A.   I'm so sorry.

18  Q.   That's okay, we'll get through it, don't worry about it.

19       THE COURT:  We only have a few more minutes anyways,

20  then we're going to take a break.  We've been at it for almost

21  an hour and a half, we're not going beyond 4:30.

22      MR. OLDS:  Okay.

23      THE COURT:  Go ahead, just ask it again.

24  BY MR. OLDS:

25  Q.  We're almost done here for today, so you can relax.


52


1  Did you make a decision about contacting the police?

2  A.  Yes, I went down there on the next day to pick up my

3  paycheck, I looked for Sergeant Bowers, to talk to him about

4  it, but I couldn't find Sergeant Bowers.  I talked to the

5  sergeant on call.  And he told me we needed to go to the

6  juvenile division.  I went over to the juvenile division with

7  him and he introduced me to Detective Stanley Green.

8  Q.  So that the jury can have some idea of what time this

9  would have been, you went down there with R.P. to the police?

10  A.  I went down with R.P. around 10:30.  But I picked my

11  check up at 9:15.

12  Q.  So first you went to your job, right?

13  A.  That's correct.

14  Q.  The school crossing job?

15  A.   Yes.

16  Q.   Then you went and picked up your paycheck and talked to

17  several police officers?

18  A.   Yes.

19  Q.   Then you went home and brought R.P. back to meet with the

20  officers in the juvenile division?

21  A.   That's correct, yes.

22  Q.   Then it was at that time that she was interviewed?

23  A.   Yes.

24  Q.   Okay.  Now, in that timeframe did you have a conversation

25  with Robin J.?

53

1  A.   I had a conversation with Robin J. about a few days after

2  I had talked to the police.

3  Q.   Okay.  And tell the jury who Robin J. is?

4  A.   Robin J. is -- Robin J. had a daughter who was friends

5  with R.P.

6  Q.   Was Robin J. an acquaintance of yours?

7  A.   I knew Robin J. about 10 years ago, 9 or 10 years ago,

8  but we really didn't know each other that well.

9   Q.   Okay.  So it's true that you lived here approximately 10

10   years before 2001, in that timeframe?

11   A.   Yes.

12   Q.   You were her neighbor?

13   A.   Yes.

14   Q.   Did you ever babysit her kids?

15   A.   Yes.

16   Q.   Okay.  And in that intervening 10 years, one of you moved

17   away and you hadn't seen each other anymore?

18   A.   That's correct.

19   Q.   Now, how did it happen that you had a conversation with

20   Robin J.?

21   A.   Because I heard from R.P. that T.N. had told her she

22   couldn't hang out as friends or hang out no more with her.

23   Q.   R.P. told you what?

24   A.   That T.N. had told her that she couldn't hang out with

25   her no more.


54


1   Q.   Okay.  And so what did you do after R.P. -- did R.P. tell

2   you why T.N. had told her that?

3   A.    Yes, she said it was because her mom, that she would --

4   give them blow jobs to people.  And she didn't want her

5   daughter hanging around a kid like that.

6           THE COURT:  Do it one more time.

7   BY MR. OLDS:

8   Q.    So what did you know that Ms. Robin J. thought of R.P.,

9   repeat that and say it slowly?

10  A.    She said that she didn't want -- T.N. had told R.P. that

11  her mom said that she didn't want anybody hanging out with her,

12  that she was giving blow jobs to people, she didn't want her

13  daughter hanging out with a person like that.  Doing nasty

14  things.

15  Q.    So T.N. told R.P. that her mother didn't want her hanging

16  around with kids who gave blow jobs?

17  A.    Yes.

18  Q.    So as a result of that, you called up Robin J.?

19  A.    Oh, yeah, I was angry.

20  Q.    And did you ask Robin J. where she got the information

21  about R.P.?

