REDACTED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


RICHARD P., by and for R.P.,
and DENISE L., by and for K.L.,
     Plaintiffs

    v.          CIVIL ACTION NO. 03-390 ERIE

SCHOOL DISTRICT OF THE CITY OF
ERIE, PENNSYLVANIA, et al.,
     Defendants


JURY TRIAL - DAY NO. 2



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Tuesday, January 24, 2006.



APPEARANCES:
     EDWARD A. OLDS, Esquire, and CAROLYN SPICER
     RUSS, Esquire, appearing on behalf of the
     Plaintiffs.

file:///A|/RICHDAY2.TXT

JAMES T. MARNEN, Esquire, appearing on behalf of
the Defendants.

Ronald J. Bench, RMR - Official Court Reporter

2

1              I N D E X

2

3    WITNESSES:            DIRECT  CROSS  REDIRECT  RECROSS

4

5  FOR THE PLAINTIFFS:

6  Richard P.              3    25     61      65

7  Robin J.            67    72     --      --

8  T.N.            76    79     --      --

9  Shelley P.            80    --     --      --

10   Vikki Scully            84    93     97      --

11   Denise L.            99    132     --      --

12   Walter Love, Jr.            142    152     --      --

13

14

15              - - -

16

17

18     EXHIBITS:              IDENTIFIED     ADMITTED

19   (None Identified)

20

21

22

23

24              - - -

25


                               3


1          P R O C E E D I N G S

2

3          (Whereupon, the Jury Trial proceedings began at

4   9:00 a.m., on Tuesday, January 24, 2006, in Courtroom C.)

5

6          THE COURT:  Good morning, members of the jury.  All

7   right, Mr. Olds.

8          (Continued - DIRECT EXAMINATION)

9    BY MR. OLDS:

10   Q.    Richard P., I think where we were yesterday when we left

11   off, we were talking about Robin J.  And I think that you had

12   testified after you heard, I guess from R.P. what T.N. said,

13   you had the conversation with Robin J., is that right?

14   A.    That's correct.

15   Q.    And then in that conversation she had relayed to you what

16   Ms. Cappabianca had said to her, is that right?

17   A.    Yes.

18   Q.    And just to get back to where we were yesterday, again,

19   what did Ms. Cappabianca -- what did she tell you that Ms.

20   Cappabianca said to her?

21   A.    She said that she wanted to let Robin know what kind of

22   girl her daughter was hanging around with.  That R.P. was

23   performing blow jobs on boys.

24   Q.    Okay.  Did you, after you had that conversation with

25   Robin J., what did you do about that matter, if anything?


                              4


1    A.    Well, I asked Robin what she was talking about --

2          THE COURT:  Sir, pull the microphone over in front

3    of you.

4    BY MR. OLDS:

5    Q.    Go ahead.

6    A.    I asked Robin, you know, tell me, Robin, what's wrong,

7    did you know she was involved with rape, it was rape.  You

8    know, I was getting angry, I mean they had told nobody about

9    this.  When I found out about it, I went to the police about

10   it.  That's the only people I told.

11   Q.    Now, R.P.'s last day at school was January 11th, in fact,

12   it was January 10th because on the 11th you went to the police

13   department, is that right?

14   A.    Yes.

15   Q.    Okay.  Did she ever go back to Strong Vincent that year?

16   A.    No.

17   Q.    Who discussed with you what would happen to her in terms

18   of educational placement?

19   A.    I believe that would be Ms. Woods.

20   Q.    And what did Ms. Woods say?

21   A.    She said that R.P. would be sent to Sarah Reed for her

22   safety.

23   Q.    And did you know anything about Sarah Reed?

24  A.    I had some knowledge of Sarah Reed.

25  Q.    Now, was there a period of time when R.P. stayed home,

5

1  was home schooled?

2  A.    Yes.

3  Q.    What did the home schooling consist of?

4  A.    Not a lot.  The home school teacher, I think he showed up

5  twice.  And R.P. referred to him, she said she hated teachers,

6  she was not going to cooperate with him.

7  Q.    What was R.P. like at home that first week after you

8  found out what had happened to her?

9  A.    She was violent, out of control, defiant, uncontrollable.

10  Q.    What kind of treatment did you get her into?

11  A.    I had gotten her into mental health involvement with the

12  Base Service Unit.  I contacted the Victims Center for Rape,

13  Rape Crisis.

14  Q.    Did she have a Rape Crisis counselor?

15  A.    She was going to be receiving one, we had to do an

16  intake.

17  Q.    Explain the process that you went through in terms of

18   getting her into Sarah Reed?

19        MR. MARNEN:  Objection, relevancy.

20        THE COURT:  Let me see you at side bar.

21        (At side bar on the record.)

22        MR. OLDS:  I'm not going into -- I'm just trying to

23   do the chronology.

24        THE COURT:  Just background?

25        MR. OLDS:  I'm just taking him through the steps of

6

1   the chronology, how she ended up there.

2        MR. MARNEN:  That sounds okay.

3        THE COURT:  All right.

4        (End of discussion at side bar.)

5        THE COURT:  Mr. Olds, before you continue, let me

6   explain this to the jury.  From time to time we're going to

7   have something called a side bar conference, which is what we

8   just had.  We try to keep them to a minimum because it does

9   slow the trial down.  But they are kind of a necessary evil.

10  What goes on over there is -- remember, members of the jury,

11  you're the finders of fact, those are pure discussions of law.

12  So we have to have those over there, kind of out of your

13  earshot.  It's not because we want to huddle and talk

14  privately, but it's just something necessary that we have to

15  do.  All right, let's go.

16  BY  MR. OLDS:

17  Q.    So tell the jury what process you went through to get

18  R.P. into Sarah Reed?

19  A.    Well, they had done an intake.  We go down there and then

20  they do an assessment value on her.  And then we go to the

21  nurse, they do the physical aspects of it.  And then they tell

22  us when she'll be starting from that point.

23  Q.    Did you have the opportunity to visit Sarah Reed in

24  connection with this intake process and see what it was like?

25  A.    Yes.


                                    7


1  Q.    Tell the jury what you observed about Sarah Reed?

2  A.    Sarah Reed had children that were mixed developmental

3  delay --

4        THE COURT:  I'm sorry, what did you say?

5        THE WITNESS:  They had children with mixed

6  developmental delay, they were more aggressive children.

7  BY MR. OLDS:

8  Q.    More aggressive?

9  A.    Yeah.

10  Q.    Was that explained to you at Sarah Reed or did you just

11  learn that?

12  A.    No, that was explained to me like at the intake, they

13  told me there are those kids over there.

14  Q.    Did they tell you whether R.P. would get any

15  counseling?

16  A.    Yes.

17  Q.    Go ahead.

18  A.    They said she'd be assigned a counselor and that she

19  would have a substitute counselor --

20        THE COURT:  Sir, a little slower.  Start that again,

21  just keep thinking to yourself slow, okay, start that all over

22  again.

23  BY MR. OLDS:

24  Q.    What did they explain to you about counseling?

25  A.    They said that she would be assigned a counselor.  And

1   that she would receive services through that counselor.

2   Q.    And do you know whether she met regularly with a

3   counselor there?

4   A.    No.

5   Q.    You don't know or she didn't?

6   A.    I don't think she did.  Every time I talked to anybody --

7        MR. MARNEN:  Objection, your Honor, this is hearsay.

8        THE COURT:  Sustained.

9   BY MR. OLDS:

10  Q.    Okay.  What was R.P.'s reaction to Sarah Reed?

11  A.    She didn't want to be there.  She felt that she shouldn't

12  be there.  She was defiant.

13  Q.    And do you know what her behavior was there?

14  A.    There was a lot of emotional outbursts.  She was violent

15  there, she was agitated.  She didn't -- she didn't think she

16  needed to be there.  She felt she shouldn't have been there.

17  Q.    Do you know if they ever used restraint on her?

18  A.    Yes.

19  Q.    And what kind of restraint did they use?

20  A.    I'm not sure exactly what the type of restraint it was,

21  but they never really told me, they just said we restrained her

22  today.

23  Q.   Okay.  Now, R.P., did she have to provide testimony at

24  any of the juvenile court proceedings?

25  A.   Would you repeat that, please.


9


1  Q.   Did R.P. have to provide testimony at the juvenile court

2  proceedings involving C.B. or B.C. or A.K.?

3  A.   Yes.

4  Q.   And the prospect of that, how did that affect R.P.?

5  A.   It was extremely difficult for her.  Everything was like

6  a snowball effect.  Once movement downward, every time we went

7  to a situation like that, it went downward.  It was, we kept

8  moving from more of the ability to have our child.

9  Q.   Now, in that time period, February, March of 2002, what

10  happened to her conduct at home?

11  A.   It became extremely aggressive.  She was just -- she was

12  just not my child.  I don't know how to explain it.  She wasn't

13  who I had in the beginning.  She was not my -- I don't know how

14  to explain it.

15  Q.   Okay.  She was someone different?

16  A.   Yeah.

17  Q.   Was there a point in time when she had to be

18  hospitalized?

19  A.   Yes.

20  Q.   And that would have been that spring?

21  A.   Yes.

22  Q.   Or late winter or spring?

23  A.   Correct.

24  Q.   And when she was hospitalized, what hospital did she go

25  to?


10


1  A.   Millcreek Community Mental Health Hospital.

2  Q.   Millcreek Community Mental Health Hospital?

3  A.   Yeah.

4  Q.   What happened, what were the events that led up to that?

5  A.   The one --

6  Q.   And speak slowly so that the jury can understand?

7  A.   The instant that led up to that, there was an incident in

8  March where she had stabbed me -- she put a knife to her throat

9   and she was going to slice her throat.  And I didn't want her

10  to hurt herself, so I tried to take the knife out of her hand

11  and she stabbed me.

12  Q.    And where did she stab you?

13  A.    In my hand.  I was reaching over to take the knife out of

14  her hands, she went, come across like that, (indicating).

15  Q.    And the police took her to the hospital?

16  A.    Yes.

17  Q.    And I would assume you met with her psychiatrist and did

18  you visit her while she was in the hospital?

19  A.    Every day.

20  Q.    How long was she in the hospital?

21  A.    I think she was in the hospital for about 10 days.

22  Q.    What was she like there in the hospital?

23  A.    Out of control, violent -- they could not control her,

24  she was just so enraged.

25  Q.    When she was released from the hospital, did she come


                              11


1   back home?

2   A.    Yes.

3  Q.   And there would be another hospitalization that summer,

4  is that right?

5  A.   Yes.

6  Q.   What led up to that second hospitalization?

7  A.   I know that she had gotten into a fight with her mother,

8  she bit her mother.

9       MR. MARNEN:  Objection, if he wasn't there, it's

10  hearsay.

11       THE COURT:  Sustained, it's speculative.

12  BY MR. OLDS:

13  Q.   Were you there when this happened?

14  A.   No.

15  Q.   Okay.  But she went to the hospital, do you recall how

16  long she was in the hospital this time?

17  A.   I think about a week.

18  Q.   Did she listen to you anymore?

19  A.   No.

20  Q.   Was she roaming?

21  A.   She roamed the streets, there were times --

22  Q.   Slow down.

23       THE COURT:  Start that again.

24       THE WITNESS:  She was roaming the streets, I would

25  be out looking for her at 2:30, 3 o'clock in the morning.


12


1  BY MR. OLDS:

2  Q.    This wasn't the way she was before this happened?

3  A.    No, not my little girl.

4  Q.    Now, did she get involved in delinquent activity?

5  A.    Yes.

6  Q.    Was there multiple involvement with police?

7  A.    Yes.

8  Q.    What were some of the things that she was picked up for?

9  A.    She was picked up for getting in fights.  There was one

10  point where she was picked up for -- well, she was picked up

11  for solicitation.

12  Q.    For prostitution?

13  A.    That's correct, yes.  There were incidents where she had

14  gotten into a fight with a police officer and assaulted him.

15  There was multiple incidents.

16  Q.    At some point did you encourage the juvenile authorities

17  to put R.P. in an institution?

18  A.    Yes.

19  Q.    When did that happen, was that in the fall of 2002?

20  A.    Yes.

21  Q.    Maybe before we get to that -- before we get to that, let

22  me ask you, she finished school at Sarah Reed, her 7th grade

23  year?

24  A.    Yes.

25  Q.    Do you know if she was making any academic progress?


                                13


1   A.    No.

2   Q.    She was not?

3   A.    No.

4   Q.    How was it that she ended up going back to Strong Vincent

5   the next year, the next September?

6   A.    That was a life team member, she was involved with

7   wraparound service for mental health.  And juvenile probation,

8   Stairways, her caseworker for mental health and a

9   representative from the school district was there, and

10  everybody else wanted her to continue at Sarah Reed or go to

11  another placement, as far as schooling was concerned, except

12  for the school district, they wanted her to return to Strong

13   Vincent.

14   Q.   Okay.  So did she?

15   A.   Yes.

16   Q.   Well, she didn't stay there very long, did she?

17   A.   No, one week.

18   Q.   What happened?

19   A.   Soon after she got there --

20   Q.   Be slow when you say this?

21   A.   Soon after she got there --

22         MR. MARNEN:  Objection, no foundation.

23         THE COURT:  How does he know what he's about to

24   testify to?

25         MR. OLDS:  I'll lay a foundation, your Honor.


14


1   BY MR. OLDS:

2   Q.   You found out that something had happened at school, is

3   that right?

4   A.   Yes.

5   Q.   What was the source of the information?

6   A.   There was an officer there, I can't remember his name

7   right now, Slupski --

8   Q.   Was he an Erie School District police officer?

9   A.   Yes.

10  Q.   So he worked for the school district?

11  A.   Yes.

12  Q.   Now, what did he tell you?

13       MR. MARNEN:  Objection, hearsay.

14       THE COURT:  Overruled, he's an agent of the

15  defendant.

16  BY MR. OLDS:

17  Q.   What did Officer Slupski tell you?

18  A.   He had said that R.P. was not following -- she wasn't

19  following the dress code, they were bringing her into the

20  office.  And she had gotten agitated with him and swung at him.

21  Q.   At the officer?

22  A.   No, I think it was the principal that she swung at.

23  Q.   Okay.  So the officer detained her, he told you that he

24  detained her?

25  A.   Yeah, he put her in handcuffs.

15

1  Q.   And then did he tell you what happened after he put her

2  in handcuffs?

3  A.   Yes -- excuse me, yes.  He said that he was going to walk

4  her down to the main area of the school and as they were

5  walking passed the auditorium, a bunch of people were taunting

6  R.P., saying things to her.  And she had -- had somehow gotten

7  out of the handcuffs, and he said she swung the handcuffs and

8  almost hit him in the head with it, and she took off running.

9  Q.   Okay.  And then was it some point after that that you

10  decided that she had to be placed in some kind of longer term

11  institution?

12  A.   Yes.  They were talking about --

13       THE COURT:  Who's they?

14  BY MR. OLDS:

15  Q.   Who's they?

16  A.   I'm sorry --

17       THE COURT:  Would you ask the question again.

18  BY MR. OLDS:

19  Q.   When you say they, who do you mean?

20  A.   The officer and the principal at the school.

21  Q.   So the officer informed you that there was a conversation

22   about whether to bring criminal charges against R.P. arising

23   out of that incident?

24   A.   Yes.

25   Q.   What did the officer say to you about that?


16


1   A.   He was kind of reluctant to do so, but I kind of asked

2   him to push the charges against her.

3   Q.   She would be 13-years-old at this time?

4   A.   Yes.

5   Q.   And why did you encourage him to press the charges?

6   A.   Because I felt that if something was brought against her,

7   that somehow she would get some better services or she would

8   get more increased help.  It's the only thing I could think of,

9   maybe she would perhaps get better services.

10   Q.   Did you understand that would mean that she would be

11   taken out of your home?

12   A.   Yes.

13   Q.   By this time could you control her at all?

14   A.   No.

15   Q.   13-years-old?

16  A.   Yep, 13, I couldn't control her.  It was difficult

17  because -- she's used to listen, she's used to do what she was

18  supposed to do.  But she was just so out of control, I

19  couldn't -- I was afraid at night to sleep because I thought

20  maybe she would run out of the house.  I was always questioning

21  what she was going to do.

22  Q.   Was her first placement out of the house at Hermitage

23  House?

24  A.   Yes.

25  Q.   And relative to Erie, where is Hermitage House?


17


1  A.   That's in Cambridge Springs.

2  Q.   Cambridge Springs?

3  A.   Yes.

4  Q.   Was she there a short time?

5  A.   Yes.

6  Q.   And then was there another placement that followed that

7  at Andromeda House?

8  A.   Yes.

9  Q.   And where is Andromeda House?

10   A.    That's in Spartansburg -- I think it's in Spartansburg.

11   I can't remember -- I don't remember, I know it's out in the

12   country.

13   Q.    Did you visit her there?

14   A.    Yes.

15   Q.    Tell the jury what kind of place it was?

16   A.    That was a place that girls who have gotten into a lot of

17   trouble with the law and they were there, each individual is

18   taught how to do special -- my daughter, they were trying to

19   basically give her manners, get her to understand the correct

20   rules, to help her, as well academically.  She went to school

21   there.

22   Q.    When she was there, how often would you get a chance to

23   visit her?

24   A.    Once a week.

25   Q.    Was that limited by the school, that you were only


18


1   allowed to be out there once a week?

2   A.    Yes, up until they got what they called special

3   privileges.  If they felt that she was doing exceptionally

4  well, they would let her go on what they call home pass visits.

5  Q.    And did she reach that point where she was allowed to

6  come home?

7  A.    Yes.

8  Q.    How much had her behavior changed from the point when you

9  told Officer Slupski that he should bring criminal charges, how

10  much had her behavior changed by the time she was released from

11  Andromeda House?

12  A.    She fluctuated, as far as the way her behavior elevated,

13  then deescalated, and elevated again.

14  Q.    She did come home.  Was she at Andromeda House about, say

15  four to five months?

16  A.    Yes.

17  Q.    And then she came home.  She would have been in about 8th

18  grade at that time?

19  A.    Yes.

20  Q.    So this would be almost a year or so after the assault

21  and that she had left Strong Vincent?

22  A.    That's correct, yes.

23  Q.    When she came back, do you remember what school she went

24  to?

25  A.    Sarah Reed.

19

1  Q.    And that would be her -- she would have been in 8th

2  grade.  Did she get into some more trouble that summer or at

3  anytime after she came back from Andromeda House?

4  A.    Yes.

5  Q.    And can you remember exactly what kind of trouble it was?

6  A.    I know at Sarah Reed that she had a lot of trouble with

7  staff members, against staff members.  She would throw things

8  and she would run away from the Sarah Reed program.

9        THE COURT:  Slow down.

10  BY MR. OLDS:

11  Q.    You're doing okay, just keep it slow.

12  A.    She was very defiant with the staff there.

13  Q.    Did she get into more criminal trouble?

14  A.    Yes.

15  Q.    Do you know the nature of the criminal trouble, did you

16  learn what the charges against her were?

17  A.    I could remember once where she was actually -- she was

18  on probation at the time and she had ended slapping her mother

19  in the face.  They would take her out of the home at that time

20  again.

21  Q.  Eventually, did she end up at a place called Cornell

22  Abraxas?

23  A.  Yes.

24  Q.  Was that a boot camp type facility?

25  A.  Yes.


                                    20


1  Q.  Was she placed there because of criminal activity?

2  A.  Yes.

3  Q.  She was what, 13 or 14?

4  A.  Fourteen.

5  Q.  Did you visit her there?

6  A.  No.

7  Q.  You were there once, right?

8  A.  Once.

9  Q.  So you did visit her?

10  A.  Yes.

11  Q.  Tell the jury what it was like, what you observed at

12  Cornell Abraxas?

13  A.  Everybody was wearing military uniforms.

14  Q.    Speak slowly, okay.

15  A.    Everybody was wearing military uniforms.  They seemed to

16  have the look of the military, they held one individual on one

17  side of a person and the other individual on the other side,

18  they both would take turns yelling back and forth at that

19  person, if they felt they did something wrong.  They were

20  pretty loud.  I didn't think my daughter should have been

21  there, but that was out of my hands.

22  Q.    And she spent about four-and-half months there, is that

23  right?

24  A.    That's correct, yes.

25  Q.    So she would have been in 9th grade at that time?


                                    21


1   A.    Yes.

2   Q.    Did her stay there seem to help her?

3   A.    Yes.

4   Q.    When she came back, this would have been sometime -- was

5   she still in 9th grade?

