REDACTED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD P., by and for R.P.,
and DENISE L., by and for K.L.,
          Plaintiffs

          v.                    CIVIL ACTION NO. 03-390 ERIE

SCHOOL DISTRICT OF THE CITY OF
ERIE, PENNSYLVANIA, et al.,
          Defendants


JURY TRIAL - DAY NO. 3


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Wednesday, January 25, 2006.


APPEARANCES:
          EDWARD A. OLDS, Esquire, and CAROLYN SPICER
          RUSS, Esquire, appearing on behalf of the

Plaintiffs.

JAMES T. MARNEN, Esquire, appearing on behalf of the Defendants.

Ronald J. Bench, RMR - Official Court Reporter

2

1             I N D E X

2

3     WITNESSES:            DIRECT  CROSS  REDIRECT  RECROSS

4  FOR THE PLAINTIFFS:

5  K.L.                3     --     --     --

6  Matthew Bogardus          16    21     --       --

7  Robert Iddings          23    --     --      --

8  Janet Woods            --    47     --      --

9  Linda Cappabianca          --   107     --      --

10  R.P.              130   153    158      --

11

12          - - -

13

| 14 | EXHIBITS: | IDENTIFIED | ADMITTED |
|----|-----------|------------|----------|
|    | FOR THE PLAINTIFFS: | | |
| 15 | | | |
|    | Plaintiff's Exhibit 36 | 26 | 47 |
| 16 | Plaintiff's Exhibit 2 | 32 | 47 |
|    | Plaintiff's Exhibit 9 | 33 | 47 |
| 17 | Plaintiff's Exhibit 5 | 36 | 47 |
|    | Plaintiff's Exhibit 30 | 38 | 47 |
| 18 | Plaintiff's Exhibit 34 | 38 | 47 |
|    | Plaintiff's Exhibit 8 | 41 | 47 |
| 19 | Plaintiff's Exhibit 127 | 43 | 47 |
|    | Plaintiff's Exhibit 108 | 43 | 47 |
| 20 | Plaintiff's Exhibit 136 | 45 | 47 |
|    | Plaintiff's Exhibit 141 | 45 | 47 |
| 21 | Plaintiff's Exhibit 62 | 54 | 56 |
|    | Plaintiff's Exhibit 59 | 90 | -- |
| 22 | Plaintiff's Exhibit 58 | 92 | -- |
|    | Plaintiff's Exhibit 230 | 109 | 110 |
| 23 | Plaintiff's Exhibit 228 | 153 | -- |
|    | Plaintiff's Exhibit 228.1 | 153 | -- |
| 24 | Plaintiff's Exhibit 233 | 131 | -- |

25                     - - -


3


1             P R O C E E D I N G S

2

3        (Whereupon, the Jury Trial proceedings began at

4   9:05 a.m., on Wednesday, January 25, 2006, in Courtroom C.)

5

6             THE COURT:  Good morning, members of the jury.  Are

7   you ready to go?

8          MR. OLDS:  Good morning, yes.  We're going to call

9  K.L. now.

10                   K.L., PLAINTIFF HEREIN, SWORN

11                   DIRECT EXAMINATION

12  BY MR. OLDS:

13  Q.   Hi, K.L.

14  A.   Hi.

15  Q.   Can you say your full name for the record?

16  A.   K.L.

17  Q.   And you're going to try to talk slow, okay.

18  A.   Okay.

19  Q.   How old are you?

20  A.   I'm 16-years-old.

21  Q.   And what's your birthday?

22  A.   1989.

23  Q.   And you have a sister, Kayla?

24  A.   Yes.

25  Q.   And now you live in San Diego?

4

1  A.   Yes.

2   Q.   Do you like it?

3   A.   Yeah, a lot, there's no snow.

4   Q.   You like the snow, too?

5   A.   I like the snow, too.

6   Q.   Okay.

7   A.   Once in a while.

8   Q.   How long have you lived in Erie -- before you moved to

9   San Diego, did you live in Erie all your life?

10   A.   Yes.

11   Q.   And when you were in 7th grade, you went to Strong

12   Vincent School?

13   A.   Yes.

14   Q.   Was that a big school?

15   A.   Yeah, pretty big.

16   Q.   Had you ever been in a school that big?

17   A.   No.

18   Q.   Did you get lost a lot?

19   A.   Quite a few times, actually.

20   Q.   Do you remember the names of some of your teachers?

21   A.   Ms. Scully -- I don't know.

22   Q.   Okay.  You remember Ms. Cappabianca, right?

23   A.   Yeah, Ms. Cappabianca.

24  Q.   She was a principal?

25  A.   Vice principal.


                            5


1   Q.   And did you spend much time with her?

2   A.   Yeah, whenever I had problems, I went down to see her.

3        THE COURT:  You're talking a little too fast, slow

4   down.

5        THE WITNESS:  Whenever I had problems, I went down

6   to see her.

7   BY MR. OLDS:

8   Q.   So you started at Strong Vincent in September?

9   A.   I believe so.

10  Q.   Okay.  Were there any kids at Strong Vincent that scared

11  you?

12  A.   B.C. and C.B.

13  Q.   And how did you know -- were they in your classes?

14  A.   Yes, one was.

15  Q.   C.B.?

16  A.   Yes.

17  Q.   One class?

18   A.   Yeah, Ms. Scully's.

19   Q.   Then did B.C. call you names?

20   A.   Yeah, she would call me really bad names.

21   Q.   And did C.B. call you names?

22   A.   C.B. would just mainly mess with me in class.

23   Q.   Did you ever have to leave class because you were afraid

24   of them?

25   A.   Yeah.


6


1   Q.   That one time where did you go?

2   A.   The one time I left the classroom and I had been to the

3   bathroom.

4   Q.   Were you afraid to come back?

5   A.   Yeah.

6   Q.   And that was because C.B. was saying stuff to you?

7   A.   Yeah, and he was poking me with his pencil.

8   Q.   Did you get into trouble for not coming back to class?

9   A.   Yeah.

10   Q.   And then C.B. and B.C. hurt you over at the laundromat?

11   A.   Yeah.

12  Q.    Lead us up to the point that night where you saw them;

13  were you supposed to be in PASS?

14  A.    Yeah, but I didn't go because he was going to be there.

15  Q.    So you were afraid of him?

16  A.    Uh-hum.

17  Q.    He didn't call you names, he just bothered you?

18  A.    Yeah.

19  Q.    So instead of going to PASS, where did you go?

20  A.    I left the school, I went over to the laundromat, I was

21  going to call my mom.  But then she didn't pick up her phone,

22  so I just waited there until the end of PASS.  That's when all

23  this happened.

24  Q.    Okay, that's when you saw C.B.?

25  A.    Um-hum.


                              7


1  Q.    And B.C. --

2  A.    B.C.

3        THE COURT:  Wait until he finishes asking the

4  question before you answer, okay?

5        THE WITNESS:  Okay.

6        THE COURT:  Go ahead.

7   BY MR. OLDS:

8   Q.   C.B. forced you to engage in oral sex, is that right?

9   A.   Yes.

10  Q.   How did that make you feel?

11  A.   It was very hurtful, and was also very nasty.

12  Q.   Did you talk to Ms. Cappabianca the next day?

13  A.   Yes, I had told her what happened and she said that's

14  what people do when they're in love.

15  Q.   Did you think that she was your friend?

16  A.   At first.

17  Q.   After that, after you talked to Ms. Cappabianca and she

18  said that to you, did anything happen, did anything change in

19  school -- was C.B. still in your class?

20  A.   Uh-huh.

21        THE COURT:  You have to say yes or no.

22        THE WITNESS:  Yes.

23  BY MR. OLDS:

24  Q.   Did the other kids bother you?

25  A.   Yeah, mostly everyone bothered me.

1  Q.   What did they do?

2  A.   They would say sexual remarks at me in the classrooms.

3  Q.   Was it both boys and girls that did this to you?

4  A.   Uh-huh.

5        THE COURT:  Yes or no.

6        THE WITNESS:  Yes, sorry.

7  BY MR. OLDS:

8  Q.   And you weren't able to tell your mother?

9  A.   No.

10  Q.   Why not?

11  A.   Because I was scared.

12  Q.   Did you ever tell Ms. Cappabianca that the kids were

13  bothering you?

14  A.   A few times.

15  Q.   Can you remember what you told her?

16  A.   Most of the time I asked her to switch my class.

17        THE COURT:  You have to speak louder, keep talking

18  loud, go ahead.

19        THE WITNESS:  Most of the time I asked her to switch

20  my class because they were in there.  And I couldn't be in the

21  same class as them.

22  BY MR. OLDS:

23  Q.   What would she say to you?

24  A.   She said she would change them, but she never did.

25  Q.   And then the night that you hurt yourself, do you

9

1  remember that night?

2  A.   Yes, I do.

3  Q.   What happened?

4  A.   My sister had found out and had told my mother.  And I

5  told my mother I was going to the bathroom, then I went into

6  the kitchen and I burnt my wrist.

7  Q.   How badly?

8  A.   Bad enough that I had to be put in a mental institution.

9  Q.   And that was Millcreek?

10  A.   Yes.

11  Q.   And when you were at Millcreek, did you tell your mother

12  what happened?

13  A.   Bits and pieces until I felt brave enough.

14  Q.   It was a big thing, right?

15   A.   Yes.

16   Q.   And then after that you never -- did you go back to

17   Strong Vincent ever?

18   A.   No.

19   Q.   Were you afraid after the incident and after you talked

20   to Ms. Cappabianca, were you afraid to be in Strong Vincent?

21   A.   Yeah.

22   Q.   So where did you go after that?

23   A.   After that I went to Sarah Reed partial.

24   Q.   What was Sarah Reed like?

25   A.   Um -- it was a pretty good school.


                                10


1   Q.   Okay.  Did they protect you there?

2   A.   Yeah.

3   Q.   Were some of the kids bad?

4   A.   Yes.

5   Q.   You say some of the kids were bad?

6   A.   Yes.

7   Q.   What kinds of things would go on there?

8   A.   Fighting, yelling and cussing, and everyone would get in

9    restraints.

10   Q.   Did you ever have to be put in restraints?

11   A.   Yes.

12   Q.   Did you start feeling worse -- I mean, what was going on

13   inside of you?

14   A.   I just became more violent and aggressive to everyone.

15   Q.   Did you get into fights at Sarah Reed?

16   A.   I got into one fight.

17   Q.   What about at home with your mother or your sister?

18   A.   I would get into a lot of fights with them.

19   Q.   Did you quit listening to your mother?

20   A.   Yes.

21   Q.   Did you start staying out, not going home?

22   A.   Yes.

23   Q.   Who were you running with?

24   A.   I was running with one of my ex-friends.

25   Q.   Do you remember her name?

11

1    A.   No, I don't.

2    Q.   And then you finished that year at Sarah Reed, did you

3    have to go to the hospital again?

4    A.    I can't remember.

5    Q.    Okay.  To begin your 8th grade year, did they send you

6    back to a regular school?

7    A.    For my 8th grade year they sent me back to Wayne, they

8    sent me to Wayne.

9    Q.    What was Wayne like?

10   A.    It was a pretty good school, until the principal had put

11   his hands on me.

12   Q.    And why did that happen?

13   A.    Because I was getting ready to -- because the principal

14   didn't believe me and he wouldn't let me go and grabbed me, he

15   left marks on my wrist.

16   Q.    He left marks on your wrist?

17   A.    (Witness nods head.)

18   Q.    Did that scare you?

19   A.    Yeah.

20   Q.    You were sent away to live away from your mother then,

21   is that right?

22   A.    Yes.

23   Q.    Was that to Hermitage House?

24   A.    Yes.

25  Q.    In this timeframe did you want to hurt yourself?


12


1  A.    Some of the time, yeah.

2  Q.    Were you ever on suicide watch?

3  A.    Yes.

4  Q.    Where were you on suicide watch?

5  A.    Hermitage.

6  Q.    When you were on suicide watch, what did that mean for

7  you, what did they do to you?

8  A.    I had -- someone had to be outside the bathroom.  I had

9  to leave the door open, keep the shower curtain closed.  I

10  wasn't allowed to have any razors or anything.

11  Q.    How strong was this feeling that you had?

12  A.    Very.

13  Q.    Did you get into trouble with the juvenile authorities?

14  A.    Yes.

15  Q.    What kinds of things did you do?

16  A.    I had broken into a car.

17  Q.    And were you on probation?

18  A.    Yes.

19  Q.  Did you have an ankle monitor?

20  A.  Yes.

21  Q.  And you were what, 13 then?

22  A.  I believe so.

23  Q.  And then you were at Andromeda House, is that right?

24  A.  Yes.

25  Q.  Were you there a long time?


                                    13


1  A.  About nine months.

2  Q.  What kind of place was that?

3  A.  It was for girls that had -- problems with their family

4  or were in trouble.

5  Q.  And did you get into trouble when you were there?

6  A.  Yeah.

7  Q.  What kinds of things would you do?

8  A.  I would instigate people, and I had to be put in

9  restraint because I tried to throw myself in front of a car.

10  Q.  What were they trying to teach you at Andromeda House?

11  A.  Self-control.

12  Q.  And you have a lot of anger, is that it?

13  A.   Yes.

14  Q.   And you went to Andromeda House for nine months?

15  A.   Yes.

16  Q.   Did you make any other attempts on your life?

17  A.   Can you repeat it again.

18  Q.   Did you try to hurt yourself any other times?

19  A.   Yes.

20  Q.   At Andromeda House?

21  A.   Yes.

22  Q.   What did you do?

23  A.   I was stabbing my arms and my legs with a pin.

24  Q.   Did there come a point in time when you felt you could

25  control yourself a little bit more?


14


1  A.   Yeah.

2  Q.   In other words, did you start getting a little better?

3  A.   A little bit.

4  Q.   And they let you out of Andromeda House?

5  A.   They kept me there for a while.

6  Q.   After you started to get better?

7   A.   Yeah.

8   Q.   You're still in pretty bad shape, aren't you?

9   A.   Yes.

10  Q.   What kind of feelings do you have?

11  A.   Hurt, sad.  And I can't really be around men anymore.

12       THE COURT:  I'm sorry, say that again?

13       THE WITNESS:  I can't really be around guys anymore.

14  BY MR. OLDS:

15  Q.   Are you in school in California?

16  A.   Yes.

17  Q.   You've had to go to the hospital out there, haven't you?

18  A.   Yes.

19  Q.   Are you trying to do stuff outside of school?

20  A.   Yes.

21  Q.   Like trying to get your life back together?

22  A.   (Witness nods head.)

23  Q.   What are you doing?

24  A.   I made the JV varsity soccer team.

25  Q.   What would you like to do with your life?

15

1  A.   Go to college become a pediatrician.

2  Q.   Do you think you can handle that?

3  A.   Yes.

4  Q.   You've written a little statement, and I okayed this with

5  Mr. Marnen, it's just a short little paragraph.  Did you say

6  you memorized it?

7  A.   Yes.

8  Q.   Do you want to try to say it?

9  A.   All right.  It's called Stay Strong.  This story is about

10  a girl who wants to be the best she can be.  One rainy day I

11  wrote to let people know that the road they take will not be

12  easy.  But don't give up.  I was really hurt and I did not give

13  up because God came to me, he said I know what happened to you

14  and he told me to be strong and don't give up just believe in

15  yourself and you will make it in the world.  I now know that

16  everyone has a purpose in life that needs to be fulfilled.  By

17  K.L.

18        MR. OLDS:  I don't have any other questions, your

19  Honor.

20        THE COURT:  All right.  Mr. Marnen.

21        MR. MARNEN:  No questions, your Honor.

22          THE COURT:  Mr. Olds, call your next witness.

23          THE CLERK:  Could you please state your full name

24   and spell your last name for the record?

25          THE WITNESS:  Matthew Robert Bogardus,


16


1   B-o-g-a-r-d-u-s.

2          MATTHEW R. BOGARDUS, PLAINTIFFS' WITNESS, SWORN

3                DIRECT EXAMINATION

4   BY MR. OLDS:

5   Q.   Mr. Bogardus, would you state your name?

6   A.   Matthew Robert Bogardus.

7   Q.   Who is your employer?

8   A.   Sarah Reed Children's Center.

9   Q.   How long have you worked there?

10   A.   It will be 20 years in June.

11   Q.   What is your job there?

12   A.   One of the intake supervisors.

13   Q.   What is Sarah Reed Children's Center?

14   A.   We work with children with emotional, behavioral and

15   mental health problems.

16   Q.    And it has an outpatient program, is that right?

17   A.    Yes.

18   Q.    And the outpatient program consists of what?

19   A.    Individual therapy, family therapy, psychiatric,

20   medication management.

21   Q.    There's also a school, is that right?

22   A.    It's an alternative education program.

23   Q.    Where does it receive students from?

24   A.    Students from the Erie School District and county school

25   district in Erie County.


17


1   Q.    Might other counties in northwestern Pennsylvania send

2   students to Sarah Reed?

3   A.    We've had referrals.  But because of distance, it usually

4   is not workable.

5   Q.    And children in the school, that's a day program?

6   A.    Yes.

7   Q.    So they go home at night?

8   A.    Yes.

9   Q.    Do you, as an intake supervisor, specifically do you deal

10  with the educational components, do you deal with the whole

11  program?

12  A.    The whole program.

13  Q.    So tell me how the intake process works?

14  A.    If a particular school is considering a student for our

15  program, they would contact me to give me some referral

16  information, some information as to why they're requesting a

17  placement with us.  And if we take the student, then I would

18  meet the student and family together to gather background

19  information from them and to get all of our paperwork signed to

20  admit them into treatment.

21  Q.    You say you're an intake supervisor, are there regular

22  intake people that work under you?

23  A.    No.

24  Q.    Okay.  And the intake process itself is managed by a

25  committee, is that right?


18


1  A.    The referral process is.

2  Q.    You receive information, then you present that

3  information to the committee?

4  A.   Yes.

5  Q.   And do you know who's on the committee?

6  A.   At this time?

7  Q.   Well, the case is about what happened in 2001-2002, maybe

8  you could just tell us the types of people who were on the

9  committee, if you can't remember specifically who was on the

10  committee back then?

11  A.   Our medical director, supervisory staff, both clinical

12  and program supervisory staff and myself.

13  Q.   What kinds of students does the Erie School District

14  refer to you at Sarah Reed?

15  A.   A variety of students.

16  Q.   Well, certainly kids who are not behavior problems, who

17  are making A's in class don't get referred to Sarah Reed, is

18  that correct?

19  A.   Correct.

20  Q.   Okay.  So there are certain types of students that do get

21  referred to Sarah Reed, is that right?

22  A.   Correct.

23  Q.   What types of students generally get referred to Sarah

24  Reed?

25  A.   They would be experiencing behavioral problems in the

19

1  classroom, emotional problems in the classroom.  And it would

2  be determined that they need perhaps some type of clinical

3  intervention, clinical support.

4  Q.    Do you know how many -- on a given day how many kids from

5  the Erie School District might be attending Sarah Reed; is it

6  more than 50, less than 50?

7  A.    Less than 50, but more than 40.

8  Q.    What are the grade levels?

9  A.    It can be, well, in our building from second grade

10  through high school.

11  Q.    How are the kids segregated into classrooms?

12  A.    Roughly by grade.

13  Q.    And so each grade would have a teacher, is that right?

14  A.    Yes.

15  Q.    And then now you received the referral for K.L. and R.P.

16  from Erie School District, is that right?

17  A.    Yes.

18  Q.    And what was the nature of that referral, how did the

19  Erie School District contact you?

20   A.   I was contacted by phone.

21   Q.   And do you know who called you?

22   A.   No, I do not.

23   Q.   And what information were you told about K.L. and R.P.?

24   A.   I was told that they were sexually victimized in school

25   and then further harassed by other students in school.


20


1   Q.   And were you given any other information about them?

2   A.   No.

3   Q.   You weren't given educational files or disciplinary

4   records, is that right?

5   A.   I'm sorry, I didn't hear you.

6   Q.   You were not given educational files or discipline

7   records, is that right?

8   A.   No.

9   Q.   What information did you take to the admissions

10   committee?

11   A.   The information that the school district had given me

12   that the students had been victimized and harassed.

13   Q.   Were the students admitted to Sarah Reed based upon that

14  information?

15  A.   Yes.

16  Q.   Did you have any further involvement with them on that

17  occasion; I mean once they're admitted, your role ends?

18  A.   Correct.

19  Q.   Both K.L. and R.P. came back multiple times, is that

20  right?

21  A.   Yes.

22  Q.   Do you remember how many times R.P. came back?

23  A.   I do not.

24  Q.   And K.L., do you remember?

25  A.   I do not.


                                21


1  Q.   But you know they came back multiple times?

2  A.   Yes.

3        MR. OLDS:  Okay, no other questions, your Honor.

4                  CROSS-EXAMINATION

5  BY MR. MARNEN:

6  Q.   Mr. Bogardus, just briefly.  The intake process then was

7  comprised in part of an interview by you of the parents and the

8  children?

9  A.   Yes.

10  Q.   And at the time of the interview, you had information

11  from Erie School District indicating these kids had been

12  sexually victimized and harassed?

13  A.   Correct.

14  Q.   And that was the information passed on to the committee?

15  A.   Yes.

16  Q.   Of which you were a part of?

17  A.   Yes.

18  Q.   Did you also at the intake ascertain whether the parents

19  of the two girls consented to the placement at Sarah Reed?

20  A.   In order for the intake to be scheduled, they have to

21  consent to the placement.

22  Q.   And did they in fact consent?

23  A.   Yes.

24       MR. MARNEN:  Thank you, no further questions.

25       THE COURT:  Thank you, sir, you're excused.


22


1       MR. OLDS:  Your Honor, may we approach the bench for

2  one second?

3       THE COURT:  Sure.

4       (At side bar on the record.)

5       MR. OLDS:  I apologize, the exhibits that I want to

6  use with the next witness, I can't find them.

7       THE COURT:  Who is the next witness?

8       MR. OLDS:  Robert Iddings from Sarah Reed.

9       THE COURT:  Do you want to take a break so you can

10  find those exhibits?

11       MR. OLDS:  Yes, your Honor.

12       (End of discussion at side bar.)

