REDACTED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD P., by and for R.P.,
and DENISE L., by and for K.L.,
        Plaintiffs

        v.                  CIVIL ACTION NO. 03-390 ERIE

SCHOOL DISTRICT OF THE CITY OF
ERIE, PENNSYLVANIA, et al.,
        Defendants

JURY TRIAL - DAY NO. 4

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Judge's Chambers & Courtroom C,

U.S. Courthouse, Erie, Pennsylvania,

on Thursday, January 26, 2006.

APPEARANCES:
        EDWARD A. OLDS, Esquire, and CAROLYN SPICER
        RUSS, Esquire, appearing on behalf of the

Plaintiffs.

JAMES T. MARNEN, Esquire, appearing on behalf of
the Defendants.

Ronald J. Bench, RMR - Official Court Reporter

2

1                    I N D E X

2

3      WITNESSES:            DIRECT  CROSS  REDIRECT  RECROSS

4   FOR THE PLAINTIFFS:

5   Stephen P. Schachner         3     48      75      80

6

7   FOR THE DEFENSE:

8   Janet Woods           83     91     --      --

9   Linda Cappabianca         97    140    149     --

10

11              - - -

12      EXHIBITS:            IDENTIFIED    ADMITTED

13  FOR THE DEFENSE:
    Defendant's Exhibit C          57         82

| | | | |
|---|---|---|---|
| 14 | Defendant's Exhibit D | 59 | 82 |
| | Defendant's Exhibit E | 62 | 82 |
| 15 | Defendant's Exhibit F | 62 | 82 |
| | Defendant's Exhibit G | 67 | 82 |
| 16 | Defendant's Exhibit H | 80 | 82 |
| | Defendant's Exhibit I | 103 | 106 |
| 17 | Defendant's Exhibit J | 106 | 110 |
| | Defendant's Exhibit K | 110 | 111 |
| 18 | Defendant's Exhibit L | 111 | 112 |
| | Defendant's Exhibit M | 112 | 115 |
| 19 | Defendant's Exhibit N | 115 | 115 |
| | Defendant's Exhibit O | 115 | 118 |
| 20 | Defendant's Exhibit P | 118 | 122 |
| | Defendant's Exhibit Q | 122 | 124 |
| 21 | Defendant's Exhibit R | 124 | 125 |

22

FOR THE PLAINTIFFS:

| | | | |
|---|---|---|---|
| 23 | Plaintiff's Exhibits 2 - 233 | 82 | 83 |

24

25                     - - -


3


1                P R O C E E D I N G S

2

3            (Whereupon the Jury Trial proceedings began at

4   9:00 a.m., on Thursday, January 26, 2006, in Courtroom C.)

5

6            THE COURT:  Good morning, are you ready to go?

7            MR. OLDS:  Good morning, your Honor, yes.

8          THE CLERK:  Could you please state your full name

9    and spell your last name for the record?

10         THE WITNESS:  My name is Stephen Paul Schachner,

11    S-c-h-a-c-h-n-e-r.

12    STEPHEN P. SCHACHNER, Ph.D., PLAINTIFFS' WITNESS, SWORN

13              DIRECT EXAMINATION

14    BY MR. OLDS:

15    Q.    Good morning, Dr. Schachner.  For the record would you

16    state your full name?

17    A.    My name is Stephen Paul Schachner.

18    Q.    And you're a licensed clinical psychologist?

19    A.    I'm a licensed psychologist, I specialize in clinical

20    psychology.

21    Q.    Okay.  Where is your business offices?

22    A.    My offices are located at 128 North Craig Street in

23    Pittsburgh, the Oakland section.

24    Q.    We've asked you to review the records in this case and be

25    prepared to render certain opinions, is that right?


                              4


1    A.    Yes, that's correct.

2  Q.   Before getting to that, I wanted to go through your

3  credentials a bit.  Could we start with your education, what

4  education did you accomplish in order to achieve your current

5  status?

6  A.   I received a bachelor of arts degree in English

7  literature and psychology at American International College in

8  Springfield, Massachusetts.  I attended Duquesne University,

9  where I obtained a master of education degree in guidance and

10  counseling.  And then I went to the University of Pittsburgh

11  and received a doctor of philosophy degree, a Ph.D. from the

12  department of educational, developmental and school psychology.

13  While I was at the University of Pittsburgh, I also obtained my

14  certification as a certified school psychologist.

15  Q.   How many years of education did all of this entail?

16  A.   Let me see if I can count that high, it seems like a lot.

17  About 21 years of school time.

18  Q.   And when did you receive your Ph.D. from Pitt?

19  A.   In 1976 I think it was.

20  Q.   And you're certified as a school psychologist?

21  A.   Yes, that is granted by the Department of Education by

22  the state.

23  Q.   When did you achieve that certification?

24  A.  Around 1975.

25  Q.  You indicated that you are licensed to provide clinical

5

1  psychology, is that right?

2  A.  Yes.

3  Q.  What do you have to do to achieve that license?

4  A.  The licensing for a psychologist is generic, in the same

5  manner that physicians get an MD degree, psychologists can get

6  a Ph.D. or psychiatric degree.  Their ability to specialize is

7  dependent upon their training, usually during and after the

8  receipt of the degree.  I spent a couple of years at a

9  community mental health center working at Gusti child guidance

10  clinic in Turtlecreek, a community mental health center,

11  offering services and participating in training, which was

12  equivalent to an internship.  Subsequent to that, I continued

13  to work at the clinic and then opened up a private practice.

14  And have been working since then.

15  Q.  In terms of your work history, have you either worked for

16  a school district, taught or have you had any kind of activity

17  such as that?

18  A.    Prior to my entering graduate school at Duquesne

19  University, I was a teacher of English for 7th, 8th and 9th

20  graders in the Canon-McMillen School District, which is south

21  of Pittsburgh.  I have received a comprehensive certificate for

22  teaching English for all grades prior to my completing my

23  master's degree in guidance and counseling.  So I worked as a

24  teacher for a number of years supporting myself while I went to

25  school for my graduate degrees.


6


1  Q.    Have you either worked or provided services as a school

2  psychologist?

3  A.    Yes, in order to be certified as a school psychologist,

4  you have to work and put a certain number of hours in working

5  in a school setting.  So I've worked in public and private and

6  parochial schools offering services as a school psychologist.

7  From that time going forward, I've combined my practice so that

8  I have, during the course of any given week, offered services

9  as a certified school psychologist and/or as a clinical

10  psychologist.

11  Q.    And as a clinical psychologist, you're providing therapy

12  to individual patients or couples?

13  A.   Yes, I practice evaluation, as well as counseling and

14  therapy for couples or individuals and some group work.

15  Q.   In terms of that aspect of your professional activity

16  involved in providing school psychology, you still do that,

17  that's an ongoing thing that you're involved in?

18  A.   Yes, it is.

19  Q.   And you work for the schools or do you assist parents and

20  children or is it a combination of both?

21  A.   For the most part I receive referrals from schools or

22  directly from physicians or parents requesting me to evaluate

23  children.  Occasionally I evaluate adults as well.  Those

24  assessments are then used in planning for the child's IEP or

25  individual educational plan.


                                7


1  Q.   Now, how long have you been in private practice as a

2  clinical psychologist?

3  A.   Thirty years.

4  Q.   Do you have any relationship with any court or court

5  agency concerning providing services to the courts?

6   A.    Beginning about 15 to 20 years ago and continuing up

7   until five years ago, I was a court-appointed psychologist

8   working independently in my practice, but receiving referrals

9   from the Court of Common Pleas of Allegheny County for

10  conducting evaluations in child custody matters.  And also in

11  the juvenile court system conducting evaluations in reference

12  to child mental treatment.  So I was working at the behest of

13  the court.  I have also at times worked for parents who have

14  gone through attorneys and had consent orders in which they

15  agreed that I should conduct an evaluation outside of the

16  court.  I've also worked as an expert in evaluating the

17  assessments that other psychologists may make in these matters.

18  Q.    In the course of all of these activities, have you

19  encountered instances where your patients are either victims of

20  sexual abuse or physical abuse or are members of families where

21  that kind of conduct has occurred?

22  A.    Yes.

23  Q.    Do you encounter much of that when you worked for the

24  juvenile court system?

25  A.    Yes.

1  Q.   And then, finally, are you a member of any societies or

2  other professional organizations?

3  A.   I am a member of three organizations that promote good

4  practice in psychology.  The Greater Pittsburgh Psychological

5  Association; the Pennsylvania Psychological Association; and

6  the American Psychological Association.  And I've also had my

7  credentials reviewed by the National Register, which is a

8  council of members that evaluate people for the practice of

9  clinical psychology.  And I've been a member of the National

10  Register for over 20 years.

11  Q.   Are there any professional achievements or

12  accomplishments that you achieved that we haven't discussed

13  yet?

14  A.   I'm a little modest about this, but I did receive a

15  legacy award from the Greater Pittsburgh Psychological

16  Association.  I told them that I thought if I was around long

17  enough I'd be a legacy, but I think they were happy with some

18  of the work that I professionally offered to the organization.

19  Q.   You've testified before and rendered psychological

20  opinions in a number of court cases, is that right?

21  A.   Yes.

22         MR. OLDS:  I have no further questions along the

23  lines of his credentials.

24         THE COURT:  Mr. Olds, the way you do it is now you

25  offer him as an expert in whatever area you're going to offer


                                9


1   him in and I'll turn to Mr. Marnen to see if he has any voir

2   dire.

3          MR. OLDS:  We intend to offer Mr. Schachner as an

4   expert, your Honor.

5          THE COURT:  Is it Mr. or Dr., it's Doctor, isn't it?

6          THE WITNESS:  Yes.

7          THE COURT:  What do you intend to do?

8          MR. OLDS:  Offer him to render an expert opinion

9   concerning the psychological injuries suffered by our clients

10  in this case.

11         THE COURT:  All right, let me turn to Mr. Marnen, do

12  you have any voir dire?

13         MR. MARNEN:  I have no voir dire, your Honor.

14         THE COURT:  I recognize him as an expert in the area

15  so described.  Go ahead.

16  BY MR. OLDS:

17  Q.   Dr. Schachner, you actually have conducted a review in

18  this case of various records, is that right?

19  A.   Yes, I have.

20  Q.   We carried up -- maybe you could just show the jury the

21  sort of the records that are in your file on this case?

22  A.   I think this is a majority of the records that I had to

23  review.

24  Q.   You made a list -- we'll deal with making that list part

25  of the record here, I don't want to take the time to do that

10

1  now.  You also had the opportunity to meet with K.L. and R.P.

2  as well, is that right, Dr. Schachner?

3  A.   Yes, I did.

4  Q.   And how many times did you meet with them?

5  A.   I met with each of the girls at least two, if not three

6  times, and not on the same day.

7  Q.   The records that we provided to you, include the

8  educational records, hospital records, treatment records or

9   examinations from psychologists or psychiatrists, school

10   records and also certain legal records, is that right?

11   A.   Yes.

12   Q.   And I didn't ask you this, before you came here, do you

13   have an idea of how much time you have spent looking at this

14   material; roughly, is it more than 50 hours?

15   A.   I spent approximately 30 to 40 hours on the reading of

16   the records and also interpreting them.

17   Q.   And then you've also written a report which we provided

18   to the court, is that right?

19   A.   Yes.

20   Q.   So I'm going to start with some premises and then go from

21   that and ask you some questions.  One premise, Dr. Schachner is

22   that the plaintiffs in this case were at the time in 2001, one

23   was 12-years-old and one had just turned 13-years-old, and they

24   were raped, forced to engage in oral sex.  One of them with

25   multiple boys, one with one boy.  And you have information

11

1   about that incident in your records, don't you?

2   A.   Yes, I do.

3  Q.   And each of these girls suffered either learning

4  disabilities or other developmental problems, is that correct?

5  A.   Yes, it is.

6  Q.   In terms of K.L., for instance, what was her functional

7  intellectual capacity when she was 12-years-old in December of

8  2001?

9  A.   I believe that she was functionally at a mild level of

10  mental retardation or able to learn at a lower than low average

11  level.  And that can be defined in terms of school work, as

12  functioning between two and three years below your grade

13  placement that you would normally have based on your age.

14  Q.   Can you also give an age equivalent to her functional

15  abilities?

16  A.   Well, if you were 12 years of age and you were

17  functioning the way that K.L. was, you would expect her to be

18  able to communicate in both reading, writing and perhaps verbal

19  expression between eight and nine years of age level.

20  Q.   So that would limit her ability to communicate with

21  everyone, adults, other students?

22  A.   Yes, the type of communication might vary.  She might be

23  somewhat stronger in one area than another.  But, in general,

24  the communication would be years below her actual age.

25  Q.    What about R.P., what were her developmental problems?


12


1  A.    R.P. had been treated for a good part of her life for

2  speech and language deficits.  And these deficits can play a

3  distinct role in decreasing your functional intellectual

4  ability, your ability to work in school and certainly for R.P.

5  to communicate.  And R.P. was 13 at the time of these rapes.  I

6  think that R.P.'s ability to verbally communicate at that time

7  would have been at best a 9 or a 10-year-old.

8  Q.    Part of your review included reviewing her diaries as

9  well, is that right?

10  A.    Yes.

11  Q.    Was writing in her diary sort of an outlet for her, in

12  terms of she could express herself in writing perhaps better

13  than verbal?

14  A.    Yes, it's very interesting that R.P. enjoyed writing and

15  although she might have difficulty spelling or using words

16  equivalent to a 13-year-old, she was able to communicate her

17  feelings and her experiences in writing.  And she loved to

18  write, and she wrote a great deal in her diaries.

19  Q.    Okay.  Now, another premise that I would like to give

20  you, in terms of the stuff that we're going to talk about, is

21  that both R.P. and K.L. have testified here in court that after

22  they were victimized, after they were raped, they each tried,

23  either told or tried to tell or tried to advise the school

24  district authorities that they had been subjected to the rape,

25  there's been testimony to that effect.  And your records also

13

1  encompass information to that effect as well?

2  A.    Yes, the records indicate that, and the girls, when they

3  spoke with me, indicated the same.  So there was conjunction

4  between what they reported to me and what I found in the

5  records.

6  Q.    Now, I think another premise that I would like you to

7  consider in terms of the stuff we're going to talk about, is

8  that apparently neither of the girls, neither R.P. nor K.L.,

9  had been able to tell their parents about the rape after it

10  happened.  Did your records disclose that?

11  A.    The records did disclose it, but I think it's important

12  to understand that children suffering sexual abuse and rape

13  will be very uncomfortable and feel very guilty.  They may

14  blame themselves, they may be very embarrassed.  It's not

15  likely they will verbalize the experience very quickly.  But

16  they may engage in other activities that show a great distress.

17  Q.   In terms of what you know and what knowledge there is in

18  the field, it's not surprising or even much of a matter of the

19  moment that they were unable to tell their parents?

20  A.   No, for treating clinicians, they would expect the girls

21  to not first tell parents.

22  Q.   Okay.  Another premise that I would like you to consider

23  in terms of these reports, the opinions that you're going to

24  give, is that each has testified that when they attempted to

25  tell school authorities about what happened to them, that they


14


1  were either ignored or shushed.  There has been evidence or

2  testimony that when K.L. told Ms. Cappabianca what had happened

3  to her, Ms. Cappabianca told her that that's what adults do

4  when they're in love, and then didn't call K.L.'s mother.  And

5  that information is consistent with the information that you

6  reviewed in the records as well, is that right?

7  A.    Yes.  There were a number of different sources in the

8  records that confirmed the experience that they're reporting.

9  Q.    R.P. has testified in court that Ms. Cappabianca in her

10  presence called her filthy, and R.P. had also learned from a

11  friend, there has been testimony that has been presented in

12  court, that Ms. Cappabianca apparently informed the mother of a

13  friend that R.P. was engaged in sexual activity in the school,

14  engaging in oral sex, and that the friend called up R.P. and

15  said we can't play anymore and gave R.P. that information.  And

16  that's part of the information in your record as well, is that

17  right?

18  A.    Yes, that's correct.

19  Q.    And another premise is that shortly after the incident

20  and after spending about three days in school after she spoke

21  with Ms. Cappabianca, with a Christmas break in the intervening

22  time, K.L., when her mother found out about, learned about what

23  happened to her, injured herself, put her hand in a hot skillet

24  and was hospitalized.  And, obviously, your records have that

25  information, right?

15

1  A.    Yes, I think that the visit for K.L. to the hospital was

2  on the 4th of January, if I recall.

3  Q.    Okay.  And then another premise is that a few days later,

4  after R.P. testified that she had numerous attempts to talk to

5  Ms. Cappabianca, she had an outburst in class and she was

6  removed, and Ms. Cappabianca and Ms. Woods questioned her about

7  that.  And that is a fact that's in your records as well, is

8  that right?

9  A.    Yes, the outburst in class was followed up with a meeting

10  with school personnel, she was removed from class.

11  Q.    Okay.  And then another premise that we're going to

12  consider is that each was, each R.P. and K.L. or both of them I

13  should say, were transferred to a school called Sarah Reed

14  Children's Center, which was an alternative school.  And this

15  is a school setting where the other students in the school were

16  essentially there because they presented behavioral problems in

17  regular schools and they couldn't adjust to regular school

18  settings, so that's why they had been sent to Sarah Reed.  I

19  think the record shows, the record has shown here that R.L. and

20  K.L. were sent to Sarah Reed because they had been sexually

21  harassed in school and because of the assault.  And your

22  records contain that information as well, is that right?

23  A.   That's correct.

24  Q.   I think that R.P. has testified that she was very unhappy

25  at Sarah Reed.  And your records indicate, the record

16

1  information supports that in the records that you reviewed, is

2  that correct?

3  A.   Yes.  As a matter of fact, R.P. in her first meeting, I

4  believe, with a case manager, said she was very angry, that she

5  didn't know why she was placed at Sarah Reed, she was being

6  blamed for it.

7  Q.   Finally, each of the girls after that sort of spiraled

8  downhill, there were multiple hospitalizations for R.P. in

9  mental hospitals, psychiatric hospitals.  There was another

10  hospitalization for K.L.  There was juvenile delinquent

11  activity, acting out, rebelling from the family, eventual

12  placement in juvenile detention facilities.  And your records

13  disclose that as well?

14  A.   Yes, there was a horrific slide downward into behaviors

15  that were associated with juvenile delinquency,

16  self-destructive behaviors.  Nothing close to the way they were

17  depicted prior to these incidents.

18  Q.    Okay.  Now, what I'd like to do, first of all, with those

19  premises in mind, sort of address the psychological injuries

20  that were suffered by these girls as a result of what happened

21  to them.  Now, in general, as a psychologist, can you render

22  any opinion on the likelihood that a child who is the victim of

23  a sexual assault, such as occurred to R.P. and K.L., the rape

24  by other students, can you render an opinion whether that event

25  is likely to cause psychological injury?


                                    17


1  A.    Yes, it is.

2          MR. MARNEN:  Objection, your Honor, that's not in

3  the proper form.

4          MR. OLDS:  May we approach.

5          THE COURT:  I think we can handle this right here.

6  I rather anticipated the objection, I was a step ahead of it.

7  May I assume that you are asking the doctor with respect to all

8  his opinions, whether they are being expressed to a reasonable

9  degree of psychiatric certainty?

10          MR. OLDS:  Yes.

11          THE COURT:  Go ahead.

12    BY MR. OLDS:

13    Q.    The opinions that you're about to give us will be based

14    upon your 30 or 40 hours of record review, record analysis,

15    your experience and are rendered to a reasonable degree of

16    psychiatric certainty?

17    A.    Yes.  And may I add, also, the evaluation of the

18    children, as well as the records.  In response to your

19    question --

20    Q.    Yes.

21    A.    It is both supported by our research in the field of

22    child mental treatment and by clinical experience.  And

23    expectation that victims of child mental treatment are going to

24    possibly have post-traumatic stress disorder arise from direct

25    victimization.  And it can even occur from even just witnessing


                                18


1    maltreatment, in this case it is the rape and victimization.

2    So the expectation for this unique psychological description,

3    post-traumatic stress disorder, is expected.  It is my opinion

4  that that is exactly what both of the girls have experienced.

5  Q.   We can get to your authority for that in a second, but

6  perhaps we should just step back a second, Doctor, will you

7  maybe tell the jury what post-traumatic stress syndrome is?

8  A.   Post-traumatic stress disorder is best explained by using

9  some words that you may have heard before, such as battle shock

10  or battle fatigue.  It certainly came to our conscious

11  awareness most surely from World War I, World War II, Korean

12  War, and particularly for those of us who recall the Vietnam

13  War, when individuals would return from combat and would seem

14  to be okay.  And then they might freak out or have terrible

15  experiences.  We've had some well-known movies that included

16  these behaviors and the experience.  What happens is that there

17  are symptoms that occur after a person has been exposed to an

18  extreme traumatic stress.  And those symptoms are going to

19  occur usually when the person's had a personal experience, not

20  just hearing a story, but having something happen to them

21  that's very traumatic.  We usually would think of this in terms

22  of military combat, violent personal assault, and this would

23  certainly include any violent sexual assault.

24  Q.   Doctor, in terms of -- there is a reference book that

25  psychologists and practitioners of mental health use -- by the

19

1  way, you're not a psychiatrist, right?

2  A.    That's correct, I'm a psychologist.

3  Q.    The difference being that psychiatrists can provide

4  medication?

5  A.    Psychiatrists are first medical doctors, who then

6  specialize in psychology.  They're able to write prescriptions

7  and treat neurological disorders, as well as psychiatric

8  disorders.  Psychologists are trained only in the clinical or

9  specialty areas in psychology.  Although we learn about

10  medications and we learn about medicine, we are not licensed to

11  practice or to give advice about medicine.  Instead, our focus

12  is on the behavior of individuals and treating them.

13  Q.    Okay.  Both psychologists and psychiatrists use this

14  resource book --

15  A.    The book that you're referring to is the Diagnostic and

16  Statistical Manual of the American Psychiatric Association.

17  It's called the DSM-IV for short-term usage.  And it is

18  followed by all psychologists and psychiatrists for their use

19  in diagnosing patients and when they file their insurance forms

20  for the patients.

21  Q.    Okay.  And post-traumatic stress syndrome is recognized

22  by that manual as a disorder that inflicts the people who have

23  had traumatic experiences?

24  A.    Yes, it's listed under the area called anxiety disorders.

25  And PTSD or post-traumatic stress disorder is one that is well


                                    20


1   studied and frequently referred to to help explain people's

2   reactions.  And, in particular, reactions to traumatic events.

3   Q.    And you indicated that a sexual assault for --

4         MR. MARNEN:  Objection, your Honor, I'd like to hear

5   the witness testify, not Mr. Olds.

6         THE COURT:  You are leading, just don't lead.  Go

7   ahead.

8   BY MR. OLDS:

9   Q.    What does the manual say relative to children suffering

10  sexual assaults?

11  A.    Well, the Diagnostic and Statistical Manual does draw a

12  distinction between adults suffering PTSD and children.  For

13  children, their response can include intense fear, feelings of

14  helplessness or harm, and they can experience agitated behavior

15  and disorganized behavior.  And for children, sexually

16  traumatic events do not have to be the same as we associate

17  with adults.  For children, anything that is developmentally

18  inappropriate as a sexual experience could cause this trauma.

19  So even if it were not violent sexual assault, it could still

20  be very traumatic to the child.  Even if it was threatened

21  sexual assault, it could be felt by the child as a traumatic

22  event.  So the manual helps us distinguish the adult from the

23  child in this regard.

24  Q.    Now, we had a little digression there.  What are the

25  recognized symptoms of post-traumatic stress disorder?


                                   21


1  A.    The first one that we would think of would be

2  re-experiencing the trauma, remembering the trauma, being

3  afraid of it and thinking about it, would cause you as much

4  fear as if you had been in it.  You'll avoid any of the things

5  that remind you of the trauma, any stimuli that would bring

6  that to mind.  You will have an increased arousal or level of

7  agitation, you will be jumpy and excited and uncomfortable.

8  These experiences can occur, not only when you're thinking

9  about the trauma, but it could be nightmares, difficulty going

10  to sleep, and having any experience that will remind you of it.

11  Q.    Might someone who is suffering from post-traumatic

12  stress -- well, let me phrase it differently.  What might the

13  impact be of someone suffering from post-traumatic stress

14  disorder?

15        MR. MARNEN:  Objection, calls for speculation.

16        THE COURT:  Let me see you at side bar just for one

17  second.

18        (At side bar on the record.)

