IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD P., by and for R.P., and DENISE L., by and for K.L., <br>         Plaintiffs, <br>    v. <br><br> SCHOOL DISTRICT OF THE CITY OF ERIE, PENNSYLVANIA, et al., <br>         Defendants. | C.A. No. 03-390 Erie <br> District Judge McLaughlin |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

  **I.  BACKGROUND**

  On November 24, 2003, Plaintiffs R.L. and K.P., by and through their parents Denise L. and Richard P., filed a Complaint in this Court alleging that the Defendant Erie School District had violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et. seq.*, ("Title IX")as a result of the Plaintiffs having been subjected to severe and pervasive harassment between December 19, 2001, and January 9, 2002 at Strong Vincent High School.  In addition, Plaintiff R.P. alleged that Defendant Linda Cappabianca, an assistant principal at Strong Vincent High School, had made a defamatory statement about R.P. to a third party.

  The events underlying this action commenced on December 19, 2001, at which time R.L. and K.P. were female students attending 7th grade at Strong Vincent High School.  R.P. and K.L. were sexually assaulted by three fellow Strong Vincent students at a laundromat near school. Specifically, R.P. and K.L. were forced to perform oral sex on an 8th grade male Strong Vincent student, and R.P. was forced to perform oral sex on a 12th grade male Strong Vincent student. Afterwards, both Plaintiffs contended that they were subjected to harassment from other students based upon the events that occurred on December 19.

1

The jury trial of this action commenced on January 23, 2006. On January 30, 2006, the trial concluded with a special verdict. The jury answered "no" to three interrogatories asking whether Defendant Erie School District "had actual knowledge of the harassment of [R.P. or K.L.] after the December 19, 2001 rapes" and whether Defendant Linda Cappabianca, an assistant principal at Strong Vincent, "made a defamatory communication" to a third party concerning Plaintiff R.P. On January 31, 2006, judgment was entered for Defendants on the special verdict.

On February 13, 2006, Plaintiffs filed a motion for new trial. In their motion for a new trial, Plaintiffs contend that the verdict at trial was against the weight of the evidence, that the Court erred in refusing to instruct the jury in accordance with paragraphs 11, 17 and 20 of Plaintiffs' Points for Charge, that the Court committed plain error in the first and sixth interrogatories in the special verdict slip, and that defense counsel's closing argument contained improper remarks that were prejudicial to Plaintiffs. On July 17, 2006, Defendants filed a brief in opposition. This matter is ripe for review.

## II. STANDARD FOR REVIEW

Federal Rule of Civil Procedure 59(a) governs a motion for a new trial. According to Rule 59(a), a court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a)(1). "A new trial may be granted where 'the verdict is contrary to the great weight of the evidence.'" Wilson v. Phila. Det. Ctr., 986 F.Supp. 282, 287 (E.D.Pa.1997) (quoting Roebuck v. Drexel Univ., 852 F.2d 715, 735 (3rd Cir.1988)). New trials may also be directed when the "conduct of counsel or the court has tainted the verdict." Kiss v. K-mart Corp., 2001 WL 568974, at *1 (E.D. Pa. May 22, 2001) (citation omitted).

Generally, the decision whether or not to grant a new trial "is committed to the sound discretion of the district court." Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 812 (3rd Cir.1984). The court's latitude varies, however, depending on the type of error alleged. Klein v. Hollings, 992 F.2d 1285, 1289-90 (3rd Cir.1993). Its latitude "is broad when the reason for

2

interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court," such as evidentiary rulings. Id. The court's discretion is more limited when granting a new trial on the basis that the jury's verdict is against the weight of the evidence; in such cases a new trial should be awarded "only when the record shows that the jury's verdict resulted in a miscarriage of justice or when the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1353 (3rd Cir.1991). Moussa v. Commonwealth of Pennsylvania Dept. of Public Welfare, 89 F.Supp.2d 639, 648 (W.D. Pa. 2003).