22  A.    Yes, I said to her, I said who told you anything about

23  that.  And she said, well, Ms. Cappabianca had called me to the

24  office and said that we need to talk about who your daughter is

25  hanging around with.  And she said, she told me that R.P. --


55


1          THE COURT:  Too fast.

2          MR. OLDS:  You have to slow down.

3          THE COURT:  Start that again.

4  BY MR. OLDS:

5  Q.   She said that R.P. --

6  A.   She said R.P. was going around giving boys blow jobs.

7  Q.   Okay.  So she had heard that from Ms. Cappabianca?

8  A.   Yes.

9  Q.   Did she recognize you, did she remember you initially

10  when you called her up and said oh, that's Richard P., who was

11  my neighbor 10 years ago?

12  A.   No.

13  Q.   Okay.  Did you know that it was Robin J., the person that

14  you had been neighbors with or neighbors near 10 years earlier?

15  A.   I knew who T.N. was, but I didn't, you know, I haven't

16  seen Robin.

17          THE COURT:  Mr. Olds, we're going to take our break.

18  Sir, you can get off the stand, thank you.  We'll continue

19  tomorrow.  But, members of the jury, I'm going to have my clerk

20  take you out the back way, she'll show you how to come in.  Now

21  that you actually have been sworn and the trial is under way, I

22  don't want you walking through the courtroom doors to come in.

23  She'll show you the back way.  I have a couple matters I want

24  to take up with counsel, so I'm going to stay on the bench.

25      MR. OLDS:  When you're done, I just have one point


56


1  that I wanted to make.  I didn't mean to interrupt you, I

2  thought you were done.

3      THE COURT:  All right.

4      MR. OLDS:  I thought you might give the jury the

5  typical cautionary instruction that we can't acknowledge them

6  or have eye contact with them.

7      THE COURT:  I'll do that.  Look it, this is the

8  realty of things.  This is a fairly big courthouse, but once

9  you get into a trial, it becomes a fairly small space.  And

10  you'll see Mr. Marnen, you'll see Mr. Olds, you'll see his

11  co-counsel, you'll see the parties, you'll see all kinds of

12  people.  But with respect to the group I just indicated, this

13  is pursuant to Mr. Olds' request, which I think is accurate, it

14  is unlikely that you'll see any lawyers or the parties

15  acknowledging you like they would in a normal everyday setting.

16  The point is that's just the appropriate way to act, nobody

17  should become, no one should take any offense at it.  All

18  right, take the jurors out.

19          (Whereupon, at 4:29 p.m., the Jury is dismissed from

20  Courtroom C.)

21          THE COURT:  Just by way of refreshing my

22  recollection, you indicated that Ms. Woods had been a party to

23  the case?

24          MR. MARNEN:  Yes.

25          THE COURT:  Did I dismiss her?


57


1          MR. MARNEN:  Yes, you have.

2          THE COURT:  Was that part of the partial summary

3  judgment motion?

4          MR. MARNEN:  Yes.

5          THE COURT:  I just wanted to refresh my recollection

6  on that.  Who do you have lined up for tomorrow, besides

7  finishing up with the witness who just left the stand?

8       MR. OLDS:  Denise L., Ms. Scully, the classroom

9  teacher.  We had that subpoena to A.F., the Marshals are going

10  bring him in.  If I could have five minutes with my co-counsel,

11  I might not want him to come in, we might cancel that.

12       THE COURT:  Is he in jail?

13       MR. OLDS:  Yes.  We were going to do Shelley P. --

14       THE COURT:  I apologize for interrupting you, you

15  have to make the decision right now as to whether you want the

16  Marshals to go to that effort of bringing that man over here.

17  Because they will be over there the first thing tomorrow

18  morning.

19       MR. OLDS:  I don't think we need him, so I think he

20  could be canceled.

21       THE COURT:  So the short story is you have

22  sufficient witnesses to fill up the day tomorrow?

23       MR. OLDS:  Yes.

24       THE COURT:  Okay.  All right, then we're adjourned

25  until tomorrow.

58

1          (Whereupon, at 4:31 p.m., the Jury Trial proceedings

2    were adjourned for the day.)

3

4

5                    - - -

6

7

8

9

10

11               C E R T I F I C A T E
                 – – – – – – – – – –

12

13

14

15        I, Ronald J. Bench, certify that the foregoing is a

16   correct transcript from the record of proceedings in the

17   above-entitled matter.

18

19

20

21   _____

22   Ronald J. Bench

23

24

25