6   A.    Yes.

7   Q.    She came back -- you were working with social agencies

8   with her, is that right?

9   A.   Yes.

10  Q.   What did the social agencies do to help you when she came

11  back?

12  A.   Well, when she came back, there was an issue they did not

13  want her to attend the school district, they suggested that we

14  relocate and move to another area.  And we wasn't really sure

15  where to go.  But we had found an apartment out in North East,

16  Pennsylvania, and they helped us relocate from Erie to North

17  East so R.P. would not have to go to the school system in Erie.

18  Q.   Have you lived in North East since that time?

19  A.   Yes.

20  Q.   That would be what, a couple years now?

21  A.   Yes.

22  Q.   Okay.  Does R.P. have -- is she still the recipient of

23  any social services being provided to her?

24  A.   Yes.

25  Q.   Does she have a wraparound program?


22


1   A.   Well, she has a wraparound service program, but they're

2  talking about closing it.

3  Q.   But until now she has that?

4        THE COURT:  Mr. Olds, the jury wouldn't understand

5  what a wraparound service program is.

6        MR. OLDS:  Okay, I'll explain that.

7  BY MR. OLDS:

8  Q.   The wraparound program, what does that mean for R.P.?

9  A.   That is a program that has intensive case management,

10  specialized counselor.  And she also receives mobile therapy,

11  which is a counselor that comes to the house.  And then they

12  get involved with juvenile probation as well, and they all work

13  together as a team to find out what is the best for R.P.

14  Q.   This program is going on as we speak, is that right?

15  A.   That's correct, yes.

16  Q.   You say there's a mobile therapist that comes to the

17  house?

18  A.   Yes.

19  Q.   How frequently does that mobile therapist come?

20  A.   Twice a week.

21  Q.   Had that mobile therapist been coming more frequently

22  than that in the immediate past?

23  A.   In the past, yes, in the immediate past.

24  Q.   How many times a week was the mobile therapist coming at

25  the most intense level of therapy?


23


1  A.   I think they had, at the most I think it was four hours a

2  week, if I remember correctly.

3  Q.   So that means the therapist would come to your house four

4  days a week?

5  A.   Yes.

6  Q.   You say there's another sort of counseling or therapy in

7  the program that she is receiving?

8  A.   Yeah, that would be the intensive case management, what

9  they call ICM.

10  Q.   What is that intensive case management?

11  A.   She is an advocate for R.P.  If there's a problem that

12  arises in either the legal system or in the mental health

13  issues, she intervenes, steps forward and works with R.P. to

14  help resolve the issues.

15  Q.   Did R.P. have to drop out of school?

16  A.   Yes.

17  Q.    And did that make her sad?

18  A.    Yes.

19  Q.    Is she working on her GED?

20  A.    That is one of the things that the intensive case

21  management is working with her.  She dropped out of school, not

22  because she wanted to drop out, she dropped out of school

23  because the intensive case management, the juvenile probation

24  officer, the Stairways agency, and her mobile therapist all

25  felt that in light of the trial coming up, it would be too


24


1  upsetting for her to maintain the school aspects and her mental

2  health together, and they felt that she would not be able to

3  handle both issues.  Even the North East School District said

4  that if she was to drop out, they would not object, they felt

5  she was not able to handle everything all at once.

6  Q.    Her relationship with you and her mother, that's healed

7  now or somewhat healed?

8  A.    It's actually gotten a lot better.

9  Q.    Has she had any -- well, let me put it like this.  What

10  criminal, has there been any delinquency issues or criminal

11   issues that have happened within the last year?

12   A.   Yes.

13   Q.   And what was that?

14   A.   She had assaulted a boy in school because he kept doing

15   something that she felt was inappropriate.

16   Q.   She wasn't sent away, is that right?

17   A.   No.

18   Q.   And you say that some of the wounds have healed, is she

19   staying home now?

20   A.   Yes.

21   Q.   What kind of person do you think she is now?

22   A.   I think R.P. is a very intelligent girl.  I think my

23   daughter is very caring.  I think her compassion level is

24   getting higher.  I think finally we're starting to see my

25   little girl come back.


25


1   Q.   And how many years has it be now, five?

2   A.   Five.

3        MR. OLDS:  No other questions, your Honor.

4        THE COURT:  All right, you can cross-examine, Mr.

5   Marnen.

6                      CROSS-EXAMINATION

7   BY MR. MARNEN:

8   Q.    Richard P., you lived in Mesa, Arizona until the spring

9   of 2001?

10  A.    That's correct.

11  Q.    And you lived there with R.P. and Shelley P., your wife,

12  and your other two children?

13  A.    Yes.

14  Q.    And you came back here to Erie in about March?

15  A.    Yes.

16  Q.    And isn't it so that in May of 2001, you contacted the

17  Base Service Unit about R.P. for some mental health treatment?

18  A.    Repeat that, please.

19  Q.    In May of 2001 you contacted the Base Service Unit in

20  Erie County for mental health treatment for R.P.?

21  A.    Yes.

22  Q.    And you arranged that treatment and you were placed at

23  Sarah Reed for that treatment?

24  A.    Yes.

25  Q.    You accompanied R.P., did you not, to a psychiatrist's

1  office on a couple occasions in the course of that treatment?

2  A.   Yes.

3  Q.   And one of those visits was the very day you spoke with

4  Janet Woods, is it not?

5  A.   Could you speak a little slower, please.

6  Q.   I may have been speaking too rapidly.

7  A.   I'm trying to read your lips a little bit.

8  Q.   You testified that on January 10, 2002, you spoke with

9  Janet Woods and Chris Ruhl at Strong Vincent?

10  A.   Yes.

11  Q.   And that was early in the morning, about 9:00 or 9:30?

12  A.   Yes.

13  Q.   After you left Strong Vincent that day after having a

14  meal?

15  A.   Yes.

16  Q.   Was that meal lunch or breakfast?

17  A.   It was lunch.

18  Q.   Lunch.  So you left Strong Vincent in the afternoon?

19  A.   Yeah, I think it was around 12:30, if I remember

20  correctly.

21  Q.    That afternoon, isn't it so that you took R.P. to see the

22  psychiatrist?

23  A.    To see a psychiatrist?

24  Q.    Yes, Charles Joy -- do you remember Dr. Joy?

25  A.    I know she's seen Dr. Joy.


27


1  Q.    And she saw him the very day that she saw Janet Woods,

2  that you saw Janet Woods?

3  A.    I don't recall.

4  Q.    How many visits were there to Dr. Joy?

5  A.    I think four, maybe.  I'm not really sure.

6  Q.    And those happened before you became aware that R.P. had

7  been assaulted, correct?

8  A.    I'm sorry, what?

9  Q.    Those four visits were before you became aware, through

10  Janet Woods, that R.P. had been assaulted?

11  A.    Yes.

12  Q.    And the original contact you made with Base Service Unit

13  was because R.P. was injuring herself, isn't that right?

14  A.    Yes.

15   Q.   She was cutting herself with a knife?

16   A.   Yes.

17   Q.   But there's no question about the fact that after this

18   rape in December of 2001, her conduct was worse, wasn't it?

19   A.   Yes.

20   Q.   No question about it?

21   A.   No.

22   Q.   Did you notice a difference over Christmas vacation,

23   2001-2002?

24   A.   Did I notice?

25   Q.   Did you notice a difference in R.P.'s conduct during that

28

1   period of time?

2   A.   Yes.

3   Q.   And in what way was it different?

4   A.   It was spiraling downwards.

5   Q.   Did you discuss her conduct with her?

6   A.   I actually called my mother.

7   Q.   You called your mother?

8   A.   Uh-huh.

9   Q.   And what did you do that for?

10  A.   Because I thought at the time, I thought R.P. was,

11  because you know 12, 13 and preadolescence, I thought maybe

12  perhaps she was going through, you know, puberty.  So I thought

13  my mother would be able to -- I told my mother she was getting

14  really out of control, I didn't know if it was some hormonal

15  changes or something was wrong with her.

16  Q.   This getting out of control was occurring in December

17  over the Christmas vacation of 2001?

18  A.   Yes.

19  Q.   Did you question R.P. about what was going on?

20  A.   Yes.

21  Q.   What did she tell you?

22  A.   She didn't tell me anything.

23  Q.   At no time, in fact, before Janet Woods told you that

24  R.P. had been raped, did R.P. tell you what happened?

25  A.   Would you repeat that, please.


29


1   Q.   You met with Janet Woods on January 10, 2002, and you

2   found out for the first time that R.P. had been involved in

3   this event on December 19, 2001, isn't that correct?

4   A.   I found out, yes.

5   Q.   That was the first time you learned anything about that?

6   A.   Yes.

7   Q.   You had no knowledge whatsoever before that?

8   A.   No.

9   Q.   R.P. did not tell you?

10   A.   No.

11   Q.   Okay.  Now, Dr. Joy, the psychiatrist she was seeing, he

12   was associated with Sarah Reed, wasn't he?

13   A.   Yes.

14   Q.   And did R.P. keep seeing Dr. Joy after she left Strong

15   Vincent and started going to Sarah Reed?

16   A.   I think so.

17   Q.   Did she also receive treatment, that wraparound service

18   you talked about?

19   A.   Yes.

20   Q.   You also talked about R.P. having been counseled by Rape

21   Crisis?

22   A.   Yes.

23   Q.   So she also went to Rape Crisis after this all came to a

24  head on January 10, 2002?

25  A.   It was the later part of January, but yes.


30


1  Q.   I'm sorry, what?

2  A.   It was in the later part of January before she went to

3  Rape Crisis.

4  Q.   Okay.  She was also seeing a mobile therapist at that

5  time, was she not?

6  A.   I think they had assigned her one, yes.

7  Q.   Okay.  And wraparound services and mobile therapy are two

8  different things, do I have that straight?

9  A.   Well, actually wraparound services is -- all those

10  services that come together and they decide what is the best

11  for her.  The mobile therapy, the intensive case management, if

12  any juvenile probation, all of them people come together.

13  Q.   So wraparound services is kind of an umbrella concept

14  with different types of services?

15  A.   Yes.

16  Q.   And one of those is mobile therapy?

17  A.   That's correct.

18  Q.    And one of those is probation, if she's involved --

19  A.    It can be.  It's not part of it unless the child is under

20  probation.

21  Q.    Later on R.P. was involved with probation officers

22  because she had had some criminal problems, correct?

23  A.    That's correct.

24  Q.    But back in January and February of 2001, there were no

25  probation officers involved with her because she was the

31

1  victim, not the criminal?

2  A.    That's true.

3  Q.    Okay.  But she did receive these services from a

4  psychiatrist and also from a mobile therapist?

5  A.    Yes.

6  Q.    All right.  And she started going to Sarah Reed, did she

7  not, the third or fourth week in January, 2002?

8  A.    Yes.

9  Q.    Now, you indicated that she finished -- I think you said

10  that she finished the 7th grade at Sarah Reed?

11  A.    Yes.

12  Q.    Did she go to Sarah Reed over the summer of 2002?

13  A.    There was a summer that she did go to Sarah Reed.

14  Q.    But it wasn't that summer?

15  A.    I don't remember which one it was.

16  Q.    But, in any event, she went back to Strong Vincent in the

17  fall of 2002?

18  A.    Yes.

19  Q.    You said that was the idea of the Erie School District?

20  A.    Of the Erie School District, yes.

21  Q.    R.P. was in special education, was she not?

22  A.    Yes.

23  Q.    And to change her placement, there had to be an

24  individualized educational program established for her?

25  A.    A what?


32


1  Q.    An IEP?

2  A.    Oh, yes.

3  Q.    And that process involved getting the parents involved,

4  did it not?

5  A.    Yes.

6   Q.   You had a right to object to a placement to, for example,

7   Strong Vincent, didn't you?

8   A.   Everybody objected.

9        MR. OLDS:  Excuse me, your Honor, objection, I'd

10  like to approach the court at side bar.

11       THE COURT:  All right.

12       (At side bar on the record.)

13       MR. OLDS:  The IEPs had been taken care by a

14  pretrial order, a motion in limine -- and Mr. Marnen is

15  bringing up the IEP process that we worked so hard to keep out

16  of the case.

17       THE COURT:  Overruled.

18       (End of discussion at side bar.)

19  BY MR. MARNEN:

20  Q.   In the fall of 2002, R.P. went to Strong Vincent pursuant

21  to an IEP, correct?

22  A.   Yes.

23  Q.   You participated in that process?

24  A.   Yes.

25  Q.   You did not object to it, isn't that correct?

33

1   A.   No, I objected to it.

2   Q.   You objected to it?

3   A.   Yes, I did.

4   Q.   Did you then ask for a hearing on it?

5   A.   No.

6   Q.   And you knew you had the right to a hearing if you

7   objected and they wouldn't go along with you?

8   A.   Yes.

9   Q.   Okay.  Now, she was in Strong Vincent for about one week?

10   A.   Yes.

11   Q.   And then she went from Strong Vincent to Hermitage House

12   you say?

13   A.   Yes.

14   Q.   And then over the years she's been at various

15   institutions since then?

16   A.   Yes.

17   Q.   One of those was Sarah Reed?

18   A.   Yes.

19   Q.   When was she in Sarah Reed again the second time?

20   A.   That would have been her 8th grade year.

21   Q.   So that would be after Strong Vincent?

22  A.   Yes.

23  Q.   Did she go from Strong Vincent to Sarah Reed or Hermitage

24  House, do you know?

25  A.   From Strong Vincent to Sarah Reed to Hermitage House.


34


1  Q.   I didn't quite hear that?

2       THE COURT:  Ask the question again.

3  BY MR. MARNEN:

4  Q.   Did she go from Strong Vincent to Hermitage House?

5  A.   Yes.

6  Q.   Did she go from Hermitage House to Sarah Reed?

7  A.   Yes.

8  Q.   And was that in the 8th grade?

9  A.   I believe so, yes.

10  Q.   So she finished 8th grade at Sarah Reed?

11  A.   Yes.

12  Q.   When did she drop out of North East High School?

13  A.   About November 16th.

14  Q.   November 16th of 2005?

15  A.   Yes.

16  Q.   What grade was she in when she dropped out?

17  A.   Eleventh.

18  Q.   She started going to North East High School in 10th

19  grade, did she not?

20  A.   Yes.

21  Q.   So she started in the fall of 2004 at North East High

22  School?

23  A.   I think that she went to Sarah Reed for a couple of

24  weeks, and then from there she went to North East in the fall.

25  Q.   Let's go back to January of 2002.  You testified that on

35

1  January 9, 2002, you were met by Linda Cappabianca and Janet

2  Woods on the front steps of Strong Vincent High School at about

3  6 o'clock or 6:30 in the evening?

4  A.   Yes.

5  Q.   And one of them said we need to speak with you, can you

6  come in and see us tomorrow?

7  A.   Ms. Woods.

8  Q.   Ms. Woods.  Ms. Woods was the principal, correct?

9  A.   Yes.

10  Q.    Had you ever in your life before met Janet Woods before

11  that evening?

12  A.    I don't think so.

13  Q.    Had you ever met Linda Cappabianca before that evening?

14  A.    Yes.

15  Q.    Under what circumstances had you met her?

16  A.    The time when she told me to come down and pick up my

17  daughter.

18  Q.    Was that the only contact you had with Linda Cappabianca

19  before that meeting on the steps on January 9th?

20  A.    No, I met her in the hall after the meeting.

21  Q.    After what meeting?

22  A.    The meeting on January 10th.

23  Q.    All right, I'm talking about before January 9th, your

24  first contact with Linda Cappabianca was that telephone call

25  she made?

36

1  A.    Yes.

2  Q.    Was there any contact with Linda Cappabianca between that

3  telephone call and that meeting you had with her on that day

4   and January 9th?

5   A.   No.

6   Q.   Okay.  Was that telephone call that Linda Cappabianca

7   made the same week as the day you saw Janet Woods and Linda

8   Cappabianca on the steps?

9   A.   I don't remember the exact date that she called.

10  Q.   Well, you said it was clearly January, correct?

11  A.   I don't remember.

12  Q.   I thought you said -- didn't you say on direct

13  examination it was in January?

14  A.   I'm sorry, what?

15       THE COURT:  Mr. Marnen, you're going way too fast.

16  He has a hearing disability, he's having a hard time picking

17  you up.  Remember speak into the microphone because you're

18  turning away and the jury can't hear you.  So you slow down and

19  you speak louder and slower.  Go ahead.

20  BY MR. MARNEN:

21  Q.   I thought you said that during direct examination you

22  said that Linda Cappabianca called you to tell you to come to

23  school to see her about R.P. in January, 2002?

24  A.   I remember her calling me, but I really don't remember

25  the time, the date.


37


1  Q.    Can you approximate the time period between that call and

2  January 9th -- weeks, days, months?

3  A.    I think it was either late December or early January, I

4  can't remember.

5  Q.    Well, late December would have been Christmas vacation,

6  correct?

7  A.    Yes.

8  Q.    So does that help you out, figure out when this was --

9  was it after Christmas vacation?

10  A.    I believe, I can't remember -- no, it was earlier than

11  that.  It was earlier than that.

12  Q.    Earlier than late December, late December, early January?

13  A.    I can't -- I don't remember.

14        THE COURT:  Keep your voice up, you got to really

15  try to keep your voice up.  Even the person way down on the end

16  has to be able to hear you.

17  BY MR. MARNEN:

18  Q.    When she did call, it's your testimony, if I understand

19   it correctly, that on the telephone Linda Cappabianca said to

20   you -- first of all, she introduced herself, correct?

21   A.   Yes.

22   Q.   And then she said she's having difficulties with R.P.,

23   right?

24   A.   No, she said that she's having a problem with R.P.  She

25   said that she's talking dirty.

38

1   Q.   She has a dirty, filthy mouth she said to you?

2   A.   Yes.

3   Q.   And you need to discipline her?

4   A.   Yes.

5   Q.   Come and get her, she's filthy, that's what Linda

6   Cappabianca said?

7   A.   Yes.

8   Q.   And your response was you don't understand -- I don't

9   understand what you're talking about, Ms. Cappabianca?

10   A.   Yes.

11   Q.   And then she repeated the accusation?

12   A.   Yes.

13  Q.    And your response at that point was to get in your car

14  and come to Strong Vincent?

15  A.    Yes.

16  Q.    And you were there within minutes, I would imagine?

17  A.    Within a few minutes.

18  Q.    And you met Ms. Cappabianca where?

19  A.    She was in an office and R.P. was with her.  And we had

20  exited out of there, her door was open, and we had met halfway

21  in.

22  Q.    So did you meet in a room with a door on it that was

23  closed?

24  A.    Pardon me.

25  Q.    Did you meet with Ms. Cappabianca in a room that had a

39

1  door on it?

2  A.    Yes.

3  Q.    Was that door closed when you met with her?

4  A.    When I met with her, no, it was half open.

5  Q.    Was R.P. in the same room with you?

6  A.    She was in the same room as Ms. Cappabianca, yes.

7  Q.   Was anyone else there besides the three of you?

8  A.   In the main office there was a secretary.

9  Q.   In the room you were in, was anyone else there?

10  A.   No.

11  Q.   When you had your conversation with Ms. Cappabianca, did

12  the door get closed by anybody?

13  A.   No.

14  Q.   It was left open?

15  A.   Yes.

16  Q.   And there were people outside the door?

17  A.   Yes.

18  Q.   And Ms. Cappabianca said what, she repeated the

19  accusation?

20  A.   Yeah, she said I need to take her home and discipline

21  her.  She was very direct about that.

22  Q.   And she said it was because R.P. was?

23  A.   Talking dirty.

24  Q.   Talking dirty.  And she actually used the words that R.P.

25  used?

40

1  A.   No.

2  Q.   She just said she was talking dirty?

3  A.   She said R.P. was talking dirty.

4  Q.   And your response was what?

5  A.   I yelled at my daughter.

6  Q.   And you yelled at your daughter right there in that room

7  or you took her outside?

8  A.   I would deal with her when I get home.  I yelled at her.

9  I don't remember exactly word for word, but I know she was

10  already crying.

11  Q.   R.P. had been involved in discipline in school before,

12  had she not?

13  A.   Yes.

14  Q.   She had been in PASS, for example?

15  A.   Yes.

16  Q.   And she had PASS, that after-school suspension thing?

17  A.   Yes.

18  Q.   Had she had other discipline besides after-school

19  suspension?

20  A.   Other disciplines?

21  Q.   Pardon me.

22  A.   Other disciplines?

23    Q.    Yes, other discipline besides after-school suspension,

24    that you might know about?  I'm not saying she did, I'm just

25    asking a question?