13       THE COURT:  Members of the jury, as occasionally

14  happens, some exhibits have been temporarily misplaced.  They

15  are here but they can't be located.  So rather than sit there

16  while people rummage around for them, we're going to take a

17  short recess.

18       (Recesss from 9:35 a.m.; until 9:40 a.m.)

19       THE COURT:  All right, let's go.

20       MR. OLDS:  Thank you, your Honor.

21       THE CLERK:  Could you state your full name and spell

22  your last name for the record?

23        THE WITNESS:  Robert Ray Iddings,

24  I-d-d-i-n-g-s.

25        ROBERT R. IDDINGS, PLAINTIFFS' WITNESS, SWORN


23


1              DIRECT EXAMINATION

2  BY MR. OLDS:

3  Q.    Mr. Iddings, would you state your full name for the

4  record?

5  A.    Yes, Robert Ray Iddings.

6  Q.    You're with Sarah Reed, what is your position?

7  A.    I'm the clinical supervisor of the partial

8  hospitalization and alternative education program.

9  Q.    In that capacity who do you supervise?

10  A.    The therapists, the master level therapists in the

11  program.

12  Q.    Do you supervise teachers?

13  A.    No.

14  Q.    Maybe you could just give the jury -- let's maybe try to

15  set that hierarchy here just briefly.  You're the clinical

16  supervisor?

17  A.   Right.

18  Q.   You report to whom?

19  A.   The director of our clinical services --

20       THE COURT:  Mr. Iddings, two things, pull in a

21  little bit, and then slow down a little bit.

22       THE WITNESS:  Okay.  I report to the director of

23  clinical services, Dr. Schwartz, who is a licensed

24  psychologist.

25  BY MR. OLDS:


                              24


1  Q.   What is your educational background?

2  A.   I have a master's degree in clinical psychology and have

3  completed my doctorate in clinical psychology.

4  Q.   And then this clinical side at Sarah Reed, does that

5  involve both the outpatient and the school -- in other words,

6  Sarah Reed has an outpatient program?

7  A.   Right, Sarah Reed has a number of different programs on

8  what we call the continuum of services.  So the least

9  restrictive is probably the outpatient, that is the traditional

10  type of service where people come into the office and receive

11   therapy.  The partial hospitalization program is where kids are

12   there for the majority of the day to receive their education

13   there, as well as mental health services off a menu of

14   different items.  And we also have a residential program where

15   kids go and they live there 24 hours a day.  And each of those

16   is just on a more intense level of service.

17   Q.    And you supervise the clinicians who deal with all three

18   of those levels of service?

19   A.    I do not, I only supervise the clinicians in the partial

20   hospitalization.

21   Q.    And the partial hospitalization program, is that an

22   alternative education program?

23   A.    It is actually two separate programs.  All of the

24   children who are there are there as alternative education

25   students.  Some of the children who are there receive mental

25

1   services, some of them don't, they're only there for their

2   educational purposes.

3   Q.    The kids who are only there for educational purposes, who

4   are not receiving partial hospitalization services, those kids

5    would be there because they exhibit some kind of behavioral

6    problems, is that right?

7    A.    Usually, yes.

8    Q.    The percentage of kids who are there in the day school,

9    what percentage are just there because they're in an

10   alternative education program, what percentage are actually

11   receiving partial hospitalization services?

12   A.    That will fluctuate.  But it generally runs between 10 to

13   25 percent of the children there who are only there for

14   educational purposes.

15   Q.    So the partial hospitalization services consists of some

16   kind of counseling?

17   A.    There could be -- nearly all of the children receive

18   group therapy.  Along the range of different topics.  Some of

19   the children may receive individual therapy, there may be some

20   family therapy.  The main component is that there has to be

21   psychiatric monitoring.  Whether they receive medication or

22   not, that depends on the child and the family circumstances and

23   the doctor's recommendations.  But the main requirement is that

24   a psychiatrist review the treatment plan every 20 days.

25   Q.    Okay.  I'm going to approach the witness, your Honor, and

1   show the witness Plaintiff's 36 -- and actually Plaintiff's

2   Exhibit 36 is a pamphlet prepared by Sarah Reed, is that right?

3   A.   That's right.

4   Q.   How does Sarah Reed use this pamphlet?

5   A.   We generally give it to parents when their children start

6   the program.

7   Q.   And this particular pamphlet, does this principally

8   describe the school base services, is that right?

9   A.   Correct.

10  Q.   What kind of school services -- strike that.  Sarah Reed

11  has, in terms of its services, what is the limit of students

12  that you have, is there an upper limit?

13  A.   Our capacity is probably around -- do you mean how many

14  students?

15  Q.   Yes.

16  A.   Our capacity -- we also service children three to five,

17  so preschool.  If you take the kids from three-years-old

18  through to high school, our capacity is round 160.

19  Q.   If you eliminate those preschool, how many students?

20  A.   It's about 100.

21  Q.   One-hundred students.  That would range from grade two to

22  high school?

23  A.   Correct.

24  Q.   Are the classes separated by grades; in other words, do

25  you have a class with third graders?

27

1  A.   Unfortunately not.  We try to pair the children with

2  grade and developmental level.  But we could have two to three

3  grades in one classroom at one time.

4  Q.   What are the types of students who are typically referred

5  to Sarah Reed?

6  A.   They really range in -- the entire range of diagnoses and

7  behavioral problems.  So it's really hard to pin that down.

8  Q.   Is it fair to say that most have some kind of behavior

9  problem?

10  A.   The majority will.

11  Q.   The majority have been referred to Sarah Reed because

12  they've had trouble adjusting or adapting to a regular school

13  setting?

14  A.   Right.

15  Q.    And a significant number of the students at Sarah Reed

16  are kids who have been kind of acting out, they would pose

17  discipline problems at their home school?

18  A.    Generally, yes.

19  Q.    I want to, just in terms of terms of -- just taking you

20  through real quickly here and talk a little bit about the

21  educational modality, the educational program, and this is from

22  page seven of your pamphlet here?

23  A.    Yes.

24  Q.    It's true that for every student who comes in, they have

25  to go through an orientation process, is that right?


                                    28


1  A.    Right.

2  Q.    What does that orientation process consist of?

3  A.    It's usually just helping the kids understand the rules

4  and the routines, allows them sometime to get acclimated to a

5  new type of educational structure.

6  Q.    That lasts for two weeks for all students?

7  A.    No, some students it takes longer than two to get through

8  that process.

9    Q.    What kind of problems might students encounter that the

10   orientation process takes longer?

11   A.    Some of the students will become, you know, defiant, they

12   don't want to follow the rules, they don't want to participate

13   in any of the activities.  Some of the kids will withdraw and

14   not want to participate as well.

15   Q.    And so what do you do when you encounter those kinds of

16   problems at the orientation level, how are those students

17   handled?

18   A.    Most of the time, because we have such a small classroom

19   environment, we only have 13 children in a class with two

20   different staff members.  That they will continue to just

21   encourage those kids to start, you know, following the rules

22   and learning how they can earn incentives because we also have

23   an incentive program.  The more points the kids earn by

24   completing tasks and following rules and meeting expectations,

25   the more points they can earn.


29


1    Q.    It's fair to say that a lot of the effort or energy at

2    Sarah Reed is devoted to maintaining a certain level of

3   behavior in class?

4   A.   Yes.

5   Q.   And then after the students go through the orientation

6   level, they go to level one.  And level one, it says "level one

7   students continue to require constant supervision within the

8   program and must be in staff sight at all times," is that

9   right?

10   A.   Right.

11   Q.   The constant supervision, that means if there's 13 kids

12   in the classroom, there are two teachers?

13   A.   Yes.

14   Q.   And the teachers are constantly seeing the kids.  Then

15   the kids have to remain in sight of the teachers at all times?

16   A.   Correct.

17   Q.   Why is that?

18   A.   It depends on a child's development.  For our

19   preschoolers, they always have to be in staff sight at all

20   times.  But for the older children, part of it is that -- for

21   the level system, we want them to earn respect and

22   responsibility.  And as they move up the level system, they

23   will be given more responsibilities.

24          THE COURT:  Slow down, you're going way to fast.

25          THE WITNESS:  They'll be given more


                                30


1   responsibilities.  And part of that is being able to go out and

2   do things on their own.  So they will be able to go out and

3   help one of the teachers make copies or they will be able to go

4   down to the gym and use it on their own.  So it's just part of

5   the philosophy that as children gain that respect and that

6   responsibility, that we'll provide them with more opportunities

7   to practice that.

8   BY MR. OLDS:

9   Q.   But until they do, they're not allowed out of the

10  teacher's sight?

11  A.   Theoretically, right.

12  Q.   Is that also a function of the fact that some of these

13  students with behavior problems might either hurt other

14  students or get into trouble when they're at level one?

15  A.   Right, that we may not know the child well enough to be

16  able to make that determination at that point in time.  There

17  are also students who remain on level one because of the

18   aggressiveness that they've shown.

19   Q.   They might remain on level one for long periods of time?

20   A.   Correct.

21   Q.   I'm not going to go through all of this -- but going on

22   to the next page, page eight, it describes in that first

23   sentence here, do you see where it says "students who are able

24   to demonstrate a consistent level of performance by earning a

25   weekly average of at least 80 percent for two consecutive

31

1   program weeks will be considered for promotion to level two."

2   What kind of behavior are you looking at in terms of promoting

3   from level one to level two?

4   A.   The therapist who creates the treatment plans try to base

5   the goals on the children's level and their ability.  So level

6   one goals generally are compliance types of goals.

7   Q.   In other words, they're listening to the teacher?

8   A.   Listening to the teacher, staying seated, keeping their

9   hands and feet to themselves, completing assignments.  As

10   children progress through the program, and they may be to level

11   three or four, they may then be working on goals as far as

12    identifying, expressing feelings in a positive manner.  Being a

13    positive role model for other children.  We gradually help kids

14    develop more and more self-advocacy.

15    Q.    But that process can be a very long process for some

16    kids, is that true?

17    A.    True.

18    Q.    That can take months?

19    A.    Months, sometimes years.

20    Q.    You worked for Sarah Reed back in 2002, didn't you?

21    A.    In 2002 I did, yes.

22    Q.    I'm going to show you what's been marked as Exhibit 2,

23    I'll put that on the screen, and Exhibit 3 -- excuse me,

24    Exhibit 9, I'll put that on the screen, also.  But let me put

25    that on the screen here.  Just so you can see the whole thing,


32


1    Exhibit 2 at the top of it says -- "Sarah A. Reed Children's

2    Center, narrative addendum.  Name, K.L.  Date, 1/22/02."  Do

3    you see that?

4    A.    Yes.

5    Q.    And that appears to be the admissions narrative?

6   A.   Correct.

7   Q.   Mr. Bogardus would have made this when he interviewed

8   K.L. after the referral from the Erie School District?

9   A.   Right.

10   Q.   I just want to draw your attention to the reasons for the

11   referral.  And Mr. Bogardus testified about this.  The reason

12   that K.L. was referred was that it was reported that K.L. was

13   victimized sexually in school by other students and also

14   suffered harassment by her peers.  And that's what Mr. Bogardus

15   would have written, is that right?

16   A.   Right.

17   Q.   Would he have actually presented this document to the

18   admissions committee?

19   A.   Yes.

20   Q.   You were on the admissions committee, is that right?

21   A.   Correct.

22   Q.   When he writes "it was reported that K.L. was victimized

23   sexually in school," does that mean that he's writing that as

24   if it were not a fact, it's just an allegation?

25   A.   I can't answer that.

33

1   Q.   But Sarah Reed did accept K.L. into its program, is that

2   right?

3   A.   Yes.

4   Q.   And then I want to show you a document, this a

5   Plaintiff's Exhibit 9 on K.L., the top of the page reads "Sarah

6   A. Reed Children's Center, partial hospitalization program,

7   initial psychiatric evaluation."  Explain to the jury how it

8   comes about that a psychiatric evaluation is done for students

9   being admitted into the partial hospitalization program?

10  A.   Based on the regulations by the Pennsylvania --

11        THE COURT:  Keep your voice up a little bit.

12        THE WITNESS:  The Department of Public Welfare, any

13  child that enters the partial hospitalization program has to be

14  seen by a psychiatrist and have a psychiatric evaluation

15  completed within a certain amount of time, within I think five

16  days of admission.  And then it's repeated every 20 treatment

17  days following that.

18  BY MR. OLDS:

19  Q.   This report was signed by Kirstin E. Brunner-Martinez, is

20  she a psychiatrist with Sarah Reed?

21  A.   Yes, she is.

22  Q.    She came up with an initial diagnosis, do you have any

23  idea what the type of --

24        THE COURT:  Let me see counsel at side bar for a

25  second, please.


                            34


1        (At side bar on the record.)

2        THE COURT:  This is once again in my capacity as the

3  person who's responsible for moving this thing along.  This

4  simply is by way of suggesting, you're fumbling back and forth

5  with this thing, it's taking time unnecessarily.  Why don't you

6  stand up there and work with that.  It's herky-jerky, we're

7  covering some of the same ground, let's move this out.

8        (End of discussion at side bar.)

9        MR. OLDS:  I heard what you said and I'll try to

10  limit that.

11  BY MR. OLDS:

12  Q.    Dr. Brunner-Martinez did not diagnose K.L. with suffering

13  from post-traumatic stress disorder, did she?

14  A.    Not in this document.

15  Q.    Did you subsequently learn that in fact that diagnosis

16  for K.L. was arrived at?

17  A.   I'd have to look at the record, I'm not sure.

18  Q.   What aspect of the Sarah Reed program addresses a child

19  who's suffering from post-traumatic stress syndrome; in other

20  words, what services does your in-school program provide such

21  children?

22  A.   One, having a smaller structure, with a great deal of

23  support in the classroom can be helpful for kids who have had

24  any number of diagnoses related to anxiety and post-traumatic

25  stress disorder, certainly a severe form of anxiety.  Another


35


1  is to have a therapist available throughout the day that they

2  can talk to if they wish.  They'll have groups on how to manage

3  some of their symptoms, as far as anxiety, depression, anger.

4  We also run an adolescent program now, I don't think we ran

5  this in 2001 or 2002, but we run a work base learning program,

6  which gives the children a chance to work in a kind of real

7  life setting and develop self-esteem in that way.  Plus our

8  psychiatrist, especially Dr. Brunner, is very well versed in

9  working with kids who have been traumatized.

10  Q.   But she didn't diagnose post-traumatic stress syndrome

11  for K.L.?

12  A.   Not at this time.

13  Q.   And you indicated this work program wasn't in place in

14  2001-2002?

15  A.   I don't believe it was.

16  Q.   There's nothing about the day program itself, the school

17  program, the behavior modification program that you use in the

18  classes, that addresses symptoms that a child might have as

19  suffering from post-traumatic stress syndrome, is there?

20  A.   No, not specifically.

21  Q.   It's true then that the counselor that was assigned to

22  K.L. and R.P. in 2001-2002, didn't meet with them for a period

23  of several months, is that right?

24  A.   Again, I'd have to look at the record to see what the

25  notes said.

36

1  Q.   One of the things that is done initially at Sarah Reed is

2  the development of a master plan, is that right?

3  A.   Correct.

4  Q.   I'm going to show you Plaintiff's Exhibit 5, which is the

5  master plan for K.L.  Will you tell the jury what the master

6  plan is?

7  A.   At the time this was written, which it was a plan that

8  encompassed all of the goals that the child would be working on

9  and the interventions used to help the child meet those goals.

10  Q.   The goals are set here in that column, is that right?

11  A.   Under the goal statement and objectives column.

12  Q.   In the column next to it, it says problems/needs, is that

13  right?

14  A.   Right.

15  Q.   So the goals are to address the supposed problems that

16  the child has, is that right?

17  A.   Correct.

18  Q.   You can look through this document, it's fair to say this

19  document doesn't mention any problems that K.L. had as a result

20  of her sexual assault -- I'd just like you to confirm that for

21  me?

22  A.   That's correct.

23  Q.   The purpose of the master plan is to identify problems

24  that the child might have so that Sarah Reed can address those

25  problems?

37

1   A.   That's right.  I would like to mention that probably 80

2   percent of our kids come to us with trauma.

3   Q.   It's so important that a child, a 12-year-old child who's

4   been sexually assaulted, forced to engage in oral sex, do you

5   think that that might cause problems for a child?

6   A.   I do believe it would.

7   Q.   Would it be worth mentioning that kind of problem in your

8   master plan so that, for instance, the teachers who look at it

9   or the counselors who look at it might know that particular

10  trauma that child might have suffered?

11  A.   The way our program is set up now, that probably would

12  not occur.

13  Q.   People who are dealing with K.L. based upon this master

14  plan, for instance, wouldn't know that she was forced to engage

15  in oral sex, she was raped, wouldn't know that?

16  A.   Right, we wouldn't put that in the treatment plan.

17  Q.   And you wouldn't put in that the child has a problem

18  because they suffered from a sexual assault, we need to develop

19  some kind of goal or objective or method or intervention to

20  address that problem?

21  A.   How we would probably word it is we would help the child

22  manage feelings associated with previous experiences.

23  Q.   And that doesn't appear here?

24  A.   That does not.

25  Q.   I'm going to show you what has been marked as Plaintiff's

38

1  Exhibit 30 now, which is R.P.'s master plan, is that right?

2  A.   Yes.

3        MR. OLDS:  Your Honor, for the record, in our

4  exhibit book, 30 had been broken up into 30, 31, 32, I've

5  combined those pages for one exhibit.  So I'm letting Mr.

6  Marnen know that, also.

7  BY MR. OLDS:

8  Q.   In terms of R.P.'s master plan, is there any mention of

9  the trauma or the monitoring that she has to get?

10 A.   No.

11 Q.   And I asked you a question about the counseling that R.P.

12 and K.L. received, I'm going to show a document that has been

13  marked as Plaintiff's Exhibit 34 -- can you look at the

14  clinical progress notes and determine whether or not R.P.

15  received counseling for the period of time, February, March of

16  2001?

17  A.    On January 30th, it appears she had individual therapy.

18  On February 7th, the therapist met with R.P.'s father.  On

19  February 13th, the therapist met with R.P.'s father.  On

20  February 15th, she had individual therapy.  On February 20th,

21  the therapist spoke with R.P.'s father.  On April 16th, the

22  therapist attempted to call R.P.'s father.  And on April 16th

23  she spoke with R.P.'s father.

24  Q.    So in that list how many times did the therapist meet

25  with R.P.?

39

1  A.    Twice.

2  Q.    Between the end of January and April?

3  A.    It appears so.

4  Q.    Who was the therapist?

5  A.    Jennifer Vaglia.

6  Q.    Now, each of the counselors at Sarah Reed are assigned 26

7  students?

8  A.   Approximately, yes.

9  Q.   And the counselors are expected to work with -- they're

10  expected to spend about five hours of their time meeting with

11  the students, is that right?

12  A.   Right.

13  Q.   So that means they need to divide five hours by 26 and

14  allocate that time to the students that the counselors are to

15  meet with?

16  A.   About that, right.

17  Q.   So that's about between 15 and 20 minutes a week that

18  counselor might meet with one of the students?

19  A.   If they were going to do individual, not all the students

20  receive individual therapy.

21  Q.   Did you have interactions with either R.P. or K.L.?

22  A.   Very little.

23  Q.   Do you know how R.P. responded to the program at Sarah

24  Reed?

25  A.   Based on my memory, I'd have to look at the record, but

40

1    based on my memory, I don't believe she did very well.

2    Q.    Do you have Exhibit 34, that has some indication of how

3    she did, is that right?

4    A.    Correct.  Right, I can look through here.  Based on her

5    points, it doesn't look like she was earning very many points.

6    So she wouldn't have very many privileges.  And, also, she was

7    absent a great deal.

8    Q.    Let me show you what's been marked as Exhibit 8 --

9          THE COURT:  Mr. Olds, how much longer do you have

10   with this witness?

11          MR. OLDS:  Probably less than 10 minutes.

12          THE COURT:  Who is your next witness?

13          MR. OLDS:  It will be Ms. Woods.

14          THE COURT:  Ms. Woods, then Ms. Cappabianca?

15          MR. OLDS:  Yes.

16          THE COURT:  We're going to take a short recess.

17          (Recess from 10:15 a.m.; and reconvened at 10:22 in

18   Judge's Chambers.)

19          THE COURT:  My deputy clerk tells me that when she

20   took some of the jurors down for their cigarette break, that

21   one of the jurors indicated that some of the jurors are talking

22   about the case.  I don't know what that means, talking about

23  the case.  Of course, the standard admonition up front is don't

24  talk about the case until it's over.  We always hope the jurors

25  adhere to that.  I would simply propose to do this.  To remind

41

1  them that they don't talk about the case until the case is

2  over.  I think that will solve the problem.  Is that

3  acceptable?

4        MR. MARNEN:  That's fine, that's okay with me.

5        MR. OLDS:  Yes.

6        (Recess at 10:23 a.m., in Judge's Chambers; and

7  reconvened at 10:25 a.m., in Courtroom C.)

8        THE COURT:  Members of the jury, you'll remember

9  that I told you at the beginning of the case that you are not

10  to discuss the case among yourselves until the case is over.

11  The case is not over.  The only time you're supposed to talk

12  about the case is once you begin your deliberations.  So keep

13  that in mind.  All right, go ahead.

14        MR. OLDS:  Thank you, your Honor.

15  BY MR. OLDS:

16  Q.   I think just before the break I showed you K.L.'s grades,

17   is that right?

18   A.   Yes.

19   Q.   What exhibit number was that?

20   A.   Exhibit 8.

21   Q.   And how did K.L. do?

22   A.   The first two weeks I have here she did very well.

23   Q.   K.L. in her testimony mentioned the issue of restraints

24   at Sarah Reed, what type of restraints does Sarah Reed use?

25   A.   Currently we use a model called therapy crisis


                                42


1    intervention.

2    Q.   Would you make sure that when you're answering my

3    questions, that you let me know what it was using in 2002 when

4    K.L. and R.P. were there?

5    A.   Right, that is the same model that we were using in 2002.

6        THE COURT:  Slow down, please.

7        THE WITNESS:  We're in the process of converting

8    over to another model.  But therapy crisis intervention is what

9    we used.