19        THE COURT:  State the question again, I didn't hear

20  the end of it?

21        MR. OLDS:  What would the impact be of someone

22  suffering from post-traumatic stress syndrome?

23        THE COURT:  Sustained.

24        (End of discussion at side bar.)

25  BY MR. OLDS:


22


1  Q.    Post-traumatic stress syndrome, does it have an effect on

2   the person's behavior?

3   A.   It has a distinct effect on their behavior.  For

4   children, the effect is multiplied or increased because it can

5   interfere with their moral development.  With the adult, it's

6   going to interfere with their functioning at a significant

7   level, that would interfere with their occupational, their

8   family life, education, their functioning on a daily basis.

9   For children it will have the same impact, but it may also

10  interfere with reaching normal developmental milestones.

11  Because frequent responses to post-traumatic stress disorder

12  will include not just high levels of anxiety and depression,

13  but acting out behaviors, difficulties with sleep, difficulties

14  with feeling okay instead of numb.  These interfere with their

15  functioning as they try to develop relationships with people.

16  Q.   I think you indicated that one of the symptoms of

17  post-traumatic stress disorder would be a fear of being in the

18  vicinity of where the traumatic event occurred, is that right?

19  A.   Yes.  In fact, you can be afraid to be near any of the

20  stimuli that reminded you of the traumatic event.  And you can

21  actually re-experience the event and trauma as if it was

22  reoccurring.  Examples could be given to explain this.

23  Q.    Well, maybe we could tie that sort of symptoms to the

24  events of this case.  One of the premises that I gave when we

25  were, before we started rendering your opinion, was that there

23

1  had been the sexual assault involving R.P. and K.L.  There had

2  been a report of that assault to the school officials.  And

3  then that the girls had been in school.  And maybe one of the

4  premises that I didn't state was that the perpetrators of the

5  assault were in the school as well after the assault.  How did

6  this affect specifically R.P. and K.L.?

7  A.    The expected response to a person, adult or child, who's

8  gone through a traumatic event, generally post-traumatic stress

9  disorder, would include heightened levels of anxiety and fear

10  and possibly to re-experience of that trauma, if they are

11  brought to the place, people or even the environment that would

12  remind them of what had been so traumatizing to them.  For

13  bringing the children back into the environment in school where

14  those people who had attacked them, were sitting next to them

15  in class or even in class asking them, speaking to them, it

16  would have generated tremendous fear and terror, because they

17   would be, even if nothing was said to them, would be feeling

18   that this could happen again, and they would be thinking what

19   happened to them.

20   Q.    And, for instance, B.C. was the girl who coerced R.P. and

21   K.L. into engaging in, well, into the rapes.  And the records

22   disclose that there was a second incident in school where B.C.

23   forced R.P. down the steps with another boy, and that happened

24   in the school.  That was in your records as well, right?

25   A.    Yes, B.C. played a very aggressive verbal and physical

24

1   role in the initial attacks against the girls.  And it appeared

2   from the record that she was engaging in similar types of

3   behaviors in that area of the hallway and stairwell.

4   Q.    Certainly the initial sexual assault could cause an onset

5   of post-traumatic stress syndrome -- what impact on R.P. and

6   K.L. would it have had that they were forced to go back to that

7   school, be harassed by other students, relive that experience

8   in school for the length of time, K.L. was three or four days,

9   and R.P. it was a little bit over a week, what impact would

10   that have on those girls?

11  A.    There's a strong likelihood that the impact on

12  post-traumatic stress disorder for these girls would be to

13  re-experience not only the trauma, but to be traumatized again

14  as if it was actually happening.  Their fears would be

15  unfortunately filled, they would be afraid and they would have

16  reason to be afraid.

17  Q.    What does the literature say about the onset of treatment

18  for post-traumatic stress syndrome?

19  A.    We have learned an awful lot about treatment for

20  post-traumatic stress disorder.  And, unfortunately, some of it

21  has been learned very recently after 9/11.  Because

22  psychologists have increased their training that they've always

23  had clinically when people presented with post-traumatic stress

24  disorder, to be able to even go out immediately to sites to do

25  what we call critical incident debriefing.  Many of you may


25


1  have heard of that in the newspaper.  It is imperative when

2  there is trauma, to as quickly as possible approach and try to

3  treat the victim.  And to approach and treat the victim to try

4  and stop the development of further symptoms of post-traumatic

5  stress disorder.  And we have techniques for doing that.  Those

6  techniques are similar for what we would do if somebody

7  presented in our office.  But here we're talking about leaving

8  the office and going out, reaching out to the person as quickly

9  as possible.  So in this circumstance the trauma that the girls

10  suffered certainly required immediate treatment and the

11  opportunity to make that treatment available might have

12  ameliorated or limited the experience of their behaviors

13  regressing and becoming worse and worse.  For them to come back

14  to the school and continue to be harassed or sexually

15  assaulted, is the opposite of treatment, it's actually the

16  embedding into them, putting into them more trauma.

17  Q.    The two things that you don't want to happen, the absence

18  of treatment and then the occurrence of more trauma?

19  A.    You have terrible trauma from the rape.  You then want to

20  interdict that, you want to get to it and treat it.  You do not

21  want the child to re-experience the trauma and to actually have

22  the trauma occur in reality or to be reminded of the trauma

23  except with the care of a clinician.  And you want that care of

24  a clinician to be as soon as possible.

25  Q.    Now, R.P. and K.L. were sent to Sarah Reed after the

1   assault.  And you've had occasion to review Sarah Reed's

2   records about them, right?

3   A.    Yes.

4   Q.    And in addition to that, we've provided you with some

5   information concerning the educational structure or the

6   educational tools and devices that Sarah Reed employed.  Let me

7   first ask you the question -- did you observe anything, in

8   terms of what Sarah Reed was doing, that indicated that either

9   R.P. or K.L. was receiving treatment, recognized treatment for

10  post-traumatic stress syndrome?

11  A.    There's nothing that I could find in the record

12  indicating that they were receiving treatment in the school for

13  post-traumatic stress disorder.

14  Q.    What about the actual education process that Sarah Reed

15  employs, the behavior modification techniques and tools that

16  the school used for the other students, how did that impact

17  either R.P. or K.L. in your record review?

18  A.    Behavior modification is the technique used to try to

19  manage the behavior of children, gives rewards and punishments

20  and tracking them so as to encourage good behavior and to

21  decrease off task or bad behavior.  And it would typically be

22  used for children who had a history of behavioral problems in

23  the classroom, not being on track.  It has nothing to do with

24  behavioral therapy or psychotherapy for post-traumatic stress

25  disorder.


27


1  Q.   Is that what R.P. and K.L. needed?

2  A.   Yes.  They needed psychotherapy and they needed behavior

3  therapy, specifically to attack the terror and anxiety that

4  they had ingested, that they had lived with.

5  Q.   Now, your record review also shows that as time

6  progressed, both R.P. and K.L. spiraled downhill, is that

7  right?

8  A.   Yes.

9  Q.   Now, R.P. became rebellious, started being essentially a

10  street person, hanging around on the street all night.  She was

11  hospitalized within -- I guess that would have been in

12  February, March of 2001.  How does that play into what happened

13  to her, can you draw anything connecting that there?

14  A.    Yes.  When there's post-traumatic stress disorder, when

15  there is trauma to the adult, we may have certain expectations,

16  it describes her as not being able to functional at all.

17  Occasionally failing, high anxiety, trouble sleeping, even

18  having fearful experiences during the day.  For children, our

19  research is unfortunately more upsetting to hear about the

20  factors that are associated with psychological impacts of

21  sexual abuse and, of course, this is rape.  Includes regressive

22  behavior.  You have your sleep disturbance, you have your

23  anxiety and fearfulness.  You have avoidance of people and

24  places that scare you.  You have depression.  These are

25  comparable to what an adult might have.  But children will also

28

1  have disturbances in their sexual behavior.  They may become

2  sexually hyper aroused or they may become aggressive.  They may

3  become inappropriate or even precocious in their sexual

4  behavior, and they will become more aggressive and they may get

5  into substance abuse.  So our research and our experience

6  clinically tells us that children who suffer from traumatic

7  experiences, including sexual abuse, not only experience those

8  associated with adult, the symptoms with adults, but they will

9  also turn into what you might call a juvenile delinquent.

10  Where they are being aggressive, where they are being sexually

11  promiscuous, where they are getting involved in drugs.  They

12  are really acting out.

13  Q.   All that happened to R.P., is that right?

14  A.   Yes.

15  Q.   And all of it happened to K.L., is that right?

16  A.   Yes, many of them.

17  Q.   How does that -- we have two issues here.  One is the

18  initial assault and how the children were treated after that.

19  How might the way that the children were treated after that in

20  the sense that their reports of the rape were ignored and they

21  were harassed in school, how might that affect their subsequent

22  course.  Let's start with K.L. first, and then we'll go to

23  R.P.?

24  A.   For each of the girls, and particularly now we're talking

25  about K.L. --


29


1  Q.   And, by the way, she went through a period of

2  hospitalization and delinquent behavior as well, is that right?

3   A.   That's correct.  As a matter of fact, K.L. was

4   hospitalized within a few weeks or three weeks of the rape.

5   And she was unable to communicate directly to her mother, her

6   confidant usually.  But it did come out in the house, in which

7   she got very upset and she hurt herself and became suicidal.

8   And that was truly a call for help.  And she was hospitalized

9   immediately.

10  Q.   K.L. had -- your records disclosed that K.L. had other

11  incidents of suicidal ideation or behavior?

12  A.   She did.  That was the beginning of it.

13  Q.   Okay.  And then we were talking about how the fact that

14  K.L. went to -- the records show that K.L. went to Ms.

15  Cappabianca, an authority figure that she trusted, and told Ms.

16  Cappabianca what had happened to her and Ms. Cappabianca didn't

17  respond.  How would that affect -- can you give an opinion of

18  how that affected the subsequent course of K.L.?

19  A.    In order to answer that question, you have to remember

20  that K.L., we think of her as really needing a lot of help and

21  support in school to get by, and having received help for many

22  years.  This is a child who was reported in the school record

23  as being very desirous of pleasing teachers, of wanting to do

24  the best job she could.  She had all the behaviors associated

25  with a child who was a slow learner and wanted to do well.  So

30

1  this is a well-behaved child in class.  The teachers were

2  viewed as people who helped her get by since she was certainly

3  smart enough to know she couldn't keep up with the other

4  children.  So to then go to a teacher after a traumatic event

5  and say I had a terrible time, something has happened to me,

6  and then to be informed you're not supposed to behave this way,

7  you're bad.  You're doing something that adults do, you don't

8  belong doing that, cuts the feet out from underneath the child.

9  It takes away their sense that the adult, the person, the

10  teacher, the authority, protects them or helps them or cares

11  for them.  There is no question that this has to be the way in

12  which this child felt.  In my evaluation of her, she was able

13  to describe these feelings as well.  And even drew a picture

14  that talked about how her heart was not only broken and

15  stabbed, but wounded for life, that this was always going to be

16  a wound.  And the wound would begin with the experience of no

17  care giving or no protection.  And I anticipate that would have

18    an affect going forward in any attempt to treat or help her.

19    Q.    So relative to R.P., I think you indicated that you

20    reviewed her diary, is that right?

21    A.    Yes.

22    Q.    Did a review of her diary help you, in terms of arriving

23    at these conclusions that you've arrived at concerning her?

24    A.    R.P.'s dairy was an amazing book to read.  It was very

25    telling in answering this question.  In the beginning of R.P.'s

31

1    diary she is talking about her developing friendships, her

2    hopes or dreams for love and attachment to people.  And they're

3    written as you would think a 9 or 10-year-old would write them.

4    Of course, we know she was older, but her writing skills were

5    not at that same level as a 13-year-old.  It was very positive

6    and very loving and very hopeful.  When you read the diary

7    subsequent, after this rape, attack, there is anger, there is

8    dismay, there is guilt.  And there are repetitive statements of

9    her not being able to trust people.  And to be angry with the

10    people who have hurt her.  People who have hurt her, by her own

11    report to me, included those who did not believe her.

12  Q.   I'm going to ask you to read from her diary several

13  pages --

14        THE COURT:  Do I have that up here?

15        MR. OLDS:  It would be Exhibit 228 in the book.  As

16  I take this to show Dr. Schachner, if I could just show it as I

17  walk by the jury?

18        THE COURT:  That's fine, go ahead.

19        MR. OLDS:  Let them see it as well.

20  BY MR. OLDS:

21  Q.   I'm having Dr. Schachner read from this page.  I'm going

22  to read from this page and this page (indicating).  Dr.

23  Schachner, the date on these are January 4, Monday, p.m., 2002,

24  and then the next would be Monday, p.m., page 2.  I would like

25  you to read those two pages?


                                32


1  A.   "Dear diary, I'm getting really sick" -- there's a curse

2  word here, is that all right?

3        THE COURT:  Read it if it appears in the text.

4        THE WITNESS:  "I'm getting really sick to fuck" -- I

5  can't read the next word, "the world as each day passes.

6    Sometimes I look in the mirror thinking why did it have to

7    happen to me.  I get mad so easy when people" -- something,

8    "talk to me."

9            THE COURT:  Could that be "touch"?

10           THE WITNESS:  "Touch or talk to me.  I hate to be

11   forced to do something I don't want to do.  If you were forced

12   to do what I had to do -- would be mad," and the person is a

13   picture of a person crying.  "And not like people kicking or

14   talking to you."

15   BY MR. OLDS:

16   Q.   And then the next page, Doctor?

17   A.   "Dear diary, every day and every night I'm always awake

18   thinking about what happened and how I feel and what's

19   remembered.  It made me more sad than I was.  I didn't,"

20   something "anybody," I can't read that one word.  "But when Ms.

21   Cap wouldn't" -- something, "about what happened and my dad

22   yelled and when Ms. Cap wanted me to call home about saying

23   sucking dick.  And that hurt my feelings so bad.  I really

24   started to cry and went out of Ms. Cap's, slammed the door.  I

25   couldn't stop crying then.  I got five day PASS and I got"  --

33

1  Q.   Harassed?

2  A.   "Harassed," something.

3  Q.   Raped?

4  A.   "Raped after PASS."  PASS from the school records

5  indicates an after-school detention program.

6  Q.   Okay.  Now, after reading that diary aloud, you could

7  have some insight in actually how R.P. was feeling on those

8  early January days of 2002 about authority figures, is that

9  right?

10  A.   Yes.

11       THE COURT:  Mr. Olds, we're going to take about five

12  minutes.

13       (Recess from 10:01 a.m.; until 10:14 a.m.)

14       THE COURT:  All right, Mr. Olds.

15  BY MR. OLDS:

16  Q.   R.P. described some of her feelings about trying to tell

17  her story in the her diary; what effect on R.P. did the

18  rejection of adults, maybe the punishment imposed upon her,

19  what effect did that have on her?

20  A.   I believe it made her very angry.  And I think that it

21  made it less and less likely for her to be able to share or

22    communicate with adults.  And when she did, I believe that she

23    was pretty upset.  I think that the effect of the comments upon

24    her were striking in terms of making her feel injured or

25    reinjured.

34

1    Q.   Long term, what would this, both on K.L. and R.P., what

2    impact would this have on their ability to trust adults,

3    conform behavior to adult expectations?

4    A.   I'm pretty sure that whatever normal or typical teenage

5    challenge that might occur, when children move into teenage

6    years, we would expect some challenge to adults.  But here

7    we're talking about a child losing a sense of trust and comfort

8    at a much deeper level.  It's not about adolescence rebellion,

9    it's about not feeling safe or comfortable even though adults

10    are supposed to be protecting us.  And R.P.'s move into all

11    kinds of juvenile delinquent behavior can be reviewed by her

12    reactions initially to what happened as she talks in the record

13    at Sarah Reed, saying why am I the guilty party, why am I being

14    blamed, what did I do wrong, why am I here.  Everything about

15    her experience from adults is funneled through the eyes of this

16   victim who is being told she is bad, she is wrong.  I don't

17   think that we can even imagine how badly this hurt her because

18   this was a girl in her diary telling us before even 2001,

19   telling us how she is looking at people and being close to them

20   and dreaming of this.  Not only in a romantic sense, but also

21   in a comfort.  And her diary after the fact is an angry,

22   unhappy diary.  I believe that there's a connection.

23   Q.    Now, R.P. engaged in significant juvenile behavior,

24   there's a record of drug use and even an arrest for

25   solicitation for prostitution.  Is that kind of behavior

35

1   consistent with the injuries that she suffered stemming not

2   only from the sexual assault, but also from her treatment after

3   the assault and her sense of being rejected or not protected by

4   adults?

5   A.    Yes.  And it is necessary to understand this, I believe,

6   on two levels.  On the obvious level, this is a child who

7   cannot trust adults.  And on a deeper level, this is a child

8   who may identify with dangerous people, thinking that if she

9   makes them happy, she can be safer.  Associated with many

10   individuals who have been traumatized and feel trapped, whether

11   through kidnappings or involved always with bad people.  The

12   part of R.P. that has become more against society, more

13   improper behavior, is the part of R.P. that is trying to deal

14   with her fear and trauma of being a woman, being treated like a

15   woman.  This is a girl who has been introduced to being grownup

16   in a sexual way, long before she was ready.  And I believe what

17   that we are looking at is her struggle with trying to find a

18   way to handle people's reactions to her.

19   Q.   Okay.  R.P. and K.L. have sort of brought us up to date

20   in terms of where they are now.  R.P., as you know, was

21   discharged from the juvenile detention system and went back to

22   school, had some violent acting out incidents.  By the way, is

23   violent, the violent acting out that she might engage in even

24   now, can you say that relates to the post-traumatic stress

25   syndrome that she suffered?


36


1  A.   It's partly related to the post-traumatic stress.  And it

2  incorporates the frustrations that we anticipate her feeling

3  with speech and language problems, trying to express herself.

4    And if she fails to be able to express herself, then she will

5    get more emotionally upset. And this is a very important part

6    of understanding R.P.'s dynamics. She is more likely to become

7    angry and frustrated. To the extent that life gives her

8    reasons to be. Because of her speech and language

9    difficulties, her greatest trauma that we can read in the

10   record occurs at 13 years of age, and she tries to talk about

11   it. And in trying to talk about it, she reaches into nothing

12   but a failure experience. I think that R.P.'s propensity for

13   then getting upset is seen in the record and will continue.

14   Q.    And K.L. has testified that she's been hospitalized

15   recently numerous times. K.L. also testified that she can't

16   trust men, she can't trust males. Is this part of the

17   post-traumatic stress syndrome?

18   A.    It is. It is a part of her reaction that she expressed

19   to me in my assessment time with her. It would be easier for

20   her to be a male than a female. She doesn't want to be this

21   object. And it is very difficult for her to be in a female

22   role. I also believe this begins with the experience of a

23   female who is instead of the victim, being treated for this

24   victimization, is told that they're at fault, they're doing

25  something wrong.  I think it totally confuses and overwhelms

37

1  her, this reaction to the trauma.  So we have a trauma and a

2  reaction.

3  Q.    She was 12 at the time and functioning maybe on the level

4  of a nine-year-old?

5  A.    Right.

6  Q.    So first let's address K.L.  Is she better now, has she

7  recovered?

8  A.    I'm not comfortable using the word better or recovered

9  for K.L.  I know that there is an improvement in her

10  functioning, in terms of her intellectual functioning.  I think

11  that she probably able to communicate better now than she did

12  when she was younger.  She is still very immature.  She is

13  still very uncomfortable with her whole conceptions of

14  male-female relationships.  And she is still very afraid.  In a

15  very heart breaking way, this is a child who drew a picture of

16  a heart with a knife going through it and blood dripping out of

17  it.  And this was a free drawing exercise in the assessment,

18  and as I asked her to explain it, she said this is a heart that

19    been killed.  I asked her if this heart can repair, get better,

20    and she said I don't think so.  Her acting out behaviors, her

21    difficulties in school are part of issues that we can look at

22    in the record, but we have to understand emotionally how she is

23    still in pain.

24    Q.    Could you draw any conclusions how K.L.'s educational

25    progress was interrupted by these events?


38


1    A.    That's a more complex question.  Clearly, when you take a

2    child who's receiving special education and help to do work in

3    school and behaving well and goes through a certain incident

4    and an experience that is traumatizing and is placed into a

5    behavior modification program, we might hope for continued

6    growth educationally.  And certainly there has been some.  But

7    this was not a program that fit K.L.'s behavior.  This is a

8    program that was somehow determined for her.  It appears from

9    the record that K.L. was more affected by that behaviors and

10    acting out, perhaps that was around her, than her maintaining

11    this positive appearance of being a student trying to please

12    teachers.  And so I don't think that she experienced a good

13  educational first few years at Sarah Reed.

14  Q.    And she was in placement, she was on suicide watches, she

15  had suicidal ideations for a period of time, did you make any

16  assessment in your evaluation of her of where she's performing

17  now educationally?

18  A.    Yes.  The review of her educational functioning indicated

19  that she is working below high school level in her use of

20  language.  That her reading comprehension is about a 5th grade

21  level, this was at the time that I evaluated her about nine

22  months ago.  Her general ability to read, write and spell is

23  far below her grade level.  She does have the ability to learn

24  at a higher level than I was able to measure.  I think there is

25  in this child the ability to function at a very low average

39

1  level.  But I do not believe all these hospitalizations and

2  special treatment gave her much comfort and time in learning.

3  Q.    Let's talk about R.P. now.  I'm going to ask you the same

4  question.  Has R.P. recovered or is she better?

5  A.    In my opinion R.P. has not recovered based upon my

6  assessment of her.  I believe that the record for R.P. shows

7    not only multiple hospitalizations, but a lot of acting out

8    behavior that seems to be coming right out of the textbook when

9    I read about the promiscuous behavior, the experimentation with

10   drugs, the aggressive behavior.  But, in addition, R.P. is

11   still hurting.  She's hurting so much that even though she

12   improved in her communication skills, she is very upset if she

13   has to talk about this experience.  This is still a trauma to

14   her.  I believe that she is still very distrusting of adults.

15   I'm not sure how much the experience between the first and

16   second rape affected her ability to be involved in counseling

17   to talk and trust an adult.  It's a very difficult issue to

18   measure, but it appears to be present.

19   Q.    She's living at home with her family, were you able to

20   make any judgment about her current social life and her current

21   level of functioning, in the sense of conforming to social

22   expectations or norms?

23   A.    At the time that I interviewed R.P., she received

24   wraparound services in the home and explained to me that her

25   TSS --

40

1  Q.   What is a TSS?

2  A.   This is one of the people who offer behavioral services

3  in the home.  There is a behavioral specialist, the TSS is

4  somewhat like a companion.  And you also have a case manager.

5  The majority of these people have a bachelor degree, but they

6  are not, you would not call them a trained therapist.  In other

7  words, they're not licensed to practice therapy.  R.P. was

8  describing how the TSS helped her to go out of the house, that

9  she wouldn't really be going out and meeting people if she were

10  not with this adult.  When she would talk about having a

11  friend, a friend would be somebody she could see with the help

12  of this adult to help her to meet this person.  In more of a

13  fantasy description she would say -- well, I have a lot of

14  friends, but then when you asked her detailed questions, it is

15  apparent that it is very restricted.  Her social life and

16  comfort with males and females were limited.  And she was very

17  specifically describing that she was afraid, much more afraid

18  of males.

19  Q.   Okay.  Dr. Schachner, I'd like to address whether going

20  into the future psychiatric therapy or remedial education might

21  be provided to K.L. and R.P. to help them sort of get back to

22  where they might have been if this hadn't happened.  So if you

23  were designing a program -- let's start for K.L. first, if you

24  were designing a program for her, what would you say she

25  needed?


41


1  A.   First, she would require at least one, if not twice a

2  week, to see a highly trained psychotherapist.  This therapist

3  would be knowledgeable about art therapy and nonverbal therapy,

4  including play therapy.  As well as how to approach trauma in a

5  victim, what we call post-traumatic stress disorder treatment,

6  knowing that there had not been treatment at the time of the

7  trauma.  That visualized therapy --

8        MR. MARNEN:  Your Honor, may we approach the bench?

9        THE COURT:  Yes.

10        (At side bar on the record.)

11        THE COURT:  The first question is is there anything

12  in his report where he opines on future treatment?

13        MR. OLDS:  Can I confer with him and ask him?

14        THE COURT:  His report, are you familiar with it?

15        MR. OLDS:  Yes.

16        THE COURT:  I'm going to excuse the jury so we can

17  talk about this.

18        (Whereupon, the Jury is excused from Courtroom C.)