In determining that the verdict is against the weight of the evidence, a different standard of review is applied from that which is applied in deciding a motion for judgment as a matter of law. A judge must "evaluate all significant evidence, deciding in the exercise of his own best judgment whether the jury has so disregarded the clear weight of the credible evidence that a new trial is necessary to prevent injustice." Berndt v. Kaiser Aluminum & Chemical Sales, Inc., 789 F.2d 253, 258 (3rd Cir.1986) (citing Zegan v. Central Railroad Company of New Jersey, 266 F.2d 101 (3rd Cir.1959)). However, a court may not substitute its judgment for that of the jury. A new trial "cannot be granted ... merely because the court would have weighed the evidence differently and reached a different conclusion." Markovich v. Bell Helicopter Textron, Inc., 805 F.Supp. 1231, 1235 (E.D. Pa.), *aff'd*, 977 F.2d 568 (3rd Cir.1992).

In reviewing a challenge to a jury charge or interrogatories, the relevant inquiry is whether the charge taken as a whole accurately instructed the jury on the applicable law. Colegrove v. Cameron Machine Co., 172 F.Supp.2d 611, 634 (W.D. Pa. 2001). "A trial judge is not required to adopt the exact wording of a point for charge submitted by counsel." Posttape Associates v. Eastman Kodak Co., 537 F.2d 751, 757 (3rd Cir.1976); see also James v. Continental Insurance Co., 424 F.2d 1064 (3rd Cir.1970). Where the challenged portion of the charge was not objected to during trial, the challenging party must demonstrate "plain error in the [interrogatories] affecting [their] substantial rights." Fed. R. Civ. P. 51(d). The plain error doctrine is to be used sparingly and is applied only where (1) an error is committed in the jury instructions or interrogatories, (2) the error is plain or

3

fundamental, and (3) the error was highly prejudicial or resulted in manifest injustice. See, e.g., Simmons v. City of Philadelphia, 947 F.2d 1042, 1078 (3rd Cir. 1991).

A new trial may also be ordered when counsel has used improper remarks in a closing argument. Where a party requests a new trial based on an allegation of improper remarks by counsel, the test is "whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." Waldorf v. Shuta, 142 F.3d 601, 628 (3rd Cir.1998) (citations and internal quotations omitted). Although different standards may apply depending upon the reasons advanced for the new trial, "[t]he decision to grant or deny a motion for a new trial 'is confided almost entirely to the discretion of the district court.'" Wilson, 986 F. Supp. at 287 (quoting Blancha v. Raymark Indus., 972 F.2d 507, 512 (3rd Cir.1992)).

### III.   ANALYSIS

#### A.   Weight of the Evidence

The standard for granting a new trial based on the weight of the evidence is extremely stringent so as "to ensure that a district court does not substitute its 'judgment of the facts and the credibility of the witnesses for that of the jury,'" usurping the function of the jury as the finder of facts. Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1076 (3rd Cir. 1996). Thus, where there is a rational basis to support the verdict, a new trial should not be granted. Delli Santi v. CNA Insurance Companies, 88 F.3d 192, 202 (3rd Cir. 1996).

In order to prevail at trial, the Plaintiffs had the burden of proving each of the following elements of their Title IX case: (1) that the school district had "actual knowledge" of the sexual harassment; (2) that the school district acted with "deliberate indifference" to the known acts of harassment; and (3) that the school district's deliberate indifference to known acts of sexual harassment caused the Plaintiffs to suffer injury. Davis v. Monroe County Board of Education, 526 U.S. 629 (1991). Contrary to the jury's verdict, the Plaintiffs contend that the great weight of the

evidence supported the fact that the School District officials had actual knowledge of the harassment of R.P. and K.L. by other students following the December 19, 2001 rapes.

Plaintiffs' focus first on the events of December 20, 2001, the day following the sexual assaults at the laundromat. On that date, Linda Cappabianca testified that she overheard hall talk concerning sexual activity between K.L. and C.B. (Tr., Day Four, p. 127). When Cappabianca observed K.L. in a hallway later that day, she queried her as to the rumors:

> I said I was hearing things about [K.L.] and [C.B.], I don't know if they're true. And she said yes, they are. I said these are things that you would do when you're older and care about each other.