                                    41


1    A.    I don't recall any.

2    Q.    Each time that R.P. went to PASS, you were informed of

3    that fact, were you not?

4    A.    R.P. would tell me.

5    Q.    Well, you were also informed by the school, weren't you?

6    A.    There was one time I recall --

7    Q.    The school would telephone you and they would also send

8    you a letter, isn't that right?

9    A.    I got a phone call.

10    Q.    When R.P. got PASS, did you get letters telling you there

11    would be PASS for R.P.?

12    A.    I got a letter once.

13    Q.    Okay.  Did Ms. Cappabianca, whenever you had this meeting

14    with her, tell you that she was disciplining R.P. for using bad

15    language in school?

16    A.    I don't recall her saying that.

17   Q.   Do you know whether R.P. was disciplined in school as a

18   result of using bad language?

19   A.   I know she was given five days of PASS.

20   Q.   Was that related to the bad language?

21   A.   It was my assumption, but I wasn't sure.

22   Q.   Do you think it was odd that the assistant principal was

23   calling you to school and telling you to take your daughter out

24   of school and discipline her for in-school conduct?

25   A.   Did I think it was odd?

42

1   Q.   Yes.

2   A.   I thought it was bad.

3   Q.   You thought it was bad what Ms. Cappabianca was doing?

4   A.   I thought that what she was doing was making my daughter

5   out like a whore.

6   Q.   Like what?

7   A.   I remember I talked to my wife, I hung up the phone, I

8   said, I was telling my wife that she made her out to sound

9   like -- almost like a whore.  She said she was talking

10   filthy -- R.P. didn't talk like that.

11  Q.    You were upset about the accusation and did not believe

12  Ms. Cappabianca?

13  A.    I took Ms. Cappabianca at her word.  Because she was an

14  authority figure.  That's why I was going to discipline my

15  daughter.  That's why I was going have a talk with her.

16  Q.    So you did believe the accusation?

17  A.    I believed what Ms. Cappabianca was saying, yes.

18  Q.    All right.  Did you think it was odd that she was asking

19  you to take her out of school to discipline her and she wasn't

20  dealing with it in school?

21  A.    Yeah.

22  Q.    Did you tell her that?

23  A.    No, I told her -- I already told you, I would take care

24  of it when I get home, I would talk with her.

25  Q.    Did you think that Ms. Cappabianca's conduct was

43

1  improper?

2  A.    It was very improper, yes.

3  Q.    Did you bring that to the attention of Janet Woods?

4  A.    No.

5  Q.   Why not?

6  A.   I felt that Ms. Cappabianca was the one in charge.

7  Q.   You knew Janet Woods was the principal, didn't you?

8  A.   Yes, but I also know that Ms. Cappabianca was the one

9  that was dealing with R.P.  I didn't see Ms. Woods dealing with

10  R.P.  I saw Ms. Cappabianca dealing with R.P.  Therefore,

11  that's the one I went to, that's the one I felt was in charge.

12  Q.   Did you know Denise L. before January 10, 2002?

13  A.   No.

14  Q.   Denise L. is K.L.'s mother?

15  A.   Yes.

16  Q.   When did you first meet Denise?

17  A.   I met Denise one time, the first time I met her I think

18  is when she came to the house to pick up K.L.  She was going to

19  pick up K.L. and leave.

20  Q.   Was this before or after you found out about the rapes?

21  A.   I believe it was before.

22  Q.   Did you discuss with Denise L. the rapes before Janet

23  Woods told you about them?

24  A.   No.

25  Q.   So the first information you ever received about it was

44

1  on January 10th, when you talked to Janet Woods, right?

2  A.   Yes.

3  Q.   And you met that morning with Janet Woods and Chris Ruhl?

4  A.   Yes.

5  Q.   Chris Ruhl was a mental health specialist at Strong

6  Vincent, was he not?

7  A.   Yes.

8  Q.   Had you ever met Chris Ruhl before January 10, 2002?

9  A.   No.

10  Q.   When you came to Strong Vincent that morning, you met

11  Janet Woods at the administration office?

12  A.   I met her in the office.

13  Q.   Isn't it true that you met her in the big office where

14  the central office is, and she walked you to where Chris Ruhl's

15  office was to meet?

16  A.   Yes.

17  Q.   And when she did that, was Chris Ruhl in the office when

18  you walked in?

19  A.   Yes.

20  Q.    And R.P. was with you, too, correct?

21  A.    Correct.

22  Q.    So you and Chris Ruhl and Janet Woods are sitting in the

23  same office on the morning of January 10th?

24  A.    There was another woman there.

25  Q.    Another woman, do you know who that was?


                                    45


1  A.    No.

2          THE COURT:  Excuse me, Mr. Marnen, we're going to

3  take a five-minute recess.

4          (Recess from 10:01 a.m.; until 10:12 a.m.)

5          THE COURT:  All right, Mr. Marnen.

6  BY MR. MARNEN:

7  Q.    Richard P., we left off talking about the meeting on

8  January 10, 2002, between you, Ms. Woods and Mr. Ruhl, correct?

9  A.    That's correct.

10  Q.    It was in Mr. Ruhl's office, you and Ms. Woods and Mr.

11  Ruhl were there and some other woman you cannot identify,

12  right?

13  A.    I don't know who she is.

14   Q.   And R.P. was there?

15   A.   Yes.

16   Q.   How long did the meeting take, last?

17   A.   I think about an hour, maybe a half-hour.

18   Q.   And this time the door was closed?

19   A.   Yes.

20   Q.   Did Ms. Woods explain why Mr. Ruhl was there?

21   A.   She mentioned that he was there because he's a mental

22   health -- specialist or something.

23   Q.   Mental health specialist?

24   A.   I don't remember exactly.

25   Q.   He was employed by the school district?


                                46


1   A.   That's correct.

2   Q.   In fact, that was his office?

3   A.   Yes.

4   Q.   You were meeting in?

5   A.   Yes.

6   Q.   I think your testimony on direct examination was that Ms.

7   Woods opened the meeting by saying are you ready for this?

8  A.   Yes.

9  Q.   And then she followed that with R.P. has been sucking

10  dicks and giving blow jobs to boys?

11  A.   Yes.

12  Q.   And as she made this statement, R.P. was sitting next to

13  you?

14  A.   Yes.

15  Q.   Did Ms. Woods say anything more about what happened?

16  A.   She said they were doing an investigation on the issue.

17  Q.   Did she say that criminal activity was suspected?

18  A.   She said they were doing an investigation on the issue.

19  Q.   Did she explain why she was doing an investigation?

20  A.   Well, because of the nature of what was being done.

21  Q.   She was concerned, was she not, that R.P. had been -- a

22  crime had been committed on R.P.?

23  A.   She was concerned.

24  Q.   She made it clear that she thought there was a crime,

25  didn't she?


47


1  A.   I don't recall her making it clear that there was a

2  crime, I remember her saying, I asked if there was any police

3  involved, and she said no.

4  Q.    You asked if there was any police involvement because she

5  made it clear to you that she strongly suspected at least that

6  a rape had been committed?

7  A.    No.

8  Q.    Are you testifying that Ms. Woods made it sound to you

9  like R.P. was doing this voluntarily?

10  A.    She made it sound as if R.P. was a willful participant.

11  Q.    And why then did you bring up the police if Ms. Woods was

12  saying that R.P. was a willful participant?

13  A.    Because of R.P.'s age, I asked her what were the ages of

14  the boys that had done this.  And she said we were checking

15  into that.  That's why I brought up the issue of the police.

16  Q.    Did Ms. Woods ask R.P. to tell you anything during that

17  meeting?

18  A.    She asked R.P. to tell me what had happened.

19  Q.    And did R.P. do that?

20  A.    No.

21  Q.    Did Ms. Woods tell you what she had learned in her

22  investigation?

23  A.    She had learned that there was a couple of boys that had

24  been taunting her and asking her to do things.  And then that

25  possibly I think B.C. was one of the other people involved.


48


1  Q.    And didn't she tell you that B.C., she had learned, had

2  coerced R.P.?

3  A.    I'm sorry?

4  Q.    Had coerced R.P., B.C. had coerced R.P.?

5  A.    I believe so, if I remember correctly.

6  Q.    She told you that B.C. coerced R.P. into providing oral

7  sex to boys, isn't that true?

8  A.    She didn't say oral sex, she said sucking dicks and

9  giving blows jobs, is the words she used.

10  Q.    Those words you found totally inappropriate, didn't you?

11  A.    Yes.

12  Q.    And you found them to be offensive?

13  A.    Yes.

14  Q.    Did you tell her that?

15  A.    Yes.

16  Q.    You did, you told Ms. Woods that?

17  A.    I told her, I asked her --

18          THE COURT:  Hang on a second, excuse me.  Slowly and

19   articulate the best you can.

20          THE WITNESS:  I told her my daughter would not do

21   things like that.

22   BY MR. MARNEN:

23   Q.   I'm talking, sir, about the use of foul language like

24   that in front of a 13-year-old girl, didn't you have a problem

25   with that?


                              49


1   A.   Yes, I had a problem with it.

2   Q.   Did you tell her that?

3   A.   No, I didn't -- I was in shock, I was not prepared to

4   hear what I was about to hear.  I know I didn't believe it.

5   Q.   So your answer is you did not object to the use of that

6   foul language?

7   A.   I didn't say that, I didn't say I objected to her use of

8   bad language.  I said I did not appreciate it in my own self,

9   but I didn't say anything to her about that.  But yeah, I did

10  object to it.

11  Q.   But you kept that to yourself?

12   A.   Yes.

13   Q.   You also testified that you asked Janet Woods whether she

14   had gotten in touch with the police?

15   A.   Yes.

16   Q.   And she told you that she had not been in touch with the

17   police?

18   A.   Yes, she said she would deal with it, I need to keep my

19   mouth shout about it.

20   Q.   Did she say she was going to contact the police?

21   A.   That was my assumption, she probably was going to do so.

22   Q.   You believe she was going to contact the police based on

23   what she told you?

24   A.   I believe based on what I was thinking, yes.

25   Q.   You didn't think at that point that she was going to


50


1   cover this up, did you?

2   A.   I didn't know what to think, to be honest with you.

3   Q.   I mean Janet Woods, you just told us that she told you

4   that R.P. had been coerced into providing sex, and that she was

5   investigating it, you don't think she was going to sweep this

6   under the rug, do you?

7   A.   No.

8   Q.   You then were at the police department the following day

9   to pick up your paycheck?

10   A.   Yes.

11   Q.   And that was your first visit -- I'm sorry, while you

12   were there, you asked to see Officer Bowers?

13   A.   Yes.

14   Q.   And officer -- is it officer or sergeant, I think it's

15   sergeant, isn't it?

16   A.   I think he was Sergeant Bowers at that time.

17   Q.   And Sergeant Bowers at that time, wasn't he the head of

18   the traffic division of the Erie Police Department?

19   A.   Yes.

20   Q.   He was your ultimate superior because you were a crossing

21   guard, correct?

22   A.   Yes.

23   Q.   So you were acquainted with him?

24   A.   Yes.

25   Q.   And so you asked to see him so you could get some advice

51

1  about what to do?

2  A.   Yes.

3  Q.   But you couldn't find him?

4  A.   That's correct.

5  Q.   And someone sent you to Detective Sergeant Green?

6  A.   Yes, the officer that was in charge -- I told him about

7  what I had found out.  He said you need to go to the juvenile

8  division.  And then we went over to the juvenile division,

9  where he had introduced me to Detective Stanley Green.

10  Q.   You did not go to the police on January 10th, the day

11  that Janet Woods had the conversation with you?

12  A.   No.

13  Q.   And you talked to Detective Sergeant Green, and he told

14  you to get R.P. and bring her back, is that what you said?

15  A.   He said that if a report had been filed, and so they did

16  a check on the computer system to see if any report had been

17  filed.  And they didn't see any.  And he asked me if I wanted

18  to make a statement, so I did, I made a statement to him of

19  what I had learned.  Then about an hour later he called me on

20  my cell phone and asked me if I could bring in R.P. to ask her

21  some questions.  I told him yeah, it would be about 11 o'clock.

22  Q.    Did he interview her before Pamela Barber interviewed

23  her?

24  A.    If I remember correctly, I think he had talked to her

25  first.  But he thought that she would be more comfortable with

52

1  a woman, so they brought in Detective Barber.

2  Q.    About a half-hour after you arrived, Detective Sergeant

3  Barber came to the Erie Police Department and interviewed R.P.?

4  A.    Yes.

5  Q.    And you were present for that interview, right?

6  A.    Yes.

7  Q.    And she was interviewed two times by Detective Barber?

8  A.    Yes.

9  Q.    The second time was on videotape?

10  A.    Yes.

11  Q.    And did that look like the videotape that we showed

12  yesterday?

13  A.    Yes.

14  Q.    You decided on January 10th, when you met with Janet

15 Woods, that you wanted R.P. out of Strong Vincent, is that

16 right?

17 A.   I asked her what we were going to do and she said we're

18 going to place R.P. in Sarah Reed for her safety.

19 Q.   You thought that getting her out of Strong Vincent was a

20 good idea, didn't you?

21 A.   Yeah.

22 Q.   In fact, you testified on direct examination, did you

23 not, that I decided she should not go back to Strong Vincent?

24 A.   Yeah, I felt she shouldn't go back.

25 Q.   So R.P. and you left Strong Vincent at about noon on


53


1 January 10th and R.P. was not at Strong Vincent again the rest

2 of that school year?

3 A.   I took her home, but I think she still had PASS that she

4 had to perform, if I remember correctly.  I remember that we

5 went and she would have an intake -- for Sarah Reed, but she

6 actually started at Sarah Reed I think around January 25th.

7 Q.   Do you remember that January 10th was a Thursday?

8 A.   Yeah, because I picked up my check up on Friday.

9   Q.   And on Friday R.P. was interviewed by Pamela Barber,

10  correct?

11  A.   Yes.

12  Q.   The 11th.  And isn't it true that the following week R.P.

13  spent at home, had in-home placement and saw the home school

14  visitor teacher?

15  A.   Yes.

16  Q.   Okay.  And then the week after that is when she was

17  placed, she actually had her intake interview at Sarah Reed,

18  right?

19  A.   Yeah.

20  Q.   And she was immediately accepted and started Sarah Reed

21  before January was up?

22  A.   Yes.

23  Q.   And then several days after meeting with, I think you

24  said several days after meeting with Janet Woods, you found out

25  from T.N. -- I'm sorry, you found out from R.P. that T.N. told


54


1   her that T.N.'s mother did not want T.N. hanging out with R.P.

2   because R.P. was performing oral sex on boys?

3   A.   That's correct.

4   Q.   And R.P. told you this, right?

5   A.   Yes.

6   Q.   R.P., when she told you this, was agitated?

7   A.   Yes.

8   Q.   And you were agitated, correct?

9   A.   I was angry.

10  Q.   You were angry?

11  A.   Uh-huh.

12  Q.   Did you find out from R.P. who was spreading this

13  information?

14  A.   No, I found out from -- I had called Robin J.

15       THE COURT:  Say that again?

16       THE WITNESS:  I found out, I called Robin J. and

17  asked her what she was talking about.

18  BY MR. MARNEN:

19  Q.   Robin J., right?

20  A.   Yes.

21  Q.   Robin J is the mother of T.N.?

22  A.   Yes.

23  Q.   So you called her right away?

24  A.   Pardon me.

25  Q.  Did you call her right away?


55


1  A.  I don't think it was too much longer after R.P. told me

2  about it.

3  Q.  You must have found out about this during the week that

4  R.P. was on home schooling?

5  A.  Right about then.

6  Q.  So R.P. was staying at home and doing school work that

7  week, right?

8  A.  Yes.

9  Q.  And T.N. and R.P. were friends?

10  A.  Yes.

11  Q.  T.N. had been to your house on prior occasions?

12  A.  I don't remember her actually, I think she might have

13  been.

14  Q.  Do you know whether R.P. was visiting T.N. before this?

15  A.  She may have.

16  Q.  Did you even know the name T.N. when R.P. told you this?

17  A.  I knew who T.N. was.

18  Q.  How did you know who T.N. was?

19  A.    Pertaining to our neighbors in North East, Pennsylvania,

20  about 1990, 1989, somewhere around there.

21  Q.    So about 10 or 12 years before this all happened you knew

22  T.N.?

23  A.    Yes.

24  Q.    In 2001-2002, she was only 12-years-old, right?

25  A.    Yeah.


                                    56


1  Q.    So she must have been a baby when you knew her?

2  A.    She was a toddler.

3  Q.    And you knew Robin J. at that time, also?

4  A.    I knew Robin as far as being my neighbor.

5  Q.    You and Robin J. were neighbors in North East?

6  A.    Yes.

7  Q.    Are you neighbors now?

8  A.    No.

9  Q.    You both live in North East, don't you?

10  A.    Yes.

11  Q.    So you knew T.N., that name, from way back in North East

12  10 years ago?

13  A.   Yeah.

14  Q.   That's how you recognized the name when R.P. told you

15  what T.N. said?

16  A.   Yeah.

17  Q.   Did you remember that T.N.'s mother was Robin J.?

18  A.   I remembered her name, Robin.

19  Q.   How did you get ahold of her, by telephone?

20  A.   Pardon me.

21  Q.   Did you call Robin J. on the telephone?

22  A.   Yes.

23  Q.   How did you get her number?

24  A.   R.P. had it.

25  Q.   And so you called Robin, did you get her right away, the

57

1  first call?

2  A.   No, it took a couple calls before I got ahold of her.

3  Q.   Did you get ahold of her within 24 hours?

4  A.   I'm thinking maybe a day or two, I think it took a couple

5  days.

6  Q.   So you called Robin J. and asked her where she got this

7    information, right?

8    A.    Well, I had asked her, first off I had asked her what she

9    was talking about.

10   Q.    Okay.  And what did she say in response to that?

11   A.    She said well, I heard the kind of stuff that she called

12   R.P., she said R.P. had been doing.  I says like what.  And she

13   said well, I heard she's been -- she tried to put it a more

14   gentle way.  I said no, that's not --

15   Q.    I'm sorry, I didn't mean to interrupt you, go ahead?

16   A.    I said that's not exactly the way it is.  I said where

17   did you hear this information from.  She said well, Ms.

18   Cappabianca told me.  And I says did she tell you R.P. had been

19   raped.  Did she tell you that R.P. had been coerced into sex.

20   And she just told me what Ms. Cappabianca had said to her.  And

21   I said well, that's not true.  I was extremely angry because --

22   I hadn't told anybody but the police, this isn't something, you

23   just don't go around telling people.

24   Q.    You said that, I think you just said that Robin J. tried

25   to be gentle with the language in describing what she had been

58

1  told by Linda Cappabianca?

2  A.   She said R.P. was performing oral sex.  I said well, how

3  do you know that.  She said Ms. Cappabianca said R.P. had been

4  giving blow jobs to boys in the laundromat.  I said -- no,

5  that's not the way it was.  I said did she tell you she was

6  raped.  I was angry, I said why would she tell you this, and

7  she hadn't even come to me, why couldn't she come to me.

8  Q.   I'm sorry, go ahead.

9  A.   I wanted to know why she went to her about it.

10  Q.   Robin J., I would imagine, had no answers to these

11  questions?

12  A.   Pardon me.

13  Q.   Robin J. didn't know why Linda Cappabianca came to her?

14  A.   She told me that she wanted to let Robin know what kind

15  of kid her daughter was hanging around with, and that's why she

16  did it.

17  Q.   T.N. was not either a participant or a witness to the

18  rapes on December 19, 2001, was she?

19  A.   She wasn't there.

20  Q.   As far as you know, the only connection between T.N. and

21  R.P. was they were friends?

22  A.   Yes.

23  Q.   And somehow you got Robin J. telling you that Linda

24  Cappabianca called her into her office and told her these

25  things?

59

1  A.   Yes.

2  Q.   In gutter language?

3  A.   Pardon me.

4  Q.   Using the word blow job?

5  A.   Yes.

6  Q.   So this must have made you very angry?

7  A.   Yeah.

8  Q.   And what did you do about your anger?

9  A.   I -- I don't know, I just was very, very, very

10  frustrated.  Everything was happening at an extremely fast

11  pace.  Between the court appearances, between C.B. and B.C. and

12  the police and everything, was hitting at an extremely fast

13  rate.

14  Q.   So you did not contact Linda Cappabianca and tell her

15  that you thought that what she did was totally inappropriate,

16  did you?