10   BY MR. OLDS:

11  Q.   And can you describe to the jury what that means?

12  A.   If the child cannot be maintained or deescalated and is a

13  danger to themselves or others, we will have two people put

14  them into a therapeutic hold face down on the ground and hold

15  them there until they're able to self regulate and they're able

16  to manage their behaviors and won't be a danger to others.

17  Q.   What is a therapeutic hold?

18  A.   That's what that would be.

19  Q.   Describe actually what the two staff members do?

20  A.   The staff members have certain procedures that they do in

21  order to put a child down onto the ground.  And then one staff

22  member will wedge their arms between their hip and their elbow

23  and another staff member will be on their legs, and a third

24  staff will be there to document.  All that needs to be ordered

25  by a doctor.


43


1  Q.   So, in other words, if there's an incident where a child

2  needs restraint, a doctor is consulted first?

3  A.   No, usually after it's happened.

4  Q.   So the staff is trained to use a procedure that involves

file:///A|/RICHDAY3.TXT

5  taking the kids down?

6  A.    Right.

7  Q.    One staff member sits on their legs?

8  A.    Right.

9  Q.    The other holds back their arms like this?

10  A.    Their arms are against their side, wedged against their

11  side.

12  Q.    I'm going to show you two documents that have been marked

13  as Plaintiff's Exhibits 127 and 108.  Now, will you tell the

14  jury what Exhibit 108 is -- excuse me, let's go to Exhibit 127

15  first.

16          THE COURT:  Do you have the document handy, sir?

17          THE WITNESS:  I do.  It is the initial psychiatric

18  report dated 2/1/02.

19  BY MR. OLDS:

20  Q.    I'm showing the jury what the impression or diagnosis

21  was, would you read what the doctor said?

22  A.    "Dysthymia.  Oppositional defiant disorder.  Axis II,

23  deferred.  Axis III, unknown bleeding disorder.  Axis IV,

24  moderate.  Axis V, global assessment functioning 45."

25  Q.    That global assessment functioning 45, do you understand

44

1   what that means?

2   A.   Yes.

3   Q.   Tell the jury what it means?

4   A.   On a scale from 0 to 100, there are certain criteria that

5   people are rated on, as far as their ability to function

6   independently.  And so it's a rating scale that doctors use to

7   gauge where the child's at.

8   Q.   And do you know what a GAF of 45 signifies in terms of

9   the child's ability to function?

10  A.   That's a fairly low global assessment of functioning,

11  meaning that they probably would have difficulty functioning

12  independently in the community.

13  Q.   And then Exhibit 108, would you just tell the jury what

14  that is?

15  A.   Exhibit 108 is also an initial psychiatric evaluation

16  dated July 16, 2003.

17  Q.   And so this is approximately 18 months later?

18  A.   Yes.

19  Q.   And the same doctor performed this examination, right,

20  Dr. Brunner-Martinez?

21  A.   That's right.

22  Q.   Did she render -- why don't you just read what the

23  diagnosis was?

24  A.   Axis I is dysthymia.  Axis II is oppositional defiant

25  disorder.  Ruled out conduct disorder.  History of marijuana


                                45


1  and alcohol abuse.  And then Axis II, she has borderline

2  personality traits.  Ruled out learning disability.  Axis III

3  is a medical term that I'm not familiar with.  Axis IV is

4  moderate.  Axis V is global assessment functioning, 45.

5  Q.   So she has the same low level global assessment

6  functioning?

7  A.   Right.

8  Q.   And I want to show you two other documents that we

9  haven't looked at yet, Plaintiff's Exhibits 136 and 141.

10  What is Exhibit 136?

11  A.   Exhibit 136 appears to be the narrative that Matt

12  Bogardus wrote at intake.  It's an intake summary.

13  Q.   What is the date of this intake?

14   A.   June 8, 2004.

15   Q.   So that was another occasion when K.L. came back to Sarah

16   Reed?

17   A.   Correct.

18   Q.   And then 141 is Dr. Brunner-Martinez's initial

19   psychiatric evaluation at that time?

20   A.   Correct.

21   Q.   And the date of that is 6/17/04?

22   A.   That's right.

23   Q.   And, again, her impressions are anxiety disorder,

24   attention deficit, hyperactivity disorder and oppositional

25   defiant disorder; ruled out conduct disorder, is that right?


46


1   A.   Right.

2   Q.   Essentially, K.L. was the same in June of 2004 as she had

3   been, according to the doctor, as she had been in January of

4   2002?

5   A.   Her diagnoses were the same, yes.

6   Q.   Now, for some kids Sarah Reed doesn't always work, is

7   that right?

8   A.   Right, unfortunately not.

9   Q.   At Sarah Reed you have children sometimes who are

10  passive, who are withdrawn, who are placed with very aggressive

11  children in the same classroom, is that right?

12  A.   That's correct.

13  Q.   Your review of the records was that it appeared that R.P.

14  did not do very well at Sarah Reed?

15  A.   That's right.

16  Q.   And do you know whether she has a history of conflict

17  with your staff such that she was subject to restraint?

18  A.   I don't know if she was restrained, but it does appear

19  there were conflicts.

20       MR. OLDS:  I have no other questions.  Before Mr.

21  Marnen gets up, I think we've identified Exhibits 2, 5, 8, 9,

22  30, 34, 36, 108, 136, 127 and 141.  I would move for their

23  admission.

24       THE COURT:  They're admitted.

25       THE COURT:  All right, Mr. Marnen.


47


1        MR. MARNEN:  I have no questions, your Honor.

file:///A|/RICHDAY3.TXT

2          THE COURT:  Thank you, sir, you're excused.

3          THE WITNESS:  Thank you, judge.

4          THE COURT:  Call your next witness?

5          MR. OLDS:  That will be Ms. Woods, Janet Woods.

6          THE CLERK:  Would you raise your right hand.

7          JANET WOODS, PLAINTIFFS' WITNESS, SWORN

8          MR. OLDS:  Your Honor, I'd like to be able to

9  proceed --

10          THE COURT:  As on cross-examination?

11          MR. OLDS:  Yes, as on cross-examination.

12          THE COURT:  All right.

13          (Called as on CROSS-EXAMINATION)

14  BY MR. OLDS:

15  Q.    Ms. Woods, would you state your full name for the record?

16  A.    My name is Janet Mary Woods.  J-a-n-e-t, middle name is

17  Mary, M-a-r-y, last name is Woods, W-o-o-d-s.

18  Q.    And are you retired now?

19  A.    I took early retirement, that is correct, in 2003.

20  Q.    How long had you worked for the Erie School District?

21  A.    I was employed by the City of Erie School District in

22  1990, I was employed there from 1990 through 2003.

23  Q.    And were you employed at a school district prior to

24   working for the Erie School District?

25   A.   Yes, in 1974 I was employed by Penncrest School District

48

1   in Crawford County.  I was employed in the special services

2   department.  I worked with special education and disadvantaged

3   students for six years in special education and vocational

4   programs.  In 1980 I was an assistant principal at Cambridge

5   High School.  I was also the principal there for a period of

6   time, when the principal had a stroke, for about a year.  I was

7   also the assistant principal at Maywood High School in 1990.

8   I came to the City of Erie School District as an assistant

9   principal.

10   Q.   At some point you became the principal of Strong Vincent

11   High School?

12   A.   That is correct, in 2000 I was assigned to Strong Vincent

13   High School.

14   Q.   Strong Vincent High School at that time consisted of --

15   it had encompassed grades 7 through 12?

16   A.   That is correct.

17   Q.   There was a middle school, would that consist of 7th and

18  8th grade?

19  A.   Middle school, high school.  7th and 8th was the middle

20  school, 9th through 12th was the high school.

21  Q.   Was there any physical division of classes so that the

22  middle school kids didn't interact with the high school kids?

23  A.   The middle school had its own curriculum, identical to

24  the other curriculums in the middle schools in the City of Erie

25  system.  Those students were -- they were totally segregated,

49

1  obviously, it's one building.  But we had the majority of 7th

2  and 8th grade classes, basic curriculum classes, on the second

3  floor of the northeast, east end, southeast side of the

4  building.  I located my administrative assistant principal in

5  that area specifically to be with those children.

6  Q.   How many children were in the middle school?

7  A.   Oh -- about 200.

8  Q.   Do you have any idea how many of those 200 children had

9  learning support classes?

10  A.   Well, that number fluctuates, Mr. Olds, but basically

11  about 25 percent, 20 percent of the students are in learning

12    support.  That could be learning disabled, emotional support,

13    that also could be educable mentally retarded, which is a wide

14    area.

15    Q.    What were your responsibilities as the principal?

16    A.    Any principal in the school district is the CEO of the

17    building, it's the person in charge of all programs.  In the

18    building, for curriculum, for hiring, supervision of teachers,

19    all meetings downtown, anything pertaining to school district

20    policy, policy to be made.  Daily operation of the building.

21    Which would include all teaching faculty, all maintenance, all

22    activities.  At Strong Vincent that was a very big

23    responsibility because it was a middle and a high school.  So

24    we were running two schools, two curriculums, two athletic

25    teams of middle and high school.  Daily operation of everything


50


1    in the building.  Primarily, supervision of the assistant

2    principals, who took care of discipline primarily.  And all

3    school functions, and also any programing that would have been

4    extracurricular.

5    Q.    How many assistant principals were there?

6  A.    There were three assistant principals assigned that year.

7  Q.    Ms. Cappabianca would be for the middle school students?

8  A.    Yes, I had requested when I arrived there, when I was

9  assigned to Strong Vincent in 2000, I had a specific request

10  that Ms. Cappabianca be retained as the 7th and 8th grade

11  assistant principal.  She was assigned there in March, I wanted

12  her to remain there.  She knew the students, and I wanted her

13  to be specifically there for the 7th and 8th graders.  I had

14  two other assistants.  A gentleman and another woman, who were

15  in charge of programing and the 9th through 12th graders.

16  Q.    And Ms. Cappabianca was an assistant principal, right?

17  A.    Yes, sir, she was.

18  Q.    At Strong Vincent High School.  What were her

19  responsibilities?

20  A.    To shepherd those kids.  Linda's responsibility was to be

21  in that area of the building, her office was on the second

22  floor, I specifically gave her a place on the second floor

23  where she would be in constant contact with those students,

24  with the 7th and 8th grade.  And she also took care of a lot

25  of, as did all the assistant principals, took care of any

1  discipline issues that would come up.  In the 7th or 8th grade,

2  if there were a discipline issue, she would take care of that.

3  Her main goal, as was all assistants, was to make sure if there

4  were any concerns about any students, that we address those.  I

5  was mostly interested in making sure that every student in that

6  school was successful.  When you have a 7th through 12th

7  school, Mr. Olds, it is always my hope that when a student

8  comes there in 7th grade -- that we could make certain that

9  that student would have six successful years.  I was very

10  interested and I've always been a career high school principal.

11  I am always interested in a student completing a high school

12  diploma.  I'm also interested in that family and that student

13  feeling successful in having a good high school experience.

14  When you have a junior or middle or senior high school

15  combination, I always think it's a golden opportunity to get

16  that student in 7th grade and be able to hang on to them for

17  six years and make sure that they're successful.  My goal for

18  Linda was, for Ms. Cap to make certain that those students had

19  the foundation that they needed, both academically and

20  socially, that they felt a part of that school.  And that they

21  were going to be successful in that school.  And would

22  graduate, would complete, that was really critical.  They had

23  closed another school, they had closed Gridley Middle School

24  and put those students at Strong Vincent in 1992.  I was very

25  interested in having those students as good high school

52

1  students.

2  Q.   Well, specifically, her duties would be, number one, she

3  would be responsible for disciplining for the middle school

4  students, is that right?

5  A.   That's correct.  She was responsible for the

6  curriculum -- the teachers, and the discipline.  She was

7  responsibility for making sure that there were substitutes.

8  She was in charge of student supervision, that is correct.

9  Q.   If, for instance, if a student was acting up, acting out

10  behaviorally, Ms. Cappabianca, rather than you, Ms. Cappabianca

11  would be the person to deal with that student?

12  A.   That's correct.  But Ms. Cap -- if I could finish --

13      THE COURT:  Excuse me a second.  First of all, I

14  presume the record should reflect that Ms. Cap is Linda

15  Cappabianca, is that correct?

16      THE WITNESS:  That's correct, your Honor.

17      THE COURT:  All right, go ahead.

18  BY MR. OLDS:

19  Q.    And then if a student complained to Ms. Cappabianca, at

20  least on an initial basis, she would be responsible -- say a

21  student complained about another student, on an initial basis

22  she would be responsible for handling that, isn't that right?

23  A.    Correct.

24  Q.    And did she have authority to impose discipline on

25  students in the sense that she could send them to the PASS or

53

1  impose in-school discipline, she had that authority?

2  A.    That is correct.

3  Q.    And she would be the person principally responsible for

4  overseeing the behavior of the students at that school, is that

5  correct, the middle school students?

6  A.    In concert with the teachers, that is correct.

7  Q.    You, as the principal, on occasion would be involved with

8  maybe more serious discipline issues, but she was the person

9   that would handle the day-to-day problems and was responsible

10  for those problems, is that right?

11  A.   That is correct.

12  Q.   Now, I would assume that you're familiar with Title IX?

13  A.   Correct.

14  Q.   What is your understanding of what Title IX means to a

15  high school -- let's actually confine that to middle school?

16  A.   Okay, I would treat them both the same.  Because those

17  students are all minors.  All students are informed at the

18  beginning of the year in plain language, when we review the

19  discipline handbook with them, when I had individual class

20  meetings with every single class, they were given instructions

21  that absolutely no one -- every student in class meetings,

22  which are held by me, were told that absolutely no one had

23  permission to touch them without their permission, no one had

24  permission to bother them.  All students were informed in class

25  meetings by me and the 7th and 8th graders were informed at


54


1   lunches, because I met those 7th graders everyday at their

2   lunch, I went and got caught up with Ms. Cappabianca, I met

3  those 7th and 8th graders.  They were informed about Title IX

4  through the handbook.  But to make it relevant to them, they

5  were told that absolutely no one was allowed to touch them.  No

6  one was allowed to bother them.  And if they needed help, they

7  had to say one thing, they had to say three words to me.  This

8  has been my personal policy for the 23 years that I've been a

9  principal in the system, what do you say if you need help.  And

10  the students will say to me I need help.  I said what do you

11  say if your friend needs help and they won't speak for

12  themselves.  It's on you to speak for them and say she needs

13  help, he needs help.  And that was explained to them in those

14  terms when we covered the student handbook.  We did that both

15  in homeroom, we did that over a two-week period, the second or

16  third week of school, we had homeroom teachers review different

17  parts of that handbook.  It's a very, very lengthy document.

18  And then there were explicit parts that I just covered with my

19  class meetings.  One of those was whether someone is bothering

20  you.

21  Q.    Okay.  Let me show you Exhibit 62 -- I believe you made

22  reference to that, that's the handbook that you were

23  discussing, is that right?

24  A.    Yes, sir.

25  Q.    Where is the Title IX policy in the handbook?


55


1  A.    Mr. Olds, turn to page 27, there is very explicit

2  information about harassment and sexual harassment.  There is

3  also information in other categories of this handbook.  I would

4  draw your attention to page 23 about disrespect.  I've been a

5  principal for 23 years, I've always had four rules, no matter

6  what school I was in.  I was at Wayne Middle School, Maplewood

7  High School, Cambridge Junior, Senior High School, Wayne Middle

8  School, those schools, the four rules were respect others and

9  their property; be on time; be prepared; and have school

10  spirit.  And we spent a great deal of time on respect.  There

11  is half a page devoted to that on page 23.  Sometimes that

12  carries over into, depending on the severity of the infraction,

13  would carry over into harassment and other categories.  This

14  book has several places that alludes to that.

15          THE COURT:  Ms. Woods, wait for the next question.

16  Go ahead.

17  BY MR. OLDS:

18  Q.    I'm showing the jury from page 27, the sexual harassment

19  policy that proceeds onto page 28, is that right?

20  A.    Correct.

21  Q.    Who was the Title IX officer for Strong Vincent High

22  School?

23  A.    I am responsible to make sure that this entire book and

24  the procedures regarding this book are followed.

25  Q.    Ms. Woods, who was the Title IX officer for the Erie

56

1  School District?

2  A.    For the Erie School District?

3  Q.    Right.

4  A.    I believe it's Danny Jones.

5  Q.    Who is Stanley Jones?

6  A.    Danny Jones is, well, at that time, I don't know if he's

7  still with the district, but at that time he was in charge of

8  student assistance programs and several student services.

9  Q.    Let me just step back a second.

10        MR. OLDS:  The whole policy we marked as Plaintiff's

11  Exhibit 62, I would move for the admission of Exhibit 62.

12        THE COURT:  It's admitted.

13  BY MR. OLDS:

14  Q.    This is called, the title of the document is "Middle and

15  High School Discipline Policy, 2001-2002," is that right?

16  A.    Correct.

17  Q.    This wasn't published by you at Strong Vincent, this was

18  published by the Erie School District, is that right?

19  A.    That's correct.

20  Q.    So all of its provisions are applicable throughout the

21  school district, is that right?

22  A.    Correct.

23  Q.    They weren't just provisions that you had enacted at

24  Strong Vincent?

25  A.    Correct.


57


1  Q.    Now, what other documents were there that were given to

2  the students that talked about student rights; were there any

3  other student documents or did this encompass all of them?

4  A.    Teachers would -- teachers were required be me in my

5  building to list all the rules, all instructions for their

6  classroom and to submit a copy to me.  So if I ever had a

7   conversation with that teacher or any student relating to that

8   particular teacher, so there were -- those were building

9   specific.

10  Q.   Now, what was the complaint procedure under Title IX with

11  students?

12  A.   If a student or parent had a concern, they were -- all

13  the assistant principals, if they would happen to take a

14  complaint, were instructed to come to me.  I would then deal

15  with the issue and inform downtown that there was a complaint

16  and make sure that we were compliant.

17          THE COURT:  Tell the jury what you mean by downtown?

18          THE WITNESS:  Thank you, your Honor.  As a principal

19  we were responsible to the director of the high schools.  We

20  were responsible to the director of special education, for

21  example, Mr. Scozzie.  We were responsible to the assistant to

22  the superintendent, Mr. Scozzie.  We were responsible to the

23  assistant superintendent, who was John Linden.  So when I say

24  downtown, I would be referring to someone in an administrative

25  position.  If it was special education, we would have then

58

1   perhaps also talked to Charlise Moore or Jim McKenzie, who was

2   the supervisors of special education.  Was that clear, judge,

3   your Honor?

4        THE COURT:  Well, it's really up to the jury.  But I

5   think for present purposes you described it, go ahead.

6   BY MR. OLDS:

7   Q.   Were you aware that Title IX requires a school district

8   to adopt and publish a grievance procedure?

9   A.   I don't know, I'm sure they are.  But I can't give it to

10  you off the top of my head.

11  Q.   Are you familiar, do you know if there is a grievance

12  procedure set out in this handbook that governs Title IX?

13  A.   There are rights and responsibilities in the front.  And

14  I haste to take up too much time to do this --

15       THE COURT:  Let me see counsel at side bar a minute,

16  please.

17       (At side bar on the record.)

18       THE COURT:  This isn't by way of meddling, but for

19  the life of me I don't know how any of this relates to the

20  heart of this case.  Procedures, the grievance procedures, the

21  records.  What they do elsewhere at the district.  Why don't

22  you cut to the chase of this case.

23      MR. OLDS:  I think, your Honor -- trial tactics.

24  She's giving me three minute answers.

25      THE COURT:  Step in and do something about it.


                                59


1  You're not doing it, number one.  You're right, she is rambling

2  on.  But more to the point, I think let's get to the point.

3  There is no point just bringing out record after record after

4  record if it isn't germane.  Let's sharpen this discussion up.

5  And you are free, if you think that she's going on, you can ask

6  that she be interrupted.  I am not permitted to jump in to try

7  anybody's case, much less interrupt witnesses.  You have to

8  take control.

9      (End of discussion at side bar.)

10  BY MR. OLDS:

11  Q.    There isn't a description of Title IX grievance procedure

12  in the handbook, is there?

13  A.    I don't see one off the top of my head, but on page four,

14  "responsibilities of administrators, provide the opportunity

15  for students, staff" --

16        THE COURT:  Too fast.

17        THE WITNESS:  I apologize.  "Provide the opportunity

18   for students, staff and parents to approach the administrator

19   directly for redress of grievance."  I had an open-door policy,

20   obviously.  It's the only way to communicate with parents and

21   kids is to hear what is on their mind.

22   BY MR. OLDS:

23   Q.    Did you fashion yourself as a good listener, Ms. Woods?

24   A.    Absolutely.

25   Q.    Okay.  I do want to show you one page at the beginning of


                                60


1   this document, this is on page one of the handbook, it says

2   "student discipline records will remain a part of the student's

3   permanent files."  Was that the policy of the Erie School

4   District when you taught there, apparently it was?

5   A.    Yes.

6   Q.    Now, you had interactions with my clients, K.L. and R.P.

7   in 2001-2002, is that accurate?

8   A.    Correct.

9   Q.    Did you know K.L. before she was sexually assaulted?

10  A.   I knew -- all of the 7th and 8th graders from being in

11  the lunchroom.  I did not have direct contact with her about

12  any particular issue.

13  Q.   Did you know R.P.?

14  A.   Sure.

15  Q.   Before the assault?

16  A.   Sure.

17  Q.   And K.L. was a petite, slight girl, is that right?

18  A.   She was an average size kid.

19  Q.   She wasn't average, she was small?

20  A.   Yes, she was small, short.

21  Q.   R.P. was actually sort of tall?

22  A.   Yes, she was taller.

23  Q.   You understood that K.L. was part of the learning support

24  class?

25  A.   Correct.


61


1  Q.   You were not familiar with kid's IEPs -- when I say IEP,

2  for the jury that means an individualized education plan.  Were

3  you familiar with those plans for the students?

4  A.   I was familiar in that I knew which students in my

5  building were identified as special education students,

6  learning support.  All of those students are required by law to

7  have an IEP written every year in November.  Often I would be

8  apprised.  If there was anything out of the ordinary, if there

9  was information that I needed to be apprised of in an IEP, for

10  example, a schedule change.  Generally, I knew about them.  I

11  wouldn't be involved in every IEP, no.  Assistance may be

12  involved in special education supervisors and the teacher of

13  record that was in charge of that student.