19        THE COURT:  First of all, just to tee this up, you

20  were objecting to him expressing opinions about the nature of

21  future needs and what it might do, is that right?

22        MR. MARNEN:  Yes, your Honor.  I think we may be

23  going into costs now, too.

24        THE COURT:  Is that because, it's your contention

25  that nowhere in his reports does he express an opinion on

42

1  future damages?

2        MR. MARNEN:  Yes, your Honor.

3        THE COURT:  Let me swing over to Mr. Olds.  Where

4  does he express an opinion on future damages?

5        MR. OLDS:  In the psychological evaluation, which is

6  part of our pretrial statement, and it's dated --  actually,

7  there is no date, but we provided to it Mr. Marnen with the

8  report.  In his last paragraph he says "At the present time

9  K.L. does not" --

10        THE COURT:  Just show it to me.

11          MR. OLDS:  Page seven, first paragraph.

12          THE COURT:  I'll read it.  "It is strongly

13   recommended that K.L. continue to receive individual intensive

14   psychotherapy at a level associated with her intelligence and

15   not one that is based solely on talk therapy.  K.L. needs

16   modeling to play and learn and to expose herself to symbolic

17   representation which should be associated with verbal

18   development.  It is far too soon to make any final judgments on

19   her potential for cognitive growth and development, but it is

20   certainly true that her social and emotional development has

21   many years to catch up.  The fact that K.L. has shown

22   improvement in the recent past bodes well for her response to

23   continued appropriate treatment for her learning problems for

24   mildly mental retardation and psychological problems.  And then

25   post-traumatic stress disorder and anxiety and depression

43

1   associated with trauma of a physical and sexual nature that

2   occurred in November, December and January of her 7th grade

3   years at Strong Vincent."  All right.  Now, so what do you want

4   to tell me about that?

5          MR. OLDS:  Well, I think that his expert report

6   addresses the question of whether K.L. needs future treatment.

7   And, obviously, that's part of our damages.  We're not going to

8   necessarily put a specific dollar figure on it, but he's going

9   to describe the kinds of treatment that she needs.

10          THE COURT:  What do you have to say?

11          MR. MARNEN:  Well --

12          THE COURT:  I mean there is a reference to the

13   futures.

14          MR. MARNEN:  It's very brief and quite frankly, your

15   Honor, there are a lot of reports and I forgot about it.

16          THE COURT:  All right, it's there.

17          MR. MARNEN:  He should not be able to get into any

18   dollar figures.

19          THE COURT:  I agree with that.  I take it it's not

20   your intention to get into any dollar figures?

21          MR. OLDS:  Right.

22          THE COURT:  He did express an opinion on future

23   treatment, so he can testify to that.  All right, bring the

24   jury back in.

25          (Whereupon, the Jury reenters Courtroom C.)

44

1      THE COURT:  All right, Mr. Olds, you can continue.

2  BY MR. OLDS:

3  Q.    Now, you indicated that this psychotherapy that K.L. will

4  need in the future will be by a trained psychotherapist, sort

5  of at your level of experience?

6  A.    Yes, I believe that the psychotherapist, whether a social

7  worker or a psychologist or a psychiatrist, would have

8  experience working with children, but also experience in

9  working with children who are not able to verbalize all their

10  feelings.  So you use alternative means of discussion and

11  discovery.  That's play therapy, it could be art therapy, it

12  could be drawing therapy.  K.L. is very responsive to drawing

13  and expressing her feelings with drawing.  That could be used

14  as a basis for helping her to begin to talk about her

15  experiences.  In addition, the reason for the once or twice a

16  week is to insure a continuity for the child to focus on this.

17  And it is not just a matter of her being very anxious or

18  depressed at any given moment.  It is what is necessary over

19  time to approach experiences that have not been resolved.

20  Q.    And would she need any other treatment in terms of

21  psychotherapy or behavioral type stuff?

22  A.    Yes.  Connected to the individual therapy, most

23  therapists would recommend group therapy.  And the purpose of

24  the group therapy would be to help build on what was done

25  individually.  And the group therapy might need to be not

45

1  associated with school.  In the school is where K.L. is most

2  aware of her feelings and weaknesses as compared to other

3  children.  From the perspective of other care that she needs,

4  she continues to need special education.  And because of some

5  the underlying strengths that I saw in her intellect, I believe

6  that an individualized educational plan, an IEP, that focuses

7  on her need for remediation, recognizing that she does not have

8  a specific learning disability, but she is a slow learner, so

9  that she may be exposed to material that she may not have

10  learned at a younger age, will be valuable in bringing her

11  along.

12  Q.    Okay.  Can you think of anything else that K.L. needs

13  going into the future?

14  A.    Yes, she continues to need medical evaluation by a

15  psychiatrist to make an assessment as to what drug therapy, if

16  any, would be beneficial.  And that would always be in

17  conjunction with the psychotherapy.  The medical doctor and

18  therapist talk to one another to evaluate her behavior, to see

19  what kind of medical treatment is necessary.

20  Q.    Can you think of anything else that K.L. needs to help

21  her recovery?

22  A.    When children are trying to recover from the experiences

23  of this trauma, we try to build for them social experiences

24  outside of the therapist's office in order to help them

25  develop.  You can use wraparound and you may be able to give


46


1  specific direction to wraparound, so as to insure that their

2  goal is to build on what's being done individually in therapy.

3  There may be an alternative to wraparound.  If there is

4  community therapy available from a community mental health

5  center.  But it is a therapeutic approach to bringing to her

6  real life those experiences she's ready for.  So the individual

7  therapist and the psychiatrist directs the group therapy, the

8   special education or education and wraparound.

9   Q.   If K.L. were able to have these services, what would be

10  her prognosis for recovery?

11  A.   Until she has the opportunity to experience that level of

12  treatment for at least a year, it would be premature to give a

13  prognosis that was any different from her current functioning.

14  Q.   And she's never had anything like this since this assault

15  happened five years ago?

16  A.   I believe that she's had some group therapy in school, I

17  believe that was part of Sarah Reed, but that would be in an

18  area where I would recommend the group therapy.  She has had

19  special education.  From my reading of the records, it has not

20  been directed for a child who is a slow learner, it was not

21  defined as such.  She has had medical evaluation but,

22  unfortunately, the medical evaluation did not include the cause

23  for her original trauma.  It was only in the very latter part

24  of the record that I saw a correct description of the rape.

25  Q.   Okay.  Let's get to R.P.  What does R.P. need going


47


1   forward if she's going to be, if our goal was to try to put her

2  where she might have been had this not happened, what does R.P.

3  need?

4  A.    R.P., not unlike K.L., continues to need individual

5  psychotherapy.  The individual psychotherapy has to be brought

6  to her with a very gentle understanding that she is very upset

7  if asked to talk directly about her experience.  R.P. is going

8  to respond to therapy, that includes creative writing and the

9  opportunity to expand upon her diary.  Many therapists will use

10  diaries with teenagers to help them approach problems that they

11  have, to talk about them.  R.P. also needs to have ongoing

12  evaluation by a physician.  Because unless she is receiving

13  therapy from a psychiatrist, the therapist would not be able to

14  define the value for medicine for her presentation.  And I

15  should point out that post-traumatic stress disorder is treated

16  by a combination of medications for behavior, as well as

17  talking therapy or play therapy.  So the involvement of the

18  physician, the psychiatrist, as well as the therapist, go hand

19  in hand.  In addition, R.P. needs to continue growing in her

20  instructional skills.  She needs an individualized educational

21  plan as well.  R.P. gives very clear indications of having a

22  stronger intelligence than she can show in school when we see

23  what she writes.  So we know that she is still needing help

24  with language development.  The development of group work,

25  group therapy follows as well.  With the intention of building

48

1  upon whatever she would gain from individual therapy.  Whether

2  or not wraparound is necessary for R.P. would depend upon her

3  continuing to be comfortable or not comfortable in leaving the

4  house.  When I saw R.P. nine months ago, she would still need

5  wraparound.  I want to emphasize that wraparound needs to be

6  directed from the psychiatrist and the therapist and not work

7  independently.  Wraparound specialists are not taking the place

8  of the therapy offered by the physician or the psychologist or

9  social worker or psychiatric nurse.

10  Q.   If R.P. were given or had been or had a chance to have

11  this treatment going into the future, what would the prognosis

12  for her be in terms of her recovery from these events?

13  A.   I have a slightly more positive view of R.P.'s ability to

14  recover, but that may be due to her ability to communicate with

15  me a little bit more than K.L.  But I hesitate giving a

16  prediction for what you would call prognosis without these

17  treatments first being available to this child for not less

18  than six months to a year.

19        MR. OLDS:  Your Honor, I don't have any other

20  questions for Dr. Schachner on direct.

21        THE COURT:  All right.  Mr. Marnen, do you have some

22  cross?

23        MR. MARNEN:  Yes, sir.

24              CROSS-EXAMINATION

25  BY MR. MARNEN:


                        49


1  Q.    Doctor, is it fair to say that R.P. was a pretty unhappy

2  little girl before this event happened?

3  A.    I believe that my reading of the school record indicated

4  that R.P. began to experience problems in school in October and

5  November, by the reports of teachers.

6        THE COURT:  What year, Doctor?

7        THE WITNESS:  This was in the year of 2001, in the

8  7th grade at Strong Vincent High School.  The note from Linda

9  Cappabianca indicated that she had been a quiet girl and the

10  impression was that the teacher needed to discuss her behavior,

11  was something not expected.  In other words, she was going down

12  hill from when she first went to school.

13  BY MR. MARNEN:

14  Q.    R.P. testified yesterday, I think if I have that right,

15  that the only difficulty she had before this event was one of

16  these kids, B.C., wanting to fight with her; are you aware of

17  that?

18  A.    I am aware of that.

19  Q.    Have you reviewed R.P.'s diary from before the assault?

20  A.    I've read parts of her diary from before the assault.

21  It's a very large diary.

22  Q.    Do you happen to have that diary there?

23  A.    Yes.  I have copies of parts of it.

24  Q.    Would you go to Exhibit 228, please.  This page, Doctor,

25  is from October 18, 2001, do you see that?


                                50


1  A.    Yes.

2  Q.    That's about two months before the assault.  And would

3  you mind reading that aloud?

4  A.    "I give up.  I don't care no more.  I just let everything

5  stop or step or sleep.  What happens happens.  Because I don't

6  care no more.  If I die I die.  If I fail 7th grade I fail 7th

7  grade.  I should just do anything I want now since I don't

8  care.  All I'm going to say" -- I can't make out the last word.

9  Q.    "Oh well" perhaps?

10  A.    "Oh well."

11  Q.    And then if you look at the next page of that diary, the

12  same date, read that aloud, please?

13  A.    "Things I think of myself.  Stupid.  Retarded.  Ugly.

14  Mental.  I have no talent.  I can't read, write, math,

15  spelling.  I can't do any sports."

16  Q.    And then continuing?

17  A.    "I don't have very much friends.  I am too skinny."

18  Q.    And then, Doctor, there's another entry from October 19,

19  2001, you may have reviewed, would you read that, please?

20  A.    "I'm retarded, stupid, ugly, crazy and mental and I'm

21  going insane."

22  Q.    That's from October 19th, is it not?

23  A.    Yes.

24  Q.    I'm sure you reviewed this particular entry, too, from

25  October 21, 2001?

51

1  A.   "We all are going to die" -- something, "so why should we

2  care."

3  Q.   "We all are going to die sometime so why should we care?"

4  A.   Yes.

5  Q.   And then the very last page, also, October 21st, could

6  you read that?

7  A.   "Sadness, state of being unhappy.  Depressed, in low

8  spirits."

9  Q.   And, Doctor, there's another entry on October 21st, would

10  you read that please, too?

11  A.   I'm not sure of the first word, is it swear?

12  Q.   I'm not sure, either.

13  A.   "I wish I could die right here and right now."

14  Q.   Doctor, the next page in the diary is as follows.  It's

15  also dated October 21st, do you see that?

16  A.   I can see part of it.

17  Q.   Now, do you see it -- I'll move it back, the problem is

18  the reader isn't big enough.

19  A.   You'll have to move it down for me.

20  Q.   I want to establish the date?

21  A.    "10-21-01."

22  Q.    I'll move that.

23  A.    Looks like a person crying, it says "R.P.".

24  Q.    Then we have another page from October 21st, do you see

25  the date there?


52


1  A.    Yes, I do.

2  Q.    And then that's the top of the page.  Can you tell what

3  that depicts?

4  A.    Well, it looks like a gun shooting somebody, the person

5  saying ha-ha, and there's the word "R.P.," I can't make out the

6  word after it, but it might be identifying herself.

7  Q.    Then if we move down?

8  A.    Says "I'm stupid, retarded, ugly, mental, ugly, ugly,

9  ugly," and she pointed a gun at her head, she's showing her

10  teeth.  "She's angry, fed up, ugly, not happy, stupid."

11  Q.    And then the following page on the same date, that says

12  what?

13  A.    "You could die tonight.  Now later tomorrow."

14  Q.    Then, Doctor, there are some entries from October 24th,

15  I'll show you the first page -- here's the date, October 24th,

16  do you see that?

17  A.    Yes.

18  Q.    2001?

19  A.    Yes.

20  Q.    If you could read that, I'd appreciate it?

21  A.    "In fourth grade I brang a knife to school because I got

22  mad at the whole school.  Most people were nice to me but not

23  all.  There was this girl that didn't like me, she was in 6th

24  grade, she always pick on me.  So one day I got mad and brang a

25  knife to school.  But that's not the only reason I brang a

53

1  knife to school.  Reasons.  That girl got me mad.  No one would

2  talk to me.  I had no one to hang out with.  I had no friends."

3  Q.    And, Doctor, there's an entry on November 5, 2001, I'll

4  show you the date first, do you see that?

5  A.    Yes.

6  Q.    And then there's some words and a picture?

7  A.    "R.P.'s death bed.  R.P.'s dead body."

8  Q.    And there is a picture there of someone apparently inside

9   a casket?

10  A.    Yes, it says "R.P.'s dead body," there's a drawing,

11  drawing of somebody.

12  Q.    Doctor, then if we go to the entry of November 6th, and

13  there's a date, do you see that in the upper left-hand corner?

14  A.    Yes, November 6th.

15  Q.    '01, correct?

16  A.    Yes.

17  Q.    This is six weeks before the event.

18  A.    "I'm retarded, stupid and ugly and dissed and all that

19  other bullshit.  Remember he said all the shit to me.  We'll

20  now see at every moment and time he says that I get mad and

21  start to feel more like well maybe he is right I'm stupid.

22  Because I am LS and I am ugly because I was born like that.  I

23  do have a bleeding dizzeze and if someone's ugly, stupid and

24  dezzed on the way to skinny.  Why should they want to live."

25  And there is somebody shooting a gun to the heart.  Two people

54

1   shown.

2   Q.    The next page, Doctor, November 6, 2001, there's a date,

3  do you see that up in the upper left-hand corner?

4  A.    Yes.

5  Q.    And that is a drawing of, what does that look like to

6  you?

7  A.    That looks like somebody being hung.

8  Q.    And then down below there?

9  A.    "I have no reason to live.  Do I."

10  Q.    Doctor, in the course of your review of the medical

11  records, did you review the initial psychiatric evaluation from

12  February 1, 2002, at Sarah Reed?

13  A.    I would have to go through the records to find it if you

14  want me to.

15  Q.    Let me show it to you, it's been admitted into evidence

16  as Plaintiff's Exhibit 9.  This has a list of the present

17  illnesses on there, do you see that?

18  A.    You'll have to let me get my records here, I have a long

19  list of them, okay.

20  Q.    The date is February 1, 2002?

21  A.    February 1, 2002, thank you.  The initial psychiatric

22  evaluation from Sarah Reed Children's Center?

23  Q.    Yes, sir.

24  A.    Okay.

25  Q.    Concerning K.L., is it not?


55


1  A.    Pardon me.

2  Q.    Concerning K.L.?

3  A.    That's correct, that's what's I have.  But I have to, if

4  you'll bear with me, get to my notation of it, please.  I'm not

5  so sure if I have that in the group of records.  If you want me

6  only to look and identify I can.  But to compare the other

7  records, I need to do some more looking.

8  Q.    Do you remember reviewing the initial psychiatric

9  evaluation of Sarah Reed?

10  A.    I'm trying to tell you that I viewed hundreds of records.

11  There are many more than one initial psychiatric evaluation,

12  many more.

13  Q.    You cannot locate this right now?

14  A.    I asked if I may have another minute, I looked at one

15  list I have.

16  Q.    Yes, you may, sure, I don't mean to rush you.

17       THE COURT:  Let me make this suggestion, Doctor.

18  Unless you're right on the verge of a discovery there, I would

19  suggest that you proceed with your examination unless it's

20  critical for you to know right now whether he has the report.

21        MR. MARNEN:  I just want to eliminate any doubt this

22  was part of the record.

23        THE WITNESS:  I just found it, it's in another group

24  of records.  There were records that were delayed in getting to

25  me.


                              56


1        THE COURT:  The question was have you succeeded in

2  finding that record in your records?

3        THE WITNESS:  I'll be there in a second.  I'll tell

4  you in one minute.

5        THE COURT:  I thought you did, okay.

6        THE WITNESS:  Yes, I have found the record.

7  BY MR. MARNEN:

8  Q.   Thank you.  Now, if you would look, do you see history of

9  present illness there, a category of information on that?

10  A.   Yes.

11  Q.   Is that a typical category of information on a

12  psychiatric evaluation?

13  A.   Yes.

14  Q.   And the history of the patient's relevant condition is

15  important to know, is it not?

16  A.   Yes.

17  Q.   In that information there would you please read that,

18  please?

19  A.   "Patient has been home-schooled recently due to

20  harassment regarding some forced oral sex that occurred with a

21  12-year-old male peer at school.  She does have a long history

22  of behavior problems, including aggression with hitting

23  siblings and mother, fire setting, such as setting fire to

24  paper on the stove, and threats to kill herself.  She has a

25  history of physical abuse by her stepfather, James, who hits

57

1  her with belts, boards and cords, and choked her with a cord.

2  She was also molested by her older sister, Kayla, who was

3  touching her and inserting toys in her vagina for four months

4  when she was three-years-old.  There were also allegations of

5  possible sexual abuse by her father, which are still being

6  investigated."

7   Q.    Doctor, did you also, when you reviewed the medical

8   records on these girls, did you review the initial psychiatric

9   evaluation on R.P. dated February 1, 2002?

10   A.    Again, I'll be happy to find that and answer that

11   question.  Would you like to give me the date again, please.

12   Q.    Yes, February 1, 2002, R.P.

13        THE COURT:  Why don't you put it up on the screen in

14   the meantime.

15   BY MR. MARNEN:

16   Q.    This is, for the record, Plaintiff's Exhibit 127.

17   A.    The first initial psychiatric evaluation I have is dated

18   December 20, 2001.  This is another initial psychiatric

19   evaluation, and I may not have that.  My records, it may be

20   included, depending upon what date, if I could see the rest of

21   the record, it could help.

22   Q.    You mentioned that December 20th one, let me go to that.

23   I'm going to mark this as Defendant's Exhibit C.  If I may,

24   your Honor, I'd like to approach the witness and show it to

25   him.

58

file:///A|/RICHDAY4.TXT

1      THE COURT:  All right.  While you're doing that --

2  are you going to be putting Ms. Cappabianca and Ms. Woods back

3  on the stand after lunch?

4      MR. MARNEN:  Yes, your Honor.  Whenever we finish

5  Dr. Schachner I will.

6  BY MR. MARNEN:

7  Q.   Would you like to look at this, might help you to match

8  it up.  You said you found it, I thought?

9  A.   The December 20th, I have a number of different batches

10  of records.  What I found was in my view, I didn't find the

11  original.

12  Q.   Let's push ahead with what we have.  Doctor, you do

13  recall reviewing this December 20th evaluation?

14  A.   You'll have to give it to me to read that.  I think I did

15  review it, yes.

16  Q.   All right.  And this initial psychiatric evaluation is

17  by -- Dr. Charles Joy?

18  A.   Yes.

19  Q.   If you go there on the last page, okay.  This is dated

20  December 20, 2001, a day after the rape, is it not?

21  A.   Yes.

22  Q.   And you indicated that it would be important for R.P. and

23  K.L. to get psychiatric help immediately?

24  A.   Yes.

25  Q.   And so R.P. did get psychiatric help immediately, didn't

59

1  she?

2  A.   The very next day.  Not for rape.

3  Q.   She's seeing a psychiatrist, is she not?

4  A.   Yes.

5  Q.   And the record indicates they're with her father?

6  A.   Yes.

7  Q.   And there is in fact no discussion of rape in there, is

8  there?

9  A.   Pardon.

10  Q.   There is no discussion of rape in there?

11  A.   That's correct.

12  Q.   But she was seeing a psychiatrist?

13  A.   Yes.

14  Q.   And Dr. Joy then saw her on another occasion, did he not?

15  A.   I don't have records listed by doctor's names.

16  Q.   Do you remember Dr. Joy saw her the very day she had the

17  meeting with the principal at Strong Vincent on January 10,

18  2002?

19  A.   Yes.  I have a psychiatric outpatient evaluation that was

20  handwritten and difficult to read.

21  Q.   I will show you, Doctor, what I've marked as Defendant's

22  Exhibit D -- I just want to make sure we're talking about the

23  same thing.  This is the record you're talking about, isn't it?

24  A.   Can you bring it close enough so I can see it.

25  Q.   Yes.


                              60


1  A.   Yes, this is the January 10th -- are you referring to

2  January 10th?

3  Q.   Yes, sir.

4  A.   Okay.

5  Q.   Now, it is in handwriting, is it not?

6  A.   Yes.

7  Q.   And it's difficult to read?

8  A.   Yes.

9  Q.   You're a doctor maybe you can read it.  Would you give it

10  a try?

11  A.    Because I'm am a doctor I'm afraid to make those kinds of

12  errors.  I prefer you to try.

13  Q.    All right.  "Here with father," does that look right?

14  A.    That's good.

15  Q.    "Patient says she's been feeling okay?"

16  A.    All right.

17  Q.    "Patient says" something, I can't read it, or bad at

18  school, I think it says "things are bad at school," do you

19  agree with that?

20  A.    I think that's a good guess.

21  Q.    "But doesn't want to talk about it?"

22  A.    Right.

23  Q.    "They had school meeting today re her problems?"

24  A.    And it says conflict with something peer, I think.

25  Q.    "Conflict with female peer?"


61


1  A.    Yeah, I think that's good.

2  Q.    "Patient being encouraged toward promiscuous sex,"

3  agreed?

4   A.   I think that would go, yeah.  I would guess that.

5   Q.   "Dad feels it could be unsafe for her at school?"

6   A.   Where do you see the dad?

7   Q.   On the line below "home behavior?"

8   A.   I see school feels it could be something for her.

9   Q.   You're right, it does say school.  "School feels it could

10  be unsafe for her at school?"

11  A.   Okay.

12  Q.   Somebody "wants her to go to partial?"

13  A.   Okay.  With possibly is my guess.

14  Q.   With possibly something in the meantime?

15  A.   Okay.

16  Q.   Maybe 7 to 14 boys?

17  A.   That would probably be days.

18  Q.   Days.

19  A.   I can't make out the last line.

20  Q.   I think we should stop with this.

21  A.   I think you did very well reading those words.

22  Q.   Doctor, eventually these girls were diagnosed with

23  post-traumatic stress disorder, were they not?

24  A.   Eventually, yes.

25  Q.   In the case of R.P., it occurred in March, didn't it?

62

1  A.   I'm not sure that I have my records to tell me when.

2  Q.   Let me if I can find them here.  I'm going to show you

3  what I'm going to mark as Defendant's Exhibit E -- see if you

4  have those records in your collection there; do you recognize

5  that?

6  A.   Yes, this would be March 26th, yes, I reviewed that

7  record.

8  Q.   And that's the psychiatric evaluation at Millcreek

9  Community Hospital, correct?

10  A.   I think that was an initial assessment.

11  Q.   By Mary Anne Albaugh, MD?

12  A.   Yes.

13  Q.   And, Dr. Albaugh on March 26th, that's the date of the

14  admission -- I guess there is no date of the exact -- I'm

15  sorry, there's no date of the evaluation on here, but during

16  that admission in March of 2002, on page three there is a

17  diagnosis of PTSD?

18  A.   Yes.  That's so according to the records I have here.

19  Q.   Do you remember when K.L. was diagnosed with PTSD?

20  A.   I would not recall that by date.  Although, I'd be happy

21  to look through the documents.