(Tr., Day 4, p. 130). Cappabianca then followed K.L. to detention and, in K.L.'s presence, asked C.B. whether anything of a sexual nature was going on between the two students. According to C.B., Cappabianca stated, "What's this I hear about oral sex?" (Deposition of C.B., Tr. p. 50-52). C.B. insisted that nothing was going on. (Tr., Day 4, p. 131). Cappabianca recommended that the two students "needed to stay away from each other." (Id.) Later, Cappabianca reported these events to Janet Woods, who instructed her to continue to monitor the situation. (Tr., Day 4, p. 133).

Plaintiffs assert that these interactions should have placed Cappabianca on actual notice of the sexual assaults which had occurred the day before. Plaintiffs categorize this hall talk as "startling, loud and explicit," and note that K.L. readily admitted to Cappabianca that something of a sexual nature taken place between K.L. and C.B. (Plaintiffs' Motion for New Trial, p. 8). Plaintiffs also present C.B.'s assertion that Cappabianca specifically asked him about oral sex as clear evidence that Cappabianca had been aware, at a minimum, that some type of sexual misconduct had occurred. Finally, Plaintiffs emphasize that Cappabianca was sufficiently alarmed about the rumors to bring them to the attention of Principal Woods.

Cappabianca, in contrast, denied that she acquired any knowledge of the sexual assaults during any of the aforementioned December 20, 2001 encounters. Rather, because of the young ages of the students involved, Cappabianca testified that she was concerned about the possibility of consensual sexual activity such as handholding or kissing, rather than anything more severe.

5

(Tr., Day 4, p. 130). Cappabianca denied that K.L. ever informed her that she had been forced to perform oral sex or any other sex act on the previous evening or that any other student had informed her of the assaults of the day before. (Tr., Day Four, p. 131). Cappabianca further testified that, throughout the encounter, K.L.'s demeanor was "very calm," and that nothing about K.L.'s conduct lead Cappabianca to suspect that anything was wrong. (Id.)  When Cappabianca escorted K.L. to detention, she observed that K.L. sat down "right next to [C.B.]" and exhibited no nervousness or fear around him. Nothing about K.L.'s demeanor in any indicated that she had been involved in a forced sexual act, or that anything at all was wrong. (Tr., Day Four, p. 147). Finally, Cappabianca testified that her meeting with Woods, and the ensuing discussion about K.L. and C.B., was merely part of her daily habit of meeting with Woods at the end of each day to discuss various matters that had occurred throughout the day. (Tr., Day 4, p. 133).

Plaintiffs also rely on testimony indicating that, on separate occasions, Cappabianca spoke with Richard P, the father of R.P., and Denise L., the mother of K.L., about matters arguably related to the December 19 assaults and the ongoing harassment. Denise L testified that on January 4, 2002, K.L. injured herself intentionally as a result of her mother's discovery of the sexual assault. Denise further testified that she then contacted Cappabianca to discuss the rape:

> Q: You're there meeting with Ms. Cappabianca on January 7, 2002, after you've learned about what happened to your daughter, tell the jury about the conversation that you had with Ms. Cappabianca?
>
> A: I just told her that why didn't she tell me that my daughter was assaulted, but they can call me and tell me when my other daughter has an ear infection or is tugging at her ear, they can call me for that, but they can't call me to let me know my daughter was assaulted.
>
> Q: And did Ms. Cappabianca have a response?
>
> A: After she stood there, her and the other guy that was there -- I don't remember if she said anything after that or not, I can't remember.

(Tr., Day 2, p. 124).

Richard P. testified that at some point in early January, 2002, Cappabianca phoned to inform him that R.P. had been ejected from a music class for an outburst in which she expressed that she was sick of boys asking her to perform oral sex. (Tr., Day 3, pp. 157-58). Richard testified that Cappabianca, during their conversation, accused R.P. of having "a very filthy mouth" and being "filthy." (Tr., Day 1, p. 45). Richard felt that Cappabianca was "making [his] daughter out like a whore." Richard indicated that the first time he learned of the December 19 assaults was on January 10, 2002, when Woods and Cappabianca invited him to a meeting as part of their investigation, but testified that Woods had admitted to him at the meeting that she had known about the assaults "since December." (Tr., Day 1, pp. 47-51; Day 2, p. 65).