17  A.    No, I never told her.

18  Q.    And you never contacted Janet Woods about this subject,

19  correct?

20  A.    That's correct.

21  Q.    As a matter of fact, you never contacted anybody at the

22  Erie School District about that subject?

23  A.    That's also correct, yes.

24  Q.    Until after you filed your lawsuit?

25  A.    That's not right, no.


                            60


1  Q.    Pardon me.

2  A.    No.

3  Q.    When was the first time you complained about this?

4  A.    I told counselors.

5  Q.    You told counselors?

6  A.    Well, they're someone you could talk to.

7  Q.    Counselors who were counseling R.P. you mean?

8  A.    Yeah.

9  Q.    But the first time you ever made note of this accusation

10  about the conversation between Linda Cappabianca and Robin J.

11  was in this lawsuit, isn't that correct?

12  A.    No, not really.  Like I said before, R.P. --

13        THE COURT:  Hand on a second, way too fast.

14        THE WITNESS:  I'm sorry.

15        THE COURT:  Please ask the question again, start the

16  answer again.

17  BY MR. MARNEN:

18  Q.    Let me make the question clear.  At no time did you

19  communicate to Erie School District any complaint you had about

20  the conversation between Robin J. and Linda Cappabianca until

21  you filed this lawsuit?

22  A.    No, because I said I had talked to counselors about what

23  I had heard --

24  Q.    Go ahead.

25  A.    I complained about the way, I felt that it was


61


1  inappropriate for her to do these things.  I talked to

2  counselors because I felt the best way is you talk to people

3  who you trust.  I didn't trust Ms. Cappabianca.  Nor did I

4    trust Ms. Woods.  I didn't trust them people in any way.  As

5    far as I was concerned, they had hurt my child.  Regardless of

6    the situation, they hurt my girl.

7    Q.    Nor did you contact the superintendent of schools or a

8    school board member or an administrator downtown?

9    A.    I thought who would believe me anyways in that area.

10   They hurt my little girl.

11          MR. MARNEN:  I have no other questions, thank you.

12          THE COURT:  Do you have any redirect?

13          MR. OLDS:  Yes, your Honor.

14                REDIRECT EXAMINATION

15   BY MR. OLDS:

16   Q.    Mr. Marnen asked you some questions about whether you

17   received --

18          THE COURT:  Use the microphone, please.

19          MR. OLDS:  I'm sorry, your Honor.

20   BY MR. OLDS:

21   Q.    Mr. Marnen asked you several questions about whether you

22   received written notice that R.P. was assigned to PASS?

23   A.    Yes.

24   Q.    Do you recall that?

25   A.    I do.

file:///A|/RICHDAY2.TXT

62

1    Q.    And what was your answer?

2    A.    I said I had received one phone call and I also received

3    one letter.

4    Q.    Did you ever approach the school district and ask the

5    school district to allow you to see your daughter's

6    disciplinary history?

7    A.    No.

8    Q.    Did you ask to see papers regarding what happened to your

9    daughter?

10    A.    No.

11    Q.    Okay.  Were you ever told that the discipline history had

12    been destroyed, the documents had been destroyed?

13         MR. MARNEN:  Objection.

14         THE COURT:  What is the nature of the objection?

15         MR. MARNEN:  The objection is he just said he never

16    even asked.  No foundation as to how he knows it.

17         THE COURT:  Sustained.

18         MR. OLDS:  Can I approach the area with a different

19    question to lay a foundation?

20          THE COURT:  Go ahead.

21    BY MR. OLDS:

22    Q.    Did you come to learn that your daughter's disciplinary

23    records had been destroyed?

24          MR. MARNEN:  Objection, no foundation.

25          THE COURT:  Sustained.  Let me see you at side bar.


                                63


1          (At side bar on the record.)

2          THE COURT:  Now, let's see if we can get to the

3    bottom of this.  What was the nature of the objection?

4          MR. MARNEN:  I hadn't heard any foundation,

5    indicating this is hearsay.

6          MR. OLDS:  The first question is, I asked did you

7    learn that -- either yes or no.  If he says no, then I don't go

8    any further.  If he says yes, then I lay a foundation.

9          THE COURT:  What do you reasonably anticipate him to

10    say in response to the question?

11          MR. OLDS:  That he went to the school district and

12    asked for her disciplinary files and they were destroyed.

13          THE COURT:  Will he testify that someone at the

14   school district told him they were destroyed?

15        MR. OLDS:  Before I ask him anything about that,

16   I'll ask who he contacted, where he got the information.

17        THE COURT:  He will testify that an agent of the

18   school district told him that?

19        MR. OLDS:  Yes.

20        THE COURT:  That's a sufficient foundation.

21        (End of discussion at side bar.)

22   BY MR. OLDS:

23   Q.   Did you learn whether your daughter's -- just answer this

24   one yes or no, did you learn whether your daughter's

25   disciplinary records had been destroyed?


                            64


1   A.   Yes.

2   Q.   And who did you learn that from?

3   A.   There was a female principal at Strong Vincent, I can't

4   recall her name.

5   Q.   And how were you talking to that female principal, how

6   did it happen that you went to her to talk about this subject?

7   A.   I had initially -- filed a lawsuit.

8   Q.   No, did you talk to her before you filed the lawsuit?

9   A.   Yes.

10   Q.   Okay.  And when you talked to her about those

11   disciplinary records, what did she say?

12   A.   She said they had been destroyed.

13   Q.   Okay.  Mr. Marnen asked you if you knew Denise Long

14   before the events that happened; do you recall those questions?

15   A.   Yes.

16   Q.   Now, when you met with Ms. Woods and Mr. Ruhl on January

17   10th, did they tell you that there was another girl who had

18   been a victim, who had been engaging in oral sex?

19   A.   No, no.

20   Q.   How did you find out that the same thing had happened to

21   K.L.?

22   A.   I think it was R.P.'s friend somehow -- the information

23   got -- I don't recall.

24   Q.   That's fine.  Now, Mr. Marnen asked you a couple

25   questions about -- he asked you a number of questions about

65

1   that meeting that you had with Ms. Woods and Mr. Ruhl and the

2    conversations that you had?

3    A.    Yes.

4    Q.    Was there any point in time when you either -- well, let

5    me break this down.  Was there any point in time when you asked

6    them how long have you known about this?

7    A.    Yes, I did, I asked Ms. Woods that.

8    Q.    What did Ms. Woods say?

9    A.    She said she had known about it since December.

10          MR. OLDS:  Okay.  No other questions.

11          THE COURT:  Anything further?

12          MR. MARNEN:  Yes.

13                  RECROSS-EXAMINATION

14    BY MR. MARNEN:

15    Q.    You asked Janet Woods how long she had known about the

16    rape and she said --

17    A.    About the issue.

18    Q.    About the issue?

19    A.    Uh-huh.

20    Q.    Well, could you be more specific, as best you remember

21    what exactly did you ask Janet Woods?

22    A.    I said how long have you known this.

23  Q.   Is t-h-i-s the word you used?

24  A.   This, t-h-i-s.

25  Q.   And her response was, exactly as you remember, as best

66

1  you remember it?

2  A.   She said they've known about this since December.

3  Q.   Since December.  Did you follow-up on that?

4  A.   Follow-up?

5  Q.   Did you ask some more questions, what did you know since

6  December, did you ask her that?

7  A.   No.

8  Q.   Did you come away from that conversation believing they

9  knew that R.P. had been raped, they knew in December that R.P.

10  had been raped, their knowledge was in December?

11  A.   That's my knowledge of it, yes.

12  Q.   And they kept it to themselves?

13  A.   They were doing an investigation.

14  Q.   From December until the time you met with her?

15  A.   Yes.

16  Q.   They were doing an investigation?

17  A.   That's my understanding, yes.

18  Q.   Did she tell you?

19  A.   That they were doing an investigation on the issue.

20  Q.   Did she say what date in December?

21  A.   No.

22  Q.   Did she say December 19th?

23  A.   I don't recall her saying December 19th, I thought she

24  said December.

25  Q.   So she could have been doing an investigation for 40


67


1  days, as far as you knew?

2  A.   As far as I knew.

3       MR. MARNEN:  No other questions.

4       THE COURT:  All right, thank you, sir, you're

5  excused.  Sir, you can step down, thank you.  Ma'am, stand in

6  front of the bench and my clerk will swear you in.

7       THE CLERK:  Raise your right hand.  Can you please

8  state your full name and spell your last name?

9       THE WITNESS:  Robin J.

10       ROBIN J., PLAINTIFFS' WITNESS, SWORN

11                    DIRECT EXAMINATION

12   BY MR. OLDS:

13   Q.    Please tell us what your name is?

14   A.    Robin J.

15   Q.    And where do you live?

16   A.    North East.

17   Q.    How many years have you lived in North East?

18   A.    All of my life off and on.

19         THE COURT:  Ma'am, you really have to project.

20         THE WITNESS:  Off and on all my life.

21   BY MR. OLDS:

22   Q.    Speak into the microphone.  There were times when you

23   lived in Erie?

24   A.    Yes.

25   Q.    Now, you're here to testify about a conversation that you


                              68


1    had with Ms. Cappabianca.  Were you living in Erie in

2    2001-2002?

3    A.    Yes.

4    Q.    How many children do you have?

5  A.   Three.

6  Q.   What are their names?

7  A.   Ashley, Toni and Erica?

8  Q.   Ashley, Toni and Erica?

9  A.   Yes.

10  Q.   And how old is T.N.?

11  A.   Sixteen.

12  Q.   And Ashley is how old?

13  A.   Eighteen today.

14  Q.   And Erica?

15  A.   Twelve.

16  Q.   Did you at some point, when Ashley was an infant or maybe

17  a toddler, had you been a neighbor of the P.'s?

18  A.   I don't remember that.  But they remember babysitting for

19  me.

20  Q.   Okay.  So you don't really remember them as a family?

21  A.   No.

22  Q.   Okay.  Now, do you recall having a conversation with --

23  excuse me, do you recall Ms. Cappabianca calling you and Toni

24  into her office?

25  A.   Yes.

1  Q.   Did you know why?

2  A.   No.

3  Q.   Do you remember what grade T.N. was in that year, was it

4  7th?

5  A.   I think it was 7th, yes.

6  Q.   And tell me what Ms. Cappabianca said to you when she

7  called you in the office?

8  A.   She wanted to let me know what kind of -- children T.N.

9  was hanging around with, she didn't think it was appropriate.

10  Q.   Did she mention any children by name?

11  A.   R.P., but I didn't know her as R.P., I know her as R.P.,

12  not R.P.

13  Q.   What name did she use?

14  A.   R.P.

15  Q.   Okay.  And did she tell you what R.P. had been doing?

16  A.   Yes.

17  Q.   What did she say?

18  A.   Giving blow jobs, I believe was the correct word, to boys

19  in the school.

20  Q.   Was T.N. with you?

21  A.  Yes.

22  Q.  And do you recall very much else from that conversation?

23  A.  Excuse me.

24  Q.  Well, did Ms. Cappabianca say anything else about what

25  R.P. had been doing?


70


1  A.  Just things she was doing with the boys in school.  She

2  didn't think it was appropriate for T.N. to be hanging around

3  with someone like that.

4  Q.  And did she say that this was going on in the school?

5  A.  Yes.

6  Q.  And do you remember if she talked about anything else in

7  that meeting?

8  A.  No, that's what the meeting was over, to let me know who

9  T.N. was hanging around with, what was going on.

10  Q.  Do you know how long the meeting lasted?

11  A.  No, maybe -- if I had to guess, maybe 20 minutes.

12  Q.  When you left the meeting, did you happen to see either

13  R.P. or her father?

14  A.  When we went to the office, R.P. and her dad were down

file:///A|/RICHDAY2.TXT

15  there, and T.N. gave R.P. a hug.  I didn't know at the time who

16  Ms. Cappabianca was talking about because I had known her as

17  R.P., not R.P.

18  Q.   Did T.N. mention anything that that's the girl or --

19  A.   Yes.

20  Q.   So what did you tell T.N.?

21  A.   That I wouldn't let T.N. play with her.

22  Q.   T.N. was 12 at the time or 13?

23  A.   I'm not real sure.

24  Q.   Now, do you remember if you received a phone call from

25  Richard P.?


71


1  A.   Yes, after T.N. had talked to R.P. and wanted to go over

2  there, I wouldn't let her.  So T.N. told R.P. why I wouldn't

3  allow her.  Richard P. had called later and asked what was

4  said, so I told him what I was told.

5  Q.   What did you tell Richard P. that Ms. Cappabianca had

6  said to you?

7  A.   That R.P. was doing dirty things with boys and called her

8  names for doing stuff with them in school.

9   Q.    Did you eventually tell him that Ms. Cappabianca had

10   informed you that R.P. was engaging in oral sex?

11   A.    Yes.

12   Q.    Shortly after that T.N. withdrew from Strong Vincent,

13   isn't that right?

14   A.    Yeah, they told me that wasn't her school district

15   anymore, I had to move her.

16   Q.    How did you feel when Ms. Cappabianca told you these

17   things about R.P. and the fact that R.P. was your daughter's

18   friend?

19   A.    I was shocked when she first told me because it didn't

20   really have anything to do with my daughter, T.N.  But then

21   after I found out who it was, I kind of felt bad because I was

22   just -- it was something I really didn't know.  I was telling

23   T.N. she couldn't play with R.P., I really didn't know the

24   truth, if it was true or not.

25            MR. OLDS:  No other questions, your Honor.


                              72


1            THE COURT:  All right, Mr. Marnen.

2                    CROSS-EXAMINATION

3  BY MR. MARNEN:

4  Q.   T.N. changed schools in January of 2002, didn't she?

5  A.   I don't recall the exact month, but yes, she did move

6  schools.

7  Q.   You lived at the beginning of the year on West 2nd Street

8  and during the year you moved to West 20th Street, right?

9  A.   Right, it was West 3rd.  West 3rd Street and Sass.

10  Q.   And at some point the school district told you that she

11  had to change schools?

12  A.   Yes.

13  Q.   That was all during the 7th grade, was it not?

14  A.   Yes, it was when I moved up on 20th Street.

15  Q.   That's 2001-2002?

16  A.   I believe so.

17  Q.   And this conversation with Linda Cappabianca was before

18  T.N. changed schools?

19  A.   Yes.

20  Q.   How long before?

21  A.   I don't really recall, she didn't go to school that much

22  longer after that.

23  Q.   Was this conversation in January?

24  A.   I don't really know, I know it was wintertime.

25  Q.   Prior to this meeting with Ms. Cappabianca, you had never


73


1  met Ms. Cappabianca before, right?

2  A.   No.

3  Q.   You had had no contact whatsoever with her?

4  A.   No, not that I recall.

5  Q.   Did you go to a parent-teacher conference in the prior

6  fall?

7  A.   I don't really remember.

8       THE COURT:  Keep your voice up, please.

9  BY MR. MARNEN:

10  Q.   You don't remember?

11  A.   No, I don't.

12  Q.   But you do know you never had contact with Linda

13  Cappabianca before this meeting?

14  A.   Yes.

15  Q.   And what time of day did Linda Cappabianca call you?

16  A.   It was in the daytime, I took T.N. home with me when I

17  left the school, it was almost time for school to end.

18  Q.   You received a telephone call from Ms. Cappabianca, who

19  asked you to come from your home to the school?

20  A.   Yes.

21  Q.   How did you get there?

22  A.   I walked.

23  Q.   So you walked from West 3rd Street to West 8th Street?

24  A.   No, I was at West 20th then.

25  Q.   You were at 20th then?

74

1  A.   Yes.

2  Q.   Okay.  So you walked 12 blocks?

3  A.   Yes.

4  Q.   Down and back, right?

5  A.   No, Ms. Cappabianca gave us two bus tokens when we left

6  to ride the bus home.

7  Q.   Did you tell Ms. Cappabianca you had to walk from 20th

8  Street to Strong Vincent to have this conversation with her?

9  A.   I don't believe so.  But I don't have a car, she already

10  knew that.

11  Q.   When she talked to you on the telephone, what did she

12   tell you about the reason for the meeting was?

13   A.   A meeting about T.N.

14   Q.   That's it?

15   A.   Yes.

16   Q.   And when you got there, the only subject discussed was

17   the sexual activities of R.P.?

18   A.   Yes, my daughter was hanging around her.

19   Q.   And T.N. was not present when this rape occurred, was

20   she?

21   A.   No, she was there when we were having a conversation.

22   Q.   She wasn't a witness to anything that had to do with the

23   rape of R.P. or K.L.?

24   A.   No, she wasn't there when it actually happened.

25   Q.   During the meeting with Ms. Cappabianca, the only person

75

1   she talked about was R.P., she didn't talk about K.L.?

2   A.   No.

3   Q.   And as far as you know, this is the only conversation Ms.

4   Cappabianca had with any parent of any girl at Strong Vincent

5   that year about this?

6    A.    As far as I know, yes.

7    Q.    And not only did she tell you that R.P. was engaging in

8    oral sex, but she used words that weren't very nice?

9    A.    Yes.

10    Q.    She used the word blow job?

11    A.    Yes.

12    Q.    Any other words like that?

13    A.    She called her, she said R.P. was acting like a little

14    whore.

15    Q.    Didn't you also indicate in an affidavit you filed in

16    this case that she made a motion with her hand or something?

17    A.    Yes.

18    Q.    Simulating something like oral sex?

19    A.    Yes.

20    Q.    Didn't this offend you?

21    A.    Yes.

22    Q.    Your daughter is sitting right there at the time?

23    A.    Yes.

24    Q.    Did you object?

25    A.    I didn't know what to say.

76

1   Q.   So you did not object?

2   A.   I didn't say anything.

3   Q.   Nor did you complain to anybody at the school district

4   about this outrageous conduct by Linda Cappabianca?

5   A.   No, I really didn't know what to do.

6   Q.   As a matter of fact, you instructed T.N. to stay away

7   from R.P.?

8   A.   Yes.

9   Q.   But as soon as Richard P. talked to you, you changed your

10   mind, let her hang around with her then?

11   A.   No, they didn't really hang together too much more after

12   that.

13   Q.   But you did not forbid her from hanging out together,

14   right?

15   A.   No.

16        MR. MARNEN:  I have no other questions, thank you.

17        THE COURT:  Anything further, Mr. Olds?

18        MR. OLDS:  No, your Honor.

19        THE COURT:  Call your next witness, please.

20        THE CLERK:  Can you state and spell your last name

21   for the record, please?

22          THE WITNESS:  T.N.

23                T.N., PLAINTIFFS' WITNESS, SWORN

24                    DIRECT EXAMINATION

25   BY MR. OLDS:


                            77


1   Q.   You're T.N.?

2   A.   Yes.

3   Q.   And how old are you, T.N.?

4   A.   Sixteen.

5   Q.   Sixteen?

6   A.   (Witness nods head.)

7   Q.   Do you know R.P.?

8   A.   Yes.

9   Q.   Do you know her as R.P. or R.P.?

10  A.   R.P.

11  Q.    And, actually, do you know K.L.?

12  A.   I know her, but I don't really know her --

13          THE COURT:  You're really going to have to speak a

14   little bit louder.

15          THE WITNESS:  Yes, I do know her.

16  BY MR. OLDS:

17  Q.    You're not close friends with her?

18  A.    No.

19  Q.    Okay.  Did you attend Strong Vincent school in 7th grade?

20  A.    Yes.

21  Q.    For a little while?

22  A.    Yes.

23  Q.    Did you have a meeting with your mother and Ms.

24  Cappabianca at some point?

25  A.    Yes.


78


1  Q.    And did you know -- were you in school when you were

2  called to the meeting?

3  A.    Yes.

4  Q.    And do you remember what Ms. Cappabianca said at that

5  meeting?

6  A.    She said that -- uh, that I was hanging around with the

7  wrong people.

8  Q.    She told that to your mom?

9  A.    Yeah.

10  Q.   And did she mention any names?

11  A.   I'm not sure.

12  Q.   Did she ever -- did the subject get around to R.P.?

13  A.   I'm not sure.

14  Q.   Did Ms. Cappabianca talk about -- do you remember if she

15  talked about dirty things?

16  A.   Dirty things?

17  Q.   Yes.

18  A.   Yes.

19  Q.   You don't want to say what she talked about, is that

20  right?

21  A.   Yes.

22  Q.   Did she make a gesture or a hand gesture?

23  A.   Yes.

24  Q.   And you don't want to do that either, is that right?

25  A.   No.


79


1  Q.   Was it involving a dirty act?

2  A.   Yeah.

3  Q.   And after that did you tell R.P. that you couldn't play

4   with her, hang out with her?