14  Q.   An IEP might be written because a child has a learning

15  disability or because they're cognitively challenged, is that

16  right?

17  A.   That's correct, we determine what percent of their

18  regular education or special education will be.

19  Q.   We will move a little faster through this, just sort of

20  answer my questions?

21  A.   I will try.

22  Q.   And so if you recall that K.L. was cognitively deficient

23  in that she was mildly mentally retarded?

24  A.   Correct.

25  Q.   R.P. had a learning support program based upon her

file:///A|/RICHDAY3.TXT

62

1   ability to express and her communication skills, is that right,

2   in reading and math?

3   A.    I wouldn't know that, sir, without looking at her IEP.

4   Q.    Now, you have a wide range of behavioral problems with

5   students in middle schools, is that right?

6   A.    As you do in any school.

7   Q.    In particular, middle school students can be maybe the

8   most active, make the most trouble to deal with, with all of

9   the students K through 12, is that right?

10  A.    I would not necessarily agree with that statement.

11  Q.    Now, in the school at Strong Vincent, there would be

12  middle school students who might pick on other students, is

13  that right?

14  A.    That could happen in any school.

15  Q.    Well, that's what we're talking about.  And that could

16  happen at Strong Vincent as well, is that right?

17  A.    Yes.  Students pick on each other in every grade, at

18  every level.  The difference is middle school students are

19  younger.

20  Q.    And there's also a group of students or there could be a

21  class of students who become the targets or the victims of the

22  classroom, of the class bullies or school bullies, is that

23  right?

24  A.    I don't allow bullying.

25  Q.    But you're not saying that there wasn't bullying going on

63

1  at Strong Vincent, there was an absence of bullies, is that

2  what you're saying?

3  A.    My goal was to have no one bother anyone.

4  Q.    I know that was your goal, are you saying that there was

5  no bullies at Strong Vincent?

6  A.    Kids participate in bothering others everywhere.  And my

7  goal was to always put a stop to that, no one was to bother

8  anyone.

9  Q.    And when kids and since kids do that everywhere, then we

10  can assume that they did that at Strong Vincent as well?

11  A.    Sure.

12  Q.    And you weren't just dealing with a middle school there,

13  you were the principal of a high school that accompanied the

14  middle school, is that right?

15  A.   I was the principal of Strong Vincent High School.

16  Q.   You spent a lot of time downtown with the administrators,

17  is that right?

18  A.   I spent as little time as I could downtown, I spent the

19  majority of my time in that building.

20  Q.   You had a lot of things to deal with, athletics,

21  curriculum, the whole range of things, is that right?

22  A.   Yes.

23  Q.   You wouldn't tell the jury that on given days that there

24  weren't times when there was some kids bullying other kids in

25  that school, you wouldn't tell them that, would you?


                                    64


1  A.   Would you restate that, sir.

2  Q.   You wouldn't tell this jury that there were not days when

3  kids were bothering other kids at Strong Vincent?

4  A.   It's a typical school.  Kids are going to try to --

5  Q.   Has it been your experience as a principal that children

6  who are maybe mildly mentally retarded might be more vulnerable

7  to bullying or being bothered by other students?

8   A.    No.

9   Q.    So it's your opinion, based upon some 25 or 30 years in

10  the school system, that students don't pick on kids who are

11  mildly mentally retarded?

12  A.    They do, but I don't think it's disproportionate to any

13  other disability or any other kind of student.  Boys picks on

14  girls.  I mean, there are a myriad of reasons that someone

15  might.

16  Q.    The mildly mentally retarded might not be able to defend

17  themselves in the same fashion that a kid with normal

18  intelligence would defend themselves, though, is that right --

19  you would agree with that, wouldn't you?

20  A.    I would agree with that, as well as students that are 12

21  and 13 and 14-years-old don't have the skills that a high

22  school senior has, absolutely.

23  Q.    Now, concerning K.L., before we get to K.L. -- we've

24  heard the names of a couple students in here in this case, C.B.

25  and B.C.; I'm sure you remember C.B.?


65


1   A.    Sure.

2  Q.   C.B. was a significant problem for the school, wasn't he?

3  A.   He was -- he was a bad egg, he was insubordinate and

4  disrupted others educationally, yes.  No all the time, he had a

5  good side to him.

6  Q.   You say he was a bad egg.  He was dishonest at times?

7  A.   He stole a jar of candy once that I remember.

8  Q.   Do you recall saying that he would always deny being

9  wrong or doing wrong?

10  A.   He was a sneak.  He would try to weasel out of stuff.  He

11  was sort of a typical, he was a typical young kid who liked to

12  be a sneak.

13  Q.   It's a fact that as the fall of 2001 progressed, Ms.

14  Cappabianca was compiling records to try to get C.B. out of

15  Strong Vincent?

16  A.   Correct.

17  Q.   And, in fact, if we looked at the disciplinary code here,

18  I believe there is a progressive discipline system -- there was

19  a progressive discipline system at the school, wasn't there?

20  A.   Yes, and C.B. was in special education, so we frequently

21  visited his behavior modification behavior plan.  As we did

22  with any student that we thought needed to improve their

23  behavior.

24  Q.   This is from page 11 of Exhibit 62, the discipline

25  policy, what I have on the screen here for the jury to see is


66


1  the discipline policy beginning with -- you start off with

2  after-school detention, Saturday detention, after-school

3  suspension, out-of-school suspension, alternative education,

4  and expulsion, is that right?

5  A.   That is correct.

6  Q.   And a child who presents a behavior problem at Erie

7  School District, gets into that progressive discipline system

8  and if their behavior didn't modify or correct, it would go to

9  the next level, the discipline would be upped on them, is that

10  correct?

11  A.   That's correct.  But in special education it was very

12  difficult to -- we didn't suspend students out of school.  And

13  alternative education was not -- it was very difficult when a

14  student was in special education.

15  Q.   Because there are different rules and regulations?

16  A.   Exactly.

17  Q.   But, in fact, isn't it true before Christmas of 2001,

18  C.B. was at the level of discipline that Ms. Cappabianca was

19  trying to get his mother to agree that he would go to an

20  alternative education setting?

21  A.   Yes, and I was there, I was present at that meeting.

22  Q.   So that means that he had engaged in conduct that first

23  he had after-school detention, and then the Saturday, he

24  progressed through that system, is that right?

25  A.   Yes, any student in that building, special education or

67

1  regular education, this is the format that is used.  And, in

2  particular, special education students, we spend a lot of time

3  doing behavior plans with those students.  That's part of their

4  IEP.

5  Q.   And then there was another student that we heard of, a

6  B.C., and she was another bad egg, isn't that right?

7  A.   I was less involved with B.C., less aware of her than

8  Linda was.  I won't speak to that because I knew B.C., but I

9  didn't know that much about B.C.  I knew that all those girls

10  were friends.

11  Q.    And it is true that before Christmas of 2001, Linda

12  Cappabianca came to you and told you that she had heard hall

13  talk that there had been some sexual activity between C.B. and

14  K.L.?

15  A.    Correct, she told me that there had been some hall chat,

16  that's correct.

17  Q.    That was shortly before the Christmas break, 2001?

18  A.    Yes, I know exactly when that was.  It was after school

19  on a Wednesday, we had activities for students on the Friday,

20  Friday was their last day before that holiday break.  It was

21  after school that Wednesday because I was on my way down --

22        THE COURT:  Slow down, please.

23        THE WITNESS:  I'm sorry, judge.  I was on my way

24  after school down the hall talking to some teachers about the

25  activities we had arranged for students on Friday.  Friday, the


68


1  day before vacation, is traditionally a low attendance day, but

2  we have a lot of activities planned for those students.  I was

3  on my way down the hall when she apprised me of that situation,

4  actually, she came in to see me, but I said I'll be right back,

5   I'm on my way down the hall.

6   Q.   When she reported that hall talk and, basically, that

7   means that she had overheard students discussing the

8   possibility of a sexual encounter between C.B. and K.L.?

9   A.   It wasn't a discussion -- the comment, as I recall, she

10   described to me the comment was made during class change.

11   There was a great deal, a number of students out in the hall,

12   something was shouted from one side of the hall to the other,

13   or one end -- just down the hall, and she said that she heard

14   someone calling out something.  It was not a discussion.  It

15   was during a class change, it was a comment.

16   Q.   So someone called about something?

17   A.   Yes.

18       THE COURT:  Hang on a second, you're speaking over

19   each other.  Wait until he finishes and wait till she finishes.

20   Why don't you start that question again.

21   BY MR. OLDS:

22   Q.   Let me remember real quick.  So, it actually is, as you

23   recall it, someone shouted out some word or a series of words

24   that Ms. Cappabianca heard, is that right?

25   A.   Correct.

1   Q.   And the words that they shouted out involved something

2   involving sexual activity between C.B. and K.L., is that right?

3   A.   Yes.

4   Q.   So Ms. Cappabianca must have heard enough in that -- I

5   guess in that instant of shouting out that she was able to,

6   number one, identify who the students were talking about or who

7   the comment was referring to, it was referring to C.B. and

8   K.L., right?

9   A.   I don't know that.

10  Q.   Well, we'll get to that, and that she also knew it had

11  something to do with sexual activity, is that right?

12  A.   I'm not going to speak for her.

13  Q.   Well, I'm talking about --

14       THE COURT:  Hang on a second, you have to really

15  slow down.  We will have no record that's worth anything if

16  everybody doesn't slow down a little bit.  Okay.  Let's go.

17  BY MR. OLDS:

18  Q.   Let me try it again, I'll try to slow down.  Ms. Cap came

19  to you and said --

20       THE COURT:  Use her real name.

21      MR. OLDS:  I'm sorry about that.

22  BY MR. OLDS:

23  Q.    Ms. Cappabianca came to you and advised you that she knew

24  that there was something said about two students, C.B. and

25  K.L.?

70

1  A.    Correct.

2  Q.    And there was also something said about sexual activity?

3  A.    Correct.

4  Q.    And it was you who told her to investigate that by

5  talking to C.B. and K.L.?

6  A.    I told her to go to talk to C.B., he was in PASS that

7  night.  It was pretty vague -- there was nothing specific said

8  in the hall.  But when you hear a student shouting during hall

9  change, that catches your attention.  I mean, when you have

10  class change and you have somebody, and the students are

11  passing by and talking in a normal tone of voice and someone

12  shouts something, it's going to be something that catches your

13  attention.  She brought it to my attention, as she did

14  everyday.  I saw her at the lunchroom, I went down to see the

15  7th and 8th graders everyday.  I met with each assistant

16  principal at the end of the day before they went home to cover

17  things, and this one of the things that she brought to my

18  attention.  It didn't appear that there was anything specific

19  we could get.  I asked her to maybe to keep -- I know I said

20  keep your ear to the ground.  That was something I always said,

21  keep your ear to the ground, if there's something to be taken

22  care of, we would certainly know about it sooner or later.

23  Kids talk.  So someone shouting something in the hall and it

24  becomes substantive, we're going to deal with it.  I said keep

25  your ear to the ground.


71


1  Q.    You started off your testimony I think referring to three

2  words, I need help?

3  A.    Exactly.

4  Q.    Obviously, that involves an administrator listening to a

5  student who approaches them and says I need help?

6  A.    Yes, but that student --

7  Q.    Well, there's an obligation on the administrator to

8  listen to the student?

9   A.   Oh, sure, absolutely.

10   Q.   I mean, I think you said that was the most important role

11   that if the student says I need help, you're going to help that

12   student, is that right?

13   A.   Yes, that's not the most important rule, but that is

14   certainly the way I ran the school.

15   Q.   Okay.  Now, Ms. Cappabianca didn't report to you every

16   instance when some student made a comment about another

17   student, she didn't report every instance, did she?

18   A.   Certainly not.

19   Q.   For her to make a report, such as the report she gave you

20   on December 19th, it must have been about a matter that struck

21   her as having some urgency, right?

22   A.   No, not urgency, noteworthiness.  If it would have been

23   urgent, I would have been able to do something with that

24   information.  But there wasn't any information.  It was

25   noteworthy and that's it.


72


1   Q.   Well, to get the information, you're going to have to

2   listen to the students, is that right?

3  A.    Right, and she came cross that student by accident, it

4  wasn't the student approached her.  The student was in the

5  front hall because and I saw her talking, I saw her approach

6  that student.  Ms. Cappabianca approached that student.  It

7  wasn't the other way around, the student didn't approach her,

8  she approached that student.

9  Q.    Well, let's see.  First of all, when we're talking about

10  that student, we're talking about K.L.?

11  A.    Yes.

12  Q.    And when you say you saw her approach K.L., that means

13  that what you're telling this jury is that you must have been

14  outside of your office, is that right?

15  A.    I was walking down -- down the hall to talk to some

16  teachers about the activities on Friday.  I saw her talking to

17  K.L.

18  Q.    Well, you said you saw her approach K.L.?

19  A.    No, Ms. Cap told me --

20        THE COURT:  Excuse me, I'm going to say it again.

21  I'm not being accusatory, I'm just trying to help.  Please slow

22  down.  Slow down your examination, slow down your responses.

23  Go ahead.

24  BY MR. OLDS:

25  Q.   I thought you said that you saw Ms. Cappabianca approach

73

1   this student and you were certain that the student had not

2   approached Ms. Cappabianca?

3   A.   I saw Ms. Cappabianca talking to the student.  We have a

4   little fish in the front hallway.  I saw Ms. Cap talking to

5   that student.  When she came into see me, when I returned to my

6   office, she came in and she said -- she had been told about the

7   hall chatter.  She then said that she had seen K.L. when she

8   was coming to the office, because her office is upstairs.  And

9   she had came down to the main office, she talked to K.L., she

10  saw K.L. at the go fish and she went over and talked to her.

11  Q.   Did you say K.L. was going to her office?

12  A.   No.

13  Q.   And K.L. was 12-years-old at that time, is that right?

14  A.   I don't know.

15  Q.   The age of consent -- are you, as an administrator who's

16  been a principal for several decades, vice principal and

17  principal, you're aware that below a certain age sexual

18  activity involving a minor is a crime, is that right?

19  A.   Correct.

20  Q.   Now, K.L. was mildly mentally retarded, is that right?

21  A.   She was a pretty average kid, she was identified as a

22  learning support student.

23  Q.   Ms. Cappabianca told you that K.L. told her that some

24  sexual activity occurred between K.L. and C.B., is that

25  correct?

74

1  A.   Correct.

2  Q.   It is correct?

3       THE COURT:  We tilled this field.

4       MR. OLDS:  I didn't hear her?

5       THE WITNESS:  Correct.

6       THE COURT:  She said correct, let's go.

7  BY MR. OLDS:

8  Q.   Do you think that a 12-year-old who has had sexual

9  contact is likely to be injured by that sexual contact?

10  A.   When someone shouts something in the hall did you hear

11  what happened with C.B. or whatever was shouted in the hall,

12    that can mean anything from -- you know, kissing in the

13    hallway, hand holding.  We had no information on that day of

14    anything that would have raised my antenna so severely that we

15    would have known it was absolute sexual contact.  I would

16    never, I would never in a thousand years ignore something that

17    I thought was severe.  That was a passive comment.  She brought

18    it to my attention, we talked about it, I said keep your ear to

19    the ground if there's something, you know.

20    Q.    But you know that Ms. Cappabianca heard K.L. say that

21    yes, there was sexual activity involving C.B., and K.L. told

22    that to Ms. Cappabianca and you knew that, isn't that true?

23    A.    And I don't know if I can repeat -- your Honor, I may

24    need a little help here.

25          THE COURT:  Hang on a second, break down the


                                    75


1     question.

2           THE WITNESS:  I need a little help.

3           THE COURT:  The help that can be given is only a

4     clarification of the question if you're unsure about the

5     question and want it repeated?

6          THE WITNESS:  Can I state, your Honor, what Ms. Cap

7    said to me?

8          THE COURT:  Well, I'm not going to ask you the

9    question, that's up to the lawyer.  Go ahead.

10    BY MR. OLDS:

11    Q.    So you can't answer the question as I propounded it to

12    you, is that right?

13    A.    Try it again, Mr. Olds.

14    Q.    You saw Ms. Cappabianca talking to K.L.?

15    A.    Correct.

16    Q.    Ms. Cappabianca told you that, number one, she had heard

17    something about sexual activity shouted in the hall?

18    A.    From what I understand was shouted in the hall was did

19    you hear about so and so and so and so.  It wasn't about a

20    sexual activity.  It was, I guess you could maybe infer that,

21    although I would not infer that, unless I heard it directly

22    from a student.  She said that she had talked to K.L. --

23          THE COURT:  She meaning?

24          THE WITNESS:  Ms. Cappabianca had talked to K.L.  I

25    saw her talking to her and questioned her about the comment in

76

1   the hall.

2   BY MR. OLDS:

3   Q.   Right, isn't it a fact that Ms. Cappabianca told you that

4   K.L. said yes, some sexual activity occurred?

5   A.   There was something between she and C.B., correct.  I

6   don't think sexual activity, Mr. Olds, was the choice of words,

7   although, I don't know, I don't believe it was the choice of

8   words.

9   Q.   Okay.  We're talking about a 12-year-old mildly mentally

10  retarded girl, is that right?

11  A.   We're talking about a learning support student, that is

12  correct.

13  Q.   Well, no, we're talking about K.L., we're not talking

14  about a learning support student; we're talking about K.L., a

15  real person, is that right -- we are talking about K.L.?

16  A.   Correct.

17  Q.   And K.L., a mildly mentally retarded 12-year-old girl,

18  advises Ms. Cappabianca that something of a sexual nature

19  occurred between her and C.B.?

20        MR. MARNEN:  I think she's answered this question.

21        THE COURT:  It's been asked and answered, move on to

22  another area.  We're going to take a five-minute recess.

23      (Recess from 11:28 a.m.; until 11:35 a.m.)

24      THE COURT:  Go ahead, Mr. Olds.

25  BY MR. OLDS:


                        77


1  Q.    Ms. Woods, do you recall I took your deposition on April

2  11th of 2005?

3  A.    Yes.

4  Q.    And do you recall that I asked you the question "whether

5  the hall talk that Ms. Cappabianca overheard involved sexual

6  activities?"  Do you recall that I asked that you question?

7  A.    Yes.

8  Q.    Do you recall what your answer was at that time?

9  A.    No.

10  Q.    You don't recall?

11  A.    That there was some hall chatter and that she apprised me

12  that she was --

13  Q.    I'm asking you the question, do you recall what your

14  answer was at that time?

15  A.    No.

16          MR. OLDS:  Your Honor, may I approach the witness?

17          THE COURT:  You don't have to ask permission, go

18   ahead.

19   BY MR. OLDS:

20   Q.    Page 58 of your deposition, I asked you the question --

21          THE COURT:  What line?

22          MR. OLDS:  Line 11, your Honor.

23   BY MR. OLDS:

24   Q.    "And that the hall talk centered on the fact that there

25   was some type of sexual activity between the two of them, is

78

1    that right?"

2    A.    Correct.

3    Q.    Could you read what your answer was?

4    A.    What line again?

5    Q.    Would be line 11, then the answer?

6    A.    Line 11, "Question:  And that hall talk centered on the

7    fact that there was some type of sexual activity between the

8    two of them, is that correct?"  Line 14, "Answer:  Yes."

9    That's what we ascertained from what occurred.

10   Q.   So when I took your deposition, you recall that the hall

11   talk centered on sexual activity and in fact it did, didn't it?

12   A.   Yes.

13   Q.   And do you recall that at your deposition on April 11th,

14   I asked you some questions about what K.L. -- what Ms.

15   Cappabianca learned from K.L. after she talked to K.L.; do you

16   recall I asked those questions?

17   A.   Yes.

18   Q.   And I asked a question, and this would be on page 58,

19   line 23, "And in fact isn't it true that Linda Cappabianca told

20   you that K.L. said that there had been sexual contact between

21   her and C.B.?"  That was the question; do you recall what your

22   answer was?

23   A.   No.

24   Q.   I'm going to show you at the top of page 59 what your

25   answer was.


79


1   A.   Page 59, line 1, "What Ms. Cappabianca told me was that

2   she heard --

3        THE COURT:  Too fast, ma'am, slow down.  Start on

4    page 59, line 1.

5         THE WITNESS:  "What Ms. Cappabianca told me was that

6    she had overheard some hall talk.  Then she was talking to K.L.

7    after school and said is it true or something and K.L. said

8    yes.  Ms. Cappabianca normally would call the mother, inform me

9    and we would try to talk to the other student and see if we

10   could verify that -- that's not written here, but they're

11   middle school kids so you try to listen" --

12        THE COURT:  So the record is clear, you're now off

13   the deposition?

14        THE WITNESS:  Sorry.  Then there's two lines, "but,

15   again, they are middle school kids, so you try to listen with a

16   discriminating ear."

17   BY MR. OLDS:

18   Q.   Now, when you gave that answer on April 11, 2005, was it

19   the truth?

20   A.   Yes.

21   Q.   So, now, you'll agree with me that a rape is an awful

22   thing, is that right?

23   A.   Absolutely.

24   Q.   A rape of a 12-year-old is an awful thing, is that right?

25  A.   Absolutely.


80


1  Q.   And it's true that children have trouble talking about

2  being violently sexually assaulted, isn't that true?

3  A.   Absolutely.

4  Q.   Okay.  So you would expect if a child had been violently

5  sexually assaulted, raped, that that child would have

6  difficulty talking about it?

7  A.   Yes.

8  Q.   Okay.  And here we have a situation where Ms. Cappabianca

9  tells you that K.L. has told her that there was some sexual

10  activity between her and C.B.; that happened, didn't it?

11  A.   That she told me?

12  Q.   Ms. Cappabianca told you that K.L. told her that some

13  sexual activity occurred between her and C.B.?

14  A.   Yes.

15  Q.   And K.L. was 12-years-old at the time, right?

16  A.   As I stated before, I don't know if she was 12 at that

17  particular time.

18  Q.   When you gave your deposition, part of the answer, which

19  you just read, is that normally you would call the mother; you

20  gave that answer?

21  A.   Yes.  The assistant principal would call the mother if

22  there's something to report.