22  Q.   I'm going to show you what I'm going to mark as

23  Defendant's Exhibit F, this relates to an admission to

24  Millcreek Community Hospital on August 5, 2002.  I'll show you

25  my copy and perhaps you can confirm that you have a copy of


63


1  that?

2  A.   Yes, actually we have two records from that admission,

3  that's one of two records.  That would be Dr. Joy, who was

4  there for Dr. Borczon.

5  Q.   And Dr. Joy has under Axis I, under diagnosis, PTSD by

6  history?

7  A.   That's correct.

8  Q.   What does PTSD by history mean?

9  A.   That means that somebody told Dr. Joy that this was a

10  problem.  It's very difficult to interpret what Dr. Joy means,

11  other than that we know it is not from her assessment.

12  Q.   Does it mean that at sometime prior to Dr. Joy signing

13  this document, that she was diagnosed with PTSD?

14  A.   No.  As a matter of fact, it's more likely to mean that

15  somebody who brought the child was claiming that.

16  Q.   For example, a parent?

17  A.   Could be a parent, sure, or a nurse.

18  Q.   You indicated that in the course of your evaluation you

19  reviewed the medical records, correct?

20  A.   Yes.

21  Q.   And you reviewed R.P.'s diary?

22  A.   Yes.

23  Q.   And did you review any other records besides those two

24  kinds of records?

25  A.   I reviewed all the educational records that were made


64


1  available to me.  For K.L., that began in her first year of

2  life.  For R.P., a fewer years later, but still in a preschool.

3  I reviewed all the medical records that were made available to

4  me.  I reviewed the transcripts of what I think were

5  depositions of Mr. Iddings.  I reviewed a police report.  I

6  reviewed a handwritten and then transcribed report of a child

7  with the initials AG.  That would be a student, I believe, that

8  was being interviewed or reporting.  There was something

9  written by Linda Cappabianca.  And I reviewed the diary, as you

10  know, not the full original, but a copy of pages.  I think that

11  covers the list.  The medical records were extensive.  For

12  example, you noticed my hesitation on the initial psychiatric

13  evaluation I was presented with because there was multiple

14  documents labeled initial psychiatric evaluation.  There are

15  multiple records that overlap.  And I could go on.  But the

16  point is that I tried to read everything.  I think I did,

17  whatever I was given.

18  Q.    You indicated that the records you reviewed indicated to

19  you that after the rapes occurred, the girls told the

20  authorities at Strong Vincent or at least tried to tell them --

21  A.    They reported that to me.  And then there were records

22  that would have supported that by interpretation.

23  Q.    And those records were what, the depositions of --

24  A.    For example, there was a report from the father of the

25  conversation with Linda Cappabianca.  And his personal report


65


1  to me.  There was something written by Linda Cappabianca

2  reporting her investigation of events that preceded January.

3  There were a variety of indices or examples of what was going

4  on.  And there are some of them by report and some by people

5  themselves.

6  Q.    The thing that Ms. Cappabianca wrote, are you talking

7  about that January 10th --

8  A.    I can look at the date if you would like me to.

9  Q.    I just want to make sure we know what we're talking about

10  here.  Let me show you on the document reader, you might

11  recognize it.  This is a copy of Plaintiff's Exhibit 58 -- is

12  that the document you're talking about?

13  A.    Yes, it's January 10, 2001.

14  Q.    That document doesn't say, does it, that these girls

15  reported this to Linda Cappabianca or any authority?

16  A.    No, it does not.  I have a note attached to this document

17  that it was interpreted as a record that was produced from the

18  police, the note says this was produced by the police from

19  their records.  We assume it was written by either Cappabianca

20  or Woods, most likely Cappabianca.

21  Q.    And there has been testimony, Doctor, I can tell you that

22  Ms. Cappabianca wrote it.

23  A.   Okay.

24  Q.   That's not one of the records you relied upon to conclude

25  that these girls told authorities at Strong Vincent High School

66

1  about the rape, is it -- told them and were ignored?

2  A.   I would have to review it because I did not read this in

3  order to establish proof of something that you're referring to.

4  I did explain to you that the initial reports to me were by

5  father and R.P. directly.  And then in the record I found

6  references to these.  And if you'd like to know, I think this

7  is one of them, it will just take me a second.

8  Q.   That's fine.

9       THE COURT:  We're going to take a five-minute

10  recess.  We'll go to about noon, then we're going to be

11  breaking until 1:30 today.

12       (Recess from 11:25 a.m.; until 11:35 a.m.)

13       THE COURT:  All right, Mr. Marnen.

14  BY MR. MARNEN:

15  Q.   Dr. Schachner, did you get a chance to review Plaintiff's

16  Exhibit 58?

17  A.   Yes, I did.  And my answer to your question -- if you

18  would mind repeating it for my benefit.

19  Q.   I do not mind.  I only wanted to explore with you whether

20  this document contains information suggesting that the girl's

21  reported the rapes to some school official at Strong Vincent

22  and they did nothing about it?

23  A.   I believe that this document does not have a timeframe

24  that would permit me to reach that conclusion.  It only made it

25  clear that there was something going on in school and this is


67


1  being reported by the person who wrote the document.  So I

2  can't draw a connection to the line that this person actually

3  knew what they were reporting.

4  Q.   Isn't it true to draw the conclusion that the girls

5  reported the rapes to school officials and they did nothing

6  about it, you would have to accept the testimony of the girls?

7  A.   I have trouble answering that because there's a school

8  document indicating in a verbal report that the schools were

9  being, that the children were being harassed at the school.

10  That document was a Sarah Reed document indicating why the

11  girls were there.  It was like an intake written by Mr.

12  Bogardus or something like that.

13  Q.  Bogardus?

14  A.  Yes.  And that document that I read was saying that

15  school reports that there's been harassment.  That added to my

16  impression, aside from what the parents and the children told

17  me.

18  Q.  I'm going to show you what I just marked as Defendant's

19  Exhibit G and ask you whether this is the intake document by

20  Mr. Bogardus concerning R.P.?

21  A.  Yes, that's exactly the document I'm referring to.

22  Q.  There's nothing in there, Doctor, is there, indicating

23  that the school officials at Strong Vincent were told about the

24  rapes and disregarded it?

25  A.  That's correct.  I just have a problem with, I'm not


68


1  sure -- I want to answer the question, but it's not all there

2  about that question.

3  Q.  Let's look at the document on the document reader with

4  the jury.  And if you don't mind, I'm going to have you read

5    it.

6    A.    Where would you like me to begin?

7    Q.    Well, if you don't mind, read all three paragraphs?

8    A.    Identifying information dated January 23, 2002.  "R.P.

9    currently resides with her biological parents, Richard P. and

10   Shelley P. and her siblings, J.P. and M.P.  R.P. has been

11   attending a learning support 7th grade placement at Strong

12   Vincent High School.  General medical care is provided by Dr.

13   Grisier.  R.P. is currently receiving outpatient psychiatric

14   care with Dr. Joy through the Sarah Reed Children's Center.

15   R.P. is currently prescribed Zoloft.

16        Referral concerns.  Referral was made by the Erie City

17   School District for the Special Education Track.  It was

18   reported that R.P. was victimized sexually in school and was

19   suffering harassment by peers.  The incidents in school are

20   currently under police investigation and charges are pending

21   against the perpetrator or perpetrators.  Please refer to the

22   intake dated 5/8/01 for further historical information

23   resulting in the referral for outpatient services.

24        Treatment recommendations.  R.P. appears appropriate for

25   services and will be placed in a group that will assess

1  treatment needs and to develop a treatment plan.  R.P. will

2  also continue to see Dr. Joy and will receive individual

3  therapy."

4  Q.    Then, Doctor, I'm going to show you now a narrative

5  concerning the admission of the intake of K.L., also prepared

6  by Mr. Bogardus, this has been admitted into evidence; would

7  you read that, please?

8  A.    This for K.L., her address, dated January 22, 2002.

9  Identifying information.  "K.L. currently resides with her

10  biological mother, Denise L., sister, Kayla, and Denise L's

11  fiancee, Andy.  K.L. has been attending learning support 7th

12  grade placement at Strong Vincent Middle School.  General

13  medical care is provided through Community Health Network.

14  K.L. currently sees Dr. Wilson who prescribes Adderall and

15  Celexa.  K.L. will soon start Wraparound Services.  K.L. had a

16  recent inpatient stay in Millcreek Hospital and was discharged

17  on January 11, 2002.  Please refer to the previous intakes from

18  1995 for historical information.

19      Referral concerns.  Referral was made by the Erie City

20  School District for the Special Education Track.  It was

21   reported that K.L. was victimized sexually in school by other

22   students and also suffered harassment by her peers.  The School

23   District also reported that the Office of Children and Youth

24   Services is currently conducting an investigation of K.L.'s

25   father for allegations of sexual abuse.  The police are

70

1   conducting an investigation of the allegations of sexual

2   mistreatment in school and there are charges pending against

3   the perpetrator or perpetrators.

4        Treatment recommendations.  K.L. appears appropriate for

5   services due to referral concerns and special education

6   services and will be placed in a group to identify treatment

7   needs and to develop a treatment plan."

8   Q.   Doctor, you also testified that the girls were told that

9   what they had done was bad and wrong by school officials, did

10   you not?

11   A.   Yes.

12   Q.   Where did you get that information?

13   A.   I believe that was by report of both parents and children

14   of K.L. and R.P.  Was also, I believe, interpreted from the

15  diary, although, I do not have reference for those pages.  And

16  if you wait one minute, I'll check my records as well.

17  Q.    Your answer satisfies me, if you want to look further, go

18  ahead?

19  A.    I think that the references that I've offered are also

20  based upon my comparison of the information, for example, for

21  R.P. and an IEP in July, and the description of her behavior

22  and the description of her behavior by both in school by R.P.

23  after the first attack and thereafter.  The IEP in July had

24  described her as a shy girl and enjoys talking with girls.

25  That went along with what R.P. had described in here and what

71

1  her father had described.  And then it is in conjunction with

2  what Linda Cappabianca had reported in the student assistance

3  program meeting.  Then subsequent to that report by R.P. and

4  her parents of the failure to be listened to by the school

5  personnel.

6  Q.    So the conclusion you've reached is that they were told

7  they had done something wrong, was that a conclusion reached

8  based on what the parents and the children told you?

9   A.   I think that I said it was based upon review of the

10  record and parts of those records, including the parents and

11  children.

12  Q.   Is there anything in those records, source of information

13  in those records that supports that contention, besides what

14  the parents and children say?

15  A.   I thought I just gave that to you, I'm indicating that my

16  interpretation included the reports of the school by the

17  children's behavior before and after the incidents.  And I'm

18  not -- I'm not expecting to, nor do I find something in the

19  school's records telling me that they purposefully ignored the

20  children.  So this is by interpretation, that's correct.

21  Q.   In fact, no one from the school said that, no one from

22  the school district said that?

23  A.   That's right.

24  Q.   All right.  You indicated you had seen R.P. and K.L. two

25  or three times?

72

1   A.   Yes.

2   Q.   When did you see them?

3   A.    R.P. was interviewed on April 19th, May 17th and June 15,

4   2005.  And K.L. was interviewed on March 14th, April 15th and

5   April 28, 2005.

6   Q.    Before you go on with that, incidentally, you indicated

7   that with a post-traumatic stress disorder victim, going back

8   to the place where the event happened is traumatic in and of

9   itself, correct, did I understand that correctly?

10  A.    Yes, it wasn't just going back to the place where it

11  happened, it would be going back to the place that reminded

12  them.  So it would be as far as going to the physical

13  environment, it would be stimuli that brought back the same

14  feelings, yes.

15  Q.    I would imagine that you would agree that their transfers

16  out of Strong Vincent was a good idea?

17  A.    In reference to what?

18  Q.    Getting out of the place where it happened?

19  A.    I did not -- I don't think that was possibly a good idea.

20  It depends upon the larger question as to their perception of

21  it.  What I think you said makes an awful lot of sense until

22  one reads the record in which R.P. is complaining in the first

23  appointment with a counselor at Sarah Reed, I think it is

24  referenced, in which she said why am I here, as if I did

25  something wrong, why am I at fault.


73


1  Q.    Incidentally, they were, were they not, receiving

2  counseling outside of Sarah Reed?

3  A.    K.L. had gone to, I believe K.L. had gone to Rape Crisis.

4  And I believe that R.P. had been involved in outpatient

5  appointments subsequent to May of 2001.  But the record

6  indicates it was not regular attendance, as a matter of fact,

7  it's noted that, I don't think that she was in any treatment at

8  the time of these.  She may have been seen once.

9  Q.    K.L. was seen at Millcreek Community Hospital January 4,

10  2002 to January 11, 2002?

11  A.    That's when she was inpatient.

12  Q.    Yes.  The diagnosis of post-traumatic stress disorder

13  were both made at Millcreek Community Hospital, were they not?

14  A.    I don't want to confuse the records of the two --

15  Q.    Those were the ones we went over.

16  A.    One of them had a diagnosis to be determined.  But that

17  was listed by history at that time.

18  Q.   You're quite right, one is by history?

19  A.   Okay.  That's not the diagnosis.

20  Q.   One was by history, one was the diagnosis of both that

21  were made by Millcreek Community Hospital?

22  A.   I believe those were at two locations, there's other

23  places in the record that was referenced.

24  Q.   After K.L. was discharged from Millcreek Community

25  Hospital on January 11, 2002, she was receiving wraparound

74

1  services, was she not?

2  A.   Yes.

3  Q.   And we know that R.P. saw Dr. Joy on December 20, 2001

4  and January 10, 2002?

5  A.   Right.

6  Q.   And that she got her diagnosis again of PTSD in March of

7  2002 at Millcreek?

8  A.   Yes.

9  Q.   Doctor, you have made some observations about what the

10  future care of these girls require, have you provided any of

11  that care thus far?

12  A.   Have I personally?

13  Q.   Yes, sir.

14  A.   No, I wouldn't be allowed to.  I'm only conducting an

15  assessment.

16  Q.   You're conducting an assessment for purposes of

17  litigation, are you not?

18  A.   Yes.

19  Q.   This is not the first time you've done this, is it?

20  A.   Done what?

21  Q.   Testified in court?

22  A.   Correct.

23  Q.   And testified for a party in litigation?

24  A.   Correct.

25  Q.   And, as a matter of fact, you've been retained on prior


75


1  occasions by Mr. Olds, have you not?

2  A.   I was retained on one occasion previously by Mr. Olds to

3  conduct a forensic assessment, also.

4  Q.   And each time you were retained, you are retained for a

5  fee, are you not?

6  A.   Oh, yes.

7  Q.   What is that fee, Doctor?

8  A.   The fee is $175 per hour, and then I have an hourly for

9  records on my work.

10        MR. MARNEN:  Thank you, sir, no further questions.

11        THE COURT:  Do you have anything else?

12        MR. OLDS:  Yes, I do have a few follow-up questions.

13                REDIRECT EXAMINATION

14  BY MR. OLDS:

15  Q.   Mr. Marnen showed you some pages from R.P.'s diary.  From

16  your review of that diary and your discussions with R.P., did

17  you reach a conclusion that she had suffered more harassment in

18  the school?

19        MR. MARNEN:  Objection, leading.

20        THE COURT:  Sustained.

21        MR. OLDS:  I'll rephrase the question.

22  BY MR. OLDS:

23  Q.   Did you make any conclusions concerning what was going on

24  with R.P. in the fall of 2001, Dr. Schachner?

25  A.   I believe that R.P. was entering school with this very

76

file:///A|/RICHDAY4.TXT

1  positive demeanor, looking for friendships and having a

2  positive, new experience, even though she found it difficult

3  moving back to Erie from Mesa.  That was found in diaries, as

4  well as her report.  In the beginning part of her diary are

5  really those of a happy little girl looking forward to what

6  will take place.  But the diary over time becomes more and more

7  negative.  In particular, the diary in November, although it

8  some positive references that were not shown to me, such as

9  Halloween and looking forward to the gifts that she was

10  receiving for a purpose or a party, some positive aspects, I

11  can see a continued concern of aggression, she actually begins

12  within the dates that were asked of me to read, which is an

13  indication of -- I think the name of the child beginning with

14  "B", that this person wanted to fight with her, and wanted to

15  meet her after school.  So it's very clear that there is a lot

16  of upset occurring in her dealing with the kids.  Probably

17  beginning in October.  That certainly is from the teacher's

18  records and in November.  So the teacher's records and the

19  diary coincide.

20  Q.    Did you observe, in your review of records, that R.P. was

21  sensitive to aggression from other students?

22  A.   Extremely sensitive.  So sensitive that she almost would

23  rather hurt herself than get into a fight with somebody.

24  Q.   Mr. Marnen showed you a diary reference from 11/6/01 and

25  he asked for you to read it.  There's a word used in it,


77


1  dizzed, are familiar with that word as slang?

2  A.   Yes.

3  Q.   And what does it mean?

4  A.   If you're dizzing somebody, somebody is making fun of

5  you, criticizing you, teasing you, but it's all negative.  And

6  if you're strong, you're supposed to give it back to them.

7  You're supposed to then make something fun out of something

8  very negative.  But it is clearly attacks verbally upon you.

9  Q.   Down here R.P. wrote -- I'll show it to you, I do have a

10  bleeding dizzeze and if someone's ugly, stupid.  You said

11  disease, but she might be writing dizzed again there?

12  A.   Yes.

13  Q.   "Dizzed on the way to skinny, why should they want to

14  live?"

15  A.   That's correct.

16  Q.    Did you conclude, I mean does an entry like that go to

17  your conclusion about what was going on with R.P.?

18  A.    That added to my impression, aside from what she was able

19  to tell me in our conversation, what she was comfortable in

20  reporting.  I'd like to point out, if you give me one second --

21  I don't want to take too much time, I wanted to show you the

22  reports that were handwritten by the teachers that indicated

23  that she needed support, talked about her social relations, and

24  indicated that there were difficulties for her in that specific

25  regard.

78

1  Q.    In your review of the records concerning K.L., Dr.

2  Schachner, Mr. Marnen showed you again the records from 1/22/02

3  concerning K.L., and he drew your attention, I think that you

4  read the parts about K.L., there was an investigation of K.L.'s

5  father for allegations of abuse.  What was your general

6  impression of the records concerning K.L. as to you went

7  through them?

8  A.    My impression of the records was that an awful lot of

9  material in the history was written without identifying the

10   source of the information, nor giving evidence that was

11   accurate.  And, in fact, some of the records for Sarah Reed

12   were referring to ongoing behavioral problems historically,

13   let's say in school, for R.P. or K.L., which did not match up

14   to their earlier records.  This was by what occurred through

15   history.  The record that I was referring to earlier when I

16   said that there were things in the diary and they were

17   referenced by teachers, indicating tension or difficulty with

18   the child was from the student assistance program, in which the

19   different teachers would meet and discuss the problems the

20   child would have.  And they would check off either educational

21   problems or behavioral problems.  And, for example, they might

22   indicate how they saw the child has behaved historically and

23   then recently.

24   Q.   Okay.  Getting back to K.L.'s records, though, did you

25   make a conclusion about whether the inaccuracies in those

79

1   records might have impacted the treatment and course of

2   treatment as she went along?

3   A.   Absolutely.  The one that would be the most telling from

4    both girls is that you fail to indicate the cause for

5    behavioral disturbance, I don't know you would properly treat

6    it.

7    Q.    Mr. Marnen showed you this psychiatric record,

8    handwritten record, Defendant's Exhibit D, and you guys were

9    trying to figure out what she was saying.  I think one of the

10   things that is reported is that R.P. didn't want to talk about

11   what was going on at school.  That was in this record, is that

12   right?

13   A.    Yes.

14   Q.    Now, R.P. was seen by a psychiatrist the day after the

15   assault?

16   A.    Yes.

17   Q.    Does it surprise you that R.P. didn't mention anything

18   about the assault to that psychiatrist?

19   A.    No, I would expect her not to.

20   Q.    So unless the psychiatrist knew -- it's not going to come

21   out?

22   A.    Unless there is some information for the psychiatrist --

23         THE COURT:  That was a little fast there.

24         THE WITNESS:  I apologize.

25          THE COURT:  Start that over again.


80


1          THE WITNESS:  The child was brought to the

2   psychiatrist by a parent.  It is very unlikely that subsequent

3   to a traumatic personal event like rape, that a child will

4   think that they can report this to the doctor and not have this

5   information released.  They have to either -- the doctor either

6   has to know the cause for bringing the child in so they can

7   help them, approach the child and discuss their privacy and

8   safety.  Or the psychiatrist or therapist would have to have

9   spent enough visits with the child to be able to bring out

10  their readiness to share this with other people, including the

11  parents.  It's a very important part of post-traumatic

12  treatment, and it is found in, for example, Allegheny General

13  Hospital has a description of the approach to treatment of

14  children that have been traumatized.  None of which would

15  surprise me in terms of the child not reporting to this person.

16          THE COURT:  How much more do you have?

17          MR. OLDS:  I think, your Honor, that was my last

18  question.

19          THE COURT:  All right, Mr. Marnen?

20          MR. MARNEN:  Very briefly, your Honor.

21                RECROSS-EXAMINATION

22  BY MR. MARNEN:

23  Q.    Doctor, I'd like to show you what's been marked as

24  Defendant's Exhibit H, that should be part of your records,

25  also, that you reviewed?


                        81


1  A.    Yes, I recalling seeing this.

2  Q.    And if I may, I'm going to put it on the reader.  This is

3  a client contact summary from the Base Service Unit in Erie

4  County, is it not?

5  A.    Yes.

6  Q.    And this relates to Richard P. taking R.P. to the Base

7  Service Unit for mental health care in May of 2001?

8  A.    Yes.

9  Q.    And in fact the date is May 8, 2001?

10  A.    Yes.

11  Q.    And would you read the presenting problem or reason for

12  call on the right-hand side?

13   A.   Yes.  "Richard P. called to find out what services he can

14   access for his daughter.  The family moved back to Erie from

15   Arizona on March 27, 2001.  Since that time R.P. met a girl

16   that Richard P. termed as odd.  R.P. and this girl had a fight

17   last week and the girl told R.P. that she was going to have her

18   friends beat R.P. up.  R.P. said she would kill herself before

19   she would let anyone hurt her.  R.P. took a knife and proceeded

20   to cut herself on the stomach.  Richard P. said the school

21   called him to let him know about the cuts on her stomach.  He

22   was unsure why R.P. didn't tell him or her mother that she had

23   cut herself.  Richard P. says that R.P. is a very easy going

24   child and all of her teachers love her.  Richard P. has not

25   noticed any problems with her appetite or sleep."


82


1   Q.   This visit to the Base Service Unit was before she went

2   to Strong Vincent and met B.C.?

3   A.   Yes.

4        MR. MARNEN:  Thank you.  Your Honor, I'd like to

5   move for the admission of Defendant's Exhibits C through H.

6        MR. OLDS:  No objection.

7         THE COURT:  They're admitted.  This is your expert,

8   are you done with him?

9         MR. OLDS:  Yes.

10        THE COURT:  Thank you, Doctor, you're free to go.

11   We're going to be in recess until 1:30.

12        (Luncheon recess from 12:05 p.m.; until 1:30 p.m.)

13        MR. OLDS:  Your Honor, prior to resting, I wanted to

14   make the following offer in terms of exhibits.  Mr. Marnen and

15   I have discussed this to save time.  Exhibits 232 and 233 were

16   the pictures of the girls.  R.P.'s diary is 228, and 228.1  And

17   we've agreed that the documents reviewed by Dr. Schachner,

18   which were part of his report, Plaintiff's Exhibits 2 through

19   9, 12, 13, 17, 25 -- 8 through 35, 63, 72, 73, 77 through 82,

20   96, 99 through 183, 185, 204, 209 through 222, 224 through 226,

21   and 231.  We move to admit those.

22        THE COURT:  Those are admitted.

23        MR. OLDS:  And plaintiffs rest.

24        THE COURT:  All right.  Mr. Marnen.

25        MR. MARNEN:  May it please the court, we recall

83

1  Janet Woods to the stand.

2         THE COURT:  Ms. Woods, you're still under oath.

3         THE WITNESS:  Yes, sir.

4         JANET WOODS, DEFENSE WITNESS, PREVIOUSLY SWORN

5              DIRECT EXAMINATION

6  BY MR. MARNEN:

7  Q.   Ms. Woods, I'd like to direct your attention to January

8  10, 2002.  Did you attend a meeting that day with Richard P.

9  and R.P.?