Cappabianca's testimony offered a different interpretation of these two interactions. Cappabianca denied that Denise L. ever mentioned the rape to her during their conversation on January 7, 2002. Rather, Cappabianca testified that Denise simply mentioned that K.L. had injured herself over the weekend, and that she would like to collect her work while K.L. was in the hospital. (Id. at 139).

Cappabianca also testified that, while she did speak with Richard P. several times on the telephone, she denied ever using the word "filthy." (Tr., Day 4, p. 138). She denied that she had known about the assaults prior to January 9, 2002. Similarly, Woods denied having told Richard P. that she had known about the *assaults* since December; rather, she testified only to having heard the hall talk about some sort of contact between R.P. and C.B. on December 20th, as a result of her conversation with Cappabianca. Woods testified that she did not know about any type of assault until January 9, 2002. (Tr., Day 3, p. 105).

Plaintiffs point to the following additional evidence in support of their claim that Defendants were on actual notice of ongoing harassment after December 19, 2001. R.P. testified that on January 7, 2002, one of the students who had been involved in the rapes at the laundromat on December 19, 2001, had tried to force her to again perform oral sex on a male student. (Tr., Day 3, p. 138-39). When R.P. refused, the student pushed her down a stairwell. R.P. testified that she

spoke to Cappabianca about the incident, but could not remember what she told Cappabianca. (<u>Id</u>. at 139).

R.P. also testified that, at some point after the assaults, several students had pushed her roughly against some lockers and threatened her. (Tr., Day 3, pp. 134-35). She testified that Cappabianca came to her rescue, but could not recall whether she informed Cappabianca of the ongoing harassment at that time. R.P. asserted that she tried to talk to Cappabianca about the problem on many other occasions, but that Cappabianca "wouldn't let [her] talk sexual or [make] any gestures or to say what happened." (<u>Id</u>. at 136).

Cappabianca, however, denied that R.P. ever attempted to discuss the December 19 assault or any incident of ongoing harassment with her. (Tr., Day 4, p. 138). Cappabianca testified that she did not learn of any of the assaults until January 9, 2002, on which date R.P. had an outburst in a class that compelled the teacher to send her to see Cappabianca. Cappabianca questioned R.P. about the outburst and learned, for the first time, about the December 19, 2001 rapes. (Tr., Day 4, p. 134-36). Cappabianca and Woods immediately launched an investigation, interviewing students, summoning the police, and meeting with both girls parents. (Tr., Day 4, p. 135-36).

In light of the foregoing testimony, we find that there clearly existed "a rational basis to support the verdict" as delivered by the jury. See <u>Delli Santi</u>, 88 F.3d at 202. It was the province of the jury to evaluate Cappabianca's testimony and determine whether she was worthy of belief. Here, we do not find that the "the jury's verdict resulted in a miscarriage of justice" or "cries out to be overturned or shocks our conscience." <u>Williamson</u>, 926 F.2d at 1353.

Similarly, we do not find that the weight of the evidence requires a new trial on R.P.'s defamation claim. Robin J., the mother of a friend of R.P., testified that Cappabianca warned her sometime after January 9, 2002 that R.P. had been "[g]iving blow jobs. . . to boys in school" and that Robin J. should keep her daughter away from R.P. (Tr., Day 2, pp. 69-71, 75-76). However, Cappabianca denied that such a meeting ever took place or that she ever spoke with Robin J. at any point during the week of January 7th. (Tr., Day 4, p. 140).

In rendering the verdict on the defamation claim, the jury once again was called upon to resolve a credibility issue. Such choices are the fundamental province of the jury. In such situations, a court may not substitute its judgment for that of the jury because to do so would "effect[] a denigration of the jury system and . . . usurp . . .the prime function of the jury as the trier of facts." Lind v. Schenley Indus. Inc., 278 F.2d 79, 90 (3rd Cir.) (en banc), *cert. denied*, 364 U.S. 835 (1960).