5   A.   Yeah.

6   Q.   And why did you tell her that?

7   A.   Because of what happened at school.

8        MR. OLDS:  No other questions, your Honor.

9                   CROSS-EXAMINATION

10  BY MR. MARNEN:

11  Q.   Did your mother tell you what happened at school -- are

12  you referring to the meeting with Ms. Cappabianca?

13  A.   What.

14  Q.   Well, you said that your mother told you that you could

15  not hang out with R.P. because of what happened at school; I'm

16  trying to find out what happened at school?

17  A.   Stuff that happened with R.P. and the boys.

18  Q.   What happened with R.P. and the boys?

19  A.   And the boys.

20  Q.   Did your mother know when she told you that that R.P. had

21  been raped?

22  A.   Yeah.  Ms. Cappabianca told my mom that there was stuff

23  happening in the basement of the laundromat with R.P. and the

24  boys.

25  Q.    The basement of the laundromat in the school?

80

1  A.    Not the basement in the school, in the laundromat across

2  the street.

3  Q.    Any other girls besides R.P.?

4  A.    Not that I know of, I don't know.

5        MR. MARNEN:  No other questions, thank you.

6        THE COURT:  Thank you, you can step down now.  Call

7  your next witness, please.

8        MR. OLDS:  Shelley P.

9        THE CLERK:  Please state and spell your full name

10  for the record?

11        THE WITNESS:  Shelley P.

12        SHELLEY P., PLAINTIFFS' WITNESS, SWORN

13              DIRECT EXAMINATION

14  BY MR. OLDS:

15  Q.    Shelley P., for the record would you state your full

16  name?

17  A.    It's Shelley P.

18        THE COURT:  Ma'am, pull in a little bit, will you.

19  Go ahead.

20  BY MR. OLDS:

21  Q.   You're R.P's mother?

22  A.   Yes.

23  Q.   How long have you been married to Richard?

24  A.   It's been I think 20 years.

25  Q.   And you have other children, is that right?


81


1  A.   Yes.

2  Q.   You have some medical problems yourself, is that right?

3  A.   Yes.

4  Q.   And are you on medication for those problems?

5  A.   Yes.

6  Q.   And does sometime that medication affect your memory?

7  A.   Yes.

8  Q.   Okay.  Who principally took care of issues involving R.P.

9  in school?

10  A.   Richard did.  He took care of everything.

11  Q.   Did you, for instance, when there were parent-teacher

12  conferences, would you attend those?

13   A.   When I could.  Which was rarely because I wasn't well.

14   Q.   Your illness keeps you from leaving the house?

15   A.   Yes, sometimes.

16   Q.   Meetings, such as IEP meetings, would you go to those?

17   A.   I don't believe so, no.

18   Q.   Well, first of all, before all this stuff happened, what

19   kind of kid was R.P.?

20   A.   She was your average kid.  She was sweet -- she was a

21   good kid.  We never had any problems with her in school.  She

22   was very well behaved.

23   Q.   Do you remember what the state of your health was when

24   all this stuff came up about what had happened to R.P.?

25   A.   I believe I was very sick.  Yeah, I was.


                                    82


1   Q.   You at some point had a liver transplant?

2   A.   Yes.

3   Q.   Was that around this time?

4   A.   I believe so, yes.

5   Q.   So what was going on in your family when it first came

6   out that R.P. had been assaulted?

7   A.   A lot of chaos.  And it was emotional.  It was hard --

8   Q.   I'm sorry to interrupt you, go ahead, could you repeat

9   what you were saying?

10  A.   It was hard to deal with, physically and mentally.

11  Q.   How did R.P. change?

12  A.   It was like she was a whole different person, overnight.

13  She wasn't our little girl anymore.  She -- she was angry, very

14  angry, aggressive -- and hateful.  She didn't trust any of us

15  or anybody in our family.  She didn't trust Richard and I.  She

16  lost all trust in adults.  She just hated the world around her

17  and everything, and blamed the whole world for what happened to

18  her.

19  Q.   Do you remember the second time she was hospitalized?

20  A.   My memory is not good, no.

21  Q.   Do you remember there was a fight between you and her?

22  A.   Yes, I remember that.

23  Q.   What was that fight, tell the jury what happened?

24  A.   If I can remember right, I believe that was the time that

25  she just lost control and slapped me in the face.  If that was

83

1    the right time, I'm not sure.

2    Q.    Did that happen, though?

3    A.    That did happen.

4    Q.    Were there other times when she was physically violent

5    with you?

6    A.    Yes.

7    Q.    Can you remember specifically what happened on those

8    other times?

9    A.    There were times when she pushed me, that I can remember.

10   She would get angry with me for no reason.

11   Q.    She went through a period where she was pretty bad,

12   didn't she?

13   A.    Yes.

14   Q.    Was there anything that you could do to deal with that?

15   A.    There was nothing, there was no reaching her.  I didn't

16   know what to do.  I wanted to do something for her, but there

17   really wasn't anything I could do except pray, you know.

18   Q.    And how is she now?

19   A.    She's pretty good now, she's done a lot better.  She

20   still has her problems, every once in a while she gets angry.

21   But she is doing a lot better now.

22        MR. OLDS:  No other questions, your Honor.

23        THE COURT:  All right.

24        MR. MARNEN:  No questions, your Honor.

25        THE COURT:  Thank you very much, ma'am, you're


                              84


1   excused.

2          THE CLERK:  Could you please state your full name

3   and spell your last name for the record, please?

4          THE WITNESS:  Vikki Marie Scully, S-c-u-l-l-y.

5          VIKKI SCULLY, PLAINTIFFS' WITNESS, SWORN

6              DIRECT EXAMINATION

7   BY MR. OLDS:

8   Q.   Ms. Scully, for the record would you state your full

9   name?

10  A.   Vikki Marie Scully.

11  Q.   You work for the Erie School District?

12  A.   Yes.

13  Q.   And what do you teach?

14  A.   I'm a learning support teacher.

15  Q.   Do you teach at Strong Vincent?

16  A.   I'm now at Roosevelt Middle School.

17　Q.　You were at Strong Vincent in 2001-2002?

18　A.　Yes.

19　Q.　How long have you taught?

20　A.　Eight years teaching, seven with the school district.

21　Q.　And this goes back five years to 2001-2002, you say you

22　taught learning support, what kind of class is that?

23　A.　I've taught learning support English, learning support

24　math, reading and science in my career.

25　Q.　And in 2001-2002, Strong Vincent was a high school and a

85

1　middle school?

2　A.　Correct.

3　Q.　Okay.  Were there particular grades that you taught?

4　A.　That year I only taught the middle school students, which

5　was the 7th and 8th grade.

6　Q.　And were the learning support classes with the 7th and

7　8th graders been put together in one class?

8　A.　They were mixed in.

9　Q.　Do you remember what class you were teaching in

10　2001-2002?

11  A.    I taught a few blocks of science and a few blocks of

12  reading.

13  Q.    And what was the school day like in terms of how long

14  would the kids be in your class?

15  A.    We were on a block schedule.  Which meant there was four

16  blocks throughout the day.  And we were with them about an hour

17  and 20 minutes, I believe a block was.

18  Q.    Would the children -- they would go from class to class,

19  move around in between periods?

20  A.    Yeah, they had independent schedules.  They each followed

21  their own schedule.

22  Q.    What was the class, the typical class size for a special

23  needs class?

24  A.    It varied.  I would say average was about 13, 14

25  children.

86

1  Q.    And would you have an aide or anyone to help you in these

2  classes?

3  A.    No.

4  Q.    I want to ask you about your observations of several

5   students.  First of all, was K.L. in any of your classes?

6   A.   I had her for a class, I believe it was science, learning

7   support science.

8   Q.   Do you remember what kind of kid she was like back in 7th

9   grade?

10  A.   She seemed to be kind of a happy-go-lucky girl.  Little

11  bit scattered, would get lost a lot.  But pleasant and

12  outgoing.

13  Q.   You would have had a chance to look at her as a special

14  needs teacher, is that right?

15  A.   I'm sorry, what was the question?

16  Q.   What was the exact term?

17  A.   Learning support.

18  Q.   Would you have access to her IEPs?

19  A.   I was the person who wrote, I was the teacher of record.

20  So I wrote K.L.'s IEP that school year.

21  Q.   All right.  Would you have, in that capacity, would you

22  have access to, for instance, psychological records about K.L.?

23  A.   The district evaluates students every two years to

24  determine if they're still eligible for special education.  So

25  I would have had access in the counselors' office, they have

87

1   the evaluation report that I would have access to.

2   Q.   K.L. was cognitively impaired, wasn't she?

3   A.   Yes.

4   Q.   And so the jury might understand what that means, could

5   you explain that, in terms of either her intellectual abilities

6   or her social behavioral abilities?

7   A.   The students that are in learning support would either

8   fit into two categories.  Learning disabled students, who have

9   a normal IQ, but for some reason are not performing to that IQ.

10  So after they are evaluated, usually to determine if it could

11  be either a reading disability or a math disability.  Other

12  students that were in learning support would have mild levels

13  of mental retardation, which would mean that they have an IQ

14  set at a certain number.  Which I'm not sure, it's changed

15  since I started teaching, what the exact cutoff is.

16  Q.   Is that why K.L. was in your class because she is mildly

17  mentally retarded?

18  A.   I believe that's what her diagnosis was.

19  Q.   And do you remember -- you probably don't remember her

20   reading abilities or her other intellectual abilities, is that

21   right?

22   A.   Her reading level would have been significantly below

23   grade level, so she wasn't in regular mainstream classes.

24   Q.   How were her verbal skills?

25   A.   I didn't notice that they were any different than with

88

1   other students.  She was articulate, she could explain, if I

2   asked questions, she could answer in class.

3   Q.   Did she have any characteristics that sort of made her

4   stand out from the other students?

5   A.   She just got lost a lot.  She would come to class a

6   little bit later than other people.  The building is very big,

7   the way it's shaped, when I first started, I got lost a little

8   bit, too.  So there was more of a scattered look about her.

9   Q.   Did you ever observe that she had developed a

10   relationship with Ms. Cappabianca?

11   A.   Yes, I would see them walking up from the lunchroom and

12   talking.  She was a nice young lady and she's the kind of

13   student that would tell you, you know, about what she did over

14  the weekend.  Or at the end of lunch I would see her walking

15  and talking with Linda on different occasions.

16  Q.    She was a kid that was interested in pleasing adults?

17  A.    Yeah, and she participated.  Some students don't.  She

18  would answer questions or if you were talking about something

19  and she had something to contribute, she was more than

20  comfortable to contribute it.

21  Q.    Okay.  Did she ever complain to you that other kids were

22  either bullying her or picking on her?

23  A.    No.

24        MR. MARNEN:  Objection, your Honor.

25        THE COURT:  Let me see you at side bar.


89


1         (At side bar on the record.)

2         MR. OLDS:  That's the only question I had on that

3  subject.

4         THE COURT:  Sustained.

5         (End of discussion at side bar.)

6         THE COURT:  How much longer do you have with this

7  witness on direct?

8          MR. OLDS:  I would say, your Honor, 20 minutes or

9   so.

10          THE COURT:  All right, keep going.

11   BY MR. OLDS:

12   Q.   Okay.  Now, R.P. was also in one of your classes, is that

13   right?

14   A.   Yes.

15   Q.   And in terms of the scheme of why students would be in

16   your class -- do you remember what the reasons were that R.P.

17   was in your class?

18   A.   Not R.P. specifically.  Students are in learning support

19   because they are working below grade level.  If it's science or

20   social studies or language class or it's because of reading

21   difficulty.  If they have a math problem, then they would take

22   learning support in math.

23   Q.   Do you remember what kind of student R.P. was?

24   A.   R.P. was very quiet, reserved, shy, kept to herself.

25   Q.   And did you also have C.B. in your class?

90

1   A.   I did.

2  Q.   And was C.B. in 8th grade, do you remember that year?

3  A.   I believe he was in 8th grade, but I'm not sure on that.

4  Q.   What kind of kid was C.B.?

5  A.   He was more of a charismatic student.  He was active,

6  very social, talkative.

7  Q.   He was a troublemaker, wasn't he?

8  A.   He got himself into trouble.  And I had him for science,

9  he liked science, so I was fortunate enough not to have as many

10  behavioral problems.  When a student likes a subject, they

11  sometimes are a little bit better in class.

12  Q.   Do you know if he was having discipline problems based

13  upon what you heard from other teachers?

14  A.   My classroom is right across from Ms. Cappabianca's

15  office, I would see him from my door.  If my door was open, I

16  could see him in there.  So he was in there.

17  Q.   You said you thought he was sort of charismatic?

18  A.   Yeah.

19  Q.   In terms of social skills, was he at an elevated level

20  relative to K.L. or R.P.?

21  A.   He was -- I think he was a typical 8th grade or 7th grade

22  middle school boy.  I wouldn't say elevated, no.

23  Q.   But you did use the word charismatic to describe him?

24  A.   Yeah.

25  Q.   What I mean is, he was like a leader?


                            91


1  A.   Just personable.  I recall he has a smile, he was smiling

2  a lot.  And was just, you know, the kids did like him, he was

3  popular in terms of, I would say middle school stature.

4  Q.   Now, was it your class where R.P. had her outburst?

5  A.   Yes.

6  Q.   Describe for the jury your recollection of that outburst?

7  A.   I believe it was the beginning of first period in the

8  morning and homeroom was ending and the kids were coming in, as

9  I was doing something administrative paperwork, getting

10  attendance issues done, R.P. yelled out something using the "F"

11  word.  And I looked at her, and just said that she probably

12  needed to go to the office.  I don't know who she was talking

13  to, nor what context it came.  But it was surprising to hear

14  that, I hadn't heard her use that language in my room before,

15  so I was a little surprised by it.

16  Q.   Was it uncharacteristic for her?

17  A.   Yeah, with my experience of her, yes.

18  Q.    And then did you -- were you involved in any aspect of

19  the investigation of about what had happened to K.L. and R.P.?

20  A.    Meaning did I do any of the investigation?

21  Q.    Were you involved in it?

22  A.    No, my responsibility is to teach in the classroom.  So

23  at that point I sent her out and Ms. Cappabianca and Ms. Woods

24  are the administrative team and began the investigative

25  process.

92

1  Q.    Are you friends with Ms. Cappabianca?

2  A.    Yes, I am.

3        THE COURT:  Mr. Olds, hold on a second.  We're going

4  to take a short recess now.  This is the game plan, members of

5  the jury.  We'll take one more short recess, then we're going

6  to run till noon, another 15 minutes or so.  We will then break

7  promptly at noon, we'll reconvene at 1 o'clock.

8        (Recess from 11:28 a.m.; until 11:35 a.m.)

9        THE COURT:  All right, Mr. Olds.

10  BY MR. OLDS:

11  Q.    Ms. Scully, have you taught middle school kids your

12  entire career?

13  A.    Yes, except for my first year, seven of eight years, yes.

14  Q.    Do they have a fascination with sex?

15  A.    No.  I think some middle school kids might be more mature

16  than others, but I would say that's not a true statement for

17  middle school.  They might becoming curious.  Of course, their

18  bodies are changing at that time.

19  Q.    Just in the course of, going back in 2001-2002, would you

20  stumble upon kids having conversations about sex or gossiping

21  about other kids or stuff like that?

22  A.    More about who liked who or who, you know, was going out

23  with who or who wanted to go out with who.

24  Q.    You know what happened in this case, right?

25  A.    Yes.


93


1  Q.    And you know that R.P. and K.L. were raped?

2  A.    Yes.

3  Q.    Did you overhear any of the other kids talking about

4  that?

5  A.    No.

6   Q.    Did you have any contact with the family members, either

7   Richard P. -- well, strike that.  Had you got to know or meet

8   either Richard P. or Denise L.?

9   A.    Yes, I met both of them.

10  Q.    Okay.  Do you remember when you met with them?

11  A.    Richard P. and I met probably at, it was either at open

12  house or parent-teacher conference time.  And Ms. long was in

13  the building on several different occasions, so I had met her.

14  Q.    Did you have any communication with either Denise L. or

15  Richard P. after you discovered what happened to their

16  daughters?

17  A.    I met with Denise L. at the end of that school year or at

18  the beginning of the next one to go over an evaluation report

19  for K.L.

20  Q.    Did you talk at all about what happened to K.L.?

21  A.    No.

22          MR. OLDS:  No other questions, your Honor.

23          THE COURT:  All right.  Mr. Marnen.

24                  CROSS-EXAMINATION

25  BY MR. MARNEN:

1  Q.    Ms. Scully, the outburst in class, do you remember the

2  date?

3  A.    I don't remember the date.

4  Q.    Do you remember if it was before Christmas vacation or

5  after?

6  A.    It was after the Christmas holiday.

7  Q.    Can you estimate how long after the Christmas holiday?

8  A.    Within the first week when we got back in school.

9  Q.    This was in your what class?

10  A.    Learning support science.

11  Q.    In the morning?

12  A.    Yeah, it was fifth period, it was technically first

13  period.

14  Q.    You heard, not overheard, you heard R.P. verbally shout

15  an obscenity?

16  A.    Yes.

17  Q.    And your reaction was to send her to where?

18  A.    Ms. Cappabianca's office.

19  Q.    Why did you send her there?

20  A.    It was very out of character, I was concerned that that

21  happened.  So I sent her there because Ms. Cap would have the

22  time to find out why she --

23  Q.    Did anything like that ever happen in your class on any

24  other occasions?

25  A.    With R.P.?

95

1  Q.    With anyone?

2  A.    No, not that year.

3  Q.    What kinds of things would you send kids to any

4  administrator for?

5  A.    There's two different reasons.  Behavioral wise or

6  discipline, if they're breaking one of the rules.  Or if you're

7  concerned about their reaction to something.  So if a child was

8  chronically disrupting classroom rules, they would be referred

9  with a teacher referral.  If something else is happening that

10  is changing their behavior, I would send them to talk with the

11  principal.  Somebody who could give them the time that a

12  classroom teacher doesn't really have the time to devote at

13  that moment.

14  Q.    This behavior on R.P.'s part was not characteristic?

15  A.   No.

16  Q.   So you sent her because it was out of character for her?

17  A.   Yes.  From what I had seen from R.P., yes.

18  Q.   You wanted her to devote some time to Ms. Cappabianca?

19  A.   Yes.

20  Q.   Why did you send her to Ms. Cappabianca?

21  A.   Ms. Cappabianca was the middle school principal.  She was

22  assistant principal, she typically dealt with middle school

23  students.  So she would be able to talk to R.P. and find out

24  what happened, why the outburst.

25  Q.   When did you become aware of the rapes?


                              96


1  A.   When did I become aware?

2  Q.   Yes.

3  A.   A day or two after the outburst in my classroom.

4  Q.   How did you become aware of them?

5  A.   Linda Cappabianca talked to me about, informed me what

6  had happened to the girls.

7  Q.   Did Ms. Cappabianca explain why she was telling you about

8  this?

9   A.    She just wanted us to know because a couple of our

10  students were involved.  And wanted us to know the information

11  that we needed to know.  Just to help if there was any kind of

12  talk, to keep talk down and to just keep redirecting the

13  students.  Some of them that were involved in the investigation

14  process.

15  Q.    Did you become aware of any bothering or bullying of K.L.

16  or R.P. after the kids came back after Christmas vacation that

17  year?

18  A.    No.  The first I knew of this is when she had the

19  outburst, and then everything kind of fell into place after

20  that.

21  Q.    You found out about this after you found out about

22  bothering or bullying?

23  A.    No, I was just told what happened at the laundromat.

24  Q.    Did someone tell you about any bothering or bullying or

25  harassment?

97

1   A.    No.

2   Q.    Just about the rapes?

3  A.    Yeah, just what we needed to know about it.

4  Q.    At no time between the time the kids came back from

5  Christmas vacation and the time Ms. Cappabianca told you about

6  the rapes, did you become aware of any bullying?

7  A.    No.

8        MR. MARNEN:  Thank you.

9        THE COURT:  Anything else, Mr. Olds?

10        MR. OLDS:  Just a couple questions, your Honor.

11                  REDIRECT EXAMINATION

12  BY  MR. OLDS:

13  Q.    When Ms. Cappabianca talked to you afterwards, did she

14  talk to the teachers individually or did you get together as a

15  group?