23  Q.   And so you guys must have thought that there was nothing

24  to report because you didn't call the mother and let her know

25  that K.L. had told Ms. Cappabianca that there had been sexual

81

1  activity?

2  A.   That's correct.  Because there is a range of sexual

3  activity when you have a young student, when you have a

4  12-year-old.  It necessarily wasn't rape.  When you have --

5  Q.   It could have been?

6  A.   Absolutely.

7  Q.   But you have to listen with a discriminating ear?

8  A.   Exactly.  I felt that we would have, if there was

9  something to this, there would be information forthcoming.

10  Especially if it was identified who said that.  If there was

11  hall chatter, something, that it would be brought to the

12  assistant principal's attention that she could investigate, if

13   she heard it, we would be able to ascertain that information

14   later.

15   Q.   What more do you need to hear than a 12-year-old telling

16   you that she had a sexual encounter with another student; isn't

17   the next question, Ms. Woods, what was the sexual encounter,

18   what was the nature of it, isn't that the next question?

19   A.   And I believe Ms. Cappabianca afforded K.L. that

20   opportunity.  They talked regularly.  Ms. Cappabianca was the

21   person who was in touch with students a lot.  And she had a

22   good relationship with this student.  I felt that if we took it

23   at the value that it was at the time, we were going to keep our

24   ear to the ground, I knew she had already established a

25   relationship with K.L.


82


1   Q.   Was there a counselor at that school?

2   A.   We had several counselors at our school.

3   Q.   Was there a school nurse?

4   A.   Absolutely.

5   Q.   Did it occur to you to have K.L. perhaps talk with

6   someone who was professionally attuned to young students who

7  maybe were victims of rape to see if K.L. had something to say?

8  A.   She was talking to somebody who was professionally

9  attuned and that was Ms. Cappabianca at that point.

10  Q.   Do you know what Ms. Cappabianca said to K.L. when K.L.

11  told her that it was true that there was some sexual activity

12  between her and C.B.?

13  A.   I don't recall.

14  Q.   Now, you did tell Ms. Cappabianca to talk to C.B., is

15  that right?

16  A.   Correct.

17  Q.   He denied it, is that right?

18  A.   Correct.

19  Q.   But he was a sneak, right?

20  A.   Yes.

21  Q.   So based upon his denial, you and Ms. Cappabianca chose

22  to do nothing after she had that talk with K.L.?

23  A.   We chose to keep our ear to the ground.  We chose to

24  monitor any other -- any kind of other talk that might have

25  come up.  Often you hear things.  You just keep listening and

83

1  listening until you have some real, until you have some

2  evidence or until you have something that you can go on.  I

3  felt that at that time that was -- that's what she needed to

4  do, was go talk to C.B., he was in PASS that day, so she went

5  down and talked to C.B.  And we left it at that for then.

6  Q.    But you know from the things that unfolded subsequently,

7  that K.L. was raped the day before she had this conversation?

8  A.    That's correct.

9  Q.    With Ms. Cappabianca?

10  A.    That's correct.

11  Q.    You can imagine that K.L. was in tremendous pain, is that

12  correct?

13  A.    I imagine she was, absolutely.  That was a very tragic

14  thing.

15  Q.    You did not call her mother?

16  A.    No, sir.  We had no knowledge of the day before, I wish I

17  had.

18  Q.    At this time you didn't call the police?

19  A.    We had absolutely no reason to call the police based on

20  the conversation that Ms. Cap had with --

21        THE COURT:  Please slow down.

22        THE WITNESS:  We had absolutely no reason on the

23  20th of December to call the police.

24  BY MR. OLDS:

25  Q.   Other than a 12-year-old girl said that there was sexual


84


1  contact or activity, at a minimum said there was sexual contact

2  or activity between her and an older student?

3  A.   If a student --

4  Q.   Could you just answer that question, I think that was a

5  yes or no, can you answer that question yes or no?

6  A.   Ask the question again.

7       THE COURT:  Reask the question with the benefit of

8  the microphone.

9  BY MR. OLDS:

10  Q.   You did have information that a 12-year-old girl said

11  that there was sexual activity between her and an older boy,

12  you had that information?

13  A.   Yes, we had that information, we didn't have any

14  specifics about the sexual activity.  If there were two

15  12-year-olds kissing outside the school after school, I

16  wouldn't call the police.

17   Q.   Right.  That's not this case?

18   A.   We found that out subsequently in January.

19   Q.   You didn't even think it warranted having the girl,

20   having K.L. talk to the counselor or the school nurse?

21   A.   No, she was talking to Ms. Cap, that was sufficient.

22   Q.   Now, you learned later on that you had a problem on your

23   hands concerning K.L. and R.P., didn't you?

24   A.   Yes.

25   Q.   And that came to your attention because R.P. had an

85

1   outburst in class?

2   A.   That's correct.

3   Q.   And when R.P. had the outburst, she was sent to Ms.

4   Cappabianca's office?

5   A.   Correct.

6   Q.   And that was on a Wednesday, is that right?

7   A.   Yes, that's correct.

8   Q.   That happened in the morning, is that right?

9   A.   About mid morning.

10   Q.   And at some point Ms. Cappabianca let you know about what

11  R.P. said that morning, is that right?

12  A.   Well, R.P. was with Ms. Cappabianca, was sent by the

13  teacher across the hall from Ms. Cappabianca's room, Ms.

14  Scully.  When Ms. Cappabianca was, when she questioned R.P.,

15  and learned the nature of the outburst, the reason for the

16  outburst, which is out of character for her, she immediately

17  brought her to my office.  So R.P. was with her.

18  Q.   And then you and Ms. Cappabianca interviewed R.P.?

19  A.   Yes, we talked to her at my office, correct.

20  Q.   And R.P. told you that she had been raped multiple times,

21  is that right?

22  A.   She told me that B.C. had coerced her.  She told me about

23  an unidentified older male, she didn't know who the kid was,

24  but we were able to find out who the kid was.

25  Q.   She told you that she had been forced to engage in oral

86

1  sex with multiple students, multiple times at the laundromat?

2  A.   I don't know about multiple students.  I know yes, she

3  did tell me about the incident at the laundromat.  We talked a

4  lot about that.

5  Q.    When she told you that, did you call her father?

6  A.    We tried to contact her father that day, we ended up

7  seeing her father that evening, that was the evening, that was

8  Wednesday the 9th, we saw Richard P. that night and wanted to

9  talk with him.  We weren't able to get him during the day, I

10  don't believe.  We were able to finally see him that evening

11  after the PASS program.  And he couldn't talk to us at that

12  time, and asked if we could -- he asked if we could wait until

13  morning, I said it could.  We had obviously encouraged R.P. to

14  talk to her father that evening when she got home.

15  Q.    You had learned that day that R.P. had been raped, is

16  that right?

17  A.    Well, we learned that day that something had gone on at

18  that laundromat.  We knew that the girls were not in PASS that

19  day, that only -- there were two students, male students, who

20  were in PASS, A.K. and A.F., none of the girls were in PASS.

21  They went home after -- they went home after school and this

22  incident happened at the laundromat after the PASS program,

23  about 6:30 at night, 7 o'clock at night.

24  Q.    My question was you learned that R.P. had been raped?

25  A.    Yes.

1  Q.   And you still had her go to PASS that evening after she

2  explained to you that she had been raped -- you had her go to

3  PASS that evening?

4  A.   We had R.P. --

5  Q.   Ms. Woods, just answer the question yes or no?

6        THE COURT:  Hang on.  Listen to the question very

7  carefully, he's going to repeat it now, confine yourself to

8  answering the question.

9        THE WITNESS:  Yes.

10  BY MR. OLDS:

11  Q.   You sent R.P. to PASS that night?

12  A.   Yes, she was in PASS that night.

13        THE COURT:  All right, we're going to take our

14  luncheon recess.  Members of the jury, be back at 1:30.

15        (Luncheon recess from 11:55 a.m.; until 1:35 p.m.)

16        THE COURT:  All right, Mr. Olds.

17        MR. OLDS:  Thank you, your Honor.

18  BY MR. OLDS:

19  Q.   Ms. Woods, I think that when we broke we were talking

20  about the interview with R.P., this would be on January 9,

21  2002. I think that you said and I might not have heard you

22  right, but I think that you said that what R.P. talked about

23  was the incident in the hallway, is that the first thing you

24  talked about?

25  A.    No.  R.P. had an outburst in Ms. Scully's class that

88

1  morning, about mid morning, and Ms. Scully took her over to Ms.

2  Cappabianca's office, which is right across the hall.  And Ms.

3  Cappabianca inquired, and then brought her down to me.

4  Q.    And did you say that one of the things that R.P. talked

5  about was the incident in the hallway where B.C. shoved her

6  down into the stairwell?

7  A.    No, we talked about the incident at the laundromat.

8  Q.    Okay.  Now, supposedly you interviewed a number of people

9  over the course of the next several days, is that right?

10  A.    Over the course of that afternoon and the next day, we

11  tried to sort out the details.  We tried to determine what

12  happened, where it happened and tried to get a good sense of

13  what happened, tried to contact parents.  That was over just

14   the course of that afternoon and then the next day.  Because

15   the police came about 8 o'clock on Friday morning, I summoned

16   them.

17   Q.    Of course, I'm sure that right away when you heard about

18   this, that you called downtown, you called the administration

19   offices downtown to talk to them about it?

20   A.    I apprised them that we were going to talk to students

21   about a situation that we believed happened on December 19th,

22   we knew that a couple of, we knew at least at that time that

23   R.P. had been violated and I wanted to get to the bottom of it.

24   Q.    Maybe in the back of your mind did something click and

25   you said oh, I remember that K.L. told us about C.B. and

89

1   something on December 19th, she told us that on December 20th,

2   did that like click in the back of your mind then?

3   A.    I don't know that it clicked in the back of my mind then,

4   but over the course of -- took in the school day that day and

5   then on Thursday, we were able to make all those connections.

6   Q.    Right.  Now, as you met these people and talked to these

7   students, did you make notes of what they said?

8   A.   We took --

9   Q.   Just answer my question, did you make notes?

10   A.   Brief notes, yes.

11   Q.   And you've destroyed those notes, is that right?

12   A.   I left those notes -- everything I had was turned over to

13   the policemen that came to interview all of the students and

14   the parents on Friday morning.

15   Q.   You gave your notes to the police and didn't retain a

16   copy?

17   A.   I don't recall if I retained a copy or not.

18   Q.   But you don't have a copy today?

19   A.   That's correct.

20   Q.   Did you have students write statements?

21   A.   There was one student we had -- yes.

22   Q.   One student wrote a statement, is that right?

23   A.   There was one student that had to dictate because he was

24   not capable of writing it out himself, so he dictated it.  I

25   think Ms. Cap wrote it and read it back to him several times to

90

1   make sure it was accurate.

2  Q.   Let me show you what has been marked as Plaintiff's

3  Exhibit 59, that was by A.F.?

4  A.   A.F., correct.

5  Q.   Isn't it common practice when you're investigating like

6  what kids do at school, to ask them to write out a statement?

7  A.   That's correct.

8  Q.   You didn't ask the kids to write out statements

9  concerning this incident, did you?

10  A.   No, because we had a lot of kids we had to talk to.  I

11  was interested in sorting out the fact and fiction very quickly

12  so that we could notify the police.  I thought what was going

13  on was not on school property, was going to be criminal

14  activity, Friday was coming and so I wanted the police

15  involved.

16  Q.   As we sit here today, you can't say what student you

17  talked to?

18  A.   I can tell you the students I talked to, at least a half

19  a dozen.

20  Q.   What students did you talk to?

21  A.   Well, we talked to -- I need to ask the judge a question

22  here.  I'm not to use last names, is that correct, your Honor?

23       THE COURT:  Use the first names.

24        THE WITNESS:  I talked to A.F., A.K., C.B., Y.H.,

25  C.A., R.P. -- B.C.  I couldn't talk to K.L., she was not

91

1  present in school that week, she was at Millcreek Hospital.

2  And perhaps a few others.  But those were the key players.

3  BY MR. OLDS:

4  Q.   At what point did it click in your mind that what had

5  happened to R.P. had also happened to K.L., and that K.L. was

6  truthful when she told you that there had been sexual activity

7  between her and C.B.?

8  A.   Sometime -- pardon me, sometime between the time that

9  R.P. came to my office and Thursday afternoon.  Within that

10  one-day period.

11  Q.   I want to show you, put on the screen a document that has

12  marked as Plaintiff's Exhibit 58?

13  A.   Yes.

14  Q.   You've seen this document before, right?

15  A.   Yep.

16  Q.   I want to draw your attention to this paragraph here that

17  reads --

18        THE COURT:  Mr. Olds, the jury doesn't know what

19  this document is, why don't you identify it?

20        MR. OLDS:  Okay.

21  BY MR. OLDS:

22  Q.    What is this document?

23  A.    I asked Ms. Cap to type up a summary after we had sorted

24  out what we thought was correct information.  I asked her to

25  type up a summary.  We had contacted the Erie Police Department

92

1  and they agreed -- they came Friday morning.  And I believe we

2  did, Mr. Olds, if you would go to the top of that page -- your

3  Honor, am I correct in assuming that the jury can see this,

4  also?

5        THE COURT:  Yes.

6        THE WITNESS:  January 10th, R.P. came down to my

7  office on January 9th about midmorning.  And we started talking

8  to students.  We talked to, for example, Richard P. that night.

9  We talked to parents on the 9th and the 10th.  And at the end

10  of the 10th I asked Ms. Cap to prepare something that we would

11  have in hand, along with names and addresses of all of the

12  students, have it ready for the police.  I believe they came

13  around 8 o'clock on the 11th.  Because they right away started

14  interviewing parents.  I felt this was the best summary of the

15  information that we had, I felt this was accurate.  Does that

16  answer your question, Mr. Olds?

17  BY MR. OLDS:

18  Q.   Yes, Ms. Cappabianca prepared this.  Now, I want to draw

19  your attention to this paragraph.  "R.P. is now being taunted

20  by B.C. at school.  B.C. is bothering her to perform this act

21  on other male students.  On Monday, 1/7/02, there was a second

22  incident.  R.P. was at the water fountain.  B.C. was in the

23  hall asking R.P. to give head to a male student that walked by.

24  R.P. refused.  According to R.P., B.C. had shoved her into the

25  stairwell and pushed her to follow the male student.  R.P.


93


1  walked down the stairs in the same direction as the male

2  student, but nothing had happened."  I've read that accurately,

3  haven't I?

4  A.   Yes.

5  Q.   Now, that is certainly an incident that happened on

6  school grounds, is that right?

7  A.   Yes, late on the 10th, before the police came on the

8  11th, we came upon this information and we felt it was --

9  credible, that it happened.

10  Q.   Well, hadn't this incident been brought to your attention

11  by a faculty member?

12  A.   I don't recall if it was brought to my attention by a

13  faculty member or if it came from R.P.

14  Q.   Do you recall when I asked you at your deposition about

15  this incident, when I asked you at your deposition on April 11,

16  2005, when we talked about this incident -- do you remember?

17  A.   No.

18  Q.   Okay.

19  A.   Do you want to show it to me?

20  Q.   Yes, I will in just a second.  It came up in the context

21  of -- let me just take a step to the side here.  I'm going to

22  show you page 12 -- before we get to that incident, I'd like to

23  show you page 12 of Exhibit 62, that discipline policy.  I've

24  actually highlighted the provision here.  Do you see that on

25  the screen?

1  A.    Yes.

2  Q.    That provision reads "all provisions regarding student

3  behavior are applicable to students while on school property,

4  at any school-sponsored activity, including graduation, dances,

5  field trips, etc., on any public conveyance providing

6  transportation to a school or school-sponsored activity, and to

7  students going to and returning from school.  Depending on the

8  severity of a student's behavior, any student behavior offense

9  may be treated as a second or third offense.  Offenses

10  addressing student behavior are as follows."  That language is

11  in the discipline code for students in the school district

12  policy, is that correct?

13  A.    Yes.

14  Q.    That language would allow you to discipline students for

15  conduct coming to school and on the way home from school, is

16  that right?

17  A.    Correct.

18  Q.    Ms. Cappabianca's note, which has been marked as

19  Plaintiff's Exhibit 58, that first line reads "it had been

20  brought to my attention that on Wednesday, December 19, 2001,

21  several students were engaged in inappropriate sexual behavior

22  on their way home from the PASS program."  It reads that way,

23  is that correct?

24  A.    That's correct.

25  Q.    And so the student conduct that occurred on the way home

95

1  from the PASS program would be encompassed by the school's

2  discipline code, is that right?

3  A.    The two students that were on their way home that were in

4  PASS -- excuse me, the two students that were in PASS that day

5  were A.K. and A.F.  C.B. was not in PASS that day.  The girls

6  were not in PASS that day.  So they left school at 3 o'clock

7  and the incident happened at 7:00.

8  Q.    Certainly, A.F. was in PASS and A.K. was in PASS?

9  A.    A.K. was in PASS.

10  Q.    A.K. was not punished by the school district or

11  disciplined by the school district for his conduct on December

12  19th, was he?

13  A.    Incorrect, he was sent to the alternative education

14  program for an accumulation -- he was a special education

15  student, also, and he was sent to alternative education for an

16  accumulation of offenses.

17  Q.    For accumulation of offenses?

18  A.    Of which this is one, right.

19  Q.    Now, B.C. was not disciplined for the offenses that

20  occurred on Monday, 1/7/02, as related in Ms. Cappabianca's

21  report, was she?

22  A.    At this particular time I'm going to address the answer

23  to this question in two parts.  Number one, we had a situation

24  on our hands where two girls were violated and it happened off

25  school property.  I was very concerned, they were our students,

96

1  we had to sort out the details.  We had a big fish to fry, when

2  you talk about this incident at the laundromat.  This was a

3  huge thing that I wanted taken care of.  I wanted the

4  perpetrators out of the building.  They interrupted the

5  educational process of kids in that building.  In about a day's

6  time we had enough information that was credible, which this

7  document is a part, to give to the police.  In comparison, when

8  this thing on B.C. surfaced, it was small, it paled in

9   comparison to the large problem that had happened over at the

10  laundromat.  And B.C. was -- in January not immediately, but in

11  January she was sent to AP and she was -- I don't know if she

12  got there, she got locked up.

13  Q.    As a matter of fact, do you remember when I questioned

14  you about this incident at your deposition, I'd like you to

15  read --

16  A.    Go ahead.

17  Q.    I'm going to show it to you, then you can read it.  On

18  page 53, line 16 through --

19        THE COURT:  Mr. Olds, just take it up there, it's

20  the shortest distance between two points.

21  BY MR. OLDS:

22  Q.    Through page 54 -- you can read, actually, start with

23  this line right here, 16, and you can actually read this whole

24  page to get yourself comfortable.  You're going to read that

25  silently.

97

1  A.    Okay.  Line 14 says -- "who is they?"  The answer is "the

2  police department."

3   Q.   First of all, I wanted you to read it to yourself, then

4   I'll ask you questions.  I wanted you to familiarize yourself

5   with it.

6   A.   All right.

7   Q.   Now, when I deposed you in April of this year -- excuse

8   me, April of last year, you weren't even certain whether this

9   conduct that's described on Exhibit 58, it violated the school

10  district's sexual harassment policy, were you?

11  A.   Correct.

12  Q.   You thought pushing someone down steps might just be

13  harassment --

14  A.   Right, we had a discussion between sexual harassment and

15  harassment, that is correct.

16  Q.   And you weren't even certain that that was sexual

17  harassment, is that right?

18  A.   Correct.  It could be either.

19  Q.   Now, you say that this seemed like small fry, right, is

20  that what you said?

21  A.   Relative to what happened at that laundromat, we were

22  focusing on getting correct information about the laundromat

23  incident.  There were two kids that were violated.  We were

24  very interested in getting the details of that down.  It was a

25  very serious matter.  Two girls had been injured.  And we were


98


1   interested in making sure that the perpetrators were charged.

2   Very late in our talks with students, this information came to

3   light and B.C. was disciplined regarding this.  There were

4   criminal charges and you'd have to know what the police report

5   was to know about the criminal charges, but this was included,

6   this went to the police.  This was the document we handed them

7   because we felt these were criminal charges.

8   Q.   Well, the police report has been admitted in evidence,

9   that's Plaintiff's Exhibit 52?

10  A.   All right.

11  Q.   I want to draw your attention to an entry, it begins on

12  page 12 of the police report, Stanley Green writes "on 1/29/02

13  I went to Strong Vincent to interview several witnesses."  That

14  continues to the point in time where Officer Green, and this

15  would be on page 14 of Exhibit 58, Officer Green writes here,

16  "A.K. advised at this time that he was also being harassed on a

17  daily basis by B.C.  He states that she calls him snitch and

18  told the other students that he was telling the police on her.

19  He states that she singles him out in the hall and says things

20  like hey, A.K., you MF'g snitch.  After gathering the

21  information from these witnesses and a conversation with the

22  victim, I decided to detain B.C. on the charge of being a

23  conspirator in a sexual assault and harassment of the

24  witnesses."  It's true, therefore, Ms. Woods, that B.C. was

25  still in that school on January 29th, '02, harassing the


99


1  witnesses of this sexual assault, is that true?

2  A.    Let me state for the record I've never seen this document

3  prior to this.  And we apprised the police on January 11th of

4  the information that we had.  This is the first time I've heard

5  about -- a male being bothered by B.C.  This is news to me.

6  Q.    Well, you knew on January 10th, no later than January

7  10th, because Ms. Cappabianca wrote it, that B.C. was forcing

8  R.P. down the hall, down the steps, to try to get her to

9  perform oral sex on a boy in school -- you knew that on January

10  10th, is that right?

11  A.    Right, what we have here is what I knew.

12  Q.    And that's small fry, right?

13  A.    Compared to what happened -- what happened there in that

14  laundromat was awful.  And that is what we spent our entire

15  time investigating.  This last piece of information came out

16  just as, I don't want to say as an afterthought, but it really

17  was not a large part of the big picture at the time.

18  Q.    Now, I want to direct your attention to Plaintiff's

19  Exhibit 62, page 50.  Let me know when you find that, Ms.

20  Woods?

21  A.    Hang on a second.

22  Q.    Plaintiff's Exhibit 62, the discipline code, Ms. Woods?

23  A.    I got it.

24        THE COURT:  Ms. Woods, actually it's on the screen.

25        THE WITNESS:  Go ahead.


100


1  BY MR. OLDS:

2  Q.    This portion that I took this page out of the discipline

3  code relates to punishment for disciplinary offenses, is that

4  right?