10  A.   Yes.

11  Q.   Was anyone else present at that meeting?

12  A.   Yes.

13  Q.   Who else was there?

14  A.   The meeting on January 10th was held in the office of Mr.

15  Chris Ruhl.  Chris Ruhl was the student assistance personnel at

16  Strong Vincent High School.  He was a counselor for the student

17  assistance program.

18  Q.   Was there a meeting that you arranged with Richard P. on

19  the evening of January 9, 2002?

20  A.   Yes.

21  Q.   And what time of the day on January 10, 2002, did the

22  meeting occur?

23  A.    It was in the morning, Richard P. said he couldn't meet

24  with us the night before, he agreed to come in the next

25  morning.

84

1  Q.    Was that meeting at Strong Vincent High School?

2  A.    Yes, sir.

3  Q.    And where was it held within the building?

4  A.    Strong Vincent High school is a large two-story building,

5  it is absolutely square.  And Chris Ruhl's office is in the

6  southeast corner of the first floor.  To put that in

7  perspective of where the main office is, the main office is in

8  the middle of the building on the first floor.

9  Q.    Why was the meeting held there, if there was a reason,

10  and why was Chris Ruhl there?

11  A.    I'll treat that as a two-part question.

12  Q.    Well, I guess we can start with the first part, why was

13  it held in his office?

14  A.    Ms. Cap and one of the other persons, perhaps one of the

15  resource officers, had someone in my office.  Richard P. came

16  into the building, I wanted to meet with him.  Specifically I

17   went to Chris Ruhl's office, because Chris Ruhl was apprised of

18   the situation and R.P. had been referred to us through the

19   assistance program in November.

20   Q.   What is the student assistance program?

21   A.   All schools are mandated to have a program in place in

22   their school for students to receive help for teachers to refer

23   students who may need more academic or some kind of support

24   service.  Student assistance programs have been in existence

25   since about 1985.  Typically, in the student assistance

85

1   program, you have an administrator, I sat on that program, I

2   sat in on those meetings, also, they were held once a week.  At

3   Strong Vincent the student assistance program consisted of

4   several teachers, probably a half dozen teachers, all grade

5   levels, across all curriculum areas.  The probation officer,

6   the assistant principal, at least one assistant principal, I

7   put myself on that team, I felt it was important.  The school

8   nurse was on that team.  The intensive -- I'm saying this

9   slowly for benefit of the recorder, IJDP, intensive juvenile

10   delinquent program.  It is a probationary program for students

11  that need support in the building.

12  Q.    So the head of that program was there?

13  A.    Yes, that program was at Strong Vincent, we had that

14  person on the team.  Occasionally resource officers would

15  attend, that was very infrequent.

16  Q.    Are the resource officers Officers Slupski and Love?

17  A.    That's correct.  Many members of the faculty.  Generally,

18  there would be at least 12 people at those meetings.  Chris

19  Ruhl was the student assistance program coordinator for our

20  building, he was full-time on staff.  He was a certified

21  counselor.

22  Q.    The student assistance program, with the word assistance

23  in it, it seems like they deliver some kind of assistance to

24  someone?

25  A.    Absolutely.

86

1  Q.    To who, students?

2  A.    Yes.

3  Q.    What kind of assistance?

4  A.    For example, typically if a student has attendance

5   problems, we would want to survey all teachers, that's the

6   first thing we do is survey all teachers that the student has,

7   and determine if there could be other observations by teachers

8   that might be helpful.  So that we could assist that student in

9   making sure that there at school on time.  If the student came

10  to an assistant principal or to maybe the school nurse would

11  refer them, maybe a probation officer would refer them.  But

12  any student that we thought had a need above and beyond what is

13  normally provided to our students.

14  Q.   And Chris Ruhl is the head of that program?

15  A.   Yes, sir.

16  Q.   What other position, if any, did Chris Ruhl hold at

17  Strong Vincent at that time?

18  A.   That was his only job.  He was hired as the student

19  assistance personnel for Strong Vincent High School, grades 7

20  through 12.

21  Q.   What if anything did he have to do with mental health

22  services?

23  A.   Frequently if a student was referred, needed to be

24  referred, he was the liaison for all of the mental health

25  agencies in this area.  He would serve as the school

87

1   representative between the school, the student assistance

2   program and the outside agency providing services.

3   Q.    Are you familiar with his credentials?

4   A.    Only that he was certified, certified as a counselor.

5   Q.    Did he do any counseling as the head of the SAP program?

6   A.    That was his primary job.

7   Q.    So why was he invited to this meeting with the Polancys

8   on January 10, 2002?

9   A.    Well, he was familiar with R.P.  R.P. had been referred

10   to the student assistance program and Richard P. had actually

11   also initiated a request that she be part of the student

12   assistance program.  And when Richard P. came in with R.P., I

13   felt, because we always had to have any time during the whole

14   time we were sorting out the details, the seriousness of the

15   matter, all of that, gave credence to the fact we had to have

16   two people in the room at all times, and I wanted the important

17   key players, and Chris Ruhl was one of those.  In talking with

18   R.P., he had established a relationship with her.  And I went

19   to his office, mine was very busy, and I felt because of the

20  delicacy of the material we were going to discuss, that I

21  wanted to have a counselor present all the time.

22  Q.    Now, was it decided to have this meeting with Richard P.

23  and R.P.?

24  A.    Right.  We tried to reach him the day before and we

25  finally got a hold of him in the evening.

88

1  Q.    What was your motivation in having that meeting?

2  A.    To inform Richard P. of what information we had so far,

3  and it was changing hourly.  But, also, primarily to talk with

4  him about getting R.P. some help.  I knew she had been involved

5  with a Sarah Reed counselor, was active with a Sarah Reed

6  counselor, I wanted to get her some help.

7  Q.    Did you know whether before that meeting took place, did

8  you know then, say on January 9, 2002, whether Richard P. was

9  aware that his daughter had been raped on December 19, 2001?

10  A.    Did I know at that meeting, before the meeting?

11  Q.    Did you know before that meeting?

12  A.    No.

13  Q.    Did you know whether he knew about the rape?

14  A.   No.

15  Q.   And so what was the purpose then of the meeting?

16  A.   The purpose of the meeting was to inform him of what we

17  knew so far.

18  Q.   And do you remember what time of the day it happened?

19  A.   It was in the morning, as I recall it was kind of early.

20  Q.   How long did the meeting last?

21  A.   Oh, 30 minutes, 40 minutes.

22  Q.   Would you describe how the meeting proceeded, what was

23  said, please?

24  A.   Very carefully.  Richard P. and I and R.P. went to Mr.

25  Ruhl's office --

89

1  Q.   Go ahead.

2  A.   Okay.  We went to Mr. Ruhl's office, it's a very, very

3  narrow office, it's an old book room.  So it's pretty narrow.

4  I sat down across from R.P., Mr. Ruhl was next to me, Richard

5  P. was across, and we were in very close proximity to each

6  other.  R.P. was quiet, Richard P. and I always had a good

7  relationship, so we sat down and talked.  And I said there is

8  going to be some unbelievable information here, this is going

9  to be very difficult but, R.P., you got to tell your dad what

10  happened here, about what we know.  And it was at that time

11  that I informed him that something had gone on over at the

12  laundromat, that I felt R.P. had been violated, that did she

13  talk to you about that.  And the answer was no.  I said we got

14  to talk about this.  She was really quiet, a little -- I don't

15  know if I would say weepy, just -- it was tough.  That was

16  very, very difficult.  And we talked about it.  Talked about

17  did she have the resources that we knew that she had.  He had

18  asked me in the course of that to try to find an alternative

19  educational placement for her.  He felt she shouldn't return.

20  I said that I would certainly look into that, get back to him

21  as soon as I could get an answer for him, which I felt would be

22  that day or the next day.  I had asked him if he would please

23  contact her counselor.  And she was not forthcoming with

24  information, but we were able to at least get a little more

25  information.  We did tell him what she told us the day before.


90


1  Which there were -- I don't know if we got the older boy

2    identified at that time, I'm pretty sure we did.  I told him

3    that we had the names, the police were definitely going to be

4    involved, we were just gathering the rest of our material that

5    day and we were going to have the police involved very shortly.

6    Q.    I'm going to ask you a question that is going to contain

7    some vulgar language, for which I apologize.  There has been

8    testimony in this case that you said to Richard P. in the

9    presence of R.P. the following:  "Are you ready for this.  R.P.

10   has been sucking dicks and giving blow jobs to boys."  Did you

11   say that?

12   A.    Absolutely not.  Absolutely not.

13   Q.    Was there any discussion during the meeting that you were

14   going to contact the police?

15   A.    Yes.

16   Q.    Did you bring up that subject, were you the first person

17   in that meeting to bring up that subject?

18   A.    Yes.

19   Q.    Did you at anytime in the course of that meeting tell

20   Richard P. to shut his mouth?

21   A.    Never.  I don't conduct parent conferences that way.  And

22   this was a very, very -- delicate, serious, I wanted R.P. to be

23   able to talk to her father.  Because she said that she hadn't

24  talked to him yet.  And it was difficult material to get

25  through, but we had to get through it.


91


1        MR. MARNEN:  Thank you, I have no other questions.

2                    CROSS-EXAMINATION

3  BY MR. OLDS:

4  Q.    Are you saying that in the presence of Chris Ruhl and

5  Richard P., you were telling R.P. to tell her father what

6  happened?

7  A.    Yes, a father, a parent and a child hopefully have some

8  kind of relationship established and we wanted to have her

9  talk.  I told him what we knew and R.P. spoke, also.

10  Q.    Do you have any idea what a 13-year-old feels like when

11  they've been raped?

12  A.    No, sir, I do not.  No one would know.

13  Q.    You don't have any training in terms of dealing with

14  post-traumatic stress syndrome?

15  A.    I'm not a medical officer, but I've been trained, I had

16  micro-psychology, I was trained by St. Francis Hospital in

17  1985.

18        THE COURT:  Slow down, please.

19        THE WITNESS:  I'm sorry, sir.

20        THE COURT:  Start that again.

21        THE WITNESS:  I was trained as part of a student

22  assistance program at St. Francis Hospital in Pittsburgh in

23  1985.

24        THE COURT:  You're riding that same bicycle again,

25  you've got to slow down.


92


1        THE WITNESS:  I'm sorry, your Honor.

2        THE COURT:  You have to try to slow down.  Go ahead.

3        THE WITNESS:  I don't think anyone could know what

4  that child felt like.  But sometimes, as a professional, when

5  you feel you are absolutely the most qualified person, we have

6  a responsibility and I was interested in getting those bed eggs

7  out of that school, I was interested in these girls getting

8  some help.  I was interested in --

9        MR. OLDS:  We're going far afield.

10        THE COURT:  Let the witness finish her answer.

11        THE WITNESS:  I was interested in having criminal

12    charges pressed on something that didn't even happen on school

13    property.  But I felt would have a major impact on that school

14    if we didn't do something.  Somebody has got to do something.

15    And R.P. did talk.  R.P. never had a history of being -- she

16    was sullen, she didn't talk a lot.  She was more sullen as a

17    kid, as a student.  So it hadn't been the first time, Mr. Olds,

18    that I ever had to deliver very, very tragic news to a parent.

19    And life is tough.  It was tough for her to talk to him.  But

20    she didn't say much, but we had to get through some of that.

21    And he informed me that she was still involved with a

22    counselor, as I knew, at Sarah Reed, and that he was going to

23    take her directly there.  We didn't dwell on this a long time

24    because I was not interested in making is worse than it was.

25          THE COURT:  Hang on.


                                  93


1          THE WITNESS:  I'm finished.

2          THE COURT:  Let's get back to question and answer.

3    BY MR. OLDS:

4    Q.    My question was where did you learn that a 13-year-old

5    child, who has been raped, has to be set down in an office and

6   confronted and told to tell her father what happened, just from

7   your history of your vast experience dealing with these kinds

8   of matters, where did you learn that that's the proper way to

9   debrief a girl who has been raped, a 13-year-old girl, where

10  did you learn that?

11  A.   I have a masters of science in counseling.  Did I learn

12  it there, I learned a lot of skills about talking to people and

13  talking to kids.  Specifically, about rapes, I can't answer

14  that question.

15  Q.   As a matter of fact, you never learned anything about how

16  you handle a victim of rape, have you?

17  A.   No, but we had talked to R.P. the day before, also, a

18  lot.

19  Q.   And R.P. was weepy?

20  A.   She was sullen.  She was quiet, she wasn't crying.  She

21  was -- kind of hiding herself, you know, keeping to herself.

22  Q.   And I think you said that you brought Richard P. up to

23  date on what you knew, but the information was changing hourly?

24  A.   Well, that was early in the morning.  We still had quite

25  a few parents that were coming in that morning.

1  Q.    So you hadn't talked to everyone?

2  A.    Probably not.

3  Q.    Do you know which students you had talked to?

4  A.    No, at that point, no.

5  Q.    You don't remember which students you had talked with?

6  A.    On Wednesday -- you want to know who I talked with on

7  Wednesday?

8  Q.    Yes.

9  A.    We talked to a lot of kids.

10  Q.    So the answer to my question would be you do not remember

11  who you talked to, is that the answer to my question?

12  A.    Correct.

13  Q.    Okay.  You don't have any notes today that you could look

14  at and refresh your recollection, this is who we talked to, is

15  that right?

16  A.    Yes, I think I stated yesterday in my testimony, is that

17  we had in the course of the 24-hour period between the time we

18  learned of the information on Wednesday midday and Thursday,

19  that I talked there, we knew who the key persons were.  We had

20  ascertained who all the key persons were.

21  Q.    Okay.  And among the students you talked to, B.C. denied

22  she had done anything wrong, is that right?

23  A.    Oh, of course.

24  Q.    C.B. denied he did anything wrong, right?

25        MR. MARNEN:  Your Honor, I think we're beyond the

95

1   scope of direct here.

2         MR. OLDS:  Your Honor, this is going to what she

3   talked about, what she knew.

4         THE COURT:  Well, you're teetering on the edge, but

5   within the scope.  I'm going to let you go a little bit

6   farther.

7         MR. OLDS:  Thank you, your Honor.

8   BY MR. OLDS:

9   Q.    C.B. denied it, is that right?

10  A.    This is not a conversation I had with Richard P.  We're

11  off of that, correct?

12  Q.    I'm talking about you told Richard P. that you knew, you

13  told him you, you brought him up to date with the information

14  that you knew and I'm trying to understand what information you

15  knew; in other words, what you told Richard P.  Okay, so that's

16  where we are.  Now, C.B. had denied it, is that right?

17  A.    The first time we talked to him, yes.

18  Q.    A.K. denied it, is that right?

19  A.    I wasn't sure if I talked to all of these kids at that

20  time, but A.K. denied it, sure.

21  Q.    Y.H. wasn't any help, was she?

22  A.    She was a little help because she was there.

23  Q.    And, in fact, you hadn't called the police on this

24  Thursday morning because you hadn't decided what had happened

25  yet, isn't that correct?


96


1  A.    I hadn't called the police yet because we got the

2  information on Wednesday, I informed the two school resource

3  officers about it and specifically had caught them up to speed

4  about 3 o'clock in the afternoon.  And on Thursday we made the

5  decision to call the police.

6  Q.    Right.  I'm talking about Thursday morning, you hadn't

7  called the police Thursday morning because you hadn't decided

8  what had happened yet, had you?

9  A.    I hadn't called the police because we hadn't interviewed

10  everyone yet.

11  Q.    Because you hadn't interviewed anyone yet, you hadn't

12  decided what had happened, had you?

13  A.    We pretty much ascertained what had happened.  B.C. --

14  the other two students had violated R.P. and K.L.

15  Q.    Now, you used the term violated here in front of this

16  jury and you indicated that you didn't tell Richard P., that

17  you denied using the language that your daughter's been sucking

18  dick and giving blow jobs.  But then I think that you used the

19  language that you told Richard P. that his daughter was

20  violated, is that what you told him?

21  A.    We knew that -- I don't know that I used the word

22  violated in that conference, but we knew she had been -- that

23  she had been abused, absolutely.

24  Q.    That's what you used, did you use --

25        THE COURT:  Hang on a second, excuse me.  It's an

97

1  impossibility for this fellow.  You got to slow down a bit and

2  you do, too.  Let's roll the tape back and go forward.  Go

3   ahead.

4   BY MR. OLDS:

5   Q.   Did you use the word abused in that conference?

6   A.   I don't know which -- to me, either word fits the bill,

7   violated or abused, I don't know which word I used.  It was

8   clear to Richard P. in our conversation that some very bad

9   things had happened to his daughter at that laundromat.

10  Q.   Well, as a matter of fact, as we sit here today, you

11  don't know what words you used in that conference, do you?

12  A.   Exact words, no.

13        MR. OLDS:  No other questions, your Honor.

14        THE COURT:  Anything further of this witness?

15        MR. MARNEN:  No other questions, your Honor.

16        THE COURT:  Thank you, ma'am, you're excused.  Call

17  your last witness.

18        MR. MARNEN:  Linda Cappabianca, your Honor.

19        THE COURT:  Ms. Cappabianca, you also are still

20  under oath.

21        LINDA CAPPABIANCA, DEFENSE WITNESS, PREVIOUSLY SWORN

22                  DIRECT EXAMINATION

23  BY MR. MARNEN:

24  Q.   Ms. Cappabianca, I hate to ask you this, but what is your

25   age?


98


1   A.   Thirty-eight.

2   Q.   What is your education?

3   A.   I have a B.S. a, dual degree in special education and

4   elementary education from Edinboro University.  I have a

5   master's in school administration from Edinboro University.

6   I am currently enrolled at Edinboro University.  So I have a

7   master's plus.

8   Q.   You say you are currently enrolled?

9   A.   I am currently enrolled, yes.

10  Q.   Are you going for your doctorate?

11  A.    Not at this point, I'm working on my superintendent

12  papers.

13  Q.   When did you get your bachelor's?

14  A.   I think I graduated in 1991, May of 1991.

15  Q.   And your master's?

16  A.   I completed it in '97.

17  Q.   And you started it?

18  A.   Right after I was out, so '91, '92.

19  Q.    And when did you have your first job?

20  A.    September of '91.

21  Q.    And by whom were you employed at that time?

22  A.    Erie School District.

23  Q.    And what was your job?

24  A.    Special ed teacher, I taught learning support math at

25  Roosevelt Middle School.

99

1  Q.    You did not remain there your entire career?

2  A.    I did not.

3  Q.    Where did you go next, when did you do it?

4  A.    After Roosevelt I had left, that would be '91, '92, I

5  went to Glenwood Elementary, where I taught learning support

6  classes.  One class, it was self-contained, 4th and 5th grade

7  students.  And then I went back to Roosevelt.

8  Q.    You spent one year at Glenwood?

9  A.    One year at Glenwood.

10  Q.    So now you're in your second tour of duty at Roosevelt,

11  how long were you there?

12  A.    I was there until I got my administrative position at

13  Strong Vincent High School.

14  Q.    So that's until when?

15  A.    Okay -- that would have been '93, '94, I was at

16  Roosevelt.  And I went to Strong Vincent High School as the

17  middle school assistant principal, it happened in -- it was in

18  March the year before this incident happened, it was 2000.

19  Q.    Incidentally, the testimony is irrefutable it happened in

20  2001?

21  A.    2001-2002 school year.  So the March before that is when

22  I started before that.

23  Q.    March of 2001 is when you started at Strong Vincent?

24  A.    Yes.

25  Q.    Did you remain at Strong Vincent -- obviously, you did


100


1  for some time, how long?

2  A.    I spent the rest of that year and then two years after

3  that.

4  Q.    And so at the end of the 2002-2003 school year, you moved

5  on?

6  A.    It would have been -- I think it was 2001-2002 was my

7   last year there.

8   Q.   2001-2002 was the year of the incident in question, so

9   does that help you?

10  A.   I had another year there, you're correct.  Then I went to

11  Harding Elementary, Harding School, it's K through 8th, until

12  the present.

13  Q.   That's to the present?

14  A.   Yes.

15  Q.   What have you done at Harding?

16  A.   Assistant principal.

17  Q.   What is that, two years, three years?

18  A.   I'm working on four, this is my fourth.

19  Q.   Okay.  You were assistant principal at Strong Vincent for

20  two years, a little over two years?

21  A.   Yes.

22  Q.   Part of the '99-2000 school year, and two years after

23  that?

24  A.   Correct.

25  Q.   As an assistant principal in the middle school, what were

101

1  your duties?

2  A.   At Strong Vincent my main duties were discipline and

3  attendance.

4  Q.   Did you have other duties?

5  A.   Supervision of staff, supervision of before and after

6  school.  Supervision of the cafeteria -- curriculum.

7  Q.   In the course of your performance of your job, did you

8  have occasion to come into contact with students?

9  A.   Yes.

10  Q.   Under what kinds of circumstances did you come in contact

11  with the students?

12  A.   Varied reasons.  It could have been behavioral, it could

13  have been academic problems.  It could have been a teacher

14  referring them because something was uncharacteristic of a

15  child and felt they needed someone to talk to.

16  Q.   When a student is referred out of the class by a teacher

17  for disciplinary reasons and it's a middle school student,

18  during the time you were there, where would the teacher refer

19  them?

20  A.   To my office.

21  Q.   Where is your office located in the high school there?

22    A.    It was on the second floor, and it would have been on the

23    east side of the building -- kind of between north and south,

24    kind of right in the middle.

25    Q.    Is that where the main office is at Strong Vincent?


                                    102


1    A.    At Strong Vincent, as soon as you walk in the building,

2    it's on the first floor.

3    Q.    In the center of the building, south side?

4    A.    Yes.

5    Q.    Where was the middle school located during your tenure

6    there?

7    A.    It was up the stairs, right by the office.  It was right

8    in the middle of it.

9    Q.    Where was Vikki Scully's classroom located?

10    A.    She was directly across from me.  If I walked out of my

11    room, I went right into hers.

12    Q.    If I remember the testimony, Connie Manus was also a

13    special ed teacher?

14    A.    Correct.

15    Q.    So was Jodie --

16   A.   Gray.

17   Q.   Were they in that area, also?

18   A.   Jodie was right beside me.  Vikki was, Vikki Scully was

19   directly cross from me.  And Connie Manus was beside Vikki

20   Scully.

21   Q.   Were there any classes in that area for any students

22   besides middle school students?

23   A.   On both corners of the hallway there was an art room, I

24   want to say it was ceramics, it was a form of art, and then the

25   music room, which they had all grade levels, 7 through 12.


103


1   Q.   All grade levels went to those two rooms?

2   A.   Correct.

3   Q.   But otherwise the second floor east end was all middle

4   school?

5   A.   Yes.

6   Q.   And your office?

7   A.   Pardon.

8   Q.   And your office was located there, too?

9   A.   Right in the middle, yes.

10  Q.    I'd like to show you some records before we move on.  Let

11  me show you first what's been marked as Defendant's Exhibit

12  I -- I don't know that a trip up there is necessary, your

13  Honor, I'm just going put it down on the reader, it's not going

14  to pick up the whole thing.  First, would you just tell us, if

15  you know, what Exhibit I is?

16  A.    It's a school calendar.  The district provides each

17  administrator with one at the beginning of every school year.

18  Q.    So each year the school district publishes a calendar

19  that shows events that are during that year on the calendar?

20  A.    Correct.

21  Q.    Does that include when school is in and when school is

22  out?

23  A.    Yes, it does.

24  Q.    And this particular Exhibit I signifies for what school

25  year?

104

1  A.    2001-2002.

2  Q.    The first sheet is August of 2001, and the last page is

3  June of 2002, correct?

4   A.   Yes, it is.

5   Q.   Can you tell us by looking at that first page when school

6   started that year?

7   A.   It's very blurry.

8   Q.   It's hard to read.

9        THE COURT:  It's think it's going to be difficult to

10  improve.  Just run it up, just take it up to her, we'll move

11  much faster.

12  BY MR. MARNEN:

13  Q.   When was the first day of school?

14  A.   For students?

15  Q.   Yes.

16  A.   The first day for students was August 27th of 2001.

17  Q.   All right.  When was the first vacation day of that

18  school year?

19  A.   August 31st of 2001.

20  Q.   I guess let's fast forward to Thanksgiving, what were the

21  dates of Thanksgiving?

22  A.   Okay.  Thanksgiving, the district holiday was November

23  22nd of 2001, November 23rd of 2001.  That was a Thursday and

24  Friday.  Saturday, November 24th.  Sunday, November 25th.  And

25  Monday, November 26th of 2001.

105

1  Q.   When did Christmas vacation begin that year?

2  A.   It looks like the first day would have been on the 21st

3  of December, 2001, so it would have began Saturday, December

4  22nd of 2001.