### B.     Alleged Errors in Points for Charge

Plaintiffs second contention is that the Court erred in failing to charge the jury on the subjective nature of the knowledge component of the "deliberate indifference" standard, and on the proper inferences a jury may draw if they find a lack of honesty on the behalf of the defendants. Where an objection to a jury charge is properly preserved, as here, the inquiry we must conduct is whether the charge, "taken as a whole, properly apprises the jury of the issues and the applicable law." Limbach Co. v. Sheet Metal Workers Int'l. Ass'n, 949 F.2d 1241, 1259 n. 15 (3rd Cir. 1991) (en banc).

The first objection raised by the Plaintiffs is that the Court declined to give the following instruction on the use of circumstantial evidence to demonstrate subjective knowledge:

> 11. The knowledge element of deliberate indifference is subjective, not objective knowledge. Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). See id. at 837-38, 114 S.Ct. 1970. However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk. See Farmer at 842, 114 S.Ct. 1970. Finally, a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring. See id. at 844, 114 S.Ct. 1970. Beers-Capitol v. Whetzel, 256 F.3d 120, 132 (3d Cir. 2001).

9

In the charge, we instructed the jury that Plaintiffs were required to prove that the Erie School District had actual knowledge of the sexual harassment and that the District would be "deemed to have had 'actual knowledge' of the discrimination" if the jury found that "Ms. Cappabianca or Ms. Woods had knowledge of facts sufficiently indicating substantial danger to the plaintiffs such that the institution can reasonably be said to be aware of the danger." (Tr., Day 5, p. 30). We then instructed the jury as follows on circumstantial evidence:

> The other type of evidence is called "circumstantial evidence." Circumstantial evidence is evidence which tends to prove a disputed fact by proof of other facts, and I will give you an example of what the term "circumstantial evidence" means. Assume that when you came into the courthouse this morning, the sun was shining and it was a nice day. Assume that the courtroom blinds were drawn and you could not look outside. As you were sitting here, someone walked in with an umbrella that was dripping wet. Somebody else then walked in with a raincoat that also was dripping wet. You cannot look outside of the courtroom to see whether it is raining, so you have no direct evidence of that fact. But, based on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.
>
> That is all there is to circumstantial evidence. You infer on the basis of reason, experience and common sense from an established fact, the existence or the non-existence of some other fact.
>
> Circumstantial evidence is of no less value than direct evidence. As a general rule, the law makes no distinction between direct and circumstantial evidence.

As noted above, our inquiry here is whether the charge, "taken as a whole, properly apprises the jury of the issues and the applicable law." Limbach, 949 F.2d at 1259 n.15. In our view, the charge, as a whole, adequately informed the jury that "actual knowledge" on the part of the Defendants could be inferred from circumstantial evidence. Indeed, the charge informed the jury that *any* fact could be inferred from circumstantial evidence.

Plaintiff also asserts that the following two points for charge, each of which concern the appropriate inferences that can be drawn from falsehoods or dishonesty by a Defendant, should have been given to the jury:

17. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the party who has given it is dissembling to cover up a material fact which would make the party culpable. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." <u>Wright v. West</u>, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); <u>see</u> <u>also</u> <u>Wilson v. United States</u>, 162 U.S. 613, 620-621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); 2 J. Wigmore, Evidence §278(2), p. 133 (J. Chadbourn rev. 1979). <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 147, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105, 68 USLW 4480, (2000)

20. In making your judgments about the evidence, you may consider the documentary evidence that the parties have presented. You may give more weight to items prepared before the present litigation commenced. If you conclude that the Defendants have been less than truthful and forthcoming with regard to the reasons that they have advanced for the actions they took, you may conclude that the lack of candor or forthrightness conceals illicit or illegal motives. Thus, if you find that the Defendants' testimony is less than forthright, you may conclude that the Defendants are attempting to conceal their true actions and motives, and that they were guided by illicit reasons in their conduct. <u>Chipollini</u>, *supra*. <u>Reeves v Sanderson Plumbing Products, Inc.</u>, ___U.S. ___, 120 S.Ct. 2097 (2000)