16  A.    She talked to me individually.

17  Q.    Did she mention at all of B.C.'s involvement?

18  A.    No, I didn't know the other students that were involved

19  until they started being removed from my classroom, or were not

20  showing up for class.

21  Q.    So she just told you, at that time when she talked to

22  you, she just said that R.P. and K.L. wouldn't be in your class

23  anymore?

24  A.    Yes.

25   Q.    Did she describe the event as an assault on R.P. and

98

1   K.L.?

2   A.    She described what they were coerced into doing.  And

3   then she had said that some of the students were involved in

4   this investigation process.

5   Q.    Did she say that it had been other students that had

6   assaulted R.P. and K.L.?

7   A.    Yes, she had just said they were doing an investigation,

8   she didn't get specific.  But I wouldn't presume to know at

9   that point.  I wouldn't need to know at that point.

10   Q.    Did you ever learn that any of these other students were

11   disciplined by the school?

12   A.    I don't know what the school did because it went to -- my

13   understanding is that it went through the legal process.  My

14   understanding is that all of the students that were involved in

15   it were prosecuted.

16   Q.    And this outburst that R.P. had in your class, did she

17   scream out that word?

18   A.    Yes.

19  Q.   So she was extremely upset?

20  A.   Yes, she was angry.

21       MR. OLDS:  No other questions, your Honor.

22       THE COURT:  Thank you very much, ma'am, you are now

23  excused.  Ma'am, I'm going to swear you in.  Tell my court

24  reporter your full name?

25       THE WITNESS:  Denise L.


99


1       DENISE L., PLAINTIFF HEREIN, SWORN

2            DIRECT EXAMINATION

3  BY MR. OLDS:

4  Q.   Could you state your full name for the record?

5  A.   Denise L.

6  Q.   Are you are K.L.'s mother?

7  A.   Yes.

8  Q.   Do you have any other children?

9  A.   Yes.

10  Q.   How many?

11  A.   I have two others besides K.L.

12  Q.   And K.L. is how old now?

13  A.   Sixteen.

14  Q.   And your other two children, what are their names?

15  A.   Kayla and James.

16  Q.   How old is Kayla?

17  A.   Eighteen.

18  Q.   And James?

19  A.   Is 13.

20  Q.   Are you currently married?

21  A.   No.

22  Q.   Where do you live now?

23  A.   In California.

24  Q.   Did you move out to California recently?

25  A.   About probably six, seven months ago.


100


1  Q.   What part of California?

2  A.   Le Mesa,

3  Q.   And are you employed out there?

4  A.   Yes.

5  Q.   And what kind of job do you have?

6  A.   I work at Vaughn's grocery store in the deli.

file:///A|/RICHDAY2.TXT

7    Q.    Before that, before moving to California, did you live in

8    this area most of your life or all of your life?

9    A.    All of my life.

10   Q.    Did you go to school in the Erie School District?

11   A.    Yes.

12   Q.    Did you graduate from school?

13   A.    No, I got a GED.

14   Q.    And once you've had children, including K.L., did you

15   work, did you have employment?

16   A.    No, not at first.  As they got older, then I got a job in

17   a laundromat.

18   Q.    And you worked in a laundromat, have you had other

19   employment?

20   A.    Yes.

21   Q.    What kind?

22   A.    Janitorial.  I was a -- a prep cook at Gannon.  And I was

23   a personal care attendant.

24   Q.    Were you working at Gannon when K.L. was assaulted?

25   A.    Yes.

101

1   Q.   And has K.L. lived with you all of your life, excuse me,

2   I mean all of her life?

3   A.   No.

4   Q.   Before she was raped, had she always lived with you or

5   was there a time when she was living elsewhere?

6   A.   There was a time she was living with my ex-husband.

7   Q.   Is he her father?

8   A.   No.

9   Q.   He would be her stepfather?

10   A.   Yes.

11   Q.   And why was she living with him?

12   A.   Because I was in and out of the hospital because of the

13   abuse that he put me through.

14   Q.   Have you had problems -- when you say the hospital, were

15   you there for physical violence?

16   A.   Mental health.

17   Q.   And do you remember how old K.L. was when she was living

18   with her stepfather?

19   A.   I don't really recall.

20        THE COURT:  Keep your voice up, try to keep your

21   voice up.

22  BY MR. OLDS:

23  Q.    When did she come back to live with you?

24  A.    She was 12.

25  Q.    Had she lived in Erie when she lived with her stepfather?

102

1  A.    Yes.

2  Q.    Did she ever live in Meadville?

3  A.    Yes.

4  Q.    In her life do you know when this happened first, this

5  happened second, when did she live in Meadville?

6  A.    After she was, after James, then she went to Meadville.

7  And then she came back to live with me.

8  Q.    Okay.  And has Kayla lived with you all of her life or

9  have there been times when Kayla didn't live with you?

10  A.    There were times when she wasn't with me, too.

11  Q.    Does Kayla have any physical or developmental problems?

12  A.    Yes.

13  Q.    What are they?

14  A.    She has mild mental retardation and she's in learning

15  support.

16   Q.   Okay.  Were there any developmental issues or problems

17   with K.L. when she was very young?

18   A.   Yes, she had developmental problems, actually from

19   birth -- well, maybe not from birth, but when she started to

20   walk and crawl, she didn't do all that on time.

21   Q.   Were you able to get help for her to overcome those

22   problems?

23   A.   Yes.

24   Q.   And, specifically, what kind of help did you get for her?

25   A.   She went to the Achievement Center and they worked on her


103


1   motor skills and taught her how to walk, stuff like that.

2   Q.   Do you remember at what age, was that when she was two or

3   three?

4   A.   Yes, she even went there when she was younger than that,

5   I believe.

6   Q.   Has she been in special education classes all of her

7   life?

8   A.   Yes.

9   Q.   Learning support?

10   A.   Yes.

11   Q.   And there were periods of time before she was raped that

12   she attended Erie schools, is that accurate -- she attended

13   schools in Erie?

14   A.   Yes.

15   Q.   When she was younger?

16   A.   Yes.

17   Q.   In fact, do you remember what grades?

18   A.   She went to Erie schools the whole time until she went to

19   Meadville.

20   Q.   Okay.  Was she in Meadville less than a year?

21   A.   Yes.

22   Q.   When she came back from Meadville she was 12, she was

23   going to start school at Strong Vincent, is that right?

24   A.   Yes.

25   Q.   Were there any problems getting her enrolled into school

104

1   when she came back to Erie and was going to go to Strong

2   Vincent?

3   A.   Yes, her papers didn't come in time for her to start

4  school on time.  So she started later than the other kids.

5  Q.  Was Kayla going to Strong Vincent as well?

6  A.  Yes.

7  Q.  And had Kayla been in Meadville or just K.L.?

8  A.  Kayla was there, too.

9  Q.  Because of problems that Kayla was having, were you

10  frequently at Strong Vincent?

11  A.  Yes.

12  Q.  Did you have to go to Strong Vincent that fall for issues

13  about K.L. as well?

14  A.  Yes.

15  Q.  How did K.L. adapt to Strong Vincent?

16  A.  At first she got lost a lot.  She was kind of nervous

17  about starting at first.  It's a different place, it's bigger,

18  it has different kids and stuff in there.

19  Q.  Did you have a particular reason why you took her to

20  Strong Vincent, as opposed to some other Erie school?

21  A.  People was telling me that that school was better than

22  the other ones.  And I had experience with the other ones, a

23  couple of them, I didn't care for those.  So I thought I'd just

24  try that school.

25  Q.  How far did you live from Strong Vincent?

file:///A|/RICHDAY2.TXT

105

1   A.    Probably six or seven miles.

2   Q.    And then at some point did K.L. and R.P. get to be

3   friends that fall?

4   A.    Yes.

5   Q.    How did K.L. and Kayla get to school in the morning?

6   A.    I drove them.

7   Q.    Would you pick them up at night?

8   A.    Yes.

9   Q.    And there is something that we heard about called PASS,

10  that would be the after-school detention program.  Were either

11  of your girls ever assigned to PASS?

12  A.    Yes.

13  Q.    When they were assigned to PASS, would someone from the

14  school district call you up and explain what they had done or

15  why they were being given that after-school detention?

16  A.    Sometimes.  I got a couple of calls.

17  Q.    When K.L. was assigned to PASS, do you remember whether

18  anyone ever told you why she was assigned to PASS?

19  A.    The last time was she skipped class.  And I was at the

20  school and I talked to Ms. Cappabianca on the phone, in the

21  office and she said she would start her in five days of PASS

22  after Thanksgiving vacation.

23       THE COURT:  Mr. Olds, that's it for this morning.

24  Members of the jury, I said 1 o'clock, we're going to make it

25  1:15.


106


1       (Luncheon recess from 11:55 a.m.; until 1:05 p.m.,

2  in Judge's Chambers.)

3       MR. OLDS:  Your Honor, there's two or three things I

4  want to talk about.  Number one, Denise L. is going to testify

5  about some interaction she had with Ms. Cappabianca about B.C.

6  bullying K.L. before the assault.  I just wanted to let you

7  know that so you can give a cautionary instruction that that

8  can only be considered for purposes of damages.  I just wanted

9  to alert you that I'm going to get into that area.

10       MR. MARNEN:  May I address that for a moment.

11       THE COURT:  Yes.

12       MR. MARNEN:  I don't think it's necessary to talk

13  about interaction with Ms. Cappabianca.  I thought your ruling

14   was bullying gets in as it relates to an eggshell condition.

15   Talking about complaints to Cappabianca doesn't advance the

16   ball on that.

17          THE COURT:  How does it?

18          MR. OLDS:  Maybe it doesn't in terms of the eggshell

19   theory.

20          THE COURT:  Put it this way, as a finer point on it.

21   She can testify as to what she personally knows about any pre

22   December 19th bullying that went on.  But I'm not going to

23   permit her to testify as to conversations she had with school

24   district officials concerning it.  Also, it seems to me it will

25   obviate the need for a cautionary instruction at that point.  I


                                   107


1    intend to cover that in my charge, unless you feel differently

2    about it?

3          MR. MARNEN:  No.

4          THE COURT:  The second point?

5          MR. OLDS:  The other thing is most likely at some

6    point tomorrow I'm going to be done with all the witnesses that

7    I will present in our case except our expert, who's scheduled

8   to come Thursday morning at nine.  So I just wanted to alert

9   you to that.  If you want to go to Mr. Marnen to have him start

10  at that point -- the case went in a little bit faster.

11          THE COURT:  I think you misjudged your case time

12  wise.

13          MR. OLDS:  Probably.

14          MR. MARNEN:  I think we both did.

15          THE COURT:  This is no two week case.  That having

16  been said, though, we're not going to finish this case on

17  Thursday, that is clear enough to me.

18          MR. OLDS:  I think we'll have to come back Monday.

19          THE COURT:  Who do you have today besides this

20  witness?

21          MR. OLDS:  The video of C.B., that will take about

22  an hour and a half.

23          THE COURT:  At the police station?

24          MR. OLDS:  His deposition.  Then we're going to do

25  Wally Love, who is the school district police officer.  If


108


1   we're still going today and I need to, I can start with Ms.

2   Cappabianca.

3          THE COURT:  You certainly can if time permits.  And

4   then tomorrow?

5          MR. OLDS:  I'll call her on cross.  Cappabianca,

6   Woods, the two people from Sarah Reed, Iddings and Bogardus.

7          THE COURT:  Are they condition witnesses?

8          MR. OLDS:  Right.  Then my two plaintiffs.  And I

9   have scheduled 9 o'clock Thursday morning my expert.

10         THE COURT:  If for some reason things speed up

11   tomorrow and you're done with nobody else to call and it's not

12   too late, I'll probably have you start your case out of turn.

13         MR. MARNEN:  Okay.

14         THE COURT:  Just be prepared for that.

15         MR. OLDS:  I think just for your planning, maybe for

16   Jim's planning, I anticipate that the expert will be on at

17   least the morning, at least three hours, direct and cross.

18         THE COURT:  There's been so many motions filed on

19   this case, that I can't frankly remember the substance of all

20   of them.  It's true, is it not, this expert's testimony is not

21   nor was not the subject of a motion in limine?

22         MR. MARNEN:  To a limited extent it was.  To keep

23  him from saying we had a duty to report.  But that's it.

24      THE COURT:  Do you have an expert?

25      MR. MARNEN:  No.


109


1       THE COURT:  All right.

2       MR. OLDS:  We'll finish up with Denise L., do the

3  deposition, then Love is going to come in.

4       THE COURT:  If we have time Thursday afternoon, late

5  Thursday afternoon, I'll play it by ear, my intention is to

6  hold a charge conference late Thursday afternoon.  So I can get

7  my law clerk working on this Friday.  I have a feeling the

8  whole shooting match may conceivably end on Monday.  All right,

9  let's go.

10      (Whereupon, the In Chambers proceedings recessed at

11  1:14 p.m.; and reconvened at 1:15 p.m., in Courtroom C.)

12      THE COURT:  All right, Mr. Olds, you may continue.

13      MR. OLDS:  Thank you, your Honor.

14  BY MR. OLDS:

15  Q.   Denise L., going back to the fall of 2001, before K.L.

16  was raped, did you know of any troubles that she was having in

17   school?

18   A.   She says she was being picked on.

19   Q.   Back in the fall of 2001, what was your relationship with

20   K.L. in terms of her talking to you, confiding to you?

21   A.   She was very open with me.  She could talk to me about

22   anything.

23   Q.   So you would often talk about how school was going?

24   A.   Yes.

25   Q.   Was she ever afraid to go to school?


110


1   A.   Not before that happened.

2   Q.   But she would talk to you about incidents at school?

3   A.   Yes.

4   Q.   Now, K.L. didn't tell you she was raped, did she?

5   A.   No.

6   Q.   The date that this happened, tell the jury what you were

7   doing that day and maybe trace your interactions with K.L.; do

8   you understand that question -- let me break that down for you,

9   okay.  Number one, I think you said that you picked up K.L.,

10   you took her to school and picked her up after school?

11  A.   Yes.

12  Q.   And if she was in PASS, that would mean what, in terms of

13  your ability to pick her up?

14  A.   I had to leave work early to go and get her.

15  Q.   And you were working at Gannon here?

16  A.   Yes.

17  Q.   In the dietary department?

18  A.   In the cafeteria.

19  Q.   What were you doing there?

20  A.   Making sandwiches, cooking pizzas.

21       THE COURT:  Keep your voice up, ma'am, try to speak

22  very clearly and loudly.

23       THE WITNESS:  Basically, just cooking and serving

24  food.

25  BY MR. OLDS:


111


1  Q.   Okay.  In terms of K.L., she didn't tell you she was

2  raped.  But after events happened and you look back on it, can

3  you remember how it was that you picked her up that night, the

4  night she was raped?

5   A.   I don't understand.

6   Q.   Was that one of the nights that she was supposed to be in

7   PASS?

8   A.   Yes.

9   Q.   But that would mean you would be picking her up at what

10   time?

11   A.   At 6:30.

12   Q.   Did you go to pick her up that evening?

13   A.   Yes.

14   Q.   Was she where she was supposed to be?

15   A.   No.

16   Q.   Where was she supposed to meet you?

17   A.   She was supposed to meet me in front of the school, and

18   she wasn't there.

19   Q.   Were you on time?

20   A.   Yes.

21   Q.   By any chance do you recollect other students coming out

22   of the school as they were being discharged from PASS?

23   A.   Yes.

24   Q.   Did you know either C.B. or B.C.?

25   A.   Yes.

112

1  Q.    And how is it that you knew both of them?

2  A.    I didn't know C.B., but I knew B.C. from going to the

3  school.

4  Q.    And how had you encountered her at the school; I mean,

5  did you see her in the hall, was she a friend of K.L.'s, how

6  did you come to know her?

7  A.    I just saw her when I went in for my other daughter, they

8  were in class together.

9  Q.    Did B.C. give your daughters trouble?

10  A.    Yes.

11  Q.    Both of them?

12  A.    Yes.

13  Q.    What kind of trouble did she give K.L.?

14  A.    She would just call her names, make fun of her.

15  Q.    What names did she call her?

16      MR. MARNEN:  Objection, your Honor, she wasn't

17  there, there is no foundation.

18      THE COURT:  Sustained.

19  BY MR. OLDS:

20  Q.    Would K.L. tell you after school what names B.C. called

21  her?

22  A.   Yes.

23       MR. MARNEN:  Objection.

24       THE COURT:  Sustained.

25       MR. OLDS:  May we approach the bench, your Honor.

113

1        THE COURT:  Sure.

2        (At side bar on the record.)

3        THE COURT:  I presume it was a hearsay objection?

4        MR. MARNEN:  Yes, sir.

5        MR. OLDS:  I would say that for the record, I'd like

6   to say that would come in under res gestae.

7        THE COURT:  What do you mean, I mean I know res

8   gestae, how does it fit here?

9        MR. OLDS:  That K.L. is telling her mother close to

10  the time --

11       THE COURT:  Sustained.

12       (End of discussion at side bar.)

13  BY MR. OLDS:

14  Q.   Getting back to -- had you ever had any words with B.C.?

15  A.   No.

16  Q.   And you never talked to her parents or anything like

17  that?

18  A.   No.

19  Q.   So that night the kids were coming out of PASS and K.L.

20  is not there, what did you do?

21  A.   I was driving around looking for her.

22  Q.   And did you have Kayla with you?

23  A.   No, I believe Kayla was at home.

24  Q.   Do you have any idea how long it took you to find K.L.

25  that night?


                                114


1  A.   I know it was after 7 o'clock.  So it was dark when that

2  happened.

3  Q.   Eventually you found her, where was she?

4  A.   She was hiding behind the sign beside Strong Vincent.

5  Q.   What was her condition?

6  A.   She just looked kind of blank.  And then I told her to

7  get in the car, and then she was crying.

8  Q.   And did you try to talk to her, ask her why she was

9    crying?

10   A.   I did ask her why she was crying, she didn't say

11   anything.  I figured she was crying because she wasn't where

12   she was supposed to be.

13   Q.   When you think back, do you remember how she acted the

14   rest of that night?

15   A.   She went home and she went to bed.  And she just didn't

16   want anybody to bother her.

17        MR. OLDS:  Your Honor, I'm going to get this chart

18   out.

19        THE COURT:  All right.  Can you see that, ma'am?

20        THE WITNESS:  No.

21        MR. OLDS:  Let me try to get it a little bit closer.

22   Maybe Denise L. could step down again, your Honor.

23        THE COURT:  Why don't you do that, ma'am.

24   BY MR. OLDS:

25   Q.   Stand right there, Denise L.  This time line shows that


                              115


1    R.P. and K.L. were assaulted at the laundromat.  And it also

2    shows a date, right before the Christmas break that Ms.

3    Cappabianca had a conversation with your daughter, K.L.  You

4    don't know anything about that conversation firsthand, do you?

5    A.    No.

6    Q.    But December 20th, and this assault, according to the

7    police, happened on December 19th.  Do you know exactly what

8    day it happened?

9    A.    I don't believe it happened in December, it happened --

10           MR. MARNEN:  Objection.

11           THE COURT:  Sustained.

12    BY MR. OLDS:

13    Q.    When do you think it happened?

14           MR. MARNEN:  Objection, your Honor.

15           THE COURT:  Sustained, there is no foundation.

16    BY MR. OLDS:

17    Q.    When you learned about the assault and you spoke with

18    K.L., did you ask her about the events and try to figure out

19    when it happened, did you try to do that yourself?

20    A.    Yes, I talked to her --

21           MR. MARNEN:  Objection.

22           THE COURT:  Sustained, it's hearsay.

23    BY MR. OLDS:

24  Q.    Do you think -- you believe, it's your belief that it

25  happened before December 19th?


116


1  A.    Yes.

2  Q.    And there's an indication, not all the testimony has been

3  received yet on that issue, but Ms. Cappabianca had a

4  conversation with K.L. on December 20th, that's going to be

5  developed; did Ms. Cappabianca call you before Christmas in

6  2001 and let you know that she had heard reports that K.L. had

7  had a sexual encounter with C.B.?

8  A.    No.

9  Q.    And how old was K.L. at the time?

10  A.    Twelve.

11  Q.    Now, after December 20th, the last day of school for the

12  Christmas break was December 21st, do you know if K.L. went to

13  school that day?

14  A.    I believe so.

15  Q.    And, obviously, she was in school on December 20th when

16  she talked to C.B. -- excuse me, Linda Cappabianca?

17  A.    Yes.

18   Q.    Okay.  And then there was the Christmas break, right?

19   A.    Uh-huh.

20   Q.    Is there anything about K.L.'s behavior during that

21   period of time that stands out in your memory, that Christmas?