5  A.    Correct.

6  Q.    And the punishment for sexual harassment -- sexual

7  harassment is minimum five days out of school, suspension, OSS,

8  with possible discipline up to and including expulsion, is that

9  correct?

10  A.    Correct.

11  Q.    And B.C., at least according to the police report, was

12  still in that school on January 29th harassing students?

13  A.    Well, according to this police report, this is

14  information that we did not have about this male student.  When

15  the incident happened when R.P. had her outburst, I informed

16  the special education department, because all the special

17  education students, all students were in special education, I

18  was apprised that because the incident at the laundromat

19  happened off school property and quite a while after school,

20  that I was gathering as much information as I could, to get the

21  police involved, keep them apprised downtown, and then a

22  determination would be made at some point later.  Which it was,

23  B.C. was taken out of that school, she was in special

24  education, and she was taken out and placed in AEP.  That

25  process for special education students takes time.  I

101

1   thought -- she went to AEP in January, and I'm not even sure

2   she got there.  I think she was -- there were lots of criminal

3   charges prior to that, I'm pretty sure she was placed.

4   Q.   Well, the police report differs.  By the time you met

5   with Richard P., you had not called the police, is that

6   accurate?

7   A.   Mr. --

8   Q.   Yes or no, Ms. Woods, by the time you met with Richard P.

9   on January 10, 2002, you had not called the police?

10   A.   I had not called the City of Erie Police Department.

11   I had notified our two school resource officers, who are police

12   officers.  I had notified Jim Perfetto, who is the director of

13   security, he's an ex-police officer, for the school district.

14   I had notified everybody downtown of the situation.  I had not

15   called the City of Erie Police Department.  I called them,

16   excuse me, I contacted them, either by call or by resource

17   officers on the 10th, because I asked someone to be there early

18   on the 11th.  They were there about 8:00, 8:30 on the 11th.

19   Q.   Were you honest when you talked to the police on January

20   11th?

21   A.   Absolutely.

22  Q.    This police report that is admitted into evidence,

23  Exhibit 52, page 5, which I have on the screen, says that

24  police -- I'll be reading the second paragraph here, this

25  paragraph right here?

102

1  A.    Yes, I see it.

2  Q.    Says "Ms. Woods says that on 1/9/02, at approximately

3  1500 hours, she became aware of a situation involving several

4  Strong Vincent school students, the first of which allegedly

5  occurred on December 19, 2001, at the Frontier Village Laundry,

6  1258 West 8th Street, after PASS (after-school suspension)."

7  And, in fact, you did tell the police that you became aware of

8  this incident on January 9, '02, is that accurate, that's what

9  you told the police?

10  A.    At 1500 hours, it's 3 o'clock in the afternoon, the two

11  resource, the school resource officers, the police officers

12  that are assigned to our building, frequently check in with me

13  before they check out, the time clock is right outside of my

14  office.  Although, earlier in the day I had mentioned it to

15  them, they always come in and check with me right before they

16  punch out.  And I know I would have said to them at 3 o'clock,

17  we're going to investigate this again tomorrow, I'm sure that

18  is how the 1500 hours came up.  R.P. came down to us about

19  midmorning.  I could understand why this says 1500 hours.

20  Because that is the time that the school resource officers

21  punch out.  School ends at 3 o'clock.

22  Q.    I wasn't talking about the time, I was talking about the

23  date.  Did you tell the police officers that you became aware

24  of this incident on 1/9/02?

25  A.    Yes, that's when R.P., that's Wednesday, the 9th, is when


103


1  R.P. came down.

2  Q.    But you actually had learned from Ms. Cappabianca on

3  February 20, '01?

4          THE COURT:  You said February.

5          THE WITNESS:  You're confusing me, sir.

6  BY MR. OLDS:

7  Q.    I'm sorry, on December 20, '01, that K.L. said that she

8  had had a sexual encounter -- well, we went through this

9  morning and in fact you knew on December 20, '01, that K.L.

10    reported sexual encounters or sexual activity between her and

11    C.B.; you knew that, right?

12    A.    We knew that she stated that there had been some sexual

13    activity.  That could be kissing, hand holding, at 12-years-old

14    that could mean a lot.

15    Q.    You talked to the police on January 11th, is that right?

16    A.    Correct, to the Erie Police Department on January 11th.

17    Q.    I'm showing you the second page of Plaintiff's Exhibit

18    58, this is the note that Ms. Cappabianca wrote on January

19    10th.  And this last paragraph on that note right here says

20    "K.L. was unable to be interviewed because she was hospitalized

21    at Millcreek Hospital for mental health reasons.  While at

22    Millcreek, K.L.'s mom had said she had admitted to the

23    counselor that she had participated in oral sex with a student

24    at Strong Vincent High School.  K.L. had stated in her

25    interview that R.P. and K.L. had taken turns doing it to C.B."


104


1    So on January 10th you knew, according to Ms. Cappabianca's

2    report, that K.L. also had been forced to engage in oral sex

3    with C.B.; you knew that, right?

4   A.   Right.  We didn't know that from K.L., we knew it from

5   talking to other students.

6   Q.   And you also knew on December 20, 2001, K.L. had told Ms.

7   Cappabianca that there was sexual activities between her and

8   C.B., you knew that as well?

9   A.   Correct.

10  Q.   You knew that on December 20th, and you knew that on

11  January 11th when you talked to the police?

12  A.   Correct.

13  Q.   Didn't you think it would be important for the police

14  investigation that they knew that you had had information as

15  early as December 20th that one of these girls had been raped?

16  A.   We did not know that on December 20th.  On December 20th

17  there was talk in the hall from one student to another going

18  down a hall during class change, and until January 9th, when

19  R.P. had that outburst -- until January 9th, it was not clear

20  to us, it was not brought to our attention.  And when we found

21  out about it, we were on it.  When we found out about it, we

22  took it very seriously.  Someone had been violated, we didn't

23  know about K.L., until we talked to R.P., we didn't know

24  anything about K.L.  It wasn't until R.P. came forward and

25  talked, that we were able to piece any of this together.

105

1  Q.   I'm talking about what you should have told the police?

2  A.   Okay, what should have I told the police?

3  Q.   Well, that you had had information --

4        MR. MARNEN:  Your Honor, he's arguing his case now,

5  I object.

6        THE COURT:  Let me see if I can unscramble this egg.

7  You started to ask him a question, but they go the other way.

8  So if you have another question, go ahead and ask it.  How much

9  longer do you have with this witness?

10       MR. OLDS:  I'm real close to being done.

11       THE COURT:  What does that mean?

12       MR. OLDS:  Either one minute or three minutes, but

13  not too much longer.

14       THE COURT:  All right, go ahead.

15       MR. OLDS:  Your Honor, I think I'll just say that

16  I've wrapped up and I have no more questions right now.

17       THE COURT:  Mr. Marnen, are you going to reserve or

18  are you going to go now?

19       MR. MARNEN:  Well, your Honor, we talked about

20  this --

21        THE COURT:  Let me see you at side bar.

22        (At side bar on the record.)

23        MR. MARNEN:  I guess yesterday you told me that you

24  wanted me to fill in if we had to.  It looks like we have to.

25  I don't care really if you want to do it now.


106


1        THE COURT:  Here's my point.  I wasn't suggesting

2  that you had to take her now out of your case in chief.  Nor

3  was I suggesting that you would be waiving anything by doing

4  that if you chose to do it.  I understand you have one more

5  witness?

6        MR. OLDS:  I have several.

7        THE COURT:  So my point is you don't need to take

8  her now to fill up this day, if you prefer to defer until your

9  case in chief.

10        MR. MARNEN:  I would prefer to defer, thank you.

11        THE COURT:  All right.

12        (End of discussion at side bar.)

13        THE COURT:  Ms. Woods, you are excused.

14          THE WITNESS:  Thank you, sir.

15          MR. OLDS:  Your Honor, do you want me to start on

16  Ms. Cappabianca now?

17          THE COURT:  I do.

18          MR. MARNEN:  Ms. Woods, I will be calling you back

19  during my case.

20          THE COURT:  Ms. Woods, before you get away.  As Mr.

21  Marnen just told you, you will be back here again when Mr.

22  Marnen begins his case.  He will take you on direct

23  examination.  I'm sure he will be in touch as to the time.  But

24  for timing purposes, it appears to me this case is going to

25  conclude on Monday.  So when you're called, it's just going to


107


1  be up to how quickly we move through the witnesses.  But for

2  now you can go.  All right, Ms. Cappabianca, come on up here,

3  my clerk will swear you in.

4          LINDA CAPPABIANCA, DEFENDANT HEREIN, SWORN

5          THE COURT:  Mr. Olds, I won't tell you how to

6  conduct your examination, but I think in the interest of moving

7  things along, a lot of the background information has now been

8   established.  The nature of the school, the fact it is a high

9   school and a junior high.  I will leave it to your discretion

10  how often you want to re-till that ground.

11          MR. OLDS:  Okay.  I'll try not to do it too much,

12  your Honor.  I would ask that I be allowed to proceed as on

13  cross.

14          THE COURT:  Absolutely, it's an adverse witness.

15          (Called as on CROSS-EXAMINATION)

16  BY MR. OLDS:

17  Q.   I won't revisit too much, your Honor, but I guess I'll

18  start with asking you to state your full name and maybe spell

19  it?

20  A.   You'll have to excuse me, I'm fighting a cold.  But it's

21  Linda L. Cappabianca, C-a-p-p-a-b-i-a-n-c-a.

22  Q.   And you were the vice principal at Strong Vincent School?

23  A.   Yes, I was.

24  Q.   In this time period.  Your duties involved principally

25  discipline, is that right?


108


1  A.   Mainly discipline and attendance and everything, those

2   were the two main duties.

3   Q.   And you, in terms of having the authority to impose

4   discipline or investigate discipline, you certainly had the

5   authority to investigate any disciplinary matter, any

6   infraction that came to your attention, is that right?

7   A.   Yes, I did.

8   Q.   And you had the authority to stop any infraction or make

9   sure if a student was involved in what was the fraction of the

10  rules, you had the authority to stop that infraction?

11  A.   Yes.

12  Q.   Okay.  And you had the responsibility, if there was

13  serious cases of discipline, did you have the ability to impose

14  an immediate suspension on a student?

15  A.   It depends on the case.

16  Q.   If a student, if you saw a student engaged in a physical

17  assault, would you be able to take the student out of the

18  school?

19  A.   It would take some looking into, but yes.  Nothing is

20  ever immediate.

21  Q.   And we've had testimony, you sat and listened to the

22  testimony throughout this case.  We dealt with a number of

23   students who had problems.  One in particular was a C.B.  C.B.

24   had a number of disciplinary infractions, is that right?

25   A.   Yes, he did.


109


1   Q.   I'm going to show you what's been marked as Plaintiff's

2   Exhibit 230, this is a packet of C.B., the discipline involving

3   C.B. working up through you.  I'm going to ask you to identify

4   this, I'll probably have a couple questions.  It's Plaintiff's

5   Exhibit 230.

6   A.   Okay.

7        MR. OLDS:  Your Honor, I would move for the

8   admission of Plaintiff's Exhibit 230.

9        THE COURT:  It's admitted.  But I don't believe the

10  witness identified the document.

11       MR. OLDS:  I'm sorry, I lost track of where I was.

12  BY MR. OLDS:

13  Q.   Does that appear to be the discipline file on C.B.?

14  A.   It does.

15  Q.   And the purpose of compiling that discipline on C.B. was,

16  well, number one, he was involved in conduct that warranted

17  being disciplined, right?

18  A.   Can you repeat that.

19  Q.   C.B. repeatedly broke the school's rules?

20  A.   Yes, he had some challenging behavior.

21  Q.   In the course of his breaking the rules, teachers would

22  write out a slip and refer it to you, right?

23  A.   Yes.

24  Q.   And I think we looked at this progressive discipline

25  chart -- which was page 11 of Exhibit 62, and you had compiled

110

1  discipline of C.B., you were working your way down through that

2  system, and by December you were trying to get him out of

3  school, is that right?

4  A.   And there were extenuating circumstances considering he

5  was a learning support student.

6  Q.   Maybe we could spend just a little bit of time on that.

7  That means that if his parents would not agree to having him

8  placed in a different school, the school district would have to

9  go through the process of changing his IEP, is that right?

10  A.   The parent has to be in agreement of the placement, yes.

11  Q.   Or the school district would have to proceed through some

12  kind of hearing and due process?

13  A.   Yes.

14  Q.   To effect the change?

15  A.   Yes.

16  Q.   You were in the process in December of 2001 of attempting

17  to meet with C.B.'s mother to get him out of school, right?

18  A.   I don't think to phrase it to get him out of school, to

19  place him in an environment that might be more suitable for

20  him, yes.

21  Q.   Okay.  Would he have gone to -- if the process had

22  proceeded down through the level where it says -- right here,

23  alternative education, would he have to go to Sarah Reed, is

24  that where he would have gone?

25  A.   No.


111


1  Q.   Erie did use Sarah Reed as part of the alternative

2  education program, didn't it?

3  A.   Anytime you take a child and it's a non-traditional

4  setting, it's considered an alternative placement, yes.  There

5   are different forums.  Perseus House is what we used for middle

6   school and high school kids for behavioral reasons.

7   Q.    And you use Sarah Reed for elementary school kids?

8   A.    For behavioral problems.

9   Q.    Now, did you meet with C.B. and his mother to try to get

10  him to leave Strong Vincent?

11  A.    I actually met -- I don't believe C.B. was at the

12  meeting, there were several adults there, yes.  Would you like

13  me to name them?

14  Q.    Was Ms. Woods there?

15  A.    Ms. Woods was there.

16  Q.    And what other adults?

17  A.    Ms. Manus, who would have been one of his classroom

18  teachers.  The special ed supervisor, Charlise Moore, myself.

19  Q.    Okay.  Now, it came to your attention -- it came to your

20  attention in December of 2001, that there had been some sexual

21  encounter or activity involving C.B. and K.L., is that right?

22  A.    What had happened was, it was during the change of

23  classes.  When we change classes -- they have four periods --

24  they are called blocks.  I was trying to get --

25         THE COURT:  Ms. Cappabianca, slow down just a little

1  bit.

2        THE WITNESS:  Sorry, I'm a fast talker.  During the

3  change in classes, all 500 plus students are out in the hall.

4  We try to segregate, separate the middle school from the high

5  school.  However, being where the art room was located and the

6  music room, sometimes you did have kids passing through there,

7  older kids.  So yes, during the change of classes I had

8  overheard someone say did you hear what happened with K.L. and

9  C.B. last night.  I inferred that it might have been of a

10  sexual nature.

11  BY MR. OLDS:

12  Q.   Okay.  You said that you inferred that it might be of a

13  sexual nature?

14  A.   Yes, I did.

15        THE COURT:  Let him finish, Ms. Cappabianca, before

16  you answer, all right?

17        THE WITNESS:  Okay.

18  BY MR. OLDS:

19  Q.   And this was, according to your belief, this event

20  happened on December 20th, is that when you overheard the talk?

21  A.   It was on December 20th when I overheard them talking,

22  yes.

23  Q.   You talked to K.L., right?

24  A.   I did.

25  Q.   What did you say to her?

113

1  A.   It was actually after school.  School lets out at 3

2  o'clock, I was checking on my PASS students to make sure they

3  showed up --

4       THE COURT:  Slow down, you're talking too fast.

5       MR. OLDS:  Your Honor, I think she's talking too

6  close to the mike, it's difficult for me to hear the words.

7       THE COURT:  We're in a catch 22 because you have a

8  bad throat.  Let's see how she does.  Go ahead.

9       THE WITNESS:  Do you want me to start over?

10      MR. OLDS:  Yes.

11      THE WITNESS:  School gets out at 3 o'clock.  We

12  usually go outside and make sure that, you know, students leave

13  the premises, supervise the outside.  So I went back to check

14  on my PASS students to make sure that they were attending PASS

15  that evening. PASS starts at 3:30. So it was somewhere

16  between 3:00 and 3:30, I was right in front of the auditorium.

17  I saw K.L., that's when it clicked, did you hear about C.B. and

18  K.L. So I approached her and said I'm hearing things about you

19  and C.B., I don't know if they're true. She said yes. That's

20  when I said that those are things people do when they're older.

21  BY MR. OLDS:

22  Q.   Okay. You said I'm hearing things about you and C.B.?

23  A.   Correct.

24  Q.   K.L. said yes, they're true?

25       THE COURT:  You have to answer yes or no.


114


1       THE WITNESS:  I'm sorry, yes.

2  BY MR. OLDS:

3  Q.   And you said that's what -- what did you say?

4  A.   That's what people do when they're older and care about

5  each other. I believe I told her when you care about each

6  other.

7  Q.   Now, you knew that K.L. was 12-years-old, right?

8  A.   Yes.

9   Q.   She had actually become attached to you?

10   A.   I think we had a pretty good relationship.

11   Q.   You were familiar with her IEP, she was mildly mentally

12   retarded, she was cognitively challenged?

13   A.   She was academically challenged, yes.

14   Q.   Had you seen her IQ, she was in the moderate -- I mean in

15   the mild mental retardation level, wasn't she?

16   A.   Most of the people in question here were.

17   Q.   Okay.  I didn't hear your answer to that?

18   A.   Most of the people that were involved in that night were,

19   yes.

20   Q.   Okay.  And do you know that girls who have been sexually

21   assaulted, raped, particularly young children, can't talk about

22   it -- you know that, don't you, from your training?

23   A.   I think it's true with older women as well.

24   Q.   And so K.L. said that it's true, right?

25   A.   Correct.


115


1   Q.   Okay.  Now, and then you said that's what people do when

2   they're older and in love?

3   A.   Yes, I did.

4   Q.   When you said that, what did you mean?

5   A.   I wasn't specific, she was 12-years-old.  The last thing

6   I'm thinking of that took place was oral sex or sexual

7   intercourse.  I'm thinking holding hands, kissing.  And which

8   to me is enough for a 12-year-old to be doing -- they're too

9   young to even be doing those things.

10   Q.   What you had heard in the hallway was sufficiently

11   alarming for you to talk to K.L. about it, right?

12   A.   It was enough to peek my curiosity.  You know, Mr. Olds,

13   we did have a relationship.  First of all, I didn't know her

14   knowledge based on sex.  I didn't know if she knew was sexual

15   intercourse was.  And she was comfortable enough with me being

16   I heard things, that she would be comfortable enough in talking

17   about it, I don't know.

18   Q.   She said that's true?

19   A.   Correct.

20   Q.   You didn't ask her, well, do you want to go into my

21   office and talk about it?

22   A.   No, I honestly did conduct that conversation in the

23   hallway.

24          THE COURT:  I apologize for interrupting, you're

25  going way too fast.


116


1          THE WITNESS:   I'm sorry, I've been told that I'm a

2  quick talker.

3          THE COURT:  You're being told again, okay, so slow

4  down.

5  BY MR. OLDS:

6  Q.    You didn't take her into your office?

7  A.    No, I did not.

8  Q.    You didn't send her to the counselor to talk about it?

9  A.    Well, I guess I would have -- I was reading her body

10  language as well.  She was very particular as to how she

11  looked.  She was darling.  She had her makeup on and her hair

12  up, she didn't look like she was upset to me.

13  Q.    But a 12-year-old girl, mildly mentally retarded, said

14  yes to you when you said I heard something happened between you

15  and C.B. --

16  A.    I didn't go any further with her, correct.

17  Q.    And you didn't call her mother?

18   A.   I don't know if I called her mother.  It's normal

19   protocol to call a parent if you suspect something.  Do I

20   recall having that conversation with her mother, no, I do not.

21   Q.   And then you did go to C.B.?

22   A.   Yes, I did.

23   Q.   And talked to him.  And did you say to him what's this I

24   hear about oral sex, C.B.?

25   A.   No, I said I heard that in the hall, I heard some people

117

1   saying things about you and K.L. and the night before.  I don't

2   know if they're true.  He goes no, she's saying things about me

3   because she likes me.

4   Q.   And he was a sneak, right?

5   A.   He had some challenging behaviors, yes.

6   Q.   He was, Ms. Scully described him as charismatic?

7   A.   He was very charming and very well liked.

8   Q.   K.L. was no match for C.B., in terms of sexual skills,

9   was she?

10   A.   They both had the same disability, if that's what you're

11   asking me.

12  Q.   But C.B. had social skills that K.L. did not have, didn't

13  he?

14  A.   I don't know if I can answer that.

15  Q.   Well, Ms. Scully called him charismatic, that suggests

16  he's a leader, right?

17  A.   I think he's personable.

18  Q.   K.L. did have trouble expressing herself, right, she

19  spoke on a very fundamental, very low level, in terms of her

20  ability?

21  A.   Orally she was okay, she was verbal.  Written, I'm sure

22  she had difficulty with her writing skills.

23  Q.   Do you remember in your deposition you called C.B.

24  sneaky, do you remember that?

25  A.   No, but --


                                118


1  Q.   Let me show you line 14 from your deposition, page 93, on

2  April 4, 2005.  Just this line right here?

3  A.   Yes.

4  Q.   C.B. was sneaky?

5  A.   (Witness nods head.)

6  Q.   And you went to him and he said no, nothing happened, Ms.

7  Cap.  Would you expect C.B. to admit to you that he had raped

8  K.L.?

9  A.   Probably not.

10  Q.   Okay.  The school district had a practice, didn't it,

11  that if one child accused another child of doing something,

12  that you wouldn't discipline, based upon just the word of a

13  child, is that accurate?

14  A.   I don't know if I would say the school district had a

15  practice.  I'd like to listen to all sides and then make a

16  determination.

17  Q.   Okay.  Do you recall that I asked you that question at

18  your deposition on Friday, April 29, 2005.  I'm going to show

19  it to you, page 35.  It's page 35, line 11 through line 15.  I

20  asked you at line 11, "And in an instance like that, the school

21  district won't discipline a student if it's one student's word

22  against another?"  "Answer:  I can't, if they have nothing to

23  back up what the person is saying, yes."  And you answered, you

24  indicated, then, that the school district wouldn't discipline

25  if it was just one student's word against another, is that

119

1    right?