5  Q.   The evidence indicates that the incident in question

6  occurred on December 19th, that would have been on the previous

7  Wednesday?

8  A.   Yes, it would have.

9  Q.   So that there were two school days between the night of

10  the incident and the first day of Christmas vacation?

11  A.   Yes.

12  Q.   All right.  When was the first day of school after

13  Christmas and New Years?

14  A.   It would have been Wednesday, January 2nd of 2002.

15  Q.   You testified, I think yesterday, that on January 9th,

16  R.P. was sent to you after an outburst in Vikki Scully's

17  office -- and I believe Vikki testified to the same effect?

18  A.   Correct.

19  Q.   What day of the week was January 9th?

20  A.   That would have been the following Wednesday.

21  Q.   So the kids came back on January 2nd, and the outburst

22  was on January 9th, seven days later?

23  A.   Yes, both Wednesdays.

24  Q.   How many days of school were there after the kids got

25  back from vacation, up to January 9th?

106

1  A.   Just school days, not the weekend?

2  Q.   School days?

3  A.   Am I including the 2nd?

4  Q.   Yes.

5  A.   The 9th would have been the 6th day.

6  Q.   The 9th was a Wednesday?

7  A.   Yes, it was.

8  Q.   And the day the police came was when?

9  A.   That would have been the 11th.

10  Q.   That was a Friday?

11  A.   It was Friday, the 11th, 2002.

12  Q.   The investigation conducted by Janet Woods and you was

13  conducted when?

14  A.   The 9th and the 10th.

15  Q.   And the police were there the third day?

16  A.   Yes, they were.

17       MR. MARNEN:  Your Honor, I would move the admission

18  of Defendant's Exhibit I.

19       THE COURT:  It's admitted.

20  BY MR. MARNEN:

21  Q.   Ms. Cappabianca, I'd like to now show you what's been

22  marked as Defendant's Exhibit J, and I think we can do it on

23  the reader, let's find out.  What is this document, Defendant's

24  Exhibit J?

25  A.   This would be a copy of R.P.'s past attendance record.


107


1  Q.   For the school year 2001-2002?

2  A.   Yes.

3  Q.   Let me put it on the reader then.  Are you able to read

4  that, Ms. Cappabianca?

5  A.   Yes, I am.

6  Q.   Okay.  I'd like to have your help, if I may, in reading

7  this.  Let's look at the left-hand column, appears to have the

8   months on it, do you see that?

9   A.   Yes, I do.

10   Q.   August through June on the left.  And then if we look at

11   the month of October and follow over in those boxes to the

12   right, under the columns headed the 30th and 31st there are

13   some marks, do you see that?

14   A.   Yes, I do.

15   Q.   First of all, what are the 30th and 31st, are those days

16   of the month?

17   A.   Yes, they are.

18   Q.   On one of the marks below those, looks like "P" and "A",

19   what does that mean?

20   A.   "P" actually means that she was present on October 30th,

21   that she was in PASS that evening.  PASS is a program that we

22   have for -- a detention program for after-school suspension --

23        THE COURT:  Slow down a little bit.

24        THE WITNESS:  Do you want me to repeat that.

25   BY MR. MARNEN:


108


1   Q.   You're moving too fast.  Just go ahead and describe the

2   PASS program?

3   A.   It's a program, after-school suspension, and it's for

4   students who may have violated -- something from the discipline

5   policy, and it runs from 3:30 to 6:30 at night.

6   Q.   Now, as we look at Exhibit J, some of those boxes on

7   there have no marks in them.  Do you notice that, for example,

8   on August 29th there, it is completely blank, do you notice

9   that?

10  A.   Yes.

11  Q.   What does that mean?

12  A.   She wasn't assigned PASS that evening.

13  Q.   So if there's a mark in the box she was assigned it and

14  she either was there or not there?

15  A.   A "P" would indicate that she was present, and an "X"

16  would indicate she was absent.

17  Q.   And a blank means she wasn't assigned to go that day?

18  A.   Correct.

19  Q.   Okay.  So if we look at the month of December, on

20  December 7th there's an "X" there, that means what?

21  A.   She did not attend PASS.

22  Q.   And she was assigned PASS and did not attend?

23  A.    Correct.

24  Q.    So if we go across there on the 10th, the same thing?

25  A.    Yes.


                                    109


1   Q.    But on the 11th she was assigned and attended?

2   A.    Correct.

3   Q.    I guess 12th through the 14th she was assigned but did

4   not attend?

5   A.    Correct.

6   Q.    And the same thing on the 16th, 17th, 18th and 19th,

7   right?

8   A.    Yes.

9   Q.    Now, under the 20th and 21st, it looks to me like there

10  is something different there from a "P" or an "X," is it

11  different?

12  A.    It's says "OSS."

13  Q.    What is it?

14  A.    OSS is out of school suspension.

15  Q.    I was going to ask you what that means, out of school

16  suspension?

17   A.   Yes.

18   Q.   Would you translate that, please, for the jury?

19   A.   If a child receives out of school suspension, then they

20   are to stay home between normal school hours under the

21   supervision of their parents.  Usually, if a child is suspended

22   from PASS, it's because they didn't attend PASS or something

23   subsequently happened while they were in school during the

24   school day that led to them being suspended from the PASS

25   program.


110


1   Q.   And then if we look at Exhibit J, in January she was

2   assigned PASS on the 7th, 8th and 9th?

3   A.   Yes.

4   Q.   And attended those days?

5   A.   Yes.

6        MR. MARNEN:  Your Honor, I move for the admission of

7   Defendant's Exhibit J.

8        THE COURT:  It's admitted.

9   BY MR. MARNEN:

10   Q.   Ms. Cappabianca, I'm going to show you the same document

11   concerning K.L.  I'm sorry, Mr. Olds, Defendant's Exhibit K.

12   If we could direct your attention to December, would you

13   translate the marks on there for us, please?

14   A.    In the month of December, on the 18th she was present in

15   PASS.  On 19th she was absent from PASS.  On the 20th she was

16   present.  On the 21st she was present.  And then is released

17   from the program.

18   Q.    And then in January?

19   A.    In January she was assigned PASS on the 7th, but she was

20   absent January 7th, January 8th, January 9th, January 10th,

21   January 11th and then --

22   Q.    Is that the week K.L. was in the hospital?

23   A.    Yes, it was.

24        MR. MARNEN:  I would move the admission of

25   Defendant's Exhibiit K, your Honor.


                                 111


1        THE COURT:  It's admitted.

2   BY MR. MARNEN:

3   Q.    I'm now going to refer you to Defendant's Exhibit L, Ms.

4   Cappabianca.  This is the same kind of document concerning

5    C.B.?

6    A.    Yes, it is.

7    Q.    Now, let's direct our attention, please, to December for

8    C.B.  And it looks like on the 17th he was assigned PASS and

9    was not there?

10    A.    That is correct.

11    Q.    And on the 18th he was assigned PASS and was present?

12    A.    Yes.

13    Q.    And the 20th and 21st -- I'm not sure I understand those.

14    A.    Can I explain.

15    Q.    Yes, please.

16    A.    On the 20th he was assigned PASS.  On the 20th there is a

17    "P" there, then an "X" over this.  If we look down further, the

18    PASS teachers keep varied records or did, it will explain to

19    you that he was originally there.

20    Q.    I'm going to point something out with my pen, do you see

21    that "PRES" -- do you see my pen on there?

22    A.    I'm sorry, yes, I do.

23    Q.    And then I see to the right of that 12/18?

24    A.    Correct.

25    Q.    Does that mean he was present on 12/18?

1  A.   Yes, it does.

2  Q.   Then to the right of that there's a 20, looks like with

3  an "X" through it?

4  A.   And with an explanation about it.

5  Q.   That says "walked out?"

6  A.   Yes.

7  Q.   Does that mean he was there some of the time and then he

8  left early?

9  A.   He chose to leave, yes.

10  Q.   And then in January C.B. was also assigned PASS and was,

11  from the "Xs" and "Ps", there some of the time and not there

12  other times?

13  A.   Correct.

14  Q.   He was there on the 7th, 8th and 9th, correct?

15  A.   Of January, yes.

16       MR. MARNEN:  Move for the admission of Defendant's

17  Exhibit L.

18       THE COURT:  It's admitted.

19  BY MR. MARNEN:

20  Q.   And then, Ms. Cappabianca, I'm going to show you

21  Defendant's Exhibit M, and this is the same document as with

22  regards to B.C.  By the way, Ms. Cappabianca, this is not the

23  original, this is obviously a photocopy?

24  A.   Yes, it is.

25  Q.   What do these documents look like in there original form?


113


1  A.   I don't know the size, but it's like an index type card,

2  a lot larger than index cards -- it has like a cardboard

3  texture to it.  And then it looks just like this on the bottom

4  part of this, which would be written on the backs of the card.

5  Q.   So the document is half the size of this one -- the

6  information on the bottom is on the back of it?

7  A.   Yes, it is.

8  Q.   Now, B.C. in December, what's happening there on December

9  3rd, can you tell?

10  A.   Okay -- it looks like it's a "P" to me.

11  Q.   Do those numbers down below help you?

12  A.   What I'm looking for -- but I don't even see December.

13  Oh, 12/3, yes, present.

14  Q.   All right.  It's right here, isn't it?

15  A.  Yes, it is.

16  Q.  And then to the right there's another "P" under the 5th?

17  A.  Yes, there is.

18  Q.  Then there's a word, looks like "release" after that?

19  A.  Correct.

20  Q.  What does that mean, if you know?

21  A.  That means that if she was assigned three days of PASS,

22  she served her three days of PASS.  She finished her assignment

23  and was released from the program.

24  Q.  Who would prepare these documents in the Erie School

25  District, this Exhibit M and the other ones we've been looking


114


1  at?

2  A.  Strong Vincent did this.

3  Q.  Who at Strong Vincent?

4  A.  We have teachers that work the PASS program.  When they

5  work that evening, then they are responsible for keeping track

6  of the student's attendance.

7  Q.  And where are these records maintained, are they

8  maintained there at the main office or where?

9  A.   Actually, they were in the assistant principal's for the

10  9th through 12th boys office, which is centrally located, so we

11  could all use it.

12  Q.   If you look at B.C.'s PASS attendance record after she

13  was released in December, she was not at PASS anymore that

14  month?

15  A.   Correct.

16  Q.   But in December she was back on -- I'm sorry, in January,

17  she was back on January 3rd?

18  A.   Yes, she was.

19  Q.   And she was present, correct?

20  A.   Yes, she was.

21  Q.   But she was assigned and absent on the 4th and 7th?

22  A.   Yes.

23  Q.   But on the 8th and 9th she was present?

24  A.   That is correct.

25  Q.   And also present on the 10th, 11th and 14th?


115


1  A.   Yes.

2        MR. MARNEN:  I would move the admission of

3   Defendant's Exhibit M, your Honor.

4          THE COURT:  It's admitted.

5   BY MR. MARNEN:

6   Q.   And last but not least, Ms. Cappabianca, the same record

7   concerning A.K, this is Exhibit N, as in November.  Ms.

8   Cappabianca, I think I've got the drill here and to move it

9   along, on December 11th A.K. was assigned PASS and he was not

10  present?

11  A.   Correct.

12  Q.   But on the 12th he was present, 13th absent, 14th

13  present?

14  A.   That is correct.

15  Q.   And on the day in question, on the day of the rape, he

16  was present in PASS?

17  A.   Yes, he was.

18          MR. MARNEN:  Move for the admission of Defendant's

19  Exhibit N, your Honor.

20          THE COURT:  It is admitted.

21  BY MR. MARNEN:

22  Q.   Ms. Cappabianca, I'd like to show you now what's been

23  marked as Defendant's Exhibit O, tell me, please, if you know

24  what this is, please identify the document if you can?

25  A.   This would have been attendance for R.P.


116


1  Q.   Let's take a look at this on the reader.  This is

2  attendance at Strong Vincent High School in 2001-2002?

3  A.   That's correct.

4  Q.   Give us and give the jury an idea how to read this, Ms.

5  Cappabianca, if you would?

6  A.   Okay.  If you go to where it has -- they'll actually have

7  the date -- 8/27 would be the first day of school, then 8/28.

8  Q.   That's right here, I'll try to follow along with you?

9  A.   Yes.

10  Q.   8/27, then it lists the dates, so they go down in order?

11  A.   Yes, they do.

12  Q.   So I guess November 1st was the 46th day of school, is

13  that what that means?

14  A.   I don't see that.

15  Q.   Down on the bottom of the page, 11/1, do you see that --

16  look at my pen?

17  A.   I don't see your pen.

18  Q.    That's my fault, I'm sorry.  This thing doesn't cover the

19  whole sheet.  Right here?

20  A.    Where the arrow is, yes.

21  Q.    And to the left of that is day 46?

22  A.    That would be day 46, we were 46 days in school.

23  Q.    That's not calendar days, that's school days, right?

24  A.    Those are school days, correct.

25  Q.    And then what are these columns here, "leg," what would

117

1  that be?

2  A.    That would be legal.  Unexcused is on the page, where you

3  use legal or unexcused, and the reason why.

4  Q.    I guess legal is a kind of absence?

5  A.    A legal absence, you would have to provide the home room

6  teacher with a note.  They're supposed to provide it within

7  three days.

8  Q.    Illegal is the one -- you don't follow the rules or you

9  just aren't there?

10  A.    It would be skipping school.  If they don't provide us

11  with a note so we know where they were.

12  Q.    And the "reason" column, what is that meant to convey?

13  A.    It's so that we know, usually put like a parent note,

14  doctor note, so we know what type of note they brought in.

15  After 10 days of absences, a child is required to bring in a

16  doctor's excuse.  So that helps us when I do attendance, I go

17  to court, this paper would help me when I go to court.

18  Q.    Directing your attention then to December 20th and 21st

19  of 2001?

20  A.    Yes.

21  Q.    And there's an "X" under legal, right?

22  A.    Yes, it is.

23  Q.    That means she was not there in school that day but

24  legally?

25  A.    Yes, I would have spoken to the parent and I would write


                                118


1  approved, they call me Ms. Cap.

2  Q.    We've heard that a lot, Cap is your nickname sort of?

3  A.    The younger students can say Cappabianca, but for some

4  reason the older students like to call me Ms. Cap.

5  Q.    And it says per "Cap, do you have any idea what that

6  means?

7  A.   I don't recall what the reason was.  But I know it was

8  something that would have caused an excused absence, yes.

9  Q.   When it says per "Cap" does that mean you would have

10  played some role in that absence?

11  A.   I would have okayed it being an excused absence, yes.

12       MR. MARNEN:  Your Honor, move the admission of

13  Defendant's Exhibit O.

14       THE COURT:  It's admitted.

15  BY MR. MARNEN:

16  Q.   Ms. Cappabianca, I'd like to show you now what's been

17  marked as Defendant's Exhibit P, and the question to you is

18  whether you can identify this two-page document?

19  A.   Am I suppose to tell you what it is?

20  Q.   Are you able to identify it, if you can, tell us what it

21  is?

22  A.   This is a withdrawal card.  Whenever a child withdraws

23  from a middle school or high school, they have to take this

24  card around to their teachers and the teachers sign it, put the

25  grade on that the child has earned at that point.  And many

119

1   times a teacher will communicate whether or not they still have

2   a book out.

3   Q.   What is the second page?

4   A.   The second page is, it's called a student assignment

5   sheet.  It's a placement letter.  We talked much about special

6   education through this trial.  It's says placement letter for

7   B.C.

8   Q.   Do both of these documents relate to the same student?

9   A.   Yes, it does.

10  Q.   Let me put it on the reader and we'll talk about it.  All

11  right, it says B.C. at the top, do you see that?

12  A.   Yes, I do.

13  Q.   That's the B.C. that we know in this case?

14  A.   Yes, it is.

15  Q.   And on the second line it looks like her home address is

16  supposed to go there, you can't read it on this?

17  A.   That is correct.

18  Q.   The third line, it says date, and someone has written

19  1/30/02?

20  A.   That is correct.

21  Q.   Does that mean January 30th, '02?

22  A.   Yes.

23  Q.   And to the right of that, it looks like there's something

24  else written, can you read that?

25  A.   Looks likes 1/28/02.


120


1  Q.   What does this card mean with respect to B.C. and what

2  does 1/28/02 mean?

3  A.   As I said before, when a child withdraws from middle or

4  high school, they have a withdrawal card.  Under where it says

5  reasons for leaving, maybe they put out of district, might have

6  moved to another school district.

7  Q.   This means that B.C. was moved out of Strong Vincent on

8  January 28, 2002?

9  A.   Correct.

10  Q.   And the second page?

11  A.   It had a reason why.  To me, if they're coming to me, I

12  want to know the reason.

13  Q.   What is the reason?

14  A.   Placement, she was placed somewhere.  It wasn't because

15  she transferred to another school or she was moving from a

16  school within our district, it was because she was being

17  placed.

18  Q.   What does W-12 mean?

19  A.   That's just the code that we use for placement when a

20  child is placed.

21  Q.   Does that mean some location?

22  A.   That would be like Edmund L. Thomas, a detention center.

23  Q.   Do you remember what W-12 means?

24  A.   It's written right next to placement.  There are

25  different codes, like out of district, I don't know what W-2 or

121

1  W-4, I don't know what they are.

2  Q.   You don't know if it's Edmund Thomas or whatever?

3  A.   I do not know.

4  Q.   Okay.  If we go to the second page, does that help you

5  out where she went?

6  A.   Okay.  This will tell me that her present assignment is

7  Strong Vincent High School with us.  And her new assignment

8  will be Perseus House alternative education.

9  Q.   Is that the PH/AEP there?

10  A.   Yes, it is.

11  Q.   What is Perseus House AEP, in terms of educational

12  placement?

13  A.   If a child is unsuccessful in a traditional school

14  setting and you've tried everything, and I'm not talking just

15  PASS, and you try many interventions to try to help shape the

16  child's behavior and it hasn't worked, then you put them in a

17  building where they may have more success and modify your

18  behavior.

19  Q.   And with respect to the case of B.C., why was she placed

20  in Perseus House, if you know?

21  A.   I'm not sure.  But can I go back.  That W-12 or whatever

22  it was they put on the first card, you would not have done that

23  for ADP.  So we were referring her to ADP, but she was placed

24  before we got her there.  Do you understand that?

25  Q.   Yes.


122


1       MR. MARNEN:  Your Honor, I would move for the

2  admission of Defendant's Exhibit P.

3       THE COURT:  It's admitted.  I'm inclined to push

4    ahead to try and finish up direct and then take a break.  How

5    much longer do you have on direct?

6        MR. MARNEN:  I'm trying to rush through these

7    documents, but I think I'll be in the vicinity of a half hour

8    after I get through these.

9        THE COURT:  Let's push ahead a little bit more.

10        MR. MARNEN:  All right.

11   BY MR. MARNEN:

12   Q.   Ms. Cappabianca, I'd like to show you the same kind of

13   document in relation to C.B. and try and speed this up.

14   Defendant's Exhibit Q, do you see this relates to  C.B., that's

15   the C.B. in this case, correct?

16   A.   Yes, it is.

17   Q.   The date on him is January 21, 2002?

18   A.   Yes, it is.

19   Q.   And it says reason for leaving out of district?

20   A.   That is accompanied with a W-3.

21   Q.   There is some handwriting on the left-hand side, do you

22   see that?

23   A.   Yeah, it's cutoff.

24   Q.   Sorry.

25   A.    Looks like a home and work phone number.  It has Chris


123


1   Ruhl's name on it.  I don't know, C. Ruhl maybe.  C. Ruhl on

2   the top.

3   Q.    Do you have a personal recollection as to when C.B. left

4   Strong Vincent High School?

5   A.    We met with his father after the incident, Ms. Woods and

6   I did.

7   Q.    If I could interrupt you one moment, when did you meet

8   with his father?

9   A.    Well, if you'd look at the attendance records, it was

10  either on the 9th or the 10th.  We met, I want to say, 4:30

11  that afternoon, it was after school hours.  He never came back

12  to school after that.  And there was that period, I'd say it

13  was the 10th, that we couldn't locate where he was.  We sent

14  home school visitors, we had reports that he was at Sacred

15  Heart school.  Eventually we found out he was at First

16  Christian Assembly.

17  Q.    So he didn't formally withdraw, he just disappeared?

18  A.    He just never showed back up, correct.

19  Q.   This was immediately after you and Ms. Woods interviewed

20  him and his father?

21  A.   Yes.

22  Q.   That would either be January 9th or January 10th, 2002?

23  A.   Correct.

24       MR. MARNEN:  I would move the admission of

25  Defendant's Exhibit Q, your Honor.


124


1        THE COURT:  It's admitted.

2  BY MR. MARNEN:

3  Q.   Ms. Cappabianca, I have a couple documents tacked

4  together here, Defendant's Exhibit R -- and just tell us what

5  type of documents they are and I will represent that they

6  relate to A.K.  Take the first page, just tell us briefly what

7  it is, then I'll put it on the reader?

8  A.   This is a paper that informs us, I don't know the

9  official title to this paper, but it's informing us that Ms.

10  Chrisman, who works for the Erie School District, she was the

11  special ed supervisor, that the team reviewed, that they okayed

12  or authorized the placement of A.K. to an alternative education

13  program.

14  Q.   And then the second page looks like the same kind of

15  document we discussed before?

16  A.   The withdrawal card, right.

17  Q.   The third page is what?

18  A.   This would have been from Chris Primavere, who was

19  actually in charge of the Perseus House alternative education

20  program, he sends this to us to let us know when the student

21  begins the program, attendance.  This would have been the date

22  that the student had his intake, where he goes with the

23  student, the parent, to go down and get acquainted with the

24  entire education program.

25  Q.   Rather than going through that process again, do these


                                    125


1  documents indicate that A.K. went to Perseus House AEP on

2  February 26, 2002?

3  A.   All the end of the school year, yes, it does.

4        MR. MARNEN:  Your Honor, move for the admission of

5  Defendant's Exhibit R.

6        THE COURT:  It's admitted.

file:///A|/RICHDAY4.TXT

7  BY MR. MARNEN:

8  Q.    Ms. Cappabianca, in December of 2001, what resources, if

9  any, were available at Strong Vincent to students there if they

10  needed help?

11  A.    We had a guidance counselor, actually two, one was for

12  7th, 8th and 9th, and one was for 10th, 11th and 12th grade

13  students.  Although, they were always available if needed.

14  We had Ms. Woods, who was the principal of the entire building.

15  There was Mr. Hart, who had 9th through 12th grade boys.  Ms.

16  Popochak was responsible for the 9th through 12th grade girls.

17  If something happened in the middle school and if I was not

18  available, they would be more than happy, we were a team, we

19  worked together.  We had a school nurse.  We had Mr. Ruhl, who

20  we already established was our mental health specialist, he was

21  housed right in our building, he was there.  We had what is

22  called the intensive juvenile delinquents program or IJDP, at

23  that time was Mindy DiBello, she worked with our students as

24  well.

25  Q.    I think I heard during Ms. Woods' testimony the

126

1   initials -- and I always forget?

2   A.   IJDP.

3   Q.   IJDP, is that person also available for that kind of

4   service?

5   A.   Yes.  Her name is Mindy DiBello.  Sometimes students were

6   in the program, the judge would say you have no choice, you

7   have to go.  But she worked very well with lots of our

8   students.

9   Q.   Did officers Wally Love and Ron Slupski play any role in

10  this regard?

11  A.    They were always available, so yes.  I mean they were

12  always someone that the kids could talk to.  And they often

13  assisted me if I needed it, help.

14        THE COURT:  Mr. Marnen, can I see both counsel at

15  side bar just for a second.

16        (At side bar on the record.)

17        THE COURT:  This is just a gentle nudge to try to

18  get into this charge conference this afternoon.  My suggestion

19  is let's cut to the chase.

20        MR. MARNEN:  Your Honor, I was just going to do

21  that.

22        (End of discussion at side bar.)

23  BY MR. MARNEN:

24  Q.    Ms. Cappabianca, let's go to December 20, 2001.  We all

25  know that is the day after these rapes occurred?

127

1  A.    Yes, it was.

2  Q.    Did you acquire any information that day that may have

3  related to those rapes?

4  A.    Not that I was aware of.

5  Q.    You mentioned during your examination by Mr. Olds

6  something about hall talk?