These points were also discussed at the charge conference:

| | |
|---|---|
| The Court: | Are you trying in a sense to get a *falsus in uno, falsus in omnibus* on 17? |
| Mr. Olds: | . . . What I'm suggesting is that there was the evidence that they gave the bad information to the police when she learned about the assault. |
| The Court: | It's too close to me commenting on the evidence, I'm not going to do it. |
| Mr. Olds: | As part of the general charge do you talk about if you disbelieve a portion – |
| The Court: | What I will say in my standard charge, I say if you find that a witness has lied to you in any material |

>                              portion of his or her testimony, you may, I say you
>                              may find, I'm paraphrasing, you may find them not
>                              credible in other matters. I charge on direct
>                              evidence. I charge on circumstantial evidence.
>
> Mr. Olds:    Twenty is sort of a pretext type charge again.
>
> The Court:   I'm not going to give that.

(Tr., Day Four, pp. 156-57).

The following language concerning dishonesty by a witness was contained in the charge to the jury:

> I charge you that if you find a witness has lied to you in any material portion of his or her testimony you may disregard that witness's testimony in its entirety. I say that you may disregard that testimony, not that you must. If you choose to disregard the testimony of any witness because you believe that the witness has been untruthful with you, it must have been untruthfulness in a material portion of that witness's testimony. You must be careful, though, that the untrue part of the testimony was not a result of a mistake or inadvertence, but was, rather, willful and stated with a design or intent to deceive.
>
> Regardless of whether a witness's testimony is untruthful by design or inadvertence, however, you may reject all or any portion of the testimony, as in the case of any witness, if the testimony is not believable by you. On the other hand, you may be convinced that, despite the falsity of a part of the witness's testimony, he or she, in other parts, testified truthfully.

This language was sufficient to inform the jury that, if they believed that Cappabianca had lied to them in any material portion of her testimony, they could disregard her testimony in its entirety, including implicitly her claim of lack of actual knowledge of the assaults of December 19, 2001, and the subsequent harassment.

Plaintiffs cite Smith v. Borough of Wilkinsburg, 147 F.3d 272, 280 (3rd Cir. 1998), and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), for the proposition that "the jurors must be instructed that they are entitled to infer, but need not, that the plaintiff's ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence can be met

if they find that the facts needed to make up the prima facie case have been established and they disbelieve the employer's explanation for its decision." Smith, 147 F.3d at 280. Specifically, Smith, within the context of the McDonnell Douglas burden shifting framework, requires that a jury be informed that they may infer that a proffered reason for discriminatory treatment is pretextual *if* the jury finds that the defendant's testimony was untruthful *and* a *prima facia* case has been presented. Neither Smith nor Reeves, however, supports the Plaintiffs' proposition that the jury must be instructed that dishonest testimony alone can be used to infer actual knowledge of sexual harassment. These cases are inapposite because they arose under the context of Title VII and concern Title VII issues such as pretext and *prima facia* burdens that are not relevant here.

### C.     Alleged Plain Error in Interrogatories

The first and sixth special interrogatories to the jury queried as follows:

1. Do you find that defendant Erie School District had actual knowledge of the harassment of plaintiff Rachel P. By other students after the December 19, 2001 rapes?

6. Do you find that defendant Erie School District had actual knowledge of the harassment of plaintiff Kristina L. By other students after the December 19, 2001 rapes?

Plaintiffs asserts that these interrogatories misstated the first element of the Title IX claim by precluding the jury from analyzing the actual knowledge acquired by Woods and Cappabianca *about* the rapes of the Plaintiffs, as opposed to that knowledge acquired by Woods and Cappabianca about harassment occurring after the rapes. Plaintiffs assert that knowledge of the rapes, while not actionable under Title IX, impacts upon whether the Defendants were deliberately indifferent to events occurring after the rapes.