22   A.    Well, she was the same as she was, just kind of

23   withdrawn.

24   Q.    And then school began on January 2nd, as far as you can

25   remember, K.L. went to school, is that right?


                                117


1   A.    Yes.

2   Q.    Okay.  And then on January 4th, that was a Friday, do you

3   remember that Friday, January 4th?

4   A.    Yes.

5   Q.    Okay.  It's in the evening after school, is that right?

6   A.    Right.

7   Q.    What's going on at your household?

8   A.    K.L. comes in the living room --

9         THE COURT:  Mr. Olds this isn't working, through no

10   fault of yours.  I got Mr. Marnen standing behind the witness

11   trying to hear.  Would you take the stand, ma'am.  Just refer

12    to dates, she doesn't need to see it.  Come on up here.

13    BY MR. OLDS:

14    Q.    Denise L., going back to that Friday, January 4th, in

15    your house after school, it's in the evening, what happened?

16    A.    Kayla, my other daughter said, I can't remember the exact

17    words, but something about K.L. and C.B.  And I confronted K.L.

18    Q.    Now, let me ask you a question.  So you confronted K.L.?

19    A.    Yes.

20    Q.    Do you have a recollection of what Kayla said about C.B.

21    and K.L.?

22    A.    At this point I can't remember.

23    Q.    So you did talk to K.L.?

24    A.    Yes.

25    Q.    And what happened, what did you talk to her about?


118


1    A.    Well, I asked her, because she overheard what Kayla was

2    saying, and I asked her was it true what Kayla said, and what

3    the other kids are saying to her.  And then she got real quiet,

4    she denied that.  And she got real quiet and she said she had

5    to go to the bathroom.  She went that way to go to the bathroom

6  and I heard the stove go on.  As I -- I went out into the

7  kitchen and she was burning her wrist on the skillet.

8  Q.   Now, you indicated Kayla said, must have told you

9  something that the other kids were saying to her, right?

10  A.   Right.

11  Q.   And you asked K.L. if that were true, what the other kids

12  were saying to Kayla?

13  A.   Yes.

14  Q.   Did it have something to do with a sexual encounter?

15  A.   Yes.

16  Q.   Was K.L. badly burned?

17  A.   It wasn't real bad.  But they just treated it when she

18  was in the hospital.

19  Q.   How did it go from her putting her hand in -- was it her

20  hand or arm?

21  A.   Her arm.

22  Q.   How did it go from her putting her arm in that skillet to

23  her getting to the hospital?

24  A.   Well, after she burned herself, she ran into the bathroom

25  and locked the door.  And then I called Crisis Services, which

119

1    is people who come out to your house when a person needs help.

2    So they came out and she threatened to pour hot water on them.

3    So they called the police.

4    Q.    Had she unlocked the door to the bathroom by this time?

5    A.    Not at that time, not until the police got there.  And

6    then they talked to her through the door and then she opened

7    the door.

8    Q.    And can you tell the jury how long you think this took,

9    how long she was in the bathroom before the Crisis Center

10    people came down and then the police, how long that might have

11    taken?

12    A.    The whole thing maybe an hour.

13    Q.    Okay.  And was K.L. during this time, what was she doing

14    when she was in the bathroom, was she saying anything?

15    A.    No.

16    Q.    What were you doing?

17    A.    Well, until they got there, I was standing by the door

18    trying to talk to her to try to get her to come out.

19    Q.    So the police came and K.L. opened the door, what

20    happened next?

21    A.    And then they talked to her and then they calmed her

22  down, then they took her to the hospital.

23  Q.    And did you go to the hospital that night with her?

24  A.    Yes.

25  Q.    And you say they calmed her down, what was she doing that

120

1  she needed calmed down?

2  A.    She started to get really upset and she started to cry.

3  And she at one point went back into the bathroom and sat in the

4  shower.  We had like a tub/shower thing.  She closed the

5  curtain so nobody could see her.

6  Q.    Had you seen her act like this before?

7  A.    No.

8  Q.    Did you have any idea what was going on?

9  A.    No.

10  Q.    How much time -- she was in the hospital for about a week

11  after that?

12  A.    Yes.

13  Q.    How much time did you spend with her while she was in the

14  hospital?

15  A.    I was there everyday, as long as visiting hours went.

16  Q.    Had she ever been hospitalized for mental health reasons

17  prior to that?

18  A.    No.

19  Q.    Were you there when she had the intake procedures, did

20  you accompany her when the intake procedures were going on?

21  A.    Yes.

22  Q.    Did she mention anything about rape in those intake

23  procedures?

24  A.    No, she didn't really say much of anything.

25  Q.    Eventually, that weekend, did you learn something about


                                        121


1  the incident?

2  A.    Yes.

3  Q.    Tell me what you learned?

4  A.    We was at the visit, we were playing a game, me, her and

5  my sister, and it just came out.  She told me what happened,

6  what C.B. did to her, and B.C.  And I was angry.

7  Q.    How was she when she was talking about this, how was she

8  acting?

9  A.    She was kind of down.  She started to cry a little bit.

10  And, you know, when I saw her crying, that really, you know,

11  made me more angrier.  Because, you know, then after the thing

12  was over, I just was thinking to myself why didn't they tell me

13  that this happened.

14  Q.    Did she tell you about that conversation that she had

15  with Ms. Cappabianca?

16  A.    Yes.

17  Q.    What did she say about that conversation?

18  A.    She said that she told Ms. Cappabianca the day after it

19  happened and what had happened to her.  And she said that she

20  told her that's what people do when they're in love.

21  Q.    So K.L. told you that in that first time that she talked

22  about it?

23  A.    Yes.

24  Q.    So this was on that first weekend that she was in the

25  hospital?

122

1  A.    Yes.

2  Q.    And then did you go to the school after K.L. told you

3  this story?

4    A.    Yes.

5    Q.    Do you remember what day you went to the school?

6    A.    On the 7th.

7    Q.    What day of the week was that?

8    A.    That was Monday.

9    Q.    And are you certain that you went that Monday?

10    A.    Yes.

11    Q.    And you went in, do you remember why you went to the

12    school?

13    A.    Because I wanted to talk to Ms. Cappabianca to find out,

14    you know, why she didn't tell me or why anybody didn't tell me

15    what was going on.

16    Q.    Do you remember what time of the day you went in?

17    A.    It was probably in the morning.

18    Q.    Did you have the chance to meet with Ms. Cappabianca?

19    A.    Yes, I talked to her in the office.

20    Q.    You had had dealings with her both with K.L. and Kayla in

21    the past?

22    A.    Yes.

23    Q.    So you knew her?

24    A.    Yes.

25   Q.    Did you have an idea, based upon your interactions with

123

1   her and K.L., how K.L. and her had gotten along prior to this

2   incident?

3   A.    Yes.

4   Q.    What was your understanding of that?

5   A.    My understanding was she would go to her quite

6   frequently, sometime even just to go in and talk to her.

7   Q.    So K.L. liked Ms. Cappabianca?

8   A.    Yes.

9   Q.    Okay.  So you're in the office and you're going to meet

10   with Ms. Cappabianca, tell the jury what happened next?

11   A.    Can you say that question again.

12   Q.    You're there meeting with Ms. Cappabianca on January 7,

13   2002, after you've learned about what happened to your

14   daughter, tell the jury about the conversation that you had

15   with Ms. Cappabianca?

16   A.    I just told her that why didn't she tell me that my

17   daughter was assaulted, but they can call me and tell me when

18   my other daughter has an ear infection or is tugging at her

19  ear, they can call me for that, but they can't call me to let

20  me know my daughter was assaulted.

21  Q.   And did Ms. Cappabianca have a response?

22  A.   After she stood there, her and the other guy that was

23  there -- I don't remember if she said anything after that or

24  not, I can't remember.

25  Q.   K.L. got out of the hospital that following Friday?


                                124


1  A.   Yes.

2  Q.   In terms of K.L.'s personality while she was in the

3  hospital, do you recall how she acted?

4  A.   In the hospital?

5  Q.   Yes, does anything stand out in your mind?

6  A.   The only thing about the hospital that really stands out

7  is, of course, when she told me what happened and the

8  discharge.

9  Q.   The discharge was Friday morning, right?

10  A.   Right.

11  Q.   Who was present at the discharge meeting?

12  A.   It was me, K.L., the doctor, Chris Ruhl -- and she had a

13    TSS worker, which is therapy staff support, she was there.

14    Q.    Chris Ruhl was from the school district?

15    A.    Yes.

16    Q.    And do you know if he was a school district employee?

17    A.    I think so.

18    Q.    And do you know what his job was at the school district?

19    A.    Not at that point I didn't.  Then he told me he was some

20    kind of psychologist or something.

21    Q.    Okay.  And what happened at the discharge meeting?

22    A.    He said that he's going to have to remove K.L. from the

23    school for her safety.

24    Q.    And so she went to Sarah Reed?

25    A.    Right.


                                125


1    Q.    Was there a point in time when she was home schooled?

2    A.    Yes.

3    Q.    How long did that last?

4    A.    I believe it was five days.

5    Q.    What did that education consist of?

6    A.    Basically, coloring, that's all they did.

7   Q.   Did you know what Sarah Reed was, what kind of school it

8   was?

9   A.   Yes.

10   Q.   What did you know about Sarah Reed?

11   A.   I know that they have different types of programs, but

12   most of the times bad kids go there.

13   Q.   Did you have any questions about why K.L. was being sent

14   to Sarah Reed?

15   A.   Yes, and Chris Ruhl said that there's going to be an

16   investigation going on and the police are going to be in the

17   school and it's better that she's not there.

18   Q.   Did you understand how long her Sarah Reed placement was

19   going to be?

20   A.   No.

21   Q.   And did you notice any change in K.L. from the way she

22   had been, did you notice any change coming upon her?

23   A.   Yes.

24   Q.   What was that?

25   A.   She had -- she would get real depressed and she would get

126

1   very angry.  And her moods would change real rapid.  And she

2   would -- she would hit me, she would hit her sister.

3   Q.   How did she do at Sarah Reed?

4   A.   She did okay there.  I think she was glad that she didn't

5   have to go back there to be picked on anymore.

6   Q.   So she felt safe?

7   A.   Right.

8   Q.   Do you know if she was given any therapy at Sarah Reed?

9   A.   I'm not aware of any.

10   Q.    You indicated that she had bouts of anger?

11   A.    Yes.

12   Q.    She couldn't control her conduct at times?

13   A.    Yes.

14   Q.    Did that get worse as time progressed?

15   A.    Yes.

16   Q.    Can you remember any incidents specifically of her acting

17   out?

18   A.   I had a boyfriend at the time that was staying with me,

19   and she was fighting with her sister and he tried to stop her

20   from fighting with her sister, because she would always hit me,

21   so he talked to her at first and told her she would quit, and

22   she got really angry, she started hitting him with a coat

23  hanger.

24  Q.   Did she have subsequent hospitalizations after that first

25  one at Millcreek?


                                    127


1  A.   Yes.

2  Q.   And do you remember whether that was in the summer of

3  2002?

4  A.   I believe that -- I believe so.

5  Q.   Do you remember why she had to go in the hospital that

6  second time?

7  A.   I can't remember.

8  Q.   Do you remember how long she was in the hospital?

9  A.   I don't think it was over a week.  But I can't really

10  remember.

11  Q.   She finished up that 2002 year, her 7th grade, at Sarah

12  Reed, is that right?

13  A.   Yes.

14  Q.   Where did she go to begin 8th grade?

15  A.   Wayne Middle School.

16  Q.   Is that in the Erie School District?

17  A.   Yes.

18  Q.   And how was it -- describe for me how it was decided that

19  she would go back to Wayne?

20  A.   She wanted to try a regular school again.  So I decided

21  that instead of sending her back to Sarah Reed, to put her at

22  Wayne.

23  Q.   How did she do at Wayne?

24  A.   Not good.

25  Q.   Did she start engaging in criminal activity?


                                128


1  A.   Yes.

2  Q.   Delinquent activity, I should say?

3  A.   Yes.

4  Q.   What kinds of delinquent activity did she get involved

5  in?

6  A.   She stole out of a car and got put on probation.

7  Q.   How about did she listen to you?

8  A.   No, she was running away.  And just basically doing

9  whatever she wanted to do.  And also at Wayne kids picked on

10  her there, too.

11  Q.  She was 13 then?

12  A.  She was 13.

13  Q.  Had she behaved anything like this before the assault?

14  A.  No.

15  Q.  Was she put in any out-of-home placements?

16  A.  Yes.

17  Q.  Which out-of-home placements was she put in?

18  A.  She was put back at foster care.

19  Q.  How long did that last?

20  A.  About a week.  And then she went to -- they moved her to

21  Hermitage House.

22  Q.  Did you the visit her at Hermitage House?

23  A.  Yes.

24  Q.  Do you remember specifically what it was that led that

25  she be put in Hermitage House?

129

1  A.  Well, she was on a monitor for a while, after she got off

2  she started running away more, just basically doing what she

3  wanted.  So the probation officer wanted her at Hermitage

4  House.

5  Q.   Why was she on probation, because she had stolen from a

6  car?

7  A.   Yes.

8  Q.   Could you control her at all?

9  A.   No.

10  Q.   She didn't listen to you?

11  A.   No, not at all.

12  Q.   Do you know what kinds of kids she was running with?

13  A.   No.  That changed, when I did find out who they were, it

14  changed daily.

15  Q.   And what kind of things did you try to do to make her

16  stay home?

17  A.   I told her I was going to call her probation officer.

18  That didn't work.  So there wasn't really much I could do.  I

19  couldn't tie her to the bed, I couldn't strap her down or

20  anything.  So I really couldn't do anything.

21  Q.   Was she violent with you on more than one occasion?

22  A.   Yes.

23  Q.   When she would get violent -- would she hit you or what?

24  A.   Yes, she would hit me.

25  Q.   How?

130

1  A.   She would use words that hurt me.

2  Q.   And had she used words like that before this happened?

3  A.   No.

4  Q.   Eventually, she went to a place called Andromeda House as

5  well, is that right?

6  A.   Yes.

7  Q.   Do you remember what kind of place Andromeda House was?

8  A.   Andromeda House was -- like a treatment facility.  And

9  also a place that taught the kids rules and expectations.  And

10  how to deal with things in a different manner instead of the

11  way that they were dealing with them.

12  Q.   And was she at Andromeda House for almost a year or how

13  long?

14  A.   It was almost a year.

15  Q.   Was that when she was in what, 8th and 9th grade?

16  A.   Yes.

17  Q.   And when she was in Andromeda House, were you able to

18  visit her?

19  A.   Yes.

20  Q.   How often were you able to visit?

21  A.   Only on Sunday.

22  Q.   When you visited her, what did she act like?

23  A.   Well, sometimes she was okay and other times she wouldn't

24  follow the rules.  And she would go beyond boundaries and stuff

25  like that.  But nothing really major.  But it took her a long

131

1  time to adjust in order to -- you get like weekend passes or

2  overnight passes or whatever, it took her a long time to even

3  get one of those.

4  Q.   Do you have a recollection of when she got out of

5  Andromeda House?

6  A.   It was -- I think it was in June.

7  Q.   June of '04?

8  A.   Yes.

9  Q.   And since that time had she lived with you?

10  A.   Yes.

11  Q.   When she was released from Andromeda House, had she

12  improved, was she the same, how was she?

13  A.   Well, she was okay for a little while.  And then she just

14   went back to the way that she was, and just started like going

15   downhill again.

16   Q.   What kind of ongoing treatment or therapy is she

17   receiving?

18   A.   She sees a psychiatrist in California where we live now.

19   She's been in a hospital out there like five or six times.  I

20   had the police come to my house once because she had a knife

21   and she went into her room, she was cutting herself.

22   Q.   Is she on medication?

23   A.   Yes.

24   Q.   What kind of medication?

25   A.   She's on Ritalin, Trilitherol, and Trazidol.

132

1   Q.   Does she have trouble sleeping now?

2   A.   Yes.

3   Q.   Is that something that has happened since this assault?

4   A.   Yes, she doesn't sleep at night.  She'll sleep during the

5   day but she won't sleep at night.

6   Q.   Is she becoming socialized in California?

7   A.   Yeah, she's starting to socialize, starting to make

8  friends.  Sometimes friends aren't so good, sometimes they are.

9  She's starting to come around, starting to listen a little bit

10  more.

11  Q.    Do you still have problems?

12  A.    Yeah.

13  Q.    How has this affected her education?

14  A.    Well, she -- I don't believe that she has enough credits

15  to graduate.  She could have probably benefit from like a

16  little more tutorage to try to catch her up.  She still needs a

17  lot of help in that area.

18  Q.    Does she have either dreams or like goals for her future?

19  A.    Yes, she tells me that she wants to be a pediatrician and

20  stuff like that.  But she goes I know I'll never do it.

21        MR. OLDS:  No other questions, your Honor.

22        THE COURT:  All right.

23        MR. OLDS:  If I could just have one second.  No

24  other questions, your Honor.

25              CROSS-EXAMINATION


                        133


1  BY MR. MARNEN:

2   Q.    Good afternoon, Denise L.  You said that over Christmas

3   of 2001-2002, K.L. was like she had been before; did you say

4   moody and quiet?

5   A.    Moody and she would cry.

6   Q.    Moody and cry.  When did she first become moody and cry

7   with any frequency?

8   A.    In November.

9   Q.    In November?

10  A.    Well, maybe a little before that, too.  Because she kept

11  telling me kids were picking on her, it would kind of make her

12  sad.

13  Q.    So during the Christmas break she wasn't acting any

14  differently than the way she was in October or November?

15  A.    She was worse.  She got worse as time went by.

16  Q.    I gather you didn't suspect anything was wrong, I mean

17  you didn't suspect, for example, a rape?

18  A.    No.

19  Q.    That was beyond your wildest nightmares, right?

20  A.    Right.

21  Q.    And you did not become aware of the fact that K.L. had

22  been raped until that first week in Millcreek Community

23  Hospital, correct?

24  A.   Right.

25  Q.   K.L. went in Millcreek Community Hospital on the evening


134


1  of January 4, 2002, correct?

2  A.   Right.

3  Q.   And she was discharged one week later, January 11, 2002?

4  A.   Yes.

5  Q.   And she has not been back at Strong Vincent High School

6  as a student since then?

7  A.   No.

8  Q.   And you had contact with Linda Cappabianca on Monday,

9  January 7, 2002?

10  A.   Yes.

11  Q.   And you complained to her about the fact that she did not

12  let you know about the incident and you had to find it out from

13  your daughter?

14  A.   Yes.

15  Q.   And you indicated that K.L. had told you that she

16  informed Ms. Cappabianca that C.B. had raped her?

17  A.   Yes.

18  Q.    And, nonetheless, Ms. Cappabianca did not tell you about

19  that rape, correct?

20  A.    No.

21  Q.    And, in fact, she told K.L. that's what people do who are

22  in love?

23  A.    Yes.

24  Q.    During the week that K.L. was in Millcreek Community

25  Hospital, she was treated by a number of mental health people,


                                    135


1  isn't that right, or providers?

2  A.    Yes.

3  Q.    One of those was a Dr. Borczon, a psychiatrist?

4  A.    Yes, I believe so.

5  Q.    That's the doctor who was at the discharge meeting,

6  wasn't it?

7  A.    Yes.

8  Q.    He was there and you indicated that a couple other people

9  were there -- a nurse was there?

10  A.    Yes.

11  Q.    And some kind of mental health person besides the

12  psychiatrist?

13  A.  Yeah, it's called TSS, that's therapy and staff support.

14  Q.  TSS?

15  A.  Yes.

16  Q.  Okay, therapeutic staff support?

17  A.  Yes.

18  Q.  Is that person a psychologist or social worker, do you

19  know?

20  A.  She's a counselor.  And I think -- but she worked with

21  K.L. and stuff for a while, even before she was in the

22  hospital.

23  Q.  Did K.L. have wraparound services before she was in

24  Millcreek Community Hospital?

25  A.  Yes.


136


1  Q.  Those wraparound services were comprised of what, a

2  mobile therapist?

3  A.  A mobile therapist and TSS.

4  Q.  And a TSS?

5  A.  Uh-huh.

6   Q.   The mobile therapist, if I understand the concept

7   correctly, comes to your home?