2    A.    I guess it depends on the situation.  Can you tell me

3    what led to that conversation?

4    Q.    I'll let you look at -- we were talking about the

5    laundromat incident, also, the incident that happened on

6    Monday.  I'll let you read from the beginning of page 34, line

7    12, you can read through that there?

8    A.    May I read it silently?

9    Q.    Yes.

10        THE COURT:  Ms. Cappabianca, you can read that while

11    we take a short recess.

12        (Recess from 2:33 p.m.; until 2:44 p.m.)

13        THE COURT:  All right, sir.

14    BY MR. OLDS:

15    Q.    Ms. Cappabianca, you've had a chance to look at that

16    deposition testimony, right.  Really the context was that I was

17    talking to you about is the incident that happened between R.P.

18    and B.C. in the hallway, right, wasn't that the context of

19    that -- on the page before I had said what about the incident

20    that happened on Monday --

21        THE COURT:  Use the mike.

file:///A|/RICHDAY3.TXT

22  BY MR. OLDS:

23  Q.   I had said "okay, when B.C. tried to force R.P. down the

24  steps and give oral sex to a male student, why wasn't she

25  disciplined for that?"  And you had said, "B.C. didn't even

120

1  admit to it and took any responsibility for that night at the

2  laundromat, so it was R.P.'s word against B.C."  And then I

3  followed up and said, "and in an incident like that the school

4  district wouldn't discipline a student if it's one student's

5  word against another?"  And you said "I can't if they had

6  nothing to back up what the person is saying, yes."

7  A.   Right.

8  Q.   That's our colloquy, right?

9  A.   Pardon me.

10  Q.   That was our colloquy?

11  A.   Yes.

12  Q.   That's what went on between you and I.  Is it true what

13  that means is if one student accuses another student of some

14  conduct and there's not something to back it up, the school

15  district won't take action on that?

16  A.   If I usually look into it, I cannot take one person's

17  word over another, no.  I usually look into it and make a

18  determination.

19  Q.   Once you had K.L.'s word that something had happened

20  between her and C.B., and C.B.'s denial, you couldn't act on

21  that because it was one student's word against another, right?

22  A.   Well, I'm not exactly sure what to act on.  We both seem

23  to think that different things were said that night.  Both

24  being you and I.

25  Q.   Well, I mean do you understand that below a certain age


                                    121


1  level children cannot consent to sexual activity?

2  A.   Does that include holding hands?

3  Q.   Well, you didn't ask K.L. if that's what she was doing

4  with C.B., did you?

5  A.   No, I did not.

6  Q.   You wouldn't have asked her and reported to Ms. Woods and

7  asked C.B. if you thought it was just K.L. holding C.B.'s hand,

8  you wouldn't have gone through all that work for that kind of

9  thing, would you?

10   A.   I thought it was a crush that was developing, absolutely

11   I would have.

12   Q.   You knew that the conduct that you were talking about was

13   more serious than holding hands, right?

14   A.   No.

15   Q.   Okay.

16   A.   That's not right.

17   Q.   You said that you can't remember whether you called

18   Denise L. --

19   A.   I do not recall having an actual conversation with her,

20   no.

21   Q.   Now, don't you think that given what happened after

22   December 20, 2001, you would know whether you talked to Denise

23   L. on December 20, 2001 -- I mean, if your recollection would

24   have been rejuvenated sometime between December 20, 2001 and

25   December 11, 2001, when all of this went to the police, you


122


1   would have known that you talked to her, don't you think?

2        THE COURT:  I'm not testifying, I just don't want

3   the record -- I'm listening to what you're saying, you said on

4    December 11, 2001 when they went to the police, that's

5    incorrect on the record.

6         MR. OLDS:  January 11, 2002.

7    BY MR. OLDS:

8    Q.   Let me rephrase that.  There's no indication anywhere in

9    the record that you gave to the police or the police report,

10   that you called Denise L. and told her that you heard her

11   daughter was involved with some kind of sexual activity with

12   C.B. prior to your meeting with her in January of 2002?

13   A.   There was no written record of that, no.

14   Q.   And speaking of written records, when you were

15   interviewing all these students, did you make notes?

16   A.   I typically do, yes.

17   Q.   And those notes have been destroyed by you, is that

18   right?

19   A.   I no longer have them.

20   Q.   You destroyed them, right?

21   A.   No, when I left Strong Vincent High School the following

22   year, I was assigned to a different building, I left all the

23   boys records with Mr. Hart, who was the assistant principal for

24   the 9th through 12th grade boy students.  And all the girls

25   records with Ms. Popochak, who is the 9th through 12th grade

123

1   students assistant principal.

2   Q.    Now, R.P. talked to you several times about being

3   harassed by male and female students, didn't she?

4   A.    Never.

5   Q.    R.P. was -- basically, she was an average kid, pretty

6   good kid, wasn't she?

7   A.    Behaviorally?

8   Q.    Yes.

9   A.    Yes, she was very quiet, kind of withdrawn.  I would say

10  more introverted.

11  Q.    And then Ms. Scully brought R.P. to you on January 9,

12  2002?

13  A.    I don't know that she physically brought her to me, but

14  she had sent her to me, yes.

15  Q.    What was the reason Ms. Scully sent R.P. to you?

16  A.    She had used the "F" word in her classroom.

17  Q.    She screamed it out, right?

18  A.    I'm sorry.

19   Q.    She screamed it out?

20   A.    Yes.

21   Q.    Was R.P. pretty distraught when you met with her?

22   A.    She seemed angered.

23   Q.    When you and Ms. Woods started this investigation --

24   well, you didn't really have any idea what happened, is that

25   right?

124

1   A.    We had what R.P. told us, she was the first we spoke to,

2   yes.

3   Q.    Isn't it true that you thought R.P. was complicit in this

4   sexual activity?

5   A.    I didn't think either way.

6   Q.    You had an open mind?

7   A.    Well, I have to kind of remain impartial and gather the

8   facts, yes.

9   Q.    I want you to take a look at this Exhibit 58, which is

10   the letter that you wrote.  First, I want to draw your

11   attention to that first paragraph, right here, I'm going to

12   read that.  "It has been brought to my attention that on

13  Wednesday, December 19, 2001, several students were engaged in

14  inappropriate sexual behavior on their way home from the PASS

15  program.  B.C., R.P., C.A., Y.H., K.L., C.B., A.F., and A.K.,

16  were the students in question.  After interviewing all the

17  persons involved, with the exception of K.L., because she was

18  hospitalized at Millcreek Hospital for mental health reasons,

19  it is apparent that C.A., Y.H. and A.F. did not participate in

20  sexually defiant behavior."  That is what you wrote, right?

21  A.    That is.

22  Q.    Now, by not putting R.P.'s name and K.L.'s name along

23  with C.A. Y.H. and A.F., did you mean to say that they engaged

24  in sexually defiant behavior?

25  A.    No.  I think if you read further, you'll see that they


                                125


1  were forced into doing it.

2  Q.    Let's take a look at that next sentence.  It says right

3  here, it says "R.P. admittedly went into the bathroom at the

4  laundromat with A.K. and performed oral copulation on C.B. on

5  December 19, 2001."  Your use of the word admittedly it's as

6  if -- R.P. was agreeing that she had done something wrong?

7   A.   No, she admitted to me that that had happened.  Read the

8   next sentence, please.

9   Q.   "The girls had gone to Strong Vincent" --

10  A.   No, "she states that B.C. had forced her to go into the

11  bathroom" --

12       THE COURT:  Hang on a second.  Start the questioning

13  again.

14  BY MR. OLDS:

15  Q.   I'll read that next sentence.  "She states that B.C. had

16  forced her to go into the bathroom with A.K."  So, basically,

17  all you're doing is you're saying that R.P. stated that, you're

18  not saying that you believed her?

19  A.   I was writing this up for the police.  I wasn't saying

20  whether I believed or disbelieved any of the people involved.

21  We talked to several students, obviously, you're going to have

22  conflicting stories talking to eight or nine people.  So I was

23  trying to put it together in some semblance, some order.

24  Q.   B.C. absolutely denied that she had done anything, right?

25  A.   Yes, she did.

126

1  Q.   She was totally innocent, that's what she told you,

2  right?

3  A.   Uh-huh, yes.

4  Q.   B.C. told you that, well, R.P. wanted to give oral sex to

5  C.B. and A.K., that's what B.C. told you, right?

6  A.   I don't remember if that's what she said, but she denied

7  going in.

8  Q.   And, obviously, C.B. said, well, I didn't force anyone,

9  that's what he said, is that right?

10  A.   Yes.

11  Q.   Okay.  And A.K. said I didn't do anything, right?

12  A.   Yes.

13  Q.   Okay.  So after listening to those students, you didn't

14  form a judgment about what had happened, is that correct?

15  A.   Let's see.  You try through the whole gathering of facts,

16  try to stay impartial.  And then come to a conclusion of

17  whether there was an fraction committed.  As to the conclusion

18  after the fact gathering, did I think the boys victimized the

19  girls, yes, I did.

20  Q.   Do you recall the meeting with Richard P. where you told

21  him that his daughter was a dirty little girl and she had a

22  filthy mouth?

23  A.   That meeting never took place.

24  Q.   Do you recall the meeting where you told Ms. Robin J.

25  that R.P. was engaging in oral sex in the school, that she

127

1  should keep her daughter away from R.P.?

2  A.   That meeting also never took place.

3  Q.   In your deposition you testified that you didn't remember

4  that meeting, is that right?

5  A.   No, I don't really recall R.N. very well.

6        MR. OLDS:  Can I have just a second, your Honor, to

7  find the deposition?

8        THE COURT:  I'm sorry?

9        MR. OLDS:  Can I have just a second to find the

10  deposition?

11        THE COURT:  Sure.

12  BY MR. OLDS:

13  Q.   Do you recall I did ask you about Robin J. at your

14  deposition?

15  A.   Yes, I do.

16  Q.   Do you recall what you said in your deposition?

17   A.   No.

18   Q.   I'm going to refer you to the deposition of April 29,

19   2005, page 18, lines 5 through 25.  I asked you, "do you

20   remember meeting with T.N.'s mother, Robin J.?"  And you said

21   "no."  I said "you don't remember the meeting with her at all?"

22        THE COURT:  No, that's not what it says.  "You don't

23   remember meeting with her at all?"

24   BY MR. OLDS:

25   Q.   "You don't remember meeting with her at all?"  And you

128

1   answered "um-hum or hum-um," and Mr. Marnen says "verbalize

2   your answer."  And you answered "no, I'm sorry.  And I said, I

3   questioned you "she prepared an affidavit in this case, has

4   your counsel ever shared that affidavit with you?"  And you

5   said "yes."  And I said "you have no recollection of that

6   incident or these events that she describes?"  You said

7   "correct, on the 9th, 10th and 11th, we worked on nothing but

8   this case, I wouldn't have met with people that weren't

9   involved in this case.  I never even went to my office for

10   those three days."

11       THE COURT:  I apologize, you got to get it right,

12   though, it's in the transcript.  Do it again.

13   BY MR. OLDS:

14   Q.   "On the 9th, 10th and 11th, we worked on nothing about

15   this case.  I wouldn't have met with people that weren't

16   involved in this case, I never even went to my office for those

17   three days."  I said "do you recall ever meeting with Robin

18   J.?"  And you said "no, I don't recall T.N."  I said she had a

19   sister, A.N., do you recall her?"  And you say "no, was she in

20   the 7th or 8th grade."  So that was our colloquy about that, is

21   that right?

22   A.   Yes.

23   Q.   You didn't meet with Richard P. or when Ms. Woods met

24   with him, to tell him that his daughter had been the victim of

25   a rape, did you?

129

1   A.   I was not there, no.

2   Q.   Do you recall who you were meeting with?

3   A.   I do not.

4   Q.   If we had your notes, you might know because you had

5  dated your notes?

6  A.   I would have taken notes, absolutely.

7  Q.   Do you recall that I talked to you about the fact that

8  there were no records from the meetings with these students, at

9  your first deposition?

10  A.   Yes.

11  Q.   Do you recall what you said at that time?

12  A.   That we destroyed them at the end of each year, the

13  records.

14  Q.   Do you recall that you indicated that you had these big

15  shredders and you took all these records and destroyed them,

16  ran them through the shredder?

17  A.   I personally didn't, I left them for the assistant

18  principal at the school, at Strong Vincent, because I was

19  moved, and they had put them in there.

20  Q.   Did you meet with Ms. Woods and the police when they

21  arrived on January 11, 2002?

22  A.   I was there, yes.

23  Q.   Did you tell the police that you had heard before

24  Christmas that there was sexual activity between K.L. and C.B.?

25  A.   No, I did not.

130

1        MR. OLDS:  Your Honor, I don't have any other

2   questions.

3        THE COURT:  All right.  Are you going to reserve?

4        MR. MARNEN:  I'm going to reserve, your Honor.

5        THE COURT:  Thank you, ma'am, you may step down.

6   Who would be your next witness?

7        MR. OLDS:  R.P.

8        THE COURT:  R.P., come on up here, please.  Raise

9   your right hand.

10             R.P., PLAINTIFF HEREIN, SWORN

11               DIRECT EXAMINATION

12   BY MR. OLDS:

13   Q.   I'm going to show R.P. a picture, which we've marked and

14   I'll show the jury, this is Plaintiffs' Exhibit 233 --

15        THE COURT:  Before you start showing her pictures,

16   you better ask her what her name is for the record.

17   BY MR. OLDS:

18   Q.   For the record would you state your name, R.P.?

19   A.   R.P.

20  Q.    And is this a picture of you of what you looked like in

21  2001 and 2002?

22  A.    Yes.

23  Q.    You were born in Erie, right?

24  A.    Yes.

25  Q.    Did you live in Erie most of your life?


131


1  A.    Yes.

2  Q.    Do you remember how old you were when you moved to

3  Arizona?

4  A.    I think -- either 9 or I just turned 10.

5  Q.    And how long did you live in Arizona?

6  A.    A year-and-a-half to two years.

7  Q.    Did you like the schools out there?

8  A.    Yes.

9  Q.    In your life, say up through these things that we're

10  talking about, up through 2001, how did you find school, did

11  you like it?

12  A.    Can you repeat that.

13  Q.    Did you like school?

14   A.   Yes.

15   Q.   Okay.  Were you in learning support classes?

16   A.   Yes.

17   Q.   What kind of help did you need, R.P.?

18   A.   Mainly math, a little bit of reading.  And I think

19   writing.

20   Q.   Before you went to Arizona, you went to school in Erie,

21   what school was it?

22   A.   Diehl.

23   Q.   Diehl?

24   A.   Yes.

25   Q.   When you came back, what school did you go to?


132


1   A.   Emerson Gridley.

2   Q.   And then Strong Vincent?

3   A.   Yes.

4   Q.   You started at Strong Vincent as a 7th grader?

5   A.   Yes.

6   Q.   Did you live close to Strong Vincent?

7   A.   Yes.

8  Q.   Who were you friends back then when you were at Strong

9  Vincent?

10  A.   C.A., S.L. and K.L. -- that's all I can think of.

11  Q.   You were sexually assaulted by C.B. and A.K., is that

12  right?

13  A.   Yes.

14  Q.   Okay.  Had they done anything to hurt you before that

15  night?

16  A.   B.C. threatened to beat me up.

17  Q.   You hadn't had any encounters with C.B. or A.K.?

18  A.   No, not before that night.

19  Q.   Were you afraid that night?

20  A.   Yes.

21  Q.   Okay.  And there were multiple -- there was more than one

22  sexual encounter, is that right, that night?

23  A.   Yes.

24  Q.   Did you also observe that the same thing happened to

25  K.L.?


133


1  A.   Observed?

2  Q.    See, did you see it happen to K.L.?

3  A.    I didn't see it happen, but from a distance I could see

4  her shaking her head no, and her hand motions were going like

5  this, (indicating).

6  Q.    After the sexual assault, did kids bother you in school?

7  A.    Yes.

8  Q.    What would go on in school?

9  A.    I would walk down the halls and people, like the boys,

10  they would make gestures or they would ask me to do that to

11  them.  And there was one time they shoved me against the

12  lockers and threatened me.

13         THE COURT:  Why don't we take a little recess.

14         (Recess from 3:11 p.m.; until 3:16 p.m.)

15         (In Courtroom C outside the presence of the Jury.)

16         THE COURT:  R.P., come up here and have a seat just

17  a second.  Look it, the reason I wanted to talk to you -- see,

18  the jury isn't here, just to tell you a couple things.  First

19  of all, everybody who testifies, I have never seen anybody who

20  testified that wasn't nervous.  Okay.  And that includes

21  adults.  So there's nothing wrong with that.  And many times

22  because of the nature of the testimony, people get upset.  And

23  that's very natural.  But understand you're in court, you don't

24  have anything to worry about.  We'll go as long as we need to.

25  And just all you have to do is listen to the questions from Mr.


134


1  Marnen, if he has any for you, and your own lawyer, and then

2  just answer them.  If you need water, we'll get you water.

3        MR. OLDS:  May I ask a question.  Would it be

4  appropriate or I guess I'm making a request that either her

5  mother or father be allowed to stand close to her?

6        THE COURT:  No, it would not be appropriate.  R.P.

7  can do it.

8        (Whereupon, at 3:18 p.m., the Jury reenters

9  Courtroom C.)

10        THE COURT:  All right, Mr. Olds.

11  BY MR. OLDS:

12  Q.   R.P., when you were backed up against the lockers, did

13  someone help you get away?

14  A.   K.L. told Ms. Cappabianca, and Ms. Cappabianca came.  She

15  grabbed my hand and I pulled away because I thought she was one

16  of the boys.  And when I knew it was her, I grabbed her hand

17  and then she took me to her office.

18   Q.   Did you try to tell Ms. Cappabianca what was going on

19   with you?

20   A.   I don't know if I did at that time.

21   Q.   Other times did you try to talk to her?

22   A.   Yes.

23   Q.   What did you say to her?

24   A.   Well, it was kind of hard to talk to her because she

25   wouldn't let me talk sexual or any gestures or to say what


135


1   happened.

2   Q.   You tried to tell her?

3   A.   Yes.

4   Q.   What would she do when you would try to tell her?

5   A.   She would like use some sounds, like sounds to keep me

6   from talking.

7   Q.   You can show the jury, if you can imitate what she did?

8   A.   She would -- I don't know how to explain it.

9   Q.   Can you show them what she did, can you actually show

10   them?

11   A.   Well, one time she told me not to use --

12        THE COURT:  Excuse me, one second, Mr. Olds.  Just

13    as a point of clarification.  The timeframe is completely

14    unclear here, where we are.

15    BY MR. OLDS:

16    Q.    Would this all have been after you were assaulted by

17    C.B.?

18    A.    Yes.

19    Q.    Before you left the school with your dad to go to Sarah

20    Reed, it happened in that time period?

21    A.    Yes.

22    Q.    And did you have -- how many times do you think you tried

23    to talk to Ms. Cappabianca?

24    A.    I don't know how many times, but I know it was a lot.

25    Q.    Okay.  And you were going -- and that was all in that


136


1    time period between the time you were sexually assaulted and

2    the time you left the school?

3    A.    Yes.

4    Q.    By the way, you hadn't been able to tell your parents

5    what happened to you, were you?

6    A.    No.

7    Q.    Why not?

8    A.    I don't think they would understand.

9    Q.    Okay.  But you tried to tell Ms. Cappabianca?

10   A.    Yes.

11   Q.    Okay.  Now, you were about to show the jury what she

12   would do when you would try to tell her.  Can you do that, can

13   you sort of imitate what she did?

14   A.    When I would try to tell her, she would go like this,

15   (indicating).

16          THE COURT:  You indicate what the record is

17   reflecting, then if Mr. Marnen has an objection, he can voice

18   it.

19   BY MR. OLDS:

20   Q.    What would she do, R.P.?

21   A.    She would like put her hands up.

22          THE COURT:  Put your hands so the jury can see,

23   please.

24          THE WITNESS:  And every time that I would try to say

25   something, she would make a noise like, mmm, uh, I couldn't say

1  anything.

2  BY MR. OLDS:

3  Q.    You tried a number of times to get through to her?

4  A.    Yes.

5  Q.    Was it something that was happening to you daily that the

6  kids were being mean to you?

7  A.    Yes.

8  Q.    And boys were asking you to engage in oral sex?

9  A.    Yes.

10  Q.    You tried to tell Ms. Cappabianca?

11  A.    Yes.

12  Q.    Do you remember the incident where B.C. pushed you down

13  the steps?

14  A.    Yes.

15  Q.    Do you remember who the boy was?

16  A.    No, I didn't know him.

17  Q.    She pushed you down the steps, she was telling the boy

18  that you were going to give him oral sex?

19  A.    She was shoving me down the stairs, and she told me that,

20  she first told him when he was walking by, hey, this girl wants

21  to give you head.

22  Q.   What happened, did someone break that up?

23  A.   When we got downstairs, there was a teacher down there,

24  that told us to get back to class.

25  Q.   Were you afraid of B.C.?


138


1  A.   Yes.

2  Q.   Were you sent to the office to talk to Ms. Cappabianca

3  about this?

4  A.   Yes.

5  Q.   Did you go to see her that day?

6  A.   I can't remember if it was the next day or that day.

7  Q.   Do you remember -- well, what happened when you talked to

8  her about that incident?

9  A.   I can't remember what I told her, but she gave me five

10  days of PASS.

11  Q.   Do you remember -- your dad talked about the time that

12  Ms. Cappabianca called him?

13  A.   Yes.

14  Q.   Were you in her office then?

15   A.   Yes.

16   Q.   What did she say to him on the phone?

17   A.   I can't really remember, something about filthy.

18   Q.   Did she call you filthy?

19   A.   Yes.

20   Q.   Did your dad come to school?

21   A.   She gave the phone to me after she was done talking to

22   him.

23   Q.   Did your dad talk to you?

24   A.   He yelled at me.

25   Q.   And then was there another incident that happened after

139

1   PASS with C.B. and another kid?

2   A.   Yes, but C.B. didn't do anything to me that time.

3   Q.   Did this happen after the first incident when C.B. and

4   A.K. did what they did to you?

5   A.   Yes.

6   Q.   What happened that day that you had that explosion in Ms.

7   Scully's class?

8   A.   I can't remember what I said, but it had to do with the

9   "F" word.  I was getting frustrated with the kids bothering me.