7  A.    Yes.

8  Q.    And what did you hear and who said it?

9  A.    It was sometime on the 20th, it was between change of

10  classes, I couldn't tell who said --

11        THE COURT:  Ma'am, you're talking too fast.  Slow

12  down a little bit, take your time.  Start that again, Mr.

13  Marnen, would you, please.

14  BY MR. MARNEN:

15  Q.    What time of the day did you hear the hall talk?

16  A.    I don't know what time it was.

17  Q.    Where were you?

18  A.    It was between the change of classes, I was in the hall.

19  Q.    In the middle school area?

20  A.    Yes.

21  Q.    Why were you in the hall?

22  A.    Between the change of classes we're required, teachers

23  and myself as well, to be out in the hall to supervise the

24  students.

25  Q.    And what did you hear?


                                128


1  A.    I heard --

2  Q.    As best you remember exactly?

3  A.    Did you hear what happened between K.L. and C.B. last

4  night.

5  Q.    Is that an exact quote?

6  A.    Not exact.

7  Q.    A rough approximation?

8  A.    Yes.

9  Q.    Who said it?

10  A.    I don't know that answer.

11  Q.   Was it a student?

12  A.   Yes.

13  Q.   Boy or girl, do you remember?

14  A.   I don't know.

15  Q.   What if anything did you do in response to hearing that?

16  A.   At the time I really, I guess I didn't really think about

17  it, there's 600 kids in the building, there are 200 probably in

18  my vicinity.  You don't want to them to loiter, you want them

19  to get from one class to the next without any problems

20  occurring.

21  Q.   What was your interpretation of the comment?

22  A.   I thought that there was an attraction developing between

23  two students.

24  Q.   Why did that occur to you?

25  A.   I just thought it was an odd combination, I really had

129

1  never seen K.L. and C.B. together.

2  Q.   Did you at any time that day have a conversation with

3  K.L. about that information you heard?

4  A.   I did after school.

5   Q.    What time of day?

6   A.    School let's out at three, we go out to supervise the

7   kids to make sure that they all go where they're supposed to go

8   at the end of the day off school premises and home.  And so

9   from when I returned from outside, I was going to check on the

10  PASS rooms, so it would have been roughly 3:15.

11  Q.    And where did the conversation take place?

12  A.    In the front hallway.

13  Q.    Did you approach K.L. or did she approach you?

14  A.    I approached her.  She was on her way to the PASS room.

15  Q.    What was your purpose in approaching her?

16  A.    When I had saw her, it reminded me of what I had heard.

17  So I brought it to her attention I was hearing things.

18  Q.    What exactly did you say, if you remember, or closely

19  approximate, if you can?

20  A.    I said I was hearing things about you and C.B., I don't

21  know if they're true.  And she said yes, they are.  I said

22  these are things that you would do when you're older and care

23  about each other.

24  Q.    Why did you say that to her?

25  A.    Because she had indicated that something had occurred.

130

1  Being 12, I assumed it was they were holding hands or they were

2  kissing.  To me that's bad enough for a 12-year-old, that was

3  my response to her.

4  Q.    What was K.L.'s demeanor, what was she acting like at

5  that time, was she agitated or happy?

6  A.    No, she was very calm.  She looked darling because she

7  was all made up, she had lipstick on, her hair down, she was

8  very concerned about her appearance, she is a darling girl.

9  Q.    Did anything about her conduct or anything about what she

10  said raise your suspicion -- were you suspicious at all?

11  A.    That something was wrong?

12  Q.    Yes.

13  A.    No.

14  Q.    Did K.L. tell you that the previous evening she had been

15  raped?

16  A.    No.

17  Q.    Did she tell you that she had been forced to do any sex

18  acts?

19  A.    No.

20  Q.    Did she tell you that she performed oral sex the previous

21  evening?

22  A.    No.

23        MR. OLDS:  Your Honor, these are leading questions.

24        THE COURT:  No, they're not, overruled.

25  BY MR. MARNEN:


                              131


1  Q.    Did you have any conversation with C.B. that day on the

2  same topic?

3  A.    Well, I actually walked down with K.L. to PASS, and when

4  we got there, C.B. was there.

5  Q.    Why did you walk K.L. to PASS?

6  A.    I usually go down there anyway, we were having a

7  conversation, I figured she was going there, I would go down

8  there.

9  Q.    Were you there to protect her?

10  A.    I didn't, at this time I didn't know she needed

11  protected, so no.

12  Q.    Why did you go to PASS?

13  A.    I wanted to make sure the students I assigned are there.

14   Q.   And did you see K.L. enter the room and sit down?

15   A.   Yes.  As a matter of fact, she sat down right next to

16   C.B., that is when I had asked him.

17   Q.   Did she -- was there anything about her conduct that

18   appeared to demonstrate nervousness or fear around C.B.?

19   A.   No.

20   Q.   Did you have any conversation with C.B.?

21   A.   I asked him exactly the same thing I asked her.

22   Q.   Did you ask him about that in K.L.'s presence?

23   A.   Yes, I did.

24   Q.   What did he say?

25   A.   He said nothing is going on, that she is saying things


132


1   because she likes me.

2   Q.   What did K.L. say, if anything?

3   A.   She did not say anything.

4   Q.   Did you follow the conversation any further?

5   A.   No, I told him that they needed to stay away from each

6   other.

7   Q.   Was that it or was there more?

8   A.   That was it.

9   Q.   Did you have a conversation that day with Janet Woods on

10  that topic?

11  A.   Yes, I did.

12  Q.   Did you have that conversation, was that your only

13  purpose in seeing Janet Woods to talk about that?

14  A.   No, that was at the end of the day, I was at her room.

15  Q.   Why were you in Janet Woods' room?

16  A.   I often went down there at the end of the day kind of

17  talked about things that happened at the end of the day.

18  Q.   Was this the only topic, this K.L.-C.B. thing, was that

19  the only topic you discussed with Ms. Woods?

20  A.   No.

21  Q.   Was it the first topic you raised?

22  A.   I don't remember that.

23  Q.   What did you say to Ms. Woods about this topic?

24  A.   I said I think something is going between K.L. and C.B.,

25  I may not have used a word like develop.  She told me to watch

133

1   it, if some something was, we'll know.

2  Q.   All right.  Let's direct your attention now to January 9,

3  2002.  Did you have occasion that day to have any conversation

4  with R.P.?

5  A.   Yes.

6  Q.   And what was the occasion for that happening?

7  A.   She was referred to me from her teacher, Ms. Scully.

8  Q.   Did Ms. Scully come in person, did she send her by

9  herself?

10  A.   I don't know, I was right across the hall, so often she

11  would just send her across.

12  Q.   You learned what about the referral?

13  A.   I asked them there what happened, what led up to that,

14  whatever happened.  It was through my questioning that she was

15  able to tell me, express to me what had happened that evening.

16  Q.   Were you told what happened in Ms. Scully's classroom

17  that caused her to refer her to you, her to refer R.P. to you?

18  A.   I know it was because of language that she had used in

19  the classroom.  Ms. Scully never had seen that from R.P., that

20  behavior, so she was concerned.  Is that what you're asking me?

21  Q.   I just wanted to know what the event was that caused her

22  to be there in front of you?

23  A.   I don't know what led her to using, she said something,

24   the "F" word, I don't know what led her to say that, no.

25   Q.   So you carried on a conversation then with R.P. about

134

1   what led up to that?

2   A.   Yes.

3   Q.   What did she tell you?

4   A.   I can't say what she said word for word, but I can tell

5   you the content of it.  I asked her why she would, were things

6   bothering her, were people bothering you.  She said they wanted

7   her to perform oral sex.  Although, I don't know if that's the

8   term she used.  I said why were they going to do that.  That's

9   when she told me about that evening.

10   Q.   How much time did you spend with her?

11   A.   You know what -- I don't think it was very long because

12   of the nature of what she had explained to me that took place.

13   I know I went right down to Ms. Woods.

14   Q.   So you went from your office on the second floor to the

15   main administration office on the first floor?

16   A.   Yes.

17   Q.   Did you take R.P. with you?

18  A.   Yes.

19  Q.   And did you see Ms. Woods right away, did you have to

20  wait or what?

21  A.   I don't know.

22  Q.   Did you and Ms. Woods then discuss the matter with R.P.?

23  A.   Yes.  I talked to Ms. Woods first.  But then, yes, we

24  did.

25  Q.   And did R.P. describe what happened on the evening of


135


1  December 19th?

2  A.   She did.

3  Q.   Was she able to identify the assailants?

4  A.   Yes.

5  Q.   All of them, all three?

6  A.   Two, I thought there were two of them.

7  Q.   I'm talking C.B., B.C., and A.K.?

8  A.   Yes.

9  Q.   When did you first become aware, if you ever did, about

10  the incident on the stairwell on January 7, 2002?

11  A.    It would have been through Ms. Woods and I were trying to

12    gather the facts of what happened on the 19th.  It either would

13    have been on the 9th or the 10th.

14    Q.    Did you also become aware of another assault at the

15    laundromat?

16    A.    Yes.

17    Q.    Did R.P. tell you about that, too?

18    A.    Yes, she did.

19    Q.    Did you learn about that on the 9th or 10th?

20    A.    Yes.

21    Q.    Tell me, please, what you did after that, you and Ms.

22    Woods, if anything, in relation to this matter?

23    A.    As far as with R.P. or in general?

24    Q.    With anybody, dealing with this sexual assault that

25    occurred on December 19, 2001?


                                    136


1    A.    We spent -- I didn't even go back to my office for the

2    next two days.  We spent the whole time trying to figure out

3    exactly what took place.  We did have conflicting stories.  We

4    had eight or so kids that we had to interview, they all kind of

5    perceived things a little differently.  We had to gather the

6   facts. We had to find time. I know Ms. Woods was on the phone

7   with the central administration office, special education

8   supervisors. There was a whole slew of people that we needed

9   to confer with. We called the parents, we had parents in.

10  Q.   Did you identify all of the kids who were there that

11  evening?

12  A.   I believe we did, yes.

13  Q.   Are you able to remember their names now?

14  A.   I think so, would you like me to list them?

15  Q.   First names only?

16  A.   There was B.C. Do you want everyone that was there or --

17  Q.   Yes.

18  A.   There was B.C., Y.H., C.A., A.F., C.B., A.K., R.P.,

19  K.L. -- I think that's it.

20  Q.   Was every one of those kids interviewed on the 9th and

21  10th?

22  A.   Yes. Oh, no, K.L. wasn't in the building at time,

23  everyone else was.

24  Q.   Now, there's been testimony about Plaintiff's Exhibit 58,

25  I'm going to put it on the reader. What is that document, Ms.

1  Cappabianca?

2  A.   Ms. Woods had asked me to write up a summary so that when

3  the police came to the building on the morning of January 11th,

4  that we'd have something to provide to them.  It's my summary

5  of the events.

6  Q.   Do you know when you prepared this, there's a date on it

7  of January 10th?

8  A.   It says January 10th, I know I did it at home.  So I'm

9  assuming I did it on the 10th.

10  Q.   At any time between December 19, 2001 and January 9,

11  2002, not counting January 9th, did R.P. ever discuss with you

12  the rapes of December 19, 2001?

13  A.   No.

14  Q.   At any time during that period of time, did she come to

15  you and attempt to talk with you and you refused to listen to

16  her?

17  A.   No.

18  Q.   At any time did you telephone her father at home and tell

19  him to come to see you and that R.P. was dirty and filthy and

20  needed discipline?

21  A.   No.  I called him on a few occasions, but never said

22  that, no.

23  Q.   Do you have a practice in regard to handling the use of

24  profanity by students in school?

25  A.   Yes.

138

1  Q.   What is your practice?

2  A.   I would have followed the discipline handbook, I believe

3  at the time because it changed, for a first offense it was a

4  Saturday detention.  Whenever we assign Saturday detention or a

5  program of after-school suspension or out-of-school suspension,

6  we contact the parent.  If you can't get a hold of them by

7  phone, then oftentimes I would send what we call a home school

8  visitor, who would go to the house and let them know that Ms.

9  Cappabianca needs to speak with them ASAP.  So yes, some means

10  of communication.  They need to know where an educational

11  assignment was going to be, either Saturday or after school.

12  Q.   Do you pay attention to the language you use in

13  discussing these kinds of situations with parents?

14  A.   Yes, I do.

15  Q.    Are words like dirty and filthy as descriptive terms of

16  students ever used by you?

17  A.    Never.

18  Q.    Why not?

19  A.    I like to think that I'm professional in all aspects of

20  my job.  I try to put myself in place of the parent when I'm

21  talking to them.  I know how I would feel if it was my child, I

22  try to be as tactful as I can.  But I also let them know

23  exactly what happened.

24  Q.    Did you have any contact with Denise L. during the week

25  of January 7, 2002, concerning this matter?


139


1  A.    I spoke with Denise L. on January 7th right after K.L.

2  was admitted.  It was not regarding this matter.  She informed

3  me that she had hurt herself over the weekend, she was

4  admitting her into the hospital, she would collect work for

5  her.

6  Q.    Did Denise L. accuse you of withholding information about

7  this incident?

8  A.    No, never.

9   Q.    Was that a telephone conversation or in person?

10  A.    No, it was telephone.

11  Q.    Did you, during the week of January 7, 2002, meet with

12  Robin J. and T.N.?

13  A.    No.

14  Q.    Do you know Robin J. and T.N.?

15  A.    T.N. is a student.  I don't recall her very well, I know

16  the name.  I didn't recognize her when she showed up here the

17  other day.  But she was a former student of Strong Vincent.  I

18  do not know her mother, nor would I have met with her on

19  January 9th, 10th or 11th.  We devoted that entire time to

20  trying to figure out what happened to these girls.

21  Q.    Have you ever met with Robin J. about anything?

22  A.    I don't recall ever meeting with her.  I know she

23  withdrew her daughter and, typically, I do meet with parents

24  whenever they withdraw their child.

25  Q.    Did you ever tell Robin J. or any other parent to keep

140

1   this child away from R.P.?

2   A.    No.

3   Q.   Because she was promiscuous?

4   A.   Never.

5   Q.   Were you here when Robin J. used the term that you

6   supposedly used when you met with her?

7   A.   Yes.

8   Q.   Do you use language like that in front of 12-year-olds?

9   A.   No.  Or in front of parents.

10  Q.   Were you also here when she described a gesture you made?

11  A.   Yes.

12  Q.   Did you ever use that gesture in front of anybody?

13  A.   No.

14       MR. MARNEN:  No further questions, your Honor.

15       THE COURT:  Members of the jury, we're going to take

16  a five-minute recess, come back and conclude the case.

17       (Recess from 2:55 p.m.; until 3:05 p.m.)

18       THE COURT:  All right, Mr. Olds.

19              CROSS-EXAMINATION

20  BY MR. OLDS:

21  Q.   Ms. Cappabianca, you testified that you didn't, R.P.

22  didn't tell you what happened that night at any time prior to

23  January 9, 2002?

24  A.   Correct.

25  Q.   R.P.'s diary has been admitted into evidence, I want to

141

1   show the jury a page -- Dr. Schachner read this.  I'm going to

2   start reading right here, this line right here, (indicating),

3   and then ask you a couple questions.  R.P. wrote "I think that

4   she was thinking about what happened and how I felt and what I

5   remembered.  It made me more sad than I was" -- I can't make

6   out the word.  "But when Ms. Cap wouldn't do anything about

7   what happened and my dad yelled at me when Ms. Cap wanted me to

8   be sent home about saying sucking dick.  And that hurt my

9   feelings so bad, I really started to cry and went out of Ms.

10  Cap's, slammed her door, I couldn't stop crying.  Then I got

11  five days PASS and I got harassed, raped after PASS."

12  The date of that entry is a little confusing, it says January

13  4th, Monday.  The calendar that your counsel offered as an

14  exhibit shows that January 4th was a Friday, is that accurate?

15  A.   Yes.

16  Q.   Now, R.P. wrote about that incident in her diary -- R.P.,

17  by the way, the only way that R.P. could be assigned to PASS

18  would be if you assigned her to PASS, is that right?

19  A.    If I was busy and another administrator, like I said, Mr.

20  Hart, Ms. Potocki did.  Generally, it's me, yes.

21  Q.    And R.P. was -- if January 4th was a Friday, and that

22  incident happened on January 4th, R.P. was in PASS on Monday,

23  Tuesday and Wednesday of the next week, is that accurate,

24  that's what the school district's records show?

25  A.    Yes, she was.

                                142

1  Q.    Then you would have to send her to PASS, is that right?

2  A.    Yes.

3  Q.    You would send her to PASS for saying sucking dick,

4  wouldn't you?

5  A.    Yes, I would.

6  Q.    And you had a conversation with her in your office about

7  that, isn't that true?

8  A.    I don't remember the conversation, but if she said it, I

9  would have had a conversation with her.

10  Q.    Right.  And R.P. was 13-years-old at the time?

11  A.    She was 13-years-old when the rapes took place, so yes.

12  Q.    And she indicates in there, her diary also indicates that

13  there was contact between her dad and her after you had her in

14  your office; but you deny that happened?

15  A.  I denied calling her a filthy little girl.  I have talked

16  to her father on a couple occasions.  Whenever I assign PASS on

17  Saturdays, I talk to the parent.

18  Q.  You recognize Dr. Schachner testified today that he

19  thought back in 2001, 2002, K.L. was functioning on the level

20  of an eight or nine-year-old child?

21  A.  Yes, he did say that.

22  Q.  And based upon her intelligence testing, her educational

23  testing, that's accurate about where she was functioning at

24  that time, isn't that accurate?

25  A.  Probably, yes.


143


1  Q.  Eight or nine-years-old?

2  A.  Probably all the people involved were, because they were

3  all --

4  Q.  R.P., I mean, these are kids, right, R.P., K.L., they're

5  kids, right?

6  A.  Yes, they are.

7   Q.   And if you had R.P. in your office and she was there

8   because she had an outburst in music class saying quit asking

9   me to suck dick, would you ask her and let her explain why she

10   used that language?

11   A.   Yes, I would have.

12   Q.   And then you would send her to PASS?

13   A.   I wouldn't have sent her to PASS if she would have told

14   me what happened.  I wouldn't refer what I read in the letter,

15   just says as in sucking dick.  I've read her diary, if you read

16   on, she goes on to say about how she didn't tell Ms.

17   Cappabianca.

18   Q.   So you have read her diary?

19   A.   Absolutely.  Not every page, just like the doctor said he

20   didn't, I didn't read every page, but I read parts.

21   Q.   She testified that she told you or tried to tell you?

22   A.   Yes, she did.

23   Q.   Interestingly -- you testified that on January 9th, that

24   would be January 9th R.P. was in PASS that night as well,

25   right?

144

1    A.    Yes, she was.

2    Q.    Before we get to that, over here there's a notation on

3    these records that says OSS, and you said that means

4    out-of-school suspension?

5    A.    Yes, I did.

6    Q.    How could R.P., who was a special needs --

7    A.    She was learning disabled.  If they're EMR, if they've

8    not been excluded from school, she was learning disabled, you

9    have 10 school days, actually 15.

10    Q.    So could C.B. have been?

11    A.    C.B. was EMR.

12    Q.    And B.C.?

13    A.    B.C. was EMR.

14    Q.    So R.P. could be suspended but not C.B.  Now, I'm a

15    little confused, well -- let's just get back to this PASS.  On

16    January 9th, you meet with R.P. after this outburst?

17    A.    Yes.

18    Q.    And she tells you, she begins to tell her story, that is

19    so critical you go down to Ms. Woods, for the next two days

20    you're debriefing students, is that right?

21    A.    Yes.

22  Q.    Then R.P. has PASS that night, she attends, is that

23  correct?

24  A.    Yes.

25  Q.    Of course, this happens to be one of the nights that C.B.


145


1   is in PASS, right?

2   A.    Yes, it is.

3   Q.    You send her and C.B. to PASS together knowing that C.B.

4   raped her two weeks ago, right?

5   A.    They were both at PASS, yes.  May not have been in the

6   same room, we did have more than one room, depending on the

7   number of students, but yes.

8   Q.    You don't know as we sit here today whether they were in

9   the same room or a different room?

10  A.    No, we do not.

11  Q.    You testified about a conversation that you had with

12  K.L., who we agree functioned on a level of an eight-year-old

13  or nine-year-old on December 20th -- 19th, excuse me, 2001.  Do

14  you recall what you said -- what you said to her at your

15  deposition -- after she said yes, do you recall what you

16   testified that you said to her?

17   A.   Those are things that --

18          THE COURT:  Ma'am, slow down, start that all over

19   again, please?

20          THE WITNESS:  Those are things that people do when

21   they're older adults or in love and care about each other.  I'm

22   not sure which words.

23   BY MR. OLDS:

24   Q.   You said when two people love and care about each other,

25   that these are things that people do when they love and care

146

1   about each other.  So that's what you told K.L., who functions

2   at a level of an eight-year-old or nine-year-old, that's what

3   you told her that night?

4   A.   Yes.

5   Q.   And if we sort of de-construct or analyze that language,

6   what you're really telling her is be careful, K.L., right?

7   A.   I wasn't condoning anything, no, that's what I'm telling

8   her.

9   Q.   Well, you're telling her, I mean, you must be telling her

10  that it's not a good idea, right, you should wait until you're

11  older and in love to do that kind of thing; I mean you were

12  telling her that, right, this nine-year-old girl, I mean

13  12-year-old, who has the mental capacity of a nine-year-old?

14  A.    It was just something I said, I don't think I really put

15  a lot of thought into it.  It was a brief conversation on the

16  way down the hall to the PASS program.

17  Q.    In terms of a child, a nine-year-old child, trying to

18  tell you that they had been raped the night before, that a boy

19  had inserted a penis into their mouth, what would you expect a

20  child functioning as a nine-year-old to be able to say to you

21  to describe that act?

22  A.    First of all, Mr. Olds, she didn't come to me, I saw her.

23  And I went up to her.  Secondly, I don't know, maybe by giving

24  the option, I heard things, that she was to start crying, I

25  don't know, I can't speak for why she wasn't able to articulate


147


1  it to me.  Yes, we established she has a eight or nine-year-old

2  maturity level.  I don't know, the conversation never went

3  there.  I told you yesterday she's 12, I would have never ever

4   assumed oral sex or sexual intercourse.  She had the mind of a

5   nine-year-old, I don't know if she knew what sexual intercourse

6   was or oral sex.

7   Q.   You didn't bother to maybe call her father or send a

8   professional or say, ma'am, this child, who I know is extremely

9   limited, is telling me that something happened last night and

10  I'm not going to have the care, the empathy, the sympathy for

11  this child, to have maybe a professional talk to her and say

12  what did happen, you didn't do that, right?

13  A.   There are usually certain signs you can tell if a child's

14  distressed or upset.  She didn't exhibit those signs.  We

15  walked into the PASS room, she sat next to C.B.  I'm sorry I

16  did not read into anything more than what I thought had

17  happened.

18  Q.   You just made that up that she sat next to C.B.?

19  A.   No, I did not make that up.

20       THE COURT:  Hang on a second, you're talking right

21  over her now.  You have to slow down.  Go ahead.

22  BY MR. OLDS:

23  Q.   So five years after this event you now remember that she

24  sat next to C.B. that day?

25  A.   It was a big event in everyone's life.  I would never

148

1    equate what happened to the effect it has had on all of us in

2    that school.  But it's something in a person's career you never

3    forget, Mr. Olds.  I may not remember exactly the words I used,

4    I remember that incident.

5    Q.    And that night, December 19th, C.B., apparently after you

6    talked to him, he just got up and left PASS, right?

7    A.    Apparently.

8    Q.    Do you think that might have been a sign of guilt?

9    A.    I can't answer that, I'm not C.B.

10   Q.    I think that you mentioned that -- and these are the

11   words I wrote down, that when you heard about K.L. and C.B.,

12   you mentioned that you thought that there was an attraction

13   developing, is that right?

14   A.    Yes.

15   Q.    You used that word?

16   A.    Yes.

17   Q.    You thought, well, K.L. must like C.B., right?

18   A.    Or C.B. likes her, mutual.

19   Q.    C.B. told you, well, K.L. likes me, Ms. Cap, that's just

20   stories, it's not true what you're hearing, that's what C.B.

21   said to you?

22   A.   Yes, he did.

23   Q.   Is it your experience that kids functioning at an eight

24   or nine-year-old level have these sexual attractions?

25   A.   I think -- I don't want to make generalizations, but I

149

1    think it's uncommon for middle school kids, when their bodies

2    are developing, even though their minds may be cognitively

3    impaired, to have certain feelings towards one another.  But I

4    can't make that generalization, every child is different.  And

5    every child develops differently and at different rates.