Plaintiffs did not object to these interrogatories at trial:

> The Court:  You also have in front of you interrogatories to the jury, which I believe should now be consistent with our in-chambers discussion. Would you please glance at them. Is it acceptable to the plaintiff?

> Mr. Olds: Yes.

(Tr., Day 5, p.28). Thus, in order to obtain a new trial on the basis of the interrogatories, Plaintiffs must demonstrate "plain error in the [interrogatories] affecting [their] substantial rights." Fed. R. Civ. P. 51(d). As noted above, the plain error doctrine is to be used sparingly in situations where the error is plain and resulted in manifest injustice. Simmons, 947 F.2d at 1078.

Contrary to the Plaintiffs' contention, the interrogatories did not deprive the jury of the right to have considered whether Defendants had actual knowledge of the December 19th assaults as part of the jury's calculus in determining whether the Defendants were on actual notice of severe and pervasive harassment thereafter. Indeed, a major portion of the evidence at trial and the arguments of counsel centered upon when Cappabianca learned of the December 19th assaults and her subsequent conduct.[1]

### D. Improper Remarks by Counsel During Closing

Plaintiffs assert that defense counsel, during closing arguments, utilized prejudicial statements and claims unsupported by the evidence to prejudice the jury into finding for the Defendants. Specifically, Plaintiffs assert that defense counsel characterized Plaintiffs' claims as "baseless," "nasty" and "vicious," the testimony of Plaintiffs and their witnesses as a "preposterous story," the testimony of Robin J. and her daughter as "piling on" with "ridiculous and . . . outrageous claims," and the lawsuit as an attempt to "smear the reputation and character of two people, two good professional educators, who are trying to do the right thing." Plaintiffs also assert that no evidence supported defense counsel's argument that there were "10 or 15 people at a minimum in that building" with whom the victims could have discussed the assaults.

In reviewing allegedly improper remarks by counsel that have been objected to, the appropriate query consists of whether (1) the remarks were improper, and (2) the improper remarks

---

[1] Indeed, even if this were not a situation where plain error review applied, we would find no error in these interrogatories.

made it reasonably probably that the verdict was influenced by the prejudice resulting from the remarks.  Forrest v. Beloit Corp., 424 F.3d 344, 351 (3rd Cir. 2005).[2]

After an exhaustive review of the closing arguments in this case and the specific portions referenced by Plaintiffs, we conclude that the remarks here fail to approach the level of prejudice required for a new trial.  The factual issues in this case were hotly joined.  The remarks of counsel at closing, while certainly aggressive and passionate, did not breach any rules of professional responsibility or prejudice the jury's verdict.  Court's have uniformly required misconduct by counsel to be extremely pervasive and egregious before a new trial will be granted.  See, e.g., Blanch Road Corp. v. Bensalem Township, 57 F.3d 253, 264 (3rd Cir. 1995) (granting new trial where "counsel for Plaintiffs pursued a pattern of misconduct from opening statement through final argument"); Fineman v. Armstrong World Industries, 980 F.2d 171, 206-07 (3rd Cir 1992) (affirming grant of new trial where counsel's remarks were pervasive and noting that "a combination of improper remarks are required to persuade us of prejudicial impact"); Draper v. Airco, Inc., 580 F.2d 91, 96-97 (3rd Cir. 1978) (concluding that a verdict had likely been prejudiced by prejudicial statements where the closing contained "numerous and serious violations of . . . many rules of proper argument").  The conduct alleged her simply does not rise to that level.

---

[2] We note parenthetically that, given the lack of objection to these remarks at trial, a plain error analysis would technically apply.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD P., by and for R.P., and DENISE L., by and for K.L., )<br>Plaintiffs, )<br>v. )<br> )<br>SCHOOL DISTRICT OF THE CITY OF ERIE, PENNSYLVANIA, et al., )<br> )<br>Defendants. ) | C.A. No. 03-390 Erie<br>District Judge McLaughlin<br><br>Magistrate Judge Baxter |

## **ORDER**

AND NOW, this 30th day of September, 2006, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Motion for New Trial filed by Plaintiffs Richard P., by and for R.P., and Denise L., by and for K.L., is DENIED.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___