8   A.   Yes.

9   Q.   And does counseling?

10  A.   Yes.

11  Q.   And so K.L. was receiving counseling before she was in

12  Millcreek Community Hospital?

13  A.   Yes.

14  Q.   When did that begin?

15  A.   I believe in December, I think.

16  Q.   December of 2001?

17  A.   Yeah, like the beginning of December.

18  Q.   You said she lived in Meadville for a while?

19  A.   Yes.

20  Q.   And that was because why?

21  A.   Because she broke into a car, and her probation officer

22  wanted to put her at Hermitage House, but they didn't have

23  room.  And she was there before, so they had a rapport with

24  her.

25  Q.   Was this before she went to Strong Vincent or after?

1  A.    After.

2  Q.    I was talking about before she went to Meadville and you

3  were in the hospital, do you remember that part?

4  A.    Yes.

5  Q.    She was down there for a year or something?

6  A.    I believe it was eight or nine months.

7  Q.    Was that in 2000-2001?

8  A.    Yes.

9  Q.    And was she receiving any kind of mental health services

10  at that time?

11  A.    No.

12  Q.    Did she receive any mental health services in 2001,

13  before December of 2001?

14  A.    I don't believe she did.  My other daughter did, though.

15  Q.    What was it that prompted K.L. to get mental health

16  services in December of 2001?

17  A.    Because she started having problems and -- I told them it

18  started happening in November.  I mean even back in, as early

19  as -- October.

20  Q.    Where did she get the mental health services?

21   A.   Through the Base Service Unit.

22   Q.   And that's where she got this wraparound arrangement?

23   A.   Right.

24   Q.   And when she got out of Millcreek Community Hospital on

25   January 11, 2002, she remained in this wraparound arrangement?


138


1   A.   Yes.

2   Q.   Was she also seeing a psychiatrist?

3   A.   Yes.

4   Q.   She also went to Rape Crisis, did she not?

5   A.   Yes.

6   Q.   Was she getting mental health services anyplace else at

7   that time -- we're in the January, February time period?

8   A.   No.

9   Q.   And since that time has she on a regular basis, has she

10   received mental health services from those kinds of people,

11   psychiatrists, counselors and wraparound services?

12   A.   Yes.

13        MR. MARNEN:  I have no other questions, thank you.

14        MR. OLDS:  Your Honor, I have no other questions.

15   Our next witness will be by way of video.  If you want to give

16   us maybe a little time to set that up.

17          THE COURT:  While you're setting it up -- how long

18   do you figure the tape is?

19          MR. OLDS:  About an hour and 15 minutes.

20          THE COURT:  All right, let's take a short recess

21   while you're setting up.

22          (Recess from 2:06 p.m.; until 2:18 p.m.)

23          THE COURT:  We're going to get started, the tape is

24   an hour and 15 minutes.  I have to take a call at 2:40.  So

25   we're only going to get in 20 minutes.  The good news is we're


                                   139


1    ahead of schedule in this case.  It's not going to be a two

2    week case, I can assure you.  All right, let's go.

3           MR. OLDS:  Your Honor, this is the deposition

4    testimony of C.B.  His deposition was taken, I don't know

5    offhand the date, but it was taken this year.

6           THE COURT:  While he does that, let me tell you that

7    you should treat a videotaped deposition no differently than

8    you would treat live testimony here in trial.  The witness is

9   sworn and the lawyers examine him or her in the same fashion.

10  So for all intents and purposes, there is not a wit of

11  difference between a videotaped deposition or testimony here in

12  the courtroom.  All right, you can get it going.

13          (Whereupon, the videotaped deposition testimony of

14  C.B. was played for the Jury.)

15          (Recess from 2:48 p.m.; until 2:55 p.m.)

16          MR. OLDS:  Your Honor, may I approach for just a

17  second.

18          THE COURT:  Yes.

19          (At side bar on the record.)

20          MR. OLDS:  There are two hearsay objections at the

21  end of this tape that I'm going to withdraw, you don't have to

22  rule on them.

23          THE COURT:  All right.  Can I make an observation.

24  There is a lot of unnecessary stuff on this tape.  I mean, this

25  could and should have been trimmed down.  We're essentially


140


1   listening to a discovery deposition, as opposed to a deposition

2   for use at trial.  That having been said, even at this late

3   date, with the mutual agreement of both of you as to what

4   absolutely is essential to the jury hearing for their case, is

5   there a way to speed this up?

6          MR. OLDS:  If you give us five minutes, maybe we

7   could look at it.

8          THE COURT:  I'm not asking the impossible from you

9   fellows, you know the tape, I don't.  You know the transcript,

10  I don't.

11         MR. OLDS:  If you give us five minutes, maybe we can

12  eliminate some of this.

13         THE COURT:  I'm going to send the jury out so we can

14  talk about this.

15         (End of discussion at side bar.)

16         THE COURT:  Members of the jury, will you step in

17  there for just one second.

18         (Whereupon, the Jury was excused from Courtroom C.)

19         THE COURT:  Just to reset the scene here.  As I was

20  saying at side bar, hearing the first 20 minutes of this tape,

21  a lot of it is irrelevant, it's like a discovery deposition, as

22  opposed a deposition for use at trial.  For the benefit of the

23  jury and in the interest of judicial economy, is there any way

24  for you fellows to edit this thing and zero in on what is

25  really important?

141

1      MR. MARNEN:  I don't think there is, your Honor.

2  There are things that are important to what we're doing now

3  that are interspersed.  I believe, not all of it, but some of

4  the information that came out that the jurors heard is

5  important.  Not very much, I will admit I know it's dragged

6  out.  It is in fact a discovery deposition.  But I don't see

7  how we can do it.  One of the points I'm going to make isolates

8  out what he wants, I think it would be unfair to me, I think

9  C.B. is confused, we need to have the whole thing to show them.

10      THE COURT:  The tape is being played at Mr. Olds

11  behest, is that right?

12      MR. MARNEN:  Yes.

13      THE COURT:  What is it pertinently in his deposition

14  that you think is important for the jury to hear?

15      MR. OLDS:  Well, there were actually -- what's

16  important is that he said that in a conversation that he had

17  with Ms. Cappabianca before Christmas of 2001, that Ms.

18  Cappabianca said to him what's this I hear about oral sex.

19  Which is the principal, most important point from our

20  perspective.  Although, there are some other points that are

21  significant in terms of school district's knowledge of this

22  event.  I think that's what Mr. Marnen is saying.  We're at

23  page 27, it's a 53 page deposition.  So we are halfway through.

24  Most of the meat is towards the end than at the beginning.  I

25  know if I just made those points that I want to make, Mr.


142


1  Marnen would want to hear more.

2       MR. MARNEN:  One point, your Honor, that first part

3  was to show this guy has been incarcerated for about five years

4  following this incident.

5       THE COURT:  I've heard enough to know I can't ask

6  you to do the impossible.  If there are needles that are stuck

7  all through this haystack, we're going to have to knock down

8  the whole haystack.  Bring in the jury.

9       (Whereupon, the Jury reenters Courtroom C.)

10       THE COURT:  All right, you can turn it back on.

11       (Whereupon, the videotaped deposition testimony of

12  C.B. was continued to be played for the Jury.)

13        MR. OLDS:  That's it, your Honor.

14        THE COURT:  Who will your next witness be?

15        MR. OLDS:  Wally Love or Walter Love.

16        THE COURT:  He's here?

17        MR. OLDS:  Yes.

18        THE CLERK:  Raise your right hand.

19        WALTER LOVE, JR., PLAINTIFFS' WITNESS, SWORN

20            DIRECT EXAMINATION

21  BY MR. OLDS:

22  Q.    Good afternoon.

23  A.    Good afternoon.

24  Q.    Would you state your full name for the record?

25  A.    Walter R. Love, Jr.


143


1  Q.    And you're an employee of the City of Erie Police

2  Department, is that right?

3  A.    I'm retired from the police department.  I'm currently an

4  employee for the Erie School District.

5  Q.    How long did you work for the Erie Police Department?

6  A.    Thirty years.

7   Q.   Thirty years.  And when did you retire?

8   A.   March of 2004.

9   Q.   And in addition, you currently work with the school

10  district?

11  A.   Yes, sir.

12  Q.   Did you work for the school district at any time while

13  you were also an officer with the Erie Police Department?

14  A.   Yes, I have.

15  Q.   And when did you work at the school district?

16  A.   I started with the school district in 1993, until the

17  present time.

18  Q.   Did you have two full-time jobs?

19  A.   Basically, yes.

20  Q.   The job at the city police department, what was your

21  detail or duty?

22  A.   I was a detective in the Criminal Investigation Unit.

23  Q.   Was there a particular kind of investigation or

24  particular kind of crime that you were principally assigned to

25  investigate?

144

1   A.    I was in the fraud department.

2   Q.    And the job with the Erie School District, what was that?

3   A.    Supplying security for the school.

4   Q.    Were you assigned one particular school?

5   A.    Yes, Strong Vincent.

6   Q.    You worked for Strong Vincent from 1993 to the present?

7   A.    Actually, I had been at Strong Vincent, I started there

8   basically full-time in '98.  But prior to that I worked at area

9   schools in the Erie area.

10   Q.    What part of the day were you assigned to Strong Vincent?

11   A.    I was there eight until three.

12   Q.    Monday through Friday?

13   A.    Yes, sir.

14   Q.    After three, was that when you would go to your city job?

15   A.    Yes, I would start the city job at 3:30.

16   Q.    Now, at Strong Vincent what were your responsibilities?

17   A.    Basically, to check to make sure the building was secured

18   at all times, and would respond to any fight calls or classroom

19   disruptions.

20   Q.    Was there another officer assigned to this school?

21   A.    Yes, sir.

22  Q.   Who was that?

23  A.   Sergeant Ronald Slupski.

24  Q.   How many students were at Strong Vincent?

25  A.   At that time we had approximately 600, I believe.


145


1  Q.   And we're talking about 2001-2002, there was a middle

2  school there and a high school?

3  A.   Yes, sir.

4  Q.   Did you have responsibility for one or the other?

5  A.   No, if any type of incident occurred, we would have to

6  respond to it, whether it was junior high or senior high.

7  Q.   During the day would you be in the hallway or would you

8  be in a central location?

9  A.   Most times we'd be in the hallways, like I said, checking

10  the building, responding to any calls from the office to go to

11  the classroom.

12  Q.   Before school and after school did you have -- in other

13  words, when students were either coming in in the morning or

14  being discharged in the afternoon, did you leave the school and

15  patrol any areas off school grounds?

16  A.   No, sir.

17  Q.   Did Officer Slupski do that?

18  A.   No, sir.

19  Q.   Did you guys ever patrol what is called Smokers Corner?

20  A.   Yes, we would, my particular assignment was right outside

21  of the school on 8th Street.  And Sergeant Slupski --

22  basically, would take the rear parking lot.  And before school

23  started, the kids that would smoke on the corner, we would make

24  them come into school once the bell would ring.

25  Q.   Smokers Corner, was that the corner that the laundromat


146


1  was on?

2  A.   Yes, sir.

3  Q.   That would be at 8th Street and Washington?

4  A.   Yes, sir.

5  Q.   So he would go over there and bring the kids in in the

6  morning?

7  A.   Yes.

8  Q.   Would kids congregate there after school as well?

9  A.   Yes, sir.

10   Q.    Would you ever go over or would he go over there after

11   school to patrol that area?

12   A.    Most of the time it was his area, he would take care of

13   that.

14   Q.    And, now, when you worked as Strong Vincent -- you were

15   working for the school district, not for the police department?

16   A.    Correct.

17   Q.    When crimes occurred at the school, what was your

18   responsibilities?

19   A.    Basically, the only crimes that we handled would be

20   summary offenses, such as disorderly conduct, if there was a

21   fight that was involved.  Other than that, we would summon the

22   police if something more serious that we were aware of

23   happened.

24   Q.    Your job was not to investigate crime?

25   A.    No, sir.


147


1   Q.    At the school?

2   A.    No, sir.

3   Q.    But it was -- if crime was occurring, to stop it?

4  A.   Correct.

5  Q.   Now, did you know -- the names of several students have

6  come up in this case; did you know a C.B.?

7  A.   Yes, I did.

8  Q.   What kind of student was he -- not academically, in other

9  words, did you have encounters with him?

10  A.   Yes.

11  Q.   What kind of encounters did you have with him?

12  A.   Most I got summoned because of his classroom behavior, I

13  had to escort him to the office several times because he was

14  being disruptive.

15  Q.   Were you ever called because he was bothering any

16  students?

17  A.   No.

18  Q.   There was another student, B.C., did you remember her?

19  A.   Yes, I do.

20  Q.   And did you ever have to get involved in apprehending her

21  or detaining her?

22  A.   Yes, she was a behavioral problem, also.

23  Q.   What kinds of things involved B.C.?

24  A.   Lots of disrupting class, swearing at the teacher.  Just

25  disrespect totally for any supervision at all.  Skipping class

148

1   and stuff like that.

2   Q.   Did she ever treat you in that fashion?

3   A.   Yes.

4   Q.   What did she do to you?

5   A.   When I was sent to get her from a classroom, it was

6   mostly about cursing, I don't have to go with you, when I would

7   escort her to her appropriate principal.  And normally she was

8   suspended for a couple days.

9   Q.   Would that have been Ms. Cappabianca then?

10   A.   Yes.

11   Q.   Did you have any interactions with A.K.?

12   A.   From what I remember, he was fairly new at the school.

13   I might have had one occasion to have to deal with him.

14   Q.   Did you ever have occasion to deal with my clients, R.P.

15   or K.L.?

16   A.   I didn't.

17   Q.   Now, did Ms. Cappabianca or Ms. Woods -- strike that.

18   Let me approach that from a different way.  You became aware at

19   some point that the school district administration was

20  investigating the occurrence of a sexual assault in 2001 or

21  2002?

22  A.    Yes, sir.

23  Q.    And would you tell me how you became aware that the

24  school district was investigating that assault?

25  A.    It was after the Christmas break when I became aware of

149

1  it, I believe it was January 9th or 10th.  I was in Ms. Woods'

2  office and she had called down to the station and spoke with, I

3  believe it was Deputy Chief Jim Skindell at the time.  And he

4  had sent a couple detectives over to continue the

5  investigation.  That's when I became aware of the incident.

6  Q.    Do you remember that you were in her office in the

7  afternoon when she made this call?

8  A.    I don't remember offhand.

9  Q.    When she made the call asking for officers, do you

10  remember when the officers came?

11  A.    It seems to me like it was in the morning.  But, like I

12  said, I'm not sure.

13  Q.    Was it the day following the day you heard her make the

14  call?

15  A.    No, it was that day.

16  Q.    You heard her make the call the same day they came?

17  A.    Yes.

18  Q.    So she talked to -- she asked, it was the deputy chief at

19  that point?

20  A.    Deputy Chief James Skindell, I believe it was.

21  Q.    So that might have been in the morning that she made that

22  call?

23  A.    Yes, it's possible.

24  Q.    Could it have possibly been on January 11, 2002, that is

25  the date that Officer Barber and I guess it was Detective Green

150

1  came out?

2  A.    Correct.

3  Q.    So --

4  A.    That would be the date then.

5  Q.    You heard her make the call to the chief of police that

6  morning?

7  A.    Yes, sir.

file:///A|/RICHDAY2.TXT

8   Q.   Did you understand that she had been interviewing or

9   meeting with students about this matter?

10   A.   Not until later on that day, I saw several students

11   coming to the office.  I did see Detective Barber and Green

12   there.

13   Q.   Did you assist her in any interviews with students before

14   the other police officers came, Barber and Green; in other

15   words, in the days before Detective Green and Detective Barber

16   came, had you sat in with Ms. Woods and interviewed any

17   students?

18   A.   No.  What we usually do -- I had worked in adult crime,

19   so we didn't handle juveniles at all.  Normally, when a student

20   is giving an administrative type of student statement, we don't

21   get involved as police officers, just for legal reasons, as far

22   as not advising them of their rights and whatnot.  The

23   administration has more leeway of doing that without any

24   encouragement from us.  It's just as a matter of policy, that's

25   the way they handle things, to try to get the information

151

1   regarding incidents.

2  Q.  Did you ever talk to C.B. or did you sit in on any

3  interviews involving C.B. concerning this sexual assault?

4  A.  I don't remember.  There was another student, A.F., I

5  know he was giving Ms. Woods a statement, so I left the room.

6  Q.  You didn't sit in at all on those interviews?

7  A.  No, I left when Barber and Green were there.

8  Q.  It was a matter of policy you wouldn't be involved in

9  those interviews because of the dual capacity as a City of Erie

10  police officer?

11  A.  Correct.

12      THE COURT:  Let me see counsel at side bar for a

13  minute.

14      (At side bar on the record.)

15      THE COURT:  I'm not telling anybody how to do their

16  examination, but as the person who is responsible for keeping

17  this moving in some useful fashion, what is the purpose of this

18  witness -- there is a value in the sharpness of a question.

19  What is the purpose of this witness's testimony insofar as it

20  is pertinent to any issue in the case, it hasn't shaken itself

21  out?

22      MR. OLDS:  It goes to the quality of the

23    investigation concerning credibility issues with Ms. Woods and

24    Ms. Cappabianca, that he was there, and it goes to the extent

25    of the school district's jurisdiction, which has something to

152

1    do with disciplinary rules when there is discipline.

2         THE COURT:  All right.

3         (End of discussion at side bar.)

4    BY MR. OLDS:

5    Q.    Did Ms. Woods ever ask you for advice concerning how to

6    investigate these allegations?

7    A.    No, sir.

8    Q.    Did Ms. Cappabianca ever ask you for advice in terms of

9    investigating these allegations?

10   A.    No, sir.

11   Q.    Had they in the past talked to you about questioning

12   students who might have been involved in some criminal

13   activity, had they sought your advice, maybe not your presence,

14   but your advice in questioning those students previously?

15   A.    No, sir, that policy is already in place.

16        MR. OLDS:  No other questions your Honor.

17        THE COURT:  Mr. Marnen, do you have anything?

18        MR. MARNEN:  Very briefly, your Honor.

19              CROSS-EXAMINATION

20   BY MR. MARNEN:

21   Q.    Mr. Love, is it Mr. Love now that you are retired?

22   A.    Yes.

23   Q.    Do you remember sitting in during the interview of A.F.

24   by Janet Woods?

25   A.    Yes.


                    153


1   Q.    When you sat in on that, were the police there yet or was

2   that some other interview?

3   A.    No, the police weren't there yet.

4   Q.    So when you talk about leaving the room when A.F. was

5   interviewed by Pamela Barber or Detective Barber, that's when

6   they arrived, that's the following day?

7   A.    Yes, it was the following day.

8   Q.    So the interview of A.F. by Woods in your presence, when

9   did that take place, do you remember?

10   A.    That was -- it was before the Barbers got there, I think

11  it was the same day, though.

12       MR. MARNEN:  Thank you.

13       THE COURT:  Thank you, sir, you're excused.

14       MR. OLDS:  May we approach the bench, your Honor.

15       THE COURT:  Sure.

16       (At side bar on the record.)

17       MR. OLDS:  We could start with Ms. Cappabianca now,

18  I would prefer not to.

19       THE COURT:  We're not going to.

20       MR. OLDS:  Thank you.

21       (End of discussion at side bar.)

22       THE COURT:  Members of the jury, the next witness

23  that is going to be called may be somewhat more lengthy.  I

24  don't see any good purpose to be gained by starting this

25  witness now at 4 o'clock, so I'm not going to do it.  We're


                              154


1  going to start at 9 o'clock tomorrow.  Remember what I told you

2  about not reading anything in the newspaper or listening to any

3  news or television reports.  And importantly, remember not to

4  talk about this case with anyone, including your family

5    members.  I simply can't remember if I told you, if I did,

6    forgive me, we're not going to be having court on Friday

7    because I have other commitments.  In my best guesstimate, in

8    terms of your planning and your personal lives, it is likely,

9    well, I shouldn't say it's likely, this case will end on either

10   Monday or Tuesday.  And I will know better, I can assure you,

11   by the close of testimony on Wednesday or on Thursday, rather.

12   But that having been said, we're adjourned until 9 o'clock

13   tomorrow morning.

14

15          (Whereupon, at 3:55 p.m., the Jury Trial proceedings

16   were adjourned for the day.)

17

18                   - - -

19

20

21

22

23

24

25

1          C E R T I F I C A T E
           _ _ _ _ _ _ _ _ _ _ _

2

3

4        I, Ronald J. Bench, certify that the foregoing is a

5    correct transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   Ronald J. Bench

12

13

14

15

16

17

18

19

20

21

22

23

24

25