10  Q.    Did it seem like it was all the time by now?

11  A.    Yes.

12  Q.    Was there anyplace you could go to get peace?

13  A.    Well -- not in school.

14  Q.    And when you went to Ms. Cappabianca's this time, what

15  happened?

16  A.    I can't remember.

17  Q.    Okay.  Did they -- did Ms. Cappabianca and Ms. Woods

18  question you?

19  A.    I think Ms. Cap did.

20  Q.    And were any of the other kids around?

21  A.    You mean in her office?

22  Q.    Yes.

23  A.    I don't think so.

24  Q.    After you left Ms. Scully's class, did you go back to any

25  classes that day?


140


1  A.    I think I did because it was in the morning and it was

2  first period.

3   Q.   Did you have to go to PASS that night?

4   A.   I think so.

5   Q.   And did your dad pick you up after PASS?

6   A.   Yes.

7   Q.   Do you remember that Ms. Woods talked to him then and

8   asked him to come to a meeting -- maybe you don't remember?

9   A.   No.

10   Q.   Did you go and meet with your dad and Ms. Woods the next

11   day?

12   A.   At the meeting?

13   Q.   Yes.

14   A.   Yes.

15   Q.   Do you remember who was there besides you and your dad?

16   A.   Chris and some other lady.

17   Q.   And do you remember what Ms. Woods said?

18   A.   She said are you ready for this, to my dad.  And she said

19   your daughter has been giving blow jobs.

20   Q.   What did you feel like?

21   A.   I was -- I don't know, I was -- I was crying, I felt

22   really hurt.

23   Q.   And then you left the school that day, you never went

24   back to Strong Vincent?

25  A.   I went back in 8th grade.


141


1  Q.   8th grade, okay.  Can you talk at all about how you were

2  feeling then, those last days when you were at Strong Vincent,

3  can you talk about what you were feeling?

4  A.   It was -- it was hard.  Like I couldn't -- I don't know

5  how to explain it.

6  Q.   Did you want to hurt yourself?

7  A.   Not at that moment, later on I did.  But not at that

8  moment.  I was getting very -- I don't know how to explain it.

9  Q.   Did you have the conversation with T.N., and she said --

10  T.N., and she said she wasn't going to be allowed to hang with

11  you anymore?

12  A.   Yes.

13  Q.   What did she say to you?

14  A.   She said my mom said I can't hang out with you anymore.

15  Q.   Did she say why?

16  A.   I asked why, and she said because Ms. Cappabianca told us

17  that you gave head somewhere in school, I can't remember.

18  Q.   How did that make you feel?

19  A.   I was angry.

20  Q.   Had you talked to T.N. about what had happened to you?

21  A.   My dad did.

22  Q.   After?

23  A.   Yes.

24  Q.   You went to Sarah Reed next?

25  A.   Yes.

142

1  Q.   What did you think about going to Sarah Reed?

2  A.   I really hated it.

3  Q.   Did you wonder why you went there?

4  A.   Yes.

5  Q.   What was going on there at Sarah Reed?

6  A.   I was getting in trouble a lot.

7  Q.   How did the other kids act?

8  A.   Most of them were bad.

9  Q.   Did it make you feel bad that you had been sent there?

10  A.   Yes.

11  Q.   Why?

12  A.   Because I didn't think it was right for me to be there,

13  and the boys to be left in school.  I thought they should send

14  me to another place.

15  Q.    Did you think you were being punished?

16  A.    It felt like it.

17  Q.    Things didn't go very well at Sarah Reed, right?

18  A.    Yes.

19  Q.    And was your life starting to get worse?

20  A.    Yes.

21  Q.    You ended up in the hospital not too long after this,

22  right?

23  A.    Yes.

24  Q.    Did you try to hurt yourself?

25  A.    Yes.


                                    143


1  Q.    Can you remember what you were thinking?

2  A.    Before the time I went to the hospital?

3  Q.    Yes.

4  A.    I felt like going crazy, I didn't know how to deal with

5  the emotions I was feeling.

6  Q.    Were you angry?

7   A.    Not only angry, it was kind of mixed with different

8   feelings.

9   Q.    And was that the time that you cut your father?

10  A.    Yes.

11  Q.    What kind of knife did you have?

12  A.    I remember what it looks like, but I don't remember what

13  kind it was.

14  Q.    Did your relationship -- I mean you started to change,

15  right, as a person?

16  A.    Yes.

17  Q.    What were you becoming?

18  A.    I was starting out to know myself.  I didn't like the

19  feeling that changed me, I don't know how to explain it.  I

20  wasn't liking myself.

21  Q.    You quit listening to your parents?

22  A.    Yes.

23  Q.    You were 13?

24  A.    Yes.

25  Q.    Did you start running around at night, not coming home?

144

1   A.   Yes.

2   Q.   You were hospitalized after you cut your dad, do you

3   remember how long it was?

4   A.   How long I was in the hospital?

5   Q.   Yes.

6   A.   It must have been a week or more.

7   Q.   What was that like to be in that hospital?

8   A.   I hated it.

9   Q.   Why did you hate it?

10  A.   I don't know, I just didn't feel comfortable being there.

11  Q.   Did things get worse at Sarah Reed when you got out of

12  the hospital?

13  A.   Yes.

14  Q.   Were you ever restrained at Sarah Reed?

15  A.   Yes.

16  Q.   Once or more than once?

17  A.   More than once.

18  Q.   What happened when you were restrained?

19  A.   Why did I great restrained?

20  Q.   No, how did they do it?

21  A.   I can't remember.

22  Q.   Do you remember why you were restrained?

23  A.   There was times I threw my fists at people.  And I would

24  throw things or -- I can't remember the rest.

25  Q.   Could you control yourself?

145

1  A.   I didn't feel like it.

2  Q.   Then there was another, you were in the hospital again in

3  the summertime of 2002 before your 8th grade year, is that

4  right?

5  A.   Yes.

6  Q.   Did you do something to hurt your mother then?

7  A.   Yes, I think I bit her.

8  Q.   Were you angry at all adults by then?

9  A.   Yes.

10  Q.   Did you trust anyone?

11  A.   Not really.

12  Q.   And what kind of kids were you hanging out with?

13  A.   Not very good influence kids.

14  Q.   In the fall you ended up back at Strong Vincent?

15  A.   Yes.

16  Q.   What happened at Strong Vincent?

17  A.   I was only there for a week and I had a white shirt on

18  without a collar and they wanted me to change my shirt because

19  it was not to dress code.  So I didn't want to do that.  And I

20  can't really remember, but I remember not listening to them,

21  and I was in the principal's office and I threw my fists at

22  him, so he put handcuffs on me.

23  Q.   And officer, was it Slupski, that took you out of school?

24  A.   Yes.

25  Q.   Did you end up hitting him with the handcuffs?


146


1  A.   Yes.

2  Q.   And what was going on?

3  A.   There was these girls and boys in the gym, and they were

4  saying stuff to me.  And I didn't like it, so I slipped out of

5  the handcuffs and I hit the officer and started running.  But

6  he caught me and he handcuffed me again.

7  Q.   What kind of stuff were they saying to you?

8  A.   I can't really remember.

9  Q.   Did you start engaging in criminal conduct?

10   A.   Yes.

11   Q.   Do you know why?

12   A.   I don't know why.

13   Q.   What did you do?

14   A.   Drugs and alcohol and fighting.  There was other things.

15   Q.   Was this when you were still 13?

16   A.   I think 13 and 14.

17   Q.   What is your birthday, R.P.?

18   A.   1988.

19   Q.   And were you sent to juvenile detention facilities?

20   A.   Yes.

21   Q.   Do you remember which ones -- were you at Hermitage

22   House?

23   A.   Yes.

24   Q.   Were you at Andromeda House?

25   A.   Yes.


147


1   Q.   Were you at Edmund L. Thomas Detention Center?

2   A.   Yes.

3   Q.   And you were at Cornell Abraxas?

4   A.   Yes.

5   Q.   All of that was because of criminal stuff that you were

6   doing?

7   A.   Yes.

8   Q.   And did you recognize yourself anymore?

9   A.   No.

10   Q.   How did you treat your parents?

11   A.   Not very good.

12   Q.   Were you out on the streets all night?

13   A.   Most of the time.

14   Q.   Did you do anything in school, did you do any learning?

15   A.   Once in a while I did my work.

16   Q.   But not often?

17   A.   Yes.

18   Q.   What was Cornell Abraxas like?

19   A.   It was very hard.  At first it was all kind of scary

20   because they're yelling at you in your face.  But once you

21   achieve your goals while you're there, it gets better and more

22   comfortable with the place.

23   Q.   That was at boot camp, right?

24   A.   Yes.

25   Q.   So they made you wear a uniform?

148

1  A.   Yes.

2  Q.   If you did something wrong there, would people be

3  screaming at you?

4  A.   Yes.

5  Q.   More than one person screaming at you, right?

6  A.   Most of the time.

7  Q.   And how long were you there?

8  A.   I think five months.

9  Q.   And at some point did things seem to start getting --

10  when you were at Cornell Abraxas, would that have been when you

11  were in 10th grade?

12  A.   I think so.

13  Q.   So you would have been how old?

14  A.   Fourteen, I think I had my 15th birthday there.

15  Q.   Your 15th birthday?

16  A.   Yes.

17  Q.   And you're 17 today?

18  A.   Yes.

19  Q.   Did things start changing when you were at Cornell

20  Abraxas?

21  A.    Yes.

22  Q.    What happened?

23  A.    My self-esteem went higher, my confidence.  And I started

24  to feel better.

25  Q.    Did you miss your family when you were away?


149


1  A.    Yes.

2  Q.    You were there for five months, I think?

3  A.    Yes.

4  Q.    When you came back from Cornell Abraxas, after you came

5  back from Cornell Abraxas, did you get into trouble anymore?

6  A.    Yes.

7  Q.    Couple times?

8  A.    Yes.

9  Q.    What kind of trouble did you get into -- you would have

10  been 15 then?

11  A.    Yes.

12  Q.    What kind of trouble did you get into?

13  A.    I got in one fight with this boy in my school in a class.

14  Q.    Did you have a bout of drinking, too?

15  A.    Excuse me.

16  Q.    Did you have a bout of drinking, did you get drunk one

17  night?

18  A.    Yes.

19  Q.    Was that a probation violation?

20  A.    I can't remember if I was on probation at that time or

21  not.

22  Q.    And it's almost two years now since you got out of

23  Cornell Abraxas?

24  A.    Yes.

25  Q.    What kinds of therapy or support do you have, have you


                                150


1  had recently, what kinds of programs are you involved in?

2  A.    Through Stairways, which is a life meeting, they help me

3  get a job, and they counsel me when I need it.

4  Q.    And do you have wraparound services still?

5  A.    Yes.  They're closing me real soon.

6  Q.    What about mobile therapy, do you have that?

7  A.    Yes.

8   Q.   What is your counselor's name, your mobile therapist?

9   A.   Linda Gray.

10   Q.   How often does she come to your house -- maybe not now,

11   but say last summer or last spring, how often would she come to

12   your house?

13   A.   Either four -- I mean, either four or six hours a week.

14   Q.   And do you go places for counseling, also?

15   A.   Yes.

16   Q.   And you say the wraparound services, it's going to end?

17   A.   Yes.

18   Q.   And do you know why it's going to end?

19   A.   Because Lori, which is one of my counselors, says there's

20   no need for me to be on it if I'm doing this good.

21   Q.   Okay.  So you're doing better?

22   A.   Yes.

23   Q.   How do you spend your days now -- you had to drop out of

24   school, right?

25   A.   Yes.

151

1   Q.   And that made you sad?

2    A.    Yes.

3    Q.    Very sad?

4    A.    Yes.

5    Q.    How are you spending your days now?

6    A.    I stay at home, I'm trying to get a job.

7    Q.    You're not on the streets anymore, are you?

8    A.    No.

9    Q.    When you think back on what's happened to you, do you do

10    that now?

11    A.    Yes.

12    Q.    Do you have a picture, maybe an understanding, I guess,

13    of what happened to you; I mean have you figured it out yet?

14    A.    Can you explain that a little better.

15    Q.    Sure, I'll try.  When you think about all the stuff

16    that's happened to you, what do you think?

17    A.    Well, it still hurts, I mean, you can heal, but you can't

18    heal all the way.

19    Q.    Okay.  You're close with your parents again?

20    A.    Yes.

21    Q.    Okay.  And do your parents talk to you, do you guys talk

22    about what happened to you and how they reacted originally?

23  A.   Once in a while.

24  Q.   Do you and your dad ever talk about that time when Ms.

25  Cap called him and she put you on the phone, do you ever talk

152

1  about that?

2  A.   No.

3  Q.   Did that hurt you when she did that?

4  A.   Yes.

5       MR. OLDS:  I'm just going to mark for identification

6  purposes two journals, your Honor.  These are marked as 228 and

7  228.1.

8  BY MR. OLDS:

9  Q.   Are these diaries that you kept in 7th grade at Strong

10  Vincent when these events happened?

11  A.   This one was 7th grade, this one was --

12  Q.   Starts 2003 --

13       THE COURT:  Identify the exhibit by numbers?

14       MR. OLDS:  I'm sorry.

15  BY MR. OLDS:

16  Q.   Exhibit 228 is 7th grade?

17   A.   Yes.

18   Q.   Exhibit 228.1 begins with 2002?

19   A.   It's 7th and 8th grade.

20   Q.   You kept diaries, is that right -- do you remember when

21   you started to keep a diary?

22   A.   Twelve.

23   Q.   When you were 12-years-old?

24   A.   Yes.

25   Q.   And some of the time in your diaries you wrote about what

153

1   happened to you, is that right?

2   A.   Yes.

3   Q.   You wrote about your feelings?

4   A.   Yes.

5   Q.   And do you still keep a diary?

6   A.   I don't call it a diary anymore, I call it a journal.

7   Q.   Have you kept one since your 12 -- I mean at different

8   times you've written daily what's happened to you or how you're

9   feeling?

10   A.   Yes.

11   Q.   Do you have goals, what would you like to do with your

12   life, I mean if you could pick?

13   A.   Well, I do want to get my GED really much.  And I want to

14   go to college to be a counselor.

15        MR. OLDS:  Okay.  No other questions, your Honor.

16        THE COURT:  All right, Mr. Marnen.

17        MR. MARNEN:  I have a few, your Honor.

18             CROSS-EXAMINATION

19   BY MR. MARNEN:

20   Q.   R.P., I'd like to refer to the first sexual assault by

21   A.K. and C.B., is that okay with you?

22   A.   Yes.

23   Q.   Did that assault occur a couple days before Christmas of

24   2001?

25   A.   That's what I saw on the video, but I'm not sure now.


154


1    That's what I said on the video.

2    Q.   That's what you testified to at the hearing on B.C., too,

3    correct?

4    A.   Yes.

5  Q.    And December 19, 2001, is a couple days before Christmas

6  vacation?

7  A.    Yes.

8  Q.    And you missed school the two days after that assault

9  occurred, isn't that right?

10  A.    I can't remember.

11  Q.    Isn't it true the day after the assault you saw a doctor,

12  a psychiatrist?

13  A.    I can't remember.

14  Q.    You don't remember that?

15  A.    No.

16  Q.    Did you make any attempts to talk with Ms. Cappabianca

17  before you left for Christmas vacation about this assault?

18  A.    Before Christmas vacation?

19  Q.    Yes, ma'am.

20  A.    No.

21  Q.    You came back from Christmas vacation, didn't you, about

22  January 2nd?

23  A.    Yes.

24  Q.    And that was the middle of the week, wasn't it, on the

25  first week you came back right after New Years?

1   A.   I think.

2   Q.   Did you try to talk to Ms. Cappabianca that week about

3   the sexual assault?

4   A.   Yes.

5   Q.   And did you go to her office when you tried this?

6   A.   Yes.

7   Q.   And did you do this every single day?

8   A.   Almost.

9   Q.   Almost?

10   A.   Yes.

11   Q.   Well, between September 2nd and -- let me try it this

12   way.  Eventually, you did tell Ms. Cappabianca about it, did

13   you not?

14   A.   Yes.

15   Q.   When you did that, was that the same day you had the

16   outburst in Ms. Scully's office?

17   A.   No.

18   Q.   It was some other day?

19   A.   I think so.

20   Q.   Was it before the day you had the outburst in Ms.

21  Scully's office or after that day?

22  A.   I think it was after.

23  Q.   Was it within a couple days or a couple weeks or what?

24  A.   I can't remember.

25  Q.   Now, between the time you came back from Christmas

156

1   vacation and the time you told Ms. Cappabianca what happened,

2   how many times did you see her and try and talk about this?

3   A.   I don't know how many times, but it was a lot.

4   Q.   Was it every single --

5   A.   I said almost everyday.

6   Q.   And each and every time she would not let you tell her?

7   A.   Yes.

8   Q.   Each and every time you tried to tell her, she would

9   shush you up?

10  A.   There was one time she told me she knows what happened.

11  Q.   And that was before the day that you told her all the

12  details?

13  A.   Yes.

14  Q.   What was it that happened that caused Ms. Cappabianca to

15  make that telephone call to your father?

16  A.  Because I was in the music class and the kids were

17  messing with me.  And I got mad and I said something out loud,

18  something about I'm tired of these kids asking me something.

19  And the music teacher told me to go out of class.  So I did, I

20  went to Ms. Cap's office, then she called my dad.

21  Q.  And when you spoke in music class, did you use bad

22  language?

23  A.  Yes.

24  Q.  Did the music teacher tell Ms. Cappabianca you used that

25  bad language?


                                  157


1  A.  Can you say that again?

2  Q.  Did the music teacher tell Ms. Cappabianca you used that

3  bad language?

4  A.  No, I told her what I said.

5  Q.  Okay.  And Ms. Cappabianca called your father in your

6  presence?

7  A.  Yes.

8  Q.  And did she ask your father to come to the school?

9   A.   I can't remember.

10  Q.   Did he come to the school?

11  A.   Yes.

12  Q.   Did he come to the school that day?

13  A.   I can't remember.

14  Q.   You can't remember, all right.  You said some of your

15  friends were C.A., you said S.L. and K.L.?

16  A.   Yes.

17  Q.   Was T.N. also a friend?

18  A.   I just -- well, I knew her when I was younger, but we

19  haven't spoken in years.

20  Q.   She was a good friend in 7th grade, wasn't she?

21  A.   Not a real good friend at that time.

22  Q.   You used to hang out with her?

23  A.   I started to, yes.

24  Q.   Do you remember Ms. Woods at assemblies and other class

25  meetings talking about coming to her if you need help?


158


1  A.   Yes.

2  Q.   Did you ever ask Ms. Woods for some help here?

3  A.   No.

4       MR. MARNEN:  No other questions, thank you very

5  much.

6       THE COURT:  Anything else?

7       MR. OLDS:  Yes, I just have one or two.

8       THE COURT:  All right.

9                REDIRECT EXAMINATION

10  BY MR. OLDS:

11  Q.   Music class -- the incident in music class, R.P.?

12  A.   Yes.

13  Q.   Was the language that you used I'm tired of these kids

14  asking me to suck dick?

15  A.   Yes, something like that.

16  Q.   And you were sent to the office for that?

17  A.   Yes.

18  Q.   And you told that to Ms. Cappabianca?

19  A.   Yes.

20       MR. OLDS:  No other questions, your Honor.

21       THE COURT:  All right, R.P., you're excused.

22       MR. OLDS:  May we approach the bench?

23       THE COURT:  About scheduling matters?

24          MR. OLDS:  Yes.

25          THE COURT:  Have you completed your witnesses for

159

1   the day?

2          MR. OLDS:  Yes.

3          THE COURT:  Members of the jury, that's it for the

4   day.  We're still pushing along pretty good.  Remember, don't

5   read anything, look at the newspaper.  If anything should be on

6   TV, avoid it.  Let me remind you again, don't talk about the

7   case amongst yourselves until this case is over.  I'm going to

8   stay on the bench -- have a pleasant evening, we'll see you

9   tomorrow at 9 o'clock.

10          (Whereupon, at 3:55 p.m., the Jury was excused for

11   the day.)

12          THE COURT:  All right, Mr. Olds.

13          MR. OLDS:  Your Honor, we indicated that we're going

14   to do Dr. Schachner tomorrow morning at 9 o'clock.

15          THE COURT:  Is he the psychologist?

16          MR. OLDS:  Yes.  The only loose end, and we'll let

17   the court know tomorrow, is Detective Green, who we had

18    subpoenaed, he's on vacation.  We'll take a look at his

19    deposition and find out whether he's back or try to get some

20    information on him.  But after Dr. Schachner testifies, and

21    depending upon what we decide with Detective Green, I think

22    that the plaintiffs will be resting their case tomorrow.

23          THE COURT:  How long do you anticipate Dr. Schachner

24    to be?

25          MR. OLDS:  I would assume at least all morning.


                              160


1           THE COURT:  That long on direct?

2           MR. OLDS:  Actually, probably direct and cross.  I

3    don't think I'll be with him three hours on direct, but I think

4    probably an hour and a half to two hours on direct.

5           THE COURT:  But in all likelihood that's your last

6    witness?

7           MR. OLDS:  Yes.

8           THE COURT:  What about you?

9           MR. MARNEN:  I think I only have two and they've

10    already been examined, Linda Cappabianca and Janet Woods.

11          THE COURT:  So that will abbreviate somewhat your

12    direct examination?

13         MR. MARNEN:  No question about it, your Honor.  I

14    need to think about that, but I think it's only going to be

15    those two witnesses.

16         THE COURT:  Here's the game plan then.  When we

17    finish late in the morning or finish early in the afternoon,

18    the jurors then are going to be sent home and we're going to do

19    the points for charge.  Which will give us extra time to try to

20    get those things prepared.  All right, we're in recess.

21

22         (Whereupon, at 3:56 p.m., the Jury Trial proceedings

23    were adjourned for the day.)

24

25              - - -


161


1         C E R T I F I C A T E
          – – – – – – – – – –

2

3

4

5    I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11   _____

12   Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25