6    Q.   Now, of course, people in love don't rape each other, is

7    that right?

8    A.   I think it's happened.

9         MR. OLDS:  Your Honor, I don't have any other

10   questions.

11        THE COURT:  Mr. Marnen.

12              REDIRECT EXAMINATION

13   BY MR. MARNEN:

14   Q.   One question, what does EMR mean?

15   A.   I'm sorry, EMR is educable mentally retarded, meaning you

16   can educate them.

17          THE COURT:  Say that one more time?

18          THE WITNESS:  Okay.  Educable mentally retarded.

19   You can educate them, they're able to be educated.

20          THE COURT:  Thank you, you are excused.

21          MR. MARNEN:  Thank you.  We rest, your Honor.

22          THE COURT:  All right.

23          MR. OLDS:  We have no rebuttal, your Honor.

24          THE COURT:  Mr. Olds had run through his exhibits at

25   the conclusion of his case, let me just ask you, are there


                          150


1   exhibits you need to move, are you all moved up?

2          MR. MARNEN:  I'm moved, I think.  I know I did, I'm

3   finished.

4          THE COURT:  Members of the jury, that concludes the

5   case, the testimonial part of the case.  I want you here Monday

6   morning at 9:00 a.m.  Friday is your day off.  Monday morning

7   you will hear the closing arguments of the lawyers and I will

8   give you my legal charge.  Once the lawyers get their things

9   packed up, I want to see you in chambers because I want to

10  start reviewing your points for charge.  So that we can get

11  working on that tomorrow.  We're in recess until 9 o'clock on

12  Monday.

13        (Whereupon, the Jury was excused at 3:25 p.m., for

14  the day; and at 3:35 p.m., reconvened in Judge's Chambers for a

15  charge conference.)

16        THE COURT:  We're in here for a charge conference.

17  What I would propose we do is I'm going to go through these

18  points and indicate one by one whether I think we're going to

19  give it.  If not, whether it's already been given or whether I

20  think we're not going to give it.  I'd be willing to entertain

21  any discussion on any of those points.  Let's start, since

22  they're the longest, let's start with the plaintiffs' points.

23        With respect to one, it seems to me since it's a

24  Title IX case, we need to tell the jury what Title IX says,

25  that language will work its way in.


151


1        I'm not going to give two as stated.  But I'll come

2   back to that.

3           Number three is unnecessary, it's a legal fact of

4   life, the jury doesn't need to know it.

5           Four, they will be charged on appropriate person,

6   but I'm not going -- this is long and fractioned into a million

7   pieces, really doesn't have to be.  You're going to get an

8   appropriate person charge.  In essence, Bostic_v._Smyrna_School

9   District case, that's the running law in this circuit

10  consistent with Davis.

11          You'll get a charge similar to five.

12          Six, you'll get a charge, as I say, on an

13  appropriate person.  Incidentally, on the question of

14  appropriate person in this case, it strikes me that is an issue

15  that the jury need not pass on.  Because it's beyond dispute

16  that both Ms. Woods and Ms. Cappabianca were appropriate

17  persons, do you agree?

18          MR. MARNEN:  I agree.

19          MR. OLDS:  I agree.

20          THE COURT:  So the jury will be instructed that they

21  are appropriate persons.  I think seven is an accurate

22  statement of the law.  And I think I just read Bostic on the

—————

23  bench, that's accurate verbiage.  Bear in mind if you have any

24  objection on any of this, you're remaining silent at your own

25  risk.

152

1       Eight.  I don't understand eight, I'm not going to

2  give it, it's convoluted.  We will charge on deliberate

3  indifference, but I'm not going to give it separately like

4  that.

5       MR. OLDS:  Judge, I had envisioned that you would

6  give, your instructions would take the form of a narrative and

7  one of these might be a sentence.

8       THE COURT:  That is essentially right.  Do you have

9  an objection to 10?

10       MR. MARNEN:  No.

11       THE COURT:  Ten will then be the definition for

12  deliberate indifference that we give.

13       I'm not going to give 11, it would difficult for a

14  lawyer to understand it.  Seems to me 10 says it all on

15  unreasonable in light of the known circumstances.

16       MR. OLDS:  The issue about 11 is that, and I think

17  it would be appropriate for you to address it in your

18  instructions, that this knowledge can be proved by

19  circumstantial evidence.

20       THE COURT:  The jury will be instructed on

21  circumstantial evidence.  Not with respect to any particular

22  matter, but with respect to any matter on evidence, there are

23  two types, circumstantial and direct.

24       Twelve, let me ask a fundamental question.  Here if

25  the jury concludes that the administrators or one had actual


153


1  notice of a pattern of harassment post December 19th assault,

2  is it, as the evidence has come in, isn't it beyond dispute but

3  that the children were deprived of an educational opportunity?

4       MR. MARNEN:  Yes.

5       THE COURT:  That will be taken from the jury.  That

6  was one of your prongs, that's why I raised it.  It was so

7  pervasive and offensive that it effectively deprived them of

8  educational opportunities or benefits.  I'll come back to that.

9   For present purposes if they find -- it is accurate to say, is

10  it not, if they find the severity of the harassment or the

11  pervasiveness of the harassment is a jury issue?

12          MR. MARNEN:  I think it is, your Honor.

13          THE COURT:  I'm inclined to think that it is.  In

14  other words, if the jury finds there was harassment, it was

15  sufficiently pervasive and severe, which is necessary under a

16  Title IX case, I suggest that they have demonstrated as a

17  matter of fact they were deprived of educational opportunities;

18  anyone disagree with that?

19          MR. MARNEN:  Please say that again.

20          THE COURT:  I said if they conclude that they were

21  subjected to harassment which was sufficiently pervasive and

22  severe so as to rise to that hostile environment level, if you

23  will, that as a matter of law they have been deprived of their

24  educational opportunities; in other words, it would be

25  incongruous for a jury to decide one without the other?


154


1           MR. MARNEN:  I think that's right.

2           THE COURT:  So I'm not giving 12.  13 I'm not

3    giving.  I'm not going to sum up somebody else's factual

4    pattern.

5          MR. OLDS:  In terms of, I would like you to look at

6    the case over the weekend.  In terms of giving a specific

7    charge on the pervasiveness of circumstantial evidence to prove

8    deliberate indifference.  I don't know that citation.  The name

9    of the case is Smith_v._Borough_of_Wilkinsburg.
           _____ __ _____ __ _____

10          THE COURT:  Is that a Title VII case?

11          MR. OLDS:  It is a Title VII case, Third Circuit

12    case.

13          THE COURT:  I'm not going to look at the case, but

14    it is sufficient for me to tell the jury a necessary element of

15    your case may be proven by circumstantial or direct evidence.

16          MR. OLDS:  Okay.

17          THE COURT:  It's not because I don't want to look at

18    the case, it's unnecessary.  Fourteen is going to be given in

19    some form or fashion.  We're going to give the definition of

20    deliberate indifference.

21          MR. MARNEN:  This one may sound like a negligence

22    standard.

23          THE COURT:  This does sound like a negligence

24  standard.

25          MR. MARNEN:  This one throws out the actual


                                155


1  knowledge.

2          MR. OLDS:  That does state it.

3          THE COURT:  Says here the school district has actual

4  knowledge that its efforts to remediate are ineffective.

5          MR. MARNEN:  I'm sorry, I didn't see that.

6          MR. OLDS:  The definition you're going to use is

7  deliberate indifference, whether the response is clearly

8  unreasonable, that goes back to 10.  I guess this is another

9  way to say it.

10          THE COURT:  That's why I'm not going to give it.

11  The shorter and simpler the charge, in my experience, as long

12  as it's accurate, the better for the jury to follow.

13          Fifteen.  I've already indicated that if it's

14  severe, pervasive and objectively offensive -- it satisfies the

15  requirement that detracts the educational experience, so I'm

16  not going to give that.  In other words, you don't need that.

17          Sixteen, I'm not going to give, gender-oriented

18  conduct.  What does 16 get us in the context of what we're

19  talking about?

20          MR. OLDS:  Only it's really like again you're

21  looking at this analogue is Title VII.  What the courts have

22  said in Title VII, you have to look at the whole picture.

23  Really what 16 is, what I'm suggesting is that there be some

24  language in your charge that says, well, the jury has to look

25  at the whole picture to determine whether the harassment was so

156

1  severe, pervasive.

2          THE COURT:  I will borrow a portion of your charge

3  from my Title VII hostile environment case, which flushes out

4  what the concept of a hostile environment is.

5          MR. OLDS:  Okay.

6          THE COURT:  Are you trying in a sense to get a

7  falsus in uno, falsus in omnibus on 17?

8          MR. OLDS:  I don't know Latin.  What I'm suggesting

9  is that there was the evidence that they gave the bad

10  information to the police when she learned about the assault.

11          THE COURT:  It's too close to me commenting on the

12  evidence, I'm not going to do it.

13          MR. OLDS:  As part of the general charge do you talk

14  about if you disbelieve a portion --

15          THE COURT:  What I will say in my standard charge, I

16  say if you find that a witness has lied to you in any material

17  portion of his or her testimony, you may, I say you may find,

18  I'm paraphrasing, you may find them not credible in other

19  matters.  I charge on direct evidence.  I charge on

20  circumstantial evidence.

21          MR. OLDS:  Twenty is sort of a pretext type charge

22  again.

23          THE COURT:  I'm not going to give that.  Now, what

24  about this spoliation business.  Before we talk about

25  individual requests here, what sets of documents does that


                                157


1   relate to?

2           MR. OLDS:  They both testified that they took notes

3   at these meetings with the students.  And those notes don't

4   exist anymore.

5           MS. RUSS:  Plus R.P.'s discipline records.

6            MR. OLDS:  Plus R.P.'s discipline records.  And they

7  destroyed those notes.  Those notes were destroyed.

8            THE COURT:  To be accurate that's not quite

9  accurate.  They are no longer in existence for a number of

10  reasons.  I'm not sure that they destroyed all the notes.  Some

11  were given to the police, as understand it and whatnot.  But be

12  that as it may, in essence, by virtue of the fact they have

13  gone missing, you want a charge that incorporates the inference

14  that there's something that would not be helpful to the

15  district if they were produced, is that right?

16            MR. OLDS:  Right.

17            THE COURT:  What do you have to say about this?

18            MR. MARNEN:  It's a proper charge.  I think it's

19  weak, but it's a proper charge.

20            THE COURT:  I think it is.

21            MR. OLDS:  I don't know that you have to give all

22  that language.

23            THE COURT:  Why did you give it?

24            MR. OLDS:  So you could pick and choose what you

25  think is best.

158

1          THE COURT:  Let me just read it here.  These are all

2    probably variations on the same thing.  We will give something

3    like 22, it's going to be abbreviated.

4          MR. OLDS:  Okay.  Judge, in terms of damages, I did

5    quite a bit of research, I couldn't find any specific case law

6    on damages in a Title IX case.

7          THE COURT:  My view is you get the same damages you

8    would in a Title VII hostile environment case.  I have a

9    standard charge on that.  But let me just say that all we're

10   talking about here, to be accurate, is noneconomic loss.  No

11   future medicals, no past medicals.  When you see my charge, I

12   think you'll find it largely covers all those areas.

13         MR. OLDS:  There was some evidence that there would

14   need to be future medical treatment.

15         THE COURT:  I'm not going to permit the jury to put

16   a dollar figure on that, that would be speculative.  Notice

17   here under lost education, there is a request for impairment of

18   reputation, future earning capacity.  There's no testimony on

19   that at all.

20         MR. OLDS:  I don't think a punitive damage charge in

21   a Title IX case is proper.

22        THE COURT:  Twenty-five I'm not going to give, I

23   think the concept in general is adequately covered in my

24   charge.  I'm not going to give 26.

25        MR. OLDS:  I don't know if you need to distinguish,


159


1   this is what we discussed at the partial summary judgment.

2   Maybe your charge adequately covers that.  I guess I need to

3   see your charge before I argue about this point.

4        THE COURT:  You're talking about the separate

5   contention that the psychiatric or psychological care that she

6   received or they received or didn't receive at Sarah Reed was

7   inadequate and the environment was not conducive to quick

8   healing, therefore, they suffered harm there?

9        MR. OLDS:  Right.

10        THE COURT:  Well, certainly I'm going to, in

11   essence, tell the jury that they are, the defendants are

12   responsible for all damages essentially flowing from the

13   statutory tort, provided that they find that those damages,

14   that the conduct was a substantial factor in producing them.

15   And among the arguments I presume you will make to the jury is

16  that the placement at Sarah Reed was inappropriate for all

17  reasons that your expert said?

18        MR. OLDS:  Right.

19        THE COURT:  Now, I don't understand 27.

20        MR. MARNEN:  Not the placement, but the treatment?

21        THE COURT:  I meant the treatment.  This is not an

22  apportionment case?

23        MR. OLDS:  It didn't come up, so you don't need to

24  give that charge.

25        THE COURT:  Twenty-eight is withdrawn, the punitive


                              160


1  damage issue?

2        MR. OLDS:  That's correct.  There might be a

3  punitive damage claim in connection with defamatory acts.

4        THE COURT:  We're getting there, we're not there

5  yet.  I've never seen so much law on defamation in my life.  To

6  be quite honest, I'm not saying it's not accurate, but

7  defamation is the tail on the dog here.  I'm not going to spend

8  half my charge on defamation, it's unnecessary.  It's your

9  points, looking at your requested points, can you boil this

10   down, what do you think would really cover this?  First of all,

11   let me ask you this.  Is this standard per se, Mr. Marnen?

12        MR. MARNEN:  Yes.

13        THE COURT:  What's the legal implication to that --

14   what precisely was the statement again?

15        MR. OLDS:  That she was engaging in sexual conduct,

16   oral sex.

17        THE COURT:  The upshot being --

18        MR. OLDS:  Robin J. made it sound like R.P. was a

19   whore.  I think it's slander per se.  I don't have to show the

20   damage, special damages.  In other words, if it's just slander,

21   I have to actually present some proof of some actual harm,

22   whereas, if it's slander per se, general damages, meaning

23   embarrassment, humiliation, suffice to make it actionable.

24        THE COURT:  Have you shown any special damages?

25        MR. OLDS:  I don't need to.


161


1         THE COURT:  So it's a variation of 34?

2         MR. OLDS:  I think 33 and 34 more or less capture --

3         THE COURT:  I don't have to tell the jury all that.

4   Remember when we agree on something, that's it.  Basically, all

5   I have to tell them with respect to a defamation claim is a

6   defendant who publishes a statement, such as that allegedly

7   attributed to Ms. Cappabianca in this case -- tell you what.

8   I'm not going to do this off the cuff.  We'll look at that

9   case, you'll see what we say.  But the essence is going to

10  be -- you have to decide whether that upshot is you have to

11  prove by a preponderance of the evidence that a statement was

12  made.  If they find that a statement was made, then the jury

13  would be entitled to award such general damages in the nature

14  of impairment of reputation, standing in the community,

15  personal humiliation, such as they find causally, such as they

16  find reasonable.

17          MR. OLDS:  Your Honor, if you could jump to

18  paragraphs 49 and 50, I think I got those out of the standard

19  charge for damages in Pennsylvania.

20          THE COURT:  Let me look at 49, "the plaintiff is

21  entitled to be fairly and adequately compensated for all harm

22  he suffered as a result of the false and defamatory

23  communication published," if you find there was one published.

24  That's essentially it then on this.

25        MR. OLDS:  I think we might be entitled to punitive


162


1  damages on defamation.

2        THE COURT:  Do you have a proposed charge?

3        MR. MARNEN:  Fifty-one it looks like.

4        MR. 0LDS:  Maybe this is not a punitive damage,

5  maybe I didn't propose that.  I guess I should look at that.

6        THE COURT:  Look at it if you want over the weekend.

7  What do you say as to punitive damages in the context of

8  defamation?

9        MR. MARNEN:  I think he's entitled to a charge on

10  that.

11        THE COURT:  Under what standard?

12        MR. MARNEN:  Willful, malicious, that kind of thing.

13        THE COURT:  In other words, we'll charge if you find

14  that the publication was done willfully or maliciously.

15        MR. MARNEN:  Or being made recklessly.

16        THE COURT:  We'll look at some standard law on

17  punitive damages.  We'll give the standard charge on punitive

18  damages.

19          MR. MARNEN:  Okay.

20          THE COURT:  Let's look at yours.  After we tell them

21   what Title IX says, in other words, we're going to say -- I

22   think here's the point I want to throw out for your

23   consideration.  Just so the jury isn't confused because there's

24   been so much testimony about the first assault.  I intend to

25   tell them in my charge at some point, in determining whether

163

1   either plaintiff -- in determining whether the school district

2   is liable to either plaintiff for any of the alleged damages

3   that they sustained, the jury may not consider, the jury may

4   only consider conduct that occurred subsequent to December

5   19th.  Is that acceptable?

6          MR. MARNEN:  Yes.

7          MR. OLDS:  I'd have to see it in context, but I

8   understand where you're going.

9          THE COURT:  You can look at it.  I assume what's

10   going to happen in the charge and in your closings, this is

11   going to be refocused for the jury so they understand if the

12   district is liable at all, it's liable for the post December

13  19th failure to prevent what you consider to be pervasive and

14  severe harassment?

15        MR. OLDS:  Right.

16        THE COURT:  So then to your points here, I would say

17  "consisting of conduct of a sexual nature," take out the "in

18  defendant's programs or activities."  There is no dispute that

19  if anything occurred, it occurred in connection with that.

20  Such as unwelcome sexual propositions and sexual derogatory

21  language or sexual assault.  And then the second one should be

22  this alleged conduct was so severe and pervasive, and offensive

23  to a reasonable person of -- I'd say offensive to a reasonable

24  person of the plaintiffs' sex.  Let me change this.  This

25  alleged conduct was so severe and pervasive and offensive to a


164


1  reasonable person of the plaintiffs' sex.  Third. I would say

2  the defendant Erie School District had knowledge, actual

3  knowledge, of the alleged sexual harassment.  It's fine in that

4  context.  Fourth.  We'll give it as it is.  I think that's

5  accurate.  Fifth, that's a causation prong?

6        MR. MARNEN:  Yes, sir.

7          THE COURT: Okay. We're already charging, talked

8   about deliberate indifference. Yours is the same request

9   essentially as Mr. Olds. Let me see here, maybe it isn't.

10          MR. MARNEN: It's about the same.

11          THE COURT: Yes, it is.

12          MR. MARNEN: Number three, the post December 19th

13   issue, we're not responsible for the rape.

14          THE COURT: I would just say this. I instruct

15   you -- maybe this is the cleanest way, the best way to clean

16   this up. I instruct you as a matter of law that the school

17   district is not liable for the rape of the plaintiffs which

18   occurred on December 19, 2001.

19          MR. MARNEN: That does it. Four is a non-issue on

20   officials. Five is a simple defamation charge.

21          THE COURT: Since we've already determined that it's

22   slander per se, they wouldn't have to determine whether it

23   caused the actual injury.

24          MR. OLDS: We still have to show --

25          THE COURT: Special damages. Maybe this is an

165

1  adequate charge, let me just read it.

2      MR. MARNEN:  That really is a legal issue that gets

3  to the jury, they still have to convince the jury what the

4  damages are.

5      THE COURT:  We're going to give five, I think that's

6  an accurate charge.  That will take care of our defamation.

7      MR. OLDS:  I guess in terms of that charge -- I

8  think it would be appropriate to say something similar to what

9  I have in 33 of mine, the words that impute criminal offense,

10  loathsome disease, business misconduct, serious sexual

11  misconduct, can be defamatory.

12      THE COURT:  This says if you find that Cappabianca

13  made a communication to Robin J. and T.N. that was defamatory.

14  Well, if they find that she made a communication, she allegedly

15  made it, it's defamatory -- as a matter of law.

16      MR. MARNEN:  Essentially, what is special damages.

17      MR. OLDS:  Special damages I think means economic

18  damages.

19      THE COURT:  I'm going to change your point in this

20  way.  If you find that defendant Cappabianca made the

21  communication to Robin J. and T.N. as alleged by the plaintiff,

22  R.P., then you determine whether it caused actual injury to

23  plaintiff, R.P.  Because if they find that, it's got to be

24  defamatory.

25          MR. MARNEN:  Right.


                              166


1          THE COURT:  How long do you anticipate your closings

2  in the case is going to be, you'll go first?

3          MR. MARNEN:  I think it will be about a half hour.

4          MR. OLDS:  I don't think I'm able to talk more than

5  40 minutes, so between 30 and 40 minutes.

6          THE COURT:  I strongly suggest that any time you get

7  north of 30 minutes, you start to lose the jury anyways.

8          MR. OLDS:  You'll give the jury charge after the

9  argument?

10          THE COURT:  Yes.  On the subject of the charge, let

11  me tell you this.  By Monday morning we will have prepared a

12  draft charge.  And I would like you here at 8:30.  You'll see

13  the lion's share of my charge, the standard charge.  And it

14  will take you 15 minutes to read it.  And then what I'll do,

15  after you read it, we'll pass it out, get here at 8:30.  We'll

16  get you the charge soon thereafter as we can conveniently do

17  it.  And then we'll have one last get-together, where we

18  actually look at the charge for any objections, corrections,

19  additions or deletions.

20      MR. MARNEN:  Will there be a general verdict form,

21  judge?

22      THE COURT:  That was my next thing.  No one

23  submitted an initial verdict form.

24      MR. MARNEN:  May we work on that tomorrow and try to

25  get something in here?


167


1       THE COURT:  Yes.  I think it would be helpful, this

2  is a case where there should be a special verdict form, it's

3  too confusing for the jury.  Rather than just say do you find

4  that the plaintiff has proven her case by a preponderance of

5  the evidence.  There's an awful lot flying here.  It would be

6  helpful for the jury to understand and, quite frankly, a

7  special verdict form in a case like this sometimes obviates

8  some problems on appeal, if it ever comes to that.  So why

9  don't you put together something, fax it on up to me.  What I'm

10  saying is file it and I'll take a look at it.  That having been

11  said, it seems to me in broad brush the issues in dispute are

12  whether or not one or both of the plaintiffs were subjected to

13  severe and pervasive harassment after December 19th, that's

14  going to be one of the issues of material fact in dispute.

15        Number two, whether the district had actual

16  knowledge of the ongoing harassment.

17        And, number three, whether the response of the

18  district, in light of the actual knowledge, was deliberately

19  indifferent.

20        MR. OLDS:  One point, I know what your response will

21  be to this, one point is from our perspective and, obviously, I

22  don't know what the jury is going to say, from our perspective

23  when Cappabianca heard whatever she heard on December 20th,

24  that's actual knowledge.  And even though they're not

25  responsible for that rape, I think the charge or these


168


1  instructions to have deal with either deliberate indifference

2  to their knowledge of that incident.  It's not the harassment

3  that occurred after that.  But they became aware that there was

4  a rape, that's what we will argue, on December 20th, and they

5    were deliberately indifferent to that and, therefore, failed to

6    take steps, starting December 20th, to make sure nothing else

7    happened.

8        THE COURT:  Put it this way.  If all they knew was

9    that a rape occurred, if they knew the rape occurred on

10   December 20th, as you suggested that they learned or reasonably

11   should have learned in the context of that conversation, but

12   nothing else ever happened, let's assume there was no further

13   harassment, well, then, it would be like a tree falling in the

14   forest with nobody to hear it, there would be no damages.  You

15   will be entitled to argue to the jury that, I'm not sure what

16   you're asking me, you're going to argue to the jury, and

17   presumably you will argue that the quality of notice that was

18   acquired on December 20th should have put reasonable

19   administrators on notice that what had occurred the day before

20   was very serious and, therefore, the steps that they took

21   should have been entirely different.  That's what you're going

22   to argue, right?

23       MR. OLDS:  Yes.  I guess I have to see the language

24   in these special instructions.

25       THE COURT:  I think we're on the same page.

169

1   Anything else you need to call to my attention?

2          MR. OLDS:  Not at this time.

3          MR. MARNEN:  No, your Honor.

4

5          (Whereupon, at 4:14 p.m., the Jury Trial proceedings

6   were adjourned for the day.)

7

8

9                    - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

170

1           C E R T I F I C A T E
          _ _ _ _ _ _ _ _ _ _

2

3

4       I, Ronald J. Bench, certify that the foregoing is a

5   correct transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10   _____

11   Ronald J. Bench

12

13

14

15

16

17

18

19

20

21

22

23

24

25